1
2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

3

**CASE NUMBER 07-61295-CIV-GONZALEZ/COHN**

4  **REINALDO RAMON LAMONICA,**          **COURTROOM C**
   **AUGUSTIN MILAN,**
5  **ANGELES LAMONICA SOLER,**
   **MARIO FELICIANO,**
6  **GUILLERMO ALBOREZ, and**
   **JULIO ALBOREZ,**

7
                    Plaintiffs,          **FORT LAUDERDALE, FLORIDA**
8
          vs.
9
   **SAFE HURRICANE SHUTTERS, INC.,**     **APRIL 12, 2011**
10 **EDWARD LEIVA, STEVE HEIDELBERGER,**
   **and FRANCIS M<sup>c</sup>CARROLL,**

11
                    Defendants.          **{Pages 1 - 97}**
12 ────────────────────────────────────────────────────

13            **JURY TRIAL - VOLUME II OF VI**
      **BEFORE THE HONORABLE JOSE A. GONZALEZ, JR.,**
14         **SENIOR UNITED STATES DISTRICT JUDGE**

15 ────────────────────────────────────────────────────

   **APPEARANCES:**
16

17 **FOR THE PLAINTIFFS:**
                         **K. DAVID KELLY, ESQ.**
                         *J.H. Zidell, PA*
18                       300 71st Street, Suite 605
                         Miami Beach, FL  33141
19                       T: 305.865.6766; F: 305.865.7167
                         david.kelly38@rocketmail.com
20
   **FOR THE DEFENDANTS:**
21 (Safe Hurricane         **CHRIS KLEPPIN, ESQ.**
   Shutters, Inc.,         *Glasser, Boreth & Kleppin*
22 Steve Heidelberger,     8751 W. Broward Boulevard
   and Francis McCarroll)  Plantation, FL  33324
23                         T: 954.424.1933; F: 954.474.7405
                           glabor@aol.com
24

25

1   **FOR THE DEFENDANT:**          **EDWARD LEIVA, PRO SE**
    (Edward Leiva)

2

3   **REPORTED BY:**

                                    **JILL MICHELLE HARDY-HOBBS, CCR, FPR**
                                    *Official United States Court Reporter*
4                                   400 North Miami Avenue, Suite 08S33
                                    Miami, FL  33128     T: 305.523.5022
5                                   Jill_hardy-hobbs@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **INDEX TO EXAMINATION OF PLAINTIFFS' WITNESSES**

2                                                                **PAGE**

3     **ROLANDO IBACACHE**

4     Direct examination by Mr. Kelly........................    5

5     Cross-examination by Mr. Kleppin......................   21

6     Cross-examination by Mr. Leiva........................   79

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:45 | 1 | **(Call to the order of the Court)** |
| 09:18 | 2 | **THE COURT:**  Good morning. |
| 09:18 | 3 | **MR. KLEPPIN:**  Good morning. |
| 09:18 | 4 | **MR. KELLY:**  Good morning. |
| 09:18 | 5 | **THE COURT:**  Be seated, please.  Okay.  Mr. Kelly, are |
| 09:18 | 6 | you ready? |
| 09:18 | 7 | **MR. KELLY:**  Yes, Your Honor. |
| 09:18 | 8 | **THE COURT:**  All right.  Bring in the jury.  We're late |
| 09:18 | 9 | getting started because one of our jurors, of course, was tied |
| 09:18 | 10 | in traffic.  So she has arrived, and we're ready to proceed. |
| 09:19 | 11 | **(Jury In)** |
| 09:19 | 12 | **THE COURT:**  Members of the Jury, good morning. |
| 09:19 | 13 | **THE JURY:**  Good morning. |
| 09:19 | 14 | **THE COURT:**  When we -- have a seat, please.  When we |
| 09:19 | 15 | recessed yesterday afternoon, we were in the process of |
| 09:19 | 16 | cross-examining Mr. Aguirre as you will recall.  The |
| 09:19 | 17 | cross-examination of that witness has been interrupted because |
| 09:19 | 18 | of a glitch in the scheduling, so we're going to interrupt and |
| 09:19 | 19 | postpone the remainder of his cross-examination and take |
| 09:19 | 20 | another witness now.  So we can proceed with the trial. |
| 09:19 | 21 | So you may call your next witness, Mr. Kelly. |
| 09:19 | 22 | **MR. KELLY:**  My next witness will be Rolando Ibacache. |
| 09:19 | 23 | **THE COURT:**  All right. |
| 09:19 | 24 | **MR. KELLY:**  I'll step out. |
| 09:20 | 25 | **THE COURT:**  Please raise your right hand and be sworn. |

**<u>ROLANDO IBACACHE, PLAINTIFFS' WITNESS, SWORN.</u>**

**THE COURT:**  All right.  Be seated, please.  Please tell us your full name and spell your last name.

**MR. IBACACHE:**  My name is Rolando Ibacache, I-b-a-c-a-c-h-e.

**DIRECT EXAMINATION**

**BY MR. KELLY:**

Q.  Good morning, Mr. Ibacache.

A.  Good morning.

Q.  Mr. Ibacache, were you ever employed by the defendant, Safe Hurricane Shutters?

A.  Yes.

Q.  And do you recognize today in our courtroom we have Mr. M<sup>c</sup>Carroll, Mr. Heidelberger, and Mr. Leiva, the defendants, other defendants?  Do you recognize those gentlemen?

A.  Yes.

Q.  And do you currently have a separate lawsuit in Miami pending against these defendants?

A.  Yes.

Q.  And could you tell me when you first started working for the defendant Safe Hurricane Shutters, the date.

A.  Approximately in April 2006.

Q.  And when you started working for Safe Hurricane Shutters, what was your title that you were given, your job?

A.  Well, when Edward Leiva invited us to work here, first he

09:23 1   told us to fix up the offices and then to go through some

09:23 2   training to learn how to install the shutters.

09:23 3   Q.   So you knew Mr. Leiva in New York?

09:23 4   A.   Yes.

09:23 5   Q.   And then -- and when you say he invited -- he invited you

09:23 6   to work?

09:23 7   A.   Yes.

09:23 8   Q.   And then did you come to Florida?

09:23 9   A.   Yes.

09:23 10  Q.   And when you said you fixed offices, where did you fix

09:23 11  offices?

09:23 12  A.   He rented the premises.  And then he told us to install the

09:24 13  floors, the walls, all that because we used to work in

09:24 14  construction in New York.

09:24 15  Q.   Where were those premises?

09:24 16  A.   I don't remember the address well, but it's over here close

09:24 17  to Sample Road and 95.

09:24 18  Q.   And when you started fixing those offices, was that in

09:24 19  April of 2006?

09:24 20  A.   Exactly.

09:24 21  Q.   How long did you work on those offices?

09:24 22  A.   Fixing them approximately for a month.

09:25 23  Q.   And after -- you said before that you got training to

09:25 24  install hurricane shutters.  Was that at the same time you were

09:25 25  working on the offices or after?

09:25  1    A.   During the time.

09:25  2    Q.   Do you know -- were those offices used for Safe Hurricane

09:25  3    Shutters' business?

09:25  4    A.   Yes.

09:25  5    Q.   And did you thereafter start working as a hurricane shutter

09:25  6    installer?

09:25  7    A.   Yes.

09:25  8    Q.   When did you actually if you can remember -- which date in

09:25  9    2006 did you start actually installing hurricane shutters?

09:26  10   A.   Almost on the same day.  Let's say about 15 days later on

09:26  11   -- after, correction, approximately.

09:26  12   Q.   15 days after the offices were completed?

09:26  13   A.   We did it together because in the mornings we worked in the

09:26  14   offices, and in the afternoon they trained us.

09:26  15   Q.   So you started actually installing hurricane shutters in

09:26  16   April of 2006?

09:26  17            MR. KLEPPIN:   I just object on leading, Your Honor.

09:26  18            THE COURT:   Sustained.

09:26  19   BY MR. KELLY:

09:26  20   Q.   When you first started working for the defendants, were you

09:26  21   given a wage or a salary?

09:27  22   A.   When Mr. Leiva talked to us, he told us he was going to

09:27  23   give us a certain amount for working for him for 40 hours.

09:27  24   Q.   And can you tell me how much that certain amount was for

09:27  25   the 40 hours when you first started?

09:27   1   A.   When we first started, it was $600 a week.

09:27   2   Q.   And when you started installing the hurricane shutters, did

09:27   3   you -- which days of the week did you normally work if you can

09:28   4   recall?

09:28   5   A.   Well, since we were practically alone here -- we were a

09:28   6   group of four people -- we worked on Saturdays.

09:28   7   Q.   And did you work any other days other than Saturdays?

09:28   8   A.   No.

09:28   9   Q.   So you worked only one day a week?

09:28   10   A.   No.  We worked from Monday through Saturday.

09:28   11   Q.   Do you know who the plaintiffs are who are with us today,

09:28   12   the present plaintiffs over here, Mr. Feliciano and Mr. Milan?

09:28   13   A.   Yes.

09:28   14   Q.   Did you start work -- did they work for Safe Hurricane

09:29   15   Shutters that you recall?

09:29   16   A.   Yes.

09:29   17   Q.   Did you -- did they start working for Safe Hurricane

09:29   18   Shutters after you were already there?

09:29   19        MR. KLEPPIN:  Objection, Your Honor.  It's leading.

09:29   20   Continuing to do it.

09:29   21        THE COURT:  Overruled.

09:29   22        MR. IBACACHE:  Yes.

09:29   23   BY MR. KELLY:

09:29   24   Q.   Did you work on the same crew installing hurricane shutters

09:29   25   with Mr. Feliciano?

09:29  1    **MR. KLEPPIN:**  Objection; leading.

09:29  2    **THE COURT:**  Sustained.

09:29  3 **BY MR. KELLY:**

09:29  4 Q.  Did you ever work with Mr. Feliciano?

09:29  5    **MR. KLEPPIN:**  Objection.

09:29  6    **THE COURT:**  Overruled.

09:29  7    **MR. IBACACHE:**  Yes.  We worked together for

09:30  8 approximately nine months.

09:30  9 **BY MR. KELLY:**

09:30  10 Q.  Can you recall which month and year you started working

09:30  11 together with Mr. Feliciano?

09:30  12 A.  From August 2006 till approximately July/August.  I don't

09:30  13 remember exactly when he started, but it was around August or

09:30  14 September.

09:30  15 Q.  And when did you -- and how long did you work with him

09:31  16 after that start date?

09:31  17 A.  For approximately nine months.  What happens is that Mr.

09:31  18 Edward Leiva made teams, groups of three; and he used to rotate

09:31  19 us.  That's why I don't remember the date exactly, and that's

09:31  20 why I say that it was approximately for nine months.

09:31  21 Q.  When you first started working with Mr. Feliciano, which

09:31  22 days of the week did you work?

09:31  23 A.  We always worked from Monday through Saturday at the

09:32  24 company.

09:32  25 Q.  Can you identify a particular time in the morning on Monday

09:32 1   that you and Mr. Feliciano would start working.

09:32 2   A.  Well, the arrival time in the office was 7:00 to 7:15.  We

09:32 3   started preparing the materials there.  And then the time when

09:32 4   we left to work was approximately 8:00.  And we would come back

09:33 5   approximately around 6:00, 6:30 in the afternoon.

09:33 6   Q.  And was the schedule any different Tuesday through Friday?

09:33 7   A.  It was not.  From Monday through Friday, there was no

09:33 8   difference regarding arrival time.  The difference was when we

09:33 9   went to different places and then the time we came back, but it

09:33 10  was almost always approximately at 6:00.

09:33 11  Q.  6:00 p.m.?

09:33 12  A.  Yes.

09:33 13  Q.  How about on Saturdays?

09:34 14  A.  It was the same departure time, 7:30.  And then we would

09:34 15  come back approximately at 5:30 or 6:00 back to the office.

09:34 16  Q.  This schedule that you just described, was that at the

09:34 17  beginning of the period that you worked with Mr. Feliciano?

09:34 18          MR. KLEPPIN:  Objection; leading.

09:34 19          THE COURT:  I'm sorry.  Let me hear the question

09:34 20  again.

09:34 21  BY MR. KELLY:

09:34 22  Q.  Was that schedule that you described, was that the schedule

09:34 23  that you and Mr. Feliciano worked when you first started

09:34 24  working together?

09:34 25          THE COURT:  Overruled.

09:35  1          **MR. IBACACHE:**  As I said before, we were a team of

09:35  2    three people.  So Mr. Feliciano was generally the driver.

09:35  3    Consequently always we would leave together and come back

09:35  4    together.

09:35  5    **BY MR. KELLY:**

09:35  6    Q.  Now, you just said a few moments ago that you worked with

09:35  7    Mr. Feliciano for about nine months, correct?

09:35  8    A.  That's correct.  It might be one more month because I don't

09:35  9    remember exactly when we started.

09:35  10   Q.  During that nine-month period can you identify at any time

09:35  11   that the schedule changed, the schedule you just described?

09:35  12   A.  No.  It never changed.

09:36  13   Q.  Do you recall whether or not when you and Mr. Feliciano

09:36  14   worked together whether you had any particular amount of time

09:36  15   assigned for lunch?

09:36  16   A.  No.  We never had lunch because there was lots of dust in

09:36  17   there at the job.  And since we were working outside in the

09:36  18   houses, we never had lunch because of all the dirt.

09:36  19   Q.  So when did you eat during the day?

09:37  20   A.  We generally drank fluids rather than eating, and generally

09:37  21   we didn't have lunch.  I don't remember having had lunch.

09:37  22   Q.  Did -- do you recall any during the time that you worked

09:37  23   for Mr. Feliciano during the day and during the week that you

09:37  24   were assigned any particular break periods?

09:37  25   A.  No.  We started working early due to the heat here in

09:37  1    Miami, so generally we didn't have lunch.

09:37  2    Q.  Any other type of break periods other than a lunch period?

09:38  3    A.  No.

09:38  4    Q.  During the time that you worked with Mr. Feliciano can you

09:38  5    remember any particular holidays or vacation periods that you

09:38  6    and Mr. Feliciano were given?

09:38  7    A.  I remember -- well, I didn't have vacations during all that

09:38  8    time.  I remember -- it seems to me that Mario took some days

09:38  9    off for Christmas, but it was like about three to four days.  I

09:38  10   mean it was about a week.

09:39  11   Q.  Do you recognize Mr. Milan who's with us today?

09:39  12   A.  Yes.

09:39  13   Q.  And did you ever work with Mr. Milan?

09:39  14   A.  We belong to the same teams.  And we worked more than once

09:39  15   together on a project, on a project in particular.

09:39  16   Q.  Do you remember which project that was?

09:39  17   A.  Well, sometimes the houses were too big so we divided the

09:40  18   job in two groups.  And when we worked in a building, he would

09:40  19   go to an apartment; and we would go to another apartment.

09:40  20   Q.  Do you remember -- can you remember the first date that you

09:40  21   ever worked with Mr. Milan?

09:40  22   A.  I don't remember because we were two different groups.

09:40  23   Q.  Is there any way that you can remember approximately how

09:40  24   many days that you actually worked with Mr. Milan?

09:40  25   A.  Well, since I saw him that he was working in another group,

09:41   1   I believe I saw him for around three months.

09:41   2   Q.   Do you know what time he would start working?

09:41   3   A.   It was the same time, the same time as we started, at 7:00

09:41   4   or 7:30.   And when we came back, which it was approximately the

09:41   5   time all the groups came back, it was around 6:00 o'clock in

09:41   6   the afternoon.

09:41   7   Q.   Is there any way that you can tell the jury what is the

09:41   8   least amount of hours that you recall working in one week

09:41   9   during the time you worked with Mr. Feliciano?

09:42  10   A.   Well, with Mr. Feliciano we always worked together, so his

09:42  11   time was the same time I worked in the company.

09:42  12   Q.   Can you tell the jury what the average amount -- total

09:42  13   amount of hours was that you normally worked per week when you

09:42  14   worked for Mr. Feliciano, the total hours.

09:42  15   A.   Approximately 60 hours because we always worked past 6:00

09:43  16   o'clock; and we worked on Saturdays.   Approximately 60 hours a

09:43  17   week.

09:43  18   Q.   You said before that you started -- when you first started

09:43  19   working, you were paid a salary of $600 a week; is that

09:43  20   correct?

09:43  21   A.   Yes.   We were paid $600.

09:43  22   Q.   Do you recall getting a raise?

09:43  23   A.   Gradually they gave us raises until we got to $900.

09:44  24   Q.   How many hours per week was that $900 per week supposed to

09:44  25   be for?

09:44   1   A.   Always the same.  40 hours a week because that was the

09:44   2   initial deal.

09:44   3   Q.   And who was -- who made that deal?

09:44   4   A.   Well, the first time the person who talked to us was Mr.

09:44   5   Edward Leiva.  But later on he introduced us to the other

09:45   6   people in the company because the company was not his alone.

09:45   7   Q.   And who were these other people that you're talking about?

09:45   8   A.   Well, Mr. Steve and Mr. Frank M$^c$Carroll.

09:45   9   Q.   You mean Steve Heidelberger and Frank M$^c$Carroll who's with

09:45   10   us in the courtroom today?

09:45   11        MR. KLEPPIN:  Objection; leading.

09:45   12        THE COURT:  Sustained.

09:45   13        MR. KELLY:  I withdraw the question.

09:45   14   BY MR. KELLY:

09:45   15   Q.   And when you -- and who are those persons that you're

09:45   16   talking about?

09:45   17   A.   Well, the two people that you had me recognize at the

09:45   18   beginning who are here in the room.

09:45   19   Q.   Do you know when you -- can you recall the date when you

09:45   20   met Mr. M$^c$Carroll and Mr. Heidelberger?

09:45   21   A.   Well, when we arrived, that was in April.  And it was

09:46   22   approximately 15 days later that he introduced us to the other

09:46   23   people.

09:46   24   Q.   Did you talk with Mr. Heidelberger?

09:46   25        MR. KLEPPIN:  Objection; leading.

09:46　1　　　　　**THE COURT:**  Overruled.

09:46　2　　　　　**MR. IBACACHE:**  Yes, yes.  I did talk with him through

09:46　3　an interpreter, but I did talk with him.

09:46　4　**BY MR. KELLY:**

09:46　5　Q.  Do you recall what you talked with him about?

09:46　6　A.  Well, when he arrived, he would talk to us about how the

09:46　7　work was going, what we were doing, or how we had been doing,

09:47　8　something to start the conversation; but I do remember one time

09:47　9　when he personally talked to us about salaries.

09:47　10　Q.  Mr. Heidelberger?

09:47　11　A.  Mr. Steve.

09:47　12　Q.  And do you recall specifically what you talked about?

09:47　13　A.  Well, what happened is that everybody in the company was

09:47　14　about to stop working for good because they owed us

09:48　15　approximately three weeks of salaries.  So when he arrived in

09:48　16　Miami, he called us team by team; and those people who spoke

09:48　17　English he called them personally.  And he promised to solve

09:48　18　the situation so that we could continue working.

09:48　19　Q.  Did he ever solve the situation?

09:48　20　A.  He started for a little bit, but then almost right away he

09:48　21　did not continue.

09:48　22　Q.  Do you remember when this was, the date?

09:48　23　A.  It was in the year 2007, around July or August.

09:49　24　Q.  Do you remember the first time?  Do you remember the month

09:49　25　and the year the first time you met Mr. Heidelberger?

09:49  1   A.   Heidelberger is Steve, right?

09:49  2   Q.   Steve Heidelberger, yes.

09:49  3   A.   Yes.  I just said it.  Approximately during the first 15

09:49  4   days when we arrived.

09:49  5   Q.   And are you able to identify how often you saw him on a

09:50  6   monthly basis?

09:50  7            MR. KLEPPIN:  Objection; leading.

09:50  8            THE COURT:  Overruled.

09:50  9            MR. IBACACHE:  Well, Mr. Steve would go to the company

09:50  10  approximately three times a month, and Mr. M$^c$Carroll would go

09:50  11  two times a month; but then he would stay for about a week.

09:50  12  BY MR. KELLY:

09:50  13  Q.   Were you able to see what Steve Heidelberger was doing when

09:50  14  he was there?

09:50  15  A.   Not really.  We only saw him when he came to the job site

09:51  16  to visit us.

09:51  17  Q.   And what did Steve Heidelberger do at the job sites?

09:51  18  A.   Well, he would go there to see how the job was being

09:51  19  performed, if everything was correct, if we needed anything.

09:51  20  Q.   How about Mr. M$^c$Carroll, Francis M$^c$Carroll, Frank M$^c$Carroll?

09:51  21  Where did -- I mean I just want to clarify for the record how

09:51  22  many times did you see him per month?

09:51  23  A.   Two times a month; but he would stay longer, three/four

09:51  24  days sometimes a week.

09:51  25  Q.   And could you tell us what you would observe him doing when

09:52  1   you would see him.

09:52  2   A.   Well, he would keep track of the jobs that were being

09:52  3   performed, and he would visit us in the different houses or

09:52  4   buildings.  So he spent more time with us.

09:52  5   Q.   Can you give us any specifics when he would visit you at

09:52  6   the sites what he would do.

09:52  7   A.   Well, I remember on one occasion when I and my co-workers

09:53  8   had an accident in one of the buildings when the scaffolding

09:53  9   fell, he was present there.  And he was, you know, concerned

09:53  10  about us.  And he asked us how it had happened.  Well -- and he

09:53  11  also every time -- the time that he came -- when he would come,

09:53  12  he would observe us how we were doing the installations.  He

09:53  13  would ask us how we were doing the installations.  He would

09:53  14  talk to us.

09:53  15  Q.   Before you had talked about Steve Heidelberger meeting with

09:54  16  the groups regarding a dispute over the wages.  Do you recall

09:54  17  saying that?

09:54  18          MR. KLEPPIN:  Objection.

09:54  19          THE COURT:  Sustained.

09:54  20  BY MR. KELLY:

09:54  21  Q.   Do you know whether any of the -- did you ever meet with

09:54  22  Mr. M$^c$Carroll to discuss issues regarding wages?

09:54  23          MR. KLEPPIN:  Objection.

09:54  24          THE COURT:  Overruled.

09:54  25          MR. IBACACHE:  We didn't meet with Mr. M$^c$Carroll

09:54   1   personally to talk about salaries; but when they owed us for

09:55   2   weeks, we did express our feelings to him.  He knew about it.

09:55   3   Then he would tell us to go to work; that he was going to try

09:55   4   and take care of the situation.

09:55   5   Q.   Do you know who the plaintiffs Reinaldo Lamonica and

09:55   6   Angeles Lamonica Soler are who are not with us today, the

09:55   7   names?

09:55   8            THE INTERPRETER:  Can you repeat that.

09:56   9            MR. KELLY:  The plaintiffs Angeles Lamonica Soler and

09:56   10  Reinaldo Lamonica.

09:56   11           MR. IBACACHE:  Yes.  I know them.

09:56   12  BY MR. KELLY:

09:56   13  Q.   Do you recall -- did they work for Safe Hurricane Shutters?

09:56   14  A.   Yes.  They worked with us.

09:56   15  Q.   Did you know what their -- do you recall what their jobs

09:56   16  were?

09:56   17  A.   Well, Mr. Lamonica worked with us in support.  He would

09:56   18  provide us certain materials like screws.  He would provide us

09:57   19  the drill bits for making the holes.  And whenever we had

09:57   20  problems, we would call him and he would send us the materials.

09:57   21  Q.   How about Angeles?

09:57   22  A.   She worked in the office inside.

09:57   23  Q.   During any time during your employment with Safe Hurricane

09:57   24  Shutters were you ever paid extra for the hours that you worked

09:57   25  over 40?

09:57   1   A.   No.   That would have been good, but since they owed us

09:58   2   money it was difficult for them to give us any extra money.

09:58   3   Q.   Do you have -- do you know what time -- let me ask it this

09:58   4   way:   When you would work in the morning, did you see Reinaldo

09:58   5   Lamonica when you first started working in the morning?

09:58   6   A.   Yes.   We all arrived at the same time.

09:58   7   Q.   Did you see Angeles as well?

09:58   8   A.   Yes.   I also saw her.   They both arrived together.

09:58   9   Q.   Do you recall the date that you first started working with

09:58   10   the Lamonicas?

09:59   11   A.   I don't remember exactly when they started, but they were

09:59   12   with us for approximately -- for over a year.

09:59   13   Q.   So what time would you see them in the morning?

09:59   14   A.   Well, at the time we always arrived between 7:00 and 7:15.

09:59   15   Q.   Which days of the week?

09:59   16   A.   Every day we all worked together.

09:59   17   Q.   But they were there every day when you were there?

09:59   18        MR. KLEPPIN:   Objection; leading.

09:59   19        THE COURT:   Overruled.

09:59   20        MR. IBACACHE:   Yes.

09:59   21   BY MR. KELLY:

09:59   22   Q.   Do you know when they would stop working at the end of the

10:00   23   day, the time?

10:00   24   A.   No.   But -- no, no.   I don't remember.

10:00   25   Q.   Do you have any idea how much Angeles and Reinaldo were

10:00  1   paid?

10:00  2   A.   No.

10:00  3   Q.   Do you know who some other plaintiffs in the case that

10:00  4   aren't here?  Do you know who Guillermo Alborez is and Julio

10:00  5   Alborez?

10:00  6   A.   No, I don't remember them.  Oh, wait.  Yes, yes.  Yeah.

10:01  7   They were two people who came from outside, from outside Miami.

10:01  8   I do remember them.

10:01  9   Q.   You don't remember them?

10:01  10  A.   Yes, yes.  I remember them.

10:01  11  Q.   Did you work with them?

10:01  12  A.   No.  They were in a separate team.

10:01  13  Q.   Do you have any idea when they would start in the morning?

10:01  14  A.   We all had the same schedule.

10:01  15  Q.   Do you have any idea when Guillermo Alborez first started

10:01  16  working for the company?

10:01  17  A.   I don't remember.  No, no.

10:01  18  Q.   Do you have any idea how much either Guillermo or Julio

10:02  19  were paid?

10:02  20  A.   No.

10:02  21  Q.   Why did you stop working for Safe Hurricane Shutters?

10:02  22  A.   After not receiving your salary for approximately a month,

10:02  23  there is nothing else you can do but leaving.  We were never

10:02  24  fired either.

10:02  25  Q.   When you were working on the projects, do you ever recall

10:03  1    the work having to stop because of the weather?

10:03  2    A.  Well, they always recommended when there was a storm.  We

10:03  3    used to work with ladders, and it was always dangerous; but

10:03  4    storms don't last long, and they don't occur every day.

10:03  5    Q.  When -- normally when there was a storm after the storm was

10:03  6    over, would -- well, let me withdraw that.  When it would

10:03  7    storm, would you and the crew normally stop working for the day

10:03  8    when it started to storm?

10:04  9    A.  No.

10:04  10            MR. KELLY:  I don't have anything further.

10:04  11            THE COURT:  Cross-examine, Mr. Kleppin.

10:04  12                         CROSS-EXAMINATION

10:04  13   BY MR. KLEPPIN:

10:05  14   Q.  Good morning.

10:05  15   A.  Good morning.

10:05  16   Q.  Now, I think you had testified that you knew Ed Leiva from

10:05  17   New York and he offered you the job with Safe Hurricane

10:05  18   Shutters back up in New York, correct?

