```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                 FORT LAUDERDALE DIVISION

3          CASE NUMBER 07-61295-CIV-GONZALEZ/COHN

4    REINALDO RAMON LAMONICA,         COURTROOM C
     AUGUSTIN MILAN,
5    ANGELES LAMONICA SOLER,
     MARIO FELICIANO,
6    GUILLERMO ALBOREZ, and
     JULIO ALBOREZ,
7
                  Plaintiffs,         FORT LAUDERDALE, FLORIDA
8
          vs.
9
     SAFE HURRICANE SHUTTERS, INC.,   APRIL 13, 2011
10   EDWARD LEIVA, STEVE HEIDELBERGER,
     and FRANCIS McCARROLL,
11
                  Defendants.         {Pages 1 - 182}
12   _____

13            JURY TRIAL - VOLUME III OF VI
         BEFORE THE HONORABLE JOSE A. GONZALEZ, JR.,
14           SENIOR UNITED STATES DISTRICT JUDGE

15   _____

     APPEARANCES:
16

17   FOR THE PLAINTIFFS:
                          K. DAVID KELLY, ESQ.
18                        J.H. Zidell, PA
                          300 71st Street, Suite 605
                          Miami Beach, FL  33141
19                        T: 305.865.6766; F: 305.865.7167
                          david.kelly38@rocketmail.com
20

     FOR THE DEFENDANTS:
21   (Safe Hurricane           CHRIS KLEPPIN, ESQ.
     Shutters, Inc.,           Glasser, Boreth & Kleppin
22   Steve Heidelberger,       8751 W. Broward Boulevard
     and Francis McCarroll)    Plantation, FL  33324
23                             T: 954.424.1933; F: 954.474.7405
                               glabor@aol.com
24

25
```

1  **FOR THE DEFENDANT:**        **EDWARD LEIVA, PRO SE**
   (Edward Leiva)

2

   **REPORTED BY:**

3                               **JILL MICHELLE HARDY-HOBBS, CCR, FPR**
                                *Official United States Court Reporter*

4                               400 North Miami Avenue, Suite 08S33
                                Miami, FL  33128      T: 305.523.5022

5                               Jill_hardy-hobbs@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 13, 2011

| 1 | **INDEX TO EXAMINATION OF PLAINTIFFS' WITNESSES** | |
|---|---|---|

**PAGE**

**ROLANDO IBACACHE (Continued from 4-12-11)**

Cross-examination by Mr. Leiva..........................  5

**FRANCIS X. McCARROLL**

Direct examination by Mr. Kelly........................  43

Cross-examination by Mr. Kleppin......................  77

**STEVE HEIDELBERGER**

Direct examination by Mr. Kelly........................ 106

Cross-examination by Mr. Kleppin...................... 124

**MARIO FELICIANO**

Direct examination by Mr. Kelly........................ 147

* * * * *

**INDEX TO PLAINTIFFS' EXHIBITS**

| NUMBER | MOVED INTO EVIDENCE | ADMITTED INTO EVIDENCE |
|---|---|---|
| 21 | 153 | 153 |
| 23 | 153 | 153 |

APRIL 13, 2011

1   **(Call to the Order of the Court)**

09:06   2        **THE COURT:**  Good morning.

09:06   3        **MR. KLEPPIN:**  Good morning.

09:06   4        **MR. KELLY:**  Good morning.

09:06   5        **THE INTERPRETER:**  Good morning.

09:06   6        **THE COURT:**  Be seated.  Are you ready, Mr. Leiva?

09:06   7        **MR. LEIVA:**  Yes, sir.  Yes, Your Honor.

09:06   8        **THE COURT:**  Okay.  Are you ready?

09:06   9        **MR. LEIVA:**  Yes, Your Honor.

09:06   10       **THE COURT:**  Bring in the jury.  I keep calling you

09:06   11  Leiva.  Leiva.  I'm sorry.

09:06   12       **MR. LEIVA:**  Leiva.  It's okay.

09:06   13       **THE COURT:**  Leiva.  Mr. Leiva.

09:06   14   **(Jury In)**

09:07   15       **THE COURT:**  Good morning, Ladies and Gentlemen.  Be

09:07   16  seated, please.

09:07   17       Mr. Ibacache, you were sworn yesterday, sir.  You're

09:07   18  reminded that you are still under oath.  You may continue your

09:07   19  cross-examination, Mr. Leiva.

09:07   20   <u>**ROLANDO IBACACHE, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN.**</u>

09:07   21       **MR. LEIVA:**  Good morning, Members of the Jury and

09:07   22  everybody present.  Good morning.  I will wait for the

09:07   23  translator to be ready.

09:07   24       **THE INTERPRETER:**  I am ready, sir.

09:07   25       **MR. LEIVA:**  You're ready.  Good.

09:07    1                CROSS-EXAMINATION (Continued from 4-12-11)

09:07    2    BY MR. LEIVA:

09:07    3    Q.   I'm a little bit sluggish.  I mean I'm a limo driver, and

09:07    4    unfortunately I had to work last night until 1:30 in the

09:08    5    morning.  And that's how I make a living now, but I had to do

09:08    6    it.

09:08    7              Mr. Ibacache, the first question is are you a legal

09:08    8    resident?

09:08    9    A.   At this moment yes.

09:08   10    Q.   The time that you worked for me were you a legal resident?

09:08   11              MR. KELLY:  Your Honor, I have to object to this.

09:08   12    It's highly -- it's illegal.  It's in violation of *Patel*.  It's

09:08   13    completely irrelevant.

09:08   14              THE COURT:  Sustained.

09:08   15    BY MR. LEIVA:

09:08   16    Q.   Mr. Ibacache, you say you're currently a resident, correct?

09:08   17    A.   Yes.

09:08   18    Q.   Following that line can I ask a question if you submitted

09:08   19    this paper, your income taxes to immigration services to obtain

09:08   20    your residency.

09:08   21              MR. KELLY:  Again I'm going to renew the objection.

09:08   22              THE COURT:  Sustained.

09:09   23    BY MR. LEIVA:

09:09   24    Q.   And your income tax and for whatever reason I don't have

09:09   25    any really papers; but yesterday in your examination with the

09:09  1   other attorney present, you claimed expenses like cell phone.

09:09  2   Did the company provide you with a free cell phone?

09:09  3   A.   Yes.

09:09  4   Q.   Did the company provide you with a truck for you to go to

09:09  5   work?

09:09  6   A.   Yes.

09:09  7   Q.   Did the company pay for the gas of the truck?

09:09  8   A.   Yes.

09:09  9   Q.   So the company paid for all the expenses of the truck that

09:10  10  you were a passenger on?

09:10  11  A.   Yes.

09:10  12  Q.   The transportation from your home from Bella Sera to work,

09:10  13  who provided you with transportation?

09:10  14  A.   The company.

09:10  15  Q.   So the company purchased vans, gave you free transportation

09:10  16  to make it convenient for you because you couldn't drive

09:10  17  obviously?

09:10  18  A.   I don't know if the company bought them, but they did

09:11  19  provide the transportation to us.

09:11  20  Q.   Fair.  That's fair.  How many months of free rent did I

09:11  21  provide you?

09:11  22  A.   Two or three.

09:11  23  Q.   Can you refresh your memory.  Three.  Three.  And many of

09:11  24  the other ones four; but in your particular case, it was three.

09:11  25  A.   I don't know.  For me two or three.

09:11  1   Q.  What else did I provide you in that apartment when you

09:11  2   moved in?

09:11  3   A.  Everything that you promised.

09:11  4   Q.  Dishes, pans, towels, blankets, some dishes, paper towels?

09:12  5   A.  That's basic stuff.  He didn't provide everything to us.

09:12  6   When he started paying us, we started buying our own things.

09:12  7   Q.  Like food.  I didn't bring him with any food.  That's

09:12  8   correct.

09:12  9   A.  That is correct.

09:12 10   Q.  Everything else was there.  TV set, couches, beds.

09:13 11   A.  That is what he promised us in order for us to come from

09:13 12   New York to Florida.

09:13 13   Q.  So when I talked to you in New York, you're saying that I

09:13 14   promised you a TV set in every room?

09:13 15   A.  I don't remember exactly what he promised us; but he said,

09:13 16   Go with what you have now, and I will provide the rest to you

09:13 17   over there.  We had tools to work in New York, and it wasn't

09:13 18   necessary to bring them down here.

09:13 19   Q.  I didn't ask that question.  I mean --

09:13 20   A.  I don't understand what the question is.

09:13 21   Q.  The question that I asked it that, really, is that I

09:14 22   provided them with everything they needed including soap,

09:14 23   dishes, and everything.

09:14 24   A.  Not everything.

09:14 25   Q.  Well, a lot.  And in my experience, I mean, with people,

09:14  1    workers, it's not customary to provide them with everything

09:14  2    they need; but I was a special boss.

09:14  3    A.  And for me he continues being a special person.

09:14  4    Q.  Thank you.

09:14  5    A.  Gracious.

09:14  6    Q.  When you worked for me in New York, who paid you?

09:14  7    A.  How I paid you?

09:14  8    Q.  Who paid him?

09:15  9    A.  Well, I worked together with a co-worker; and I would tell

09:15  10   him how much I would charge him for the job, and this person

09:15  11   would talk to Mr. Leiva.

09:15  12   Q.  Who was that person?

09:15  13   A.  Eric Aguirre.

09:15  14   Q.  Okay.  Do you work by the hours in New York?

09:15  15   A.  I would tell him how much my work was worth, and I would

09:15  16   take as long as I thought it was convenient.

09:15  17   Q.  And you always got paid, correct?

09:15  18   A.  I always got paid.

09:15  19   Q.  Okay.  You said before that when I hired you, particularly

09:16  20   you, what do you do at the beginning when you came to Florida?

09:16  21   A.  What I did here in Florida?

09:16  22   Q.  Yes; at the beginning.

09:16  23   A.  I said that we had prepared the offices.

09:16  24   Q.  Correct.  They work about five to six weeks in the office.

09:16  25   How did I pay you?

09:16  1   A.  He paid me for the work that I performed.

09:16  2   Q.  But are you claiming overtime for the construction work in

09:16  3   the office?

09:16  4   A.  Now I don't remember.

09:16  5   Q.  Oh, you're claiming that I owe you $100,000 in overtime.

09:17  6   A.  I would have to see from when to when.

09:17  7   Q.  Yeah.  But you have a complaint against me for $102,000

09:17  8   just in overtime.  That's without the 40-plus thousand you

09:17  9   make.  That's $140,000.

09:17  10  A.  I am not trying to collect, Mr. Eddie.  I am not trying to

09:17  11  collect this money from Mr. Eddie.  I am trying to collect from

09:17  12  the company, not from him personally.

09:17  13  Q.  But the complaint that you have is against myself Frank

09:18  14  McCarroll I believe and Steve.  The question that I want to go

09:18  15  to -- what I really want to ask him is was your attorney the

09:18  16  one that came out with this idea?

09:18  17  A.  No.  It was not the attorney.

09:18  18  Q.  You're saying -- you and I have a conversation in 2007, in

09:18  19  October of 2007.  And you told me very clear that the reason --

09:19  20  you didn't want to sue anybody, but once you got into the

09:19  21  complaint the attorney threatened you with legal fees if you

09:19  22  withdrew; that he was going to charge you a lot of money.

09:19  23  A.  Threatened me for what?

09:19  24  Q.  With legal fees if you withdrew from this complaint?

09:19  25  A.  No.

JURY TRIAL - VOLUME III of VI

09:19　1　Q.　So he doesn't remember or he's saying that that

09:19　2　conversation never took place or --

09:19　3　A.　Or what?

09:20　4　Q.　What is it?  Is it never -- we never talk about this or you

09:20　5　don't remember?

09:20　6　A.　I don't remember having talked with you about this.

09:20　7　Q.　But he remember he worked 60 hours a week.  I mean he

09:20　8　remembered that very clearly.

09:20　9　A.　It was my work.

09:20　10　Q.　Okay.  When you started working as an installer, who was

09:20　11　your boss?

09:20　12　A.　My direct boss?

09:20　13　Q.　Yes.

09:20　14　A.　Mr. Eddie most of the time.

09:20　15　Q.　You remember Mark Morris -- Mark Saffron and Morris?

09:21　16　A.　Yes.

09:21　17　Q.　Who were they?

09:21　18　A.　They were people who worked in the company, and they taught

09:21　19　us how to install.

09:21　20　Q.　Do you remember John Pisz?

09:21　21　A.　Yes.  I also remember John.  He worked in the factory, but

09:21　22　he didn't stay in the factory for long.

09:21　23　Q.　No.  John was general manager.  The one in the factory was

09:21　24　Tom Sullivan.  He was a factory -- Sullivan.

09:21　25　A.　I worked in the factory.  I worked in the company.  There

09:21  1    was no reason for me to know what the title of the people that

09:22  2    you had hired was.

09:22  3    Q.  You don't remember.  He's the one that worked -- I mean

09:22  4    he's the one that you -- Mr. Pisz was there until December

09:22  5    2006.

09:22  6    A.  I would start working, and then we would go out to the job

09:22  7    site.  I didn't spend my whole day in the factory, and I didn't

09:22  8    know then what was happening.  Sometimes we arrived, and one of

09:22  9    those people had left the company; and they didn't have to give

09:22  10   us any explanations.

09:22  11   Q.  Mr. John Pisz was making $150,000 salary, and Mr. Pisz was

09:23  12   the one that was assigned to give you the work until he left in

09:23  13   December 2006.  He was the one that was giving you the work.

09:23  14   A.  He -- Mr. Eddie is the one who hired those people.  I don't

09:23  15   know how much money those people were making.  If I had known

09:23  16   how much money each one of them was making -- because I don't

09:23  17   have the right to go around asking, How much are you making?

09:24  18   How much are you making?  If I start asking the manager how

09:24  19   much money are you making, that is not my job.  My job is to

09:24  20   install.

09:24  21   Q.  But he was your boss.  He gave you the work.

09:24  22   A.  All right.  According to Mr. Eddie he was my boss, but

09:24  23   there is no reason for me to know how much money he was making.

09:24  24   Q.  The only reason I'm telling him about 150 is because maybe

09:24  25   the attorney here, they should have sued me for more than a

09:24  1  hundred thousand and himself personally?

09:24  2        THE COURT:  That's not a proper question.

09:24  3  BY MR. LEIVA:

09:24  4  Q.  Oh, anyway, going back to -- so he doesn't remember his

09:24  5  boss, his direct boss.  Do you remember them?

09:25  6  A.  Now that you are mentioning them I remember them.  But for

09:25  7  me the boss, the person I communicated with, since he speaks

09:25  8  Spanish it was Mr. Eddie and the other people that are part of

09:25  9  the company.

09:25 10  Q.  Sure.  We have many, many employees.  It wasn't just

09:25 11  installers, correct?

09:25 12  A.  Correct.

09:25 13  Q.  Okay.  The question that I want to ask him -- when I hired

09:25 14  them -- when I hired you particularly, we discussed salary.

09:26 15  A.  In my country we always talk about salary.  Consequently

09:26 16  salary is a common language for me because we are from the same

09:26 17  country.

09:26 18  Q.  Correct.  I come from Chile.  He's from Chile.  And I

09:26 19  believe the other nine people that are suing me are from Chile.

09:26 20  I've known them for a long time.  So since we speak the same

09:26 21  language -- Spanish is my primary language -- you didn't

09:26 22  understand when I said that I was going to pay you a salary and

09:26 23  the salary you started with was $600 a week?

09:27 24  A.  In this country when you talk about a salary, your salary

09:27 25  is for 40 hours.  That is my understanding.

09:27  1   Q.  I've been in this country 42 years, and I was vice

09:27  2   president of information technology in New York.  So I know how

09:27  3   salaries are and what hourly employees are.  And people are

09:27  4   salary, salary employees.

09:27  5   A.  I say that he knows a lot about how to manage a company

09:28  6   then.  Then I don't understand why at the end he owed us six

09:28  7   weeks of payment.  If he was the vice president of the company,

09:28  8   he has to know that the most important thing are the employees.

09:28  9   Q.  So the issue here is not overtime.  The issue here is that

09:28 10   he claims that I owe him weeks of salary at the end when the

09:28 11   company went under?

09:28 12   A.  I am not saying that he owes me one thing or the other.

09:28 13   That's why there is a claim, and what I am claiming is in that

09:28 14   claim.

09:28 15   Q.  So what he's claiming is, what, overtime or unpaid wages or

09:29 16   both?

09:29 17   A.  The claim is there.  He can take at a look at it, and it's

09:29 18   very clear.

09:29 19   Q.  Okay.  The first check that I gave you was April 19th --

09:29 20   April 18th for $600.  Why didn't you accept this check, I mean

09:29 21   one check.  And you didn't come back to me and say, Ed,

09:29 22   something is wrong here; something is missing.

09:29 23   A.  Some time went by, several months.  Some people complained

09:30 24   because of the lack of payment of the money.  And he personally

09:30 25   told them, If you don't like it, the door is there.  You may

09:30  1    leave.

09:30  2    Q.  Who -- Question, again --

09:30  3              THE INTERPRETER:  Excuse me.  Your Honor, I would like

09:30  4    to instruct the witness to talk in the first person to keep the

09:30  5    --

09:30  6              THE COURT:  Go ahead.

09:30  7              THE INTERPRETER:  Thank you.

09:30  8    BY MR. LEIVA:

09:30  9    Q.  The question here is to you.  You said after several months

09:30  10   I have 27 installers or something like that, 27 installers.

09:30  11   Not one, not one came to me.  In 15, 14 months, not one.  In 15

09:31  12   months thousands of checks, hundreds and hundreds of checks.

09:31  13   Not one.  Nobody told me anything about overtime.  Nobody came

09:31  14   to me and complained about overtime.

09:31  15             MR. KELLY:  Objection.  Is this a question or

09:31  16   testimony?

09:31  17             MR. LEIVA:  It's a question.

09:31  18   BY MR. LEIVA:

09:31  19   Q.  Did you ever --

09:31  20             THE COURT:  Did you ever claim overtime?

09:31  21             MR. IBACACHE:  No.  I never claimed for overtime

09:31  22   because I was afraid of being fired.

09:32  23   BY MR. LEIVA:

09:32  24   Q.  You were afraid of being fired you mean?  You mean all 24

09:32  25   installers were afraid of me to being fired?  How many people

09:32   1   did I fire over there during that time?

09:32   2   A.   You, Mr. Eddie, fired in very strong terms.

09:32   3   Q.   Two -- so two installers?

09:32   4   A.   You fired Ricardo Hernandez and Marcello whose last name I

09:32   5   don't remember.

09:32   6   Q.   I remember.   Espinosa.

09:32   7   A.   Yes, Espinosa.   Besides, he had a very serious fight with

09:33   8   -- we called him Kiko out of appreciation.   Even everybody came

09:33   9   around them and crowded them because they thought there was

09:33   10  going to be a real fight.

09:33   11  Q.   Between whom?

09:33   12  A.   Mr. Kiko -- Kiko Lamonica.

09:33   13  Q.   Yeah.

09:33   14  A.   Mr. Lamonica.

09:33   15  Q.   Yeah.   What about him?

09:33   16  A.   You argued very strongly.   Even the secretaries came out to

09:33   17  look, and they were scared because they had never seen anything

09:33   18  like that in an office.   And if Mr. Eddie Leiva knew Mr.

09:33   19  Lamonica for such a long time, what else could we expect if we

09:34   20  had just met him.   We didn't know anything else here in Miami

09:34   21  -- anybody else, correction, here in Miami.   And he could send

09:34   22  us out in the street and give us a ticket on everything if we

09:34   23  wanted.

09:34   24  Q.   Okay.

09:34   25  A.   Don't you --

09:34  1  Q.  Oh, I remember that.

09:34  2  A.  Don't you --

09:34  3  Q.  Can I --

09:34  4  A.  No.  Don't you remember that?

09:34  5  Q.  Oh, of course I remember that.  I mean I remember that very

09:34  6  clearly.  See -- no, no.

09:34  7          THE INTERPRETER:  I'm sorry, Your Honor; but they --

09:34  8          MR. LEIVA:  I'm sorry.  Yes.  Go ahead.

09:34  9          THE INTERPRETER:  -- they have to give me a chance to

09:34 10  interpret.

09:34 11          MR. LEIVA:  I will.  I'm going to speak very slowly.

09:34 12  BY MR. LEIVA:

09:34 13  Q.  I've known Kiko Lamonica for --

09:34 14          THE INTERPRETER:  I'm sorry.  I need to clarify

09:34 15  something.  It's not a matter of talking slowly.  It's a matter

09:34 16  of allowing me time to --

09:34 17          MR. LEIVA:  Oh, okay.  Perfect.

09:34 18          THE INTERPRETER:  -- not talking over me.

09:34 19  BY MR. LEIVA:

09:34 20  Q.  Since he bring the subject of Kiko Lamonica, I know him for

09:35 21  55 years.  He leave.  My mother raise him.

09:35 22          THE COURT:  Well, don't tell us.  Just ask questions,

09:35 23  okay.

09:35 24          MR. LEIVA:  Well, because he's bringing him, why I had

09:35 25  a fight with him.  And the fight is a personal fight.  It had

09:35  1    nothing to do with work.

09:35  2          **THE COURT:**  Well, you can't testify, Mr. Leiva.  You

09:35  3    have to ask him -- ask him if he knows anything about that.

09:35  4    **BY MR. LEIVA:**

09:35  5    Q.  Do you know the reason for the fight?

09:35  6    A.  I didn't even dare ask him because -- that was something

09:35  7    that was very strong because supposedly they knew each other

09:35  8    for such a long time, and they shouldn't have started fighting

09:35  9    in front of every one.

09:36 10    Q.  Did I fire Kiko, Reinaldo?  No, did I fire him?

09:36 11    A.  You didn't fire him because Mr. Kiko told you, Fire me,

09:36 12    fire me again.  And then he said, Okay.  And then two people

09:36 13    separated them.

09:36 14    Q.  Okay.  I admit that I had a fight with Kiko I mean, but

09:36 15    that's a -- he's like a half-brother to me.  Now, Kiko, Kiko,

09:36 16    Kiko -- you said that Kiko before started working at 7:00 in

09:37 17    the morning, correct?

09:37 18    A.  I saw him arrive between 7:00 and 7:15.  I was not his boss

09:37 19    to know at what time he started working.  I would do my work,

09:37 20    and we would leave at -- we would leave to work at 8:00.

09:37 21    Q.  Can I show something?  Can I approach?  Do you recognize

09:37 22    the handwriting?  Whose handwriting is it?  Do you recognize

09:37 23    this handwriting here?

09:37 24    A.  No, I don't recognize it.

09:38 25    Q.  So you don't know Kiko that well I mean I guess.

09:38  1   A.  He never wrote me a letter so that I could know his

09:38  2   handwriting.  I knew him.  And when you know someone, you don't

09:38  3   ask the person, Write here.  Besides this handwriting may

09:38  4   belong to anyone.  I am not -- I don't know what the people who

09:38  5   can identify handwriting are called.

09:38  6   Q.  Let me ask him a question.  Do you see the time that he

09:38  7   started every morning here?

09:39  8   A.  I see the time at which he leaves here; but I have no proof

09:39  9   that this card belongs to him, Mr. Eddie.

09:39  10          THE INTERPRETER:  Oh, it's not working?  Okay.  Okay.

09:39  11  It's working now.

09:39  12  BY MR. LEIVA:

09:39  13  Q.  I can show you the payroll records.

09:39  14          THE INTERPRETER:  Can he go back to his seat, please.

09:39  15  Just look at these timecards.

09:39  16  BY MR. LEIVA:

09:39  17  Q.  Can you read to me and everybody in the court what does it

09:40  18  say that he started.  That's his timecard.

09:40  19  A.  This timecard shows here him leaving at 7:50.

09:40  20  Q.  No.  Entering.

09:40  21          THE INTERPRETER:  Excuse me?

09:40  22  BY MR. LEIVA:

09:40  23  Q.  He started here.  The first punch on top is when he came

09:40  24  into the place.

09:40  25  A.  Well, that's what I said.  I'm sorry.  I meant he comes in

09:40   1   at 7:50.  And what is the question?

09:40   2   Q.  The question you said before your testimony that he was

09:40   3   there at 7:00 o'clock in the morning.

09:41   4   A.  I said between 7:00 and 7:15 that I saw him arriving, and I

09:41   5   don't know what week this is.  I cannot say if he arrived at

09:41   6   7:15 this week and the other week at 7:10.  He's taking my

09:41   7   words literally that he arrived at 7:15 every day.  If he

09:41   8   arrived on a certain day at 7:20, then I'm lying because I said

09:41   9   7:15.  I don't know what you're trying to do because he arrives

09:41   10  at 7:15, 7:20.

09:41   11  Q.  Show me one thing over there in those two weeks that he

09:41   12  came at 7:20.  Do you find them?  Look.

09:42   13  A.  No.  I don't see that in these cards.  It may be a week

09:42   14  before, a week after.  Remember, you were Kiko's boss, not I.

09:42   15  I could not keep tabs on him.  Remember Mr. Kiko provided us

09:42   16  with some materials for the installation.  If we generally left

09:42   17  out to work at 8:00, he had to be there before.

09:42   18  Q.  Can I approach him again?

09:42   19  A.  Yes, yes.  No problem.

09:43   20  Q.  I'm going to go back.  Oh, holiday, paid holidays, sick

09:43   21  days, paid sick days.  I was paying sick days and holidays too.

09:43   22  I paid Kiko sick days and holidays, plenty of sick days and

09:43   23  plenty of holidays.  Now, you've got two more weeks over there.

09:43   24  A.  How many holidays did you pay me and how many sick days did

09:43   25  you pay me?  I am talking for myself.  I cannot give testimony

JURY TRIAL - VOLUME III of VI

09:43  1   of what time somebody else came in or at what time somebody

09:43  2   else left.  You were the manager of a company.  You had people

09:44  3   under you who controlled the installers.  Then you, Mr. Eddie,

09:44  4   are trying to prove that I was Kiko's boss or did I have to

09:44  5   control the time when he arrived and the time he left?  I don't

09:44  6   understand your question.

09:44  7   Q.   The question is very simple.  Your lawyer had you there as

09:44  8   a witness for a lawsuit against me.  And he claims and,

09:44  9   therefore, you claim because you're part of this lawsuit and

09:44  10  you are -- and your testimony you just said that he started at

09:44  11  7:00 and 7:15 in the morning, so either you're lying about it

09:44  12  or you don't know what you're talking about.

09:45  13  A.   I know what I am talking about and I do understand.

09:45  14  Q.   So what -- please read the timecard to me over there and

09:45  15  tell me all the time that he started in the morning again.

09:45  16  These are two different weeks.  Can he answer the question?

09:45  17  A.   I repeat again I have no proof that these cards belong to

09:45  18  Kiko.  I can read what it says here for you.

09:45  19  Q.   Just -- please, just read it.  Read the time that he came

09:45  20  in.  These are punch cards.

09:45  21       THE COURT:  He says he doesn't know; that those are

09:45  22  Kiko's timecards.

09:45  23       MR. LEIVA:  But he testified that he started at 7:00

09:45  24  o'clock in the morning.

09:45  25       THE COURT:  He says he doesn't know that.  That's not

09:45  1   what he said.

09:45  2         MR. LEIVA:  Oh, he said before and that he doesn't

09:45  3   know now that he started at 7:15 in the morning.

09:45  4         THE COURT:  You can ask him that.  Do you know what

09:46  5   time Kiko started?

09:46  6         MR. IBACACHE:  I saw him arrive at that time.  I don't

09:46  7   know what time he started working.  Now, if he punched before

09:46  8   the time, are they going to pay him the extra hours?  I don't

09:46  9   know if they paid him extra hours or not.  I did not keep

09:46  10  control of that person's time.  I don't know what his deal with

09:46  11  that person was.  That person got paid for holidays.  I didn't.

09:46  12  They were different contracts, different people.  He had a

09:46  13  manager he told he paid $150,000.  He didn't pay me that.  And

09:46  14  I was not the company manager.  I was the employee.

09:46  15  BY MR. LEIVA:

09:46  16  Q.  But you are the one bringing Kiko up.  You brought him up.

09:47  17  And I'm now showing you his timecard.  And you said before that

09:47  18  --

09:47  19        THE COURT:  You're not showing him his timecard.  He

09:47  20  says he doesn't know whose timecards those are.

09:47  21        MR. LEIVA:  I asked him that question.  The Judge does

09:47  22  not agree that --

09:47  23        THE COURT:  Do you know whose timecards those are?

09:47  24        MR. IBACACHE:  No, I don't know.

09:47  25        MR. LEIVA:  He doesn't know.

**BY MR. LEIVA:**

09:47 1

09:47 2 Q.  Read the name at the top.  What does it say?

09:47 3 A.  There it says Kiko.

09:47 4 Q.  And what does -- what time that he started there?  What

09:47 5 does it say?  Just give me one time that he started.  Read the

09:47 6 -- one day, any day in particular, whatever day you want.

09:47 7 A.  7:38.

09:47 8 Q.  7:38.  Okay.  Do you know Angeles Lamonica?

09:48 9 A.  I know her.

09:48 10 Q.  I know.  Read another day over there on the card.

09:48 11 A.  7:31.

09:48 12 Q.  And the next day?

09:48 13 A.  It seems to be 7:31, yes.

09:48 14 Q.  And the next day?

09:48 15 A.  It's written in pencil.

09:48 16 Q.  And what does it say?

09:48 17 A.  7:40.

09:48 18 Q.  And the next day?

09:48 19 A.  I'm lost here.  There is no more.

09:48 20 Q.  Four days.  And the next card with the times?

09:49 21 A.  8:00, 8:03, 8:00, 8:05.

09:49 22 Q.  He was late every day?

09:49 23 A.  Why didn't you fire him then if he was no good for you?

09:49 24 Q.  Family.  What -- but in your testimony you said that when

09:49 25 you got there, Kiko was already there.

09:49   1   A.  Exactly.  Because I arrived at that time, at 7:15.  And I

09:49   2   did not stand at the door checking at what time this person

09:50   3   arrived or the other person arrived.  I started working.  What

09:50   4   we did is we saw him.  We never looked at the watch and told

09:50   5   him, Oh, you're late.

09:50   6           Now, if you arrived to work, sometimes you arrive and

09:50   7   you punch your card.  Sometimes you forget and you punch in

09:50   8   later.  Remember that he was family and you forgave him those

09:50   9   hours if he arrived before or after.  He had holidays.  He had

09:50  10   other licenses and we didn't.  He could either be late or not

09:51  11   be late and nobody was going to tell him anything.

09:51  12   Q.  He's suing for $100,000 too I think overtime.  Wow.  I said

09:51  13   he's suing me for another hundred thousand dollars too.

09:51  14   A.  Who?

09:51  15   Q.  Kiko.

09:51  16   A.  I have not read that complaint.

09:51  17   Q.  Anyway, let me ask you really the question that you have to

09:51  18   answer me.  Who opened the building in the morning?

09:51  19   A.  I had the key to the building, and sometimes I opened; not

09:51  20   always but sometimes.

09:51  21   Q.  Question, Who was there in the morning?  Who was the first

09:51  22   person in the building in the morning?  Yes.

09:52  23   A.  Are you asking me every day, any day in particular, any

09:52  24   week?

09:52  25   Q.  Every single day.

09:52  1    A.  So as not to lie, some people arrived earlier.  Some
09:52  2    arrived later; but he was always there before 8:00.  Mr. Eddie
09:52  3    was always there before 8:00.
09:52  4    Q.  So some people arrived later than me you're saying to the
09:52  5    office?
09:52  6    A.  I don't know.  I went to work.  I was not the doorman.  I
09:53  7    insist I went to work, and I was not keeping control of who
09:53  8    arrived earlier or later.  If that had been my job, I would be
09:53  9    able to answer to you; but that was not my job.
09:53  10   Q.  Well, the answer to that is that I opened the building
09:53  11   every morning, every morning.  It's not easy.  Isn't that true?
09:53  12   A.  I also had the key to the door, and sometimes I also opened
09:53  13   the office.
09:53  14   Q.  I never find -- I never found you in the office before me,
09:53  15   never.
09:53  16   A.  I am not going to argue; but if I had the key to the
09:53  17   office, it was because I could open the door.
09:54  18   Q.  He never came before me.
09:54  19   A.  I?
09:54  20   Q.  Do you know at what time I got to the office.  Ask him
09:54  21   that, please.  Do you know what time I got to the office every
09:54  22   morning?
09:54  23   A.  I just told you that you always arrived early.
09:54  24   Q.  What time?
09:54  25   A.  Are you asking me what day it was --

| 09:54 | 1 | Q.  Always. |

**Q.**  Always.

**A.**  -- because I don't know.  I just told you always arrived in early.

**Q.**  Always, always.  And you were not there, and I got there at 7:30 every morning.

**THE INTERPRETER:**  The interpreter requests repetition of the question.  Sir?

**THE COURT:**  Don't argue with the lawyer (sic), Mr. Leiva.

**BY MR. LEIVA:**

**Q.**  I was there at 7:30.  I opened that building every morning.

**A.**  I am not going to argue with him at what time he arrived because he was my boss.  If I say one time, he would say another; and we are going to spend the whole morning like that.

**Q.**  You established before that I don't lie, and now you're saying that it's possibly a lie what I'm saying now?  I'm lying?

**THE COURT:**  No, you're not lying.  That's not proper.

**MR. LEIVA:**  Okay.

**BY MR. LEIVA:**

**Q.**  What is proper then to say is the following:  When you got your transportation to the office, who was the driver of your van?

**A.**  There were several drivers.

**Q.**  Name me one.

09:56 1   A.  Ricardo.  Sometimes I drove.  Ruben.

09:56 2   Q.  Hymen.

09:56 3   A.  One of your -- one of his nephews whose name I don't

09:56 4   remember right now.  Hymen.

09:56 5   Q.  And there were many times when not everybody was ready to

09:56 6   leave in the morning and you had to wait for that person.

09:56 7   A.  I don't believe so.

09:56 8   Q.  No?

09:56 9   A.  No.

09:56 10  Q.  Everybody was ready -- punctual you mean every single

09:56 11  morning you mean?

09:56 12  A.  I didn't say that everybody was ready.  I said that I

09:56 13  didn't believe that.

09:56 14  Q.  Well, which is the answer?  Is it yes or no?

09:57 15  A.  I don't believe so.

09:57 16  Q.  The answer is no, they were not ready?

09:57 17  A.  Okay.  No.

09:57 18  Q.  But you said that everybody got there between 7:00 and 7:15

09:57 19  in the morning.  That's your testimony.

09:57 20  A.  And I insist to that.

09:57 21  Q.  You're telling me -- you're going to tell me -- look in my

09:57 22  face that you got there at 7:00 o'clock in the morning every

09:57 23  morning?

09:57 24  A.  I didn't say every day at 7:00 a.m.  I said between 7:00

09:57 25  and 7:15.

09:57  1   Q.  Look at me again.  You're going to tell me that you got

09:57  2   there at 7:15 in the morning every morning?

09:58  3   A.  He just repeated the same question again.  Between 7:00 and

09:58  4   7:15.  It could be 7:17, 7:12.  Remember that traffic after

09:58  5   that time got very slow.

09:58  6   Q.  Okay.  Do you know Angeles Lamonica?

09:58  7   A.  Yes.  I remember the lady.

09:58  8   Q.  Okay.  And can I approach him?  Can I approach?  Here's

09:58  9   one.  I'm going to give you a lot of timecards.  That's his

09:58  10  handwriting, Angeles Lamonica.  You don't recognize the

09:58  11  handwriting, right?

09:59  12  A.  No.

09:59  13  Q.  What is in the top -- what does it say in the top of this

09:59  14  timecard, all these timecards?

09:59  15  A.  It says Angeles Lamonica.

09:59  16  Q.  Read to me the time the first day.

09:59  17         THE COURT:  We don't know where these came from, Mr.

09:59  18  Leiva.

09:59  19         MR. LEIVA:  But I have to -- I'm going to show --

09:59  20  BY MR. LEIVA:

09:59  21  Q.  What week -- what week is that it says over there?

09:59  22         THE COURT:  Unless the witness can tell us --

09:59  23  BY MR. LEIVA:

09:59  24  Q.  What week --

09:59  25         THE COURT:  -- that these cards -- that he can

09:59  1    identify these cards as this lady's cards, it doesn't matter.

09:59  2    He says he doesn't recognize her handwriting.

09:59  3         MR. LEIVA:  Your Honor, would it be okay if I show

09:59  4    Angeles Lamonica, corresponding week, and the number of hours?

09:59  5    BY MR. LEIVA:

09:59  6    Q.  Do you see the number of hours over there.  Just give me

10:00  7    the number of hours over there.  No?  I want to show him the

10:00  8    payroll book.

10:00  9         THE COURT:  You can show him whatever you want to show

10:00  10   him, but he can't testify about a document that he can't

10:00  11   identify and he doesn't know what it is.

10:00  12   BY MR. LEIVA:

10:00  13   Q.  What week is that, sir?

10:00  14   A.  I don't know.  I've never used cards.

10:00  15   Q.  Can I approach with this book?

10:00  16        THE COURT:  What's the question?

10:00  17        MR. LEIVA:  I want to establish the exact number of

10:00  18   hours in that timecard correspond to the payroll records with

10:00  19   the overtime in here.

10:00  20        THE COURT:  Well, since the payroll records are not in

10:00  21   evidence it doesn't matter.  You have to establish the

10:00  22   authenticity of these documents before someone can testify

10:01  23   about the documents.

10:01  24        MR. LEIVA:  You're saying these payroll records are

10:01  25   not in evidence you mean?

10:01  1    **THE COURT:**  I don't know anything about a payroll

10:01  2  record.  The fact that you say that it's a payroll record

10:01  3  doesn't mean anything.  I could say it's a payroll record, and

10:01  4  I know what I'm talking about.

10:01  5    **MR. LEIVA:**  I guess you're right.  The payroll records

10:01  6  are useless.  I don't know.  I mean -- so it's hearsay and they

10:01  7  said, I said.  All right.  I'm going to take those back.

10:01  8  **BY MR. LEIVA:**

10:01  9  Q.  Now, let's go back to the $600 a week.  First check, April

10:01 10  18.  And why didn't you say that overtime was missing in that

10:02 11  check?

10:02 12  A.  Because it is not paid within that.  I mean I worked 40

10:02 13  hours.  No, I don't understand.

10:02 14  Q.  I gave you a check for $600.  Why didn't you come back to

10:02 15  me and say, Eddie, this is wrong?

10:02 16  A.  I already answered that question.

10:02 17  Q.  How do you answer?  Can you repeat?

10:02 18  A.  I just answered about three minutes ago.

10:02 19  Q.  I want you to repeat the answer.

10:02 20  A.  Don't you remember what you're asking.

10:02 21  Q.  I want to repeat the question.  When I gave you the $600,

10:02 22  the first check, why didn't you come to me and say, Eddie, this

10:03 23  is not what it should be?

10:03 24  A.  I don't know.

10:03 25  Q.  And the second check?

10:03   1   A.  I don't remember.

10:03   2   Q.  You don't remember if you ever came to me.  You didn't come

10:03   3   to me once and told me anything about that check or any check

10:03   4   that I gave you?

10:03   5   A.  No.  I never went to him to tell him anything.

10:03   6   Q.  Why is that?  Why?

10:04   7   A.  Because as time went by we started getting to know him

10:04   8   better the way he was, and he was offering us to leave Florida.

10:04   9   Because you should remember that I and Eric Aguirre left

10:04   10  everything behind in New York to come and work for the company

10:04   11  here.  We only brought what we were wearing, our clothes,

10:04   12  because he told us that we didn't need anything else.  What

10:04   13  would happen if he fired me?  I didn't have money for tickets.

10:04   14  I didn't have money to rent in New York again.  When the

10:05   15  company went under, my wife fell into a depression.  She's in

10:05   16  depression -- she's depressed until now.

10:05   17  Q.  Me too.  Can you --

10:05   18  A.  It is not good to see --

10:05   19       MR. LEIVA:  Your Honor, I asked him a question about

10:05   20  the first check.

10:05   21       MR. IBACACHE:  It is not good to see your wife in bed

10:05   22  every day not able to get up.

10:05   23  BY MR. LEIVA:

10:05   24  Q.  Can I -- I know this individual since New York.  He was a

10:05   25  friend.  He talked to me about intimate -- I mean he's not a

| | | |
|---|---|---|
| 10:05 | 1 | person that was afraid of me.  Nobody was afraid of me to begin |
| 10:05 | 2 | with.  So he supine that I threatened him. |
| 10:05 | 3 | A.  Not me. |
| 10:05 | 4 | Q.  I'm asking you.  I'm asking you.  I'm asking him. |
| 10:06 | 5 | A.  10 or 15 people. |
| 10:06 | 6 | THE COURT:  Just answer the question. |
| 10:06 | 7 | MR. LEIVA:  Tell him to answer the question. |
| 10:06 | 8 | MR. IBACACHE:  And he said, Whoever doesn't like it |
| 10:06 | 9 | may leave. |
| 10:06 | 10 | BY MR. LEIVA: |
| 10:06 | 11 | Q.  And that was an issue about overtime? |
| 10:06 | 12 | A.  After you are told -- |
| 10:06 | 13 | Q.  The question, Was that an issue about overtime? |
| 10:06 | 14 | A.  After you are told if you don't like it, you may leave. |
| 10:06 | 15 | Q.  Okay. |
| 10:06 | 16 | A.  Will you have the intention to say, you know, or just even |
| 10:06 | 17 | raising your hand.  That's what I'm telling -- I'm saying.  You |
| 10:06 | 18 | couldn't make any claims or a complaint about anything that you |
| 10:07 | 19 | were being paid or the work because they were offering the |
| 10:07 | 20 | streets to you. |
| 10:07 | 21 | Q.  Look at me.  Are you saying that I threatened you? |
| 10:07 | 22 | A.  I insist.  There was a meeting.  We were over 10 people, |
| 10:07 | 23 | and you told everyone the same thing. |
| 10:07 | 24 | Q.  It was about performance.  It was nothing to do with |
| 10:07 | 25 | overtime, but -- |

10:07  1   A.   How do you take it?  I mean that you -- that you are giving

10:07  2   a complaint about your work, about what you are getting paid?

10:07  3   Q.   Okay.  We established that he never complained to me about

10:07  4   overtime once in -- he received about 70 checks.

10:08  5          THE INTERPRETER:  70, seven zero, ma'am.  70.

10:08  6   BY MR. LEIVA:

10:08  7   Q.   And if you multiply that times 24, there's a thousand

10:08  8   checks, a thousand.  And nobody came to me once, once, my

10:08  9   children, once.  And you're going to tell me that all 24

10:08  10  installers were afraid of me because they would be fired --

10:08  11  they could be fired?

10:08  12  A.   If you are being offered the streets and you don't have

10:09  13  anywhere to go, would you have the intention even to argue when

10:09  14  most of the people moved from New York down here and they

10:09  15  didn't have any acquaintances here like to be able to get

10:09  16  another job.  We depended on that job, and he knows that.

10:09  17  Q.   Who did you work -- in New York who did you work for?

10:09  18  A.   Different people.

10:09  19  Q.   Did you work for me in New York?

10:09  20  A.   Not directly.  I worked for Eric Aguirre, but I knew that

10:09  21  Eric talked to him.

10:09  22  Q.   And you never complained about your pay in New York?

10:09  23  A.   No; because I would say that my work was worth a certain

10:10  24  amount of money, and then he would accept or not.  Then why was

10:10  25  I going to complain?

APRIL 13, 2011

10:10  1   Q.  So in New York you were not afraid of me?

10:10  2   A.  I never talked to you much except for two or three minutes.

10:10  3   I didn't like spend a half an hour with you or the whole day.

10:10  4   It's not like I knew you.

10:10  5   Q.  I spent a lot of time with you in New York.  You had worked

10:10  6   for me for five months, six months?

10:10  7   A.  For how long did he stay when he went to see what we were

10:10  8   working -- where we were working?  Half an hour and he would

10:10  9   leave.  And he talked more to Eric Aguirre than to me.

10:11  10  Q.  Okay.  I'm going to change the line of questioning because

10:11  11  when I hired you originally -- we talked about this -- did you

10:11  12  ever talk to me that you were going to work 40 hours only?

10:11  13  A.  I never told him that.

10:11  14  Q.  Because I offered you a salary per week?

10:11  15  A.  No.

10:11  16  Q.  So we didn't discuss the hour.  We didn't discuss the pay

10:11  17  rate.  Did I discuss a pay rate for you like you're going to

10:11  18  make $10 an hour, $12 an hour?

10:11  19  A.  I don't remember.

10:12  20  Q.  You're suing for $102,000, and you don't remember if I

10:12  21  offered you $10 an hour or $12 an hour?

10:12  22  A.  I don't remember.  We made that deal in New York, and from

10:12  23  there we moved down here.  I don't remember how the whole

10:12  24  conversation went.

10:12  25  Q.  So he doesn't remember 40 hours.  He doesn't remember the

10:12  1    pay rate.  He doesn't remember anything whatsoever.  Okay.

10:12  2    A.  It's not like that.  I know how long I worked at that

10:12  3    company for and what time I started and what time it finished.

10:12  4    He's not telling the truth.

10:13  5    Q.  I'm not telling the truth?

10:13  6    A.  That I don't -- about the fact that I don't remember

10:13  7    anything.

10:13  8    Q.  Oh, oh, I thought you were calling me a liar here.

10:13  9    A.  No.  I cannot call a liar to someone that I appreciate and

10:13 10    I know is a straight person.

10:13 11    Q.  Let me ask you a question.  How well do you know Steve

10:13 12    Heidelberger?

10:13 13    A.  I don't know what you mean by "how well."

10:13 14    Q.  Him.  Do you know him?

10:13 15    A.  Yes, I have seen him.

10:13 16    Q.  How many times have you saw him?

10:13 17    A.  What I said in my testimony yesterday.

10:13 18    Q.  A week?  A month?  More than that?

10:13 19    A.  I didn't say that.

10:13 20    Q.  Oh, I'm sorry.

10:14 21         MR. LEIVA:  Your Honor, can I ask because I'm --

10:14 22         MR. IBACACHE:  Your memory getting bad.

10:14 23         MR. LEIVA:  Mine too.

10:14 24    BY MR. LEIVA:

10:14 25    Q.  You said one or two times a month for one or two days, so

10:14  1   maybe a total of four days?  You did?

10:14  2   A.  Yes.  Yes.  That's what I said.

10:14  3   Q.  You saw him?

10:14  4   A.  Of course.

10:14  5   Q.  Look at him.  Are you sure this is the same person?

10:14  6   A.  I am going to remind you something if you give me a second.

10:14  7   Q.  By all means.

10:14  8   A.  Remember when that gentleman -- we were outside where we

10:15  9   used to park the vans.  And he grabbed a football, an American

10:15  10  football balloon.  And he started playing with his nephew like

10:15  11  this --

10:15  12  Q.  One time.

10:15  13  A.  -- for over one hour.  And you say that I didn't see him?

10:15  14  Well, but he's saying that I don't remember him; and I am

10:15  15  saying that I did see him playing.

10:15  16  Q.  So you saw him playing once throwing a football?

10:15  17  A.  He never invited me to play with him again, so I only saw

10:15  18  him playing once.

10:15  19  Q.  Okay.  The bottom line is this:  Mr. Heidelberger was five

10:15  20  times, five, five times he was here in Florida, five times

10:16  21  during the whole duration for one or two days, five times.

10:16  22  That's it.

10:16  23  A.  If he says so, if he says five times, I have to believe

10:16  24  him; but I didn't count.

10:16  25  Q.  But you say you saw him twice a month times 15 months, and

10:16  1   that's 30 times.  He was here five times.

10:16  2   A.  I don't remember every time.  That's a person who would

10:16  3   come.  He would be here, and he would leave.  My job was to

10:16  4   work, not to --

10:16  5   Q.  Who was your boss?

10:16  6   A.  -- keep control of the people who went in and out.

10:16  7          THE INTERPRETER:  Excuse me?

10:16  8          THE COURT:  Okay.  I'm going to give you 15 more

10:17  9   minutes, Mr. Leiva, and then I'm going to withdraw the witness.

10:17 10   So speed it up.  You're being repetitious.

10:17 11   BY MR. LEIVA:

10:17 12   Q.  Who was your only boss over there?  Who gave you the work

10:17 13   every day?

10:17 14   A.  He turned in the work in a folder every day; and Mario went

10:17 15   to get it, Mario who's here.

10:17 16   Q.  Who gave you the work?

10:17 17   A.  I would have to ask Mario.  I saw these people who were in

10:17 18   the office and who came to the job site to visit us sometimes.

10:17 19   Q.  Did he know that I gave the work every morning?

10:17 20   A.  You, Mr. Eddie, is the one who was there most of the time.

10:17 21   Q.  Well, after December.  Before that was John Pisz.  But I

10:17 22   always gave you the work.  I always assigned the crew.  I, I --

10:18 23   they don't know anything about the crews.

10:18 24   A.  I believe they knew about the crews because once we had a

10:18 25   meeting with Mr. Steve, and he called us team by team.  Then he

10:18  1  knew.

10:18  2  Q.  Well, I gave them the list of the team; and that was the

10:18  3  financial meeting when I had financial difficulties at the end.

10:18  4  He helped me, tried to help me once.

10:18  5      MR. KELLY:  I just have to object to this testimony,

10:18  6  Your Honor.  He's testifying over and over again.  And that's

10:18  7  my job just to at least object for the record.

10:18  8      MR. LEIVA:  Can we -- I'm going to change it.

10:18  9  BY MR. LEIVA:

10:18  10  Q.  Do you know Luis Palma?

10:19  11  A.  More or less.  Not very well.

10:19  12  Q.  Are you aware that he stole aluminum from me?

10:19  13  A.  I don't know.

10:19  14  Q.  You are going to tell me that you didn't receive any money

10:19  15  from the proceeds of the stolen aluminum?

10:19  16  A.  I have not received any money from Mr. Palma.

10:19  17  Q.  So you don't remember when you meet with Palma at his

10:19  18  apartment to give you the money?

10:19  19  A.  I have not met with him in his apartment so that he can

10:19  20  give me money as you say.

10:19  21  Q.  I went there.

10:19  22  A.  I went there also.  You want me to remind you why we were

10:20  23  -- why we went there.

10:20  24  Q.  Absolutely.

10:20  25  A.  Mr. Eddie came with me to the apartment to remove things

10:20  1    that Mr. Palma had there.

10:20  2    Q.  And you were there, right?

10:20  3    A.  We both went.  I went to help taking the things that Palma

10:20  4    had.

10:20  5    Q.  I'm talking when you went to receive the money.

10:20  6    A.  No.  The only time that I went is with him on that

10:20  7    occasion.

10:20  8    Q.  So you don't remember?

10:20  9    A.  I don't know.  I don't remember.

10:20 10    Q.  Okay.  Page 90.  His lawyers are more formal than I am, you

10:21 11    know.  On page 90 of your deposition, line 18 -- page 80.  I'm

10:21 12    sorry.  Page 80.

10:21 13            THE INTERPRETER:  Line?

10:21 14            MR. LEIVA:  18.

10:21 15    BY MR. LEIVA:

10:21 16    Q.  Do you have it?  Question, So how are you going to prove

10:21 17    how many hours you worked a week?  The answer to that question

10:22 18    was, Possibly, possibly going to the homes or the building that

10:22 19    we work on.

10:22 20            That's your answer, right?

10:22 21    A.  That's what's written here.

10:22 22    Q.  You see what it says there, right?  That's your answer,

10:22 23    right?

10:22 24    A.  That's what's written here.

10:22 25    Q.  Okay.  Now, the question is, Do you work at Points of

10:22  1    America.  Points of America.  The building, Points of America.

10:23  2    Okay.  One of the buildings is Points of America.  Do you go to

10:23  3    that building and have any proof that you work 12 hours a day?

10:23  4            **THE INTERPRETER:**  That you worked how many hours?

10:23  5            **MR. LEIVA:**  12 hours a day or 11 hours they're

10:23  6    claiming that they worked.

10:23  7            **MR. IBACACHE:**  I went to that building, and we worked

10:23  8    very hard.

10:23  9    **BY MR. LEIVA:**

10:23  10   Q.  That's not the question.  Do you have any proof -- do you

10:23  11   go to -- do you go to the building and the building have a

10:23  12   piece of document?  It's called a log.  You signed in when you

10:23  13   went into that building, right, or Mario or whoever?

10:24  14   A.  Yes.

10:24  15   Q.  Okay.  What were the hours that you could work at that

10:24  16   building?

10:24  17   A.  We went in approximately at 8:30 or 9:00 a.m., and we had

10:24  18   to leave around 5:00 in the afternoon; but we had to be there

10:24  19   before that so that we could put the new shutters in a cart and

10:24  20   take them to the building, then take them up to the apartment.

10:24  21   And once we were done we would remove the old ones.  We would

10:24  22   go down to the -- down the building.  We would take them to the

10:25  23   truck.  And after that we returned to the company.

10:25  24   Q.  I'm not asking for a description of the job.  I'm asking

10:25  25   specifically at what time the crew start working at Points of

10:25  1    America.  That's not the question.

10:25  2    A.  If he tells me --

10:25  3    Q.  Can he answer the question?

10:25  4    A.  If he tells me that loading the materials at the company,

10:25  5    taking them -- putting them in the van, taking them to the

10:25  6    site, and then removing the material from the site, taking it

10:25  7    back to the company, if he's telling me that that is not work,

10:26  8    then we only worked the time that is posted there at the

10:26  9    building.  If that had been the work only at the building, the

10:26  10   trucks would have been left at the building.  We would have

10:26  11   taken the cars back.

10:26  12   Q.  I would like to remind them that in order for them to work

10:26  13   at Points of America, number one, I had a contract with them.

10:26  14   I had a contract that I couldn't violate where they could start

10:26  15   at 9:00 o'clock into the building, 9:00 into the building and

10:26  16   finish at 5:00 o'clock.

10:26  17   A.  Exactly.

10:26  18   Q.  Okay.  And the question -- he answered the question.  He

10:27  19   answered the question yes.  He answered the question.

10:27  20          THE INTERPRETER:  Sorry.  I can't interpret like that.

10:27  21          MR. LEIVA:  He said yes.

10:27  22   BY MR. LEIVA:

10:27  23   Q.  Is it yes or no?

10:27  24   A.  He's, Answer the question, answer the question.  He's not

10:27  25   allowing me to answer.  He's not allowing me to answer.  He

10:27  1   doesn't allow me to answer.

10:27  2   Q.  I've got another question.  Did you need a security guard

10:27  3   over there in order to go into the building.  Do you need

10:27  4   security?  I had to hire security.  They couldn't go into the

10:27  5   building or into the apartments without a security guard that I

10:27  6   had to hire, a private security person.  They were not allowed

10:27  7   in.  Do you remember the security guard?

10:27  8          THE INTERPRETER:  What's the last part of the

10:27  9   question?

10:27 10   BY MR. LEIVA:

10:28 11   Q.  The question is the security guard work from 9:00 to 5:00,

10:28 12   and they couldn't go into any unit without a security guard,

10:28 13   most of the units.  Is it true?

10:28 14   A.  It is true that he hired a security guard because the

10:28 15   building demanded that, but once a security guard finished his

10:28 16   job there he would go home.  We had to load the materials that

10:29 17   we had removed back into the truck.  And from there we had to

10:29 18   go to the company, unload all those old materials, and then we

10:29 19   finished our work.

10:29 20   Q.  They couldn't be in the building without a security guard,

10:29 21   and they had -- they usually finished before 5:00 so they could

10:29 22   clean up, and they had to be out of there.  They couldn't be by

10:29 23   themselves in those units.

10:29 24   A.  But our work did not finish at 5:00 because we had to load

10:30 25   the materials, take our things out, clean everything up, and

| 10:30 | 1 | only then we could leave. |

10:30 1 only then we could leave.

10:30 2      **THE COURT:** All right. It's now 10:30. Pursuant to

10:30 3 Rule 403 and Rule 611 of the Federal Rules of Evidence the

10:30 4 Court will withdraw this witness. You may step down, Mr.

10:30 5 Ibacache, and you're excused.

10:30 6      Who will your next witness be, Mr. Kelly?

10:30 7      **MR. KELLY:** Your Honor, I'm going to call the

10:30 8 defendant, Mr. M$^c$Carroll.

10:30 9      **THE COURT:** All right. Members of the Jury, we're

10:30 10 going to take our morning recess at this time. We'll be in

10:30 11 recess for 15 minutes. You can take the jury out, Mr. Marshal.

10:43 12      **THE MARSHAL:** All rise for the jury.

10:45 13   **(Jury Out)**

10:45 14   **(Recess)**

10:45 15      **THE LAW CLERK:** All rise.

10:45 16      **THE COURT:** All right. Bring in the jury, Mr.

10:45 17 Marshal.

10:46 18    **(Jury In)**

10:46 19      **THE COURT:** Be seated, please. Call your next

10:46 20 witness, Mr. Kelly.

10:46 21      **MR. KELLY:** Yes. I'd like to call the defendant, Mr.

10:46 22 Francis M$^c$Carroll.

10:46 23      **THE COURT:** Please raise your hand and be sworn, sir.

10:46 24      <u>**FRANCIS X. McCARROLL, DEFENDANT, SWORN.**</u>

10:46 25      **THE COURT:** Have a seat, please, and tell us your full

| 10:46 | 1 | name. |

                    **MR. M<sup>c</sup>CARROLL:**  Francis X. M<sup>c</sup>Carroll.

                    **THE COURT:**  Would you spell you last name, please.

                    **MR. M<sup>c</sup>CARROLL:**  M-<sup>c</sup>-C-a-r-r-o-l-l.

                              **DIRECT EXAMINATION**

**BY MR. KELLY:**

Q.  Good morning, Mr. M<sup>c</sup>Carroll.  Mr. M<sup>c</sup>Carroll, with respect to
the corporate defendant, Safe Hurricane Shutters, did you ever
have any ownership interest in that company?

A.  Yes, I did.

Q.  And when did you first acquire ownership in the company?

A.  Around January or February of 2006.

Q.  And did you maintain that ownership interest through the
duration of the company?

A.  Yes, sir.

Q.  And when did the company dissolve?

A.  Around August of 2007.

Q.  And during that time could you identify what your ownership
percentage was of the company?

A.  I owned 20 shares.  There were 85 shares.  And that
represented 22-and-a-half percent.

Q.  Now, did Mr. Heidelberger own a percentage as well during
that period?

A.  He owned the same amount.

Q.  Okay.  And who owned the remaining shares?

10:48  1    A.   Other people.

10:48  2    Q.   And during the duration of your ownership can you give the

10:48  3    jury a total -- an idea of the total amount of money that you

10:48  4    invested in this company?

10:48  5    A.   It was considerable.  The initial investment was $200,000.

10:48  6    And then I made loans to the corporation of about $450,000 --

10:48  7    pardon me, $400,000.

10:48  8    Q.   So would you say you invested about a total of $600,000

10:48  9    into this corporation?

10:48  10   A.   Yes.

10:48  11   Q.   Do you have any idea how much Mr. Heidelberger, the other

10:48  12   defendant, invested?

10:48  13   A.   Yes.

10:49  14   Q.   And how much total did he invest during the life of the

10:49  15   company?

10:49  16   A.   I believe Mr. Heidelberger invested approximately $400,000.

10:49  17   The initial investment was $200,000.  The remaining -- the

10:49  18   initial investment was $200,000 for each person, and the

10:49  19   additional investments were really not investments.  They were

10:49  20   loans which we never got back.

10:49  21   Q.   Do you know whether Mr. Leiva had any ownership interest in

10:49  22   this company?

10:49  23   A.   He had the same percentage as Mr. Heidelberger and myself,

10:49  24   and he also invested $200,000 initially.

10:49  25   Q.   Now, were you ever an officer or director of Safe Hurricane

10:49  1    Shutters?

10:49  2    A.  I was not an officer of the company.  I was a director.

10:49  3    Q.  Were you ever -- okay.  You were -- I'm sorry.  You were a

10:50  4    director, correct?

10:50  5    A.  Correct.  A director, not an officer.

10:50  6    Q.  Did you ever have a particular title with respect to that

10:50  7    directorship?

10:50  8    A.  I was really an absentee investor.  That's what I was.

10:50  9    Q.  Were you ever a president or vice president, anything like

10:50  10   that?

10:50  11   A.  Negative.

10:50  12         MR. KELLY:  I'd like to show to the witness what I

10:50  13   have pre-marked as Plaintiffs' Exhibit Rebuttal D.  May I

10:50  14   approach the witness, Your Honor?

10:50  15         THE COURT:  Yes, sir.

10:50  16   BY MR. KELLY:

10:51  17   Q.  Mr. M^cCarroll, do you see this business card that I just

10:51  18   handed to you?

10:51  19   A.  Yes, I do.

10:51  20   Q.  Does that business card say Advanced Hurricane Protection?

10:51  21   A.  Yes, it does.

10:51  22   Q.  Is Advanced --

10:51  23         MR. KLEPPIN:  Objection, Your Honor, to questions

10:51  24   about this exhibit or its admission into evidence.  If we could

10:51  25   have a sidebar.

10:51   1          THE COURT:  Let me see it, please.  Could I see it?

10:51   2          MR. KELLY:  Pass it to the Judge, please.  It's a

10:51   3   rebuttal, Your Honor.

10:51   4          THE COURT:  Well, you can't do rebuttal --

10:51   5          MR. KELLY:  Right.

10:51   6          THE COURT:  -- in your case.

10:51   7          MR. KELLY:  Right.

10:51   8          THE COURT:  But that's another story.  What's the

10:51   9   objection?

10:51   10          MR. KLEPPIN:  Rule 26 and not disclosed on the exhibit

10:51   11   list or throughout this case to us.

10:51   12          THE COURT:  Okay.  Sustained.

10:51   13   BY MR. KELLY:

10:51   14   Q.  So your testimony is that you were never a vice president

10:51   15   or president of this company, correct?

10:51   16   A.  Correct.

10:51   17   Q.  Did you ever hold yourself out to the public as being a

10:52   18   president or vice president?

10:52   19   A.  In terms of possibly marketing, I held myself out as being

10:52   20   a vice president but never -- I was never actually a vice

10:52   21   president.

10:52   22   Q.  So you did identify yourself --

10:52   23   A.  In terms of marketing to possible customers.

10:53   24   Q.  Have you ever -- during the life of the company did you

10:53   25   ever hire or fire any employees?

APRIL 13, 2011

10:53  1    A.  Yes, I did.  Under the direction of Mr. Leiva.

10:53  2    Q.  Who did you hire?

10:53  3    A.  I hired either four or five salesmen.  I'm not certain

10:53  4    about that, the quantity.  I let go of two installers once that

10:53  5    had worked for us for two days.  After two days we determined

10:53  6    that they were unskilled enough to work for the company so we

10:53  7    let them go, and I assisted Eddie in letting these two people

10:53  8    go.  They did not speak English, so Eddie actually did the

10:53  9    firing; but I was there as like a backup.

10:53  10        I also fired -- under Eddie's direction in every

10:53  11   situation, I let go of one of our engineers.  The other thing

10:54  12   about letting go of that engineer, it was really an economizing

10:54  13   measure.  I mean we were not making much money.  We weren't

10:54  14   making any money at all.  We had to.  We just couldn't afford

10:54  15   him.

10:54  16   Q.  Anybody else that you can identify that you hired and

10:54  17   fired?

10:54  18   A.  Not that I can remember at this time.

10:54  19   Q.  During the period in 2006 and 2007 were you ever -- were

10:54  20   you a signatory on Safe Hurricane Shutters' business account?

10:54  21   A.  Yes.

10:54  22   Q.  And you were authorized to sign checks on their behalf?

10:54  23   A.  Yes.

10:54  24   Q.  Did you ever sign any payroll checks?

10:54  25   A.  Once I signed payroll checks.  I signed about 30 checks for

10:54  1   one payroll period.

10:55  2   Q.  At any time during the business' life did you and Mr. Leiva

10:55  3   ever split any profits with any of the salespersons?

10:55  4   A.  Split any profits with the salespeople?

10:55  5   Q.  Yes.

10:55  6   A.  There were no profits.  I mean the salespeople got paid,

10:55  7   but there were no profits.

10:55  8   Q.  Did you ever split any of the funds that were -- let me ask

10:55  9   you this:  During the time that Hurricane Shutters was in

10:55  10  operation did Safe Hurricane Shutters ever get paid by any

10:55  11  clients and receive money?

10:55  12  A.  Yes.

10:55  13  Q.  Did you and Mr. Leiva ever split any of that money with any

10:55  14  of the salespersons?

10:55  15  A.  What do you split money with the salespeople?  On what

10:55  16  basis would we have split money with the sales people?  You

10:55  17  have to pay people.  If they're entitled to get paid, they

10:55  18  would get paid.

10:55  19  Q.  Did you ever take any of that money for your personal use?

10:55  20  A.  I never collected a dime from the company.  Let me say that

10:56  21  again.  I never collected any money at all from that company

10:56  22  except direct expenses.  That company owes me a tremendous

10:56  23  amount of money, and I never expect to see it.

10:56  24  Q.  So at the current time does any accounts at all for Safe

10:56  25  Hurricane Shutters have any amount of funds left at all?

10:56  1   A.  Not that I know of.

10:56  2   Q.  Did you ever -- with respect to starting up the business

10:56  3   did you ever yourself -- were you ever involved in signing any

10:56  4   leases on behalf of the corporate defendant Safe Hurricane

10:56  5   Shutters?

10:56  6   A.  I'm not certain about that.  I may have signed the initial

10:57  7   lease.  I'm not certain.  Let me rephrase that.  Okay.  I

10:57  8   signed personal guaranties for the corporation in terms of

10:57  9   Ford, with Ford Motor Company.  And when those companies --

10:57  10  those cars -- those vehicles were taken back, I had to pay the

10:57  11  difference.

10:57  12  Q.  You signed -- you say you signed guaranties, correct?

10:57  13  A.  That's right.  On two Ford vehicles.

10:57  14  Q.  Did you ever sign any other documents you can identify on

10:57  15  behalf of Safe Hurricane Shutters?

10:57  16  A.  Not that I recall at this time.

10:57  17  Q.  Did you ever sign any -- can you recall ever signing any

10:58  18  hold harmless agreements on behalf of the company along with

10:58  19  Mr. Leiva?

10:58  20  A.  Citibank.  With Citibank I guess.  I don't know.  I'd have

10:58  21  to see the agreement.

10:58  22           MR. KELLY:  I'd like to refresh the witnesses memory,

10:58  23  Your Honor.

10:58  24           THE COURT:  All right, sir.

10:58  25           MR. KELLY:  I have this marked as Rebuttal B, but I

10:58  1    won't use it for that purpose.  I'll just use it to refresh his

10:58  2    memory at this time.

10:58  3    **BY MR. KELLY:**

10:58  4    Q.  And that's -- tell me when you've had an opportunity to

10:58  5    look at the document.

10:58  6    A.  I signed this on November 9th of 2006.  This is between --

10:58  7         MR. KLEPPIN:  Just wait for the question.  I would

10:58  8    object to narrative testimony without a question.

10:58  9    **BY MR. KELLY:**

10:58  10   Q.  So have you --

10:58  11        THE COURT:  Your client's testimony.

10:58  12        MR. KLEPPIN:  Just that way of procedure.

10:58  13        THE COURT:  Okay.

10:59  14        MR. KLEPPIN:  That's all.

10:59  15        THE COURT:  All right.

10:59  16        MR. M^cCARROLL:  I had forgotten about this.

10:59  17   **BY MR. KELLY:**

10:59  18   Q.  Okay.  And so what -- well, when you -- so you did sign a

10:59  19   hold harmless agreement along with Mr. Leiva on behalf of Safe

10:59  20   Hurricane Shutters?

10:59  21   A.  Yes.

10:59  22   Q.  And what was the purpose of that?

10:59  23   A.  I forget what this gentleman's title was.  Bristol August

10:59  24   was -- he was an engineer of sorts.  And what we had to do is

10:59  25   promise him that if something went wrong, that he wouldn't --

10:59  1   and if he was sued, we would protect him.  Basically that's

10:59  2   what it is.

10:59  3   Q.  And was there some particular reason that you -- that

10:59  4   somebody needed protection from being sued that you can

10:59  5   identify?

10:59  6   A.  Because he put his name on the work orders.  I believe

10:59  7   that's true.  Okay?

11:00  8   Q.  Who put his name on the work orders?

11:00  9   A.  This guy here.  His name is Patrick Javanov, J-a-v-a-n-o-v.

11:00  10  Q.  So Patrick put his name on work orders that the plaintiffs

11:00  11  such as Mr. Feliciano and Mr. Milan would fulfill?

11:00  12  A.  Right.

11:00  13  Q.  And then you signed a hold harmless agreement --

11:00  14  A.  Just a second.

11:00  15  Q.  -- in relation to that.

11:00  16  A.  You said Mr. Milan.  I don't know Mr. Milan.  I've never

11:00  17  seen him before in my life.

11:00  18  Q.  Mr. Feliciano then?

11:00  19  A.  I know Mr. Feliciano.

11:00  20  Q.  So Mr. Javanov would sign work orders that the plaintiff

11:00  21  would fulfill, and you on behalf of the company along with Mr.

11:00  22  Leiva signed a hold harmless agreement so he wouldn't be sued

11:00  23  in relation to those work orders?

11:00  24  A.  Something like that, yes.

11:01  25  Q.  Do you know what an exempt employee is?

11:01  1   A.   No.

11:01  2   Q.   Have you ever heard of any employees being exempt from

11:01  3   overtime, salaried employees being exempt from overtime?  Have

11:01  4   you ever heard of anything like that?

11:01  5   A.   Yes.

11:01  6   Q.   Is it your testimony that Mr. Feliciano is an exempt

11:01  7   employee?

11:01  8   A.   They were hired at a specific salary for a specific week.

11:01  9   Q.   And he was to be paid for 40 hours of work?

11:01  10  A.   He was to be paid for the week's work.

11:01  11  Q.   No matter how many hours he worked?

11:02  12  A.   Pretty much so.

11:02  13  Q.   Do you know whether or not the plaintiff was trained before

11:02  14  he started working for the company to hang -- to install

11:02  15  hurricane shutters?

11:02  16        THE COURT:   Now, which plaintiff are you talking

11:02  17  about?

11:02  18        MR. KELLY:   Plaintiff Feliciano.  I'm sorry.  The only

11:02  19  -- the one he indicated he knows.

11:02  20        MR. M<sup>C</sup>CARROLL:   He would have been trained, and I

11:02  21  don't know the -- I didn't see him being trained, but he would

11:02  22  have been trained by the initial people that we hired to train

11:02  23  all of the workers to install the hurricane shutters.  I did

11:02  24  not see him being trained personally, but I would imagine he

11:02  25  was because he was a good installer.

APRIL 13, 2011

11:03  1   Q.  Do you know whether Mr. Heidelberger ever fired any

11:03  2   employees of Safe Hurricane Shutters?

11:03  3   A.  One time he and I escorted one employee out of the company

11:03  4   and let him go.

11:03  5   Q.  And who was that?

11:03  6   A.  Tom Sullivan.

11:03  7   Q.  Tom Sullivan.  Why did you and Mr. Heidelberger escort him

11:03  8   out of the building?

11:03  9   A.  Because he was not being honest with the corporation.

11:03  10  Q.  A could you explain what you mean by that?

11:03  11  A.  He was stealing.

11:03  12  Q.  So you and Mr. Heidelberger had authority to escort him out

11:03  13  of the building?

11:03  14  A.  Because we were ordered to by Mr. Leiva.

11:03  15  Q.  And how come Mr. Leiva --

11:03  16  A.  But just you find someone -- you catch someone stealing a

11:04  17  significant amount of money.  What do you do?

11:04  18  Q.  Well, how come Mr. Leiva didn't escort him out himself if

11:04  19  he was the one with the authority?

11:04  20  A.  Because he asked us to do it.

11:04  21  Q.  Did you ever decide to -- I'm not talking about fire, but

11:04  22  did you ever lay off any workers?

11:04  23  A.  One engineer was -- it was sort of a layoff/fire, whatever

11:04  24  you want to call it.  We were economizing at the time.

11:05  25  Q.  During the operation of Safe Hurricane Shutters can you

11:05  1    identify a percentage of time that you believe that you were

11:05  2    actually at the work sites or at the job in Florida here?

11:05  3    A.  Well, at the work sites we would visit the work sites every

11:05  4    now and then, Eddie and I; but in terms of myself being present

11:05  5    at the corporation, I was there 40 percent of the time or less.

11:05  6    Okay?  I lived in New York.  I still live in New York.  I would

11:05  7    fly back and forth.

11:05  8    Q.  So during the time the corporation was active from the time

11:05  9    it opened till it closed you would estimate about 40 percent of

11:05  10   the time you were there conducting -- being involved in the

11:05  11   business?

11:05  12   A.  Approximately.  40 percent of the time or less.  Ed was

11:05  13   there every single day, and he ran the business.  It was his

11:05  14   brainchild.

11:06  15   Q.  Did you ever have any input regarding any of the salaries

11:06  16   of any employees?

11:06  17   A.  Not really, no.  In other words, Eddie had set the salaries

11:06  18   up with the installers especially.  Let me give you just one

11:06  19   example of one of the salaries that I did not have any input

11:06  20   on.  It was the sales manager.  The sales manager received a

11:06  21   draw of $5,000 a week.  If I had known that, I would have

11:06  22   argued that point staunchly.  I found that out about six months

11:06  23   into the deal.  When the sales manager was not making his draw.

11:07  24   He was short on his draw.  In other words -- do you know how a

11:07  25   draw works?  A draw works -- it's an advance payment against

11:07  1    commissions.  He was not making his commissions.  To pay

11:07  2    someone $5,000 a week, that is -- that's very, very heavy and

11:07  3    especially for a start-up corporation.  That was an error.

11:07  4    Q.  So you're saying --

11:07  5    A.  So if I had known that, sir, I would have argued against

11:07  6    that.  I didn't know that.

11:07  7    Q.  So you did not have input with respect to the salesman?

11:07  8    A.  Not a great deal.  Ed ran the show.

11:07  9        MR. KELLY:  I would like to approach the witness and

11:07  10   hand him his deposition transcript.

11:08  11       THE COURT:  All right.

11:08  12   BY MR. KELLY:

11:08  13   Q.  Would you, Mr. M^cCarroll, please turn to page 21.  And when

11:08  14   you're at 21, let me know.

11:08  15   A.  I'm here.

11:08  16   Q.  Okay.  If you would please turn to or look to lines 22

11:08  17   through 25.  I'm going to read it to you and if you'll tell me

11:08  18   if this is accurate after I read it.  This is the question

11:08  19   posed to you:  So you never had any input with respect to any

11:08  20   salaries or --

11:08  21       Well, certainly I had input with the salesman's

11:08  22   salary.  I said we should pay them different.

11:08  23   A.  You're taking this out of context here.  This was after Mr.

11:08  24   Shankman had left.  Okay?  This was after Mr. Shankman had left

11:08  25   and Eddie had come to me.  This is like in January or February

APRIL 13, 2011

11:09  1   of 2007.  Eddie had come to me and said, We have to hire more

11:09  2   salesmen.  So I went out and I hired more salesmen.  And when I

11:09  3   hired more salesmen, I then changed what the draw was for these

11:09  4   salesmen.

11:09  5   Q.  So you stick by the answer you did have input regarding the

11:09  6   salary?

11:09  7   A.  Yes; towards the end but not initially in the beginning.

11:09  8   Okay?

11:09  9   Q.  Did you ever meet with any of the installers to discuss any

11:09  10  issues concerning complaints about them not being paid?

11:09  11  A.  No.

11:09  12  Q.  Did you ever intend or attempt to communicate to any of the

11:09  13  installers regarding complaints that they weren't being paid?

11:10  14  A.  No.  One time though Mr. Feliciano came up to me and asked

11:10  15  me, Could I get a raise.  I didn't have the power to give him a

11:10  16  raise.  I spoke to Eddie.  I said, Feliciano wants a raise.

11:10  17  He'd like a raise.  Eddie gave him another $200 a week, brought

11:10  18  him up to a thousand dollars.

11:10  19  Q.  And that thousand dollars was a flat salary?

11:10  20  A.  Flat salary.

11:10  21  Q.  And he got that regardless of how many hours he worked per

11:10  22  week, correct?

11:10  23  A.  Regardless of what he worked.

11:10  24  Q.  How about Mr. Heidelberger?  Do you know whether he ever

11:10  25  attempted to communicate through some translators?

11:10  1  A.  Not that I know of.

11:10  2  Q.  Regarding wages?

11:10  3  A.  Mr. Heidelberger was only there when we had employees about

11:10  4  five or six times, okay?  I wasn't there all the time.  So if

11:10  5  he had a situation where he spoke with a translator, he may

11:11  6  have done it when I wasn't there or he may have done it when I

11:11  7  was not around.  I don't remember him actually doing that.

11:11  8  Q.  Do you know whether he ever spoke with Mr. Feliciano about

11:11  9  alleged payments that were not made to any installers?

11:11 10  A.  I don't know that.

11:11 11  Q.  Do you have any independent knowledge during the life of

11:11 12  the company whether there was a period where the installers

11:11 13  were working and not being paid?

11:11 14  A.  In December of 2006, one time I had to tell the people that

11:11 15  they weren't getting paid.

11:11 16  Q.  Who did you -- you told the workers?

11:11 17  A.  I told everybody.  That was extremely difficult.

11:11 18  Q.  Did you tell them through a Spanish translator?

11:12 19  A.  They didn't need a translator.  They got it.

11:12 20  Q.  And how did they react to that?

11:12 21  A.  Mr. Feliciano came up and patted me on the shoulder.  My

11:12 22  wife told me that the other day.  I had forgotten.  I felt

11:12 23  very, very bad about that.

11:12 24  Q.  Do you have any idea why they weren't being paid?

11:12 25  A.  They didn't have the money.  We didn't have the money.

11:12  1   That's all.  What can I tell you?  That's the truth.

11:12  2   Q.  And that was December of 2006?

11:12  3   A.  I'm guessing at the actual time.  It was the end of

11:12  4   December.  I would say December, January possibly.

11:12  5   Q.  Do you believe that Mr. Feliciano continued to work for the

11:12  6   company through September of 2007?

11:12  7   A.  I really don't know when he quit.  In -- from -- in June --

11:13  8   no, pardon me.  In July through most of August, a good portion

11:13  9   of July and August I was not at the company at all.  So I don't

11:13  10  know if he worked at that period of time or not.

11:13  11  Q.  But did the installers continue to work when they weren't

11:13  12  being paid?

11:13  13  A.  I don't know if they were getting paid at all at that time.

11:13  14  I don't know if we were or not getting paid at that time in the

11:13  15  June and July, August period -- July and August period.

11:13  16  Q.  When you told them in December of 2006, do you know how

11:13  17  long a period it was?

11:13  18  A.  It was one week or so, and they got -- they eventually got

11:13  19  paid for that.  In other words, they didn't go without that pay

11:13  20  one hundred percent.  They got paid maybe three or four days

11:13  21  later or whatever it was.

11:13  22  Q.  Did you -- do you remember exactly what you told them?  Can

11:13  23  you tell the jury?

11:14  24  A.  I just told them I was very, very sorry.

11:14  25  Q.  Did any of them threaten to leave or --

11:14  1    A.  No.

11:14  2    Q.  Was there any other period other than that period in

11:14  3    December 2006 you can identify that the workers were not being

11:14  4    paid?

11:14  5    A.  No.

11:14  6    Q.  Did you talk with Mr. Heidelberger at all about that

11:14  7    December period in 2006 when the workers weren't being paid?

11:14  8    A.  I don't think I saw him in December of 2006.  I might have

11:15  9    mentioned it to him, you know, on the telephone.  He lived in

11:15 10    Colorado.

11:15 11    Q.  Do you recall Mr. Heidelberger -- what his response was

11:15 12    when he found out the workers were not being paid?

11:15 13    A.  Repeat that question, please.

11:15 14    Q.  Do you recall what Mr. Heidelberger -- how Mr. Heidelberger

11:15 15    responded to you when you explained to him that the workers

11:15 16    weren't being paid?

11:15 17    A.  I'm sure he was -- well, that one time when they weren't

11:15 18    paid I'm sure he was very upset about that also.

11:15 19    Q.  Did he have any suggestions on what to do?

11:15 20    A.  Well, one of the suggestions he had was we should raise our

11:15 21    prices.

11:15 22    Q.  So Mr. Heidelberger suggested that you raise the prices to

11:15 23    be able to meet payroll; is that correct?

11:15 24    A.  To meet our everyday expenses.

11:15 25    Q.  Was that action taken?

11:15  1    A.   No.

11:16  2    Q.   Can you identify anything in particular that was taken to

11:16  3    make sure that payroll could have been met?

11:16  4    A.   Really -- what do you mean by that?

11:16  5    Q.   You indicated that Mr. Heidelberger said, Maybe we should

11:16  6    raise prices, right?

11:16  7    A.   Yes.

11:16  8    Q.   And that was when you were talking to him about the

11:16  9    inability to pay the workers, correct?

11:16  10   A.   Right.

11:16  11   Q.   And you said that the company didn't raise prices, right?

11:16  12   A.   It did not, no.

11:16  13   Q.   Was there some other action that was taken to ensure that

11:16  14   the payroll was made?

11:16  15   A.   Just tried to be more economical in our purchases and

11:16  16   things of that nature.  That's all.

11:16  17   Q.   Did you and Mr. Heidelberger have any further meetings at

11:16  18   all regarding that issue as far as being able to make payroll?

11:16  19   A.   Well, we spoke about the fact that we weren't making money

11:16  20   quite often -- what can I tell you -- whenever we did speak.

11:17  21   Q.   Did Mr. Heidelberger provide any type of suggestions or

11:17  22   outlines of any sort, number-crunching type of information to

11:17  23   try to resolve these issues?

11:17  24   A.   He worked up something to do with the price per square foot

11:17  25   that we were paying for the aluminum and the price per square

11:17  1  foot -- you know, when I say "the aluminum," I mean the

11:17  2  shutters that we were manufacturing and putting up on the wall

11:17  3  and what we were selling for and how the two didn't match up in

11:17  4  terms of one was too low, the sale end.

11:17  5  Q.  Do you have any idea what Mr. Feliciano's schedule was on

11:17  6  Monday through Friday, the hours he worked?

11:17  7  A.  He generally got there -- they all got there around 8:30 in

11:18  8  the morning, something like that.  And they were back, you

11:18  9  know, late in the afternoon, 3:00 o'clock, 3:30, 4:00 o'clock,

11:18  10  something like that.

11:18  11  Q.  And they worked Saturday?  I'm sorry.

11:18  12  A.  And they generally worked about a half a day Saturday.

11:18  13  Q.  Could you -- since you've lumped -- you said "all of them."

11:18  14  Can you give me an idea with your testimony what you believe

11:18  15  Mr. Feliciano's average hours per week were that he worked.

11:18  16  A.  Around 35, 40 hours a week.

11:18  17  Q.  Your testimony is that he rarely ever worked, if at all,

11:18  18  overtime?

11:18  19  A.  Say that again.

11:18  20  Q.  Is your testimony then that he rarely ever worked, if at

11:18  21  all, over 40 hours in one week?

11:18  22  A.  Well, there were a lot of weeks he couldn't work, okay?  He

11:18  23  couldn't work because of high winds.  In August of -- late

11:18  24  August of 2006 there were a couple of days that we didn't work

11:19  25  at all.  Nobody worked because of this Hurricane Ernesto that

11:19   1   came through.  Okay?  He got paid for those days and so did

11:19   2   everybody else.  The offices were closed on those days.  Okay?

11:19   3   If there were high winds -- he worked a lot of times at Points

11:19   4   of America.  If there were high winds, he couldn't be up there.

11:19   5   You can't hold a piece of equipment spread out to be 20 feet

11:19   6   long and was 8 or 9 feet high, whatever it was, right, in, you

11:19   7   know, 25 knot winds.  You just can't do it.

11:19   8   Q.  Can you -- do you have any independent recollection at all

11:19   9   of any instances when Mr. Feliciano and the other workers did

11:19   10  work more than 40 hours one week?

11:19   11  A.  Occasionally they came in at 5:00/5:30 but not that often.

11:19   12  Q.  What's the most hours in one week that you can recall the

11:19   13  workers worked?

11:19   14  A.  I really don't know.  I can't give you an honest answer on

11:20   15  that.  First of all, I wasn't there all the time.  Some weeks

11:20   16  they might have worked more.  Some weeks they might have worked

11:20   17  less.  Okay?

11:20   18  Q.  I just want to be clear for the record.  So your -- is your

11:20   19  testimony that you couldn't tell me the specific hours that Mr.

11:20   20  Feliciano, Mr. Milan, the Lamonicas and the Alborezes worked

11:20   21  during their employment?

11:20   22  A.  They worked in the neighborhood of 35 to 40 hours a week,

11:20   23  maybe less.

11:20   24  Q.  The company kept time records to keep track of their hours?

11:20   25  A.  Well, I know the factory workers and the office workers

11:20   1   punched in and out.  The installers did not.

11:20   2   Q.  The installers did not punch?

11:20   3   A.  In and out.

11:21   4         MR. KELLY:  I'd like to show the plaintiff -- I'm

11:21   5   sorry -- the defendant what's pre-marked as Plaintiffs' Exhibit

11:21   6   Number 24.

11:21   7         THE COURT:  All right.

11:21   8   BY MR. KELLY:

11:21   9   Q.  Are these the type of timecards when Safe Hurricane

11:21  10   Shutters used timecards that they used?  Is this the type that

11:21  11   they used?

11:21  12   A.  I never -- first of all, I think they used a clock.  And

11:21  13   this is all handwritten, so I don't know if this is true or

11:21  14   not.

11:21  15   Q.  Do you know Julio Alborez and Guillermo Alborez are?

11:21  16   A.  Absolutely not.  I really don't know these two guys.  I

11:21  17   don't know who they are.

11:21  18   Q.  So looking at this document here you couldn't tell me

11:22  19   whether this is even a timecard from Safe Hurricane Shutters?

11:22  20   Is that what you're telling me?

11:22  21   A.  Right.  I notice it's all in Spanish too.

11:22  22         MR. KELLY:  May I approach the witness?  I'm going to

11:22  23   get the exhibit back since he doesn't know what this is.

11:22  24         MR. M^cCARROLL:  Can I just --

11:22  25         MR. KELLY:  Sure.

11:22   1          **MR. M^cCARROLL:**  I'm looking -- I'm just looking at

11:22   2   Saturday.  It says here that he came here at 8:00 o'clock and

11:22   3   never left.

11:22   4   **BY MR. KELLY:**

11:22   5   Q.  Okay.  And I -- since you opened the door on that I wanted

11:22   6   to ask you.  You see Salbado (ph) there and you see 8:00

11:22   7   o'clock.  Do you see an end time?

11:22   8   A.  No end time.

11:22   9   Q.  So if this is a punch card or a timecard from Safe

11:22   10  Hurricane Shutters, how is the jury supposed to know how many

11:22   11  hours he worked on Saturday?

11:22   12  A.  I don't know that this is a punch card from Safe Hurricane

11:23   13  because this is all written by these two individuals

11:23   14  apparently.  Okay?  And it's all written -- every word is in

11:23   15  Spanish.  All the weekdays are in Spanish.

11:23   16         **MR. KLEPPIN:**  Objection to any further speculation

11:23   17  about this document from this witness, Your Honor.

11:23   18         **THE COURT:**  Sustained.

11:23   19  **BY MR. KELLY:**

11:23   20  Q.  Do you feel that Safe Hurricane Shutters was under any type

11:23   21  of obligation to keep accurate time regards of the workers, the

11:23   22  installers, the hours they worked?

11:23   23  A.  Do I feel --

11:23   24  Q.  Do you believe or --

11:23   25  A.  Do I feel or believe it was our responsibility?

11:23  1   Q.   Yes.

11:23  2   A.   These people were paid on a salary basis.  All my life I've

11:23  3   worked in positions where I was a salary man.  One of the first

11:24  4   jobs I ever had as a salary man was I was a data processing

11:24  5   manager in a small corporation.  I was there from 10:00 o'clock

11:24  6   in the morning to 1:00 o'clock in the morning.  And I only got

11:24  7   paid my straight time, my salary, whatever that was.  And the

11:24  8   president of that company didn't care how many hours I worked,

11:24  9   but I had to get that job done.  And what was I making at that

11:24  10  time?  I was making about $10,000 a year.  He didn't care.  In

11:24  11  other words, it was -- we were there to do a specific job.

11:24  12  Okay?  What time you came in the morning, what time you left,

11:24  13  that was your business.  Okay?  You just had to get that job

11:24  14  done, and I was a salaried worker.  I was about 24 years old at

11:24  15  the time.

11:24  16  Q.   What was your job there again?  I'm sorry.

11:24  17  A.   I was a data processing manager in a small IBM account.

11:24  18  Q.   So you were a manager, right?

11:25  19  A.   Yes.

11:25  20  Q.   These guys weren't managers, were they, these installers?

11:25  21  A.   Were they managers?

11:25  22  Q.   No.

11:25  23  A.   Didn't they manage each little crew?  Wasn't Feliciano --

11:25  24  wasn't he a manager of his little crew?

11:25  25  Q.   Was he a manager or installer?

11:25  1   A.   A manager/installer.  He ran his crew.

11:25  2   Q.   Do you know -- because you brought this up I just want to

11:25  3   ask.  Do you know -- do you have a -- can you explain what you

11:25  4   believe the difference between an exempt and a nonexempt worker

11:25  5   is.

11:25  6   A.   What are you talking about?  Exempt from being an hourly

11:25  7   worker or a wage worker?

11:25  8   Q.   Yes.

11:25  9   A.   The difference is?

11:25  10  Q.   Right.

11:25  11  A.   What's really stated in the beginning.  I'm going to be

11:25  12  working for $7.85 an hour.  You're going to get $800 a week.

11:25  13  That's the difference.

11:26  14  Q.   But all these installers were paid salaries, right?

11:26  15  A.   Yes.

11:26  16  Q.   So there's really no difference in the pay system between

11:26  17  Mr. Feliciano and the other installers.  They're all paid a

11:26  18  salary, right?

11:26  19  A.   They're all paid a salary, and they all agreed to that.

11:26  20  Q.   Do you think that an employee and employer can make an

11:26  21  agreement even if it isn't legal?

11:26  22  A.   Why wouldn't it be legal?

11:26  23  Q.   I'm just asking you if the law says something, do you

11:26  24  believe that an employer and --

11:26  25  A.   No, no.

11:26  1    Q.  -- employee an make an agreement?

11:26  2    A.  It has to be -- it has to be within the law.  I mean your

11:26  3    company alone is advertising right now for an attorney.  And

11:26  4    they say it's 60-plus hours a week, and the salary range is

11:26  5    between 50 and $55,000.  Your firm alone.  So is that an

11:26  6    agreement that you're making with a guy, some guy who's going

11:26  7    to come and ask you for a job?

11:27  8    Q.  I'm sorry to say I can't get overtime.

11:27  9    A.  Neither can I.

11:27  10   Q.  I wish I could.  Do you know what job the Lamonicas were --

11:27  11   what jobs they performed?

11:27  12   A.  Angeles worked in the office.  Okay?

11:27  13   Q.  Okay.

11:27  14   A.  And she did some clerical work.  And Kiko, he was sort of a

11:27  15   gopher.  He did this and that.  He would pick me up at the

11:27  16   airport sometimes, things of that nature.

11:27  17   Q.  Kiko.  You mean Reinaldo, correct?

11:28  18   A.  That's correct.  Reinaldo Lamonica.

11:28  19   Q.  Did Reinaldo get a salary as well?

11:28  20   A.  I don't know how he got paid.

11:28  21        MR. KELLY:  I'd like to approach the witness with

11:28  22   what's pre-marked as Plaintiffs' Exhibit 7.

11:28  23        THE COURT:  All right, sir.

11:28  24   BY MR. KELLY:

11:28  25   Q.  If you'll look at the first page there, do you see the name

11:28  1    Reinaldo Lamonica on the document?

11:28  2    A.  Yes.

11:28  3    Q.  Okay.  And you know who Reinaldo Lamonica is, correct?

11:28  4    A.  Yes.

11:28  5    Q.  And is this an earning statement from Safe Hurricane

11:29  6    Shutters, Incorporated?

11:29  7    A.  Sure does look like one.

11:29  8    Q.  Do you have any reason to believe that this is not an

11:29  9    accurate earning statement from Safe Hurricane Shutters,

11:29  10   Incorporated, the defendant?

11:29  11   A.  No.

11:29  12        MR. KELLY:  I'd like to move this into evidence as

11:29  13   Plaintiffs' Exhibit 7?

11:29  14        MR. KLEPPIN:  Objection, Your Honor.

11:29  15        THE COURT:  What's the objection?

11:29  16        MR. KLEPPIN:  Rules 401, 402, and 403.

11:29  17        THE COURT:  Well, that doesn't tell me anything.

11:29  18   What's the objection?

11:29  19        MR. KLEPPIN:  Well, with respect to the Lamonicas this

11:29  20   witness doesn't know anything about the Lamonicas' pay, number

11:29  21   one.  Number two, they're not here to prosecute their claims.

11:29  22   This witness doesn't know what hours that they worked, and so I

11:29  23   don't think that this is an exhibit that ought to be coming

11:29  24   into evidence.

11:29  25        THE COURT:  Can I see it, please?  That objection will

11:30  1    be sustained.

11:30  2    **BY MR. KELLY:**

11:30  3    Q.   Do you know whether -- if Reinaldo Lamonica -- if he worked

11:30  4    more than 40 hours in one week whether he was paid overtime

11:30  5    pay?

11:30  6    A.   I don't know one way or the other.

11:30  7         MR. KELLY:   Next I'd like to attempt to get into --

11:30  8    well, can I give the witness what's pre-marked as Plaintiffs'

11:30  9    Exhibit 10?

11:30 10         THE COURT:   You may.

11:30 11    **BY MR. KELLY:**

11:30 12    Q.   You know who Angeles Lamonica is, correct?

11:31 13    A.   That was Reinaldo's wife.

11:31 14    Q.   Okay.  What was her position there at Safe Hurricane

11:31 15    Shutters?

11:31 16    A.   She worked in the office.

11:31 17    Q.   And do you know what her schedule was, what days of the

11:31 18    week she worked?

11:31 19    A.   I believe it was five days a week.

11:31 20    Q.   And do you know how much she was paid, what her pay rate

11:31 21    was?

11:31 22    A.   I don't know.  Just looking at these checks, each check is

11:31 23    $600, $600.

11:31 24         MR. KLEPPIN:   I just ask that the witness not read

11:31 25    from an exhibit that's not admitted into evidence.

11:31  1          THE COURT:  Okay.  Sustained.

11:31  2          MR. M^cCARROLL:  So I don't know what she made other

11:31  3  than the fact that these are the checks, her checks.

11:31  4  BY MR. KELLY:

11:31  5  Q.  Would you agree though that this is a copy of a check from

11:31  6  Hurricane Shutters, Incorporated., Safe Hurricane Shutters to

11:31  7  Angeles Lamonica dated August 25th, 2007?

11:32  8          MR. KLEPPIN:  Objection, Your Honor; authenticity and

11:32  9  predicate.

11:32 10          THE COURT:  Sustained.

11:32 11          MR. KLEPPIN:  This witness has no idea about this

11:32 12  document.

11:32 13          MR. KELLY:  He can answer if he knew.

11:32 14          THE COURT:  Next question.

11:32 15  BY MR. KELLY:

11:32 16  Q.  So do you know whether any time in 2007 Ms. Angeles

11:32 17  Lamonica whether she was given checks that bounced?

11:32 18  A.  She may have been.

11:32 19  Q.  What makes you say that she may have been?

11:32 20  A.  I guess those checks --

11:32 21          MR. KLEPPIN:  Objection, Your Honor, with respect to

11:32 22  relevance with any checks that went to Angeles Lamonica that

11:32 23  might have bounced.

11:32 24          THE COURT:  Sustained.

11:32 25  BY MR. KELLY:

11:32    1    Q.  Just to clarify for the record previously you discussed or

11:32    2    you testified that workers weren't paid in 2006 in December,

11:33    3    correct?

11:33    4          MR. KLEPPIN:  Objection; mischaracterization of his

11:33    5    testimony.

11:33    6          THE COURT:  Overruled.

11:33    7          MR. M<sup>c</sup>CARROLL:  Let me state, the time that I told the

11:33    8    workers that they weren't getting paid they were eventually

11:33    9    paid, okay, within a week or so.

11:33   10    BY MR. KELLY:

11:33   11    Q.  Was there ever a time after that in 2007?

11:33   12    A.  Not that I know of, no.

11:33   13    Q.  Prior to this lawsuit being filed, let's say two to --

11:33   14    let's say three years, from a period of three years prior to

11:34   15    this lawsuit being filed are you yourself personally aware that

11:34   16    there are laws that require payment of overtime and minimum

11:34   17    wages to some workers in Florida?

11:34   18    A.  No.

11:34   19    Q.  So when did you first -- if you can think back, when is the

11:34   20    first time you heard about minimum wages in your lifetime?

11:34   21    A.  When I was about 16 years old and I was making 85 cents an

11:34   22    hour because that was the minimum wage at that time.

11:34   23    Q.  So prior to this lawsuit you were aware that there were

11:34   24    laws in the United States that required minimum wages to be

11:34   25    paid?

11:34  1   A.   Absolutely.

11:34  2   Q.   And you were also aware that there were laws that require

11:34  3   under certain circumstances overtime to be paid, correct --

11:34  4   A.   Yes.

11:34  5   Q.   -- for time and a half?

11:34  6   A.   Yes.

11:34  7   Q.   Any time prior to this lawsuit can you identify any actions

11:34  8   that you took or Mr. Leiva or Mr. Heidelberger or anybody else

11:35  9   in Safe Hurricane Shutters took to verify that you were paying

11:35  10  the workers in accordance with the overtime and minimum wage

11:35  11  loss?

11:35  12          MR. KLEPPIN:  Objection with respect to Count 9.

11:35  13          THE COURT:  Sustained.

11:35  14          MR. KELLY:  What?

11:35  15          MR. KLEPPIN:  It needs to be broken up, that question.

11:35  16          MR. KELLY:  Okay.

11:35  17  BY MR. KELLY:

11:35  18  Q.   Did you yourself at any time prior to this lawsuit contact

11:35  19  anybody outside the company to verify -- to determine whether

11:35  20  or not the company was complying with overtime and minimum wage

11:35  21  laws?

11:35  22  A.   No.

11:35  23  Q.   Did anybody else at the company make some type of that

11:35  24  contact --

11:35  25          MR. KLEPPIN:  Objection.

APRIL 13, 2011

11:35  1  **BY MR. KELLY:**

11:35  2  Q.  -- that you're aware of.

11:35  3          **MR. KLEPPIN:**  Objection.

11:35  4          **THE COURT:**  Overruled.

11:35  5          **MR. McCARROLL:**  I don't know if anyone did.

11:36  6          **MR. KELLY:**  Your Honor, can I quickly confer with my

11:36  7  client?

11:36  8          **THE COURT:**  Yes, sir.

11:36  9          **MR. KELLY:**  Thank you.

11:37  10      (Plaintiffs' Counsel and plaintiff confer sotto voce.)

11:37  11  **BY MR. KELLY:**

11:37  12  Q.  With respect to the workers I just want to lead into

11:37  13  another question.  I want to ask you what time is it your

11:37  14  testimony that the workers normally returned after work?  What

11:37  15  was quitting time?

11:37  16          **MR. KLEPPIN:**  Objection, Your Honor.  It's been asked

11:37  17  and answered.

11:37  18          **MR. KELLY:**  I'm laying a foundation --

11:37  19          **THE COURT:**  Overruled.

11:37  20          **MR. KELLY:**  -- to go with my next question.

11:37  21          **MR. McCARROLL:**  They generally got back around 3:30 or

11:37  22  so.

11:37  23          **MR. KELLY:**  Okay.

11:37  24          **MR. McCARROLL:**  Sometimes they got back a little

11:37  25  later.  On other days they would get back maybe at 5:30, at

11:37 1  5:00/5:30.  Not always at 3:30, but very often because of

11:37 2  weather or conditions or whatever it was; or, sometimes they

11:37 3  would finish a job.  In other words, if the workers were out

11:37 4  there and they completed the job, let's say 2:00 o'clock in the

11:37 5  afternoon or something of that nature, they couldn't start

11:37 6  another job so they would come back to the office.

11:37 7  **BY MR. KELLY:**

11:37 8  Q.  Were there any times that the jobs themselves dictated when

11:38 9  they were to return?  For example, the job would close at 5:00

11:38 10  o'clock, one of the buildings?

11:38 11  A.  Well, yes.

11:38 12  Q.  Which buildings were they?

11:38 13  A.  The two major buildings that we did, and they would clean

11:38 14  up the job site.  They would have to clean up the job site and

11:38 15  be out of the building before whatever time it was they had to

11:38 16  be out, maybe 5:00 o'clock or whatever it was.  So they would

11:38 17  begin to leave earlier than that.

11:38 18  Q.  So two major buildings.  What were those two major

11:38 19  buildings?

11:38 20  A.  Points of America which is right at the entrance to Ft.

11:38 21  Lauderdale Harbor and Marine Tower which is on Las Olas

11:38 22  Boulevard.

11:38 23  Q.  Those were the two major -- would you say the most major

11:38 24  projects at the company?

11:38 25  A.  They were two very big projects, yes.

11:38  1  Q.  How long did those go on for?

11:38  2  A.  I can't give a specific but a good period of time, months.

11:39  3  Q.  A year?  At least a year?

11:39  4  A.  Ed would know the answer to that better, how long we spent

11:39  5  at these places.  I know we -- it was months, maybe four or

11:39  6  five months.

11:39  7  Q.  So would those -- would the workers normally leave those

11:39  8  jobs around 5:00?

11:39  9  A.  They would leave before then sometimes because of wind

11:39 10  conditions, rain.  Okay?  Sometimes we would go to the job

11:39 11  sites at night and they wouldn't be there.  We would have

11:39 12  trouble finding them.

11:39 13  Q.  What time would that be?

11:39 14  A.  That could be in the afternoon.

11:39 15  Q.  You say under normal.  You mentioned wind and rain.  But

11:39 16  under normal circumstances would they be there till about 5:00?

11:39 17  A.  They would leave at 5:00.  They would be -- they'd be all

11:39 18  packed up and they would leave at 5:00.

11:39 19  Q.  And then they would have to go -- where would they go after

11:39 20  they left?

11:39 21  A.  They would go to the office.

11:39 22  Q.  And when they got to the office, what did they have to do

11:39 23  there?

11:39 24  A.  Not much.  They just bugged out.  They parked the trucks

11:40 25  and left.

| | | |
|---|---|---|
| 11:40 | 1 | Q.  They had to go to park the trucks? |
| 11:40 | 2 | A.  We brought the trucks in the building. |
| 11:40 | 3 | Q.  Any unloading? |
| 11:40 | 4 | A.  Not much. |
| 11:40 | 5 | Q.  So what time did they -- |
| 11:40 | 6 | A.  In fact -- in fact, that was one of the things that I |
| 11:40 | 7 | always wanted to see changed.  They should have prepared the |
| 11:40 | 8 | trucks for the next day, and they never did. |
| 11:40 | 9 | Q.  What time did they normally then leave the building, the |
| 11:40 | 10 | office? |
| 11:40 | 11 | A.  Around 4:30 a lot of times. |
| 11:40 | 12 | Q.  But if they -- |
| 11:40 | 13 | A.  If they had left at 5:00, well, you know, they would leave |
| 11:40 | 14 | the -- you know, they would get back, park the truck, and |
| 11:40 | 15 | leave. |
| 11:40 | 16 | Q.  If they left -- |
| 11:40 | 17 | A.  They would leave -- let's say they left the job site at, |
| 11:40 | 18 | you know, 4:30 or 5:00 o'clock or something of this nature. |
| 11:40 | 19 | They would get back.  It would take them half an hour or so to |
| 11:40 | 20 | get back to the office.  They would park the truck and leave. |
| 11:40 | 21 | Q.  So what would you estimate that they would be leaving then |
| 11:40 | 22 | if they left the job site at 5:00?  What time would they drop |
| 11:40 | 23 | the stuff off and go home?  6:00? |
| 11:40 | 24 | A.  No.  It would be very shortly after that.  Very often they |
| 11:41 | 25 | were back here at 3:30, very often, especially when they had |

11:41  1   jobs out in the field.

11:42  2          MR. KELLY:  Okay.  I don't have anything further at

11:42  3   this time.  Thank you, Mr. M\(^c\)Carroll.

11:42  4          THE COURT:  Cross-examination.

11:42  5                    CROSS-EXAMINATION

11:42  6   BY MR. KLEPPIN:

11:42  7   Q.  Good afternoon, Mr. M\(^c\)Carroll.

11:42  8   A.  Good afternoon.

11:42  9   Q.  Who had keys to the shop or office, whatever it should be

11:42  10  characterized as, at Safe Hurricane Shutters?

11:42  11  A.  I had a key.  Eddie had a key, and possibly one or two

11:42  12  other people.  I don't know who.

11:42  13  Q.  When do you remember Mr. -- well, when would you arrive at

11:42  14  the office when you were here?

11:42  15  A.  Generally before 8:00 o'clock.

11:42  16  Q.  When would Mr. Lamonica get there?

11:42  17  A.  He would get there between 8:00 and 8:30 a lot of times.

11:43  18  Q.  When did the -- when would the crews get there?

11:43  19  A.  They got there about -- between 8:30 and 9:00.

11:43  20  Q.  You had discussed with -- when Mr. Kelly was asking you

11:43  21  some questions about payroll checks that I think you said you

11:43  22  signed one time.

11:43  23  A.  I signed payroll checks once.

11:43  24  Q.  But my question to you is:  Just explain -- well, first of

11:43  25  all, who would typically sign the payroll checks if you know?

11:43  1  A.  The payroll checks were typically signed by the controller.

11:43  2  His name was Brad Bungo.  When he left the company, there was

11:43  3  another gentleman by the name of Keith Lares; and he would sign

11:43  4  the checks.

11:43  5  Q.  Why was it that for whatever reason this one time that you

11:43  6  signed the payroll checks, what were the circumstances that

11:43  7  presented you to sign the checks that week?

11:43  8  A.  Because the checks had not been signed.  It was payday, and

11:43  9  neither one of those two people were there.  I signed the

11:44 10  checks.

11:44 11  Q.  With respect to the shutters that you were describing were

11:44 12  these made of metal?

11:44 13  A.  They were made of aluminum.

11:44 14  Q.  And with respect to their installation were they installed

11:44 15  using electric drills drilling into concrete?

11:44 16  A.  Yes.  It was a very, very noisy job; and they would drill

11:44 17  into the concrete.  And that's why these people at these

11:44 18  condominiums didn't want to hear all that noise at night.  Get

11:44 19  these guys out of here.  We don't want to hear this stuff.

11:44 20  Q.  During the location of Safe Hurricane Shutters in south --

11:44 21  Safe Hurricane Shutters was open for business from

11:44 22  approximately May of '06 to August of '07; is that fair?

11:44 23  A.  That's fair to say.

11:44 24  Q.  During that time how many locations did Safe Hurricane

11:44 25  Shutters have, physical locations?

11:45  1   A.  Just one location at a time.

11:45  2   Q.  Okay.  One location at a time, but did that location change

11:45  3   at all?

11:45  4   A.  At the end it changed.

11:45  5   Q.  How many times?

11:45  6   A.  I think it changed twice after that.  Again, I wasn't

11:45  7   really there in August; and that's when it was changing.

11:45  8   Q.  My question to you is did you have any involvement

11:45  9   whatsoever in the location change -- the two location changes

11:45  10  that you've identified concerning the company?

11:45  11  A.  I didn't know where the buildings were.  I had to -- I went

11:45  12  to the office and it was gone sort of.  That's a little

11:45  13  exaggeration.  I'm sorry.  But I didn't know where --

11:45  14  Q.  The business was gone I think you meant?

11:45  15  A.  The business was sort of gone.

11:45  16  Q.  In terms -- did you even know --

11:45  17  A.  I didn't know that they were going to --

11:45  18  Q.  -- that Safe --

11:45  19  A.  We were put out of the place because of the fact that we

11:45  20  hadn't been paying the rent.  The rent was extremely high.  It

11:45  21  was $22,000 a month.

11:45  22  Q.  How many -- what sort of square footage was this?

11:45  23  A.  It about 22,000 square feet.

11:46  24  Q.  And just to try --

11:46  25  A.  26.

11:46  1   Q.   -- to describe these premises to the jury, there's offices

11:46  2   and a warehouse and what else?  Just describe it for them.

11:46  3   A.   It was offices and mainly a warehouse space with a number

11:46  4   of bay doors.  And we could not leave the trucks outside at

11:46  5   night because it was too dangerous.  They would be ransacked

11:46  6   every night.  And to unload the trucks and re-load them in the

11:46  7   morning with the tools, the trucks were not covered and they

11:46  8   were open Ford trucks, the tools would have all disappeared.

11:46  9   And it saved them time not having to do that, so we pulled the

11:46 10  trucks into the building.

11:46 11  Q.   With respect to installers working do you have a personal

11:46 12  recollection of the weather being so bad in certain areas in

11:46 13  south Florida that certain crews might not work at all on a

11:47 14  particular day?  They might not even go out to the site at all.

11:47 15  A.   That would happen occasionally.  That would happen

11:47 16  occasionally.  Under very bad rainy conditions, they would not

11:47 17  go out because you can't lay an extension cord out and have it

11:47 18  plugged in the wall and what have you.  That's just too

11:47 19  dangerous.

11:47 20  Q.   Were there times that weather necessitated crews to come

11:47 21  back to the shop even before noon?

11:47 22  A.   Occasionally.  One time Eddie and I went to a job.  It was

11:47 23  blowing 35 knots.  It was just a job at a residential house,

11:47 24  and it wasn't going to stop.  So everybody just came back to

11:47 25  the shop and, you know, they still got paid for the day.

11:47  1   Q.   Now, when you gave your average to Mr. Kelly, the average

11:47  2   time of when you recall these installers working, 8:30 to 9:00,

11:47  3   approximately 3:30 in the afternoon on average, does your

11:48  4   average take into account that sometimes they would stop

11:48  5   working as early as you've described and sometimes they'd stop

11:48  6   working as late as you've described, as late as 5:30 sometimes?

11:48  7   A.   Well, that's -- exactly what he's saying is true.  Okay?

11:48  8   Sometimes because of the weather, because of the weather

11:48  9   conditions, because of rain and lightening, you know, they

11:48  10  would have to quit.  It would be too dangerous to work.  Okay?

11:48  11  Other times did they work a little later?  Yes, they did.  In

11:48  12  other words, if they were almost finished with the job and they

11:48  13  were out on the job and it was a beautiful day, they would stay

11:48  14  maybe a little later sometimes and finish the job so they

11:48  15  didn't have to go back the next morning.

11:48  16  Q.   And is the testimony that you've just described when

11:48  17  they're at those locations where perhaps the building that

11:48  18  they're working at doesn't require them to depart the premises

11:48  19  by a certain time?

11:48  20  A.   Yes.  In all those situations really.  In other words, when

11:49  21  the building said to leave, you had to leave.  You had to be

11:49  22  out of the building, completely out of the building.  There was

11:49  23  no clean-up at that time.  You had to be completely out.

11:49  24  Q.   Was it out of the building or off the premises?

11:49  25  A.   Out of the building and off the premises, yeah.

11:49  1    Q.   You described your ownership with respect to Safe Hurricane

11:49  2    Shutters as a minority shareholder/director/nonofficer

11:49  3    position; is that true?

11:49  4    A.   That is true.  I own 20 shares which represented

11:49  5    22-and-a-half percent along with Ed and Steve.  They both own

11:49  6    20 shares.  The remaining 15 shares to bring it up to 85

11:49  7    shares, a total of 85 shares were issued, were owned by three

11:49  8    other people.

11:49  9    Q.   Did the minority ownership that you owned, did that give

11:50  10   you the authority to tell the president and CEO Ed Leiva what

11:50  11   to do or what not to do when he was operating the company?

11:50  12   A.   It gave me no authority.  Really it did not.  Ed ran the

11:50  13   company.  We gave Ed money to spend.  He spent it at his

11:50  14   discretion.  We felt that he spent it to the best of his

11:50  15   ability, and he -- the end result is the answer.

11:50  16   Q.   If we add your minority interest to Mr. Heidelberger's

11:50  17   minority interest and come up with around 45/46 percent

11:50  18   ownership interest in the company, whatever that would be, did

11:50  19   that give the two of you as a duo or combined the authority to

11:50  20   tell Ed Leiva --

11:50  21   A.   No.

11:50  22   Q.   -- the president and CEO how to operate the business?

11:50  23   A.   We gave Ed autonomy too.  He was allowed to do whatever he

11:50  24   wanted to.  He was the boss.  It was his idea to begin with.

11:51  25   And we said, Ed, go make us some money.

11:51  1   Q.   Would trumping Ed Leiva's day-to-day operational control of

11:51  2   the company require a majority of the board?

11:51  3   A.   Yes.  We would have had to have had a board meeting with

11:51  4   all the other members.

11:51  5   Q.   Did you -- Mr. Kelly elicited from you some pretty specific

11:51  6   financial -- amounts of money that you gave to this company to

11:51  7   invest and then later to loan.  Did you ever tell Eddie Leiva

11:51  8   how to invest that money?

11:51  9   A.   Ed Leiva invested the money as he saw fit.

11:51  10  Q.   Did you --

11:51  11  A.   And we allowed him to do that.

11:51  12  Q.   In fact, was that his job?

11:51  13  A.   That was his job.  Correct.

11:51  14  Q.   Did you ever submit any -- okay.  Let's just move beyond Ed

11:51  15  Leiva for a moment.  Did you ever instruct any other employee,

11:52  16  administrator, operator, whatever of Safe Hurricane Shutters

11:52  17  how to invest the money?

11:52  18  A.   No.

11:52  19  Q.   Did you ever submit financial plans --

11:52  20  A.   No.

11:52  21  Q.   -- to Ed Leiva?

11:52  22  A.   No.

11:52  23  Q.   Did you ever -- are you listed in the articles of

11:52  24  incorporation of Safe Hurricane Shutters as an officer, a

11:52  25  director, an officer and director?

11:52  1    A.   I'm listed as a director only.

11:52  2    Q.   Did you ever set any corporate policies whatsoever at Safe

11:52  3    Hurricane Shutters?

11:52  4    A.   No.  Ed set all the corporate policies.

11:52  5    Q.   Did you have any supervisory authority over Mr. Leiva?

11:52  6    A.   None.

11:52  7    Q.   When you were -- you had said that you were actually

11:52  8    physically at Safe Hurricane Shutters or down here in Florida

11:53  9    40 percent or less of the time.  Where were you the rest of the

11:53  10   time?

11:53  11   A.   I was in New York where I live.

11:53  12   Q.   Could you describe what it was that you did when you would

11:53  13   come down to Safe Hurricane Shutters?

11:53  14   A.   I would work a lot of times on advertising.  I would work

11:53  15   with the salespeople.  Okay?  When the salesmen left -- when

11:53  16   the sales manager left in January, that's when I hired these

11:53  17   other salesmen under the orders of Eddie.  I would hire the

11:53  18   salesmen under the orders of Eddie, and that's basically what

11:53  19   my task was.  We would go out and visit job sites every now and

11:53  20   then a little bit; but mainly, you know, I worked in the

11:53  21   office.

11:53  22   Q.   What was the name of the sales manager that you've just

11:53  23   talked about?

11:53  24   A.   Mark Shankman.

11:54  25   Q.   He's the man that was being paid the draw of $5,000 per

11:54  1   week that you found out later?

11:54  2   A.   Yes.

11:54  3   Q.   Did you supervise any employees?

11:54  4   A.   Mark Shankman had his own little fiefdom there, right?  And

11:54  5   he ran his sales department.  He was the sales manager, and I

11:54  6   didn't supervise anyone there.

11:54  7   Q.   Was it after Mark Shankman left in approximately February

11:54  8   of '07 that you then began to get involved in sales?

11:54  9   A.   Yes.  Sales and advertising.

11:54  10  Q.   Can you describe the involvement that you had with the

11:54  11  sales personnel after Mark Shankman left in approximately

11:54  12  February of 2007.

11:54  13  A.   Well, we would have sales meetings.  We would discuss

11:54  14  strategies in terms of how to approach customers and how to

11:54  15  find customers and things like that.  We would discuss

11:54  16  advertising; how does this ad look; where should we place this

11:55  17  ad?  I think it's the *Post* and the other Fort Lauderdale

11:55  18  newspapers, things of that nature.

11:55  19  Q.   Did you ever supervise any of the plaintiffs?

11:55  20  A.   No.

11:55  21  Q.   Were you involved in evaluating the plaintiffs' work?

11:55  22  A.   No.

11:55  23  Q.   Do you even know --

11:55  24  A.   Not really.  But I know that Mr. Feliciano did very good

11:55  25  work just because we did look at some of the work that he did,

11:55  1   and he did good work.

11:55  2   Q.   Now, is that what people have told you and you agree with

11:55  3   it or can you independently judge and know when you see --

11:55  4   A.   I saw some of his work, and he did a good job.

11:55  5   Q.   With respect to Mr. Augusto Milan, have you ever seen him

11:55  6   before in your life?

11:55  7   A.   Not that I recall to be God's honest truthfully.

11:55  8   Q.   Monday was the first time?

11:55  9   A.   Well, what did you -- the question that you asked me, Are

11:55  10  those the two guys over there?  I looked over at these two men

11:55  11  sitting down on the other side.  No, that's not them.  I don't

11:56  12  know them.  Then I realized one was Mario and the other

11:56  13  gentleman that I know now as Milan, I don't recognize them

11:56  14  right now.  Granted I wasn't there all the time.  And he only

11:56  15  worked for the company supposedly for two-and-a-half months or

11:56  16  so, maybe three months.  I'm not certain how long he worked

11:56  17  there, but I did not recognize him at all.  So --

11:56  18  Q.   With respect to supervising the plaintiffs, overseeing

11:56  19  their work, even though you did not do that, could you have

11:56  20  done that?

11:56  21  A.   Not really because I'm not -- my background is not in

11:56  22  construction in any way, shape, or form.  So I mean I couldn't

11:56  23  put the shutters up on the wall myself.  I didn't know how to

11:56  24  do it.  If I had put them up, they would have fallen off.

11:57  25  Okay?  These guys were good at what they did mostly.

APRIL 13, 2011

11:57   1   Q.   What is your background?  What have you done in business

11:57   2   professionally, say, for the last 30 years?  Can you sum that

11:57   3   up for us in a paragraph?

11:57   4   A.   Well, I had my own business with another business partner

11:57   5   for about 25 years.  We used to buy, sell, and lease IBM

11:57   6   computer equipment, printers, and CPUs, and CRTs, and that type

11:57   7   of equipment.  And it was a great business.  I worked many,

11:57   8   many hours.  My wife yelled at me all the time.

11:57   9   Q.   Do you have ownership interest or have you in the last 10,

11:57  10   20 years in other businesses like what happened here with Safe

11:57  11   Hurricane Shutters where I guess to use the term venture

11:57  12   capital where maybe you've given seed money to a business with

11:58  13   a minority ownership that you might then profit if the business

11:58  14   is successful?

11:58  15   A.   I currently open a small IBM maintenance company.  They

11:58  16   have about 20 employees.  They've been in business about almost

11:58  17   18 years, and they pay their bills.  That's it.  I -- Ed and

11:58  18   Steve and I used to own -- we had a mail business.  When I say

11:58  19   a mail business, we used to sort first class mail.  And the

11:58  20   business was -- it was a good business for about six or seven

11:58  21   years.  It did very well.  And then things changed, and we

11:58  22   closed the business.  It was a good business.

11:58  23   Q.   With respect to these businesses that you've described were

11:58  24   you involved in operations and administration day to day or

11:58  25   were you just -- did you just simply have an ownership

11:58  1    interest?

11:58  2    A.   In the maintenance company, my other partner and I from the

11:58  3    first corporation, from the first computer corporation, we'd

11:59  4    meet with this guy once every month or so, meet with the

11:59  5    president, how is it going, what's happening, what are you

11:59  6    doing new.  Okay?  And that's the extent of our involvement

11:59  7    with it.

11:59  8         With the mail sorting company I used to be down there

11:59  9    once a week.  We had about eight or ten employees.  They did a

11:59  10   great job.  And they worked from about 4:00 o'clock in the

11:59  11   afternoon till about 1:00 o'clock in the morning, 2:00 o'clock

11:59  12   in the morning, like that.  We wanted to put on another shift

11:59  13   because we needed more work done.  They said, No more shifts.

11:59  14   We don't want to hire anybody else.  They worked on an hourly

11:59  15   basis.  They got time and a half.  They were making 8 and $900

11:59  16   a week these guys.  They loved it.  They didn't want us to hire

11:59  17   any more people, so we didn't.  And when the business closed

11:59  18   because of just changes in the business, okay, we closed down

11:59  19   the business, sold the equipment and went on.  And we gave

11:59  20   these guys a little bonus as we left because it was a good

12:00  21   business.  It just changed.

12:00  22   Q.   Did you ever work with the plaintiffs doing installations

12:00  23   at Safe Hurricane Shutters?

12:00  24   A.   No.

12:00  25   Q.   Did you ever give the plaintiffs instructions as to how to

12:00 1    perform their jobs while they were with Safe Hurricane

12:00 2    Shutters?

12:00 3    A.  I really couldn't because I didn't know how to do it.  In

12:00 4    other words, I didn't know how to install hurricane shutters.

12:00 5    So I -- who am I to tell somebody how to do something if I

12:00 6    don't know how to do it myself.

12:00 7    Q.  Just roughly do you know what percentage of installers

12:00 8    spoke English to where you could communicate with them?

12:00 9    A.  Mario's English is very good.

12:00 10   Q.  Anyone else's?

12:00 11   A.  There were I would say four -- I think Eddie said there

12:00 12   were 27 installers.

12:00 13   Q.  Something like that.

12:00 14   A.  I would say there were about five of them that were pretty

12:00 15   -- had good English skills.  Eric --

12:00 16   Q.  Were you --

12:00 17   A.  Eric, the man who --

12:00 18   Q.  Yes.

12:00 19   A.  -- was here, his English skills are excellent.

12:00 20        THE COURT:  All right.  It's 12:00 o'clock now.  We'll

12:01 21   recess for lunch at this time, Members of the Jury.  And we'll

12:01 22   be back at 1:00 o'clock and we'll continue the examination of

12:01 23   Mr. M^cCarroll at that time.  So court's in recess until 1:00

12:01 24   o'clock.

12:01 25        THE MARSHAL:  All rise for the jury.

APRIL 13, 2011

| | | |
|---|---|---|
| 12:01 | 1 | **THE COURT:**  Who will your witness be after this, Mr. |
| 12:01 | 2 | Kelly? |
| 12:01 | 3 | **(Jury Out)** |
| 01:08 | 4 | **MR. KELLY:**  Mr. Heidelberger. |
| 01:08 | 5 | **THE COURT:**  Okay. |
| 01:08 | 6 | **(Recess)** |
| 01:08 | 7 | **THE LAW CLERK:**  All rise. |
| 01:08 | 8 | **THE COURT:**  Are you ready? |
| 01:08 | 9 | **MR. KLEPPIN:**  Yes, Your Honor. |
| 01:08 | 10 | **THE COURT:**  Good.  All right.  Bring in the jury, |
| 01:08 | 11 | please.  Mr. M^cCarroll, we need you back up there.  Thank you. |
| 01:08 | 12 | Well, there's never a dull moment here.  Okay. |
| 01:08 | 13 | **(Jury In)** |
| 01:08 | 14 | **THE COURT:**  Members of the Jury, be seated, please. |
| 01:08 | 15 | Hope you enjoyed all the excitement.  Okay.  We're all back and |
| 01:09 | 16 | we're ready to go again. |
| 01:09 | 17 | Mr. M^cCarroll, you're reminded you're still under |
| 01:09 | 18 | oath.  You may be seated.  You can continue your |
| 01:09 | 19 | cross-examination. |
| 01:09 | 20 | **MR. KLEPPIN:**  I miscalculated how unexciting this |
| 01:09 | 21 | trial would be. |
| 01:09 | 22 | **BY MR. KLEPPIN:** |
| 01:09 | 23 | Q.  Okay.  Mr. M^cCarroll, did you ever make any employment |
| 01:09 | 24 | decisions with respect to the two plaintiffs in this case? |
| 01:09 | 25 | A.  No. |

01:09  1   Q.  Did you have any involvement in any employment decisions

01:09  2   concerning any installers?  Employment meaning any -- let me

01:09  3   rephrase that.  Did you make any determinations concerning

01:09  4   employment-related decisions with respect to installers?

01:09  5   A.  No.

01:10  6   Q.  Do you even know how to install hurricane shutters?

01:10  7   A.  No, I don't.

01:10  8   Q.  With respect to what the plaintiffs were paid did you have

01:10  9   any determination with respect to their pay?

01:10 10   A.  None other than the fact that Mario Feliciano had asked me

01:10 11   for a raise, and I said I would pass it on to Steve -- pardon

01:10 12   me -- pass it on to Eddie, and Eddie subsequently gave him a

01:10 13   raise to a thousand dollars.

01:10 14   Q.  Now, do you characterize your involvement with respect to

01:10 15   -- your testimony that you've just given, would you

01:10 16   characterize that as you determined that his pay would be

01:10 17   raised?

01:10 18   A.  Eddie determined.

01:10 19   Q.  Okay.

01:10 20   A.  Eddie determined his pay would be raised.  Eddie said all

01:10 21   the payroll for everyone.

01:10 22   Q.  Did you have any even involvement at any level concerning

01:11 23   policy decisions with respect to how the installers would be

01:11 24   paid?

01:11 25   A.  None.  I had no involvement in that.

01:11  1    Q.  Did you have --

01:11  2    A.  Eddie made those decisions.  They were his decisions.

01:11  3    Again, it was his -- it was his show completely.  It was his

01:11  4    brainchild.  It was his idea.  And knowing Eddie for so many

01:11  5    years we followed through.  We followed through with it,

01:11  6    allowed him to do what he wanted to do.

01:11  7    Q.  So whether they were going to be paid salary, whether they

01:11  8    were going to be paid hourly, is that something you decided or

01:11  9    Mr. Leiva?

01:11  10   A.  Mr. Leiva decided that one hundred percent.

01:11  11   Q.  With respect to the hours that the installers worked, did

01:11  12   you have any involvement as to that?

01:11  13   A.  None.

01:11  14   Q.  Did you have any involvement as to scheduling with respect

01:11  15   to the installers?

01:11  16   A.  None.

01:12  17   Q.  Let's talk about the sales department just for a moment.

01:12  18   And you've given some testimony about how you assisted that

01:12  19   department.  Did you have operational control over that

01:12  20   department at any time?

01:12  21   A.  Eddie had operational control of the entire corporation all

01:12  22   the time.  I helped out somewhat.  Again, I was not there most

01:12  23   of the time.  I was there 40 percent of the time or less.  He

01:12  24   worked the job.  He worked the business.

01:12  25   Q.  So even after Mr. Shankman left you still didn't have

01:12  1   day-to-day control over --

01:12  2   A.  No, I didn't.

01:12  3   Q.  -- the sales department?

01:12  4   A.  No.  I interviewed people to be hired as salesmen, and I

01:12  5   said -- I interviewed maybe a dozen people.  And I said, Let's

01:12  6   look at this man, this man, and this man.  And we hired four or

01:12  7   five.  I think we hired one once, and then subsequent to that I

01:13  8   hired three additional gentlemen.

01:13  9   Q.  Were you ever involved in the day-to-day operations or

01:13  10  administration of Safe Hurricane Shutters at any level?

01:13  11  A.  No.

01:13  12  Q.  What were the various operational divisions of the company?

01:13  13  A.  Well, there were sales, manufacturing, office, accounting,

01:13  14  and installation.  That was basically it.  And there was like

01:13  15  an engineering department also.  That was part of the

01:13  16  installation.

01:13  17  Q.  When you talk about manufacturing, would that be better

01:13  18  described as fabrication?

01:13  19  A.  I guess so.  In other words, we would buy the raw materials

01:13  20  in long slats; blades they would call it.  And the

01:13  21  manufacturing or the fabrication of it, they would cut it to

01:13  22  size and put it together and ready for it to be placed up on

01:14  23  the wall.

01:14  24  Q.  Did you have any involvement at all with respect to the

01:14  25  fabrication department of Safe Hurricane Shutters?

01:14  1   A.   No.   A fellow by the name of Tom Sullivan, he worked that

01:14  2   section of the business.

01:14  3   Q.   What about after he was no longer there?  Did you have any

01:14  4   involvement at all in the --

01:14  5   A.   No.   We actually -- for the fabrication of it we used a

01:14  6   young man named John Wolfe.  He was about 20 years old or

01:14  7   thereabouts, and he did a very good job for his age.

01:14  8   Q.   Did you have any involvement at all with respect to

01:14  9   warehouse?

01:14  10  A.   No.

01:14  11  Q.   Did you have any involvement with respect to the accounting

01:14  12  department?

01:14  13  A.   None whatsoever.

01:14  14  Q.   During the time that Safe Hurricane Shutters was

01:14  15  operational was there always a controller that was heading the

01:14  16  accounting department?

01:14  17  A.   It was either Brad Bungo or Keith Lares.

01:15  18  Q.   Was it ever brought to your attention that perhaps there

01:15  19  was a pricing problem with respect to Safe Hurricane Shutters's

01:15  20  business plan?

01:15  21  A.   Steve and I spoke about that.  It cost more to manufacture

01:15  22  it than it did to -- than we sold it for.  That was one of the

01:15  23  grave errors of the corporation.

01:15  24  Q.   Well, you're two minority owners in the company.  Didn't

01:15  25  you do something about that?

01:15  1    A.  We spoke to Mr. Leiva about it.  We said we should really

01:15  2    raise the prices on these things.

01:15  3    Q.  What did he do or what did he say in response?

01:15  4    A.  He said, Then we won't be able to sell it.  He said the

01:15  5    price will be too high or we would be out of -- we would not be

01:15  6    competitive with the other shutter companies in the area, and

01:15  7    he did not raise the prices.  He tried to skimp in other areas.

01:15  8    Q.  So the pricing suggestions you brought to Mr. Leiva --

01:16  9    A.  Were disregarded.

01:16  10   Q.  -- he rejected their implementation?

01:16  11   A.  Yes.  They were disregarded.

01:16  12   Q.  What time frame was that?  Just a month and a year if you

01:16  13   know.

01:16  14   A.  We brought that up to him.  That was brought up to him a

01:16  15   number of times.  Okay?

01:16  16   Q.  Starting when?

01:16  17   A.  I would say in September, October, November 2006.

01:16  18   Q.  Now, were you ever outside of the country for an extended

01:16  19   period of time in 2007?

01:16  20   A.  Yes.

01:16  21   Q.  What period of time was that?

01:16  22   A.  It was about two months.  From July and August, all of

01:16  23   August for all intents and purposes.  Maybe the last couple of

01:16  24   days in August.  But a good portion of July and August.

01:16  25   Q.  And were you in communication with Safe Hurricane Shutters

01:16  1   during that time?

01:16  2   A.   No, I wasn't.

01:16  3   Q.   And where were you?

01:17  4   A.   I was in France, and I was delivering a vessel.  I'm a boat

01:17  5   captain, and I deliver vessels.  And so I was out of the -- in

01:17  6   the Canary Islands and Portugal and throughout there.

01:17  7   Q.   Did you have the authority to fire any installers without

01:17  8   Eddie's approval?

01:17  9   A.   None.

01:17  10  Q.   Were you ever in charge of maintaining employee records at

01:17  11  all at Safe Hurricane Shutters?

01:17  12  A.   Not in the least.

01:17  13  Q.   Did you have any involvement in maintaining any business

01:17  14  records with respect to Safe Hurricane Shutters?

01:17  15  A.   No records.  I maintained no records for the company.

01:17  16  Q.   Did you ever give the department heads instruction on how

01:17  17  to run their various departments?

01:17  18  A.   No.

01:17  19  Q.   Did you ever suggest to Eddie Leiva how he should operate

01:18  20  the business day to day?

01:18  21  A.   No.  Ed had complete autonomy on how to operate the

01:18  22  business.

01:18  23  Q.   Did you ever discuss any overtime issues at all at the

01:18  24  company?

01:18  25  A.   None.

01:18 1  Q.  Did you ever discuss or have any involvement in alleged

01:18 2  minimum wage issues at the company?

01:18 3  A.  None.

01:18 4  Q.  As far as you know, was every installer paid what they were

01:18 5  due?

01:18 6  A.  As far as I'm concerned they were.

01:18 7  Q.  Did Ed Leiva have authority over you?

01:18 8  A.  Yes.  He was the president of the corporation.

01:18 9  Q.  Did you have to do what he said?

01:18 10  A.  Pretty much.

01:18 11  Q.  Now, with respect to your testimony about when the

01:18 12  installers arrived in the morning, why didn't the installers

01:18 13  arrive earlier?  In other words, why wouldn't the company have

01:19 14  these 27 installers come at 6:00 or 7:00 in the morning?

01:19 15  A.  Well, at 6:00 or 7:00 -- at 6:00 o'clock in the morning

01:19 16  it's still dark here in Florida for one thing.  Sort of repeat

01:19 17  that.  I don't really understand what your question is.

01:19 18  Q.  Sure.  Would the business have been open at 6:00 or 7:00 in

01:19 19  the morning --

01:19 20  A.  No one was there at that time.

01:19 21  Q.  -- for them to get in.

01:19 22  A.  In other words, we were not there at that time.  And you

01:19 23  can't begin to install something on somebody's house at 6:00

01:19 24  o'clock in the morning or 7:00 o'clock in the morning because

01:19 25  who wants to -- if you're in the lawnmower business, do you

01:19  1    want somebody mowing the lawn in front your house at 6:00

01:19  2    o'clock in the morning or 7:00 o'clock in the morning?

01:19  3    Probably not.  The same way with these guys drilling into

01:19  4    concrete walls on houses.  The neighbors don't want it.  The

01:20  5    homeowner doesn't want it.  So they weren't there that early.

01:20  6    Q.  So there was a policy then for work to begin later in the

01:20  7    morning --

01:20  8    A.  Yes.

01:20  9    Q.  -- so as not to disturb homeowners and condominium unit

01:20  10   owners?

01:20  11   A.  Especially on the homeowners -- on the condominiums.

01:20  12   Q.  Would there --

01:20  13   A.  You couldn't go into the condominiums before 9:00 o'clock.

01:20  14   Q.  Did you ever when you got to the office in the morning with

01:20  15   Eddie -- you're the first two people to arrive.  You open it

01:20  16   up.  Did you ever get there and there's a bunch of installers

01:20  17   just standing there in the parking lot waiting to be let in?

01:20  18   A.  Not very often.  Once or twice in the very beginning there

01:20  19   were but not much, not very often at all.

01:20  20   Q.  Well, let's talk about the very beginning.  Was there --

01:20  21   did this company even have much work in the very beginning?

01:20  22   A.  We didn't have a lot of work in the beginning.  That's

01:20  23   true.  Because we didn't have orders in the beginning.

01:20  24   Q.  So were the work hours even less in the beginning?

01:20  25   A.  Yes, they were.

01:20  1  Q.  Would there have been anything at all for the installers to

01:20  2  do in the shop between 6:00 or 7:00 a.m. and 9:00 a.m. if they

01:21  3  really did get there as early as 6:00 to 7:00 a.m.?  And I know

01:21  4  you can test that.  But is there something for these installers

01:21  5  --

01:21  6  A.  They could have --

01:21  7  Q.  -- to have done in the shop?

01:21  8  A.  -- swept the floors I guess but not really, no.  No.  There

01:21  9  was not -- no.  Nothing really for them to do.

01:21  10  Q.  So had they come -- if you could just let me finish the

01:21  11  question, I think it would help the court reporter.  She just

01:21  12  can't take us down at the same time, Frank.  So there's no need

01:21  13  for 27 installers just to be standing around or sitting around

01:21  14  this business for two to three hours if they were coming in at

01:21  15  6:00 in the morning until they left at 8:30 or 9:00?

01:21  16  A.  Correct.

01:22  17  Q.  Is it even remotely possible from what you observed that

01:22  18  Mr. Feliciano could have worked 66 hours in any week?

01:22  19  A.  I severely doubt it.  I don't think so at all.  Absolutely

01:22  20  not.

01:22  21  Q.  Is there -- is it even remotely possible for Mr. Ibacache

01:22  22  to have worked even 60 hours in a week much less every single

01:22  23  week?

01:22  24  A.  No.

01:22  25  Q.  Were some of the jobs as far away as Miami and Palm Beach

01:22  1    County?

01:22  2    A.  Not many jobs in Miami.  We didn't do many jobs in Miami.

01:22  3    There were one or two jobs up in Palm Beach.  A few jobs.  Not

01:22  4    much.

01:22  5    Q.  Is it true that with the truck that the company provided

01:23  6    for the installers that the installers were free to come to the

01:23  7    shop and ride out to the job site on that truck if they wanted,

01:23  8    but that wasn't mandatory?

01:23  9    A.  That's correct.

01:23  10   Q.  If they wanted to, a crew member --

01:23  11   A.  They could have taken their own vehicle.

01:23  12   Q.  From their home out to the place of work.  Was the shop

01:23  13   closed holidays?

01:23  14   A.  Yes, it was closed.

01:23  15   Q.  In other words, were -- was Mario Feliciano hanging

01:23  16   hurricane shutters from 6:00 in the morning to 6:00 o'clock at

01:23  17   night --

01:23  18   A.  He wasn't doing it on --

01:23  19   Q.  -- on Christmas Day?

01:23  20   A.  Not on Christmas Day, not on New Year's Day, not on

01:23  21   Thanksgiving, not on Labor Day, and not during the little

01:23  22   hurricane that we had, Hurricane Ernesto.  He wasn't doing it

01:23  23   then either, or Memorial Day.

01:23  24   Q.  Was Safe Hurricane Shutters open for business on Sundays?

01:23  25   A.  Negative.

01:24  1  Q.  Were there some customers who prohibited any Saturday work?

01:24  2  A.  I believe Points of America prohibited it along with Marine

01:24  3  Tower, two major jobs.

01:24  4  Q.  What time would you and Eddie leave the business at the end

01:24  5  of the day?

01:24  6  A.  6:00 o'clock or later.

01:24  7  Q.  Could Eddie leave before the last crew arrived?

01:24  8  A.  He could if he wanted to.  I had a key to the building, and

01:24  9  I would close up if the last crew wasn't in already.

01:24  10  Q.  Do you have a recollection of sitting around waiting to

01:24  11  close up the shop waiting for the last crew to get in at 6:00,

01:24  12  6:30, 7:00 o'clock?

01:24  13  A.  Not many times.  Not very much, no.  A few times.  Three or

01:24  14  four times, something like that.  Again, I wasn't there a lot

01:24  15  too.

01:24  16  Q.  Well, I'm just -- and they understand that.  We're just

01:25  17  talking about the time that you were there from what you recall

01:25  18  upon your personal recollection.

01:25  19  A.  Not many times.  Three or four times maybe.

01:25  20  Q.  What is the earliest that you saw Mr. Leiva leave?

01:25  21  A.  I think he had a dentist appointment once or something like

01:25  22  that and he left around 2:00 o'clock once.

01:25  23  Q.  Short of that he'd stay till --

01:25  24  A.  He was always there.  Once in a while he left at 5:00.

01:25  25  Q.  I wanted to talk to you about Department of Labor posters

JURY TRIAL - VOLUME III of VI

01:25  1   that are hung in the workplace.  Are you familiar with those?

01:25  2   A.   Yes.

01:25  3   Q.   And could you just briefly describe to the jury what those

01:25  4   are.

01:25  5   A.   It was a picture of a poor woman with her arm in a sling,

01:25  6   and it said -- had to do with, you know, if you get hurt on the

01:25  7   job or Workmen's Comp, things of that nature.  And that was

01:25  8   posted in the main hallway that led into the factory, from the

01:26  9   office to the back.

01:26  10  Q.   And did that poster also discuss overtime and minimum wage

01:26  11  and wage-and-hour issues?

01:26  12  A.   I believe it did, yes.

01:26  13  Q.   And was that poster in plain view where the installers

01:26  14  could have seen it?

01:26  15  A.   It was in plain view right in the main hall that went into

01:26  16  the factory.  If you went into the -- there were two doors into

01:26  17  the factory.  If you went into -- if you used either -- if you

01:26  18  used the main door going into the factory area, you'd have to

01:26  19  see that.  It was right at eye level.

01:26  20  Q.   Is that an area though in the company where the installers

01:26  21  would have regularly walked through?

01:26  22  A.   Everybody walked through there all the time.

01:26  23  Q.   So that wasn't just office personnel?

01:26  24  A.   No.

01:26  25  Q.   Did anyone ever stop you and point that out and say, That

01:26 1  sign right there.  See that?

01:26 2  A.  I actually looked at it a couple of times.

01:26 3  Q.  The question is:  Did any of the installers --

01:26 4  A.  Not that I know of.

01:26 5  Q.  -- in particular the plaintiffs?

01:26 6  A.  They could have.  They could have.

01:26 7  Q.  Do you have a recollection of them -- let me finish the

01:26 8  question.

01:26 9  A.  Okay.

01:26 10  Q.  Do you have a recollection of them taking you aside and

01:27 11  saying, you know, You have the very poster there on the wall

01:27 12  and your company's violating that somehow?

01:27 13  A.  Never.

01:27 14  Q.  I think you had said that there were a few shares of

01:27 15  ownership of the company that were actually never issued?

01:27 16  A.  That's correct.

01:27 17  Q.  Just describe to the jury how many shares that was, first

01:27 18  of all.

01:27 19  A.  There was 15 unissued shares.

01:27 20  Q.  And was there any intention as to who -- to whom those

01:27 21  shares would be issued at some time?

01:27 22  A.  They were going to be given to employees at some point in

01:27 23  our history.  It was never done, but it was supposed to be for

01:28 24  work that was done if they were exceptional workers or

01:28 25  something like that.  Originally it was originally scheduled

01:28 1    for the three main managers, but their shares were never issued

01:28 2    to them.

01:28 3    Q.  Would this be the three department heads that you --

01:28 4    A.  Three department heads.

01:28 5    Q.  -- described?

01:28 6    A.  Yes.

01:28 7    Q.  You had described a period of time where some of the

01:28 8    employees of the company -- there was a delay in receiving

01:28 9    their pay for a few days, they or four days, whatever it was.

01:28 10   Do you remember describing that in your direct examination?

01:28 11   A.  Yes.

01:28 12   Q.  And is that how that's most accurately characterized; that

01:28 13   it was just simply the employees were informed that there would

01:29 14   be a three- or four-day delay in receipt of their pay?

01:29 15   A.  The company didn't have enough money to pay them at the

01:29 16   time, and they received their pay within a short time after

01:29 17   that.

01:29 18   Q.  So --

01:29 19   A.  A short time is again three to four days the following

01:29 20   week.

01:29 21   Q.  So it was really nothing beyond that?

01:29 22   A.  Correct.

01:29 23   Q.  And then after that did the -- the payroll resumed normally

01:29 24   --

01:29 25   A.  Yes.

JURY TRIAL - VOLUME III of VI

01:29  1  Q.  -- as far as you know?

01:29  2  A.  As far as I know it did.  As I mentioned before, I had to

01:29  3  tell the people that they weren't getting paid one week, and it

01:29  4  was a dreadful thing to do; and they got paid the following

01:29  5  week?

01:29  6  Q.  When you told them that, did you know precisely when they

01:29  7  actually would be paid?  Did you say, You'll be paid in three

01:29  8  or four days or did you not know that the money would be coming

01:29  9  in in three or four days if you remember?

01:29  10  A.  I didn't really know when the money was coming in; but I

01:30  11  was pretty sure we were going to have money by the end of the

01:30  12  following week, and we did.

01:30  13          MR. KLEPPIN:  No further questions at this time, Your

01:30  14  Honor.

01:30  15          THE COURT:  All right.  Mr. M$^c$Carroll, thank you, sir.

01:30  16          Who's your next witness, Mr. Kelly?

01:30  17          MR. KELLY:  Redirect, Your Honor.  May I have a short

01:30  18  redirect?

01:30  19          THE COURT:  No, sir.

01:30  20          MR. KELLY:  Thank you.  I'll call Mr. Heidelberger.

01:30  21          THE COURT:  Please raise your right hand and be sworn.

01:31  22          **STEVE HEIDELBERGER, DEFENDANT, SWORN.**

01:31  23          THE COURT:  Please have a seat, sir, and tell us your

01:31  24  full name.

01:31  25          MR. HEIDELBERGER:  My name is Steve Heidelberger.

APRIL 13, 2011

JURY TRIAL - VOLUME III of VI

01:31 1  Last name is H-e-i-d-e-l-b-e-r-g-e-r.

01:31 2  **DIRECT EXAMINATION**

01:31 3  **BY MR. KELLY:**

01:31 4  Q.  Good afternoon, Mr. Heidelberger.  Did you also have an

01:31 5  ownership interest with Mr. M$^c$Carroll in Safe Hurricane

01:31 6  Shutters?

01:31 7  A.  I did; the same as Mr. M$^c$Carroll, 22-and-a-half percent.

01:31 8  Q.  And that was the same percent that Mr. Leiva had, correct?

01:31 9  A.  Correct.

01:31 10  Q.  So Mr. Leiva never had more ownership percentage than you

01:31 11  or Mr. M$^c$Carroll, did he?

01:31 12  A.  No.

01:31 13  Q.  And as far as the total that you invested in the company,

01:32 14  how much would that be?

01:32 15  A.  $407,000.

01:32 16  Q.  And were you ever a director of the company?

01:32 17  A.  Yes.

01:32 18  Q.  And were you ever an officer of the company?

01:32 19  A.  No.

01:32 20  Q.  Was -- do you know whether Mr. M$^c$Carroll ever held himself

01:32 21  out to be a president of the company?

01:32 22  A.  No.

01:32 23  Q.  A vice president?

01:32 24  A.  Not to my knowledge.

01:32 25  Q.  He never had any business cards that called him the vice

APRIL 13, 2011

01:33  1    president?

01:33  2    A.  If he had business cards, I don't know about them.

01:33  3    Q.  Is it possible that you could have been an officer of the

01:33  4    company as well?  Is it possible?

01:33  5    A.  No.  I would have had to have known about it.

01:33  6    Q.  Okay.

01:33  7         MR. KELLY:  Your Honor, may I approach the witness

01:33  8    with this transcript?

01:33  9         THE COURT:  Yes, sir.

01:33  10   BY MR. KELLY:

01:33  11   Q.  Mr. Heidelberger, you remember you took your deposition on

01:34  12   June 19th, 2008?

01:34  13   A.  I remember taking the deposition, yes.

01:34  14   Q.  And you were under oath to tell the truth at that time,

01:34  15   correct?

01:34  16   A.  Yes.

01:34  17   Q.  Would you please turn to page 12.

01:34  18   A.  Okay.

01:34  19        MR. KLEPPIN:  I object to the use of the transcript in

01:34  20   this manner.  It does not contradict what he just said.

01:34  21        THE COURT:  Well, I don't know what he's going to say.

01:34  22   What's the question?

01:34  23   BY MR. KELLY:

01:34  24   Q.  If we turn to page 12 and look at line 22, I'll just read

01:34  25   it to you.  Were you a member or were you an officer or

JURY TRIAL - VOLUME III of VI

01:34  1    director of the company?

01:34  2           Yes.

01:34  3           And I asked, line 25, Which?  Officer or director?

01:34  4           Then I'll go to page 13, line 1.  I think I was both.

01:34  5    I'm not exactly sure --

01:34  6           So are you sure?

01:34  7      **MR. KLEPPIN:**  Please read in the entire answer.

01:34  8    **BY MR. KELLY:**

01:34  9    Q.  I think I was both.  I'm not exactly sure about that.  I

01:35 10    think Mr. -- I think Rosen would know that better.

01:35 11    A.  Right.

01:35 12    Q.  So do you know or not?

01:35 13    A.  Well, I'm telling you now that I know the difference.

01:35 14    Q.  Okay.  But you didn't then?

01:35 15    A.  I was a director.  I wasn't exactly sure, no.  And I said

01:35 16    that.

01:35 17    Q.  And is it true that or did you ever fire anybody at Safe

01:35 18    Hurricane Shutters?

01:35 19    A.  Per Eddie's instructions, yes, I helped fire Tom Sullivan.

01:35 20    Q.  Okay.  Now, was Mr. -- you heard Mr. M$^c$Carroll's testimony

01:35 21    a few moments ago, correct?

01:35 22    A.  Uh-huh (affirmative).

01:35 23    Q.  Was Tom Sullivan -- would you say -- what department was he

01:35 24    in?

01:35 25    A.  He was the warehouse manager.

01:35  1   Q.   Was that in manufacturing?

01:35  2   A.   Yes.

01:35  3   Q.   Do you consider that to be one of the operational

01:35  4   departments at the company?

01:36  5   A.   Yes.

01:36  6   Q.   And was Mr. Sullivan in charge of that department?

01:36  7   A.   Yes.

01:36  8   Q.   Now, Mr. Sullivan -- and you and Mr. M$^c$Carroll both

01:36  9   escorted Mr. Sullivan out --

01:36  10  A.   Yes.

01:36  11  Q.   -- of the building, correct?

01:36  12  A.   Yes.

01:36  13  Q.   And he was the one that was in charge of the operation of

01:36  14  that wing?

01:36  15  A.   Yes.

01:36  16  Q.   Anybody else that you ever discussed about the hiring or

01:36  17  firing of?

01:36  18  A.   No.

01:36  19  Q.   Did you hear Mr. M$^c$Carroll's testimony about -- regarding

01:36  20  December 2006 where he talked about him telling some of the

01:36  21  employees that they weren't going to be paid at that time?

01:37  22  A.   I don't remember it in December 2006.

01:37  23  Q.   Was there a different time that you have independent

01:37  24  recollection of employees not being paid?

01:37  25  A.   Towards the very end there were phone calls about us not

01:37  1  being able to meet payroll, somewhere around August of 2007.

01:37  2  Q.  2007.  And why weren't --

01:37  3  A.  Wait, wait, wait.  I do remember the 2006 because I had

01:37  4  actually put I think $20,000 on a credit card to help meet the

01:37  5  payroll at that point in time.

01:37  6  Q.  So you actually took your own money and paid the payroll in

01:37  7  2006 in December?

01:37  8  A.  Well, it wasn't the entire payroll.  It was whatever I

01:37  9  could put on the credit card to help get the money over there

01:37 10  as quickly as possible.

01:37 11  Q.  And what about in 2007 of August?  Did you put up any

01:38 12  personal funds to pay --

01:38 13  A.  I had no more funds.

01:38 14  Q.  Did you at any time meet with Mr. Feliciano to talk about

01:38 15  paying the workers who might be complaining about not being

01:38 16  paid?

01:38 17  A.  Yes.

01:38 18  Q.  Okay.  And can you recall what you told Mr. Feliciano?

01:38 19  A.  This was late in 2007, towards the end of the business.

01:38 20  And the company was really struggling, and I had flown in.  And

01:38 21  Eddie asked me to gather all the accounts payable and accounts

01:38 22  receivable information and try to figure out how we were going

01:38 23  to pay whom and at what point.  And I had done an analysis of

01:39 24  the accounts payable and receivable according to what Eddie and

01:39 25  Keith told me.  At that point in time I showed that analysis to

01:39   1   Eddie.  And I said, Can you think of anything else that needs

01:39   2   to go on here; and are we going to be able to collect all this

01:39   3   receivable money in the schedule that I put together.

01:39   4        And Eddie looked it over, made a couple of changes,

01:39   5   and then said, Yes, this is doable in this fashion.  And I

01:39   6   said, Okay.  Then you can tell the employees that this is what

01:39   7   we're going to try to do.  And Eddie said, Well, I'm not going

01:39   8   to be here in the morning tomorrow.  I want you to have a

01:39   9   meeting with them.  I said, Well, I don't speak Spanish.  Most

01:39  10   of them speak Spanish.  Eddie said, Take Yerko -- that was Mr.

01:39  11   Aguirre who was here testifying the other day -- and have him

01:40  12   interpret for you.  And I said, Okay.

01:40  13        And the next day I had a meeting with the employees,

01:40  14   and I showed them the chart that we had developed.  And I told

01:40  15   them, We're going to try to pay you out in this manner assuming

01:40  16   the money comes in as expected.

01:40  17   Q.  And did Mr. Aguirre -- did he then translate that to the

01:40  18   Spanish-speaking workers?

01:40  19   A.  The ones that spoke no English, yes.  The other ones I was

01:40  20   able -- like Mario I was able to talk to directly.

01:40  21   Q.  Can you give me -- can you recall the specific details of

01:40  22   the conversation you had with Mr. Feliciano?

01:40  23   A.  Some to the effect that, This is what you're owed.  This is

01:40  24   how the company is going to try to pay you that money.  And it

01:40  25   takes into account our ability to bring in the funds that are

01:41  1   due us from the jobs that we finish.

01:41  2   Q.  Were they -- regarding that -- this was in August of 2007?

01:41  3   A.  Somewhere around there.

01:41  4   Q.  Regarding that period were they then -- were the workers

01:41  5   paid in full?

01:41  6   A.  I don't know.  That was my last day there.

01:41  7   Q.  Do you remember whether you were waiting for any payments

01:41  8   from the Points of America project?

01:41  9   A.  At that point in time, no.  I think that project was over.

01:41  10  Q.  How much did that -- do you remember how much that project

01:41  11  brought in?

01:41  12  A.  Well, I have no idea.

01:41  13  Q.  How about the Marine Tower project?

01:41  14  A.  We got stiffed on the Marine Tower project, and that was

01:41  15  around that point in time.  We expected a great deal of money

01:41  16  from the Marine Tower project which never came through.

01:42  17  Q.  Do you recall when -- the first date that you came to Miami

01:42  18  for business purposes for Safe Hurricane Shutters?

01:42  19  A.  I think it was January of 2006, and that was to have the

01:42  20  initial meeting with Eddie and Frank about starting the

01:42  21  company.

01:42  22  Q.  And how many days were you here?

01:42  23  A.  Either one or two.

01:42  24  Q.  And then do you -- can you recall the next time you were in

01:42  25  Florida for business purposes at this company?

01:42   1   A.   I think it was around March of 2006.

01:42   2   Q.   And do you recall how many days you were here?

01:42   3   A.   Two.

01:42   4   Q.   And what was the purpose of that visit?

01:42   5   A.   Eddie introduced us to the three men that were going to be

01:43   6   running the company, and I think the next morning we went

01:43   7   around looking for warehouse space in a couple of buildings

01:43   8   that Eddie had found.

01:43   9   Q.   Anything else that you did during that visit?

01:43   10  A.   No.

01:43   11  Q.   Do you recall --

01:43   12  A.   Oh, we may have signed corporate documents.  We did that

01:43   13  either then or in January.  I'm not sure which.  One of those

01:43   14  two visits we went to the lawyer's office and signed the

01:43   15  corporate documents.

01:43   16  Q.   Can you recall the next time that you came to Florida for

01:43   17  business purposes?

01:43   18  A.   I believe it was late May of 2006.

01:43   19  Q.   And do you recall how long you were here?

01:43   20  A.   Two-and-a-half days.

01:44   21  Q.   And what was the purpose of that visit?

01:44   22  A.   Eddie wanted to show us the operation and, you know, the

01:44   23  newly designed warehouse space and all that.

01:44   24  Q.   So Eddie was introducing you to the operation of the

01:44   25  company?

01:44  1    A.   Right.

01:44  2    Q.   And for what need did you have to know about the operations

01:44  3    of the company?

01:44  4    A.   I didn't.  But I'm a friend of Eddie's, and he wanted to

01:44  5    show me what he had put together.  He was pretty proud of it.

01:44  6    Q.   And during these three -- the period that we're talking

01:44  7    about, these three visits you indicated, would you communicate

01:44  8    with Mr. M$^{c}$Carroll and Mr. Leiva on the phone regarding the

01:44  9    progress of the company?

01:44 10    A.   Not so much with Frank unless he -- well, during those

01:45 11    three visits -- two of them Frank was present for, the one in

01:45 12    January and the one in March before the company ever started

01:45 13    operations; but Eddie and I would talk maybe once every ten

01:45 14    days.

01:45 15    Q.   About the -- about how the business was operating?

01:45 16    A.   Yeah; in general.

01:45 17    Q.   You were living in Colorado at the time?

01:45 18    A.   Yes.

01:45 19    Q.   And then after -- as far as your physical presence in

01:45 20    Florida, after that meeting in May, when did you come back

01:45 21    again to Florida?

01:45 22    A.   It was either September or October of 2006.

01:45 23    Q.   And how long were you here for?

01:45 24    A.   Also about two-and-a-half days.

01:45 25    Q.   Any particular reason regarding that visit?

01:46  1   A.  Eddie had wanted me to come down and help him.  I think he

01:46  2   also at that point had asked for an additional investment

01:46  3   because the funds were running a little low, so I made the

01:46  4   investment.  And I came down and I asked him what he needed

01:46  5   help with.

01:46  6   Q.  Did you go around and inspect the sites at all, the job

01:46  7   sites?

01:46  8   A.  No.

01:46  9   Q.  At any time from January till this time did you at all go

01:46  10  out to the job sites to see how the operations were running?

01:46  11  A.  Not to be on the job sites but to speak with customers

01:46  12  along with Eddie.  They happened to be job sites.  So I guess

01:46  13  from that standpoint, yes.

01:46  14  Q.  Anything else in that September/October meeting you can

01:46  15  identify?

01:46  16  A.  Yes.

01:46  17  Q.  What else?

01:46  18  A.  Since the funds were running low, it was time to take a

01:47  19  look at what was going on with the business.  So I did a cost

01:47  20  analysis, and I realized that our costs in producing shutters

01:47  21  were grossly underestimated for a number of reasons.  And I

01:47  22  suggested to Eddie that we're losing money every single square

01:47  23  foot that we sell and that something needs to be done.  Either

01:47  24  production needs to be drastically increased or prices need to

01:47  25  be raised significantly.

APRIL 13, 2011

01:47 1  Q.  Did you give any Mr. Leiva any timetable in which to

01:47 2  complete any one of these suggestions?

01:47 3  A.  No.

01:47 4  Q.  And did you -- during this period we're talking did you

01:47 5  usually continue to talk to Eddie at least around every ten

01:48 6  days regarding the operation of the business?

01:48 7  A.  Yeah; ten days, two weeks.  Yeah.

01:48 8  Q.  Did you also speak with Mr. M^cCarroll on a regular basis

01:48 9  regarding the business?

01:48 10  A.  Every once in awhile.  Not nearly as often as with Eddie.

01:48 11  Q.  And after September -- so that last meeting we just talked

01:48 12  about, that was September or October of 2006, right?

01:48 13  A.  Right.  Somewhere in there.

01:48 14  Q.  Okay.  And when was the next time you came to Florida?

01:48 15  A.  I think I was here somewhere around the middle of December

01:48 16  of 2006.

01:48 17  Q.  And how long did you stay for that time?

01:48 18  A.  About two, two-and-a-half days.

01:48 19  Q.  During that time did you discuss with anybody the issue of

01:48 20  the workers not being paid, December 2006?

01:48 21  A.  No.  I don't think so it was at that point.  I believe that

01:48 22  issue -- when I put in the 20,000, that was when Brad Bungo

01:48 23  called me on the phone and said he was having trouble meeting

01:49 24  payroll; can I do anything.  And so I put $20,000 on a credit

01:49 25  card.

01:49  1    Q.  When you met in -- so you did that via telephone, that

01:49  2    communication?  You weren't in Florida at that time.  You were

01:49  3    in Colorado?

01:49  4    A.  I was in Colorado when I put in that money, yeah.

01:49  5    Q.  And then in the middle of December 2006, what were you

01:49  6    doing with the business at that time?

01:49  7    A.  Eddie had asked me to come down again and take a look and

01:49  8    just talk in general.

01:49  9    Q.  Any particular things you addressed when you were here and

01:49  10   took care of?

01:49  11   A.  Same as before.  Either production has to increase or we

01:49  12   need to raise prices.  We need to do something.

01:49  13   Q.  Were you happy with what Mr. Leiva was doing at this time?

01:49  14   A.  No.

01:49  15   Q.  Did you let him know that?

01:49  16   A.  Well, he knew that.  He himself was unhappy because he

01:49  17   didn't want to lose any money.

01:49  18   Q.  Did you tell him -- did you give him any ultimatums or any

01:49  19   instructions on what he needed to --

01:49  20   A.  I was not in a position to give Mr. Leiva ultimatums.

01:50  21   Q.  Did you have any arguments with him at all?

01:50  22   A.  I've known Eddie for over 20 years, and in that time we had

01:50  23   one argument.  We don't generally argue.  We try to reason

01:50  24   things out.

01:50  25   Q.  At that time did he indicate what actions he intended to

01:50  1    take to try to resolve the issues?

01:50  2    A.   Supposedly he would talk to the sales staff and try to

01:50  3    elicit a higher price per square foot.  And one of the things I

01:50  4    had done was provide a chart that depending on how many square

01:50  5    feet of shutters were manufactured in a given week.  This would

01:50  6    be what it would cost us because our costs were pretty

01:50  7    standardized for payroll, for overhead, for all that stuff.  So

01:51  8    depending on how much you manufacture -- the more you

01:51  9    manufacture, the more your cost goes down.

01:51  10            And I had come up with a break-even point of 8500

01:51  11   square feet.  At that time they had been manufacturing about

01:51  12   5,000 square feet at most in a given week, and that was simply

01:51  13   not enough to be able to sell those shutters for $17 or $18 a

01:51  14   square foot.  So the choice was either to ramp it up to 8500 as

01:51  15   a break even or 10,000 to make a little profit or you need to

01:51  16   raise the price drastically to be able to make ends meet.

01:51  17   Q.   Do you have any idea how much Mr. Feliciano was paid?

01:51  18   A.   I do now.

01:51  19   Q.   Did you use to have -- own a company in New York with Mr.

01:52  20   M$^c$Carroll?

01:52  21   A.   Yes.

01:52  22   Q.   What was the name of that company?

01:52  23   A.   EFS.

01:52  24   Q.   Did you all sell that company?

01:52  25   A.   Yes.

01:52  1   Q.  All right.  How much did you sell it for?

01:52  2   A.  Honestly I don't remember.  I know it was like a two-year

01:52  3   or a three-year payout to us.  I don't remember what the sales

01:52  4   price was.

01:52  5   Q.  Was Mr. Leiva part owner of that company?

01:52  6   A.  Yes.

01:52  7   Q.  Did you all split the sales price between the three of you,

01:52  8   you, Mr. M<sup>c</sup>Carroll, and Mr. Leiva?

01:52  9   A.  Well, we gave the employees some of that money and, yes,

01:52  10  then the remainder we split.

01:52  11  Q.  You have no idea at all how much that was sold for, that

01:52  12  company?

01:52  13  A.  I could guess, but I don't want to testify to something

01:52  14  that I don't really know offhand.

01:52  15  Q.  Did Mr. M<sup>c</sup>Carroll -- did your workers -- did any of your

01:52  16  workers at that company in New York, did they get

01:52  17  time-and-a-half pay?

01:52  18  A.  They did, yes.

01:52  19  Q.  Did any of the workers -- any of these installers in

01:53  20  Florida get time-and-a-half pay?

01:53  21  A.  I don't know what they got.

01:53  22  Q.  Did you ever -- so after the -- did you ever inquire about

01:53  23  how much -- did you ever talk to anybody about their pay

01:53  24  schedules or pay scales, their rates?

01:53  25  A.  Eddie may have mentioned a few to me.  You know, I thought,

01:53  1   if anything, they were high; but that's Eddie's show.  He was

01:53  2   always pretty generous with his employees.

01:53  3   Q.  After the middle of December -- I'm sorry.  After December

01:53  4   2006 when is the next time you came to Florida for a business

01:53  5   purpose of Safe Hurricane?

01:53  6   A.  Again, I'm kind of estimating; but I believe it was March.

01:54  7   It could have been February.  If it was February, it was

01:54  8   probably late February.

01:54  9   Q.  Of '07, right?

01:54  10  A.  Yes.

01:54  11  Q.  And how long were you here for that?

01:54  12  A.  Each time I was here I was here for approximately

01:54  13  two-and-a-half days.

01:54  14  Q.  Is there any particular reason you came to Florida for

01:54  15  this?

01:54  16  A.  More of the same.

01:54  17  Q.  When is the next time you came?

01:54  18  A.  I don't remember if the next time was the last time or

01:54  19  before the last time.  I believe I was here in late May.

01:54  20  Q.  More of the same reason as the previous times?

01:54  21  A.  Yeah.  Whatever Eddie needed me to do.  You know, I would

01:54  22  try to help him out as much as I could.

01:54  23  Q.  Either the last time or the time before that, that was when

01:55  24  you met with the employees and Yerko --

01:55  25  A.  Yeah.

01:55  1   Q.  -- Aguirre?

01:55  2   A.  And that wasn't till -- it was either the beginning of

01:55  3   August or it was late July.

01:55  4   Q.  Did any of those employees indicate they wanted to quit or

01:55  5   they were going to walk out; do you recall?

01:55  6   A.  You know, I think Mario may have indicated that; but I

01:55  7   really didn't talk to anybody else except Yerko, and Yerko was

01:55  8   kind of like the de facto manager of the installers.  He was a

01:55  9   quality control guy.  And they were also really the only two

01:55  10  guys that spoke really good English.

01:55  11  Q.  Did you try to persuade Mr. Feliciano, Mario, or anybody

01:55  12  else to not quit?  Do you recall doing that or not?

01:56  13  A.  I don't know.

01:56  14  Q.  In those times you came back to -- when you actually

01:56  15  visited Florida, was Mr. M<sup>c</sup>Carroll always here when you came

01:56  16  here?

01:56  17  A.  No.  I think -- except for the first two times I think I

01:56  18  saw him two or three more times when I was here.  I think I was

01:56  19  here a total of seven or eight times including the initial two

01:56  20  visits.

01:56  21  Q.  And you -- did you consistently though throughout that

01:56  22  period we just discussed talk to Mr. Leiva about every ten days

01:56  23  on the phone about the operation of the company?

01:56  24  A.  Well, let's say starting in June of 2006, I would probably

01:56  25  talk to him once every ten days, ten days/two weeks, something

01:56  1   like that.

01:57  2   Q.  Do you know how often Mr. M^cCarroll would be in Florida?

01:57  3   Do you have any idea of the percentage based on your own

01:57  4   personal knowledge?

01:57  5   A.  Let's do it this way:  If I saw him twice when I was here

01:57  6   and I was here six times, then he was here 33 percent of the

01:57  7   time.

01:57  8   Q.  Well, you would only know based on the times you were here?

01:57  9   A.  Yes.

01:57 10   Q.  Did you talk to him on the phone about business, though,

01:57 11   this particular business?

01:57 12   A.  I would say no more than five times throughout the whole

01:57 13   life of the company.

01:58 14          MR. KELLY:  May I confer with my client for a moment,

01:58 15   Your Honor?

01:58 16          THE COURT:  Sure.

01:58 17      **(Plaintiffs' counsel confers with plaintiff sotto voce.)**

01:58 18   **BY MR. KELLY:**

01:59 19   Q.  I just want to clarify.  Did you ever -- did you know prior

01:59 20   to this lawsuit who Mr. Milan was, the plaintiff here?

01:59 21   A.  I have no idea who Mr. Milan is.

01:59 22   Q.  How about the Lamonica plaintiffs, Angeles and Reinaldo?

01:59 23   A.  I know them.

01:59 24   Q.  Okay.  Do you have any idea -- do you recall ever

01:59 25   communicating with them when they were on the job?

| | | |
|---|---|---|
| 01:59 | 1 | A.  Sure.  I saw Kiko and Angeles usually whenever I was there. |
| 01:59 | 2 | Q.  Did you ever talk with them about the business at all? |
| 01:59 | 3 | A.  No.  I talked to them on a personal level. |
| 01:59 | 4 | Q.  How about -- do you know who the Alborez plaintiffs are, |
| 01:59 | 5 | Guillermo and Julio? |
| 01:59 | 6 | A.  I know them by sight, but I don't know the names. |
| 01:59 | 7 | Q.  Do you have any idea what the Lamonicas' schedule was, the |
| 02:00 | 8 | days of the week they worked? |
| 02:00 | 9 | A.  I don't know what their schedule was supposed to be.  I |
| 02:00 | 10 | know Kiko would show up, you know, around 8:00, 8:30, 9:00 |
| 02:00 | 11 | sometimes with Angeles.  Sometimes without. |
| 02:00 | 12 | Q.  So prior to this lawsuit being filed were you yourself |
| 02:00 | 13 | aware that there were laws in the United States that require |
| 02:00 | 14 | overtime and minimum wages to be paid to certain employees? |
| 02:00 | 15 | A.  To hourly workers, yes. |
| 02:00 | 16 | Q.  Did you yourself ever take any steps or affirmative actions |
| 02:00 | 17 | to contact anybody outside the company to find or check whether |
| 02:01 | 18 | the company was complying with the overtime and minimum wage |
| 02:01 | 19 | laws with respect to pay to the installers? |
| 02:01 | 20 | A.  No.  I had no reason to. |
| 02:01 | 21 | Q.  Did anybody else?  Mr. Leiva or Mr. M^cCarroll or anybody |
| 02:01 | 22 | else?  Do you know whether they did or didn't? |
| 02:01 | 23 | A.  I would assume because all the posters were in the right |
| 02:01 | 24 | places that they had gotten those.  So at the very least for |
| 02:01 | 25 | that they did, yes. |

02:01  1    Q.  You don't have any independent knowledge though --

02:01  2    A.  No.

02:01  3    Q.  -- of whether they actually did or if they didn't?

02:01  4    A.  No, no.

02:01  5         MR. KELLY:  I don't have anything further, Your Honor.

02:01  6         THE COURT:  Cross-examine.

02:02  7         MR. KLEPPIN:  Thank you.

02:02  8                    CROSS-EXAMINATION

02:02  9    BY MR. KLEPPIN:

02:02  10   Q.  Good afternoon.

02:02  11   A.  How are you?

02:02  12   Q.  I'm well.  I'd ask you how you are, but I think we'll just

02:02  13   leave that alone.

02:02  14   A.  Thank you.

02:02  15   Q.  You had -- you were questioned and shown a page in your

02:02  16   deposition where you said that -- you were asked, Were you an

02:02  17   officer or director.  You thought you were both.  You're not

02:02  18   sure.  Steve Rosen would know?

02:02  19   A.  Right.

02:02  20   Q.  Who is Rosen?

02:02  21   A.  Rosen was the attorney for the corporation, and he also

02:02  22   filed the articles of incorporation.

02:02  23   Q.  And did he draft up this shareholder's agreement and the

02:03  24   other governing documents of Safe Hurricane Shutters?

02:03  25   A.  Yes, he did.

02:03   1    Q.   Okay.  After your deposition was over, did you go back and

02:03   2    look at those documents and see whether they characterized you

02:03   3    as a director or as an officer or both?

02:03   4    A.   Yes, I did.

02:03   5    Q.   And how did they characterize you?

02:03   6    A.   As a director.

02:03   7    Q.   Only?

02:03   8    A.   Yes.

02:03   9    Q.   Can you describe the -- can you just generally describe for

02:03   10   the jury how a corporation like Safe Hurricane Shutters works

02:03   11   when it has a board in place.  Some of the board members have

02:03   12   minority ownership shares in the company, and they hire a CEO

02:03   13   who then hires a management team to operate the business.

02:03   14   A.   That's correct.  And the CEO was Eddie.  That's what

02:03   15   everybody agreed upon.  And Eddie had met three gentlemen who

02:04   16   between them should have been able to run a hurricane business.

02:04   17   They had experience with other hurricane shutter companies in

02:04   18   Florida.  And it was Mark Shankman for sales, John Pisz as a

02:04   19   general manager of the business, and Tom Sullivan as a

02:04   20   manufacturing/warehouse manager.  And that's the way the

02:04   21   company was formed with the intent that those three gentlemen

02:04   22   were going to be the hands-on day-to-day operational team of

02:04   23   the business.

02:04   24   Q.   And Mr. Bungo, controller?

02:04   25   A.   Mr. Bungo was t he accounting manager/controller, yes.

02:04  1   Q.   Did he directly report to Eddie with a dotted line to John

02:04  2   Pisz --

02:04  3   A.   I'm not quite --

02:04  4   Q.   -- or the other way around?

02:04  5   A.   I'm not quite sure if it was that way or the other way

02:04  6   around; but, yeah, he had a direct pipeline to both.

02:05  7   Q.   It's not unusual, is it, that a company like this that the

02:05  8   CEO may have of a minority ownership interest as well?

02:05  9   A.   Well, I think the reason for that was we had been partners

02:05  10  in other businesses and we all had even shares in the

02:05  11  companies.  And I don't think Eddie wanted to change that, nor

02:05  12  did Frank, nor did I.

02:05  13  Q.   Because you had an even share with Eddie and you've

02:05  14  testified that that does not mean that you could just go in and

02:05  15  tell him what to do, describe for the jury why that is so from

02:05  16  a corporate governance perspective.

02:05  17  A.   Right.  It was understood in the beginning that since

02:05  18  neither Frank nor I resided in Florida nor did we have any

02:05  19  interest in residing in Florida, that we were going to be

02:05  20  absentee owners.  And we would be able to provide very little

02:06  21  help with the business, if any.  And, therefore, we were -- our

02:06  22  interest in the business was strictly financial, and we didn't

02:06  23  have any desire for it to ever be anything else.

02:06  24  Q.   So was this a situation where Leiva as CEO operated the

02:06  25  business day to day with his management team and reported to

02:06  1    the board, meaning the whole board, not you and Frank?

02:06  2    A.   There was not even any requirement for him to report to the

02:06  3    board.   Any reportage was done on a very informal basis; and,

02:06  4    yeah, he was the Florida person who was hands-on directing the

02:06  5    company doing what he needed to do.

02:06  6    Q.   So there were no monthly or quarterly or annually or annual

02:06  7    board meetings where Ed would have to answer to the board.

02:06  8    This was all informal 'cause you're buddies?

02:06  9    A.   Yes.

02:07  10   Q.   Did you ever set any corporate policies for Safe Hurricane

02:07  11   Shutters?

02:07  12   A.   No.

02:07  13   Q.   Now, you had -- you've described when you would come here

02:07  14   that it was two-and-a-half days.   Why do you describe that as

02:07  15   being two-and-a-half days?   Just when would you fly in and when

02:07  16   would you fly out?

02:07  17   A.   The standard way would be -- well, because I'm coming from

02:07  18   the west flying east, I lose the majority of that first day.

02:07  19   That's why I say two-and-a-half days.   But I would generally

02:07  20   come in on one day and leave two days later on the night

02:07  21   flight.

02:07  22   Q.   So your time at the company would really be two days, but

02:07  23   you're two-and-a-half days in Florida?

02:07  24   A.   Right.

02:07  25   Q.   And then when you would come in for these and you'd spend

02:08  1   these two days every so often as you've described it at the

02:08  2   company, what did you spend your time doing typically in

02:08  3   general?

02:08  4   A.  Whatever Eddie really wanted me to do.

02:08  5   Q.  Did you have any --

02:08  6   A.  It varied from time to time.

02:08  7   Q.  So you had no specific duties?

02:08  8   A.  No.

02:08  9   Q.  Were you ever involved in the day-to-day operations of Safe

02:08  10  Hurricane Shutters?

02:08  11  A.  I can't be from Colorado.

02:08  12  Q.  Were you even interested in what was going on day to day

02:08  13  with respect to the operations of Safe Hurricane Shutters?

02:08  14  A.  No.  I was an investor.  I -- you know, I told Eddie from

02:08  15  the beginning I don't want to come here.  I'm not going to be

02:08  16  able to help out with the business.  That was understood.

02:08  17  Q.  So you're more looking at the bottom line.  You don't care

02:08  18  how they get to bottom line.

02:08  19  A.  Honestly I didn't even look at the bottom line until things

02:08  20  really started getting bad and more investments were necessary.

02:09  21  Q.  Did you ever supervise any employees at Safe Hurricane

02:09  22  Shutters?

02:09  23  A.  No.

02:09  24  Q.  Were you responsible for the hiring and firing of any

02:09  25  employees at Safe Hurricane Shutters?

APRIL 13, 2011

02:09  1    A.  Like I said, I assisted in the firing of Tom Sullivan for

02:09  2    cause.  I did not hire anybody ever in the existence of the

02:09  3    company, and I didn't fire anybody else.

02:09  4    Q.  Did you ever set wages or salaries for any employees at

02:09  5    Safe Hurricane Shutters?

02:09  6    A.  No.

02:09  7    Q.  Were you even remotely involved in any decisions related to

02:09  8    wages or salaries?

02:09  9    A.  No.

02:09  10   Q.  Were you even apprised of what wages and salaries employees

02:09  11   at Safe Hurricane Shutters were being paid?

02:09  12   A.  With the exception of Mark Shankman because it seemed

02:09  13   outrageous to Frank and it seemed equally outrageous to me what

02:09  14   he was getting as a draw when Frank informed me.  I wasn't even

02:10  15   appraised of what they were getting, no.

02:10  16   Q.  So when Frank learned about that, he called you and said,

02:10  17   you know, hey, did you hear --

02:10  18   A.  Do you know what this guy's getting?  This is ridiculous.

02:10  19   Q.  Did you ever supervise any employees at Safe Hurricane

02:10  20   Shutters?

02:10  21   A.  No.

02:10  22   Q.  Were you responsible for the hiring and firing of any

02:10  23   employees at Safe Hurricane Shutters?

02:10  24   A.  No.

02:10  25   Q.  Do you have any idea how to install hurricane shutters?

APRIL 13, 2011

02:10 1    A.   No.

02:10 2    Q.   Do you speak any Spanish?

02:10 3    A.   Very, very little.

02:10 4    Q.   I want to talk about these seven times that you came here

02:10 5    and you said that only two of them were during the actual

02:10 6    operations of the company.

02:10 7    A.   No, no, no.  Two of them were before the operation of the

02:10 8    company.  The remainder was starting in late May of --

02:10 9    Q.   Sorry about that.  I -- yeah.  I misspoke.  Two were before

02:10 10   it became operational.  The other five were after it was

02:10 11   running?

02:10 12   A.   Yeah.  It was either five or six.  I think you're right.  I

02:10 13   think it was five, but I can't swear to it.

02:11 14   Q.   When you came when it was operational?

02:11 15   A.   Right.

02:11 16   Q.   During the first visit what did you discuss with Eddie the

02:11 17   first time that you came in January of '06?

02:11 18   A.   Honestly not a whole lot.  The first visit was kind of an

02:11 19   introduction to the newly developed office space and the

02:11 20   warehouse and this is how we do this and this is how we do

02:11 21   that.  And I said, Cool.

02:11 22   Q.   In March of '06 the next time you came down before the

02:11 23   company was operational, had the management team already been

02:11 24   hired?

02:11 25   A.   I was talking about the first time that the company was

02:11  1    already operational.

02:11  2    Q.  Oh, I'm sorry.  I'm sorry.  I meant in January of '06

02:11  3    whether you first came down --

02:11  4    A.  Right.

02:11  5    Q.  -- before it was operational --

02:11  6    A.  Yeah.

02:11  7    Q.  -- that was just to talk to Eddie about this concept that

02:11  8    he had --

02:11  9    A.  Yes, yes.

02:11  10   Q.  -- for a hurricane shutter business?

02:11  11   A.  Yes, yes.

02:11  12   Q.  And apparently an agreement was reached between you, Frank,

02:11  13   Eddie, and maybe others that you'd make a go of this?

02:11  14   A.  Yes.  And that agreement was based upon the existence of

02:12  15   the three gentlemen who were interested in forming a new

02:12  16   company and running it and in return for that a year down the

02:12  17   line getting some shares in the corporation.

02:12  18   Q.  So in March then of 2006 when you came down the second time

02:12  19   and the last time you came down before the company became

02:12  20   operational, had Mr. Leiva already hired the three department

02:12  21   heads and the controller?

02:12  22   A.  Yes.

02:12  23   Q.  Did you have any involvement in the decision as to who to

02:12  24   hire and what they would be paid, anything with respect to

02:12  25   those four people we've just identified?

02:12  1  A.  Other than that we agreed to the business being formed on

02:12  2  the basis of those three gentlemen being interested in running

02:12  3  the company.  That was the extent of the involvement.

02:12  4  Q.  Okay.  So you knew that in concept, Eddie, you're going to

02:12  5  be the CEO running it day to day.  You're going to hire these

02:13  6  four people to run these four divisions --

02:13  7  A.  Right.

02:13  8  Q.  -- but who they were, what their qualifications would be,

02:13  9  what they were to be paid, you had nothing to do with that?

02:13  10  A.  I had nothing to do with what they were going to be paid.

02:13  11  Eddie described in great detail what their qualifications were

02:13  12  in January.

02:13  13  Q.  Was that something --

02:13  14  A.  And that's why Frank and I agreed to the formation of the

02:13  15  business because we knew absolutely nothing about hurricane

02:13  16  shutters.  I didn't even know such a thing existed outside of

02:13  17  the steel plates that people put up.

02:13  18  Q.  So Eddie then had said, I'm going to use my connections to

02:13  19  hire people I know who can run this company with me

02:13  20  successfully?

02:13  21  A.  Right.  And he had already met these three gentlemen.  We

02:13  22  just hadn't, Frank and I.

02:13  23  Q.  Okay.  So you had no idea who these people were --

02:13  24  A.  No.

02:13  25  Q.  -- when they already came on board to be part of the

02:13   1   management team by Eddie?

02:13   2   A.   Right.   We were introduced to them in March as the three

02:13   3   gentlemen who were going to be running the company.

02:13   4   Q.   So you really had no say-so in their hire?

02:14   5   A.   Well, the say-so was in the formation of the company.

02:14   6   Q.   Right.

02:14   7   A.   But since none of us knew anything about the shutter

02:14   8   business, it was imperative that we have people who do.

02:14   9   Q.   That's what I'm asking.

02:14   10   A.   That have a vested stake.

02:14   11   Q.   What I'm asking, though, is did you have a say-so in

02:14   12   whether Mr. Mark Shankman would be hired to run sales --

02:14   13   A.   Oh, no.

02:14   14   Q.   -- very Mr. P or B.

02:14   15   A.   I had no idea who these people were.

02:14   16   Q.   Okay.

02:14   17   A.   Yeah.

02:14   18   Q.   And with respect to who's going to operate -- manage the

02:14   19   warehouse, did you have any input as to whether it would be Tom

02:14   20   Sullivan or Candidate B or C?

02:14   21   A.   No.

02:14   22   Q.   Okay.   All those decisions were made by Mr. Leiva?

02:14   23   A.   Right.

02:14   24   Q.   Were you asked by Eddie to have any input in who these

02:14   25   managers ought to be?

02:14  1   A.   I didn't know anybody in the hurricane business so I

02:14  2   couldn't have any input.

02:14  3   Q.   When you would come to Florida during the times that you've

02:14  4   described there, who would you stay with?

02:14  5   A.   Eddie.

02:15  6   Q.   Now, with respect to the June 2006 visit, late May/June of

02:15  7   2006, you said that was the first time you came down after the

02:15  8   company began its operations?

02:15  9   A.   Uh-huh (affirmative).

02:15 10   Q.   Other than just seeing Eddie and having Eddie kind of show

02:15 11   you the business is there anything else that you did during

02:15 12   that time?

02:15 13   A.   I probably did; but there was definitely nothing of

02:15 14   significance, that trip.

02:15 15   Q.   Well, did you involve yourself in operations of the company

02:15 16   in any manner?

02:15 17   A.   No.

02:15 18   Q.   In any of the subdepartments of the company?

02:15 19   A.   No.

02:15 20   Q.   Did you fire anybody?

02:15 21   A.   No.

02:15 22   Q.   Hire anybody?

02:15 23   A.   I said hi to some people that I knew from New York.  Other

02:15 24   than that, no.

02:15 25   Q.   Were you involved in any personnel decisions of any kind?

JURY TRIAL - VOLUME III of VI

02:15  1    A.   No.

02:15  2    Q.   Any human resources decisions?

02:15  3    A.   No.

02:15  4    Q.   Decisions concerning pay?

02:15  5    A.   No.

02:15  6    Q.   Let's talk about the fourth trip that you came to Florida;

02:15  7    and that was approximately September of 2006, perhaps October

02:16  8    you said?

02:16  9    A.   I think it was more likely October.

02:16  10   Q.   Okay.  You're just giving an approximation.

02:16  11   A.   Yeah.

02:16  12   Q.   We understand that.

02:16  13   A.   Yeah.

02:16  14   Q.   And I think that's when you told Mr. Kelly that you were

02:16  15   taking a look at the pricing of the business?

02:16  16   A.   Right.  Because it was already another investment needed,

02:16  17   and Eddie had asked me to do an analysis of what was going on

02:16  18   because he saw that the funds were starting to run low compared

02:16  19   to what he wanted them to be.

02:16  20   Q.   Okay.  So this -- what prompted this inquiry is you're

02:16  21   coming down here to Florida.  You're being asked by the CEO,

02:16  22   Look, we need you to put up some more money?

02:16  23   A.   Right.

02:16  24   Q.   You're curious as to why am I having to do this?

02:16  25   A.   Well, I had already sent the money; but now, you know,

02:16  1  let's figure out what's going on.

02:16  2  Q.  Okay.  And what exactly -- with respect to the cost

02:16  3  analysis, what did you come out to that this company could

02:17  4  actually install these hurricane shutters for per square foot

02:17  5  at that time?

02:17  6  A.  Well, at that time they were approaching manufacturing

02:17  7  about $4500 to 5,000 square feet.  And at that rate they had to

02:17  8  be able to sell the shutters for somewhere around $21 just to

02:17  9  be able to break even.

02:17  10  Q.  And what were they selling the shutters for?

02:17  11  A.  17 to 17.50.

02:17  12  Q.  And naturally you spoke to Eddie about this problem?

02:17  13  A.  Absolutely.

02:17  14  Q.  It's clear that the company's not going to be making money

02:17  15  unless, as you said, revenue increases --

02:17  16  A.  Right.

02:17  17  Q.  -- or they raise the price?

02:17  18  A.  Right.  And I actually remember saying if we walk around

02:17  19  this place, what can we get for all these materials we have in

02:17  20  inventory because we should probably sell them and shut the

02:17  21  company down.

02:17  22  Q.  With respect to increasing revenue you were asked some

02:18  23  questions by Mr. Kelly about that.  Is it that as you sell --

02:18  24  your costs are relatively fixed, so the more shutters that you

02:18  25  sell your costs are lower per shutter and your revenue

02:18  1    increases exponentially?  Is that --

02:18  2    A.   The more shutters that you manufacture -- it's a straight

02:18  3    line to a break even.  And at the time it was -- the chart I

02:18  4    had done based on all the information available to me was if we

02:18  5    manufactured and installed 8500 square feet of shutters per

02:18  6    week, then we would be breaking even.

02:18  7    Q.   So you suggested to Eddie, We need to either change the

02:18  8    pricing structure or we simply need to shut this down?

02:18  9    A.   Correct.  Or you need to manufacture and install more than

02:18 10    8500 square feet worth of shutters per week.

02:18 11    Q.   What did Eddie do with respect to your suggestion?

02:18 12    A.   Well, I had talked to him probably a week or ten days after

02:19 13    I left Florida.  And he told me, you know, they're on great

02:19 14    pace.  I think they're going to make 10,000 this week.  I said,

02:19 15    Okay.  We're getting there.  No problem.  I'm good.

02:19 16    Q.   Let me ask it this way:   Did Mr. Leiva raise the prices of

02:19 17    the hurricane shutters that the company was selling?

02:19 18    A.   No.

02:19 19    Q.   Did he shut the business down?

02:19 20    A.   No.

02:19 21    Q.   Was he able to increase the revenue or the amount of

02:19 22    shutters that were being fabricated and sold and installed to

02:19 23    where it was --

02:19 24    A.   He said he was, but it turns out that that wasn't so.

02:19 25    Q.   So he didn't follow --

02:19  1    A.   At least not sufficiently.

02:19  2    Q.   So he didn't follow your suggestion?

02:19  3    A.   I'm sure he tried; but in reality, no.

02:19  4    Q.   So he neither raised the prices nor shut down the business?

02:19  5    A.   Right.

02:19  6    Q.   Now, did you involve yourself in operations at all during

02:20  7    the visit?

02:20  8    A.   No.

02:20  9    Q.   You didn't hire or fire anyone during that visit?

02:20  10   A.   No.

02:20  11   Q.   Now, the fifth time that you came to Safe Hurricane

02:20  12   Shutters approximately December of 2006?

02:20  13   A.   Right.

02:20  14   Q.   Had Eddie implemented your suggested pricing structure

02:20  15   changes by then?

02:20  16   A.   No.

02:20  17   Q.   And certainly he hadn't shut down the business yet.  We

02:20  18   know that.

02:20  19   A.   Right.  The manufacturing was a little better at that

02:20  20   point, but it was still hovering around 6,000 square feet a

02:20  21   week.  And that just wasn't enough to break even.

02:20  22   Q.   So it's that Eddie didn't have to follow your suggestion?

02:20  23   A.   Of course not.

02:20  24   Q.   Did you ever think about convening a board meeting to force

02:21  25   Eddie to convince a majority of the board that we need to

02:21 1  change the pricing structure.  The CEO won't do it.  Maybe we

02:21 2  should have a vote on this and force the issue?

02:21 3  A.  Every member of the board was a friend of Eddies as was I.

02:21 4  And to do something like that would be very embarrassing to

02:21 5  him, and I would not do that.

02:21 6  Q.  So it's a matter of confrontation and really undermining

02:21 7  his authority, and you didn't want to do that?

02:21 8  A.  And backstabbing a friend.

02:21 9  Q.  Did you speak to Frank M$^c$Carroll by the way about these

02:21 10  pricing structure issues?

02:21 11  A.  Yes.

02:21 12  Q.  Did he agree with you by the way that Eddie should take up

02:21 13  your suggestions?

02:21 14  A.  Well, at first he couldn't believe that it was as bad as I

02:22 15  said, and I showed him the chart that I developed.  And I said,

02:22 16  Tell me if I'm missing something.  I mean numbers don't lie.

02:22 17  And he finally agreed; and he said, Yeah, this is not good.

02:22 18  But, you know, he pretty much felt the same way as I did.  He

02:22 19  had been a friend of Eddies for longer than I have.

02:22 20  Q.  You acknowledge it was Mr. Leiva's business to run as he

02:22 21  saw fit?

02:22 22  A.  Yes.  That was understood from the beginning.

02:22 23  Q.  Did you ever go to a job site when the installers were

02:22 24  working there?

02:22 25  A.  I went to the building.  I didn't go to the installation

02:22  1    area.

02:22  2    Q.   Okay.  So --

02:22  3    A.   And this was at Points of America.

02:22  4    Q.   So this is a condominium.  It's not a private home?

02:22  5    A.   Right.

02:22  6    Q.   And perhaps there was a crew hanging shutters at that time;

02:22  7    but you were dealing with people in the business office, not

02:23  8    with the crew?

02:23  9    A.   Correct.

02:23  10   Q.   So during that particular meeting you weren't supervising

02:23  11   installers or anything like that?

02:23  12   A.   No.  I never supervised the installers.

02:23  13   Q.   Okay.  So during all of these visits that you've described

02:23  14   --

02:23  15   A.   Uh-huh (affirmative).

02:23  16   Q.   -- and that Mr. Kelly spoke to you about, you never went to

02:23  17   a job site and supervised any installers?

02:23  18   A.   Again, I have gone to job sites because they happen to be

02:23  19   in the building, Points of America specifically.  And later on

02:23  20   I did go to Marine Towers and met with the board there with Mr.

02:23  21   Leiva, but I didn't go to the particular installation sites to

02:23  22   supervise or anything else.

02:23  23   Q.   What you've just described sound like customer relations

02:23  24   issues.  Is that more of an accurate description?  You're not

02:23  25   going to visit a job site to see the substantive performance --

02:23 1   A.  Right.

02:24 2   Q.  -- of the work?

02:24 3   A.  Right.

02:24 4   Q.  You're going to speak to a customer --

02:24 5   A.  Correct.

02:24 6   Q.  -- along with Mr. Leiva?

02:24 7   A.  Correct.  And in the case of Points of America, the reason

02:24 8   was they were late getting us the check which we wanted to be

02:24 9   able to pay the employees.

02:24 10  Q.  Okay.  So the customer relations issue that you dealt with

02:24 11  during these visits had nothing to do with what these

02:24 12  installers were doing --

02:24 13  A.  No.

02:24 14  Q.  -- or how they were performing their job?

02:24 15  A.  No.

02:24 16  Q.  During all of your visits did you ever make any employment

02:24 17  decisions concerning any of the plaintiffs in this case?

02:24 18  A.  No.

02:24 19  Q.  Concerning any installers?

02:24 20  A.  Not at all.

02:24 21  Q.  With your telephone conversations to Ed Leiva did you ever

02:24 22  make any --

02:24 23  A.  No.

02:24 24  Q.  -- decisions or have any involvement in anything to do with

02:24 25  the plaintiffs in this case --

APRIL 13, 2011

02:24  1    A.   No.

02:24  2    Q.   -- or any installers?

02:24  3    A.   No.

02:24  4    Q.   Did you communicate with Ed Leiva in any other means other

02:25  5    than what we've described here that had anything to do with --

02:25  6    that could be characterized as you having an involvement with

02:25  7    respect to employment issues concerning the installers?

02:25  8    A.   Again when I say I was an absentee owner, take it to the

02:25  9    truest meaning of the word.  I had nothing to do with any of

02:25  10   that.  This was Eddie's company to run.

02:25  11   Q.   You don't speak Spanish?

02:25  12   A.   I know a few words.  There are times I can actually under

02:25  13   -- I understand more than I know how to say.  I was married to

02:25  14   a girl who was from Puerto Rico.  So, you know, I heard her

02:25  15   curse under her breath every once in a while.  So, yes, I do

02:25  16   understand some, but I speak hardly any.

02:25  17   Q.   Okay.  Were you not involved in any pay decisions

02:25  18   concerning the installers from a policy perspective?

02:26  19   A.   No.

02:26  20   Q.   Did the -- I know that you were there a limited amount of

02:26  21   time; but when these times that you went to the business when

02:26  22   it was operational, did you go there with Eddie or did you go

02:26  23   there alone?

02:26  24   A.   No.  I always went with Eddie.

02:26  25   Q.   What time would you and Eddie arrive there typically?

02:26  1    A.   A quarter till 8:00, 8:00.  Sometimes a little bit before

02:26  2    that.

02:26  3    Q.   Were you the first ones to arrive there or were other

02:26  4    people already there?

02:26  5    A.   I recall one time where somebody was actually waiting for

02:26  6    us to open the door.  Other than that we always opened up.

02:26  7    Q.   Was that an installer or someone else or a warehouse

02:26  8    worker?

02:26  9    A.   No.  That was an installer, but I don't remember his name.

02:26  10   Q.   Who had the keys to the business?

02:27  11   A.   To my knowledge Eddie had the key.  Brad had the key, and I

02:27  12   think Frank later on got the key.  Other than that I don't know

02:27  13   of anybody who had the key.

02:27  14   Q.   These times that you were there at Safe Hurricane Shutters

02:27  15   did you ever observe when the installers arrived?

02:27  16   A.   Yes.

02:27  17   Q.   When was that?

02:27  18   A.   Maybe starting 8:15, you know, 8:30.  Usually by 8:30 they

02:27  19   were there.

02:27  20   Q.   Did you observe when the installers would arrive back --

02:27  21   let me ask it -- let me step back for one moment.  Were there

02:27  22   times when installers would not come into the office until

02:27  23   mid-day or so because for whatever reason there wasn't going to

02:27  24   be any work performed that morning at a job site?

02:28  25   A.   You know what, I didn't pay that great of attention to

APRIL 13, 2011

02:28  1    that.  I'm sure there were; but, again, I was there so little

02:28  2    that I probably wouldn't have noticed that because I'd already

02:28  3    be in the office.  In the meantime, you know, they'd walk in

02:28  4    later and I wouldn't know about it.

02:28  5    Q.  So you don't recall a specific instance of that occurring?

02:28  6    A.  I don't.

02:28  7    Q.  What about -- what time would the installers arrive back on

02:28  8    average from what you personally observed later in the day?

02:28  9    A.  From what I saw, the trucks started pulling in maybe

02:28  10   between 1:30 and 2:00 and go to maybe 5:00, 5:30; but usually

02:28  11   most of the trucks were there by 4:00 o'clock.

02:28  12   Q.  If you had to say from what you personally observed on

02:28  13   average when these installers would arrive back at the shop,

02:28  14   what time would that be approximately?

02:28  15   A.  On average probably 3:00 o'clock.

02:29  16   Q.  Were there times because of lightening and rain and storms

02:29  17   that the installers wouldn't work at all in the course of a

02:29  18   day?

02:29  19   A.  There was one time while I was down here that the

02:29  20   lightening storms were so bad the crews actually came back for

02:29  21   the most part by 10:30 or so, and they wouldn't go out for the

02:29  22   rest of the day.  They'd just stop.

02:29  23   Q.  And then did they go home?

02:29  24   A.  Yes.

02:29  25   Q.  Is it possible from what you observed that a crew could

02:29  1   have worked consistently week after week after week after week

02:29  2   much less even one week 66 hours for Safe Hurricane Shutters?

02:29  3   A.   You know, anything is possible; but there's no way.

02:29  4   Q.   From what you observed?

02:29  5   A.   There's no way.

02:30  6   Q.   So from what you observed, the installers weren't working

02:30  7   over 40 hours in a week?

02:30  8   A.   Maybe if they worked Saturday, they worked 40, maybe.

02:30  9   Q.   Did Eddie ever run operational decisions before (sic) you

02:30  10  before making them --

02:30  11  A.   No.

02:30  12  Q.   -- during the time Safe Hurricane Shutters was open for

02:30  13  business?

02:30  14  A.   No.

02:30  15  Q.   Did he ever running firing decisions by you before he would

02:30  16  make them?

02:30  17  A.   With the exception of John Pisz and Tom Sullivan, no.

02:30  18  Q.   Did he ask for your okay or did he just say, Look --

02:30  19  A.   No.  He --

02:30  20  Q.   -- I'm going to fire this guy?

02:30  21  A.   He just said -- well, regarding Tom Sullivan, Tom Sullivan

02:30  22  basically stole from the company; and that was a no-brainer.

02:31  23  With John Pisz I think both Frank and I advised him to try to

02:31  24  work things out with John Pisz as much as he could; but they

02:31  25  never did, and Eddie decided to fire him or John Pisz just

02:31  1   left, one of the two.

02:31  2   Q.  Did you ever earn or make any money from this venture at

02:31  3   all?

02:31  4   A.  Unfortunately no.

02:31  5   Q.  Actually how much was Mr. Leiva paid?  Do you know what his

02:31  6   salary was?

02:31  7   A.  I know Eddie took a check for $500 a week.  I also know

02:31  8   that the majority of them were never cashed.

02:31  9   Q.  How do you know that?

02:31  10  A.  I've seen them, you know.  So, you know, if he got on the

02:31  11  average a hundred dollars a week, that would be a lot.

02:31  12  Q.  So Eddie's making half of what Mr. Feliciano was making?

02:31  13  A.  No.  I said if he got --

02:31  14  Q.  If he was --

02:31  15  A.  No, no, no.

02:31  16  Q.  -- cashing the checks?

02:31  17  A.  He wasn't cashing the checks.  That's the whole point.  I

02:32  18  think he probably ended up with a hundred dollars a week or so.

02:32  19  Q.  How much -- did the company have the Department of Labor

02:32  20  posters that are required to be posted in the workplace?

02:32  21  A.  Yes.

02:32  22  Q.  And were they in a place that were in conspicuous view for

02:32  23  the installers to see?

02:32  24  A.  Yes.  It was right before you walk into the back of the

02:32  25  company so that everybody who came in the door basically saw

02:32  1   them.

02:32  2   Q.   Were you an officer with day-to-day operational control at

02:32  3   any time at Safe Hurricane Shutters?

02:32  4   A.   Never.

02:32  5        MR. KLEPPIN:  No further questions, Your Honor.

02:32  6        THE COURT:  All right.  Mr. Leiva, do you have any

02:32  7   questions, cross-examination of this witness?

02:32  8        MR. LEIVA:  No.  No, Your Honor.

02:33  9        THE COURT:  All right.  You can step down, Mr.

02:33 10   Heidelberger.  And I neglected, Mr. Leiva, to ask you if you

02:33 11   had any cross-examination of Mr. M$^{c}$Carroll.  If you do, you can

02:33 12   do it now.

02:33 13        MR. LEIVA:  No, Your Honor.  That's okay.

02:33 14        THE COURT:  All right.  We can have your next witness

02:33 15   then, Mr. Kelly.

02:33 16        MR. KELLY:  Your Honor, I call the plaintiff, Mr.

02:33 17   Feliciano.

02:33 18        THE COURT:  Please raise your right hand and be sworn.

02:33 19        **MARIO FELICIANO, PLAINTIFF, SWORN.**

02:33 20        THE COURT:  Please have a seat and please tell us your

02:33 21   full name.

02:33 22        MR. FELICIANO:  My name is Mario Feliciano, last name

02:33 23   F-e-l-i-c-i-a-n-o.

02:33 24                    **DIRECT EXAMINATION**

02:33 25   BY MR. KELLY:

02:33  1   Q.   Good afternoon, Mr. Feliciano.

02:33  2   A.   Good afternoon.

02:33  3   Q.   You were employed by the defendant Safe Hurricane Shutters

02:34  4   and the individual defendants, correct?

02:34  5   A.   Yes.

02:34  6   Q.   And could you tell the jury what your position was with the

02:34  7   company.

02:34  8   A.   I was an installer.

02:34  9   Q.   And can you tell us when you first started working for the

02:34  10  company.

02:34  11  A.   I started working for the company I believe at the

02:34  12  beginning of August of 2006, maybe the second half, second week

02:34  13  to maybe the middle or the end of September 2007.

02:34  14  Q.   And would you -- when you first started working for the

02:34  15  defendants, were you given a pick of your salary?

02:34  16  A.   Well, the agreement was when I met Mr. Leiva -- that was

02:34  17  the first person I met in the company -- it was going to be for

02:35  18  40 hours a week.  I started at $800.  And after that they gave

02:35  19  me a raise.

02:35  20  Q.   And was there an understanding as to how much you were

02:35  21  supposed to work when you were an installer per week?

02:35  22  A.   When they described the type of work that I was going to

02:35  23  do, they told me that I was supposed to work from 8:00 o'clock

02:35  24  and that I was about to finish around 3:00, 4:00 o'clock in the

02:35  25  afternoon.  That never happened.

02:35  1   Q.  So were you ever led to believe that you were expected to

02:35  2   work more than 40 hours in a week?

02:35  3   A.  I wasn't expecting to work more than 40 hours.

02:35  4   Q.  And so just to refer to my next question, what was the

02:35  5   exact amount you were paid when you were first hired?

02:35  6   A.  I started at $800, and a couple of months later they raised

02:36  7   me to a thousand dollars.

02:36  8   Q.  When was that?

02:36  9   A.  I started at 800 in August, and around November or December

02:36  10  of the same year, 2006, they raised me to a thousand dollars.

02:36  11  Q.  Did you ever make more than a thousand dollars per week?

02:36  12  A.  No.

02:36  13  Q.  So no matter how many hours a week you worked it was always

02:36  14  the same --

02:36  15  A.  Yes, sir.

02:36  16  Q.  -- amount?

02:36  17  A.  Yes, sir.

02:36  18  Q.  When you first started, what was your -- can you recall

02:36  19  what days of the week you worked in August of 2006?

02:36  20  A.  I worked Monday through Saturday.  And we used to go there

02:36  21  -- we had to be there by 7:30.  We used to get there between

02:36  22  7:00, 7:20, 7:15, depends on the traffic.  And we -- after

02:36  23  that, depends on the time that we finish, maybe 5:30, 6:00

02:36  24  o'clock sometimes.  Sometimes more than that.  7:30.  Depends

02:37  25  on the day of work.

JURY TRIAL - VOLUME III of VI

02:37  1    Q.  And so -- and what time would you finish on Mondays?

02:37  2    A.  On Mondays -- it would depend on the day of work, but never

02:37  3    before 5:00 o'clock.

02:37  4    Q.  So the earliest was 5:00?

02:37  5    A.  The earliest that I recall, 5:00; just a few times.

02:37  6    Q.  So when you first -- the first place you went, where was

02:37  7    that in the morning?

02:37  8    A.  Okay.  We got into the place around, like I said, around

02:37  9    7:15, 7:20.  We got to the lounge, got a little coffee, and

02:37 10    then I went to the office to get the work order to see what

02:37 11    type of work we were supposed to do during that day.  And we

02:37 12    went -- after that we went to the place where they install --

02:37 13    you know, make the shutters to get the work that we were

02:37 14    supposed to do or install and load the truck because we had to

02:38 15    leave the premises at 8:00 o'clock in the morning no matter

02:38 16    where we were going.

02:38 17         After that we went to the place to install.  It could

02:38 18    be a house.  It could be buildings.  Whatever job was assigned

02:38 19    to us.  And we stayed there until we finish.  Many times we

02:38 20    didn't finish the job.  We had to go back again the next day,

02:38 21    two days, three days, depend on how big the job was.

02:38 22    Q.  So were you required to go to the lounge first in the

02:38 23    morning?

02:38 24    A.  We always got together there, got a little coffee, and then

02:38 25    went to get the work order.

02:38  1   Q.  Who gave you the work orders?

02:38  2   A.  Depends on who was available.  Most of the time Mr. Leiva.

02:38  3   I got work orders from Mr. Frank.

02:38  4   Q.  Frank M<sup>c</sup>Carroll?

02:38  5   A.  Frank M<sup>c</sup>Carroll.  Yes, sir.

02:38  6   Q.  Now, was that -- now, you said you at least would work till

02:39  7   5:00.  Was that the standard amount?  Was it usually 5:00 or

02:39  8   sometimes 5:00?

02:39  9   A.  No.  It was -- the least -- if I recall, I got to the place

02:39  10  at 5:00 o'clock so few times.  Usually it would be between

02:39  11  6:00, 6:30.  Many times 7:30, you know.  It would depend on the

02:39  12  day.  But the areas that I got there 90 percent of the times,

02:39  13  95 percent of the time was around 6:00 o'clock.

02:39  14  Q.  And was that Monday through Friday?

02:39  15  A.  Monday through Saturday.

02:39  16  Q.  Now, was there any -- just to save time here, was there any

02:39  17  period during your entire employment up till the end around

02:39  18  September of 2007?

02:39  19  A.  Around the middle or the end of 2007, September, yes.

02:39  20  Q.  Was that schedule pretty much the same --

02:39  21  A.  It was standard.

02:39  22  Q.  -- throughout that period?

02:39  23  A.  It was standard.

02:39  24      MR. KLEPPIN:  Objection; leading.

02:40  25      THE COURT:  Sustained.

02:40  1  **BY MR. KELLY:**

02:40  2  Q.  Can you identify any changes in your schedule?

02:40  3  A.  No.  It was the same.  It was the same.  We were supposed

02:40  4  to be there at 7:30.  We had to leave the place with the truck

02:40  5  loaded at 8:00 o'clock.  Sometimes it took us a little bit

02:40  6  more, but we had to start loading the trucks at 7:30.

02:40  7  Q.  And when you would get back to the -- when you returned to

02:40  8  the office, what would you have to do when you got back?

02:40  9  A.  When we finished the job, we -- the installation process is

02:40  10  difficult.  They gave us materials.  They gave us tracks.  They

02:40  11  gave us the accordions prepared; but we have to cut.  We have

02:40  12  to measure.  We have to install, you know.  You know, to be

02:40  13  able to put everything in a window, for example, you had to

02:40  14  take the material, raw material, cut it, measure it correct,

02:41  15  and put it according to the sheet that they gave us, you know,

02:41  16  according to the measurements of the windows or whatever we

02:41  17  were doing; windows, doors, whatever it was that had to be

02:41  18  installed.

02:41  19          You know, after we -- if we were able to finish a job

02:41  20  the same day, we had to clean everything out.  All the scrap

02:41  21  material, we had to load it in the truck, load the tools and

02:41  22  everything, get back to the job site, to the company, and

02:41  23  unload and clean the truck in order to get the material for the

02:41  24  next day.  So we were -- you know, we were working from 7:30

02:41  25  until the time we got there to clean the trucks and get

02:41  1    everything ready for the next day.

02:41  2          MR. KELLY:  Your Honor, I just wanted to approach the

02:41  3    witness with what I have pre-marked as Plaintiffs' Exhibit 23

02:41  4    and 21.

02:41  5          THE COURT:  All right, sir.  I don't believe there's

02:41  6    an objection.

02:41  7          MR. KLEPPIN:  No.  The defense isn't going to object

02:42  8    to the admission of these documents, Your Honor.

02:42  9          MR. LEIVA:  I don't object either.  Please.

02:42  10         THE COURT:  Okay.  They'll be received in evidence.

02:42  11      **(Plaintiffs' Exhibit 21 and 23 received in evidence.)**

02:42  12         THE COURT:  What are they marked, Mr. Kelly?

02:42  13         MR. KELLY:  Plaintiffs' Exhibit 21 which is a check

02:42  14    dated August 6th, 2007, to Mr. Feliciano in the amount of

02:42  15    $1,000.

02:42  16         THE COURT:  21 is received in evidence.

02:42  17         MR. KELLY:  And that also includes -- it's a

02:42  18    composite.  It includes a second check as well, October -- I'm

02:42  19    sorry, August 13th, 2007, $1500.

02:42  20         THE COURT:  All right.  That's received in evidence.

02:42  21         MR. KELLY:  And they're both from Safe Hurricane

02:42  22    Shutters.  And also a letter to whom it may concern regarding

02:42  23    Mr. Feliciano concerning $800 a week from Mr. Brad Bungo.

02:42  24         THE COURT:  Received in evidence.

02:42  25         MR. KELLY:  Thank you.

APRIL 13, 2011

02:42  1          **MR. KLEPPIN:**  Can I get a copy of David, please.

02:42  2     Thank you.

02:42  3     **BY MR. KELLY:**

02:42  4     Q.  Just so that the jury has a reference with respect to your

02:42  5     actual pay, that $800 in that letter, was that your starting

02:42  6     salary?

02:42  7     A.  I started at $800.  That was, you know, like I said at the

02:43  8     beginning of August of 2006.  I believe it was more to the

02:43  9     second week of that month.  And I got a letter from a Mr. Brad

02:43  10    Bungo because that was -- the reason I started working for

02:43  11    Advanced is because the guys -- I used to work for Bella Sera

02:43  12    as a maintenance person, and I met the guys that started

02:43  13    working with this company because they were staying there.

02:43  14    They had apartments there.  So I used to, you know, fix

02:43  15    anything that happened in the apartments.  So I met them, and

02:43  16    they talked to me about the company.  They told me about how it

02:43  17    was, you know, and stuff like that.  So they asked me if I

02:43  18    wanted to, you know, work with them.

02:43  19          One of the guys talked to Mr. Leiva and they -- you

02:43  20    know, he said to, you know, take me to the place to start

02:44  21    working with them.  You know, if I like it, to start working

02:44  22    with them.  And because I wasn't an employee with Bella Sera as

02:44  23    a maintenance person, I had to move because they don't let

02:44  24    people -- you know, if you work in that place, they don't let

02:44  25    you stay there.  So I had to find a place.  So when I was

02:44   1   renting that second place, I needed a letter stating that I was

02:44   2   working with them; that I did start working with them, and they

02:44   3   gave me this letter showing how much I was making, you know,

02:44   4   when I started.  That's this letter here.

02:44   5   Q.   And the check -- I see there's two checks there, one for a

02:44   6   thousand and one for $1500.

02:44   7   A.   Uh-huh (affirmative).

02:44   8   Q.   Well, the thousand dollars, what was that for?

02:44   9   A.   The thousand dollars, this is for a week pay.  And the

02:44  10   other one is for another week pay.  But at the end of the

02:44  11   company life, August, July, August, September of 2007, like

02:45  12   they said, they started having problems paying.  And they owed

02:45  13   us about five weeks of back-pay.  And one of the agreements was

02:45  14   to help us to, you know, get into -- get the payment that we

02:45  15   needed to get.  And one of these payments, the $1500, is

02:45  16   showing one week of pay plus whatever, you know, they could

02:45  17   give me to compensate the money that they owed me.

02:45  18   Q.   So the back-pay, was that ever paid off?

02:45  19   A.   No, never.

02:45  20   Q.   Do you have any idea total how much of the back-pay wasn't

02:45  21   paid?

02:45  22   A.   I think it was around four or five weeks.

02:45  23   Q.   Based on the schedule that you just described what would

02:45  24   you say the least amount of hours that you would work?

02:45  25   A.   An average, you know, I could say -- we start at 7:30.  The

JURY TRIAL - VOLUME III of VI

02:45  1    earliest we got there, you know, a few times at 5:00; but

02:46  2    average we got there after 6:00.  Around 60, a little bit more

02:46  3    than that; but it's an average.  I can't say the exact amount

02:46  4    of time, you know; but I know we did work more than 40 hours,

02:46  5    and they know that too.

02:46  6    Q.  Now, with respect to the schedule were you assigned a

02:46  7    particular period set aside for lunch that you can identify?

02:46  8    Was there a certain amount of time that was your lunch period?

02:46  9    A.  In the type of work that we did, when we got to the place,

02:46 10    we start installing.  We usually got a little -- like a little

02:46 11    cooler with a little water, juice, anything that -- you know,

02:46 12    like a sandwich or something like that.  And by the time we

02:46 13    were moving the materials and stuff like that, we took a bite

02:46 14    here, took the water, whatever; but we didn't have a specific

02:46 15    lunch hour.  At 12:00 we stop.  At 1:00 we come back.  We never

02:47 16    did that.  We never did that.

02:47 17    Q.  Any other particular breaks that you would take during the

02:47 18    day?

02:47 19    A.  Not that I recall.

02:47 20    Q.  Now, with respect to that period that you worked from

02:47 21    August 2006 through September 2007 --

02:47 22    A.  Uh-huh (affirmative).

02:47 23    Q.  -- there were some holidays you were off, were there?

02:47 24    A.  Yeah.  Like Thanksgiving, Christmas.  I took like three,

02:47 25    four days to go to Puerto Rico at Christmastime.  It was like a

02:47  1   week.  It was like a week.  It was around a week.

02:47  2   Q.  Is there any way just so that you can quantify based on

02:47  3   your best recollection how many work days?  Obviously if you're

02:47  4   off on Sunday, you didn't work Sunday.  I'm talking about work

02:47  5   days that you took off, a number that you can tell the jury so

02:47  6   they can know --

02:47  7   A.  Probably I took like --

02:47  8   Q.  -- how many days you didn't work.

02:47  9   A.  Maybe 10 days, 12 days the whole year and two months that I

02:48 10   worked including vacation time.  Around 12 days.

02:48 11   Q.  Now, do you know Mr. Milan who's with us today?

02:48 12   A.  Yes.

02:48 13   Q.  Did you work with him on the crews?

02:48 14   A.  I worked on a couple of job sites.  He worked with me on a

02:48 15   couple of job sites.  He went with other crews too, but he

02:48 16   worked with the company too.

02:48 17   Q.  Is there any way you can identify how many months maybe you

02:48 18   actually worked with him at the same time?  Is that possible?

02:48 19   A.  Probably -- approximately maybe four or five months.

02:48 20   Q.  Do you know whether he -- did he have a different schedule

02:48 21   from you that you described or was it --

02:48 22   A.  Everybody -- like I said, we were supposed to be there at

02:48 23   7:30 at the latest.  And everybody used to get there at the --

02:49 24   around the same time.  Most of the people had a truck, came

02:49 25   from the Bella Sera Apartments all together.  And they got

02:49 1   there -- you know, most of those people -- I think probably two

02:49 2   or three of those people had a key for the place, and they

02:49 3   opened many times that place.

02:49 4   Q.   Who had a key?

02:49 5   A.   The installers.  A couple of those installers had the key

02:49 6   too, and they know that.  And they know that.

02:49 7   Q.   Do you know which -- do you remember which installers had

02:49 8   keys?

02:49 9   A.   Rolando has one -- had a key.

02:49 10  Q.   Ibacache?  Rolando --

02:49 11  A.   Ibacache had a key.  I don't remember the other two people

02:49 12  that had it, but they had the key.  The reason why they had the

02:49 13  key because, you know, Mr. Leiva was there most of the time on

02:49 14  time; but we had to -- we had -- the day before that we had a

02:49 15  job to do, we had an idea of what we had to do on the trucks.

02:49 16  For example, take out materials, clean the trucks, or move the

02:50 17  -- if they told us the day before, You've got to do this job,

02:50 18  so we went to the place that the job was assigned by numbers.

02:50 19  We got the materials, started loading the trucks because we had

02:50 20  to leave the place by 8:00.  That was a rule.  We had to.

02:50 21  There was many times that we left later than 8:00, but that was

02:50 22  the schedule.

02:50 23         One of the reasons why because, you know, there was

02:50 24  many times that it rained.  So we had to try to finish

02:50 25  everything, you know, before the rain or try to do more -- most

02:50  1    of the work because the rain interrupted the job sometimes for

02:50  2    maybe an hour, hour-and-a-half.  You know, we never left the

02:50  3    place until we finished the job; but we had to do it that way

02:50  4    because the jobs that we did it was based on the timeframe.

02:50  5           We had to tell the customer, Okay, we're going to

02:50  6    finish your house -- depends how big it was -- two, maybe three

02:51  7    days.  If it was a small house, we could do it in one day.  If

02:51  8    it was, for example, buildings, we had a schedule to follow.

02:51  9    That's true.  You know, we -- for example, the big building,

02:51  10   Points of America, we had to be out of there by 5:00, you know,

02:51  11   for each apartment that we had to work.  And the earliest that

02:51  12   we would start there was at 9:00 o'clock; but the agreement was

02:51  13   we had to -- we started at 9:00.

02:51  14          We had to stop making noise at 5:00.  We were drilling

02:51  15   all the time, making a lot of noise.  People didn't want the

02:51  16   noise.  That's true.  We understood that.  But by the time it

02:51  17   got close to 5:00 o'clock, we had to stop making noise.  We

02:51  18   stopped doing whatever we had to do, start loading the

02:51  19   materials in elevators, buildings that had 25/30 floors, wait

02:52  20   for elevators, go down, go to the truck, load the truck, and

02:52  21   get out of the place, go to the business.  When we got to the

02:52  22   business, all the scrap material, we had to clean the trucks.

02:52  23          From Points of America to the place where we were, at

02:52  24   least 45 minutes driving.  So if we leave at 5:00 and we get

02:52  25   there at 5:45, just to be on the safe side, clean the trucks.

02:52  1   If we had to load materials, it will be 6:00, 6:30.  And we

02:52  2   were working.  Our work wasn't just installing.  Our job was to

02:52  3   pick up materials.  Our job was to clean the place after we

02:52  4   worked.  You know, we had to leave those apartments neat and

02:52  5   clean because the customers don't want your apartment or your

02:52  6   place filthy, so we had to do all that.  So our job is to from

02:52  7   start, 7:30, to whatever time we finish.  And 90, 92, 95

02:53  8   percent of the times was after 6:00; and they know that.

02:53  9   Q.  Do you know the plaintiffs who aren't with us today:  the

02:53  10  Alborezes, Guillermo, and Julio?

02:53  11  A.  I saw them.  Alborez and Julio, they used to work in the --

02:53  12  installing the shutters in the factory.  I never -- I'm going

02:53  13  to be straight with you.  I never saw them leave or anything

02:53  14  like that.  I saw them a lot of times there, yes, because,

02:53  15  remember, we were in the teams only installation.  We just got

02:53  16  the materials and load the trucks and off we go until we

02:53  17  finish.

02:53  18  Q.  So are those particular -- just so we're clear, those

02:53  19  particular ones, you're not sure of those particular

02:53  20  installers' schedule or you are?

02:53  21  A.  No, no, I'm not sure of their schedule; but I know they

02:53  22  work for company, but I wasn't sure of their schedule.

02:53  23  Q.  And Mr. Milan, you're more familiar with his schedule?

02:54  24  A.  Yeah; because he was installing like us.

02:54  25  Q.  What was different about the Alborezes?

02:54  1    A.  They --

02:54  2            MR. KLEPPIN:  Objection, Your Honor --

02:54  3            THE COURT:  Sustained.

02:54  4            MR. KLEPPIN:  -- with respect to the Alborezes.

02:54  5            MR. KELLY:  Okay.  All right.  I'll withdraw that.

02:54  6    BY MR. KELLY:

02:54  7    Q.  How about the Lamonicas, Reinaldo and Angeles?

02:54  8            MR. KLEPPIN:  Objection with respect to the Lamonicas

02:54  9    as well, Your Honor.

02:54  10           THE COURT:  Sustained.

02:54  11           MR. KELLY:  I can't ask anything about those

02:54  12   plaintiffs, Your Honor?

02:54  13           THE COURT:  That's correct.

02:54  14           MR. KELLY:  Okay.  Your Honor, if we're going to stop

02:54  15   at 3:00, I'd rather start tomorrow if I can.  I can get five

02:55  16   more minutes in, but I'm going to go into a different --

02:55  17           THE COURT:  Okay.  If you're going into a different

02:55  18   place, we'll recess at this time.

02:55  19           Step down, Mr. Feliciano.

02:55  20           We'll recess for the day at this time, Members of the

02:55  21   Jury.  We'll be in recess until tomorrow morning at 9:00

02:55  22   o'clock.  At that time we'll proceed with the direct

02:55  23   examination of the plaintiff, Mr. Feliciano.  I hope you have a

02:55  24   pleasant evening.  I'm sorry for the interruption this

02:55  25   afternoon; but luckily it was a false alarm.  So good night and

APRIL 13, 2011

JURY TRIAL - VOLUME III of VI

02:55  1    we'll see you in the morning at 9:00 o'clock.  Court's in

02:55  2    recess until tomorrow morning at 9:00 o'clock.

02:55  3            Oh, one more thing.  Who will be your witness after

02:55  4    Mr. Feliciano?

02:55  5            **MR. KELLY:**  It will be Mr. Milan.

02:55  6            **THE COURT:**  Okay.  And will you then be ready to

02:55  7    proceed if we need to with the defendants?

02:55  8            **MR. KLEPPIN:**  Yes.

02:55  9            **THE COURT:**  Okay.  Good.  We'll be in recess until

10    9:00.  Goodnight.

11        **(Adjourned)**

12

13

14                    C E R T I F I C A T E

15

16        I hereby certify that the foregoing is an accurate

17    transcription of proceedings in the above-entitled matter.

18

19
       6/24/11                    /s/ Jill Michelle Hardy-Hobbs
20     -------                    --------------------------------------
        DATE                      JILL MICHELLE HARDY-HOBBS, CCR, FPR
21                                *OFFICIAL UNITED STATES COURT REPORTER*
                                  400 NORTH MIAMI AVENUE, SUITE 08S33
22                                MIAMI, FL  33128    T: 305.523.5022
                                  jill_hardy-hobbs@flsd.uscourts.gov
23

24

25

JURY TRIAL - VOLUME III of VI

## $

**$1,000** [1] - 153:15
**$10** [2] - 33:18, 33:21
**$10,000** [1] - 65:10
**$100,000** [2] - 9:5, 23:12
**$102,000** [1] - 9:7, 33:20
**$12** [2] - 33:18, 33:21
**$140,000** [1] - 9:9
**$150,000** [2] - 11:11, 21:13
**$1500** [3] - 153:19, 155:6, 155:15
**$17** [1] - 118:13
**$18** [1] - 118:13
**$20,000** [2] - 110:4, 116:24
**$200** [1] - 56:17
**$200,000** [4] - 44:5, 44:17, 44:18, 44:24
**$21** [1] - 136:8
**$22,000** [1] - 79:21
**$400,000** [2] - 44:7, 44:16
**$407,000** [1] - 106:15
**$450,000** [1] - 44:6
**$4500** [1] - 136:7
**$5,000** [3] - 54:21, 55:2, 84:25
**$500** [1] - 146:7
**$55,000** [1] - 67:5
**$600** [7] - 12:23, 13:20, 29:9, 29:14, 29:21, 69:23
**$600,000** [1] - 44:8
**$7.85** [1] - 66:12
**$800** [6] - 66:12, 148:18, 149:6, 153:23, 154:5, 154:7
**$900** [1] - 88:15

## '

**'06** [4] - 78:22, 130:17, 130:22, 131:2
**'07** [3] - 78:22, 85:8, 120:9

## /

**/s** [1] - 162:19

## 0

**07-61295-CIV-**

## GONZALEZ/COHN [1] - 1:3

**08S33** [2] - 2:4, 162:21

## 1

**1** [2] - 1:11, 108:4
**10** [5] - 31:5, 31:22, 69:9, 87:9, 157:9
**10,000** [2] - 118:15, 137:14
**106** [1] - 3:9
**10:00** [1] - 65:5
**10:30** [2] - 42:2, 144:21
**11** [1] - 39:5
**12** [6] - 39:3, 39:5, 107:17, 107:24, 157:9, 157:10
**124** [1] - 3:10
**12:00** [2] - 89:20, 156:15
**13** [2] - 1:9, 108:4
**13th** [1] - 153:19
**14** [1] - 14:11
**147** [1] - 3:12
**15** [8] - 14:11, 31:5, 35:25, 36:8, 42:11, 82:6, 103:19
**150** [1] - 11:24
**153** [4] - 3:18, 3:19
**16** [1] - 71:21
**17** [1] - 136:11
**17.50** [1] - 136:11
**18** [4] - 29:10, 38:11, 38:14, 87:17
**182** [1] - 1:11
**18th** [1] - 13:20
**19th** [2] - 13:19, 107:12
**1:00** [5] - 65:6, 88:11, 89:22, 89:23, 156:15
**1:30** [2] - 5:4, 144:10

## 2

**20** [8] - 43:20, 62:5, 82:4, 82:6, 87:10, 87:16, 94:6, 117:22
**20,000** [1] - 116:22
**2006** [38] - 11:5, 11:13, 43:12, 47:19, 50:6, 57:14, 58:2, 58:16, 59:3, 59:7, 59:8, 61:24, 71:2, 95:17, 109:20, 109:22, 110:3, 110:7,

112:19, 113:1, 113:18, 114:22, 116:12, 116:16, 116:20, 117:5, 120:4, 121:24, 131:18, 134:6, 134:7, 135:7, 138:12, 148:12, 149:10, 149:19, 154:8, 156:21
**2007** [23] - 9:18, 32:19, 43:17, 47:19, 56:1, 58:6, 70:7, 70:16, 71:11, 85:12, 95:19, 110:1, 110:2, 110:11, 110:19, 112:2, 148:13, 151:18, 151:19, 153:14, 153:19, 155:11, 156:21
**2008** [1] - 107:12
**2011** [1] - 1:9
**21** [7] - 3:18, 55:13, 55:14, 153:4, 153:11, 153:13, 153:16
**22** [2] - 55:16, 107:24
**22,000** [1] - 79:23
**22-and-a-half** [3] - 43:21, 82:5, 106:7
**23** [3] - 3:19, 153:3, 153:11
**24** [5] - 14:24, 32:7, 32:9, 63:6, 65:14
**25** [4] - 55:17, 62:7, 87:5, 108:3
**25/30** [1] - 159:19
**25th** [1] - 70:7
**26** [2] - 46:10, 79:25
**27** [5] - 14:10, 89:12, 97:14, 99:13
**2:00** [4] - 74:4, 88:11, 101:22, 144:10

## 3

**30** [3] - 36:1, 47:25, 87:2
**300** [1] - 1:18
**305.523.5022** [2] - 2:4, 162:22
**305.865.6766** [1] - 1:19
**305.865.7167** [1] - 1:19
**33** [1] - 122:6
**33128** [2] - 2:4, 162:22
**33141** [1] - 1:18
**33324** [1] - 1:22
**35** [3] - 61:16, 62:22,

80:23
**3:00** [4] - 61:9, 144:15, 148:24, 161:15
**3:30** [5] - 61:9, 73:21, 74:1, 76:25, 81:3

## 4

**4-12-11** [2] - 3:3, 5:1
**40** [21] - 12:25, 29:12, 33:12, 33:25, 52:9, 54:5, 54:9, 54:12, 61:16, 61:21, 62:10, 62:22, 69:4, 84:9, 92:23, 145:7, 145:8, 148:18, 149:2, 149:3, 156:4
**40-plus** [1] - 9:8
**400** [2] - 2:4, 162:21
**401** [1] - 68:16
**402** [1] - 68:16
**403** [2] - 42:3, 68:16
**42** [1] - 13:1
**43** [1] - 3:6
**45** [1] - 159:24
**45/46** [1] - 82:17
**4:00** [4] - 61:9, 88:10, 144:11, 148:24
**4:30** [2] - 76:11, 76:18

## 5

**5** [1] - 3:4
**5,000** [2] - 118:12, 136:7
**50** [1] - 67:5
**55** [1] - 16:21
**5:00** [28] - 39:18, 40:16, 41:11, 41:21, 41:24, 74:9, 74:16, 75:8, 75:16, 75:17, 75:18, 76:13, 76:18, 76:22, 101:24, 144:10, 150:3, 150:4, 150:5, 151:7, 151:8, 151:10, 156:1, 159:10, 159:14, 159:17, 159:24
**5:00/5:30** [2] - 62:11, 74:1
**5:30** [4] - 73:25, 81:6, 144:10, 149:23
**5:45** [1] - 159:25

## 6

**6,000** [1] - 138:20
**6/24/11** [1] - 162:19
**60** [3] - 10:7, 99:22, 156:2
**60-plus** [1] - 67:4
**605** [1] - 1:18
**611** [1] - 42:3
**66** [2] - 99:18, 145:2
**6:00** [20] - 76:23, 97:14, 97:15, 97:18, 97:23, 98:1, 99:2, 99:3, 99:15, 100:16, 101:6, 101:11, 149:23, 151:11, 151:13, 156:2, 160:1, 160:8
**6:30** [3] - 101:12, 151:11, 160:1
**6th** [1] - 153:14

## 7

**7** [2] - 67:22, 68:13
**70** [3] - 32:4, 32:5
**71st** [1] - 1:18
**77** [1] - 3:7
**7:00** [20] - 17:16, 17:18, 19:3, 19:4, 20:11, 20:23, 26:18, 26:22, 26:24, 27:3, 97:14, 97:15, 97:18, 97:24, 98:2, 99:2, 99:3, 101:12, 149:22
**7:10** [1] - 19:6
**7:12** [1] - 27:4
**7:15** [15] - 17:18, 19:4, 19:6, 19:7, 19:9, 19:10, 20:11, 21:3, 23:1, 26:18, 26:25, 27:2, 27:4, 149:22, 150:9
**7:17** [1] - 27:4
**7:20** [5] - 19:8, 19:10, 19:12, 149:22, 150:9
**7:30** [11] - 25:5, 25:11, 149:21, 149:24, 151:11, 152:4, 152:6, 152:24, 155:25, 157:23, 160:7
**7:31** [2] - 22:11, 22:13
**7:38** [2] - 22:7, 22:8
**7:40** [1] - 22:17
**7:50** [2] - 18:19, 19:1

**8**

**8** [2] - 62:6, 88:15
**80** [2] - 38:11, 38:12
**800** [1] - 149:9
**85** [4] - 43:20, 71:21, 82:6, 82:7
**8500** [4] - 118:10, 118:14, 137:5, 137:10
**8751** [1] - 1:22
**8:00** [18] - 17:20, 19:17, 22:21, 24:2, 24:3, 64:2, 64:6, 77:15, 77:17, 123:10, 143:1, 148:23, 150:15, 152:5, 158:20, 158:21
**8:03** [1] - 22:21
**8:05** [1] - 22:21
**8:15** [1] - 143:18
**8:30** [9] - 39:17, 61:7, 77:17, 77:19, 81:2, 99:15, 123:10, 143:18

**9**

**9** [2] - 62:6, 72:12
**90** [4] - 38:10, 38:11, 151:12, 160:7
**92** [1] - 160:7
**95** [2] - 151:13, 160:7
**954.424.1933** [1] - 1:23
**954.474.7405** [1] - 1:23
**9:00** [16] - 39:17, 40:15, 41:11, 77:19, 81:2, 98:13, 99:2, 99:15, 123:10, 159:12, 159:13, 161:21, 162:1, 162:2, 162:10
**9th** [1] - 50:6

**A**

**a.m** [5] - 26:24, 39:17, 99:2, 99:3
**ability** [2] - 82:15, 111:25
**able** [21] - 24:9, 30:22, 32:15, 59:23, 60:18, 95:4, 110:1, 111:2, 111:20, 118:13, 118:16, 125:16, 126:20, 128:16, 136:8, 136:9, 137:21, 141:9,

152:13, 152:19
**above-entitled** [1] - 162:17
**absentee** [3] - 45:8, 126:20, 142:8
**absolutely** [6] - 37:24, 63:16, 72:1, 99:19, 132:15, 136:13
**accept** [2] - 13:20, 32:24
**accordance** [1] - 72:10
**according** [4] - 11:22, 110:24, 152:15, 152:16
**accordions** [1] - 152:11
**account** [4] - 47:20, 65:17, 81:4, 111:25
**accounting** [4] - 93:13, 94:11, 94:16, 125:25
**accounts** [4] - 48:24, 110:21, 110:24
**accurate** [5] - 55:18, 64:21, 68:9, 140:24, 162:16
**accurately** [1] - 104:12
**acknowledge** [1] - 139:20
**acquaintances** [1] - 32:15
**acquire** [1] - 43:11
**action** [2] - 59:25, 60:13
**actions** [3] - 72:7, 117:25, 123:16
**active** [1] - 54:8
**actual** [3] - 58:3, 130:5, 154:5
**ad** [2] - 85:16, 85:17
**add** [1] - 82:16
**additional** [3] - 44:19, 93:8, 115:2
**addressed** [1] - 117:9
**Adjourned** [1] - 162:11
**administration** [2] - 87:24, 93:10
**administrator** [1] - 83:16
**admission** [2] - 45:24, 153:8
**admit** [1] - 17:14
**admitted** [1] - 69:25
**ADMITTED** [1] - 3:17
**advance** [1] - 54:25
**advanced** [2] -

45:20, 154:11
**Advanced** [1] - 45:22
**advertising** [4] - 67:3, 84:14, 85:9, 85:16
**advised** [1] - 145:23
**affirmative** [5] - 108:22, 134:9, 140:15, 155:7, 156:22
**afford** [1] - 47:14
**afraid** [7] - 14:22, 14:24, 14:25, 31:1, 32:10, 33:1
**afternoon** [14] - 39:18, 61:9, 74:5, 75:14, 77:7, 77:8, 81:3, 88:11, 106:4, 124:10, 148:1, 148:2, 148:25, 161:25
**age** [1] - 94:7
**ago** [2] - 29:18, 108:21
**agree** [4] - 21:22, 70:5, 86:2, 139:12
**agreed** [5] - 66:19, 125:15, 132:1, 132:14, 139:17
**agreement** [12] - 49:21, 50:19, 51:13, 51:22, 66:21, 67:1, 67:6, 124:23, 131:12, 131:14, 148:16, 159:12
**agreements** [2] - 49:18, 155:13
**Aguirre** [7] - 8:13, 30:9, 32:20, 33:9, 111:11, 111:17, 121:1
**ahead** [2] - 14:6, 16:8
**airport** [1] - 67:16
**alarm** [1] - 161:25
**Alborez** [4] - 63:15, 123:4, 160:11
**ALBOREZ** [2] - 1:6, 1:6
**Alborezes** [4] - 62:20, 160:10, 160:25, 161:4
**alleged** [2] - 57:9, 97:1
**allow** [1] - 41:1
**allowed** [4] - 41:6, 82:23, 83:11, 92:6
**allowing** [3] - 16:16, 40:25
**almost** [2] - 81:12, 87:16
**alone** [4] - 67:3, 67:5, 124:13, 142:23

**aluminum** [5] - 37:12, 37:15, 60:25, 61:1, 78:13
**America** [15] - 39:1, 39:2, 40:1, 40:13, 62:4, 74:20, 101:2, 112:8, 140:3, 140:19, 141:7, 159:10, 159:23
**American** [1] - 35:9
**amount** [15] - 32:24, 43:24, 44:3, 48:23, 48:25, 53:17, 137:21, 142:20, 149:5, 149:16, 151:7, 153:14, 155:24, 156:3, 156:8
**amounts** [1] - 83:6
**analysis** [5] - 110:23, 110:25, 115:20, 135:17, 136:3
**Angeles** [14] - 22:8, 27:6, 27:10, 27:15, 28:4, 67:12, 69:12, 70:7, 70:16, 70:22, 122:22, 123:1, 123:11, 161:7
**ANGELES** [1] - 1:5
**annual** [1] - 127:6
**annually** [1] - 127:6
**answer** [26] - 20:16, 23:18, 24:9, 24:10, 26:14, 26:16, 29:17, 29:19, 31:6, 31:7, 38:17, 38:20, 38:22, 40:3, 40:24, 40:25, 41:1, 56:5, 62:14, 70:13, 75:4, 82:15, 108:7, 127:7
**answered** [6] - 29:16, 29:18, 40:18, 40:19, 73:17
**anyway** [2] - 12:4, 23:17
**apartment** [7] - 7:1, 37:18, 37:19, 37:25, 39:20, 159:11, 160:5
**apartments** [5] - 41:5, 154:14, 154:15, 157:25, 160:4
**aPPEARANCES** [1] - 1:15
**appointment** [1] - 101:21
**appraised** [1] - 129:15
**appreciate** [1] - 34:9
**appreciation** [1] - 15:8
**apprised** [1] - 129:10
**approach** [12] -

17:21, 19:18, 27:8, 28:15, 45:14, 55:9, 63:22, 67:21, 85:14, 107:7, 153:2
**approaching** [1] - 136:6
**approval** [1] - 96:8
**approximation** [1] - 135:10
**April** [3] - 13:19, 13:20, 29:9
**APRIL** [1] - 1:9
**area** [4] - 95:6, 102:18, 102:20, 140:1
**areas** [3] - 80:12, 95:7, 151:12
**argue** [5] - 24:16, 25:8, 25:12, 32:13, 117:23
**argued** [3] - 15:16, 54:22, 55:5
**argument** [1] - 117:23
**arguments** [1] - 117:21
**arm** [1] - 102:5
**arrive** [11] - 17:18, 21:6, 23:6, 77:13, 97:13, 98:15, 142:25, 143:3, 143:20, 144:7, 144:13
**arrived** [20] - 11:8, 19:5, 19:7, 19:8, 20:5, 23:1, 23:3, 23:6, 23:9, 24:1, 24:2, 24:4, 24:8, 24:23, 25:2, 25:12, 97:12, 101:7, 143:15
**arrives** [1] - 19:9
**arriving** [1] - 19:4
**articles** [2] - 83:23, 124:22
**aside** [2] - 103:10, 156:7
**assigned** [5] - 11:12, 36:22, 150:18, 156:6, 158:18
**assisted** [3] - 47:7, 92:18, 129:1
**assume** [1] - 123:23
**assuming** [1] - 111:15
**attempt** [2] - 56:12, 69:7
**attempted** [1] - 56:25
**attention** [2] - 94:18, 143:25
**attorney** [7] - 6:1, 9:15, 9:17, 9:21, 11:25, 67:3, 124:21
**August** [28] - 43:17,

50:23, 58:8, 58:9,
58:15, 61:23, 61:24,
70:7, 78:22, 79:7,
95:22, 95:23, 95:24,
110:1, 110:11, 112:2,
121:3, 148:12, 149:9,
149:19, 153:14,
153:19, 154:8,
155:11, 156:21
   **AUGUSTIN** [1] - 1:4
   **Augusto** [1] - 86:5
   **authenticity** [2] -
28:22, 70:8
   **authority** [9] - 53:12,
53:19, 82:10, 82:12,
82:19, 84:5, 96:7,
97:7, 139:7
   **authorized** [1] -
47:22
   **autonomy** [2] -
82:23, 96:21
   **available** [2] - 137:4,
151:2
   **AVENUE** [1] - 162:21
   **Avenue** [1] - 2:4
   **average** [12] - 61:15,
81:1, 81:3, 81:4,
144:8, 144:13,
144:15, 146:11,
155:25, 156:2, 156:3
   **aware** [6] - 37:12,
71:15, 71:23, 72:2,
73:2, 123:13
   **awhile** [1] - 116:10

### B

   **back-pay** [3] -
155:13, 155:18,
155:20
   **background** [2] -
86:21, 87:1
   **backstabbing** [1] -
139:8
   **backup** [1] - 47:9
   **bad** [7] - 34:22,
57:23, 80:12, 80:16,
128:20, 139:14,
144:20
   **balloon** [1] - 35:10
   **based** [7] - 122:3,
122:8, 131:14, 137:4,
155:23, 157:2, 159:4
   **basic** [1] - 7:5
   **basis** [6] - 48:16,
65:2, 88:15, 116:8,
127:3, 132:2
   **bay** [1] - 80:4
   **Beach** [3] - 1:18,

99:25, 100:3
   **beautiful** [1] - 81:13
   **became** [2] - 130:10,
131:19
   **bed** [1] - 30:21
   **beds** [1] - 7:10
   **began** [2] - 85:8,
134:8
   **begin** [5] - 31:1,
74:17, 82:24, 97:23,
98:6
   **beginning** [16] -
8:20, 8:22, 56:7,
66:11, 98:18, 98:20,
98:21, 98:22, 98:23,
98:24, 121:2, 126:17,
128:15, 139:22,
148:12, 154:8
   **behalf** [6] - 47:22,
49:4, 49:15, 49:18,
50:19, 51:21
   **behind** [1] - 30:10
   **Bella** [4] - 6:12,
154:11, 154:22,
157:25
   **belong** [2] - 18:4,
20:17
   **belongs** [1] - 18:9
   **best** [2] - 82:14,
157:3
   **better** [5] - 30:8,
75:4, 93:17, 108:10,
138:19
   **between** [19] - 15:11,
17:18, 19:4, 26:18,
26:24, 27:3, 50:6,
66:4, 66:16, 67:5,
77:17, 77:19, 99:2,
119:7, 125:16,
131:12, 144:10,
149:21, 151:10
   **beyond** [2] - 83:14,
104:21
   **big** [4] - 74:25,
150:21, 159:6, 159:9
   **bills** [1] - 87:17
   **bit** [5] - 5:3, 84:20,
143:1, 152:5, 156:2
   **bite** [1] - 156:13
   **blades** [1] - 93:20
   **blankets** [1] - 7:4
   **blowing** [1] - 80:23
   **board** [14] - 83:2,
83:3, 125:11, 127:1,
127:3, 127:7, 132:25,
138:24, 138:25,
139:3, 140:20
   **boat** [1] - 96:4
   **bonus** [1] - 88:20
   **book** [2] - 28:8,

28:15
   **Boreth** [1] - 1:21
   **boss** [15] - 8:2,
10:11, 10:12, 11:21,
11:22, 12:5, 12:7,
17:18, 19:14, 20:4,
25:13, 36:5, 36:12,
82:24
   **bottom** [4] - 35:19,
128:17, 128:18,
128:19
   **bought** [1] - 6:18
   **Boulevard** [2] - 1:22,
74:22
   **bounced** [2] - 70:17,
70:23
   **Brad** [6] - 78:2,
94:17, 116:22,
143:11, 153:23, 154:9
   **brainchild** [2] -
54:14, 92:4
   **brainer** [1] - 145:22
   **break** [12] - 118:10,
118:15, 136:9, 137:3,
138:21
   **break-even** [1] -
118:10
   **breaking** [1] - 137:6
   **breaks** [1] - 156:17
   **breath** [1] - 142:15
   **briefly** [1] - 102:3
   **bring** [8] - 4:10, 7:7,
7:18, 16:20, 42:16,
82:6, 90:10, 111:25
   **bringing** [2] - 16:24,
21:16
   **Bristol** [1] - 50:23
   **broken** [1] - 72:15
   **brother** [1] - 17:15
   **brought** [10] - 21:16,
30:11, 56:17, 66:2,
76:2, 94:18, 95:8,
95:14, 112:11
   **Broward** [1] - 1:22
   **buddies** [1] - 127:8
   **bugged** [1] - 75:24
   **building** [41] - 23:18,
23:19, 23:22, 24:10,
25:11, 38:18, 39:1,
39:3, 39:7, 39:11,
39:13, 39:16, 39:20,
39:22, 40:9, 40:10,
40:15, 41:3, 41:5,
41:15, 41:20, 53:8,
53:13, 74:15, 76:2,
76:9, 80:10, 81:17,
81:21, 81:22, 81:24,
81:25, 101:8, 109:11,
139:25, 140:19, 159:9
   **buildings** [11] - 39:2,

74:10, 74:14, 74:13,
74:18, 74:19, 79:11,
113:7, 150:18, 159:8,
159:19
   **bunch** [1] - 98:16
   **Bungo** [7] - 78:2,
94:17, 116:22,
125:24, 125:25,
153:23, 154:10
   **business** [79] -
45:17, 45:20, 47:20,
49:2, 54:11, 54:13,
65:13, 78:21, 79:14,
79:15, 82:22, 87:1,
87:4, 87:7, 87:12,
87:13, 87:16, 87:18,
87:19, 87:20, 87:22,
88:17, 88:18, 88:19,
88:21, 92:24, 94:2,
94:20, 96:13, 96:20,
96:22, 97:18, 97:25,
99:14, 100:24, 101:4,
106:25, 107:2,
110:19, 112:18,
112:25, 113:17,
114:15, 115:19,
116:6, 116:9, 117:6,
120:4, 122:10,
122:11, 123:2,
125:13, 125:16,
125:19, 125:23,
126:21, 126:22,
126:25, 128:16,
131:10, 132:1,
132:15, 133:8, 134:1,
134:11, 135:15,
137:19, 138:4,
138:17, 139:20,
140:7, 142:21,
143:10, 145:13,
159:21, 159:22
   **business'** [1] - 48:2
   **businesses** [3] -
87:10, 87:23, 126:10
   **buy** [2] - 87:5, 93:19
   **buying** [1] - 7:6
   **BY** [65] - 2:2, 5:2,
5:15, 5:23, 12:3, 14:8,
14:18, 14:23, 16:19,
17:4, 18:12, 18:16,
18:22, 21:15, 22:1,
25:10, 25:20, 27:20,
27:23, 28:5, 28:12,
29:8, 30:23, 31:10,
32:6, 34:24, 36:11,
37:9, 38:15, 39:9,
40:22, 41:10, 43:6,
45:16, 46:13, 50:3,
50:9, 50:17, 55:12,
63:8, 64:4, 64:19,

67:24, 69:2, 69:11,
70:4, 70:15, 70:25,
71:10, 72:17, 73:1,
73:11, 74:7, 77:6,
90:22, 106:3, 107:10,
107:23, 108:8,
122:18, 124:9,
147:25, 152:1, 154:3,
161:6

### C

   **Canary** [1] - 96:6
   **candidate** [1] -
133:20
   **cannot** [3] - 19:5,
19:25, 34:9
   **capital** [1] - 87:12
   **captain** [1] - 96:5
   **card** [11] - 18:9,
22:10, 22:20, 23:7,
45:17, 45:20, 64:9,
64:12, 110:4, 110:9,
116:25
   **cards** [9] - 19:13,
20:17, 20:20, 27:25,
28:1, 28:14, 106:25,
107:2
   **care** [4] - 65:8,
65:10, 117:10, 128:17
   **cars** [2] - 40:11,
49:10
   **cart** [1] - 39:19
   **case** [8] - 1:3, 6:24,
46:6, 46:11, 90:24,
141:7, 141:17, 141:25
   **cashed** [1] - 146:8
   **cashing** [2] - 146:16,
146:17
   **catch** [1] - 53:16
   **CCR** [2] - 2:3, 162:20
   **cell** [2] - 6:1, 6:2
   **cents** [1] - 71:21
   **CEO** [9] - 82:10,
82:22, 125:12,
125:14, 126:8,
126:24, 132:5,
135:21, 139:1
   **certain** [12] - 19:8,
32:23, 47:3, 49:6,
49:7, 72:3, 80:12,
80:13, 81:19, 86:16,
123:14, 156:8
   **certainly** [2] - 55:21,
138:17
   **certify** [1] - 162:16
   **chance** [1] - 16:9
   **change** [7] - 33:10,
37:8, 79:2, 79:9,

126:11, 137:7, 139:1
**changed** [6] - 56:3, 76:7, 79:4, 79:6, 87:21, 88:21
**changes** [5] - 79:9, 88:18, 111:4, 138:15, 152:2
**changing** [1] - 79:7
**characterize** [3] - 91:14, 91:16, 125:5
**characterized** [4] - 77:10, 104:12, 125:2, 142:6
**charge** [5] - 8:10, 9:22, 96:10, 109:6, 109:13
**chart** [4] - 111:14, 118:4, 137:3, 139:15
**check** [19] - 13:19, 13:20, 13:21, 29:9, 29:11, 29:14, 29:22, 29:25, 30:3, 30:20, 69:22, 70:5, 123:17, 141:8, 146:7, 153:13, 153:18, 155:5
**checking** [1] - 23:2
**checks** [26] - 14:12, 32:4, 32:8, 47:22, 47:24, 47:25, 69:22, 70:3, 70:17, 70:20, 70:22, 77:21, 77:23, 77:25, 78:1, 78:4, 78:6, 78:7, 78:8, 78:10, 146:16, 146:17, 155:5
**children** [1] - 32:9
**Chile** [3] - 12:18, 12:19
**choice** [1] - 118:14
**CHRIS** [1] - 1:21
**Christmas** [3] - 100:19, 100:20, 156:24
**Christmastime** [1] - 156:25
**circumstances** [3] - 72:3, 75:16, 78:6
**Citibank** [2] - 49:20
**claim** [5] - 13:13, 13:14, 13:17, 14:20, 20:9
**claimed** [2] - 6:1, 14:21
**claiming** [5] - 9:2, 9:5, 13:13, 13:15, 39:6
**claims** [4] - 13:10, 20:8, 31:18, 68:21
**clarify** [3] - 16:14, 71:1, 122:19

**class** [1] - 87:19
**clean** [13] - 41:22, 41:25, 74:13, 74:14, 81:23, 152:20, 152:23, 152:25, 158:16, 159:22, 159:25, 160:3, 160:5
**clean-up** [1] - 81:23
**clear** [5] - 9:19, 13:18, 62:18, 136:14, 160:18
**clearly** [2] - 10:8, 16:6
**clerical** [1] - 67:14
**CLERK** [2] - 42:15, 90:7
**client** [2] - 73:7, 122:14
**client's** [1] - 50:11
**clients** [1] - 48:11
**clock** [1] - 63:12
**close** [4] - 74:9, 101:9, 101:11, 159:17
**closed** [7] - 54:9, 62:2, 87:22, 88:17, 88:18, 100:13, 100:14
**clothes** [1] - 30:11
**co** [1] - 8:9
**co-worker** [1] - 8:9
**coffee** [2] - 150:9, 150:24
**collect** [4] - 9:10, 9:11, 111:2
**collected** [2] - 48:20, 48:21
**Colorado** [5] - 59:10, 114:17, 117:3, 117:4, 128:11
**combined** [1] - 82:19
**coming** [6] - 68:23, 99:14, 105:8, 105:10, 127:17, 135:21
**commissions** [2] - 55:1
**common** [1] - 12:16
**communicate** [5] - 56:12, 56:25, 89:8, 114:7, 142:4
**communicated** [1] - 12:7
**communicating** [1] - 122:25
**communication** [2] - 95:25, 117:2
**Comp** [1] - 102:7
**companies** [4] - 49:9, 95:6, 125:17, 126:11
**company** [140] - 6:2, 6:4, 6:7, 6:9, 6:14,

6:15, 6:18, 9:12, 10:18, 10:25, 11:9, 12:9, 13:5, 13:7, 13:11, 20:2, 21:14, 30:10, 30:15, 34:3, 39:23, 40:4, 40:7, 41:18, 43:9, 43:11, 43:14, 43:16, 43:19, 44:4, 44:15, 44:22, 45:2, 46:15, 46:24, 47:6, 48:20, 48:21, 48:22, 49:18, 51:21, 52:14, 53:3, 57:12, 58:6, 58:9, 60:11, 62:24, 65:8, 67:3, 72:19, 72:20, 72:23, 74:24, 78:2, 79:10, 82:11, 82:13, 82:18, 83:2, 83:6, 86:15, 87:15, 88:2, 88:8, 93:12, 94:24, 96:15, 96:24, 97:2, 97:13, 98:21, 100:5, 102:20, 103:15, 104:8, 104:15, 106:13, 106:16, 106:18, 106:21, 107:4, 108:1, 109:4, 110:20, 111:24, 112:21, 112:25, 113:6, 113:25, 114:3, 114:9, 114:12, 118:19, 118:22, 118:24, 119:5, 119:12, 119:16, 121:23, 122:13, 123:17, 123:18, 125:12, 125:21, 126:7, 127:5, 127:22, 128:2, 129:3, 130:6, 130:8, 130:23, 130:25, 131:16, 131:19, 132:3, 132:19, 133:3, 133:5, 134:8, 134:15, 134:18, 136:3, 136:21, 137:17, 142:10, 145:22, 146:19, 146:25, 148:7, 148:10, 148:11, 148:17, 152:22, 154:13, 154:16, 155:11, 157:16, 160:22
**Company** [1] - 49:9
**company's** [2] - 103:12, 136:14
**compared** [1] - 135:18
**compensate** [1] - 155:17

**competitive** [1] - 95:6
**complain** [1] - 32:25
**complained** [4] - 13:23, 14:14, 32:3, 32:22
**complaining** [1] - 110:15
**complaint** [7] - 9:7, 9:13, 9:21, 9:24, 23:16, 31:18, 32:2
**complaints** [2] - 56:10, 56:13
**complete** [2] - 96:21, 116:2
**completed** [1] - 74:4
**completely** [4] - 5:13, 81:22, 81:23, 92:3
**complying** [2] - 72:20, 123:18
**composite** [1] - 153:18
**computer** [2] - 87:6, 88:3
**concept** [2] - 131:7, 132:4
**concern** [1] - 153:22
**concerned** [1] - 97:6
**concerning** [11] - 56:10, 79:10, 91:2, 91:3, 91:22, 135:4, 141:17, 141:19, 142:7, 142:18, 153:23
**concrete** [3] - 78:15, 78:17, 98:4
**conditions** [4] - 74:2, 75:10, 80:16, 81:9
**condominium** [2] - 98:9, 140:4
**condominiums** [3] - 78:18, 98:11, 98:13
**conducting** [1] - 54:10
**confer** [3] - 73:6, 73:10, 122:14
**confers** [1] - 122:17
**confrontation** [1] - 139:6
**connections** [1] - 132:18
**consequently** [1] - 12:15
**consider** [1] - 109:3
**considerable** [1] - 44:5
**consistently** [2] - 121:21, 145:1
**conspicuous** [1] - 146:22

**construction** [2] - 9:2, 86:22
**contact** [3] - 72:18, 72:24, 123:17
**context** [1] - 55:23
**continue** [5] - 4:18, 58:11, 89:22, 90:18, 116:5
**continued** [1] - 58:5
**Continued** [2] - 3:3, 5:1
**continues** [1] - 8:3
**contract** [2] - 40:13, 40:14
**contracts** [1] - 21:12
**contradict** [1] - 107:20
**control** [10] - 20:5, 21:10, 24:7, 36:6, 83:1, 92:19, 92:21, 93:1, 121:9, 147:2
**controlled** [1] - 20:3
**controller** [4] - 78:1, 94:15, 125:24, 131:21
**convenient** [2] - 6:16, 8:16
**convening** [1] - 138:24
**conversation** [4] - 9:18, 10:2, 33:24, 111:22
**conversations** [1] - 141:21
**convince** [1] - 138:25
**cool** [1] - 130:21
**cooler** [1] - 156:11
**copy** [2] - 70:5, 154:1
**cord** [1] - 80:17
**corporate** [8] - 43:8, 49:4, 84:2, 84:4, 113:12, 113:15, 126:16, 127:10
**corporation** [16] - 44:6, 44:9, 49:8, 53:9, 54:5, 54:8, 55:3, 65:5, 88:3, 92:21, 94:23, 97:8, 124:21, 125:10, 131:17
**correct** [41] - 5:16, 7:8, 7:9, 8:17, 8:24, 12:11, 12:12, 12:18, 17:17, 45:4, 45:5, 46:15, 46:16, 49:12, 56:22, 59:23, 60:9, 67:17, 67:18, 68:3, 69:12, 71:3, 72:3, 83:13, 99:16, 100:9, 103:16, 104:22,

JURY TRIAL - VOLUME III of VI

106:8, 106:9, 107:15, 108:21, 109:11, 125:14, 137:9, 140:9, 141:5, 141:7, 148:4, 152:14, 161:13

**correction** [1] - 15:21

**correspond** [1] - 28:18

**corresponding** [1] - 28:4

**cost** [5] - 94:21, 115:19, 118:6, 118:9, 136:2

**costs** [4] - 115:20, 118:6, 136:24, 136:25

**couches** [1] - 7:10

**Counsel** [1] - 73:10

**counsel** [1] - 122:17

**count** [2] - 35:24, 72:12

**country** [5] - 12:15, 12:17, 12:24, 13:1, 95:18

**County** [1] - 100:1

**couple** [9] - 61:24, 95:23, 103:2, 111:4, 113:7, 149:6, 157:14, 157:15, 158:5

**course** [4] - 16:5, 35:4, 138:23, 144:17

**Court** [3] - 2:3, 4:1, 42:4

**court** [2] - 18:17, 99:11

**COURT** [99] - 1:1, 4:2, 4:6, 4:8, 4:10, 4:13, 4:15, 5:14, 5:22, 12:2, 14:6, 14:20, 16:22, 17:2, 20:21, 20:25, 21:4, 21:19, 21:23, 25:8, 25:18, 27:17, 27:22, 27:25, 28:9, 28:16, 28:20, 29:1, 31:6, 36:8, 42:2, 42:9, 42:16, 42:19, 42:23, 42:25, 43:3, 45:15, 46:1, 46:4, 46:6, 46:8, 46:12, 49:24, 50:11, 50:13, 50:15, 52:16, 55:11, 63:7, 64:18, 67:23, 68:15, 68:17, 68:25, 69:10, 70:1, 70:10, 70:14, 70:24, 71:6, 72:13, 73:4, 73:8, 73:19, 77:4, 89:20, 90:1, 90:5, 90:8, 90:10, 90:14, 105:15, 105:19, 105:21,

105:23, 107:9, 107:21, 122:16, 124:6, 147:6, 147:9, 147:14, 147:18, 147:20, 151:25, 153:5, 153:10, 153:12, 153:16, 153:20, 153:24, 161:3, 161:10, 161:13, 161:17, 162:6, 162:9, 162:21

**court's** [1] - 89:23

**Court's** [1] - 162:1

**COURTROOM** [1] - 1:4

**covered** [1] - 80:7

**CPUs** [1] - 87:6

**craft** [3] - 110:4, 110:9, 116:24

**crew** [12] - 36:22, 39:25, 65:23, 65:24, 66:1, 100:10, 101:7, 101:9, 101:11, 140:6, 140:8, 144:25

**crews** [8] - 36:23, 36:24, 77:18, 80:13, 80:20, 144:20, 157:13, 157:15

**Cross** [3] - 3:4, 3:7, 3:10

**CROSS** [3] - 5:1, 77:5, 124:8

**cross** [6] - 4:19, 77:4, 90:19, 124:6, 147:7, 147:11

**CROSS-EXAMINATION** [3] - 5:1, 77:5, 124:8

**Cross-examination** [3] - 3:4, 3:7, 3:10

**cross-examination** [5] - 4:19, 77:4, 90:19, 147:7, 147:11

**cross-examine** [1] - 124:6

**crowded** [1] - 15:9

**CRTs** [1] - 87:6

**crunching** [1] - 60:22

**curious** [1] - 135:24

**current** [1] - 48:24

**curse** [1] - 142:15

**customary** [1] - 8:1

**customer** [4] - 140:23, 141:4, 141:10, 159:5

**customers** [6] - 46:23, 85:14, 85:15, 101:1, 115:11, 160:5

**cut** [3] - 93:21,

152:11, 152:14

# D

**dangerous** [3] - 80:5, 80:19, 81:10

**dare** [1] - 17:6

**dark** [1] - 97:16

**data** [2] - 65:4, 65:17

**date** [1] - 112:17

**Date** [1] - 162:20

**dated** [2] - 70:7, 153:14

**David** [1] - 154:1

**DAVID** [1] - 1:17

**david.kelly38@ rocketmail.com** [1] - 1:19

**day-to-day** [3] - 83:1, 93:1, 93:9, 125:22, 128:9, 147:2

**days** [56] - 19:21, 19:22, 19:24, 22:20, 34:25, 35:1, 35:21, 47:5, 58:20, 61:24, 62:1, 62:2, 69:17, 69:19, 73:25, 95:24, 104:9, 104:19, 105:8, 105:9, 112:22, 113:2, 113:20, 114:14, 114:24, 116:6, 116:7, 116:18, 120:13, 121:22, 121:25, 123:8, 127:14, 127:15, 127:19, 127:20, 127:22, 127:23, 128:1, 137:12, 149:19, 150:21, 156:25, 157:3, 157:5, 157:8, 157:9, 157:10, 159:7

**days/two** [1] - 121:25

**de** [1] - 121:8

**deal** [5] - 21:10, 33:22, 54:23, 55:8, 112:15

**dealing** [1] - 140:7

**dealt** [1] - 141:10

**December** [22] - 11:4, 11:13, 36:21, 57:14, 58:2, 58:4, 58:16, 59:3, 59:7, 59:8, 71:2, 109:20, 109:22, 110:7, 116:15, 116:20, 117:5, 120:3, 138:12, 149:9

**decide** [1] - 53:21

**decided** [3] - 92:8, 92:10, 145:25

**decision** [1] - 131:23

**decisions** [16] - 90:24, 91:1, 91:4, 91:23, 92:2, 129:7, 133:22, 134:25, 135:2, 135:4, 141:17, 141:24, 142:17, 145:9, 145:15

**defendant** [8] - 42:8, 42:21, 43:8, 44:12, 49:4, 63:5, 68:10, 148:3

**DEFENDANT** [3] - 2:1, 42:24, 105:22

**Defendants** [1] - 1:11

**DEFENDANTS** [1] - 1:20

**defendants** [3] - 148:4, 148:15, 162:7

**defense** [1] - 153:7

**definitely** [1] - 134:13

**delay** [2] - 104:8, 104:14

**deliver** [1] - 96:5

**delivering** [1] - 96:4

**demanded** [1] - 41:15

**dentist** [1] - 101:21

**depart** [1] - 81:18

**Department** [2] - 101:25, 146:19

**department** [15] - 85:5, 92:17, 92:19, 92:20, 93:3, 93:15, 93:25, 94:12, 94:16, 96:16, 104:3, 104:4, 108:23, 109:6, 131:20

**departments** [2] - 96:17, 109:4

**depended** [1] - 32:16

**deposition** [6] - 38:11, 55:10, 107:11, 107:13, 124:16, 125:1

**depressed** [1] - 30:16

**depression** [2] - 30:15, 30:16

**describe** [10] - 80:1, 80:2, 84:12, 85:10, 102:3, 103:17, 125:9, 126:15, 127:14

**described** [18] - 81:5, 81:6, 81:16, 82:1, 87:23, 93:18, 104:5, 104:7, 127:13, 128:1, 132:11, 134:4,

140:13, 140:23, 142:5, 148:22, 155:23, 157:21

**describing** [2] - 78:11, 104:10

**description** [2] - 39:24, 140:24

**designed** [1] - 113:23

**desire** [1] - 126:23

**detail** [1] - 132:11

**details** [1] - 111:21

**determination** [1] - 91:9

**determinations** [1] - 91:3

**determine** [1] - 72:19

**determined** [4] - 47:5, 91:16, 91:18, 91:20

**developed** [3] - 111:14, 130:19, 139:15

**dictated** [1] - 74:8

**difference** [6] - 49:11, 66:4, 66:9, 66:13, 66:16, 108:13

**different** [10] - 20:16, 21:12, 32:18, 55:22, 109:23, 157:20, 160:25, 161:16, 161:17

**difficult** [2] - 57:17, 152:10

**difficulties** [1] - 37:3

**dime** [1] - 48:20

**direct** [6] - 10:12, 12:5, 48:22, 104:10, 126:6, 161:22

**Direct** [3] - 3:6, 3:9, 3:12

**DIRECT** [3] - 43:5, 106:2, 147:24

**directing** [1] - 127:4

**direction** [2] - 47:1, 47:10

**directly** [3] - 32:20, 111:20, 126:1

**director** [14] - 44:25, 45:2, 45:4, 45:5, 83:25, 84:1, 106:16, 108:1, 108:3, 108:15, 124:17, 125:3, 125:6

**directorship** [1] - 45:7

**disappeared** [1] - 80:8

**disclosed** [1] - 46:10

**discretion** [1] - 82:14

**discuss** [11] - 33:16,

JURY TRIAL - VOLUME III of VI

33:17, 56:9, 85:13, 85:15, 96:23, 97:1, 102:10, 116:19, 130:16

**discussed** [5] - 12:14, 71:1, 77:20, 109:16, 121:22

**dishes** [3] - 7:4, 7:23

**disregarded** [2] - 95:9, 95:11

**dissolve** [1] - 43:16

**DISTRICT** [3] - 1:1, 1:1, 1:14

**disturb** [1] - 98:9

**DIVISION** [1] - 1:2

**divisions** [2] - 93:12, 132:6

**doable** [1] - 111:5

**document** [7] - 28:10, 39:12, 50:5, 63:18, 64:17, 68:1, 70:12

**documents** [8] - 28:22, 28:23, 49:14, 113:12, 113:15, 124:24, 125:2, 153:8

**dollars** [11] - 23:13, 56:18, 56:19, 91:13, 146:11, 146:18, 149:7, 149:10, 149:11, 155:8, 155:9

**done** [16] - 39:21, 57:6, 65:9, 65:14, 86:20, 87:1, 88:13, 99:7, 103:23, 103:24, 110:23, 115:23, 118:4, 127:3, 137:4

**door** [8] - 13:25, 23:2, 24:12, 24:17, 64:5, 102:18, 143:6, 146:25

**doorman** [1] - 24:6

**doors** [3] - 80:4, 102:16, 152:17

**dotted** [1] - 126:1

**doubt** [1] - 99:19

**down** [32] - 7:18, 32:14, 33:23, 39:22, 42:4, 84:8, 84:13, 86:11, 88:8, 88:18, 99:12, 115:1, 115:4, 117:7, 118:9, 130:22, 131:3, 131:16, 131:18, 131:19, 134:7, 135:21, 136:21, 137:8, 137:19, 138:4, 138:17, 144:19, 147:9, 159:20, 161:19

**dozen** [1] - 93:5

**draft** [1] - 124:23

**drastically** [2] - 115:24, 118:16

**draw** [8] - 54:21, 54:23, 54:24, 54:25, 56:3, 84:25, 129:14

**dreadful** [1] - 105:4

**drill** [1] - 78:16

**drilling** [2] - 78:15, 98:3, 159:14

**drills** [1] - 78:15

**drive** [1] - 6:16

**driver** [2] - 5:3, 25:22

**drivers** [1] - 25:24

**driving** [1] - 159:24

**drop** [1] - 76:22

**drove** [1] - 26:1

**due** [2] - 97:5, 112:1

**dull** [1] - 90:12

**duo** [1] - 82:19

**duration** [2] - 35:21, 43:14, 44:2

**during** [38] - 15:1, 35:21, 43:18, 43:22, 44:2, 44:14, 46:24, 47:19, 48:2, 48:9, 53:25, 54:8, 57:11, 62:21, 78:20, 78:24, 94:14, 96:1, 100:21, 113:9, 114:6, 114:10, 116:4, 116:19, 130:5, 130:16, 134:3, 134:11, 138:6, 138:9, 140:10, 140:13, 141:11, 141:16, 145:12, 150:11, 151:17, 156:17

**duties** [1] - 128:7

## E

**earliest** [5] - 101:20, 150:4, 150:5, 156:1, 159:11

**early** [5] - 24:23, 25:3, 81:5, 98:5, 99:3

**earn** [1] - 146:2

**earning** [2] - 68:5, 68:9

**east** [1] - 127:18

**easy** [1] - 24:11

**economical** [1] - 60:15

**economizing** [2] - 47:12, 53:24

**Ed** [22] - 13:21, 54:12, 55:8, 75:4, 82:5, 82:10, 82:12, 82:13, 82:20, 82:23,

82:25, 83:1, 83:9, 83:14, 83:21, 84:4, 87:17, 96:21, 97:7, 127:7, 141:21, 142:4

**eddie** [2] - 91:20, 111:10

**Eddie** [93] - 9:10, 9:11, 10:14, 11:14, 11:22, 12:8, 15:2, 15:18, 18:9, 20:3, 24:2, 29:15, 29:22, 36:20, 37:25, 47:7, 47:8, 54:4, 54:17, 55:25, 56:1, 56:16, 56:17, 77:11, 80:22, 83:7, 84:17, 84:18, 89:11, 91:12, 91:18, 91:20, 92:2, 92:4, 92:21, 96:19, 98:15, 101:4, 101:7, 110:21, 110:24, 111:1, 111:4, 111:7, 112:20, 113:5, 113:8, 113:22, 113:24, 114:13, 115:1, 115:12, 115:22, 116:5, 116:10, 117:7, 117:22, 119:25, 120:21, 125:14, 125:15, 126:1, 126:11, 126:13, 128:4, 128:14, 130:16, 131:7, 131:13, 132:4, 132:11, 132:18, 133:1, 133:24, 134:5, 134:10, 135:17, 136:12, 137:7, 137:11, 138:14, 138:22, 138:25, 139:12, 142:22, 142:24, 142:25, 143:11, 145:9, 145:25, 146:7

**Eddie's** [7] - 47:10, 96:8, 108:19, 114:4, 120:1, 142:10, 146:12

**Eddies** [2] - 139:3, 139:19

**EDWARD** [1] - 1:10

**eDWARD** [1] - 2:1

**Edward** [1] - 2:1

**effect** [1] - 111:23

**EFS** [1] - 118:23

**eight** [2] - 88:9, 121:19

**either** [16] - 20:11, 23:10, 47:3, 94:17, 100:23, 102:17, 112:23, 113:13,

114:22, 115:23, 117:11, 118:14, 121:2, 130:12, 137:7, 153:9

**Either** [1] - 120:23

**electric** [1] - 78:15

**elevators** [2] - 159:19, 159:20

**elicit** [1] - 118:3

**elicited** [1] - 83:5

**embarrassing** [1] - 139:4

**employed** [1] - 148:3

**employee** [9] - 21:14, 51:25, 52:7, 53:3, 66:20, 67:1, 83:15, 96:10, 154:22

**employees** [32] - 12:10, 13:3, 13:4, 13:8, 46:25, 52:2, 52:3, 53:2, 54:16, 57:3, 85:3, 87:16, 88:9, 103:22, 104:8, 104:13, 109:21, 109:24, 111:6, 111:13, 119:9, 120:2, 120:24, 121:4, 123:14, 128:21, 128:25, 129:4, 129:10, 129:19, 129:23, 141:19

**employer** [2] - 66:20, 66:24

**employment** [8] - 62:21, 90:23, 91:1, 91:2, 91:4, 141:16, 142:7, 151:17

**employment-related** [1] - 91:4

**end** [18] - 13:6, 13:10, 37:3, 56:7, 58:3, 61:4, 64:7, 64:8, 79:4, 82:15, 101:4, 105:11, 109:25, 110:19, 148:13, 151:17, 151:19, 155:10

**ended** [1] - 146:18

**ends** [1] - 118:16

**engineer** [1] - 47:12, 50:24, 53:23

**engineering** [1] - 93:15

**engineers** [1] - 47:11

**English** [7] - 47:8, 89:8, 89:9, 89:15, 89:19, 111:19, 121:10

**enjoyed** [1] - 90:15

**ensure** [1] - 60:13

**entering** [1] - 18:20

**entire** [4] - 92:21, 108:7, 110:8, 151:17

**entitled** [2] - 48:17, 162:17

**entrance** [1] - 74:20

**equally** [1] - 129:13

**equipment** [4] - 62:5, 87:6, 87:7, 88:19

**Eric** [7] - 8:13, 30:9, 32:20, 32:21, 33:9, 89:15, 89:17

**ernesto** [1] - 61:25, 100:22

**error** [1] - 55:3

**errors** [1] - 94:23

**escort** [2] - 53:7, 53:12, 53:18

**escorted** [2] - 53:3, 109:9

**especially** [4] - 54:18, 55:3, 76:25, 98:11

**Espinosa** [2] - 15:6, 15:7

**ESQ** [2] - 1:17, 1:21

**establish** [2] - 28:17, 28:21

**established** [2] - 25:15, 32:3

**estimate** [2] - 54:9, 76:21

**estimating** [1] - 120:6

**evaluating** [1] - 85:21

**evening** [1] - 161:24

**eventually** [2] - 58:18, 71:8

**everyday** [1] - 59:24

**Evidence** [1] - 42:3

**EVIDENCE** [2] - 3:17

**evidence** [11] - 28:21, 28:25, 45:24, 68:12, 68:24, 69:25, 153:10, 153:11, 153:16, 153:20, 153:24

**exact** [3] - 28:17, 149:5, 156:3

**exactly** [9] - 7:15, 23:1, 40:17, 58:22, 81:7, 108:5, 108:9, 108:15, 136:2

**exaggeration** [1] - 79:13

**EXAMINATION** [7] - 3:1, 5:1, 43:5, 77:5, 106:2, 124:8, 147:24

**examination** [15] - 3:4, 3:6, 3:7, 3:9,

JURY TRIAL - VOLUME III of VI

3:10, 3:12, 4:19, 5:25, 77:4, 89:22, 90:19, 104:10, 147:7, 147:11, 161:23
**examine** [1] - 124:6
**example** [6] - 54:19, 74:9, 152:13, 158:16, 159:8, 159:9
**excellent** [1] - 89:19
**except** [4] - 33:2, 48:22, 121:7, 121:17
**exception** [2] - 129:12, 145:17
**exceptional** [1] - 103:24
**excitement** [1] - 90:15
**excuse** [2] - 14:3, 18:21
**Excuse** [1] - 36:7
**excused** [1] - 42:5
**exempt** [6] - 51:25, 52:2, 52:3, 52:6, 66:4, 66:6
**Exhibit** [7] - 63:5, 67:22, 68:13, 69:9, 153:3, 153:11, 153:13
**exhibit** [6] - 45:13, 45:24, 46:10, 63:23, 68:23, 69:25
**EXHIBITS** [1] - 3:16
**existed** [1] - 132:16
**existence** [2] - 129:2, 131:14
**expect** [2] - 15:19, 48:23
**expected** [3] - 111:16, 112:15, 149:1
**expecting** [1] - 149:3
**expenses** [4] - 6:1, 6:9, 48:22, 59:24
**experience** [2] - 7:25, 125:17
**explain** [3] - 53:10, 66:3, 77:24
**explained** [1] - 59:15
**explanations** [1] - 11:10
**exponentially** [1] - 137:1
**extended** [1] - 95:18
**extension** [1] - 80:17
**extent** [2] - 88:6, 132:3
**extra** [2] - 21:8, 21:9
**extremely** [2] - 57:17, 79:20
**eye** [1] - 102:19

## F

**F-e-l-i-c-i-a-n-o** [1] - 147:23
**fabricated** [1] - 137:22
**fabrication** [4] - 93:18, 93:21, 93:25, 94:5
**face** [1] - 26:22
**fact** [9] - 29:2, 34:6, 60:19, 70:3, 76:6, 79:19, 83:12, 91:10
**facto** [1] - 121:8
**factory** [12] - 10:21, 10:22, 10:23, 10:24, 10:25, 11:7, 62:25, 102:8, 102:16, 102:17, 102:18, 160:12
**fair** [4] - 6:20, 78:22, 78:23
**fallen** [1] - 86:24
**false** [1] - 161:25
**familiar** [2] - 102:1, 160:23
**family** [2] - 22:24, 23:8
**far** [8] - 60:18, 97:4, 97:6, 99:25, 105:1, 105:2, 106:13, 114:19
**fashion** [1] - 11:5
**February** [7] - 43:12, 55:25, 85:7, 85:12, 120:7, 120:8
**Federal** [1] - 42:3
**fees** [2] - 9:21, 9:24
**feet** [10] - 62:5, 62:6, 79:23, 118:5, 118:11, 118:12, 136:7, 137:5, 137:10, 138:20
**FELICIANO** [4] - 1:5, 3:11, 147:19, 147:22
**Feliciano** [32] - 51:11, 51:18, 51:19, 52:6, 52:18, 56:14, 56:16, 57:8, 57:21, 58:5, 62:9, 62:20, 65:23, 66:17, 85:24, 91:10, 99:18, 100:15, 110:14, 110:18, 111:22, 118:17, 121:11, 146:12, 147:17, 147:22, 148:1, 153:14, 153:23, 161:19, 161:23, 162:4
**Feliciano's** [2] - 61:5, 61:15

**fell** [1] - 30:15
**fellow** [1] - 94:1
**felt** [3] - 57:22, 82:14, 139:18
**few** [10] - 100:3, 101:13, 103:14, 104:9, 108:21, 119:25, 142:12, 150:5, 151:10, 156:1
**fiefdom** [1] - 85:4
**field** [1] - 77:1
**fifth** [1] - 138:11
**fight** [7] - 15:7, 15:10, 16:25, 17:5, 17:14
**fighting** [1] - 17:8
**figure** [2] - 110:22, 136:1
**filed** [4] - 71:13, 71:15, 123:12, 124:22
**filthy** [1] - 160:6
**finally** [1] - 139:17
**financial** [5] - 37:3, 83:6, 83:19, 126:22
**finish** [17] - 40:16, 41:24, 74:3, 81:14, 99:10, 103:7, 112:1, 148:24, 149:23, 150:1, 150:19, 150:20, 152:19, 158:24, 159:6, 160:7, 160:17
**finished** [7] - 34:3, 41:15, 41:19, 41:21, 81:12, 152:9, 159:3
**fire** [17] - 15:1, 17:10, 17:11, 17:12, 22:23, 46:25, 53:21, 96:7, 108:17, 108:19, 129:3, 134:20, 138:9, 145:20, 145:25
**fired** [11] - 14:22, 14:24, 14:25, 15:2, 15:4, 30:13, 32:10, 32:11, 47:10, 47:17, 53:1
**firing** [6] - 47:9, 109:17, 128:24, 129:1, 129:22, 145:15
**firm** [1] - 67:5
**first** [42] - 5:7, 13:19, 14:4, 18:23, 23:21, 27:16, 29:9, 29:22, 30:20, 43:11, 62:15, 63:12, 65:3, 67:25, 71:19, 71:20, 77:24, 86:8, 87:19, 88:3, 98:15, 103:17, 112:17, 121:17, 127:18, 130:16,

130:17, 130:18, 130:25, 131:3, 134:7, 139:14, 143:3, 148:9, 148:14, 148:17, 149:5, 149:18, 150:6, 150:22
**fit** [2] - 83:9, 139:21
**five** [23] - 8:24, 33:6, 35:19, 35:20, 35:21, 35:23, 36:1, 47:3, 57:4, 69:19, 75:6, 89:14, 93:7, 122:12, 130:10, 130:12, 130:13, 155:13, 155:22, 157:19, 161:15
**fix** [1] - 154:14
**fixed** [1] - 136:24
**FL** [4] - 1:18, 1:22, 2:4, 162:22
**flat** [2] - 56:19, 56:20
**flight** [1] - 127:21
**floors** [2] - 99:8, 159:19
**FLORIDA** [2] - 1:1, 1:7
**Florida** [30] - 7:12, 8:20, 8:21, 30:8, 35:20, 54:2, 71:17, 80:13, 84:8, 97:16, 112:25, 113:16, 114:20, 114:21, 116:14, 117:2, 119:20, 120:4, 120:14, 121:15, 122:2, 125:18, 126:18, 126:19, 127:4, 127:23, 134:3, 135:6, 135:21, 137:13
**flown** [1] - 110:20
**fly** [3] - 54:7, 127:15, 127:16
**flying** [1] - 127:18
**folder** [1] - 36:14
**follow** [4] - 137:25, 138:2, 138:22, 159:8
**followed** [2] - 92:5
**following** [5] - 5:18, 25:21, 104:19, 105:4, 105:12
**food** [2] - 7:7
**foot** [6] - 60:24, 61:1, 115:23, 118:3, 118:14, 136:4
**footage** [1] - 79:22
**football** [3] - 35:9, 35:10, 35:16
**FOR** [3] - 1:16, 1:20, 2:1
**force** [2] - 138:24,

139:2
**Ford** [4] - 49:9, 49:13, 80:8
**foregoing** [1] - 162:16
**forgave** [1] - 23:8
**forget** [2] - 23:7, 50:23
**forgotten** [2] - 50:16, 57:22
**form** [1] - 86:22
**formal** [1] - 38:10
**formation** [2] - 132:14, 133:5
**formed** [2] - 125:21, 132:1
**forming** [1] - 131:15
**FORT** [2] - 1:2, 1:7
**Fort** [1] - 85:17
**forth** [1] - 54:7
**foundation** [1] - 73:18
**four** [6] - 6:24, 22:20, 35:1, 47:3, 58:20, 75:5, 89:11, 93:6, 101:14, 101:19, 104:9, 104:14, 104:19, 105:8, 105:9, 131:25, 132:6, 155:22, 156:25, 157:19
**four-day** [1] - 104:14
**fourth** [1] - 135:6
**FPR** [2] - 2:3, 162:20
**frame** [1] - 95:12
**France** [1] - 96:4
**FRANCIS** [3] - 1:10, 3:5, 42:24
**Francis** [3] - 1:22, 42:22, 43:2
**frank** [2] - 129:13, 129:16
**Frank** [18] - 9:13, 99:12, 112:20, 114:10, 114:11, 126:12, 126:18, 127:1, 129:14, 131:12, 132:14, 132:22, 139:9, 143:12, 145:23, 151:3, 151:4, 151:5
**free** [4] - 6:2, 6:15, 6:20, 100:6
**Friday** [2] - 61:6, 151:14
**friend** [5] - 30:25, 114:4, 139:3, 139:8, 139:19
**front** [2] - 17:9, 98:1
**Ft** [1] - 74:20

JURY TRIAL - VOLUME III of VI

**fulfill** [2] - 51:11, 51:21
**full** [4] - 42:25, 105:24, 112:5, 147:21
**funds** [8] - 48:8, 48:25, 110:12, 110:13, 111:25, 115:3, 115:18, 135:18

## G

**gas** [1] - 6:7
**gather** [1] - 110:21
**general** [5] - 10:23, 114:16, 117:8, 125:19, 128:3
**generally** [8] - 19:16, 61:7, 61:12, 73:21, 77:15, 117:23, 125:9, 127:19
**generous** [1] - 120:2
**gentleman** [2] - 35:8, 78:3, 86:13
**gentleman's** [1] - 50:23
**Gentlemen** [1] - 4:15
**gentlemen** [7] - 93:8, 125:15, 125:21, 131:15, 132:2, 132:21, 133:3
**girl** [1] - 142:14
**given** [8] - 70:17, 87:12, 91:15, 92:18, 103:22, 118:5, 118:12, 148:15
**glabor@aol.com** [1] - 1:23
**Glasser** [1] - 1:21
**God's** [1] - 86:7
**GONZALEZ** [1] - 1:13
**Goodnight** [1] - 162:10
**gopher** [1] - 67:15
**governance** [1] - 126:16
**governing** [1] - 124:24
**grabbed** [1] - 35:9
**Gracious** [1] - 8:5
**granted** [1] - 86:14
**grave** [1] - 94:23
**great** [7] - 55:8, 87:7, 88:10, 112:15, 132:11, 137:13, 143:25
**grossly** [1] - 115:21
**guaranties** [2] - 49:8, 49:12

**guard** [8] - 41:2, 41:5, 41:7, 41:11, 41:12, 41:14, 41:15, 41:20
**guess** [9] - 17:25, 29:5, 49:20, 70:20, 87:11, 93:19, 99:8, 115:12, 119:13
**guessing** [1] - 58:3
**GUILLERMO** [1] - 1:6
**Guillermo** [3] - 63:15, 123:5, 160:10
**guy** [6] - 51:9, 67:6, 88:4, 121:9, 145:20
**guys** [12] - 63:16, 65:20, 78:19, 86:10, 86:25, 88:16, 88:20, 98:3, 121:10, 154:11, 154:12, 154:19

## H

**H-e-i-d-e-l-b-e-r-g-e-r** [1] - 106:1
**half** [21] - 17:15, 33:3, 33:8, 61:12, 72:5, 76:19, 86:15, 88:15, 113:20, 114:24, 116:18, 119:17, 119:20, 120:13, 127:14, 127:15, 127:19, 127:23, 146:12, 148:12, 159:2
**half-brother** [1] - 17:15
**hall** [1] - 102:15
**hallway** [1] - 102:8
**hand** [5] - 31:17, 42:23, 55:10, 105:21, 147:18
**handed** [1] - 45:18
**hands** [2] - 125:22, 127:4
**hands-on** [2] - 125:22, 127:4
**handwriting** [9] - 17:22, 17:23, 18:2, 18:3, 18:5, 27:10, 27:11, 28:2
**handwritten** [1] - 63:13
**hang** [1] - 52:14
**hanging** [2] - 100:15, 140:6
**happy** [1] - 117:13
**harbor** [1] - 74:21
**hard** [1] - 39:8

**hardly** [1] - 142:16
**Hardy** [1] - 162:19
**HARDY** [2] - 2:3, 162:20
**Hardy-Hobbs** [1] - 162:19
**HARDY-HOBBS** [2] - 2:3, 162:20
**harmless** [4] - 49:18, 50:19, 51:13, 51:22
**heading** [1] - 94:15
**heads** [4] - 96:16, 104:3, 104:4, 131:21
**hear** [4] - 78:18, 78:19, 109:19, 129:17
**heard** [5] - 52:2, 52:4, 71:20, 108:20, 142:14
**hearsay** [1] - 29:6
**heavy** [1] - 55:2
**HEIDELBERGER** [4] - 1:10, 3:8, 105:22, 105:25
**Heidelberger** [27] - 1:22, 34:12, 35:19, 43:22, 44:11, 44:16, 44:23, 53:1, 53:7, 53:12, 56:24, 57:3, 59:6, 59:11, 59:14, 59:22, 60:5, 60:17, 60:21, 72:8, 90:4, 105:20, 105:25, 106:4, 107:11, 147:10
**Heidelberger's** [1] - 82:16
**held** [2] - 46:19, 106:20
**help** [11] - 37:4, 38:3, 99:11, 110:4, 110:9, 115:1, 115:5, 120:22, 126:21, 128:16, 155:14
**helped** [3] - 37:4, 92:22, 108:19
**hereby** [1] - 162:16
**Hernandez** [1] - 15:4
**hi** [1] - 134:23
**high** [7] - 61:23, 62:3, 62:4, 62:6, 79:20, 95:5, 120:1
**higher** [1] - 118:3
**highly** [1] - 5:12
**himself** [4] - 12:1, 53:18, 106:20, 117:16
**hire** [16] - 41:4, 41:6, 46:25, 47:2, 56:1, 84:17, 88:14, 88:16, 125:12, 129:2, 131:24, 132:5, 132:19, 133:4,

134:22, 138:9
**hired** [22] - 8:19, 11:2, 11:14, 12:13, 12:14, 33:11, 41:14, 47:3, 47:16, 52:8, 52:22, 56:2, 56:3, 84:16, 93:4, 93:6, 93:7, 93:8, 130:24, 131:20, 133:12, 149:5
**hires** [1] - 125:13
**hiring** [3] - 109:16, 128:24, 129:22
**history** [1] - 103:23
**Hobbs** [1] - 162:19
**HOBBS** [2] - 2:3, 162:20
**hobbs@flsd. uscourts.gov** [2] - 2:5, 162:22
**hold** [6] - 46:17, 49:18, 50:19, 51:13, 51:22, 62:5
**holiday** [1] - 19:20
**holidays** [9] - 19:20, 19:21, 19:22, 19:23, 19:24, 21:11, 23:9, 100:13, 156:23
**home** [6] - 6:12, 41:16, 76:23, 100:12, 140:4, 144:23
**homeowner** [1] - 98:5
**homeowners** [2] - 98:9, 98:11
**homes** [1] - 38:18
**honest** [3] - 53:9, 62:14, 86:7
**honestly** [2] - 119:2, 130:18
**Honestly** [1] - 128:19
**Honor** [36] - 4:7, 4:9, 5:11, 14:3, 16:7, 28:3, 30:19, 34:21, 37:6, 42:7, 45:14, 45:23, 46:3, 49:23, 64:17, 68:14, 70:8, 70:21, 73:6, 73:16, 90:9, 105:14, 105:17, 107:7, 122:15, 124:5, 147:5, 147:8, 147:13, 147:16, 153:2, 153:8, 161:2, 161:9, 161:12, 161:14
**HONORABLE** [1] - 1:13
**hope** [2] - 90:15, 161:23
**hour** [15] - 33:3, 33:8, 33:16, 33:18, 33:21, 35:13, 66:12,

71:22, 76:19, 102:11, 156:15, 159:2
**hour-and-a-half** [1] - 159:2
**hourly** [5] - 13:3, 66:6, 88:14, 92:8, 123:15
**hours** [51] - 8:14, 10:7, 12:25, 21:8, 21:9, 23:9, 28:4, 28:6, 28:7, 28:18, 29:13, 33:12, 33:25, 38:17, 39:3, 39:4, 39:5, 39:15, 52:9, 52:11, 56:21, 61:6, 61:15, 61:16, 61:21, 62:10, 62:12, 62:19, 62:22, 62:24, 64:11, 64:22, 65:8, 67:4, 68:22, 69:4, 87:8, 92:11, 98:24, 99:14, 99:18, 99:22, 145:2, 145:7, 148:18, 149:2, 149:3, 149:13, 155:24, 156:4
**house** [6] - 80:23, 97:23, 98:1, 150:18, 159:6, 159:7
**houses** [1] - 98:4
**hovering** [1] - 138:20
**human** [1] - 135:2
**hundred** [6] - 12:1, 23:13, 58:20, 92:10, 146:11, 146:18
**hundreds** [2] - 14:12
**hung** [1] - 102:1
**hurricane** [19] - 45:20, 48:9, 52:15, 52:23, 61:25, 70:6, 89:4, 91:6, 100:16, 100:22, 125:16, 125:17, 129:25, 131:10, 132:15, 134:1, 136:4, 137:17
**Hurricane** [64] - 1:21, 43:8, 44:25, 47:20, 48:10, 48:25, 49:4, 49:15, 50:20, 53:2, 53:25, 63:9, 63:19, 64:10, 64:12, 64:20, 68:5, 68:9, 69:14, 70:6, 72:9, 77:10, 78:20, 78:21, 78:24, 82:1, 83:16, 83:24, 84:3, 84:8, 84:13, 87:11, 88:23, 89:1, 93:10, 93:25, 94:14, 94:19, 95:25, 96:11, 96:14, 100:24, 106:5, 108:18, 112:18, 120:5, 124:24,

125:10, 127:10, 128:10, 128:13, 128:21, 128:25, 129:5, 129:11, 129:19, 129:23, 138:11, 143:14, 145:2, 145:12, 147:3, 148:3, 153:21

**HURRICANE** [1] - 1:9

**hurt** [1] - 102:6

**Hymen** [2] - 26:2, 26:4

**I**

**IBACACHE** [9] - 3:3, 4:20, 14:21, 21:6, 21:24, 30:21, 31:8, 34:22, 39:7

**Ibacache** [7] - 4:17, 5:7, 5:16, 42:5, 99:21, 158:10, 158:11

**IBM** [3] - 65:17, 87:5, 87:15

**idea** [21] - 9:16, 44:3, 44:11, 57:24, 61:5, 61:14, 70:11, 82:24, 92:4, 112:12, 118:17, 119:11, 122:3, 122:21, 122:24, 123:7, 129:25, 132:23, 133:15, 155:20, 158:15

**identified** [2] - 79:10, 131:25

**identify** [16] - 18:5, 28:1, 28:11, 43:18, 46:22, 47:16, 49:14, 51:5, 54:1, 59:3, 60:2, 72:7, 115:15, 152:2, 156:7, 157:17

**III** [1] - 1:13

**illegal** [1] - 5:12

**imagine** [1] - 52:24

**immigration** [1] - 5:19

**imperative** [1] - 133:8

**implementation** [1] - 95:10

**implemented** [1] - 138:14

**important** [1] - 13:8

**inability** [1] - 60:9

**Inc** [1] - 1:21

**INC** [1] - 1:9

**includes** [2] - 153:17, 153:18

including [3] - 7:22, 121:19, 157:10

**income** [2] - 5:19, 5:24

**Incorporated** [3] - 68:6, 68:10, 70:6

**incorporation** [2] - 83:24, 124:22

**increase** [2] - 117:11, 137:21

**increased** [1] - 115:24

**increases** [2] - 136:15, 137:1

**increasing** [1] - 136:22

**independent** [4] - 57:11, 62:8, 109:23, 124:1

**independently** [1] - 86:3

**INDEX** [2] - 3:1, 3:16

**indicate** [2] - 117:25, 121:4

**indicated** [4] - 52:19, 60:5, 114:7, 121:6

**individual** [2] - 30:24, 148:4

**individuals** [1] - 64:13

**informal** [2] - 127:3, 127:8

**information** [4] - 13:2, 60:22, 110:22, 137:4

**informed** [2] - 104:13, 129:14

**initial** [7] - 44:5, 44:17, 44:18, 49:6, 52:22, 112:20, 121:19

**input** [9] - 54:15, 54:19, 55:7, 55:19, 55:21, 56:5, 133:19, 133:24, 134:2

**inquire** [1] - 119:22

**inquiry** [1] - 135:20

**insist** [3] - 24:7, 26:20, 31:22

**inspect** [1] - 115:6

**install** [14] - 10:19, 11:20, 52:14, 52:23, 89:4, 91:6, 97:23, 129:25, 136:4, 137:9, 150:12, 150:14, 150:17, 152:12

**installation** [8] - 19:16, 78:14, 93:14, 93:16, 139:25, 140:21, 152:9, 160:15

**installations** [1] -

88:22

**installed** [4] - 78:14, 137:5, 137:22, 152:18

**installer** [8] - 10:10, 52:25, 65:25, 97:4, 143:7, 143:9, 148:8, 148:21

**installers** [65] - 12:11, 14:10, 14:25, 15:3, 20:3, 32:10, 47:4, 54:18, 56:9, 56:13, 57:9, 57:12, 58:11, 63:1, 63:2, 64:22, 65:20, 66:14, 66:17, 80:11, 81:2, 89:7, 89:12, 91:2, 91:4, 91:23, 92:11, 92:15, 96:7, 97:12, 97:14, 98:16, 99:1, 99:4, 99:13, 100:6, 102:13, 102:20, 103:3, 119:19, 121:8, 123:19, 139:23, 140:11, 140:12, 140:17, 141:12, 141:19, 142:2, 142:7, 142:18, 143:15, 143:20, 143:22, 144:7, 144:13, 144:17, 145:6, 146:23, 158:5, 158:7

**installers'** [1] - 160:20

**installing** [4] - 156:10, 160:2, 160:12, 160:24

**instance** [1] - 144:5

**instances** [1] - 62:9

**instruct** [2] - 14:4, 83:15

**instruction** [1] - 96:16

**instructions** [3] - 88:25, 108:19, 117:19

**intend** [1] - 56:12

**intended** [1] - 117:25

**intent** [1] - 125:21

**intention** [3] - 31:16, 32:13, 103:20

**intents** [1] - 95:23

**interest** [12] - 43:9, 43:13, 44:21, 82:16, 82:17, 82:18, 87:9, 88:1, 106:5, 126:8, 126:19, 126:22

**interested** [3] - 128:12, 131:15, 132:2

**interpret** [3] - 16:10, 40:20, 111:12

**INTERPRETER** [18] -

4:5, 4:24, 14:3, 14:7, 16:7, 16:9, 16:14, 16:18, 18:10, 18:14, 18:21, 25:6, 32:5, 36:7, 38:13, 39:4, 40:20, 41:8

**interpreter** [1] - 25:6

**interrupted** [1] - 159:1

**interruption** [1] - 161:24

**interviewed** [2] - 93:4, 93:5

**intimate** [1] - 30:25

**INTO** [2] - 3:17

**introduced** [2] - 113:5, 133:2

**introducing** [1] - 113:24

**introduction** [1] - 130:19

**inventory** [1] - 136:20

**invest** [4] - 44:14, 83:7, 83:8, 83:17

**invested** [7] - 44:4, 44:8, 44:12, 44:16, 44:24, 83:9, 106:13

**investment** [6] - 44:5, 44:17, 44:18, 115:2, 115:4, 135:16

**investments** [3] - 44:19, 128:20

**investor** [2] - 45:8, 128:14

**invited** [1] - 35:17

**involve** [2] - 134:15, 138:6

**involved** [10] - 49:3, 54:10, 85:8, 85:21, 87:24, 93:9, 128:9, 129:7, 134:25, 142:17

**involvement** [19] - 79:8, 85:10, 88:6, 91:1, 91:14, 91:22, 91:25, 92:12, 92:14, 93:24, 94:4, 94:8, 94:11, 96:13, 97:1, 131:23, 132:3, 141:24, 142:6

**irrelevant** [1] - 5:13

**Islands** [1] - 96:6

**issue** [9] - 13:9, 31:11, 31:13, 60:18, 116:19, 116:22, 139:2, 141:10

**issued** [4] - 82:7, 103:15, 103:21, 104:1

**issues** [9] - 56:10, 60:23, 96:23, 97:2,

102:11, 118:1, 139:10, 140:24, 142:7

**J**

**J-a-v-a-n-o-v** [1] - 51:9

**J.H** [1] - 1:17

**January** [11] - 43:12, 55:25, 58:4, 84:16, 112:19, 113:13, 114:12, 115:9, 130:17, 131:2, 132:12

**Javanov** [2] - 51:9, 51:20

**jILL** [1] - 2:3

**Jill** [1] - 162:19

**JILL** [1] - 162:20

**jill_hardy** [2] - 2:5, 162:22

**jill_hardy-hobbs@flsd.uscourts.gov** [2] - 2:5, 162:22

**job** [71] - 8:10, 11:6, 11:19, 24:8, 24:9, 32:16, 36:3, 36:18, 37:7, 39:24, 41:16, 54:2, 65:9, 65:11, 65:13, 65:16, 67:7, 67:10, 74:3, 74:4, 74:6, 74:9, 74:14, 75:10, 76:17, 76:22, 78:16, 80:22, 80:23, 81:12, 81:13, 81:14, 83:12, 83:13, 84:19, 86:4, 88:10, 92:24, 94:7, 100:7, 102:7, 115:6, 115:10, 115:11, 115:12, 122:25, 139:23, 140:17, 140:18, 140:25, 141:14, 143:24, 150:18, 150:20, 150:21, 152:9, 152:19, 152:22, 157:14, 157:15, 158:15, 158:17, 158:18, 159:1, 159:3, 160:2, 160:3, 160:6

**jobs** [14] - 65:4, 67:11, 74:8, 75:8, 77:1, 89:1, 99:25, 100:2, 100:3, 101:3, 112:1, 159:4

**John** [12] - 10:20, 10:21, 10:23, 11:11, 36:21, 94:6, 125:18, 126:1, 145:17, 145:23, 145:24,

145:25
**JOSE** [1] - 1:13
**JR** [1] - 1:13
**Judge** [2] - 21:21, 46:2
**JUDGE** [1] - 1:14
**judge** [1] - 86:3
**juice** [1] - 156:11
**Julio** [4] - 63:15, 123:5, 160:10, 160:11
**JULIO** [1] - 1:6
**July** [8] - 58:8, 58:9, 58:15, 95:22, 95:24, 121:3, 155:11
**June** [5] - 58:7, 58:15, 107:12, 121:24, 134:6
**jury** [17] - 4:10, 42:11, 42:12, 42:16, 44:3, 58:23, 64:10, 80:1, 89:25, 90:10, 102:3, 103:17, 125:10, 126:15, 148:6, 154:4, 157:5
**JURY** [1] - 1:13
**Jury** [10] - 4:14, 4:21, 42:9, 42:13, 42:18, 89:21, 90:3, 90:13, 90:14, 161:21

## K

**keep** [7] - 4:10, 14:4, 19:15, 21:9, 36:6, 62:24, 64:21
**keeping** [1] - 24:7
**Keith** [3] - 78:3, 94:17, 110:25
**Kelly** [12] - 42:6, 42:20, 77:20, 81:1, 83:5, 90:2, 105:16, 135:14, 136:23, 140:16, 147:15, 153:12
**KELLY** [77] - 1:17, 4:4, 5:11, 5:21, 14:15, 37:5, 42:7, 42:21, 43:6, 45:12, 45:16, 46:2, 46:5, 46:7, 46:13, 49:22, 49:25, 50:3, 50:9, 50:17, 52:18, 55:9, 55:12, 63:4, 63:8, 63:22, 63:25, 64:4, 64:19, 67:21, 67:24, 68:12, 69:2, 69:7, 69:11, 70:4, 70:13, 70:15, 70:25, 71:10, 72:14, 72:16, 72:17, 73:1,

73:6, 73:9, 73:11, 73:18, 73:20, 73:23, 74:7, 77:2, 90:4, 105:17, 105:20, 106:3, 107:7, 107:10, 107:23, 108:8, 122:14, 122:18, 124:5, 147:16, 147:25, 152:1, 153:2, 153:13, 153:17, 153:21, 153:25, 154:3, 161:5, 161:6, 161:11, 161:14, 162:5
**Kelly**......................
[3] - 3:6, 3:9, 3:12
**kept** [1] - 62:24
**key** [17] - 23:19, 24:12, 24:16, 77:11, 101:8, 143:11, 143:12, 143:13, 158:2, 158:4, 158:5, 158:9, 158:11, 158:12, 158:13
**keys** [3] - 77:9, 143:10, 158:8
**Kiko** [23] - 15:8, 15:12, 16:13, 16:20, 17:10, 17:11, 17:14, 17:15, 17:16, 17:25, 19:15, 19:22, 20:18, 21:5, 21:16, 22:3, 22:25, 23:15, 67:14, 67:17, 123:1, 123:10
**kiko** [2] - 17:15, 17:16
**Kiko's** [3] - 19:14, 20:4, 20:22
**kind** [5] - 120:6, 121:8, 130:18, 134:10, 134:25
**KLEPPIN** [38] - 1:21, 4:3, 45:23, 46:10, 50:7, 50:12, 50:14, 64:16, 68:14, 68:16, 68:19, 69:24, 70:8, 70:11, 70:21, 71:4, 72:12, 72:15, 72:25, 73:3, 73:16, 77:6, 90:9, 90:20, 90:22, 105:13, 107:19, 108:7, 124:7, 124:9, 147:5, 151:24, 153:7, 154:1, 161:2, 161:4, 161:8, 162:8
**Kleppin** [1] - 1:21
**Kleppin**....................
... [2] - 3:7, 3:10
**knot** [1] - 62:7
**knots** [1] - 80:23
**knowing** [1] - 92:4

**knowledge** [5] -
57:11, 106:24, 122:4, 124:1, 143:11
**known** [7] - 11:15, 12:20, 16:13, 54:21, 55:5, 107:5, 117:22
**knows** [4] - 13:5, 17:3, 32:16, 52:19

## L

**Labor** [3] - 100:21, 101:25, 146:19
**lack** [1] - 13:24
**Ladies** [1] - 4:15
**lady** [1] - 27:7
**lady's** [1] - 28:1
**LAMONICA** [2] - 1:4, 1:5
**Lamonica** [20] -
15:12, 15:14, 15:19, 16:13, 16:20, 22:8, 27:6, 27:10, 27:15, 28:4, 67:18, 68:1, 68:3, 69:3, 69:12, 70:7, 70:17, 70:22, 77:16, 122:22
**Lamonicas** [5] -
62:20, 67:10, 68:19, 161:7, 161:8
**Lamonicas'** [2] -
68:20, 123:7
**language** [3] - 12:16, 12:21
**Lares** [2] - 78:3, 94:17
**Las** [1] - 74:21
**last** [18] - 5:4, 15:4, 41:8, 43:3, 87:2, 87:9, 95:23, 101:7, 101:9, 101:11, 106:1, 112:6, 116:11, 120:18, 120:19, 120:23, 131:19, 147:22
**late** [16] - 22:22, 23:5, 23:10, 23:11, 61:9, 61:23, 81:6, 110:19, 113:18, 120:8, 120:19, 121:3, 130:8, 134:6, 141:8
**latest** [1] - 157:23
**LAUDERDALE** [2] -
1:2, 1:7
**Lauderdale** [2] -
74:21, 85:17
**LAW** [2] - 42:15, 90:7
**law** [2] - 66:23, 67:2
**lawn** [1] - 98:1
**lawnmower** [1] -

97:25
**laws** [6] - 71:16, 71:24, 72:2, 72:21, 123:13, 123:19
**lawsuit** [9] - 20:8, 20:9, 71:13, 71:15, 71:23, 72:7, 72:18, 122:20, 123:12
**lawyer** [2] - 20:7, 25:8
**lawyer's** [1] - 113:14
**lawyers** [1] - 38:10
**lay** [2] - 53:22, 80:17
**laying** [1] - 73:18
**layoff/fire** [1] - 53:23
**lead** [1] - 73:12
**leading** [1] - 151:24
**learned** [1] - 129:16
**lease** [2] - 49:7, 87:5
**leases** [1] - 49:4
**least** [10] - 37:7, 75:3, 96:12, 116:5, 123:24, 138:1, 151:6, 151:9, 155:24, 159:24
**leave** [37] - 14:1, 16:21, 17:20, 26:6, 30:8, 31:9, 31:14, 33:9, 36:3, 39:18, 42:1, 58:25, 74:17, 75:7, 75:9, 75:17, 75:18, 76:9, 76:13, 76:15, 76:17, 76:20, 80:4, 81:21, 101:4, 101:7, 101:20, 124:13, 127:20, 150:15, 152:4, 158:20, 159:24, 160:4, 160:13
**leaves** [1] - 18:8
**leaving** [2] - 18:19, 76:21
**led** [2] - 102:8, 149:1
**left** [32] - 11:9, 11:12, 19:16, 20:2, 20:5, 30:9, 40:10, 48:25, 55:24, 64:3, 65:12, 75:20, 75:25, 76:13, 76:16, 76:17, 76:22, 78:2, 84:15, 84:16, 85:7, 85:11, 88:20, 92:25, 99:15, 101:22, 101:24, 137:13, 146:1, 158:21, 159:2
**legal** [6] - 5:7, 5:10, 9:21, 9:24, 66:21, 66:22
**leiva** [1] - 4:13
**LEIVA** [65] - 1:10, 2:1, 4:7, 4:9, 4:12, 4:21, 4:25, 5:2, 5:15,

5:23, 12:3, 14:8, 14:17, 14:18, 14:23, 16:8, 16:11, 16:12, 16:17, 16:19, 16:24, 17:4, 18:12, 18:16, 18:22, 20:23, 21:2, 21:15, 21:21, 21:25, 22:1, 25:10, 25:19, 25:20, 27:19, 27:20, 27:23, 28:3, 28:5, 28:12, 28:17, 28:24, 29:5, 29:8, 30:19, 30:23, 31:7, 31:10, 32:6, 34:21, 34:23, 34:24, 36:11, 37:8, 37:9, 38:14, 38:15, 39:5, 39:9, 40:21, 40:22, 41:10, 147:8, 147:13, 153:9
**Leiva** [63] - 2:1, 4:6, 4:11, 4:12, 4:13, 4:19, 8:11, 15:18, 17:2, 25:9, 27:18, 36:9, 44:21, 47:1, 48:2, 48:13, 49:19, 50:19, 51:22, 53:14, 53:15, 53:18, 72:8, 82:10, 82:20, 83:7, 83:9, 83:15, 83:21, 84:5, 92:9, 92:10, 95:1, 95:8, 96:19, 97:7, 101:20, 106:8, 106:10, 114:8, 116:1, 117:13, 117:20, 119:5, 119:8, 121:22, 123:21, 126:24, 131:20, 133:22, 137:16, 140:21, 141:6, 141:21, 142:4, 146:5, 147:6, 147:10, 148:16, 151:2, 154:19, 158:13
**Leiva's** [2] - 83:1, 139:20
**leiva**......................
[1] - 3:4
**less** [10] - 37:11, 54:5, 54:12, 62:17, 62:23, 84:9, 92:23, 98:24, 99:22, 145:2
**letter** [7] - 18:1, 153:22, 154:5, 154:9, 155:1, 155:3, 155:4
**letting** [2] - 47:7, 47:12
**level** [4] - 91:22, 93:10, 102:19, 123:3
**liar** [2] - 34:8, 34:9
**licenses** [1] - 23:10
**lie** [24] - 24:1, 25:15,

JURY TRIAL - VOLUME III of VI

25:16, 139:16
**life** [9] - 44:14, 46:24, 48:2, 51:17, 57:11, 65:2, 86:6, 122:13, 155:11
**lifetime** [1] - 71:20
**lightening** [3] - 81:9, 144:16, 144:20
**likely** [1] - 135:9
**limited** [1] - 142:20
**limo** [1] - 5:3
**line** [14] - 5:18, 33:10, 35:19, 38:11, 38:13, 107:24, 108:3, 108:4, 126:1, 128:17, 128:18, 128:19, 131:17, 137:3
**lines** [1] - 55:16
**list** [2] - 37:2, 46:11
**listed** [2] - 83:23, 84:1
**literally** [1] - 19:7
**live** [2] - 54:6, 84:11
**lived** [2] - 54:6, 59:9
**living** [2] - 5:5, 114:17
**load** [9] - 41:16, 41:24, 80:6, 150:14, 152:21, 159:20, 160:1, 160:16
**loaded** [1] - 152:5
**loading** [4] - 40:4, 152:6, 158:19, 159:18
**loan** [1] - 83:7
**loans** [2] - 44:6, 44:20
**location** [6] - 78:20, 79:1, 79:2, 79:9
**locations** [2] - 78:24, 78:25, 81:17
**log** [1] - 39:12
**look** [23] - 13:17, 15:17, 18:15, 19:12, 26:21, 27:1, 31:21, 35:5, 50:5, 55:16, 67:25, 68:7, 85:16, 85:25, 93:6, 107:24, 115:19, 117:7, 125:2, 128:19, 135:15, 135:22, 145:18
**looked** [4] - 23:4, 86:10, 103:2, 111:4
**looking** [6] - 63:18, 64:1, 69:22, 113:7, 128:17
**lose** [2] - 117:17, 127:18
**losing** [1] - 115:22
**loss** [1] - 72:11
**lost** [1] - 22:19

**lounge** [2] - 150:9, 150:22
**loved** [1] - 88:16
**low** [4] - 61:4, 115:3, 115:18, 135:18
**lower** [1] - 136:25
**luckily** [1] - 161:25
**Luis** [1] - 37:10
**lumped** [1] - 61:13
**lunch** [4] - 89:21, 156:7, 156:8, 156:15
**lying** [4] - 19:8, 20:11, 25:17, 25:18

## M

**m-c-C-a-r-r-o-l-l** [1] - 43:4
**ma'am** [1] - 32:5
**mail** [4] - 87:18, 87:19, 88:8
**main** [4] - 102:8, 102:15, 102:18, 104:1
**maintain** [1] - 43:13
**maintained** [1] - 96:15
**maintaining** [2] - 96:10, 96:13
**maintenance** [4] - 87:15, 88:2, 154:12, 154:23
**major** [6] - 74:13, 74:18, 74:23, 101:3
**majority** [4] - 83:2, 127:18, 138:25, 146:8
**man** [8] - 65:3, 65:4, 84:25, 89:17, 93:6, 94:6
**manage** [3] - 13:5, 65:23, 133:18
**management** [4] - 125:13, 126:25, 130:23, 133:1
**manager** [20] - 10:23, 11:18, 20:2, 21:13, 21:14, 54:20, 54:23, 65:5, 65:17, 65:18, 65:24, 65:25, 84:16, 84:22, 85:5, 108:25, 121:8, 125:19, 125:20
**manager/controller** [1] - 125:25
**manager/installer** [1] - 66:1
**managers** [4] - 65:20, 65:21, 104:1, 133:25
**mandatory** [1] -

100:8
**manner** [3] - 107:20, 111:15, 134:16
**manufacture** [5] - 94:21, 118:8, 118:9, 137:2, 137:9
**manufactured** [2] - 118:5, 137:5
**manufacturing** [8] - 61:2, 93:13, 93:17, 93:21, 109:1, 118:11, 136:6, 138:19
**manufacturing/warehouse** [1] - 125:20
**Marcello** [1] - 15:4
**March** [6] - 113:1, 114:12, 120:6, 130:22, 131:18, 133:2
**marine** [2] - 74:21, 101:2
**Marine** [4] - 112:13, 112:14, 112:16, 140:20
**Mario** [11] - 36:14, 36:15, 36:17, 39:13, 86:12, 91:10, 100:15, 111:20, 121:6, 121:11, 147:22
**MARIO** [3] - 1:5, 3:11, 147:19
**Mario's** [1] - 89:9
**mark** [9] - 10:15, 84:24, 85:4, 85:7, 85:11, 125:18, 129:12, 133:12
**marked** [7] - 45:13, 49:25, 63:5, 67:22, 69:8, 153:3, 153:12
**marketing** [2] - 46:19, 46:23
**married** [1] - 142:13
**Marshal** [2] - 42:11, 42:17
**MARSHAL** [2] - 42:12, 89:25
**match** [1] - 61:3
**material** [6] - 40:6, 152:14, 152:21, 152:23, 159:22
**materials** [15] - 19:16, 40:4, 41:16, 41:18, 41:25, 93:19, 136:19, 152:10, 156:13, 158:16, 158:19, 159:19, 160:1, 160:3, 160:16
**matter** [9] - 16:15, 28:1, 28:21, 52:11, 139:6, 149:13,

150:15, 162:17
**may/June** [1] - 134:6
**mccarroll** [1] - 42:24
**McCarroll** [46] - 1:10, 1:22, 3:5, 9:14, 42:8, 42:22, 43:2, 43:4, 43:7, 45:17, 50:16, 52:20, 55:13, 63:24, 64:1, 70:2, 71:7, 73:5, 73:21, 73:24, 77:3, 77:7, 89:23, 90:11, 90:17, 90:23, 105:15, 106:5, 106:7, 106:11, 106:20, 109:8, 114:8, 116:8, 118:20, 119:8, 119:15, 121:15, 122:2, 123:21, 139:9, 147:11, 151:4, 151:5
**McCarroll's** [2] - 108:20, 109:19
**mean** [30] - 5:3, 7:19, 7:25, 10:7, 11:3, 13:20, 14:24, 16:5, 17:14, 17:25, 26:10, 26:11, 28:25, 29:3, 29:6, 29:12, 30:25, 32:1, 34:13, 47:13, 48:6, 53:10, 60:4, 61:1, 67:2, 67:17, 86:22, 126:14, 139:16
**meaning** [3] - 91:2, 127:1, 142:9
**means** [2] - 35:7, 142:4
**meant** [3] - 18:25, 79:14, 131:2
**meantime** [1] - 144:3
**measure** [3] - 47:13, 152:12, 152:14
**measurements** [1] - 152:16
**meet** [10] - 37:17, 56:9, 59:23, 59:24, 88:4, 110:1, 110:4, 110:14, 118:16
**meeting** [13] - 31:22, 36:25, 37:3, 83:3, 111:9, 111:13, 112:20, 114:20, 115:14, 116:11, 116:23, 138:24, 140:10
**meetings** [3] - 60:17, 85:13, 127:7
**member** [3] - 100:10, 107:25, 139:3
**Members** [5] - 4:21, 42:9, 89:21, 90:14, 161:20
**members** [2] - 83:4,

125:11
**memorial** [1] - 100:23
**memory** [4] - 6:23, 34:22, 49:22, 50:2
**men** [2] - 86:10, 113:5
**mentioned** [4] - 59:9, 75:15, 105:2, 119:25
**mentioning** [1] - 12:6
**met** [12] - 15:20, 37:19, 60:3, 117:1, 120:24, 125:15, 132:21, 140:20, 148:16, 148:17, 154:12, 154:15
**metal** [1] - 78:12
**MIAMI** [2] - 162:21, 162:22
**Miami** [9] - 1:18, 2:4, 2:4, 15:20, 15:21, 99:25, 100:2, 112:17
**Michelle** [1] - 162:19
**MICHELLE** [2] - 2:3, 162:20
**mid** [1] - 143:23
**mid-day** [1] - 143:23
**middle** [5] - 116:15, 117:5, 120:3, 148:13, 151:19
**might** [8] - 59:8, 62:16, 70:23, 80:13, 80:14, 87:13, 110:15
**Milan** [11] - 51:11, 51:16, 62:20, 86:5, 86:13, 122:20, 122:21, 157:11, 160:23, 162:5
**MILAN** [1] - 1:4
**mine** [1] - 34:23
**minimum** [10] - 71:16, 71:20, 71:22, 71:24, 72:10, 72:20, 97:2, 102:10, 123:14, 123:18
**minority** [8] - 82:2, 82:9, 82:16, 82:17, 87:13, 94:24, 125:12, 126:8
**minutes** [6] - 29:18, 33:2, 36:9, 42:11, 159:24, 161:16
**miscalculated** [1] - 90:20
**mischaracterization** [1] - 71:4
**missing** [3] - 13:22, 29:10, 139:16
**misspoke** [1] - 130:9

JURY TRIAL - VOLUME III of VI

**moment** [6] - 5:9, 83:15, 90:12, 92:17, 122:14, 143:21

**moments** [1] - 108:21

**Monday** [5] - 61:6, 86:8, 149:20, 151:14, 151:15

**Mondays** [2] - 150:1, 150:2

**money** [55] - 9:11, 9:22, 11:15, 11:16, 11:19, 11:23, 13:24, 30:13, 30:14, 32:24, 37:14, 37:16, 37:18, 37:20, 38:5, 44:3, 47:13, 47:14, 48:11, 48:13, 48:15, 48:16, 48:19, 48:21, 48:23, 53:17, 57:25, 60:19, 82:13, 82:25, 83:6, 83:8, 83:9, 83:17, 87:12, 104:15, 105:8, 105:10, 105:11, 110:6, 110:9, 111:3, 111:16, 111:24, 112:15, 115:22, 117:4, 117:17, 119:9, 135:22, 135:25, 136:14, 146:2, 155:17

**month** [7] - 34:18, 34:25, 35:25, 79:21, 88:4, 95:12, 154:9

**monthly** [1] - 127:6

**months** [19] - 6:20, 13:23, 14:9, 14:11, 14:12, 33:6, 35:25, 54:22, 75:2, 75:5, 75:6, 86:15, 86:16, 95:22, 149:6, 157:9, 157:17, 157:19

**morning** [63] - 4:2, 4:3, 4:4, 4:5, 4:15, 4:21, 4:22, 5:5, 17:17, 18:7, 19:3, 20:11, 20:15, 20:24, 21:3, 23:18, 23:21, 23:22, 24:11, 24:22, 25:5, 25:11, 25:14, 26:6, 26:11, 26:19, 26:22, 26:23, 27:2, 36:19, 42:10, 43:7, 61:8, 65:6, 65:12, 80:7, 81:15, 88:11, 88:12, 97:12, 97:14, 97:15, 97:19, 97:24, 98:2, 98:7, 98:14, 99:15, 100:16, 111:8, 113:6, 143:24, 150:7, 150:15, 150:23,

161:21, 162:1, 162:2

**Morris** [2] - 10:15

**most** [19] - 10:14, 13:8, 32:14, 36:20, 41:13, 58:8, 62:12, 74:23, 92:22, 104:12, 111:9, 118:12, 144:11, 144:21, 151:2, 157:24, 158:1, 158:13, 158:25

**mostly** [1] - 86:25

**mother** [1] - 16:21

**Motor** [1] - 49:9

**move** [4] - 68:12, 83:14, 154:23, 158:16

**MOVED** [1] - 3:17

**moved** [3] - 7:2, 32:14, 33:23

**moving** [1] - 156:13

**mowing** [1] - 98:1

**MR** [196] - 4:3, 4:4, 4:7, 4:9, 4:12, 4:21, 4:25, 5:2, 5:11, 5:15, 5:21, 5:23, 12:3, 14:8, 14:15, 14:17, 14:18, 14:21, 14:23, 16:8, 16:11, 16:12, 16:17, 16:19, 16:24, 17:4, 18:12, 18:16, 18:22, 20:23, 21:2, 21:6, 21:15, 21:21, 21:24, 21:25, 22:1, 25:10, 25:19, 25:20, 27:19, 27:20, 27:23, 28:3, 28:5, 28:12, 28:17, 28:24, 29:5, 29:8, 30:19, 30:21, 30:23, 31:7, 31:8, 31:10, 32:6, 34:21, 34:22, 34:23, 34:24, 36:11, 37:5, 37:8, 37:9, 38:14, 38:15, 39:5, 39:7, 39:9, 40:21, 40:22, 41:10, 42:7, 42:21, 43:2, 43:4, 43:6, 45:12, 45:16, 45:23, 46:2, 46:5, 46:7, 46:10, 46:13, 49:22, 49:25, 50:3, 50:7, 50:9, 50:12, 50:14, 50:16, 50:17, 52:18, 52:20, 55:9, 55:12, 63:4, 63:8, 63:22, 63:24, 63:25, 64:1, 64:4, 64:16, 64:19, 67:21, 67:24, 68:12, 68:14, 68:16, 68:19, 69:2, 69:7, 69:11, 69:24, 70:2, 70:4, 70:8, 70:11,

70:13, 70:15, 70:21, 70:25, 71:4, 71:7, 71:10, 72:12, 72:14, 72:15, 72:16, 72:17, 72:25, 73:1, 73:3, 73:5, 73:6, 73:9, 73:11, 73:16, 73:18, 73:20, 73:21, 73:23, 73:24, 74:7, 77:2, 77:6, 90:4, 90:9, 90:20, 90:22, 105:13, 105:17, 105:20, 105:25, 106:3, 107:7, 107:10, 107:19, 107:23, 108:7, 108:8, 122:14, 122:18, 124:5, 124:7, 124:9, 147:5, 147:8, 147:13, 147:16, 147:22, 147:25, 151:24, 152:1, 153:2, 153:7, 153:9, 153:13, 153:17, 153:21, 153:25, 154:1, 154:3, 161:2, 161:4, 161:5, 161:6, 161:8, 161:11, 161:14, 162:5, 162:8

**multiply** [1] - 32:7

## N

**name** [23] - 15:4, 22:2, 25:25, 26:3, 43:1, 43:3, 51:6, 51:8, 51:9, 51:10, 67:25, 78:2, 78:3, 84:22, 94:1, 105:24, 105:25, 106:1, 118:22, 143:9, 147:21, 147:22

**named** [1] - 94:6

**names** [1] - 123:6

**narrative** [1] - 50:8

**naturally** [1] - 136:12

**nature** [6] - 60:16, 67:16, 74:5, 76:18, 85:18, 102:7

**nearly** [1] - 116:10

**neat** [1] - 160:4

**necessary** [2] - 7:18, 128:20

**necessitated** [1] - 80:20

**need** [19] - 8:2, 16:14, 30:12, 41:2, 41:3, 57:19, 90:11, 99:12, 114:2, 115:24, 117:12, 118:15, 135:22, 137:7, 137:8, 137:9, 138:25, 162:7

**needed** [10] - 7:22,

51:4, 88:13, 115:4, 117:19, 120:21, 127:5, 135:16, 155:1, 155:15

**needs** [4] - 72:15, 111:1, 115:23, 115:24

**negative** [2] - 45:11, 100:25

**neglected** [1] - 147:10

**neighborhood** [1] - 62:22

**neighbors** [1] - 98:4

**nephew** [1] - 35:10

**nephews** [1] - 26:3

**never** [51] - 10:2, 10:4, 14:21, 15:17, 18:1, 23:4, 24:14, 24:15, 24:18, 28:14, 30:5, 32:3, 32:22, 33:2, 33:13, 35:17, 44:20, 46:14, 46:20, 48:20, 48:21, 48:23, 51:16, 55:19, 63:12, 64:3, 76:8, 90:12, 103:13, 103:15, 103:23, 104:1, 106:10, 106:25, 112:16, 140:12, 140:16, 145:25, 146:8, 147:4, 148:25, 150:2, 155:19, 156:15, 156:16, 159:2, 160:12, 160:13

**new** [3] - 39:19, 88:6, 131:15

**New** [23] - 7:12, 7:13, 7:17, 8:6, 8:14, 13:2, 30:10, 30:14, 30:24, 32:14, 32:17, 32:19, 32:22, 33:1, 33:5, 33:22, 54:6, 84:11, 100:20, 118:19, 119:16, 134:23

**newly** [2] - 113:23, 130:19

**newspapers** [1] - 85:18

**next** [26] - 22:12, 22:14, 22:18, 22:20, 42:6, 42:19, 69:7, 70:14, 73:20, 76:8, 81:15, 105:16, 111:13, 112:24, 113:6, 113:16, 116:14, 120:4, 120:17, 120:18, 130:22, 147:14, 149:4, 150:20, 152:24, 153:1

**night** [8] - 5:4, 75:11, 78:18, 80:5, 80:6, 100:17, 127:20, 161:25

**nine** [1] - 12:19

**no-brainer** [1] - 145:22

**nobody** [6] - 14:13, 23:11, 31:1, 32:8, 61:25

**noise** [5] - 78:18, 159:14, 159:15, 159:16, 159:17

**noisy** [1] - 78:16

**none** [10] - 84:6, 91:10, 91:25, 92:13, 92:16, 94:13, 96:9, 96:25, 97:3, 133:7

**nonexempt** [1] - 66:4

**noon** [1] - 80:21

**normal** [2] - 75:15, 75:16

**normally** [4] - 73:14, 75:7, 76:9, 104:23

**NORTH** [1] - 162:21

**North** [1] - 2:4

**nothing** [10] - 17:1, 31:24, 99:9, 104:21, 132:9, 132:10, 132:15, 134:13, 141:11, 142:9

**notice** [1] - 63:21

**noticed** [1] - 144:2

**November** [3] - 50:6, 95:17, 149:9

**Number** [2] - 1:3, 63:6

**number** [12] - 28:4, 28:6, 28:7, 28:17, 40:13, 60:22, 68:20, 68:21, 80:3, 95:15, 115:21, 157:5

**NUMBER** [1] - 3:17

**number-crunching** [1] - 60:22

**numbers** [2] - 139:16, 158:18

## O

**o'clock** [47] - 19:3, 20:24, 26:22, 40:15, 40:16, 61:9, 64:2, 64:7, 65:5, 65:6, 74:4, 74:10, 74:16, 76:18, 77:15, 88:10, 88:11, 89:20, 89:22, 89:24, 97:15, 97:24, 98:2, 98:13, 100:16, 101:6,

JURY TRIAL - VOLUME III of VI

101:12, 101:22,
144:11, 144:15,
148:23, 148:24,
149:24, 150:3,
150:15, 151:10,
151:13, 152:5,
159:12, 159:17,
161:22, 162:1, 162:2
**oath** [2] - 4:18,
90:18, 107:14
**object** [7] - 5:11,
37:5, 37:7, 50:8,
107:19, 153:7, 153:9
**Objection** [3] -
14:15, 45:23, 72:25
**objection** [17] - 5:21,
46:9, 64:16, 68:14,
68:15, 68:18, 68:25,
70:8, 70:21, 71:4,
72:12, 73:3, 73:16,
151:24, 153:6, 161:2,
161:8
**obligation** [1] - 64:21
**observe** [2] - 143:15,
143:20
**observed** [6] - 99:17,
144:8, 144:12,
144:25, 145:4, 145:6
**obtain** [1] - 5:19
**obviously** [2] - 6:17,
157:3
**occasion** [1] - 38:7
**occasionally** [4] -
62:11, 80:15, 80:16,
80:22
**occurring** [1] - 144:5
**October** [7] - 9:19,
95:17, 114:22,
116:12, 135:7, 135:9,
153:18
**OF** [3] - 1:1, 1:13, 3:1
**offered** [3] - 32:12,
33:14, 33:21
**offering** [2] - 30:8,
31:19
**offhand** [1] - 119:14
**office** [34] - 8:24, 9:3,
15:18, 24:5, 24:13,
24:14, 24:17, 24:20,
24:21, 25:22, 36:18,
62:25, 67:12, 69:16,
74:6, 75:21, 75:22,
76:10, 76:20, 77:9,
77:14, 79:12, 84:21,
93:13, 98:14, 102:9,
102:23, 113:14,
130:19, 140:7,
143:22, 144:3,
150:10, 152:8
**officer** [12] - 44:25,

45:2, 45:5, 83:24,
83:25, 106:18, 107:3,
107:25, 108:3,
124:17, 125:3, 147:2
**offices** [4] - 8:23,
62:2, 80:1, 80:3
**Official** [1] - 2:3
**OFFICIAL** [1] -
162:21
**often** [10] - 60:20,
62:11, 74:1, 76:24,
76:25, 98:18, 98:19,
116:10, 122:2, 128:1
**Olas** [1] - 74:21
**old** [5] - 39:21,
41:18, 65:14, 71:21,
94:6
**once** [26] - 9:20,
30:3, 32:4, 32:8, 32:9,
35:16, 35:18, 36:24,
37:4, 39:21, 41:15,
47:4, 47:25, 77:23,
88:4, 88:9, 93:7,
98:18, 101:21,
101:22, 101:24,
114:13, 116:10,
121:25, 142:15
**One** [1] - 35:12
**one** [99] - 9:16,
10:23, 11:3, 11:4,
11:8, 11:12, 11:13,
11:14, 11:16, 13:12,
13:21, 14:11, 14:13,
17:9, 19:11, 21:16,
22:5, 22:6, 25:13,
25:25, 26:3, 27:9,
34:25, 35:13, 35:21,
36:20, 39:2, 40:13,
47:11, 48:1, 52:19,
53:3, 53:19, 53:23,
54:18, 54:19, 56:14,
57:14, 58:18, 58:20,
59:17, 59:20, 61:4,
61:21, 62:10, 62:12,
65:3, 68:7, 68:21,
69:4, 69:6, 74:10,
76:6, 77:11, 77:22,
78:5, 78:9, 79:1, 79:2,
80:22, 86:12, 92:10,
93:7, 94:22, 97:16,
97:20, 100:3, 105:3,
109:3, 109:13,
112:23, 113:13,
114:11, 114:12,
116:2, 117:23, 118:3,
127:20, 143:5,
143:21, 144:19,
145:2, 146:1, 154:19,
155:5, 155:6, 155:10,
155:13, 155:15,

155:16, 158:9,
158:23, 159:7, 162:3
**ones** [6] - 6:24,
39:21, 111:19, 143:3,
160:19
**open** [9] - 24:17,
78:21, 80:8, 87:15,
97:18, 98:15, 100:24,
143:6, 145:12
**opened** [9] - 23:18,
23:19, 24:10, 24:12,
25:11, 54:9, 64:5,
143:6, 158:3
**operate** [5] - 82:22,
96:19, 96:21, 125:13,
133:18
**operated** [1] - 126:24
**operating** [2] -
82:11, 114:15
**operation** [8] -
48:10, 53:25, 109:13,
113:22, 113:24,
116:6, 121:23, 130:7
**operational** [16] -
83:1, 92:19, 92:21,
93:12, 94:15, 109:3,
125:22, 130:10,
130:14, 130:23,
131:1, 131:5, 131:20,
142:22, 145:9, 147:2
**operations** [11] -
87:24, 93:9, 114:2,
114:13, 115:10,
128:9, 128:13, 130:6,
134:8, 134:15, 138:6
**operator** [1] - 83:16
**opportunity** [1] -
50:4
**order** [6] - 7:11,
40:12, 41:3, 150:10,
150:25, 152:23
**Order** [1] - 4:1
**ordered** [1] - 53:14
**orders** [10] - 51:6,
51:8, 51:10, 51:20,
51:23, 84:17, 84:18,
98:23, 151:1, 151:3
**originally** [3] - 33:11,
103:25
**ought** [2] - 68:23,
133:25
**outlines** [1] - 60:22
**outrageous** [1] -
129:13
**outside** [6] - 35:8,
72:19, 80:4, 95:18,
123:17, 132:16
**overhead** [1] - 118:7
**overruled** [3] - 71:6,
73:4, 73:19

**overseeing** [1] -
86:18
**overtime** [29] - 9:2,
9:5, 9:8, 13:9, 13:15,
14:13, 14:14, 14:20,
14:21, 23:12, 28:19,
29:10, 31:11, 31:13,
31:25, 32:4, 52:3,
61:18, 67:8, 69:4,
71:16, 72:3, 72:10,
72:20, 96:23, 102:10,
123:14, 123:18
**owe** [2] - 9:5, 13:10
**owed** [4] - 13:6,
111:23, 155:12,
155:17
**owes** [2] - 13:12,
48:22
**own** [11] - 7:6, 43:22,
82:4, 82:5, 85:4, 87:4,
87:18, 100:11, 110:6,
118:19, 122:3
**owned** [5] - 43:20,
43:24, 43:25, 82:7,
82:9
**owner** [2] - 119:5,
142:8
**owners** [3] - 94:24,
98:10, 126:20
**ownership** [17] -
43:9, 43:11, 43:13,
43:18, 44:2, 44:21,
82:1, 82:9, 82:18,
87:9, 87:13, 87:25,
103:15, 106:5,
106:10, 125:12, 126:8

## P

**PA** [1] - 1:17
**pace** [1] - 137:14
**packed** [1] - 75:18
**PAGE** [1] - 3:2
**Page** [1] - 38:10
**page** [9] - 38:11,
38:12, 55:13, 67:25,
107:17, 107:24,
108:4, 124:15
**Pages** [1] - 1:11
**paid** [78] - 6:9, 8:6,
8:7, 8:8, 8:17, 8:18,
9:1, 19:20, 19:21,
19:22, 21:9, 21:11,
21:13, 29:12, 31:19,
32:2, 48:6, 48:10,
48:17, 48:18, 52:9,
52:10, 56:10, 56:13,
57:13, 57:15, 57:24,
58:12, 58:13, 58:14,

58:19, 58:20, 59:4,
59:7, 59:12, 59:16,
59:18, 62:1, 65:2,
65:7, 66:14, 66:17,
66:19, 67:20, 69:4,
69:20, 71:2, 71:8,
71:9, 71:25, 72:3,
80:25, 84:25, 91:8,
91:24, 92:7, 92:8,
97:4, 105:3, 105:4,
105:7, 109:21,
109:24, 110:6,
110:16, 112:5,
116:20, 118:17,
123:14, 129:11,
131:24, 132:9,
132:10, 146:5, 149:5,
155:18, 155:21
**Palm** [2] - 99:25,
100:3
**Palma** [5] - 37:10,
37:16, 37:17, 38:1,
38:3
**pans** [1] - 7:4
**paper** [2] - 5:19, 7:4
**papers** [1] - 5:25
**paragraph** [1] - 87:3
**pardon** [3] - 44:7,
58:8, 91:11
**park** [4] - 35:9, 76:1,
76:14, 76:20
**parked** [1] - 75:24
**parking** [1] - 98:17
**part** [7] - 12:8, 20:9,
41:8, 93:15, 119:5,
132:25, 144:21
**particular** [19] - 6:24,
22:6, 23:23, 45:6,
51:3, 60:2, 80:14,
103:5, 114:25, 117:9,
120:14, 122:11,
140:10, 140:21,
156:7, 156:17,
160:18, 160:19
**particularly** [2] -
8:19, 12:14
**partner** [2] - 87:4,
88:2
**partners** [1] - 126:9
**Pass** [1] - 46:2
**pass** [2] - 91:11,
91:12
**passenger** [1] - 6:10
**Patel** [1] - 5:12
**Patrick** [2] - 51:9,
51:10
**patted** [1] - 57:21
**pay** [49] - 6:7, 8:25,
12:22, 19:24, 19:25,
21:8, 21:13, 32:22,

JURY TRIAL - VOLUME III of VI

33:16, 33:17, 34:1,
48:17, 49:10, 55:1,
55:22, 58:19, 60:9,
66:16, 68:20, 69:5,
69:20, 87:17, 91:9,
91:16, 91:20, 104:9,
104:14, 104:15,
104:16, 110:12,
110:23, 111:15,
111:24, 119:17,
119:20, 119:23,
119:24, 123:19,
135:4, 141:9, 142:17,
143:25, 154:5, 155:9,
155:10, 155:13,
155:16, 155:18,
155:20

**payable** [2] - 110:21,
110:24

**payday** [1] - 78:8

**paying** [7] - 7:6,
19:21, 60:25, 72:9,
79:20, 110:15, 155:12

**payment** [5] - 13:7,
13:24, 54:25, 71:16,
155:14

**payments** [3] - 57:9,
112:7, 155:15

**payout** [1] - 119:3

**payroll** [29] - 18:13,
28:8, 28:18, 28:20,
28:24, 29:1, 29:2,
29:3, 29:5, 47:24,
47:25, 48:1, 59:23,
60:3, 60:14, 60:18,
77:21, 77:23, 77:25,
78:1, 78:6, 91:21,
104:23, 110:1, 110:5,
110:6, 110:8, 116:24,
118:7

**pencil** [1] - 22:15

**people** [56] - 7:25,
10:18, 11:1, 11:9,
11:14, 11:15, 12:8,
12:19, 13:3, 13:23,
14:25, 17:12, 18:4,
20:2, 21:12, 24:1,
24:4, 31:5, 31:22,
32:14, 32:18, 36:6,
36:17, 44:1, 47:7,
48:16, 48:17, 52:22,
57:14, 65:2, 77:12,
78:9, 78:17, 82:8,
86:2, 88:17, 93:4,
93:5, 98:15, 105:3,
131:25, 132:6,
132:17, 132:19,
132:23, 133:8,
133:15, 134:23,
140:7, 143:4, 154:24,

157:24, 158:1, 158:2,
158:11, 159:15

**per** [14] - 33:14,
56:21, 60:24, 60:25,
61:15, 84:25, 108:19,
118:3, 136:4, 136:25,
137:5, 137:10,
148:21, 149:11

**percent** [16] - 43:21,
54:5, 54:9, 54:12,
58:20, 82:5, 84:2,
84:9, 92:10, 92:23,
106:7, 106:8, 122:6,
151:12, 151:13, 160:8

**percentage** [7] -
43:19, 43:22, 44:23,
54:1, 89:7, 106:10,
122:3

**Perfect** [1] - 16:17

**perform** [1] - 89:1

**performance** [2] -
31:24, 140:25

**performed** [3] - 9:1,
67:11, 143:24

**performing** [1] -
141:14

**perhaps** [4] - 81:17,
94:18, 135:7, 140:6

**period** [25] - 43:23,
47:19, 48:1, 57:12,
58:10, 58:15, 58:17,
59:2, 59:7, 71:14,
75:2, 95:19, 95:21,
104:7, 112:4, 114:6,
116:4, 121:22,
151:17, 151:22,
156:7, 156:8, 156:20

**person** [22] - 8:3,
8:10, 8:12, 12:7, 14:4,
18:3, 21:11, 23:2,
23:3, 23:22, 26:6,
31:1, 34:10, 35:5,
36:2, 41:6, 44:18,
127:4, 148:17,
154:12, 154:23

**person's** [1] - 21:10

**personal** [8] - 16:25,
48:19, 49:8, 80:11,
101:18, 110:12,
122:4, 123:3

**personally** [7] - 9:12,
12:1, 13:24, 52:24,
71:15, 144:8, 144:12

**personnel** [3] -
85:11, 102:23, 134:25

**perspective** [2] -
126:16, 142:18

**persuade** [1] -
121:11

**ph** [1] - 64:6

**phone** [7] - 6:1, 6:2,
109:25, 114:8,
116:23, 121:23,
122:10

**physical** [2] - 78:25,
114:19

**physically** [1] - 84:8

**pick** [3] - 67:15,
148:15, 160:3

**picture** [1] - 102:5

**piece** [2] - 39:12,
62:5

**pipeline** [1] - 126:6

**Pisz** [4] - 10:20,
126:2, 145:17, 145:24

**pisz** [7] - 11:4, 11:11,
36:21, 125:18,
145:23, 145:25

**place** [29] - 10:2,
18:24, 79:19, 85:16,
100:12, 125:11,
136:19, 146:22,
150:6, 150:8, 150:12,
150:17, 151:9, 152:4,
154:20, 154:24,
154:25, 155:1, 156:9,
158:2, 158:3, 158:18,
158:20, 159:3,
159:21, 159:23,
160:3, 160:6, 161:18

**placed** [1] - 93:22

**places** [2] - 75:5,
123:24

**plain** [2] - 102:13,
102:15

**plaintiff** [10] - 51:20,
52:13, 52:16, 52:18,
63:4, 73:10, 122:17,
122:20, 147:16,
161:23

**PLAINTIFF** [1] -
147:19

**Plaintiffs** [2] - 1:7,
1:16

**plaintiffs** [14] -
51:10, 85:19, 86:18,
88:22, 88:25, 90:24,
91:8, 103:5, 122:22,
123:4, 141:17,
141:25, 160:9, 161:12

**PLAINTIFFS'** [3] -
3:1, 3:16, 4:20

**plaintiffs'** [3] - 45:13,
63:5, 85:21

**Plaintiffs'** [8] - 67:22,
68:13, 69:8, 73:10,
122:17, 153:3,
153:11, 153:13

**plan** [1] - 94:20

**plans** [1] - 83:19

**Plantation** [1] - 1:22

**plates** [1] - 132:17

**play** [1] - 35:17

**playing** [4] - 35:10,
35:15, 35:16, 35:18

**pleasant** [1] - 161:24

**plenty** [2] - 19:22,
19:23

**plugged** [1] - 80:18

**plus** [1] - 155:16

**point** [13] - 54:22,
102:25, 103:22,
110:5, 110:23,
110:25, 112:9,
112:15, 115:2,
116:21, 118:10,
138:20, 146:17

**points** [14] - 38:25,
39:1, 39:2, 39:25,
40:13, 62:3, 74:20,
101:2, 112:8, 140:3,
140:19, 141:7,
159:10, 159:23

**Points** [1] - 39:1

**policies** [3] - 84:2,
84:4, 127:10

**policy** [3] - 91:23,
98:6, 142:18

**poor** [1] - 102:5

**portion** [2] - 58:8,
95:24

**Portugal** [1] - 96:6

**posed** [1] - 55:19

**position** [4] - 69:14,
82:3, 117:20, 148:6

**positions** [1] - 65:3

**possible** [9] - 46:23,
99:17, 99:21, 107:3,
107:4, 110:10,
144:25, 145:3, 157:18

**possibly** [6] - 25:16,
38:18, 46:19, 58:4,
77:11

**Post** [1] - 85:17

**posted** [3] - 40:8,
102:8, 146:20

**poster** [1] - 102:10,
102:13, 103:11

**posters** [3] - 101:25,
123:23, 146:20

**power** [1] - 56:15

**pre** [5] - 45:13, 63:5,
67:22, 69:8, 153:3

**pre-marked** [5] -
45:13, 63:5, 67:22,
69:8, 153:3

**precisely** [1] - 105:6

**predicate** [1] - 70:9

**premises** [5] - 80:1,
81:18, 81:24, 81:25,

150:15

**prepared** [3] - 8:23,
76:7, 152:11

**presence** [1] -
114:19

**present** [4] - 4:22,
6:1, 54:4, 114:11

**presented** [1] - 78:7

**president** [18] - 13:2,
13:7, 45:9, 46:14,
46:15, 46:18, 46:20,
46:21, 65:8, 82:10,
82:22, 88:5, 97:8,
106:21, 106:23, 107:1

**pretty** [10] - 52:12,
83:5, 89:14, 97:10,
105:11, 114:5, 118:6,
120:2, 139:18, 151:20

**previous** [1] - 120:20

**previously** [1] - 71:1

**PREVIOUSLY** [1] -
4:20

**price** [8] - 60:24,
60:25, 95:5, 118:3,
118:16, 119:4, 119:7,
136:17

**prices** [10] - 59:21,
59:22, 60:6, 60:11,
95:2, 95:7, 115:24,
117:12, 137:16, 138:4

**pricing** [7] - 94:19,
95:8, 135:15, 137:8,
138:14, 139:1, 139:10

**primary** [1] - 12:21

**printers** [1] - 87:6

**private** [2] - 41:6,
140:4

**PRO** [1] - 2:1

**problem** [4] - 19:19,
94:19, 136:12, 137:15

**problems** [1] -
155:12

**procedure** [1] -
50:12

**proceed** [2] - 161:22,
162:7

**proceedings** [1] -
162:17

**proceeds** [1] - 37:15

**process** [1] - 152:9

**processing** [2] -
65:4, 65:17

**producing** [1] -
115:20

**production** [2] -
115:24, 117:11

**professionally** [1] -
87:2

**profit** [2] - 87:13,
118:15

JURY TRIAL - VOLUME III of VI

**profits** [4] - 48:3, 48:4, 48:6, 48:7
**progress** [1] - 114:9
**prohibited** [2] - 101:1, 101:2
**project** [6] - 112:8, 112:9, 112:10, 112:13, 112:14, 112:16
**projects** [2] - 74:24, 74:25
**promise** [1] - 50:25
**promised** [4] - 7:3, 7:11, 7:14, 7:15
**prompted** [1] - 135:20
**proof** [4] - 18:8, 20:17, 39:3, 39:10
**proper** [3] - 12:2, 25:18, 25:21
**prosecute** [1] - 68:21
**protect** [1] - 51:1
**protection** [2] - 45:20, 51:4
**proud** [1] - 114:5
**prove** [2] - 20:4, 38:16
**provide** [11] - 6:2, 6:4, 6:19, 6:21, 7:1, 7:5, 7:16, 8:1, 60:21, 118:4, 126:20
**provided** [4] - 6:13, 7:22, 19:15, 100:5
**public** [1] - 46:17
**Puerto** [2] - 142:14, 156:25
**pulled** [1] - 80:9
**pulling** [1] - 144:9
**punch** [7] - 18:23, 20:20, 23:7, 63:2, 64:9, 64:12
**punched** [2] - 21:7, 63:1
**punctual** [1] - 26:10
**purchased** [1] - 6:15
**purchases** [1] - 60:15
**purpose** [5] - 50:1, 50:22, 113:4, 113:21, 120:5
**purposes** [4] - 95:23, 112:18, 112:25, 113:17
**pursuant** [1] - 42:2
**put** [21] - 39:19, 51:6, 51:8, 51:10, 79:19, 86:23, 86:24, 88:12, 93:22, 110:4, 110:9, 110:11, 111:3, 114:5, 116:22, 116:24,

117:4, 132:17, 135:22, 152:13, 152:15
**putting** [2] - 40:5, 61:2

## Q

**qualifications** [2] - 132:8, 132:11
**quality** [1] - 121:9
**quantify** [1] - 157:2
**quantity** [1] - 47:4
**quarter** [1] - 143:1
**quarterly** [1] - 127:6
**questioned** [1] - 124:15
**questioning** [1] - 33:10
**questions** [7] - 16:22, 45:23, 77:21, 105:13, 136:23, 147:5, 147:7
**quickly** [2] - 73:6, 110:10
**quit** [4] - 58:7, 81:10, 121:4, 121:12
**quite** [3] - 60:20, 126:3, 126:5
**quitting** [1] - 73:15

## R

**rain** [6] - 75:10, 75:15, 81:9, 144:16, 158:25, 159:1
**rained** [1] - 158:24
**rainy** [1] - 80:16
**raise** [21] - 16:21, 42:23, 56:15, 56:16, 56:17, 59:20, 59:22, 60:6, 60:11, 91:11, 91:13, 95:2, 95:7, 105:21, 117:12, 118:16, 136:17, 137:16, 147:18, 148:19
**raised** [6] - 91:17, 91:20, 115:25, 138:4, 149:6, 149:10
**raising** [1] - 31:17
**RAMON** [1] - 1:4
**ramp** [1] - 118:14
**ran** [5] - 54:13, 55:8, 66:1, 82:12, 85:5
**range** [1] - 67:4
**ransacked** [1] - 80:5
**rarely** [2] - 61:17, 61:20

**rate** [5] - 33:17, 34:1, 69:20, 136:7
**rates** [1] - 119:24
**rather** [1] - 161:15
**raw** [2] - 93:19, 152:14
**re** [1] - 80:6
**re-load** [1] - 80:6
**reached** [1] - 131:12
**react** [1] - 57:20
**read** [15] - 18:17, 20:14, 20:18, 20:19, 22:2, 22:5, 22:10, 23:16, 27:16, 55:17, 55:18, 69:24, 107:24, 108:7
**ready** [14] - 4:6, 4:8, 4:23, 4:24, 4:25, 26:5, 26:10, 26:12, 26:16, 90:8, 90:16, 93:22, 153:1, 162:6
**real** [1] - 15:10
**reality** [1] - 138:3
**realized** [2] - 86:12, 115:20
**Really** [1] - 60:4
**really** [36] - 5:25, 7:21, 9:15, 23:17, 44:19, 45:8, 47:12, 54:17, 58:7, 62:14, 63:16, 66:11, 66:16, 79:7, 81:20, 82:12, 85:24, 86:21, 89:3, 95:1, 97:17, 99:3, 99:8, 99:9, 104:21, 105:10, 110:20, 119:14, 121:7, 121:9, 121:10, 127:22, 128:4, 128:20, 133:4, 139:6
**reason** [19] - 5:24, 9:19, 11:1, 11:23, 11:24, 17:5, 51:3, 68:8, 78:5, 114:25, 117:23, 120:14, 120:20, 123:20, 126:9, 141:7, 143:23, 154:10, 158:12
**reasons** [2] - 115:21, 158:23
**rebuttal** [4] - 45:13, 46:3, 46:4, 49:25
**receipt** [1] - 104:14
**receivable** [3] - 110:22, 110:24, 111:3
**receive** [3] - 37:14, 38:5, 48:11
**received** [9] - 32:4, 37:16, 54:20, 104:16, 153:10, 153:11,

153:16, 153:20, 153:24
**receiving** [1] - 104:8
**recess** [9] - 42:10, 42:11, 89:21, 89:23, 161:18, 161:20, 161:21, 162:2, 162:9
**Recess** [2] - 42:14, 90:6
**recognize** [7] - 17:21, 17:22, 17:24, 27:10, 28:2, 86:13, 86:17
**recollection** [8] - 62:8, 80:12, 101:10, 101:18, 103:7, 103:10, 109:24, 157:3
**record** [6] - 29:2, 29:3, 37:7, 62:18, 71:1
**records** [10] - 18:13, 28:18, 28:20, 28:24, 29:5, 62:24, 96:10, 96:14, 96:15
**Redirect** [1] - 105:17
**redirect** [1] - 105:18
**refer** [1] - 149:4
**reference** [1] - 154:2
**refresh** [3] - 6:23, 49:22, 50:1
**regarding** [14] - 54:15, 56:5, 56:13, 57:2, 60:18, 109:19, 112:2, 112:4, 114:8, 114:25, 116:6, 116:9, 145:21, 153:22
**regardless** [2] - 56:21, 56:23
**regards** [1] - 64:21
**regular** [1] - 116:8
**regularly** [1] - 102:21
**Reinaldo** [9] - 17:10, 67:17, 67:18, 67:19, 68:1, 68:3, 69:3, 122:22, 161:7
**REINALDO** [1] - 1:4
**Reinaldo's** [1] - 69:13
**rejected** [1] - 95:10
**related** [2] - 91:4, 129:7
**relation** [1] - 51:15, 51:23
**relations** [2] - 140:23, 141:10
**relatively** [1] - 136:24
**relevance** [1] - 70:22
**remainder** [2] - 119:10, 130:8

**remaining** [3] - 43:25, 44:17, 82:6
**remember** [64] - 7:15, 9:4, 10:1, 10:5, 10:6, 10:7, 10:15, 10:20, 10:21, 11:3, 12:4, 12:5, 12:6, 15:5, 15:6, 16:1, 16:4, 16:5, 19:14, 19:15, 23:8, 26:4, 27:4, 27:7, 29:20, 30:1, 30:2, 30:9, 33:19, 33:20, 33:22, 33:23, 33:25, 34:1, 34:6, 35:8, 35:14, 36:2, 37:17, 38:8, 38:9, 41:7, 47:18, 57:7, 58:22, 77:13, 104:10, 105:9, 107:11, 107:13, 109:22, 110:3, 112:7, 112:10, 119:2, 119:3, 120:18, 136:18, 143:9, 158:7, 158:11, 160:15
**remembered** [1] - 10:8
**remind** [3] - 35:6, 37:22, 40:12
**reminded** [2] - 4:18, 90:17
**remotely** [3] - 99:17, 99:21, 129:7
**remove** [2] - 37:25, 39:21
**removed** [1] - 41:17
**removing** [1] - 40:6
**renew** [1] - 5:21
**rent** [4] - 6:20, 30:14, 79:20
**renting** [1] - 155:1
**repeat** [6] - 20:17, 29:17, 29:19, 29:21, 59:13, 97:16
**repeated** [1] - 27:3
**repetition** [1] - 25:6
**repetitious** [1] - 36:10
**rephrase** [2] - 49:7, 91:3
**report** [2] - 126:1, 127:2
**reportage** [1] - 127:3
**REPORTED** [1] - 2:2
**reported** [1] - 126:25
**REPORTER** [1] - 162:21
**reporter** [1] - 99:11
**Reporter** [1] - 2:3
**represented** [2] - 43:21, 82:4

JURY TRIAL - VOLUME III of VI

**requests** [1] - 25:6
**require** [5] - 71:16, 72:2, 81:18, 83:2, 123:13
**required** [3] - 71:24, 146:20, 150:22
**requirement** [1] - 127:2
**resided** [1] - 126:18
**residency** [1] - 5:20
**resident** [3] - 5:8, 5:10, 5:16
**residential** [1] - 80:23
**residing** [1] - 126:19
**resolve** [2] - 60:23, 118:1
**resources** [1] - 135:2
**respect** [44] - 43:7, 45:6, 49:2, 55:7, 55:19, 68:19, 70:21, 72:12, 73:12, 78:11, 78:14, 80:11, 82:1, 86:5, 86:18, 87:23, 90:24, 91:4, 91:8, 91:9, 91:14, 91:23, 92:11, 92:14, 93:24, 94:8, 94:11, 94:19, 96:14, 97:11, 123:19, 128:13, 131:24, 133:18, 134:6, 136:2, 136:22, 137:11, 142:7, 154:4, 156:6, 156:20, 161:4, 161:8
**responded** [1] - 59:15
**response** [2] - 59:11, 95:3
**responsibility** [1] - 64:25
**responsible** [2] - 128:24, 129:22
**rest** [3] - 7:16, 84:9, 144:22
**result** [1] - 82:15
**resumed** [1] - 104:23
**return** [2] - 74:9, 131:16
**returned** [3] - 39:23, 73:14, 152:7
**revenue** [4] - 136:15, 136:22, 136:25, 137:21
**Ricardo** [2] - 15:4, 26:1
**Rico** [2] - 142:14, 156:25
**ride** [1] - 100:7
**ridiculous** [1] - 129:18

**rise** [4] - 42:12, 42:15, 89:25, 90:7
**rolando** [1] - 158:9
**ROLANDO** [2] - 3:3, 4:20
**Rolando** [1] - 158:10
**room** [1] - 7:14
**Rosen** [4] - 108:10, 124:18, 124:20, 124:21
**roughly** [1] - 89:7
**Ruben** [1] - 26:1
**rule** [1] - 158:20
**Rule** [3] - 42:3, 46:10
**rules** [1] - 68:16
**Rules** [1] - 42:3
**run** [9] - 96:17, 125:16, 132:6, 132:19, 133:12, 135:18, 139:20, 142:10, 145:9
**running** [10] - 113:6, 115:3, 115:10, 115:18, 130:11, 131:16, 132:2, 132:5, 133:3, 145:15

## S

**Safe** [65] - 1:21, 43:8, 44:25, 47:20, 48:10, 48:24, 49:4, 49:15, 50:19, 53:2, 53:25, 63:9, 63:19, 64:9, 64:12, 64:20, 68:5, 68:9, 69:14, 70:6, 72:9, 77:10, 78:20, 78:21, 78:24, 79:18, 82:1, 83:16, 83:24, 84:2, 84:8, 84:13, 87:10, 88:23, 89:1, 93:10, 93:25, 94:14, 94:19, 95:25, 96:11, 96:14, 100:24, 106:5, 108:17, 112:18, 120:5, 124:24, 125:10, 127:10, 128:9, 128:13, 128:21, 128:25, 129:5, 129:11, 129:19, 129:23, 138:11, 143:14, 145:2, 145:12, 147:3, 148:3, 153:21
**SAFE** [1] - 1:9
**safe** [1] - 159:25
**Saffron** [1] - 10:15
**salaried** [2] - 52:3, 65:14

**salaries** [9] - 13:3, 54:15, 54:17, 54:19, 55:20, 66:14, 129:4, 129:8, 129:10
**salary** [29] - 11:11, 12:14, 12:15, 12:16, 12:22, 12:23, 12:24, 13:4, 13:10, 33:14, 52:8, 55:22, 56:6, 56:19, 56:20, 65:2, 65:3, 65:4, 65:7, 66:18, 66:19, 67:4, 67:19, 92:7, 146:6, 148:15, 154:6
**Salbado** [1] - 64:6
**sale** [1] - 61:4
**sales** [20] - 48:16, 54:20, 54:23, 84:16, 84:22, 85:5, 85:8, 85:9, 85:11, 85:13, 92:17, 93:3, 93:13, 118:2, 119:3, 119:7, 125:18, 133:12
**salesman** [1] - 55:7
**salesman's** [1] - 55:21
**salesmen** [9] - 47:3, 56:2, 56:3, 56:4, 84:15, 84:17, 84:18, 93:4
**salespeople** [4] - 48:4, 48:6, 48:15, 84:15
**salespersons** [2] - 48:3, 48:14
**sandwich** [1] - 156:12
**Saturday** [8] - 61:11, 61:12, 64:2, 64:11, 101:1, 145:8, 149:20, 151:15
**save** [1] - 151:16
**saved** [1] - 80:9
**saw** [24] - 17:18, 19:4, 21:6, 23:4, 34:16, 35:3, 35:16, 35:17, 35:25, 36:17, 59:8, 83:9, 86:4, 101:20, 121:18, 122:5, 123:1, 135:18, 139:21, 144:9, 146:25, 160:11, 160:13, 160:14
**say-so** [1] - 133:4, 133:5, 133:11
**scales** [1] - 119:24
**scared** [1] - 15:17
**schedule** [16] - 61:5, 69:17, 111:3, 123:7, 123:9, 151:20, 152:2,

155:23, 156:6, 157:20, 158:22, 159:8, 160:20, 160:21, 160:22, 160:23
**scheduled** [1] - 103:25
**schedules** [1] - 119:24
**scheduling** [1] - 92:14
**scrap** [1] - 152:20, 159:22
**SE** [1] - 2:1
**seat** [4] - 18:14, 42:25, 105:23, 147:20
**seated** [5] - 4:6, 4:16, 42:19, 90:14, 90:18
**second** [9] - 29:25, 35:6, 51:14, 131:18, 148:12, 153:18, 154:9, 155:1
**secretaries** [1] - 15:16
**section** [1] - 94:2
**security** [11] - 41:2, 41:4, 41:5, 41:6, 41:7, 41:11, 41:12, 41:14, 41:15, 41:20
**See** [1] - 16:6
**see** [34] - 9:6, 18:6, 18:8, 19:13, 28:6, 30:18, 30:21, 33:7, 35:13, 35:15, 38:22, 45:17, 46:1, 48:23, 49:21, 52:21, 52:24, 64:6, 64:7, 67:25, 68:25, 76:7, 86:3, 102:19, 103:1, 115:10, 125:2, 140:25, 146:23, 150:10, 155:5, 162:1
**seed** [1] - 87:12
**seeing** [1] - 134:10
**sell** [10] - 87:5, 95:4, 115:23, 118:13, 118:24, 119:1, 136:8, 136:20, 136:23, 136:25
**selling** [3] - 61:3, 136:10, 137:17
**send** [1] - 15:21
**SENIOR** [1] - 1:14
**sent** [1] - 135:25
**separated** [1] - 17:13
**September** [11] - 58:6, 95:17, 114:22, 116:11, 116:12, 135:7, 148:13,

151:18, 151:19, 155:11, 156:21
**September/ October** [1] - 115:14
**sera** [4] - 6:12, 154:11, 154:22, 157:25
**serious** [1] - 15:7
**services** [1] - 5:19
**set** [8] - 7:10, 7:14, 54:17, 84:2, 84:4, 127:10, 129:4, 156:7
**seven** [4] - 32:5, 87:20, 121:19, 130:4
**several** [3] - 13:23, 14:9, 25:24
**severely** [1] - 99:19
**Shankman** [10] - 55:24, 84:24, 85:4, 85:7, 85:11, 92:25, 125:18, 129:12, 133:12
**shape** [1] - 86:22
**share** [1] - 126:13
**shareholder's** [1] - 124:23
**shareholder/ director/nonofficer** [1] - 82:2
**shares** [16] - 43:20, 43:25, 82:4, 82:6, 82:7, 103:14, 103:17, 103:19, 103:21, 104:1, 125:12, 126:10, 131:17
**sheet** [1] - 152:15
**shift** [1] - 88:12
**shifts** [1] - 88:13
**shop** [9] - 77:9, 80:21, 80:25, 99:2, 99:7, 100:7, 100:12, 101:11, 144:13
**short** [5] - 54:24, 101:23, 104:16, 104:19, 105:17
**shortly** [1] - 76:24
**shoulder** [1] - 57:21
**show** [17] - 17:21, 18:13, 19:11, 27:19, 28:3, 28:7, 28:9, 45:12, 55:8, 63:4, 92:3, 113:22, 114:5, 120:1, 123:10, 134:10
**showed** [3] - 110:25, 111:14, 139:15
**showing** [4] - 21:17, 21:19, 155:3, 155:16
**shown** [1] - 124:15
**shows** [1] - 18:19
**shut** [5] - 136:20,

JURY TRIAL - VOLUME III of VI

137:8, 137:19, 138:4, 138:17

**shutter** [5] - 95:6, 125:17, 131:10, 133:7, 136:25

**SHUTTERS** [1] - 1:9

**Shutters** [60] - 1:21, 43:8, 45:1, 48:10, 48:25, 49:5, 49:15, 50:20, 53:2, 53:25, 63:10, 63:19, 64:10, 64:20, 68:6, 68:9, 69:15, 70:6, 72:9, 77:10, 78:20, 78:21, 78:25, 82:2, 83:16, 83:24, 84:3, 84:8, 84:13, 87:11, 88:23, 89:2, 93:10, 93:25, 94:14, 95:25, 96:11, 96:14, 100:24, 106:6, 108:18, 112:18, 124:24, 125:10, 127:11, 128:10, 128:13, 128:22, 128:25, 129:5, 129:11, 129:20, 129:23, 138:12, 143:14, 145:2, 145:12, 147:3, 148:3, 153:22

**shutters** [28] - 39:19, 48:9, 52:15, 52:23, 61:2, 70:6, 78:11, 86:23, 89:4, 91:6, 100:16, 115:20, 118:5, 118:13, 129:25, 132:16, 136:4, 136:8, 136:10, 136:24, 137:2, 137:5, 137:10, 137:17, 137:22, 140:6, 150:13, 160:12

**Shutters'** [1] - 47:20

**Shutters's** [1] - 94:19

**sic** [2] - 25:8, 145:9

**sick** [6] - 19:20, 19:21, 19:22, 19:24

**side** [2] - 86:11, 159:25

**sidebar** [1] - 45:25

**sight** [1] - 123:6

**sign** [10] - 47:22, 47:24, 49:14, 49:17, 50:18, 51:20, 77:25, 78:3, 78:7, 103:1

**signatory** [1] - 47:20

**signed** [18] - 39:12, 47:25, 49:6, 49:8, 49:12, 50:6, 51:13,

51:22, 77:22, 77:23, 78:1, 78:6, 78:8, 78:9, 113:12, 113:14

**significance** [1] - 134:14

**significant** [1] - 53:17

**significantly** [1] - 115:25

**signing** [2] - 49:3, 49:17

**simple** [1] - 20:7

**simply** [4] - 87:25, 104:13, 118:12, 137:8

**single** [5] - 23:25, 26:10, 54:13, 99:22, 115:22

**site** [15] - 11:7, 36:18, 40:6, 74:14, 76:17, 76:22, 80:14, 100:7, 139:23, 140:17, 140:25, 143:24, 152:22

**sites** [14] - 54:2, 54:3, 75:11, 84:19, 115:6, 115:7, 115:10, 115:11, 115:12, 140:18, 140:21, 157:14, 157:15

**sitting** [3] - 86:11, 99:13, 101:10

**situation** [3] - 47:11, 57:5, 126:24

**situations** [1] - 81:20

**six** [8] - 8:24, 13:6, 33:6, 54:22, 57:4, 87:20, 122:6, 130:12

**size** [1] - 93:22

**skills** [2] - 89:15, 89:19

**skimp** [1] - 95:7

**slats** [1] - 93:20

**sling** [1] - 102:5

**slow** [1] - 27:5

**slowly** [2] - 16:11, 16:15

**sluggish** [1] - 5:3

**small** [4] - 65:5, 65:17, 87:15, 159:7

**soap** [1] - 7:22

**sold** [4] - 88:19, 94:22, 119:11, 137:22

**SOLER** [1] - 1:5

**someone** [7] - 18:2, 28:22, 34:9, 53:16, 55:2, 143:7

**sometimes** [26] - 11:8, 23:6, 23:7, 23:19, 23:20, 24:12, 26:1, 36:18, 67:16,

73:24, 74:2, 75:9, 75:10, 81:4, 81:5, 81:6, 81:8, 81:14, 123:11, 143:1, 149:24, 151:8, 152:5, 159:1

**somewhat** [1] - 92:22

**somewhere** [5] - 110:1, 112:3, 116:13, 116:15, 136:8

**sorry** [22] - 4:11, 16:7, 16:8, 16:14, 18:25, 34:20, 38:12, 40:20, 45:3, 52:18, 58:24, 61:11, 63:5, 65:16, 67:8, 79:13, 120:3, 130:9, 131:2, 153:19, 161:24

**sort** [8] - 53:23, 60:22, 67:14, 79:12, 79:15, 79:22, 87:19, 97:16

**sorting** [1] - 88:8

**sorts** [1] - 50:24

**sotto** [2] - 73:10, 122:17

**sound** [1] - 140:23

**south** [2] - 78:20, 80:13

**sOUTHERN** [1] - 1:1

**space** [4] - 80:3, 113:7, 113:23, 130:19

**Spanish** [11] - 12:8, 12:21, 57:18, 63:21, 64:15, 111:9, 111:10, 111:18, 130:2, 142:11

**Spanish-speaking** [1] - 111:18

**speaking** [1] - 111:18

**speaks** [1] - 12:7

**special** [2] - 8:2, 8:3

**specific** [10] - 52:8, 62:19, 65:11, 75:2, 83:5, 111:21, 128:7, 144:5, 156:14

**specifically** [2] - 39:25, 140:19

**speculation** [1] - 64:16

**speed** [1] - 36:10

**spell** [1] - 43:3

**spend** [6] - 11:7, 25:14, 33:3, 82:13, 127:25, 128:2

**spent** [4] - 33:5, 75:4, 82:13, 82:14

**split** [8] - 48:3, 48:4, 48:8, 48:13, 48:15,

48:16, 119:7, 119:10

**spread** [1] - 62:5

**square** [5] - 60:24, 60:25, 79:22, 79:23, 115:22, 118:3, 118:4, 118:11, 118:12, 118:14, 136:4, 136:7, 137:5, 137:10, 138:20

**staff** [1] - 118:2

**stake** [1] - 133:10

**stand** [1] - 23:2

**standard** [4] - 127:17, 151:7, 151:21, 151:23

**standardized** [1] - 118:7

**standing** [2] - 98:17, 99:13

**standpoint** [1] - 115:13

**start** [16] - 11:6, 11:18, 39:25, 40:14, 55:3, 74:5, 152:6, 154:20, 154:21, 155:2, 155:25, 156:10, 159:12, 159:18, 160:7, 161:15

**start-up** [1] - 55:3

**started** [40] - 7:6, 10:10, 12:23, 17:8, 17:16, 17:19, 18:7, 18:18, 18:23, 20:10, 20:15, 20:23, 21:3, 21:5, 21:7, 22:4, 22:5, 23:3, 30:7, 34:3, 35:10, 52:14, 114:12, 128:20, 144:9, 148:9, 148:11, 148:14, 148:18, 149:6, 149:9, 149:18, 154:7, 154:10, 154:12, 155:4, 155:12, 158:19, 159:13

**starting** [8] - 49:2, 95:16, 112:20, 121:24, 130:8, 135:18, 143:18, 154:5

**state** [1] - 71:7

**statement** [2] - 68:5, 68:9

**States** [3] - 2:3, 71:24, 123:13

**STATES** [3] - 1:1, 1:14, 162:21

**stating** [1] - 155:1

**staunchly** [1] - 54:22

**stay** [7] - 10:22, 33:7, 81:13, 101:23, 116:17, 134:4, 154:25

**stayed** [1] - 150:19

**staying** [1] - 154:13

**stealing** [2] - 53:11, 53:16

**steel** [1] - 132:17

**step** [4] - 42:4, 143:21, 147:9, 161:19

**steps** [1] - 123:16

**Steve** [10] - 1:22, 9:14, 34:11, 36:25, 82:5, 87:18, 91:11, 94:21, 105:25, 124:18

**STEVE** [3] - 1:10, 3:8, 105:22

**stick** [1] - 56:5

**stiffed** [1] - 112:14

**still** [7] - 4:18, 54:6, 80:25, 90:17, 92:25, 97:16, 138:20

**stole** [2] - 37:12, 145:22

**stolen** [1] - 37:15

**stop** [9] - 80:24, 81:4, 81:5, 102:25, 144:22, 156:15, 159:14, 159:17, 159:19

**stopped** [1] - 159:18

**storms** [2] - 144:16, 144:20

**story** [1] - 46:8

**straight** [4] - 34:10, 65:7, 137:2, 160:13

**strategies** [1] - 85:14

**street** [1] - 15:22

**Street** [1] - 1:18

**streets** [2] - 31:20, 32:12

**strictly** [1] - 126:22

**strong** [1] - 15:2, 17:7

**strongly** [1] - 15:16

**structure** [4] - 137:8, 138:14, 139:1, 139:10

**struggling** [1] - 110:20

**stuff** [6] - 7:5, 76:23, 78:19, 118:7, 154:17, 156:13

**subdepartments** [1] - 134:18

**subject** [1] - 16:20

**submit** [2] - 83:14, 83:19

**submitted** [1] - 5:18

**subsequent** [1] - 93:7

**subsequently** [1] - 91:12

**substantive** [1] - 140:25

JURY TRIAL - VOLUME III of VI

successful [1] - 87:14
successfully [1] - 132:20
sue [1] - 9:20
sued [4] - 11:25, 51:1, 51:4, 51:22
sufficiently [1] - 138:1
suggest [1] - 96:19
suggested [4] - 59:22, 115:22, 137:7, 138:14
suggestion [3] - 137:11, 138:2, 138:22
suggestions [6] - 59:19, 59:20, 60:21, 95:8, 116:2, 139:13
suing [4] - 12:19, 23:12, 23:13, 33:20
SUITE [1] - 162:21
Suite [2] - 1:18, 2:4
Sullivan [16] - 10:24, 53:6, 53:7, 94:1, 108:19, 108:23, 109:6, 109:8, 109:9, 125:19, 129:1, 133:20, 145:17, 145:21
sum [1] - 87:2
Sunday [2] - 157:4
Sundays [1] - 100:24
supervise [6] - 85:3, 85:6, 85:19, 128:21, 129:19, 140:22
supervised [2] - 140:12, 140:17
supervising [2] - 86:18, 140:10
supervisory [1] - 84:5
supine [1] - 31:2
supposed [9] - 64:10, 103:23, 123:9, 148:21, 148:23, 150:11, 150:14, 152:3, 157:22
supposedly [3] - 17:7, 86:15, 118:2
Sustained [3] - 70:10, 72:13, 161:3
sustained [9] - 5:14, 5:22, 46:12, 64:18, 69:1, 70:1, 70:24, 151:25, 161:10
swear [1] - 130:13
swept [1] - 99:8
sworn [4] - 4:17, 42:23, 105:21, 147:18
SWORN [4] - 4:20,

42:24, 105:22, 147:19
system [1] - 66:16

## T

tabs [1] - 19:15
task [1] - 84:19
taught [1] - 10:18
tax [1] - 5:24
taxes [1] - 5:19
team [8] - 36:25, 37:2, 125:13, 125:22, 126:25, 130:23, 133:1
teams [1] - 160:15
technology [1] - 13:2
telephone [3] - 59:9, 117:1, 141:21
ten [8] - 88:9, 114:13, 116:5, 116:7, 121:22, 121:25, 137:12
term [1] - 87:11
terms [8] - 15:2, 46:19, 46:23, 49:8, 54:4, 61:4, 79:16, 85:14
test [1] - 99:4
testified [3] - 20:23, 71:2, 126:14
testify [4] - 17:2, 28:10, 28:22, 119:13
testifying [2] - 37:6, 111:11
testimony [24] - 14:16, 19:2, 19:25, 20:10, 22:24, 26:19, 34:17, 37:5, 46:14, 50:8, 50:11, 52:6, 61:14, 61:17, 61:20, 62:19, 71:5, 73:14, 81:16, 91:15, 92:18, 97:11, 108:20, 109:19
Thanksgiving [2] - 100:21, 156:24
THE [121] - 1:13, 1:16, 1:20, 2:1, 4:2, 4:5, 4:6, 4:8, 4:10, 4:13, 4:15, 4:24, 5:14, 5:22, 12:2, 14:3, 14:6, 14:7, 14:20, 16:7, 16:9, 16:14, 16:18, 16:22, 17:2, 18:10, 18:14, 18:21, 20:21, 20:25, 21:4, 21:19, 21:23, 25:6, 25:8, 25:18, 27:17, 27:22, 27:25, 28:9, 28:16, 28:20, 29:1, 31:6, 32:5, 36:7, 36:8,

38:13, 39:4, 40:20, 41:8, 42:2, 42:9, 42:12, 42:16, 42:19, 42:23, 42:25, 43:3, 45:15, 46:1, 46:4, 46:6, 46:8, 46:12, 49:24, 50:11, 50:13, 50:15, 52:16, 55:11, 63:7, 64:18, 67:23, 68:15, 68:17, 68:25, 69:10, 70:1, 70:10, 70:14, 70:24, 71:6, 72:13, 73:4, 73:8, 73:19, 77:4, 89:20, 90:1, 90:5, 90:7, 90:8, 90:10, 90:14, 105:15, 105:19, 105:21, 105:23, 107:9, 107:21, 122:16, 124:6, 147:6, 147:9, 147:14, 147:18, 147:20, 151:25, 153:5, 153:10, 153:12, 153:16, 153:20, 153:24, 161:3, 161:10, 161:13, 161:17, 162:6, 162:9
themselves [2] - 41:23, 74:8
thereabouts [1] - 94:7
therefore [2] - 20:9, 126:21
They've [1] - 87:16
thousand [14] - 9:8, 12:1, 23:13, 32:7, 32:8, 56:18, 56:19, 91:13, 149:7, 149:10, 149:11, 155:6, 155:8, 155:9
thousands [1] - 14:12
threaten [1] - 58:25
threatened [4] - 9:21, 9:23, 31:2, 31:21
three [41] - 6:22, 6:23, 6:24, 6:25, 29:18, 33:2, 58:20, 71:14, 82:7, 86:16, 93:8, 99:14, 101:13, 101:19, 104:1, 104:3, 104:4, 104:14, 104:19, 105:7, 105:9, 113:5, 114:6, 114:7, 114:11, 119:3, 119:7, 121:18, 125:15, 125:21, 131:15, 131:20, 132:2,

132:21, 133:2, 150:21, 156:24, 158:2, 159:6
three-year [1] - 119:3
throughout [5] - 46:11, 96:6, 121:21, 122:12, 151:22
throwing [1] - 35:16
ticket [1] - 15:22
tickets [1] - 30:13
time-and-a-half [2] - 119:17, 119:20
timecard [9] - 18:18, 18:19, 20:14, 21:17, 21:19, 27:14, 28:18, 63:19, 64:9
timecards [8] - 18:15, 20:22, 21:20, 21:23, 27:9, 27:14, 63:9, 63:10
timeframe [1] - 159:4
timetable [1] - 116:1
title [3] - 11:1, 45:6, 50:23
TO [2] - 3:1, 3:16
today [2] - 157:11, 160:9
together [6] - 8:9, 93:22, 111:3, 114:5, 150:24, 157:25
Tom [10] - 53:7, 94:1, 108:19, 108:23, 125:19, 129:1, 133:19, 145:17, 145:21
tom [2] - 10:24, 53:6
tomorrow [4] - 111:8, 161:15, 161:21, 162:2
took [13] - 10:2, 72:8, 72:9, 107:11, 110:6, 117:10, 146:7, 152:5, 156:13, 156:14, 156:24, 157:5, 157:7
tools [4] - 7:17, 80:7, 80:8, 152:21
top [4] - 18:23, 22:2, 27:13
total [9] - 35:1, 44:3, 44:8, 44:14, 82:7, 106:13, 121:19, 155:20
towards [3] - 56:7, 109:25, 110:19
towels [2] - 7:4
tower [4] - 74:21, 101:3, 112:14, 112:16
Tower [1] - 112:13
towers [1] - 140:20
track [1] - 62:24

tracks [1] - 152:10
traffic [2] - 27:4, 149:22
train [1] - 52:22
trained [5] - 52:13, 52:20, 52:21, 52:22, 52:24
transcript [2] - 55:10, 107:8, 107:19
transcription [1] - 162:17
translate [1] - 111:17
translator [4] - 4:23, 57:5, 57:18, 57:19
translators [1] - 56:25
transportation [5] - 6:12, 6:13, 6:15, 6:19, 25:22
tremendous [1] - 48:22
TRIAL [1] - 1:13
trial [1] - 90:21
tried [4] - 37:4, 60:15, 95:7, 138:3
trip [2] - 134:14, 135:6
trouble [2] - 75:12, 116:23
truck [16] - 6:4, 6:7, 6:9, 39:23, 41:17, 76:14, 76:20, 100:5, 100:7, 150:14, 152:4, 152:21, 152:23, 157:24, 159:20
trucks [20] - 40:10, 75:24, 76:1, 76:2, 76:8, 80:4, 80:6, 80:7, 80:8, 80:10, 144:9, 144:11, 152:6, 152:25, 158:15, 158:16, 158:19, 159:22, 159:25, 160:16
true [13] - 24:11, 41:13, 41:14, 51:7, 63:13, 81:7, 82:3, 82:4, 98:23, 100:5, 108:17, 159:9, 159:16
truest [1] - 142:9
trumping [1] - 83:1
truth [4] - 34:4, 34:5, 58:1, 107:14
truthfully [1] - 86:7
try [14] - 60:23, 79:24, 110:22, 111:7, 111:15, 111:24, 117:23, 118:1, 118:2, 120:22, 121:11, 145:23, 158:24,

JURY TRIAL - VOLUME III of VI

158:25
**trying** [5] - 9:10, 9:11, 19:9, 20:4
**turn** [4] - 55:13, 55:16, 107:17, 107:24
**turned** [1] - 36:14
**turns** [1] - 137:24
**TV** [2] - 7:10, 7:14
**twice** [4] - 35:25, 79:6, 98:18, 122:5
**Two** [1] - 15:3
**two** [73] - 6:22, 6:25, 15:3, 17:12, 19:11, 19:23, 20:16, 33:2, 34:25, 35:21, 47:4, 47:5, 47:7, 49:13, 61:3, 63:16, 64:13, 68:21, 71:13, 74:13, 74:18, 74:23, 74:25, 77:11, 78:9, 79:9, 82:19, 86:10, 86:15, 90:24, 94:24, 95:22, 98:15, 99:14, 100:3, 101:3, 102:16, 112:23, 113:3, 113:14, 113:20, 114:11, 114:24, 116:7, 116:18, 119:2, 120:13, 121:9, 121:17, 121:18, 121:19, 127:14, 127:15, 127:19, 127:20, 127:22, 127:23, 128:1, 130:5, 130:7, 130:9, 146:1, 150:21, 155:5, 157:9, 158:1, 158:11, 159:6
**two-and-a-half** [9] - 86:15, 113:20, 114:24, 116:18, 120:13, 127:14, 127:15, 127:19, 127:23
**two-year** [1] - 119:2
**type** [10] - 60:21, 60:22, 63:9, 63:10, 64:20, 72:23, 87:6, 148:22, 150:11, 156:9
**typically** [4] - 77:25, 78:1, 128:2, 142:25

## U

**ultimatums** [2] - 117:18, 117:20
**under** [17] - 4:18, 13:11, 20:3, 30:15, 47:1, 47:10, 64:20, 72:3, 75:15, 75:16, 80:16, 84:17, 84:18,

90:17, 107:14, 142:12, 142:15
**underestimated** [1] - 115:21
**undermining** [1] - 139:6
**understood** [4] - 126:17, 128:16, 139:22, 159:16
**unexciting** [1] - 90:20
**unfortunately** [2] - 5:4, 146:4
**unhappy** [1] - 117:16
**unissued** [1] - 103:19
**unit** [2] - 41:12, 98:9
**United** [3] - 2:3, 71:24, 123:13
**UNITED** [2] - 1:1, 162:21
**uNITED** [1] - 1:14
**units** [2] - 41:13, 41:23
**unless** [3] - 27:22, 114:10, 136:15
**unload** [4] - 41:18, 80:6, 152:23
**unloading** [1] - 76:3
**unpaid** [1] - 13:15
**unskilled** [1] - 47:6
**unusual** [1] - 126:7
**up** [49] - 21:16, 30:22, 36:10, 39:20, 41:22, 41:25, 49:2, 54:18, 55:3, 56:14, 56:18, 57:21, 60:24, 61:2, 61:3, 62:4, 66:2, 67:15, 72:15, 74:14, 75:18, 81:23, 82:6, 82:17, 86:23, 86:24, 87:3, 90:11, 93:22, 95:14, 98:16, 100:3, 101:9, 101:11, 110:11, 118:10, 118:14, 123:10, 124:23, 132:17, 135:22, 139:12, 143:6, 146:18, 151:17, 160:3
**upset** [1] - 59:18
**useless** [1] - 29:6

## V

**vacation** [1] - 157:10
**van** [2] - 25:23, 40:5
**vans** [2] - 6:15, 35:9
**varied** [1] - 128:6

**various** [2] - 93:12, 96:17
**vehicle** [1] - 100:11
**vehicles** [2] - 49:10, 49:13
**venture** [2] - 87:11, 146:2
**verify** [2] - 72:9, 72:19
**vessel** [1] - 96:4
**vessels** [1] - 96:5
**vested** [1] - 133:10
**VI** [1] - 1:13
**via** [1] - 117:1
**vice** [9] - 13:1, 13:7, 45:9, 46:14, 46:18, 46:20, 106:23, 106:25
**view** [3] - 102:13, 102:15, 146:22
**violate** [1] - 40:14
**violating** [1] - 103:12
**violation** [1] - 5:12
**visit** [13] - 36:18, 54:3, 84:19, 113:4, 113:9, 113:21, 114:25, 130:16, 130:18, 134:6, 138:7, 138:9, 140:25
**visited** [1] - 121:15
**visits** [7] - 113:14, 114:7, 114:11, 121:20, 140:13, 141:11, 141:16
**voce** [2] - 73:10, 122:17
**VOLUME** [1] - 1:13
**vote** [1] - 139:2
**vs** [1] - 1:8

## W

**wage** [8] - 66:7, 71:22, 72:10, 72:20, 97:2, 102:10, 102:11, 123:18
**wage-and-hour** [1] - 102:11
**wages** [9] - 13:15, 57:2, 71:17, 71:20, 71:24, 123:14, 129:4, 129:8, 129:10
**wait** [7] - 4:22, 26:6, 50:7, 110:3, 159:19
**waiting** [5] - 98:17, 101:10, 101:11, 112:7, 143:5
**walk** [4] - 121:5, 136:18, 144:3, 146:24
**walked** [2] - 102:21,

102:22
**wall** [5] - 61:2, 80:18, 86:23, 93:23, 103:11
**walls** [1] - 98:4
**wants** [2] - 56:16, 97:25
**warehouse** [9] - 80:2, 80:3, 94:9, 108:25, 113:7, 113:23, 130:20, 133:19, 143:7
**watch** [1] - 23:4
**water** [2] - 156:11, 156:14
**wearing** [1] - 30:11
**weather** [5] - 74:2, 80:12, 80:20, 81:8
**week** [18] - 10:7, 12:23, 19:5, 19:6, 19:13, 19:14, 23:24, 27:21, 27:24, 28:4, 28:13, 29:9, 33:14, 34:18, 38:17, 52:8, 54:21, 55:2, 56:17, 56:22, 58:18, 61:15, 61:16, 61:21, 62:10, 62:12, 62:22, 66:12, 67:4, 69:4, 69:18, 69:19, 71:9, 78:7, 85:1, 88:9, 88:16, 99:18, 99:22, 99:23, 104:20, 105:3, 105:5, 105:12, 118:5, 118:12, 123:8, 137:6, 137:10, 137:12, 137:14, 138:21, 145:1, 145:2, 145:7, 146:7, 146:11, 146:18, 148:12, 148:18, 148:21, 149:2, 149:11, 149:13, 149:19, 153:23, 154:9, 155:9, 155:10, 155:16, 157:1
**week's** [1] - 52:10
**weekdays** [1] - 64:15
**weeks** [13] - 8:24, 13:7, 13:10, 19:11, 19:23, 20:16, 61:22, 62:15, 62:16, 116:7, 121:25, 155:13, 155:22
**west** [1] - 127:18
**whatsoever** [4] - 34:1, 79:9, 84:2, 94:13
**whole** [10] - 11:7, 25:14, 33:3, 33:23, 35:21, 122:12, 127:1, 130:18, 146:17, 157:9

**wife** [5] - 30:15, 30:21, 57:22, 69:13, 87:8
**wind** [2] - 75:9, 75:15
**window** [1] - 152:13
**windows** [2] - 152:16, 152:17
**winds** [4] - 61:23, 62:3, 62:4, 62:7
**wing** [1] - 109:14
**wish** [1] - 67:10
**withdraw** [3] - 36:9, 42:4, 161:5
**withdrew** [2] - 9:22, 9:24
**witness** [25] - 14:4, 20:8, 27:22, 36:9, 42:4, 42:6, 42:20, 45:12, 45:14, 55:9, 63:22, 64:17, 67:21, 68:20, 68:22, 69:8, 69:24, 70:11, 90:1, 105:16, 107:7, 147:7, 147:14, 153:3, 162:3
**WITNESS** [1] - 4:20
**witnesses** [1] - 49:22
**WITNESSES** [1] - 3:1
**wolfe** [1] - 94:6
**woman** [1] - 102:5
**word** [2] - 64:14, 142:9
**words** [14] - 19:7, 54:17, 54:24, 58:19, 65:11, 74:3, 81:12, 81:20, 89:4, 93:19, 97:13, 97:22, 100:15, 142:12
**worker** [6] - 8:9, 65:14, 66:4, 66:7, 143:8
**workers** [31] - 8:1, 52:23, 53:22, 57:16, 59:3, 59:7, 59:12, 59:15, 60:9, 62:9, 62:13, 62:25, 64:21, 71:2, 71:8, 71:17, 72:10, 73:12, 73:14, 74:3, 75:7, 103:24, 110:15, 111:18, 112:4, 116:20, 119:15, 119:16, 119:19, 123:15
**Workmen's** [1] - 102:7
**workplace** [2] - 102:1, 146:20
**works** [3] - 54:25, 125:10
**worth** [3] - 8:15, 32:23, 137:10

JURY TRIAL - VOLUME III of VI

**Wow** [1] - 23:12
**write** [1] - 18:3
**written** [5] - 22:15, 38:21, 38:24, 64:13, 64:14
**wrote** [1] - 18:1

### Y

**year** [9] - 65:10, 75:3, 95:12, 119:2, 119:3, 131:16, 149:10, 157:9
**Year's** [1] - 100:20
**years** [14] - 13:1, 16:21, 65:14, 71:14, 71:21, 87:2, 87:5, 87:10, 87:17, 87:21, 92:5, 94:6, 117:22
**yelled** [1] - 87:8
**Yerko** [4] - 111:10, 120:24, 121:7
**yesterday** [3] - 4:17, 5:25, 34:17
**York** [22] - 7:12, 7:13, 7:17, 8:6, 8:14, 13:2, 30:10, 30:14, 30:24, 32:14, 32:17, 32:19, 32:22, 33:1, 33:5, 33:22, 54:6, 84:11, 118:19, 119:16, 134:23
**young** [1] - 94:6
**yourself** [9] - 46:17, 46:22, 49:3, 71:15, 72:18, 123:12, 123:16, 134:15, 138:6

### Z

**zero** [1] - 32:5
**Zidell** [1] - 1:17

APRIL 13, 2011