```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FORT LAUDERDALE DIVISION

 3          CASE NUMBER 07-61295-CIV-GONZALEZ/COHN

 4   REINALDO RAMON LAMONICA,        COURTROOM C
     AUGUSTIN MILAN,
 5   ANGELES LAMONICA SOLER,
     MARIO FELICIANO,
 6   GUILLERMO ALBOREZ, and
     JULIO ALBOREZ,
 7
                    Plaintiffs,      FORT LAUDERDALE, FLORIDA
 8
          vs.
 9
     SAFE HURRICANE SHUTTERS, INC.,  APRIL 14, 2011
10   EDWARD LEIVA, STEVE HEIDELBERGER,
     and FRANCIS McCARROLL,
11
                    Defendants.      {Pages 1 - 190}
12   _____

13            JURY TRIAL - VOLUME IV OF VI
         BEFORE THE HONORABLE JOSE A. GONZALEZ, JR.,
14            SENIOR UNITED STATES DISTRICT JUDGE

15   _____

     APPEARANCES:
16

17   FOR THE PLAINTIFFS:
                         K. DAVID KELLY, ESQ.
18                       J.H. Zidell, PA
                         300 71st Street, Suite 605
                         Miami Beach, FL  33141
19                       T: 305.865.6766; F: 305.865.7167
                         david.kelly38@rocketmail.com
20
     FOR THE DEFENDANTS:
21   (Safe Hurricane
     Shutters, Inc.,     CHRIS KLEPPIN, ESQ.
22   Steve Heidelberger, Glasser, Boreth & Kleppin
     and Francis McCarroll) 8751 W. Broward Boulevard
                         Plantation, FL  33324
23                       T: 954.424.1933; F: 954.474.7405
                         glabor@aol.com
24

25
                       APRIL 14, 2011
```

1  **FOR THE DEFENDANT:**            **EDWARD LEIVA, PRO SE**
   (Edward Leiva)

2

3  **REPORTED BY:**
                                     **JILL MICHELLE HARDY-HOBBS, CCR, FPR**
                                     *Official United States Court Reporter*
4                                    400 North Miami Avenue, Suite 08S33
                                     Miami, FL  33128     T: 305.523.5022
5                                    Jill_hardy-hobbs@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              ## INDEX TO EXAMINATION OF PLAINTIFFS' WITNESSES

2                                                              **PAGE**

3    **MARIO FELICIANO** (Continued from 4-13-11)

4    Direct examination by Mr. Kelly......................      8

5    Cross-examination by Mr. Kleppin....................     47

6    Cross-examination by Mr. Leiva......................    100

7    **AUGUSTIN MILAN**

8    Direct examination by Mr. Kelly......................    141

9    Cross-examination by Mr. Kleppin....................    149

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

09:03    1    **(Call to the order of the Court)**

09:03    2         **THE COURT:**  Good morning.

09:03    3         **MR. KLEPPIN:**   Good morning.

09:03    4         **MR. LEIVA:**  Good morning.

09:03    5         **MR. KELLY:**  Good morning.

09:03    6         **THE COURT:**  Mr. Feliciano, would you take the witness

09:03    7    stand again, please.

09:03    8         **MR. KELLY:**  And, Your Honor, before we call the jury

09:03    9    in, I just wanted to see if I could bring up a preliminary

09:03   10    matter about -- that's somewhat relevant to his testimony.

09:03   11         **THE COURT:**  The what?

09:03   12         **MR. KELLY:**  A preliminary matter regarding -- that's

09:03   13    relevant to his testimony.

09:03   14         **THE COURT:**  Right.

09:03   15         **MR. KELLY:**  The thing that I have is that we have

09:03   16    obviously the Alborezes and the Lamonicas in the court

09:03   17    yesterday or when the defendant objected and said no more

09:03   18    testimony regarding those absent plaintiffs.

09:03   19         There was a ruling prior to this by Judge Cohn prior

09:03   20    to this trial in respect to a case called *Donovan versus New*

09:03   21    *Floridian*.  It's 676 F.2d 468, and it's an 11th Circuit case

09:03   22    from '82.  Basically that case stands for the proposition that

09:04   23    you can reconstruct the hours of other workers without them

09:04   24    being here.  I can tell you straightforward that Mr. Feliciano

09:04   25    -- you know, I believe he's going to have testimony -- at least

APRIL 14, 2011

09:04  1   he did work different jobs.  I think that's clear.  However, he

09:04  2   will have testimony as to when they were there in the morning

09:04  3   and when they were after, you know, when they quit.

09:04  4        And I think that based on the fact that I wasn't

09:04  5   allowed to have these other witnesses bring in some of the

09:04  6   records just to establish their pay -- I don't want to call Mr.

09:04  7   Leiva as a fact witness, a general fact witness, but at least

09:04  8   to validate a couple of letters -- a couple of records as to

09:04  9   their pay.  In other words, I can at least establish when they

09:04 10   -- you know, when they were there in the morning, when they

09:04 11   were there at the end of the day through him some records.

09:04 12        I think at least I want to try to bring that to the

09:04 13   jury as to what they were paid and what they weren't paid.

09:04 14   That's the evidence, the extent of it I have.  I do have the

09:04 15   case with me that does stand for the proposition of

09:04 16   reconstruction of hours.  They're not here.  They won't be

09:05 17   here, the Lamonicas.  And I want to bring it up and ask the

09:05 18   Court if I can at least try to proceed with that line of

09:05 19   questioning.

09:05 20        **MR. KLEPPIN:**  May I be heard on this, Your Honor?

09:05 21        **MR. KELLY:**  I have the case here highlighted for Your

09:05 22   Honor.

09:05 23        **MR. KLEPPIN:**  Your Honor, the Floridian case that he's

09:05 24   talking about was a class action involving hundreds of people.

09:05 25   The Judge wasn't going to have hundreds of people testify about

09:05  1    their hours.  He was going to have a handful testify.  And if

09:05  2    they worked the same shifts and so forth whatever the jury

09:05  3    found considering the number of hours those people worked would

09:05  4    be attributed to the other class members.  This is not a class

09:05  5    action case.  The Lamonicas are named party plaintiffs in this

09:05  6    case.  That's number one.

09:05  7            Number two, it should be self-evident to the Court.

09:05  8    If it isn't, I'll remind you what the evidence has been.  The

09:05  9    Lamonicas worked in the shop.  Mr. Feliciano and Mr. Milan

09:05  10   worked out in the field.  They didn't work anywhere near each

09:05  11   other.  Even if -- and we heard Mr. Ibacache say every morning

09:06  12   he got there, boy, Mr. Lamonica was already there.  And we

09:06  13   heard -- saw what some of the timecards said about when Mr.

09:06  14   Lamonica got to the office in the morning.  It wasn't sometimes

09:06  15   until well after 8:00 o'clock.

09:06  16           So even if Mr. Feliciano can say, I got to the office

09:06  17   every day at 7:00 o'clock.  The Lamonicas were both already

09:06  18   there.  I got in every day after 6:00 o'clock.  The Lamonicas

09:06  19   were still there.  That gives us eight to ten hours of what the

09:06  20   Lamonicas may or may not be doing that Mr. Feliciano cannot

09:06  21   account for, and we can't -- it can't be assumed to this jury

09:06  22   or suggested to them that, oh, that's just all work time.  They

09:06  23   would have been all working during that entire time.  It's all

09:06  24   compensable.  So you can find that the Lamonicas worked from

09:06  25   7:00 a.m. to 6:00 at night.  And the defendants vigorously

09:06  1   object to that and also vigorously object to try to leak in

09:07  2   claims of people who aren't even here to prosecute them.

09:07  3         The last point I want to make is is that Judge Cohn

09:07  4   didn't issue a ruling saying that this could occur.  All Judge

09:07  5   Cohn said was, I'll have to think about that.  He was talking

09:07  6   out loud.  He said, Perhaps if you can find people that were on

09:07  7   the exact same crew and those crew members aren't there,

09:07  8   perhaps that's something I would consider letting in.  In no

09:07  9   way -- in no way did Judge Cohn even suggest --

09:07  10        **THE COURT:**  All right.  Let me cut you off.  I think

09:07  11  it's hearsay, and I think it's inadmissible; and it will not be

09:07  12  received.

09:07  13        **MR. KLEPPIN:**  Thank you, Your Honor.

09:07  14        **THE COURT:**  The objection is sustained.  Ready?  Bring

09:07  15  in the jury.

09:07  16        Where are you from, Mr. Feliciano?

09:07  17        **MR. FELICIANO:**  Puerto Rico.

09:07  18        **THE COURT:**  What part?

09:07  19        **MR. FELICIANO:**  The west side.

09:08  20      **(Jury In)**

09:08  21        **THE COURT:**  Ladies and Gentlemen, good morning.  I

09:08  22  report to you that the fire alarm yesterday was a false alarm.

09:08  23  A pole station was accidentally activated on the first floor by

09:08  24  a contractor working in the building.  That happens.  Be

09:08  25  seated, please.

09:08  1       Mr. Feliciano, you were sworn yesterday.  You are

09:08  2  reminded that you are still under oath.  And, Mr. Kelly, you

09:08  3  can proceed with your examination of this witness.

09:08  4       **MR. KELLY:**  Thank you.

09:08  5       **MARIO FELICIANO, PLAINTIFF, PREVIOUSLY SWORN.**

09:08  6       **DIRECT EXAMINATION (Continued from 4-13-11)**

09:08  7  BY MR. KELLY:

09:08  8  Q.  Good morning.

09:08  9  A.  Good morning.

09:09  10  Q.  We left off talking about your schedule.  I wanted to ask

09:09  11  you at any time during your employment with respect to the

09:09  12  hours that you did work, were you ever specifically paid for

09:09  13  any hours that you worked in excess of 40 in one week?

09:09  14  A.  No, I was not.

09:09  15  Q.  Did anybody at Safe Hurricane Shutters ever tell you that

09:09  16  you were?

09:09  17  A.  Can you repeat that?

09:09  18  Q.  Did anybody at Safe Hurricane Shutters including the

09:09  19  defendants, did any of them ever indicate to you or tell you,

09:09  20  Here's some additional money or here's some money --

09:09  21  A.  No.

09:09  22  Q.  -- that's to compensate you for --

09:09  23  A.  Nobody did.

09:09  24  Q.  Do you recall any time from August 2006 through September

09:09  25  2007 do you recall ever filling out any type of timecards as an

09:09  1    installer or punching any clocks?

09:09  2    A.  No, we didn't.  Wait.  When I started working with the

09:10  3    company -- like I said yesterday, I started working --

09:10  4            MR. KLEPPIN:  I'm sorry, Your Honor.  I'm having

09:10  5    trouble hearing him.  He needs to be closer to the microphone.

09:10  6            MR. FELICIANO:  Okay.  When I started working at the

09:10  7    company, I started -- like I said yesterday, I started working

09:10  8    at the beginning of -- I think the first or second week of

09:10  9    August of 2006.  I understand there was a time clock for the

09:10  10   people in the shop.  For us we never did, you know, any time

09:10  11   clock.  You know, however, it was indicated to us that we had

09:10  12   to be there by 7:30.

09:10  13           So you understand, you know, the way we worked, when I

09:10  14   started working with the company, I started working as an

09:10  15   installer.  For a couple of weeks, three or four weeks, I was,

09:10  16   you know, learning the process, how to install.

09:11  17           MR. KLEPPIN:  I object to this narrative testimony and

09:11  18   move to strike.  He was simply asked if he ever punched a time

09:11  19   clock or filled out a timecard.

09:11  20           THE COURT:  Sustained.

09:11  21   BY MR. KELLY:

09:11  22   Q.  Did -- you were talking about your being trained as an

09:11  23   installer.  Did that -- did the training -- what type of

09:11  24   training schedule did you get?

09:11  25   A.  Well, the first two or three weeks of August they gave me

09:11 1   training.  They put me with a crew.  And after that they

09:11 2   assigned me a crew.  I was driving the truck.  I was assigned

09:11 3   to the truck.  I was in charge of the group.  And I had to do,

09:11 4   you know, all the -- you know, all the things that they told me

09:11 5   to do.  For example, when I got the work orders, I took the

09:11 6   work orders to get the materials.

09:11 7       MR. KLEPPIN:  Objection again to the narrative.  He

09:11 8   was simply asked what his training was.

09:12 9       THE COURT:  Sustained.

09:12 10  BY MR. KELLY:

09:12 11  Q.  Let's move on.  Do you recognize -- let me ask you one more

09:12 12  question before I move on.  Can you identify the most amount of

09:12 13  hours in one week that you recall working?

09:12 14  A.   The most amount of hours that I worked, an average, I

09:12 15  worked between 10, 11 hours a day.  At the beginning from

09:12 16  August to December --

09:12 17      MR. KLEPPIN:  I object to him narrating about things

09:12 18  he's not asked.

09:12 19      THE COURT:  Sustained.

09:12 20  BY MR. KELLY:

09:12 21  Q.  Let's start with August 2006.

09:12 22      MR. KLEPPIN:  Move to strike the testimony that I

09:12 23  objected.

09:12 24      THE COURT:  Motion denied.  Go ahead.

09:13 25  BY MR. KELLY:

09:13   1    Q.  Let's start with August 2006.  Let's try to stick to the

09:13   2    amount of hours.

09:13   3    A.  Okay.  In August 2006 when -- I started at 7:30, like I

09:13   4    said.  I had my training for a couple of weeks.  Usually we got

09:13   5    out at 8:00 o'clock from the shop to the workplace.  Mostly all

09:13   6    of the work that we did at that time was a house, you know, the

09:13   7    homeowners' work.  And we got back from the work site around

09:13   8    5:30.  Left the place, be to the place, to our job around 6:00

09:13   9    o'clock in the afternoon, sometimes 6:30.  It would depend on

09:13   10   the daylight too.  But in those months, August through

09:13   11   December, it was around that period of time, that amount of

09:13   12   hours.

09:14   13   Q.  So in the one week if you were to tally it up, how many

09:14   14   total hours would you say in August of 2006 that you worked on

09:14   15   the average?

09:14   16   A.  In the month of August or --

09:14   17   Q.  2006, yes.

09:14   18   A.  2006?  Around 10, 11 hours a day.

09:14   19   Q.  And how many days a week?

09:14   20   A.  Six days a week.

09:14   21   Q.  Did that change in the following month, in September 2006?

09:14   22   A.  September, October, November, December it was around the

09:14   23   same amount of hours.

09:14   24   Q.  Going into 2007 of January any noticeable difference that

09:14   25   you can recall that stands out in your mind as to any change in

09:14  1    that schedule that you just described, the hours?

09:14  2    A.  Well, January was almost the same amount of time.  February

09:14  3    -- at the end of February there was a big project that the

09:14  4    company had, Points of America, two big buildings.  In that

09:14  5    time there was a time schedule that we had to follow.  Start at

09:15  6    9:00 o'clock, and we had to finish working or making noises --

09:15  7    the agreement was that -- at 5:00.  Get all the materials and

09:15  8    stuff like that down.

09:15  9           MR. KLEPPIN:  I just object, Your Honor, to this

09:15 10    continued narration that goes way beyond the question and move

09:15 11    to strike it.

09:15 12           THE COURT:  Sustained.

09:15 13           MR. KELLY:  I'm sorry?  I'm sorry, Your Honor.

09:15 14           THE COURT:  Go ahead.  He says he's doing a narrative.

09:15 15    Just make your question straight.

09:15 16    BY MR. KELLY:

09:15 17    Q.  Try to -- so in that month of -- given the Points of

09:15 18    America project, can you tell the jury did that in any way

09:15 19    increase or decrease the hours in any way on the average?

09:15 20    A.  It was about -- an average, about the same time.  We got to

09:15 21    our job site -- not a job site -- the company, 7:30, load

09:15 22    materials, go to the job site to be there by 9:00, work until

09:15 23    5:00, take all the -- you know, when we finish, take all the

09:16 24    old shutters and stuff like that, put it in the truck, go back

09:16 25    to the company, be at the company around 6:00, 6:30, depends on

09:16  1    the traffic.

09:16  2    Q.   At any time during your employment was there any period

09:16  3    where you worked different days of the week, you know, Monday,

09:16  4    Tuesday, et cetera?

09:16  5    A.   No.  I worked Monday through Saturday.

09:16  6    Q.   Was that to the end of your employment, from the beginning

09:16  7    till the end, normally those six days?

09:16  8    A.   Yeah; six days a week.

09:16  9    Q.   Going into March of 2007 was there any change in your

09:16 10    schedule that you described regarding the average?

09:16 11    A.   The average, it was about the same time because I worked in

09:16 12    Points of America for about two months.

09:16 13    Q.   How about the following month in April?

09:16 14    A.   April was about the same because I was working between --

09:16 15    March and April I was working at Points of America most of the

09:17 16    time.

09:17 17    Q.   When you worked at the Points of America building, did you

09:17 18    -- where did you go first in the morning?

09:17 19    A.   We went to the gate.  We had to log in, you know, before

09:17 20    9:00 o'clock.

09:17 21    Q.   Where is the location?  Where is that that you're

09:17 22    describing?

09:17 23    A.   Points of America is two buildings like 10 minutes from

09:17 24    here.  It's two big buildings.  You can see them next to the

09:17 25    port, in that area over there.  And when we got to the gate, we

09:17  1  registered.  We had to go to the security guard to, you know,

09:17  2  log into the building.  We had to get our security guard

09:17  3  because most of those --

09:17  4       MR. KLEPPIN:  I again object, Your Honor.  He just was

09:17  5  asked where did he first go when he got to the Points of

09:17  6  America.

09:17  7       THE COURT:  Sustained.

09:18  8  BY MR. KELLY:

09:18  9  Q.  Prior to going to Points of America did you go anywhere

09:18  10  first to report to work?

09:18  11  A.  Yeah.

09:18  12  Q.  Where?

09:18  13  A.  At the company.

09:18  14  Q.  And what time did you get there normally?

09:18  15  A.  Between, like I said yesterday, between 7:00, 7:15, 7:20.

09:18  16  We had to be there by 7:30.

09:18  17  Q.  When you first got to work, what was the first thing that

09:18  18  you would do?

09:18  19  A.  I went to the -- I went to the lounge.  I got my coffee

09:18  20  like every morning and got to -- went to the office to get my

09:18  21  paperwork to see what department or what work I was going to do

09:18  22  that day.

09:18  23  Q.  And then after you got your work orders, then what did you

09:18  24  do?

09:18  25  A.  I went to the shop to pick up the materials and load the

09:18  1    trucks to take the trucks back to the workplace.

09:18  2    Q.  And then you would arrive at Points of America?

09:18  3    A.  Arrive at Points of America, register in the log-in, and

09:18  4    start -- you know, start working until 5:00 o'clock.  That was

09:18  5    the close point.

09:18  6    Q.  About what time.

09:18  7    A.  The closing time.

09:18  8    Q.  I'm sorry.  About what time -- when you punched in or you

09:18  9    logged with the security guard, about what time was that?

09:19  10   A.  It was always before 9:00, ten minutes till 9:00 because we

09:19  11   were supposed to start at 9:00.  So we had to be there a little

09:19  12   bit earlier than that.

09:19  13   Q.  And then what time did you actually start doing physical

09:19  14   labor with respect to the installation?

09:19  15   A.  Installation?  Once we put all materials up to the

09:19  16   apartments that we had to do, right away.

09:19  17   Q.  Can you give me an idea about what time actually you

09:19  18   started actually putting those shutters up, installing the

09:19  19   shutters?

09:19  20   A.  It depends on the time it took us to put them up because

09:19  21   those two buildings are I believe 25, 30 floors.  And we had to

09:19  22   go through the basement, load everything in the commercial

09:19  23   elevator to get to the apartments, to the different apartments,

09:19  24   whichever it was.

09:19  25   Q.  If you were installing a shutter that was on an outside

09:20  1   window that was up about 20 stories, how did you reach those

09:20  2   windows?

09:20  3   A.   Well, the things that -- all we did in the Points of

09:20  4   America was to install windows on balconies.  So we were inside

09:20  5   balconies all the time.  And the way we did it -- you know, I

09:20  6   will have to, you know, explain how the process is.  We got the

09:20  7   accordions built from the factory, and we had all the tracks

09:20  8   that we need to put in the -- to drill and put in the ceiling

09:20  9   and the floor to be able to put those accordions on those

09:20 10   tracks.

09:20 11         So when we got there, we had to get the blueprints,

09:20 12   get the measurements, you know, how it was going to be cut, you

09:20 13   know, all the tracks, cut all the tracks by the exact

09:20 14   measurement by the engineering department to be able to hang

09:20 15   those accordions.

09:21 16   Q.   And during the course of the day can you tell us -- when

09:21 17   did you eat during the course of the day?

09:21 18   A.   Like I said yesterday, the type of work like that, if you

09:21 19   have a schedule, you bring your little lunch box.  You got your

09:21 20   water or sandwich whatever it is.  You know, while you're

09:21 21   working, you drink a little bit of water or juice or whatever

09:21 22   you have.  Get a bite of a sandwich.  Keep working.

09:21 23         MR. KLEPPIN:  Objection.  He was asked what time he

09:21 24   ate.

09:21 25         THE COURT:  Overruled.

09:21  1   **BY MR. KELLY:**

09:21  2   Q.   Okay.  And then just at the end of the day -- you would

09:21  3   work through the course of the day.  And when would you stop

09:21  4   working, actually stop installing the shutters.

09:21  5   A.   At Points of America, that's the one we're talking about,

09:21  6   we had to stop making noise by 5:00.

09:21  7   Q.   And then after you were done, then what would you do --

09:21  8   A.   Then we had --

09:21  9   Q.   -- after you quit installing?

09:21  10  A.   -- to clean the place.  The role material, the scrape --

09:21  11  that's what we call it -- or the pieces that, you know, are

09:21  12  left over, we had to load it in the little cart that we had,

09:22  13  you know, to load everything; the leftovers, the tools, and

09:22  14  everything like that, clean the place, go down and go to the

09:22  15  truck and load everything and go back to the shop.

09:22  16  Q.   And what time would you arrive back to the shop?

09:22  17  A.   Like I said, around 6:00 o'clock, 6:30.  Depends on the

09:22  18  traffic.

09:22  19  Q.   And then when you arrived at the shop, was there anything

09:22  20  else you had to do once you got to the shop?

09:22  21  A.   Of course I had to clean the trucks, take the material that

09:22  22  was left over.  And if we had the materials ready for the next

09:22  23  day job, we loaded that day; that we wouldn't have to do it in

09:22  24  the morning.  If not, we wait in the morning and load the

09:22  25  materials for the next day job.

09:22  1   Q.  But when you would arrive back at the shop, was there an

09:22  2   amount of time that you can identify on the average that you

09:22  3   would remain at that shop before you would leave and go home?

09:22  4   A.  Probably a half hour to unload the truck and clean the

09:22  5   truck and have everything ready for the next day.

09:22  6   Q.  And then can you identify how long of a period the Points

09:23  7   of America project lasted, when it started and when it ended?

09:23  8   A.  If I recall, the project was supposed to be finished in

09:23  9   four months.  I don't have the information because they --

09:23  10  actually I worked around two months in that place.

09:23  11  Q.  With respect to other projects that you worked, you just

09:23  12  described how you would prepare.  You'd show up, prepare for

09:23  13  it, go to work, and return back.  Was there any other job that

09:23  14  you would -- that there was a different procedure during the

09:23  15  day of how you would -- your workday would work?

09:23  16  A.  Well, after Points of America, they got a second big

09:23  17  project.  It was the Marine Towers.  It's a building on Las

09:23  18  Olas Boulevard right in this area.  And that schedule -- it was

09:23  19  a little bit early.  We were supposed to be there by 8:00 and

09:23  20  the same amount of time, by 5:00.  That job we were supposed to

09:23  21  finish in the month and a couple of weeks or a month and a half

09:24  22  because that was the time period that we had to finish that

09:24  23  job.  And for that period of time I did work in that building

09:24  24  for the duration of the project, like a month and a half.  It

09:24  25  was the same amount of hours.  Be there by 8:00, 8:30, you

09:24  1    know, whatever time it took us from the shop to the job site,

09:24  2    do what we had to do; and at 5:00 load everything, go back to

09:24  3    the shop, and do it all over again.

09:24  4    Q.  Do you any idea what month and year that particular job

09:24  5    started, the month and year of that job you just described on

09:24  6    Las Olas?

09:24  7    A.  I believe that was -- it was supposed to start in April of

09:24  8    2007, and we were supposed to finish at the end of May.  That

09:24  9    was the deadline to finish that job.

09:24 10    Q.  What was the name of that job; do you remember?

09:24 11    A.  Marine Towers.

09:25 12    Q.  And do you know when it actually did stop, from April till

09:25 13    -- do you have the -- do you recall the ending date?

09:25 14    A.  The last days of May.

09:25 15    Q.  Okay.  So you actually did work on that -- from what date

09:25 16    in April; do you know?  Was it the beginning of April?

09:25 17    A.  I believe it was the middle of April; beginning middle of

09:25 18    April.

09:25 19    Q.  And is the only project that you worked on for that period?

09:25 20    A.  On that period of time, yes.  That was the only project

09:25 21    that I worked.

09:25 22    Q.  Was that Monday through Saturday as well?

09:25 23    A.  Monday through Saturday.

09:25 24    Q.  And after that project ended, did a new one start?

09:25 25    A.  Yeah.  We started a building in Pompano Beach.  It was the

09:25  1    Pompano Beach Sheriff's Department, new building.  I believe

09:25  2    it's Federal Highway or US 1 I believe it is.  We did that,

09:25  3    that building.  That building was for probably like three

09:25  4    weeks.

09:25  5    Q.  So would you say it started in late May?  Is that when it

09:25  6    started?

09:25  7    A.  No actually I believe it started at the beginning of June.

09:26  8    May, June of 2007.

09:26  9    Q.  And how long did -- and it went on for three weeks?

09:26  10   A.  Around two, three weeks.  Yes.

09:26  11   Q.  How long did it take you to drive from -- well, let me ask

09:26  12   you this:  Did you first go to the lounge in the morning?

09:26  13   A.  I always -- we had to always go to the company in the

09:26  14   morning.

09:26  15   Q.  Do you remember the address of the lounge?

09:26  16   A.  Of the company?

09:26  17   Q.  Yeah.  The company, the lounge of the company.

09:26  18   A.  It was on Andrews Avenue.  I don't remember the exact

09:26  19   number.  Andrews Avenue and Sample Road in Pompano Beach.

09:26  20   Q.  The lounge where Safe Hurricane Shutters was located?

09:26  21   A.  Yeah.  That was the address of the company.

09:26  22   Q.  And what time did that project, that Pompano Sheriff

09:26  23   Department project -- did it have a -- did the project itself

09:26  24   have a particular time you needed to arrive at the project?

09:26  25   A.  No.  We went to our company, got the materials, got to the

09:26  1   place and worked until we were able to finish.

09:27  2   Q.  Was there -- do you recall what time you would normally

09:27  3   arrive at that Sheriff's Department project?

09:27  4   A.  You could say like 20 minutes maybe from the shop to the

09:27  5   place after we load the materials in morning.  Around 8:15,

09:27  6   8:20 at the most.

09:27  7   Q.  And then after that project completed, do you remember that

09:27  8   completed in June?

09:27  9   A.  I believe, yes, we did, complete that in June.

09:27 10   Q.  And during the time you worked on that project that was the

09:27 11   only project you worked on?

09:27 12   A.  Well, we worked on that project for about three weeks; but

09:27 13   in between we did some houses, you know, homeowners' houses;

09:27 14   but approximately, you know, it was, you know -- I probably did

09:28 15   like maybe one or two different jobs, but I went back to finish

09:28 16   a job.

09:28 17   Q.  When you would to a private -- when you think back during

09:28 18   this period of working on the Sheriff's project and doing homes

09:28 19   in between --

09:28 20   A.  Uh-huh (affirmative).

09:28 21   Q.  -- did either one of those -- did the sheriff's project

09:28 22   require any different amount of hours per week or time than the

09:28 23   residential projects?

09:28 24   A.  No; because that one didn't have any time to go in and go

09:28 25   out.  From the place -- from our company, we left in the

09:28 1 morning like always. We went to the place. And during that

09:28 2 time -- it depends on what we did -- we always finish around

09:28 3 5:00/5:30, you know, and then went back to the shop again to

09:28 4 arrive to the place around -- to arrive back to the place

09:29 5 around 6:30, 6:00/6:30.

09:29 6 Q. And after that project, was there another commercial

09:29 7 project that you started after the Sheriff Department project

09:29 8 ended?

09:29 9 A. Yeah. We did another one. It was in Boynton. I believe

09:29 10 it was called Boynton Beach golf course. We did a golf club

09:29 11 and the gym, tennis court, gym and another building in the same

09:29 12 facilitates.

09:29 13 Q. Do you know when that Boynton Beach project started?

09:29 14 A. Say it again.

09:29 15 Q. Do you know when the Boynton Beach project started, the

09:29 16 date, the month?

09:29 17 A. I believe that one started once we finished the project in

09:29 18 -- if I recall, once we finished Boynton Beach Sheriff's

09:29 19 Department we started that project.

09:29 20 Q. And the Sheriff's Department was in what city or what town?

09:30 21 A. Pompano Beach.

09:30 22 Q. Pompano. And then was that in July or June?

09:30 23 A. Probably at the end of June, beginning of July. That one

09:30 24 didn't start -- didn't last long. It lasted like probably two

09:30 25 weeks.

09:30 1   Q.   So you say end of June 2007 or early July is your best --

09:30 2   A.   Uh-huh (affirmative).

09:30 3   Q.   And when you would -- was there any particular time in the

09:30 4   morning you were required by the client or the club to be at

09:30 5   that project?

09:30 6   A.   It wasn't an entrance or out time; but we had to like

09:30 7   always go to the shop, get the material, go there.  By the time

09:30 8   we got from our shop to Boynton Beach -- it's a long drive --

09:30 9   we got there by maybe 8:30/9:00 o'clock and work until probably

09:30 10  5:00/5:30 and then head back to the shop.  The turnpike coming

09:30 11  down, usually we get back at 6:30/7:00 o'clock at night.

09:31 12  Q.   Then you said -- how many weeks did that project last?

09:31 13  A.   Around two weeks.

09:31 14  Q.   And then was there another particular commercial project

09:31 15  that you --

09:31 16  A.   Uh-huh (affirmative).  After that it was all homeowners'

09:31 17  work.

09:31 18  Q.   Was there any particular -- so with respect to the

09:31 19  residential projects after that, so would you say that they

09:31 20  started in July, the sole residential projects?

09:31 21  A.   We did residential projects from August of 2006 to around

09:31 22  January 2007 because after that, that's when those -- I call

09:31 23  four big projects even though two of them were a little bit

09:31 24  small.  Those are the only two big projects that we did.

09:32 25  Q.   But in about July 2007 after you finished the Boynton Beach

24

09:32 1  project --

09:32 2  A.  Uh-huh (affirmative).  Yes.

09:32 3  Q.  -- after that point it was only residential projects?

09:32 4  A.  Residential projects, yes.

09:32 5  Q.  And was there a particular place that those residential

09:32 6  projects were located?  Were they --

09:32 7  A.  Different houses all over.  Parkland, Coral Springs, West

09:32 8  Palm Beach, different places, different places.

09:32 9        MR. KELLY:  Your Honor, can we ask this individual

09:32 10  here to leave the courtroom.  He could possibly be a rebuttal

09:32 11  witness at some point, and they're invoking the rule.

09:32 12        THE COURT:  Okay.  What's your name, sir?

09:33 13        MR. YOLAND:  Pedro Patrick Yoland (ph).

09:33 14        THE COURT:  Okay.  Could you step outside, please.

09:33 15  You can't be in here during the trial.

09:33 16        MR. YOLAND:  Oh, I cannot?

09:33 17        THE COURT:  No.  You have to wait in the hall.

09:33 18        MR. KELLY:  At the request of the defendant you have

09:33 19  to.

09:33 20        MR. YOLAND:  All right.  Okay.  Thank you.

09:33 21        THE COURT:  Thank you.  Go ahead.

09:33 22  BY MR. KELLY:

09:33 23  Q.  At this time -- so during the remainder of your employment

09:33 24  through the -- let me withdraw that question, that half

09:33 25  question.  So just so we're clear for the jury, this -- when

09:33  1    this Boynton Beach project ended and the company started solely

09:33  2    working on residential projects, can you tell me the

09:33  3    approximate date in 2007?

09:33  4    A.   Can you repeat the question?

09:33  5    Q.   Yeah.  After the Boynton Beach project stopped, do you know

09:33  6    the date that was?

09:33  7    A.   It was probably -- it was only about two weeks, probably at

09:33  8    the end of June.  I don't recall the time, you know, the exact

09:34  9    date.  I know it was during the summer of that year.

09:34  10   Q.   So when you started the -- just the residential projects,

09:34  11   is that all you did then for the rest of your employment?

09:34  12   A.   The rest of the employment was residential.

09:34  13   Q.   And your employment ended in what month?

09:34  14   A.   It was around the last -- middle of the last week of

09:34  15   September of 2007.

09:34  16   Q.   And during that period of time was there an expectation

09:34  17   that you were aware of by the defendants as to when you were

09:34  18   supposed to show up to the lounge?

09:34  19   A.   We were supposed to be at 7:30 in the morning.  That's what

09:34  20   -- that was the time to start.

09:34  21   Q.   And what time did you -- during that last part of your

09:34  22   employment do you -- are you able to tell the jury when you

09:34  23   normally would show up?

09:34  24   A.   The last months of my employment there, most of the time,

09:35  25   90 percent of the time we were back around 7:00/7:30 at night.

09:35  1    It was light outside, and we were working -- we had to work to

09:35  2    finish the jobs, to be able to collect the money, to be able to

09:35  3    get paid.  I had to collect the money.  I was in charge of that

09:35  4    too.  I had to collect the money, the remaining balance because

09:35  5    the way it worked --

09:35  6              MR. KLEPPIN:  I object again to the narration.  It's

09:35  7    way beyond what he was asked.

09:35  8              THE COURT:  Sustained.

09:35  9    BY MR. KELLY:

09:35  10   Q.  Let me ask you this:  So you just said that you stopped at

09:35  11   7:00 to 7:30?  Is that what you just said?

09:35  12   A.  No.  We stopped around 6:30.  By the time we got back it

09:35  13   was 7:00/7:30.  Usually we got back in that period of the

09:35  14   summertime, the last months of our employment.

09:35  15   Q.  When you say 7:00 or 7:30, you mean when you were done at

09:35  16   the shop and you walked out the door to go home?

09:36  17   A.  Exactly.

09:36  18   Q.  In the morning at that time --

09:36  19   A.  Say it again.

09:36  20   Q.  In the morning during that time you were expected to be

09:36  21   there by 7:30?

09:36  22   A.  7:30.

09:36  23   Q.  What time did you actually normally -- do you recall when

09:36  24   you actually would normally show up?

09:36  25   A.  Always around 7:15/7:20 I was there because I had to be

09:36  1   there at 7:30.  We had to start at 7:30.

09:36  2   Q.  Okay.  Now, do you recognize in this courtroom today Mr.

09:36  3   Steve Heidelberger, the defendant, and the other defendant --

09:36  4   A.  Yes, I do.

09:36  5   Q.  -- Mr. M$^c$Carroll?

09:36  6   A.  Yes, I do.

09:36  7   Q.  Do you recall the month and the year when you first met Mr.

09:36  8   M$^c$Carroll?

09:36  9   A.  I started in August of 2006.  A couple of weeks after, I

09:36  10  was introduced by Mr. -- to Mr. M$^c$Carroll by Mr. Leiva.

09:36  11  Q.  Okay.  What month was that?

09:36  12  A.  It was -- I believe it was at the end of August, a couple

09:36  13  of weeks after I started.

09:36  14  Q.  End of August 2006?

09:36  15  A.  2006, yes.

09:36  16  Q.  How about Mr. Heidelberger?  When did you first -- month

09:37  17  and year that you recall meeting Mr. Heidelberger?

09:37  18  A.  When I met him, I believe it was the first time I met him,

09:37  19  around September of that year.

09:37  20  Q.  September of 2006?

09:37  21  A.  2006.

09:37  22  Q.  Did Mr. Leiva introduce you to Mr. Heidelberger at that

09:37  23  time?

09:37  24  A.  Excuse me?

09:37  25  Q.  Did Mr. Leiva --

09:37  1    A.   Yes, he did.

09:37  2    Q.   -- introduce you to Mr. Heidelberger?

09:37  3    A.   Yes.  Yes, he did.

09:37  4    Q.   When you first met Mr. M$^c$Carroll in August of 2006, did you

09:37  5    have a conversation with him?

09:37  6    A.   Yes, I did.  I was introduced by Mr. Leiva to them like my

09:37  7    other bosses, you know.  He was -- they were the owners of the

09:37  8    company too, and they were my boss.

09:37  9            MR. KLEPPIN:  I object to the narration and move to

09:37  10   strike.  He wasn't asked that.

09:37  11           THE COURT:  Motion denied.  Overruled.

09:37  12   BY MR. KELLY:

09:37  13   Q.   Okay.  Could you -- if you can, and I only want what you

09:37  14   can actually remember with respect to Mr. M$^c$Carroll.  Do you

09:37  15   remember having a conversation with him?

09:37  16   A.   Yes, I did.  Many times.

09:38  17   Q.   Okay.  But the first time you met him, if you can remember

09:38  18   -- this was back in August of 2006.  If you can remember the

09:38  19   content of the conversation, I want you to tell the jury what

09:38  20   the conversation involved.

09:38  21   A.   When I was at the shop, he was there.  You know, when Mr.

09:38  22   Leiva presented M$^c$Carroll to me the first time, you know, like

09:38  23   I said, as my boss, we talked about, you know, how the job was

09:38  24   going to be, all the things that they were expecting about the

09:38  25   company.  The first conversations that I had with him were in

09:38  1    March because I was just starting to meet him; but the

09:38  2    expectations of the company, you know, all the things that they

09:38  3    wanted to do, how it was to be, you know, things like that.

09:38  4    Q.  And so -- now, after that August 2006 meeting, do you have

09:39  5    any idea how long Mr. M^cCarroll was in Florida?

09:39  6    A.  Mr. M^cCarroll was here at least two, maybe three weeks a

09:39  7    month.  He was here -- he was with us a lot.

09:39  8    Q.  At the beginning from August 2006 would you see Mr.

09:39  9    M^cCarroll?  Would you see Mr. M^cCarroll at the workplace?

09:39  10   A.  Like I said, you know, the times that he was there we had

09:39  11   to be in contact with him all the time.  I'm talking about me

09:39  12   and my group.  I know the other employees too, but -- because

09:39  13   being my boss I had to get instructions sometimes about where I

09:39  14   was going to go, what I was going to do.  It depends on the job

09:39  15   that I had.  Sometimes I got work orders of the, you know, work

09:40  16   that I was supposed to perform or do with my crew.  And it was

09:40  17   like that on a daily basis when he was present in the company.

09:40  18   Q.  When he was present?

09:40  19   A.  Yes.

09:40  20   Q.  And could you describe to the jury what a work order is.

09:40  21   A.  Okay.

09:40  22        MR. KLEPPIN:  Objection, Your Honor.  We went through

09:40  23   this yesterday.  Asked and answered.

09:40  24        THE COURT:  Sustained.

09:40  25   BY MR. KELLY:

09:40  1    Q.   Okay.  You got the work orders from Mr. M<sup>c</sup>Carroll?

09:40  2         MR. KLEPPIN:  Objection; leading.  And we went through

09:40  3    this before.

09:40  4         THE COURT:  Sustained.

09:40  5    BY MR. KELLY:

09:40  6    Q.   Who did you get the work orders from?

09:40  7         MR. KLEPPIN:  Objection; asked and answered.  We went

09:40  8    through this yesterday.

09:40  9         THE COURT:  Overruled.

09:40 10         MR. FELICIANO:  I got the work orders -- if not from

09:40 11    Mr. Leiva, I got them from Mr. M<sup>c</sup>Carroll.  Whoever was there in

09:40 12    charge at the moment I got the work orders from them.

09:41 13    BY MR. KELLY:

09:41 14    Q.   Did you -- in 2006 do you recall seeing Mr. M<sup>c</sup>Carroll at

09:41 15    any of the actual projects?

09:41 16    A.   Actually he was in most of the projects, especially in the

09:41 17    big projects.  Houses, he hardly went to them.  But the big

09:41 18    projects he was there.  You know, at the -- the time he spent

09:41 19    in the company he was there supervising, making sure that what

09:41 20    we were doing was doing, you know --

09:41 21         MR. KLEPPIN:  Objection to the narration.

09:41 22         THE COURT:  Sustained.

09:41 23         MR. KLEPPIN:  He was just asked if he saw him at the

09:41 24    big projects.

09:41 25    BY MR. KELLY:

09:41  1    Q.  When you saw Mr. M<sup>c</sup>Carroll at the big projects, what was

09:41  2    the first big project you can remember?

09:41  3    A.  The first big product, like I said, was Points of America.

09:41  4    Q.  Okay.  Now, at that big -- at the Points of America's

09:41  5    project what did -- you saw Mr. -- did you see Mr. M<sup>c</sup>Carroll --

09:41  6    A.  Yes, I did.

09:42  7    Q.  -- at the Points of America?  When you say Mr. M<sup>c</sup>Carroll at

09:42  8    the Points of America project, what was he doing there?

09:42  9    A.  Okay.  The times that he went to the project he was making

09:42 10    sure that we're following the schedule and that we were, you

09:42 11    know, doing what we were supposed to do, what apartment we were

09:42 12    doing, if we were going to be able to finish the job, and

09:42 13    things like that.

09:42 14    Q.  Did -- who did he -- did he communicate with anybody, any

09:42 15    of the installers?

09:42 16    A.  Yeah.

09:42 17    Q.  Who?

09:42 18    A.  Yeah.  He went to different crews.  There were a lot of

09:42 19    crews.  And my crew -- he came.  He saw, you know, the work

09:42 20    that we were doing, how fast we were going.  And he talked to

09:42 21    us, asked us questions like, for example:  How long do you

09:42 22    think it's going to last?  Are you going to be able to finish

09:42 23    today?  Are you going to be able to finish in two days?  It

09:42 24    depends on how big was the project too, you know whatever we

09:42 25    were doing.

APRIL 14, 2011

09:42  1    Q.  At the Points of America project, just to lead into my next

09:43  2    question, can you tell me how long that project lasted?

09:43  3    A.  As I said before, I believe it lasted like maybe

09:43  4    three-and-a-half/four months; but I worked in that place around

09:43  5    two months only.

09:43  6    Q.  During the time that you were there is there any way that

09:43  7    you can, if you can remember, identify how often you saw Mr.

09:43  8    M$^c$Carroll actually at the project.

09:43  9    A.  Times is going to be hard, but I know he was there often.

09:43 10    You know, he went to the place more than -- I could say maybe

09:43 11    seven, eight times, ten times.

09:43 12    Q.  At the project?

09:43 13    A.  At the project.

09:43 14    Q.  Did you see Mr. M$^c$Carroll ever at the lounge in the morning

09:43 15    at the office?

09:43 16    A.  At the workplace?

09:43 17    Q.  Yes.

09:43 18    A.  Yes.  The company was a small place.  It was -- well, I'm

09:43 19    not going to say a small place.  It was a place divided by

09:43 20    offices.  And behind the offices was the --

09:44 21        MR. KLEPPIN:  Objection, Your Honor.  The question was

09:44 22    simply did he ever see him at the lounge.

09:44 23        MR. FELICIANO:  Yes, I did.

09:44 24    BY MR. KELLY:

09:44 25    Q.  Okay.  And what was he doing at the lounge when you saw

09:44  1   him?

09:44  2   A.   In the morning we always did -- got our coffee, start

09:44  3   talking about the job, what we're going to do during the day,

09:44  4   talk about the work orders that we got, you know, and stuff

09:44  5   like that, like, you know, things that had to do with the work.

09:44  6   Q.   I heard you before.  I heard the word "supervise" during

09:44  7   this question.  What did you mean by "supervise"?

09:44  8   A.   Well, when you got a boss, that person goes to the place

09:44  9   that you work to make sure that you're doing what you're

09:44  10  supposed to do, you know, make sure that the job is being done

09:44  11  and to get information about the job itself.  Is this going to

09:45  12  be able to be done today?  Is this going to be able to be done

09:45  13  in two/three days, you know, and see the process of the work

09:45  14  that we're doing.  For me that's a supervisor.  That's a person

09:45  15  that is in charge that is telling you, you know, and finding

09:45  16  out what are you doing and how are you going to do it.

09:45  17  Q.   And the next project after Points of America, what was the

09:45  18  next what you consider to be the big project?

09:45  19          MR. KLEPPIN:  Objection, Your Honor; asked and

09:45  20  answered.  We went through --

09:45  21          THE COURT:  Sustained.

09:45  22          MR. KLEPPIN:  -- all of this this morning.

09:45  23          THE COURT:  Sustained.

09:45  24  BY MR. KELLY:

09:45  25  Q.   Were there any other big projects that you can tell me that

09:45  1  you saw Mr. M^cCarroll at the projects?

09:45  2  A.  I saw him in the Marine Towers project many times.  The one

09:46  3  -- he was in charge the Boynton Beach golf course project.

09:46  4  He was the one that sold it, and he was the one that supervised

09:46  5  the project.  I was in direct contact with him if he wasn't

09:46  6  there over the phone about, you know, problems that we had in

09:46  7  the project.  For example, we had to install --

09:46  8         MR. KLEPPIN:  Objection, Your Honor.  He was just

09:46  9  asked --

09:46  10        THE COURT:  Sustained.

09:46  11        MR. KLEPPIN:  -- what projects he saw the man at.

09:46  12  BY MR. KELLY:

09:46  13  Q.  Okay.  And you indicated that he was supervising at the

09:46  14  Boynton Beach project.  Could you give me some details as to

09:46  15  that, what you mean.

09:46  16  A.  Okay.  He was there to make sure that we were doing what we

09:46  17  were supposed to do.  He was in contact with me at all times

09:46  18  because, like I said, I was in charge of my crew.  And, for

09:47  19  example, we did -- in that project we did the accordions, the

09:47  20  shutters.  We installed that.  But there was a part of the

09:47  21  project that was where they parked their golf carts.  They had

09:47  22  a -- like sliding.  Instead of sliding doors, they had like

09:47  23  screen doors.  And we had to remove the old screen doors

09:47  24  because another company was going to come and install the

09:47  25  sliding doors because we didn't do that, so he -- I think he

09:47   1   contracted that company, and he --

09:47   2       MR. KLEPPIN:  Objection on speculation.

09:47   3   BY MR. KELLY:

09:47   4   Q.  Just say what you actually know --

09:47   5       THE COURT:  Sustained.

09:47   6   BY MR. KELLY:

09:47   7   Q.  -- and not what you might think.

09:47   8   A.  Okay.  There was a company that was supposed to install

09:47   9   sliding doors.  And he was in contact with me at all times in

09:47  10   that specific time to make sure that the company that was going

09:47  11   to install that was there on time.  He always, you know, called

09:48  12   me to make sure that -- you know, find out how was the project

09:48  13   going, what material did I needed, if I needed something, like

09:48  14   tracks, any missing materials and stuff like that.

09:48  15   Q.  Did the persons that you worked with on these projects, did

09:48  16   they -- did most of them speak English?

09:48  17   A.  No, no.

09:48  18   Q.  Would you communicate to the workers in Spanish regarding

09:48  19   what --

09:48  20   A.  I had to.  I had to.  Most of them didn't know any English.

09:48  21   Q.  You would act like a translator?

09:48  22   A.  Yes.

09:48  23   Q.  Were you actually at the projects working doing the

09:48  24   physical work?

09:48  25   A.  All the time.

09:48  1   Q.   You were actually hanging up the --

09:48  2   A.   Of course.

09:48  3   Q.   -- hurricane shutters?

09:48  4   A.   Like he said, I was one of the best installers in the

09:48  5   company.

09:49  6   Q.   Were there any other what you consider to be major projects

09:49  7   that you can identify that you saw Mr. M^cCarroll on?

09:49  8   A.   Boynton Beach Sheriff's Department building.  He went there

09:49  9   to supervise our progress in the job, and he was involved in

09:49 10   that project too.

09:49 11   Q.   How often did you see him at that --

09:49 12   A.   On the duration -- on the duration of the project, he was

09:49 13   there probably three or four times.

09:49 14   Q.   And how often would you speak to Mr. -- let me ask you

09:49 15   this:  Did you speak to Mr. M^cCarroll on the telephone when he

09:49 16   wasn't there regarding the project?

09:49 17   A.   Of course.  I had -- when I had trouble -- I had the

09:49 18   numbers for him and Mr. Leiva.  When I had trouble, if I

09:49 19   couldn't get Mr. Leiva, I would call Frank M^cCarroll to --

09:49 20   whatever need we had on the job site we had to communicate with

09:49 21   him.

09:49 22   Q.   Any other what you consider to be big projects that you saw

09:50 23   Mr. M^cCarroll on?

09:50 24   A.   Not really.  After that I just saw him in the office all

09:50 25   the time.

09:50  1   Q.   Now, Mr. -- let's go to Mr. Heidelberger.  You first met

09:50  2   him in September 2006, correct?

09:50  3   A.   Yes.

09:50  4   Q.   And did you have a conversation with Mr. Heidelberger at

09:50  5   that time?

09:50  6   A.   Yes, I did.

09:50  7   Q.   And could you -- I just want to know, if you can remember,

09:50  8   what the content of the conversation was.

09:50  9   A.   Like Mr. M$^c$Carroll, I was introduced to him.  He was

09:50  10  introduced to me as my boss.  We talked about, you know -- at

09:50  11  the beginning, the first time I met him, not much because I

09:50  12  didn't, you know, know the guy a lot.  Well, I had never met

09:50  13  him better.  I met him as my boss at that time.  And we talked

09:50  14  about the business, you know, how -- things they were going to

09:51  15  be, all the things that they said they were going to do, you

09:51  16  know, things like that.

09:51  17  Q.   Can you recall any details about what they said they were

09:51  18  going to do, what Mr. Heidelberger might have said or did say?

09:51  19  A.   The specific details I cannot recall right now.

09:51  20  Q.   And do you have any -- can you remember at that time in

09:51  21  September of 2006 how long Mr. Heidelberger was in Florida, how

09:51  22  many days if at all?

09:51  23  A.   I saw Mr. Heidelberger maybe once a month.  He was here for

09:51  24  a couple of days.  At the most I saw him it was I believe four

09:51  25  or five days; and it was through the end of the work, you know,

09:51  1    of the job, at the end of July of 2007.

09:51  2    Q.   When you -- just to clarify, when you say four to five

09:51  3    days, do you mean -- what do you mean?  During one time or over

09:51  4    a period of time?

09:52  5    A.   No.  Like I said, he used to be here at least once a month,

09:52  6    you know, in the first -- you know, those first months that I

09:52  7    saw him, in other words, he was here like two, two-and-a-half,

09:52  8    maybe three days.  But the duration of the time that he spent

09:52  9    the most with us was at the end of July -- that was the last

09:52  10   time I saw him -- of 2007, but I believe he was here for about

09:52  11   maybe four or five days.

09:52  12   Q.   Now, after this first time you met him in September 6 --

09:52  13   I'm sorry -- September of 2006, do you remember the next month

09:52  14   that you actually know that he came back to Florida?

09:52  15   A.   In September probably -- maybe at the end of October,

09:52  16   beginning of November.

09:52  17   Q.   All right.  Let's stop there.  End of October, early

09:52  18   November, did you talk with him at that time?

09:52  19   A.   Yes, we did.  We talked about the job, you know, what we

09:52  20   were doing, how was the company going.  Like, for example, you

09:53  21   know, the type of work we were doing.  At that time I had my

09:53  22   crew.  And he was informed that my crew was one of the best

09:53  23   installation crews that the company had.  So we had a lot of,

09:53  24   you know, conversation about how much work we were getting out

09:53  25   and things like that.  But, you know, after that not much.

09:53 1   Q.  Where did you see in November of -- early November or the

09:53 2   end of October, where was Mr. Heidelberger when you saw him?

09:53 3   A.  He was at the office.  He was at the company.

09:53 4   Q.  At the lounge?

09:53 5   A.  No.  I saw him at the lounge.  He was inside the factory

09:53 6   where they did the materials in the morning.  You know, when I

09:53 7   came back from work, you know, he was there.

09:53 8   Q.  And did you -- do you remember where you talked to him?

09:53 9   Was it in the lounge or somewhere else?

09:54 10  A.  No.  Like I said, you know, when we got to the company in

09:54 11  the lounge in the morning, then we went back to load the

09:54 12  trucks.  He went back with us.  You know, he talked to me.  For

09:54 13  example, he talked to me and other people that he met.  Or, by

09:54 14  the time -- you know, the times he talked to me we were loading

09:54 15  the trucks, you know.  He was -- at times he asked things like,

09:54 16  Where are you going today?  What are you going to be doing?

09:54 17  How big is the job?  Things like that.

09:54 18  Q.  Did he offer any instructions at that time or suggestions

09:54 19  you can recall?

09:54 20  A.  Not that I can recall.

09:54 21  Q.  Did -- during that year when's the next time that you met

09:54 22  with him?

09:54 23  A.  I guess -- I think I saw him, if I recall, you know, once

09:54 24  in maybe December; and after that it was in July, in the next

09:54 25  year, 2007.

09:54  1   Q.  Did you ever see him at any of the job sites?

09:55  2   A.  Yes, I did.

09:55  3   Q.  Which job sites did you see him?

09:55  4   A.  At the big projects.  When we started Points of America, he

09:55  5   went with Mr. Leiva, Frank M$^c$Carroll to supervise, you know,

09:55  6   the job and make sure that, you know, the schedule that we had

09:55  7   --

09:55  8           MR. KLEPPIN:  Object to the narration.

09:55  9           THE COURT:  Sustained.

09:55  10          MR. KLEPPIN:  He just asked what projects he saw him.

09:55  11  BY MR. KELLY:

09:55  12  Q.  What did -- at the Points of America you used the word --

09:55  13  you just described what he was doing there.  What do you mean

09:55  14  by that?  Give me details.

09:55  15  A.  He went to the job site to supervise what we were doing,

09:55  16  see the process, you know, the progress of the project, you

09:55  17  know, because we had a deadline on that big project.  So they

09:55  18  want to make sure that -- it was supposed to be done -- with

09:55  19  the amount of time that we had to finish the job that it was

09:55  20  done, you know, properly.  So he was there to, you know, make

09:55  21  sure that whatever was done it was done, you know, the right

09:55  22  way.

09:56  23  Q.  Did he say anything specific to you that you can recall?

09:56  24  A.  When he was there he -- for example, one of the

09:56  25  conversations that we had in that project, you know, he asked

09:56  1   me how long it takes me to install, you know, accordions in a
09:56  2   building, you know, how many hours it would take me to do one,
09:56  3   only one balcony and stuff like that, you know, about the job.
09:56  4   Q.   Other than Points of -- how many times -- do you know how
09:56  5   many times you saw him at the Points of America project?
09:56  6   A.   Probably two times.
09:56  7   Q.   Did he at that point ever -- did he make any suggestions
09:56  8   that you can identify at that time other than inquiring about
09:56  9   the installation, any more details you can provide?
09:56 10   A.   I can't recall right now.
09:56 11   Q.   Did you ever meet -- have any meetings with him with
09:57 12   respect to issues concerning payment, payment of wages?
09:57 13   A.   Yes, I did.
09:57 14   Q.   And when was that when you --
09:57 15   A.   It was at the end of July 2007.  That was when the company
09:57 16   owes five weeks of back pay.  He came to the company to solve
09:57 17   the problem, and he met with each one of us in the company.
09:57 18   Q.   And when you met with him can you give me as much detail as
09:57 19   possible as to what you and him spoke.  Let me withdraw that.
09:57 20   Did you speak to him directly?
09:57 21   A.   Yes, I did.
09:57 22   Q.   Did you communicate what he said to anybody else?  Did you
09:57 23   translate what he said to anybody else?
09:57 24   A.   No; because I met with him directly.  I didn't have the
09:57 25   chance -- I didn't have the need to get a translator because I

09:57   1    know English.

09:57   2    Q.   I mean did you translate what he said to you to any other

09:57   3    workers?

09:57   4    A.   No, I didn't.  I didn't.  I didn't translate to anybody

09:58   5    else.  They had a translator there.  I believe it was Yerko,

09:58   6    Mr. Aguirre.

09:58   7    Q.   Yerko Aguirre?

09:58   8    A.   Yeah.  He was translating for the other guys.

09:58   9    Q.   Were you and Mr. Aguirre in the same meeting?

09:58   10    A.   I don't recall.  I don't recall if Mr. Aguirre was there.

09:58   11    I know I spoke to Steve directly.

09:58   12    Q.   And what did he say to you about the wages?

09:58   13    A.   Okay.  The problem that we had is that they owe us five

09:58   14    weeks' back pay.  And I was about to -- you know, I said that I

09:58   15    was going to quit.  I was going to leave the company and that

09:58   16    when I came to the office, he came to make arrangements with us

09:58   17    to make arrangements for the payment of the back pay so we

09:58   18    could stay in the company.  They owe us five weeks of payment.

09:59   19    And he promised me -- he talked to me.  He promised me that he

09:59   20    was going to -- they were going to pay me what they owe me in a

09:59   21    matter of two, at the most three weeks.  He -- one of the

09:59   22    things that I remember the most, I wanted to leave the place so

09:59   23    bad because I couldn't take it anymore.

09:59   24             MR. KLEPPIN:  Object to the narration, Your Honor.

09:59   25             THE COURT:  Sustained.

09:59  1          MR. FELICIANO:  One of the things that he told me --

09:59  2          THE COURT:  No.  There's no question.

09:59  3          MR. KELLY:  Okay.

09:59  4          THE COURT:  Next question.

09:59  5  BY MR. KELLY:

09:59  6  Q.  So what did -- so can you give me specifics as to what Mr.

09:59  7  Heidelberger told you.

09:59  8  A.  Okay.  He compromised with me that he was going to pay me

09:59  9  in the next two weeks, you know, the payment of the work that I

09:59  10  had plus, you know, installments to be able to pay those extra

09:59  11  weeks that they owe me.  And he told me that he was going to

10:00  12  make sure that that was going to be done.  He was my boss.  I

10:00  13  considered him my boss.  He was introduced to me like my boss.

10:00  14          MR. KLEPPIN:  Again, objection to the narration.

10:00  15          THE COURT:  Sustained.

10:00  16  BY MR. KELLY:

10:00  17  Q.  Did he -- can you recall if you can -- I just want to know.

10:00  18  If you can't, that's fine.  But I want to know if you can

10:00  19  remember accurately any particular things that he specifically

10:00  20  said to you.

10:00  21  A.  One of the things that I remember the most -- that's one of

10:00  22  the reasons why I didn't leave the company at that time -- is

10:00  23  he assured me that he was going to pay me.  And this was his

10:00  24  words:  I'm going to make sure this works.  If I don't make it

10:00  25  work, I'll put a bullet through my -- in my head.  And he did

10:00  1    -- he did tell me those specifics words.  And when somebody

10:00  2    tells you something like that with that security, you know, I

10:01  3    do trust that person.

10:01  4    Q.  Did you ever get -- did he ever -- did you ever receive

10:01  5    those five weeks?

10:01  6    A.  No.

10:01  7    Q.  Do you remember which five weeks those five weeks are from;

10:01  8    can you remember?

10:01  9    A.  The problem with those five weeks is that they started

10:01 10    accumulating, you know, after -- I believe they started in May.

10:01 11    They started to roll over little by little.  When we got to

10:01 12    July, it was already five weeks.  You know, it's like May.

10:01 13    They pay us like, for example, two weeks after working one

10:01 14    week; and then they stopped paying us.  At the end of July it

10:01 15    was already five weeks' payment.  You know, when we were -- at

10:01 16    the point that I was working at Marine Towers -- that was

10:02 17    around the beginning of May -- that's when the problem started.

10:02 18    They stopped paying us according to, you know, the way they

10:02 19    were doing it before.  And so they started rolling over one by

10:02 20    one.  At the end of July it was already five weeks.

10:02 21    Q.  Did -- when you met with Mr. McCarroll, was anybody else

10:02 22    present with you at that particular time?

10:02 23    A.  No, not that I recall.

10:02 24    Q.  Did -- with respect to that particular issue at that time

10:02 25    did you meet with anybody else before or after Mr. Heidelberger

10:02  1   regarding that nonpayment issue?

10:02  2   A.  Well, everybody talk -- like when Heidelberger was here,

10:02  3   also Mr. M$^c$Carroll was here and Leiva, we were -- we talked

10:02  4   before the meeting why the meeting was going to be held because

10:02  5   everybody was going to quit.  They were going to leave the

10:02  6   company.

10:03  7   Q.  Did you meet with Mr. M$^c$Carroll yourself and talk to him?

10:03  8   A.  Of course I did talk to him.  I talked to him many times

10:03  9   about the problems.

10:03 10   Q.  What did -- can you recall anything specific Mr. M$^c$Carroll

10:03 11   would tell you?

10:03 12   A.  The same way that Mr. Heidelberger told me; that they were

10:03 13   going to fix the problem.  They didn't want to let me go

10:03 14   because my crew was one of the -- was the crew that made them

10:03 15   the most work, and they didn't want to let me go.  Mr.

10:03 16   M$^c$Carroll and Mr. Heidelberger are the reason why I didn't quit

10:03 17   because they assured me that they were going to pay me, pay me

10:03 18   the money that they owe me and work things out.

10:04 19   Q.  Mr. Leiva, did you speak with Mr. Leiva as well during this

10:04 20   period about the --

10:04 21   A.  I spoke to Mr. Leiva.  With Mr. Leiva it got to the point

10:04 22   that nobody could talk to him.

10:04 23   Q.  Why couldn't you talk to Mr. Leiva?

10:04 24   A.  Because he also threatened people to fire them, to fire the

10:04 25   people.

10:04  1    Q.  Did Mr. Leiva at all when you'd try to approach him, did he

10:04  2    get emotional in any way?

10:04  3    A.  All the time.  All the time.  He offered the street to

10:04  4    everybody all the time.  The person that I spoke the most about

10:04  5    my problems was Mr. M$^c$Carroll.

10:05  6    Q.  Are there any other -- any conversations in particular with

10:05  7    Mr. Heidelberger that we haven't discussed that you wanted to

10:05  8    point out, specifics that you remember?

10:05  9    A.  One of the big projects, Marine Towers.

10:05  10   Q.  What specifically was --

10:05  11          MR. KLEPPIN:  Objection with respect to --

10:05  12          THE COURT:  Sustained.

10:05  13   BY MR. KELLY:

10:05  14   Q.  Was there anything regarding the progress of the job that

10:05  15   you talked about with Mr. Heidelberger at that --

10:05  16          MR. KLEPPIN:  Objection; leading.

10:05  17          THE COURT:  Overruled.

10:05  18          MR. FELICIANO:  When I was working at Marine Towers,

10:05  19   one of our big projects, he was there seeing the process of

10:05  20   that project.  That project was really difficult because we had

10:05  21   a deadline.  We had to start -- we had like a month and a half

10:06  22   to finish that job.  And what I did in that job I was in a

10:06  23   scaffold.  A scaffold is the one that goes up and down, and I

10:06  24   was --

10:06  25          MR. KLEPPIN:  Objection to the narration.

10:06  1       **THE COURT:**  Sustained.

10:06  2   **BY MR. KELLY:**

10:06  3   Q.   I need you to go right into the -- only tell me what's

10:06  4   necessary to describe with respect to Mr. Heidelberger.

10:06  5   A.   When I was doing my job, he went there to supervise like

10:06  6   the few times he did on the other big jobs to make sure that

10:06  7   the job was done because we had a deadline to cover.

10:06  8   Q.   Did he say anything in particular that you can recall?

10:06  9   A.   He asked me about the -- how soon I think I was going to --

10:06 10   my crew was going to be able to finish the job that we had.  In

10:06 11   one of the conversations that we had, he did -- he told me --

10:07 12   he told me, I respect what you do because if -- no matter if

10:07 13   they pay me a million dollars I wouldn't get into a scaffold 12

10:07 14   floors up to do what you do there.  So, you know, he was there

10:07 15   watching what we were doing because in a way -- you know, I was

10:07 16   proud of what I was doing.  He wanted to make sure that the job

10:07 17   was done, and it was -- for him the way he told me it was

10:07 18   something that he wouldn't dare do it .

10:07 19       **MR. KELLY:**  I think at this time I don't have anything

10:07 20   further of the witness at this time.

10:07 21       **THE COURT:**  Cross-examination, Mr. Kleppin.

10:07 22                   **CROSS-EXAMINATION**

10:07 23   **BY MR. KLEPPIN:**

10:08 24   Q.   Good morning.

10:08 25   A.   Good morning.

10:08  1   Q.   Now, with respect to what you earned at Safe Hurricane

10:08  2   Shutters it was about a thousand dollars a week; isn't that

10:08  3   true?

10:08  4   A.   Yes, sir.

10:08  5   Q.   And so for the year 2007 your testimony was you worked from

10:08  6   January till about the end of September; isn't that true?

10:08  7   A.   Yes.

10:08  8   Q.   Okay.  So that would be -- 4.33 weeks in a month, nine

10:08  9   months.  That would be right at about 40 weeks, correct?

10:09 10   A.   About right.

10:09 11   Q.   Okay.  So a thousand dollars a week, that's about $40,000

10:09 12   you earned in 2007 while working at Safe Hurricane Shutters;

10:09 13   isn't that true?

10:09 14   A.   Yes, sir.

10:09 15        MR. KLEPPIN:  May I approach the witness, Your Honor?

10:09 16        THE COURT:  Yes, sir.

10:09 17   BY MR. KLEPPIN:

10:09 18   Q.   Mr. Feliciano, I'm handing your 2007 individual income tax

10:09 19   return.  Do you see that?

10:09 20   A.   Yes, I do.

10:09 21   Q.   And do you see on line 7 for wages, salaries, and tips you

10:09 22   have listed $11,299 as your income; isn't that true?

10:09 23   A.   Yes, I did.

10:09 24   Q.   You have one W-2 attached to this income tax return, don't

10:09 25   you?

10:09   1   A.  You had to be there.

10:09   2   Q.  Don't take my word for it.  Find it in there.  Do you have

10:10   3   it?

10:10   4   A.  Yes.

10:10   5   Q.  And that's from King Motor Company of Coconut Creek where

10:10   6   you earned $11,299 in the latter part in 2007 after you stopped

10:10   7   working for Safe Hurricane Shutters; isn't that true?

10:10   8   A.  That's true.

10:10   9   Q.  So you didn't declare any of your earnings at Safe

10:10   10   Hurricane Shutters on your income tax return for 2007, correct?

10:10   11   A.  That's true.

10:10   12   Q.  And in this particular case -- I have your answers to

10:10   13   interrogatories -- you're seeking $105,000; isn't that true?

10:10   14   A.  I'm seeking what is entitled by law of the work that I did.

10:10   15           **MR. KLEPPIN:**  May I approach the witness, Your Honor?

10:10   16           **MR. KELLY:**  Your Honor, may I have a sidebar just for

10:10   17   a moment?

10:10   18           **THE COURT:**  No.

10:10   19   **BY MR. KLEPPIN:**

10:10   20   Q.  You're seeking $105,300.  That's what you're seeking

10:11   21   according to your interrogatory answer, correct?

10:11   22   A.  Yes.

10:11   23           **THE COURT:**  You mean in this case?  Is that what

10:11   24   you're asking?

10:11   25           **MR. KLEPPIN:**  Yes.  In this case.

10:11  1          THE COURT:  Oh.

10:11  2          MR. FELICIANO:  Yes.

10:11  3          THE COURT:  That wasn't clear.

10:11  4          MR. KELLY:  Object for the record based on a previous

10:11  5     ruling by Judge Cohn.

10:11  6          THE COURT:  Overruled.

10:11  7          MR. KELLY:  Wow.

10:11  8     BY MR. KLEPPIN:

10:11  9     Q.  You are certainly -- if this jury awards you $105,300 or

10:11 10     whatever they award you, you're not going to pay your income

10:11 11     taxes on it, are you?

10:11 12     A.  That's no true because I pay my taxes.

10:11 13     Q.  Okay.  Let's take a look at your 2006 return.

10:11 14          MR. KLEPPIN:  May I approach, Your Honor?

10:11 15          THE COURT:  Yes, sir.

10:11 16     BY MR. KLEPPIN:

10:11 17     Q.  I've handed you your 2006 income tax return.  Do you see

10:11 18     that?

10:11 19     A.  Yes, I do.

10:11 20     Q.  And in 2006 you worked about according to your testimony

10:12 21     about five months or about 21, 22 weeks, correct, with the

10:12 22     company?

10:12 23     A.  Yes, sir.

10:12 24     Q.  You'd earned about $20,000, right, in '06?

10:12 25     A.  Yes, sir.

10:12  1  Q.  And in 2006 you have listed as your wages, salaries, tips

10:12  2  in that column of the return $8,171, correct?

10:12  3  A.  Yes, sir.

10:12  4  Q.  And you have a W-2 attached or do you know this already?

10:12  5  You do not need to look at the W-2?

10:12  6  A.  Yeah.

10:12  7  Q.  You have the W-2 attached from an investors management

10:12  8  trust, correct?

10:12  9  A.  Yes.

10:12  10  Q.  That has nothing to do with your income at Safe Hurricane

10:12  11  Shutters, right?

10:12  12  A.  No, it don't.

10:12  13  Q.  So for 2006 you didn't declare any of your income from Safe

10:12  14  Hurricane Shutters on your Federal income tax return, correct?

10:12  15  A.  I didn't.

10:12  16  Q.  So you want this jury to award you money and enable you to

10:13  17  evade taxes; isn't that true?

10:13  18  A.  That's not true.

10:13  19  Q.  I have another question for you, and that is with respect

10:13  20  to these cash -- these payments, you just described very

10:13  21  clearly in your conversation with Mr. Kelly where you

10:13  22  complained to Mr. Heidelberger about you're behind in getting

10:13  23  paid allegedly and he was going to make it better.  Do you

10:13  24  remember that?

10:13  25  A.  Yes.

10:13  1   Q.  Conspicuously absent from your testimony was any mention,

10:13  2   any, that you talked to him about overtime; isn't that true?

10:13  3   A.  I talked about the money that they owe me.

10:13  4   Q.  On direct you didn't say anything about the overtime, and

10:13  5   that's because you didn't say anything to Mr. Heidelberger

10:13  6   about the overtime; isn't that true?

10:13  7   A.  At that time it didn't come to my mind, overtime.

10:13  8   Q.  It didn't?  According to you you were working almost around

10:14  9   the clock.  You were working from dawn to dusk every day; isn't

10:14 10   that true?

10:14 11   A.  That's true.

10:14 12   Q.  Six days a week, right?

10:14 13   A.  That's true.

10:14 14   Q.  And it never entered your mind that, Gee, maybe you should

10:14 15   talk to Mr. Heidelberger or Mr. McCarroll or whoever about all

10:14 16   these hours you're allegedly working; isn't that true?

10:14 17   A.  That's true.

10:14 18   Q.  It's because you didn't work them?

10:14 19   A.  Yes, I did.  Yes, I did.

10:14 20   Q.  So in late July -- let me get this straight.  They're

10:14 21   already five weeks behind in paying you your wages; isn't that

10:14 22   true?

10:14 23   A.  Yes, sir.

10:14 24   Q.  But you worked all the way until the end of September

10:14 25   according to you?

10:14 1    A.   Yes, I did.

10:14 2    Q.   Uh-huh (affirmative).  And your testimony is all that time

10:14 3    you weren't paid anything.  Is that what you're saying?

10:14 4    A.   I was behind five weeks, and they -- from August to

10:14 5    September after I met with Mr. Heidelberger, they paid me one

10:14 6    week.  They made some payments in cash, but then they never

10:15 7    paid me the five weeks that they owe me.

10:15 8    Q.   Before you left that company, you were paid every penny of

10:15 9    what you were owed; isn't that true?

10:15 10   A.   No.

10:15 11   Q.   And you never --

10:15 12   A.   No.

10:15 13   Q.   You never put any of these what you claim failure to be

10:15 14   paid for weeks worked, you never put any complaints about that

10:15 15   in writing to the company; isn't that true?

10:15 16   A.   I couldn't do it.

10:15 17   Q.   You don't know how to write?

10:15 18   A.   I have a right, but I couldn't do it because I was offered

10:15 19   the street.

10:15 20   Q.   The question is:  Did you -- you did not put any complaints

10:15 21   about not being paid in writing to either -- to the company,

10:15 22   correct?

10:15 23   A.   Not to the --

10:15 24   Q.   Yes or no?

10:15 25   A.   Not in writing.  Not in writing.

10:15 1   Q.   Okay.  You also didn't make any complaints in writing to

10:15 2   Mr. Heidelberger about not getting paid money, correct?

10:15 3   A.   Not in writing.

10:15 4   Q.   Or Mr. M$^{c}$Carroll, correct?

10:15 5   A.   Not in writing.

10:15 6   Q.   Or even Mr. Leiva?

10:15 7   A.   Not in writing.

10:15 8   Q.   Okay.  Now, your attorney introduced into evidence

10:16 9   Plaintiffs' Exhibit Number 21.  Is that still up on the witness

10:16 10  stand?

10:16 11  A.   Which one is that one?

10:16 12  Q.   And Plaintiffs' Exhibit 21 consists of two checks, doesn't

10:16 13  it?

10:16 14  A.   Yes.

10:16 15  Q.   The first check is for a thousand dollars.  It's dated

10:16 16  August 6th of '07, correct?

10:16 17  A.   Uh-huh (affirmative).

10:16 18  Q.   Yes?

10:16 19  A.   Yes.

10:16 20  Q.   And the second check is dated August 13th, 2007, for $1500,

10:16 21  correct?

10:16 22  A.   Hold on.  August 6th.  Yeah.  Yes.

10:17 23  Q.   The $1500 check they're paying you for a week's worth --

10:17 24  one-and-a-half weeks' worth of work; isn't that true?

10:17 25  A.   Part of the money that they owe me, yes.

10:17   1    Q.  They're catching up on these payments, aren't they?

10:17   2    A.  They owe me five weeks.  They gave me $500, $500 that week.

10:17   3    Q.  I'm not disputing with you that they may have been late

10:17   4    paying you.  The issue is they're making it up to you, and

10:17   5    that's what we're seeing in Plaintiffs' Exhibit 21?

10:17   6    A.  That's true.  $500 of that five weeks.  Still owe me money.

10:17   7    Q.  Okay.  And we're going to get to the rest of that money.

10:17   8             MR. KLEPPIN:  May I approach, Your Honor?

10:17   9             THE COURT:  Yes, sir.

10:17  10    BY MR. KLEPPIN:

10:17  11    Q.  I'm going to show you what we've marked for identification

10:17  12    purposes as Defendants' Exhibit Number 31.  It's a handwritten

10:17  13    note where you signed for the receipt of a thousand dollars;

10:17  14    isn't that true?

10:18  15    A.  Yes, sir.

10:18  16    Q.  And Ed Leiva filled this out for you and had you sign it to

10:18  17    prove that you were paid?

10:18  18    A.  Yes, sir.

10:18  19    Q.  And that's as late as August 28th you're paid a thousand

10:18  20    dollars, and that payment is for the week of August 3rd, 2007;

10:18  21    isn't that true?

10:18  22    A.  Yes, sir.

10:18  23    Q.  Okay.  And then if you could turn the page, there's more of

10:18  24    these because Mr. Ed Leiva had you actually sign for the

10:18  25    receipt of these cash payments that he gave you; isn't that

10:18  1   true --

10:18  2   A.  Yes.

10:18  3   Q.  -- towards the end of your employment there?

10:18  4   A.  Yes, sir.

10:18  5   Q.  And if you take a look at the next one, it's dated

10:18  6   September 1st of '07.  He's still paying you.  There he paid you

10:18  7   for the week of August 10th of '07; isn't that true?  It's all

10:18  8   written here.

10:18  9   A.  Yeah.  That's true.

10:18  10  Q.  Okay.  And if you could turn the page to the last sheet

10:18  11  there --

10:18  12  A.  Uh-huh (affirmative).

10:18  13  Q.  -- there's an outline of other cash payments that you've

10:19  14  been paid; isn't that true?

10:19  15  A.  Yes, sir.

10:19  16  Q.  Do you know that Mr. Leiva -- you do know he paid you that

10:19  17  money out of his pocket?

10:19  18  A.  No, he didn't.

10:19  19  Q.  The company didn't have any money then.  You know that,

10:19  20  don't you?

10:19  21  A.  No, he didn't.

10:19  22  Q.  Now, with respect to your testimony about -- just so I'm

10:19  23  clear, with respect to what you claim are minimum wage

10:19  24  violations, none of those alleged violations were ever

10:19  25  complained by you to anyone in the company in writing, correct?

10:19  1    A.  Not in writing.

10:19  2    Q.  Okay.  If you could take a look at Plaintiffs' Exhibit 23.

10:19  3    It's on your -- yes.  Exactly.  It's up on the stand there.

10:19  4    Thank you.  And that is a letter that's written by Brad Bungo

10:20  5    to whom it may concern stating that you're an installer there

10:20  6    earning $800 a week, correct?

10:20  7    A.  That was at the beginning of my job, yes.

10:20  8    Q.  Right.  And the letter will say to the jury when the letter

10:20  9    was dated.  It's August 25th of '06.  This is when you were

10:20 10    making 800 before you got the raise to a thousand a week,

10:20 11    correct?

10:20 12    A.  Yes, sir.

10:20 13    Q.  Okay.  And if you notice there, it says that what you're

10:20 14    earning -- the author, Brad Bungo, you know who he is, don't

10:20 15    you?

10:20 16    A.  Yes.

10:20 17    Q.  He was the controller, right?

10:20 18    A.  Yes, sir.

10:20 19    Q.  He was the guy in charge of all the financial issues in the

10:20 20    company?

10:20 21    A.  Yes, sir.

10:20 22    Q.  And he says that you're earning $800 a week, correct?

10:20 23    A.  Yes, sir.

10:20 24    Q.  You understand what a week is.  It's a block of time

10:20 25    between Sunday and Saturday.  168 hours.

10:20  1    A.  It was supposed to be --

10:20  2    Q.  Right?

10:20  3    A.  -- for 40 hours' work.

10:20  4    Q.  The question is:  You understand what a week is?  It's a

10:20  5    back of time seven days in a row that are 24 hours, 168 hours

10:20  6    in a row Sunday to Saturday, correct?

10:20  7    A.  Yeah.  That's a week.

10:20  8    Q.  And this letter characterizes how you would be paid at $800

10:21  9    a week, correct?

10:21  10   A.  That's what the letter says, yes.

10:21  11   Q.  It doesn't say that you're to be paid $800 for the first 40

10:21  12   hours you work and the hours if you work any after that aren't

10:21  13   going to be compensated, correct?

10:21  14   A.  It doesn't say that.

10:21  15   Q.  If you're real -- that means then that the deal that you

10:21  16   made with Ed Leiva was for $800 a week.  Otherwise you would

10:21  17   have gone to the company and said, No, Brad Bungo, you need to

10:21  18   change that.  I'm not getting paid $800 a week.  I don't want

10:21  19   that in writing anywhere.  I get $800 for only my first 40

10:21  20   hours.  But you didn't do that, did you?

10:21  21   A.  No, I didn't do it.

10:21  22   Q.  That's why we have this letter today, right, because you

10:21  23   didn't.  Correct?

10:21  24   A.  I didn't.  Was that a question?

10:21  25   Q.  Yes.

APRIL 14, 2011

10:21  1   A.  Can you repeat it?

10:21  2   Q.  Yeah.  That's why the letter exists, and it's unrebutted.

10:21  3   There's no writing saying, Wait a minute.  You've made a

10:21  4   mistake here, Company.  Don't mischaracterize how you're paying

10:22  5   me.

10:22  6   A.  That's what the letter says, yes.

10:22  7   Q.  That never happened, right.  Okay.  Now, you say you have

10:22  8   this minimum wage claim that you were paid late, and I want to

10:22  9   show you where you were asked to describe what the alleged

10:22 10   violations were of the Fair Labor Standards Act in an

10:22 11   interrogatory in this case.  And for some reason I only have

10:22 12   one copy of this, so we'll read this together.

10:22 13        Interrogatory 2 states, Describe in detail each act or

10:22 14   omission on the part of defendants of any of its employees that

10:22 15   you contend constituted a violation of the Fair Labor Standards

10:22 16   Act including but not limited to an explanation of all facts

10:22 17   supporting your claim that such a violation occurred.

10:22 18        Answer, Plaintiff was never paid overtime wages as

10:23 19   required by the Fair Labor Standards Act for any of the hours

10:23 20   that he worked for the defendants as stated above over 40 hours

10:23 21   weekly.

10:23 22        Isn't that what that states?

10:23 23   A.  Yes, sir.

10:23 24   Q.  Okay.  No mention that any of these late payments is a

10:23 25   violation of the Fair Labor Standards Act; isn't that true?

JURY TRIAL - VOLUME IV OF VI

10:23  1    A.  I don't understand what --

10:23  2    Q.  I read your answer into the record accurately, correct?

10:23  3    A.  Yes.  Yes, you did.

10:23  4    Q.  It only mentions overtime?

10:23  5    A.  Yes, it does.

10:23  6    Q.  It doesn't say anything about any of these alleged late

10:23  7    payments that now you claim you never even got, correct?

10:23  8    A.  It doesn't say anything.

10:23  9    Q.  And this cash that Mr. Leiva gave you, you didn't declare

10:23 10    that on your tax return either, did you?

10:23 11    A.  No, I didn't.

10:23 12    Q.  What?

10:23 13    A.  No, I didn't.

10:23 14    Q.  The interrogatory asked you to describe the facts and

10:23 15    circumstances behind any alleged violations of the Fair Labor

10:24 16    Standards Act.  And you pointed out you believe you have an

10:24 17    overtime claim.  Conspicuously absent from your answer is any

10:24 18    mention of the facts involved; isn't that true?

10:24 19    A.  You have to rephrase in a better way.

10:24 20    Q.  In the answer we read in, you don't mention anything about

10:24 21    what your work hours were, correct?

10:24 22    A.  No, I don't.

10:24 23    Q.  You don't mention what days you worked and what days you

10:24 24    didn't, correct?

10:24 25    A.  No.  It doesn't say that.

APRIL 14, 2011

10:24  1   Q.  All right.  With respect to who drove the truck on your

10:24  2   crew, you told Mr. Kelly you drove the truck, right?

10:24  3   A.  Most of the time, yes.  90 percent of the times I drove the

10:24  4   truck.

10:24  5   Q.  Okay.  Mr. Ibacache told us the other day he drove the

10:24  6   truck some.  Remember that?

10:24  7   A.  Sometimes.  Yeah.  That's true.

10:24  8   Q.  Chris Jerico was the driver of the truck on your crew;

10:25  9   isn't that true?

10:25  10  A.  He wasn't on my crew.

10:25  11  Q.  Never?

10:25  12  A.  He was the one that gave me the training at the beginning,

10:25  13  and then the company assigned me a crew.  My crew was Rolando

10:25  14  Ibacache and -- I forgot the other name -- Catalan, Ruben

10:25  15  Catalan.  Not me.

10:25  16  Q.  You can remember these alleged conversations you had five

10:25  17  years ago with Steve Heidelberger that amounted to nothing, but

10:25  18  you can't remember who was on your crew?

10:25  19  A.  I just told you.  Rolando Ibacache, Ruben Catalan, and

10:25  20  myself.  That was the crew.

10:25  21  Q.  I thought Mr. Milan was on your crew?

10:25  22  A.  No.  Milan was on a different crew, and he worked like

10:25  23  maybe two or three jobs at the houses with us because there was

10:25  24  times that not only one crew went to the job site.  Depends on

10:26  25  how big the work was.

APRIL 14, 2011

10:26  1   Q.   The two months that Mr. Milan worked, he worked on your

10:26  2   crew; isn't that true?

10:26  3   A.   No, he didn't work on my crew.

10:26  4   Q.   A couple of questions that I have about your hours in

10:26  5   general.  Certainly, certainly you won't dispute that your

10:26  6   hours every week varied?

10:26  7   A.   Yes, they did.

10:26  8   Q.   And they, in fact, varied greatly; isn't that true?

10:26  9   A.   It was about the same time, like I said, from 5:30/6:00

10:26 10   o'clock at the beginning.  In the summertime it was around

10:26 11   6:30/7:00 o'clock.  I said that.

10:26 12   Q.   So rarely -- if we actually had exact time records, rarely

10:27 13   would your hours be the same, correct?

10:27 14   A.   It wouldn't be the same.

10:27 15   Q.   Okay.

10:27 16   A.   On an average it would be about the same amount of time;

10:27 17   but it wouldn't be the same, exact same amount of hours.

10:27 18   Q.   So with the fact that the hours that you worked varied

10:27 19   every week you were paid -- the checks that I'm giving you show

10:27 20   that each week your pay would be the same?

10:27 21   A.   Yes.

10:27 22   Q.   You would get the same salary, correct?

10:27 23   A.   Yes.

10:27 24   Q.   And you cashed these checks every week, correct?

10:27 25   A.   Yes, I did.

10:27   1   Q.   Okay.  You never disputed that these checks weren't for the
10:27   2   right amount as to what you were to be paid.  You cashed them,
10:27   3   right?
10:27   4   A.   Yeah, I did.
10:27   5   Q.   Okay.  And so from cashing those checks, that certainly
10:27   6   taught you that regardless of how many hours I work in a week,
10:27   7   that's the money I'm going to receive from the company?
10:27   8   A.   Unfortunately that was the way.
10:27   9   Q.   So the sides -- the two sides, you and the company, had a
10:28  10   very clear and mutual understanding that no matter how many
10:28  11   hours you worked that's what you get paid?
10:28  12   A.   That wasn't the case.
10:28  13   Q.   I'm sorry?
10:28  14   A.   That wasn't the case.
10:28  15   Q.   Wait a minute.  For all the months that you've talked about
10:28  16   that you've worked and you would get the same salary -- I know
10:28  17   there was a raise or whatever, but it was always a salaried
10:28  18   rate.  No matter how many hours you worked you'd get that
10:28  19   salary.  You had to have had a clear and mutual understanding
10:28  20   that no matter how many hours I work, that's what my pay's
10:28  21   going to be because it happened for over a year, correct?
10:28  22   A.   The problem was that we had an agreement.
10:28  23   Q.   Yes or no.  Then you can explain.
10:28  24   A.   Yes.
10:28  25   Q.   Okay.

JURY TRIAL - VOLUME IV OF VI

10:28  1   A.   Yes.

10:28  2   Q.   Now, you never kept track of your own hours, correct?

10:28  3   A.   The company is supposed to keep track of the hours that I

10:28  4   worked.

10:28  5   Q.   That's not what I'm asking.

10:28  6   A.   I know the hours that I worked.

10:28  7   Q.   Not what I'm asking.  Did you keep -- you didn't keep track

10:29  8   of your own hours?

10:29  9   A.   I know the hours that I worked on an average.  I didn't

10:29  10  track the hours completely.

10:29  11  Q.   It never dawned on you, Gosh, I'm working from almost dawn

10:29  12  to dusk.  I think I'm going to start creating a log of the

10:29  13  actual hours that I'm working because, gee, there must be

10:29  14  something wrong with this under the law.  This just can't be.

10:29  15  That never dawned on you, did it?

10:29  16  A.   It didn't.

10:29  17  Q.   Actually the reason why you never kept a log of your hours

10:29  18  is because if you really wanted to know what hours you worked,

10:29  19  we could get the logs when your crew logged in on Points of

10:29  20  America, and Marine Tower and these bigger projects that you

10:29  21  worked on for a months; isn't that true?

10:29  22  A.   Yeah.  You could get that.

10:29  23  Q.   And you don't have them on your exhibit list, do you?

10:29  24  A.   No, I don't have it.

10:29  25  Q.   Yeah.  You didn't go get them, did you, to prove what you

10:29  1    really worked when you really got there and when you really

10:29  2    left everyday.  Isn't that true?

10:30  3    A.  I didn't know I could get them.

10:30  4    Q.  You didn't know you could -- you certainly knew you could

10:30  5    subpoena or go obtain the logs that would show the real hours

10:30  6    you worked.  You knew you'd have to come into court and prove

10:30  7    it, and you didn't do it; isn't that true?

10:30  8    A.  Didn't do it.

10:30  9    Q.  And you didn't do it because you want to greatly

10:30  10   overestimate your hours so you can get tens of thousands of

10:30  11   dollars that you're then not going to declare on your income

10:30  12   tax return?  Isn't that what's going on here?  It's obvious.

10:30  13   A.  That's not the case.

10:30  14   Q.  Isn't it true that when the ground would get wet you

10:30  15   couldn't work?

10:30  16   A.  No.  When there was a really bad storm, raining, we stopped

10:30  17   until the storm stopped; and then we kept working.

10:30  18          THE COURT:  Okay.  Before we take another question,

10:31  19   we'll take our morning recess, Members of the Jury.  We'll be

10:31  20   in recess for 15 minutes.

10:31  21          THE MARSHAL:  All rise for the jury.

10:31  22          THE COURT:  Take the jury out.

10:31  23      (Jury Out)

10:31  24          THE COURT:  Court's in recess.

10:31  25          MR. KLEPPIN:  Your Honor, if we could just -- one

APRIL 14, 2011

| | | |
|---|---|---|
| 10:31 | 1 | second.  Mr. Leiva would really like some sort of a note from |
| 10:31 | 2 | his employer that he's here and there's a trial.  He's -- |
| 10:31 | 3 | THE COURT:  I'll be happy to do that. |
| 10:31 | 4 | MR. KLEPPIN:  Thank you, Your Honor. |
| 10:31 | 5 | THE COURT:  Would you take care of that, Ms. Rickert? |
| 10:31 | 6 | THE LAW CLERK:  Okay. |
| 10:31 | 7 | MR. KLEPPIN:  We'll give her the details, the name of |
| 10:31 | 8 | the employer and telephone number, whatever. |
| 10:31 | 9 | THE COURT:  Yeah. |
| 10:31 | 10 | MR. KLEPPIN:  Okay.  Thank you. |
| 10:31 | 11 | THE COURT:  Very good. |
| 10:31 | 12 | MR. KLEPPIN:  Thank you. |
| 10:45 | 13 | (Recess) |
| 10:45 | 14 | THE LAW CLERK:  All rise. |
| 10:45 | 15 | THE COURT:  All right.  Bring the jury in, Mr. |
| 10:46 | 16 | Marshal. |
| 10:46 | 17 | (Jury In) |
| 10:46 | 18 | THE COURT:  Okay.  Mr. Kleppin, you may continue your |
| 10:46 | 19 | cross-examination. |
| 10:46 | 20 | MR. KLEPPIN:  Thank you, Your Honor. |
| 10:46 | 21 | BY MR. KLEPPIN: |
| 10:46 | 22 | Q.  Mr. Feliciano, I have in my notes that through Mr. Kelly |
| 10:46 | 23 | you had said that you would get the work assignments from Mr. |
| 10:46 | 24 | McCarroll? |
| 10:46 | 25 | A.  Yes. |

10:46 1  Q.  Okay.  See the issue with that is that doesn't really work

10:47 2  for you because you acknowledge that Mr. M$^c$Carroll was only

10:47 3  there two to three weeks every month.  So did you -- you didn't

10:47 4  work the week to two weeks a month that Mr. M$^c$Carroll wasn't

10:47 5  there to hand out your work assignment?

10:47 6  A.  Like I said in my -- before, if I didn't get the work

10:47 7  orders from Mr. M$^c$Carroll, I got it from Mr. Leiva.

10:47 8  Q.  The vast majority of the time you got those work orders

10:47 9  from Mr. Leiva and you know it?

10:47 10  A.  Yeah.  I got it most of the time from Mr. Leiva.  Mr.

10:47 11  M$^c$Carroll also gave me work orders.

10:47 12  Q.  Now, you had said that you had all these telephone calls,

10:47 13  cellular telephone calls with Mr. M$^c$Carroll, didn't you?

10:47 14  A.  Yes.

10:47 15  Q.  About work-related things?

10:47 16  A.  Yes, sir.

10:47 17  Q.  And the cellular companies, they track all of those phone

10:47 18  calls; and you didn't bring in any records, did you, of the

10:48 19  phone -- the cellular phone calls you allegedly had with Mr.

10:48 20  M$^c$Carroll to prove that you really needed to follow up about

10:48 21  work-related things with him, did you?

10:48 22  A.  The cellular phone was the company phone.

10:48 23  Q.  Is the answer to the question yes?

10:48 24  A.  No.  No, I didn't bring it.

10:48 25  Q.  I want to back up just for a moment about actually how you

10:48  1  found this job at Safe Hurricane Shutters.  Didn't you come to

10:48  2  this country approximately May of '06?

10:48  3  A.  Yes, sir.

10:48  4  Q.  Okay.  And where you're from you were the backup singer in

10:48  5  a salsa band, correct?

10:48  6  A.  Yes, sir.  Yeah.

10:48  7  Q.  So -- and you admit you knew nothing, nothing about the

10:48  8  installation of hurricane shutters before you got a job with

10:48  9  this company, correct?

10:48 10  A.  That's true.

10:48 11  Q.  And they taught you a trade, didn't they?

10:48 12  A.  Yeah.

10:49 13  Q.  You acknowledge when you first learn how to hang hurricane

10:49 14  shutters -- 'cause you keep saying you were the best crew --

10:49 15  you couldn't have been the best installer when you first learn

10:49 16  how to do something; isn't that true?

10:49 17  A.  I became the -- we became the best installer once we got

10:49 18  our training.

10:49 19  Q.  You were a good installer, not the best; isn't that more

10:49 20  accurate?

10:49 21  A.  I was the best.  My crew was the best, and they know that.

10:49 22  They know it.

10:49 23  Q.  You actually -- now, you worked in this apartment complex

10:49 24  where a number of people worked who worked at Safe Hurricane

10:49 25  Shutters, correct?

10:49 1    A.   Yes, sir.

10:49 2    Q.   Okay.  And you actually found out what a great job this

10:49 3    was, how good the pay was and how good the working conditions

10:49 4    were.  And that's why you quit what you were doing and you went

10:49 5    and got a job at Safe Hurricane Shutters, correct?

10:49 6    A.   They promised me some stuff.  And I said, Well, it's good.

10:49 7    Let's take the job.

10:49 8    Q.   So the answer to the question is yes with that explanation?

10:49 9    A.   Yes.

10:49 10   Q.   Ed Leiva hired you, right?

10:49 11   A.   Yes, he did.

10:50 12   Q.   Ed Leiva told you all about the job, right?

10:50 13   A.   Yes, sir.

10:50 14   Q.   There were times you stopped working because of rain,

10:50 15   lightning, whatever at 2:00/3:00 o'clock and you went back to

10:50 16   shop; isn't that true?

10:50 17   A.   That's not true.

10:50 18   Q.   That's not true?

10:50 19   A.   That's not true.  We stopped.  When the rain was over, we

10:50 20   kept going until we finished the job.

10:50 21           MR. KLEPPIN:  May I approach the witness, Your Honor?

10:50 22           THE COURT:  Yes, sir.

10:50 23   BY MR. KLEPPIN:

10:50 24   Q.   Page 32 of your deposition, line 6, Were there ever times

10:50 25   when you finished a job early 2:00/3:00 in the afternoon and

10:50    1    you would return back to the shop?  Answer, Yes.

10:50    2        Did I read your former testimony into the record

10:50    3    accurately?

10:50    4    A.   Yes.

10:50    5    Q.   Okay.  And that's what would happen for all sorts of

10:50    6    reasons.  You'd have to quit at 2:00 or 3:00 and come back to

10:51    7    the shop.  That's what those records at Points of America and

10:51    8    Marine Tower would show, wouldn't they?

10:51    9    A.   Sometimes it happens, yes.  Yes.

10:51   10    Q.   But unlike what Mr. Ibacache said, you certainly are not

10:51   11    foolish enough to work in rain and heavy lightning and wind

10:51   12    conditions that aren't safe; isn't that true?

10:51   13    A.   When there was times that there was bad weather -- there

10:51   14    weren't not many -- we stopped.

10:51   15    Q.   There are also a lot of days at Points of America and

10:51   16    Marine Tower that you did not go directly to those job

10:51   17    locations from the shop; that you guys would go stop and have

10:51   18    breakfast and eat and lounge around for an hour or two and then

10:51   19    get to those locations; isn't that true?

10:51   20    A.   That's not true because we had to be there by 9:00.

10:51   21    Q.   And that's why you didn't bring the records to those

10:51   22    condominiums here in this court case; isn't that true?

10:51   23    A.   No.  That's not true.

10:51   24    Q.   You by your own admission were the foreman or head of the

10:51   25    crew; isn't that true?

JURY TRIAL - VOLUME IV OF VI

10:52  1   A.   Yes, sir.

10:52  2   Q.   And really because you're working away from the shop where

10:52  3   someone's really supervising you, you're really on an honor

10:52  4   system as when you get to the job location and how hard you

10:52  5   work when you get there and what it is that you would do; isn't

10:52  6   that true?

10:52  7   A.   Repeat the question.

10:52  8   Q.   You weren't supervised by anybody.  You worked off site,

10:52  9   correct?

10:52  10  A.   Yes, sir.

10:52  11  Q.   Okay.  And because of that you're really on an honor system

10:52  12  with respect to how hard you would work, how many breaks you

10:52  13  would take and how long they would be; isn't that true?

10:52  14  A.   I still don't understand what you are trying to say.

10:52  15  Q.   In other words, working away from any sort of direct

10:52  16  supervision, that puts you on an honor system as to how hard

10:52  17  you're going to work; isn't that true?

10:52  18  A.   The honor system, that's what I'm trying to understand what

10:52  19  you are trying to --

10:52  20  Q.   Yes.  In other words, your boss isn't there at the job on

10:52  21  location telling you, Okay, do this now and, you know what,

10:53  22  we're not taking a break now.  In fact, we're not going to have

10:53  23  one day today and, you know what, we're not going to stop for

10:53  24  breakfast before we get to the location and, no, we're not

10:53  25  going to leave yet.  We're working another hour.  There was no

10:53  1    boss directing you to do that at your job site.  Do you

10:53  2    understand what I'm saying?

10:53  3    A.   Yeah.  That's true.

10:53  4    Q.   Okay.  That was you -- as crew leader, that was your

10:53  5    decision day in and day out, correct?

10:53  6    A.   Yes, sir.

10:53  7    Q.   Now, we heard -- we just heard Mr. Ibacache deny that there

10:53  8    was even one lunch and then where he admitted in his deposition

10:53  9    he took a half an hour for lunch everyday.  Isn't it true that

10:53  10   on your crew you took a half an hour to an hour for lunch every

10:53  11   day?

10:53  12   A.   Never.

10:53  13   Q.   You're going to tell this jury you worked hard labor from

10:53  14   7:00 in the morning to 7:00 at night six days a week for over a

10:53  15   year and you never once took lunch?

10:53  16   A.   I didn't say that I worked from 7:00 o'clock to 7:00 at

10:53  17   night every day.  I told you that the times that I told you

10:53  18   that I worked were average approximately.

10:54  19   Q.   Well, believe me, I have some questions about your

10:54  20   averages.  We will get into that.

10:54  21   A.   Yeah.  Go ahead.

10:54  22   Q.   We will get into that shortly.

10:54  23   A.   Yes.

10:54  24   Q.   But the question that I have for you now is your testimony

10:54  25   really is, I worked from -- whether it's 7:00 to 7:00 or 7:00

10:54  1   to 6:00, I'm sure -- I'm still unclear as to what that is.  Pre
10:54  2   this trial you were at 11 hours a day.  Are you still at 11
10:54  3   hours a day or are you at 12:00?
10:54  4   A.  I said approximately between 10 and 11 hours a day
10:54  5   approximately.
10:54  6   Q.  Now it's 10 or 11.  Is it -- Mr. Ibacache was at 10.
10:54  7   Remember, he was at 60 hours of overtime he claimed he was
10:54  8   owed.  Do you remember that?
10:54  9   A.  Yes, sir.
10:54  10  Q.  You know in all your papers, your damages calculations,
10:54  11  you're at 66.  You're aware of that?
10:54  12  A.  On average 11 hours a day.
10:54  13  Q.  Okay.  So here's two crew members already that are in
10:54  14  disagreement.  They both have lawsuits going on, both retained
10:54  15  by the same lawyer that have a disagreement as to how many
10:55  16  hours were worked every week.  You understand that?
10:55  17  A.  Yeah.  I understand that.
10:55  18  Q.  Okay.
10:55  19  A.  Approximately for me it could be 11 hours, a little bit
10:55  20  more, a little bit less.  That's approximately.
10:55  21  Q.  So we'll leave it at 11 -- well, is it -- so we'll leave it
10:55  22  at whether it's 10 to 11 or 11 hours.  And you did this job for
10:55  23  about 54 weeks, didn't you, according to your testimony?
10:55  24  A.  Yes, sir.
10:55  25  Q.  And your testimony then is in that time as hard as it takes

JURY TRIAL - VOLUME IV OF VI

10:55  1    to do that sort of labor, hauling things and putting things up

10:55  2    and holding heavy drills that drill into concrete, that you

10:55  3    didn't stop for half an hour to an hour every day for lunch to

10:55  4    hydrate yourself and to renourish yourself.

10:55  5    A.   Yes.

10:55  6    Q.   That's your testimony to this jury?

10:55  7    A.   That's my testimony.  We got our lunch box.  We took our

10:55  8    drinks, whatever we got into the job.  And while we were

10:55  9    working we were drinking or taking a bite or doing something,

10:55  10   you know, to hydrate or eat; but we never stopped, you know,

10:55  11   like 11:00 o'clock to 12:00 o'clock, to stop to take lunch.  We

10:56  12   didn't do that.

10:56  13   Q.   You admit, sir, that with respect to your hours it's really

10:56  14   not an approximation.  It's a guess.  And you admit that.

10:56  15   You're guessing as to what hours you worked?

10:56  16   A.   Approximately.  That's an average.  That's what I -- from

10:56  17   the time that I started working till the time that I finish

10:56  18   including all the months that I worked, approximately it came

10:56  19   out to be 11 hours a day.

10:56  20   Q.   So what you've told the jury and what Mr. Kelly elicited

10:56  21   through you, your testimony right here from the stand is that

10:56  22   it's not a guess.  Is that your testimony?

10:56  23   A.   It's not a guess because if you take average -- you know,

10:56  24   if you put the amount of time that you work and the amount of

10:56  25   hours that you work and you divide it by how many hours you

10:56 1    work, you're going to get an average, an estimated

10:56 2    approximately amount of time.

10:57 3    Q.  I'm on page 52 of your deposition.  Could you take a look

10:57 4    at line 21 for me.

10:57 5            You were asked, Question, But again what are you doing

10:57 6    here?  This is a guess.  This is not based on any specific, I

10:57 7    worked at 7:30, I left at 7:00 at night, I worked this day at,

10:57 8    you know, 7:30.  I left this day at 4:00 p.m.  you don't have

10:57 9    those figures.  You don't have an exact number of overtime

10:57 10   hours that you worked?

10:57 11           Answer, I never kept that.  The company never gave us

10:57 12   that either.

10:57 13           And then on 53, Question, line 11, Question, But again

10:57 14   beyond the estimates that you've got, beyond the guesses that

10:57 15   you have put in your pleadings, you don't have an exact amount

10:57 16   of overtime.  You can't say, This is exactly what I'm owed.

10:57 17   This is the closest guess you can give today?

10:58 18           Answer, Yeah.

10:58 19           Did I read that testimony into the record accurately?

10:58 20   A.  Yes, sir.

10:58 21   Q.  Okay.

10:58 22   A.  Yes, sir.

10:58 23   Q.  And that's what we're left with.  We're left with --

10:58 24   because you didn't go get those logs from the condominiums,

10:58 25   we're left with a guessing game.  And it allows you to greatly

APRIL 14, 2011

10:58  1   expand what hours that you claim to have worked; isn't that

10:58  2   true?

10:58  3   A.   That's not true.  The hours that I worked, that was the

10:58  4   hours that I said to the jury and I said in my testimony.

10:58  5   Q.   You just told your lawyer that in the fall of 2006, the

10:58  6   fall, going all the way to December of '06 --

10:58  7   A.   Uh-huh (affirmative).

10:58  8   Q.   -- you said you worked at the location, the site until

10:58  9   6:30.  I have that right in my notes.

10:58 10   A.   What location?

10:58 11   Q.   The job location where you were to be working at.

10:58 12   A.   Oh, yeah.  Yes.

10:58 13   Q.   And you're sure of that.  I can see you're adamant about

10:58 14   that.

10:58 15   A.   Yeah.

10:58 16   Q.   You know that?

10:58 17   A.   Of course.  Yes.

10:58 18   Q.   The problem that you have with this is that in November and

10:58 19   December it gets dark at about 5:30, see.  So your testimony is

10:59 20   for the last hour you worked in the dark at the job site.

10:59 21   That's what you're saying?

10:59 22   A.   I'm not saying that.

10:59 23   Q.   You never worked in the dark; isn't that true?

10:59 24   A.   I always said on those months, at the beginning of the

10:59 25   months, we're always there between 5:00/5:30; and we got back

10:59 1    around 6:00/6:30, depends on the traffic.

10:59 2    Q.  The question is you never worked in the dark?

10:59 3    A.  Of course.  It's impossible.

10:59 4    Q.  Thank you.  Now, because -- as we've been through -- we've

10:59 5    just been through this.  To some extent you as the crew foreman

10:59 6    could determine when you'd get out to the job site, how many

10:59 7    breaks you'd take, how long they were, and when you would get

10:59 8    back to the warehouse shop at the end of the day.  To some

10:59 9    extent you could control your own hours; isn't that true?

10:59 10   We've been through that.

11:00 11   A.  In a way, yes.

11:00 12   Q.  Okay.  And, see, that's just it.  If you thought that this

11:00 13   company was making you work longer hours than what the deal

11:00 14   was, if you're really working 66 rather than 40, you as the

11:00 15   crew foreman would have shut that down in a minute --

11:00 16   A.  We tried.

11:00 17   Q.  -- and you would have made sure --

11:00 18   A.  We tried many times.

11:00 19   Q.  -- that you were only working 40; isn't that true?

11:00 20   A.  We tried many times.

11:00 21   Q.  How did you try?  See, it would be very easy.

11:00 22   A.  Talking --

11:00 23   Q.  Hold on.

11:00 24   A.  -- to Mr. Leiva --

11:00 25   Q.  Let me --

11:00  1   A.  -- about the problem.

11:00  2   Q.  Let me finish the question.  You could very easily have --

11:00  3   and let's say you did complain to Mr. Leiva.  It's very simple

11:00  4   with the situation that you had working off site; that if

11:00  5   you're mad about the hours you work, you just simply, You know,

11:00  6   we'll take two hours for lunch today because, you know, they're

11:00  7   making us work too long of an hour -- of a day.  We've

11:00  8   complained about it.  There's an issue here.  There's a million

11:00  9   ways you could shave off your work time, isn't there --

11:00  10  A.  But we didn't do it.

11:01  11  Q.  -- during the course of a day?

11:01  12  A.  We didn't do it.

11:01  13  Q.  Marine Tower, you worked there a number of months.  You

11:01  14  went through that with Mr. Kelly, correct?

11:01  15  A.  Like a month, month and a half.  Yes, sir.

11:01  16  Q.  Oh, it was longer than that, wasn't it?

11:01  17  A.  The duration of the project.

11:01  18  Q.  Okay.  Let's ask it that way.  Did any other crew work on

11:01  19  Marine Tower other than you or was that your baby --

11:01  20  A.  No.  There was --

11:01  21  Q.  -- that project?

11:01  22  A.  No.  There was other crews doing the job.

11:01  23  Q.  At Marine Tower they don't let you work there on Saturdays;

11:01  24  isn't that true?

11:01  25  A.  I don't recall, but I believe we did work on Saturdays too.

11:01 1  Q.  You're not sure.  I want you to really be sure about Marine

11:01 2  Tower.  Think back.  At Marine Tower you didn't work Saturdays,

11:01 3  did you?

11:01 4  A.  I know I worked Saturdays on that place.  I know.

11:01 5  Q.  Okay.  You're sure?  You have the recollection -- you've

11:02 6  thought in your mind, I remember it.  On Saturdays we would get

11:02 7  there.  You're sure?

11:02 8  A.  I worked so many places I really don't recollect if we

11:02 9  really worked on Saturdays at Marine Tower.

11:02 10  Q.  The question that I want to know is when you filled out the

11:02 11  damages calculations in this case and you said, I worked 66

11:02 12  hours every week, you never even thought to think back, Gee, at

11:02 13  Marine Tower did we work Saturdays?  That thought never even

11:02 14  crossed your mind, did it?

11:02 15  A.  If we didn't work on Saturdays at Marine Tower, we also had

11:02 16  to work somewhere else because we worked every Saturday.

11:02 17  Q.  I asked -- the question I asked, When you filled out the

11:02 18  damages calculations in this case saying, Oh, we worked 66

11:02 19  hours every week, you didn't think back, Gosh, did I -- did we

11:02 20  work Saturdays at Marine Tower?  You never thought about that,

11:03 21  did you?

11:03 22  A.  No, I didn't.

11:03 23  Q.  And you also never thought about how many hours you worked

11:03 24  on Saturday, did you?  Did you.

11:03 25  A.  No.  I thought about the hours that I worked on Saturdays.

11:03  1    Q.  And you never thought about the holidays you took either,

11:03  2    did you?

11:03  3    A.  How many holidays in a year?  Three?  Four?

11:03  4    Q.  I just -- the question isn't how many holidays there are.

11:03  5    The question is when you filled out your damages calculations

11:03  6    in this case, when you're seeking a lot of money from the

11:03  7    defendants, you never took into account the fact that you had

11:03  8    holidays, did you?

11:03  9    A.  Maybe I didn't.

11:03  10   Q.  You never took into account that you went back home that

11:03  11   one week for three or four days either, did you?

11:03  12   A.  No, I didn't.

11:03  13   Q.  And it's clear, isn't it, that when you come up with your

11:03  14   estimate, your damages, which we've shown is really a guess,

11:03  15   you -- everything that we've discussed is all heavily weighted

11:03  16   in favor of an overembellishment, an overexaggeration of the

11:04  17   number of hours that you worked so you can get more money.

11:04  18   Isn't that clear?

11:04  19   A.  It wasn't an overexaggeration.  The hours that I worked,

11:04  20   the time that I went to the place and the time I left, those

11:04  21   are true.  And I could -- I swear, and I'm doing it under oath

11:04  22   right now.  Those are the hours that I worked.

11:04  23   Q.  You did your tax return under penalty of perjury, both of

11:04  24   them; isn't that true?

11:04  25   A.  Unfortunately yes.

APRIL 14, 2011

11:04    1    Q.   On the bottom of both of those tax returns, it says that

11:04    2    you're signing those tax returns and what is true -- the

11:04    3    information that is contained thereon under penalty of perjury

11:04    4    is true; isn't that true?

11:04    5    A.   That's true.

11:04    6    Q.   With respect to the work orders -- we talked about those

11:04    7    briefly -- isn't a work order just a piece of paper that says

11:04    8    work order on it and has a brief description of the work that

11:04    9    would be -- needed to be done out on the job site that day in

11:05   10    general terms?

11:05   11    A.   In general terms, yes.

11:05   12    Q.   Okay.

11:05   13    A.   Yes.

11:05   14    Q.   So that's something that anyone can really give you, isn't

11:05   15    it?

11:05   16    A.   Not anyone.  I got it from Frank McCarroll or Mr. Leiva

11:05   17    when I went to the job place.

11:05   18    Q.   Why did you point at McCarroll first just now and list his

11:05   19    name first when you testified that the vast majority of the

11:05   20    time Ed Leiva gave you those?

11:05   21    A.   No reason.

11:05   22    Q.   The night janitor could have given you that, couldn't he,

11:05   23    and then you just take it --

11:05   24    A.   They weren't in charge of that.  The janitor wasn't in

11:05   25    charge of giving the work orders.

11:05  1    Q.  The fact is anyone could have just handed that to you.

11:05  2    It's a piece of paper, right?

11:05  3    A.  No, no.  Because it wasn't that way.  They were in charge

11:05  4    of giving us a job every day.

11:05  5    Q.  I have in my notes that you said Milan worked four to five

11:06  6    months.  Do you have any idea how many months Mr. Milan worked?

11:06  7    A.  Around three or four months.  That's what I said.  Four or

11:06  8    five months.

11:06  9    Q.  And all those three or four months you were at job sites

11:06  10   with him working with him during those months.  Is that your

11:06  11   testimony?

11:06  12   A.  No.  Like I said before, I think we did like two or three

11:06  13   jobs together with a different crew; but I wasn't with him all

11:06  14   the time.  I saw him in the morning, but I wasn't with him all

11:06  15   the time.  He was on another crew.

11:06  16   Q.  See, Points of America, that's the job that you were

11:06  17   working on in late August of '06, correct?

11:06  18   A.  Points of America?  Points of America --

11:06  19   Q.  No.  I'm sorry.  Points of America was October of '06 to

11:06  20   March of '07, correct?

11:06  21   A.  From my understanding --

11:06  22   Q.  Approximately?

11:06  23   A.  No.  Points of America I believe we started at beginning of

11:06  24   '07, something like that.

11:06  25   Q.  Now, I want to just try to go through what I heard Mr.

JURY TRIAL - VOLUME IV OF VI

11:07  1    Kelly elicit from you about what your tasks were in general on

11:07  2    a given day.  Can we do that?

11:07  3    A.  Do what?

11:07  4    Q.  I want to go through with you briefly what Mr. Kelly had

11:07  5    you testify to about what your tasks were in general on a given

11:07  6    day.

11:07  7    A.  Yes.

11:07  8    Q.  Okay.  What I heard was that you would get to the shop --

11:07  9    and you heard Mr. Ibacache say it was always 7:00 o'clock to

11:07  10   7:15.  You seem to think it's later than that that you got to

11:07  11   the shop.

11:07  12   A.  We had to be there by 7:30.  We were there before 7:30.  It

11:08  13   would be 10 minutes before, 15 minutes before.  It depend on

11:08  14   traffic like I said.

11:08  15   Q.  Let's just go through this.  You got to the shop.  You

11:08  16   would then go to the lounge you said and have coffee --

11:08  17   A.  Yes, sir.

11:08  18   Q.  -- right?  For a half an hour or so?

11:08  19   A.  No.  We got the coffee, and we got to the office or Mr.

11:08  20   Leiva or whoever it handling the work order, took the work

11:08  21   order and went back to the shop, inside the shop to get the

11:08  22   materials.

11:08  23   Q.  Okay.  So you arrive at the shop.  You have coffee in the

11:08  24   lounge.  You then pick up the work order.  You then go into the

11:08  25   warehouse with it and you pick up materials to load in the

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

11:08  1  truck?

11:08  2  A.  Yes, sir.

11:08  3  Q.  You then go out to the job site, right?

11:08  4  A.  Yes, sir.

11:08  5  Q.  And then you work during the day?

11:08  6  A.  Yes, sir.

11:08  7  Q.  And then you get back to the shop?

11:08  8  A.  Yes, sir.

11:08  9  Q.  Right?  And then you have to clean the truck?

11:08  10  A.  Yes, sir.

11:08  11  Q.  And you have to load the truck for the next day, correct?

11:08  12  A.  If the material was ready for the next day, yes.  If not,

11:09  13  we wait for the next day.

11:09  14  Q.  See, here's the thing.  Here's the thing.  You don't load

11:09  15  the truck in the morning and also load the truck at night.

11:09  16  It's one or the other.  If you load the truck every morning

11:09  17  before you go out on the job site, you ain't unloading it at

11:09  18  night when you get back, when the day's over; isn't that true?

11:09  19  A.  Like I said, sometimes we were able to load the truck when

11:09  20  we got there.  Most of the times we did it in the morning, like

11:09  21  I said.

11:09  22  Q.  It's one or the other.  There's no loading the truck in the

11:09  23  morning, loading the truck in the evening for the next day.  If

11:09  24  you loaded the truck in the evening for the next day, you ain't

11:09  25  loading it in the morning.

APRIL 14, 2011

11:09  1   A.  Like I said before --

11:09  2   Q.  Is that yes or no?  You can explain, but yes or no to that?

11:09  3   A.  Yes, yes.  That's true.

11:09  4   Q.  Isn't it true that there really wasn't much to these work

11:10  5   orders at all for these condominium projects because they have

11:10  6   standardized windows.  The window -- once you cut one of the

11:10  7   shutters for one of the windows once you have the bolt pattern

11:10  8   and the same shape and size of the shutter; isn't that true?

11:10  9   A.  I don't understand the --

11:10  10  Q.  Let me try to explain it this way:  Houses have all sorts

11:10  11  of different size windows, correct?

11:10  12  A.  Yes.

11:10  13  Q.  You could have bay windows, sliding doors, smaller windows

11:10  14  that might be in a bathroom or a laundry room?

11:10  15  A.  Yes, sir.

11:10  16  Q.  A bigger window but not a bay window in a bedroom, that

11:10  17  sort of thing, different sizes and shapes?

11:10  18  A.  Yes.

11:10  19  Q.  Condominiums, that's much less so, a big tower with 400

11:10  20  units in it.  And other than maybe the penthouse and the first

11:10  21  floor, all those windows are going to be the same size,

11:10  22  correct, around the condo?

11:10  23  A.  On average they were around the same size.  On average.

11:10  24  Q.  So the work order then -- and taking the material out to

11:11  25  those job sites, it becomes standardized.  It's just a matter

11:11  1    of how many windows you're going to do in a again day; isn't

11:11  2    that true?

11:11  3    A.   That's true.

11:11  4    Q.   So it's just simply, Hey, we'll do five balconies today, so

11:11  5    give us enough shutters for five balconies' worth.  And that

11:11  6    went on for months; isn't that true?

11:11  7    A.   I worked for about two months in that place, yes.

11:11  8    Q.   Okay.  So the answer to the question is yes?

11:11  9    A.   Yes.

11:11  10   Q.   Okay.  So it's not as if -- given that situation that we've

11:11  11   just described, it's not as if Frank M^cCarroll would be giving

11:11  12   you day-to-day directions when he's handing out the work order

11:11  13   with respect to how you would perform your job because you knew

11:11  14   how to do that; isn't that true?

11:11  15   A.   That's true.

11:11  16   Q.   You know a hundred times more about installing hurricane

11:11  17   shutters than Mr. M^cCarroll; isn't that true?

11:11  18   A.   Of course.

11:11  19   Q.   And probably 10,000 times more than Mr. Heidelberger;

11:11  20   wouldn't you agree?

11:11  21   A.   Yes.

11:11  22   Q.   Okay.  So that being the case, Mr. M^cCarroll and Mr.

11:12  23   Heidelberger aren't in any position to be telling you how to do

11:12  24   your job as an installer?

11:12  25   A.   Not as an installer but give us the instruction, yes.

87

11:12  1   Q.  Your testimony is that Mr. M<sup>c</sup>Carroll and Mr. Heidelberger

11:12  2   would give you instructions on how to hang hurricane shutters;

11:12  3   isn't that true?

11:12  4   A.  Not about hanging hurricane shutters.  About the job that

11:12  5   we had to do, what we had to do, take the materials to what

11:12  6   place and supervise us to make sure that we were doing what we

11:12  7   had to do at the time that we were supposed to be working.

11:12  8   Q.  We just went through this.  And here's the syllogism:

11:12  9   Stick with me.  M<sup>c</sup>Carroll and Heidelberger according to you

11:12  10  were only at the big jobs?

11:12  11  A.  That's true.

11:12  12  Q.  The big jobs all have standardized windows; that it was

11:12  13  just a matter of how many balconies you do that day, correct?

11:12  14  Correct?  You'd said that?

11:12  15  A.  Yes.

11:12  16  Q.  You've already said that.

11:12  17  A.  Yes.

11:12  18  Q.  So then M<sup>c</sup>Carroll and Heidelberger weren't telling you what

11:12  19  to do and giving you instructions on the day as to how you need

11:13  20  to be performing your job at these big jobs.  It didn't happen

11:13  21  because it didn't need to; isn't that true?

11:13  22  A.  They didn't give me instructions how to install because

11:13  23  they didn't know how to do it, but they were supervising what I

11:13  24  was doing, the times that they went there.

11:13  25  Q.  So you admit you're the best installer and these two guys

88

11:13  1    don't even know how to install?

11:13  2    A.   That's true.  They don't know how to install.

11:13  3    Q.   It's pretty clear they weren't telling you how to do

11:13  4    anything on any of these job sites?

11:13  5    A.   They were there to supervise our progress.

11:13  6    Q.   Now, the other question that I have for you that I caught

11:14  7    in listening to you testify, you had said very clearly that

11:14  8    with the Sheriff's building in Pompano Beach on Federal Highway

11:14  9    you said so clearly that that was 20 minutes from the shop?

11:14  10   A.   Yes, sir.

11:14  11   Q.   And you also said that you would stop working at that

11:14  12   Sheriff's building at 5:00 to 5:30?

11:14  13   A.   That's true.

11:14  14   Q.   And actually isn't that really a gross exaggeration of what

11:14  15   you worked because that was in the summer.  We're talking in

11:14  16   the summer of '07, rain and lightening.  You didn't work on

11:14  17   average at that Sheriff's building until 5:00 or 5:30; isn't

11:14  18   that true?

11:14  19   A.   Yes, I did.  Yes, I did.

11:14  20   Q.   And the other --

11:14  21   A.   Like I said before, when there was rain, we stopped.  And

11:14  22   we kept going after the rain was over.  Here in Florida it

11:14  23   rains maybe for an hour or maybe 30 minutes.  And we stayed on

11:14  24   the job site, and we worked.  And you have to understand

11:15  25   something.  That building, there was openings that were under

11:15   1   ceilings.  So we didn't have no need -- you know, if it was

11:15   2   raining, there was a place that we could work where there was

11:15   3   no rain coming in.  We kept working.

11:15   4   Q.  Okay.  So let's break this down.

11:15   5   A.  Yes.  Of course.

11:15   6   Q.  You're handling metal hurricane shutters?

11:15   7   A.  Yes.

11:15   8   Q.  You are installing them through the use of a large

11:15   9   hand-held drill that is run off of electricity?

11:15  10   A.  Yes, sir.

11:15  11   Q.  It's plugged into an outlet?

11:15  12   A.  Yes, sir.

11:15  13   Q.  And you're drilling into a building so you can put a

11:15  14   threaded -- a thing in there to bolt the shutter into?

11:15  15   A.  Yes, sir.

11:15  16   Q.  In general?

11:15  17   A.  Yeah.

11:15  18   Q.  Okay.  They call that a Tapcon® or something that goes --

11:15  19   A.  Yeah.

11:15  20   Q.  -- into the cement?

11:15  21   A.  Yeah.

11:15  22   Q.  Okay.  All right.  Your testimony is that it could be

11:15  23   raining extremely hard, lightening; but you're still going to

11:15  24   keep working because, you know, you've got a little overhang so

11:15  25   we'll just work with all this metal and these electric drills

11:16  1    through the violent thunderstorm.  And you as a crew foreman

11:16  2    allowed this.  That's your testimony?

11:16  3    A.  What I said is that if we had the chance to do it, we did

11:16  4    it.  If we weren't getting wet, we did it.

11:16  5    Q.  In a minute given that you're paid a salary and given that

11:16  6    if you go back to the shop at 2:00 o'clock or you go back to

11:16  7    the shop at 5:00 o'clock, you're paid exactly the same amount

11:16  8    of money.  When it becomes late afternoon and there's a

11:16  9    thunderstorm and it's raining and you have no idea when it's

11:16  10   going to clear up, wouldn't you go back to the shop and quit

11:16  11   working for the day?  Come on.

11:16  12   A.  We could have done it a couple of times.  Yes.  That's

11:16  13   true.

11:16  14   Q.  A couple of times?

11:16  15   A.  Yes.  That's true.

11:16  16   Q.  This is -- especially as time went on, weren't you

11:16  17   irritated that you're working all these hours and you said you

11:16  18   were upset with your pay, remember?

11:16  19   A.  Repeat the question again.

11:16  20   Q.  Didn't you really repeatedly go back to the shop at

11:16  21   2:00/3:00 --

11:16  22   A.  No.

11:17  23   Q.  -- in the afternoon because you --

11:17  24   A.  I didn't.

11:17  25   Q.  -- didn't want to work anymore --

11:17  1    A.  I didn't.

11:17  2    Q.  -- because you'd get paid the same --

11:17  3    A.  That's not true.

11:17  4    Q.  -- regardless?

11:17  5    A.  That's not true.  That's not true.

11:17  6    Q.  Towards the end of your work at Safe Hurricane Shutters the

11:17  7    company didn't have much work, did it?

11:17  8    A.  At the end of the work --

11:17  9    Q.  Yes or no?

11:17  10   A.  No.

11:17  11   Q.  Okay.

11:17  12   A.  He had work.  He didn't have as much as he did when I

11:17  13   started out in late July; but August/September he didn't have

11:17  14   too many jobs.

11:17  15   Q.  Okay.  So there's all this time then that you admit there's

11:17  16   no jobs.  There's no work?

11:17  17   A.  He didn't have not many jobs; but we, my crew, always got

11:17  18   the first job.  Always, always.

11:17  19   Q.  There were times in August and September of '07, sir, there

11:17  20   were days that you wouldn't work.  There were weeks you might

11:17  21   have worked 10 or 15 hours, and Mr. Leiva still paid you that

11:18  22   salary --

11:18  23   A.  That's not true.

11:18  24   Q.  -- cash out of his pocket?

11:18  25   A.  That's not true.

11:18  1   Q.   You're saying that's not true?

11:18  2   A.   That's not true because the jobs that we were doing we were

11:18  3   trying to get paid so he could pay us the money that he owed

11:18  4   us.

11:18  5   Q.   Anyway, I'm sorry for the digression.  I actually missed

11:18  6   the point I was going to make with the Sheriff's office.  You

11:18  7   said it was 20 minutes from the shop?

11:18  8   A.   Yes, sir.

11:18  9   Q.   You said you stopped working there on average 5:00 to 5:30?

11:18  10  A.   Uh-huh (affirmative).

11:18  11  Q.   Right?

11:18  12  A.   Yes, sir.

11:18  13  Q.   Well, you told Mr. Kelly that on days you worked at the

11:18  14  Sheriff's office you didn't back to the shop until 6:30, and

11:18  15  then you'd work for another half an hour doing stuff with the

11:18  16  truck after that, remember that?

11:18  17  A.   No.  I went to the shop around 5:30/6:00 o'clock, and then

11:18  18  we left.  We'd go home.

11:18  19  Q.   Oh, your testimony was you'd stop work at the Sheriff's

11:18  20  office at 5:00 to 5:30, but you wouldn't get to the shop until

11:18  21  6:30.  Your testimony is, Oh, you'd stay at the shop till

11:18  22  6:30/7:00 most days, isn't it?

11:18  23  A.   I'd get in -- I didn't say that about that job.  During the

11:18  24  summertime in homes, in the home work, we stayed longer than

11:19  25  6:00 o'clock.  That's what I said.

11:19  1  Q.  If you left that Sheriff's office job at 5:00 o'clock and

11:19  2  you're not getting back to that office until 6:30, you're

11:19  3  stopping for 40 minutes or an hour and you're taking some kind

11:19  4  of break or you're doing something; isn't that true?

11:19  5  A.  From the Sheriff's office when we finish, we went back to

11:19  6  the shop.

11:19  7  Q.  You had mentioned that Yerko Aguirre was actually serving

11:19  8  as a translator for people who speak English and people who

11:19  9  speak Spanish 'cause he speaks both fluently to communicate?

11:19  10  A.  He doesn't speak fluently, but he understands a little bit.

11:19  11  Q.  Okay.  So your testimony is that Mr. Aguirre just speaks a

11:19  12  little bit of English?

11:19  13  A.  Yeah.  He understands and speak English, yes.

11:20  14  Q.  Do you speak English with Mr. Aguirre?

11:20  15  A.  No.  Spanish.

11:20  16  Q.  Never English?

11:20  17  A.  My main language is Spanish.

11:20  18  Q.  I'm not contesting that.

11:20  19  A.  Oh, okay.

11:20  20  Q.  The question isn't what your main language is.  I want to

11:20  21  know how you communicate with Mr. Aguirre.

11:20  22  A.  Spanish.

11:20  23  Q.  And you're saying Spanish only.

11:20  24  A.  Always is Spanish.  All of them spoke Spanish.

11:20  25  Q.  I'm not suggesting there's anything wrong with that.  I

11:20  1   just want to know with respect to Mr. Aguirre.  Your testimony

11:20  2   is you've never spoken English to him ever?

11:20  3   A.  No.  I'm not saying that.  We could have conversations in

11:20  4   English and Spanish, but most of it was Spanish.

11:20  5   Q.  You had mentioned that Steve Heidelberger told you that,

11:20  6   Oh, my goodness, I'm going to make sure that you guys get paid

11:21  7   or I'm going to put a bullet in my head.  Do you remember

11:21  8   saying that?

11:21  9   A.  That's true.

11:21  10  Q.  Well, Mr. Heidelberger didn't put a bullet in his head, so

11:21  11  apparently you got paid, right?

11:21  12  A.  No.  That's not true.

11:21  13  Q.  No?  He did put a bullet in his head, and he's miraculously

     14  recovered --

     15  A.  No.

     16  Q.  -- or you weren't paid?

     17  A.  That wasn't the case.

     18  Q.  Which is it?

11:21  19  A.  I said what he expressed to me at that time, and I trusted

11:21  20  him.  He was my boss.  He was presented to me like my boss, and

11:21  21  I trusted him.  That's why I never -- that's why I didn't leave

11:21  22  the company.

11:21  23  Q.  So you're saying --

11:21  24  A.  I trusted him.

11:21  25  Q.  You're saying Steve Heidelberger, just his powers of

11:21  1   persuasion are such that you -- here we are in July.  You

11:21  2   haven't been paid in five weeks.  You don't -- you question

11:21  3   whether you're ever going to get paid.  You want to leave.  You

11:21  4   worked for another two months without any pay at all just

11:21  5   because Mr. Heidelberger was just really able to persuade you

11:21  6   to hang in there.  Is that what you're telling us?

11:21  7   A.   If you have a family and they owe money, what you want to

11:21  8   get is get paid.  You want to get money to pay your bills and

11:22  9   do what you have to do to support your family.  When you come

11:22  10  from a country and try to start a life like I did, like many of

11:22  11  the guys did.  Most of them, 90 percent of them didn't have no

11:22  12  papers, illegal -- they were illegal immigrants hired by the

11:22  13  company that broke the law doing that, and we don't know what

11:22  14  to do because if I lose a job, if leave the job and I don't get

11:22  15  paid, what am I going to do for my family?

11:22  16  Q.   Okay.  I want to -- first of all, are you taking about the

11:22  17  child support payments that you owe?  Is that what you're

11:22  18  talking about?

11:22  19  A.   No.  I still pay my child support.

11:22  20  Q.   That's the money that you need?

11:22  21  A.   That doesn't have to do anything about this case.  I still

11:22  22  pay my child support.

11:22  23  Q.   The second thing I want to know is this:  When you were

11:23  24  working at Safe Hurricane Shutters, you knew that there were

11:23  25  illegal immigrants working there.  Is that what --

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

11:23  1   A.  Yes.

11:23  2   Q.  Is that your testimony?

11:23  3   A.  Yes.

11:23  4   Q.  And you didn't say anything about it, did you?

11:23  5   A.  When there's families -- if I say something and you have

11:23  6   friends in there, because they became my friends, if you say

11:23  7   something, what are they going to do?

11:23  8   Q.  So you --

11:23  9   A.  They're going to take them and take them away.  Would you

11:23  10  do that to the families?

11:23  11  Q.  So you harbored --

11:23  12  A.  I wouldn't do that.

11:23  13  Q.  You harbored and concealed illegal aliens.  Is that what --

11:23  14  that's what you're saying?

11:23  15  A.  No.  What I'm saying is they have the right to work.  They

11:23  16  have the right to work.  Like me, you know, I'm blessed because

11:23  17  I'm Puerto Rican.  I'm a U.S. citizen.  I'm blessed.  Thank God

11:23  18  for that.  And when I work, I work to make my money for my

11:23  19  payments, you know, to make a living for my family.

11:23  20  Q.  The question is we all work for our family, sir.

11:23  21  A.  Of course.

11:23  22  Q.  We all work for our families.

11:23  23  A.  They have the rights like us.

11:23  24  Q.  Wait a minute.  An illegal alien does not have the right to

11:24  25  work in our country.  Hello.

11:24  1   A.  That's true.  That's true.

11:24  2   Q.  And it's a crime, did you know that, to harbor and conceal

11:24  3   illegal aliens?

11:24  4   A.  Yes.

11:24  5   Q.  Okay.

11:24  6   A.  Why did they hire them?  Why did they brought them from New

11:24  7   York over here to work?

11:24  8   Q.  What did you have to do with the hiring decisions at the

11:24  9   company?

11:24  10  A.  Nothing.

11:24  11  Q.  You're going to sit here and accuse Mr. Leiva of bringing

11:24  12  someone from New York down here who's illegal?  You did not

11:24  13  come into this company till August of '06; isn't that true?

11:24  14  A.  That's true.

11:24  15  Q.  Okay.  And if you thought that there was any problem with

11:24  16  the hiring of illegal aliens in this company; that if that was

11:24  17  -- somehow the company knew that was occurring and didn't do

11:24  18  anything about it, you could have done something about it

11:24  19  yourself and you chose not to do; isn't that true?

11:24  20  A.  I didn't do it.  I didn't do it.  I wasn't thinking about

11:24  21  other people's family.

11:24  22  Q.  It's not all about families.  You understand there's a

11:24  23  process to become -- to come -- anyone who wants to can come to

11:24  24  the United States and attempt to become a citizen and do so

11:24  25  legally and then work here.  You understand that?

APRIL 14, 2011

11:24  1   A.   Yeah, I understand that.

11:25  2   Q.   You understand my family came to the United States from

11:25  3   another country --

11:25  4   A.   I don't know your family.

11:25  5   Q.   -- legally?

11:25  6   A.   I don't know your family.  I couldn't say that.  But if you

11:25  7   say so, I believe it.

11:25  8   Q.   You weren't involved in any hiring decisions?

11:25  9   A.   No, I wasn't.

11:25  10  Q.   So you're just saying -- what you're saying is you believe

11:25  11  a bunch of people working for the company were here illegally

11:25  12  and now you want to blame Mr. Leiva for having hired someone on

11:25  13  purpose that he knew was here illegally, and you have no idea

11:25  14  about any of that because you weren't involved in the hiring

11:25  15  decisions; isn't that true?

11:25  16  A.   That's true.

11:25  17  Q.   Okay.  You're just trying to smear him to curry favor with

11:25  18  the jury.  Isn't that obvious?

11:25  19  A.   No.  That's not the case.  I'm just explaining what was

11:25  20  going on with the company.

11:25  21  Q.   You heard what Mr. Ibacache said about what a great boss

11:25  22  Mr. Leiva was.  You heard him say that?

11:26  23  A.   That's what --

11:26  24  Q.   Mr. Ibacache was on your crew?

11:26  25  A.   That's what he said.

11:26  1    Q.   You agree with Mr. Ibacache about all he said about Mr.

11:26  2    Leiva; isn't that true?

11:26  3    A.   No.

11:26  4    Q.   You don't?

11:26  5    A.   No, I don't.

11:26  6    Q.   So here we have two crew members.  They both have lawsuits

11:26  7    against this company, Mr. Leiva, and these two individuals

11:26  8    here.  They're both represented by the same counsel.  Mr.

11:26  9    Ibacache will say, Mr. Leiva is the best boss he's ever had in

11:26 10    his life.  And you're going to say Mr. Leiva was a crappy boss?

11:26 11    A.   I'm not going to insult anybody, and I don't do that.  I

11:26 12    don't insult anybody.  He wasn't a great boss.  He was not.

11:26 13    Anytime I tried to talk to him and he offered me the streets

11:26 14    like he did with everybody else that was working in the

11:26 15    company.

11:26 16    Q.   Another thing, you heard Mr. Ibacache say that he -- when

11:26 17    he got there in the morning, the Lamonicas were always there.

11:26 18    Do you remember that?

11:26 19    A.   Yes.

11:26 20    Q.   Okay.  And you remember the timecard that showed the

11:27 21    Lamonicas weren't getting there anywhere from 7:34 something to

11:27 22    8:25 or thereabouts?  Do you remember that?

11:27 23    A.   Yeah.

11:27 24    Q.   Okay.  So isn't it clear that you and your crew members,

11:27 25    you weren't getting to work every day at 7:30.  You were

11:27 1 clearly getting to work at 8:00 to 8:30, 9:00 maybe?

11:27 2 A. No.

11:27 3 Q. Isn't that true?

11:27 4 A. 7:30.

11:27 5 Q. Those cards linked with Mr. Ibacache's testimony prove it,

11:27 6 don't they?

11:27 7 A. It doesn't prove anything because you could get to a

11:27 8 workplace at 7:30 and then you starting time is at 8:00.

11:27 9 You're going to punch in around 8:00 o'clock. That was the

11:27 10 case with Mr. Lamonica.

11:27 11 Q. If when you get there the -- if when you get to a work site

11:27 12 Mr. "A" is always there before you and Mr. "A" arrives there

11:27 13 any time between 7:34 and 8:25, what we heard on the cards, we

11:27 14 know that you're not getting there before 7:34 or 8:25; isn't

11:28 15 that painfully obvious?

11:28 16 A. That's not true. That's not true.

11:28 17         MR. KLEPPIN: I just need one moment, Your Honor.

11:28 18     **(Counsel and clients confer sotto voce)**

11:29 19         MR. KLEPPIN: No further questions at this time, Your

11:29 20 Honor.

11:29 21         THE COURT: Mr. Leiva, you may cross-examine.

11:29 22         MR. LEIVA: Thank you, Your Honor.

11:29 23                 **CROSS-EXAMINATION**

11:29 24 BY MR. LEIVA:

11:29 25 Q. That's going to be -- I'm sorry. I worked late last night

11:29  1    again.  I have a few questions for you.  It really hurt what

11:29  2    you just said a minute ago.  You know, I pride myself with

11:30  3    helping people.  You know that very well.  And to call me that

11:30  4    I threatened you to put you on the street, that's what you said

11:30  5    to these people.

11:30  6    A.  Many times you did.

11:30  7    Q.  I never did that.

11:30  8    A.  Yes, you did.

11:30  9    Q.  You're lying.

11:30  10          THE COURT:  Don't argue with the witness.  Just ask

11:30  11   him the questions.

11:30  12   BY MR. LEIVA:

11:30  13   Q.  There is a problem with this.  They turned you into a

11:30  14   monster.  Greed.  The first thing I want to ask you a question.

11:30  15   Who gave you the work in the morning?

11:30  16   A.  You.  Sometimes Mr. M<sup>c</sup>Carroll like I said.

11:30  17   Q.  Mr. M<sup>c</sup>Carroll doesn't know what a work order is.

11:30  18   A.  He doesn't know what a work order is?  Come on.

11:30  19   Q.  Those people -- these people don't know the difference --

11:30  20   what do they know about a 90-degree shutter and 125-degree

11:30  21   shutters?  He doesn't know.  What was in the work order?

11:30  22   Describe to me what was in the work order that I gave you every

11:31  23   morning.  My handwriting is in every envelope.  Why this

11:31  24   attorney never requested that documentation is beyond me.  He's

11:31  25   not my lawyer.  But if he was my lawyer, all the folders that

11:31  1   would have been my handwriting, I wrote the name in every

11:31  2   folder.  You know that.  I used to -- I gave you a copy of the

11:31  3   yellow folder.

11:31  4   A.   Yes, sir.

11:31  5   Q.   Ask him about the yellow folder.  What is it?  Ask him

11:31  6   what's the yellow folder.  He doesn't know.  And you're never

11:31  7   going to see his handwriting on one single work order.  Don't

11:31  8   you understand what you're doing?

11:31  9   A.   What is the question?

11:31  10  Q.   Ah, what's the question.  Do you see his handwriting in any

11:31  11  of the yellow envelope?

11:31  12  A.   I didn't look at who wrote that.  I didn't know who did the

11:31  13  work orders.  I got the work orders from you.

11:32  14  Q.   No, no.  You had to look in there, in that yellow envelope,

11:32  15  because in that yellow envelope it had the name of your crew

11:32  16  for that day.

11:32  17  A.   That's true.

11:32  18  Q.   Oh.

11:32  19  A.   That's true.

11:32  20  Q.   So after seeing my handwriting for all these months, you

11:32  21  don't know who wrote that?

11:32  22  A.   This is not a question of who wrote it or who prepared it.

11:32  23  It's a question of who gave it to me.  Most of the times you

11:32  24  gave it to me.  That's true.

11:32  25  Q.   Every morning.

APRIL 14, 2011

11:32  1   A.   And he also gave me work orders.  The building --

11:32  2   Q.   Don't point your finger at me, number one.

11:32  3   A.   Okay.  Sorry.  The building that we did, the golf course in

11:32  4   Boynton Beach, he was in charge of the whole project.  He sold

11:32  5   it, and you know that.

11:32  6   Q.   You started working for me August 21st, and I remember when

11:32  7   I hired you.  And you had previously spoken to all the people

11:32  8   in Bella Sera.  You know, I had them there with the apartment

11:33  9   that I got them; and they spoke to you about the job.

11:33 10   A.   Yes.

11:33 11   Q.   And when they spoke to you about the job, they must have

11:33 12   told you that I wasn't paying overtime?

11:33 13   A.   No, they didn't.  They told me --

11:33 14   Q.   Why not?  They're testifying here that I -- I mean you

11:33 15   didn't ask them how they got paid?

11:33 16   A.   When I talked -- when I spoke to you and you have to

11:33 17   remember that.

11:33 18   Q.   No.  My question is not that.  Okay.  So they never told

11:33 19   you anything about how they got paid.  When I hired you, did I

11:33 20   tell you what you're going to make a week?

11:33 21   A.   You told me that we were going to make for 40 hours a pay

11:33 22   period, a week, 40 hours.

11:33 23   Q.   That's not true.

11:33 24   A.   That's true.

11:33 25        THE COURT:  Don't argue with the witness.

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

11:33  1    MR. LEIVA:  Okay.

11:33  2    MR. FELICIANO:  You told me -- can I answer the

11:33  3 question?

11:33  4    THE COURT:  Of course.

11:33  5    MR. FELICIANO:  When you -- when I met with you, you

11:33  6 told me 'cause you hired me that the most I was going to work,

11:34  7 40 hours a week, and you were going to pay me for that amount

11:34  8 of money -- that amount of hours.  The money that I got, I

11:34  9 started at $800.  It increased to 9 and then to a thousand

11:34  10 dollars.

11:34  11 BY MR. LEIVA:

11:34  12 Q.  So here when I -- you are an intelligent man obviously.

11:34  13 You were one of the best workers by the way.

11:34  14 A.  Thank you.

11:34  15 Q.  No.  I admit it.  I mean I'm not lying.

11:34  16 A.  Thank you.  Me either.

11:34  17 Q.  You did a good job for me, very good job.  There's no

11:34  18 question about it.  And when you got your paycheck -- again I

11:34  19 asked the question to everybody -- you didn't never question me

11:34  20 why there was no overtime there, right?

11:34  21 A.  No.  I didn't ask you about the overtime.

11:34  22 Q.  Never.  You never did once?

11:34  23 A.  No, I did.  The first -- you asked me about the first

11:34  24 check.

11:34  25 Q.  You asked me, and what did I say?

JURY TRIAL - VOLUME IV OF VI

| | | |
|---|---|---|
| 11:34 | 1 | A.  No.  You asked me about the first check. |
| 11:34 | 2 | Q.  Yeah.  When I paid you and gave you the first check -- |
| 11:34 | 3 | A.  First check. |
| 11:34 | 4 | Q.  -- what did you say? |
| 11:34 | 5 | A.  I didn't ask you about the overtime. |
| 11:34 | 6 | Q.  But you never did.  Never did. |
| 11:34 | 7 | A.  No.  There was a lot of times that we had discussions about |
| 11:35 | 8 | the payment. |
| 11:35 | 9 | Q.  We never discussed anything about payment. |
| 11:35 | 10 | A.  Yes, we did. |
| 11:35 | 11 | Q.  No.  See, here you go again.  Everybody's saying that they |
| 11:35 | 12 | never approached me because supposedly they were afraid of me. |
| 11:35 | 13 | You never approached me about a paycheck.  Never did. |
| 11:35 | 14 | A.  Of course I did. |
| 11:35 | 15 | Q.  Never. |
| 11:35 | 16 | A.  Of course I did. |
| 11:35 | 17 | Q.  And you told me about the overtime?  And you keep working |
| 11:35 | 18 | and working and getting the same check every week? |
| 11:35 | 19 | A.  And you told me you were going to fix the problem with the |
| 11:35 | 20 | overtime.  You asked me -- |
| 11:35 | 21 | Q.  From August, September -- |
| 11:35 | 22 | A.  You asked me to give -- |
| | 23 | Q.  -- October -- |
| | 24 | A.  -- you time to put everything together. |
| | 25 | THE COURT:  Mr. Leiva -- |

1      **MR. LEIVA:**  Okay.

2      **THE COURT:**  -- let him finish the answer.  What's the

3   question, Mr. Leiva?

11:35   4      **MR. FELICIANO:**  What's the question?

11:35   5   **BY MR. LEIVA:**

11:35   6   Q.  The question that I want to ask you, When you lost that

11:35   7   apartment in Bella Sera, you remember you came to me crying?

11:35   8   A.  Yes.  I remember that.

11:35   9   Q.  You were crying.  I didn't know you.  I mean it was a week,

11:35  10   not even a week.

11:35  11   A.  Yes.

11:35  12   Q.  What did I do for you?

11:35  13   A.  I lent me the money to put the down payment for the other

11:35  14   apartment I was going to --

11:35  15   Q.  But I didn't know you.  You could have taken the money and

11:35  16   leave.  So I'm a monster, but here every time you came to me --

11:36  17   A.  Not every time.  That's the only time that you helped me.

11:36  18   Q.  And you were trying.  And you know what?  I did that with

11:36  19   everybody that came to me.

11:36  20   A.  Yeah.

11:36  21   Q.  My door was always open.  And you know --

11:36  22   A.  Yeah.

11:36  23   Q.  -- I helped the world.  Okay.  Going to another issue.  We

11:36  24   started -- just to make things seem clear here, we started at

11:36  25   Points of America in November through the first week of April.

JURY TRIAL - VOLUME IV OF VI

11:36  1   Okay?  You loved that job at Points of America because it was

11:36  2   simple.  They were all balconies.  There was no windows.  All

11:36  3   balconies.  Did you finish a balcony every day?

11:36  4   A.  We finished a balcony, and we started a second balcony.

11:36  5   And you know that when we started, my crew -- my crew usually

11:36  6   do -- used to do more than the -- a balcony and a half a day.

11:36  7   It took us -- it took us on average four hours to put -- to get

11:37  8   a balcony.

11:37  9   Q.  A small balcony.  Now, when you took the material, you took

11:37 10   the material for the two balconies.

11:37 11   A.  Yes.

11:37 12   Q.  So that means that half the time you didn't load the truck

11:37 13   in the morning because the material was already at the site?

11:37 14   A.  What do you mean at the site?

11:37 15   Q.  Because you claim that you loaded the truck every morning.

11:37 16   Yes or no?

11:37 17   A.  Yes, I did.

11:37 18   Q.  But how can you load the truck every morning if you already

11:37 19   took the material for that particular apartment that previous

11:37 20   morning, that morning?  And you only completed some of the

11:37 21   balcony.  So, therefore, the material had to be there if you

11:37 22   only finished half a balcony that day and you had to resume the

11:37 23   work the next day?

11:37 24   A.  Because you know that we had to follow a schedule.  And you

11:37 25   know many times, a lot of times, most of the times when we knew

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

11:37  1    -- when you knew that I was -- we were going to finish a

11:38  2    balcony, what did you do?  Give us another work order.

11:38  3    Q.  I never gave you two work orders at the same time.  Never.

11:38  4    Never.  Never in my life I gave you two work orders.

11:38  5              **MR. KELLY:**  Objection.  He's testifying again.

11:38  6              **MR. LEIVA:**  Okay.

11:38  7              **THE COURT:**  Sustained.  You can't testify.

11:38  8              **MR. LEIVA:**  Okay.

11:38  9    **BY MR. LEIVA:**

11:38  10   Q.  So you're saying here -- and this is the question -- that I

11:38  11   gave you two work orders at the same time?

11:38  12   A.  No.  Well, like I said, we started a job.  If we're about

11:38  13   to finish a job in an apartment, we started the second job, you

11:38  14   know, if we had the chance the next day.  That's what I'm

11:38  15   saying.

11:38  16   Q.  How can you start a job without a work order?  You needed a

11:38  17   plan.  You needed a permit.  You needed my instruction.  You

11:38  18   needed the engineering plan.  I had to -- all the measurement

11:38  19   -- everything was there.

11:38  20   A.  Of course.

11:38  21   Q.  So how could you finish a job, then continue with another

11:38  22   job?  You didn't have the paperwork.  I never gave you the

11:38  23   paperwork for the next job.

11:39  24   A.  Of course you did.

11:39  25   Q.  But how could you load the material for the next job?  What

APRIL 14, 2011

11:39  1    would you do with the material?

11:39  2    A.  I don't understand what you're trying to --

11:39  3    Q.  Well, you couldn't access any apartment other than the one

11:39  4    you were working, so how could you have material to start a

11:39  5    second job?  Where do you put it?  In the same apartment you

11:39  6    were working?

11:39  7    A.  No.  When we had to work -- and you know it -- when we had

11:39  8    to work and we had the chance to start a second job, when we

11:39  9    finished the first job, we went down to the truck when we had

11:39  10   the other material and loaded it to the other apartment that we

11:39  11   were doing.  It was a schedule that we followed.  We -- and you

11:39  12   know it.

11:39  13   Q.  Just say yes or no because -- also your testimony you said

11:39  14   that you cleaned material from the building?

11:39  15   A.  Yeah.

11:39  16   Q.  And if you were cleaning, you were bringing it to the

11:39  17   truck.  So now you're telling me that you had a loaded truck

11:40  18   downstairs and at the same time you were loading materials into

11:40  19   the truck, correct?

11:40  20   A.  No.  I'm not saying.

11:40  21   Q.  That's what you said before; that you removed materials and

11:40  22   you -- when you finish a job, you clean up.  So which one is

11:40  23   which?  You've got materials in the truck already for the next

11:40  24   job.

11:40  25   A.  We clean up.  If we had the chance to start a second job --

11:40  1   like I said, it wasn't all the time -- we removed whatever we

11:40  2   had in the truck to go to the second apartment and load the

11:40  3   materials that was left over.  We had a schedule to follow.

11:40  4   And you are only talking about that specific job, Points of

11:40  5   America, that I worked like two months because I was

11:40  6   transferred to a different job; and you know that.

11:40  7   Q.  The log for Points of America will prove that you're there

11:40  8   four-and-a-half months, so I don't understand why --

11:40  9   A.  I wasn't straight in the Points of America for

11:40 10   four-and-a-half months.  I worked in other sites too because

11:41 11   you sent --

11:41 12   Q.  Specifically you remember any other site other than Points

11:41 13   of America?

11:41 14   A.  We did so many houses, and you know that.  We did so many

11:41 15   houses.  It wasn't just Points of America.

11:41 16   Q.  You did almost exclusively Points of America for a simple

11:41 17   reason.  You were one of the best installers.  You were -- and

11:41 18   I have to say it again to them because I don't lie.  He was

11:41 19   probably the best installer that I had for Points of America.

11:41 20   A.  Thank you.

11:41 21   Q.  No question about it.

11:41 22   A.  Thank you.

11:41 23   Q.  No, no.  You did a great job.

11:41 24   A.  Thank you.

11:41 25   Q.  Now, you say you never had lunch at Points of America?

| 11:41 | 1 | A.  Like I said, many times you went to the job site for us -- |

11:41 1  A.  Like I said, many times you went to the job site for us --

11:41 2  with us to see what we were doing, and we never took an hour

11:41 3  lunch.  You know that.

11:41 4  Q.  Oh, now it's an hour lunch.  I had lunch with you guys at

11:41 5  Points of America.

11:41 6  A.  Never.  I remember that you gave me lunch.

11:41 7  Q.  No.  You brought your lunch box.  I was at Points of

11:41 8  America many times when you guys were having lunch.  I was

11:42 9  there.  I saw it.  Say yes or no.

11:42 10  A.  The times that you went there -- the times that you went

11:42 11  there to supervise what we were doing --

11:42 12  Q.  Say yes or no.  Did I see you there having lunch?

11:42 13  A.  No, you didn't.  No, you didn't.  When we were drinking

11:42 14  whatever it was or whatever little sandwich that we took, we

11:42 15  didn't stop and sit down to take it.  We didn't have a lunch, a

11:42 16  specific lunchtime.  We grabbed bites.  Why?  Because we had to

11:42 17  finish the job because we have a schedule to follow.

11:42 18  Q.  I know.  Let me ask you a question.  How many apartments at

11:42 19  Points of America you had to remove shutters?

11:42 20  A.  Not many.

11:42 21  Q.  At least we're getting somewhere.  I would say about 10

11:42 22  percent.  We did about 144 units.  We removed about 14

11:42 23  apartments (sic) where we had to remove.

11:42 24  A.  Yes, sir.

11:43 25  Q.  And you say there that it took you awhile to clean up, to

11:43  1    load the truck back after 5:00 o'clock.  So what you were

11:43  2    loading back into the truck if only 10 percent of the job we

11:43  3    were removing shutters?

11:43  4    A.  Are you going to let me answer that question?

11:43  5    Q.  Absolutely.

11:43  6    A.  Thank you.  Like I said before, they made the accordions.

11:43  7    They gave us -- the accordions are already assembled.  We had

11:43  8    to take the tracks.  We had to measure the tracks, cut every

11:43  9    leftover, every leftover.  And there was a lot of material cut

11:43  10   because we had to cut a lot of things to make everything

11:43  11   measure the right way.  Even the shutters that we got from the

11:43  12   shop many times they were too long so we had to take them

11:43  13   apart, cut them to make them the right measurement.  And all

11:43  14   that -- all the dirt, all the pieces of metal, all that stuff

11:43  15   we had to clean all of that up.  And those pieces of materials,

11:44  16   we had to take them down and load it in the truck.  We couldn't

11:44  17   leave the apartments or -- the apartments that we were working

11:44  18   at dirty.  We couldn't.

11:44  19   Q.  The answer was really to me, but that's okay.  A question

11:44  20   about -- you had Exhibit -- I was able to get one of them.  I

11:44  21   don't even know where they are; but it says Plaintiffs' Exhibit

11:44  22   Number 20, and I believe these are your bank records.  Can I

11:44  23   show you?

11:44  24   A.  Yeah.

11:44  25   Q.  This is your bank records?

JURY TRIAL - VOLUME IV OF VI

| 11:44 | 1 | A. Yes. |
|---|---|---|

11:44  2  Q.  Can you show me all the deposits that you made between

11:44  3  June, July, and August in this bank account from the company.

11:44  4  Show me the deposits.

11:44  5  A.  It doesn't show what the deposits were for.

11:45  6  Q.  It doesn't show any deposits.  Somebody asked you for your

11:45  7  bank record, and you submitted this bank record.

11:45  8  A.  Yes.

11:45  9  Q.  So where do you deposit the money?

11:45  10  A.  I deposited my money to the bank.

11:45  11  Q.  There's no deposit here from any -- very few checks here.

11:45  12  Out of 54 checks maybe there are ten checks over there that you

11:45  13  deposited.  Where did the other 42 checks went?

11:45  14  A.  What is the question that you want to ask.

11:45  15  Q.  The question is where do you put the money?  Do you have

11:45  16  another bank account?

11:45  17  A.  The only account that I have is this one.

11:45  18  Q.  It doesn't show any of your 54 checks that were deposited.

11:45  19  A.  Of course it didn't.

11:45  20  Q.  Why doesn't show?

11:45  21  A.  Because when we went -- most of the times we cashed the

11:45  22  check.

11:45  23  Q.  And you didn't deposit any cash in here.  Where the money

11:45  24  -- do you have another bank account?

11:45  25  A.  You have to pay your bills, correct?  Correct?

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

11:45  1  Q.  And you pay them cash?  Do you pay your bills cash?

11:45  2  A.  Well, you have to pay to -- you have to do your stuff --

11:46  3  Q.  Yes or no.  You pay your bills in cash?

11:46  4          MR. KELLY:  Can he answer the question, Your Honor?

11:46  5          THE COURT:  Okay.  We're going to recess for lunch

11:46  6  now.  Today we're going to be in recess until 1:15, Members of

11:46  7  the Jury.  So the Court will be in recess until 1:15.  When you

11:46  8  return, we'll continue the cross-examination by Mr. Leiva.

11:46  9          THE MARSHAL:  All rise for the jury.

11:46  10          THE COURT:  You can step down, Mr. Feliciano.

11:46  11          MR. FELICIANO:  Yes, sir.

01:18  12      (Jury Out)

01:18  13      (Lunch Recess)

01:19  14          THE LAW CLERK:  All rise.

01:19  15          THE COURT:  Okay.  Bring the jury in, please.

16          MR. KLEPPIN:  Did you get the jury instructions?

17          THE LAW CLERK:  Yes.  Thank you.

18          MR. KLEPPIN:  Okay.

19          MR. KELLY:  Did you want the flashcard today of the

20  jury instructions?  I have mine on a flashcard.

21          THE LAW CLERK:  That would be great.  Thank you.

01:19  22          MR. KELLY:  Okay.  Thanks.

01:19  23      (Jury In)

01:19  24          THE COURT:  All right.  Be seated, please.

01:19  25          Mr. Leiva, you may continue your cross-examination.

APRIL 14, 2011

01:19  1        MR. LEIVA:  Thank you.

01:20  2   BY MR. LEIVA:

01:20  3   Q.  I just want to make a couple of corrections about the

01:20  4   testimony that Mr. Mario probably don't remember.  It was not

01:20  5   the Sheriff's office of Pompano.  It was the City of Oakland

01:20  6   Park.  That was a job.  Instead of the Sheriff's of Pompano --

01:20  7   we never did a job at the Sheriff's office of Pompano.  It was

01:20  8   the City of Oakland Park.  Do you agree?

01:20  9   A.  (Witness nods head affirmatively).

01:20  10  Q.  Good.

01:20  11       THE COURT:  You have to answer.

01:20  12       MR. MILAN:  Oh, yes.  I'm sorry.

01:20  13  BY MR. LEIVA:

01:20  14  Q.  When you worked at Aberdeen Country Club -- that's another

01:20  15  correction.  The name is Aberdeen Country Club.  Nobody here

01:20  16  corrected that because I don't think they know what I did with

01:20  17  the company.  One of the biggest problems they have is that the

01:20  18  gentlemen there, they wanted to eat dinner early especially on

01:20  19  Saturdays, correct?

01:20  20  A.  I don't recall.

01:20  21  Q.  I was given strict instructions from the country club

01:21  22  manager that all work had to cease by 2:00 o'clock at the

01:21  23  country club.

01:21  24  A.  That's not true.

01:21  25  Q.  The people were coming to dinner at 3:00 o'clock.  You

JURY TRIAL - VOLUME IV OF VI

01:21 1   couldn't be hammering and making all the noise when the people

01:21 2   are in the country club.  It's impossible.  They would never

01:21 3   allow that to happen.  You know that.

01:21 4   A.  That's not true.

01:21 5   Q.  So you say you worked until 6:00 o'clock when people were

01:21 6   having dinner at the Aberdeen Country Club you mean?

01:21 7   A.  There was three buildings there.

01:21 8   Q.  I'm talking about the largest installation was the dining

01:21 9   room.  It was a huge building.  It was 60 to 70 percent of the

01:21 10  entire project.  My question is:  Do you tell -- are you

01:21 11  telling me that you worked until 6:00 o'clock at Aberdeen

01:21 12  Country Club where people were having dinner there and they

01:21 13  would allow that to happen?

01:21 14  A.  When we work in the country club, in the dinner place, we

01:21 15  work in the mornings; and we move to the other place where the

01:22 16  other two buildings were.

01:22 17  Q.  We finished one building at a time.  I wanted to remind you

01:22 18  of that.  We never did a portion of one building and a portion

01:22 19  of another building because we didn't manufacture that job by

01:22 20  pieces.  We did one building at a time.  So what work do you do

01:22 21  in another building?  You had no material.  You had no work.

01:22 22  A.  We were working on the premises, and we worked the hours

01:22 23  that I told you we worked.  You know that.

01:22 24  Q.  No.  I know that.  I've got the schedule of the

01:22 25  engineering.  I know exactly how the project went.

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

01:22  1    A.   Okay.

01:22  2    Q.   I've got the documentation.  Okay.  That says you worked

01:22  3    until 6:00 o'clock.

01:22  4    A.   I worked, like I said, approximately to 5:00/5:30; and I

01:22  5    came back to the shop.

01:22  6    Q.   You worked on Saturday to 5:00/5:30.  I remind you you're

01:22  7    under oath.

01:22  8    A.   I'm under oath.

01:22  9         THE COURT:  He's told us that several times, Mr.

01:22  10   Leiva.

01:22  11        MR. LEIVA:  No.  But he's --

01:22  12        THE COURT:  You don't agree with the answer the

01:22  13   witness gives.

01:22  14   BY MR. LEIVA:

01:22  15   Q.   So you say yes.  We work there till 5:30 including

01:23  16   Saturdays?

01:23  17   A.   When we worked, we worked --

01:23  18   Q.   Yes or no.

01:23  19   A.   Including Saturdays?

01:23  20   Q.   Yes or no.

01:23  21   A.   I can't say that we work including Saturdays because we

01:23  22   moved from one place to another.

01:23  23   Q.   But you said before that you work until 6:00 o'clock.  My

01:23  24   question is --

01:23  25   A.   To 5:00/5:30, and we went back to the shop.  I've been

01:23  1  saying that all the time.

01:23  2  Q.  You did that, right?

01:23  3  A.  Yes, sir.

01:23  4  Q.  Do you know what a wind load is?

01:23  5  A.  No.

01:23  6  Q.  You worked at Points of America.  You don't know wind

01:23  7  loads?

01:23  8  A.  No.  Explain it to me.

01:23  9  Q.  I gave you the wind loads with your work order every

01:23  10  morning when you worked at Points of America.

01:23  11  A.  I don't remember what it was.  What was it?

01:23  12  Q.  You don't know what a wind load is?

01:23  13        THE COURT:  Ask a question.  He answered the question.

01:23  14  BY MR. LEIVA:

01:23  15  Q.  Yes or no?  Do you know what a wind load is?

01:23  16  A.  No.

01:23  17  Q.  And you expect Frank McCarroll to know what a wind load is?

01:23  18        THE COURT:  You've asked him four times now --

01:23  19  BY MR. LEIVA:

01:23  20  Q.  Yes or no.

01:23  21        THE COURT:  -- and he says he doesn't know.

01:23  22  BY MR. LEIVA:

01:23  23  Q.  Do you expect -- do you believe Frank McCarroll will know

01:23  24  what a wind load is?

01:23  25  A.  I don't know.

JURY TRIAL - VOLUME IV OF VI

01:23  1   Q.  You mentioned before that I was behind five weeks in my

01:24  2   payroll.

01:24  3   A.  Yes.

01:24  4   Q.  My recollection is -- and I have the record -- that between

01:24  5   the time you started, August 21st, your first check was August

01:24  6   28th, 2006.  And July 6th, 2007, you got a check every week.

01:24  7   Isn't that true?

01:24  8   A.  July what?

01:24  9   Q.  July 6, 2007, you got a check every week?

01:24  10  A.  I probably had.  I don't know.

01:24  11  Q.  I have to admit that I had a problem on July 13.  That

01:24  12  payroll was a problem.  I admitted it.  My fault.  I had to

01:24  13  open a new account at Bank of America.  And, remember, I

01:24  14  started giving you funds from Bank of America; and I would

01:24  15  start paying you cash also during the time?

01:24  16  A.  You gave me cash.  That's true.

01:24  17  Q.  So we established July 6th as a date when I start giving you

01:25  18  my own checks and cash.  July 13, 20th, 27th.  He already showed

01:25  19  you what you signed previously when you signed when you

01:25  20  received the cash.

01:25  21  A.  Yes.

01:25  22  Q.  When I moved to a new location on August 14, remember that

01:25  23  I had a big warehouse, 20,000 square feet of warehouse, a

01:25  24  wonderful office that we built.  I was very proud of that.  The

01:25  25  office was magnificent.  I moved August 14th.  What happened

JURY TRIAL - VOLUME IV OF VI

01:25  1   when I moved to the new location?

01:25  2   A.  What do you want me to answer?

01:25  3   Q.  Did you work that day that I was moved to new location?

01:25  4   A.  We were moving the place.  We were moving all the materials

01:25  5   from one place to the other one.

01:25  6   Q.  You moved materials?

01:25  7   A.  Of course.  I remember that you supplied the truck, and we

01:25  8   drove to 10:00 o'clock at night to move because you were kicked

01:26  9   -- the company was kicked out of that original place.  Remember

01:26  10  those nights?

01:26  11  Q.  I remember when you were sitting there.

01:26  12  A.  Remember those nights?

01:26  13  Q.  I remember you were sitting in the chair.  You wanted to

01:26  14  get paid.  That I remember very well, and I wasn't happy about

01:26  15  it.  Remember when we moved to the new location?

01:26  16  A.  Yes, I remember.  I helped you move.

01:26  17  Q.  How many installations did we do between August 14th and

01:26  18  August 21st?

01:26  19  A.  I don't remember how many we did, but we did.

01:26  20  Q.  Zero.  You couldn't produce anything.

01:26  21  A.  We did installations.  We had materials prepared.

01:26  22  Q.  Zero.

01:26  23  A.  We had materials prepared from the place that we moved;

01:26  24  that it took us a couple of days to move.  We worked.

01:26  25  Q.  Four days to move.

APRIL 14, 2011

01:26  1   A.   Yeah.

01:26  2   Q.   Four?

01:26  3   A.   And we worked until 10:00, sometimes 11:00 o'clock, to help

01:26  4   you move.

01:26  5   Q.   So you say your work is during and also you were moving at

01:26  6   the same time?

01:26  7   A.   We helped --

01:26  8   Q.   Yes or no?  Yes or no?

01:26  9   A.   We helped you move.

01:26  10  Q.   But you also said you worked installation, right?

01:26  11  A.   I was working with you.

01:26  12  Q.   You were not doing any installation during that week?

01:27  13  A.   No.  I wasn't doing installation, but we moved.  I helped

01:27  14  you moved.  Four days we were moving.

01:27  15  Q.   When we moved to a new building, what happened?

01:27  16  A.   Well, after we moved to the new building, everything was

01:27  17  almost gone.

01:27  18  Q.   Excuse me?

01:27  19  A.   Everything was almost gone.  Hardly any --

01:27  20  Q.   No, no, no.  The second location.  The second -- the one

01:27  21  that you explain you help us move, so you must know.  So you

01:27  22  helped us move?

01:27  23  A.   Yeah.

01:27  24  Q.   Do you recollect what happened when we got to the new

01:27  25  location?

01:27    1    A.  We had to move again.

01:27    2    Q.  No.  How long did we stay there?

01:27    3    A.  I don't recall.

01:27    4    Q.  But you helped us move you said, right?

01:27    5    A.  Yes.

01:27    6    Q.  And then you don't recall what happened?

01:27    7    A.  How long we stayed in the second?  We didn't stay too long.

01:27    8    You know that.  We didn't stay too long in that second

01:27    9    location.

01:27   10    Q.  A week.

01:27   11    A.  Yeah.  Maybe a week.

01:27   12    Q.  And you helped us move from the second location to the

01:27   13    third location?

01:27   14    A.  Yes, we did.

01:27   15    Q.  You remember my accident?

01:27   16    A.  No, I don't remember that.

01:28   17            MR. LEIVA:  Can I show -- Your Honor, can I show my --

01:28   18            MR. KLEPPIN:  Eddie.

01:28   19            MR. HEIDELBERGER:  Eddie.

01:28   20    BY MR. LEIVA:

01:28   21    Q.  You don't remember my accident?  Okay.

01:28   22    A.  I don't remember.

01:28   23    Q.  I had surgery, surgery here on my spine.  Broken ribs.  I

01:28   24    have a scar from here to here.  You were there.

01:28   25            THE COURT:  He says he doesn't remember.  Now, maybe

01:28  1   if you had an accident, you can tell us about it when you're a

01:28  2   witness.

01:28  3            MR. LEIVA:  I definitely will.

01:28  4            THE COURT:  Good.

01:28  5   BY MR. LEIVA:

01:28  6   Q.  So when do you say you resumed work, you came back to work

01:28  7   like installations?

01:28  8   A.  Which period to which period?

01:28  9   Q.  I'm talking about -- we established that August 14 there

01:28  10  was no production because I got no machinery to produce

01:28  11  anything.  Then I move again four days later, five days later

01:28  12  to a new location.  August 26th I moved to the new building.

01:29  13  You were in the new building, the last one, right?

01:29  14  A.  The last one, of course.

01:29  15  Q.  And how many jobs did you get when we moved to the new

01:29  16  building, how many jobs to install?

01:29  17  A.  It probably took a couple of days to prepare new materials,

01:29  18  and then we start installing again as I recall.

01:29  19  Q.  You didn't do any work in the month of September.  None.

01:29  20  A.  In the month of September I left the company, in about the

01:29  21  first or second week of September of '07.  The company was

01:29  22  already gone.

01:29  23  Q.  The company -- when we moved to the first -- you never

01:29  24  worked any day in the month of September, never did.  You came

01:29  25  to the office to collect money?

JURY TRIAL - VOLUME IV OF VI

01:29  1   A.   Yeah.  The money that you owe me.

01:29  2   Q.   Exactly.  I don't deny that.  I owed you money.  Yes, I

01:29  3   did.  I was behind three-and-a-half weeks.  And you see the

01:29  4   receipt that you signed, and I gave you cash.  And I paid you

01:29  5   every dime that I owe you.  And in addition to that, I gave you

01:29  6   a computer too, remember?

01:29  7   A.   No.  I never took anything from you.  Never.

01:30  8   Q.   Oh, you were not the one that took all the computers?

01:30  9   A.   Never.

01:30  10  Q.   18 machines?

01:30  11  A.   Never.

01:30  12  Q.   Okay.

01:30  13  A.   I don't own a computer.

01:30  14  Q.   I didn't say you took anything.  I gave you a computer.

01:30  15  A.   No.  You didn't give me anything.

01:30  16  Q.   Yes, I did.

01:30  17  A.   No.  You didn't give me anything.

01:30  18  Q.   Okay.  So just say no.  Do you know Mark Saffron and Mike

01:30  19  Morris?

01:30  20  A.   Mark was the -- if I recall, he was the guy that was

01:30  21  supposed to train the installers.

01:30  22  Q.   Who trained you though?

01:30  23  A.   Jerico did.

01:30  24  Q.   Not Mike Morris or Mark Saffron?

01:30  25  A.   Mike, probably I saw him a couple of weeks when I started

01:30  1  because I don't know how long he lasted there.

01:30  2  Q.  Well, what did they do over there?

01:30  3  A.  Who?

01:30  4  Q.  Mark and Mike Morris.

01:30  5  A.  I don't recall.  I know Mark was supposed to be the guy

01:31  6  that gave the training.

01:31  7  Q.  Your supervisor.

01:31  8  A.  Yeah.

01:31  9  Q.  He was your supervisor.  He would go to the job and do the

01:31 10  QC's.

01:31 11  A.  I don't know how long he lasted because that was at the

01:31 12  beginning when you started the company.

01:31 13  Q.  I did this --

01:31 14  A.  I don't know.

01:31 15  Q.  They lasted until December of 2006.  So August, September

01:31 16  -- September, October, November until December.  So over

01:31 17  three-and-a-half months you worked with them because they were

01:31 18  your direct supervisor.

01:31 19  A.  At the beginning I remember, yeah, he went to the places.

01:31 20  He gave us instructions.  He was the one that gave us at the

01:31 21  beginning to the crews how to install it, yes.

01:31 22  Q.  Right.  So it wasn't Frank M^cCarroll and Steve Heidelberger

01:31 23  that ever gave you instruction from September through December.

01:31 24  It was Mike and Mark and myself, of course, correct?

01:31 25  A.  Yes.

JURY TRIAL - VOLUME IV OF VI

01:31  1   Q.   Okay.  Do you know why they left or whether they were

01:32  2   fired?

01:32  3   A.   No idea.

01:32  4   Q.   You have no idea.  I'll explain that when it's my testimony

01:32  5   why they left.  Do you know Daniel Delgado?

01:32  6   A.   I don't recall.

01:32  7   Q.   Did you work for him?

01:32  8   A.   Who?

01:32  9   Q.   Did you work for Mike Chatas (ph)?  Do you remember Mike

01:32  10   Chatas (ph)?  Daniel?  Danny?  You don't know Danny?

01:32  11   A.   I don't remember.

01:32  12   Q.   You don't know Danny, and you don't know Dorey?  Dorey was

01:32  13   his wife.

01:32  14   A.   I don't remember those people.

01:32  15   Q.   Well, okay.  Do you remember back in May when Danny switch

01:32  16   --

01:32  17   A.   Oh, okay.  The people that you hired to do private things

01:32  18   for you.

01:32  19   Q.   No, no, no, no.  He did a lot.  He worked with you at the

01:32  20   Marine Tower for a while.  Danny Delgado was there.  Remember

01:32  21   the crazy guy with the ropes?

01:32  22   A.   Yeah, yeah.  I remember him.

01:32  23   Q.   Now you remember.  I just wanted to make sure you

01:32  24   remembered him.  Very well.  You saw him for a year there.  He

01:32  25   was there all the time, in and out, whatever.  You signed a

APRIL 14, 2011

01:33  1   form.  Remember that he made you sign a form, all of you, where

01:33  2   we were switching you from salary to square foot?

01:33  3   A.  I remember when you tried to do that.

01:33  4   Q.  I tried to do that?

01:33  5   A.  Yeah.  You tried to put us from the time that you were

01:33  6   paying us to square footage, and we never got paid that way.

01:33  7   Never.

01:33  8   Q.  What happened?  What happened?  Tell the jury what

01:33  9   happened.

01:33 10   A.  Because you paid us.

01:33 11   Q.  Wait, wait.  Tell them.

01:33 12   A.  Because when that -- when you tried to do that, the

01:33 13   company, "you" company, "you" company kept paying us.  I never

01:33 14   got money from him not one time because you remember --

01:33 15   Q.  So you remember, right?  You remember how we switched and

01:33 16   you signed a form.  And then he required for every driver to

01:33 17   have their own truck, their own insurance, their own Workmen's

01:33 18   compensation.  Remember the problem?

01:33 19   A.  Yeah.

01:33 20   Q.  He wanted it?

01:33 21   A.  He was a problem and we tried -- and you --

01:33 22   Q.  It's in there.  You signed it.

01:34 23   A.  Yeah.  And you tried to do that, but you wanted to keep the

01:34 24   company in small groups.  And there was some that you wanted to

01:34 25   keep, and one of them it was me and my crews.  And you kept --

01:34  1    you kept us as your employees.  I didn't work for him.  I

01:34  2    worked for you.

01:34  3    Q.  Three weeks.

01:34  4    A.  I worked for you.

01:34  5    Q.  Remember the total diaster?  Why was it a total disaster?

01:34  6    You remember?

01:34  7    A.  Yeah.  Because they didn't pay, didn't pay the other guys.

01:34  8    Q.  No.  No, no.  Remember, remember now very -- you remember.

01:34  9    A.  Yeah.

01:34  10   Q.  Remember they couldn't make a living doing it by square

01:34  11   footage.  Ibacache was working -- not with you at that time --

01:34  12   and Ibacache one week had $325, and he came crying to me that

01:34  13   he couldn't pay his rent.  So what did I do?  Like an idiot I

01:34  14   paid him the difference.  You couldn't make a living by doing

01:34  15   it by square footage, so everybody asked me to switch back.

01:34  16   They came to me.  You know.  You were there.  You all came to

01:35  17   me and you told me to switch back to salary.  Yes or no?

01:35  18   A.  No.  That wasn't the way.  I kept working for you, and I

01:35  19   remember --

01:35  20   Q.  Listen.  You remember them?

01:35  21   A.  Yeah.  I remember them.

01:35  22   Q.  You remember the whole crew, right?

01:35  23   A.  Would you let me answer the question.

01:35  24   Q.  Yes, yes, yes.

01:35  25   A.  Okay.  Thank you.  You always kept me as your employee,

01:35  1    always.  And when we started doing that log-on for the square

01:35  2    footage, the first week we did over 2,000 square footage.  And

01:35  3    did I give it to you?  I gave you the papers.  Did you pay me

01:35  4    for it?  No, you didn't.

01:35  5    Q.  You did 2,000 square footage where?

01:35  6    A.  If the different houses that we did.

01:35  7    Q.  You never did 2,000 square feet.  You could never do 2,000

01:35  8    square feet.  What was the average house, size of a house, the

01:35  9    footage?

01:35  10   A.  I don't remember.  You remember there was --

01:35  11   Q.  You installed for a year.

01:35  12   A.  Yeah.  I installed for a year.

01:35  13   Q.  And you don't remember what the average square footage of

01:36  14   the house was?

01:36  15   A.  (Shakes head negatively).

01:36  16   Q.  You have no idea?

01:36  17   A.  I was working for a -- to install openings.

01:36  18   Q.  No, no, no.  Listen, when I gave you your paperwork, which

01:36  19   I did --

01:36  20   A.  Uh-huh (affirmative).

01:36  21   Q.  -- I gave you a description of every opening in the house

01:36  22   and the measurement of every opening in the house and the total

01:36  23   square footage of the house.  Everything was there.  There was

01:36  24   a plot.  Remember the plot form where we plotted everything

01:36  25   down?

01:36  1   A.  Like a drawing, correct?

01:36  2   Q.  Yes.  And -- well, the drawing and the plot, there were two

01:36  3   things.  The plot was the one that specifically has every

01:36  4   opening, every measurement of every window, every door and so

01:36  5   forth.  The drawing was engineering.  They didn't do a design.

01:36  6   So we got the design, the plot.  You've got the permits.  I

01:36  7   mean you've got a million documentation that I put together.

01:36  8   And it sometimes requires a wind load.  Buildings like Marine

01:37  9   Tower we have to include wind loads.  And also we have the

01:37  10  engineering for the shutters.  Remember?

01:37  11  A.  Yes.

01:37  12  Q.  125 hertz, whether it was just metal or general 90 degrees,

01:37  13  125 degrees, et cetera.  I gave you all those papers.  You

01:37  14  know, I don't think Frank M$^c$Carroll and Steve would know what

01:37  15  I'm talking about.  But that's -- when I am to the stand, I

01:37  16  will explain that.  Anyway, I switched everybody to square

01:37  17  footage.  The average house we did was 450 feet of opening.

01:37  18  When you measure your doors and your windows, only your doors

01:37  19  and your windows, not the entire walls around your house, the

01:37  20  average was 400 square feet.  We charge about $18.  So the

01:37  21  average job was about $6,000, $7,000.  You agreed to that,

01:37  22  right?  Remember?  It was 6,000, 7,000?

01:37  23  A.  It was around 10, $12,000.

01:37  24  Q.  Right.  So if you say 2,000 square feet, that you did one

01:37  25  house every day practically?

01:38  1   A.  Not all the houses have 400 square footage.

01:38  2   Q.  No, no.  Well, let's say it was 900.  Obviously it will

01:38  3   take you two days.

01:38  4   A.  900, a thousand?  Yes.  About two days.

01:38  5   Q.  Right.  So if you did 2,000 square foot in a week and you

01:38  6   did a house every day, how come I only install --

01:38  7   A.  We didn't -- couldn't do a house like, for example, 800 or

01:38  8   900 in one day.

01:38  9   Q.  No, not even for 50.  Not even for 50 because I only

01:38  10  install a total with eight crews a total of 300 homes, about

01:38  11  320 in a year and four months.  Going by what you just told me

01:38  12  that you're doing 2,000 square feet, an average of four or five

01:38  13  houses a week, that means that you did 20.  Let's say you

01:38  14  worked 52 weeks, right, and you did five.  That means that I

01:39  15  only would need your crew to complete the 250 houses.  Some of

01:39  16  the houses were bigger, you know, of course, and were the same

01:39  17  building.  But why did I have eight crews?  I mean, you know, I

01:39  18  already got you and two crews and finish all the job.  So what

01:39  19  I'm trying to say is you never did 2,000 square feet, correct?

01:39  20  A.  Of course I did.  Of course I did.  Do you want to add the

01:39  21  numbers?

01:39  22  Q.  No.

01:39  23  A.  800 square foot for a house, two days.  If you get two

01:39  24  houses like that, that's 1600 square feet in four days.  It's

01:39  25  simple mathematics.

01:39   1   Q.   I got a schedule when I gave you every job. I got

01:39   2   documentation of every job that I gave you. And unfortunately,

01:39   3   fortunately for you, I didn't bring it with me or I would show

01:39   4   you. Every time --

01:39   5   A.   You should bring it.

01:39   6   Q.   I probably will.

01:39   7   A.   You should bring it.

01:39   8   Q.   Okay. And I'm going to show you.

01:39   9   A.   You should bring it.

01:40   10   Q.   And then you're going to show me there where you did a

01:40   11   house a day. I mean that's unbelievable. Anyway, Question,

01:40   12   Isn't it true -- and this I have to read -- Isn't it true that

01:40   13   when the lawsuit was first filed, first filed Steve

01:40   14   Heidelberger and Frank M$^c$Carroll were not defendants?

01:40   15   A.   That's true.

01:40   16   Q.   Why not?

01:40   17   A.   Because for me Advance. Like you're presenting them to me,

01:40   18   there were -- the Advance was you, him, Frank M$^c$Carroll, and

01:40   19   Steve Heidelberger. You were the company. You were the

01:40   20   owners.

01:40   21   Q.   No. But that's not the question. Say yes or no. Isn't it

01:40   22   true that when the lawsuit was first filed, that Steve

01:40   23   Heidelberger and Frank M$^c$Carroll were not a defendant. It was

01:40   24   only Safe Hurricane Shutters and Edward Leiva, true?

01:40   25   A.   I just told you that.

01:40 1    Q.   No, no.  It's true or not?

01:40 2    A.   Yes.  I just told you yes.

01:40 3    Q.   Yes or no?

01:41 4    A.   And you asked me why, and I explained to you why.

01:41 5    Q.   Yes.  But why didn't you do it initially?

01:41 6    A.   Because, like I said again, for me Advance, the company --

01:41 7    Q.   No.  Initially why didn't you -- my question is -- okay.

01:41 8    Second question:  Just say okay.  When did you learn that the

01:41 9    company and myself were broke?

01:41 10   A.   Ask me the question.  What do you want?

01:41 11   Q.   I mean what I'm saying to you when do you learn and by whom

01:41 12   that the company, Safe Hurricane Shutters, was broke?

01:41 13   A.   You were saying --

01:41 14   Q.   I myself was broke.

01:41 15   A.   You were saying it all the time.

01:41 16   Q.   I'm asking you a question.  When do you learn it?

01:41 17   A.   I have no idea.  At the end of the -- at the end of -- when

01:42 18   I was working, what, September when I finish.

01:42 19   Q.   September.  You learned September that the company was

01:42 20   broke and I was broke, and still you proceeded to sue the

01:42 21   company and myself even though you knew that I was broke,

01:42 22   correct?

01:42 23   A.   You owe me money, yes.

01:42 24   Q.   So you're not suing Frank M^cCarroll and Steve.  You're just

01:42 25   suing me and the company, correct?

APRIL 14, 2011

01:42   1   A.   Like I said, yes.  Like I said, the company were you --

01:42   2   three guys:  you, Frank M$^c$Carroll, and Steve Heidelberger, the

01:42   3   owners of the company.

01:42   4   Q.   No.  You keep saying -- you sued me and Safe Hurricane

01:42   5   Shutters, not them.  You sued me, not them, me.  The complaint

01:42   6   was against me.  The lawsuit was against Edward Leiva and Safe

01:42   7   Hurricane Shutters, correct?

01:43   8   A.   The original, yes.

01:43   9   Q.   Okay.  My question to you now is when did you learn that I

01:43  10   was broke and the company was broke?  When did you learn that?

01:43  11   A.   When I went to the workplace.

01:43  12   Q.   The lawyer?

01:43  13   A.   When I went to the workplace and everything was closed.

01:43  14   Q.   But the suit -- but didn't -- and then you filed a suit.

01:43  15   Right after you found out the place was closed you filed the

01:43  16   first lawsuit against myself and the company, correct?

01:43  17   A.   Yes.

01:43  18   Q.   Okay.  And if you knew I was broke, why did you sue me?

01:43  19        MR. KELLY:  Answered and answered.

01:43  20        THE COURT:  Overruled.

01:43  21        MR. FELICIANO:  Repeat the question again.

01:43  22        THE COURT:  The question is why you sued him.

01:43  23        MR. KLEPPIN:  The defense also objects on asked and

01:43  24   answered grounds.

01:43  25        THE COURT:  It has been covered.

APRIL 14, 2011

01:43  1      **MR. LEIVA:**  Well, he never gave me a straight answer,

01:43  2  Your Honor, because I asked him why he started a lawsuit

01:43  3  against me and when he learned --

01:44  4      **THE COURT:**  Excuse me.  He wants to know why you

01:44  5  didn't sue Mr. M^cCarroll and Mr. Heidelberger originally.

01:44  6      **MR. FELICIANO:**  Because, like I explained to him,

01:44  7  again for me the company was the three defendants.  Okay?  And

01:44  8  on my behalf, I thought I was suing all of them.

01:44  9      **THE COURT:**  Okay.

01:44  10  **BY MR. LEIVA:**

01:44  11  Q.  But you sued me in my name.  You thought you were suing

01:44  12  everybody.  Okay.  Now, you cannot say that Steve Heidelberger

01:44  13  had day-to-day operational control over the business, correct?

01:44  14  A.  I said that in my testimony.

01:44  15  Q.  That he had no operational control of the business.  Did

01:44  16  you agree?  Yes?

01:44  17  A.  No.  I said that he was there once a month maybe.

01:44  18  Q.  But that's not the question.  I'm asking you a question.

01:44  19  You cannot say that Steve Heidelberger by being there once --

01:45  20  okay.  He was there one time that he talked to you.  Are you

01:45  21  going to say that Mr. Steve Heidelberger by talking to you once

01:45  22  had operational control, daily operational control, weekly

01:45  23  operational control over the business?

01:45  24  A.  If he wasn't there, he can't be doing it daily.  The times

01:45  25  he was there he was doing operational control.  He was part of

01:45  1    the company, owner of the company.

01:45  2    Q.  Being an owner of a company doesn't mean you have

01:45  3    operational control.  When you are a stockholder in a company,

01:45  4    you're also an owner of the company.  That doesn't give you

01:45  5    operational control.  I was the CEO, the CFO, and the COO of

01:45  6    the company.  I had operational control.  What operational

01:45  7    control did he have specifically?  Other than that meeting that

01:45  8    you had with him once when he came to help me out when I begged

01:45  9    him to help me out because I had financial problems, and I did.

01:45  10   July 13, and he came around July 20.  Other than that whenever

01:46  11   did he have any operational control of the business?

01:46  12   A.  Operational control is like being in the company all the

01:46  13   time and saying this and that.

01:46  14   Q.  Okay.  You already answered the question that he wasn't at

01:46  15   the business all the time, and he never gave you instructions.

01:46  16   He never gave you an order.  He didn't give you anything except

01:46  17   to come assist me at my request to help straighten a financial

01:46  18   situation.  Do you think that's operational control one time?

01:46  19   A.  I don't know.

01:46  20   Q.  You don't know.  Okay?

01:46  21   A.  I don't know.

01:46  22   Q.  Can you say that Frank M$^{c}$Carroll have operational control

01:46  23   over the business?

01:46  24   A.  Of course.  He was there most of the time.

01:46  25   Q.  So you say that Steve Heidelberger did not have operational

01:46  1   control; but Frank M<sup>c</sup>Carroll have operational control?  Yes or

01:46  2   no?

01:46  3   A.   In a way if operational control is being there all the

01:47  4   time, Frank M<sup>c</sup>Carroll was there most of the time.  If

01:47  5   operational control doesn't mean that you had to be there all

01:47  6   the time, that's -- in that case, it was be none.

01:47  7   Q.   So that's -- in your opinion operational control means just

01:47  8   being there, not necessarily being in charge, not giving orders

01:47  9   or having control over the finances.  Just being there, the

01:47  10  fact that he was there once in a while, he was the -- he was

01:47  11  more like a tourist really.  For me it was -- I wish he was

01:47  12  there more time and more involved.  I needed help in the

01:47  13  business.  They were never there.  Anyway, one more question

01:47  14  and I'm done with you.  The accident on Las Olas Boulevard, do

01:47  15  you remember that accident?

01:47  16  A.   Marine Towers?

01:47  17  Q.   Yes.

01:47  18  A.   Yes.

01:47  19  Q.   What happened when that happened?

01:47  20  A.   We were working on the scaffold.  Another company that was

01:48  21  working there was moving some cables.  He hit the high voltage

01:48  22  line.  He went through the roof and caught the line on the

01:48  23  scaffolds that we were working at.

01:48  24  Q.   You were downstairs.

01:48  25  A.   We were downstairs.

JURY TRIAL - VOLUME IV OF VI

01:48  1    Q.   You were on the ground.

01:48  2    A.   Yeah.

01:48  3    Q.   Even though you were on the ground what did I say to you.

01:48  4    Take time off.   Remember?   I gave everybody time off.

01:48  5    A.   No.

01:48  6    Q.   Didn't I give you --

01:48  7    A.   You didn't give me --

01:48  8    Q.   Did I give you money?

01:48  9    A.   Can you let me finish?

01:48  10   Q.   Sure.   Go ahead.

01:48  11   A.   Okay.   Thank you.   Who took the time off was Ruben Catalan

01:48  12   and Ibacache, the ones that were there.

01:48  13   Q.   How long did they took off?

01:48  14   A.   Like two or three days.

01:48  15   Q.   No.   They took more than that.   They took like five or six

01:48  16   days.

01:48  17   A.   Two or three days, you know.

01:48  18   Q.   For the record you say they took three days off after the

01:48  19   accident.   He claimed that he never took a day off; but,

01:48  20   anyway, did I give you any money even though you were on the

01:48  21   ground?

01:48  22   A.   Yes.   You gave me money.   Yes, you did.

01:48  23   Q.   Good.   Okay.   Just say yes.   Okay?   The loan that I gave

01:49  24   you originally, the $1,500, remember?   Did you pay me that

01:49  25   money back?

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

01:49  1   A.  Yes, I did.

01:49  2   Q.  I didn't forgave you for that loan?

01:49  3   A.  No.

01:49  4   Q.  I never forgave you for that loan?

01:49  5   A.  You know, because when I -- when we had the accident, if

01:49  6   you recall --

01:49  7   Q.  Yes.

01:49  8   A.  -- we had the accident.  The reason why I wasn't on the

01:49  9   scaffold because I was there all the time was because I blew

01:49  10  this finger.  Remember that?  I went down and the other guy

01:49  11  went up to finish whatever we were doing.

01:49  12  Q.  Uh-huh (affirmative).

01:49  13  A.  Yeah.  I was --

01:49  14  Q.  Yes.

01:49  15  A.  -- to ensure that we're, you know, safe.  And I got hurt

01:49  16  that same day.

01:49  17  Q.  Your finger got hurt.  I don't recall.

01:49  18  A.  Okay.  You went, made a deal with the company that caused

01:49  19  the accident.  How much you got?  Twenty-five, $30,000?

01:49  20  Q.  No.  Twenty-three.

01:49  21  A.  23,000?

01:49  22  Q.  Uh-huh (affirmative).

01:49  23  A.  And you gave Rolando Ibacache and --

01:49  24  Q.  They got good money.

01:49  25  A.  -- Ruben Catalan like two, $3,000.

01:49  1   Q.  No.  Ruben Catalan got 3,000 plus I forgave him a loan of

01:50  2   $4,785.  So Mr. Ruben Catalan got $7,800 for an injury that

01:50  3   lasted two days.  That's not a bad piece of change for two

01:50  4   days.  $7,800.  That's the way it was.

01:50  5   A.  Yeah.

01:50  6   Q.  That's why the company went under by the way.

01:50  7   A.  You gave me around a thousand something dollars.  I don't

01:50  8   remember how much it was.

01:50  9   Q.  You got a little less, whatever, yeah, plus 1500.  I

01:50  10  forgave you that $1500?

01:50  11  A.  No.  Because when --

01:50  12  Q.  You never paid me.

01:50  13  A.  When you gave me the original loan, Brad Bungo started

01:50  14  taking money every month, a hundred dollars.  I owed you at

01:50  15  that moment around $500 at the most.  What do you do?

01:50  16  Q.  I forgave you whatever you owed me --

01:50  17  A.  Yeah.

01:50  18  Q.  -- right?

01:50  19  A.  Yeah.

01:50  20  Q.  Okay.  Just to show that -- Ibacache, I gave him like

01:50  21  $5,000.  He really didn't have to miss any day's work.  None.

01:50  22  He wasn't hurt.  I gave the other guy 7,000 for two days' work

01:51  23  that he missed.  It's not a bad deal.  And you got about 2,000

01:51  24  for the little -- thank you very much.

01:51  25          MR. KLEPPIN:  We object on grounds of relevance, Your

01:51 1  Honor.

01:51 2  **THE COURT:**  Sustained.

01:51 3  **MR. LEIVA:**  No more questions.

01:51 4  **THE COURT:**  Okay.

01:51 5  **MR. LEIVA:**  No more questions, Your Honor.  Thank you

01:51 6  for your patience.

01:51 7  **THE COURT:**  Mr. Feliciano, you may step down.

01:51 8  **MR. FELICIANO:**  Thank you.

01:51 9  **THE COURT:**  Could we have your next witness, Mr.

01:51 10  Kelly?  Your next witness?

01:51 11  **MR. KELLY:**  Yes.  I call the plaintiff, Mr. Milan.

01:51 12  **THE COURT:**  Step up here, please.  Please raise your

01:51 13  right hand.  He needs an interpreter.  Here's the interpreter.

01:51 14  Okay.

01:51 15  **THE INTERPRETER:**  Yes, Your Honor.

01:51 16  **THE COURT:**  Okay.  Raise your right hand, please.

01:51 17  **AUGUSTIN MILAN, PLAINTIFF, SWORN.**

01:52 18  **THE COURT:**  All right.  Be seated, please.  Tell us

01:52 19  your full name.

01:52 20  **MR. MILAN:**  Augustin Milan.

01:52 21  **THE COURT:**  Spell your last name, please.

01:52 22  **MR. MILAN:**  Augustin Milan, M-i-l-a-n.

01:52 23  **DIRECT EXAMINATION**

01:52 24  BY MR. KELLY:

01:52 25  Q.  Good afternoon, Mr. Milan.

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

01:52  1    A.  Good afternoon.

01:52  2    Q.  Mr. Milan, did you -- were you ever employed by the

01:52  3    defendant Safe Hurricane Shutters and the individual

01:52  4    defendants?

01:52  5        MR. KLEPPIN:  Objection, Your Honor; calls for a legal

01:52  6    conclusion.

01:52  7        THE COURT:  Regarding what?

01:52  8        MR. KLEPPIN:  With respect to employed by all

01:52  9    defendants.

01:52 10        THE COURT:  Sustained.

01:52 11    BY MR. KELLY:

01:52 12    Q.  Did you ever work for Safe Hurricane Shutters?

01:52 13    A.  Yes.

01:52 14    Q.  And do you remember when your first day of work was, the

01:53 15    month and day and year?

01:53 16    A.  I started in July 2007, at the end of July.

01:53 17    Q.  And do you recall when you stopped working for the company?

01:53 18    A.  September of the same year, the second or the third week.

01:53 19    Q.  And what was your job at Safe Hurricane Shutters?

01:54 20    A.  Installer and driver.

01:54 21    Q.  When you would drive, would you also do installation on the

01:54 22    same days?

01:54 23    A.  Yes.

01:54 24    Q.  When you first started working in July of 2007, do you

01:54 25    recall whether there was a particular project that you

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

01:54   1   primarily worked on?

01:54   2   A.   No.  There were just small sites like homes.

01:55   3   Q.   So when you first started, you only did residential

01:55   4   projects?

01:55   5   A.   Yes.

01:55   6   Q.   Did you ever work on any of the big projects, the big

01:55   7   commercial projects?

01:55   8   A.   No.

01:55   9   Q.   When you would start work on Mondays, where would you first

01:55  10   go to in the morning, the first place?

01:55  11   A.   What was the question?

01:55  12   Q.   In the morning on Mondays when you would go to work, where

01:55  13   would be the first place that you would go?

01:55  14   A.   When I first started working for the company?

01:56  15   Q.   Yes.

01:56  16   A.   I would wait for those to come out of the company around

01:56  17   7:30 or 8:00.  And then we would go to the first job site where

01:56  18   my co-worker would be given papers to know where to go.

01:56  19   Q.   Did I hear you say 7:30?

01:56  20   A.   Yes.  We would start between -- we would leave between 7:30

01:56  21   and 8:00.

01:56  22   Q.   And the residential projects in July, were they in any

01:57  23   particular county that you can recall?

01:57  24   A.   They were in the County of Palm Beach.  Two or three others

01:57  25   were in Coconut creek.  I don't remember the others.

JURY TRIAL - VOLUME IV OF VI

01:57  1  Q.  Did you -- how many -- in July which days of the week did

01:57  2  you work?

01:57  3  A.  Monday through Saturday.

01:57  4  Q.  Was there an average time that you would normally go to the

01:58  5  office first before going to the job?

01:58  6  A.  What was the question?

01:58  7  Q.  Was there an average time that you normally would first

01:58  8  report to Safe Hurricane's office?

01:58  9  A.  When I got there in the morning when the shop was open, the

01:58  10  first thing I would do was find the keys for the truck, examine

01:58  11  it completely so I wouldn't have any problems with it during

01:58  12  the way -- during the road.  Since I was the driver I was

01:58  13  responsible for it.

01:58  14  Q.  And what time would you normally arrive at the shop?

01:59  15  A.  Between 7:10 and 7:15.

01:59  16  Q.  Was that only on Monday or was that other days as well

01:59  17  during the week?

01:59  18  A.  No.  That was the time to start.

01:59  19  Q.  When you first started working in July, were you -- how

01:59  20  much were you paid?

01:59  21  A.  Mr. Leiva gave me a check for $700.

01:59  22  Q.  Was that for -- well, how long of a period was that

01:59  23  supposed to be for?

02:00  24  A.  I'm not sure for what that was.  He gave me the check, and

02:00  25  I'm not sure if it was for 40 hours or it was going to be as a

JURY TRIAL - VOLUME IV OF VI

02:00  1   salary.

02:00  2   Q.  Did you -- how often did you -- did you ever get more than

02:00  3   $700 checks?

02:00  4   A.  No.

02:00  5   Q.  So during your entire employment whenever you got paid it

02:00  6   was $700?

02:00  7   A.  Well, I'm not sure if two or three checks.  One was cashed,

02:00  8   but one came back because it had no funds.  I handed it back to

02:01  9   him.  I spoke to him, and I told him that there was a problem.

02:01  10  There are no funds, and I need to get that money in order to

02:01  11  pay my rent.

02:01  12  Q.  And what did Mr. Leiva do?

02:01  13  A.  He took back the check, and he told me that he was going to

02:01  14  do everything possible in order to pay me.

02:01  15  Q.  Did you ever -- do you see the other two defendants in the

02:01  16  case, Mr. Heidelberger and Mr. M$^c$Carroll, sitting here?

02:01  17  A.  I never knew them in person.  I never knew them.

02:02  18  Q.  Do you know whether they ever communicated anything to you

02:02  19  through a translator?

02:02  20  A.  No, never.

02:02  21  Q.  And with respect to these $700 checks how often did you

02:02  22  receive those checks?

02:02  23  A.  It was by the week.

02:02  24  Q.  Now, in July do you recall -- was there a normal time that

02:02  25  you would after you were at a work site that you would return

JURY TRIAL - VOLUME IV OF VI

02:02  1    back to the office again with the truck?

02:02  2    A.   Yes.

02:02  3    Q.   And what time was that usually?

02:03  4    A.   Well, with my co-worker that I used to hang out with, we

02:03  5    would go back between 5:00/5:30.

02:03  6    Q.   And then when you would return at 5:00 or 5:30, when would

02:03  7    you actually then go home?

02:03  8    A.   We would get there, and my co-worker would hand in the work

02:03  9    -- the report from the day.  And I would stay and clean the

02:04  10   car, take out all the old aluminum.

02:04  11   Q.   And can you tell me about what time when you were finished

02:04  12   and you would leave the shop to go home.

02:04  13   A.   It would take me between 30 to 35 minutes to do this.

02:04  14   Q.   Now, that schedule you just described, was that -- did that

02:04  15   -- was that standard Monday through Saturday or were any of the

02:04  16   days normally shorter than other days?

02:05  17   A.   There were no short days because the other one didn't want

02:05  18   us to get there early.

02:05  19   Q.   With respect to the schedule we just discussed was the

02:05  20   August -- was August and July similar with respect to the

02:05  21   schedules?

02:05  22   A.   Yes.

02:05  23   Q.   Were you yourself involved at all in moving the shop?

02:05  24        THE INTERPRETER:  Moving the what?

02:05  25        MR. KELLY:  Moving the shop to a different location.

APRIL 14, 2011

02:06  1        **MR. MILAN:**  Yes.  They asked us to help load one of

02:06  2  the trucks and to load the small trucks with smaller things.

02:06  3  **BY MR. KELLY:**

02:06  4  Q.  Did you -- in the month of September, do you recall

02:06  5  actually doing any installation in September?

02:06  6  A.  By September he was already in the second place, so on that

02:06  7  second place he did do some installations; but I didn't have

02:07  8  anything to do with them.

02:07  9  Q.  And then in September -- after September you didn't work

02:07  10  anymore after that?  Your employment was over at that point,

02:07  11  correct?

02:07  12  A.  When he moved to that second place, I kept on going.  And I

02:07  13  kept asking Mr. Leiva to find out whether we were going to be

02:07  14  terminated or not.  And we would have some small meetings

02:07  15  between the installers, the factory workers.  And there were

02:08  16  always workers who would ask you to get out.  And that's where

02:08  17  all the conversations ended.  We never came to an agreement.

02:08  18  Q.  An agreement regarding?

02:08  19  A.  An agreement whether all of the people would be terminated

02:08  20  or whether he would terminate only certain people.

02:08  21  Q.  After the shop had moved to the new location in September,

02:08  22  did you report to work?

02:09  23  A.  I worked for three days in that new location, but there was

02:09  24  not any new installation.

02:09  25  Q.  Was that in September?

02:09  1  A.  Yes.  In September when he moved to the new location.

02:09  2  Q.  So how many days in September did you actually report to

02:09  3  the shop for work?

02:09  4  A.  Around those days.

02:09  5  Q.  Can you tell me how many days in September if you can

02:09  6  remember?

02:10  7  A.  I reported three days to that place, but I kept on going to

02:10  8  see if I could talk to Mr. Leiva.  And I kept going and going

02:10  9  up until when he moved to the third location to see if we could

02:10  10  talk to him.

02:10  11  Q.  But did you have -- but you only actually did work in three

02:10  12  days.  Is that what you said?

02:10  13  A.  At the factory.

02:10  14  Q.  And what -- could you describe what you did in the factory

02:10  15  those three days.

02:10  16  A.  Well, going back to building more shutters.

02:10  17  Q.  And during those three days that you worked in the factory

02:11  18  at the end what time would you -- do you recall a time you

02:11  19  would show up at the factory?

02:11  20  A.  I showed up there between 7:15 and 7:20.  I'm not sure

02:11  21  exactly.

02:11  22  Q.  And do you recall during those three days at the factory

02:11  23  when you would stop working and leave to go home?

02:11  24  A.  I don't remember the schedule, the time that we stopped

02:11  25  working.  There were times when we finished around 4:30, maybe

02:12  1    a little bit later; but I don't remember exactly.

02:12  2    Q.  When you -- prior to that when you were actually out

02:12  3    installing, doing the installation, did you have any or the

02:12  4    crew you worked on, did you have a specific lunchtime set aside

02:12  5    for lunch?

02:12  6    A.  My co-worker didn't like to take a lunch break.

02:12  7    Q.  And during that period that you worked did you yourself

02:12  8    take any vacation days or any other days off that you can

02:12  9    recall?

02:13  10   A.  No; not one day.

02:13  11        MR. KELLY:  I don't have anything further for this

02:13  12   witness.

02:13  13        THE COURT:  Cross-examine.

02:13  14                   CROSS-EXAMINATION

02:13  15   BY MR. KLEPPIN:

02:14  16   Q.  Good afternoon.

02:14  17   A.  Good afternoon.

02:14  18   Q.  With respect to September 2007 that you were just telling

02:14  19   us, do you recall describing three days that you worked at this

02:14  20   new warehouse location?

02:14  21   A.  Yes.

02:14  22   Q.  And I think you said that those were the first three work

02:15  23   days in September?

02:15  24   A.  No.

02:15  25   Q.  Well, you said it was the first week in September.  And you

JURY TRIAL - VOLUME IV OF VI

02:15   1   worked three days in September, and then you didn't work

02:15   2   anymore.  Isn't that what we heard you say?

02:15   3   A.   Yes.

02:15   4   Q.   Okay.  That was a Monday, Tuesday, and a Wednesday, right,

02:15   5   'cause you didn't work on Sundays?

02:15   6   A.   Nobody works on Sundays.

02:15   7   Q.   So the answer to the question is yes?

02:15   8   A.   I didn't say that.

02:15   9   Q.   Okay.  The answer to the question is no?

02:15   10   A.   No.

02:15   11   Q.   So you didn't work the first Monday, Tuesday, Wednesday in

02:16   12   September of this first week that you're telling us about?

02:16   13   A.   You're trying to confuse me with this question.

02:16   14   Q.   No, I'm not.  I'm just trying to find -- I'm just trying to

02:16   15   make sure I understand when you worked in September.  I heard

02:16   16   three days.

02:16   17   A.   Yeah.  There were three days.

02:16   18   Q.   It's the first week in September?

02:16   19   A.   I don't remember the exact days.

02:16   20   Q.   You told your lawyer it was the first week in September.

02:16   21   Now, are you changing that testimony or not?

02:16   22   A.   No.  I did say three days.

02:16   23   Q.   Okay.  You don't work Sundays?

02:17   24   A.   No.

02:17   25   Q.   So it would have been then a Monday, Tuesday, and a

JURY TRIAL - VOLUME IV OF VI

02:17  1   Wednesday that you worked in September at this new shop

02:17  2   location from what I'm hearing you say?

02:17  3   A.   Probably.  Yes.

02:17  4   Q.   That's what you remember, right?

02:17  5   A.   Yes.

02:17  6   Q.   Are you aware that the business was closed on Labor Day and

02:17  7   that the first Monday in every September is Labor Day?

02:17  8   A.   I don't remember having it been closed.

02:17  9   Q.   Now, you said you were paid about $700 a week, right?

02:18  10  A.   Yes.  That's right.

02:18  11  Q.   And you're claiming you worked about three months maybe

02:18  12  with this company?

02:18  13  A.   Yes.

02:18  14  Q.   So that would be about 13 weeks, correct?

02:18  15  A.   More or less.

02:18  16  Q.   So you earned about $9100 with this company, is that

02:18  17  correct, if we take 13 times 700?

02:18  18  A.   Well, I can't do that addition in my mind that quickly.

02:18  19  Q.   Yeah.  It's multiplication, and I'm not going to hold you

02:18  20  to that.  I don't know that I could do it much less if I were

02:19  21  testifying in a court case, but I've got a calculator here.  Do

02:19  22  you take my word for it that it's $9100, 700 times 13.

02:19  23  A.   If I had received this amount, I wouldn't be asking for

02:19  24  justice right this minute.

02:19  25  Q.   Let me re-word that.  You just must have missed something.

02:19  1    The question was I have a calculator, and I just did 700 times

02:19  2    13 and I got $9100.  Do you take my word for it or would you

02:19  3    like to do your own calculation?

02:20  4    A.  Well, you said so.

02:20  5    Q.  Before you worked at Safe Hurricane Shutters, you worked at

02:20  6    another hurricane company, didn't you, called Category Five

02:20  7    Hurricane Shutters & Doors?

02:20  8    A.  Yes.  That's true.

02:20  9            MR. KLEPPIN:  May I approach the witness, Your Honor?

02:20 10            THE COURT:  Yes, sir.

02:20 11    BY MR. KLEPPIN:

02:20 12    Q.  I've just handed you your Federal income tax for the year

02:20 13    2007, Mr. Milan.

02:20 14    A.  Yes.

02:20 15    Q.  And if you could take a look at line 7 for wages, salaries,

02:21 16    and tips.  There's an amount there of $15,051, correct?

02:21 17    A.  Yes.  That's correct.

02:21 18    Q.  And if you take a look at the W-2s that are attached.  On

02:21 19    the next page.  You're right there.  I can see that.  You're

02:21 20    right there on the second page.  There isn't a W-2 or a 1099 or

02:21 21    that type of a thing for Safe Hurricane Shutters, is there?

02:22 22    A.  If you show me a paper from the company of Mr. Leiva here

02:22 23    present.

02:22 24    Q.  The question is yes or no.  Is there a W-2 or 1099 attached

02:22 25    to your return is my question sir.  Yes or no.

JURY TRIAL - VOLUME IV OF VI

02:22  1    A.  There is no mention of a previous company where I worked at

02:22  2    here.  This company is outside of the case that we're

02:22  3    discussing here.

02:22  4    Q.  Yes.  That's right.  That's the point I'm making.  The two

02:22  5    W-2s that constitute the $15,051 that you declared on your

02:22  6    return, neither company are Safe Hurricane Shutters, correct?

02:22  7    A.  That's correct.

02:22  8    Q.  You never disclosed to the Federal Government the $9100 or

02:23  9    whatever it was that you earned while you worked at Safe

02:23  10   Hurricane Shutters in 2007; isn't that true?

02:23  11   A.  If Mr. Leiva had given me a work paper.

02:23  12   Q.  Yes or no.  Is that true?

02:23  13          MR. KELLY:  He's trying to answer.  I object.

02:23  14          THE COURT:  No.  That answer is nonresponsive.

02:23  15          MR. KLEPPIN:  Yes.  I move to strike for

02:23  16   nonresponsive.  It's very simple.  Either he declared the money

02:23  17   he earned at Safe Hurricane Shutters to the Federal Government

02:23  18   or he did not.  It's not on his return.

02:23  19   BY MR. KLEPPIN:

02:23  20   Q.  Isn't that true, sir?  Sir, the question is you did not

02:23  21   disclose the money that you earned with Safe Hurricane Shutters

02:23  22   on your 2007 Federal income tax return.  It's not there,

02:24  23   correct?

02:24  24   A.  Because I did not earn this amount.

02:24  25   Q.  The amount -- there is no amount, none, from Safe Hurricane

02:24  1   Shutters on your 2007 Federal income tax return; isn't that

02:24  2   true?

02:24  3   A.   Because I did not have the paper to attach it to this one.

02:24  4   Q.   Whether -- you understand that the two companies you did

02:24  5   disclose that gave you a W-2, whatever it was there, do you

02:24  6   understand even if they hadn't given you a W-2 that you have to

02:24  7   honestly estimate what it is you earned at those companies and

02:24  8   disclose that to our Government?

02:25  9   A.   I'm not given this form easily.

02:25  10  Q.   Do you understand when you work in America and you earn

02:25  11  money that because our Government provides services, roads and

02:25  12  bridges and medical services, an Army and whatnot, that part of

02:25  13  the money that you earn has to be given back to our Government.

02:25  14  Do you understand that?

02:25  15  A.   If I had received a work contract, I would have received a

02:25  16  paper to report my taxes.

02:25  17  Q.   Now, with respect to the crews that you were on, Mario

02:26  18  Feliciano was on your crew; isn't that true?

02:26  19  A.   No.   He had his crew, and I had my crew.

02:26  20       MR. KLEPPIN:  May I approach, Your Honor?

02:26  21       THE COURT:  Yes, sir.

02:26  22  BY MR. KLEPPIN:

02:26  23  Q.   Do you remember when you gave a deposition in my law office

02:26  24  by an associate at my firm by the name of Barry Finegold where

02:26  25  on June 16th, 2008, the very same day Mr. Feliciano was deposed,

JURY TRIAL - VOLUME IV OF VI

02:26  1   you gave a deposition where you swore you would tell the truth?

02:27  2   A.  Yes.

02:27  3   Q.  I'm on page 22, line 10.  Question, Do you remember who

02:27  4   that was in your crew?

02:27  5          THE INTERPRETER:  Excuse me.  What line?

02:27  6          MR. KLEPPIN:  10.

02:27  7          THE INTERPRETER:  Thank you.

02:27  8   BY MR. KLEPPIN:

02:27  9   Q.  Do you remember who that was on your crew?  Answer, Mario.

02:27  10  Question, Do you remember Mario's last name?  Answer, Oh, he

02:27  11  was here right now.  Question, The Mario who just left who I

02:28  12  deposed before you?  Answer, Yes.  That's what you said in your

02:28  13  deposition, correct?

02:28  14  A.  It's here written in the paper.  It is true.

02:28  15  Q.  The other thing is you had just told the jury through Mr.

02:28  16  Kelly a moment ago that you sometimes drove.  Do you remember

02:28  17  that?

02:28  18  A.  Yes; because that's what I was hired to do.

02:28  19  Q.  You didn't have a driver's license in 2007, correct?

02:28  20  A.  Yes.

02:28  21  Q.  Also Chris Jerico was the driver of the crew; isn't that

02:29  22  true?

02:29  23  A.  Well, he himself specifically did not have a license.  He

02:29  24  told me, You drive because I don't have a license.  Mr. Leiva

02:29  25  hired me because I had the license, and I showed it to him.

02:29   1   Mr. Leiva asked me, Is your license good?  And I said yes.

02:29   2   Q.  Could you turn to page 24, please, in your deposition.  It

02:29   3   should be right there in front of you.  If you would take a

02:29   4   look at line 12.  Question, Chris was the driver for your crew?

02:29   5   Answer, yes.

02:29   6           That's what you said in your deposition, right?

02:29   7   A.  It says so here.

02:29   8   Q.  Also could you just take a look for me again on the tax

02:30   9   return.  I just had one more question.  I apologize.  Do you

02:30  10   have it there?

02:30  11   A.  Yes.

02:30  12   Q.  If you could take a look at the first page of the return.

02:30  13   You list your Social Security number as starting with 971.  Do

02:30  14   you see that?

02:30  15   A.  Yes.

02:30  16   Q.  And the W-2s that are attached list a different Social

02:30  17   Security number, one that starts with 460.  Do you see that?

02:30  18   A.  Yes.

02:30  19   Q.  When you applied for work at Safe Hurricane Shutters with

02:30  20   Mr. Leiva, you provided him a false Social Security number to

02:30  21   get that employment; isn't that true?

02:31  22   A.  When I first started working, I asked Mr. Leiva -- how do

02:31  23   you call that?  Like a work form.  So that I could fill it out,

02:31  24   and he never gave me one.

02:31  25   Q.  The question again is when you applied for work at Safe

02:31  1    Hurricane Shutters, you gave Mr. Leiva a false Social Security

02:31  2    number in order to obtain employment?

02:31  3    A.   He did not ask me for any paperwork.

02:31  4    Q.   He certainly asked you for your Social Security number,

02:31  5    didn't he, sir?

02:31  6    A.   No.

02:32  7    Q.   Now, Eddie Leiva hired you; isn't that true?

02:32  8         THE INTERPRETER:  What's the name?

02:32  9         MR. KLEPPIN:  Eddie Leiva.

02:32  10        MR. MILAN:  Yes, personally.

02:32  11   BY MR. KLEPPIN:

02:32  12   Q.   And that's how you first found out about the job.  You

02:32  13   spoke with Eddie and he hired you, correct?

02:32  14   A.   Yes.  I spoke with a person that's present here.

02:32  15   Q.   And when you got the job there, they all -- all of the

02:32  16   installers told you Eddie Leiva was in charge of the

02:32  17   installers; isn't that true?

02:32  18   A.   When I first started, yes, he was.  If I had any question,

02:32  19   I would go in person to Mr. Leiva.  But the one who got the

02:33  20   work order was my co-worker.

02:33  21   Q.   You added that at the end gratuitously.  My question was

02:33  22   just simply everyone down there told you the head of the

02:33  23   installers was Ed Leiva; isn't that true?

02:33  24   A.   Yes.  That's true.

02:33  25   Q.   Okay.  You testified in your direct examination you never

02:33  1  even saw Frank M^cCarroll or Steve Heidelberger, correct?

02:33  2  A.   No.

02:33  3  Q.   Never even saw them, but yet you signed an affidavit saying

02:33  4  that they had operational control of the business day to day

02:33  5  that your lawyer had you sign.  Do you remember that?

02:34  6  A.   My attorney hasn't given me any document to sign.

02:34  7  Q.   Do you know what operational control even means?

02:34  8  A.   If you could please explain it to me.

02:34  9  Q.   Let me ask it this way:   The few months that you were at

02:34  10  Safe Hurricane Shutters wasn't it clear to you that the person

02:34  11  running this company day to day, the guy in charge, was Mr.

02:34  12  Leiva?

02:34  13  A.   It was the person that I always would see whenever I got to

02:34  14  work.

02:35  15  Q.   Now, you actually spoke with Eddie Leiva about your Social

02:35  16  Security number and filling out tax documents when you got the

02:35  17  job with the company; isn't that true?

02:35  18  A.   We didn't talk about that at all.

02:35  19  Q.   Okay.  Turn to page 17 in your deposition, please.  Are you

02:35  20  on page 17?

02:35  21  A.   Yes.

02:35  22  Q.   Line 22.  Do you have it there?

02:35  23  A.   Uh-huh (affirmative).  Yes.

02:35  24  Q.   Question, Did you ever speak with any of the other people

02:36  25  in management about wanting to fill out an application and tax

JURY TRIAL - VOLUME IV OF VI

02:36  1   documents?  Answer, No.  Only with Eddie Leiva.

02:36  2        Did I read your previous -- that's what you said in

02:36  3   your deposition, correct?

02:36  4   A.  Yes.  That's correct.

02:36  5   Q.  With respect to pay issues that you had you only dealt with

02:36  6   Mr. Leiva with respect to those issues, correct?

02:36  7   A.  Yeah because he was the first person that I spoke with when

02:37  8   I was interviewed for the job.

02:37  9   Q.  At no time did you ever deal with Mr. Heidelberger or Mr.

02:37 10   M<sup>c</sup>Carroll over pay issues?

02:37 11   A.  I don't remember.

02:37 12   Q.  With work assignments you only dealt with Mr. Leiva,

02:37 13   correct?

02:37 14   A.  Yes.  That's true.

02:37 15   Q.  For the relatively short period of time that you worked for

02:37 16   the company if there was any sort of problem at the job site,

02:37 17   Mr. Leiva would be called to sort that out, correct?

02:38 18   A.  I would ask my co-worker to call him because he was the one

02:38 19   who could contact him quicker.

02:38 20   Q.  The answer to the question is yes with that explanation?

02:38 21   A.  Yes.  My co-worker would call Mr. Leiva.

02:38 22   Q.  The only crew you worked on -- you had told your attorney a

02:38 23   minute ago that you never got back before 5:00 or 6:00 o'clock,

02:39 24   correct?

02:39 25   A.  Yes.  That's correct.

JURY TRIAL - VOLUME IV OF VI

02:39  1   Q.  But, in fact, isn't it true that the decisions to scratch a

02:39  2   day if there's rain or inclement weather, those would be made

02:39  3   at 2:00 or 3:00 o'clock and you'd stop working at that time;

02:39  4   isn't that true?

02:39  5   A.  Could you explain that question better.

02:39  6   Q.  Sure.  You had all kinds of days where there would be a

02:39  7   decision made to stop working because of the weather at 2:00 or

02:39  8   3:00 o'clock; isn't that true?

02:40  9   A.  There were never any decisions made to stop at 2:00 or 3:00

02:40  10  in the afternoon.

02:40  11  Q.  Okay.  Could you please turn to page 49 in your deposition.

02:40  12  Line 21, Question, So sometimes there would be a decision made

02:41  13  to scratch the day.  You weren't going to be able to work and

02:41  14  then the jobs were pushed back a day answer?  Answer, yes.

02:41  15  Question, did those decisions ever come at around 2:00 or 3:00

02:41  16  o'clock in the afternoon as opposed to 5:00 or 6:00 o'clock?

02:41  17          THE INTERPRETER:  I haven't been able to translate it

02:41  18  that quickly.

02:41  19          MR. KLEPPIN:  Go ahead.  Go ahead.

02:41  20  BY MR. KLEPPIN:

02:41  21  Q.  Answer, they came when it was about 2:00 or 3:00 o'clock in

02:41  22  the afternoon.

02:41  23          That's what you said in your deposition, isn't it?

02:42  24  A.  If it says so here, yes.

02:42  25  Q.  Now, with respect to the truck, I want to ask you some

02:42  1    questions about the truck.  You said when you got to the shop,

02:42  2    the first thing in the morning that you'd do is look for the

02:42  3    keys to truck because you were the driver.  Do you remember

02:42  4    that?

02:42  5    A.  Yes.

02:42  6    Q.  Now, I know we've established that really Chris was the

02:42  7    driver; but the point I want to make with this question is the

02:42  8    keys were always in the ignition in the trucks.  You'd never

02:42  9    have to go look for the keys; isn't that true?

02:43 10    A.  One or two times the keys were not there.  I don't remember

02:43 11    exactly because Chris had left something important inside the

02:43 12    truck.  I don't know what it is that he had left.

02:43 13    Q.  Okay.  So when your lawyer brought you through the typical

02:43 14    average day of work at Safe Hurricane Shutters, you started

02:43 15    that whole line of questioning with the first thing you did is

02:43 16    looking for keys which only occurred one or two times the whole

02:43 17    time you were with the company, correct?

02:43 18    A.  Yes.  That's true.

02:44 19    Q.  Now, with respect to the loading of the -- let me ask it

02:44 20    this way:  When you got in with the truck at the end of the

02:44 21    day, the crew gets in, weren't you all in a hurry to get home?

02:44 22    And you'd park the truck, grab your thermos or whatever, a

02:44 23    cooler and then leave?

02:44 24    A.  I don't think so.

02:44 25    Q.  You certainly didn't load the truck for the next day when

02:44  1  you got back in the afternoon, correct?

02:44  2  A.  After throwing away what we had that was old, then we would

02:45  3  put the material that was needed for the house because

02:45  4  sometimes it had not been finished.

02:45  5  Q.  You're saying that's what you did in the afternoon or is

02:45  6  that the morning?

02:45  7  A.  In the afternoon we would load part, the part that we were

02:45  8  going to install; but we took -- we unloaded everything that

02:45  9  was old.  So everything was already ready for the following

02:45  10  day.

02:45  11  Q.  Let me help you with this.  Isn't it true that on a typical

02:45  12  day you got back at the office with that truck at 4:00 o'clock

02:45  13  only sometimes 5:00 o'clock.  And then according to you you

02:46  14  would stay and clean the truck and do some other things until

02:46  15  7:00 p.m.?

02:46  16  A.  I never left at 7:00.

02:46  17  Q.  Okay.  If you could turn to page 27 in your deposition and

02:46  18  if you could take a look at line 4.  Question, That's the time

02:46  19  that you would get back to the yard or the warehouse?  Answer,

02:46  20  Yes.  Question, Did you ever get back earlier than that?

02:46  21  Answer, It would -- it would be we would be arriving at 4:00

02:47  22  o'clock, sometimes 5:00 o'clock at the company; but then by the

02:47  23  time we unload the truck and clean everything, it would always

02:47  24  be around that time.  Question, So you say you get back

02:47  25  sometimes between 4:00 and 5:00; but it takes you until 7:00 to

02:47  1    clean the truck and unload it?  Answer, Yes.

02:47  2         That's what you said in your deposition, correct?

02:47  3    A.  If it says so in this paper, yes.

02:47  4    Q.  And in three hours of unloading and cleaning in the

02:47  5    evening, you're going to tell the jury that that wasn't even

02:47  6    enough.  You had to spend a half hour or more doing that same

02:47  7    task in the morning, correct?

02:48  8    A.  No.

02:48  9    Q.  Well, if you could take a look at page 27 of your

02:48  10   deposition.  In fact, the very next question and answer to what

02:48  11   we just read in, line 16, But it only takes a half hour to load

02:48  12   up in the morning?  Answer, Yes.

02:48  13        That's what you said in your deposition, right?

02:48  14   A.  It's written here, yes.

02:48  15   Q.  See, is what's going on here is you acknowledge 4:00

02:48  16   o'clock primarily you got back in the afternoon.  Isn't that

02:48  17   clear from what we just looked at in your testimony under oath,

02:48  18   Mr. Milan?

02:49  19   A.  It's written here.

02:49  20   Q.  Okay.  And isn't it also true you really didn't start work

02:49  21   until 8:00, 8:30, 9:00 o'clock?

02:49  22   A.  I would get there between 7:10 and 7:15.  I would wait for

02:49  23   my co-worker to get the work order that was handed by Mr.

02:49  24   Leiva, and we would leave at around 8:00 o'clock.

02:49  25   Q.  See, even in your deposition you said it takes a half an

APRIL 14, 2011

02:49  1    hour to load the truck in the morning.  So your testimony is
02:49  2    even though that would take half an hour, you'd get there at
02:49  3    7:00 o'clock a.m. sharp every morning.  You'd load the truck
02:50  4    for half an hour even though you spent three hours doing that
02:50  5    the night before.  And then there's this other hour and a half
02:50  6    in the morning that you would just be sitting or standing
02:50  7    around wasting time.  Is that what you're telling us?
02:50  8    A.  Are you changing the questions?
02:50  9    Q.  I'm not.  I'm not changing anything.  That's the first time
02:50  10   I've asked that one.  Is the answer yes or no?
02:50  11   A.  What was the question?
02:51  12          MR. KLEPPIN:  Can we read that one back
02:51  13       (The requested testimony was read.)
02:51  14          MR. MILAN:  I did not say that I came in at 7:00
02:51  15   sharp.
02:51  16   BY MR. KLEPPIN:
02:51  17   Q.  The truth is -- well, let me ask it this way:  Isn't it
02:51  18   true that maybe by 9:00 o'clock or so you'd hit the road with
02:51  19   the crew in the truck, start driving out to the job site?
02:52  20   A.  I don't remember.
02:52  21   Q.  You honestly really don't remember when the heck you left
02:52  22   with the truck from the shop; isn't that obvious?
02:52  23   A.  Whenever the material was ready, we would leave early at
02:52  24   8:00 o'clock.
02:52  25   Q.  Is it true that you were really working about 35 to 40

02:52  1   hours a week when you worked for Safe Hurricane Shutters?

02:52  2   A.  What was that?

02:52  3   Q.  Sure.  Isn't it true that what you real work time was 35 to

02:52  4   40 hours a week at Safe Hurricane Shutters; isn't that true?

02:53  5   A.  There were not 35.  There were 40 hours.

02:53  6   Q.  Isn't it clear that all of this testimony about spending

02:53  7   three hours working on the truck when you got back from the

02:53  8   office and all this built-in morning time two to three hours

02:53  9   there doing things with the truck is all just to overexaggerate

02:53  10  your time so you can make it look like you worked a lot of

02:53  11  overtime?

02:54  12  A.  What was that?

02:54  13  Q.  Is the answer yes or no?  For some reason you're struggling

02:54  14  with that question.

02:54  15  A.  Could you please repeat it.

02:54  16  Q.  Sure.  Isn't it clear that what's going on here with all of

02:54  17  this time -- well, first of all, before I even ask that

02:54  18  question again, let's talk about the truck for a minute.  The

02:54  19  truck is just a small half ton Ford 150 pickup truck; isn't

02:54  20  that true?

02:54  21  A.  Yes.

02:54  22  Q.  It's just a small truck, a small bed in the back.  It

02:54  23  doesn't take long to throw some materials in there so that you

02:54  24  can then go drive out to the job site and do your work for the

02:55  25  day; isn't that true?

JURY TRIAL - VOLUME IV OF VI

02:55  1    A.  Yes.  That's true.

02:55  2    Q.  There isn't anything that you could put in the back of that

02:55  3    pickup truck that you needed to do to perform your job at Safe

02:55  4    Hurricane Shutters that could have taken anywhere remotely near

02:55  5    three hours?

02:55  6    A.  That's true.

02:55  7    Q.  And is what's happening here is is someone has you

02:55  8    overexaggerating all this time with the truck in the morning

02:55  9    and in the evening to manufacture an overtime claim when one

02:56  10   doesn't exist, correct?  It's obvious?

02:56  11   A.  No.

02:56  12   Q.  You're saying no to that?

02:56  13   A.  What was the question?

02:56  14   Q.  Let me try to break it down a little bit.  In the evening

02:56  15   we know it didn't take any three hours to do anything with that

02:56  16   truck.  The truth is you didn't do anything with that truck in

02:56  17   the evening, correct?

02:56  18   A.  When we got there, we had to clean it and go look for

02:57  19   whatever we were going to load onto it for the following day.

02:57  20   Q.  In the morning only some of the time did you load the

02:57  21   truck?

02:57  22   A.  No.  Sometimes we would load it between the two of us or

02:57  23   sometimes I would do it myself.  But once my co-worker had

02:57  24   already told me what was the work order, what was on the work

02:57  25   order.

JURY TRIAL - VOLUME IV OF VI

02:57  1   Q.  The question is not every day in the morning did you have

02:57  2   to load that truck?

02:58  3   A.  No one else would do it but us.

02:58  4   Q.  There are certainly days when you could put enough material

02:58  5   in the back of that pickup truck to use for two or three days;

02:58  6   isn't that true?

02:58  7   A.  We never did a job for three days.

02:58  8   Q.  Is what's going on here is with respect to loading and

02:58  9   unloading the truck, that could only have been done once, don't

02:58 10   you agree with that, in a day?

02:58 11   A.  Whether I loaded the truck?

02:58 12   Q.  Let me ask it this way:  You get in from your job.  You're

02:59 13   done for the day.  You get in at 4:00 o'clock.  You load the

02:59 14   truck for the next day.  Now, the next morning when you get in

02:59 15   and you're going to go drive out to the job site to work that

02:59 16   day, you don't need to load the truck 'cause you loaded it the

02:59 17   night before, correct?

02:59 18   A.  That's right.

02:59 19   Q.  It seems to me from what you're saying is you're taking the

02:59 20   position that by and large it was in the morning that you

02:59 21   loaded the truck, not in the evening, not after work?

02:59 22   A.  Whenever there was material, we normally would load it back

03:00 23   into the truck.

03:00 24   Q.  Is it true that you only worked some Saturdays?

03:00 25   A.  Not some.  During the time that I worked there, I worked

JURY TRIAL - VOLUME IV OF VI

03:00  1   all Saturdays.

03:00  2   Q.  Is it true that the Saturdays you worked those were just

03:00  3   half a days?

03:00  4   A.  No.

03:00  5   Q.  So your testimony is that when you worked on Saturday, you

03:00  6   worked -- like any other day, you worked until about 4:00?  You

03:00  7   would arrive back at the shop around 4:00 o'clock, sometimes

03:00  8   5:00, right?

03:00  9   A.  Yes.  But we would have those in the factory.  That's it.

03:01  10  Q.  Let's talk about the factory workers.  Weren't the factory

03:01  11  workers --

03:01  12          THE COURT:  It's 3:00 o'clock, Mr. Kleppin.

03:01  13          MR. KLEPPIN:  Okay.

03:01  14          THE COURT:  Ladies and Gentlemen, it is now 3:00

03:01  15  o'clock, so we'll recess for the day.  And we'll reconvene

03:01  16  tomorrow morning.  We'll continue the cross-examination of Mr.

03:01  17  Milan.  Thank you for your attention and your patience.  The

03:01  18  jury is excused until tomorrow morning at 9:00 o'clock.  You

03:01  19  can take the jury out.  I'd like counsel to remain after the

03:01  20  jury's been excused.

03:01  21          **(Jury Out)**

03:01  22          THE COURT:  Mr. Milan, you can step down.

03:01  23          MR. MILAN:  Thank you.

03:01  24          THE COURT:  Okay.  Who's the next witness for the

03:01  25  plaintiff?

JURY TRIAL - VOLUME IV OF VI

03:01  1       MR. KELLY:  That's my last witness, Your Honor.

03:01  2       THE COURT:  Mr. Milan?

03:01  3       MR. KELLY:  Yes.

03:01  4       THE COURT:  All right.  So when we finish his cross,

03:01  5  that will be the case for the plaintiff.  What will you have?

03:02  6       MR. KLEPPIN:  Well, we can either do Rule 50 then or

03:02  7  we can get right into my case.  And if you'll -- if you're

03:02  8  willing to delay Rule 50 until I'm done with my witnesses.

03:02  9  Whatever the Court prefers.

03:02 10       THE COURT:  Well, that would be good.  That will save

03:02 11  us some time.

03:02 12       MR. KLEPPIN:  Okay.  I have no problem with that as

03:02 13  long as the record reflects that that's what's going on.

03:02 14       THE COURT:  It will adequately reflect that.

03:02 15       MR. KLEPPIN:  All right.

03:02 16       THE COURT:  And how many witnesses will you have?

03:02 17       MR. KLEPPIN:  I may re-call one of the defendants that

03:02 18  I represent.  I'm going to call Mr. Leiva and Mr. Keith Lares

03:02 19  and Mr. Fernando Donoso.

03:02 20       THE COURT:  I'm sorry.  Say that again now.

03:02 21       MR. KLEPPIN:  I have about a half a dozen witnesses,

03:02 22  and they are all relatively brief.  It's not going to be these

03:02 23  examinations that go half a day.  I intend to try a very

03:02 24  concise case on the side of the defense.

03:03 25       THE COURT:  All right.  We'll be in recess until

APRIL 14, 2011

03:03  1    tomorrow morning at 9:00 o'clock.

03:03  2              MR. KLEPPIN:  Oh, yeah.  I'm sorry, Your Honor.  Mr.

03:03  3    Leiva did need that letter.  I beg your pardon.

03:03  4              THE LAW CLERK:  You said you were going to give me all

03:03  5    the information to where it needs to go.

03:03  6              MR. KLEPPIN:  I'm sorry.

03:03  7              THE LAW CLERK:  That's okay.

03:03  8              MR. KLEPPIN:  I'm sorry.  You're right.  You did say

03:03  9    that.

03:03 10              THE LAW CLERK:  Yeah.  That's okay.  I actually need a

03:03 11    name of somebody and an address.

03:03 12              THE COURT:  Give her the information.  We'll type it

      13    up.

      14              MR. KLEPPIN:  Thank you, Your Honor.

      15              THE COURT:  We'll bring it out.

      16          (Adjourned)

      17

      18

      19

      20

      21

      22

      23

      24

      25

JURY TRIAL - VOLUME IV OF VI

1                    C E R T I F I C A T E

2

3            I hereby certify that the foregoing is an accurate

4     transcription of proceedings in the above-entitled matter.

5

6
      6/24/11                    /s/ Jill Michelle Hardy-Hobbs
7     -------                    ---------------------------------------
       DATE                      JILL MICHELLE HARDY-HOBBS, CCR, FPR
8                                OFFICIAL UNITED STATES COURT REPORTER
                                 400 NORTH MIAMI AVENUE, SUITE 08S33
9                                MIAMI, FL  33128     T: 305.523.5022
                                 jill_hardy-hobbs@flsd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                               APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

## $

**$1,500** [1] - 138:24
**$105,000** [1] - 49:13
**$105,300** [2] - 49:20, 50:9
**$11,299** [2] - 48:22, 49:6
**$12,000** [1] - 130:23
**$15,051** [2] - 152:16, 153:5
**$1500** [3] - 54:20, 54:23, 140:10
**$18** [1] - 130:20
**$20,000** [1] - 50:24
**$3,000** [1] - 139:25
**$30,000** [1] - 139:19
**$325** [1] - 128:12
**$4,785** [1] - 140:2
**$40,000** [1] - 48:11
**$5,000** [1] - 140:21
**$500** [4] - 55:2, 55:6, 140:15
**$6,000** [1] - 130:21
**$7,000** [1] - 130:21
**$7,800** [2] - 140:2, 140:4
**$700** [3] - 144:21, 145:3, 145:6, 145:21, 151:9
**$8,171** [1] - 51:2
**$800** [8] - 57:6, 57:22, 58:8, 58:11, 58:16, 58:18, 58:19, 104:9
**$9100** [4] - 151:16, 151:22, 152:2, 153:8

### '

**'06** [7] - 50:24, 57:9, 68:2, 76:6, 82:17, 82:19, 97:13
**'07** [8] - 54:16, 56:6, 56:7, 82:20, 82:24, 88:16, 91:19, 123:21
**'82** [1] - 4:22

## /

**/s** [1] - 171:6

## 0

**07-61295-CIV-GONZALEZ/COHN** [1] - 1:3

**08S33** [2] - 2:4, 171:8

## 1

**1** [2] - 1:11, 20:2
**10** [14] - 10:15, 11:18, 13:23, 73:4, 73:6, 73:22, 83:13, 91:21, 111:21, 112:2, 130:23, 155:3, 155:6
**10,000** [1] - 86:19
**100** [1] - 3:6
**1099** [2] - 152:20, 152:24
**10:00** [2] - 120:8, 121:3
**10th** [1] - 56:7
**11** [13] - 10:15, 11:18, 73:2, 73:4, 73:6, 73:12, 73:19, 73:21, 73:22, 74:19, 75:13
**11:00** [2] - 74:11, 121:3
**11th** [1] - 4:21
**12** [2] - 47:13, 156:4
**125** [2] - 130:12, 130:13
**125-degree** [1] - 101:20
**12:00** [2] - 73:3, 74:11
**13** [7] - 119:11, 119:18, 136:10, 151:14, 151:17, 151:22, 152:2
**13th** [1] - 54:20
**14** [4] - 1:9, 111:22, 119:22, 123:9
**141** [1] - 3:8
**144** [1] - 111:22
**149** [1] - 3:9
**14th** [2] - 119:25, 120:17
**15** [3] - 65:20, 83:13, 91:21
**150** [1] - 165:19
**1500** [1] - 140:9
**16** [1] - 163:11
**1600** [1] - 131:24
**168** [2] - 57:25, 58:5
**16th** [1] - 154:25
**17** [2] - 158:19, 158:20
**18** [1] - 124:10
**1:15** [2] - 114:6, 114:7
**1st** [1] - 56:6

## 2

**2** [1] - 59:13
**2,000** [9] - 129:2, 129:5, 129:7, 130:24, 131:5, 131:12, 131:19, 140:23
**20** [7] - 16:1, 21:4, 88:9, 92:7, 112:22, 131:13, 136:10
**20,000** [1] - 119:23
**2006** [31] - 8:24, 9:9, 10:21, 11:1, 11:3, 11:14, 11:17, 11:18, 11:21, 23:21, 27:9, 27:14, 27:15, 27:20, 27:21, 28:4, 28:18, 29:4, 29:8, 30:14, 37:2, 37:21, 38:13, 50:13, 50:17, 50:20, 51:1, 51:13, 76:5, 119:6, 125:15
**2007** [33] - 8:25, 11:24, 13:9, 19:8, 20:8, 23:1, 23:22, 23:25, 25:3, 25:15, 38:1, 38:10, 39:25, 41:15, 48:5, 48:12, 48:18, 49:6, 49:10, 54:20, 55:20, 119:6, 119:9, 142:16, 142:24, 149:18, 152:13, 153:10, 153:22, 154:1, 155:19
**2008** [1] - 154:25
**2011** [1] - 1:9
**20th** [1] - 119:18
**21** [6] - 50:21, 54:9, 54:12, 55:5, 75:4, 160:12
**21st** [3] - 103:6, 119:5, 120:18
**22** [3] - 50:21, 155:3, 158:22
**23** [1] - 57:2
**23,000** [1] - 139:21
**24** [2] - 58:5, 156:2
**25** [1] - 15:21
**250** [1] - 131:15
**25th** [1] - 57:9
**26th** [1] - 123:12
**27** [2] - 162:17, 163:9
**27th** [1] - 119:18
**28th** [2] - 55:19, 119:6
**2:00** [8] - 70:6, 90:6, 115:22, 160:3, 160:7, 160:9, 160:15, 160:21
**2:00/3:00** [3] - 69:15,

69:25, 90:21

## 3

**3,000** [1] - 140:1
**30** [3] - 15:21, 88:23, 146:13
**300** [2] - 1:18, 131:10
**305.523.5022** [2] - 2:4, 171:9
**305.865.6766** [1] - 1:19
**305.865.7167** [1] - 1:19
**31** [1] - 55:12
**32** [1] - 69:24
**320** [1] - 131:11
**33128** [2] - 2:4, 171:9
**33141** [1] - 1:18
**33324** [1] - 1:22
**35** [4] - 146:13, 164:25, 165:3, 165:5
**3:00** [9] - 70:6, 115:25, 160:3, 160:8, 160:9, 160:15, 160:21, 168:12, 168:14
**3rd** [1] - 55:20

## 4

**4** [1] - 162:18
**4-13-11** [2] - 3:3, 8:6
**4.33** [1] - 48:8
**40** [16] - 8:13, 48:9, 58:3, 58:11, 58:19, 59:20, 77:14, 77:19, 93:3, 103:21, 103:22, 104:7, 144:25, 164:25, 165:4, 165:5
**400** [5] - 2:4, 85:19, 130:20, 131:1, 171:8
**42** [1] - 113:13
**450** [1] - 130:17
**460** [1] - 156:17
**468** [1] - 4:21
**47** [1] - 3:5
**49** [1] - 160:11
**4:00** [8] - 75:8, 162:12, 162:21, 162:25, 163:15, 167:13, 168:6, 168:7
**4:30** [1] - 148:25

## 5

**50** [4] - 131:9, 169:6, 169:8

**52** [2] - 75:3, 131:14
**53** [1] - 75:13
**54** [3] - 73:23, 113:12, 113:18
**5:00** [20] - 12:7, 12:23, 15:4, 17:6, 18:20, 19:2, 88:12, 88:17, 90:7, 92:9, 92:20, 93:1, 112:1, 146:6, 159:23, 160:16, 162:13, 162:22, 162:25, 168:8
**5:00/5:30** [7] - 22:3, 23:10, 76:25, 117:4, 117:6, 117:25, 146:5
**5:30** [8] - 11:8, 76:19, 88:12, 88:17, 92:9, 92:20, 117:15, 146:6
**5:30/6:00** [2] - 62:9, 92:17

## 6

**6** [3] - 38:12, 69:24, 119:9
**6,000** [1] - 130:22
**6/24/11** [1] - 171:6
**60** [2] - 73:7, 116:9
**605** [1] - 1:18
**66** [4] - 73:11, 77:14, 79:11, 79:18
**676** [1] - 4:21
**6:00** [13] - 6:18, 6:25, 11:8, 12:25, 17:17, 73:1, 92:25, 116:5, 116:11, 117:3, 117:23, 159:23, 160:16
**6:00/6:30** [2] - 22:5, 77:1
**6:30** [9] - 11:9, 12:25, 17:17, 22:5, 26:12, 76:9, 92:14, 92:21, 93:2
**6:30/7:00** [3] - 23:11, 62:11, 92:22
**6th** [4] - 54:16, 54:22, 119:6, 119:17

## 7

**7** [4] - 48:21, 152:15
**7,000** [2] - 130:22, 140:22
**70** [1] - 116:9
**700** [3] - 151:17, 151:22, 152:1
**71st** [1] - 1:18
**7:00** [19] - 6:17, 6:25,

APRIL 14, 2011

JURY TRIAL - VOLUME IV OF VI

14:15, 26:11, 26:15, 72:14, 72:16, 72:25, 75:7, 83:9, 162:15, 162:16, 162:25, 164:3, 164:14
**7:00/7:30** [2] - 25:25, 26:13
**7:10** [2] - 144:15, 163:22
**7:15** [5] - 14:15, 83:10, 144:15, 148:20, 163:22
**7:15/7:20** [1] - 26:25
**7:20** [2] - 14:15, 148:20
**7:30** [21] - 9:12, 11:3, 12:21, 14:16, 25:19, 26:11, 26:15, 26:21, 26:22, 27:1, 75:7, 75:8, 83:12, 99:25, 100:4, 100:8, 143:17, 143:19, 143:20
**7:34** [3] - 99:21, 100:13, 100:14

## 8

**8** [1] - 3:4
**800** [3] - 57:10, 131:7, 131:23
**8751** [1] - 1:22
**8:00** [12] - 6:15, 11:5, 18:19, 18:25, 100:1, 100:8, 100:9, 143:17, 143:21, 163:21, 163:24, 164:24
**8:15** [1] - 21:5
**8:20** [1] - 21:6
**8:25** [3] - 99:22, 100:13, 100:14
**8:30** [3] - 18:25, 100:1, 163:21
**8:30/9:00** [1] - 23:9

## 9

**9** [1] - 104:9
**90** [4] - 25:25, 61:3, 95:11, 130:12
**90-degree** [1] - 101:20
**900** [3] - 131:2, 131:4, 131:8
**954.424.1933** [1] - 1:23
**954.474.7405** [1] - 1:23
**971** [1] - 156:13
**9:00** [12] - 12:6,

12:22, 13:20, 15:10, 15:11, 70:20, 100:1, 163:21, 164:18, 168:18, 170:1

## A

**a.m** [2] - 6:25, 163:3
**Aberdeen** [4] - 115:14, 115:15, 116:6, 116:11
**able** [18] - 16:9, 16:14, 21:1, 25:22, 26:2, 31:12, 31:22, 31:23, 33:12, 43:10, 47:10, 84:19, 95:5, 112:20, 160:13, 160:17
**above-entitled** [1] - 171:4
**absent** [3] - 4:18, 52:1, 60:17
**absolutely** [1] - 112:5
**access** [1] - 109:3
**accident** [9] - 122:15, 122:21, 123:1, 137:14, 137:15, 138:19, 139:5, 139:8, 139:19
**accidentally** [1] - 7:23
**according** [8] - 44:18, 49:21, 50:20, 52:8, 52:25, 73:23, 87:9, 162:13
**accordions** [7] - 16:7, 16:9, 16:15, 34:19, 41:1, 112:6, 112:7
**account** [8] - 6:21, 80:7, 80:10, 113:3, 113:16, 113:17, 113:24, 119:13
**accumulating** [1] - 44:10
**accurate** [2] - 68:20, 171:3
**accurately** [4] - 43:19, 60:2, 70:3, 75:19
**accuse** [1] - 97:11
**acknowledge** [3] - 67:2, 68:13, 163:15
**Act** [5] - 59:10, 59:16, 59:19, 59:25, 60:16
**act** [2] - 35:21, 59:13
**action** [2] - 5:24, 6:5

**activated** [1] - 7:23
**actual** [2] - 30:15, 64:13
**adamant** [1] - 76:13
**add** [1] - 131:20
**added** [2] - 157:21
**addition** [2] - 124:5, 151:18
**additional** [1] - 8:20
**address** [3] - 20:15, 20:21, 170:11
**adequately** [1] - 169:14
**Adjourned** [1] - 170:16
**admission** [1] - 70:24
**admit** [7] - 68:7, 74:13, 74:14, 87:25, 91:15, 104:15, 119:11
**admitted** [2] - 72:8, 119:12
**advance** [2] - 132:17, 132:18, 133:6
**affidavit** [1] - 158:3
**affirmative)** [13] - 21:20, 23:2, 23:16, 24:2, 53:2, 54:17, 56:12, 76:7, 92:10, 129:20, 139:12, 139:22, 158:23
**affirmatively)** [1] - 115:9
**afraid** [1] - 105:12
**afternoon** [15] - 11:9, 69:25, 90:8, 90:23, 141:25, 142:1, 149:16, 149:17, 160:10, 160:16, 160:22, 162:1, 162:5, 162:7, 163:16
**ago** [4] - 61:17, 101:2, 155:16, 159:23
**agree** [6] - 86:20, 99:1, 115:8, 117:12, 135:16, 167:10
**agreed** [1] - 130:21
**agreement** [5] - 12:7, 63:22, 147:17, 147:18, 147:19
**Aguirre** [9] - 42:6, 42:7, 42:9, 42:10, 93:7, 93:11, 93:14, 93:21, 94:1
**ahead** [7] - 10:24, 12:14, 24:21, 72:21, 138:10, 160:19
**ain't** [2] - 84:17, 84:24
**alarm** [2] - 7:22

**ALBOREZ** [2] - 1:6, 1:6
**Alborezes** [1] - 4:16
**alien** [1] - 96:24
**aliens** [3] - 96:13, 97:3, 97:16
**alleged** [5] - 56:24, 59:9, 60:6, 60:15, 61:16
**allegedly** [3] - 51:23, 52:16, 67:19
**allow** [2] - 116:3, 116:13
**allowed** [2] - 5:5, 90:2
**allows** [1] - 75:25
**almost** [6] - 12:2, 52:8, 64:11, 110:16, 121:17, 121:19
**aluminum** [1] - 146:10
**america** [1] - 119:14
**America** [47] - 12:4, 12:18, 13:12, 13:15, 13:17, 13:23, 14:6, 14:9, 15:2, 15:3, 16:4, 17:5, 18:7, 18:16, 31:3, 31:7, 31:8, 32:1, 33:17, 40:4, 40:12, 41:5, 64:20, 70:7, 70:15, 82:16, 82:18, 82:19, 82:23, 106:25, 107:1, 110:5, 110:7, 110:9, 110:13, 110:15, 110:16, 110:19, 110:25, 111:5, 111:8, 111:19, 118:6, 118:10, 119:13, 154:10
**America's** [1] - 31:4
**amount** [26] - 10:12, 10:14, 11:2, 11:11, 11:23, 12:2, 18:2, 18:20, 18:25, 21:22, 40:19, 62:16, 62:17, 63:2, 74:24, 75:2, 75:15, 90:7, 104:7, 104:8, 151:23, 152:16, 153:24, 153:25
**amounted** [1] - 61:17
**Andrews** [2] - 20:18, 20:19
**ANGELES** [1] - 1:5
**answer** [40] - 49:21, 59:18, 60:2, 60:17, 60:20, 67:23, 69:8, 70:1, 75:11, 75:18, 86:8, 104:2, 106:2, 112:4, 112:19, 114:4,

115:11, 117:12, 120:2, 128:23, 135:1, 150:7, 150:9, 153:13, 153:14, 155:9, 155:10, 155:12, 156:5, 159:1, 159:20, 160:14, 160:21, 162:19, 162:21, 163:1, 163:10, 163:12, 164:10, 165:13
**Answer** [1] - 160:14
**answered** [8] - 29:23, 30:7, 33:20, 118:13, 134:19, 134:24, 136:14
**answers** [1] - 49:12
**anytime** [1] - 99:13
**Anyway** [3] - 92:5, 130:16, 137:13
**anyway** [2] - 132:11, 138:20
**apart** [1] - 112:13
**apartment** [11] - 31:11, 68:23, 103:8, 106:7, 106:14, 107:19, 108:13, 109:3, 109:5, 109:10, 110:2
**apartments** [7] - 15:16, 15:23, 111:18, 111:23, 112:17
**apologize** [1] - 156:9
**aPPEARANCES** [1] - 1:15
**application** [1] - 158:25
**applied** [2] - 156:19, 156:25
**approach** [8] - 46:1, 48:15, 49:15, 50:14, 55:8, 69:21, 152:9, 154:20
**approached** [2] - 105:12, 105:13
**approximate** [1] - 25:3
**approximation** [1] - 74:14
**APRIL** [1] - 1:9
**April** [10] - 13:13, 13:14, 13:15, 19:7, 19:12, 19:16, 19:17, 19:18, 106:25
**area** [2] - 13:25, 18:18
**argue** [2] - 101:10, 103:25
**Army** [1] - 154:12
**arrangements** [2] -

JURY TRIAL - VOLUME IV OF VI

42:16, 42:17
**arrive** [11] - 15:2, 15:3, 17:16, 18:1, 20:24, 21:3, 22:4, 83:23, 144:14, 168:7
**arrived** [1] - 17:19
**arrives** [1] - 100:12
**arriving** [1] - 162:21
**aside** [1] - 149:4
**assembled** [1] - 112:7
**assigned** [3] - 10:2, 61:13
**assignment** [1] - 67:5
**assignments** [2] - 66:23, 159:12
**assist** [1] - 136:17
**associate** [1] - 154:24
**assumed** [1] - 6:21
**assured** [2] - 43:23, 45:17
**ate** [1] - 16:24
**attach** [1] - 154:3
**attached** [6] - 48:24, 51:4, 51:7, 152:18, 152:24, 156:16
**attempt** [1] - 97:24
**attention** [1] - 168:17
**attorney** [4] - 54:8, 101:24, 158:6, 159:22
**attributed** [1] - 6:4
**August** [43] - 8:24, 9:9, 9:25, 10:16, 10:21, 11:1, 11:3, 11:10, 11:14, 11:16, 23:21, 27:9, 27:12, 27:14, 28:4, 28:18, 29:4, 29:8, 53:4, 54:16, 54:20, 54:22, 55:19, 55:20, 56:7, 57:9, 82:17, 91:19, 97:13, 103:6, 105:21, 113:3, 119:5, 119:22, 119:25, 120:17, 120:18, 123:9, 123:12, 125:15, 146:20
**August/September** [1] - 91:13
**aUGUSTIN** [1] - 141:17
**AUGUSTIN** [2] - 1:4, 3:7
**Augustin** [2] - 141:20, 141:22
**author** [1] - 57:14
**AVENUE** [1] - 171:8
**Avenue** [3] - 2:4,

20:18, 20:19
**average** [28] - 10:14, 11:15, 12:19, 12:20, 13:10, 13:11, 18:2, 62:16, 64:9, 72:18, 73:12, 74:16, 74:23, 75:1, 85:23, 88:17, 92:9, 107:7, 129:8, 129:13, 130:17, 130:20, 130:21, 131:12, 144:4, 144:7, 161:14
**averages** [1] - 72:20
**award** [2] - 50:10, 51:16
**awards** [1] - 50:9
**aware** [3] - 25:17, 73:11, 151:6
**awhile** [1] - 111:25

# B

**baby** [1] - 78:19
**backup** [1] - 68:4
**bad** [5] - 42:23, 65:16, 70:13, 140:3, 140:23
**balance** [1] - 26:4
**balconies** [7] - 16:4, 16:5, 86:4, 87:13, 107:2, 107:3, 107:10
**balconies'** [1] - 86:5
**balcony** [10] - 41:3, 107:3, 107:4, 107:6, 107:8, 107:9, 107:21, 107:22, 108:2
**band** [1] - 68:5
**bank** [9] - 112:22, 112:25, 113:3, 113:7, 113:10, 113:16, 113:24, 119:13
**Bank** [1] - 119:14
**Barry** [1] - 154:24
**based** [3] - 5:4, 50:4, 75:6
**basement** [1] - 15:22
**basis** [1] - 29:17
**bathroom** [1] - 85:14
**bay** [2] - 85:13, 85:16
**beach** [1] - 22:18
**Beach** [19] - 1:18, 19:25, 20:1, 20:19, 22:10, 22:13, 22:15, 22:21, 23:8, 23:25, 24:8, 25:1, 25:5, 34:3, 34:14, 36:8, 88:8, 103:4, 143:24
**became** [3] - 68:17, 96:6

**become** [2] - 97:23, 97:24
**becomes** [2] - 85:25, 90:8
**bed** [1] - 165:22
**bedroom** [1] - 85:16
**beg** [1] - 170:3
**begged** [1] - 136:8
**beginning** [19] - 9:8, 10:15, 13:6, 19:16, 19:17, 20:7, 22:23, 29:8, 37:11, 38:16, 44:17, 57:7, 61:12, 62:10, 76:24, 82:23, 125:12, 125:19, 125:21
**behalf** [1] - 135:8
**behind** [7] - 32:20, 51:22, 52:21, 53:4, 60:15, 119:1, 124:3
**Bella** [2] - 103:8, 106:7
**best** [14] - 23:1, 36:4, 38:22, 68:14, 68:15, 68:17, 68:19, 68:21, 87:25, 99:9, 104:13, 110:17, 110:19
**better** [4] - 37:13, 51:23, 60:19, 160:5
**Between** [1] - 14:15
**between** [22] - 10:15, 13:14, 14:15, 21:13, 21:19, 57:25, 73:4, 76:25, 100:13, 113:2, 119:4, 120:17, 143:20, 144:15, 146:5, 146:13, 147:15, 148:20, 162:25, 163:22, 166:22
**beyond** [5] - 12:10, 26:7, 75:14, 101:24
**big** [31] - 12:3, 12:4, 13:24, 18:16, 23:23, 23:24, 30:17, 30:24, 31:1, 31:2, 31:3, 31:4, 31:24, 33:18, 33:25, 36:22, 39:17, 40:4, 40:17, 46:9, 46:19, 47:6, 61:25, 85:19, 87:10, 87:12, 87:20, 119:23, 143:6
**bigger** [3] - 64:20, 85:16, 131:16
**biggest** [1] - 115:17
**bills** [4] - 95:8, 113:25, 114:1, 114:3
**bit** [10] - 15:12, 16:21, 18:19, 23:23, 73:19, 73:20, 93:10,

93:12, 149:1, 166:14
**bite** [2] - 16:22, 74:9
**bites** [1] - 111:16
**blame** [1] - 98:12
**blessed** [2] - 96:16, 96:17
**blew** [1] - 139:9
**block** [1] - 57:24
**blueprints** [1] - 16:11
**bolt** [2] - 85:7, 89:14
**Boreth** [1] - 1:21
**boss** [17] - 28:8, 28:23, 29:13, 33:8, 37:10, 37:13, 43:12, 43:13, 71:20, 72:1, 94:20, 98:21, 99:9, 99:10, 99:12
**bosses** [1] - 28:7
**bottom** [1] - 81:1
**Boulevard** [3] - 1:22, 18:18, 137:14
**box** [3] - 16:19, 74:7, 111:7
**boy** [1] - 6:12
**Boynton** [13] - 22:9, 22:10, 22:13, 22:15, 22:18, 23:8, 23:25, 25:1, 25:5, 34:3, 34:14, 36:8, 103:4
**Brad** [4] - 57:4, 57:14, 58:17, 140:13
**break** [5] - 71:22, 89:4, 93:4, 149:6, 166:14
**breakfast** [2] - 70:18, 71:24
**breaks** [2] - 71:12, 77:7
**bridges** [1] - 154:12
**brief** [2] - 81:8, 169:22
**briefly** [2] - 81:7, 83:4
**bring** [15] - 4:9, 5:5, 5:12, 5:17, 7:14, 16:19, 66:15, 67:18, 67:24, 70:21, 132:3, 132:5, 132:7, 132:9, 170:15
**Bring** [1] - 114:15
**bringing** [2] - 97:11, 109:16
**broke** [10] - 95:13, 133:9, 133:12, 133:14, 133:20, 133:21, 134:10, 134:18
**broken** [1] - 122:23
**brought** [2] - 97:6,

111:7, 161:13
**Broward** [1] - 1:22
**building** [33] - 7:24, 13:17, 14:2, 18:17, 18:23, 19:25, 20:1, 20:3, 22:11, 36:8, 41:2, 88:8, 88:12, 88:17, 88:25, 89:13, 103:1, 103:3, 109:14, 116:9, 116:17, 116:18, 116:19, 116:20, 116:21, 121:15, 121:16, 123:12, 123:13, 123:16, 131:17, 148:16
**buildings** [7] - 12:4, 13:23, 13:24, 15:21, 116:7, 116:16, 130:8
**built** [3] - 16:7, 119:24, 165:8
**built-in** [1] - 165:8
**bullet** [4] - 43:25, 94:7, 94:10, 94:13
**bunch** [1] - 98:11
**Bungo** [4] - 57:4, 57:14, 58:17, 140:13
**business** [10] - 37:14, 135:13, 135:15, 135:23, 136:11, 136:15, 136:23, 137:13, 151:6, 158:4
**BY** [58] - 2:2, 8:7, 9:21, 10:10, 10:20, 10:25, 12:16, 14:8, 17:1, 24:22, 26:9, 28:12, 29:25, 30:5, 30:13, 30:25, 32:24, 33:24, 34:12, 35:3, 35:6, 40:11, 43:5, 43:16, 46:13, 47:2, 47:23, 48:17, 49:19, 50:8, 50:16, 55:10, 66:21, 69:23, 100:24, 101:12, 104:11, 106:5, 108:9, 115:2, 115:13, 117:14, 118:14, 118:19, 118:22, 122:20, 123:5, 135:10, 142:11, 147:3, 149:15, 152:11, 153:19, 154:22, 155:8, 157:11, 160:20, 164:16

# C

**cables** [1] - 137:21

JURY TRIAL - VOLUME IV OF VI

**calculation** [1] - 152:3

**calculations** [4] - 73:10, 79:11, 79:18, 80:5

**calculator** [2] - 151:21, 152:1

**cannot** [5] - 6:20, 24:16, 37:19, 135:12, 135:19

**car** [1] - 146:10

**cards** [2] - 100:5, 100:13

**care** [1] - 66:5

**cart** [1] - 17:12

**carts** [1] - 34:21

**case** [32] - 1:3, 4:20, 4:21, 4:22, 5:15, 5:21, 5:23, 6:5, 6:6, 49:12, 49:23, 49:25, 59:11, 63:12, 63:14, 65:13, 70:22, 79:11, 79:18, 80:6, 86:22, 94:17, 95:21, 98:19, 100:10, 137:6, 145:16, 151:21, 153:2, 169:5, 169:7, 169:24

**cash** [15] - 51:20, 53:6, 55:25, 56:13, 60:9, 91:24, 113:23, 114:1, 114:3, 119:15, 119:16, 119:18, 119:20, 124:4

**cashed** [4] - 62:24, 63:2, 113:21, 145:7

**cashing** [1] - 63:5

**Catalan** [7] - 61:14, 61:15, 61:19, 138:11, 139:25, 140:1, 140:2

**catching** [1] - 55:1

**category** [1] - 152:6

**caught** [2] - 88:6, 137:22

**caused** [1] - 139:18

**CCR** [2] - 2:3, 171:7

**cease** [1] - 115:22

**ceiling** [1] - 16:8

**ceilings** [1] - 89:1

**cellular** [4] - 67:13, 67:17, 67:19, 67:22

**cement** [1] - 89:20

**CEO** [1] - 136:5

**certain** [1] - 147:20

**certainly** [9] - 50:9, 62:5, 63:5, 65:4, 70:10, 157:4, 161:25, 167:4

**certify** [1] - 171:3

**cetera** [2] - 13:4, 130:13

**CFO** [1] - 136:5

**chair** [1] - 120:13

**chance** [5] - 41:25, 90:3, 108:14, 109:8, 109:25

**change** [5] - 11:21, 11:25, 13:9, 58:18, 140:3

**changing** [3] - 150:21, 164:8, 164:9

**characterizes** [1] - 58:8

**charge** [15] - 10:3, 26:3, 30:12, 33:15, 34:3, 34:18, 57:19, 81:24, 81:25, 82:3, 103:4, 130:20, 137:8, 157:16, 158:11

**chatas** [1] - 126:9

**Chatas** [1] - 126:10

**check** [15] - 54:15, 54:20, 54:23, 104:24, 105:1, 105:2, 105:3, 105:18, 113:22, 119:5, 119:6, 119:9, 144:21, 144:24, 145:13

**checks** [15] - 54:12, 62:19, 62:24, 63:1, 63:5, 113:11, 113:12, 113:13, 113:18, 119:18, 145:3, 145:7, 145:21, 145:22

**child** [3] - 95:17, 95:19, 95:22

**chose** [1] - 97:19

**CHRIS** [1] - 1:21

**Chris** [5] - 61:8, 155:21, 156:4, 161:6, 161:11

**Circuit** [1] - 4:21

**circumstances** [1] - 60:15

**citizen** [2] - 96:17, 97:24

**City** [2] - 115:5, 115:8

**city** [1] - 22:20

**claim** [9] - 53:13, 56:23, 59:8, 59:17, 60:7, 60:17, 76:1, 107:15, 166:9

**claimed** [2] - 73:7, 138:19

**claiming** [1] - 151:11

**claims** [1] - 7:2

**clarify** [1] - 38:2

**class** [3] - 5:24, 6:4

**clean** [14] - 17:10, 17:14, 17:21, 18:4,

84:9, 109:22, 109:25, 111:25, 112:15, 146:9, 162:14, 162:23, 163:1, 166:18

**cleaned** [1] - 109:14

**cleaning** [2] - 109:16, 163:4

**clear** [16] - 5:1, 24:25, 50:3, 56:23, 63:10, 63:19, 80:13, 80:18, 88:3, 90:10, 99:24, 106:24, 158:10, 163:17, 165:6, 165:16

**clearly** [4] - 51:21, 88:7, 88:9, 100:1

**CLERK** [8] - 66:6, 66:14, 114:14, 114:17, 114:21, 170:4, 170:7, 170:10

**client** [1] - 23:4

**clients** [1] - 100:18

**clock** [4] - 9:9, 9:11, 9:19, 52:9

**clocks** [1] - 9:1

**close** [1] - 15:5

**closed** [4] - 134:13, 134:15, 151:6, 151:8

**closer** [1] - 9:5

**closest** [1] - 75:17

**closing** [1] - 15:7

**Club** [1] - 115:14

**club** [9] - 22:10, 23:4, 115:15, 115:21, 115:23, 116:2, 116:6, 116:12, 116:14

**co** [9] - 143:18, 146:4, 146:8, 149:6, 157:20, 159:18, 159:21, 163:23, 166:23

**co-worker** [9] - 143:18, 146:4, 146:8, 149:6, 157:20, 159:18, 159:21, 163:23, 166:23

**Coconut** [2] - 49:5, 143:25

**coffee** [5] - 14:19, 33:2, 83:16, 83:19, 83:23

**Cohn** [5] - 4:19, 7:3, 7:5, 7:9, 50:5

**collect** [4] - 26:2, 26:3, 26:4, 123:25

**column** [1] - 51:2

**coming** [3] - 23:10, 89:3, 115:25

**commercial** [4] - 15:22, 22:6, 23:14,

143:7

**communicate** [6] - 31:14, 35:18, 36:20, 41:22, 93:9, 93:21

**communicated** [1] - 145:18

**companies** [3] - 67:17, 154:4, 154:7

**company** [115] - 9:3, 9:7, 9:14, 12:4, 12:21, 12:25, 14:13, 20:13, 20:16, 20:17, 20:21, 20:25, 21:25, 25:1, 28:8, 28:25, 29:2, 29:17, 30:19, 32:18, 34:24, 35:1, 35:8, 35:10, 36:5, 38:20, 38:23, 39:3, 39:10, 41:15, 41:16, 41:17, 42:15, 42:18, 43:22, 45:6, 49:5, 50:22, 53:8, 53:15, 53:21, 56:19, 56:25, 57:20, 58:17, 59:4, 61:13, 63:7, 63:9, 64:3, 67:22, 68:9, 75:11, 77:13, 91:7, 94:22, 95:13, 97:9, 97:13, 97:16, 97:17, 98:11, 98:20, 99:7, 99:15, 113:3, 115:17, 120:9, 123:20, 123:21, 123:23, 125:12, 127:13, 127:24, 132:19, 133:6, 133:9, 133:12, 133:19, 133:21, 133:25, 134:1, 134:3, 134:10, 134:16, 135:7, 136:1, 136:2, 136:3, 136:4, 136:6, 136:12, 137:20, 139:18, 140:6, 142:17, 143:14, 143:16, 151:12, 151:16, 152:6, 152:22, 153:1, 153:2, 153:6, 158:11, 158:17, 159:16, 161:17, 162:22

**compensable** [1] - 6:24

**compensate** [1] - 8:22

**compensated** [1] - 58:13

**compensation** [1] - 127:18

**complain** [1] - 78:3

**complained** [3] - 51:22, 56:25, 78:8

**complaint** [1] - 134:5

**complaints** [3] - 53:14, 53:20, 54:1

**complete** [2] - 21:9, 131:15

**completed** [3] - 21:7, 21:8, 107:20

**completely** [2] - 64:10, 144:11

**complex** [1] - 68:23

**compromised** [1] - 43:8

**computer** [3] - 124:6, 124:13, 124:14

**computers** [1] - 124:8

**conceal** [1] - 97:2

**concealed** [1] - 96:13

**concern** [1] - 57:5

**concerning** [1] - 41:12

**concise** [1] - 169:24

**conclusion** [1] - 142:6

**concrete** [1] - 74:2

**conditions** [2] - 69:3, 70:12

**condo** [1] - 85:22

**condominium** [1] - 85:5

**condominiums** [3] - 70:22, 75:24, 85:19

**confer** [1] - 100:18

**confuse** [1] - 150:13

**consider** [4] - 7:8, 33:18, 36:6, 36:22

**considered** [1] - 43:13

**considering** [1] - 6:3

**consists** [1] - 54:12

**conspicuously** [2] - 52:1, 60:17

**constitute** [1] - 153:5

**constituted** [1] - 59:15

**contact** [5] - 29:11, 34:5, 34:17, 35:9, 159:19

**contained** [1] - 81:3

**contend** [1] - 59:15

**content** [2] - 28:19, 37:8

**contesting** [1] - 93:18

**continue** [5] - 66:18, 108:21, 114:8, 114:25, 168:16

**Continued** [2] - 3:3, 8:6

JURY TRIAL - VOLUME IV OF VI

**continued** [1] - 12:10
**contract** [1] - 154:15
**contracted** [1] - 35:1
**contractor** [1] - 7:24
**control** [23] - 77:9, 135:13, 135:15, 135:22, 135:23, 135:25, 136:3, 136:5, 136:6, 136:7, 136:11, 136:12, 136:18, 136:22, 137:1, 137:3, 137:5, 137:7, 137:9, 158:4, 158:7
**controller** [1] - 57:17
**conversation** [8] - 28:5, 28:15, 28:19, 28:20, 37:4, 37:8, 38:24, 51:21
**conversations** [7] - 28:25, 40:25, 46:6, 47:11, 61:16, 94:3, 147:17
**COO** [1] - 136:5
**cooler** [1] - 161:23
**copy** [2] - 59:12, 102:2
**Coral** [1] - 24:7
**Correct** [1] - 87:14
**correct** [81] - 37:2, 48:9, 49:10, 49:21, 50:21, 51:2, 51:8, 51:14, 53:22, 54:2, 54:4, 54:16, 54:21, 56:25, 57:6, 57:11, 57:22, 58:6, 58:9, 58:13, 58:23, 60:2, 60:7, 60:21, 60:24, 62:13, 62:22, 62:24, 63:21, 64:2, 68:5, 68:9, 68:25, 69:5, 71:9, 72:5, 78:14, 82:17, 82:20, 84:11, 85:11, 85:22, 87:13, 109:19, 113:25, 115:19, 125:24, 130:1, 131:19, 133:22, 133:25, 134:7, 134:16, 135:13, 147:11, 151:14, 151:17, 152:16, 152:17, 153:6, 153:7, 153:23, 155:13, 155:19, 157:13, 158:1, 159:3, 159:4, 159:6, 159:13, 159:17, 159:24, 159:25, 161:17, 162:1, 163:2, 163:7, 166:10, 166:17, 167:17

**corrected** [1] - 115:16
**correction** [1] - 115:15
**corrections** [1] - 115:3
**Counsel** [1] - 100:18
**counsel** [2] - 99:8, 168:19
**Country** [1] - 115:14
**country** [11] - 68:2, 95:10, 96:25, 98:3, 115:15, 115:21, 115:23, 116:2, 116:6, 116:12, 116:14
**county** [1] - 143:23
**County** [1] - 143:24
**couple** [5] - 5:8, 9:15, 11:4, 18:21, 27:9, 27:12, 37:24, 62:4, 90:12, 90:14, 115:3, 120:24, 123:17, 124:25
**course** [29] - 16:16, 16:17, 17:3, 17:21, 22:10, 34:3, 36:2, 36:17, 45:8, 76:17, 77:3, 78:11, 86:18, 89:5, 96:21, 103:3, 104:4, 105:14, 105:16, 108:20, 108:24, 113:19, 120:7, 123:14, 125:24, 131:16, 131:20, 136:24
**COURT** [110] - 1:1, 4:2, 4:6, 4:11, 4:14, 7:10, 7:14, 7:18, 7:21, 9:20, 10:9, 10:19, 10:24, 12:12, 12:14, 14:7, 16:25, 24:12, 24:14, 24:17, 24:21, 26:8, 28:11, 29:24, 30:4, 30:9, 30:22, 33:21, 33:23, 34:10, 35:5, 40:9, 42:25, 43:2, 43:4, 43:15, 46:12, 46:17, 47:1, 47:21, 48:16, 49:18, 49:23, 50:1, 50:3, 50:6, 50:15, 55:9, 65:18, 65:22, 65:24, 66:3, 66:5, 66:9, 66:11, 66:15, 66:18, 69:22, 100:21, 101:10, 103:25, 104:4, 105:25, 106:2, 108:7, 114:5, 114:10, 114:15, 114:24, 115:11, 117:9,

117:12, 118:13, 118:18, 118:21, 122:25, 123:4, 134:20, 134:22, 134:25, 135:4, 135:9, 141:2, 141:4, 141:7, 141:9, 141:12, 141:16, 141:18, 141:21, 142:7, 142:10, 149:13, 152:10, 153:14, 154:21, 168:12, 168:14, 168:22, 168:24, 169:2, 169:4, 169:10, 169:14, 169:16, 169:20, 169:25, 170:12, 170:15, 171:8
**crime** [1] - 97:2
**cross** [8] - 47:21, 66:19, 100:21, 114:8, 114:25, 149:13, 168:16, 169:4
**Cross** [3] - 3:5, 3:6, 3:9
**CROSS** [4] - 47:22, 100:23, 149:14
**Cross-examination** [3] - 3:5, 3:6, 3:9
**cross-examination** [5] - 47:21, 66:19, 114:8, 114:25, 168:16
**CROSS-EXAMINATION** [3] - 47:22, 100:23, 149:14
**cross-examine** [2] - 100:21, 149:13
**crossed** [1] - 79:14
**crying** [3] - 106:7, 106:9, 128:12
**curry** [1] - 98:17
**cut** [8] - 7:10, 16:12, 16:13, 85:6, 112:8, 112:9, 112:10, 112:13

**Court** [6] - 2:3, 4:1, 5:18, 6:7, 114:7, 169:9
**court** [5] - 4:16, 22:11, 65:6, 70:22, 151:21
**Court's** [1] - 65:24
**courtroom** [2] - 24:10, 27:2
**COURTROOM** [1] - 1:4
**cover** [1] - 47:7
**covered** [1] - 134:25
**crappy** [1] - 99:10
**crazy** [1] - 126:21
**creating** [1] - 64:12
**Creek** [1] - 49:5
**creek** [1] - 143:25
**crew** [57] - 7:7, 10:1, 10:2, 29:16, 31:19, 34:18, 38:22, 45:14, 47:10, 61:2, 61:8, 61:10, 61:13, 61:18, 61:20, 61:21, 61:22, 61:24, 62:2, 62:3, 64:19, 68:14, 68:21, 70:25, 72:4, 72:10, 73:13, 77:5, 77:15, 78:18, 82:13, 82:15, 90:1, 91:17, 98:24, 99:6, 99:24, 102:15, 107:5, 128:22, 131:15, 149:4, 154:18, 154:19, 155:4, 155:9, 155:21, 156:4, 159:22, 161:21, 164:19
**crews** [10] - 31:18, 31:19, 38:23, 78:22, 125:21, 127:25, 131:10, 131:17, 131:18, 154:17

## D

**daily** [3] - 29:17, 135:22, 135:24
**damages** [5] - 73:10, 79:11, 79:18, 80:5, 80:14
**Daniel** [2] - 126:5, 126:10
**Danny** [5] - 126:10, 126:12, 126:15, 126:20
**dare** [1] - 47:18
**dark** [4] - 76:19, 76:20, 76:23, 77:2
**date** [7] - 19:13, 19:15, 22:16, 25:3, 25:6, 25:9, 119:17
**Date** [1] - 171:7
**dated** [4] - 54:15, 54:20, 56:5, 57:9
**DAVID** [1] - 1:17
**david.kelly38@rocketmail.com** [1] - 1:19
**dawn** [2] - 52:9, 64:11
**dawned** [2] - 64:11, 64:15
**day's** [2] - 84:18, 140:21
**day-to-day** [2] -

86:12, 135:13
**daylight** [1] - 11:10
**days** [69] - 11:19, 11:20, 13:3, 13:7, 13:8, 19:14, 31:23, 33:13, 37:22, 37:24, 37:25, 38:3, 38:8, 38:11, 52:12, 58:5, 60:23, 70:15, 72:14, 80:11, 91:20, 92:13, 92:22, 120:24, 120:25, 121:14, 123:11, 123:17, 131:3, 131:4, 131:23, 131:24, 138:14, 138:16, 138:17, 138:18, 140:3, 140:4, 142:22, 144:1, 144:16, 146:16, 146:17, 147:23, 148:2, 148:4, 148:5, 148:7, 148:12, 148:15, 148:17, 148:22, 149:8, 149:19, 149:23, 150:1, 150:16, 150:17, 150:19, 150:22, 160:6, 167:4, 167:5, 167:7, 168:3
**days'** [1] - 140:22
**deadline** [4] - 19:9, 40:17, 46:21, 47:7
**deal** [5] - 58:15, 77:13, 139:18, 140:23, 159:9
**dealt** [2] - 159:5, 159:12
**December** [9] - 10:16, 11:11, 11:22, 39:24, 76:6, 76:19, 125:15, 125:16, 125:23
**decision** [3] - 72:5, 160:7, 160:12
**decisions** [6] - 97:8, 98:8, 98:15, 160:1, 160:9, 160:15
**declare** [4] - 49:9, 51:13, 60:9, 65:11
**declared** [2] - 153:5, 153:16
**decrease** [1] - 12:19
**DEFENDANT** [1] - 2:1
**defendant** [6] - 4:17, 24:18, 27:3, 132:23, 142:3
**defendants** [12] - 6:25, 8:19, 25:17, 59:14, 59:20, 80:7,

JURY TRIAL - VOLUME IV OF VI

132:14, 135:7, 142:4, 142:9, 145:15, 169:17
**Defendants** [1] - 1:11
**DEFENDANTS** [1] - 1:20
**Defendants'** [1] - 55:12
**defense** [2] - 134:23, 169:24
**definitely** [1] - 123:3
**degrees** [2] - 130:12, 130:13
**delay** [1] - 169:8
**Delgado** [2] - 126:5, 126:20
**denied** [2] - 10:24, 28:11
**deny** [2] - 72:7, 124:2
**department** [7] - 14:21, 16:14, 20:1, 20:23, 21:3, 22:7, 22:19
**Department** [2] - 22:20, 36:8
**deposed** [2] - 154:25, 155:12
**deposit** [3] - 113:9, 113:11, 113:23
**deposited** [3] - 113:10, 113:13, 113:18
**deposition** [17] - 69:24, 72:8, 75:3, 154:23, 155:1, 155:13, 156:2, 156:6, 158:19, 159:3, 160:11, 160:23, 162:17, 163:2, 163:10, 163:13, 163:25
**deposits** [4] - 113:2, 113:4, 113:5, 113:6
**describe** [7] - 29:20, 47:4, 59:9, 59:13, 60:14, 101:22, 148:14
**described** [8] - 12:1, 13:10, 18:12, 19:5, 40:13, 51:20, 86:11, 146:14
**describing** [2] - 13:22, 149:19
**description** [2] - 81:8, 129:21
**design** [2] - 130:5, 130:6
**detail** [2] - 41:18, 59:13
**details** [6] - 34:14,

37:17, 37:19, 40:14, 41:9, 66:7
**determine** [1] - 77:6
**diaster** [1] - 128:5
**difference** [3] - 11:24, 101:19, 128:14
**different** [18] - 5:1, 13:3, 15:23, 18:14, 21:15, 21:22, 24:7, 24:8, 31:18, 61:22, 82:13, 85:11, 85:17, 110:6, 129:6, 146:25, 156:16
**difficult** [1] - 46:20
**digression** [1] - 92:5
**dime** [1] - 124:5
**dining** [1] - 116:8
**dinner** [5] - 115:18, 115:25, 116:6, 116:12, 116:14
**DIRECT** [1] - 141:23
**direct** [6] - 8:6, 34:5, 52:4, 71:15, 125:18, 157:25
**Direct** [2] - 3:4, 3:8
**directing** [1] - 72:1
**directions** [1] - 86:12
**directly** [4] - 41:20, 41:24, 42:11, 70:16
**dirt** [1] - 112:14
**dirty** [1] - 112:18
**disagreement** [2] - 73:14, 73:15
**disaster** [1] - 128:5
**disclose** [3] - 153:21, 154:5, 154:8
**disclosed** [1] - 153:8
**discussed** [4] - 46:7, 80:15, 105:9, 146:19
**discussing** [1] - 153:3
**discussions** [1] - 105:7
**dispute** [1] - 62:5
**disputed** [1] - 63:1
**disputing** [1] - 55:3
**DISTRICT** [3] - 1:1, 1:1, 1:14
**divide** [1] - 74:25
**divided** [1] - 32:19
**DIVISION** [1] - 1:2
**document** [1] - 158:6
**documentation** [4] - 101:24, 117:2, 130:7, 132:2
**documents** [2] - 158:16, 159:1
**dollars** [10] - 47:13, 48:2, 48:11, 54:15, 55:13, 55:20, 65:11,

104:10, 140:7, 140:14
**done** [19] - 17:7, 26:15, 33:10, 33:12, 40:18, 40:20, 40:21, 43:12, 47:7, 47:17, 81:9, 90:12, 97:18, 137:14, 167:9, 167:13, 169:8
**Donoso** [1] - 169:19
**Donovan** [1] - 4:20
**door** [3] - 26:16, 106:21, 130:4
**doors** [9] - 34:22, 34:23, 34:25, 35:9, 85:13, 130:18, 152:7
**Dorey** [2] - 126:12
**down** [18] - 12:8, 17:14, 23:11, 46:23, 77:15, 89:4, 97:12, 106:13, 109:9, 111:15, 112:16, 114:10, 129:25, 139:10, 141:7, 157:22, 166:14, 168:22
**downstairs** [3] - 109:18, 137:24, 137:25
**dozen** [1] - 169:21
**drawing** [3] - 130:1, 130:2, 130:5
**drill** [3] - 16:8, 74:2, 89:9
**drilling** [1] - 89:13
**drills** [2] - 74:2, 89:25
**drink** [1] - 16:21
**drinking** [2] - 74:9, 111:13
**drinks** [1] - 74:8
**drive** [6] - 20:11, 23:8, 142:21, 155:24, 165:24, 167:15
**driver** [8] - 61:8, 127:16, 142:20, 144:12, 155:21, 156:4, 161:3, 161:7
**driver's** [1] - 155:19
**driving** [2] - 10:2, 164:19
**drove** [6] - 61:1, 61:2, 61:3, 61:5, 120:8, 155:16
**duration** [5] - 18:24, 36:12, 38:8, 78:17
**during** [36] - 6:23, 8:11, 13:2, 16:16, 16:17, 18:14, 21:10, 21:17, 22:1, 24:15, 24:23, 25:9, 25:16,

25:21, 26:20, 32:6, 33:3, 33:6, 38:3, 39:21, 45:19, 78:11, 82:10, 84:5, 92:23, 119:15, 121:5, 121:12, 144:11, 144:12, 144:17, 145:5, 148:17, 148:22, 149:7, 167:25
**dusk** [2] - 52:9, 64:12

# E

**early** [8] - 18:19, 23:1, 38:17, 39:1, 69:25, 115:18, 146:18, 164:23
**earn** [2] - 153:24, 154:10, 154:13
**earned** [9] - 48:1, 48:12, 49:6, 50:24, 151:16, 153:9, 153:17, 153:21, 154:7
**earning** [3] - 57:6, 57:14, 57:22
**earnings** [1] - 49:9
**easily** [2] - 78:2, 154:9
**easy** [1] - 77:21
**eat** [4] - 16:17, 70:18, 74:10, 115:18
**Ed** [7] - 55:16, 55:24, 58:16, 69:10, 69:12, 81:20, 157:23
**eddie** [2] - 122:18, 159:1
**Eddie** [6] - 122:19, 157:7, 157:9, 157:13, 157:16, 158:15
**eDWARD** [1] - 2:1
**EDWARD** [1] - 1:10
**Edward** [3] - 2:1, 132:24, 134:6
**eight** [4] - 6:19, 32:11, 131:10, 131:17
**either** [9] - 21:21, 53:21, 60:10, 75:12, 80:1, 80:11, 104:16, 153:16, 169:6
**electric** [1] - 89:25
**electricity** [1] - 89:9
**elevator** [1] - 15:23
**elicit** [1] - 83:1
**elicited** [1] - 74:20
**emotional** [1] - 46:2
**employed** [2] - 142:2, 142:8
**employee** [1] -

128:25
**employees** [3] - 29:12, 59:14, 128:1
**employer** [2] - 66:2, 66:8
**employment** [15] - 8:11, 13:2, 13:6, 24:23, 25:11, 25:12, 25:13, 25:22, 25:24, 26:14, 56:3, 145:5, 147:10, 156:21, 157:2
**enable** [1] - 51:16
**end** [32] - 5:11, 12:3, 13:6, 13:7, 17:2, 19:8, 22:23, 23:1, 25:8, 27:12, 27:14, 37:25, 38:1, 38:9, 38:15, 38:17, 39:2, 41:15, 44:14, 44:20, 48:6, 52:24, 56:3, 77:8, 91:6, 91:8, 133:17, 142:16, 148:18, 157:21, 161:20
**ended** [6] - 18:7, 19:24, 22:8, 25:1, 25:13, 147:17
**ending** [1] - 19:13
**engineering** [5] - 16:14, 108:18, 116:25, 130:5, 130:10
**english** [1] - 94:4
**English** [9] - 35:16, 35:20, 42:1, 93:8, 93:12, 93:13, 93:14, 93:16, 94:2
**ensure** [1] - 139:15
**entered** [1] - 52:14
**entire** [4] - 6:23, 116:10, 130:19, 145:5
**entitled** [2] - 49:14, 171:4
**entrance** [1] - 23:6
**envelope** [4] - 101:23, 102:11, 102:14, 102:15
**especially** [3] - 30:16, 90:16, 115:18
**ESQ** [2] - 1:17, 1:21
**establish** [2] - 5:6, 5:9
**established** [3] - 119:17, 123:9, 161:6
**estimate** [2] - 80:14, 154:7
**estimated** [1] - 75:1
**estimates** [1] - 75:14
**et** [2] - 13:4, 130:13
**evade** [1] - 51:17
**evening** [7] - 84:23, 84:24, 163:5, 166:9,

JURY TRIAL - VOLUME IV OF VI

166:14, 166:17, 167:21

**everyday** [2] - 65:2, 72:9

**evidence** [3] - 5:14, 6:8, 54:8

**evident** [1] - 6:7

**exact** [9] - 7:7, 16:13, 20:18, 25:8, 62:12, 62:17, 75:9, 75:15, 150:19

**exactly** [9] - 26:17, 57:3, 75:16, 90:7, 116:25, 124:2, 148:21, 149:1, 161:11

**exaggeration** [1] - 88:14

**EXAMINATION** [6] - 3:1, 8:6, 47:22, 100:23, 141:23, 149:14

**examination** [12] - 3:4, 3:5, 3:6, 3:8, 3:9, 8:3, 47:21, 66:19, 114:8, 114:25, 157:25, 168:16

**examinations** [1] - 169:23

**examine** [3] - 100:21, 144:10, 149:13

**example** [9] - 10:5, 31:21, 34:7, 34:19, 38:20, 39:13, 40:24, 44:13, 131:7

**except** [1] - 136:16

**excess** [1] - 8:13

**exclusively** [1] - 110:16

**excuse** [3] - 27:24, 121:18, 155:5

**Excuse** [1] - 135:4

**excused** [2] - 168:18, 168:20

**exhibit** [2] - 64:23, 112:20

**Exhibit** [6] - 54:9, 54:12, 55:5, 55:12, 57:2, 112:21

**exist** [1] - 166:10

**exists** [1] - 59:2

**expand** [1] - 76:1

**expect** [2] - 118:17, 118:23

**expectation** [1] - 25:16

**expectations** [1] - 29:2

**expected** [1] - 26:20

**expecting** [1] - 28:24

**explain** [9] - 16:6, 63:23, 85:2, 85:10, 121:21, 126:4, 130:16, 158:8, 160:5

**Explain** [1] - 118:8

**explained** [2] - 133:4, 135:6

**explaining** [1] - 98:19

**explanation** [3] - 59:16, 69:8, 159:20

**expressed** [1] - 94:19

**extent** [3] - 5:14, 77:5, 77:9

**extra** [1] - 43:10

**extremely** [1] - 89:23

---

## F

**F.2d** [1] - 4:21

**facilitates** [1] - 22:12

**fact** [11] - 5:4, 5:7, 62:8, 62:18, 71:22, 80:7, 82:1, 137:10, 160:1, 163:10

**factory** [1] - 16:7, 39:5, 147:15, 148:13, 148:14, 148:17, 148:19, 148:22, 168:9, 168:10

**facts** [3] - 59:16, 60:14, 60:18

**failure** [1] - 53:13

**Fair** [5] - 59:10, 59:15, 59:19, 59:25, 60:15

**fall** [2] - 76:5, 76:6

**false** [3] - 7:22, 156:20, 157:1

**families** [4] - 96:5, 96:10, 96:22, 97:22

**family** [9] - 95:7, 95:9, 95:15, 96:19, 96:20, 97:21, 98:2, 98:4, 98:6

**fast** [1] - 31:20

**fault** [1] - 119:12

**favor** [2] - 80:16, 98:17

**February** [2] - 12:2, 12:3

**Federal** [8] - 20:2, 51:14, 88:8, 152:12, 153:8, 153:17, 153:22, 154:1

**feet** [2] - 119:23, 129:7, 129:8, 130:17, 130:20, 130:24,

131:12, 131:19, 131:24

**FELICIANO** [18] - 1:5, 3:3, 7:17, 7:19, 8:5, 9:6, 30:10, 32:23, 43:1, 46:18, 50:2, 104:2, 104:5, 106:4, 114:11, 134:21, 135:6, 141:8

**Feliciano** [13] - 4:6, 4:24, 6:9, 6:16, 6:20, 7:16, 8:1, 48:18, 66:22, 114:10, 141:7, 154:18, 154:25

**Fernando** [1] - 169:19

**few** [4] - 47:6, 101:1, 113:11, 158:9

**field** [1] - 6:10

**figures** [1] - 75:9

**filed** [5] - 132:13, 132:22, 134:14, 134:15

**fill** [2] - 156:23, 158:25

**filled** [5] - 9:19, 55:16, 79:10, 79:17, 80:5

**filling** [2] - 8:25, 158:16

**finances** [1] - 137:9

**financial** [3] - 57:19, 136:9, 136:17

**fine** [1] - 43:18

**Finegold** [1] - 154:24

**finger** [3] - 103:2, 139:10, 139:17

**finish** [1] - 12:6, 12:23, 18:21, 18:22, 19:8, 19:9, 21:1, 21:15, 22:2, 26:2, 31:12, 31:22, 31:23, 40:19, 46:22, 47:10, 74:17, 78:2, 93:5, 106:2, 107:3, 108:1, 108:13, 108:21, 109:22, 111:17, 131:18, 133:18, 138:9, 139:11, 169:4

**finished** [13] - 18:8, 22:17, 22:18, 23:25, 69:20, 69:25, 107:4, 107:22, 109:9, 116:17, 146:11, 148:25, 162:4

**fire** [3] - 7:22, 45:24

**fired** [1] - 126:2

**firm** [1] - 154:24

**First** [1] - 105:3

**first** [76] - 7:23, 9:8,

9:25, 13:18, 14:5, 14:10, 14:17, 20:12, 27:7, 27:16, 27:18, 28:4, 28:17, 28:22, 28:25, 31:2, 31:3, 37:1, 37:11, 38:6, 38:12, 54:15, 58:11, 58:19, 68:13, 68:15, 81:18, 81:19, 85:20, 91:18, 95:16, 101:14, 104:23, 105:1, 105:2, 106:25, 109:9, 119:5, 123:21, 123:23, 129:2, 132:13, 132:22, 134:16, 142:14, 142:24, 143:3, 143:9, 143:10, 143:13, 143:14, 143:17, 144:5, 144:7, 144:10, 144:19, 149:22, 149:25, 150:11, 150:12, 150:18, 150:20, 151:7, 156:12, 156:22, 157:12, 157:18, 159:7, 161:2, 161:15, 164:9, 165:17

**five** [32] - 37:25, 38:2, 38:11, 41:16, 42:13, 42:18, 44:5, 44:7, 44:9, 44:12, 44:15, 44:20, 50:21, 52:21, 53:4, 53:7, 55:2, 55:6, 61:16, 82:5, 82:8, 86:4, 86:5, 95:2, 119:1, 123:11, 131:12, 131:14, 138:15, 139:19, 152:6

**fix** [2] - 45:13, 105:19

**FL** [4] - 1:18, 1:22, 2:4, 171:9

**flashcard** [2] - 114:19, 114:20

**floor** [3] - 7:23, 16:9, 85:21

**floors** [2] - 15:21, 47:14

**Florida** [4] - 29:5, 37:21, 38:14, 88:22

**FLORIDA** [2] - 1:1, 1:7

**Floridian** [2] - 4:21, 5:23

**fluently** [2] - 93:9, 93:10

**folder** [4] - 102:2, 102:3, 102:5, 102:6

**folders** [1] - 101:25

**follow** [5] - 12:5, 67:20, 107:24, 110:3,

111:17

**followed** [1] - 109:11

**following** [5] - 11:21, 13:13, 31:10, 162:9, 166:19

**foolish** [1] - 70:11

**foot** [3] - 127:2, 131:5, 131:23

**footage** [11] - 127:6, 128:11, 128:15, 129:2, 129:5, 129:9, 129:13, 129:23, 130:17, 131:1

**FOR** [3] - 1:16, 1:20, 2:1

**Ford** [1] - 165:19

**foregoing** [1] - 171:3

**foreman** [4] - 70:24, 77:5, 77:15, 90:1

**forgave** [5] - 139:2, 139:4, 140:1, 140:10, 140:16

**forgot** [1] - 61:14

**form** [6] - 127:1, 127:16, 129:24, 154:9, 156:23

**former** [1] - 70:2

**FORT** [2] - 1:2, 1:7

**forth** [2] - 6:2, 130:5

**fortunately** [1] - 132:3

**four** [24] - 9:15, 18:9, 23:23, 36:13, 37:24, 38:2, 38:11, 80:3, 80:11, 82:5, 82:7, 82:9, 107:7, 110:8, 110:10, 118:18, 120:25, 121:2, 121:14, 123:11, 131:11, 131:12, 131:24

**four-and-a-half** [2] - 110:8, 110:10

**FPR** [2] - 2:3, 171:7

**FRANCIS** [1] - 1:10

**Francis** [1] - 1:22

**Frank** [16] - 36:19, 40:5, 81:16, 86:11, 118:17, 118:23, 125:22, 130:14, 132:14, 132:18, 132:23, 133:24, 134:2, 136:22, 137:1, 137:4

**frank** [1] - 158:1

**friends** [2] - 96:6

**front** [1] - 156:3

**full** [1] - 141:19

**funds** [3] - 119:14, 145:8, 145:10

JURY TRIAL - VOLUME IV OF VI

# G

**game** [1] - 75:25
**gate** [2] - 13:19, 13:25
**gee** [3] - 52:14, 64:13, 79:12
**general** [8] - 5:7, 62:5, 81:10, 81:11, 83:1, 83:5, 89:16, 130:12
**gentlemen** [1] - 115:18
**Gentlemen** [2] - 7:21, 168:14
**given** [14] - 12:17, 81:22, 83:2, 83:5, 86:10, 90:5, 115:21, 143:18, 153:11, 154:6, 154:9, 154:13, 158:6
**glabor@aol.com** [1] - 1:23
**Glasser** [1] - 1:21
**God** [1] - 96:17
**golf** [5] - 22:10, 34:3, 34:21, 103:3
**GONZALEZ** [1] - 1:13
**goodness** [1] - 94:6
**gosh** [2] - 64:11, 79:19
**Government** [5] - 153:8, 153:17, 154:8, 154:11, 154:13
**grab** [1] - 161:22
**grabbed** [1] - 111:16
**gratuitously** [1] - 157:21
**great** [5] - 69:2, 98:21, 99:12, 110:23, 114:21
**greatly** [3] - 62:8, 65:9, 75:25
**greed** [1] - 101:14
**gross** [1] - 88:14
**ground** [4] - 65:14, 138:1, 138:3, 138:21
**grounds** [2] - 134:24, 140:25
**group** [2] - 10:3, 29:12
**groups** [1] - 127:24
**guard** [3] - 14:1, 14:2, 15:9
**guess** [7] - 39:23, 74:14, 74:22, 74:23, 75:6, 75:17, 80:14
**guesses** [1] - 75:14

**guessing** [2] - 74:15, 75:25
**GUILLERMO** [1] - 1:6
**guy** [8] - 37:12, 57:19, 124:20, 125:5, 126:21, 139:10, 140:22, 158:11
**guys** [9] - 42:8, 70:17, 87:25, 94:6, 95:11, 111:4, 111:8, 128:7, 134:2
**gym** [1] - 22:11

# H

**half** [30] - 18:4, 18:21, 18:24, 24:24, 38:7, 46:21, 54:24, 72:9, 72:10, 74:3, 78:15, 83:18, 92:15, 107:6, 107:12, 107:22, 110:8, 110:10, 124:3, 125:17, 163:6, 163:11, 163:25, 164:2, 164:4, 164:5, 165:19, 168:3, 169:21, 169:23
**half/four** [1] - 32:4
**hall** [1] - 24:17
**hammering** [1] - 116:1
**hand** [5] - 67:5, 89:9, 141:13, 141:16, 146:8
**hand-held** [1] - 89:9
**handed** [5] - 50:17, 82:1, 145:8, 152:12, 163:23
**handful** [1] - 6:1
**handing** [2] - 48:18, 86:12
**handling** [2] - 83:20, 89:6
**handwriting** [5] - 101:23, 102:1, 102:7, 102:10, 102:20
**handwritten** [1] - 55:12
**hang** [5] - 16:14, 68:13, 87:2, 95:6, 146:4
**hanging** [2] - 36:1, 87:4
**happy** [2] - 66:3, 120:14
**harbor** [1] - 97:2
**harbored** [2] - 96:11, 96:13

**hard** [7] - 32:9, 71:4, 71:12, 71:16, 72:13, 73:25, 89:23
**Hardly** [1] - 121:19
**hardly** [1] - 30:17
**Hardy** [1] - 171:6
**HARDY** [2] - 2:3, 171:7
**Hardy-Hobbs** [1] - 171:6
**HARDY-HOBBS** [2] - 2:3, 171:7
**hauling** [1] - 74:1
**head** [9] - 23:10, 43:25, 70:24, 94:7, 94:10, 94:13, 115:9, 129:15, 157:22
**hear** [1] - 143:19
**heard** [16] - 5:20, 6:11, 6:13, 33:6, 72:7, 82:25, 83:8, 83:9, 98:21, 98:22, 99:16, 100:13, 150:2, 150:15
**hearing** [2] - 9:5, 151:2
**hearsay** [1] - 7:11
**heavily** [1] - 80:15
**heavy** [2] - 70:11, 74:2
**heck** [1] - 164:21
**HEIDELBERGER** [2] - 1:10, 122:19
**Heidelberger** [48] - 1:22, 27:3, 27:16, 27:17, 27:22, 28:2, 37:1, 37:4, 37:18, 37:21, 37:23, 39:2, 43:7, 44:25, 45:2, 45:12, 45:16, 46:7, 46:15, 47:4, 51:22, 52:5, 52:15, 53:5, 54:2, 61:17, 86:19, 86:23, 87:1, 87:9, 87:18, 94:5, 94:10, 94:25, 95:5, 125:22, 132:14, 132:19, 132:23, 134:2, 135:5, 135:12, 135:19, 135:21, 136:25, 145:16, 158:1, 159:9
**held** [2] - 45:4, 89:9
**Hello** [1] - 96:25
**help** [8] - 121:3, 121:21, 136:8, 136:9, 136:17, 137:12, 147:1, 162:11
**helped** [9] - 106:17, 106:23, 120:16, 121:7, 121:9, 121:13, 121:22, 122:4, 122:12

**helping** [1] - 101:3
**hereby** [1] - 171:3
**hertz** [1] - 130:12
**high** [1] - 137:21
**highlighted** [1] - 5:21
**Highway** [2] - 20:2, 88:8
**himself** [1] - 155:23
**hire** [1] - 97:6
**hired** [11] - 69:10, 95:12, 98:12, 103:7, 103:19, 104:6, 126:17, 155:18, 155:25, 157:7, 157:13
**hiring** [4] - 97:8, 97:16, 98:8, 98:14
**hit** [2] - 137:21, 164:18
**HOBBS** [2] - 2:3, 171:7
**Hobbs** [1] - 171:6
**hobbs@flsd.uscourts.gov** [2] - 2:5, 171:9
**hold** [2] - 54:22, 151:19
**Hold** [1] - 77:23
**holding** [1] - 74:2
**holidays** [4] - 80:1, 80:3, 80:4, 80:8
**home** [9] - 18:3, 26:16, 80:10, 92:18, 92:24, 146:7, 146:12, 148:23, 161:21
**homeowners'** [3] - 11:7, 21:13, 23:16
**homes** [4] - 21:18, 92:24, 131:10, 143:2
**honestly** [2] - 154:7, 164:21
**honor** [4] - 71:3, 71:11, 71:16, 71:18
**Honor** [39] - 4:8, 5:20, 5:22, 5:23, 7:13, 9:4, 12:9, 12:13, 14:4, 24:9, 29:22, 32:21, 33:19, 34:8, 42:24, 48:15, 49:15, 49:16, 50:14, 55:8, 65:25, 66:4, 66:20, 69:21, 100:17, 100:20, 100:22, 114:4, 122:17, 135:2, 141:1, 141:5, 141:15, 142:5, 152:9, 154:20, 169:1, 170:2, 170:14
**HONORABLE** [1] - 1:13
**hour** [22] - 18:4,

**70**:18, 71:25, 72:9, 72:10, 74:3, 76:20, 78:7, 83:18, 88:23, 92:15, 93:3, 111:2, 111:4, 163:6, 163:11, 164:1, 164:2, 164:4, 164:5
**hours** [96] - 4:23, 5:16, 6:1, 6:3, 6:19, 8:12, 8:13, 10:13, 10:14, 10:15, 11:2, 11:12, 11:14, 11:18, 11:23, 12:1, 12:19, 18:25, 21:22, 41:2, 52:16, 57:25, 58:5, 58:12, 58:20, 59:19, 59:20, 60:21, 62:4, 62:6, 62:13, 62:17, 62:18, 63:6, 63:11, 63:18, 63:20, 64:2, 64:3, 64:6, 64:8, 64:9, 64:10, 64:13, 64:17, 64:18, 65:5, 65:10, 73:2, 73:3, 73:4, 73:7, 73:12, 73:16, 73:19, 73:22, 74:13, 74:15, 74:19, 74:25, 75:10, 76:1, 76:3, 76:4, 77:9, 77:13, 78:5, 78:6, 79:12, 79:19, 79:23, 79:25, 80:17, 80:19, 80:22, 90:17, 91:21, 103:21, 103:22, 104:7, 104:8, 107:7, 116:22, 144:25, 163:4, 164:4, 165:1, 165:4, 165:5, 165:7, 165:8, 166:5, 166:15
**hours'** [1] - 58:3
**house** [15] - 11:6, 129:8, 129:14, 129:21, 129:22, 129:23, 130:17, 130:19, 130:25, 131:6, 131:7, 131:23, 132:11, 162:3
**houses** [14] - 21:13, 24:7, 30:17, 61:23, 85:10, 110:14, 110:15, 129:6, 131:1, 131:13, 131:15, 131:16, 131:24
**huge** [1] - 116:9
**hundred** [2] - 86:16, 140:14
**hundreds** [2] - 5:24, 5:25
**hurricane** [9] - 36:3, 68:8, 68:13, 86:16, 87:2, 87:4, 89:6,

JURY TRIAL - VOLUME IV OF VI

152:6, 152:7
**Hurricane** [36] - 1:21,
8:15, 8:18, 20:20,
48:1, 48:12, 49:7,
49:10, 51:10, 51:14,
68:1, 68:24, 69:5,
91:6, 95:24, 132:24,
133:12, 134:4, 134:7,
142:3, 142:12,
142:19, 152:5,
152:21, 153:6,
153:10, 153:17,
153:21, 153:25,
156:19, 157:1,
158:10, 161:14,
165:1, 165:4, 166:4
**HURRICANE** [1] -
1:9
**hurricane's** [1] -
144:8
**hurry** [1] - 161:21
**hurt** [4] - 101:1,
139:15, 139:17,
140:22
**hydrate** [2] - 74:4,
74:10

## I

**Ibacache** [18] - 6:11,
61:5, 61:14, 61:19,
70:10, 72:7, 73:6,
83:9, 98:21, 98:24,
99:1, 99:9, 99:16,
128:11, 128:12,
138:12, 139:23,
140:20
**Ibacache's** [1] -
100:5
**idea** [10] - 15:17,
19:4, 29:5, 82:6, 90:9,
98:13, 126:3, 126:4,
129:16, 133:17
**identification** [1] -
55:11
**identify** [6] - 10:12,
18:2, 18:6, 32:7, 36:7,
41:8
**idiot** [1] - 128:13
**ignition** [1] - 161:8
**illegal** [8] - 95:12,
95:25, 96:13, 96:24,
97:3, 97:12, 97:16
**illegally** [2] - 98:11,
98:13
**immigrants** [2] -
95:12, 95:25
**important** [1] -
161:11

**impossible** [2] -
77:3, 116:2
**inadmissible** [1] -
7:11
**Inc** [1] - 1:21
**INC** [1] - 1:9
**inclement** [1] - 160:2
**include** [1] - 130:9
**Including** [1] -
117:19
**including** [5] - 8:18,
59:16, 74:18, 117:15,
117:21
**income** [13] - 48:18,
48:22, 48:24, 49:10,
50:10, 50:17, 51:10,
51:13, 51:14, 65:11,
152:12, 153:22, 154:1
**increase** [1] - 12:19
**increased** [1] - 104:9
**INDEX** [1] - 3:1
**indicate** [1] - 8:19
**indicated** [2] - 9:11,
34:13
**individual** [3] - 24:9,
48:18, 142:3
**individuals** [1] - 99:7
**information** [5] -
18:9, 33:11, 81:3,
170:5, 170:12
**informed** [1] - 38:22
**injury** [1] - 140:2
**inquiring** [1] - 41:8
**inside** [4] - 16:4,
39:5, 83:21, 161:11
**install** [16] - 9:16,
16:4, 34:7, 34:24,
35:8, 35:11, 41:1,
87:22, 88:1, 88:2,
123:16, 125:21,
129:17, 131:6,
131:10, 162:8
**installation** [13] -
15:14, 15:15, 38:23,
41:9, 68:8, 116:8,
121:10, 121:12,
121:13, 142:21,
147:5, 147:24, 149:3
**installations** [4] -
120:17, 120:21,
123:7, 147:7
**installed** [3] - 34:20,
129:11, 129:12
**installer** [12] - 9:1,
9:15, 9:23, 57:5,
68:15, 68:17, 68:19,
86:24, 86:25, 87:25,
110:19, 142:20
**installers** [8] - 31:15,
36:4, 110:17, 124:21,

147:15, 157:16,
157:17, 157:23
**installing** [8] - 15:18,
15:25, 17:4, 17:9,
86:16, 89:8, 123:18,
149:3
**installments** [1] -
43:10
**instead** [1] - 34:22,
115:6
**instruction** [3] -
86:25, 108:17, 125:23
**instructions** [10] -
29:13, 39:18, 87:2,
87:19, 87:22, 114:16,
114:20, 115:21,
125:20, 136:15
**insult** [2] - 99:11,
99:12
**insurance** [1] -
127:17
**intelligent** [1] -
104:12
**intend** [1] - 169:23
**interpreter** [2] -
141:13
**INTERPRETER** [6] -
141:15, 146:24,
155:5, 155:7, 157:8,
160:17
**interrogatories** [1] -
49:13
**interrogatory** [4] -
49:21, 59:11, 59:13,
60:14
**interviewed** [1] -
159:8
**introduce** [2] -
27:22, 28:2
**introduced** [6] -
27:10, 28:6, 37:9,
37:10, 43:13, 54:8
**investors** [1] - 51:7
**invoking** [1] - 24:11
**involved** [7] - 28:20,
36:9, 60:18, 98:8,
98:14, 137:12, 146:23
**involving** [1] - 5:24
**irritated** [1] - 90:17
**issue** [7] - 7:4, 44:24,
45:1, 55:4, 67:1, 78:8,
106:23
**issues** [5] - 41:12,
57:19, 159:5, 159:6,
159:10
**itself** [2] - 20:23,
33:11
**IV** [1] - 1:13

## J

**J.H** [1] - 1:17
**janitor** [2] - 81:22,
81:24
**January** [4] - 11:24,
12:2, 23:22, 48:6
**Jerico** [3] - 61:8,
124:23, 155:21
**Jill** [1] - 171:6
**jiLL** [1] - 2:3
**JILL** [1] - 171:7
**jill_hardy** [2] - 2:5,
171:9
**jill_hardy-hobbs@
flsd.uscourts.gov** [1]
- 2:5, 171:9
**job** [125] - 11:8,
12:21, 12:22, 17:23,
17:25, 18:13, 18:20,
18:23, 19:1, 19:4,
19:5, 19:9, 19:10,
21:16, 28:23, 29:14,
31:12, 33:3, 33:10,
33:11, 36:9, 36:20,
38:1, 38:19, 39:17,
40:1, 40:3, 40:6,
40:15, 40:19, 41:3,
46:14, 46:22, 47:5,
47:7, 47:10, 47:16,
57:7, 61:24, 68:1,
68:8, 69:2, 69:5, 69:7,
69:12, 69:20, 69:25,
70:16, 71:4, 71:20,
72:1, 73:22, 74:8,
76:11, 76:20, 77:6,
78:22, 81:9, 81:17,
82:4, 82:9, 82:16,
84:3, 84:17, 85:25,
86:13, 86:24, 87:4,
87:20, 88:4, 88:24,
91:18, 92:23, 93:1,
95:14, 103:9, 103:11,
104:17, 107:1,
108:12, 108:13,
108:16, 108:21,
108:22, 108:23,
108:25, 109:5, 109:8,
109:9, 109:22,
109:24, 109:25,
110:4, 110:6, 110:23,
111:1, 111:17, 112:2,
115:6, 115:7, 116:19,
125:9, 130:21,
131:18, 132:1, 132:2,
142:19, 143:17,
144:5, 157:12,
157:15, 158:17,
159:8, 159:16,

164:19, 165:24,
166:3, 167:7, 167:12,
167:15
**jobs** [16] - 5:1, 21:15,
26:2, 47:6, 61:23,
82:13, 87:10, 87:12,
87:20, 91:14, 91:16,
91:17, 92:2, 123:15,
123:16, 160:14
**JOSE** [1] - 1:13
**JR** [1] - 1:13
**Judge** [6] - 4:19,
5:25, 7:3, 7:4, 7:9,
50:5
**JUDGE** [1] - 1:14
**juice** [1] - 16:21
**JULIO** [1] - 1:6
**July** [32] - 22:22,
22:23, 23:1, 23:20,
23:25, 38:1, 38:9,
39:24, 41:15, 44:12,
44:14, 44:20, 52:20,
91:13, 95:1, 113:3,
119:6, 119:8, 119:9,
119:11, 119:17,
119:18, 136:10,
142:16, 142:24,
143:22, 144:1,
144:19, 145:24,
146:20
**June** [10] - 20:7,
20:8, 21:8, 21:9,
22:22, 22:23, 23:1,
25:8, 113:3, 154:25
**jury** [30] - 4:8, 5:13,
6:2, 6:21, 7:15, 12:18,
24:25, 25:22, 28:19,
29:20, 50:9, 51:16,
57:8, 65:21, 65:22,
66:15, 72:13, 74:6,
74:20, 76:4, 98:18,
114:9, 114:15,
114:16, 114:20,
127:8, 155:15, 163:5,
168:18, 168:19
**JURY** [1] - 1:13
**Jury** [8] - 7:20,
65:19, 65:23, 66:17,
114:7, 114:12,
114:23, 168:21
**jury's** [1] - 168:20
**justice** [1] - 151:24

## K

**keep** [9] - 64:3, 64:7,
68:14, 89:24, 105:17,
127:23, 127:25, 134:4
**Keep** [1] - 16:22

JURY TRIAL - VOLUME IV OF VI

**Keith** [1] - 169:18
**Kelly** [11] - 8:2, 51:21, 61:2, 66:22, 74:20, 78:14, 83:1, 83:4, 92:13, 141:10, 155:16
**KELLY** [54] - 1:17, 4:5, 4:8, 4:12, 4:15, 5:21, 8:4, 8:7, 9:21, 10:10, 10:20, 10:25, 12:13, 12:16, 14:8, 17:1, 24:9, 24:18, 24:22, 26:9, 28:12, 29:25, 30:5, 30:13, 30:25, 32:24, 33:24, 34:12, 35:3, 35:6, 40:11, 43:3, 43:5, 43:16, 46:13, 47:2, 47:19, 49:16, 50:4, 50:7, 108:5, 114:4, 114:19, 114:22, 134:19, 141:11, 141:24, 142:11, 146:25, 147:3, 149:11, 153:13, 169:1, 169:3
**Kelly**...................... [2] - 3:4, 3:8
**kept** [16] - 64:2, 64:17, 65:17, 69:20, 75:11, 88:22, 89:3, 127:13, 127:25, 128:1, 128:18, 128:25, 147:12, 147:13, 148:7, 148:8
**keys** [2] - 144:10, 161:3, 161:8, 161:9, 161:10, 161:16
**kicked** [2] - 120:8, 120:9
**kind** [1] - 93:3
**kinds** [1] - 160:6
**King** [1] - 49:5
**KLEPPIN** [87] - 1:21, 4:3, 5:20, 5:23, 7:13, 9:4, 9:17, 10:7, 10:17, 10:22, 12:9, 14:4, 16:23, 26:6, 28:9, 29:22, 30:2, 30:7, 30:21, 30:23, 32:21, 33:19, 33:22, 34:8, 34:11, 35:2, 40:8, 40:10, 42:24, 43:14, 46:11, 46:16, 46:25, 47:23, 48:15, 48:17, 49:15, 49:19, 49:25, 50:8, 50:14, 50:16, 55:8, 55:10, 65:25, 66:4, 66:7, 66:10, 66:12, 66:20, 66:21,

69:21, 69:23, 100:17, 100:19, 114:16, 114:18, 122:18, 134:23, 140:25, 142:5, 142:8, 149:15, 152:9, 152:11, 153:15, 153:19, 154:20, 154:22, 155:6, 155:8, 157:9, 157:11, 160:19, 160:20, 164:12, 164:16, 168:13, 169:6, 169:12, 169:15, 169:17, 169:21, 170:2, 170:6, 170:8, 170:14
**Kleppin** [4] - 1:21, 47:21, 66:18, 168:12
**Kleppin**....................
.. [2] - 3:5, 3:9

## L

**labor** [3] - 15:14, 72:13, 74:1
**Labor** [7] - 59:10, 59:15, 59:19, 59:25, 60:15, 151:6, 151:7
**Ladies** [2] - 7:21, 168:14
**LAMONICA** [2] - 1:4, 1:5
**Lamonica** [3] - 6:12, 6:14, 100:10
**Lamonicas** [10] - 4:16, 5:17, 6:5, 6:9, 6:17, 6:18, 6:20, 6:24, 99:17, 99:21
**language** [2] - 93:17, 93:20
**Lares** [1] - 169:18
**large** [2] - 89:8, 167:20
**largest** [1] - 116:8
**Las** [2] - 19:6, 137:14
**las** [1] - 18:17
**last** [19] - 7:3, 19:14, 22:24, 23:12, 25:14, 25:21, 25:24, 26:14, 31:22, 38:9, 56:10, 76:20, 100:25, 123:13, 123:14, 141:21, 155:10, 169:1
**lasted** [8] - 18:7, 22:24, 32:2, 32:3, 125:1, 125:11, 125:15, 140:3
**late** [11] - 20:5, 52:20, 55:3, 55:19,

59:8, 59:24, 60:6, 82:17, 90:8, 91:13, 100:25
**latter** [1] - 49:6
**LAUDERDALE** [2] - 1:2, 1:7
**laundry** [1] - 85:14
**LAW** [8] - 66:6, 66:14, 114:14, 114:17, 114:21, 170:4, 170:7, 170:10
**law** [4] - 49:14, 64:14, 95:13, 154:23
**lawsuit** [5] - 132:13, 132:22, 134:6, 134:16, 135:2
**lawsuits** [2] - 73:14, 99:6
**lawyer** [8] - 73:15, 76:5, 101:25, 134:12, 150:20, 158:5, 161:13
**lead** [1] - 32:1
**leader** [1] - 72:4
**leading** [2] - 30:2, 46:16
**leak** [1] - 7:1
**learn** [7] - 68:13, 68:15, 133:8, 133:11, 133:16, 134:9, 134:10
**learned** [2] - 133:19, 135:3
**learning** [1] - 9:16
**least** [8] - 4:25, 5:7, 5:9, 5:12, 5:18, 29:6, 38:5, 111:21
**leave** [20] - 18:3, 24:10, 42:15, 42:22, 43:22, 45:5, 71:25, 73:21, 94:21, 95:3, 95:14, 106:16, 112:17, 143:20, 146:12, 148:23, 161:23, 163:24, 164:23
**left** [24] - 8:10, 11:8, 17:12, 17:22, 21:25, 53:8, 65:2, 75:7, 75:8, 75:23, 75:25, 80:20, 92:18, 93:1, 110:3, 123:20, 126:1, 126:5, 155:11, 161:11, 161:12, 162:16, 164:21
**leftover** [1] - 112:9
**leftovers** [1] - 17:13
**legal** [1] - 142:5
**legally** [2] - 97:25, 98:5
**LEIVA** [29] - 1:10, 2:1, 4:4, 100:22,

100:24, 101:12, 104:1, 104:11, 106:1, 106:5, 108:6, 108:8, 108:9, 115:1, 115:2, 115:13, 117:11, 117:14, 118:14, 118:19, 118:22, 122:17, 122:20, 123:3, 123:5, 135:1, 135:10, 141:3, 141:5
**Leiva** [77] - 2:1, 5:7, 27:10, 27:22, 27:25, 28:6, 28:22, 30:11, 36:18, 36:19, 40:5, 45:3, 45:19, 45:21, 45:23, 46:1, 54:6, 55:16, 55:24, 56:16, 58:16, 60:9, 66:1, 67:7, 67:9, 67:10, 69:10, 69:12, 77:24, 78:3, 81:16, 81:20, 83:20, 91:21, 97:11, 98:12, 98:22, 99:2, 99:7, 99:9, 99:10, 100:21, 105:25, 106:3, 114:8, 114:25, 117:10, 132:24, 134:6, 144:21, 145:12, 147:13, 148:8, 152:22, 153:11, 155:24, 156:1, 156:20, 156:22, 157:1, 157:7, 157:9, 157:16, 157:19, 157:23, 158:12, 158:15, 159:1, 159:6, 159:12, 159:17, 159:21, 163:24, 169:18, 170:3
**Leiva**......................
[1] - 3:6
**lent** [1] - 106:13
**less** [5] - 73:20, 85:19, 140:9, 151:15, 151:20
**letter** [9] - 57:4, 57:8, 58:8, 58:10, 58:22, 59:2, 59:6, 170:3
**letters** [1] - 5:8
**letting** [1] - 7:8
**license** [5] - 155:19, 155:23, 155:24, 155:25, 156:1
**lie** [1] - 110:18
**life** [3] - 95:10, 99:10, 108:4
**light** [1] - 26:1
**lightening** [2] - 88:16, 89:23
**lightning** [2] - 69:15,

70:11
**limited** [1] - 59:16
**line** [16] - 5:18, 48:21, 69:24, 75:4, 75:13, 137:22, 152:15, 155:3, 155:5, 156:4, 158:22, 160:12, 161:15, 162:18, 163:11
**linked** [1] - 100:5
**list** [4] - 64:23, 81:18, 156:13, 156:16
**listed** [2] - 48:22, 51:1
**listen** [2] - 128:20, 129:18
**listening** [1] - 88:7
**living** [3] - 96:19, 128:10, 128:14
**load** [42] - 12:21, 14:25, 15:22, 17:12, 17:13, 17:15, 17:24, 19:2, 21:5, 39:11, 83:25, 84:11, 84:14, 84:15, 84:16, 84:19, 107:12, 107:18, 108:25, 110:2, 112:1, 112:16, 118:4, 118:12, 118:15, 118:17, 118:24, 130:8, 147:1, 147:2, 161:25, 162:7, 163:11, 164:1, 164:3, 166:19, 166:20, 166:22, 167:2, 167:13, 167:16, 167:22
**loaded** [8] - 17:23, 84:24, 107:15, 109:10, 109:17, 167:11, 167:16, 167:21
**loading** [8] - 39:14, 84:22, 84:23, 84:25, 109:18, 112:2, 161:19, 167:8
**loads** [3] - 118:7, 118:9, 130:9
**loan** [5] - 138:23, 139:2, 139:4, 140:1, 140:13
**located** [2] - 20:20, 24:6
**location** [24] - 13:21, 71:4, 71:21, 71:24, 76:8, 76:10, 76:11, 119:22, 120:1, 120:3, 120:15, 121:20, 121:25, 122:9, 122:12, 122:13,

JURY TRIAL - VOLUME IV OF VI

123:12, 146:25, 147:21, 147:23, 148:1, 148:9, 149:20, 151:2

**locations** [2] - 70:17, 70:19

**log** [7] - 13:19, 14:2, 15:3, 64:12, 64:17, 110:7, 129:1

**log-in** [1] - 15:3

**log-on** [1] - 129:1

**logged** [2] - 15:9, 64:19

**logs** [3] - 64:19, 65:5, 75:24

**look** [18] - 50:13, 51:5, 56:5, 57:2, 75:3, 102:12, 102:14, 152:15, 152:18, 156:4, 156:8, 156:12, 161:2, 161:9, 162:18, 163:9, 165:10, 166:18

**looked** [1] - 163:17

**looking** [1] - 161:16

**lose** [1] - 95:14

**lost** [1] - 106:6

**loud** [1] - 7:6

**lounge** [6] - 14:19, 20:12, 20:15, 20:17, 20:20, 25:18, 32:14, 32:22, 32:25, 39:4, 39:5, 39:9, 39:11, 70:18, 83:16, 83:24

**loved** [1] - 107:1

**Lunch** [1] - 114:13

**lunch** [21] - 16:19, 72:8, 72:9, 72:10, 72:15, 74:3, 74:7, 74:11, 78:6, 110:25, 111:3, 111:4, 111:6, 111:7, 111:8, 111:12, 111:15, 114:5, 149:5, 149:6

**lunchtime** [2] - 111:16, 149:4

**lying** [2] - 101:9, 104:15

## M

**M-i-l-a-n** [1] - 141:22

**machinery** [1] - 123:10

**machines** [1] - 124:10

**mad** [1] - 78:5

**magnificent** [1] - 119:25

**main** [2] - 93:17,

93:20

**major** [1] - 36:6

**majority** [2] - 67:8, 81:19

**man** [2] - 34:11, 104:12

**management** [2] - 51:7, 158:25

**manager** [1] - 115:22

**manufacture** [2] - 116:19, 166:9

**March** [4] - 13:9, 13:15, 29:1, 82:20

**Marine** [21] - 18:17, 19:11, 34:2, 44:16, 46:9, 46:18, 64:20, 70:8, 70:16, 78:13, 78:19, 78:23, 79:1, 79:2, 79:9, 79:13, 79:15, 79:20, 126:20, 130:8, 137:16

**MARIO** [3] - 1:5, 3:3, 8:5

**Mario** [4] - 115:4, 154:17, 155:9, 155:11

**Mario's** [1] - 155:10

**mark** [6] - 124:18, 124:20, 124:24, 125:4, 125:5, 125:24

**marked** [1] - 55:11

**MARSHAL** [1] - 114:9

**Marshal** [2] - 65:21, 66:16

**material** [22] - 17:10, 17:21, 23:7, 35:13, 84:12, 85:24, 107:9, 107:10, 107:13, 107:19, 107:21, 108:25, 109:1, 109:4, 109:10, 109:14, 112:9, 116:21, 162:3, 164:23, 167:4, 167:22

**materials** [25] - 10:6, 12:7, 12:22, 14:25, 15:15, 17:22, 17:25, 20:25, 21:5, 35:14, 39:6, 83:22, 83:25, 87:5, 109:18, 109:21, 109:23, 110:3, 112:15, 120:4, 120:6, 120:21, 120:23, 123:17, 165:23

**mathematics** [1] - 131:25

**matter** [10] - 4:10, 4:12, 42:21, 47:12, 63:10, 63:18, 63:20, 85:25, 87:13, 171:4

**McCarroll** [68] - 1:10,

1:22, 27:5, 27:8, 27:10, 28:4, 28:14, 28:22, 29:5, 29:6, 29:9, 30:1, 30:11, 30:14, 31:1, 31:5, 31:7, 32:8, 32:14, 34:1, 36:7, 36:15, 36:19, 36:23, 37:9, 40:5, 44:21, 45:3, 45:7, 45:10, 45:16, 46:5, 52:15, 54:4, 66:24, 67:2, 67:4, 67:7, 67:11, 67:13, 67:20, 81:16, 81:18, 86:11, 86:17, 86:22, 87:1, 87:9, 87:18, 101:16, 101:17, 118:17, 118:23, 125:22, 130:14, 132:14, 132:18, 132:23, 133:24, 134:2, 135:5, 136:22, 137:1, 137:4, 145:16, 158:1, 159:10

**mean** [19] - 26:15, 33:7, 34:15, 38:3, 40:13, 42:2, 49:23, 103:14, 104:15, 106:9, 107:14, 116:6, 130:7, 131:17, 132:11, 133:11, 136:2, 137:5

**means** [6] - 58:15, 107:12, 131:13, 131:14, 137:7, 158:7

**measure** [3] - 112:8, 112:11, 130:18

**measurement** [5] - 16:14, 108:18, 112:13, 129:22, 130:4

**measurements** [1] - 16:12

**medical** [1] - 154:12

**meet** [4] - 29:1, 41:11, 44:25, 45:7

**meeting** [6] - 27:17, 29:4, 42:9, 45:4, 136:7

**meetings** [2] - 41:11, 147:14

**members** [5] - 6:4, 7:7, 73:13, 99:6, 99:24

**Members** [2] - 65:19, 114:6

**mention** [6] - 52:1, 59:24, 60:18, 60:20, 60:23, 153:1

**mentioned** [3] - 93:7, 94:5, 119:1

**mentions** [1] - 60:4

**met** [18] - 27:7, 27:18, 28:4, 28:17, 37:1, 37:11, 37:12, 37:13, 38:12, 39:13, 39:21, 41:17, 41:18, 41:24, 44:21, 53:5, 104:5

**metal** [4] - 89:6, 89:25, 112:14, 130:12

**Miami** [3] - 1:18, 2:4, 2:4

**MIAMI** [2] - 171:8, 171:9

**MICHELLE** [2] - 2:3, 171:7

**Michelle** [1] - 171:6

**microphone** [1] - 9:5

**middle** [3] - 19:17, 25:14

**might** [4] - 35:7, 37:18, 85:14, 91:20

**mike** [6] - 124:18, 124:24, 124:25, 125:4, 125:24, 126:9

**Mike** [1] - 126:9

**Milan** [16] - 6:9, 61:21, 61:22, 62:1, 82:5, 82:6, 141:11, 141:20, 141:22, 141:25, 142:2, 152:13, 163:18, 168:17, 168:22, 169:2

**MILAN** [10] - 1:4, 3:7, 115:12, 141:17, 141:20, 141:22, 147:1, 157:10, 164:14, 168:23

**million** [3] - 47:13, 78:8, 130:7

**mind** [6] - 11:25, 52:7, 52:14, 79:6, 79:14, 151:18

**mine** [1] - 114:20

**minimum** [3] - 56:23, 59:8

**minute** [9] - 59:3, 63:15, 77:15, 90:5, 96:24, 101:2, 151:24, 159:23, 165:18

**minutes** [11] - 13:23, 15:10, 21:4, 65:20, 83:13, 88:9, 88:23, 92:7, 93:3, 146:13

**miraculously** [1] - 94:13

**mischaracterize** [1] - 59:4

**miss** [1] - 140:21

**missed** [3] - 92:5,

140:23, 151:25

**missing** [1] - 35:14

**mistake** [1] - 59:4

**moment** [6] - 30:12, 49:17, 67:25, 100:17, 140:15, 155:16

**Monday** [11] - 13:3, 13:5, 19:22, 19:23, 144:3, 144:16, 146:15, 150:4, 150:11, 150:25, 151:7

**Mondays** [2] - 143:9, 143:12

**money** [47] - 8:20, 26:2, 26:3, 26:4, 45:18, 51:16, 52:3, 54:2, 54:25, 55:6, 55:7, 56:17, 56:19, 63:7, 80:6, 80:17, 90:8, 92:3, 95:7, 95:8, 95:20, 96:18, 104:8, 106:13, 106:15, 113:9, 113:10, 113:15, 113:23, 123:25, 124:1, 124:2, 127:14, 133:23, 138:8, 138:20, 138:22, 138:25, 139:24, 140:14, 145:10, 153:16, 153:21, 154:11, 154:13

**monster** [2] - 101:14, 106:16

**month** [31] - 11:16, 11:21, 12:17, 13:13, 18:21, 18:24, 19:4, 19:5, 22:16, 25:13, 27:7, 27:11, 27:16, 29:7, 37:23, 38:5, 38:13, 46:21, 48:8, 67:3, 67:4, 78:15, 123:19, 123:20, 123:24, 135:17, 140:14, 142:15, 147:4

**months** [35] - 11:10, 13:12, 18:9, 18:10, 25:24, 26:14, 32:4, 32:5, 38:6, 48:9, 50:21, 62:1, 63:15, 64:21, 74:18, 76:24, 76:25, 78:13, 82:6, 82:7, 82:8, 82:9, 82:10, 86:6, 86:7, 95:4, 102:20, 110:5, 110:8, 110:10, 125:17, 131:11, 151:11, 158:9

**morning** [67] - 4:2, 4:3, 4:4, 4:5, 5:2,

JURY TRIAL - VOLUME IV OF VI

5:10, 6:11, 6:14, 7:21, 8:8, 8:9, 13:18, 14:20, 17:24, 20:12, 20:14, 21:5, 22:1, 23:4, 25:19, 26:18, 26:20, 32:14, 33:2, 33:22, 39:6, 39:11, 47:24, 47:25, 65:19, 72:14, 82:14, 84:15, 84:16, 84:20, 84:23, 84:25, 99:17, 101:15, 101:23, 102:25, 107:13, 107:15, 107:18, 107:20, 118:10, 143:10, 143:12, 144:9, 161:2, 162:6, 163:7, 163:12, 164:1, 164:3, 164:6, 165:8, 166:8, 166:20, 167:1, 167:14, 167:20, 168:16, 168:18, 170:1

**mornings** [1] - 116:15

**Morris** [3] - 124:19, 124:24, 125:4

**most** [29] - 10:12, 10:14, 13:15, 14:3, 21:6, 25:24, 30:16, 35:16, 35:20, 37:24, 38:9, 42:21, 42:22, 43:21, 45:15, 46:4, 61:3, 67:10, 84:20, 92:22, 94:4, 95:11, 102:23, 104:6, 107:25, 113:21, 136:24, 137:4, 140:15

**mostly** [1] - 11:5

**motion** [2] - 10:24, 28:11

**motor** [1] - 49:5

**move** [20] - 9:18, 10:11, 10:12, 10:22, 12:10, 28:9, 116:15, 120:8, 120:16, 120:24, 120:25, 121:4, 121:9, 121:21, 121:22, 122:1, 122:4, 122:12, 123:11, 153:15

**moved** [19] - 117:22, 119:22, 119:25, 120:1, 120:3, 120:6, 120:15, 120:23, 121:13, 121:14, 121:15, 121:16, 123:12, 123:15, 123:23, 147:12, 147:21, 148:1, 148:9

**moving** [8] - 120:4,

121:5, 121:14, 137:21, 146:23, 146:24, 146:25

**MR** [191] - 4:3, 4:4, 4:5, 4:8, 4:12, 4:15, 5:20, 5:21, 5:23, 7:13, 7:17, 7:19, 8:4, 8:7, 9:4, 9:6, 9:17, 9:21, 10:7, 10:10, 10:17, 10:20, 10:22, 10:25, 12:9, 12:13, 12:16, 14:4, 14:8, 16:23, 17:1, 24:9, 24:13, 24:16, 24:18, 24:20, 24:22, 26:6, 26:9, 28:9, 28:12, 29:22, 29:25, 30:2, 30:5, 30:7, 30:10, 30:13, 30:21, 30:23, 30:25, 32:21, 32:23, 32:24, 33:19, 33:22, 33:24, 34:8, 34:11, 34:12, 35:2, 35:3, 35:6, 40:8, 40:10, 40:11, 42:24, 43:1, 43:3, 43:5, 43:14, 43:16, 46:11, 46:13, 46:16, 46:18, 46:25, 47:2, 47:19, 47:23, 48:15, 48:17, 49:15, 49:16, 49:19, 49:25, 50:2, 50:4, 50:7, 50:8, 50:14, 50:16, 55:8, 55:10, 65:25, 66:4, 66:7, 66:10, 66:12, 66:20, 66:21, 69:21, 69:23, 100:17, 100:19, 100:22, 100:24, 101:12, 104:1, 104:2, 104:5, 104:11, 106:1, 106:4, 106:5, 108:5, 108:6, 108:8, 108:9, 114:4, 114:11, 114:16, 114:18, 114:19, 114:22, 115:1, 115:2, 115:12, 115:13, 117:11, 117:14, 118:14, 118:19, 118:22, 122:17, 122:18, 122:19, 122:20, 123:3, 123:5, 134:19, 134:21, 134:23, 135:1, 135:6, 135:10, 140:25, 141:3, 141:5, 141:8, 141:11, 141:20, 141:22, 141:24, 142:5, 142:8, 142:11, 146:25, 147:1, 147:3, 149:11, 149:15, 152:9,

152:11, 153:13, 153:15, 153:19, 154:20, 154:22, 155:6, 155:8, 157:9, 157:11, 160:19, 160:20, 164:12, 164:14, 164:16, 168:13, 168:23, 169:1, 169:3, 169:6, 169:12, 169:15, 169:17, 169:21, 170:2, 170:6, 170:8, 170:14

**multiplication** [1] - 151:19

**must** [4] - 64:13, 103:11, 121:21, 151:25

**mutual** [2] - 63:10, 63:19

## N

**name** [15] - 19:10, 24:12, 61:14, 66:7, 81:19, 102:1, 102:15, 115:15, 135:11, 141:19, 141:21, 154:24, 155:10, 157:8, 170:11

**named** [1] - 6:5

**narrating** [1] - 10:17

**narration** [8] - 12:10, 26:6, 28:9, 30:21, 40:8, 42:24, 43:14, 46:25

**narrative** [3] - 9:17, 10:7, 12:14

**near** [2] - 6:10, 166:4

**necessarily** [1] - 137:8

**necessary** [1] - 47:4

**need** [16] - 16:8, 36:20, 41:25, 47:3, 51:5, 58:17, 87:19, 87:21, 89:1, 95:20, 100:17, 131:15, 145:10, 167:16, 170:3, 170:10

**needed** [12] - 20:24, 35:13, 67:20, 81:9, 108:16, 108:17, 108:18, 137:12, 162:3, 166:3

**needs** [3] - 9:5, 141:13, 170:5

**negatively** [1] - 129:15

**Never** [7] - 61:11, 104:22, 105:6, 108:4,

124:7, 124:9

**never** [83] - 9:10, 37:12, 52:14, 53:6, 53:11, 53:13, 53:14, 59:7, 59:18, 60:7, 63:1, 64:2, 64:11, 64:15, 64:17, 72:12, 72:15, 74:10, 75:11, 76:23, 77:2, 79:12, 79:13, 79:20, 79:23, 80:1, 80:7, 80:10, 93:16, 94:2, 94:21, 101:7, 101:24, 102:6, 103:18, 104:19, 104:22, 105:6, 105:9, 105:12, 105:13, 105:15, 108:3, 108:22, 110:25, 111:2, 111:6, 115:7, 116:2, 116:18, 123:23, 123:24, 124:7, 124:11, 127:6, 127:7, 127:13, 129:7, 131:19, 135:1, 136:15, 136:16, 137:13, 138:19, 139:4, 140:12, 145:17, 145:20, 147:17, 153:8, 156:24, 157:25, 158:3, 159:23, 160:9, 161:8, 162:16, 167:7

**New** [2] - 97:6, 97:12

**new** [22] - 4:20, 19:24, 20:1, 119:13, 119:22, 120:1, 120:3, 120:15, 121:15, 121:16, 121:24, 123:12, 123:13, 123:15, 123:17, 147:21, 147:23, 147:24, 148:1, 149:20, 151:1

**next** [30] - 13:24, 17:22, 17:25, 18:5, 32:1, 33:17, 33:18, 38:13, 39:21, 39:24, 43:9, 56:5, 84:11, 84:12, 84:13, 84:23, 84:24, 107:23, 108:14, 108:23, 108:25, 109:23, 141:9, 141:10, 152:19, 161:25, 163:10, 167:14, 168:24

**Next** [1] - 43:4

**night** [13] - 6:25, 23:11, 25:25, 72:14, 72:17, 75:7, 81:22,

84:15, 84:18, 100:25, 120:8, 164:5, 167:17

**nights** [2] - 120:10, 120:12

**nine** [1] - 48:8

**nobody** [4] - 8:23, 45:22, 115:15, 150:6

**noise** [2] - 17:6, 116:1

**noises** [1] - 12:6

**none** [5] - 56:24, 123:19, 137:6, 140:21, 153:25

**nonpayment** [1] - 45:1

**nonresponsive** [2] - 153:14, 153:16

**normal** [1] - 145:24

**normally** [11] - 13:7, 14:14, 21:2, 25:23, 26:23, 26:24, 144:4, 144:7, 144:14, 146:16, 167:22

**NORTH** [1] - 171:8

**North** [1] - 2:4

**note** [2] - 55:13, 66:1

**notes** [3] - 66:22, 76:9, 82:5

**nothing** [5] - 51:10, 61:17, 68:7, 97:10

**notice** [1] - 57:13

**noticeable** [1] - 11:24

**November** [8] - 11:22, 38:16, 38:18, 39:1, 76:18, 106:25, 125:16

**number** [17] - 6:3, 6:6, 6:7, 20:19, 66:8, 68:24, 75:9, 78:13, 80:17, 103:2, 112:22, 156:13, 156:17, 156:20, 157:2, 157:4, 158:16

**Number** [3] - 1:3, 54:9, 55:12

**numbers** [2] - 36:18, 131:21

## O

**o'clock** [55] - 6:15, 6:17, 6:18, 11:5, 11:9, 12:6, 13:20, 15:4, 17:17, 23:9, 23:11, 62:10, 62:11, 69:15, 72:16, 74:11, 83:9, 90:6, 90:7, 92:17, 92:25, 93:1, 100:9,

JURY TRIAL - VOLUME IV OF VI

112:1, 115:22, 115:25, 116:5, 116:11, 117:3, 117:23, 120:8, 121:3, 159:23, 160:3, 160:8, 160:16, 160:21, 162:12, 162:13, 162:22, 163:16, 163:21, 163:24, 164:3, 164:18, 164:24, 167:13, 168:7, 168:12, 168:15, 168:18, 170:1
**Oakland** [2] - 115:5, 115:8
**oath** [5] - 8:2, 80:21, 117:7, 117:8, 163:17
**object** [13] - 7:1, 9:17, 10:17, 12:9, 14:4, 26:6, 28:9, 40:8, 42:24, 50:4, 140:25, 153:13
**objected** [2] - 4:17, 10:23
**Objection** [1] - 33:19
**objection** [16] - 7:14, 10:7, 16:23, 29:22, 30:2, 30:7, 30:21, 32:21, 34:8, 35:2, 43:14, 46:11, 46:16, 46:25, 108:5, 142:5
**objects** [1] - 134:23
**obtain** [2] - 65:5, 157:2
**obvious** [5] - 65:12, 98:18, 100:15, 164:22, 166:10
**obviously** [4] - 4:16, 104:12, 131:2
**occur** [1] - 7:4
**occurred** [2] - 59:17, 161:16
**occurring** [1] - 97:17
**October** [7] - 11:22, 38:15, 38:17, 39:2, 82:19, 105:23, 125:16
**OF** [3] - 1:1, 1:13, 3:1
**offer** [1] - 39:18
**offered** [3] - 46:3, 53:18, 99:13
**office** [25] - 6:14, 6:16, 14:20, 32:15, 36:24, 39:3, 42:16, 83:19, 92:6, 92:14, 92:20, 93:1, 93:2, 93:5, 115:5, 115:7, 119:24, 119:25, 123:25, 144:5, 144:8, 146:1, 154:23, 162:12, 165:8

**offices** [2] - 32:20
**Official** [1] - 2:3
**OFFICIAL** [1] - 171:8
**often** [6] - 32:7, 32:9, 36:11, 36:14, 145:2, 145:21
**Olas** [3] - 18:18, 19:6, 137:14
**old** [5] - 12:24, 34:23, 146:10, 162:2, 162:9
**omission** [1] - 59:14
**once** [19] - 15:15, 17:20, 22:17, 22:18, 37:23, 38:5, 39:23, 68:17, 72:15, 85:6, 85:7, 104:22, 135:17, 135:19, 135:21, 136:8, 137:10, 166:23, 167:9
**one** [100] - 6:6, 8:13, 10:11, 10:13, 11:13, 17:5, 19:24, 21:15, 21:21, 21:24, 22:9, 22:17, 22:23, 34:2, 34:4, 36:4, 38:3, 38:22, 40:24, 41:2, 41:3, 41:17, 42:21, 43:1, 43:21, 44:13, 44:19, 44:20, 45:14, 46:9, 46:19, 46:23, 47:11, 48:24, 53:5, 54:11, 54:24, 56:5, 59:12, 61:12, 61:24, 65:25, 71:23, 72:8, 80:11, 84:16, 84:22, 85:6, 85:7, 100:17, 102:7, 103:2, 104:13, 109:3, 109:22, 110:17, 112:20, 113:17, 115:17, 116:17, 116:18, 116:20, 117:22, 120:5, 121:20, 123:13, 123:14, 124:8, 125:20, 127:14, 127:25, 128:12, 130:3, 130:24, 131:8, 135:20, 136:18, 137:13, 145:7, 145:8, 146:17, 147:1, 149:10, 154:3, 156:9, 156:17, 156:24, 157:19, 159:18, 161:10, 161:16, 164:10, 164:12, 166:9, 167:3, 169:17
**one-and-a-half** [1] - 54:24

**ones** [1] - 138:12
**open** [3] - 106:21, 119:13, 144:9
**opening** [4] - 129:21, 129:22, 130:4, 130:17
**openings** [2] - 88:25, 129:17
**operational** [21] - 135:13, 135:15, 135:22, 135:23, 135:25, 136:3, 136:5, 136:6, 136:11, 136:12, 136:18, 136:22, 136:25, 137:1, 137:3, 137:5, 137:7, 158:4, 158:7
**opinion** [1] - 137:7
**opposed** [1] - 160:16
**order** [25] - 4:1, 29:20, 81:7, 81:8, 83:20, 83:21, 83:24, 85:24, 86:12, 101:17, 101:18, 101:21, 101:22, 102:7, 108:2, 108:16, 118:9, 136:16, 145:10, 145:14, 157:2, 157:20, 163:23, 166:24, 166:25
**orders** [22] - 10:5, 10:6, 14:23, 29:15, 30:1, 30:6, 30:10, 30:12, 33:4, 67:7, 67:8, 67:11, 81:6, 81:25, 85:5, 102:13, 103:1, 108:3, 108:4, 108:11, 137:8
**original** [3] - 120:9, 134:8, 140:13
**originally** [2] - 135:5, 138:24
**otherwise** [1] - 58:16
**outlet** [1] - 89:11
**outline** [1] - 56:13
**outside** [4] - 15:25, 24:14, 26:1, 153:2
**overembellishment** [1] - 80:16
**overestimate** [1] - 65:10
**overexaggerate** [1] - 165:9
**overexaggerating** [1] - 166:8
**overexaggeration** [2] - 80:16, 80:19
**overhang** [1] - 89:24
**overruled** [6] - 16:25, 28:11, 30:9, 46:17, 50:6, 134:20

**overtime** [18] - 52:2, 52:4, 52:6, 52:7, 59:18, 60:4, 60:17, 73:7, 75:9, 75:16, 103:12, 104:20, 104:21, 105:5, 105:17, 105:20, 165:11, 166:9
**owe** [15] - 42:13, 42:18, 42:20, 43:11, 45:18, 52:3, 53:7, 54:25, 55:2, 55:6, 95:7, 95:17, 124:1, 124:5, 133:23
**owed** [7] - 53:9, 73:8, 75:16, 92:3, 124:2, 140:14, 140:16
**owes** [1] - 41:16
**own** [10] - 64:2, 64:8, 70:24, 77:9, 119:18, 124:13, 127:17, 152:3
**owner** [3] - 136:1, 136:2, 136:4
**owners** [3] - 28:7, 132:20, 134:3

## P

**p.m** [2] - 75:8, 162:15
**PA** [1] - 1:17
**PAGE** [1] - 3:2
**page** [14] - 55:23, 56:10, 69:24, 75:3, 152:19, 152:20, 155:3, 156:2, 156:12, 158:19, 158:20, 160:11, 162:17, 163:9
**Pages** [1] - 1:11
**paid** [49] - 5:13, 8:12, 26:3, 51:23, 53:3, 53:5, 53:7, 53:8, 53:14, 53:21, 54:2, 55:17, 55:19, 56:6, 56:14, 56:16, 58:8, 58:11, 58:18, 59:8, 59:18, 62:19, 63:2, 63:11, 90:5, 90:7, 91:2, 91:21, 92:3, 94:6, 94:11, 94:16, 95:2, 95:3, 95:8, 95:15, 103:15, 103:19, 105:2, 120:14, 124:4, 127:6, 127:10, 128:14, 140:12, 144:20, 145:5, 151:9
**painfully** [1] - 100:15
**Palm** [2] - 24:8, 143:24

**paper** [8] - 81:7, 82:2, 152:22, 153:11, 154:3, 154:16, 155:14, 163:3
**papers** [5] - 73:10, 95:12, 129:3, 130:13, 143:18
**paperwork** [5] - 14:21, 108:22, 108:23, 129:18, 157:3
**pardon** [1] - 170:3
**park** [2] - 115:6, 161:22
**Park** [1] - 115:8
**parked** [1] - 34:21
**parkland** [1] - 24:7
**part** [10] - 7:18, 25:21, 34:20, 49:6, 54:25, 59:14, 135:25, 154:12, 162:7
**particular** [15] - 19:4, 20:24, 23:3, 23:14, 23:18, 24:5, 43:19, 44:22, 44:24, 46:6, 47:8, 49:12, 107:19, 142:25, 143:23
**party** [1] - 6:5
**patience** [2] - 141:6, 168:17
**Patrick** [1] - 24:13
**pattern** [1] - 85:7
**pay** [39] - 5:6, 5:9, 41:16, 42:14, 42:17, 42:20, 43:8, 43:10, 43:23, 44:13, 45:17, 47:13, 50:10, 50:12, 62:20, 69:3, 90:18, 92:3, 95:4, 95:8, 95:19, 95:22, 103:21, 104:7, 113:25, 114:1, 114:2, 114:3, 128:7, 128:13, 129:3, 138:24, 145:11, 145:14, 159:5, 159:10
**pay's** [1] - 63:20
**paycheck** [2] - 104:18, 105:13
**paying** [11] - 44:14, 44:18, 52:21, 54:23, 55:4, 56:6, 59:4, 103:12, 119:15, 127:6, 127:13
**payment** [10] - 41:12, 42:17, 42:18, 43:9, 44:15, 55:20, 105:8, 105:9, 106:13
**payments** [9] - 51:20, 53:6, 55:1, 55:25, 56:13, 59:24, 60:7, 95:17, 96:19

**payroll** [2] - 119:2, 119:12
**Pedro** [1] - 24:13
**penalty** [2] - 80:23, 81:3
**penny** [1] - 53:8
**penthouse** [1] - 85:20
**people** [27] - 5:24, 5:25, 6:3, 7:2, 7:6, 9:10, 39:13, 45:24, 45:25, 68:24, 93:8, 98:11, 101:3, 101:5, 101:19, 103:7, 115:25, 116:1, 116:5, 116:12, 126:14, 126:17, 147:19, 147:20, 158:24
**people's** [1] - 97:21
**per** [1] - 21:22
**percent** [6] - 25:25, 61:3, 95:11, 111:22, 112:2, 116:9
**perform** [3] - 29:16, 86:13, 166:3
**performing** [1] - 87:20
**perhaps** [2] - 7:6, 7:8
**period** [18] - 11:11, 13:2, 18:6, 18:22, 18:23, 19:19, 19:20, 21:18, 25:16, 26:13, 38:4, 45:20, 103:22, 123:8, 144:22, 149:7, 159:15
**perjury** [2] - 80:23, 81:3
**permit** [1] - 108:17
**permits** [1] - 130:6
**person** [10] - 33:8, 33:14, 44:3, 46:4, 145:17, 157:14, 157:19, 158:10, 158:13, 159:7
**personally** [1] - 157:10
**persons** [1] - 35:15
**persuade** [1] - 95:5
**persuasion** [1] - 95:1
**ph** [2] - 126:9, 126:10
**ph)** [1] - 24:13
**phone** [6] - 34:6, 67:17, 67:19, 67:22
**physical** [2] - 15:13, 35:24
**pick** [3] - 14:25, 83:24, 83:25
**pickup** [3] - 165:19, 166:3, 167:5

**piece** [3] - 81:7, 82:2, 140:3
**pieces** [4] - 17:11, 112:14, 112:15, 116:20
**place** [39] - 11:8, 17:10, 17:14, 18:10, 21:1, 21:5, 21:25, 22:1, 22:4, 24:5, 32:4, 32:10, 32:18, 32:19, 33:8, 42:22, 79:4, 80:20, 81:17, 86:7, 87:6, 89:2, 116:14, 116:15, 117:22, 120:4, 120:5, 120:9, 120:23, 134:15, 143:10, 143:13, 147:6, 147:7, 147:12, 148:7
**places** [4] - 24:8, 79:8, 125:19
**PLAINTIFF** [2] - 8:5, 141:17
**plaintiff** [4] - 59:18, 141:11, 168:25, 169:5
**plaintiffs** [2] - 4:18, 6:5
**Plaintiffs** [2] - 1:7, 1:16
**Plaintiffs'** [5] - 54:9, 54:12, 55:5, 57:2, 112:21
**PLAINTIFFS'** [1] - 3:1
**plan** [2] - 108:17, 108:18
**Plantation** [1] - 1:22
**pleadings** [1] - 75:15
**plot** [5] - 129:24, 130:2, 130:3, 130:6
**plotted** [1] - 129:24
**plugged** [1] - 89:11
**plus** [3] - 43:10, 140:1, 140:9
**pocket** [2] - 56:17, 91:24
**point** [14] - 7:3, 15:5, 24:3, 24:11, 41:7, 44:16, 45:21, 46:8, 81:18, 92:6, 103:2, 147:10, 153:4, 161:7
**pointed** [1] - 60:16
**Points** [45] - 12:17, 13:12, 13:15, 13:17, 13:23, 14:5, 14:9, 15:3, 16:3, 17:5, 18:6, 18:16, 31:3, 31:4, 31:7, 31:8, 32:1, 33:17, 40:4, 40:12, 41:4, 41:5, 64:19,

70:7, 70:15, 82:16, 82:18, 82:19, 82:23, 106:25, 107:1, 110:4, 110:7, 110:9, 110:12, 110:15, 110:16, 110:19, 110:25, 111:5, 111:7, 111:19, 118:6, 118:10
**points** [2] - 12:4, 15:2
**pole** [1] - 7:23
**Pompano** [10] - 19:25, 20:1, 20:19, 20:22, 22:21, 22:22, 88:8, 115:5, 115:6, 115:7
**port** [1] - 13:25
**portion** [2] - 116:18
**position** [2] - 86:23, 167:20
**possible** [2] - 41:19, 145:14
**possibly** [1] - 24:10
**powers** [1] - 94:25
**practically** [1] - 130:25
**pre** [1] - 73:1
**prefers** [1] - 169:9
**preliminary** [2] - 4:9, 4:12
**premises** [1] - 116:22
**prepare** [3] - 18:12, 123:17
**prepared** [3] - 102:22, 120:21, 120:23
**present** [5] - 29:17, 29:18, 44:22, 152:23, 157:14
**presented** [2] - 28:22, 94:20
**presenting** [1] - 132:17
**pretty** [1] - 88:3
**previous** [4] - 50:4, 107:19, 153:1, 159:2
**PREVIOUSLY** [1] - 8:5
**previously** [2] - 103:7, 119:19
**pride** [1] - 101:2
**primarily** [2] - 143:1, 163:16
**private** [2] - 21:17, 126:17
**PRO** [1] - 2:1
**problem** [18] - 41:17, 42:13, 44:9, 44:17, 45:13, 63:22, 76:18,

78:1, 97:15, 101:13, 105:19, 119:11, 119:12, 127:18, 127:21, 145:9, 159:16, 169:12
**problems** [6] - 34:6, 45:9, 46:5, 115:17, 136:9, 144:11
**procedure** [1] - 18:14
**proceed** [2] - 5:18, 8:3
**proceeded** [1] - 133:20
**proceedings** [1] - 171:4
**process** [6] - 9:16, 16:6, 33:13, 40:16, 46:19, 97:23
**produce** [2] - 120:20, 123:10
**product** [1] - 31:3
**production** [1] - 123:10
**progress** [4] - 36:9, 40:16, 46:14, 88:5
**project** [68] - 12:3, 12:18, 18:7, 18:8, 18:17, 18:24, 19:19, 19:20, 19:24, 20:22, 20:23, 20:24, 21:3, 21:7, 21:10, 21:11, 21:12, 21:18, 21:21, 22:6, 22:7, 22:13, 22:15, 22:17, 22:19, 23:5, 23:12, 23:14, 24:1, 25:1, 25:5, 31:2, 31:5, 31:8, 31:9, 31:24, 32:1, 32:2, 32:8, 32:12, 32:13, 33:17, 33:18, 34:2, 34:3, 34:5, 34:7, 34:14, 34:19, 34:21, 35:12, 36:10, 36:12, 36:16, 40:16, 40:17, 40:25, 41:5, 46:20, 78:17, 78:21, 103:4, 116:10, 116:25, 142:25
**projects** [35] - 18:11, 21:23, 23:19, 23:20, 23:21, 23:23, 23:24, 24:3, 24:4, 24:6, 25:2, 25:10, 30:15, 30:16, 30:17, 30:18, 30:24, 31:1, 33:25, 34:1, 34:11, 35:15, 35:23, 36:6, 36:22, 40:4, 40:10, 46:9, 46:19, 64:20, 85:5, 143:4,

143:6, 143:7, 143:22
**promised** [3] - 42:19, 69:6
**properly** [1] - 40:20
**proposition** [2] - 4:22, 5:15
**prosecute** [1] - 7:2
**proud** [1] - 47:16, 119:24
**prove** [7] - 55:17, 64:25, 65:6, 67:20, 100:5, 100:7, 110:7
**provide** [1] - 41:9
**provided** [1] - 156:20
**provides** [1] - 154:11
**Puerto** [2] - 7:17, 96:17
**punch** [1] - 100:9
**punched** [2] - 9:18, 15:8
**punching** [1] - 9:1
**purpose** [1] - 98:13
**purposes** [1] - 55:19
**pushed** [1] - 160:14
**put** [28] - 10:1, 12:24, 15:15, 15:20, 16:8, 16:9, 43:25, 53:13, 53:14, 53:20, 74:24, 75:15, 89:13, 94:7, 94:10, 94:13, 101:4, 105:24, 106:13, 107:7, 109:5, 113:15, 127:5, 130:7, 162:3, 166:2, 167:4
**puts** [1] - 71:16
**putting** [2] - 15:18, 74:1

**Q**

**QC's** [1] - 125:10
**questioning** [2] - 5:19, 161:15
**questions** [10] - 31:21, 62:4, 72:19, 100:19, 101:1, 101:11, 141:3, 141:5, 161:1, 164:8
**quicker** [1] - 159:19
**quickly** [2] - 151:18, 160:18
**quit** [8] - 5:3, 17:9, 42:15, 45:5, 45:16, 69:4, 70:6, 90:10

**R**

**rain** [8] - 69:14, 69:19, 70:11, 88:16,

JURY TRIAL - VOLUME IV OF VI

88:21, 88:22, 89:3,
160:2
   **raining** [4] - 65:16,
89:2, 89:23, 90:9
   **rains** - 88:23
   **Raise** [1] - 141:16
   **raise** [3] - 57:10,
63:17, 141:12
   **RAMON** [1] - 1:4
   **rarely** [2] - 62:12
   **rate** [1] - 63:18
   **rather** [1] - 77:14
   **re** [2] - 151:25,
169:17
   **re-call** [1] - 169:17
   **re-word** [1] - 151:25
   **reach** [1] - 16:1
   **read** [10] - 59:12,
60:2, 60:20, 70:2,
75:19, 132:12, 159:2,
163:11, 164:12,
164:13
   **ready** [6] - 7:14,
17:22, 18:5, 84:12,
162:9, 164:23
   **real** [3] - 58:15, 65:5,
165:3
   **really** [34] - 36:24,
46:20, 64:18, 65:1,
65:16, 66:1, 67:1,
67:20, 71:2, 71:3,
71:11, 72:25, 74:13,
77:14, 79:1, 79:8,
79:9, 80:14, 81:14,
85:4, 88:14, 90:20,
95:5, 101:1, 112:19,
137:11, 140:21,
161:6, 163:20,
164:21, 164:25
   **reason** [7] - 45:16,
59:11, 64:17, 81:21,
110:17, 139:8, 165:13
   **reasons** [2] - 43:22,
70:6
   **rebuttal** [1] - 24:10
   **receipt** [3] - 55:13,
55:25, 124:4
   **receive** [3] - 44:4,
63:7, 145:22
   **received** [5] - 7:12,
119:20, 151:23,
154:15
   **recess** [8] - 65:19,
65:20, 65:24, 114:5,
114:6, 114:7, 168:15,
169:25
   **Recess** [2] - 66:13,
114:13
   **recognize** [2] -
10:11, 27:2

   **recollect** [2] - 79:8,
121:24
   **recollection** [2] -
79:5, 119:4
   **reconstruct** [1] -
4:23
   **reconstruction** [1] -
5:16
   **reconvene** [1] -
168:15
   **record** [9] - 50:4,
60:2, 70:2, 75:19,
113:7, 119:4, 138:18,
169:13
   **records** [9] - 5:6, 5:8,
5:11, 62:12, 67:18,
70:7, 70:21, 112:22,
112:25
   **recovered** [1] - 94:14
   **reflect** [1] - 169:14
   **reflects** [1] - 169:13
   **Regarding** [1] -
142:7
   **regarding** [8] - 4:12,
4:18, 13:10, 35:18,
36:16, 45:1, 46:14,
147:18
   **regardless** [2] - 63:6,
91:4
   **register** [1] - 15:3
   **registered** [1] - 14:1
   **REINALDO** [1] - 1:4
   **related** [2] - 67:15,
67:21
   **relatively** [2] -
159:15, 169:22
   **relevance** [1] -
140:25
   **relevant** [2] - 4:10,
4:13
   **remain** [2] - 18:3,
168:19
   **remainder** [1] -
24:23
   **remaining** [1] - 26:4
   **remember** [106] -
19:10, 20:15, 20:18,
21:7, 28:14, 28:15,
28:17, 28:18, 31:2,
32:7, 37:7, 37:20,
38:13, 39:8, 42:22,
43:19, 43:21, 44:7,
44:8, 46:8, 51:24,
61:6, 61:16, 61:18,
73:7, 73:8, 79:6,
90:18, 92:16, 94:7,
99:18, 99:20, 99:22,
103:6, 103:17, 106:7,
106:8, 110:12, 111:6,
115:4, 118:11,

119:13, 119:22,
120:7, 120:9, 120:11,
120:12, 120:13,
120:14, 120:16,
120:19, 120:15,
122:16, 122:21,
122:22, 122:25,
124:6, 125:19, 126:9,
126:11, 126:14,
126:15, 126:22,
126:23, 127:1, 127:3,
127:14, 127:15,
128:5, 128:6, 128:8,
128:10, 128:19,
128:20, 128:21,
128:22, 129:10,
129:13, 137:15,
138:4, 138:24,
139:10, 140:8,
142:14, 143:25,
148:6, 148:24, 149:1,
150:19, 151:4, 151:8,
154:23, 155:3, 155:9,
155:10, 155:16,
158:5, 159:11, 161:3,
161:10, 164:20,
164:21
   **Remember** [6] -
120:15, 126:20,
127:18, 129:24,
130:10, 130:22
   **remembered** [1] -
126:24
   **remind** [3] - 6:8,
116:17, 117:6
   **reminded** [1] - 8:2
   **remotely** [1] - 166:4
   **remove** [2] - 34:23,
111:19, 111:23
   **removed** [3] -
109:21, 110:1, 111:22
   **removing** [1] - 112:3
   **renourish** [1] - 74:4
   **rent** [2] - 128:13,
145:11
   **repeat** [7] - 8:17,
25:4, 59:1, 71:7,
90:19, 134:21, 165:15
   **repeatedly** [1] -
90:20
   **rephrase** [1] - 60:19
   **report** [7] - 7:22,
14:10, 144:8, 146:9,
147:22, 148:2, 154:16
   **reported** [1] - 148:7
   **REPORTED** [1] - 2:2
   **REPORTER** [1] -
171:8
   **Reporter** [1] - 2:3
   **represent** [1] -

169:18
   **represented** [1] -
99:8
   **request** [2] - 24:18,
136:17
   **requested** [2] -
101:24, 164:13
   **require** [1] - 21:22
   **required** [3] - 23:4,
59:19, 127:16
   **requires** [1] - 130:8
   **residential** [12] -
21:23, 23:19, 23:20,
23:21, 24:3, 24:4,
24:5, 25:2, 25:10,
25:12, 143:3, 143:22
   **respect** [32] - 4:20,
8:11, 15:14, 18:11,
23:18, 28:14, 41:12,
44:24, 46:11, 47:4,
47:12, 48:1, 51:19,
56:22, 56:23, 61:1,
71:12, 74:13, 81:6,
86:13, 94:1, 142:8,
145:21, 146:19,
146:20, 149:18,
154:17, 159:5, 159:6,
160:25, 161:19, 167:8
   **responsible** [1] -
144:13
   **rest** [3] - 25:11,
25:12, 55:7
   **resume** [1] - 107:22
   **resumed** [1] - 123:6
   **retained** [1] - 73:14
   **return** [22] - 18:13,
48:19, 48:24, 49:10,
50:13, 50:17, 51:2,
51:14, 60:10, 65:12,
70:1, 80:23, 114:8,
145:25, 146:6,
152:25, 153:6,
153:18, 153:22,
154:1, 156:9, 156:12
   **returns** [2] - 81:1,
81:2
   **ribs** [1] - 122:23
   **Rican** [1] - 96:17
   **Rickert** [1] - 66:5
   **Rico** [1] - 7:17
   **rights** [1] - 96:23
   **rise** [4] - 65:21,
66:14, 114:9, 114:14
   **road** [2] - 20:19,
144:12, 164:18
   **roads** [1] - 154:11
   **Rolando** [3] - 61:13,
61:19, 139:23
   **role** [1] - 17:10
   **roll** [1] - 44:11

   **rolling** [1] - 44:19
   **roof** [1] - 137:22
   **room** [2] - 85:14,
116:9
   **ropes** [1] - 126:21
   **row** [2] - 58:5, 58:6
   **Ruben** [6] - 61:14,
61:19, 138:11,
139:25, 140:1, 140:2
   **Rule** [2] - 169:6,
169:8
   **rule** [1] - 24:11
   **ruling** [3] - 4:19, 7:4,
50:5
   **run** [1] - 89:9
   **running** [1] - 158:11

**S**

   **safe** [2] - 70:12,
139:15
   **SAFE** [1] - 1:9
   **Safe** [37] - 1:21, 8:15,
8:18, 20:20, 48:1,
48:12, 49:7, 49:9,
51:10, 51:13, 68:1,
68:24, 69:5, 91:6,
95:24, 132:24,
133:12, 134:4, 134:6,
142:3, 142:12,
142:19, 144:8, 152:5,
152:21, 153:6, 153:9,
153:17, 153:21,
153:25, 156:19,
156:25, 158:10,
161:14, 165:1, 165:4,
166:3
   **Saffron** [2] - 124:18,
124:24
   **salaried** [1] - 63:17
   **salaries** [3] - 48:21,
51:1, 152:15
   **salary** [8] - 62:22,
63:16, 63:19, 90:5,
91:22, 127:2, 128:17,
145:1
   **salsa** [1] - 68:5
   **sample** [1] - 20:19
   **sandwich** [3] -
16:20, 16:22, 111:14
   **Saturday** [11] - 13:5,
19:22, 19:23, 57:25,
58:6, 79:16, 79:24,
117:6, 144:3, 146:15,
168:5
   **Saturdays** [17] -
78:23, 78:25, 79:2,
79:4, 79:6, 79:9,
79:13, 79:15, 79:20,

JURY TRIAL - VOLUME IV OF VI

79:25, 115:19, 117:16, 117:19, 117:21, 167:24, 168:1, 168:2

**save** [1] - 169:10

**saw** [28] - 6:13, 30:23, 31:1, 31:5, 31:19, 32:7, 32:25, 34:1, 34:2, 34:11, 36:7, 36:22, 36:24, 37:23, 37:24, 38:7, 38:10, 39:2, 39:5, 39:23, 40:10, 41:5, 82:14, 111:9, 124:25, 126:24, 158:1, 158:3

**scaffold** [5] - 46:23, 47:13, 137:20, 139:9

**scaffolds** [1] - 137:23

**scar** [1] - 122:24

**schedule** [18] - 8:10, 9:24, 12:1, 12:5, 13:10, 16:19, 18:13, 31:10, 40:6, 107:24, 109:11, 110:3, 111:17, 116:24, 132:1, 146:14, 146:19, 148:24

**schedules** [1] - 146:21

**scrape** [1] - 17:10

**scratch** [2] - 160:1, 160:13

**screen** [2] - 34:23

**SE** [1] - 2:1

**seated** [3] - 7:25, 114:24, 141:18

**second** [23] - 9:8, 18:16, 54:20, 66:1, 95:23, 107:4, 108:13, 109:5, 109:8, 109:25, 110:2, 121:20, 122:7, 122:8, 122:12, 123:21, 133:8, 142:18, 147:6, 147:7, 147:12, 152:20

**security** [4] - 14:1, 14:2, 15:9, 44:2

**Security** [6] - 156:13, 156:17, 156:20, 157:1, 157:4, 158:16

**See** [1] - 105:11

**see** [38] - 4:9, 13:24, 14:21, 29:8, 29:9, 31:5, 32:14, 32:22, 33:13, 36:11, 39:1, 40:1, 40:3, 40:16, 48:19, 48:21, 50:17, 67:1, 76:13, 76:19, 77:12, 77:21, 82:16,

84:14, 102:7, 102:10, 111:2, 111:12, 124:3, 145:15, 148:8, 148:9, 152:19, 156:14, 156:17, 158:13, 163:15, 163:25

**seeing** [4] - 30:14, 46:19, 55:5, 102:20

**seeking** [5] - 49:13, 49:14, 49:20, 80:6

**seem** [2] - 83:10, 106:24

**self** [1] - 6:7

**self-evident** [1] - 6:7

**SENIOR** [1] - 1:14

**sent** [1] - 110:11

**September** [47] - 8:24, 11:21, 11:22, 25:15, 27:19, 27:20, 37:2, 37:21, 38:12, 38:13, 38:15, 48:6, 52:24, 53:5, 56:6, 91:19, 105:21, 123:19, 123:20, 123:21, 123:24, 125:15, 125:16, 125:23, 133:18, 133:19, 142:18, 147:4, 147:5, 147:6, 147:7, 147:21, 147:25, 148:1, 148:2, 148:5, 149:18, 149:23, 149:25, 150:1, 150:12, 150:15, 150:18, 150:20, 151:1, 151:7

**september** [1] - 133:19

**sera** [2] - 103:8, 106:7

**services** [2] - 154:11, 154:12

**serving** [1] - 93:7

**set** [1] - 149:4

**seven** [2] - 32:11, 58:5

**several** [1] - 117:9

**Shakes** [1] - 129:15

**shape** [1] - 85:8

**shapes** [1] - 85:17

**sharp** [2] - 164:3, 164:15

**shave** [1] - 78:9

**sheet** [1] - 56:10

**sheriff** [2] - 20:22, 22:7

**sheriff's** [8] - 20:1, 21:3, 21:21, 22:18, 88:8, 88:12, 88:17, 115:6

**Sheriff's** [10] - 21:18, 22:20, 36:8, 92:6, 92:14, 92:19, 93:1, 93:5, 115:5, 115:7

**shifts** [1] - 6:2

**shop** [57] - 6:9, 9:10, 11:5, 14:25, 17:15, 17:16, 17:19, 17:20, 18:1, 18:3, 19:1, 19:3, 21:4, 22:3, 23:7, 23:8, 23:10, 26:16, 28:21, 69:16, 70:1, 70:7, 70:17, 71:2, 77:8, 83:8, 83:11, 83:15, 83:21, 83:23, 84:7, 88:9, 90:6, 90:7, 90:10, 90:20, 92:7, 92:14, 92:17, 92:20, 92:21, 93:6, 112:12, 117:5, 117:25, 144:9, 144:14, 146:12, 146:23, 146:25, 147:21, 148:3, 151:1, 161:1, 164:22, 168:7

**short** [2] - 146:17, 159:15

**shorter** [1] - 146:16

**shortly** [1] - 72:22

**show** [24] - 18:12, 25:18, 25:23, 26:24, 55:11, 59:9, 62:19, 65:5, 70:8, 112:23, 113:2, 113:4, 113:5, 113:6, 113:18, 113:20, 122:17, 132:3, 132:8, 132:10, 140:20, 148:19, 152:22

**showed** [4] - 99:20, 119:18, 148:20, 155:25

**shown** [1] - 80:14

**shut** [1] - 77:15

**shutter** [4] - 15:25, 85:8, 89:14, 101:20

**Shutters** [36] - 1:21, 8:15, 8:18, 20:20, 48:2, 48:12, 49:7, 49:10, 51:11, 51:14, 68:1, 68:25, 69:5, 91:6, 95:24, 132:24, 133:12, 134:5, 134:7, 142:3, 142:12, 142:19, 152:5, 152:21, 153:6, 153:10, 153:17, 153:21, 154:1, 156:19, 157:1, 158:10, 161:14, 165:1, 165:4, 166:4

**shutters** [21] - 12:24, 15:18, 15:19, 17:4, 34:20, 36:3, 68:8, 68:14, 85:7, 86:5, 86:17, 87:2, 87:4, 89:6, 101:21, 111:19, 112:3, 112:11, 130:10, 148:16, 152:7

**SHUTTERS** [1] - 1:9

**sic** [1] - 111:23

**side** [2] - 7:19, 169:24

**sidebar** [1] - 49:16

**sides** [2] - 63:9

**sign** [5] - 55:16, 55:24, 127:1, 158:5, 158:6

**signed** [8] - 55:13, 119:19, 124:4, 126:25, 127:16, 127:22, 158:3

**signing** [1] - 81:2

**similar** [1] - 146:20

**simple** [5] - 78:3, 107:2, 110:16, 131:25, 153:16

**simply** [6] - 9:18, 10:8, 32:22, 78:5, 86:4, 157:22

**singer** [1] - 68:4

**single** [1] - 102:7

**sit** [2] - 97:11, 111:15

**site** [29] - 11:7, 12:21, 12:22, 19:1, 36:20, 40:15, 61:24, 71:8, 72:1, 76:8, 76:20, 77:6, 78:4, 81:9, 84:3, 84:17, 88:24, 100:11, 107:13, 107:14, 110:12, 111:1, 143:17, 145:25, 159:16, 164:19, 165:24, 167:15

**sites** [7] - 40:1, 40:3, 82:9, 85:25, 88:4, 110:10, 143:2

**sitting** [4] - 120:11, 120:13, 145:16, 164:6

**situation** [3] - 78:4, 86:10, 136:18

**six** [6] - 11:20, 13:7, 13:8, 52:12, 72:14, 138:15

**size** [5] - 85:8, 85:11, 85:21, 85:23, 129:8

**sizes** [1] - 85:17

**sliding** [5] - 34:22, 34:25, 35:9, 85:13

**small** [11] - 23:24,

32:18, 32:19, 107:9, 127:24, 143:2, 147:2, 147:14, 165:19, 165:22

**smaller** [2] - 85:13, 147:2

**smear** [1] - 98:17

**Social** [6] - 156:13, 156:16, 156:20, 157:1, 157:4, 158:15

**sold** [2] - 34:4, 103:4

**sole** [1] - 23:20

**solely** [1] - 25:1

**SOLER** [1] - 1:5

**solve** [1] - 41:16

**someone** [3] - 97:12, 98:12, 166:7

**sometimes** [18] - 6:14, 11:9, 29:13, 29:15, 61:7, 70:9, 84:19, 101:16, 121:3, 130:8, 155:16, 160:12, 162:4, 162:13, 162:22, 162:25, 166:23, 168:7

**Sometimes** [1] - 166:22

**somewhat** [1] - 4:10

**somewhere** [3] - 39:9, 79:16, 111:21

**soon** [1] - 47:9

**sorry** [14] - 9:4, 12:13, 15:8, 38:13, 63:13, 82:19, 92:5, 100:25, 115:12, 169:20, 170:2, 170:6, 170:8

**Sorry** [1] - 103:3

**sort** [6] - 66:1, 71:15, 74:1, 85:17, 159:16, 159:17

**sorts** [2] - 70:5, 85:10

**sotto** [1] - 100:18

**sOUTHERN** [1] - 1:1

**Spanish** [10] - 35:18, 93:9, 93:15, 93:17, 93:22, 93:23, 93:24, 94:4

**speaks** [2] - 93:9, 93:11

**specific** [8] - 35:10, 37:19, 40:23, 45:10, 75:6, 110:4, 111:16, 149:4

**specifically** [7] - 8:12, 43:19, 46:10, 110:12, 130:3, 136:7, 155:23

**specifics** [3] - 43:6,

JURY TRIAL - VOLUME IV OF VI

44:1, 46:8
**speculation** [1] - 35:2
**Spell** [1] - 141:21
**spend** [1] - 163:6
**spending** [1] - 165:6
**spent** [3] - 30:18, 38:8, 164:4
**spine** [1] - 122:23
**spoken** [2] - 94:2, 103:7
**Springs** [1] - 24:7
**square** [21] - 119:23, 127:2, 127:6, 128:10, 128:15, 129:1, 129:2, 129:5, 129:7, 129:8, 129:13, 129:23, 130:16, 130:20, 130:24, 131:1, 131:5, 131:12, 131:19, 131:23, 131:24
**stand** [6] - 4:7, 5:15, 54:10, 57:3, 74:21, 130:15
**standard** [1] - 146:15
**standardized** [3] - 85:6, 85:25, 87:12
**Standards** [5] - 59:10, 59:15, 59:19, 59:25, 60:16
**standing** [1] - 164:6
**stands** [2] - 4:22, 11:25
**start** [28] - 10:21, 11:1, 12:5, 15:4, 15:11, 15:13, 19:7, 19:24, 22:24, 25:20, 27:1, 33:2, 46:21, 64:12, 95:10, 108:16, 109:4, 109:8, 109:25, 119:15, 119:17, 123:18, 143:9, 143:20, 144:18, 163:20, 164:19
**started** [57] - 9:2, 9:3, 9:6, 9:7, 9:14, 11:3, 15:18, 18:7, 19:5, 19:25, 20:5, 20:6, 20:7, 22:7, 22:13, 22:15, 22:17, 22:19, 23:20, 25:1, 25:10, 27:9, 27:13, 40:4, 44:9, 44:10, 44:11, 44:17, 44:19, 74:17, 82:23, 91:13, 103:6, 104:9, 106:24, 107:4, 107:5, 108:12, 108:13, 119:5, 119:14, 124:25, 125:12, 129:1, 135:2,

140:13, 142:16, 142:24, 143:3, 143:14, 144:19, 156:22, 157:18, 161:14
**starting** [3] - 29:1, 100:8, 156:13
**starts** [1] - 156:17
**States** [3] - 2:3, 97:24, 98:2
**STATES** [3] - 1:1, 1:14, 171:8
**states** [2] - 59:13, 59:22
**stating** [1] - 57:5
**station** [1] - 7:23
**stay** [7] - 42:18, 92:21, 122:2, 122:7, 122:8, 146:9, 162:14
**stayed** [3] - 88:23, 92:4, 122:7
**step** [5] - 24:14, 114:10, 141:7, 141:12, 168:22
**Steve** [18] - 1:22, 27:3, 42:11, 61:17, 94:5, 94:25, 125:22, 130:14, 132:13, 132:19, 132:22, 133:24, 134:2, 135:12, 135:19, 135:21, 136:25, 158:1
**STEVE** [1] - 1:10
**stick** [2] - 11:1, 87:9
**still** [13] - 6:19, 8:2, 54:9, 55:6, 56:6, 71:14, 73:1, 73:2, 89:23, 91:21, 95:19, 95:21, 133:20
**stockholder** [1] - 136:3
**stop** [16] - 17:3, 17:4, 17:6, 19:12, 38:17, 70:17, 71:23, 74:3, 74:11, 88:11, 92:19, 111:15, 148:23, 160:3, 160:7, 160:9
**stopped** [16] - 25:5, 26:10, 26:12, 44:14, 44:18, 49:6, 65:16, 65:17, 69:14, 69:19, 70:14, 74:10, 88:21, 92:9, 142:17, 148:24
**stopping** [1] - 93:3
**stories** [1] - 16:1
**storm** [2] - 65:16, 65:17
**straight** [4] - 12:15, 52:20, 110:9, 135:1
**straighten** [1] -

136:17
**straightforward** [1] - 4:24
**street** [3] - 46:3, 53:19, 101:4
**Street** [1] - 1:18
**streets** [1] - 99:13
**strict** [1] - 115:21
**strike** [5] - 9:18, 10:22, 12:11, 28:10, 153:15
**struggling** [1] - 165:13
**stuff** [9] - 12:8, 12:24, 33:4, 35:14, 41:3, 69:6, 92:15, 112:14, 114:2
**submitted** [1] - 113:7
**subpoena** [1] - 65:5
**sue** [3] - 133:20, 134:18, 135:5
**sued** [4] - 134:4, 134:5, 134:22, 135:11
**suggest** [1] - 7:9
**suggested** [1] - 6:22
**suggesting** [1] - 93:25
**suggestions** [2] - 39:18, 41:7
**suing** [4] - 133:24, 133:25, 135:8, 135:11
**suit** [2] - 134:14
**Suite** [2] - 1:18, 2:4
**SUITE** [1] - 171:8
**summer** [3] - 25:9, 88:15, 88:16
**summertime** [3] - 26:14, 62:10, 92:24
**Sunday** [2] - 57:25, 58:6
**Sundays** [3] - 150:5, 150:6, 150:23
**supervise** [9] - 33:6, 33:7, 36:9, 40:5, 40:15, 47:5, 87:6, 88:5, 111:11
**supervised** [2] - 34:4, 71:8
**supervising** [4] - 30:19, 34:13, 71:3, 87:23
**supervision** [1] - 71:16
**supervisor** [4] - 33:14, 125:7, 125:9, 125:18
**supplied** [1] - 120:7
**support** [4] - 95:9, 95:17, 95:19, 95:22
**supporting** [1] -

59:17
**supposed** [20] - 15:11, 18:8, 18:19, 18:20, 19:7, 19:8, 25:18, 25:19, 29:16, 31:11, 33:10, 34:17, 35:8, 40:18, 58:1, 64:3, 87:7, 124:21, 125:5, 144:23
**supposedly** [1] - 105:12
**surgery** [2] - 122:23
**Sustained** [4] - 30:4, 30:22, 33:21, 40:9
**sustained** [18] - 7:14, 9:20, 10:9, 10:19, 12:12, 14:7, 26:8, 29:24, 33:23, 34:10, 35:5, 42:25, 43:15, 46:12, 47:1, 108:7, 141:2, 142:10
**swear** [1] - 80:21
**switch** [3] - 126:15, 128:15, 128:17
**switched** [2] - 127:15, 130:16
**switching** [1] - 127:2
**swore** [1] - 155:1
**SWORN** [2] - 8:5, 141:17
**sworn** [1] - 8:1
**syllogism** [1] - 87:8
**system** [4] - 71:4, 71:11, 71:16, 71:18

## T

**tally** [1] - 11:13
**Tapcon®** [1] - 89:18
**task** [1] - 163:7
**tasks** [2] - 83:1, 83:5
**taught** [2] - 63:6, 68:11
**tax** [16] - 48:18, 48:24, 49:10, 50:17, 51:14, 60:10, 65:12, 80:23, 81:1, 81:2, 152:12, 153:22, 154:1, 156:8, 158:16, 158:25
**taxes** [4] - 50:11, 50:12, 51:17, 154:16
**telephone** [4] - 36:15, 66:8, 67:12, 67:13
**ten** [4] - 6:19, 15:10, 32:11, 113:12
**tennis** [1] - 22:11
**tens** [1] - 65:10

**terminate** [1] - 147:20
**terminated** [2] - 147:14, 147:19
**terms** [2] - 81:10, 81:11
**testified** [2] - 81:19, 157:25
**testify** [5] - 5:25, 6:1, 83:5, 88:7, 108:7
**testifying** [3] - 103:14, 108:5, 151:21
**testimony** [43] - 4:10, 4:13, 4:18, 4:25, 5:2, 9:17, 10:22, 48:5, 50:20, 52:1, 53:2, 56:22, 70:2, 72:24, 73:23, 73:25, 74:6, 74:7, 74:21, 74:22, 75:19, 76:4, 76:19, 82:11, 87:1, 89:22, 90:2, 92:19, 92:21, 93:11, 94:1, 96:2, 100:5, 109:13, 115:4, 126:4, 135:14, 150:21, 163:17, 164:1, 164:13, 165:6, 168:5
**THE** [127] - 1:13, 1:16, 1:20, 2:1, 4:2, 4:6, 4:11, 4:14, 7:10, 7:14, 7:18, 7:21, 9:20, 10:9, 10:19, 10:24, 12:12, 12:14, 14:7, 16:25, 24:12, 24:14, 24:17, 24:21, 26:8, 28:11, 29:24, 30:4, 30:9, 30:22, 33:21, 33:23, 34:10, 35:5, 40:9, 42:25, 43:2, 43:4, 43:15, 46:12, 46:17, 47:1, 47:21, 48:16, 49:18, 49:23, 50:1, 50:3, 50:6, 50:15, 55:9, 65:18, 65:21, 65:22, 65:24, 66:3, 66:5, 66:9, 66:11, 66:14, 66:15, 66:18, 69:22, 100:21, 101:10, 103:25, 104:4, 105:25, 106:2, 108:7, 114:5, 114:9, 114:10, 114:14, 114:15, 114:17, 114:21, 114:24, 115:11, 117:9, 117:12, 118:13, 118:18, 118:21, 122:25, 123:4, 134:20, 134:22,

JURY TRIAL - VOLUME IV OF VI

134:25, 135:4, 135:9, 141:2, 141:4, 141:7, 141:9, 141:12, 141:15, 141:16, 141:18, 141:21, 142:7, 142:10, 146:24, 149:13, 152:10, 153:14, 154:21, 155:5, 155:7, 157:8, 160:17, 168:12, 168:14, 168:22, 168:24, 169:2, 169:4, 169:10, 169:14, 169:16, 169:20, 169:25, 170:4, 170:7, 170:10, 170:12, 170:15

**thereabouts** [1] - 99:22

**therefore** [1] - 107:21

**thereon** [1] - 81:3

**thermos** [1] - 161:22

**thinking** [1] - 97:20

**third** [3] - 122:13, 142:18, 148:9

**thousand** [9] - 48:2, 48:11, 54:15, 55:13, 55:19, 57:10, 104:9, 131:4, 140:7

**thousands** [1] - 65:10

**threaded** [1] - 89:14

**threatened** [2] - 45:24, 101:4

**three** [51] - 9:15, 9:25, 20:3, 20:9, 20:10, 21:12, 29:6, 32:4, 36:13, 38:8, 42:21, 61:23, 67:3, 80:3, 80:11, 82:7, 82:9, 82:12, 116:7, 124:3, 125:17, 128:3, 134:2, 135:7, 138:14, 138:17, 138:18, 139:20, 143:24, 145:7, 147:23, 148:7, 148:11, 148:15, 148:17, 148:22, 149:19, 149:22, 150:1, 150:16, 150:17, 150:22, 151:11, 163:4, 164:4, 165:7, 165:8, 166:5, 166:15, 167:5, 167:7

**three-and-a-half** [2] - 124:3, 125:17

**three-and-a-half/four** [1] - 32:4

**throw** [1] - 165:23

**throwing** [1] - 162:2

**thunderstorm** [2] - 90:1, 90:9

**timecard** [2] - 9:19, 99:20

**timecards** [2] - 6:13, 8:25

**tips** [3] - 48:21, 51:1, 152:16

**TO** [1] - 3:1

**today** [11] - 27:2, 31:23, 33:12, 39:16, 58:22, 71:23, 75:17, 78:6, 86:4, 114:6, 114:19

**together** [4] - 59:12, 82:13, 105:24, 130:7

**tomorrow** [3] - 168:16, 168:18, 170:1

**ton** [1] - 165:19

**took** [32] - 10:5, 15:20, 19:1, 72:9, 72:10, 72:15, 74:7, 80:1, 80:7, 80:10, 83:20, 107:7, 107:9, 107:19, 111:2, 111:14, 111:25, 120:24, 123:17, 124:7, 124:8, 124:14, 138:11, 138:13, 138:15, 138:18, 138:19, 145:13, 162:8

**tools** [1] - 17:13

**total** [6] - 11:14, 128:5, 129:22, 131:10

**tourist** [1] - 137:11

**towards** [2] - 56:3, 91:6

**tower** [9] - 70:8, 70:16, 78:13, 78:19, 78:23, 79:2, 79:9, 79:13, 85:19

**Tower** [6] - 64:20, 79:2, 79:15, 79:20, 126:20, 130:9

**towers** [1] - 46:18

**Towers** [6] - 18:17, 19:11, 34:2, 44:16, 46:9, 137:16

**town** [1] - 22:20

**track** [5] - 64:2, 64:3, 64:7, 64:10, 67:17

**tracks** [7] - 16:7, 16:10, 16:13, 35:14, 112:8

**trade** [1] - 68:11

**traffic** [4] - 13:1, 17:18, 77:1, 83:14

**train** [1] - 124:21

**trained** [2] - 9:22, 124:22

**training** [8] - 9:23, 9:24, 10:1, 10:8, 11:4, 61:12, 68:18, 125:6

**transcription** [1] - 171:4

**transferred** [1] - 110:6

**translate** [4] - 41:23, 42:2, 42:4, 160:17

**translating** [1] - 42:8

**translator** [5] - 35:21, 41:25, 42:5, 93:8, 145:19

**TRIAL** [1] - 1:13

**tried** [10] - 77:16, 77:18, 77:20, 99:13, 127:3, 127:4, 127:5, 127:12, 127:21, 127:23

**trouble** [3] - 9:5, 36:17, 36:18

**truck** [72] - 10:2, 10:3, 12:24, 17:15, 18:4, 18:5, 61:1, 61:2, 61:4, 61:6, 61:8, 84:1, 84:9, 84:11, 84:15, 84:16, 84:19, 84:22, 84:23, 84:24, 92:16, 107:12, 107:15, 107:18, 109:9, 109:17, 109:19, 109:23, 110:2, 112:1, 112:2, 112:16, 120:7, 127:17, 144:10, 146:1, 160:25, 161:1, 161:3, 161:12, 161:20, 161:22, 161:25, 162:12, 162:14, 162:23, 163:1, 164:1, 164:3, 164:19, 164:22, 165:7, 165:9, 165:18, 165:19, 165:22, 166:3, 166:8, 166:16, 166:21, 167:2, 167:5, 167:9, 167:11, 167:14, 167:16, 167:21, 167:23

**trucks** [8] - 15:1, 17:21, 39:12, 39:15, 147:2, 161:8

**true** [155] - 48:3, 48:6, 48:13, 48:22, 49:7, 49:8, 49:11, 49:13, 50:12, 51:17, 51:18, 52:2, 52:6, 52:10, 52:11, 52:13, 124:22

52:16, 52:17, 52:22, 53:9, 53:15, 54:24, 55:6, 55:14, 55:21, 56:1, 56:7, 56:9, 56:14, 59:25, 60:18, 61:7, 61:9, 62:2, 62:8, 64:21, 65:2, 65:7, 65:14, 68:10, 68:16, 69:16, 69:17, 69:18, 69:19, 70:12, 70:19, 70:20, 70:22, 70:23, 70:25, 71:6, 71:13, 71:17, 72:3, 72:9, 76:2, 76:3, 76:23, 77:9, 77:19, 78:24, 80:21, 80:24, 81:2, 81:4, 81:5, 84:18, 85:3, 85:4, 85:8, 86:2, 86:3, 86:6, 86:14, 86:15, 86:17, 87:3, 87:11, 87:21, 88:2, 88:13, 88:18, 90:13, 90:15, 91:3, 91:5, 91:23, 91:25, 92:1, 92:2, 93:4, 94:9, 94:12, 97:1, 97:13, 97:14, 97:19, 98:15, 98:16, 99:2, 100:3, 100:16, 102:17, 102:19, 102:24, 103:23, 103:24, 115:24, 116:4, 119:7, 119:16, 132:12, 132:15, 132:22, 132:24, 133:1, 152:8, 153:10, 153:12, 153:20, 154:2, 154:18, 155:14, 155:22, 156:21, 157:7, 157:17, 157:23, 157:24, 158:17, 159:14, 160:1, 160:4, 160:8, 161:9, 161:18, 162:11, 163:20, 164:18, 164:25, 165:3, 165:4, 165:20, 165:25, 166:1, 166:6, 167:6, 167:24, 168:2

**trust** [2] - 44:3, 51:8

**trusted** [3] - 94:19, 94:21, 94:24

**truth** [3] - 155:1, 164:17, 166:16

**try** [12] - 5:12, 5:18, 7:1, 11:1, 12:17, 46:1, 77:21, 82:25, 85:10, 95:10, 166:14, 169:23

**trying** [12] - 71:14, 71:18, 71:19, 92:3,

98:17, 106:18, 109:2, 131:19, 150:13, 150:14, 153:13

**Tuesday** [4] - 13:4, 150:4, 150:11, 150:25

**turn** [6] - 55:23, 56:10, 156:2, 158:19, 160:11, 162:17

**turned** [1] - 101:13

**turnpike** [1] - 23:10

**Twenty** [2] - 139:19, 139:20

**Twenty-five** [1] - 139:19

**Twenty-three** [1] - 139:20

**two** [67] - 6:7, 9:25, 12:4, 13:12, 13:23, 13:24, 15:21, 18:10, 20:10, 21:15, 22:24, 23:13, 23:23, 23:24, 25:7, 29:6, 31:23, 32:5, 38:7, 41:6, 42:21, 43:9, 44:13, 54:12, 61:23, 62:1, 63:9, 67:3, 67:4, 70:18, 73:13, 78:6, 82:12, 86:7, 87:25, 95:4, 99:6, 99:7, 107:10, 108:3, 108:4, 108:11, 110:5, 116:16, 130:2, 131:3, 131:4, 131:18, 131:23, 138:14, 138:17, 139:25, 140:3, 140:22, 143:24, 145:7, 145:15, 153:4, 154:4, 161:10, 161:16, 165:8, 166:22, 167:5

**two-and-a-half** [1] - 38:7

**two/three** [1] - 33:13

**type** [6] - 8:25, 9:23, 16:18, 38:21, 152:21, 170:12

**typical** [2] - 161:13, 162:11

**U**

**U.S** [1] - 96:17

**unbelievable** [1] - 132:11

**unclear** [1] - 73:1

**under** [10] - 6:2, 64:14, 80:21, 80:23, 81:3, 88:25, 117:7, 117:8, 140:6, 163:17

JURY TRIAL - VOLUME IV OF VI

**unfortunately** [3] - 63:8, 80:25, 132:2
**UNITED** [2] - 1:1, 171:8
**United** [3] - 2:3, 97:24, 98:2
**uNITED** [1] - 1:14
**units** [2] - 85:20, 111:22
**unlike** [1] - 70:10
**unload** [3] - 18:4, 162:23, 163:1
**unloaded** [1] - 162:8
**unloading** [3] - 84:17, 163:4, 167:9
**unrebutted** [1] - 59:2
**up** [37] - 4:9, 5:17, 11:13, 14:25, 15:15, 15:18, 15:20, 16:1, 18:12, 25:18, 25:23, 26:24, 36:1, 46:23, 47:14, 54:9, 55:1, 55:4, 57:3, 67:20, 67:25, 74:1, 80:13, 83:24, 83:25, 90:10, 109:22, 109:25, 111:25, 112:15, 139:11, 141:12, 148:9, 148:19, 148:20, 163:12, 170:13
**upset** [1] - 90:18
**US** [1] - 20:2

## V

**vacation** [1] - 149:8
**validate** [1] - 5:8
**varied** [3] - 62:6, 62:8, 62:18
**vast** [2] - 67:8, 81:19
**versus** [1] - 4:20
**VI** [1] - 1:13
**vigorously** [2] - 6:25, 7:1
**violation** [3] - 59:15, 59:17, 59:25
**violations** [4] - 56:24, 59:10, 60:15
**violent** [1] - 90:1
**voce** [1] - 100:18
**voltage** [1] - 137:21
**VOLUME** [1] - 1:13
**vs** [1] - 1:8

## W

**w-2** [2] - 51:4, 51:5

**W-2** [6] - 48:24, 51:7, 152:20, 152:24, 154:5, 154:6
**W-2s** [3] - 152:18, 153:5, 156:16
**wage** [2] - 56:23, 59:8
**wages** [7] - 41:12, 42:12, 48:21, 51:1, 52:21, 59:18, 152:15
**wait** [11] - 9:2, 17:24, 24:17, 59:3, 63:15, 84:13, 96:24, 127:11, 143:16, 163:22
**walked** [1] - 26:16
**walls** [1] - 130:19
**wants** [2] - 97:23, 135:4
**warehouse** [6] - 77:8, 83:25, 119:23, 149:20, 162:19
**wasting** [1] - 164:7
**watching** [1] - 47:15
**water** [2] - 16:20, 16:21
**ways** [1] - 78:9
**weather** [3] - 70:13, 160:2, 160:7
**Wednesday** [3] - 150:4, 150:11, 151:1
**week** [66] - 8:13, 9:8, 10:13, 11:13, 11:19, 11:20, 13:3, 13:8, 21:22, 25:14, 44:14, 48:2, 48:11, 52:12, 53:6, 55:2, 55:20, 56:7, 57:6, 57:10, 57:22, 57:24, 58:4, 58:7, 58:9, 58:16, 58:18, 62:6, 62:19, 62:20, 62:24, 63:6, 67:4, 72:14, 73:16, 79:12, 79:19, 80:11, 103:20, 103:22, 104:7, 105:18, 106:9, 106:10, 106:25, 119:6, 119:9, 121:12, 122:10, 122:11, 123:21, 128:12, 129:2, 131:5, 131:13, 142:18, 144:1, 144:17, 145:23, 149:25, 150:12, 150:18, 150:20, 151:9, 165:1, 165:4
**week's** [1] - 54:23
**weekly** [2] - 59:21, 135:22
**weeks** [48] - 9:15, 9:25, 11:4, 18:21,

20:4, 20:9, 20:10, 21:12, 22:25, 23:12, 23:13, 25:7, 27:9, 27:13, 29:6, 41:16, 42:18, 42:21, 43:9, 43:11, 44:5, 44:7, 44:9, 44:12, 44:13, 44:20, 48:8, 48:9, 50:21, 52:21, 53:4, 53:7, 53:14, 55:2, 55:6, 67:3, 67:4, 73:23, 91:20, 95:2, 119:1, 124:3, 124:25, 128:3, 131:14, 151:14
**weeks'** [3] - 42:14, 44:15, 54:24
**weighted** [1] - 80:15
**west** [1] - 7:19
**West** [1] - 24:7
**wet** [2] - 65:14, 90:4
**whatnot** [1] - 154:12
**whichever** [1] - 15:24
**whole** [4] - 103:4, 128:22, 161:15, 161:16
**wife** [1] - 126:13
**willing** [1] - 169:8
**wind** [10] - 70:11, 118:4, 118:6, 118:9, 118:12, 118:15, 118:17, 118:24, 130:8, 130:9
**window** [5] - 16:1, 85:6, 85:16, 130:4
**windows** [13] - 16:2, 16:4, 85:6, 85:7, 85:11, 85:13, 85:21, 86:1, 87:12, 107:2, 130:18, 130:19
**wish** [1] - 137:11
**withdraw** [2] - 24:24, 41:19
**Witness** [1] - 115:9
**witness** [20] - 4:6, 5:7, 8:3, 24:11, 47:20, 48:15, 49:15, 54:9, 69:21, 101:10, 103:25, 117:13, 123:2, 141:9, 141:10, 149:12, 152:9, 168:24, 169:1
**witnesses** [4] - 5:5, 169:8, 169:16, 169:21
**WITNESSES** [1] - 3:1
**wonderful** [1] - 119:24
**word** [6] - 33:6, 40:12, 49:2, 151:22, 151:25, 152:2

**words** [6] - 5:9, 38:7, 43:24, 44:1, 71:15, 71:20
**work-related** [2] - 67:15, 67:21
**workday** [1] - 18:15
**worker** [9] - 143:18, 146:4, 146:8, 149:6, 157:20, 159:18, 159:21, 163:23, 166:23
**workers** [8] - 4:23, 35:18, 42:3, 104:13, 147:15, 147:16, 168:10, 168:11
**workmen's** [1] - 127:17
**workplace** [7] - 11:5, 15:1, 29:9, 32:16, 100:8, 134:11, 134:13
**works** [2] - 43:24, 150:6
**world** [1] - 106:23
**worth** [3] - 54:23, 54:24, 86:5
**wow** [1] - 50:7
**write** [1] - 53:17
**writing** [12] - 53:15, 53:21, 53:25, 54:1, 54:3, 54:5, 54:7, 56:25, 57:1, 58:19, 59:3
**written** [5] - 56:8, 57:4, 155:14, 163:14, 163:19
**wrote** [4] - 102:1, 102:12, 102:21, 102:22

## Y

**yard** [1] - 162:19
**year** [19] - 19:4, 19:5, 25:9, 27:7, 27:17, 27:19, 39:21, 39:25, 48:5, 63:21, 72:15, 80:3, 126:24, 129:11, 129:12, 131:11, 142:15, 142:18, 152:12
**years** [1] - 61:17
**yellow** [6] - 102:3, 102:5, 102:6, 102:11, 102:14, 102:15
**Yerko** [3] - 42:5, 42:7, 93:7
**yesterday** [9] - 4:17, 7:22, 8:1, 9:3, 9:7, 14:15, 16:18, 29:23,

30:8
**YOLAND** [3] - 24:13, 24:16, 24:20
**Yoland** [1] - 24:13
**York** [2] - 97:7, 97:12
**yourself** [6] - 45:7, 74:4, 97:19, 146:23, 149:7

## Z

**zero** [2] - 120:20, 120:22
**Zidell** [1] - 1:17