10:05  19   A.  Yes.

10:05  20   Q.  He was going to start a company down here so he hired you,

10:05  21   right?

10:05  22   A.  He talked with me.

10:05  23   Q.  And Mr. Leiva told you that you were going to be paid $900

10:05  24   a week if you agreed to work for the hurricane shutter company

10:06  25   here in Florida; isn't that true?

10:06 1    A.   No.

10:06 2         MR. KLEPPIN:  May I approach the witness, Your Honor?

10:06 3         THE COURT:  Yes, sir.

10:06 4    BY MR. KLEPPIN:

10:06 5    Q.   Do you remember giving a deposition, Mr. Ibacache, on April

10:06 6    23rd, 2009, where you were sworn under oath to tell the truth?

10:06 7    There was an interpreter present interpreting English to

10:06 8    Spanish for you, and you were asked questions about your

10:06 9    lawsuit.

10:07 10   A.   Yes.

10:07 11   Q.   Could you -- I've turned your deposition to page 12.  And

10:07 12   as you can see from the start of that page, the context of the

10:07 13   discussion is Mr. Leiva and you in New York; and he's

10:07 14   describing to you what the terms of the deal are going to be

10:07 15   when you work for Safe Hurricane Shutters.  And on line 16 the

10:07 16   question was very simple.  How much did Mr. Leiva say you were

10:07 17   going to be paid?  Answer, $900 a week.

10:07 18        Did I read your former testimony into the record

10:08 19   accurately?

10:08 20   A.   Well, since I said before -- well, like I said before, he

10:08 21   offered us -- he was going to be paying us and that he

10:08 22   gradually was going to be increasing it.

10:08 23   Q.   Sir, the question was did I read your former testimony

10:08 24   under oath into the record accurately?  That's the question.

10:08 25   Yes or no?

10:09 1   A.   What was it?

10:09 2   Q.   On page 12, line 16, question, How much did Mr. Leiva say

10:09 3   you were going to be paid?  Answer, $900 a week.  That's what

10:09 4   you said in your deposition; isn't that true?

10:09 5   A.   Yes.

10:09 6   Q.   There's nothing in that testimony about $900 a week for the

10:09 7   first 40 hours and all the hours after that would be unpaid,

10:09 8   correct?

10:09 9   A.   He told us he was going to pay us that amount for 40 hours

10:10 10  a week.

10:10 11  Q.   The question is, In your deposition you don't say that in

10:10 12  that question and answer; isn't that true?

10:10 13  A.   I don't understand what you're trying to say.  I don't

10:10 14  understand what you're talking about.  Can you please be more

10:10 15  clear.

10:10 16          MR. KLEPPIN:  May I approach the witness, Your Honor?

10:10 17          THE COURT:  Why don't you just read it, Mr. Kleppin.

10:10 18          MR. KLEPPIN:  Okay.  We'll read it one more time.

10:10 19  Question, How much did Mr. Leiva say you were going to be paid?

10:10 20  Answer, $900 a week.

10:11 21          If the agreement was that the $900 was to compensate

10:11 22  only the first 40 hours and all the rest of this overtime would

10:11 23  be uncompensated, not paid for, you would have said that in

10:11 24  this answer.

10:11 25  A.   He verbally agreed to that amount with us; that he was

10:11  1   going to pay us that amount for 40 hours a week because we used

10:11  2   to work in New York and here you always get paid for a 40-hour

10:12  3   week.

10:12  4   Q.   So why did you testify untruthfully then in your

10:12  5   deposition?

10:12  6   A.   Why are you saying it is not true if he said -- he told us

10:12  7   that he was going to pay us for 40 hours a week?

10:12  8   Q.   Now, in 2006 your wife worked, correct?

10:12  9   A.   What does that have to do here?

10:12  10  Q.   Your wife worked in 2006; isn't that true?

10:12  11  A.   Where did she work?

10:12  12  Q.   Did she or not is the question, not where.  I don't care

10:13  13  where she worked.  The fact is she did.

10:13  14  A.   Well, in 2006, exactly.  I got married in December 2006.

10:13  15  Consequently in 2006 she was not working.

10:13  16  Q.   Okay.  Can you please turn to page 38 of your deposition.

10:13  17  Are you there?

10:13  18  A.   Yes.

10:13  19  Q.   Question, My first -- line 23 down at the bottom.  My first

10:13  20  question to you is, In the year 2006, did your wife work?  Top

10:14  21  of line 39, line 1, answer, The answer is yes.  That's what you

10:14  22  said in your deposition, isn't it?

10:14  23  A.   Yes; because my wife -- what I mean is before we got

10:14  24  married, she was working in New York; but she was not my wife.

10:14  25  She became my wife in December 2006.

10:14  1   Q.  The question is, That's what you said in your deposition,

10:14  2   isn't it?

10:15  3   A.  Yes.  That is what I said.

10:15  4   Q.  And, by the way, when you got married on December 1st of

10:15  5   '06, that's when you were working for Safe Hurricane Shutters,

10:15  6   right?

10:15  7   A.  That's right.  Even my -- Mr. M$^c$Carroll attended my

10:15  8   wedding, to my civil ceremony.  He was very kind, and he went

10:15  9   as a representative of the company to my wedding.  Consequently

10:15  10  he had time -- he had enough time to attend my wedding since he

10:16  11  was here.  Consequently he did know me.  I have a picture of us

10:16  12  with him.

10:16  13  Q.  Mr. Ibacache, when you got married on December 1st of 2006,

10:16  14  you took a honeymoon and time off from work; isn't that true?

10:16  15  A.  It is true.  They gave me one day and thank God.  That was

10:16  16  the best honeymoon in a day.

10:16  17  Q.  The company gave you money for getting married, didn't it?

10:16  18  A.  Exactly.  They gave me the salary for my week.

10:16  19          MR. KLEPPIN:  May I approach the witness, Your Honor?

10:16  20          THE COURT:  Yes, sir.

10:16  21  BY MR. KLEPPIN:

10:17  22  Q.  Mr. Ibacache, I've handed you your tax return for the year

10:17  23  2006 that was given to us in your court case by your attorneys.

10:17  24  Could you take a look at it, please.

10:17  25  A.  I don't understand much about this, but I am looking at it.

10:17　1　　Q.　Well, you have an accountant.　And that accountant is H&R

10:17　2　　Block; isn't that true?

10:17　3　　A.　When?

10:17　4　　Q.　When?　Isn't your accountant H&R Block?

10:17　5　　A.　This accountant?

10:17　6　　Q.　Could you turn to page 5 of your deposition.　Page 5, line

10:18　7　　19, Do you have an accountant?　Answer, yes.　Question, what's

10:18　8　　his name?　Answer, H&R Block.

10:18　9　　A.　When you asked me that question, this was after the company

10:18　10　　closed.　And consequently that is the accountant they had after

10:18　11　　the company closing.

10:18　12　　Q.　Did I read your former testimony into the record

10:18　13　　accurately?　That's the question.　Yes or no?

10:19　14　　A.　Yes.

10:19　15　　Q.　Okay.　With respect to the 2006 return your wife's name

10:19　16　　isn't listed on the top of it there, is it?

10:19　17　　A.　Yes.　No, it is not here.

10:19　18　　Q.　And if you note, your filing status is that of single you

10:19　19　　have checked off here, correct?

10:19　20　　A.　Yes.

10:19　21　　Q.　And you said you don't really know much about the tax

10:19　22　　return; but if you look on page 2 down at the bottom, it says

10:19　23　　it's self-prepared.

10:20　24　　A.　Yes.　That's what it says there.

10:20　25　　Q.　Okay.　We know in the year 2006 you said that you worked

10:20 1    from April through the end of the year for Safe Hurricane

10:20 2    Shutters.  So that's, what, somewhere between 34 and 40 weeks

10:20 3    of work?

10:20 4    A.  I can't figure it out; but approximately if you have a

10:20 5    calculator with you, you should know.

10:20 6    Q.  Well, let's talk about it.  April through December is,

10:20 7    what, about eight/nine months?  4.33 months in a -- 4.33 weeks

10:21 8    in a month and 9.4 -- 9 times 4.33 is 38.97.  We'll round that

10:21 9    down to 38 weeks.  Is that fair enough?

10:21 10   A.  It is fair enough; but if it is -- if you figure it out

10:21 11   with a calculator, just imagine for me to do it in my head.

10:21 12   Q.  I'm not asking you to do this in your head.  I have a

10:21 13   calculator right here.  I'm adding these numbers.  Would you

10:21 14   like the calculator to add them yourself to check my math?

10:22 15   A.  What is the question?

10:22 16   Q.  Sure.  I get on a calculator 38 weeks times your salary at

10:22 17   Safe Hurricane Shutters $900 a week.  I get $34,200.  Do you

10:22 18   dispute my math?  Would you like to double check that, sir?

10:22 19   A.  If you say so.

10:22 20   Q.  Well, don't take my word for it.  I'm 15 feet from you.

10:22 21   Would you like me to approach with the calculator or will you

10:22 22   take my word for it?  It's your choice.

10:22 23   A.  No, no.  You may go on.  But what is the question?

10:22 24   Q.  Here's the question:  Could you look, please, on page 1 of

10:22 25   your tax return, line 7, where it states wages, salaries, tips.

10:23  1  Are you there?

10:23  2  A.  Yes.

10:23  3  Q.  Not only is $34,200 not there, there's actually nothing

10:23  4  there; isn't that true?  There's no amount of money there?

10:23  5  A.  Yes.

10:23  6  Q.  Right?

10:23  7  A.  Yes.

10:23  8  Q.  You didn't have a business in the year 2006, correct?

10:23  9  A.  If I had had a business, I wouldn't have come here to

10:23 10  Miami.

10:23 11  Q.  The question is you didn't have a business in 2006?  Yes or

10:23 12  no.

10:24 13  A.  No.

10:24 14  Q.  The only hurricane shutter installation company you worked

10:24 15  for in 2006 is Safe Hurricane Shutters; isn't that true?

10:24 16  A.  Yes.

10:24 17  Q.  Could you please turn to the Schedule C that is connected

10:24 18  to your 2006 tax return.  I think it's the third page.  Are you

10:24 19  there, sir?

10:24 20  A.  Yes.

10:24 21  Q.  Okay.  Now, it states business address.  First of all, it

10:24 22  states that -- yeah, business address, 2823 Forest Hill

10:24 23  Boulevard, Apartment 13, Coral Springs, Florida.  Do you see

10:25 24  that?

10:25 25  A.  Yes.  That's my -- the apartment where I lived.  That's the

10:25  1   address.

10:25  2   Q.   That's the apartment that Eddie Leiva got for you when you

10:25  3   came down here from New York, right?

10:25  4   A.   No; not that one.

10:25  5   Q.   Well, that Bella Sera complex, isn't that where Mr. Leiva

10:25  6   got you the apartment when you came down here?

10:25  7   A.   That's where he got our apartment for us, but that is not

10:25  8   the apartment.

10:25  9   Q.   Okay.  You've never had a business in your life.  Isn't

10:25 10   that fair to say, sir?

10:25 11   A.   Yes.

10:26 12   Q.   And if you go to the part of the return, the Schedule C

10:26 13   profit or loss, Part I, income, do you see that on the

10:26 14   left-hand margin about a third down from the top of the page?

10:26 15   Are you there?

10:26 16   A.   Yes.

10:26 17   Q.   You see you have in that column the figure $17,985; isn't

10:26 18   that true?

10:26 19   A.   That is what I see there.

10:26 20   Q.   About half maybe what you earned from Safe Hurricane

10:26 21   Shutters for the year, correct?

10:26 22   A.   If you want to prove that I don't know how to make an

10:27 23   income return, a tax return, that is right.

10:27 24   Q.   Oh, that's not what I'm trying to prove, sir, far from it.

10:27 25   Could you please take a look at the expenses column of the

10:27 1   return.  It's right in the middle of the page, Part Roman

10:27 2   numeral II?

10:27 3   A.  Uh-huh (affirmative).

10:27 4   Q.  Do you see there that there's all sorts of expenses that

10:27 5   you took on this return, correct?

10:27 6   A.  Yes.  I see numbers here.

10:27 7   Q.  We'll go through them.  It will just take a minute.  The

10:27 8   first one, there's an advertising expense of $250; isn't that

10:27 9   true?

10:27 10  A.  Yes.  It's right here.

10:27 11  Q.  Uh-huh (affirmative).  The next business write-off is car

10:28 12  and truck expenses to the tune of $4,653, correct?

10:28 13  A.  Yes.  It's here.

10:28 14  Q.  Now, that's what the accountant put down, correct?

10:28 15  A.  What accountant?

10:28 16  Q.  Your accountant didn't fill this out?

10:28 17  A.  Where does it show that the accountant filled this out?

10:28 18  Q.  Turn to page 49 of your deposition.  Page 49, please, sir.

10:29 19  Is he there or are you there, sir?

10:29 20  A.  Yes.

10:29 21  Q.  Line 22.  Sir, you took $4,653 in car and truck expenses

10:29 22  for the business.  Can you tell me what truck or car expenses

10:29 23  you had as a hurricane installer for Safe Hurricanes?  Answer,

10:29 24  That's what the accountant put down.  I never said I spent that

10:29 25  money.

10:29   1         Did I read your former testimony into the record

10:29   2 accurately?

10:29   3 A.   That's what it says there.

10:29   4 Q.   You never even drove for Safe Hurricane Shutters.  Your

10:30   5 testimony was Mario Feliciano was the driver; isn't that true?

10:30   6 A.   The fact that I said that Mario Feliciano drove doesn't

10:30   7 mean that he drove every day.  I also had a license, and I was

10:30   8 able to drive.  Did I have to tell you that Mario Feliciano

10:30   9 drove one day, that I drove the other day, that he drove the

10:30  10 other day?  Why do I have to be so specific.  All I needed to

10:30  11 tell you is that I knew him.

10:30  12         The teams were made up of one person that had a

10:30  13 driver's license and two who didn't have a driver's license to

10:31  14 be able to work.  Besides, in every team there was one person

10:31  15 who spoke English and two who didn't speak English so that the

10:31  16 team could go -- the people who didn't speak English would go

10:31  17 to the houses and communicate with the people.

10:31  18 Q.   So when you said in your direct examination answers that

10:31  19 Mario Feliciano drove, you're now saying, No, he only drove

10:31  20 some of the time, and I drove some of the time.  Is that what I

10:31  21 hear you saying?

10:31  22 A.   I said that he drove.

10:31  23 Q.   Is the answer to the question yes?

10:31  24 A.   I said that he drove.

10:32  25 Q.   He drove some of the time.  You drove some of the time,

10:32  1   correct?  Yes or no.

10:32  2   A.  Yes.

10:32  3   Q.  Did anyone else on the crew sometimes drive?

10:32  4   A.  At that time I drove and Mario drove.

10:32  5   Q.  At other times just when you worked with Mario sometimes

10:32  6   you drove.  Sometimes Mario drove.  And sometimes did a third

10:32  7   or fourth person drive?  Yes or no.

10:32  8   A.  No.  The team was made up of three people.

10:32  9   Q.  Did the third person ever drive?  Yes or no.

10:32 10   A.  The third person didn't have a license.  He didn't drive in

10:33 11   that team.

10:33 12   Q.  Is it fair to say that you really don't have any

10:33 13   recollection how often you drove versus how often Mario might

10:33 14   have driven?

10:33 15   A.  What is the importance of one person driving or the other

10:33 16   person driving if we were a team?  A team is a group.  It

10:33 17   doesn't matter that one person drives or doesn't drive.

10:33 18   Q.  Did you even have a driver's license in 2006?

10:33 19   A.  Yes.

10:33 20   Q.  In the last three months of 2006, is it fair to say that

10:33 21   you don't have a recollection how often you drove versus how

10:34 22   often Mario Feliciano drove?

10:34 23   A.  What was it?

10:34 24   Q.  Is it fair to say that you don't know how often Mario drove

10:34 25   versus how often you drove those last three months in 2006?

10:34  1    A.  Either one of us could drive.

10:34  2    Q.  Is the answer to the question yes or no?

10:34  3    A.  Either one of us could drive.  That is my answer.

10:34  4    Q.  That sounds like your explanation.  Is the answer yes with

10:34  5    that explanation or is it no with that explanation?  That's all

10:35  6    I'd like to know.

10:35  7    A.  I just repeat it.  Either one of us could drive.  We both

10:35  8    had a driver's license.

10:35  9    Q.  Let's try it this way:  The second week in September, 2006,

10:35  10   that Monday, did you drive or did Mr. Feliciano drive?

10:35  11   A.  I don't recall.  How is someone going to recall two years

10:35  12   ago on a specific Monday what I did?  If I ask you what tie did

10:35  13   you wear two months ago, you will not be able to answer unless

10:35  14   you have just one which I don't believe.

10:36  15   Q.  If you don't know or you don't remember, you can say that.

10:36  16   I'm not here to argue with you.  I didn't expect that you would

10:36  17   recall that.  So is your answer to the question, Who drove the

10:36  18   Monday of the second week in September of 2006, you or Mario,

10:36  19   your answer is you don't know.  You don't remember?

10:36  20   A.  Why are you so specific about the second week in September?

10:36  21   What is the specific question?

10:36  22   Q.  Sir, please, is your answer that you don't remember whether

10:36  23   you drove or Mario drove the Monday of the second week in

10:36  24   September of 2006?

10:36  25   A.  If you say that I don't remember it, I don't remember it

10:37  1    then.

10:37  2    Q.   No.  I'm not testifying for you.  If you have a memory, I'd

10:37  3    like you to tell me.  If you remember it was Mario, please tell

10:37  4    me.  If you remember it was you, tell me.  If you just do not

10:37  5    remember, just tell me that.  I just want an answer.

10:37  6    A.   Okay.  I don't remember.

10:37  7    Q.   Okay.  That Tuesday I take it you don't remember either who

10:37  8    drove of that same week?

10:37  9    A.   I remember.  Mario drove.  I don't remember what is it that

10:38 10    you're trying -- I don't understand what you're trying to prove

10:38 11    on a Tuesday in September of a certain week six, seven, eight,

10:38 12    nine, five years ago.

10:38 13    Q.   That Wednesday of that week who drove, you or Mario?

10:38 14    A.   It's the same, whoever drove, because we both had a

10:38 15    license.  If he told me, You drive, I would drive.  If not, he

10:38 16    would drive.  Remember that I spent approximately nine months

10:38 17    with him.  I am not going to remember what day I drove versus

10:38 18    what day he drove.

10:38 19    Q.   So is it true then with respect to that nine-month period

10:39 20    that you claim you worked with Mario you don't know -- you

10:39 21    don't remember how often you drove versus how often Mario

10:39 22    drove?

10:39 23    A.   Mario used to drive most of the time.

10:39 24    Q.   You don't know what most of the time is, do you?  You're

10:39 25    just saying that?

10:39  1   A.  Most of the time -- let's say out of the nine months, he

10:39  2   drove for eight months.  There were occasions when we needed

10:39  3   material.  Mario would stay at the job site with my other

10:39  4   co-worker and I would drive to the company and pick up the

10:40  5   material.  There were other occasions when I stayed back

10:40  6   working.  Mario would go pick up the material, and then he

10:40  7   would come back with the material.  I just told you it is a

10:40  8   team.

10:40  9   Q.  Well, we've digressed a little bit; but we have you driving

10:40  10  for one month.  Do you even know if that one month was in '06

10:40  11  or was it in '07?

10:40  12  A.  I did not say that I drove for nine months.  I said out of

10:40  13  the nine months, it may be one day, two days, three days, four

10:40  14  days, more or less one month.

10:40  15  Q.  Let's assume that your entire one month of driving in this

10:40  16  nine-month period, all of it occurred in the year 2006.  We'll

10:41  17  give you the benefit of the doubt on that.  And if you could go

10:41  18  back to the return from our digression from it, on line 9

10:41  19  you've got $4,653 in car and truck expenses for one month of

10:41  20  driving for a business you never had; isn't that true?

10:41  21  A.  I already answered.  I told you I didn't have a business.

10:41  22  Q.  Is the answer to the question yes or no?

10:41  23  A.  I did not have a business.

10:41  24  Q.  Okay.  Line 10 for expenses, commissions, and fees you had

10:42  25  $350 down as a tax write-off for commissions and fees.  Do you

10:42  1   see that?

10:42  2   A.   Yes.

10:42  3   Q.   You never had any commissions or fees for this company that

10:42  4   you never owned, correct?

10:42  5   A.   Yes.

10:42  6   Q.   The next item, contract labor, you have $1,565 on line 11

10:42  7   for contract labor.

10:42  8   A.   Yes.  That's what it shows.  That's what it shows here.

10:42  9   Q.   And obviously you never had incurred any contract labor

10:43  10  expense in 2006 for a business you never had?

10:43  11  A.   If I didn't have a business, how am I going to -- no, no.

10:43  12  It's all right.

10:43  13  Q.   Answer the question yes or no.

10:43  14  A.   No, I did not hire anyone.

10:43  15  Q.   The next line item where you have a tax write-off for a

10:43  16  business expense is line 13.  You actually have 995 for

10:43  17  depreciation.  Do you see that?

10:43  18  A.   Yes.

10:44  19  Q.   And then if you could go to the right-hand margin, line

10:44  20  number 18, office expense, $200 for a tax write-off for office

10:44  21  expense, correct?

10:44  22  A.   Yes.  That's what it shows here.

10:44  23  Q.   Line 20, rent or lease of machinery, $450.  Do you see

10:44  24  that?

10:44  25  A.   It is right here.

10:44  1   Q.  And the next expense, line 21, repairs and maintenance,

10:44  2   $225.  Do you see that?

10:44  3   A.  Yes, I see it.

10:44  4   Q.  The next one, line 22, the tax write-off for supplies for

10:45  5   this business that never existed, $3,236, correct?

10:45  6   A.  Why don't you read everything and ask the question.

10:45  7   Q.  Is the answer to my question yes or no?  No offense, but

10:45  8   I'm allowed to ask whatever questions I'd like to.  That's --

10:45  9          THE COURT:  Well, that's not exactly true.

10:45  10         MR. KLEPPIN:  Well, that's true subject to --

10:45  11         MR. IBACACHE:  Yes, it is here.

10:45  12  BY MR. KLEPPIN:

10:45  13  Q.  Okay.  And then you have taxes and licenses of $245.

10:45  14  That's your next write-off on line 23, correct?

10:45  15  A.  Yes.  It is right here.

10:45  16  Q.  Then the next write-off, line 24-B, deductions for meals,

10:46  17  $375 in meals in the last few months of 2006, correct?

10:46  18  A.  Yes.  That's what it shows here.

10:46  19  Q.  You were very adamant in your direct examination, sir, that

10:46  20  you never took lunch, remember?

10:46  21  A.  Exactly.

10:46  22  Q.  Then you have other expenses, miscellaneous on line 27,

10:46  23  $1,825 in expenses.  Do you see that?

10:46  24  A.  Yes.  That's what it shows here.

10:47  25  Q.  And so for a grand total of $14,369 in expenses.  Do you

10:47  1    see that?

10:47  2    A.   Yes.   It's here.

10:47  3    Q.   And the other expenses consisted of uniforms, shoes, and a

10:47  4    cellular telephone.   Do you see that on the next page of the

10:47  5    return?

10:47  6    A.   We spent money in clothes and shoes.   The company just gave

10:48  7    us a T-shirt, and that was it.   And that's it.

10:48  8    Q.   Well, in your deposition you blamed all of this on your

10:48  9    accountant, don't you remember?   We read some of that in

10:48 10    already, remember?

10:48 11    A.   Yes.

10:48 12    Q.   You actually don't even know if your accountant is male or

10:48 13    female; isn't that true?

10:48 14    A.   The accountant was a lady, the one who helped me doing

10:49 15    this.

10:49 16    Q.   Could you turn to your deposition on page 55.   It's right

10:49 17    there in front of you.   Are you there?   Line 14, Question,

10:49 18    Okay.   And you don't know who this accountant is?   Answer, I

10:49 19    remember where he or she lives; but I don't remember the name

10:49 20    right now.   That's what you said in your deposition, isn't it?

10:49 21    A.   Yes.   That's the answer.

10:49 22    Q.   Okay.   And you agree with me that your -- in 2004 and in

10:49 23    2005, you filed tax returns listing your employer for those

10:50 24    years as having been Safe Hurricane Shutters; isn't that true?

10:50 25    A.   It is true; but I made a mistake because the accountant

10:50  1   wrote that.  What I mean is that it's not done right because at

10:50  2   that time I was in New York, and I have to correct all of that

10:50  3   now.

10:50  4   Q.  And even though you didn't have your own business as you've

10:50  5   said here today, your '04 and '05 tax returns have all sorts of

10:50  6   business expenses and deductions on them just like the 2006

10:50  7   return has; isn't that true?

10:51  8   A.  What happens is at that time I did not have any legal

10:51  9   papers, so I was working -- I was -- so I didn't -- and I

10:51 10   didn't have any papers for the IRS because -- and if I did it,

10:51 11   because if I needed to legalize my situation later on, the

10:51 12   Government demands that I pay my taxes.

10:51 13   Q.  Mr. Ibacache --

10:51 14   A.  And since I want to be a person -- no.  You may go ahead.

10:51 15   Q.  I'm trying to save you the trouble of going through the

10:51 16   2004 and 2005 tax returns like I did the 2006 tax returns

10:51 17   because, trust me, I have your '04 and '05 returns up here.  In

10:52 18   that regard I just want to elicit from you in general.  You

10:52 19   listed Safe Hurricane Shutters as your employer, and you took a

10:52 20   bunch of business expenses.  You deducted them on your return

10:52 21   in a very similar manner as on the '06 return; isn't that true?

10:52 22   A.  I am trying to have that corrected with the IRS and with an

10:53 23   attorney because that created trouble for me the last time, and

10:53 24   I am solving that.

10:53 25   Q.  Is the answer --

10:53  1   A.  It was a mistake putting the company's name there,

10:53  2   Hurricane Shutters, because the person who made it -- the

10:53  3   person who made it -- since she made it she copied it.  I am

10:53  4   having that solved.

10:53  5   Q.  Is the answer to my question yes or do you want me to go

10:53  6   through those returns?

10:53  7   A.  Yes, yes.  The answer is yes because I personally gave this

10:53  8   gentleman my income tax returns, and I did not have to turn in

10:54  9   my 2004 and 2005 tax returns since I did not work for Hurricane

10:54  10  Shutters at that time.

10:54  11  Q.  Is the answer to the question yes?

10:54  12  A.  And I acknowledge that that was a mistake to have the

10:54  13  company name there.  That was an involuntary mistake.

10:54  14  Q.  Is the answer to the question yes, is a fair

10:54  15  characterization of your '04 and '05 returns that it lists Safe

10:54  16  Hurricane Shutters as your employer and it has all of these

10:54  17  business deductions taken out similar to the 2006 return?  Yes

10:54  18  or no?

10:54  19  A.  I reiterate.  I apologize for having used the name -- for

10:55  20  the mistake I made having used the name of the company, but it

10:55  21  is true.

10:55  22  Q.  Okay.  So the answer to the question is yes?

10:55  23  A.  Yes.

10:55  24  Q.  Thank you.

10:55  25  A.  Gracious.

10:55  1   Q.  You had said just a minute ago that you gave these papers

10:55  2   discussing your tax situation to a he.  One last time, Was the

10:55  3   accountant a he or a she?

10:56  4   A.  It was a lady.

10:56  5   Q.  All right.  Now, you had told Mr. Kelly that you started

10:56  6   for Safe Hurricane Shutters in April 2006.  Do you remember

10:56  7   that?

10:56  8   A.  Yes.

10:56  9   Q.  You really started May 1st, 2006; isn't that true?

10:56  10  A.  It may be April or May because we were traveling.  It

10:56  11  wasn't all -- it may be April or May.

10:56  12  Q.  Why don't you turn to page 7 in your deposition.

10:56  13       THE COURT:  All right.  Before we do that, let's take

10:56  14  our morning break at this time.  We'll be in recess for 15

10:57  15  minutes.

10:57  16       You may take the jury out, Mr. Marshal.

10:57  17       THE MARSHAL:  All rise for the jury.

10:57  18       THE COURT:  Court's in recess for 15 minutes.

10:57  19       (Jury Out)

11:14  20       (Recess)

11:15  21       THE LAW CLERK:  All rise.

11:16  22       THE COURT:  All right.  Mr. Marshal, bring the jury

11:16  23  in, please.  Be seated, please.

11:16  24       (Jury In)

11:16  25       THE COURT:  Please be seated.  Mr. Kleppin, you may

11:16  1    continue your cross-examination.

11:16  2            MR. KLEPPIN:  Thank you, Your Honor.

11:16  3    BY MR. KLEPPIN:

11:16  4    Q.  Could you turn please to page 7 of your deposition, Mr.

11:16  5    Ibacache.  And right at page 7, line 12, Question, Give me your

11:17  6    dates of employment with Safe Hurricane Shutters.  Answer, May

11:17  7    of 2006; September 2007.  Question, do you know the exact date

11:17  8    you started in May of 2006?  Answer, The first day of the

11:17  9    month.  Did I read accurately your former deposition testimony?

11:17  10   A.  I do remember that question and that answer; but remember

11:18  11   that we came down to repair -- I mean to prepare the offices.

11:18  12   Q.  The question is, That's what you said in your deposition,

11:18  13   isn't it?  Yes or no?

11:18  14   A.  Yes.

11:18  15   Q.  You live in New York now, don't you?

11:18  16   A.  Yes.

11:18  17   Q.  And you weren't subpoenaed to appear here today.  You're

11:18  18   just appearing here voluntarily.  You're more than 100 miles

11:18  19   outside of the jurisdiction, correct?

11:18  20   A.  Yes; voluntarily.

11:18  21   Q.  You're here to help your friends and your own -- and help

11:18  22   your own suit; isn't that true?

11:18  23   A.  To give my testimony, the truth, nothing else.  To give my

11:19  24   testimony.

11:19  25   Q.  I want to go back to the tax returns for just two

11:19  1    questions, and then we're going to move to another area.  You

11:19  2    were saying that you don't know much about these returns.  Do

11:19  3    you remember saying that and they're confusing to you?

11:19  4    A.  Yes.

11:19  5    Q.  Do you also remember saying that -- well, with respect to

11:19  6    that the reason your wife isn't on the return is because you

11:19  7    just got married to her and you didn't want to involve her in

11:19  8    this.  That's why she's not on there; isn't that true?

11:20  9    A.  I told you that I got married in December 2006.

11:20  10   Q.  The reason she's not listed on this return and you would

11:20  11   file a tax return as being single when you were really married

11:20  12   is because you didn't want to involve her in this?

11:20  13   A.  I don't understand the law here, from what date to what

11:20  14   date.  I told you that you I did not understand this.

11:21  15   Q.  You filed these tax returns for one thing, Mr. Ibacache;

11:21  16   and that was to get an awful lot of money back from the Federal

11:21  17   Government because of all these expenses that you put on these

11:21  18   three years of returns; isn't that true?

11:21  19   A.  No.

11:21  20   Q.  Do you remember towards the end of the business you were

11:21  21   paid for a few weeks in cash.  Do you remember that?

11:21  22   A.  No, I don't remember.

11:21  23   Q.  I'm showing you some handwritten notes.  Do you see on the

11:22  24   first page it says, Rolando Ibacache, August 28th of '07,

11:22  25   received $900.  And there's a place for a signature -- do you

11:22  1   see that -- next to an X?

11:22  2   A.   Yes.   Now that you showed that to me I remember that I was

11:22  3   given that money because my signature is there.

11:23  4   Q.   And the EL down at the bottom that's circled, that's Ed

11:23  5   Leiva that had you fill this out?

11:23  6   A.   Yes.   That is his signature, but he stopped paying us with

11:23  7   a check about a month before.   And sometimes he gave us some

11:23  8   money, but I don't remember.   I only remember -- now that you

11:23  9   give me this paper I remember that he gave me that money.

11:23  10  Q.   Is the answer to the question yes?

11:23  11  A.   Yes.   The photocopy is here.

11:24  12  Q.   Is the answer to my original question yes?

11:24  13  A.   Yes.   The photocopy is here.

11:24  14  Q.   Well, I didn't ask if the photocopy was in front of you.   I

11:24  15  asked whether or not Ed Leiva filled this out with you and

11:24  16  that's his signature down at the bottom that's circled.   Yes or

11:24  17  no?

11:24  18  A.   Yes.   And it's also his handwriting.

11:24  19  Q.   Thank you.

11:24  20  A.   Gracious.

11:24  21  Q.   Could you take a look at the second page.   And do you see

11:24  22  there how there's evidence of cash payments in late July

11:24  23  through the month of August, through August 17th of 2007?

11:24  24  A.   Yes.

11:24  25  Q.   So there's somewhere around four or five payments in cash

11:25  1   that Mr. Ed Leiva paid to you towards the end when the company

11:25  2   started to have cash flow problems, correct?

11:25  3   A.   Yes.   There are five dates here.

11:25  4   Q.   Okay.   So it's somewhere around $4500 worth of your salary

11:25  5   you were paid in cash towards the end of your employment,

11:25  6   correct?

11:25  7   A.   Yes.

11:25  8   Q.   You didn't report the $4500 cash payments to the

11:25  9   Government, did you?

11:25 10   A.   Where do you report that?

11:26 11   Q.   Could you turn to page 98 in your deposition.   Line 7,

11:26 12   Question, Did you report that cash to the Government?   Answer,

11:26 13   What do you think?   Question, I don't know.   Answer, I don't

11:26 14   know either.   Question, You don't know?   Answer, No.

11:26 15        That's what you said in your deposition, isn't it?

11:26 16   A.   Yes, it is here.

11:26 17   Q.   With respect to these cash payments Ed Leiva was paying you

11:26 18   this cash out of -- this is his personal money, wasn't it?

11:27 19   A.   Personal?   His?

11:27 20   Q.   Sure.   The company's bank accounts had no money in them.

11:27 21   That's why he couldn't pay you guys or that's why the company

11:27 22   couldn't.   And he's paying you cash right out of his pocket so

11:27 23   you'd still have a job; isn't that true?

11:27 24   A.   He always paid from the company money.   He never told us,

11:27 25   This is my money that I am going to get to pay you.

11:27  1    Q.   I'm talking about the cash.  I understand when you receive

11:27  2    a company check.  That's a different matter.  But with this

11:28  3    cashed, Ed cared so much for you guys he's paying it out of his

11:28  4    pocket; isn't that true?

11:28  5    A.   We cared for him so much that we worked for him free for

11:28  6    six weeks, and we paid our own rent.  And I paid my trip from

11:28  7    Miami to New York out of my pocket because we cared for him.

11:28  8    More than three times we met with him to tell him that we

11:28  9    wanted to help the company; that we wanted to help him bring

11:28  10   the company above again, and he didn't listen to us.

11:28  11   Q.   And you met with Ed Leiva about these things?

11:29  12   A.   With him and with his partners because we also talked to

11:29  13   Mr. Frank M$^c$Carroll about our feelings through someone who

11:29  14   helped us as an interpreter.

11:29  15   Q.   And let's just talk about what you would have talked to

11:29  16   Frank M$^c$Carroll about.  You've never spoken to Frank M$^c$Carroll

11:29  17   in your life directly because you don't speak English and he

11:29  18   doesn't speak Spanish; isn't that true?

11:29  19   A.   I am talking with you, and you speak -- and you don't --

11:29  20   and I speak Spanish, and you speak English.  You tell me if you

11:29  21   don't speak Spanish, how can you understand me.

11:29  22   Q.   Let me figure this out.

11:29  23   A.   I need your answer.  Yes or no.

11:30  24   Q.   When you have these conversations --

11:30  25   A.   Please can you answer.

11:30  1    Q.  When you have these conversations with Mr. M^cCarroll, you

11:30  2    had your lawyer bring a paid interpreter in.  And this is just

11:30  3    how it went, like this.  Frank would ask you a question.  The

11:30  4    interpreter would interpret it, and then you would talk back to

11:30  5    Frank directly just like in the courtroom.  Isn't that what you

11:30  6    say occurred?

11:30  7    A.  Yes.  In our -- Mario Feliciano who's here present is on

11:30  8    our team, and he speaks English.  Whenever we had a problem the

11:31  9    three of us or the four of us got together.  All the teams got

11:31  10   together, and we talked to them.

11:31  11   Q.  You understand the court interpreter here today swore to

11:31  12   take an oath to interpret Spanish into English and English into

11:31  13   Spanish accurately.  You're aware of that, aren't you?

11:31  14   A.  Yes, yes.

11:31  15   Q.  Okay.  So to go back to my original question, you've never

11:31  16   spoken to Frank M^cCarroll directly.  It was -- you have to rely

11:31  17   on what other people might have said that Frank said or someone

11:31  18   else said, and they weren't sworn under oath to tell you the

11:31  19   truth with respect to the translation; isn't that true?

11:31  20   A.  The fact that I do not speak English fluently doesn't mean

11:32  21   that I don't understand English a hundred percent.  When you

11:32  22   are working, you need questions and answers to be direct

11:32  23   because our work is almost always up high and we were not going

11:32  24   to wait for five minutes to ask the question before somebody

11:32  25   fell down.

11:32  1   Q.   The issue is you can't testify about anything Frank

11:32  2   directly said.   You have to rely on what other people told you

11:32  3   he said?

11:32  4   A.   Exactly.   We relied on what the other person told us, but

11:33  5   the other person was on our team.   Consequently there was no

11:33  6   reason for that person not to tell the truth.   And whenever we

11:33  7   asked if there was a problem, everybody understands yes or no.

11:33  8   Q.   You understand almost no English; isn't that true?

11:33  9   A.   Yes.

11:33  10  Q.   And the same with Steve Heidelberger.   You never had a

11:33  11  direct conversation with Steve Heidelberger because of the

11:33  12  language barrier; isn't that true?

11:33  13  A.   It is not true.   Mr. Steve called us to a meeting and there

11:34  14  was a person who was working as an interpreter.   Consequently

11:34  15  that person had the same interest we had in having this money

11:34  16  problem solved.   Consequently that person was not going to be

11:34  17  lying to us about what the gentleman was telling us.

11:34  18  Q.   Isn't what happened that some people went and talked to

11:34  19  someone or the other at the job and then came back and told

11:34  20  you, Hey, they said this and they said that and they said this.

11:34  21  That's what happened here, isn't it?

11:34  22  A.   It is -- it is informal company.

11:35  23  Q.   So just to finish this thought, you've never had a

11:35  24  one-on-one conversation with either Frank or Steve where

11:35  25  someone solely interpreted your words to them and their words

11:35   1   back to you.

11:35   2   A.   Regarding the job we always had an interpreter so that our

11:35   3   doubts were clear to the other person.

11:35   4   Q.   When is the first time that you had a one-on-one

11:35   5   conversation with Mr. Heidelberger through the use -- with the

11:35   6   use of an interpreter so that you two could effectively

11:35   7   communicate?

11:36   8   A.   I don't remember the exact date.

11:36   9   Q.   Isn't that -- you're saying -- your testimony would be the

11:36  10   same with respect to Mr. M$^c$Carroll?

11:36  11   A.   Regarding what?

11:36  12   Q.   With respect to whether or not you ever had a conversation

11:36  13   just you and Frank and an interpreter.  You don't recall when

11:36  14   that occurred, do you, if at all.

11:37  15   A.   I said that I didn't remember when I had a personal

11:37  16   conversation with them.  That doesn't mean that I have not had

11:37  17   a conversation with them.

11:37  18   Q.   Now, Mr. Leiva is the one that got you this job in Florida,

11:37  19   correct?

11:37  20   A.   He talked to us.

11:37  21   Q.   He told you he was starting a company in Florida with

11:37  22   respect to hurricane shutter installation, correct?

11:37  23   A.   Yes.

11:37  24   Q.   There were other people besides just you and Yerko Aguirre

11:37  25   who Ed Leiva brought down -- hired and brought down to Florida

11:37  1   to work for the hurricane company, correct?

11:38  2   A.   Yes.

11:38  3   Q.   You never interviewed with anyone else to be hired.  Mr.

11:38  4   Leiva did that himself, correct?

11:38  5   A.   He hired everyone in the company.

11:38  6   Q.   And he fired everyone in the company, correct, who he

11:38  7   wanted fired?

11:38  8   A.   He never fired us.  He just disappeared likewise Mr. Steve

11:38  9   and Mr. Frank.

11:38  10  Q.   Ed Leiva ran the show day to day at Safe Hurricane Shutters

11:38  11  while you were there; isn't that true?

11:38  12  A.   No.

11:38  13  Q.   Ed Leiva rented an apartment for you; isn't that true?

11:39  14  A.   The first two months when we arrived, yes.  That was the

11:39  15  agreement.

11:39  16  Q.   In the first two months, he also hired -- he got apartments

11:39  17  for Ricardo Hernandez and Marcelo, didn't he?

11:39  18  A.   With me, Rolando, and Eric.  It was the four of us.  Just

11:39  19  one apartment.

11:39  20       MR. LEIVA:  No.

11:39  21  BY MR. KLEPPIN:

11:39  22  Q.   He also paid for all the --

11:39  23       THE COURT:  Mr. Leiva, please, if you're going --

11:39  24       MR. LEIVA:  I'm sorry.

11:39  25       THE COURT:  If you keep doing that, I'm going to

11:39  1    excuse you from this courtroom.  Do you hear me?

11:39  2         MR. LEIVA:  Yes, sir.

11:39  3         THE COURT:  All right.  I don't want that to happen

11:39  4    again.

11:39  5         MR. LEIVA:  Okay.

11:39  6         THE COURT:  If you can't control yourself --

11:39  7         MR. LEIVA:  Sorry.  Sorry, Your Honor.

11:39  8         THE COURT:  -- you'll have to leave the courtroom.

11:40  9         MR. LEIVA:  Oh, Your Honor.  Sorry.

11:40  10        THE COURT:  All right.  Go ahead.

11:40  11   BY MR. KLEPPIN:

11:40  12   Q.  Mr. Leiva paid for all the furnishings in these apartments;

11:40  13   isn't that true?

11:40  14   A.  Yes.  That was the agreement.

11:40  15   Q.  And on Saturdays he'd come over with barbecue, meat and

11:40  16   food and beer and whatnot and cook; and everyone would have a

11:40  17   barbecue, isn't that true, all on him?

11:40  18   A.  No.  Maybe once, but that's it.

11:40  19   Q.  That happened at Bella Sera.  That happened while you were

11:40  20   working for the hurricane installation company, didn't it, the

11:40  21   Saturday barbecues at 1:00 o'clock for the men?

11:41  22   A.  If that had been true, what you're saying at 1:00 o'clock

11:41  23   in the afternoon, then why did I say that we came back at 6:00?

11:41  24   Q.  Well, we're going to explore that in the your

11:41  25   cross-examination I assure you.  The question on the table now

11:41  1   is:  There are these barbecues at 1:00 o'clock on Saturday that

11:41  2   Ed funded and put on for the men, you and the other men with

11:41  3   the company?

11:41  4   A.  No.

11:41  5   Q.  When the company finally dissolved, it was Ed Leiva that

11:41  6   conveyed the news to you that this company was over; isn't that

11:42  7   true?

11:42  8   A.  No.

11:42  9   Q.  Turn to page 24 of your deposition, please.  Line 6,

11:42  10  Question, did you quit or were you fired?  Answer, Neither of

11:42  11  the two things.  Question, what's left?  Answer, He said this

11:42  12  is where the company is going to go.  That's it.  There's no

11:42  13  more.  Question, Who's he?  Answer, Mr. Eddie Leiva said it.

11:42  14  Question, did the company go out of business?  A, when Mr.

11:42  15  Eddie Leiva said that, it was at the point where I had helped

11:42  16  him take everything out of the company.

11:42  17       That's what you said in your deposition, isn't it?

11:43  18  A.  It is possible that he said so because during that time

11:43  19  sometimes people were coming and asking for him.  Sometimes he

11:43  20  was not there.  Everything was a whole confusion.  Because we

11:43  21  moved from the premises where we were at the beginning to

11:43  22  another one and from that one to another one, three different

11:43  23  places.  I don't know how long.  In a very short period of

11:44  24  time.

11:44  25  Q.  You told Mr. Leiva that you went to see your current

11:44  1    attorney to inquire about these cash payments that you

11:44  2    received?

11:44  3            MR. KELLY:  Objection, Your Honor.  He's going into

11:44  4    attorney/client privilege information.

11:44  5            THE COURT:  Overruled.

11:44  6    BY MR. KLEPPIN:

11:44  7    Q.  You told Ed Leiva that you went to see your current

11:44  8    attorney to inquire about these cash payments that you received

11:44  9    near the end of your employment with this hurricane company and

11:44 10    that you said that the attorney wasn't that interested in these

11:44 11    last cash payments but that he instead came up with this idea

11:44 12    to say you worked all these hours and to bring an overtime

11:44 13    claim.  Isn't that what you told Mr. Leiva?

11:45 14            THE INTERPRETER:  Can you repeat the last part,

11:45 15    please.

11:45 16            MR. KLEPPIN:  Sure.

11:45 17    BY MR. KLEPPIN:

11:45 18    Q.  You told Mr. Leiva that the attorney said oh, let's say you

11:45 19    worked all these hours and we'll get all these people involved

11:45 20    and we'll say that there was a big overtime violation here when

11:45 21    there really wasn't one.  That's what you told Mr. Leiva.

11:45 22            MR. KELLY:  Hearsay.

11:45 23            THE COURT:  Overruled.

11:45 24            MR. IBACACHE:  I don't remember.  Maybe it is here,

11:45 25    but I don't remember.

**BY MR. KLEPPIN:**

11:45  1

11:45  2  Q.   You might have said that.  You don't recall.  That rings a

11:45  3  bell.  You might have said something like that.  You can't deny

11:45  4  it?

11:45  5  A.   I said I did not remember.

11:46  6  Q.   Mr. Leiva never lied to you; isn't that true?

11:46  7  A.   What did he lie to me about?

11:46  8  Q.   No.  He -- Mr. Leiva never lied to you?

11:46  9  A.   Sometimes he would tell us not to worry; that he was going

11:46 10  to pay us on Friday.  And on Friday he would tell me that he

11:46 11  didn't have money; that he would pay us on Tuesday, the

11:46 12  following Tuesday.  If that is a lie, then he lied to us.

11:46 13  Q.   He always told you the truth, and you have no reason to

11:46 14  mistrust Ed Leiva; isn't that true?

11:46 15  A.   I always trusted -- I always trust Mr. Leiva and his

11:47 16  partners.  I trust them because I always trust people.  That is

11:47 17  something -- that is my -- that is something bad maybe, but I

11:47 18  always trust people.

11:47 19  Q.   Can you turn to page 31 of your deposition, please.  Up at

11:47 20  the top, line 2, Question, did Eddie Leiva ever lie to you?

11:47 21  Answer, no.  Question, Okay.  So he always told you the truth?

11:47 22  Answer, I have no reason to mistrust him.  That's what you said

11:47 23  in your deposition, isn't it?

11:48 24  A.   Yes.  I trust people.  I still trust him.

11:48 25  Q.   Now, your testimony is that Steve Heidelberger was there

11:48  1    one to two times a month for a couple days?

11:48  2    A.   Yes.

11:48  3    Q.   And with respect to the position that you had at Safe

11:48  4    Hurricane Shutters you come in in the morning, and then you go

11:48  5    work out in the field all day.  And then you come in and drop

11:48  6    the truck off.  And you're in a hurry to get home and so you

11:49  7    leave, correct?

11:49  8    A.   No.

11:49  9    Q.   So you're hanging -- you're doing hurricane installation,

11:49  10   correct?

11:49  11   A.   Yes.  That is correct.

11:49  12   Q.   And that's not done at the shop, correct?

11:49  13   A.   Correct.

11:49  14   Q.   And that's where Mr. Heidelberger was.  He was in the shop.

11:49  15   You're out hanging hurricane shutters, correct?

11:49  16   A.   Correct.

11:49  17   Q.   You never had the opportunity to see or know what Steve

11:49  18   Heidelberger was doing at this company; isn't that true?

11:49  19   A.   Not when he was inside the company; but, yes, when he came

11:50  20   to visit us.

11:50  21   Q.   Well, first of all, if he's only there one to two times a

11:50  22   month for one to two days, as you've said in your deposition,

11:50  23   one to two days, he was not there very often?

11:50  24   A.   Enough to know how the company is doing and to know what's

11:50  25   going on.

11:50  1   Q.  And so the little bit that he was there when he was there

11:50  2   according to you, you weren't around the man?

11:50  3   A.  It was not a big company so as not to be able to see him.

11:50  4   We always saw him.

11:51  5   Q.  You were at that office for a very limited period of time

11:51  6   during the morning and during the late afternoon; isn't that

11:51  7   true?

11:51  8   A.  Approximately 45 minutes in the morning; and then when we

11:51  9   came back, an hour.

11:51  10  Q.  By my arithmetic you had somewhere between one and four

11:51  11  days a month according to your testimony that Steve

11:51  12  Heidelberger might have worked there while you were working

11:51  13  there; isn't that true?

11:51  14  A.  More than four days.

11:52  15  Q.  So now Steve Heidelberger was really there more often than

11:52  16  once or twice a month for one to two days.  Is that what you're

11:52  17  telling us?  It's really more than that?

11:52  18  A.  Yes.  But during the year he would only come for one day

11:52  19  and go back.  Sometimes he might say one day, two days.

11:52  20  Sometimes he might even stay three days.  Sometimes maybe he

11:52  21  didn't even come to the company.  Sometimes he needed to stay

11:52  22  longer and he stayed longer.  He's the company owner.  I can't

11:53  23  tell him to come for two days and go back.

11:53  24  Q.  Could you turn to page 35 of your deposition, please.  Are

11:53  25  you there?  Line 9, Question, We didn't see each other there,

11:53  1    so now we're going to try and figure out how many times you saw

11:53  2    Steve there.  Okay?  Answer, Is that the question?  Yeah.

11:53  3    Answer, One or two times a month he would go there.  He would

11:53  4    be there for one or two days.  That's what you said in your

11:53  5    deposition, isn't it?

11:54  6    A.  Yes, yes.  It's approximate.  I cannot tell you exactly two

11:54  7    days and four hours.

11:54  8    Q.  Now, the answer was just simply that's what you said in

11:54  9    your deposition.  Your answer to that is yes, right?  That's

11:54  10   what you said in your deposition?

11:54  11   A.  Yes.

11:54  12   Q.  And it's not like you're just blindly testifying.  You had

11:54  13   a court case proceeding against this company at the time you're

11:54  14   giving your deposition, correct?

11:54  15   A.  I don't understand.

11:54  16   Q.  You were represented by counsel when you gave your

11:54  17   deposition in the court case; isn't that true?

11:54  18   A.  Yes.

11:55  19   Q.  Now, you brought your own case in 2007, correct?

11:55  20   A.  Personal?

11:55  21   Q.  Yes.  You.  You have a lawsuit against the company, sir.

11:55  22   A.  Oh, yes.  Yes; but with other people.

11:55  23   Q.  Yeah.  And you added Steve Heidelberger and Frank

11:55  24   M^cCarroll, so you're trying to hold them liable.  You

11:55  25   understand that, don't you?

11:55  1   A.  I'm not trying to add anything.  I'm just telling the

11:55  2   truth.

11:55  3   Q.  When you gave your deposition about how often Steve

11:56  4   Heidelberger was there, according to you one to two times a

11:56  5   month for one to two days each, you were represented by

11:56  6   counsel.  And one of the main issues in this case was whether

11:56  7   or not Steve Heidelberger would be personally liable

11:56  8   potentially for this alleged overtime; isn't that true?

9        THE INTERPRETER:  To hold Steve Heidelberger

10   responsible -- can you repeat the rest of the -- to hold Steve

11   Heidelberger responsible -- liable.

12        THE COURT REPORTER:  (The requested testimony was

13   read.)

11:57  14       MR. IBACACHE:  I am saying that Mr. Steve spent one or

11:57  15   two days in the company, and he was aware of what was going on

11:57  16   in the company.  That's what I said here.

11:57  17   BY MR. KLEPPIN:

11:57  18   Q.  I have handed to you, Mr. Ibacache, a document called

11:57  19   plaintiffs' joint affidavit to amend complaint.  Do you see it?

11:57  20   A.  Yes.

11:57  21   Q.  Do you remember signing this in order to add Frank

11:57  22   M$^c$Carroll and Steve Heidelberger as defendants in your lawsuit?

11:57  23   A.  Not to add Mr. Steve and Mr. Frank M$^c$Carroll because they

11:58  24   are part of the company.

11:58  25   Q.  Sir, they weren't in the lawsuit initially.  Your lawyer

11:58 1   sought to add them.  And this plaintiffs' joint affidavit to

11:58 2   amend the complaint sought to set out facts to show that they

11:58 3   had involvement in the business to be added as party

11:58 4   defendants; isn't that true?

11:58 5   A.  They are part of the company.

11:59 6   Q.  Okay.  Let's talk about these averments in your affidavit,

11:59 7   okay?

11:59 8   A.  Talk about who?

11:59 9   Q.  These averments, what he swore was the truth.  You remember

11:59 10  -- you understand this affidavit is under oath?  You were sworn

11:59 11  to be truthful in what you were stating in this affidavit?

11:59 12  A.  Yes.

11:59 13  Q.  And a number of your co-plaintiffs in the case also signed

12:00 14  the affidavit, Roberto Sanso, Fernando Acuna, and Luis Palma;

12:00 15  isn't that true?

12:00 16  A.  Yes.

12:00 17  Q.  And I'm pointing that out because the averments are in the

12:00 18  plural, and I'd like you to look at Paragraph 1.  It states, We

12:00 19  are over 18 years of age, reside in the United States.  And I

12:00 20  have personal knowledge of the matters set forth herein.

12:00 21       Do you see that is the question.

12:00 22  A.  If I see that question?

12:00 23  Q.  The question was read to you.  You understand that's

12:01 24  Paragraph 1 of the affidavit?

12:01 25  A.  Yes.

12:01 1   Q.   Paragraph 4 states, In addition to current defendant Edward

12:01 2   Leiva, Mr. Steve Heidelberger and Mr. Francis M<sup>c</sup>Carroll

12:01 3   regularly exercised control over us while we performed our job

12:01 4   for the defendants.  And they demonstrated operational control

12:01 5   on a regular basis.  That's what it states there, doesn't it?

12:02 6   A.   That's what it says there.

12:02 7   Q.   Okay.  With respect to Mr. Heidelberger you certainly can't

12:02 8   say that he did anything on a regular basis much less

12:02 9   demonstrate operational control because he was hardly ever

12:02 10  there; and when he was, you hardly saw him?

12:02 11  A.   He knew exactly what was going on in the company.

12:02 12  Q.   That's not what I asked.  I asked, You can't say he did

12:02 13  anything on a regular basis much less exercise operational

12:02 14  control because he was hardly ever there; and when he was, you

12:03 15  hardly ever saw him; isn't that true?  That's the question.

12:03 16  A.   Uh-huh (affirmative).  He knew exactly what was going on in

12:03 17  the company.

12:03 18  Q.   Is the answer to my question yes or no with that

12:03 19  explanation?

12:03 20  A.   Yes.

12:03 21  Q.   Thank you.

12:03 22  A.   Gracious.

12:03 23  Q.   You don't even know what operational control is, do you?

12:03 24  A.   Can you explain to me what operational control is.

12:03 25  Q.   I'm sorry.  I can't.  You don't know what it means.  You

12:04  1  need me to explain it.  I'm not gonna, so I take it you still

12:04  2  don't know what it means?

12:04  3  A.  How do you know that I don't know.

12:04  4  Q.  Okay.  I want to show your attention -- take your attention

12:04  5  to the first dependent clause of the sentence where you state

12:04  6  that Heidelberger and M^cCarroll, quote, regularly exercised

12:04  7  control over us.

12:04  8        THE INTERPRETER:  Can you repeat the first part of the

12:04  9  question?

12:04  10       THE COURT REPORTER:  (The requested testimony was

12:05  11  read.)

12:05  12  BY MR. KLEPPIN:

12:05  13  Q.  With respect to Mr. Heidelberger the absolute most he could

12:05  14  have regularly exercised control over you would have been one

12:05  15  to two times a month for one to two hours a day; isn't that

12:06  16  true?

12:06  17  A.  It is true, but that is enough.

12:06  18  Q.  And that by the broadest most possible definition of the

12:06  19  word regular is not regular; wouldn't you agree?

12:06  20  A.  When he was there, he exercised that control.

12:06  21  Q.  That's your explanation.  Is the answer to the question

12:06  22  yes?

12:06  23  A.  Yes.

12:06  24  Q.  With these series of questions I've just asked about Mr.

12:06  25  Heidelberger wouldn't the same also be true for Mr. M^cCarroll?

12:06  1   A.   The time that Mr. M^cCarroll spent with us was different.

12:07  2   Q.   That's true.  Mr. M^cCarroll was certainly there longer than

12:07  3   Mr. Heidelberger in terms of time, but Mr. M^cCarroll was there

12:07  4   for less than half the time; don't you agree?

12:07  5   A.   What was that?

12:07  6   Q.   Mr. M^cCarroll was at the hurricane company for less than

12:07  7   half the time; isn't that true?

12:07  8   A.   He spent more time than Mr. Steve at the company.

12:08  9   Q.   So the answer to the question is yes with that explanation?

12:08 10   A.   Yes.

12:08 11   Q.   And then you signed this affidavit stating all these things

12:08 12   even though you've never directly communicated with either of

12:08 13   these men?

12:08 14   A.   Which men are you talking about?

12:08 15   Q.   Mr. Heidelberger and Mr. M^cCarroll.

12:08 16   A.   I did not communicate with them.

12:08 17   Q.   Now, in your lawsuit you're seeking over $102,000 from Mr.

12:08 18   Heidelberger and Mr. M^cCarroll, isn't that true, for your 70

12:09 19   weeks of overtime that you allege you had?

12:09 20   A.   I am asking that money from the company that is represented

12:09 21   by Mr. Eduardo Leiva, Mr. Steve Heidelberger, and Mr. Frank

12:09 22   M^cCarroll.

12:09 23   Q.   You're seeking $102,000 from them, and that's why you're

12:09 24   down here from New York today; isn't that true?

12:09 25   A.   No.

63

12:09  1   Q.  I've placed before you, Mr. Ibacache, a series of canceled

12:10  2   checks, checks that were given to you to which you appear to

12:10  3   have signed by Safe Hurricane Shutters from a period of

12:10  4   December of '06 through May of '07.  And I'll represent to you

12:10  5   that not every single check is in there, but most or a lot of

12:10  6   them are.  And I want to ask you some questions about these

12:10  7   checks, okay?

12:10  8   A.  Okay.

12:10  9   Q.  Now, these checks, if you flip through them -- and that is

12:11  10  your signature where you've endorsed it there on the back of

12:11  11  the check in order to negotiate it?

12:11  12  A.  Yes, it is my signature.

12:11  13  Q.  And these checks are for the same amount of money.  Do you

12:11  14  see it's your salary that you got weekly?

12:11  15  A.  It's for the amount of 40 hours that we used to work.

12:11  16  Q.  Is the answer to my question yes or no?

12:11  17  A.  Yes.

12:11  18  Q.  Okay.  Would you agree with me that it would be

12:12  19  mathematically very difficult to work for 71 weeks at exactly

12:12  20  the same amount of hours every single week in particular at

12:12  21  Safe Hurricane Shutters as you've described your work there?

12:12  22  A.  What was the question?

12:12  23  Q.  In other words --

12:12  24          THE COURT:  He can't answer because you asked him --

12:12  25  you're doing multiple questions.  That's why he can't answer.

12:12   1   Break it down in three or four questions.

12:12   2            MR. KLEPPIN:  Okay.  I'll break that one down.

12:12   3   BY MR. KLEPPIN:

12:12   4   Q.   Your hours varied week to week; isn't that true?

12:13   5   A.   Yes.

12:13   6   Q.   You probably very rarely ever worked the same number of

12:13   7   hours in consecutive weeks.  They would vary a little bit,

12:13   8   wouldn't they, because of the rain, wind, whatever?

12:13   9   A.   Yes.  But we never arrived back to the company before 5:00

12:13   10  o'clock in the afternoon because if -- depending.  If it was a

12:13   11  house, we had to finish at 5:00.  And if it was a building, it

12:13   12  depended on what time the building closed.  But after that we

12:14   13  had to pick up the materials, load the trucks, go back to the

12:14   14  shop, unload the old materials, and see if the new material for

12:14   15  the following day was prepared.

12:14   16  Q.   That is very interesting gratuitous information that you've

12:14   17  given me.  The question was just simply, Your hours varied;

12:14   18  isn't that true?

12:14   19  A.   Yes.

12:14   20  Q.   No matter what your hours were, whether they were 30 or 35

12:14   21  or 40 or as you say up into the 60 -- I guess up to 60, you

12:14   22  always received the same salary; isn't that true?

12:15   23  A.   For the 40 hours, yes.

12:15   24  Q.   Oh, there's some weeks you didn't work 40 hours.  How about

12:15   25  the week of your honeymoon, the week of Christmas, et cetera?

12:15 1   A.   That is true.

12:15 2   Q.   Therefore, this money could not have gone to pay for the

12:15 3   first 40 hours.  There would be deductions from it.  There

12:15 4   would be weeks where it would be less than 800 or 900 or a

12:15 5   thousand dollars; isn't that true?

12:15 6            THE INTERPRETER:  The interpreter requests repetition

12:15 7   of the question.

12:15 8            THE COURT REPORTER:  (The requested testimony was

12:15 9   read.)

12:16 10           MR. IBACACHE:  Yes.

12:16 11  BY MR. KLEPPIN:

12:16 12  Q.   And that never happened?  You always got your money no

12:16 13  matter how many hours you worked.  You've already told us that;

12:16 14  isn't that true?

12:16 15  A.   Yes.

12:16 16  Q.   So you understand, don't you, that if it's a salary

12:16 17  situation that you're paid the salary no matter how many hours

12:16 18  you worked.  If you do prove you actually worked overtime,

12:16 19  you're only owed half time.  But if you're able to prove the

12:17 20  money was just for the first 40 hours and the rest of the hours

12:17 21  were totally uncompensated, then you'd get time and a half; and

12:17 22  you know that, don't you?

12:17 23           MR. KELLY:  Objection; compound and argumentative.  It

12:17 24  calls for a legal conclusion without instructions.

12:17 25           THE COURT:  Overruled.

12:17  1        **MR. IBACACHE:**  I did not understand the question.

12:17  2   **BY MR. KLEPPIN:**

12:17  3   Q.  In other words, it wouldn't be $102,000.  It would be

12:17  4   approximately $34,000 that you'd be owed according to you if

12:17  5   you can prove to a jury in your case that the money you were

12:17  6   given was just for the first 40 hours and you weren't paid at

12:18  7   all for the overtime hours; isn't that true?

12:18  8   A.  I don't understand.  I don't know.  Sorry.  But I don't

12:18  9   understand.

12:18  10  Q.  And that's why you're saying that you keep saying, Oh, this

12:18  11  is just for the first 40 hours.  That's what that's all about,

12:18  12  isn't it?

12:18  13  A.  No.  It is about that that's what I used to work.

12:18  14  Q.  Is it fair to say that you don't have any personal

12:18  15  recollection of the exact hours that you worked in any one work

12:18  16  week?

12:19  17  A.  It is probable because -- it is probable.

12:19  18  Q.  So if we were to go back to May 1st, 2006, you're not going

12:19  19  to have any idea what time you really arrived at Safe Hurricane

12:19  20  Shutters in the morning, correct?

12:19  21  A.  The arrival schedule was always the same.

12:19  22  Q.  You're saying that for 71 weeks you never ever, ever

12:19  23  arrived at Safe Hurricane Shutters other than exactly 7:30 on

12:19  24  the dot every single morning?

12:19  25  A.  I didn't say exactly.  We had between 7:00 and 7:15 as the

12:20  1  arrival time.  Besides, we all live together so we all went to

12:20  2  work at the same time together.

12:20  3  Q.  Could you please turn in your deposition to page 36, line

12:20  4  5, Question, Well, you were on different crews, right?  There

12:20  5  were six or eight different crews, weren't there?  Answer,

12:20  6  that's correct.  Question, and the crews wouldn't always come

12:20  7  at the same time.  Answer, We would all arrive at the same

12:20  8  time.  Question, Oh, what time was that?  Answer, 7:30.  That's

12:20  9  what you said in your deposition, isn't it?  Is that what you

12:21  10  said in your deposition is the question?

12:21  11  A.  Exactly.  But we all lived in Bella Sera except for one or

12:21  12  two people approximately.  So we all arrived at the same time

12:21  13  because we had a vehicle and we all came together.  That is

12:21  14  what I gave you, that time, more or less exactly.

12:22  15  Q.  Well, you've given us several times.  You've given us 7:00,

12:22  16  7:15, 7:30.  Was it 8:00, 8:30, 9:00?

12:22  17  A.  No, no, no.

12:22  18  Q.  You're sure?

12:22  19  A.  I just told you no.

12:22  20  Q.  You really don't remember; isn't that true?

12:22  21  A.  I am going to repeat it again.  Please pay attention.

12:22  22  Q.  If you could just answer the question.  You don't really

12:22  23  remember, do you?

12:22  24  A.  We arrived approximately between 7:00 and 7:15.  If the

12:22  25  company had had a time clock, we could have proof.

12:22  1   Q.   The question was you don't really remember.

12:23  2   A.   7:00 to 7:15.

12:23  3   Q.   The greater?

12:23  4   A.   Approximately.

12:23  5   Q.   The greater that you overestimate your hours the more money

12:23  6   you're owed according to you; isn't that true?

12:23  7   A.   All I'm doing is establishing the time arrived in the

12:23  8   morning.

12:23  9   Q.   Do you remember working where you'd have projects at

12:23  10  condominiums and they wouldn't let you work there till 9:00 or

12:23  11  9:30, and then you would come in much later on those days

12:23  12  because they wouldn't even let you get to the job site before

12:23  13  then?

12:23  14  A.   We arrived at the same time because we had to load the

12:24  15  materials.  We had to bring all the tools and implements we

12:24  16  needed to the job site.  And once we were ready and we were in

12:24  17  the company at this time we went out.

12:24  18  Q.   The tools were always kept in the truck; isn't that true?

12:24  19  A.   The tools were.  But what did we install?  We did not

12:24  20  install tools.

12:24  21  Q.   And the hurricane shutters would be delivered.  You could

12:24  22  deliver those on a Monday morning and not have to deliver them

12:24  23  the rest of the week; isn't that true?

12:24  24  A.   It is not right.  Every time we had to -- every day we had

12:25  25  to deliver them.  And we had to carry them on our shoulders,

12:25   1   approximately from 20 to 30 kilos, and bring them from one

12:25   2   building to the other, from the elevator to the apartment.

12:25   3   Remember, nobody likes to have their house messed up.

12:25   4   Q.   There were days when you wouldn't load the truck in the

12:25   5   morning because it wasn't needed; isn't that true?

12:25   6   A.   That varies.   Maybe there were days when we didn't have to,

12:26   7   but 90 percent of the time we did.

12:26   8   Q.   And you don't know when those days were that you had to

12:26   9   load the truck and those days when you didn't load the truck in

12:26  10   the morning; isn't that true?

12:26  11   A.   It is not true.

12:26  12   Q.   Do you remember ever being told by -- given instructions

12:26  13   that a homeowner or a condo, whatever, said, We don't want any

12:26  14   work in the morning.   Do not have the crew come out until the

12:26  15   afternoon today?

12:26  16   A.   Not to me personally.   The person they spoke with because

12:26  17   he spoke English was Mario.

12:26  18   Q.   No.   I understand okay.   But, okay, so that wasn't said to

12:27  19   you directly; but Mario conveyed to you and the rest of the

12:27  20   crew that, Hey, today we're not going out till 1:00 o'clock?

12:27  21   A.   I wish.

12:27  22   Q.   You're saying that never occurred, never?

12:27  23   A.   It is probable that maybe it occurred sometime, but I don't

12:27  24   remember.

12:27  25   Q.   How about this:   Weren't there homeowners and condominiums

12:27  1    that would tell you, We only want you to come out in the

12:27  2    morning.  Your crew is going to have to leave today in the

12:27  3    middle of the day for whatever reason?

12:27  4    A.   The person who was in the office coordinated that with the

12:28  5    person at whose house we were going to be doing the

12:28  6    installation.  When that occurred that we had to work half a

12:28  7    day at one place, we took material with us so at noon we would

12:28  8    move and work in another house.

12:28  9    Q.   You couldn't just pick up and start a whole new job when

12:28  10   you hadn't finished the first one yet that you were working on;

12:28  11   isn't that true?

12:28  12   A.   It is true; but we coordinated to have the whole day busy

12:28  13   and to have two houses on the same route when that occurred.

12:28  14   Q.   See, you never took any of this into account when you

12:29  15   calculated the damages that you want for this alleged overtime

12:29  16   that you claim you worked?

12:29  17   A.   Damages?  I don't understand.

12:29  18   Q.   It's just like Christmas week.  You understand you're

12:29  19   seeking overtime for Christmas week when you very clearly

12:29  20   didn't work overtime that week?

12:29  21   A.   If you're trying to find justification, you will find it;

12:29  22   but I did work all the time that I have stated.

12:30  23   Q.   The point is you're actually seeking overtime in your case

12:30  24   for certain weeks in which at a minimum those weeks as you've

12:30  25   admitted you didn't work overtime?

12:30  1   A.  I'm not looking for anything.  I am telling you the truth

12:30  2   about how long we worked.  That's all.

12:30  3   Q.  Is it true that you yourself have no minimum wage claim?

12:30  4   A.  I don't know.  I don't know what you're talking about.

12:31  5   Q.  I want to read to you an interrogatory that you were asked

12:31  6   -- served on in your case.  It's interrogatory number 9, down

12:31  7   at the bottom of the page.

12:31  8        And it states, Please state each item of damage that

12:31  9   you claim in this case.  Include in your answer, one, the

12:31 10   nature of each item of damage; two, the date, time, and place

12:31 11   of such damage; three, the category into which each item of

12:31 12   damages falls -- that is actual damages, compensatory damages,

12:31 13   punitive damages, and any other relevant categories -- four,

12:32 14   the factual basis for each item of damages; five, an

12:32 15   explanation of how you commuted each item of damages including

12:32 16   any mathematical formula used; six, identify any documents in

12:32 17   support of your damages claims; and, seven, identify each

12:32 18   person who witnessed or who had knowledge of such damage.

12:33 19        Now, in your answer you never identified any person

12:33 20   who witnessed or had knowledge with respect to any of your

12:33 21   alleged overtime other than to refer to a Rosalina Nelan (ph)

12:34 22   and a Keith Lares that were listed in interrogatory number 8;

12:34 23   isn't that true?

12:34 24   A.  Yes.

12:34 25   Q.  Who is Keith Lares?

12:34  1   A.  Someone who used to work at the company.

12:34  2   Q.  Was he a controller?

12:34  3   A.  No.  He worked at the company at a different area.

12:34  4   Q.  He used to be an installer.  Then he worked in the office.

12:34  5   Is that what you remember?

12:34  6   A.  He did.  He worked with us for a while, and then he worked

12:35  7   at the office.

12:35  8   Q.  You then list the plaintiffs in the Palma and Lamonica

12:35  9   case.

12:35  10          THE INTERPRETER:  Lamonica and which is the other one?

12:35  11          MR. KLEPPIN:  Palma, his case.

12:35  12          MR. IBACACHE:  Palma.

12:35  13  BY MR. KLEPPIN:

12:35  14  Q.  Do you understand that you didn't list the people on your

12:35  15  crew who are not suing?

12:35  16  A.  What do you mean by I didn't list?  What didn't I list?  I

12:36  17  don't understand.

12:36  18  Q.  You're not listing witnesses that would have alleged

12:36  19  knowledge of your overtime unless they're actually involved in

12:36  20  one of the suits; isn't that true?

12:36  21  A.  Those are the witnesses that I listed.

12:36  22  Q.  You worked on a crew -- on the crews that you worked on,

12:36  23  not every one of those crew members have sued the company;

12:36  24  isn't that true?

12:36  25  A.  Not every one of the members?  I don't understand.

12:36   1   Q.   It's not your contention that every one that you served on

12:36   2   a crew with has sued the company for overtime, is it?

12:37   3   A.   I am saying -- I don't understand what you're talking

12:37   4   about.  I don't.  I'm sorry, but I don't.

12:37   5   Q.   That's all right.  With respect to Mr. Heidelberger and Mr.

12:37   6   M\ :sup:`c`Carroll, do you agree that the extent of the instructions

12:37   7   that they would give you was simply to -- occasionally they

12:37   8   would give you a work order for the day that would have written

12:37   9   instructions on it?

12:37   10  A.   They gave us the work orders in an envelope, and generally

12:38   11  it would be Mario who would go to pick up the orders or to pick

12:38   12  up the envelopes; and that is what we worked in.

12:38   13  Q.   Okay.  So you're saying that the extent of the instructions

12:38   14  that Heidelberger and M^cCarroll gave you is was they would

12:38   15  occasionally give you these work orders that would contain

12:38   16  written instructions.  Is that the extent of your testimony?

12:38   17  A.   The times they were there, yes, they gave the orders.

12:38   18  Q.   Okay.  They handed you a written sheet that was a work

12:38   19  order.  Is that what you're saying?

12:39   20  A.   No.  What I am saying is that we would go pick up that work

12:39   21  order from the office.

12:39   22  Q.   And you're saying occasionally you would pick that up from

12:39   23  Heidelberger and M^cCarroll.  Is that what you're saying?

12:39   24  A.   I'm not saying that.  I never saw that they would give

12:39   25  Mario the order in person.  But anyone who could be in charge

12:39  1    in that office could have said, This is the order for you

12:39  2    because those orders were pre-approved already.

12:40  3    Q.  Okay.  These work orders were in writing.  Do you know who

12:40  4    wrote them?

12:40  5    A.  No.

12:40  6    Q.  Okay.  And you're saying Steve Heidelberger and Frank

12:40  7    M°Carroll wouldn't give you verbal orders.  Are you saying that

12:40  8    they ever gave you -- handed your crew one of those work

12:40  9    orders?

12:40  10   A.  Verbal orders they did, but written I don't remember.  No,

12:40  11   no.  I don't remember.

12:40  12   Q.  Okay.  So the kind of instructions that Heidelberger and

12:40  13   M°Carroll were given you was verbal instructions?  Do this, do

12:40  14   that, that sort of thing?

12:41  15   A.  They would come to the place where we were working, and

12:41  16   they would see if it was right or if it was not right.  They

12:41  17   knew what we were working at.

12:41  18   Q.  Okay.  If they ever went to a job site, you're saying they

12:41  19   would speak to the customer?  And you're just assuming that

12:41  20   they're talking to the customer about whether the job was

12:41  21   installed properly?

12:41  22   A.  I'm not assuming they talked to the customer.  They had to

12:41  23   meet when we did a job at the big buildings.

12:41  24   Q.  You don't know what they spoke to the customers about;

12:42  25   isn't that true?

12:42  1   A.   Personally the people who work are never present at the

12:42  2   boss' meetings.

12:42  3   Q.   Okay.  So you had absolutely no idea what Heidelberger and

12:42  4   M<sup>c</sup>Carroll might have been saying to these customers when they

12:42  5   went out on a job site, correct?

12:42  6   A.   No; because I have no reason to ask my boss what do you

12:42  7   talk to the customer about.

12:42  8   Q.   Would you turn to page 76 of your deposition, please.  Line

12:43  9   20, Question -- I'm sorry.  Line 16, Question, We'll start

12:43  10  there.  You don't know whether they were just investors or is

12:43  11  the answer no?  Answer, they were investors; but they would

12:43  12  give us instructions.  Question, great.  What instructions were

12:43  13  they giving?  Answer, Sometimes they would give us the work

12:43  14  order for the day.  They would also go to the location where we

12:43  15  were working, and they would look at how we were doing the work

12:43  16  and ask questions with the owner of the building and things

12:43  17  like that.  That's what you said in your deposition, isn't it?

12:44  18  A.   That is correct.

12:44  19  Q.   Conspicuously absent from that answer is any mention of

12:44  20  verbal instructions where Heidelberger and M<sup>c</sup>Carroll said to

12:44  21  your crew verbally, Do this, do that; isn't that true?

12:44  22  A.   When they went to the job site, they would talk to Mario

12:45  23  because Mario was on the team and he spoke English; and he gave

12:45  24  us instructions.

12:45  25  Q.   Isn't it true that you missed all kinds of days because of

12:45 1    weather-related events such as Hurricane Ernesto and the

12:45 2    massive rain and lightening that we get in south Florida in the

12:45 3    rainy season?

12:45 4    A.  I have never ever in my life got so wet as when I worked

12:45 5    here.  I have never ever in my life perspired so much as I

12:45 6    perspired here.

12:45 7    Q.  So no matter --

12:46 8    A.  I have never ever in my life received so much dust on my

12:46 9    face as when I was doing the installation.

12:46 10   Q.  So no matter how hard the rain, no matter how close the

12:46 11   lightening, no matter how gusty the winds I guess like the

12:46 12   mailman you sat right there and continued working no matter

12:46 13   what was happening weatherwise?

12:46 14   A.  When a heavy storm was approaching and there were

12:46 15   lightening problems, as everybody knows we stopped working; but

12:46 16   once the storm was over we continued working.  Many times we

12:47 17   came back to the company, and we came back because it was

12:47 18   raining; but over here it was not raining.  And on one occasion

12:47 19   Mr. Eddie Leiva sent us back because here it was not raining,

12:47 20   but over there it was.

12:47 21   Q.  You're aware that you're not owed overtime for the trip out

12:47 22   to the job site in the morning and then back to the office or

12:47 23   the shop at the end of the day in the truck, correct?

12:47 24            MR. KELLY:  Objection; calls for a legal conclusion.

12:48 25            THE COURT:  Overruled.

12:48    1         **MR. IBACACHE:**  The company provided the truck.

12:48    2    **BY MR. KLEPPIN:**

12:48    3    Q.  Is the answer to the question yes or no?  Just tell me.

12:48    4    A.  No.  They provided a truck.

12:48    5    Q.  Turn to page 86 of your deposition, please.  Line 16,

12:48    6    Question, Are you requesting overtime for the trip to and from

12:48    7    the office?  Answer, no.

12:48    8         That's what you said in your deposition, right?

12:48    9    A.  Yes.

12:48   10    Q.  When you counted out your 71 weeks that you claim that

12:49   11    you're owed, you acknowledge you included in your own personal

12:49   12    overtime calculations a week that you took off for which you

12:49   13    were paid your $900 salary?

12:49   14    A.  Which week that I did not work?

12:49   15    Q.  Turn to page 90 of your deposition.  Line 9, September 20th.

12:49   16    Okay.  So in your claim that I have in front of me, you asked

12:49   17    for 71 weeks; but you didn't -- you said 70.  What about the

12:49   18    week you were off.  How come you counted that?  Answer, Mr.

12:50   19    Eddie Leiva gave us that week.  And also it's an estimate of

12:50   20    the hours.  We're not going to figure it at 61.3 hours or

12:50   21    anything like that.  That's what you said in your deposition,

12:50   22    right?  Then -- that's what you said in your deposition, right?

12:51   23    A.  Yes.

12:51   24    Q.  And then on line 20 you say, Question, That's not my

12:51   25    question when you counted 70 weeks.  I'm saying to you how

12:51  1    could you count a week of overtime if you were out that week

12:51  2    even if you got paid?  Answer, Take out that week if you'd

12:51  3    like.  I'm not going to argue with you over one week more, one

12:51  4    week less.  That's what you said in your deposition, right?

12:51  5    A.  Yes.

12:51  6    Q.  That's what you said in your deposition, right?

12:52  7    A.  Yes.

12:52  8    Q.  Okay.  I'm going to give you one more chance.  Your crew

12:52  9    took lunches, and they were at least a half an hour long; isn't

12:52 10    that true?

12:52 11    A.  If I had known you before, I would have appreciated it if

12:52 12    you had treated us to lunch.

12:52 13    Q.  Okay.  If you could turn to your deposition on page 91,

12:52 14    please.  Line 14, Okay.  So when you came to this average of 20

12:52 15    hours, I'm trying to figure out what hours you come to come to

12:52 16    that number.  Answer, We would work normally two hours extra

12:52 17    every day.  So if you calculate 7:30, 8:30, 9:30, 10:30, 11:30,

12:53 18    12:30, 1:30, 2:30, 3:30, and then we would take half an hour

12:53 19    for lunch.  Question, I thought you didn't take a half an hour

12:53 20    for lunch.  Answer, For that reason we're going to give it to

12:53 21    you as a gift.  So that gives us 4:00 o'clock in the afternoon,

12:53 22    and we'd leave at 7:00.  That's three hours.  Three times five,

12:53 23    15, plus Saturday.

12:53 24            That's what you said in your deposition, correct?

12:53 25            THE INTERPRETER:  Line 15?

12:53 1        MR. KLEPPIN:  Starting with line 14.

12:53 2        THE INTERPRETER:  14.  Okay.

12:54 3        MR. IBACACHE:  Yes.

12:54 4  BY MR. KLEPPIN:

12:54 5  Q.  You never called the Department of Labor about this company

12:54 6  to report your wages being somehow in violation of the law,

12:54 7  correct?

12:54 8  A.  No.  I never called.

12:55 9  Q.  When you would receive these paychecks every week, you

12:55 10  never once complained to anyone in the company that somehow

12:55 11  your pay was unlawful or that you were somehow being shorted

12:55 12  under the law, correct?

12:55 13  A.  Correct.

12:55 14        MR. LEIVA:  Thank you.

12:55 15              CROSS-EXAMINATION

12:56 16  BY MR. LEIVA:

12:56 17  Q.  As you know my name -- oh, sorry.  My name is Edward Leiva.

12:56 18  And can you please -- can he look at me, my eyes?

12:56 19  A.  Yes.

12:56 20  Q.  Please can you look at me.

12:56 21  A.  Yes.

12:56 22  Q.  Okay.  Let's start with a question.  I knew you in New

12:56 23  York.  I met you in New York, correct?

12:56 24  A.  Yes.

12:56 25  Q.  How did I treat you there?

12:56  1    A.   Fine.

12:56  2    Q.   Do you agree that I was the best boss you ever had?

12:56  3    A.   Yes.

12:56  4    Q.   And there are going to be hundreds of people that will tell

12:56  5    the same thing in New York.  Especially probably about 300

12:56  6    people will be willing to testify that I'm the best boss they

12:57  7    ever had.

12:57  8    A.   I don't know.  I am not sure.  I personally, yes.

12:57  9    Q.   And many other people, of course, at the company that work.

12:57  10   When they needed me, I was there.  Let me start with the

12:57  11   question.  The first question is do you know Reinaldo Lamonica?

12:57  12   A.   Yes.

12:57  13   Q.   Did Reinaldo Lamonica ask you to join this lawsuit?

12:57  14   A.   I haven't talked with Reinaldo Lamonica for about two

12:57  15   years.

12:57  16   Q.   But this lawsuit is about two years or more.  This lawsuit

12:58  17   is about two years or more, so I'm talking at the very

12:58  18   beginning.  At the beginning of this lawsuit I would like to

12:58  19   know who recruit him?

12:58  20   A.   What do you mean by "recruiting"?

12:58  21   Q.   Who is the one -- whose idea was this to sue me because

12:58  22   this lawsuit was only against myself.  It had nothing to do

12:58  23   with this individual over here.

12:58  24   A.   It was nobody's idea.  The six people who are in the other

12:58  25   lawsuit got together.

12:58  1    Q.   So they just met out of -- after the company closed, of

12:59  2    course, they decided to meet out of coincidence, accident?

12:59  3    A.   No.  We are friends.

12:59  4    Q.   All right.  There are six people involved in this lawsuit

12:59  5    against myself and now them.  The father and son Alborez.

12:59  6             MR. LEIVA:  Oh, no.  It's Alborez.  It's not --

12:59  7    Alvarez is a different name than Alborez.  It's A-l-b-o -- b as

12:59  8    in boy o-r-e-z.  It's a different name altogether.  It's not

12:59  9    Alvarez.  It's Alborez.

12:59  10            THE INTERPRETER:  Okay.  Alborez.

12:59  11            MR. LEIVA:  Father and son.

12:59  12   BY MR. LEIVA:

12:59  13   Q.   Do you remember them?

01:00  14   A.   Alborez.  Alborez.  Father and son Alborez?  No, no.

01:00  15   Q.   You don't remember that you said you were friends.  Just

01:00  16   now you told me all six of you were friends, and they got

01:00  17   together and were discussing the suit.  Now you're telling me

01:00  18   you don't know who they are?

01:00  19   A.   No.  I am saying the people who made this lawsuit, the

01:00  20   people who are on this paper, these people, Louis Palma,

01:00  21   Roberto Sanso, Fernando Acuna, Yerko Aguirre, Rolando Ibacache,

01:00  22   Armando Catalan, Gabriel Antinao.

01:00  23   Q.   Those are the people that you know plus these people here,

01:00  24   right?

01:00  25   A.   Right.  So you don't know everybody in this lawsuit right

01:01  1    now that they have against us that you're testifying?

01:01  2         THE INTERPRETER:  Sorry.  Can you repeat the question.

01:01  3         MR. LEIVA:  Your Honor, can I ask you a question,

01:01  4    address you with all due respect?

01:01  5         THE COURT:  Yeah.

01:01  6         MR. LEIVA:  This individual is testifying, but he's

01:01  7    here to gain $112,000 in his own lawsuit.  Why do I believe

01:01  8    you're going to have an impartial witness here.  I mean

01:01  9    shouldn't he be impeached?

01:01  10        THE COURT:  Well, the jury will decide whether he's

01:01  11   impartial or not; but it is now 1:00 o'clock.

01:01  12        MR. LEIVA:  Oh, I'm just starting.  I mean I was --

01:01  13        THE COURT:  Well, I understand that; but you can come

01:01  14   back tomorrow, and you can continue your examination.

01:01  15        MR. LEIVA:  I'll definitely be here tomorrow.  I

01:01  16   haven't had a chance to ask really the questions.

01:01  17        THE COURT:  Yes?

01:01  18        MR. KELLY:  I told them that he's from New York, and

01:01  19   he has to go back today.  I told Mr. Kleppin.  I took a very

01:01  20   short time --

01:02  21        THE COURT:  Well, Mr. Kelly, you can't keep calling --

01:02  22   Mr. Kelly, you can't keep calling witnesses here and then tell

01:02  23   me that they're not available for cross-examination because

01:02  24   that's what this is all about.

01:02  25        MR. KELLY:  I just want to ask him then.  I told

01:02   1    everybody before the --

01:02   2          **THE COURT:**  All right.  Well, anyhow, I told you we

01:02   3    would leave here at 1:00 o'clock.  So tomorrow, Members of the

01:02   4    Jury, as I told you, we were going to recess at 1:00.  Today we

01:02   5    will be in recess until tomorrow morning at 9:00 o'clock and

01:02   6    remember that our schedule tomorrow is from 9:00 to 12:00 and

01:02   7    from 1:00 to 3:00.  Thank you for your attention and your

01:02   8    patience in this case; and you may take the jury out, Mr.

01:02   9    Marshall.

01:02   10         **THE MARSHAL:**  All rise for the jury.

01:02   11       **(Jury Out)**

01:02   12         **THE COURT:**  Ms. Ibacache, you may step down.

01:03   13         Are you going to tell me this witness is not going to

01:03   14   be here tomorrow either?

01:03   15         **MR. KELLY:**  Well, Your Honor, I'm trying to coordinate

01:03   16   the times for the witnesses.  I mean is there any limit at all

01:03   17   on the witnesses.  I told them, you know, he's from New York

01:03   18   and I took a very brief time with him.  And I mean, you know,

01:03   19   there's a pre-trial stipulation.  We all had an agreement as to

01:03   20   how long the trial would go.  I thought there would be some

01:03   21   cooperation with the time for the witnesses.  I mean could we

01:03   22   take each witness in question for two days?  I'm just trying to

01:03   23   coordinate.

01:03   24         **THE COURT:**  You know, a trial is like life.  Nobody

01:03   25   knows what's going to happen until it happens.  You have to be

01:03  1   prepared for every contingency.  You can't just say, Well, I

01:03  2   thought the cross-examination was going to take 10 minutes and

01:03  3   it's taken 10 hours.  Well, sometimes that happens because we

01:03  4   don't know what a witness is going to say until he says it.

01:03  5            MR. KLEPPIN:  Or not say.  Right.  Yeah.

01:03  6            THE COURT:  So if he -- you do whatever you want.  If

01:04  7   he's not here in the morning for cross-examination, I'm going

01:04  8   to declare a mistrial and we can go and start this all over

01:04  9   again because I'm not just going to keep this jury here day

01:04  10  after day while we keep recessing because we don't have

01:04  11  witnesses available.

01:04  12           MR. KLEPPIN:  Well, it's not that we don't have

01:04  13  witnesses available.  It's just that Mr. Kelly is limiting the

01:04  14  availability of the witnesses that he's calling.

01:04  15           THE COURT:  Indeed.  Yes.

01:04  16           MR. KLEPPIN:  And I don't know if we need -- I mean

01:04  17  we're already into Monday now.  And if this man needs to come

01:04  18  back Monday -- you know, I hate to do that again because I --

01:04  19           THE COURT:  No.  This man is not going to come back

01:04  20  Monday.  This man is going to come back tomorrow or we're going

01:04  21  to go someplace else tomorrow afternoon.  That's what we're

01:04  22  going to do.  All right.

01:04  23           MR. KLEPPIN:  Well, is it something that the defense

01:04  24  can consider, you know, waiving any further right to

01:05  25  cross-examine this witness as well.

01:05  1    THE COURT:  Well, the defense can do whatever it

01:05  2  thinks is in its best interest.  That's why we here.

01:05  3    MR. KLEPPIN:  Would you declare a mistrial though if

01:05  4  we were to do that?

01:05  5    THE COURT:  Would I declare a mistrial if what?

01:05  6    MR. KLEPPIN:  If we were to waive our right to further

01:05  7  cross-examine him.

01:05  8    THE COURT:  Well, I don't know.  I'll just have to

01:05  9  wait and see.  You know the way it works.  If you want to see

01:05  10  the cards --

01:05  11    MR. KLEPPIN:  No.  I know.

01:05  12    THE COURT:  -- you have to put down the money.

01:05  13    MR. KLEPPIN:  I -- yeah.  Well --

01:05  14    THE COURT:  So you --

01:05  15    MR. KLEPPIN:  I'm just trying to think for clients'

01:05  16  money.  I hear my clients here just bemoaning that there would

01:05  17  be a mistrial and --

01:05  18    THE COURT:  I understand.

01:05  19    MR. KLEPPIN:  -- have to start all over.

01:05  20    THE COURT:  No one understands better than I about

01:05  21  your clients' money; but what I'm telling you is that since

01:05  22  we're talking about money the way it works is only after the

01:05  23  money is down do we look at the cards.  We don't look at the

01:05  24  cards and then put down the money.  All right.  We'll be in

01:05  25  recess until 9:00 o'clock.  Good luck.  See you in the morning.

01:05   1   Court's is in recess until 9:00 o'clock.

2        **(Adjourned)**

3

4                      C E R T I F I C A T E

5

6            I hereby certify that the foregoing is an accurate

7   transcription of proceedings in the above-entitled matter.

8

9

        6/23/11                      /s/ Jill Michelle Hardy-Hobbs
10      -------                      ---------------------------------------
        DATE                         JILL MICHELLE HARDY-HOBBS, CCR, FPR
11                                   *OFFICIAL UNITED STATES COURT REPORTER*
                                     400 NORTH MIAMI AVENUE, SUITE 08S33
12                                   MIAMI, FL  33128     T: 305.523.5022
                                     jill_hardy-hobbs@flsd.uscourts.gov
13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,565** [1] - 36:6
**$1,825** [1] - 37:23
**$102,000** [3] - 62:17, 62:23, 66:3
**$112,000** [1] - 82:7
**$14,369** [1] - 37:25
**$17,985** [1] - 29:17
**$200** [1] - 36:20
**$225** [1] - 37:2
**$245** [1] - 37:13
**$250** [1] - 30:8
**$3,236** [1] - 37:5
**$34,000** [1] - 66:4
**$34,200** [2] - 27:17, 28:3
**$350** [1] - 35:25
**$375** [1] - 37:17
**$4,653** [3] - 30:12, 30:21, 35:19
**$450** [1] - 36:23
**$4500** [2] - 45:4, 45:8
**$600** [3] - 8:1, 13:19, 13:21
**$900** [11] - 13:23, 13:24, 21:23, 22:17, 23:3, 23:6, 23:20, 23:21, 27:17, 43:25, 77:13

## '

**'04** [3] - 39:5, 39:17, 40:15
**'05** [3] - 39:5, 39:17, 40:15
**'06** [4] - 25:5, 35:10, 39:21, 63:4
**'07** [3] - 35:11, 43:24, 63:4

## /

**/s** [1] - 86:9

## 0

**07-61295-CIV-GONZALEZ/COHN** [1] - 1:3
**08S33** [2] - 2:4, 86:11

## 1

**1** [5] - 1:11, 24:21, 27:24, 59:18, 59:24
**10** [3] - 35:24, 84:2, 84:3
**100** [1] - 42:18
**10:30** [1] - 78:17
**11** [1] - 36:6
**11:30** [1] - 78:17
**12** [4] - 1:9, 22:11, 23:2, 42:5
**12:00** [1] - 83:6
**12:30** [1] - 78:18
**13** [2] - 28:23, 36:16
**14** [4] - 38:17, 78:14, 79:1, 79:2
**15** [9] - 7:10, 7:12, 14:22, 16:3, 27:20, 41:14, 41:18, 78:23, 78:25
**16** [4] - 22:15, 23:2, 75:9, 77:5
**17th** [1] - 44:23
**18** [2] - 36:20, 59:19
**19** [1] - 26:7
**1:00** [8] - 51:21, 51:22, 52:1, 69:20, 82:11, 83:3, 83:4, 83:7
**1:30** [1] - 78:18
**1st** [4] - 25:4, 25:13, 41:9, 66:18

## 2

**2** [2] - 26:22, 54:20
**20** [5] - 36:23, 69:1, 75:9, 77:24, 78:14
**2004** [3] - 38:22, 39:16, 40:9
**2005** [3] - 38:23, 39:16, 40:9
**2006** [38] - 5:22, 6:19, 7:9, 7:16, 9:12, 24:8, 24:10, 24:14, 24:15, 24:20, 24:25, 25:13, 25:23, 26:15, 26:25, 28:8, 28:11, 28:15, 28:18, 32:18, 32:20, 32:25, 33:9, 33:18, 33:24, 35:16, 36:10, 37:17, 39:6, 39:16, 40:17, 41:6, 41:9, 42:7, 42:8, 43:9, 66:18
**2007** [4] - 15:23, 42:7, 44:23, 57:19

**2009** [1] - 22:6
**2011** [1] - 1:9
**20th** [1] - 77:15
**21** [2] - 3:5, 37:1
**22** [2] - 30:21, 37:4
**23** [2] - 24:19, 37:14
**23rd** [1] - 22:6
**24** [1] - 52:9
**24-B** [1] - 37:16
**27** [1] - 37:22
**2823** [1] - 28:22
**28th** [1] - 43:24
**2:30** [1] - 78:18

## 3

**30** [2] - 64:20, 69:1
**300** [2] - 1:18, 80:5
**305.523.5022** [2] - 2:4, 86:12
**305.865.6766** [1] - 1:19
**305.865.7167** [1] - 1:19
**31** [1] - 54:19
**33128** [2] - 2:4, 86:12
**33141** [1] - 1:19
**33324** [1] - 1:22
**34** [1] - 27:2
**35** [2] - 56:24, 64:20
**36** [1] - 67:3
**38** [3] - 24:16, 27:9, 27:16
**38.97** [1] - 27:8
**39** [1] - 24:21
**3:00** [1] - 83:7
**3:30** [1] - 78:18

## 4

**4** [1] - 60:1
**4.33** [3] - 27:7, 27:8
**40** [18] - 7:23, 7:25, 14:1, 18:25, 23:7, 23:9, 23:22, 24:1, 24:7, 27:2, 63:15, 64:21, 64:23, 64:24, 65:3, 65:20, 66:6, 66:11
**40-hour** [1] - 24:2
**400** [2] - 2:4, 86:11
**45** [1] - 56:8
**49** [2] - 30:18
**4:00** [1] - 78:21

## 5

**5** [4] - 3:4, 26:6, 67:4

**55** [1] - 38:16
**5:00** [2] - 64:9, 64:11
**5:30** [1] - 10:15

## 6

**6** [1] - 52:9
**6/23/11** [1] - 86:9
**60** [4] - 13:15, 13:16, 64:21
**605** [1] - 1:18
**61.3** [1] - 77:20
**6:00** [7] - 10:5, 10:10, 10:11, 10:15, 13:5, 13:15, 51:23
**6:30** [1] - 10:5

## 7

**7** [5] - 27:25, 41:12, 42:4, 42:5, 45:11
**70** [3] - 62:18, 77:17, 77:25
**71** [4] - 63:19, 66:22, 77:10, 77:17
**71st** [1] - 1:18
**76** [1] - 75:8
**79** [1] - 3:6
**7:00** [8] - 10:2, 13:3, 19:14, 66:25, 67:15, 67:24, 68:2, 78:22
**7:15** [6] - 10:2, 19:14, 66:25, 67:16, 67:24, 68:2
**7:30** [6] - 10:14, 13:4, 66:23, 67:8, 67:16, 78:17

## 8

**8** [1] - 71:22
**800** [1] - 65:4
**86** [1] - 77:5
**8751** [1] - 1:22
**8:00** [2] - 10:4, 67:16
**8:30** [2] - 67:16, 78:17

## 9

**9** [5] - 27:8, 35:18, 56:25, 71:6, 77:15
**9.4** [1] - 27:8
**90** [2] - 69:7, 77:15
**900** [1] - 65:4
**91** [1] - 78:13
**95** [1] - 6:17

**954.424.1933** [1] - 1:23
**954.474.7405** [1] - 1:23
**98** [1] - 45:11
**995** [1] - 36:16
**9:00** [6] - 67:16, 68:10, 83:5, 83:6, 85:25, 86:1
**9:30** [2] - 68:11, 78:17

## A

**able** [7] - 16:5, 16:13, 31:8, 31:14, 33:13, 56:3, 65:19
**above-entitled** [1] - 86:7
**absent** [1] - 75:19
**absolute** [1] - 61:13
**absolutely** [1] - 75:3
**accident** [2] - 17:8, 81:2
**according** [5] - 56:2, 56:11, 58:4, 66:4, 68:6
**account** [1] - 70:14
**accountant** [17] - 26:1, 26:4, 26:5, 26:7, 26:10, 30:14, 30:15, 30:16, 30:17, 30:24, 38:9, 38:12, 38:14, 38:18, 38:25, 41:3
**accounts** [1] - 45:20
**accurate** [1] - 86:6
**accurately** [6] - 22:19, 22:24, 26:13, 31:2, 42:9, 47:13
**acknowledge** [2] - 40:12, 77:11
**actual** [1] - 71:12
**Acuna** [2] - 59:14, 81:21
**adamant** [1] - 37:19
**add** [5] - 27:14, 58:1, 58:21, 58:23, 59:1
**added** [2] - 57:23, 59:3
**adding** [1] - 27:13
**addition** [1] - 60:1
**address** [5] - 6:16, 28:21, 28:22, 29:1, 82:4
**Adjourned** [1] - 86:2
**admitted** [1] - 70:25
**advertising** [1] - 30:8
**affidavit** [8] - 58:19, 59:1, 59:6, 59:10,

59:11, 59:14, 59:24,
62:11
**affirmative)** [3] -
30:3, 30:11, 60:16
**afternoon** [10] - 4:15,
7:14, 10:5, 13:6,
51:23, 56:6, 64:10,
69:15, 78:21, 84:21
**age** [1] - 59:19
**ago** [5] - 11:6, 33:12,
33:13, 34:12, 41:1
**agree** [6] - 38:22,
61:19, 62:4, 63:18,
73:6, 80:2
**agreed** [2] - 21:24,
23:25
**agreement** [4] -
23:21, 50:15, 51:14,
83:19
**Aguirre** [3] - 4:16,
49:24, 81:21
**ahead** [2] - 39:14,
51:10
**ALBO** [1] - 81:7
**ALBOREZ** [2] - 1:6,
1:6
**Alborez** [11] - 20:4,
20:5, 20:15, 81:5,
81:6, 81:7, 81:9,
81:10, 81:14
**allege** [1] - 62:19
**alleged** [4] - 58:8,
70:15, 71:21, 72:18
**allowed** [1] - 37:8
**almost** [5] - 7:10,
10:10, 15:20, 47:23,
48:8
**alone** [2] - 8:5, 14:6
**altogether** [1] - 81:8
**Alvarez** [2] - 81:7,
81:9
**amend** [2] - 58:19,
59:2
**amount** [13] - 7:23,
7:24, 11:14, 13:8,
13:12, 13:13, 23:9,
23:25, 24:1, 28:4,
63:13, 63:15, 63:20
**ANGELES** [1] - 1:5
**Angeles** [5] - 18:6,
18:9, 18:21, 19:7,
19:25
**Answer** [3] - 26:7,
38:18, 57:3
**answer** [68] - 22:17,
23:3, 23:12, 23:20,
23:24, 24:21, 26:8,
30:23, 31:23, 33:2,
33:3, 33:4, 33:13,
33:17, 33:19, 33:22,

34:5, 35:22, 36:13,
37:7, 38:21, 39:25,
40:5, 40:7, 40:11,
40:14, 40:22, 42:6,
42:8, 42:10, 44:10,
44:12, 45:12, 45:13,
45:14, 46:23, 46:25,
52:10, 52:11, 52:13,
54:21, 54:22, 57:2,
57:8, 57:9, 60:18,
61:21, 62:9, 63:16,
63:24, 63:25, 67:5,
67:7, 67:8, 67:22,
71:9, 71:19, 75:11,
75:13, 75:19, 77:3,
77:7, 77:18, 78:2,
78:16, 78:20
**answered** [1] - 35:21
**answers** [2] - 31:18,
47:22
**antinao** [1] - 81:22
**anyhow** [1] - 83:2
**apartment** [11] -
12:19, 28:23, 28:25,
29:2, 29:6, 29:7, 29:8,
50:13, 50:19, 69:2
**apartments** [2] -
50:16, 51:12
**apologize** [1] - 40:19
**appear** [2] - 42:17,
63:2
**aPPEARANCES** [1] -
1:15
**appearing** [1] - 42:18
**appreciated** [1] -
78:11
**approach** [4] - 22:2,
23:16, 25:19, 27:21
**approaching** [1] -
76:14
**approved** [1] - 74:2
**approximate** [1] -
57:6
**April** [10] - 5:22,
6:19, 7:16, 14:21,
22:5, 27:1, 27:6, 41:6,
41:10, 41:11
**APRIL** [1] - 1:9
**area** [2] - 43:1, 72:3
**argue** [2] - 33:16,
78:3
**argumentative** [1] -
65:23
**arithmetic** [1] - 56:10
**Armando** [1] - 81:22
**arrival** [4] - 10:2,
10:8, 66:21, 67:1
**arrive** [1] - 67:7
**arrived** [16] - 4:10,
14:21, 15:6, 15:15,

16:4, 19:6, 19:8,
19:14, 50:14, 64:9,
66:19, 66:23, 67:12,
67:24, 68:7, 68:14
**assigned** [2] - 11:15,
11:24
**assume** [1] - 35:15
**assuming** [2] -
74:19, 74:22
**assure** [1] - 51:25
**attend** [1] - 25:10
**attended** [1] - 25:7
**attention** [4] - 61:4,
67:21, 83:7
**attorney** [5] - 39:23,
53:1, 53:8, 53:10,
53:18
**attorney/client** [1] -
53:4
**attorneys** [1] - 25:23
**August** [6] - 9:12,
9:13, 15:23, 43:24,
44:23
**AUGUSTIN** [1] - 1:4
**availability** [1] -
84:14
**available** [3] - 82:23,
84:11, 84:13
**Avenue** [1] - 2:4
**AVENUE** [1] - 86:11
**average** [2] - 13:12,
78:14
**averments** [1] - 59:6,
59:9, 59:17
**aware** [3] - 47:13,
58:15, 76:21
**awful** [1] - 43:16

**B**

**bad** [1] - 54:17
**bank** [1] - 45:20
**barbecue** [2] - 51:15,
51:17
**barbecues** [2] -
51:21, 52:1
**barrier** [1] - 48:12
**basis** [5] - 16:6, 60:5,
60:8, 60:13, 71:14
**Beach** [1] - 1:18
**became** [1] - 24:25
**beer** [1] - 51:16
**beginning** [5] -
10:17, 14:18, 52:21,
80:18
**bell** [1] - 54:3
**Bella** [3] - 29:5,
51:19, 67:11
**belong** [1] - 12:14

**bemoaning** [1] -
85:16
**benefit** [1] - 35:17
**best** [4] - 25:16,
80:2, 80:6, 85:2
**better** [1] - 85:20
**between** [5] - 19:14,
27:2, 56:10, 66:25,
67:24
**big** [4] - 12:17,
53:20, 56:3, 74:23
**bit** [4] - 15:20, 35:9,
56:1, 64:7
**bits** [1] - 18:19
**blamed** [1] - 38:8
**blindly** [1] - 57:12
**Block** [3] - 26:2,
26:4, 26:8
**Boreth** [1] - 1:21
**boss** [3] - 75:6, 80:2,
80:6
**boss'** [1] - 75:2
**bottom** [5] - 24:19,
26:22, 44:4, 44:16,
71:7
**Boulevard** [2] - 1:22,
28:23
**boy** [1] - 81:8
**break** [5] - 11:24,
12:2, 41:14, 64:1,
64:2
**brief** [1] - 83:18
**bring** [7] - 4:8, 41:22,
46:9, 47:2, 53:12,
68:15, 69:1
**broadest** [1] - 61:18
**brought** [3] - 49:25,
57:19
**Broward** [1] - 1:22
**building** [5] - 12:18,
64:11, 64:12, 69:2,
75:16
**buildings** [3] - 17:4,
17:8, 74:23
**bunch** [1] - 39:20
**business** [23] - 7:3,
28:8, 28:9, 28:11,
28:21, 28:22, 29:9,
30:11, 30:22, 35:20,
35:21, 35:23, 36:10,
36:11, 36:16, 37:5,
39:4, 39:6, 39:20,
40:17, 43:20, 52:14,
59:3
**busy** [1] - 70:12
**BY** [33] - 2:2, 5:7,
7:19, 8:23, 9:3, 9:9,
10:21, 11:5, 14:14,
15:4, 16:12, 17:20,
18:12, 19:21, 21:13,

22:4, 25:21, 37:12,
42:3, 50:21, 51:11,
53:6, 53:17, 54:1,
58:17, 61:12, 64:3,
65:11, 66:2, 72:13,
77:2, 79:4, 81:12

**C**

**calculate** [1] - 78:17
**calculated** [1] -
70:15
**calculations** [1] -
77:12
**calculator** [6] - 27:5,
27:11, 27:13, 27:14,
27:16, 27:21
**canceled** [1] - 63:1
**cannot** [1] - 57:6
**car** [4] - 30:11,
30:21, 30:22, 35:19
**cards** [3] - 85:10,
85:23, 85:24
**care** [2] - 18:4, 24:12
**cared** [3] - 46:3,
46:5, 46:7
**carry** [1] - 68:25
**case** [15] - 1:3, 20:3,
25:23, 57:13, 57:17,
57:19, 58:6, 59:13,
66:5, 70:23, 71:6,
71:9, 72:9, 72:11,
83:8
**cash** [14] - 43:21,
44:22, 44:25, 45:2,
45:5, 45:8, 45:12,
45:17, 45:18, 45:22,
46:1, 53:1, 53:8,
53:11
**cashed** [1] - 46:3
**Catalan** [1] - 81:22
**categories** [1] -
71:13
**category** [1] - 71:11
**CCR** [2] - 2:3, 86:10
**cellular** [1] - 38:4
**ceremony** [1] - 25:8
**certain** [5] - 7:23,
7:24, 18:18, 34:11,
70:24
**certainly** [2] - 60:7,
62:2
**certify** [1] - 86:6
**cetera** [1] - 64:25
**chance** [2] - 78:8,
82:16
**changed** [2] - 11:11,
11:12
**characterization** [1]

- 40:15

**charge** [1] - 73:25
**check** [6] - 27:14, 27:18, 44:7, 46:2, 63:5, 63:11
**checked** [1] - 26:19
**checks** [5] - 63:2, 63:7, 63:9, 63:13
**choice** [1] - 27:22
**CHRIS** [1] - 1:21
**Christmas** [4] - 12:9, 64:25, 70:18, 70:19
**circled** [2] - 44:4, 44:16
**civil** [1] - 25:8
**claim** [7] - 34:20, 53:13, 70:16, 71:3, 71:9, 77:10, 77:16
**claims** [1] - 71:17
**clarify** [1] - 16:21
**clause** [1] - 61:5
**clear** [2] - 23:15, 49:3
**clearly** [1] - 70:19
**CLERK** [1] - 41:21
**clients** [1] - 85:16
**clients'** [2] - 85:15, 85:21
**clock** [1] - 67:25
**close** [2] - 6:16, 76:10
**closed** [3] - 26:10, 64:12, 81:1
**closing** [1] - 26:11
**clothes** [1] - 38:6
**co** [3] - 17:7, 35:4, 59:13
**co-plaintiffs** [1] - 59:13
**co-worker** [1] - 35:4
**co-workers** [1] - 17:7
**coincidence** [1] - 81:2
**column** [2] - 29:17, 29:25
**coming** [1] - 52:19
**commissions** [3] - 35:24, 35:25, 36:3
**communicate** [2] - 31:17, 49:7, 62:16
**communicated** [1] - 62:12
**commuted** [1] - 71:15
**company** [68] - 9:24, 13:11, 14:6, 15:13, 16:9, 20:16, 21:20, 21:24, 25:9, 25:17, 26:9, 26:11, 28:14, 35:4, 36:3, 38:6,

40:13, 40:20, 45:1, 45:21, 45:24, 46:2, 46:9, 46:10, 48:22, 49:21, 50:1, 50:5, 50:6, 51:20, 52:3, 52:5, 52:6, 52:12, 52:14, 52:16, 53:9, 55:18, 55:19, 55:24, 56:3, 56:21, 56:22, 57:13, 57:21, 58:15, 58:16, 58:24, 59:5, 60:11, 60:17, 62:6, 62:8, 62:20, 64:9, 67:25, 68:17, 72:1, 72:3, 72:23, 73:2, 76:17, 77:1, 79:5, 79:10, 80:9, 81:1
**company's** [2] - 40:1, 45:20
**compensate** [1] - 23:21
**compensatory** [1] - 71:12
**complained** [1] - 79:10
**complaint** [2] - 58:19, 59:2
**completed** [1] - 7:12
**complex** [1] - 29:5
**compound** [1] - 65:23
**concerned** [1] - 17:9
**conclusion** [2] - 65:24, 76:24
**condo** [1] - 69:13
**condominiums** [2] - 68:10, 69:25
**confusing** [1] - 43:3
**confusion** [1] - 52:20
**connected** [1] - 28:17
**consecutive** [1] - 64:7
**consequently** [8] - 11:3, 24:15, 25:9, 25:11, 26:10, 48:5, 48:14, 48:16
**consider** [1] - 84:24
**consisted** [1] - 38:3
**conspicuously** [1] - 75:19
**construction** [1] - 6:14
**contain** [1] - 73:15
**contention** [1] - 73:1
**context** [1] - 22:12
**contingency** [1] - 84:1
**continue** [4] - 15:18, 15:21, 42:1, 82:14

**continued** [2] - 76:12, 76:16
**continuing** [1] - 8:20
**contract** [3] - 36:6, 36:7, 36:9
**control** [10] - 51:6, 60:3, 60:4, 60:9, 60:14, 60:23, 60:24, 61:7, 61:14, 61:20
**controller** [1] - 72:2
**conversation** [7] - 15:8, 48:11, 48:24, 49:5, 49:12, 49:16, 49:17
**conversations** [2] - 46:24, 47:1
**conveyed** [2] - 52:6, 69:19
**cook** [1] - 51:16
**cooperation** [1] - 83:21
**coordinate** [2] - 83:15, 83:23
**coordinated** [2] - 70:4, 70:12
**copied** [1] - 40:3
**Coral** [1] - 28:23
**correct** [47] - 11:7, 11:8, 13:20, 16:19, 21:18, 23:8, 24:8, 26:19, 28:8, 29:21, 30:5, 30:12, 30:14, 32:1, 36:4, 36:21, 37:5, 37:14, 37:17, 39:2, 42:19, 45:2, 45:6, 49:19, 49:22, 50:1, 50:4, 50:6, 55:7, 55:10, 55:11, 55:12, 55:13, 55:15, 55:16, 57:14, 57:19, 66:20, 67:6, 75:5, 75:18, 76:23, 78:24, 79:7, 79:12, 79:13, 79:23
**corrected** [1] - 39:22
**correction** [1] - 7:11
**counsel** [2] - 57:16, 58:6
**count** [1] - 78:1
**counted** [3] - 77:10, 77:18, 77:25
**couple** [1] - 55:1
**course** [3] - 4:9, 80:9, 81:2
**COURT** [63] - 1:1, 4:2, 4:5, 4:8, 4:12, 4:14, 4:23, 4:25, 5:2, 7:18, 8:21, 9:2, 9:6, 10:19, 10:25, 14:12, 15:1, 16:8, 17:19, 17:24, 19:19, 21:11,

22:3, 23:17, 25:20, 37:9, 41:13, 41:18, 41:22, 41:25, 50:23, 50:25, 51:3, 51:6, 51:8, 51:10, 53:5, 53:23, 58:12, 61:10, 63:24, 65:8, 65:25, 76:25, 82:5, 82:10, 82:13, 82:17, 82:21, 83:2, 83:12, 83:24, 84:6, 84:15, 84:19, 85:1, 85:5, 85:8, 85:12, 85:14, 85:18, 85:20, 86:11
**court** [5] - 4:1, 25:23, 47:11, 57:13, 57:17
**Court** [1] - 2:3
**Court's** [2] - 41:18, 86:1
**courtroom** [5] - 5:13, 14:10, 47:5, 51:1, 51:8
**COURTROOM** [1] - 1:4
**created** [1] - 39:23
**crew** [13] - 8:24, 21:7, 32:3, 69:14, 69:20, 70:2, 72:15, 72:22, 72:23, 73:2, 74:8, 75:21, 78:8
**crews** [4] - 67:4, 67:5, 67:6, 72:22
**Cross** [2] - 3:5, 3:6
**CROSS** [2] - 21:12, 79:15
**cross** [1] - 4:16, 4:17, 4:19, 21:11, 42:1, 51:25, 82:23, 84:2, 84:7, 84:25, 85:7
**CROSS-EXAMINATION** [2] - 21:12, 79:15
**Cross-examination** [2] - 3:5, 3:6
**cross-examination** [7] - 4:17, 4:19, 42:1, 51:25, 82:23, 84:2, 84:7
**cross-examine** [2] - 21:11, 84:25, 85:7
**cross-examining** [1] - 4:16
**current** [1] - 52:25, 53:7, 60:1
**customer** [4] - 74:19, 74:20, 74:22, 75:7
**customers** [2] - 74:24, 75:4

## D

**damage** [4] - 71:8, 71:10, 71:11, 71:18
**damages** [9] - 70:15, 70:17, 71:12, 71:13, 71:14, 71:15, 71:17
**dangerous** [1] - 21:3
**Date** [1] - 86:10
**date** [13] - 5:21, 7:8, 9:16, 9:19, 12:20, 14:19, 15:22, 19:9, 42:7, 43:13, 43:14, 49:8, 71:10
**dates** [2] - 42:6, 45:3
**DAVID** [1] - 1:17
david.kelly38@rocketmail.com [1] - 1:19
**days** [35] - 7:10, 7:12, 8:3, 8:7, 9:22, 12:8, 12:9, 12:24, 14:22, 16:4, 16:24, 19:15, 35:13, 35:14, 55:1, 55:22, 55:23, 56:11, 56:14, 56:16, 56:19, 56:20, 56:23, 57:4, 57:7, 58:5, 58:15, 68:11, 69:4, 69:6, 69:8, 69:9, 75:25, 83:22
**deal** [3] - 14:2, 14:3, 22:14
**December** [7] - 24:14, 24:25, 25:4, 25:13, 27:6, 43:9, 63:4
**decide** [1] - 82:10
**decided** [1] - 81:2
**declare** [3] - 84:8, 85:3, 85:5
**deducted** [1] - 39:20
**deductions** [4] - 37:16, 39:6, 40:17, 65:3
**DEFENDANT** [1] - 2:1
**defendant** [3] - 5:10, 5:21, 60:1
**Defendants** [1] - 1:11
**DEFENDANTS** [1] - 1:20
**defendants** [7] - 5:14, 5:15, 5:18, 7:20, 58:22, 59:4, 60:4
**defense** [2] - 84:23, 85:1
**definitely** [1] - 82:15

**definition** [1] - 61:18
**deliver** [3] - 68:22, 68:25
**delivered** [1] - 68:21
**demands** [1] - 39:12
**demonstrate** [1] - 60:9
**demonstrated** [1] - 60:4
**deny** [1] - 54:3
**Department** [1] - 79:5
**departure** [1] - 10:14
**depended** [1] - 64:12
**dependent** [1] - 61:5
**deposition** [45] - 22:5, 22:11, 23:4, 23:11, 24:5, 24:16, 24:22, 25:1, 26:6, 30:18, 38:8, 38:16, 38:20, 41:12, 42:4, 42:9, 42:12, 45:11, 45:15, 52:9, 52:17, 54:19, 54:23, 55:22, 56:24, 57:5, 57:9, 57:10, 57:14, 57:17, 58:3, 67:3, 67:9, 67:10, 75:8, 75:17, 77:5, 77:8, 77:15, 77:21, 77:22, 78:4, 78:6, 78:13, 78:24
**depreciation** [1] - 36:17
**described** [4] - 10:16, 10:22, 11:11, 63:21
**describing** [1] - 22:14
**difference** [2] - 10:8
**different** [12] - 10:6, 10:9, 12:22, 17:3, 46:2, 52:22, 62:1, 67:4, 67:5, 72:3, 81:7, 81:8
**difficult** [2] - 19:2, 63:19
**digressed** [1] - 35:9
**digression** [1] - 35:18
**Direct** [1] - 3:4
**direct** [5] - 5:6, 31:18, 37:19, 47:22, 48:11
**directly** [6] - 46:17, 47:5, 47:16, 48:2, 62:12, 69:19
**dirt** [1] - 11:18
**disappeared** [1] - 50:8
**discuss** [1] - 17:22

**discussing** [2] - 41:2, 81:17
**discussion** [1] - 22:13
**dispute** [2] - 17:16, 27:18
**dissolved** [1] - 52:5
**DISTRICT** [3] - 1:1, 1:1, 1:14
**divided** [1] - 12:17
**DIVISION** [1] - 1:2
**document** [2] - 58:18
**documents** [1] - 71:16
**dollars** [1] - 65:5
**done** [2] - 39:1, 55:12
**dot** [1] - 66:24
**double** [1] - 27:18
**doubt** [1] - 35:17
**doubts** [1] - 49:3
**down** [24] - 21:20, 24:19, 26:22, 27:9, 29:3, 29:6, 29:14, 30:14, 30:24, 35:25, 42:11, 44:4, 44:16, 47:25, 49:25, 62:24, 64:1, 64:2, 71:6, 83:12, 85:12, 85:23, 85:24
**drank** [1] - 11:20
**drill** [1] - 18:19
**drive** [10] - 31:8, 32:3, 32:7, 32:9, 32:10, 32:17, 33:1, 33:3, 33:7, 33:10, 34:15, 34:16, 34:23, 35:4
**driven** [1] - 32:14
**driver** [2] - 11:2, 31:5
**driver's** [4] - 31:13, 32:18, 33:8
**drives** [1] - 32:17
**driving** [5] - 32:15, 32:16, 35:9, 35:15, 35:20
**drop** [1] - 55:5
**drove** [5] - 31:4, 31:6, 31:7, 31:9, 31:19, 31:20, 31:22, 31:24, 31:25, 32:4, 32:6, 32:13, 32:21, 32:22, 32:24, 32:25, 33:17, 33:23, 34:8, 34:9, 34:13, 34:14, 34:17, 34:18, 34:21, 34:22, 35:2, 35:12
**due** [2] - 11:25, 82:4
**during** [16] - 7:1, 11:10, 11:19, 11:22,

11:23, 12:4, 12:7, 13:9, 16:3, 18:23, 52:18, 56:16, 56:18
**dust** [2] - 11:16, 76:8

## E

**early** [1] - 11:25
**earned** [1] - 29:20
**eat** [1] - 11:19
**eating** [1] - 11:20
**Ed** [14] - 21:16, 44:4, 44:15, 45:1, 45:17, 46:3, 46:11, 49:25, 50:10, 50:13, 52:2, 52:5, 53:7, 54:14
**Eddie** [8] - 29:2, 52:13, 52:15, 54:20, 76:19, 77:19
**Eduardo** [1] - 62:21
**eDWARD** [1] - 2:1
**EDWARD** [1] - 1:10
**Edward** [6] - 2:1, 5:25, 9:18, 14:5, 60:1, 79:17
**effectively** [1] - 49:6
**eight** [3] - 34:11, 35:2, 67:5
**eight/nine** [1] - 27:7
**either** [10] - 20:18, 20:24, 33:1, 33:3, 33:7, 34:7, 45:14, 48:24, 62:12, 83:14
**EL** [1] - 44:4
**elevator** [1] - 69:2
**elicit** [1] - 39:18
**employed** [1] - 5:10
**employer** [3] - 38:23, 39:19, 40:16
**employment** [4] - 18:23, 42:6, 45:5, 53:9
**end** [7] - 19:22, 27:1, 43:20, 45:1, 45:5, 53:9, 76:23
**endorsed** [1] - 63:10
**English** [15] - 15:17, 22:7, 31:15, 31:16, 46:17, 46:20, 47:8, 47:12, 47:20, 47:21, 48:8, 69:17, 75:23
**entire** [1] - 35:15
**entitled** [1] - 86:7
**envelope** [1] - 73:10
**envelopes** [1] - 73:12
**Eric** [1] - 50:18
**Ernesto** [1] - 76:1
**especially** [1] - 80:5

**ESQ** [2] - 1:17, 1:21
**establishing** [1] - 68:7
**estimate** [1] - 77:19
**et** [1] - 64:25
**events** [1] - 76:1
**evidence** [1] - 44:22
**exact** [3] - 42:7, 49:8, 66:15
**exactly** [18] - 6:20, 9:13, 9:19, 11:9, 19:11, 24:14, 25:18, 37:9, 37:21, 48:4, 57:6, 60:11, 60:16, 63:19, 66:23, 66:25, 67:11, 67:14
**EXAMINATION** [4] - 3:1, 5:6, 21:12, 79:15
**examination** [13] - 3:4, 3:5, 3:6, 4:17, 4:19, 31:18, 37:19, 42:1, 51:25, 82:14, 82:23, 84:2, 84:7
**examine** [3] - 21:11, 84:25, 85:7
**examining** [1] - 4:16
**except** [1] - 67:11
**excuse** [1] - 51:1
**exercise** [1] - 60:13
**exercised** [4] - 60:3, 61:6, 61:14, 61:20
**existed** [1] - 37:5
**expect** [1] - 33:16
**expense** [6] - 30:8, 36:10, 36:16, 36:20, 36:21, 37:1
**expenses** [14] - 29:25, 30:4, 30:12, 30:21, 30:22, 35:19, 35:24, 37:22, 37:23, 37:25, 38:3, 39:6, 39:20, 43:17
**explain** [2] - 60:24, 61:1
**explanation** [7] - 33:4, 33:5, 60:19, 61:21, 62:9, 71:15
**explore** [1] - 51:24
**express** [1] - 18:2
**extent** [3] - 73:6, 73:13, 73:16
**extra** [3] - 18:24, 19:2, 78:16
**eyes** [1] - 79:18

## F

**face** [1] - 76:9
**fact** [3] - 24:13, 31:6,

47:20
**facts** [1] - 59:2
**factual** [1] - 71:14
**fair** [8] - 27:9, 27:10, 29:10, 32:12, 32:20, 32:24, 40:14, 66:14
**falls** [1] - 71:12
**far** [1] - 29:24
**father** [2] - 81:5, 81:14
**Father** [1] - 81:11
**Federal** [1] - 43:16
**feelings** [2] - 18:2, 46:13
**fees** [3] - 35:24, 35:25, 36:3
**feet** [1] - 27:20
**Feliciano** [24] - 8:12, 8:25, 9:4, 9:11, 9:21, 10:1, 10:17, 10:23, 11:2, 11:7, 11:13, 11:23, 12:4, 12:6, 13:9, 13:10, 13:14, 31:5, 31:6, 31:8, 31:19, 32:22, 33:10, 47:7
**FELICIANO** [1] - 1:5
**fell** [2] - 17:9, 47:25
**female** [1] - 38:13
**Fernando** [2] - 59:14, 81:21
**few** [3] - 11:6, 37:17, 43:21
**field** [1] - 55:5
**figure** [7] - 27:4, 27:10, 29:17, 46:22, 57:1, 77:20, 78:15
**file** [1] - 43:11
**filed** [2] - 38:23, 43:15
**filing** [1] - 26:18
**fill** [2] - 30:16, 44:5
**filled** [2] - 30:17, 44:15
**finally** [1] - 52:5
**fine** [1] - 80:1
**finish** [2] - 48:23, 64:11
**finished** [1] - 70:10
**fired** [5] - 20:24, 50:6, 50:7, 50:8, 52:10
**first** [36] - 5:20, 5:25, 7:20, 7:25, 8:1, 9:21, 10:23, 12:20, 13:18, 14:4, 15:24, 15:25, 16:3, 19:5, 19:9, 20:15, 23:7, 23:22, 24:19, 28:21, 30:8, 42:8, 43:24, 49:4,

50:14, 50:16, 55:21, 61:5, 61:8, 65:3, 65:20, 66:6, 66:11, 70:10, 80:11
**five** [6] - 34:12, 44:25, 45:3, 47:24, 71:14, 78:22
**fix** [2] - 6:1, 6:10
**fixed** [1] - 6:10
**fixing** [2] - 6:18, 6:22
**FL** [4] - 1:18, 1:22, 2:4, 86:12
**flip** [1] - 63:9
**floors** [1] - 6:13
**FLORIDA** [2] - 1:1, 1:7
**Florida** [7] - 6:8, 21:25, 28:23, 49:18, 49:21, 49:25, 76:2
**flow** [1] - 45:2
**fluently** [1] - 47:20
**fluids** [1] - 11:20
**following** [2] - 54:12, 64:15
**food** [1] - 51:16
**FOR** [3] - 1:16, 1:20, 2:1
**foregoing** [1] - 86:6
**forest** [1] - 28:22
**former** [5] - 22:18, 22:23, 26:12, 31:1, 42:9
**formula** [1] - 71:16
**FORT** [2] - 1:2, 1:7
**forth** [1] - 59:20
**four** [11] - 8:6, 12:9, 35:13, 44:25, 47:9, 50:18, 56:10, 56:14, 57:7, 64:1, 71:13
**fourth** [1] - 32:7
**FPR** [2] - 2:3, 86:10
**FRANCIS** [1] - 1:10
**Francis** [3] - 1:22, 16:20, 60:2
**Frank** [19] - 14:8, 14:9, 16:20, 46:13, 46:16, 47:3, 47:5, 47:16, 47:17, 48:1, 48:24, 49:13, 50:9, 57:23, 58:21, 58:23, 62:21, 74:6
**free** [1] - 46:5
**Friday** [4] - 10:6, 10:7, 54:10
**friends** [4] - 42:21, 81:3, 81:15, 81:16
**front** [3] - 38:17, 44:14, 77:16
**full** [1] - 5:3
**funded** [1] - 52:2

**furnishings** [1] - 51:12

**G**

**Gabriel** [1] - 81:22
**gain** [1] - 82:7
**general** [1] - 39:18
**generally** [5] - 11:2, 11:20, 12:1, 73:10
**gentleman** [2] - 40:8, 48:17
**gentlemen** [1] - 5:15
**gift** [1] - 78:21
**given** [12] - 5:24, 7:21, 12:6, 25:23, 44:3, 63:2, 64:17, 66:6, 67:15, 69:12, 74:13
**glabor@aol.com** [1] - 1:23
**Glasser** [1] - 1:21
**glitch** [1] - 4:18
**God** [1] - 25:15
**gonna** [1] - 61:1
**GONZALEZ** [1] - 1:13
**Government** [4] - 39:12, 43:17, 45:9, 45:12
**gracious** [3] - 40:25, 44:20, 60:22
**gradually** [2] - 13:23, 22:22
**grand** [1] - 37:25
**gratuitous** [1] - 64:16
**great** [1] - 75:12
**greater** [2] - 68:3, 68:5
**group** [3] - 8:6, 12:25, 32:16
**groups** [5] - 9:18, 12:18, 12:22, 13:5, 17:16
**guess** [2] - 64:21, 76:11
**GUILLERMO** [1] - 1:6
**Guillermo** [3] - 20:4, 20:15, 20:18
**gusty** [1] - 76:11
**guys** [2] - 45:21, 46:3

**H**

**H&R** [3] - 26:1, 26:4,

26:8
**half** [9] - 29:20, 62:4, 62:7, 65:19, 65:21, 70:6, 78:9, 78:18, 78:19
**hand** [3] - 4:25, 29:14, 36:19
**handed** [4] - 25:22, 58:18, 73:18, 74:8
**handwriting** [1] - 44:18
**handwritten** [1] - 43:23
**hanging** [2] - 55:9, 55:15
**hard** [1] - 76:10
**hardly** [4] - 60:9, 60:10, 60:14, 60:15
**Hardy** [1] - 86:9
**HARDY** [2] - 2:3, 86:10
**Hardy-Hobbs** [1] - 86:9
**HARDY-HOBBS** [2] - 2:3, 86:10
**hate** [1] - 84:18
**head** [2] - 27:11, 27:12
**hear** [4] - 10:19, 31:21, 51:1, 85:16
**hearsay** [1] - 53:22
**heat** [1] - 11:25
**heavy** [1] - 76:10
**HEIDELBERGER** [1] - 1:10
**Heidelberger** [42] - 1:22, 5:14, 14:9, 14:20, 14:24, 15:10, 15:25, 16:1, 16:2, 16:13, 16:17, 17:15, 48:10, 48:11, 49:5, 54:25, 55:14, 55:18, 56:12, 56:15, 57:23, 58:4, 58:7, 58:9, 58:11, 58:22, 60:2, 60:7, 61:6, 61:13, 61:25, 62:3, 62:15, 62:18, 62:21, 73:5, 73:14, 73:23, 74:6, 74:12, 75:3, 75:20
**help** [4] - 42:21, 46:9
**helped** [3] - 38:14, 46:14, 52:15
**hereby** [1] - 86:6
**herein** [1] - 59:20
**Hernandez** [1] - 50:17
**high** [1] - 47:23
**hill** [1] - 28:22
**himself** [1] - 50:4

**hire** [1] - 36:14
**hired** [5] - 21:20, 49:25, 50:3, 50:5, 50:16
**HOBBS** [2] - 2:3, 86:10
**Hobbs** [1] - 86:9
**hobbs@flsd. uscourts.gov** [2] - 2:5, 86:12
**hold** [3] - 57:24, 58:9, 58:10
**holes** [1] - 18:19
**holidays** [1] - 12:5
**home** [1] - 55:6
**homeowner** [1] - 69:13
**homeowners** [1] - 69:25
**honeymoon** [3] - 25:14, 25:16, 64:20
**Honor** [12] - 4:7, 7:17, 8:19, 22:2, 23:16, 25:19, 42:2, 51:7, 51:9, 53:3, 82:3, 83:15
**HONORABLE** [1] - 1:13
**hour** [4] - 56:9, 78:9, 78:18, 78:19
**hours** [45] - 7:23, 7:25, 13:8, 13:13, 13:14, 13:15, 13:16, 13:24, 14:1, 18:24, 23:7, 23:9, 23:22, 24:1, 24:7, 53:12, 53:19, 57:7, 61:15, 63:15, 63:20, 64:4, 64:7, 64:17, 64:20, 64:23, 64:24, 65:3, 65:13, 65:17, 65:20, 66:6, 66:7, 66:11, 66:15, 68:5, 77:20, 78:15, 78:16, 78:22, 84:3
**house** [4] - 64:11, 69:3, 70:5, 70:8
**houses** [5] - 11:18, 12:17, 17:3, 31:17, 70:13
**hundred** [1] - 47:21
**hundreds** [1] - 80:4
**HURRICANE** [1] - 1:9
**Hurricane** [32] - 1:21, 5:11, 5:21, 5:23, 7:2, 8:14, 8:17, 18:13, 18:23, 20:21, 21:17, 22:15, 25:5, 27:1, 27:17, 28:15, 29:20,

31:4, 38:24, 39:19, 40:2, 40:9, 40:16, 41:6, 42:6, 50:10, 55:4, 63:3, 63:21, 66:19, 66:23, 76:1
**hurricane** [17] - 6:24, 7:5, 7:9, 7:15, 8:2, 8:24, 21:24, 28:14, 30:23, 49:22, 50:1, 51:20, 53:9, 55:9, 55:15, 62:6, 68:21
**Hurricanes** [1] - 30:23
**hurry** [1] - 55:6

**I**

**I-b-a-c-a-c-h-e** [1] - 5:5
**Ibacache** [16] - 3:3, 4:22, 5:4, 5:8, 5:10, 22:5, 25:13, 25:22, 39:13, 42:5, 43:15, 43:24, 58:18, 63:1, 81:21, 83:12
**IBACACHE** [18] - 5:1, 5:4, 8:22, 9:7, 11:1, 15:2, 16:9, 17:25, 18:11, 19:20, 37:11, 53:24, 58:14, 65:10, 66:1, 72:12, 77:1, 79:3
**idea** [9] - 19:25, 20:13, 20:15, 20:18, 53:11, 66:19, 75:3, 80:21, 80:24
**identified** [1] - 71:19
**identify** [5] - 9:25, 11:10, 16:5, 71:16, 71:17
**II** [2] - 1:13, 30:2
**imagine** [1] - 27:11
**impartial** [2] - 82:8, 82:11
**impeached** [1] - 82:9
**implements** [1] - 68:15
**importance** [1] - 32:15
**INC** [1] - 1:9
**Inc** [1] - 1:21
**include** [1] - 71:9
**included** [1] - 77:11
**including** [1] - 71:15
**income** [3] - 29:13, 29:23, 40:8
**increasing** [1] - 22:22
**incurred** [1] - 36:9

**indeed** [1] - 84:15
**INDEX** [1] - 3:1
**individual** [2] -
80:23, 82:6
**informal** [1] - 48:22
**information** [2] -
53:4, 64:16
**initial** [1] - 14:2
**inquire** [2] - 53:1,
53:8
**inside** [2] - 18:22,
55:19
**install** [5] - 6:2, 6:12,
6:24, 68:19, 68:20
**installation** [6] -
28:14, 49:22, 51:20,
55:9, 70:6, 76:9
**installations** [2] -
17:12, 17:13
**installed** [1] - 74:21
**installer** [3] - 7:6,
30:23, 72:4
**installing** [4] - 7:9,
7:15, 8:2, 8:24
**instead** [1] - 53:11
**instructions** [12] -
65:24, 69:12, 73:6,
73:9, 73:13, 73:16,
74:12, 74:13, 75:12,
75:20, 75:24
**interest** [2] - 48:15,
85:2
**interested** [1] - 53:10
**interesting** [1] -
64:16
**interpret** [2] - 47:4,
47:12
**interpreted** [1] -
48:25
**interpreter** [11] -
15:3, 22:7, 46:14,
47:2, 47:4, 47:11,
48:14, 49:2, 49:6,
49:13, 65:6
**INTERPRETER** [10] -
18:8, 53:14, 58:9,
61:8, 65:6, 72:10,
78:25, 79:2, 81:10,
82:2
**interpreting** [1] -
22:7
**interrogatory** [3] -
71:5, 71:6, 71:22
**interrupt** [1] - 4:18
**interrupted** [1] - 4:17
**interviewed** [1] -
50:3
**introduced** [2] -
14:5, 14:22
**investors** [2] - 75:10,

75:11
**invited** [3] - 5:25, 6:5
**involuntary** [1] -
40:13
**involve** [2] - 43:7,
43:12
**involved** [3] - 53:19,
72:19, 81:4
**involvement** [1] -
59:3
**IRS** [2] - 39:10, 39:22
**issue** [1] - 48:1
**issues** [2] - 17:22,
58:6
**item** [7] - 36:6,
36:15, 71:8, 71:10,
71:11, 71:14, 71:15

**J**

**J.H** [1] - 1:17
**Jill** [1] - 86:9
**jILL** [1] - 2:3
**JILL** [1] - 86:10
**jill_hardy** [2] - 2:5,
86:12
**jill_hardy-hobbs@**
**flsd.uscourts.gov** [2]
- 2:5, 86:12
**job** [7] - 5:24, 11:17,
12:18, 16:15, 16:17,
16:18, 21:17, 35:3,
45:23, 48:19, 49:2,
49:18, 60:3, 68:12,
68:16, 70:9, 74:18,
74:20, 74:23, 75:5,
75:22, 76:22
**jobs** [2] - 17:2, 18:15
**join** [1] - 80:13
**joint** [2] - 58:19, 59:1
**JOSE** [1] - 1:13
**JR** [1] - 1:13
**JUDGE** [1] - 1:14
**Julio** [2] - 20:4,
20:18
**JULIO** [1] - 1:6
**July** [2] - 15:23,
44:22
**July/August** [1] -
9:12
**jurisdiction** [1] -
42:19
**jurors** [1] - 4:9
**JURY** [2] - 1:13, 4:13
**jury** [12] - 4:8, 13:7,
13:12, 41:16, 41:17,
41:22, 66:5, 82:10,
83:4, 83:8, 83:10,
84:9

**Jury** [5] - 4:11, 4:12,
41:19, 41:24, 83:11
**justification** [1] -
70:21

**K**

**keep** [7] - 17:2,
50:25, 66:10, 82:21,
82:22, 84:9, 84:10
**Keith** [2] - 71:22,
71:25
**Kelly** [6] - 4:5, 4:21,
41:5, 82:21, 82:22,
84:13
**KELLY** [28] - 1:17,
4:4, 4:7, 4:22, 4:24,
5:7, 7:19, 8:23, 9:3,
9:9, 10:21, 11:5,
14:13, 14:14, 15:4,
16:12, 17:20, 18:9,
18:12, 19:21, 21:10,
53:3, 53:22, 65:23,
76:24, 82:18, 82:25,
83:15
**Kelly**......................
[1] - 3:4
**kept** [1] - 68:18
**kilos** [1] - 69:1
**kind** [2] - 25:8, 74:12
**kinds** [1] - 75:25
**KLEPPIN** [51] - 1:21,
4:3, 7:17, 8:19, 9:1,
9:5, 10:18, 14:11,
14:25, 16:7, 17:18,
17:23, 19:18, 21:13,
22:2, 22:4, 23:16,
23:18, 25:19, 25:21,
37:10, 37:12, 42:2,
42:3, 50:21, 51:11,
53:6, 53:16, 53:17,
54:1, 58:17, 61:12,
64:2, 64:3, 65:11,
66:2, 72:11, 72:13,
77:2, 79:1, 79:4, 84:5,
84:12, 84:16, 84:23,
85:3, 85:6, 85:11,
85:13, 85:15, 85:19
**Kleppin** [5] - 1:21,
21:11, 23:17, 41:25,
82:19
**Kleppin**.................
.. [1] - 3:5
**knowledge** [4] -
59:20, 71:18, 71:20,
72:19
**known** [1] - 78:11
**knows** [2] - 76:15,
83:25

**L**

**labor** [3] - 36:6, 36:7,
36:9
**Labor** [1] - 79:5
**ladders** [1] - 21:3
**lady** [2] - 38:14, 41:4
**LAMONICA** [2] - 1:4,
1:5
**Lamonica** [11] -
18:5, 18:6, 18:9,
18:10, 18:17, 19:5,
72:8, 72:10, 80:11,
80:13, 80:14
**Lamonicas** [1] -
19:10
**language** [1] - 48:12
**Lares** [2] - 71:22,
71:25
**last** [9] - 5:3, 21:4,
32:20, 32:25, 37:17,
39:23, 41:2, 53:11,
53:14
**late** [3] - 4:8, 44:22,
56:6
**LAUDERDALE** [2] -
1:2, 1:7
**LAW** [1] - 41:21
**law** [3] - 43:13, 79:6,
79:12
**lawsuit** [16] - 5:17,
22:9, 57:21, 58:22,
58:25, 62:17, 80:13,
80:16, 80:18, 80:22,
80:25, 81:4, 81:19,
81:25, 82:7
**lawyer** [2] - 47:2,
58:25
**leading** [8] - 7:17,
8:19, 9:1, 10:18,
14:11, 14:25, 16:7,
19:18
**learn** [1] - 6:2
**lease** [1] - 36:23
**least** [2] - 13:8, 78:9
**leave** [6] - 11:3, 51:8,
55:7, 70:2, 78:22,
83:3
**leaving** [1] - 20:23
**left** [3] - 10:4, 29:14,
52:11
**left-hand** [1] - 29:14
**legal** [3] - 39:8,
65:24, 76:24
**legalize** [1] - 39:11
**LEIVA** [17] - 1:10,
2:1, 50:20, 50:24,
51:2, 51:5, 51:7, 51:9,
79:14, 79:16, 81:6,

81:11, 81:12, 82:3,
82:6, 82:12, 82:15
**Leiva** [45] - 2:1, 5:14,
5:25, 6:3, 7:22, 9:18,
14:5, 21:16, 21:23,
22:13, 22:16, 23:2,
23:19, 29:2, 29:5,
44:5, 44:15, 45:1,
45:17, 46:11, 49:18,
49:25, 50:4, 50:10,
50:13, 50:23, 51:12,
52:5, 52:13, 52:15,
52:25, 53:7, 53:13,
53:18, 53:21, 54:6,
54:8, 54:14, 54:15,
54:20, 60:2, 62:21,
76:19, 77:19, 79:17
**Leiva**......................
[1] - 3:6
**less** [8] - 35:14, 60:8,
60:13, 62:4, 62:6,
65:4, 67:14, 78:4
**liable** [2] - 57:24,
58:7, 58:11
**license** [7] - 31:7,
31:13, 32:10, 32:18,
33:8, 34:15
**licenses** [1] - 37:13
**lie** [3] - 54:7, 54:12,
54:20
**lied** [3] - 54:6, 54:8,
54:12
**life** [6] - 29:9, 46:17,
76:4, 76:5, 76:8,
83:24
**lightening** [3] - 76:2,
76:11, 76:15
**likewise** [1] - 50:8
**limit** [1] - 83:16
**limited** [1] - 56:5
**limiting** [1] - 84:13
**line** [35] - 22:15,
23:2, 24:19, 24:21,
26:6, 27:25, 30:21,
35:18, 35:24, 36:6,
36:15, 36:16, 36:19,
36:23, 37:1, 37:4,
37:14, 37:16, 37:22,
38:17, 42:5, 45:11,
52:9, 54:20, 56:25,
67:3, 75:8, 75:9, 77:5,
77:15, 77:24, 78:14,
78:25, 79:1
**list** [4] - 72:8, 72:14,
72:16
**listed** [5] - 26:16,
39:19, 43:10, 71:22,
72:21
**listen** [1] - 46:10
**listing** [2] - 38:23,

72:18
**lists** [1] - 40:15
**live** [2] - 42:15, 67:1
**lived** [2] - 28:25, 67:11
**lives** [1] - 38:19
**load** [5] - 64:13, 68:14, 69:4, 69:9
**location** [1] - 75:14
**look** [11] - 25:24, 26:22, 27:24, 29:25, 44:21, 59:18, 75:15, 79:18, 79:20, 85:23
**looking** [2] - 25:25, 71:1
**loss** [1] - 29:13
**Louis** [1] - 81:20
**luck** [1] - 85:25
**Luis** [1] - 59:14
**lunch** [11] - 11:15, 11:16, 11:18, 11:21, 12:1, 12:2, 37:20, 78:12, 78:19, 78:20
**lunches** [1] - 78:9
**lying** [1] - 48:17

**M**

**machinery** [1] - 36:23
**mailman** [1] - 76:12
**main** [1] - 58:6
**maintenance** [1] - 37:1
**male** [1] - 38:12
**man** [4] - 56:2, 84:17, 84:19, 84:20
**manner** [1] - 39:21
**Marcelo** [1] - 50:17
**margin** [2] - 29:14, 36:19
**MARIO** [1] - 1:5
**Mario** [28] - 12:8, 31:5, 31:6, 31:8, 31:19, 32:4, 32:5, 32:6, 32:13, 32:22, 32:24, 33:18, 33:23, 34:3, 34:9, 34:13, 34:20, 34:21, 34:23, 35:3, 35:6, 47:7, 69:17, 69:19, 73:11, 73:25, 75:22, 75:23
**married** [8] - 24:14, 24:24, 25:4, 25:13, 25:17, 43:7, 43:9, 43:11
**Marshal** [2] - 41:16, 41:22
**MARSHAL** [2] -

41:17, 83:10
**Marshall** [1] - 83:9
**massive** [1] - 76:2
**material** [6] - 35:3, 35:5, 35:6, 35:7, 64:14, 70:7
**materials** [6] - 10:3, 18:18, 18:20, 64:13, 64:14, 68:15
**math** [2] - 27:14, 27:18
**mathematical** [1] - 71:16
**mathematically** [1] - 63:19
**matter** [11] - 32:17, 46:2, 64:20, 65:13, 65:17, 76:7, 76:10, 76:11, 76:12, 86:7
**matters** [1] - 59:20
**McCarroll** [39] - 1:10, 1:22, 5:14, 14:8, 14:9, 14:20, 16:10, 16:20, 17:22, 17:25, 25:7, 46:13, 46:16, 47:1, 47:16, 49:10, 57:24, 58:22, 58:23, 60:2, 61:6, 61:25, 62:1, 62:2, 62:3, 62:6, 62:15, 62:18, 62:22, 73:6, 73:14, 73:23, 74:7, 74:13, 75:4, 75:20
**meals** [2] - 37:16, 37:17
**mean** [17] - 12:10, 14:9, 16:21, 24:23, 31:7, 39:1, 42:11, 47:20, 49:16, 72:16, 80:20, 82:8, 82:12, 83:16, 83:18, 83:21, 84:16
**means** [2] - 60:25, 61:2
**meat** [1] - 51:15
**meet** [4] - 17:21, 17:25, 74:23, 81:2
**meeting** [2] - 17:15, 48:13
**meetings** [1] - 75:2
**Members** [1] - 4:12
**members** [3] - 72:23, 72:25, 83:3
**memory** [1] - 34:2
**men** [5] - 51:21, 52:2, 62:13, 62:14
**mention** [1] - 75:19
**messed** [1] - 69:3
**met** [6] - 14:20, 15:25, 46:8, 46:11,

79:23, 81:1
**MIAMI** [2] - 86:11, 86:12
**Miami** [9] - 1:18, 2:4, 2:4, 5:17, 12:1, 15:16, 20:7, 28:10, 46:7
**Michelle** [1] - 86:9
**MICHELLE** [2] - 2:3, 86:10
**middle** [2] - 30:1, 70:3
**might** [9] - 11:8, 32:13, 47:17, 54:2, 54:3, 56:12, 56:19, 56:20, 75:4
**Milan** [8] - 8:12, 12:11, 12:13, 12:21, 12:24
**MILAN** [1] - 1:4
**miles** [1] - 42:18
**minimum** [2] - 70:24, 71:3
**minute** [2] - 30:7, 41:1
**minutes** [5] - 41:15, 41:18, 47:24, 56:8, 84:2
**miscellaneous** [1] - 37:22
**missed** [1] - 75:25
**mistake** [5] - 38:25, 40:1, 40:12, 40:13, 40:20
**mistrial** [4] - 84:8, 85:3, 85:5, 85:17
**mistrust** [2] - 54:14, 54:22
**moments** [1] - 11:6
**Monday** [12] - 8:10, 9:23, 9:25, 10:7, 33:10, 33:12, 33:18, 33:23, 68:22, 84:17, 84:18, 84:20
**money** [29] - 19:2, 25:17, 28:4, 30:25, 38:6, 43:16, 44:3, 44:8, 44:9, 45:18, 45:20, 45:24, 45:25, 48:15, 54:11, 62:20, 63:13, 65:2, 65:12, 65:20, 66:5, 68:5, 85:12, 85:16, 85:21, 85:22, 85:23, 85:24
**month** [28] - 6:22, 9:10, 11:8, 11:10, 15:24, 16:10, 16:11, 16:22, 16:23, 20:22, 27:8, 34:19, 35:10, 35:14, 35:15, 35:16, 35:19, 42:9, 44:7,

44:23, 55:1, 55:22, 56:11, 56:16, 57:3, 58:5, 61:15
**monthly** [1] - 16:6
**months** [18] - 9:8, 9:17, 9:20, 11:7, 13:1, 27:7, 32:20, 32:25, 33:13, 34:16, 35:1, 35:2, 35:12, 35:13, 37:17, 50:14, 50:16
**morning** [30] - 4:2, 4:3, 4:4, 4:12, 4:13, 5:8, 5:9, 9:25, 19:4, 19:5, 19:13, 20:13, 21:14, 21:15, 41:14, 55:4, 56:6, 56:8, 66:20, 66:24, 68:8, 68:22, 69:5, 69:10, 69:14, 70:2, 76:22, 83:5, 84:7, 85:25
**mornings** [1] - 7:13
**most** [6] - 34:23, 34:24, 35:1, 61:13, 61:18, 63:5
**move** [2] - 43:1, 70:8
**moved** [1] - 52:21
**MR** [109] - 4:3, 4:4, 4:7, 4:22, 4:24, 5:4, 5:7, 7:17, 7:19, 8:19, 8:22, 8:23, 9:1, 9:3, 9:5, 9:7, 9:9, 10:18, 10:21, 11:1, 11:5, 14:11, 14:13, 14:14, 14:25, 15:2, 15:4, 16:7, 16:9, 16:12, 17:18, 17:20, 17:23, 17:25, 18:9, 18:11, 18:12, 19:18, 19:20, 19:21, 21:10, 21:13, 22:2, 22:4, 23:16, 23:18, 25:19, 25:21, 37:10, 37:11, 37:12, 42:2, 42:3, 50:20, 50:21, 50:24, 51:2, 51:5, 51:7, 51:9, 51:11, 53:3, 53:6, 53:16, 53:17, 53:22, 53:24, 54:1, 58:14, 58:17, 61:12, 64:2, 64:3, 65:10, 65:11, 65:23, 66:1, 66:2, 72:11, 72:12, 72:13, 76:24, 77:1, 77:2, 79:1, 79:3, 79:4, 79:14, 79:16, 81:6, 81:11, 81:12, 82:3, 82:6, 82:12, 82:15, 82:18, 82:25, 83:15, 84:5, 84:12, 84:16, 84:23, 85:3, 85:6,

85:11, 85:13, 85:15, 85:19
**multiple** [1] - 63:25

**N**

**name** [14] - 5:3, 5:4, 26:8, 26:15, 38:19, 40:1, 40:13, 40:19, 40:20, 79:17, 81:7, 81:8
**names** [1] - 18:7
**nature** [1] - 71:10
**near** [1] - 53:9
**need** [4] - 46:23, 47:22, 61:1, 84:16
**needed** [8] - 16:19, 31:10, 35:2, 39:11, 56:21, 68:16, 69:5, 80:10
**needs** [1] - 84:17
**negotiate** [1] - 63:11
**Nelan** [1] - 71:21
**never** [40] - 11:12, 11:16, 11:18, 20:23, 29:9, 30:24, 31:4, 35:20, 36:3, 36:4, 36:9, 36:10, 37:5, 37:20, 45:24, 46:16, 47:15, 48:10, 48:23, 50:3, 50:8, 54:6, 54:8, 55:17, 62:12, 64:9, 65:12, 66:22, 69:22, 70:14, 71:19, 73:24, 75:1, 76:4, 76:5, 76:8, 79:5, 79:8, 79:10
**New** [17] - 6:3, 6:14, 21:17, 21:18, 22:13, 24:2, 24:24, 29:3, 39:2, 42:15, 46:7, 62:24, 79:22, 79:23, 80:5, 82:18, 83:17
**new** [2] - 64:14, 70:9
**news** [1] - 52:6
**next** [11] - 4:21, 4:22, 30:11, 36:6, 36:15, 37:1, 37:4, 37:14, 37:16, 38:4, 44:1
**nine** [12] - 9:8, 9:17, 9:20, 11:7, 11:10, 34:12, 34:16, 34:19, 35:1, 35:12, 35:13, 35:16
**nine-month** [3] - 11:10, 34:19, 35:16
**nobody** [2] - 69:3, 83:24
**nobody's** [1] - 80:24
**noon** [1] - 70:7

**normally** [5] - 8:3, 13:13, 21:5, 21:7, 78:16
**North** [1] - 2:4
**NORTH** [1] - 86:11
**note** [1] - 26:18
**notes** [1] - 43:23
**nothing** [5] - 20:23, 23:6, 28:3, 42:23, 80:22
**number** [6] - 36:20, 59:13, 64:6, 71:6, 71:22, 78:16
**Number** [1] - 1:3
**numbers** [2] - 27:13, 30:6
**numeral** [1] - 30:2

## O

**o'clock** [13] - 13:5, 13:16, 15:21, 51:22, 52:1, 64:10, 69:20, 78:21, 82:11, 83:3, 83:5, 85:25, 86:1
**o-r-e-z** [1] - 81:8
**oath** [5] - 22:6, 22:24, 47:12, 47:18, 59:10
**object** [1] - 7:17
**objection** [13] - 8:19, 9:1, 9:5, 10:18, 14:11, 14:25, 16:7, 17:18, 17:23, 19:18, 53:3, 65:23, 76:24
**observe** [2] - 16:25, 17:12
**obviously** [1] - 36:9
**occasion** [2] - 17:7, 76:18
**occasionally** [3] - 73:7, 73:15, 73:22
**occasions** [2] - 35:2, 35:5
**occur** [1] - 21:4
**occurred** [7] - 35:16, 47:6, 49:14, 69:22, 69:23, 70:6, 70:13
**OF** [3] - 1:1, 1:13, 3:1
**offense** [1] - 37:7
**offered** [2] - 21:17, 22:21
**office** [13] - 10:2, 10:15, 18:22, 36:20, 56:5, 70:4, 72:4, 72:7, 73:21, 74:1, 76:22, 77:7
**offices** [10] - 6:1, 6:10, 6:11, 6:18, 6:21,

6:25, 7:2, 7:12, 7:14, 42:11
**Official** [1] - 2:3
**OFFICIAL** [1] - 86:11
**often** [12] - 16:5, 32:13, 32:21, 32:22, 32:24, 32:25, 34:21, 55:23, 56:15, 58:3
**old** [1] - 64:14
**once** [6] - 12:14, 51:18, 56:16, 68:16, 76:16, 79:10
**one** [75] - 4:9, 8:9, 11:8, 13:8, 15:8, 17:7, 17:8, 23:18, 25:15, 29:4, 30:8, 31:9, 31:12, 31:14, 32:15, 32:17, 33:1, 33:3, 33:7, 33:14, 35:10, 35:13, 35:14, 35:15, 35:19, 37:4, 38:14, 41:2, 43:15, 48:24, 49:4, 49:18, 50:19, 52:22, 53:21, 55:1, 55:21, 55:22, 55:23, 56:10, 56:16, 56:18, 56:19, 57:3, 57:4, 58:4, 58:5, 58:6, 58:14, 61:14, 61:15, 64:2, 66:15, 67:11, 69:1, 70:7, 70:10, 71:9, 72:10, 72:20, 72:23, 72:25, 73:1, 74:8, 76:18, 78:3, 78:8, 80:21, 85:20
**one-on-one** [2] - 48:24, 49:4
**operational** [5] - 60:4, 60:9, 60:13, 60:23, 60:24
**opportunity** [1] - 55:17
**order** [9] - 4:1, 58:21, 63:11, 73:8, 73:19, 73:21, 73:25, 74:1, 75:14
**orders** [9] - 73:10, 73:11, 73:15, 73:17, 74:2, 74:3, 74:7, 74:9, 74:10
**original** [2] - 44:12, 47:15
**outside** [4] - 11:17, 20:7, 42:19
**overestimate** [1] - 68:5
**overruled** [1] - 8:21, 9:6, 10:25, 15:1, 16:8, 17:24, 19:19, 53:5, 53:23, 65:25, 76:25

**overtime** [19] - 23:22, 53:12, 53:20, 58:8, 62:19, 65:18, 66:7, 70:15, 70:19, 70:20, 70:23, 70:25, 71:21, 72:19, 73:2, 76:21, 77:6, 77:12, 78:1
**owed** [8] - 15:14, 18:1, 19:1, 65:19, 66:4, 68:6, 76:21, 77:11
**own** [7] - 39:4, 42:21, 42:22, 46:6, 57:19, 77:11, 82:7
**owned** [1] - 36:4
**owner** [2] - 56:22, 75:16

## P

**p.m** [1] - 10:11
**PA** [1] - 1:17
**page** [30] - 22:11, 22:12, 23:2, 24:16, 26:6, 26:22, 27:24, 28:18, 29:14, 30:1, 30:18, 38:4, 38:16, 41:12, 42:4, 42:5, 43:24, 44:21, 45:11, 52:9, 54:19, 56:24, 67:3, 71:7, 75:8, 77:5, 77:15, 78:13
**PAGE** [1] - 3:2
**Pages** [1] - 1:11
**paid** [24] - 13:19, 13:21, 18:24, 20:1, 20:19, 21:23, 22:17, 23:3, 23:19, 23:23, 24:2, 43:21, 45:1, 45:5, 45:24, 46:6, 47:2, 50:22, 51:12, 65:17, 66:6, 77:13, 78:2
**Palma** [5] - 59:14, 72:8, 72:11, 72:12, 81:20
**paper** [2] - 44:9, 81:20
**papers** [3] - 39:9, 39:10, 41:1
**Paragraph** [3] - 59:18, 59:24, 60:1
**part** [7] - 29:12, 29:13, 30:1, 53:14, 58:24, 59:5, 61:8
**particular** [6] - 9:25, 11:14, 11:24, 12:5, 12:15, 63:20

**partners** [2] - 46:12, 54:16
**party** [1] - 59:3
**past** [1] - 13:15
**patience** [1] - 83:8
**pay** [7] - 23:9, 24:1, 24:7, 39:12, 45:21, 45:25, 54:10, 54:11, 65:2, 67:21, 79:11
**paychecks** [1] - 79:9
**paying** [5] - 22:21, 44:6, 45:17, 45:22, 46:3
**payments** [7] - 44:22, 44:25, 45:8, 45:17, 53:1, 53:8, 53:11
**pending** [1] - 5:18
**people** [34] - 8:6, 11:2, 14:6, 14:7, 14:17, 14:23, 15:16, 20:7, 31:16, 31:17, 32:8, 47:17, 48:2, 48:18, 49:24, 52:19, 53:19, 54:16, 54:18, 54:24, 57:22, 67:12, 72:14, 75:1, 80:4, 80:6, 80:9, 80:24, 81:4, 81:19, 81:20, 81:23
**per** [4] - 13:13, 13:24, 16:22
**percent** [2] - 47:21, 69:7
**performed** [3] - 16:19, 17:3, 60:3
**period** [8] - 10:17, 11:10, 12:2, 34:19, 35:16, 52:23, 56:5, 63:3
**periods** [3] - 11:24, 12:2, 12:5
**person** [25] - 14:4, 31:12, 31:14, 32:7, 32:9, 32:10, 32:15, 32:16, 32:17, 39:14, 40:2, 40:3, 48:4, 48:5, 48:14, 48:15, 48:16, 49:3, 69:16, 70:4, 70:5, 71:18, 71:19, 73:25
**personal** [7] - 45:18, 45:19, 49:15, 57:20, 59:20, 66:14, 77:11
**personally** [8] - 15:9, 15:17, 18:1, 40:7, 58:7, 69:16, 75:1, 80:8
**persons** [1] - 14:15
**perspired** [1] - 76:5,

76:6
**ph** [1] - 71:21
**photocopy** [3] - 44:11, 44:13, 44:14
**pick** [8] - 35:4, 35:6, 64:13, 70:9, 73:11, 73:20, 73:22
**picture** [1] - 25:11
**place** [4] - 43:25, 70:7, 71:10, 74:15
**placed** [1] - 63:1
**places** [2] - 10:9, 52:23
**Plaintiffs** [2] - 1:7, 1:16
**plaintiffs** [7] - 8:11, 8:12, 18:5, 18:9, 20:3, 59:13, 72:8
**PLAINTIFFS'** [2] - 3:1, 5:1
**plaintiffs'** [2] - 58:19, 59:1
**Plantation** [1] - 1:22
**plural** [1] - 59:18
**plus** [2] - 78:23, 81:23
**pocket** [3] - 45:22, 46:4, 46:7
**point** [2] - 52:15, 70:23
**pointing** [1] - 59:17
**position** [1] - 55:3
**possible** [2] - 52:18, 61:18
**postpone** [1] - 4:19
**potentially** [1] - 58:8
**practically** [1] - 8:5
**pre** [2] - 74:2, 83:19
**pre-approved** [1] - 74:2
**pre-trial** [1] - 83:19
**premises** [3] - 6:12, 6:15, 52:21
**prepare** [1] - 42:11
**prepared** [3] - 26:23, 64:15, 84:1
**preparing** [1] - 10:3
**present** [5] - 8:12, 17:9, 22:7, 47:7, 75:1
**privilege** [1] - 53:4
**PRO** [1] - 2:1
**probable** [3] - 66:17, 69:23
**problem** [3] - 47:8, 48:7, 48:16
**problems** [3] - 18:20, 45:2, 76:15
**proceed** [2] - 4:10, 4:20
**proceeding** [1] -

57:13
  **proceedings** [1] - 86:7
  **process** [1] - 4:15
  **profit** [1] - 29:13
  **project** [3] - 12:15, 12:16
  **projects** [2] - 20:25, 68:9
  **promised** [1] - 15:17
  **proof** [1] - 67:25
  **properly** [1] - 74:21
  **prove** [6] - 29:22, 29:24, 34:10, 65:18, 65:19, 66:5
  **provide** [2] - 18:18
  **provided** [2] - 77:1, 77:4
  **punitive** [1] - 71:13
  **put** [6] - 30:14, 30:24, 43:17, 52:2, 85:12, 85:24
  **putting** [1] - 40:1

**Q**

  **questions** [10] - 22:8, 37:8, 43:1, 47:22, 61:24, 63:6, 63:25, 64:1, 75:16, 82:16
  **quit** [1] - 52:10
  **quote** [1] - 61:6

**R**

  **rain** [3] - 64:8, 76:2, 76:10
  **raining** [3] - 76:18, 76:19
  **rainy** [1] - 76:3
  **raise** [2] - 4:25, 13:22
  **raises** [1] - 13:23
  **RAMON** [1] - 1:4
  **ran** [1] - 50:10
  **rarely** [1] - 64:6
  **rather** [1] - 11:20
  **read** [14] - 22:18, 22:23, 23:17, 23:18, 26:12, 31:1, 37:6, 38:9, 42:9, 58:13, 59:23, 61:11, 65:9, 71:5
  **ready** [3] - 4:6, 4:10, 68:16
  **really** [13] - 16:15, 26:21, 32:12, 41:9,

43:11, 53:21, 56:15, 56:17, 66:19, 67:20, 67:22, 68:1, 82:16
  **reason** [8] - 43:6, 43:10, 48:6, 54:13, 54:22, 70:3, 75:6, 78:20
  **receive** [2] - 46:1, 79:9
  **received** [5] - 43:25, 53:2, 53:8, 64:22, 76:8
  **receiving** [1] - 20:22
  **Recess** [1] - 41:20
  **recess** [6] - 41:14, 41:18, 83:4, 83:5, 85:25, 86:1
  **recessed** [1] - 4:15
  **recessing** [1] - 84:10
  **recognize** [4] - 5:13, 5:15, 12:11, 14:17
  **recollection** [3] - 32:13, 32:21, 66:15
  **recommended** [1] - 21:2
  **record** [5] - 16:21, 22:18, 22:24, 26:12, 31:1
  **recruit** [1] - 80:19
  **recruiting** [1] - 80:20
  **refer** [1] - 71:21
  **regard** [1] - 39:18
  **regarding** [5] - 10:8, 17:16, 17:22, 49:2, 49:11
  **regular** [5] - 60:5, 60:8, 60:13, 61:19
  **regularly** [1] - 60:3, 61:6, 61:14
  **Reinaldo** [7] - 18:5, 18:10, 19:4, 19:25, 80:11, 80:13, 80:14
  **REINALDO** [1] - 1:4
  **reiterate** [1] - 40:19
  **related** [1] - 76:1
  **relevant** [1] - 71:13
  **relied** [1] - 48:4
  **rely** [2] - 47:16, 48:2
  **remainder** [1] - 4:19
  **remember** [79] - 6:16, 7:8, 9:13, 9:19, 11:9, 11:21, 12:5, 12:7, 12:8, 12:16, 12:20, 12:22, 12:23, 15:8, 15:22, 15:24, 17:7, 19:11, 19:24, 20:6, 20:8, 20:9, 20:10, 20:17, 22:5, 33:15, 33:19, 33:22, 33:25, 34:3, 34:4,

34:5, 34:6, 34:7, 34:9, 34:16, 34:17, 34:21, 37:20, 38:9, 38:10, 38:19, 41:6, 42:10, 43:3, 43:5, 43:20, 43:21, 43:22, 44:2, 44:8, 44:9, 49:8, 49:15, 53:24, 53:25, 54:5, 58:21, 59:9, 67:20, 67:23, 68:1, 68:9, 69:3, 69:12, 69:24, 72:5, 74:10, 74:11, 81:13, 81:15, 83:6
  **rent** [2] - 36:23, 46:6
  **rented** [2] - 6:12, 50:13
  **repair** [1] - 42:11
  **repairs** [1] - 37:1
  **repeat** [7] - 18:8, 33:7, 53:14, 58:10, 61:8, 67:21, 82:2
  **repetition** [1] - 65:6
  **report** [4] - 45:8, 45:10, 45:12, 79:6
  **REPORTED** [1] - 2:2
  **REPORTER** [4] - 58:12, 61:10, 65:8, 86:11
  **Reporter** [1] - 2:3
  **represent** [1] - 63:4
  **representative** [1] - 25:9
  **represented** [3] - 57:16, 58:5, 62:20
  **requested** [1] - 58:12, 61:10, 65:8
  **requesting** [1] - 77:6
  **requests** [1] - 65:6
  **reside** [1] - 59:19
  **respect** [14] - 26:15, 34:19, 43:5, 45:17, 47:19, 49:10, 49:12, 49:22, 55:3, 60:7, 61:13, 71:20, 73:5, 82:4
  **responsible** [2] - 58:10, 58:11
  **rest** [5] - 23:22, 58:10, 65:20, 68:23, 69:19
  **return** [19] - 25:22, 26:15, 26:22, 27:25, 28:18, 29:12, 29:23, 30:1, 30:5, 35:18, 38:5, 39:7, 39:20, 39:21, 40:17, 43:6, 43:10, 43:11
  **returns** [13] - 38:23, 39:5, 39:16, 39:17,

40:6, 40:8, 40:9, 40:15, 42:25, 43:2, 43:15, 43:18
  **Ricardo** [1] - 50:17
  **right-hand** [1] - 36:19
  **rings** [1] - 54:2
  **rise** [3] - 41:17, 41:21, 83:10
  **road** [1] - 6:17
  **Roberto** [2] - 59:14, 81:21
  **ROLANDO** [2] - 3:3, 5:1
  **Rolando** [5] - 4:22, 5:4, 43:24, 50:18, 81:21
  **Roman** [1] - 30:1
  **room** [1] - 14:18
  **Rosalina** [1] - 71:21
  **rotate** [1] - 9:18
  **round** [1] - 27:8
  **route** [1] - 70:13

**S**

  Safe [30] - 1:21, 5:10, 5:21, 5:23, 7:2, 8:14, 8:17, 18:13, 18:23, 20:21, 21:17, 22:15, 25:5, 27:1, 27:17, 28:15, 29:20, 30:23, 31:4, 38:24, 39:19, 40:15, 41:6, 42:6, 50:10, 55:3, 63:3, 63:21, 66:19, 66:23
  **SAFE** [1] - 1:9
  **salaries** [4] - 15:9, 15:15, 18:1, 27:25
  **salary** [11] - 7:21, 13:19, 20:22, 25:18, 27:16, 45:4, 63:14, 64:22, 65:16, 65:17, 77:13
  **sample** [1] - 6:17
  **Sanso** [2] - 59:14, 81:21
  **sat** [1] - 76:12
  **Saturday** [5] - 8:10, 9:23, 51:21, 52:1, 78:23
  **Saturdays** [5] - 8:6, 8:7, 10:13, 13:16, 51:15
  **save** [1] - 39:15
  **saw** [10] - 12:25, 13:1, 16:5, 16:15, 19:8, 56:4, 57:1, 60:10, 60:15, 73:24

  **scaffolding** [1] - 17:8
  **schedule** [11] - 10:6, 10:16, 10:22, 11:11, 20:14, 28:17, 29:12, 66:21, 83:6
  **scheduling** [1] - 4:18
  **screws** [1] - 18:18
  **SE** [1] - 2:1
  **season** [1] - 76:3
  **seat** [1] - 4:14
  **seated** [4] - 4:5, 5:2, 41:23, 41:25
  **second** [5] - 33:9, 33:18, 33:20, 33:23, 44:21
  **see** [39] - 16:13, 16:18, 16:22, 17:1, 19:4, 19:7, 19:13, 22:12, 28:23, 29:13, 29:17, 29:19, 30:4, 30:6, 36:1, 36:17, 36:23, 37:2, 37:3, 37:23, 38:1, 38:4, 43:23, 44:1, 44:21, 52:25, 53:7, 55:17, 56:3, 56:25, 58:19, 59:21, 59:22, 63:14, 64:14, 70:14, 74:16, 85:9
  **See** [1] - 85:25
  **seeking** [4] - 62:17, 62:23, 70:19, 70:23
  **self** [1] - 26:23
  **self-prepared** [1] - 26:23
  **send** [1] - 18:20
  **SENIOR** [1] - 1:14
  **sent** [1] - 76:19
  **sentence** [1] - 61:5
  **separate** [2] - 5:17, 20:12
  **September** [8] - 9:14, 33:9, 33:18, 33:20, 33:24, 34:11, 42:7, 77:15
  **sera** [3] - 29:5, 51:19, 67:11
  **series** [2] - 61:24, 63:1
  **served** [2] - 71:6, 73:1
  **set** [2] - 59:2, 59:20
  **seven** [2] - 34:11, 71:17
  **several** [1] - 67:15
  **sheet** [1] - 73:18
  **shirt** [1] - 38:7
  **shoes** [2] - 38:3, 38:6
  **shop** [4] - 55:12,

55:14, 64:14, 76:23
**short** [2] - 52:23,
82:20
   **shorted** [1] - 79:11
   **shoulders** [1] - 68:25
   **show** [4] - 30:17,
50:10, 59:2, 61:4
   **showed** [1] - 44:2
   **showing** [1] - 43:23
   **shows** [5] - 36:8,
36:22, 37:18, 37:24
   **shutter** [4] - 7:5,
21:24, 28:14, 49:22
   **SHUTTERS** [1] - 1:9
   **Shutters** [30] - 1:21,
5:11, 5:21, 5:23, 8:15,
8:18, 18:13, 18:24,
20:21, 21:18, 22:15,
25:5, 27:2, 27:17,
28:15, 29:21, 31:4,
38:24, 39:19, 40:2,
40:10, 40:16, 41:6,
42:6, 50:10, 55:4,
63:3, 63:21, 66:20,
66:23
   **shutters** [8] - 6:2,
6:24, 7:9, 7:15, 8:2,
8:24, 55:15, 68:21
   **Shutters'** [1] - 7:3
   **signature** [6] - 43:25,
44:3, 44:6, 44:16,
63:10, 63:12
   **signed** [3] - 59:13,
62:11, 63:3
   **signing** [1] - 58:21
   **similar** [2] - 39:21,
40:17
   **simple** [1] - 22:16
   **simply** [3] - 57:8,
64:17, 73:7
   **single** [5] - 26:18,
43:11, 63:5, 63:20,
66:24
   **site** [8] - 16:15, 35:3,
68:12, 68:16, 74:18,
75:5, 75:22, 76:22
   **sites** [2] - 16:17, 17:6
   **situation** [6] - 15:18,
15:19, 18:4, 39:11,
41:2, 65:17
   **six** [7] - 34:11, 46:6,
67:5, 71:16, 80:24,
81:4, 81:16
   **solely** [1] - 48:25
   **Soler** [2] - 18:6, 18:9
   **SOLER** [1] - 1:5
   **solve** [2] - 15:17,
15:19
   **solved** [2] - 40:4,
48:16

**solving** [1] - 39:24
   **someone** [6] - 33:11,
46:13, 47:17, 48:19,
48:25, 72:1
   **someplace** [1] -
84:21
   **sometime** [1] - 69:23
   **sometimes** [16] -
12:17, 16:24, 32:3,
32:5, 32:6, 44:7,
52:19, 54:9, 56:19,
56:20, 56:21, 75:13,
84:3
   **somewhere** [4] -
27:2, 44:25, 45:4,
56:10
   **son** [2] - 81:5, 81:11,
81:14
   **Sorry** [3] - 51:7, 82:2
   **sorry** [8] - 10:19,
50:24, 51:9, 60:25,
66:8, 73:4, 75:9,
79:17
   **sort** [1] - 74:14
   **sorts** [2] - 30:4, 39:5
   **sought** [2] - 59:1,
59:2
   **sounds** [1] - 33:4
   **south** [1] - 76:2
   **sOUTHERN** [1] - 1:1
   **Spanish** [2] - 22:8,
46:18, 46:20, 46:21,
47:12, 47:13
   **speaks** [1] - 47:8
   **specific** [4] - 31:10,
33:12, 33:20, 33:21
   **specifically** [1] -
15:12
   **specifics** [1] - 17:5
   **spell** [1] - 5:3
   **spent** [7] - 17:4,
30:24, 34:16, 38:6,
58:14, 62:1, 62:8
   **spoken** [2] - 46:16,
47:16
   **Springs** [1] - 28:23
   **start** [17] - 7:5, 7:9,
8:14, 8:17, 9:16, 10:1,
13:2, 15:8, 20:13,
21:20, 22:12, 70:9,
75:9, 79:22, 80:10,
84:8, 85:19
   **started** [29] - 4:9,
5:20, 5:23, 6:18, 7:15,
7:20, 7:25, 8:1, 8:2,
9:10, 9:13, 9:21, 10:3,
10:23, 11:9, 11:25,
13:3, 13:18, 15:20,
19:5, 19:9, 19:11,
20:15, 21:8, 41:5,

41:9, 42:8, 45:2
   **starting** [3] - 49:21,
79:1, 82:12
   **state** [2] - 61:5, 71:8
   **STATES** [3] - 1:1,
1:14, 86:11
   **states** [7] - 27:25,
28:21, 28:22, 59:18,
60:1, 60:5, 71:8
   **States** [2] - 2:3,
59:19
   **stating** [2] - 59:11,
62:11
   **status** [1] - 26:18
   **stay** [5] - 16:11,
16:23, 35:3, 56:20,
56:21
   **stayed** [2] - 35:5,
56:22
   **step** [2] - 4:24, 83:12
   **Steve** [32] - 1:22,
14:8, 14:9, 15:11,
16:1, 16:2, 16:9,
16:13, 16:17, 17:15,
48:10, 48:11, 48:13,
48:24, 50:8, 54:25,
55:17, 56:11, 56:15,
57:2, 57:23, 58:3,
58:7, 58:9, 58:10,
58:14, 58:22, 58:23,
60:2, 62:8, 62:21,
74:6
   **STEVE** [1] - 1:10
   **still** [4] - 45:23,
54:24, 61:1
   **stipulation** [1] -
83:19
   **stop** [5] - 15:14,
19:22, 20:21, 21:1,
21:7
   **stopped** [2] - 44:6,
76:15
   **storm** [7] - 21:2,
21:5, 21:7, 21:8,
76:14, 76:16
   **storms** [1] - 21:4
   **Street** [1] - 1:18
   **subject** [1] - 37:10
   **subpoenaed** [1] -
42:17
   **sue** [1] - 80:21
   **sued** [2] - 72:23,
73:2
   **suing** [1] - 72:15
   **suit** [2] - 42:22,
81:17
   **Suite** [2] - 1:18, 2:4
   **SUITE** [1] - 86:11
   **suits** [1] - 72:20
   **supplies** [1] - 37:4

**support** [2] - 18:17,
71:17
   **supposed** [1] - 13:24
   **sustained** [4] - 7:18,
9:2, 14:12, 17:19
   **swore** [2] - 47:11,
59:9
   **sworn** [4] - 4:25,
22:6, 47:18, 59:10
   **SWORN** [1] - 5:1

## T

   **T-shirt** [1] - 38:7
   **table** [1] - 51:25
   **tax** [19] - 25:22,
26:21, 27:25, 28:18,
29:23, 35:25, 36:15,
36:20, 37:4, 38:23,
39:5, 39:16, 40:8,
40:9, 41:2, 42:25,
43:11, 43:15
   **taxes** [2] - 37:13,
39:12
   **team** [14] - 11:1,
15:16, 20:12, 31:14,
31:16, 32:8, 32:11,
32:16, 35:8, 47:8,
48:5, 75:23
   **teams** [4] - 9:18,
12:14, 31:12, 47:9
   **telephone** [1] - 38:4
   **terms** [2] - 22:14,
62:3
   **testified** [1] - 21:16
   **testify** [3] - 24:4,
48:1, 80:6
   **testifying** [4] - 34:2,
57:12, 82:1, 82:6
   **testimony** [16] -
22:18, 22:23, 23:6,
26:12, 31:1, 31:5,
42:9, 42:23, 42:24,
49:9, 54:25, 56:11,
58:12, 61:10, 65:8,
73:16
   **THE** [79] - 1:13, 1:16,
1:20, 2:1, 4:2, 4:5,
4:8, 4:12, 4:13, 4:14,
4:23, 4:25, 5:2, 7:18,
8:21, 9:2, 9:6, 10:19,
10:25, 14:12, 15:1,
16:8, 17:19, 17:24,
18:8, 19:19, 21:11,
22:3, 23:17, 25:20,
37:9, 41:13, 41:17,
41:18, 41:21, 41:22,
41:25, 50:23, 50:25,
51:3, 51:6, 51:8,

51:10, 53:5, 53:14,
53:23, 58:9, 58:12,
61:8, 61:10, 63:24,
65:6, 65:8, 65:25,
72:10, 76:25, 78:25,
79:2, 81:10, 82:2,
82:5, 82:10, 82:13,
82:17, 82:21, 83:2,
83:10, 83:12, 83:24,
84:6, 84:15, 84:19,
85:1, 85:5, 85:8,
85:12, 85:14, 85:18,
85:20
   **thereafter** [1] - 7:5
   **therefore** [1] - 65:2
   **thinks** [1] - 85:2
   **third** [5] - 28:18,
29:14, 32:6, 32:9,
32:10
   **thousand** [1] - 65:5
   **three** [18] - 9:18,
11:2, 12:9, 13:1,
15:15, 16:10, 32:8,
32:20, 32:25, 35:13,
43:18, 46:8, 47:9,
52:22, 56:20, 64:1,
71:11, 78:22
   **Three** [1] - 78:22
   **three/four** [1] - 16:23
   **tie** [1] - 33:12
   **tied** [1] - 4:9
   **tips** [1] - 27:25
   **title** [1] - 5:24
   **TO** [1] - 3:1
   **today** [14] - 5:13,
8:11, 12:11, 14:10,
18:6, 39:5, 42:17,
47:11, 62:24, 69:15,
69:20, 70:2, 82:19,
83:4
   **together** [18] - 7:13,
9:7, 9:11, 10:24, 11:3,
11:4, 11:14, 12:15,
13:10, 19:8, 19:16,
47:9, 47:10, 67:1,
67:2, 67:13, 80:25,
81:17
   **tomorrow** [8] -
82:14, 82:15, 83:3,
83:5, 83:6, 83:14,
84:20, 84:21
   **took** [12] - 12:8,
25:14, 30:5, 30:21,
37:20, 39:19, 70:7,
70:14, 77:12, 78:9,
82:19, 83:18
   **tools** [4] - 68:15,
68:18, 68:19, 68:20
   **top** [4] - 24:20,
26:16, 29:14, 54:20

**total** [3] - 13:12, 13:14, 37:25
**totally** [1] - 65:21
**towards** [3] - 43:20, 45:1, 45:5
**track** [1] - 17:2
**traffic** [1] - 4:10
**trained** [1] - 7:14
**training** [2] - 6:2, 6:23
**transcription** [1] - 86:7
**translation** [1] - 47:19
**traveling** [1] - 41:10
**treat** [1] - 79:25
**treated** [1] - 78:12
**trial** [4] - 4:20, 83:19, 83:20, 83:24
**TRIAL** [1] - 1:13
**trip** [3] - 46:6, 76:21, 77:6
**trouble** [2] - 39:15, 39:23
**truck** [12] - 30:12, 30:21, 30:22, 35:19, 55:6, 68:18, 69:4, 69:9, 76:23, 77:1, 77:4
**trucks** [1] - 64:13
**true** [81] - 21:25, 23:4, 23:12, 24:6, 24:10, 25:14, 25:15, 26:2, 28:4, 28:15, 29:18, 30:9, 31:5, 34:19, 35:20, 37:9, 37:10, 38:13, 38:24, 38:25, 39:7, 39:21, 40:21, 41:9, 42:22, 43:8, 43:18, 45:23, 46:4, 46:18, 47:19, 48:8, 48:12, 48:13, 50:11, 50:13, 51:13, 51:17, 51:22, 52:7, 54:6, 54:14, 55:18, 56:7, 56:13, 57:17, 58:8, 59:4, 59:15, 60:15, 61:16, 61:17, 61:25, 62:2, 62:7, 62:18, 62:24, 64:4, 64:18, 64:22, 65:1, 65:5, 65:14, 66:7, 67:20, 68:6, 68:18, 68:23, 69:5, 69:10, 69:11, 70:11, 70:12, 71:3, 71:23, 72:20, 72:24, 74:25, 75:21, 75:25, 78:10
**trust** [7] - 39:17, 54:15, 54:16, 54:18,
54:24
**trusted** [1] - 54:15
**truth** [9] - 22:6, 42:23, 47:19, 48:6, 54:13, 54:21, 58:2, 59:9, 71:1
**truthful** [1] - 59:11
**try** [3] - 18:3, 33:9, 57:1
**trying** [13] - 23:13, 29:24, 34:10, 39:15, 39:22, 57:24, 58:1, 70:21, 78:15, 83:15, 83:22, 85:15
**Tuesday** [5] - 10:6, 34:7, 34:11, 54:11, 54:12
**tune** [1] - 30:12
**turn** [17] - 24:16, 26:6, 28:17, 30:18, 38:16, 40:8, 41:12, 42:4, 45:11, 52:9, 54:19, 56:24, 67:3, 75:8, 77:5, 77:15, 78:13
**turned** [1] - 22:11
**twice** [1] - 56:16
**two** [39] - 12:18, 12:22, 14:17, 16:11, 16:23, 20:7, 31:13, 31:15, 33:11, 33:13, 35:13, 42:25, 49:6, 50:14, 50:16, 52:11, 55:1, 55:21, 55:22, 55:23, 56:16, 56:19, 56:23, 57:3, 57:4, 57:6, 58:4, 58:5, 58:15, 61:15, 67:12, 70:13, 71:10, 78:16, 80:14, 80:16, 80:17, 83:22
**type** [1] - 12:2

## U

**uncompensated** [2] - 23:23, 65:21
**under** [5] - 22:6, 22:24, 47:18, 59:10, 79:12
**uniforms** [1] - 38:3
**United** [2] - 2:3, 59:19
**UNITED** [2] - 1:1, 86:11
**uNITED** [1] - 1:14
**unlawful** [1] - 79:11
**unless** [2] - 33:13, 72:19

**unload** [1] - 64:14
**unpaid** [1] - 23:7
**untruthfully** [1] - 24:4
**up** [19] - 6:1, 21:18, 31:12, 32:8, 35:4, 35:6, 39:17, 47:23, 53:11, 54:19, 64:13, 64:21, 69:3, 70:9, 73:11, 73:12, 73:20, 73:22

## V

**vacation** [1] - 12:5
**vacations** [1] - 12:7
**varied** [2] - 64:4, 64:17
**varies** [1] - 69:6
**vary** [1] - 64:7
**vehicle** [1] - 67:13
**verbal** [4] - 74:7, 74:10, 74:13, 75:20
**verbally** [2] - 23:25, 75:21
**versus** [5] - 32:13, 32:21, 32:25, 34:17, 34:21
**VI** [1] - 1:13
**violation** [2] - 53:20, 79:6
**visit** [4] - 16:16, 17:3, 17:5, 55:20
**VOLUME** [1] - 1:13
**voluntarily** [2] - 42:18, 42:20
**vs** [1] - 1:8

## W

**wage** [2] - 7:21, 71:3
**wages** [4] - 17:16, 17:22, 27:25, 79:6
**wait** [3] - 20:6, 47:24, 85:9
**waive** [1] - 85:6
**waiving** [1] - 84:24
**walls** [1] - 6:13
**wear** [1] - 33:13
**weather** [2] - 21:1, 76:1
**weather-related** [1] - 76:1
**weatherwise** [1] - 76:13
**wedding** [3] - 25:8, 25:9, 25:10
**Wednesday** [1] -

34:13
**week** [54] - 8:1, 8:3, 8:9, 9:22, 11:23, 12:10, 13:8, 13:13, 13:17, 13:19, 13:24, 14:1, 16:11, 16:24, 19:15, 21:24, 22:17, 23:3, 23:6, 23:10, 23:20, 24:1, 24:3, 24:7, 25:18, 27:17, 33:9, 33:18, 33:20, 33:23, 34:8, 34:11, 34:13, 63:20, 64:4, 64:25, 66:16, 68:23, 70:18, 70:19, 70:20, 77:12, 77:14, 77:18, 77:19, 78:1, 78:2, 78:3, 78:4, 79:9
**weekly** [1] - 63:14
**weeks** [19] - 15:15, 18:2, 27:2, 27:7, 27:9, 27:16, 43:21, 46:6, 62:19, 63:19, 64:7, 64:24, 65:4, 66:22, 70:24, 77:10, 77:17, 77:25
**wet** [1] - 76:4
**whatnot** [1] - 51:16
**whole** [3] - 52:20, 70:9, 70:12
**wife** [7] - 24:8, 24:10, 24:20, 24:23, 24:24, 24:25, 43:6
**wife's** [1] - 26:15
**willing** [1] - 80:6
**wind** [1] - 64:8
**winds** [1] - 76:11
**wish** [1] - 69:21
**withdraw** [2] - 14:13, 21:6
**witness** [12] - 4:17, 4:20, 4:21, 4:22, 22:2, 23:16, 25:19, 82:8, 83:13, 83:22, 84:4, 84:25
**WITNESS** [1] - 5:1
**witnessed** [2] - 71:18, 71:20
**WITNESSES** [1] - 3:1
**witnesses** [9] - 72:18, 72:21, 82:22, 83:16, 83:17, 83:21, 84:11, 84:13, 84:14
**word** [3] - 27:20, 27:22, 61:19
**words** [4] - 48:25, 63:23, 66:3
**worker** [1] - 35:4
**workers** [1] - 17:7
**works** [2] - 85:9,

85:22
**worry** [1] - 54:9
**worth** [1] - 45:4
**write** [7] - 30:11, 35:25, 36:15, 36:20, 37:4, 37:14, 37:16
**write-off** [7] - 30:11, 35:25, 36:15, 36:20, 37:4, 37:14, 37:16
**writing** [1] - 74:3
**written** [4] - 73:8, 73:16, 73:18, 74:10
**wrote** [2] - 39:1, 74:4

## Y

**year** [12] - 9:10, 15:23, 15:25, 19:12, 24:20, 25:22, 26:25, 27:1, 28:8, 29:21, 35:16, 56:18
**years** [3] - 33:11, 34:12, 38:24, 43:18, 59:19, 80:15, 80:16, 80:17
**Yerko** [2] - 49:24, 81:21
**yesterday** [1] - 4:15
**York** [17] - 6:3, 6:14, 21:17, 21:18, 22:13, 24:2, 24:24, 29:3, 39:2, 42:15, 46:7, 62:24, 79:23, 80:5, 82:18, 83:17
**yourself** [3] - 27:14, 51:6, 71:3

## Z

**Zidell** [1] - 1:17