1          **UNITED STATES DISTRICT COURT**
           **SOUTHERN DISTRICT OF FLORIDA**
2              **FORT LAUDERDALE DIVISION**

3          **CASE NUMBER 07-61295-CIV-GONZALEZ/COHN**

4  **REINALDO RAMON LAMONICA,**          **COURTROOM C**
   **AUGUSTIN MILAN,**
5  **ANGELES LAMONICA SOLER,**
   **MARIO FELICIANO,**
6  **GUILLERMO ALBOREZ, and**
   **JULIO ALBOREZ,**

7
                **Plaintiffs,**        **FORT LAUDERDALE, FLORIDA**
8
        vs.
9
   **SAFE HURRICANE SHUTTERS, INC.,**      **APRIL 15, 2011**
10 **EDWARD LEIVA, STEVE HEIDELBERGER,**
   **and FRANCIS M$^c$CARROLL,**
11
                **Defendants.**       **{Pages 1 - 165}**
12 ─────────────────────────────────────────────

13          **JURY TRIAL - VOLUME V OF VI**
      **BEFORE THE HONORABLE JOSE A. GONZALEZ, JR.,**
14        **SENIOR UNITED STATES DISTRICT JUDGE**

15 ─────────────────────────────────────────────

   **APPEARANCES:**
16

17 **FOR THE PLAINTIFFS:**
                        **K. DAVID KELLY, ESQ.**
                        *J.H. Zidell, PA*
18                      300 71st Street, Suite 605
                        Miami Beach, FL  33141
19                      T: 305.865.6766; F: 305.865.7167
                        david.kelly38@rocketmail.com
20
   **FOR THE DEFENDANTS:**
21 (Safe Hurricane           **CHRIS KLEPPIN, ESQ.**
   Shutters, Inc.,           *Glasser, Boreth & Kleppin*
22 Steve Heidelberger,       8751 W. Broward Boulevard
   and Francis M$^c$Carroll) Plantation, FL  33324
23                      T: 954.424.1933; F: 954.474.7405
                        glabor@aol.com
24

25

                        APRIL 15, 2011

1    **FOR THE DEFENDANT:**          **EDWARD LEIVA, PRO SE**
     (Edward Leiva)

2

3    **REPORTED BY:**
                                     **JILL MICHELLE HARDY-HOBBS, CCR, FPR**
                                     *Official United States Court Reporter*
4                                    400 North Miami Avenue, Suite 08S33
                                     Miami, FL  33128      T: 305.523.5022
5                                    Jill_hardy-hobbs@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **INDEX TO EXAMINATION OF PLAINTIFFS' WITNESSES**

2                                                                        **PAGE**

3     **AUGUSTIN MILAN (Continued from 4-14-11)**

4     Cross-examination by Mr. Kleppin....................      7

5     Cross-examination by Mr. Leiva.....................     20

6                          * * * * *

7          **INDEX TO EXAMINATION OF DEFENDANTS' WITNESSES**

8                                                                        **PAGE**

9     **KEITH EDWARD LARES**

10    Direct examination by Mr. Kleppin..................     30

11    Cross-examination by Mr. Leiva.....................     46

12    Cross-examination by Mr. Kelly.....................     46

13    Redirect examination by Mr. Kleppin................     55

14    **BRAD VINCENT BUNGO**

15    Direct examination by Mr. Kleppin..................     56

16    Cross-examination by Mr. Kelly.....................     60

17    Redirect examination by Mr. Kleppin................     63

18    **MARIO FELICIANO (Continued from 4-14-11)**

19    Cross-examination by Mr. Kleppin...................     65

20    **EDWARD LEIVA**

21    Direct examination by Mr. Kleppin..................     67

22    Cross-examination by Mr. Kelly.....................     75

23    Redirect examination by Mr. Kleppin................     81

24

25

APRIL 15, 2011

1        **INDEX TO EXAMINATION OF DEFENDANTS' WITNESSES**

2                                                          **PAGE**

3   **FRANCIS X. McCARROLL**

4   Direct examination by Mr. Kleppin.....................     83

5   Cross-examination by Mr. Kelly.......................     87

6   Redirect examination by Mr. Kleppin..................     89

7

8                      * * * * *

9                **TABLE OF CONTENTS**

10                                                         **PAGE**

11  Rule 41 and 50 motion by Mr. Kleppin.................     95

12  Renewed 50 motion by Mr. Kleppin and Mr. Leiva........    124

13  Charge Conference....................................    125

14

15

16

17

18

19

20

21

22

23

24

25

                              APRIL 15, 2011

| | | | |
|---|---|---|---|
| 1 | **INDEX TO EXAMINATION OF DEFENDANTS' EXHIBITS** | | |
| 2 | **NUMBER** | **MOVED IN EVIDENCE** | **RECEIVED IN EVIDENCE** |
| 3 | D-31 | 82 | 82 |
| 4 | D-2 | 83 | 83 |
| 5 | D-4 | 84 | 84 |
| 6 | D-3 | 86 | 86 |
| 7 | D-5 | 87 | 87 |

8

9                    * * * * *

10

| | | | |
|---|---|---|---|
| 11 | **INDEX TO EXAMINATION OF PLAINTIFFS' EXHIBITS** | | |
| 12 | **LETTER** | **MOVED IN EVIDENCE** | **RECEIVED IN EVIDENCE** |
| 13 | A | 89 | 89 |

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 15, 2011

09:04  1       **(Call to the Order of the Court)**

09:04  2              **THE COURT:**  Good morning, Gentlemen.

09:04  3         **MR. KLEPPIN:**  Good morning.

09:04  4         **MR. LEIVA:**  Good morning.

09:04  5              **THE COURT:**  Please be seated.  Okay.  You were

09:04  6    examining Mr. Milan, Mr. Kleppin.

09:04  7         **MR. KLEPPIN:**  Yes, Your Honor.

09:04  8         **THE COURT:**  Are you ready?

09:04  9         **MR. KLEPPIN:**  Yes, Your Honor.

09:04 10         **THE COURT:**  All right.  Bring in the jury.

09:04 11         **MR. KLEPPIN:**  Your Honor, actually one second before

09:04 12    we do that.  I neglected to tell you before we left yesterday

09:05 13    afternoon that Mr. Heidelberger needed to be excused today.  I

09:05 14    told him that the trial would probably go through Thursday, and

09:05 15    he did not make arrangements for dialysis today.  And really

09:05 16    for his physical health he had to fly back home, and I

09:05 17    apologize for not getting your approval beforehand.

09:05 18              **THE COURT:**  Well, that's fine.  That's no problem.

09:05 19         **MR. KLEPPIN:**  I don't know if we want to -- what we

09:05 20    want to say to the jury.  They may question why he's not here.

09:05 21              **THE COURT:**  Do you want me to tell them that he's not

09:05 22    well without going into details?  Whatever you say.

09:05 23         **MR. KLEPPIN:**  Yeah.  Just say that he has an ongoing

09:05 24    health issue that required a treatment --

09:05 25              **THE COURT:**  Yeah.

09:05 1          **MR. KLEPPIN:**  -- out of the area and that's why he's

09:05 2  not present today.

09:05 3          **THE COURT:**  Okay.

09:05 4          **MR. KLEPPIN:**  Thank you, Your Honor.

09:05 5          **THE COURT:**  All right.

09:05 6      **(Jury In)**

09:06 7          **THE COURT:**  Good morning, Ladies and Gentlemen.  Be

09:06 8  seated, please.  Before we get started, I want to tell you that

09:06 9  Mr. Heidelberger who is one of the defendants in this case will

09:06 10  not be with us today because he has an ongoing medical

09:06 11  condition that he has to take treatments for on a regular and

09:06 12  continuing basis; and he was scheduled to have that done today,

09:06 13  and he's had to go to tend to that.  So his absence is not

09:06 14  meant of any lack of interest in the outcome of the litigation

09:06 15  or any disrespect to you; but when you have a scheduled medical

09:06 16  treatment set up, you have to go and tend to it.  So having

09:07 17  said all of that, we'll proceed with the examination of Mr.

09:07 18  Milan.  And, Mr. Milan, you're reminded that you are still

09:07 19  under oath.

09:07 20         And you may proceed with your examination of the

09:07 21  witness.

09:07 22          **MR. KLEPPIN:**  Thank you, Your Honor.

09:07 23        **AUGUSTIN MILAN, PLAINTIFF, PREVIOUSLY SWORN.**

09:07 24       **CROSS-EXAMINATION (Continued from 4-14-11)**

09:07 25  BY MR. KLEPPIN:

09:07  1  Q.  Good morning, Mr. Milan.

09:07  2  A.  Good morning.

09:07  3  Q.  When we left off yesterday afternoon, we were talking about

09:07  4  the warehouse.  Do you remember?

09:07  5  A.  Yes.

09:07  6  Q.  Do you remember that there were warehouse workers in the

09:07  7  warehouse who were paid hourly?

09:07  8  A.  It was a salary, not by hours.

09:07  9  Q.  So your testimony is you actually know what the warehouse

09:07 10  workers were paid; and it was a salary, not hourly?

09:08 11  A.  I have no idea how much each person was paid.

09:08 12  Q.  But you don't even know how they were paid, but there were

09:08 13  warehouse workers who worked in the warehouse; is that fair

09:08 14  enough?

09:08 15  A.  Okay.  Can you repeat the question again.

09:08 16  Q.  Sure.  There were warehouse workers in the warehouse.  You

09:08 17  do not know in what manner they were compensated?

09:08 18  A.  No.

09:08 19  Q.  Let's break that down.  There were workers in the

09:08 20  warehouse, correct?

09:09 21  A.  Yes.

09:09 22  Q.  How many?

09:09 23  A.  I do not remember if it was five or six persons --

09:09 24  Q.  Okay.

09:09 25  A.  -- at the time when I began working there.

09:09  1   Q.  Did the number of warehouse people stay the same throughout

09:09  2   your employment?

09:09  3   A.  Yes.

09:09  4   Q.  Let's talk about the truck when you got back to the shop at

09:09  5   the end of the day for just a moment.  Okay?

09:10  6   A.  Yes.

09:10  7   Q.  The idea was that you would go out in the morning with

09:10  8   hurricane shutters in the back of the truck that you were going

09:10  9   to install that day?

09:10  10  A.  Yes.

09:10  11  Q.  You then installed the hurricane shutters, correct?

09:10  12  A.  That is correct.

09:10  13  Q.  Then you drive back to the shop with the crew in the truck,

09:10  14  correct?

09:10  15  A.  At the end of the day, yes.

09:10  16  Q.  And the hurricane shutters that were in the truck are now

09:11  17  up on the house where you installed them; isn't that true?

09:11  18  A.  That is correct.

09:11  19  Q.  So the only thing that would go back to the shop in the

09:11  20  truck at the end of the day is if there was a hurricane shutter

09:11  21  that was out of place or you couldn't use it for some reason?

09:11  22  It was --

09:11  23  A.  Sometimes some of them did not have the correct

09:11  24  measurements.

09:11  25  Q.  And that's all that you would bring back at the end of the

09:11  1    day.  You might have a shutter or two that you're coming back

09:11  2    to the shop with that didn't have correct measurements?

09:12  3    A.  Yes.  That is correct.

09:12  4    Q.  And the warehouse people would take those misformed or

09:12  5    mismanufactured shutters out of the truck because they would

09:12  6    recycle the aluminum; isn't that true?

09:12  7    A.  Are you telling me about the old raw material or the new

09:12  8    one processed?

09:12  9    Q.  I'm talking about the material that you would have come

09:12  10   back -- that occasionally you would have come back with

09:12  11   material in the truck because for whatever reason you couldn't

09:12  12   use the shutter.  Perhaps it wasn't manufactured correctly.

09:13  13   That's what I'm talking about.  Do you understand?

09:13  14   A.  We unloaded the materials and delivered them to the

09:13  15   factory.

09:13  16   Q.  So when you got back at the end of the day, there was no

09:13  17   unloading of a loaded pickup truck much less unloading that

09:13  18   took three hours every day; isn't that true?

09:14  19   A.  What do you mean?  I didn't understand the question very

09:14  20   well.

09:14  21   Q.  We've gone through that when you would arrive back at the

09:14  22   shop at the end of the day, there'd either be nothing in the

09:14  23   truck or perhaps a hurricane shutter or two that you weren't

09:14  24   able to install for whatever reason, correct?

09:14  25   A.  Yes, yes.  That is so.

09:14  1   Q.  So there wasn't any unloading of the truck when you got

09:14  2   back to the shop at the end of the day much less unloading that

09:14  3   would have taken three hours to perform; isn't that true?

09:15  4   A.  I do not remember.

09:15  5   Q.  Okay.

09:15  6   A.  I'll try to in a moment.

09:15  7   Q.  With respect to the tools that were on the truck, the

09:15  8   drills and extension cords and those types of things, those

09:15  9   stayed on the truck through the night, correct?

09:15 10   A.  Yes.  That is correct.

09:15 11   Q.  Now, you agree with me that you were not able to work when

09:16 12   it was dark out?

09:16 13   A.  What are you referring to?  Outside or whenever I stayed to

09:16 14   help the people in the factory?

09:16 15   Q.  Did you ever hang hurricane shutters in the dark?

09:16 16   A.  No.  Yes.  No.

09:16 17   Q.  Let's just clarify that for the record.  I think I know

09:16 18   what your answer was.  You did not ever hang hurricane shutters

09:16 19   when it was dark outside; is that correct?

09:17 20   A.  No.

09:17 21   Q.  You were paid $700 a week when you worked for the hurricane

09:17 22   shutter company; isn't that true?

09:17 23   A.  Yes.  That is true.  That was a salary that Mr. Leiva

09:17 24   agreed to give me from the very beginning.

09:17 25   Q.  And your hours varied week to week?

JURY TRIAL - VOLUME V OF V

09:18  1    A.  They varied about twice.  I'm not sure.

09:18  2    Q.  Okay.  And regardless of how many hours you worked you were

09:18  3    always paid the $700, correct?

09:18  4    A.  Yes.  That is correct.

09:18  5    Q.  Okay.  And you -- so there was a clear and mutual

09:18  6    understanding between you and the company that when you would

09:18  7    work each week no matter how many hours you worked you would

09:18  8    get that same amount of pay?

09:19  9    A.  Yes.  Like I said before, the $700 that Mr. Leiva gave me

09:19  10   every week.

09:19  11   Q.  Okay.  Now, you actually don't have any idea how many hours

09:19  12   you worked on any given day or week, correct?

09:19  13   A.  Yes.

09:19  14   Q.  You can only guess as to the amount of hours that you

09:19  15   worked, correct?

09:19  16   A.  I cannot guess because I worked until 5:00, 5:30, or 5:20

09:20  17   approximately.

09:20  18   Q.  Okay.  Is it true that you really can't even guess for any

09:20  19   given week how many hours that you worked?

09:20  20   A.  Approximately 60 hours or a little less.

09:20  21   Q.  Okay.  Is it true that you've never told anyone how many

09:20  22   hours that you worked?

09:20  23   A.  No.

09:20  24   Q.  So you've never spoken to anyone about how many hours you

09:21  25   worked or what you're owed?

09:21  1  A.  I didn't commented with anyone.

09:21  2          MR. KLEPPIN:  May I approach the witness, Your Honor?

09:21  3          THE COURT:  Yes, sir.

09:21  4  BY MR. KLEPPIN:

09:21  5  Q.  If you could look on page 30 of your deposition, line 19.

09:22  6  A.  Yes.

09:22  7  Q.  Line 19, So again if I were to pick a day at random or

09:22  8  let's say a week at random, if I said to you the last week of

09:22  9  August of 2007 how many hours did you work that week, you would

09:22 10  not be able to tell me with any accuracy, would you?

09:22 11          Answer, No.  I don't have any idea, but it was a lot.

09:22 12          Question, But again it would be -- it would just be a

09:22 13  guess as to an exact number of hours; is that true?

09:23 14          Answer, Yes.

09:23 15          Did I read your previous testimony -- that's what you

09:23 16  said in your deposition, correct?  The answer is that's what

09:23 17  you said in your deposition, correct?  I mean question.

09:23 18  A.  It's written here.  Yes.

09:23 19  Q.  And even though you've never spoken to anyone about the

09:23 20  hours that you worked or what you're owed -- in fact, before I

09:23 21  ask that, Mr. Zidell, your attorney, never ever worked with you

09:24 22  at Safe Hurricane Shutters, correct?

09:24 23  A.  It was by salary.

09:24 24  Q.  The question is Mr. Zidell, your attorney, never worked at

09:24 25  Safe Hurricane Shutters with you, correct?

09:24  1   A.  He didn't work for Mr. Leiva's company.

09:24  2   Q.  Okay.  Now, I'd like you to follow me with this.  You have

09:24  3   no idea what hours you've worked.  We've been through that.

09:24  4        THE INTERPRETER:  Say it again, please.

09:24  5   BY MR. KLEPPIN:

09:24  6   Q.  You have no idea what hours you worked any given week.

09:24  7   We've already been through that, correct?

09:25  8   A.  About 60 hours.

09:25  9   Q.  Let's go through it again.  You just told us you have -- it

09:25 10   was in your deposition -- you have no idea for any given week

09:25 11   how many hours you worked.  You never spoke with anyone about

09:25 12   how many hours you worked or what you're owed.  Mr. Zidell,

09:25 13   your attorney, did not work at Safe Hurricane Shutters; but he

09:25 14   knows, your attorney knows how much you're owed?  Isn't that

09:26 15   true?

09:26 16   A.  My attorney is the one who can answer that question.

09:26 17   Q.  Well, let's take a look at page 31 of your deposition.

09:26 18   A.  Yes.

09:26 19   Q.  Line 6, Question, How much are you owed?  Line 7, My

09:26 20   attorney has that information.

09:26 21        That's what you said in your deposition, correct?

09:26 22   A.  Yes.

09:26 23        MR. KLEPPIN:  May I approach the witness, Your Honor?

09:26 24        THE COURT:  Pardon?

09:26 25        MR. KLEPPIN:  May I approach the witness, Your Honor.

09:26  1          THE COURT:  Yes.

09:26  2  BY MR. KLEPPIN:

09:26  3  Q.  I want to show you an interrogatory answer that's been

09:26  4  submitted on behalf of you by your attorney in this case.

09:27  5  Okay?

09:27  6  A.  Yes.

09:27  7  Q.  It's interrogatory number 9.  And it states, Please state

09:27  8  each --

09:27  9          THE INTERPRETER:  Do you want me to translate all of

09:27  10  it?  Okay.

09:27  11  BY MR. KLEPPIN:

09:27  12  Q.  Please state each item of damage that you claim in this

09:27  13  case.  Include in your answer, one, the nature of each item of

09:27  14  damage; two, the date, time, and place of such damage; three,

09:27  15  the category into which each item of damages falls, that is,

09:27  16  actual damages, compensatory damages, punitive damages, and any

09:28  17  other relevant categories; four, the factual basis for each

09:28  18  item of damages; five, an explanation of how you computed each

09:28  19  item of damages including any mathematical formula used; six,

09:28  20  identify any documents in support of your damages claims and;

09:28  21  seven, identify each person who witnessed or had knowledge of

09:28  22  such damage.

09:28  23          And your answer was, Plaintiff worked for the

09:28  24  defendants from on or about July 29, 2007, until on or about

09:29  25  September 10, 2007, six days a week, approximately 11 hours per

09:29  1    day and is, therefore, claiming the following in damages:  Paid

09:29  2    per hour, $17 an hour; amount of half-time per hour not

09:29  3    compensated, $25.50; weeks, six; hours worked per week, 66;

09:29  4    overtime hours worked per week, 26.  Total wages unpaid equals

09:30  5    six weeks times 26 overtime hours times $25.50 equals $3,978.

09:30  6         Is that your answer, sir?

09:30  7    A.  It's written down there, yes.

09:30  8    Q.  Now, typically interrogatories are signed under oath.

09:30  9    They're verified by the party who is submitting them.

09:30  10   Remember, you told me yesterday you never signed anything that

09:30  11   your attorney gave you.  Remember?

09:30  12   A.  I do not remember.  I do not remember that question.

09:31  13   Q.  You don't remember telling me that yesterday?

09:31  14   A.  I do not remember.

09:31  15   Q.  You never signed these interrogatories.  You never --

09:31  16   that's not your answer.  You didn't sign it, correct?  I'll

09:31  17   approach if you'd like to see it.  Your signature is nowhere on

09:31  18   there, is it?

09:31  19   A.  Correct.  That is correct.

09:31  20   Q.  That's because this whole overtime nonsense has been made

09:31  21   by up by your attorney; isn't that true?

09:31  22        MR. KELLY:  Take those, please.

09:32  23   BY MR. KLEPPIN:

09:32  24   Q.  Is that true?

09:32  25   A.  My attorney has shown a document to you right now.

JURY TRIAL - VOLUME V OF V

09:32  1   Q.  I want to know.  Your attorney made up this whole overtime

09:32  2   thing, isn't that true, to come up with the 66 hours a week so

09:32  3   that your claim would mirror Mr. Feliciano's claim; isn't that

09:32  4   true?

09:32  5   A.  What's the meaning of that question?

09:32  6   Q.  You never spoke with anyone about what hours you worked or

09:32  7   what you're owed, sir.  You've already told us that.

09:33  8   A.  With the staff I never discussed my schedule.

09:33  9   Q.  You couldn't because you couldn't even guess what it was.

09:33  10  A.  Yes.  Close to 60 hours.

09:33  11  Q.  And you never, never would have characterized your pay as

09:33  12  $17 per hour, correct?

09:33  13  A.  I was paid $700 a week.

09:33  14  Q.  Right.

09:33  15  A.  Salary.

09:33  16  Q.  Right.  Now, your attorney has showed me that he has a

09:33  17  verification page, and I want to ask if this is your printed

09:34  18  writing.  Is any writing on that page yours?

09:34  19  A.  My name, yes.

09:34  20  Q.  Okay.  Is that -- who wrote your name there?  Is that your

09:34  21  writing or someone else?

09:34  22  A.  No.  It's my handwriting.

09:34  23  Q.  Why did you print your name rather than sign there?

09:34  24  A.  Because that's the only way I know how to write.

09:34  25  Q.  The interrogatory answer said 66.  I heard you say it was

APRIL 15, 2011

09:34  1   really 60, and then I heard you say it's really less than 60.

09:35  2   You really have absolutely no idea what you worked.  That's

09:35  3   clear.

09:35  4   A.   Yes.  Close to 60 hours.  The answer was yes, close to 60

09:35  5   hours.

09:35  6   Q.   Now, there was a time that Mr. Leiva bounced a check that

09:35  7   he gave to you for your pay; isn't that true?

09:36  8   A.   Yes.  That is correct.

09:36  9   Q.   And he paid you in cash for that check that bounced,

09:36  10  correct?

09:36  11  A.   Yes.  That is correct.

09:36  12  Q.   On the rain days that you would have when it got to be

09:36  13  raining, you would stop the project, correct?

09:36  14  A.   While the rain stopped.  The rain could last between 45

09:36  15  minutes to an hour.  Yes.

09:36  16  Q.   Is your testimony that in south Florida in the summer that

09:36  17  there aren't periods of time where it rains for two, three,

09:36  18  even four or five hours all in a row?  That's nonstop.

09:37  19  A.   I have no idea.

09:37  20  Q.   It goes beyond just raining with the stopping of the

09:37  21  project.  When the ground was wet, you couldn't work because it

09:37  22  was too dangerous because you were using electric tools; isn't

09:37  23  that true?

09:37  24  A.   Yes, we worked.

09:37  25  Q.   I have you on page 47 of your deposition, line 21,

| 09:38 | 1 | Question, Now on rain days when you were working for Advanced |
| 09:38 | 2 | Hurricane, what would happen? |
| 09:38 | 3 | Answer, We stopped the project. |
| 09:38 | 4 | Question, Stopped the -- okay.  And what would happen? |
| 09:38 | 5 | Answer, Because of extensions we had on the floor we |
| 09:38 | 6 | couldn't work. |
| 09:38 | 7 | Question, Meaning the ground would become wet and it |
| 09:38 | 8 | was too dangerous to continue working? |
| 09:38 | 9 | Answer, Yes. |
| 09:38 | 10 | That's what you said in your deposition, isn't it? |
| 09:39 | 11 | A.  If it's written here, yes. |
| 09:39 | 12 | Q.  When you gave your deposition, you were represented by your |
| 09:39 | 13 | current lawyer and that law firm, correct? |
| 09:39 | 14 | A.  At this time I am represented by him for this time. |
| 09:39 | 15 | Q.  When you gave your deposition, you were a plaintiff in this |
| 09:39 | 16 | lawsuit being represented by your attorney, correct? |
| 09:39 | 17 | A.  Yes, yes.  True. |
| 09:39 | 18 | Q.  You never kept track of your own hours, correct? |
| 09:39 | 19 | THE COURT:  You've asked him that -- |
| 09:39 | 20 | MR. KLEPPIN:  Oh, I'm sorry.  Did I? |
| 09:40 | 21 | THE COURT:  -- several times. |
| 09:40 | 22 | MR. KLEPPIN:  I'm sorry.  I did not know that.  I beg |
| 09:40 | 23 | your pardon. |
| 09:40 | 24 | BY MR. KLEPPIN: |
| 09:40 | 25 | Q.  You never complained in writing about any aspect of your |

09:40 1  pay to the company, correct?

09:40 2  A.  In what manner?

09:40 3  Q.  In writing.  Did you ever have anyone prepare something on

09:40 4  your behalf where you're complaining about your pay in writing

09:40 5  to the company?

09:40 6  A.  No.  No.  Because Mr. Leiva was a good person with me, for

09:40 7  me; and I was getting a salary, and I had the need to work.

09:41 8  Q.  And you never wrote anything on your own behalf and

09:41 9  submitted it to the company complaining in any manner about

09:41 10  your pay; isn't that true?

09:41 11  A.  That I remember, no.

09:41 12       MR. KLEPPIN:  No further questions, Your Honor.

09:41 13       THE COURT:  Mr. Leiva, you may examine.

09:41 14                    CROSS-EXAMINATION

09:41 15  BY MR. LEIVA:

09:41 16  Q.  Good morning.

09:41 17  A.  Good morning.

09:41 18  Q.  Good morning, everyone.  Mr. Milan, you said that I was a

09:42 19  good boss, right?

09:42 20  A.  Yes; an excellent man, yes.

09:42 21  Q.  If the company would have been open today, you would be

09:42 22  working for me, correct?

09:42 23  A.  Exactly.  Had I continued getting the salary that you were

09:42 24  giving me, of course.  Yes.  True.

09:42 25  Q.  The question, when -- you know Kiko, Reinaldo Lamonica?

09:42  1  A.  I met him for a brief period of time during my work time

09:42  2  there, yes.

09:42  3  Q.  He's the one that contacted you to bring this lawsuit

09:43  4  against myself?

09:43  5  A.  I do not have his phone number.

09:43  6  Q.  He called you?

09:43  7  A.  I do not remember.

09:43  8  Q.  So you don't -- it's a coincidence that everybody went to

09:43  9  see Mr. Zidell?  Actually I've got to make a correction.  The

09:43  10  lawsuit was brought by another attorney?

09:43  11  A.  Yes; with the first one, yes.

09:44  12  Q.  With the first attorney.  And how did you know about this

09:44  13  attorney?

09:44  14  A.  There was a change done.

09:44  15  Q.  No, no.  I'm sorry.  I'm not asking about the change.  I'm

09:44  16  very familiar with the change.  Who asked you to come forward

09:44  17  and start the lawsuit against myself?

09:44  18  A.  Nobody asked me.

09:44  19  Q.  So was it just a coincidence?  Everybody went to the same

09:45  20  attorney, and it was just a coincidence?  And everybody went to

09:45  21  this attorney; isn't it true?

09:45  22  A.  No.

09:45  23  Q.  So my question is again, who contacted you to bring this

09:45  24  lawsuit against myself?

09:45  25  A.  The person who contacted me unfortunately was grabbed by

09:45  1   immigration and sent to Brazil.

09:46  2   Q.   What was the name of that person?

09:46  3   A.   I do not recall very, very well, the name of that person.

09:46  4   Q.   There was a Brazilian worker; but he was deported way

09:46  5   before he even started working for me, way before.  He

09:46  6   committed a violation, and he was deported; but that was many,

09:46  7   many months before.

09:46  8           MR. KLEPPIN:  I object to Mr. Leiva's testimony, Your

09:46  9   Honor.

09:46 10           THE COURT:  I agree that it's not a question, Mr.

09:46 11   Leiva.

09:46 12           MR. LEIVA:  Oh, okay.

09:46 13           THE COURT:  Don't make statements.

09:46 14   BY MR. LEIVA:

09:46 15   Q.   So the -- okay.  The question is if he was happy there

09:46 16   working for me.

09:46 17           THE INTERPRETER:  You mean him?

09:46 18           MR. LEIVA:  Him.

09:46 19           MR. KLEPPIN:  Objection; relevance.

09:46 20           MR. LEIVA:  Okay.

09:46 21           THE COURT:  Pardon me?

09:47 22           MR. KLEPPIN:  Objection; relevance whether the

09:47 23   Brazilian guy who got deported --

09:47 24           MR. LEIVA:  I'm not asking about a Brazilian guy.

09:47 25           THE COURT:  He ask asking you, Mr. Milan was happy

09:47  1   working at --

09:47  2          **MR. KLEPPIN:**  That would be asked and answered.  He

09:47  3   said he'd be working for him now if the company was still open.

09:47  4          **THE COURT:**  I know.

09:47  5          **MR. KLEPPIN:**  Objection.

09:47  6          **THE COURT:**  Overruled.  Maybe you can encourage him.

09:47  7   I'll leave that to you.

09:47  8          **MR. LEIVA:**  But he objected.  You sustained his

09:47  9   objection?

09:47  10         **THE COURT:**  No.  You can continue, Mr. Leiva.

09:47  11         **MR. KLEPPIN:**  He overruled the objection, Mr. Leiva.

09:47  12         **THE COURT:**  That's correct.

09:47  13  BY MR. LEIVA:

09:47  14  Q.  The answer is yes or no?

09:47  15  A.  I was confused.  Can you repeat the question.

09:47  16  Q.  If he was happy working for me.

09:47  17  A.  Oh, of course.  And I would continue working there if the

09:48  18  company opened again.  Of course.

09:48  19  Q.  Okay.  I've got a couple more questions.  Do you remember

09:48  20  the procedure that you followed to load the truck in the

09:48  21  morning, and you can describe it to the jury so they have an

09:48  22  idea.

09:48  23  A.  Yes.  We arrived --

09:48  24  Q.  No, no.  That's not the question.

09:48  25  A.  -- in the morning.  And as I said before --

| 09:48 | 1 | THE INTERPRETER:  English, please. |
| 09:48 | 2 | BY MR. LEIVA: |
| 09:48 | 3 | Q.  Oh, the question is you're already there at the shop.  I |
| 09:48 | 4 | give you the paperwork, to Christian.  What do you do next? |
| 09:49 | 5 | A.  He would give me the name of the project that was going to |
| 09:49 | 6 | be carried out.  We loaded the truck, and it didn't take too |
| 09:49 | 7 | long. |
| 09:49 | 8 | Q.  How long approximately? |
| 09:49 | 9 | A.  Between 30, 35 minutes. |
| 09:49 | 10 | Q.  And what did it involve?  I want a description so they get |
| 09:49 | 11 | an idea how -- was it just the shutters that they loaded or |
| 09:49 | 12 | there were many other items that they had to load?  Explain to |
| 09:49 | 13 | them exactly what it is. |
| 09:50 | 14 | A.  There were times when the truck was left inside the garage |
| 09:50 | 15 | or it was parked outside the garage because the materials were |
| 09:50 | 16 | always placed near the door, the large doors. |
| 09:50 | 17 | MR. LEIVA:  Your Honor, may I try to help him out with |
| 09:50 | 18 | the description of the loading of the truck, Your Honor? |
| 09:50 | 19 | THE COURT:  Ask him questions. |
| 09:50 | 20 | BY MR. LEIVA: |
| 09:50 | 21 | Q.  When you said that it took about 30 minutes to load the |
| 09:50 | 22 | shutters into the truck, didn't they have to verify looking at |
| 09:50 | 23 | the cat (ph) sheet that every item in the cat (ph) sheet -- and |
| 09:50 | 24 | it was many more items than just the shutter. |
| 09:51 | 25 | A.  Yes.  That is true because sometimes we did not have the |

09:51   1    bolts or screws and we had to look for them and it took us

09:51   2    longer, somewhat longer in getting them.

09:51   3    Q.   The angles -- the angles were always together with the

09:51   4    shutters?

09:51   5    A.   No, no.  The bolts.

09:51   6    Q.   No.  I'm talking about the angles.

09:51   7         MR. LEIVA:  No, no.  The correct -- the translation is

09:51   8    not angles, sir.

09:51   9         THE INTERPRETER:  Well, you're saying angles.  Angles?

09:51  10         MR. LEIVA:  No.  No, no.

09:51  11         MR. MILAN:  They are the tracks.

09:51  12    BY MR. LEIVA:

09:52  13    Q.   No.  The -- no.  No, no.  I'm not talking about track.

09:52  14    Angles where you put on the side of the shutters.

09:52  15    A.   There were some short ones, and we placed them on the upper

09:52  16    portion of the ladder.

09:52  17    Q.   Correct.  And you had to verify that you have every single

09:52  18    one of them, correct?

09:52  19    A.   Correct, yes.

09:52  20    Q.   And also he testified before that he had to have also the

09:52  21    right type of screws because --

09:52  22         THE INTERPRETER:  Judge, for the record may the

09:52  23    gentleman say "you" instead of "he" because that confuses the

09:52  24    record.

09:53  25         MR. KLEPPIN:  Yeah.  I would object to Mr. Leiva

APRIL 15, 2011

09:53 1    addressing the interpreter.  He should just ask his questions

09:53 2    to the witness.

09:53 3              **MR. LEIVA:**  Oh, yeah.

09:53 4              **MR. KLEPPIN:**  It's totally as if the interpreter isn't

09:53 5    here.

09:53 6              **MR. LEIVA:**  It's very hard because, you know, I'm

09:53 7    talking to him.

09:53 8              **MR. KLEPPIN:**  Could we have that instruction given to

09:53 9    Mr. Leiva by the Court.

09:53 10             **THE COURT:**  Would you please do that, Mr. Leiva.

09:53 11             **MR. LEIVA:**  Absolutely.

09:53 12             **THE COURT:**  Good.

09:53 13             **MR. LEIVA:**  I have to apologize to this attorney here.

09:53 14   My apologies.

09:53 15             **MR. KLEPPIN:**  No big deal.

09:53 16   **BY MR. LEIVA:**

09:53 17   Q.  So the loading of the truck entailed many tasks?

09:53 18   A.  Yes.  That is correct.  Ladders, tracks, the toolbox,

09:53 19   material for the job.  Yes.

09:53 20   Q.  And the question I want to ask him, he said it only took

09:54 21   half an hour to 35 minutes to load a truck.

09:54 22   A.  That is correct.  In loading the truck, that's correct.

09:54 23   Q.  But unloading the truck with no material whatsoever it took

09:54 24   him three hours, three he says?

09:54 25   A.  If Mr. Leiva remembers --

09:54  1        MR. LEIVA:  He said yes.

09:54  2        MR. MILAN:  Since I worked in a factory at the other

09:54  3  company and as an installer you asked me to work helping the

09:55  4  people in the factory, the workers.

09:55  5  BY MR. LEIVA:

09:55  6  Q.  So you're saying that you worked in the factory too?

09:55  7  A.  Of course.

09:55  8  Q.  No.  He never --

09:55  9  A.  I cannot lie.

09:55  10  Q.  At what time your wife would pick you up every day?

09:55  11  A.  She would arrive 5:30, 5:45; but she had to wait longer.

09:55  12  Q.  So the poor lady would work over there.  Then she would

09:55  13  wait over there for him every day you mean?

09:55  14  A.  Of course.  She couldn't take me out of the job.

09:55  15        MR. LEIVA:  May I approach him for something?

09:55  16  BY MR. LEIVA:

09:56  17  Q.  Do you see your handwriting here?

09:56  18  A.  Of course.  I said it previously.

09:56  19  Q.  Thank you.

09:56  20  A.  You're welcome.

09:56  21        MR. LEIVA:  No more questions, Your Honor.

09:56  22        THE COURT:  All right.  Mr. Milan, thank you, sir.

09:56  23  You may step down.

09:56  24        What else do we have for the plaintiffs, Mr. Kelly?

09:56  25        THE INTERPRETER:  Thank you, Your Honor.

09:56  1          MR. KELLY:  I'm sorry, Your Honor.  Your Honor, we now

09:56  2    rest our case.  That was our last witness.

09:56  3          THE COURT:  All right.  Members of the Jury, you have

09:56  4    now heard all the evidence and testimony in this case on behalf

09:56  5    of the plaintiffs.  We will now proceed to consider whatever

09:56  6    evidence or testimony the defendants may wish to offer.

09:57  7          At this point in the trial the Court normally would

09:57  8    recess to hear motions and matters of law outside of your

09:57  9    presence.  In the spirit and in the hope of expediting the

09:57  10   disposition of this case, we will ask and order that all Rule

09:57  11   50 motions to be made at the conclusion of the plaintiffs' case

09:57  12   in chief be reserved until the jury has been excused for the

09:57  13   day or for the week as the case may be and we will continue to

09:57  14   consider whatever evidence and testimony the defendants may

09:57  15   wish to offer.

09:57  16         And this ruling is made without any prejudice to any

09:57  17   defendant to raise any objections or any motions which would

09:57  18   normally be made at the conclusion of the plaintiffs' case in

09:57  19   chief after the termination of the Court's proceedings today.

09:57  20         You may proceed with your case, Mr. Kleppin.

09:57  21         MR. KLEPPIN:  Thank you, Your Honor.  We will call Mr.

09:57  22   Keith Lares to the stand.

09:57  23         THE COURT:  All right.

09:58  24         THE INTERPRETER:  Your Honor, am I excused?

09:58  25         THE COURT:  You better hang around I guess.  I don't

APRIL 15, 2011

09:58  1  know.

09:58  2         THE INTERPRETER:  Okay.

09:58  3         MR. KELLY:  Your Honor, I think my office had arranged

09:58  4  for him; and I don't have any other witnesses.  Do you need the

09:58  5  interpreter anymore, the Spanish interpreter?  Are you going to

09:58  6  use his services?  We don't need him anymore.

09:58  7         MR. LEIVA:  No.  They speak English.

09:58  8         MR. KLEPPIN:  Yeah.  I don't think I do need the

09:58  9  interpreter.

09:58  10         THE COURT:  Okay.  Louise, you're excused.  Good to

09:58  11  see you again.

09:58  12         THE INTERPRETER:  Glad to see you again.

09:58  13         THE COURT:  This man and I have worked together now

09:58  14  for over 30 years.  Can you believe that?

09:58  15         MR. KLEPPIN:  Have a nice day.

09:58  16         THE COURT:  But he's gotten older, and I'm still the

09:58  17  same.

09:58  18         THE INTERPRETER:  37.

09:58  19         THE COURT:  All right.  Sir, would you please raise

09:58  20  your right hand and be sworn.

09:58  21         **KEITH EDWARD LARES, DEFENDANTS' WITNESS, SWORN.**

09:59  22         THE COURT:  Please tell us your full name.

09:59  23         MR. LARES:  Keith Edward Lares.

09:59  24         THE COURT:  Spell your last name, please.

09:59  25         MR. LARES:  L-a-r-e-s.

09:59  1      THE COURT:  All right.  You may inquire.

09:59  2                   **DIRECT EXAMINATION**

09:59  3  BY MR. KLEPPIN:

09:59  4  Q.  Good morning, Mr. Lares.

09:59  5  A.  Good morning.

09:59  6  Q.  When did you first start working at Safe Hurricane

09:59  7  Shutters?

09:59  8  A.  August of 2006.

09:59  9  Q.  And what was your position there?

09:59  10  A.  When I first came in, I worked in the shop.  Then I did

09:59  11  installations for a couple of months, and then I became shop

09:59  12  manager.  And in the closing I was controller.

09:59  13  Q.  Okay.  Let's just try to break that down a little bit.  In

09:59  14  August of '06 how many weeks or months did you work in the shop

09:59  15  before you started to install?

09:59  16  A.  It's tough to recall.  I would say maybe a month, three

09:59  17  weeks.

09:59  18  Q.  And then you were an installer for how long approximately?

09:59  19  A.  Maybe four months, three months.

10:00  20  Q.  Okay.  Were you always on the same crew or were you on

10:00  21  different crews when you were an installer?

10:00  22  A.  I was primarily with Mario Feliciano's group, but I did

10:00  23  bounce around a whole bunch where I was needed.

10:00  24  Q.  Okay.  So you worked on various crews, but it sounds like

10:00  25  primarily Mr. Feliciano's?

10:00  1    A.  Correct.

10:00  2    Q.  Have you ever seen the gentleman sitting next to Mr.

10:00  3    Feliciano in the courtroom?

10:00  4    A.  I vaguely remember him.

10:00  5    Q.  Okay.  This takes us to maybe early of 2007.  Starting in

10:00  6    early 2007 is that when you worked in the warehouse

10:00  7    approximately?

10:00  8    A.  Yes, approximately.

10:00  9    Q.  What was your job title at the time?

10:01 10    A.  I was the warehouse manager.

10:01 11    Q.  How long were you the warehouse manager for approximately?

10:01 12    A.  A little more than a year.

10:01 13    Q.  Okay.  And then when did you become the controller?

10:01 14    A.  I believe after Brad Bungo left the company which was July

10:01 15    of '08 -- '07.  Excuse me.  '07.  It was '07.

10:01 16    Q.  Okay.  So you were the controller for -- not for very long

10:01 17    then?

10:01 18    A.  No.

10:01 19    Q.  You were controller for how long approximately?

10:01 20    A.  About a month.

10:01 21    Q.  About a month only.  Okay.  Now, when you first started to

10:01 22    work at Safe Hurricane Shutters, how were you paid?  In what

10:01 23    manner?  Hourly, salary, by the piece?

10:01 24    A.  Salary.

10:01 25    Q.  Okay.  What was your salary?

10:01  1    A.   700 per week.

10:02  2    Q.   Did that ever change during the whole time that you worked

10:02  3    for Safe Hurricane Shutters?

10:02  4    A.   I don't remember.  Maybe at the end when I became shop

10:02  5    manager it may have went up to 800 or 850.  I don't remember

10:02  6    exactly.

10:02  7    Q.   Were you on a salary though of some sort, whether it was

10:02  8    seven --

10:02  9    A.   Yes.

10:02  10   Q.   -- hundred, and then you got a raise or two?

10:02  11   A.   Correct.

10:02  12   Q.   Was it a salary the whole time you were with the company?

10:02  13   A.   Yes.

10:02  14   Q.   Now, did you think that the salary compensated you no

10:02  15   matter how many hours that you worked or do you think the

10:02  16   salary just compensated you for the first 40, and then any

10:02  17   hours you might have worked over 40 were just totally

10:02  18   uncompensated?

10:02  19   A.   It was my understanding I was being paid that amount to do

10:02  20   the job I was asked to do.  So, you know, I was paid weekly to

10:02  21   manage the shop, that amount of money.

10:02  22   Q.   Well, were you also paid those amounts, though, when you

10:02  23   were the installer?  For example, if you worked 32 hours one

10:02  24   week as an installer, would you receive your full salary?

10:03  25   A.   Yes, I would.

APRIL 15, 2011

10:03  1   Q.   I want to talk about when you were warehouse manager for a

10:03  2   minute, and we'll back up -- we'll go to installer in just a

10:03  3   second.  When you were the warehouse manager, the trucks at the

10:03  4   end of the day come back to the shop?

10:03  5   A.   Yes, yes.

10:03  6   Q.   And do the crews have to do any unloading of those trucks

10:03  7   or do people in the warehouse do any unloading if it's

10:03  8   necessary?

10:03  9   A.   Typically there was no unloading at the end of the day.

10:03  10  Q.   Why would that be?

10:03  11  A.   There was nothing to unload.

10:03  12  Q.   Why is that?

10:03  13  A.   Sometimes there's scrap metal that shop workers would

10:03  14  unload or things of that nature, but usually in the morning you

10:03  15  would load the job if there was a job to take out in the

10:03  16  morning.  And you would bring it to the job site.

10:03  17  Q.   When you say "you," are you talking about the installers or

10:04  18  did warehouse people load the trucks in the morning?  How did

10:04  19  that work?

10:04  20  A.   In the morning it was an effort across the board.

10:04  21  Everybody --

10:04  22  Q.   A team effort?

10:04  23  A.   Correct.

10:04  24  Q.   So there were -- some installers would help load the

10:04  25  trucks.  Some warehouse people would help load it to get them

APRIL 15, 2011

10:04  1  loaded?

10:04  2  A.  Yes.

10:04  3  Q.  But no unloading at night when the trucks would come in at

10:04  4  the end of the day?

10:04  5  A.  Typically no.

10:04  6  Q.  Would the crew need to clean the trucks or do anything with

10:04  7  the trucks at the end of the day?

10:04  8  A.  Trucks were not cleaned at the end of the day, no.

10:04  9  Q.  So at the end of the day the installers would park the

10:04  10  truck and go home?

10:04  11  A.  That's the typical thing they do, yes.

10:04  12  Q.  Did you ever have any installers that would come -- drop

10:04  13  the truck off at the end of the day, say, at 4:00 o'clock on a

10:04  14  typical day and then work in the warehouse for the next three

10:04  15  hours doing something?

10:04  16  A.  No.

10:04  17  Q.  With respect to the workers in the warehouse were they paid

10:05  18  hourly or salary or how, these people that you supervised when

10:05  19  you were warehouse manager?

10:05  20  A.  We called the shop workers.  They were hourly employees.

10:05  21  Q.  Did they punch in and out?

10:05  22  A.  Yes, they did?

10:05  23  Q.  Okay.  So there was a record kept of the time they worked

10:05  24  each day?

10:05  25  A.  Yes.

10:05  1  Q.  Were they paid overtime if they worked it?

10:05  2  A.  Yes.

10:05  3  Q.  I want to talk to you now about installation for just a

10:05  4  little bit.  I'll actually -- a couple of last things as

10:05  5  warehouse manager.  Did you have an occasion to see about what

10:05  6  time on average these crews would return at the end of the day?

10:05  7  A.  Typically about 4:00 o'clock.

10:05  8  Q.  And what -- how do you come to that average when you say

10:05  9  "typically 4:00 o'clock"?  Are there some days they came in far

10:05 10  earlier than that, some days maybe a little later?  And, if so,

10:06 11  why are you saying 4:00 o'clock?

10:06 12  A.  Some crews would finish up earlier and come in earlier.

10:06 13  4:00 o'clock I would say would be a good estimate as an

10:06 14  average.  Sometimes, you know, we would have to keep the trucks

10:06 15  outside, bring them inside.  So 4:00 o'clock was when we were

10:06 16  winding down in the shop as well.

10:06 17  Q.  Okay.

10:06 18  A.  So that's kind of like how I related.

10:06 19  Q.  Okay.  When did the shop close?

10:06 20  A.  The shop closed when the work was done.  If we had a job

10:06 21  that needed to go out or a job that was imperative to be out

10:06 22  early the next day, we would work late.  If there was no jobs,

10:06 23  shop would close up early.  So it really depended on the

10:06 24  workload.

10:06 25  Q.  In general was there a sort of end of the day when this

10:06  1   company as a company would kind of be finishing up things where

10:06  2   the warehouse, the installers, the whole thing would sort of

10:06  3   shut down at this time that you're describing?

10:06  4   A.  The whole company would shut down you're asking?

10:07  5   Q.  Well, the installation and warehouse part of it.

10:07  6   A.  If there was no work, yeah.  The saws would be shut off and

10:07  7   the warehouse would be shut down.

10:07  8   Q.  Let's talk about that.  The last few months of while you

10:07  9   were there, can you describe what the workload was like as

10:07 10   opposed to maybe back in '06?

10:07 11   A.  As far as the shop is concerned?

10:07 12   Q.  Just -- yeah.  Well --

10:07 13   A.  Well, we had one primary job at that time; and that was a

10:07 14   condo we were doing.  So it depended on the material we had.

10:07 15   It can be lighter than it used to be because previously we

10:07 16   would do several jobs throughout the day.  At that point we

10:07 17   were concentrating on one job primarily, and the workload for

10:07 18   the shop was lighter.

10:07 19   Q.  Okay.  Let's talk about when you worked on a crew.  When

10:07 20   you worked on a crew, did you get to the shop around 8:30 or so

10:07 21   in the morning?

10:08 22   A.  Approximately.

10:08 23   Q.  And when is it that the crew would then go out -- drive out

10:08 24   to the job site approximately?

10:08 25   A.  It depends.  A typical day you'd come in, grab some coffee,

10:08  1   load up the truck, and you'd be heading out around 9:00, maybe

10:08  2   9:30.

10:08  3   Q.  Okay.  Now, when you're on Mr. Feliciano's crew and you

10:08  4   left the shop in the morning, where would you then go?

10:08  5   A.  Well, we would head to the job site; but prior to that we'd

10:08  6   go, you know, get ice, gas up if we had to gas up, maybe grab a

10:08  7   quick bite to eat --

10:08  8   Q.  Well, talk --

10:08  9   A.  -- drinks for the day.

10:08  10  Q.  Let's talk about the bite to eat.  Is there anyplace in

10:08  11  general where you would stop to get a bite to eat?

10:08  12  A.  Sometimes we would go to a Brazilian bakery.

10:08  13  Q.  Does it have a name?

10:09  14  A.  I don't remember the name.

10:09  15  Q.  But it's a Brazilian bakery?

10:09  16  A.  Yes.

10:09  17  Q.  Okay.  And the typical morning you would go there?

10:09  18  A.  Typically.  Yeah.

10:09  19  Q.  And was the bakery busy or is the place dead?  What's it

10:09  20  like?

10:09  21  A.  It was pretty busy.  A lot of people heading to work

10:09  22  grabbing something to eat.

10:09  23  Q.  So how long would the crew stay there every day on average?

10:09  24  A.  30 minutes or so.

10:09  25  Q.  Okay.  And this was a break where the crew's really

10:09  1  completely relieved from duty?

10:09  2  A.  Yeah.  We would just put ice in the cooler, beverage,

10:09  3  drinks.

10:09  4  Q.  Did you ever get your lunch there, get food to eat at

10:09  5  lunchtime?

10:09  6  A.  No.

10:09  7  Q.  Not there?

10:09  8  A.  Not there.

10:09  9  Q.  Okay.  So then you spend this half an hour or so at the

10:09 10  Brazilian bakery, and then where did you go as a crew member?

10:09 11  A.  Then we'd go to the job site.

10:09 12  Q.  Okay.  And did you ever take a lunch break?

10:09 13  A.  We would stop to eat.

10:09 14  Q.  And how -- every day or only some days?

10:10 15  A.  From what I recall most days.  You know, we're talking a

10:10 16  few years.  I don't remember exactly; but, you know, we would

10:10 17  stop to eat.

10:10 18  Q.  Would it be hard to do this job without taking a lunch

10:10 19  break and eating with the work that was involved?

10:10 20  A.  You need to stop.  Yeah.  It's hot.  It's hot.  You need to

10:10 21  stop, have a drink, you know.

10:10 22  Q.  How long on average do you recall spending eating lunch

10:10 23  when you were a crew member?

10:10 24  A.  You know, most often we would bring our lunch.  Maybe 30

10:10 25  minutes or so.

10:10  1   Q.  All right.  Are there some crews where it might have been

10:10  2   longer than 30 minutes or so where it could have been 45

10:10  3   minutes or an hour?

10:10  4   A.  Some crews meaning other than Mario's?

10:10  5   Q.  Yes.

10:10  6   A.  Absolutely.

10:10  7   Q.  Okay.  Now, was Mario's crew one of those 45 minutes or an

10:10  8   hour or was his crew half an hour?

10:10  9   A.  His crew was typically a half hour or so.

10:11  10  Q.  And then your recollection is you'd what?  You'd then work

10:11  11  the afternoon, and then you'd get back to the shop on an

10:11  12  average around 4:00?

10:11  13  A.  Approximately.

10:11  14  Q.  Now, did you -- if it was ever like really raining and

10:11  15  lightning hard, would you stop work -- and it was 2:00, 3:00 in

10:11  16  the afternoon, that type of thing, would you ever just stop

10:11  17  work and go back to the shop or did you literally work through

10:11  18  rain and lightening?

10:11  19  A.  No.  That's dangerous.  We worked with electrical

10:11  20  equipment, drills and extension cords, things of that nature.

10:11  21  So we would stop.

10:11  22  Q.  Did you ever see Steve Heidelberger?  Do you know who he

10:11  23  is?

10:11  24  A.  Sure.

10:11  25  Q.  Okay.  Did you ever see him at Safe Hurricane Shutters?

10:12  1   A.  Sure.  He would come by sometimes.

10:12  2   Q.  Approximately how many times during the time that you were

10:12  3   at Safe Hurricane Shutters did you ever just see Mr.

10:12  4   Heidelberger?

10:12  5   A.  If -- okay.  For the whole period I was there?

10:12  6   Q.  Yes.

10:12  7   A.  If he visited, came three or four times, I would say that's

10:12  8   maybe stretching it.

10:12  9   Q.  Okay.  So you saw --

10:12 10   A.  I would be safe with three times maybe.

10:12 11   Q.  And when Mr. Heidelberger might be in town, do you recall

10:12 12   at all how long he might be there?  Did you see him, for

10:12 13   instance, every day for a whole week?  Was it just a couple of

10:12 14   days?

10:12 15   A.  Typically it was two or three days because I know he would

10:12 16   go back to his house to tend to his things there as well.

10:12 17   Q.  Is there any aspect of the position that you performed as

10:12 18   installer that in any way Steve Heidelberger interjected his

10:13 19   authority over?

10:13 20   A.  No.

10:13 21   Q.  Could it possibly be said that Steve Heidelberger had

10:13 22   operational control day to day --

10:13 23   A.  No.

10:13 24   Q.  -- of Safe Hurricane Shutters?

10:13 25   A.  No.

10:13 1    Q.  With respect to Frank M$^c$Carroll, do you know Mr. M$^c$Carroll?

10:13 2    A.  Yes, I do.

10:13 3    Q.  Did you see Frank M$^c$Carroll at Safe Hurricane Shutters?

10:13 4    A.  Sure.  Yes.

10:13 5    Q.  Relatively how many times if you know, recall?

10:13 6    A.  I don't know.  A little more than Steve but less than half

10:13 7    maybe, less than half of the time I was there, maybe a quarter

10:13 8    of the time.

10:13 9    Q.  Okay.  So you might -- and then when you would see him

10:13 10   there, how did that work?  Is it something where he might be

10:13 11   there for a week at a time or a couple of days here and there

10:13 12   or two weeks even in a row?  Just what was that like how you

10:13 13   saw him?

10:13 14   A.  There was no specific pattern that I recall.  Again, this

10:14 15   was a while ago.  Maybe there was times for a couple of days,

10:14 16   maybe one week at a time.  I don't remember specific patterns.

10:14 17   Q.  Were there blocks of time where maybe you would not see Mr.

10:14 18   M$^c$Carroll for two or three weeks at a time?

10:14 19   A.  Absolutely.

10:14 20   Q.  When Mr. M$^c$Carroll was there, did he ever assert his

10:14 21   authority over you when you were an installer with respect to

10:14 22   anything an installer might do?

10:14 23   A.  No.

10:14 24   Q.  Did he have any -- assert his authority over how you were

10:14 25   to be paid as an installer?

10:14   1    A.   No.

10:14   2    Q.   Is that also true when you were warehouse manager?  Did he

10:14   3    involve himself in any issues with the warehouse?

10:14   4    A.   No.

10:14   5    Q.   Did he involve himself in any issues while you were

10:14   6    controller?

10:14   7    A.   No.

10:14   8    Q.   Did Frank M<sup>c</sup>Carroll have day-to-day operational control of

10:15   9    Safe Hurricane Shutters?

10:15   10   A.   Not to my knowledge, no.

10:15   11   Q.   Did he -- did he even -- the times that he was there as

10:15   12   you've described, could it be said that he had operational

10:15   13   control then from what you saw?

10:15   14   A.   No.

10:15   15   Q.   Who did have operational control?  Who was running this

10:15   16   company as you saw it day to day?

10:15   17   A.   Eddie Leiva.

10:15   18   Q.   When is it approximately that you stopped working for Safe

10:15   19   Hurricane Shutters?

10:15   20   A.   Maybe the first and second week of August of '07.

10:15   21   Q.   Okay.  Did there ever come a time -- well, first, as

10:15   22   controller, did you write the checks to people to pay them, the

10:15   23   employees at Safe Hurricane Shutters?

10:15   24   A.   Yes.

10:15   25   Q.   Did you pay Mr. Leiva?  I mean did you write his check?

43

10:16  1   A.   I don't recall writing a check for Mr. Leiva, but I know

10:16  2   that he was on the payroll if I remember correctly; but I don't

10:16  3   remember writing a check.

10:16  4   Q.   What was his salary?

10:16  5   A.   Maybe 500, in that range.  I don't remember exactly, but

10:16  6   the number that pops in my head is 500.

10:16  7   Q.   Why weren't you writing him a check?

10:16  8   A.   To -- well, there wasn't money.  He was more worried to pay

10:16  9   out the payroll and to the workers.

10:16 10   Q.   He wasn't taking a check in other words?

10:16 11   A.   No.

10:16 12   Q.   I mean did he tell you this or did Brad Bungo tell you this

10:16 13   when you took over for him that --

10:16 14   A.   I don't remember how I know.  I just know.  Somebody told

10:16 15   me.  It was probably either Brad or maybe Eddie had mentioned

10:16 16   to me at one point or another.

10:16 17   Q.   Was there a point in time when you yourself were not being

10:16 18   paid by the company or not -- or there was a delay in the

10:17 19   receipt of your checks?

10:17 20   A.   Yes.

10:17 21   Q.   Do you remember how many checks the company was behind in

10:17 22   paying you?

10:17 23   A.   It varied.  At some points we were hindering on four

10:17 24   checks.

10:17 25   Q.   Okay.  Now, this is the June/July period of time?

10:17  1   A.   Yes.

10:17  2   Q.   What eventually happened?  Did the company ever catch up?

10:17  3   A.   Well, after I parted ways with the company --

10:17  4   Q.   Yes.

10:17  5   A.   -- Eddie would call me every now and then, give me money, a

10:17  6   couple hundred dollars here and there, sometimes more than that

10:17  7   to square away with him.

10:17  8   Q.   So as you sit here today, Eddie Leiva paid you in full?  He

10:17  9   owes you nothing?

10:17  10  A.   Late; but, yes, he paid me in full.

10:17  11  Q.   And so even two, three months after you stopped working for

10:17  12  the company the man's paying you a little bit here and there to

10:18  13  make sure you got everything you were due?

10:18  14  A.   He paid me all the way -- I left in August.  I remember

10:18  15  receiving money from him even late in October, yeah.

10:18  16  Q.   Now, before you parted ways with the company and when the

10:18  17  company was delayed on your pay, did Mr. Leiva ever pay you in

10:18  18  cash?

10:18  19  A.   Yes, he did.

10:18  20  Q.   So some of your checks might have been a week or two late

10:18  21  or something and Mr. Leiva's paying a check or a couple of

10:18  22  checks at a time to try to make that up?

10:18  23  A.   That was more at the tail end.  While I was still employed

10:18  24  I wasn't paid cash.  Other people were.  I was paid cash after

10:18  25  the fact.

10:18   1   Q.  Let's talk about that.  Were the installers paid cash

10:18   2   certain weeks?

10:18   3   A.  Towards the end.

10:18   4   Q.  And did the company keep any records of those cash

10:18   5   payments?

10:18   6   A.  If I remember correctly, there were some written statements

10:19   7   that Eddie had them sign.

10:19   8   Q.  Well, let me ask you this:  Were you involved in any way in

10:19   9   the disbursement of these cash payments to the employees, in

10:19  10   particular installers I'd like focus on, during this period of

10:19  11   time in the company where there were some cash-flow problems,

10:19  12   July, early August of '07?

10:19  13   A.  I was present when Eddie would -- Eddie used to have me

10:19  14   present when he was handing them cash.

10:19  15   Q.  Okay.  And what do you recall?  How did that go down?

10:19  16   A.  We sat in the conference room with cash and paid people out

10:19  17   in cash, and Eddie had them sign -- I don't remember exactly

10:19  18   what it was -- just some piece of paper stating that the cash

10:19  19   was paid.

10:19  20   Q.  So he had some sort of prepared statement he was writing

10:19  21   that was dated?

10:19  22   A.  I'm not sure if it was printed or written but yeah.

10:20  23   Q.  Is it true that Saturday is about a half day?

10:20  24   A.  Yeah.

10:20  25   Q.  Are there some crews that don't work on Saturday?

10:20  1  A.  Some.

10:20  2  Q.  Were there some days when crews literally have to stop

10:20  3  working at 11:00 or 12:00 or 1:00 because of rain or lightning

10:20  4  or just done for the day and they come back to the shop and

10:20  5  they're through?

10:20  6  A.  Weekdays?

10:20  7  Q.  Yes.

10:20  8  A.  Yes.

10:21  9       MR. KLEPPIN:  No further questions, Your Honor, for

10:21 10  Mr. Lares.

10:21 11       THE COURT:  Mr. Leiva, you may cross-examine the

10:21 12  witness.

10:21 13                    CROSS-EXAMINATION

10:21 14  BY MR. LEIVA:

10:21 15  Q.  How are you doing?

10:21 16  A.  Hey, Eddie, how are you?

10:21 17  Q.  Do you think I was a fair person with everybody that I --

10:21 18  all the employees in the company?

10:21 19  A.  Fair?

10:21 20  Q.  Fair.  Fair with them.  I treated them fairly?

10:21 21  A.  In general, yes.

10:21 22       MR. LEIVA:  No more questions.

10:22 23       THE COURT:  Cross-examine.

10:22 24       MR. KELLY:  Thank you, Your Honor.

10:22 25                    CROSS-EXAMINATION

APRIL 15, 2011

**BY MR. KELLY:**

10:22   1

10:22   2   Q.   Good morning, Mr. Lares.

10:22   3   A.   Good morning.

10:22   4   Q.   My name's Dave Kelly. I represent the plaintiffs in this

10:22   5   case. I just -- I just wanted to ask you when you said -- I

10:22   6   think you said in general. I'm just curious what you meant.

10:22   7   Why did you qualify when he asked if he was fair?

10:22   8   A.   Eddie sometimes can be a tough leader, but he was fair in a

10:22   9   sense that he took care of people when he was able to.

10:22   10   Q.   Anything you can point out that you think was unfair with

10:22   11   respect to Eddie?

10:22   12   A.   Nothing that comes to mind, no.

10:22   13   Q.   Do you know Mr. Leiva on a personal basis?

10:22   14   A.   Yes.

10:22   15   Q.   How long have you known Mr. Leiva?

10:22   16   A.   Well, directly I became more acquainted with him when I

10:22   17   started working down here; but I'm friends of his -- a family

10:22   18   member of his.

10:22   19   Q.   Is that Freddie?

10:23   20   A.   Yes.

10:23   21   Q.   And who is Freddie?

10:23   22   A.   He's a friend of mine.

10:23   23   Q.   Is he related to Mr. Leiva?

10:23   24   A.   That's his nephew.

10:23   25   Q.   Did you grow up with --

10:23   1   A.   Yes, I did.

10:23   2   Q.   -- his nephew?  So you're a management -- you were a

10:23   3   management employee of Safe Hurricane Shutters, correct?

10:23   4   A.   Correct.

10:23   5   Q.   And you just vaguely remember Mr. Milan, correct?

10:23   6   A.   Correct.

10:23   7   Q.   You have no idea what his schedule was, do you?

10:23   8   A.   No.  I remember he was an installer towards the end.  I

10:23   9   just --

10:23   10   Q.   Now, when you first started out, you said you got a salary,

10:23   11   correct?

10:23   12   A.   Correct.

10:23   13   Q.   You thought that was regardless of how many hours you

10:23   14   worked, right?

10:23   15   A.   I didn't think of it in any terms other than that's what I

10:24   16   was being paid for the job that I was asked to do.

10:24   17   Q.   And at that point, though, when you started, though, you

10:24   18   were a manager when you first started, right?

10:24   19   A.   That's not correct.

10:24   20   Q.   Okay.  What was your title when you first started?

10:24   21   A.   I wasn't given a specific title, but I first started

10:24   22   helping in the shop.

10:24   23   Q.   Did you tell Mr. Kleppin, though -- did you use the

10:24   24   language you were paid that $700 to manage the shop?  Is that

10:24   25   what I heard?

10:24  1   A.   When I became a manager, I was being paid to manage the

10:24  2   shop.

10:24  3   Q.   When did that -- when did you become a manager?

10:24  4   A.   Sometime early '07.

10:24  5   Q.   When the -- is it -- would it be accurate to say that you

10:24  6   worked, if you tally it all up, that you worked in 2006 with

10:24  7   Mr. Feliciano for about a total of two to three weeks?

10:24  8   A.   Maybe more; but that would be fair to say, yes.

10:24  9   Q.   So it's fair to say you only worked two to three weeks.

10:25 10   When the work -- when the installers would come back to the

10:25 11   shop, you said they would -- would they unload scrap metal?  Is

10:25 12   that one of the things they would do?

10:25 13   A.   Occasionally, depending on the job, there was some scrap

10:25 14   metal.  Sometimes the installers would help.  More often than

10:25 15   not the shop workers were unloading those trucks.

10:25 16   Q.   Would they unload ladders?

10:25 17   A.   No.  Ladders would stay strapped to the truck.

10:25 18   Q.   At the least would you say that the installers would at

10:25 19   least be at the shop for half an hour at the least after they

10:25 20   returned?

10:25 21   A.   I would say the typical thing to do would be park the truck

10:25 22   and go home.

10:25 23   Q.   And when you did installing duties, were you primarily an

10:25 24   installer at that time?  Was that your primary job?

10:26 25   A.   Correct.

10:26   1   Q.   And how about -- how many months total were you at the

10:26   2   company?

10:26   3   A.   Okay.  I came from New York in '06, August.  A year.  About

10:26   4   12 to 13 months, somewhere in that time frame.

10:26   5   Q.   And out of those months how many months were you in a

10:26   6   management position?

10:26   7   A.   Six or seven.

10:26   8   Q.   I heard you before mention 8:30.  Did you ever see Mr.

10:26   9   Feliciano -- or let me ask you this:  Did he regularly, Mr.

10:26  10   Feliciano, arrive at 8:30?

10:26  11   A.   Arrive?

10:26  12   Q.   Yes.  At the lounge --

10:26  13   A.   No.

10:26  14   Q.   -- at 8:30?

10:26  15   A.   Mario was usually one of first installers there; but

10:26  16   between 8:00 and 8:30, yeah.  I came in typically about 10

10:26  17   after 8:00, and --

10:26  18   Q.   And was he -- okay.

10:26  19   A.   -- and Mario was either there or there shortly thereafter.

10:27  20   Q.   And so he was -- was he -- is it fair to say that Mario was

10:27  21   normally there before you arrived?

10:27  22   A.   About the same time.  And we would usually congregate in

10:27  23   front of the shop before -- in front of the building.

10:27  24   Q.   Are you saying normally that you both would arrive -- you

10:27  25   would see each other both coming in at the same time?

10:27  1    A.   Yes.

10:27  2    Q.   And was there any rule in the company at all, written or

10:27  3    otherwise, that there was an expectation that the installers

10:27  4    would show up about 7:30?

10:27  5    A.   Not that I'm aware of.

10:27  6    Q.   When you went -- during the short period of time that you

10:27  7    worked for Mr. Feliciano did you ever observe any of them

10:27  8    working, taking a short break, getting a bite, and then

10:27  9    continuing to work?

10:27 10    A.   We worked in 90-plus degree weather.  You had to take

10:28 11    breaks.

10:28 12    Q.   You'd spoke about Mr. Heidelberger previously, correct?

10:28 13    A.   Yes.

10:28 14    Q.   I just want to get the extent of your knowledge.  Do you

10:28 15    know a person named Mr. Sullivan?

10:28 16    A.   Tom Sullivan?

10:28 17    Q.   Yeah.

10:28 18    A.   I don't know him personally.  I know who he is.

10:28 19    Q.   Do you have any idea whether Mr. Sullivan had operational

10:28 20    control over the manufacturing department?

10:28 21    A.   He managed the warehouse.  That's the extent of my

10:28 22    knowledge of what his position was.

10:28 23    Q.   Okay.  Do you have any idea whether Mr. Steve Heidelberger

10:28 24    along with Mr. M$^c$Carroll ever escorted him out the door?

10:28 25    A.   I wasn't present when he left the building.  I don't know

10:28 1    how he left the building.

10:28 2    Q.  Do you know whether Mr. Heidelberger ever fired anybody?

10:29 3    A.  Not that I'm aware of.

10:29 4    Q.  Do you have any idea whether Mr. Heidelberger ever paid the

10:29 5    employees' wages with his personal credit card?

10:29 6    A.  Not that I'm aware of.

10:29 7    Q.  Do you have any personal knowledge as to whether or not Mr.

10:29 8    Heidelberger ever made suggestions to anybody about the need to

10:29 9    increase square footage which would necessarily require

10:29 10   increasing labor?

10:29 11   A.  I wasn't a part of any conversation.

10:29 12   Q.  Did you -- are you aware of Mr. Heidelberger ever meeting

10:29 13   personally with any of the installers to provide them

10:29 14   assurances that if they continued to work, they'd eventually

10:29 15   get paid?

10:29 16   A.  He may have.  I wasn't present for any conversation like

10:29 17   that.

10:29 18   Q.  You didn't deal with Mr. Heidelberger very much, did you?

10:29 19   A.  Workwise?  No.

10:29 20   Q.  Personally?

10:29 21   A.  Personally, yes.

10:29 22   Q.  You're a friend of Mr. Heidelberger's?

10:30 23   A.  I used to work for him previously.

10:30 24   Q.  Where did you work with Mr. Heidelberger?

10:30 25   A.  In New York.

10:30   1    Q.  What company was that?

10:30   2    A.  It was Dime-a-call, a collection agency.

10:30   3    Q.  Did Mr. Heidelberger -- did he -- up in New York prior --

10:30   4    that was prior to this company, right, prior to Safe Hurricane?

10:30   5    A.  Yes.

10:30   6    Q.  Up there did Mr. Heidelberger pay the workers time and a

10:30   7    half if they worked more than 40 hours in one week?

10:30   8    A.  We're talking years ago.  I would assume the answer would

10:30   9    be yes.

10:30  10    Q.  How about Mr. M$^c$Carroll?  Was he involved in that company?

10:30  11    A.  I don't know his involvement with that company.

10:30  12    Q.  Was Mr. Leiva, Edward Leiva involved in that company?

10:30  13    A.  I don't know his involvement with that company either.

10:30  14    Q.  With respect to this company, Safe Hurricane where you

10:30  15    were, primarily you were -- for most of the time you were a

10:30  16    management employee, right, at Safe Hurricane?

10:30  17    A.  Yes.

10:30  18    Q.  Okay.

10:30  19    A.  About half the time.

10:30  20    Q.  Could you tell me -- so with respect to Mr. M$^c$Carroll, was

10:31  21    he ever a vice president --

10:31  22          MR. KLEPPIN:  Objection, Your Honor.

10:31  23    BY MR. KELLY:

10:31  24    Q.  -- of the company?

10:31  25          MR. KLEPPIN:  Outside the course and scope of the

10:31  1  direct examination.

10:31  2          MR. KELLY:  It goes to --

10:31  3          THE COURT:  Overruled.

10:31  4  BY MR. KELLY:

10:31  5  Q.  Was he ever a vice president in the company?

10:31  6  A.  I'm not aware of what his position was in the company.

10:31  7  Q.  Did he ever hold himself out as a vice president to the

10:31  8  public?

10:31  9  A.  I don't -- again, I don't know what his position was.  He

10:31 10  never told me a position.  I never saw a business card.

10:31 11  Q.  You never saw one of his business cards, ever?

10:31 12  A.  (Shakes head negatively).

10:31 13  Q.  No.  Okay.  Could you say no for the record.  They're

10:31 14  taking it down.

10:31 15  A.  No.

10:31 16  Q.  Okay.  With respect to the installers, did Safe Hurricane

10:31 17  have a policy of keeping track of their time, punch cards, the

10:31 18  installers?

10:31 19  A.  For the installers, no.

10:31 20  Q.  Okay.  Do you have any idea why that they didn't do that?

10:32 21  A.  I wasn't part of any agreement, labor or work agreement

10:32 22  between the installers and Eddie, so I don't know.

10:32 23  Q.  You never heard anything why they weren't keeping track of

10:32 24  the time?

10:32 25  A.  No.

10:32  1   Q.  Do you have any idea whether the installers with respect to

10:32  2   the work that they did and the pay they received, whether or

10:32  3   not Safe Hurricane or anybody there provided them W-2s so that

10:32  4   they could claim their wages on their taxes?

10:32  5   A.  Not that I'm aware.

10:32  6         MR. KLEPPIN:  Objection; outside the scope of direct

10:32  7   examination.

10:32  8         THE COURT:  Overruled.

10:32  9   BY MR. KELLY:

10:32  10  Q.  So they didn't provide W-2s?

10:32  11  A.  Not that I'm aware.  Again, I wasn't a part of any of the

10:32  12  hiring or --

10:32  13  Q.  Did you get W-2s?

10:32  14  A.  No.

10:32  15  Q.  They didn't withhold your taxes for you, did they?

10:32  16  A.  No.

10:32  17        MR. KELLY:  I don't have anything further at this

10:32  18  time.  Thank you.

10:32  19        MR. KLEPPIN:  May I just have one question on

10:33  20  redirect, Your Honor?

10:33  21        THE COURT:  You may have that one.

10:33  22        MR. KLEPPIN:  Thank you.

10:33  23                    REDIRECT EXAMINATION

10:33  24  BY MR. KLEPPIN:

10:33  25  Q.  At the end of the year the company gave you a 1099 or some

10:33   1   sort of form showing the income that you received while you

10:33   2   worked there, correct?

10:33   3   A.   I received a 1099.

10:33   4   Q.   Okay.  So it's not as if you didn't have a tax document

10:33   5   that would then require you to report that income on your

10:33   6   return, correct?

10:33   7   A.   Correct.

10:33   8   Q.   I mean you did report your income to the Federal Government

10:33   9   based on the 1099, didn't you, personally?

10:33  10   A.   Yes, I did.

10:33  11        THE COURT:  Mr. Lares, we thank you.

10:33  12        Who's your next witness?

10:33  13        MR. KLEPPIN:  Brad Bungo, Your Honor?

10:33  14        THE COURT:  Fred?  Spell that.

10:33  15        MR. KLEPPIN:  B-u-n-g-o.

10:34  16        THE COURT:  Please raise your hand and be sworn.

10:34  17   **<u>BRAD VINCENT BUNGO, DEFENDANTS' WITNESS, SWORN.</u>**

10:34  18        THE COURT:  Have a seat and tell us your full name.

10:34  19        MR. BUNGO:  Brad Vincent Bungo.

10:34  20        THE COURT:  Spell your last name, please.

10:34  21        MR. BUNGO:  B-u-n-g-o.

10:34  22                   **DIRECT EXAMINATION**

10:34  23   BY MR. KLEPPIN:

10:34  24   Q.   Mr. Bungo, did you ever work at Safe Hurricane Shutters?

10:34  25   A.   I did.

10:34   1   Q.   And when did you start to work there?

10:34   2   A.   It was February -- on or about February, 2006.

10:34   3   Q.   And what position were you hired for?

10:34   4   A.   My official entitlement was vice president of IT,

10:34   5   information technology.

10:35   6   Q.   And did you have that position the whole time you were with

10:35   7   the company?

10:35   8   A.   Yes.

10:35   9   Q.   I want to show you a document that's been admitted into

10:35   10   evidence as Plaintiffs' Exhibit Number 23.  Have you had time

10:35   11   to review Plaintiffs' Exhibit 23, Mr. Bungo?

10:35   12   A.   Yes, yes.

10:35   13   Q.   And this is a letter dated August 25th, 2006, to whom it may

10:35   14   concern concerning Mario Feliciano's work at Safe Hurricane

10:35   15   Shutters doing business as Advanced Hurricane Protection?

10:35   16   A.   Uh-huh (affirmative).  That's correct.

10:35   17   Q.   Is this your signature on the letter?

10:35   18   A.   Yes.

10:35   19   Q.   Do you remember drafting this?

10:35   20   A.   No, I don't recall.

10:35   21   Q.   You suspect you did --

10:35   22   A.   I did.

10:35   23   Q.   -- given it's on the letterhead --

10:35   24   A.   It is my signature.

10:35   25   Q.   -- and it has your signature?

10:35  1    A.   Yes.

10:35  2    Q.   Now, I note that you refer to Mr. Feliciano's salary as

10:36  3    $800 a week?

10:36  4    A.   That's correct.

10:36  5    Q.   And were the installers including Mr. Feliciano -- is that

10:36  6    how they were compensated, a certain amount of salary like $800

10:36  7    like we're seeing here for this particular individual per week?

10:36  8    A.   That's correct.

10:36  9    Q.   That's regardless of how many hours they worked?

10:36 10    A.   As far as my understanding, yes.

10:36 11    Q.   So if they worked 30, 32, 35, 40, whatever --

10:36 12    A.   Correct.

10:36 13    Q.   -- this is the salary they'd receive?

10:36 14    A.   Correct.

10:36 15    Q.   So this then -- this couldn't be the salary that they

10:36 16    received only up for the first 40 hours, and hours after that

10:36 17    went totally uncompensated?

10:36 18    A.   From my understanding, no.

10:36 19    Q.   Okay.

10:36 20    A.   This is what they were paid.

10:36 21    Q.   Were there times when rain, lightening, other weather

10:36 22    events might necessitate that a crew stop working and come back

10:36 23    to the shop and quit for the day?

10:36 24    A.   Yes.

10:36 25    Q.   Did you ever actually physically see that happen while you

10:37  1   were there?

10:37  2   A.   Yes.

10:37  3   Q.   What were your dates of employment with the company

10:37  4   approximately?

10:37  5   A.   February 2006 to July 2007.

10:37  6   Q.   Okay.  You worked there during that whole time?

10:37  7   A.   Yes.

10:37  8   Q.   And what time in the afternoon generally did these crews

10:37  9   return back to the shop; do you recall?

10:37 10   A.   Generally they were back by 5:00.  On days when there was

10:37 11   weather, it could vary.  I mean they could be back at 2:00,

10:37 12   2:30, 3:00.  It depended on the weather.

10:37 13   Q.   Try to give me an average taking into account that there's

10:37 14   some days weather necessitates stopping during the middle of

10:37 15   the day and other days where they might have come in as late as

10:37 16   5:00 or so.  On average when would you say these crews returned

10:37 17   from your personal recollection?

10:38 18   A.   Probably anywhere between 3:00 and 5:00 on average.

10:38 19   Q.   When did the crewmen start to work in the morning?  Did

10:38 20   they start to come in around 8:30 or so?

10:38 21   A.   Usually they were there -- I would arrive at the office by

10:38 22   7:45/8:00 o'clock; and there would be some of them there, not

10:38 23   all of them.  It would vary by day.

10:38 24   Q.   Typically when were the trucks leaving the job site; do you

10:38 25   recall?

10:38   1    A.   Leaving to go to the job site?

10:38   2    Q.   Yes.

10:38   3    A.   Anywhere from 9:00 to 11:00, 11:30.

10:38   4    Q.   Okay.  And were there crew people still coming in at 8:30,

10:38   5    even as late as 9:00 o'clock?

10:38   6    A.   Not that I recall.

10:38   7    Q.   Okay.  So you recall the -- most of the crewmen being there

10:38   8    by 8:30?

10:38   9    A.   8:00, 8:30.  Yes.

10:38   10   Q.   Okay.  From the hours that you've described, 8:00 to 8:30

10:39   11   to approximately 4:00 o'clock, if the crew people worked half a

10:39   12   day maybe on Saturday, took an hour's worth of breaks during

10:39   13   the day, were these installers working about 35 to 40 hours a

10:39   14   week?

10:39   15   A.   That's correct.

10:39   16          MR. KLEPPIN:  No further questions, Your Honor.

10:39   17          THE COURT:  Mr. Leiva, you may inquire.

10:40   18          MR. LEIVA:  Hi.

10:40   19          MR. BUNGO:  Hi.

10:40   20          MR. KLEPPIN:  Eddie, Eddie.

10:40   21          MR. LEIVA:  No questions for the witness.

10:40   22          THE COURT:  Mr. Kelly, you may cross-examine.

10:40   23          MR. KELLY:  Thank you.

10:40   24                      CROSS-EXAMINATION

10:40   25   BY MR. KELLY:

10:40  1   Q.  Good morning, Mr. Bungo.

10:40  2   A.  Good morning.

10:40  3   Q.  Are you related to Mr. Leiva?

10:40  4   A.  I was married to his daughter, but I am since divorced from

10:40  5   his daughter.

10:40  6   Q.  How long have you known Mr. Leiva?

10:40  7   A.  I have known him since 2001.

10:40  8   Q.  Let me ask with respect to your days of employment, did

10:40  9   Keith Lares who just testified, did he take over your job at

10:40  10  some point?

10:40  11  A.  Yes.  I guess that was who was left over to take over my

10:40  12  position.

10:40  13  Q.  Are you sure you left --  are you sure you worked until

10:41  14  July or was it a prior month?

10:41  15  A.  No.  It was -- July 6 I believe was my last day.

10:41  16  Q.  When you talked -- before you referenced the letter that

10:41  17  you wrote, the exhibit concerning the salary.  So your

10:41  18  testimony is that it was for -- that was a flat salary to be

10:41  19  received and no more, correct?

10:41  20  A.  Correct.

10:41  21  Q.  So based on -- before -- I'm not going to go back into your

10:41  22  hours again, though; but did he ever work more than 40 hours in

10:41  23  a week?

10:41  24  A.  Who?

10:41  25  Q.  Mr. Feliciano?

10:41  1    A.  I don't recall.  Like I said, I was in the office all day.

10:41  2    Q.  Okay.

10:41  3    A.  I don't -- I was not in charge of the installers.  I did

10:41  4    not -- they did not file timecards with me.  I just -- my

10:41  5    general observations of all of the installers when they left

10:41  6    and when they came back.

10:41  7    Q.  And was there any reason why they didn't do -- the

10:42  8    installers didn't have timecards?

10:42  9    A.  The installers did not work for me.  They worked for Mr.

10:42 10    Leiva.  I did not have any type of dealings with the

10:42 11    installers.

10:42 12    Q.  You were an employee of Safe Hurricane Shutters; is that

10:42 13    correct?

10:42 14    A.  That's correct.

10:42 15    Q.  You don't know Mr. Milan, do you, the other plaintiff?

10:42 16    A.  No, I don't.

10:42 17    Q.  So if an installer worked over 40 hours, he certainly

10:42 18    wasn't paid time and a half for those hours over 40, was he?

10:42 19    A.  That's correct.

10:42 20    Q.  Were you -- were you the one that -- who told you to pay

10:42 21    the installers a salary?

10:42 22    A.  Mr. Leiva.

10:42 23    Q.  Now, when you did that, did you in any way analyze any

10:42 24    issues concerning the employees, some of them maybe being

10:42 25    called exempt employees or some of them being called nonexempt

10:42  1   employees?  Did it ever factor into any --

10:43  2   A.   No.

10:43  3   Q.   Okay.  Do you know whether the installers were given W-2

10:43  4   forms as employees?

10:43  5   A.   I only recall a few of them getting W-2s.

10:43  6   Q.   Whether or not they might have had a Social Security --

10:43  7             MR. KLEPPIN:  Objection; outside the scope of direct

10:43  8   examination.

10:43  9             THE COURT:  Overruled.

10:43 10   BY MR. KELLY:

10:43 11   Q.   Whether or not an installer was given a W-2 would that at

10:43 12   all be influenced by whether or not that installer had a Social

10:43 13   Security number?

10:43 14   A.   I don't understand the question.

10:43 15   Q.   Okay.  Why were some of them given W-2s and some of them

10:43 16   not given W-2s?

10:43 17   A.   Some of them were on the payroll, and some of them were

10:43 18   not.  They were given checks directly.

10:43 19   Q.   Why were some on the payroll and some not on the payroll?

10:43 20   A.   I don't know.  I was instructed by Mr. Leiva to give

10:44 21   certain individuals checks and other individuals to go on the

10:44 22   payroll.

10:44 23             MR. KELLY:  Thank you very much, Mr. Bungo.

10:44 24             MR. KLEPPIN:  Just a couple of questions, Your Honor.

10:44 25             THE COURT:  You may.

10:44  1            **REDIRECT EXAMINATION**

10:44  2     BY MR. KLEPPIN:

10:44  3     Q.   Do you know, Mr. Bungo, if -- do you have a specific

10:44  4     recollection whether these installers received a 1099 or a W-2?

10:44  5     A.   Specific individuals?  I know of one or two installers that

10:44  6     received a W-2.  That was it.

10:44  7     Q.   Okay.  What about the 1099?

10:44  8     A.   No 1099s.

10:44  9     Q.   You don't remember 1099s being issued to these individuals?

10:44 10     A.   No.

10:44 11     Q.   Okay.  If someone works for a company and they earn $40,000

10:45 12     a year and the company doesn't issue them a W-2 or a 1099 for

10:45 13     it, that individual still has to report that on their tax

10:45 14     return, don't they?

10:45 15     A.   I don't know tax law.  I would assume, yes.

10:45 16     Q.   What would you do?  Would you --

10:45 17     A.   Yes.

10:45 18     Q.   -- evade taxes on that --

10:45 19     A.   No, I would not.

10:45 20     Q.   -- or would you disclose it that you earned that money?

10:45 21     A.   I would disclose that I earned that money.

10:45 22     Q.   With respect to the individuals who did get W-2s or 1099s,

10:45 23     do you know whether or not Mario Feliciano received one?

10:45 24     A.   I don't.

10:45 25     Q.   You have no idea of the names or how that worked?

JURY TRIAL - VOLUME V OF V

10:45  1    A.  No.

10:45  2           MR. KLEPPIN:  No further questions, Your Honor.

10:45  3           THE COURT:  Mr. Bungo, we thank you, sir.  You may

10:45  4    come down.  We'll take our morning recess, and we'll be in

10:45  5    recess for 15 minutes.  Take the jury out, Mr. Marshal.

10:45  6           THE MARSHAL:  All rise for the jury.

10:45  7       **(Jury Out)**

10:45  8           THE COURT:  Who's your next witness, Mr. Kleppin?

10:45  9           MR. KLEPPIN:  I'm going to re-call Mario Feliciano to

10:46  10   the stand for just a question or two.

10:46  11          THE COURT:  All right.  Very good.

11:06  12      **(Recess)**

11:06  13          THE LAW CLERK:  All rise.

11:06  14          THE COURT:  Okay.  Mr. Feliciano, take the stand

11:06  15   again, please.

11:06  16          Bring in the jury, Mr. Marshal.  Just remain standing

11:06  17   there if you would until the jury comes in.  Mario Feliciano.

11:06  18      **(Jury In)**

11:06  19          THE COURT:  Members of the Jury, be seated.

11:06  20          Mr. Feliciano, you may have a seat, sir.  You have

11:06  21   been previously sworn in this case, and you are reminded that

11:06  22   you are still under oath.

11:07  23          And you may inquire, Mr. Kleppin.

11:07  24          MR. KLEPPIN:  Thank you, Your Honor.

11:07  25          <u>**MARIO FELICIANO, PLAINTIFF, PREVIOUSLY SWORN.**</u>

APRIL 15, 2011

11:07 1          **CROSS-EXAMINATION (Continued from 4-14-11)**

11:07 2    BY MR. KLEPPIN:

11:07 3    Q.  Just a couple questions.  With respect to when you stopped

11:07 4    working for Safe Hurricane Shutters, it was really late August,

11:07 5    close to September of '07?

11:07 6    A.  Like I said --

11:07 7    Q.  Isn't that true?

11:07 8    A.  Like I said, it was around the second week of September of

11:07 9    2007.

11:07 10   Q.  And you left because the company hadn't paid you?  It's

11:07 11   only two weeks that they were behind; isn't that true?

11:07 12   A.  They were behind four weeks when I left.

11:07 13   Q.  Okay.

11:07 14          MR. KLEPPIN:  May I approach, Your Honor?

11:07 15          THE COURT:  Yes, sir.

11:07 16   BY MR. KLEPPIN:

11:07 17   Q.  I'm showing you page 45 of your deposition, Mr. Feliciano.

11:07 18   You remember where you gave this where you were sworn to tell

11:08 19   the truth.  Do you recall?

11:08 20   A.  Yes, sir.

11:08 21   Q.  An on line 11 you were asked, How did your employment with

11:08 22   Advanced end?  Did you quit?  Were you fired?  How did your

11:08 23   employment -- how did you stop work for Advanced?  Answer, I

11:08 24   stopped working for Advanced close to September, I think it

11:08 25   was, of '07.  Actually I left the company because they owed me

11:08  1  three weeks -- two weeks' pay.  They didn't want to pay me.

11:08  2       That's what you said in your deposition, isn't it,

11:08  3  sir?

11:08  4  A.  Yes, I did.

11:08  5       MR. KLEPPIN:  No further questions.

11:08  6       THE COURT:  Okay.  Mr. Leiva?

11:08  7       MR. LEIVA:  I have no more questions for Mr.

11:08  8  Feliciano.

11:08  9       THE COURT:  Mr. Kelly?

11:08  10      MR. KELLY:  I don't have any questions, Your Honor.

11:08  11      THE COURT:  All right.  Thank you, Mr. Feliciano.  You

11:08  12  may step down.  Could we have your next witness, please.

11:08  13      MR. KLEPPIN:  Mr. Ed Leiva.

11:08  14      THE COURT:  Please raise your right hand and be sworn.

11:09  15           **EDWARD LEIVA, DEFENDANT, SWORN.**

11:09  16      THE COURT:  Please have a seat, sir, and tell us your

11:09  17  full name.

11:09  18      MR. LEIVA:  Edward Aloleo (ph) Leiva.  Edward Leiva.

11:09  19  Aloleo (ph) is a middle name that I don't use too often because

11:09  20  people cannot really pronounce it, so --

11:09  21      THE COURT:  Spell your last name, please.

11:09  22      MR. LEIVA:  Leiva, L-e-i-v as in victor-a, Leiva.

11:09  23      THE COURT:  All right.  You may inquire.

11:09  24              **DIRECT EXAMINATION**

11:09  25  BY MR. KLEPPIN:

| | | |
|---|---|---|
| 11:09 | 1 | Q.  Good morning. |
| 11:09 | 2 | A.  Good morning. |
| 11:09 | 3 | Q.  With respect to W-2s and 1099s to -- not just to installers |
| 11:09 | 4 | -- to every employee at Safe Hurricane Shutters, were those |
| 11:09 | 5 | documents created for 2006? |
| 11:09 | 6 | A.  Yes. |
| 11:09 | 7 | Q.  Were they created in 2007? |
| 11:09 | 8 | A.  Yes. |
| 11:09 | 9 | Q.  Who created them? |
| 11:09 | 10 | A.  The accounting firm.  AJ Accounting Services. |
| 11:10 | 11 | Q.  How do you know that? |
| 11:10 | 12 | A.  Because I was in charge of that, sir. |
| 11:10 | 13 | Q.  Did Brad Bungo have anything to do with the issuance or |
| 11:10 | 14 | creation of W-2s -- |
| 11:10 | 15 | A.  No. |
| 11:10 | 16 | Q.  -- and 1099s? |
| 11:10 | 17 | A.  No. |
| 11:10 | 18 | Q.  Were the W-2s and 1099s for the people who worked at Safe |
| 11:10 | 19 | Hurricane Shutters including the installers, were they provided |
| 11:10 | 20 | to the employees?  I guess for the year of '06, it would have |
| 11:10 | 21 | been early '07? |
| 11:10 | 22 | A.  Correct. |
| 11:10 | 23 | Q.  How were they provided? |
| 11:10 | 24 | A.  I personally gave them 1099s in 2007, in January, a little |
| 11:10 | 25 | bit in January.  It might have been like January 20, 2007.  We |

11:10  1    took -- in 2008 we mailed to the different people.  I mailed

11:10  2    them all.

11:10  3    Q.  Let me just try to understand this.  In January of 2007 for

11:10  4    the work year two thousand -- and tax year 2006, you gave the

11:11  5    W-2s and 1099s to the employees by hand?

11:11  6    A.  Correct.

11:11  7    Q.  Okay.  And in January two thousand -- in January 2008 for

11:11  8    tax year and work year 2007, you mailed the W-2s and 1099s to

11:11  9    the respective people?

11:11 10    A.  Correct.  Because the company closed the first week of

11:12 11    September.

11:12 12    Q.  With respect to the Lamonicas were they paid hourly?

11:12 13    A.  Yes.

11:12 14    Q.  Did they punch a time clock?

11:12 15    A.  Yes.

11:12 16    Q.  If their hours went over 40, were they paid overtime?

11:12 17    A.  Yes.

11:12 18    Q.  Do you, in fact, have their time and pay records?

11:12 19    A.  Correct.

11:12 20    Q.  Do they largely show that they arrived between 7:30 and

11:12 21    8:30 most days, the Lamonicas?

11:12 22    A.  Yes.  It's on the timecard.

11:12 23    Q.  With respect to this testimony that we've heard during this

11:12 24    trial concerning the hours that we've heard the installers

11:12 25    worked, did you set a schedule to where their work time

11:12   1    wouldn't exceed 40 hours?

11:13   2    A.   Excuse me.  If I set the schedule?

11:13   3    Q.   Yes.  This roughly 8:30 to roughly 4:00 o'clock with an

11:13   4    hour for lunch and a half day on Saturday.

11:13   5    A.   It was an honor system meaning that I gave them an

11:13   6    assignment, a job.  And I never said time, lunchtime, breaks,

11:13   7    when did you finish.  I never did.

11:13   8    Q.   But was --

11:13   9    A.   Never.

11:13   10   Q.   But was --

11:13   11   A.   Not once.

11:13   12   Q.   But was the schedule designed so these installers wouldn't

11:13   13   exceed 40 hours in a week?

11:13   14   A.   Well, in a sense, yes.  But, like I said to you, it was an

11:13   15   honor system; and I trust them.  I trust them very much.

11:13   16   Q.   With respect to what happened to the company there at the

11:13   17   end, were Mario Feliciano and Mr. Milan paid all the money for

11:14   18   the hours that they worked?

11:14   19   A.   Yes.

11:14   20   Q.   And how did you pay that to them?

11:14   21   A.   Cash.

11:14   22   Q.   Were you a little late perhaps in the payments?

11:14   23   A.   Of course.  Absolutely.

11:14   24   Q.   But like Mr. Lares they were paid?

11:14   25   A.   Well, Mr. Feliciano was there almost every day sitting in a

11:14  1    chair and asking for his money.

11:14  2  Q.   Did you pay him out of company funds or your own money?

11:14  3  A.   My own money.

11:14  4  Q.   At the end?

11:14  5  A.   Whatever I had left.  I didn't have much money left back

11:14  6    then, but I made my best to pay.  I've probably given cash

11:14  7    between 43 and $73,000 of my own money, and that's all --

11:14  8    probably have a few thousand left.  And I had an attorney that

11:14  9    took the rest.  He took me to the cleaners for whatever little

11:15  10   left.  I had nothing left but a $10 watch I believe that I

11:15  11   offered to them and a jacket.

11:15  12  Q.   The question though was with respect to the installers.

11:15  13   Some of that cash was out of your own pocket?

11:15  14  A.   Of course.

11:15  15  Q.   Was it also with Mr. Lares?

11:15  16  A.   Everyone.  Everyone.

11:15  17  Q.   Did the company ever have barbecues?

11:15  18  A.   Yes; many.

11:15  19  Q.   Could you explain how the barbecues worked.

11:15  20  A.   Well, we had barbecues on Saturdays.

11:15  21  Q.   What time?

11:15  22  A.   We started around 3:00.

11:15  23  Q.   Who put them on?

11:15  24  A.   A few of us.  Me included.  I was very close with a lot of

11:15  25   the --

11:15  1   Q.  Who funded them?

11:15  2   A.  I did, but they were my friends.  I mean I knew them for a

11:15  3   long time.  They worked for me in New York.  I mean Mr.

11:15  4   Feliciano was not a friend of mine.  Neither was Mr. Milan.

11:16  5   But the rest -- I would say 90 percent of the installers were

11:16  6   friends of mine, even relatives of mine.

11:16  7   Q.  You heard the testimony.  I just want to briefly try to go

11:16  8   through some of the work sites that Mario Feliciano worked at.

11:16  9   A.  Of course.

11:16  10  Q.  Initially I think -- well, I'll let you say it.  What was

11:16  11  this main condominium that he worked at initially I guess after

11:16  12  he was trained?

11:16  13  A.  Points of America.

11:16  14  Q.  Okay.  And roughly how long did he work there?

11:16  15  A.  November through March.

11:16  16  Q.  November of '06 through March of '07?

11:16  17  A.  Yes.  It was his favorite job.  He requested from me every

11:16  18  time that that's what he wanted to do, and he was good at it.

11:16  19  Q.  Where did he work after that?

11:16  20  A.  After that he worked -- we did some private home in April,

11:16  21  and then we started with the Marine Tower in April.

11:16  22  Q.  How long did Marine Tower take?

11:17  23  A.  Unfortunately April/May.

11:17  24  Q.  Approximately.

11:17  25  A.  Until June 2007, beginning of June.

11:17  1   Q.   So he was at Marine Tower two to three months maybe?

11:17  2   A.   Yes.

11:17  3   Q.   Does Marine Tower allow work on Saturdays?

11:17  4   A.   No.

11:17  5   Q.   Did Mr. Feliciano then work those Saturdays when he was at

11:17  6   Marine Tower or was he off those Saturdays?

11:17  7   A.   He was off quite a lot on Saturdays.  A lot of people were

11:17  8   off on Saturdays.

11:17  9   Q.   In other words, not just Mr. Feliciano's crew?

11:17  10  A.   All of them.  And they only work half a day on Saturday.

11:17  11  When they had to work on Saturday, they were half a day only.

11:17  12  The reason I know that is because I closed the warehouse.

11:17  13  Q.   It goes beyond my question.

11:17  14  A.   Okay.  I'm just trying to explain so you understand it that

11:17  15  I closed the building.  I closed that building.

11:17  16  Q.   At the end of the workday?

11:17  17  A.   Always.  Always.

11:18  18  Q.   With respect to Points of America, that particular

11:18  19  condominium --

11:18  20  A.   Yes.

11:18  21  Q.   -- there were limited work hours that the workers could be

11:18  22  on the location?

11:18  23  A.   Of course.  There's two ways to know that, is the

11:18  24  condominium rules.  It's in my contract with the Points of

11:18  25  America.  It's specifically written in a contract that I have

APRIL 15, 2011

11:18  1   with Points of America which is a surprise that it wasn't

11:18  2   subpoenaed as evidence by anyone.  And the third reason is

11:18  3   because, of course, as you know, these are elderly people.  I

11:18  4   mean they can -- you know what I mean.  There are condominium

11:18  5   rules.  It was in the contract, and the people would not

11:18  6   tolerate the noise.  It's incredible.  I mean you could hear

11:18  7   three or four floors either below or above.

11:19  8   Q.  What do you know about this lawsuit being fabricated, the

11:19  9   overtime allegations?

11:19  10  A.  Well, my belief it was Reinaldo Lamonica's idea.  He's like

11:19  11  a half a brother to me, but he's the black sheep of the family.

11:19  12  My mother raised him.  He's been in trouble many times.

11:19  13  Q.  What do you know about that, though, rather than going into

11:19  14  his entire background?

11:19  15  A.  What I know is that I spoke to the original attorney,

11:19  16  Samantha, you know.

11:19  17  Q.  Samara Bober?

11:19  18  A.  Yeah.  Samara Bober.  Right.  And she find out that I

11:19  19  didn't have any money, so they had to go to the well for money.

11:19  20  They had to find money.  And she told me, you know, you don't

11:19  21  have any.  You're broke.  My background, they knew I had

11:20  22  nothing except for like I said to you, a $10 watch.  I had very

11:20  23  little.

11:20  24  Q.  And then what happened?

11:20  25  A.  Then I met Zidell.  I was at his office.  And Samantha told

11:20 1  me she was going to give the case to Mr. Zidell.  Then I met

11:20 2  Mr. Zidell and --

11:20 3  Q.  What did Mr. Ibacache tell you about the overtime lawsuit,

11:20 4  how that got started?

11:20 5  A.  He told me --

11:20 6          MR. KELLY:  Hearsay objection.

11:20 7          THE COURT:  Sustained.

11:20 8          MR. KLEPPIN:  Your Honor, may I have a side bar on

11:20 9  that?

11:20 10         THE COURT:  No.

11:21 11         MR. KLEPPIN:  No further questions for Mr. Leiva.

11:21 12         THE COURT:  Okay.  Mr. Leiva, do you want to ask

11:21 13  yourself some questions?

11:21 14         MR. LEIVA:  Well, I will keep the jury here all day;

11:21 15  but it was a dream that I had.  In my closing argument I will

11:21 16  explain to you that it was a dream of mine.

11:21 17         THE COURT:  Okay.  We'll certainly look forward to

11:21 18  that.  You may cross-examine, Mr. Kelly.

11:21 19                          CROSS-EXAMINATION

11:21 20  BY MR. KELLY:

11:21 21  Q.  Good morning, Mr. Leiva.

11:21 22  A.  Good afternoon.

11:22 23  Q.  Mr. Leiva, I heard you mention time records a few moments

11:22 24  ago.  Were the time records kept for these two plaintiffs?

11:22 25  A.  Time records for --

11:22   1    Q.  Time records reflecting --

11:22   2    A.  Not that I know of.

11:22   3    Q.  And why weren't those records kept?  Why weren't those

11:22   4    records kept?

11:22   5    A.  What records, sir?

11:22   6    Q.  Time records reflecting the -- let me ask you:  You were

11:22   7    their employer, correct?

11:22   8    A.  Sure.  I was the boss, yes.

11:22   9    Q.  You deny the -- you deny the other defendants were their

11:22  10    employers, right?

11:22  11    A.  Excuse me.  I don't understand.

11:22  12    Q.  You deny that Mr. Heidelberger and Mr. M$^c$Carroll were their

11:22  13    employers, correct?

11:22  14    A.  Correct.  Sure.

11:22  15    Q.  Okay.  Now, when you were their -- and Safe Hurricane

11:22  16    Shutters was their employer, right?

11:22  17    A.  Yes.

11:22  18    Q.  And when you were their employer, why didn't you keep time

11:22  19    records with respect to your employees to show when they were

11:22  20    working in accordance with law?

11:22  21    A.  Because when I hired them I offered them a salary, and they

11:22  22    were all quite happy with it.  They loved it.

11:23  23    Q.  Do you think that it's -- do you think that they're legally

11:23  24    allowed to be paid a salary?

11:23  25    A.  That's what they wanted.

JURY TRIAL - VOLUME V OF V

11:23   1   Q.   When you were in New York, did you have a business in New

11:23   2   York with Mr. M<sup>c</sup>Carroll and Mr. Heidelberger?

11:23   3   A.   Yes.

11:23   4   Q.   And you had employees up there?

11:23   5   A.   Yes.

11:23   6   Q.   Did you pay them time and a half up there?

11:23   7   A.   Yes.

11:23   8   Q.   So you knew about time and a half then, right?

11:23   9   A.   Of course.

11:23   10   Q.   So why didn't you pay these guys time and a half?

11:23   11   A.   Because there was two ways to pay them.  There's only two

11:23   12   ways to pay an installer.  One way is paying by the square

11:23   13   footage.  And I have to admit that's the system that I should

11:23   14   have used to begin with because that's the only way that I have

11:23   15   to check production.  I have supervisor, Mark Saffron, Mike

11:23   16   Morris, and several other managers at the beginning that were

11:23   17   paid a lot of money; one-fifty, a hundred and twenty-five,

11:24   18   $75,000.  My major disagreement with all of them was that they

11:24   19   wanted me to have subcontractors doing this work because a

11:24   20   subcontractor has his own Workmen Compensation, his own

11:24   21   insurance, his own truck, his own tools; and they pay for their

11:24   22   own gas.  They pay for every little thing.  And a subcontractor

11:24   23   come to the business, pick up the work order from me, of

11:24   24   course.  And I have a couple of them.  They would go to the

11:24   25   job, do the square footage that is in the cat sheet that I

11:24   1    provide them.  When the job is completed, they still would not

11:24   2    get paid until that job pass inspection.  If there was

11:24   3    something wrong with the job, they would go back and fix the

11:24   4    problem as many times it failed and they would not get paid

11:25   5    until that job was approved by the inspector.

11:25   6            The other system that I have was an honor system.  I

11:25   7    offered them a salary.  It was a good salary I believe back in

11:25   8    2006; $800, $900.  Most of these people -- I would say 90

11:25   9    percent -- didn't speak English.  They had no language skills.

11:25   10   The only little English they learned it was from school that I

11:25   11   have in New York, Spanish American Institute that I financed

11:25   12   myself out of my own pocket for years to teach Spanish people

11:25   13   like them the language, the culture, American culture, and give

11:25   14   them some computer skills.  I paid for their school.  I paid

11:25   15   for the instructor out of my own pocket.

11:25   16   Q.  Mr. Leiva, let me ask with respect to some of the things

11:25   17   you just said.

11:25   18   A.  But let me answer the question about the salary because

11:25   19   that's what -- I hired them as a salary, gave them a nice

11:25   20   salary; seven, $800 to start.  And I give them an honor system.

11:26   21   I said, Look, you come; pick up the work; take the work to the

11:26   22   job site.  I don't know frankly.  It's only what I heard that

11:26   23   some of them would have used in the time too many lunches, too

11:26   24   many breaks; but I trusted these people.  And by and large all

11:26   25   of them they loved me.  I mean they really -- you heard them.

11:26  1    Some of them said they respect me.  I gave them everything.  I

11:26  2    provided an apartment for them.  I provided furniture, a TV

11:26  3    set.  I paid their electric bill, their gas.  Every little

11:26  4    detail that you can imagine I paid for them for months for

11:26  5    free.  For free.

11:26  6          Who do you know that does such a thing?  I gave them

11:26  7    loans to move their families down.  They never repaid the

11:27  8    loans.  Mario Feliciano, he came to me the first week.  I

11:27  9    didn't even know him.  No problem.  Whatever he needed I was

11:27 10    there for him.  I would be there for Milan, for anybody.

11:27 11    Q.  Have you provided during this trial any records that

11:27 12    documents the total amounts of money that you allegedly gave

11:27 13    them outside their salaries?

11:27 14    A.  What do you mean by that, sir?

11:27 15    Q.  I mean for the jury to hear what you're alleging here --

11:27 16    A.  I've got cash receipt.

11:27 17    Q.  -- I mean where are records?

11:27 18    A.  Yeah.  I got cash -- when I give them cash, I got a receipt

11:27 19    that they signed which is -- it was presented as evidence that,

11:27 20    yes, I was behind.  The last -- until July 6, 2007, we pay them

11:27 21    timely every week.  The first problem arise July 13.  That's

11:27 22    when we had the big problem and I had to switch to Bank of

11:27 23    American.  Bank of America could not provide me with checks for

11:27 24    two weeks.  In the interim these people -- I mean I know they

11:28 25    needed the money, so I had to provide them with cash.  And

80

11:28  1   that's what I did.  To the best of my ability I gave them

11:28  2   whatever I had.

11:28  3  Q.  Now, these -- you had talked about subcontractors before.

11:28  4  A.  Yes, sir.

11:28  5  Q.  But Mr. Feliciano and Mr. Milan were employee, correct?

11:28  6  A.  Yes; salary employees.

11:28  7  Q.  Okay.  And did you say before that you sent them in the

11:28  8   mail I-9s?

11:28  9  A.  1099s, sir.  I don't know what an I-9 is --

11:28  10  Q.  My fault.

11:28  11  A.  But it's 1099.

11:28  12  Q.  My mistake.

11:28  13  A.  And W-2s too.  I mailed them.

11:28  14  Q.  So you sent them W-2s and 1099s?

11:28  15  A.  Correct.

11:28  16  Q.  Why would you send them both?

11:28  17  A.  I couldn't give them personally.  The company was closed.

11:28  18  Q.  Do you have any copies of those with you today, those

11:28  19   1099s?

11:28  20  A.  I would have to search the record.  Also for the record if

11:28  21  you are probably not aware -- and Mario Feliciano remember that

11:28  22  they vandalized the office.  They destroyed the office.  You

11:28  23  remember.  They took a hammer, and they destroyed the walls.

11:29  24  It must have been a couple of them.  I don't know if he was the

11:29  25  one because the other people respect me too much to do it.

11:29  1    They took the computers.  They took tools.  They broke the

11:29  2    bathrooms.  They destroyed the walls.  I've got pictures too.

11:29  3    I can show you.  And they destroyed records too.

11:29  4    Q.  Did you keep records of the time that they worked though?

11:29  5    A.  I've got have some, yes.

11:29  6    Q.  Of Mr. Feliciano --

11:29  7    A.  Oh, yes.

11:29  8    Q.  -- and Mr. Milan?

11:29  9    A.  I've the assignments that I gave him.  I mean job

11:29  10   assignments, yes.  I do.

11:29  11   Q.  When you were --

11:29  12   A.  You want me -- would you like me to show you, Mr.

11:29  13   Feliciano?

11:29  14        MR. KELLY:  I don't have any further questions.  Thank

11:29  15   you, Mr. Leiva.

11:29  16        THE COURT:  Okay.

11:29  17        MR. KLEPPIN:  May I just have a couple --

11:30  18        THE COURT:  Yes, sir.

11:30  19        MR. KLEPPIN:  Thank you, Your Honor.

11:30  20        THE COURT:  Very briefly.

11:30  21        MR. KLEPPIN:  May I approach the witness, Your Honor?

11:30  22        THE COURT:  Yes, sir.

11:30  23                    REDIRECT EXAMINATION

11:30  24   BY MR. KLEPPIN:

11:30  25   Q.  Mr. Leiva, I'm showing you what we have marked for

APRIL 15, 2011

11:30  1    identification purposes as Defendants' Exhibit 31.

11:30  2    A.   Yes.

11:30  3    Q.   Do you identify any handwriting or your signature on these

11:30  4    documents?

11:30  5    A.   Yes.   That's my handwriting and my initials.

11:30  6    Q.   Are these records that show what you paid, Mr. Feliciano,

11:30  7    by cash after the company started to have trouble?

11:30  8    A.   Correct.

11:30  9         MR. KLEPPIN:  We move Defendants' Exhibit 31 into

11:30 10    evidence, Your Honor, at this time?

11:30 11         THE COURT:  It will be received, Defendants' 31.

11:30 12    **(Defendants' Exhibit 31 received in evidence)**

11:30 13    BY MR. KLEPPIN:

11:30 14    Q.   Did you -- after these documents were drafted, did you give

11:30 15    Mr. Feliciano any more money?  Was there a couple of weeks

11:31 16    remaining that you still had to pay him -- that you paid him

11:31 17    for after these notes here?

11:31 18    A.   Yes.

11:31 19         MR. KLEPPIN:  No further questions, Your Honor.

11:31 20         THE COURT:  Okay.  Mr. Leiva, you may step down.  Can

11:31 21    we have your next witness, Mr. Kleppin, please.

11:31 22         MR. KLEPPIN:  We're going to re-call Frank M^cCarroll

11:31 23    very, very briefly.

11:31 24         THE COURT:  All right.  Mr. M^cCarroll, you have been

11:31 25    previously sworn in this case; and you are also reminded that

11:31  1   you are still under oath.  You may be seated and please tell us

11:31  2   your full name once again.

11:31  3          MR. MᶜCARROLL:  My name is Francis X. MᶜCarroll.

11:31  4          MR. KLEPPIN:  May I approach the witness, Your Honor?

11:31  5          THE COURT:  Yes, sir.

11:31  6      **FRANCIS X. McCARROLL, DEFENDANT, PREVIOUSLY SWORN.**

11:32  7                   **DIRECT EXAMINATION**

11:32  8   BY MR. KLEPPIN:

11:32  9   Q.  Mr. MᶜCarroll, I have handed you what we've marked for

11:32  10  identification purposes as Defendants' Exhibit Number 2.  Do

11:32  11  you have it in front of you?

11:32  12  A.  Yes, sir.

11:32  13  Q.  Do you recognize these?

11:32  14  A.  Yes, sir.

11:32  15  Q.  And what is Defendants' Number 2?

11:32  16  A.  Electronic articles of incorporation for Safe Hurricane

11:32  17  Shutters.

11:32  18  Q.  And these were kept by the company in the normal course and

11:32  19  scope of business?

11:32  20  A.  Yes, sir.

11:32  21          MR. KLEPPIN:  Move for admission, Your Honor, of

11:32  22  Defendants' Exhibit Number 2 at this time.

11:32  23          THE COURT:  Defendants' Exhibit 2 is received in

11:32  24  evidence.

11:32  25      **(Defendants' Exhibit 2 received in evidence)**

11:32  1          MR. KLEPPIN:  Can I have a continuing ability to --

11:32  2          THE COURT:  Yeah.

11:32  3          MR. KLEPPIN:  Thank you, Your Honor.

11:32  4  BY MR. KLEPPIN:

11:32  5  Q.  Mr. M^cCarroll, I've handed before you a document marked for

11:32  6  identification purposes as Defendants' Exhibit Number 4.  Do

11:32  7  you see it?

11:33  8  A.  Yes, sir.

11:33  9  Q.  Do you recognize it?

11:33  10  A.  Yes.

11:33  11  Q.  And is it --

11:33  12  A.  It's the --

11:33  13  Q.  Go ahead.

11:33  14  A.  It's the 2007 for profit corporation reinstatement for the

11:33  15  entity named Safe Hurricane Shutters.

11:33  16  Q.  Okay.  And this was kept in the normal course and scope by

11:33  17  the company?

11:33  18  A.  Yes.

11:33  19          MR. KLEPPIN:  I move for admission Defendants' Exhibit

11:33  20  Number 4, Your Honor.

11:33  21          THE COURT:  It will be received in evidence.

11:33  22      (Defendants' Exhibit 4 received in evidence)

11:33  23  BY MR. KLEPPIN:

11:33  24  Q.  I just want to ask you a couple of questions about Exhibit

11:33  25  4.  Do you see where -- middle of the page to the bottom -- it

11:33   1   states officers and directors?

11:33   2   A.   Yes.

11:33   3   Q.   And it has a list of names there?

11:33   4   A.   Yes.

11:33   5   Q.   You see where Eddie Leiva is named president and also a

11:33   6   director?

11:33   7   A.   Yes.   Edward Leiva is named president and director.

11:33   8   Q.   And Alan Patton is vice president and director?

11:33   9   A.   Yes.

11:33   10   Q.   Ronald Simon is secretary and director?

11:33   11   A.   Yes.

11:33   12   Q.   Steve Heidelberger is just director?

11:34   13   A.   Yes.

11:34   14   Q.   Francis X. M$^c$Carroll is just director?

11:34   15   A.   Yes.

11:34   16   Q.   And a Michael Maria is listed as just a director?

11:34   17   A.   Correct.

11:34   18   Q.   Marked for identification purposes Defendants' Exhibit

11:34   19   Number 3 and it is now in front of you, Mr. M$^c$Carroll.   Do you

11:34   20   see that?

11:34   21   A.   Yes.

11:34   22   Q.   Do you see it's an articles -- it's an amendment to

11:34   23   articles of incorporation for Safe Hurricane Shutters?

11:34   24   A.   Yes.

11:34   25   Q.   And is this a document that was created and kept in the

11:34  1    normal course of business for Safe Hurricane Shutters?

11:34  2    A.  Yes.

11:34  3          MR. KLEPPIN:  Move for admission, Your Honor, at this

11:34  4    time of Defendants' Exhibit Number 3.

11:34  5          THE COURT:  It will be received in evidence.

11:34  6          (Defendants' Exhibit 3 received in evidence)

11:34  7    BY MR. KLEPPIN:

11:34  8    Q.  If you could just turn to the last page -- the second to

11:35  9    the last page.  You and Mr. Heidelberger are still listed as

11:35  10   just directors?

11:35  11   A.  That is correct.

11:35  12   Q.  Okay.

11:35  13   A.  The date on this by the way is June 23rd -- June 21st, 2006.

11:35  14   Q.  Thank you.  Okay.  Mr. M$^{c}$Carroll, I have placed in front of

11:35  15   you a document that we've marked for identification purposes as

11:35  16   Defendants' Exhibit Number 5.  Do you see that?

11:35  17   A.  Yes, sir.

11:35  18   Q.  And what is it?

11:35  19   A.  It's a statement of change of registered office or

11:35  20   registered agent or both for corporations.

11:35  21   Q.  Okay.  And this was kept in the normal course and scope of

11:36  22   business by Safe Hurricane Shutters?

11:36  23   A.  Yes, it was.

11:36  24   Q.  That's one of their business documents?

11:36  25   A.  Yes.

11:36  1        MR. KLEPPIN:  Move for admission, Your Honor, at this

11:36  2   time of Defendants' Exhibit Number 5.

11:36  3        THE COURT:  It will be received in evidence.

11:36  4     **(Defendants' Exhibit 5 received in evidence)**

11:36  5        MR. KLEPPIN:  No further questions for Mr. M^cCarroll,

11:36  6   Your Honor.

11:36  7        THE COURT:  All right.  Mr. Leiva, you may cross.

11:36  8        MR. LEIVA:  No questions.

11:36  9        THE COURT:  Mr. Kelly, you may cross-examine.

11:36  10        MR. KELLY:  Your Honor, I'd just like to approach the

11:36  11   witness with what is marked as Plaintiffs' Rebuttal Exhibit A.

11:36  12        THE COURT:  All right.

11:36  13        MR. KLEPPIN:  I object to questions about this.  It's

11:36  14   not on his exhibit list.  It hasn't been disclosed.

11:36  15        THE COURT:  Could I see it, Mr. M^cCarroll?

11:36  16        MR. KLEPPIN:  We went through this before yesterday.

11:36  17        MR. KELLY:  It's a rebuttal exhibit.  Now it falls

11:36  18   into the rebuttal category.

11:36  19        MR. KLEPPIN:  It isn't because we haven't rested yet,

11:37  20   Your Honor.

11:37  21        MR. KELLY:  How can I ever get it in if I can't get it

11:37  22   through any witness?

11:37  23        THE COURT:  I think it's proper cross.  Overruled.

11:37  24                    **CROSS-EXAMINATION**

11:37  25   BY MR. KELLY:

11:37  1   Q.  Mr. McCarroll, this business card here, it has the name

11:37  2   Frank McCarroll on there, does it not?

11:37  3   A.  Yes, it does.

11:37  4   Q.  And that's you, correct?

11:37  5   A.  Yes.

11:37  6   Q.  And it does say -- this business card here says Advanced

11:37  7   Hurricane Protection, correct?

11:37  8   A.  Yes, it does.

11:37  9   Q.  That's the doing business as name of the defendant Safe

11:37  10  Hurricane Shutters, Incorporated, correct?

11:37  11  A.  Yes.

11:37  12  Q.  And if you turn to the second page of this document, you'll

11:37  13  see that it's the back of the business card; is that correct?

11:37  14  A.  Yes.  I guess so, yes.

11:37  15  Q.  And that identifies the --

11:37  16  A.  The address of the building.

11:37  17  Q.  -- the address of the building, being Pompano Beach,

11:37  18  Florida.  It also has some numbers there for Broward/Palm

11:38  19  Beach; is that correct?

11:38  20  A.  Phone numbers, yes.

11:38  21  Q.  And then if we go back to the first page of this rebuttal

11:38  22  exhibit, you'll see to the right of your name, Frank McCarroll,

11:38  23  it says vice president, does it not?

11:38  24  A.  Yes, it does.

11:38  25       MR. KELLY:  I have no further questions.  Can I -- I'd

11:38  1   like that to be into evidence as a rebuttal exhibit.

11:38  2          THE COURT:  All right.  Plaintiffs' Exhibit A will be

11:38  3   received in evidence.

11:38  4       **(Plaintiffs' Exhibit A received in evidence)**

11:38  5          MR. KLEPPIN:  It's over objection, Your Honor.

11:38  6          THE COURT:  Your objection is overruled.

11:38  7          MR. KLEPPIN:  I just have a question or two for Mr.

11:38  8   M$^c$Carroll to follow-up on redirect.

11:38  9          THE COURT:  You may.

11:38 10          MR. KLEPPIN:  Thank you, Your Honor.

11:38 11                    **REDIRECT EXAMINATION**

11:38 12   BY MR. KLEPPIN:

11:38 13   Q.  Mr. M$^c$Carroll, were you ever in any of the company's

11:38 14   documents that we've admitted into evidence there listed as

11:38 15   some officer of Safe Hurricane Shutters?

11:38 16   A.  All these documents are registered with the State of

11:38 17   Florida.  None of them state that I am vice president of the

11:38 18   corporation.  That was strictly for marketing purposes.

11:38 19   Q.  Do you have any idea who created this business card and

11:38 20   what the reason was behind it?

11:38 21   A.  Just to --

11:39 22   Q.  Well, let me ask you this:  Did you create it?

11:39 23   A.  No.

11:39 24   Q.  Okay.  Someone else created this for you?

11:39 25   A.  Yes.

11:39  1   Q.  Did that person have any idea whether you're an officer or

11:39  2   director?

11:39  3   A.  I don't know for certain.  Okay?  But --

11:39  4           MR. KLEPPIN:  No further questions, Your Honor.

11:39  5           THE COURT:  Okay.  Mr. M<sup>c</sup>Carroll, step down, sir.

11:39  6   Thank you very much.

11:39  7           Who's your next witness, Mr. Kleppin?

11:39  8           MR. KLEPPIN:  I don't think we're going to call any

11:39  9   more witnesses, Your Honor.  I just would like to confer with

11:39  10  Mr. Leiva and Mr. M<sup>c</sup>Carroll for just a brief moment.

11:39  11          THE COURT:  All right.

11:39  12      (Defense counsel confer sotto voce)

11:39  13          MR. KLEPPIN:  Your Honor, at this time the defense

11:39  14  will rest subject to the Rule 50 and Rule 41 motions --

11:39  15          THE COURT:  All right.

11:40  16          MR. KLEPPIN:  -- that we're going to make.

11:40  17          THE COURT:  You understand that you still have the

11:40  18  right to cross-examine Mr. Aguirre.

11:40  19          MR. KLEPPIN:  Yes, Your Honor.  I thought we were

11:40  20  resting subject to Mr. Aguirre and the Rule 50 and Rule 41

11:40  21  motions.  I'm sorry.  Maybe what I'll do is I just will not

11:40  22  rest I guess at this time as opposed to resting.  Go ahead.

11:40  23          THE COURT:  What I want to know is are you going to

11:40  24  waive your further cross-examination of Mr. Aguirre or are you

11:40  25  going to wait for Mr. Aguirre to come in on Monday?

APRIL 15, 2011

11:40  1          MR. KLEPPIN:  We'll wait for Mr. Aguirre on Monday.

11:40  2          THE COURT:  All right.

11:40  3          MR. KLEPPIN:  Maybe what we'll do is can I just

11:40  4     withdraw that I said I will rest as opposed to -- this is for

11:40  5     the record -- as opposed to resting subject to calling Mr.

11:40  6     Aguirre back and making the motions we talked about at the

11:40  7     plaintiffs' case.  The defense will withdraw that it said that

11:40  8     it rested and I apologize --

11:40  9          THE COURT:  Okay.

11:41 10          MR. KLEPPIN:  -- for that confusion, Your Honor.

11:41 11          THE COURT:  So you want Mr. Aguirre to come back on

11:41 12     Monday so you can continue your cross-examination?

11:41 13          MR. KLEPPIN:  Yes, Your Honor, because that's what --

11:41 14          THE COURT:  Those are my marching orders.

11:41 15          MR. KLEPPIN:  I disagree with the attorney because

11:41 16     that will be another -- costly to Mr. Aguirre.  It will cost

11:41 17     him additional money to come on Monday.  I mean I disagree with

11:41 18     him.  I think we should save him the expense of --

11:41 19          THE COURT:  I want to be very clear 'cause I don't

11:41 20     want you to come back after this trial's over and say, Oh, if

11:41 21     only I had had a chance to cross-examine Mr. Aguirre.  So

11:41 22     you're telling me that you waive your right to cross-examine

11:41 23     Mr. Aguirre?

11:41 24          MR. LEIVA:  I do because I want to save him the

11:41 25     expenses of coming here; but he has the right to cross-examine,

11:41  1    sir.

11:41  2         THE COURT:  Without a doubt.  That's why I want to

11:42  3    make that very clear.  You do not waive your right to

11:42  4    cross-examine Mr. Aguirre?  I say "you," Mr. Kleppin.  That's

11:42  5    not your right.  On behalf of your respective clients, you have

11:42  6    the right to cross-examine Mr. Aguirre.  And I need to know if

11:42  7    you want to exercise that right or do you want to waive it?

11:42  8         MR. KLEPPIN:  I understand.  May I just have one

11:42  9    moment, please?

11:42 10         THE COURT:  Of course.

11:42 11         (Defense counsel and client confer sotto voce)

11:42 12         THE COURT:  In case you don't remember, Aguirre was

11:42 13    the first witness in this case.

11:43 14         MR. KLEPPIN:  We're going to go ahead and waive our

11:43 15    right to finish the cross-examination of Mr. Aguirre, and the

11:43 16    defense will rest at this time.

11:43 17         THE COURT:  All right.

11:43 18         MR. KELLY:  For the record I don't want to be

11:43 19    overkill; but I'm going to contact Mr. Aguirre, and he's not

11:43 20    going to be here on Monday.

11:43 21         THE COURT:  All right.  Very good.  Will you have any

11:43 22    rebuttal at this time, Mr. Kelly?

11:43 23         MR. KELLY:  No, Your Honor.  I'm done.

11:43 24         THE COURT:  All right.  Plaintiffs rest on rebuttal.

11:43 25         Members of the Jury, all parties have now rested and

11:43  1   all postures.  And you have now heard all the evidence and

11:43  2   testimony in connection with this case.  It but remains for you

11:43  3   to hear the closing arguments of the lawyers and the Court's

11:43  4   instructions as to the law.

11:43  5          At this time, that is at the conclusion of all the

11:43  6   evidence, the Court does have to hear motions on behalf of the

11:43  7   respective parties and consider other matters of law that

11:43  8   require consideration by the Court alone.  Also the Court must

11:44  9   confer with the lawyers concerning the instructions of law that

11:44  10  the Court will give you in its charge.

11:44  11         Following that you will hear the closing arguments of

11:44  12  the attorneys, and the Court will then ask that you retire to

11:44  13  deliberate your verdict.

11:44  14         Now, since we have been recessing at 3:00 o'clock

11:44  15  today and since it's almost noontime -- these legal matters are

11:44  16  going to take a good portion of time -- so I think the most

11:44  17  expeditious thing and most convenient thing we can do at this

11:44  18  point is to recess the trial for the week.  When you come back

11:44  19  Monday morning, we'll go directly into the closing arguments

11:44  20  and we'll have the case to you for your consideration and your

11:44  21  deliberation before noon.  So I thank you for your attention.

11:44  22  You will be excused at this time until Monday morning at 9:00

11:44  23  o'clock.  We'll take care of all the legal matters that the

11:45  24  Court has to consider for the remainder of today.  And when we

11:45  25  reconvene Monday morning, we'll go right into the closing

11:45  1    arguments.  And as I say, you'll have the case to you for your

11:45  2    consideration before noon.

11:45  3         I should also tell you that you don't have to bring

11:45  4    your lunch on Monday because although the Government is broke

11:45  5    we still have enough money left to buy your lunch.  So what

11:45  6    we're going to do is after we conclude the arguments, I'm going

11:45  7    to order your lunch; and your lunch will be served to you in

11:45  8    the jury room during the course of your deliberation.  And we

11:45  9    will then await your verdict.

11:45  10        I know that some of you have children to pick up and

11:45  11   you have other obligations; so if you have not reached a

11:45  12   verdict by 3:00 o'clock, we're going to follow our schedule and

11:45  13   recess at that time until you can go and attend to your family

11:45  14   affairs and so forth and then come back the following day.  So

11:45  15   I thank you for your patience and your attention.

11:46  16        I again remind you not to discuss the case among

11:46  17   yourselves or with anyone else or permit it to be discussed in

11:46  18   your presence until you have retired to deliberate your verdict

11:46  19   Monday morning.  And also I would again remind you not to read

11:46  20   about the case or look up the case on the internet or Google

11:46  21   it, et cetera.  You've been very patient, and we appreciate it

11:46  22   very much.  And I hope you have a nice weekend, and you are

11:46  23   excused until Monday morning at 9:00 o'clock.  So you may take

11:46  24   the jury out.

11:46  25        THE MARSHAL:  All rise for the jury.

APRIL 15, 2011

11:46  1    **THE COURT:**  Now, Counsel, we're going to recess.  You

11:46  2    can take the jury out.

11:46  3    **(Jury Out)**

11:46  4    **THE COURT:**  We're going to be in recess until 1:00

11:46  5    o'clock.  At 1:00 o'clock the Court will hear motions on behalf

11:46  6    of any party at the close of all the evidence, and we'll also

11:46  7    consider the instructions of law that the Court will give you

11:46  8    in its charge and look at the verdict forms.  So Court's in

11:46  9    recess until 1:00 o'clock.

01:06  10   **(Lunch Recess)**

01:06  11   **THE COURT:**  All right.  Be seated, please, and come to

01:06  12   order.  The Court will now hear Rule 50 motions to be made at

01:06  13   the conclusion of the plaintiffs' case in chief.  These motions

01:06  14   were reserved till the close of all the evidence pursuant to

01:06  15   the order of this Court.

01:06  16       And you may proceed, Mr. Kleppin.

01:07  17   **MR. KLEPPIN:**  Thank you, Your Honor.  And even before

01:07  18   we get to Rule 50, I am going to move for a Rule 50 in the

01:07  19   alternative if you don't grant it.  We -- the defense moves

01:07  20   under Rule 41 for involuntary dismissal of Reinaldo Lamonica,

01:07  21   Angeles Lamonica, Guillermo Alborez, and Julio Alborez for

01:07  22   failure to appear during this trial.

01:07  23       Now, we certainly in the alternative move for Rule 50

01:07  24   on that same ground.  They certainly failed to prove their case

01:07  25   in any way, shape, or form by failing to be present here for

01:07  1   these proceedings.  I frankly think the Court could grant that

01:07  2   motion under either authority that I've cited.  I've cited both

01:07  3   just to be thorough.

01:08  4           THE COURT:  Uh-huh (affirmative).

01:08  5           MR. KLEPPIN:  And --

01:08  6           THE COURT:  All right.  Do you want to be heard, Mr.

01:08  7   Kelly?

01:08  8           MR. KELLY:  Your Honor, I'll just --

01:08  9           MR. KLEPPIN:  Before Mr. Kelly goes, Mr. Leiva does

01:08  10  want to join in this motion, Your Honor.

01:08  11          THE COURT:  Okay.

01:08  12          MR. LEIVA:  Yes.

01:08  13          MR. KLEPPIN:  Say that for the record that you join in

01:08  14  the motion.

01:08  15          MR. LEIVA:  I join in the motion.

01:08  16          THE COURT:  All right.

01:08  17          MR. KELLY:  Your Honor, I just would -- the only thing

01:08  18  I can say is refer back to my testimony of previous wherein I

01:08  19  referred to prior to the start of -- I believe it was yesterday

01:08  20  where I had referenced the *Donovan versus New Floridian* case

01:08  21  where I had attempted to see if the Court would allow me to

01:08  22  elicit testimony or reconstruct the claims.  I'm just referring

01:08  23  back and re-arguing that particular argument which the Court

01:08  24  denied already for the record.  So I am objecting on those

01:08  25  grounds.

01:08  1          THE COURT:  The motion of the defendants for the entry

01:08  2     of judgment pursuant to Rule 41 and Rule 50 of the Federal

01:09  3     Rules of Civil Procedure which motion is made at the conclusion

01:09  4     of the plaintiffs' case in chief will be granted.  And those

01:09  5     parties, defendant, will stand -- those parties, plaintiff,

01:09  6     will stand dismissed.

01:09  7          MR. KLEPPIN:  Thank you, Your Honor.  And then we have

01:09  8     some Rule 50 arguments that we would like to present with

01:09  9     respect to the two plaintiffs who appeared.

01:09 10          THE COURT:  All right.  Very good.  Let's hear those.

01:09 11          MR. KLEPPIN:  The first such argument, Your Honor, is

01:09 12     with respect to individual liability.  And the case law from

01:09 13     the 11th Circuit could not be clearer, and I'm citing to you

01:09 14     *Patel versus Wargo*, 803 F.2d 632 and *Alvarez Perez versus*

01:09 15     *Sanford Orlando Kennel Club, Inc.*, 515 F.3d 1150.  And there

01:09 16     are others, a couple of other cases in the 11th Circuit on this

01:09 17     issue; and they're very, very clear.

01:10 18          They hold that corporate officers with a -- I'm

01:10 19     quoting, Corporate officers with a significant ownership

01:10 20     interest who had operational control of significant aspects of

01:10 21     the corporations day-to-day functions including compensation of

01:10 22     employees.  Those are the type of people who can be personally

01:10 23     liable.

01:10 24          In this particular case, as you heard through the

01:10 25     evidence, it's completely undisputed that neither Steve

APRIL 15, 2011

01:10   1    Heidelberger nor Frank M<sup>c</sup>Carroll were officers of this company.

01:10   2    They were directors with a nonmajority ownership interest.

01:10   3    Even combined the ownership interest isn't a majority interest.

01:10   4    It's unrebutted that they couldn't do anything.  They had no

01:10   5    authority to do anything with respect to how the plaintiffs

01:11   6    were paid and what the plaintiffs did day to day.

01:11   7         There's some evidence from the plaintiffs that Mr.

01:11   8    M<sup>c</sup>Carroll would hand out work orders, and there's some evidence

01:11   9    that they were seen at job sites allegedly looking at work that

01:11 10    was performed; but that is not the legal standard.  If the

01:11 11    legal standard is that an absentee owner, a director with a

01:11 12    nonmajority interest in the company can be liable simply

01:11 13    because they were present only very occasionally at the job

01:11 14    site, if that makes them individually liable under the law,

01:11 15    there's not going to be a standard for individual liability.

01:11 16    It would make every manager liable.  It would make virtually

01:11 17    every director liable.

01:11 18         A business owner who has any interest at all in a

01:11 19    business would then theoretically be liable if overtime

01:11 20    violations are found.  And the law is very clear as to why it

01:11 21    must be an officer as opposed to a director, particularly a

01:12 22    director with a nonmajority ownership interest.  And that is

01:12 23    because that officer if you're in charge of the day-to-day

01:12 24    operations, one, you ought to know better if there's a

01:12 25    violation of the wage and hour laws; number two, you're in a

01:12  1    position to do something about it and; number three, you're a

01:12  2    witness to it.  You're living it.  You're breathing it.  You

01:12  3    knew or should have known.  You have the authority day to day

01:12  4    to do something about it.  And that's a reason why someone

01:12  5    could be held individually liable.

01:12  6         And so, therefore, with respect to Mr. Heidelberger in

01:12  7    particular who at best if you look at the evidence in the light

01:12  8    most favorable to the plaintiff, at best the guy was here once

01:12  9    a month for one to four days at best.  He didn't have anything

01:12  10   to do with the wages of these people putting -- just to try to

01:12  11   make payroll by saying, Look, I'll give a loan on my credit

01:13  12   card.  That doesn't make someone individually liable.

01:13  13        With Mr. M$^c$Carroll, the activities that he was doing.

01:13  14   He's here less than half the time.  And this is -- this

01:13  15   argument is all in the context of if you disregard that one

01:13  16   must be an officer because the law is very clear that they must

01:13  17   be; but if you're going to hold a director -- if you're going

01:13  18   to extend this to directorship, and we've vigorously maintain

01:13  19   you should not; but if you do and if you're going to make --

01:13  20   extend this to a director with a nonmajority interest, which we

01:13  21   vigorously maintain -- contend that you should not do, if you

01:13  22   do do that, neither Mr. Heidelberger nor M$^c$Carroll had the

01:13  23   day-to-day operational control or authority to be held

01:13  24   individually liable in this case.  It's very clear.

01:13  25        Mr. Leiva didn't have the money.  The company didn't

JURY TRIAL - VOLUME V OF V

01:13  1    have the money.  They then sued two directors to try to get

01:13  2    something out of somebody, and that is -- that's not what the

01:13  3    FLSA should be used to do in these cases, Your Honor.

01:14  4            Now, the second argument that I want to make is how

01:14  5    the plaintiffs were paid.  I realize that the plaintiff said or

01:14  6    at least actually just plaintiff Feliciano -- Mr. Milan

01:14  7    admitted that the salary was to pay for all of the hours no

01:14  8    matter how many hours he worked.  Mr. Feliciano even though he

01:14  9    said it was to pay the first 40 hours, the case law is very

01:14  10   clear that you should view the manner in which the plaintiffs

01:14  11   were paid in this situation to be a salary that was designed to

01:14  12   compensate for all hours worked for two reasons:

01:14  13           One, they said their hours varied.  That's undisputed

01:14  14   in this record.  Number two, it's undisputed that at least some

01:14  15   weeks they didn't work overtime.  At least some weeks.

01:14  16           Therefore, Your Honor, this salary could not as a

01:14  17   matter of law been designed to compensate just the first 40

01:15  18   hours.  And under the authority of *Davis versus Friendly

01:15  19   Express* -- it's an 11th Circuit case, 2003 WL 21488682.  And it

01:15  20   cites a 4th Circuit case, *Griffin versus Wake County*, 142 F.3d

01:15  21   712.  It stands for the proposition -- and you may recall when

01:15  22   I was asking these witnesses.  I said, You received a regular

01:15  23   lesson on what your pay would be.  And, boy, it's those checks

01:15  24   in front of you there that are the same amount every week when

01:15  25   your hours varied.  And that's exactly what these cases hold.

APRIL 15, 2011

01:15   1   They hold that if there's a situation where hours vary and it's

01:15   2   a clear and mutual understanding, that that's what -- that the

01:15   3   clear and mutual understanding is determined as a matter of law

01:15   4   by the fact that the paychecks were accepted week after week.

01:15   5   The hours varied, and the paychecks were accepted.  And that's

01:16   6   what we have here.

01:16   7          You can't now go back later and say, Oh, I want triple

01:16   8   the amount of what would otherwise be just half-time damages.

01:16   9   I want time and a half, and I want to argue that this is

01:16  10   compensable from a time-and-a-half standpoint because really

01:16  11   what was going on is the deal was, I was only to be paid the

01:16  12   salary for the first 40 hours; and anything over that would be

01:16  13   noncompensable.  And those cases are very clear.  This is

01:16  14   called the fluctuating workweek.  It all emanates from 29

01:16  15   C.F.R. 778.114 in the Code of Federal Regulations.  And as a

01:16  16   matter of law we've proven that this fluctuating work week

01:16  17   should apply.  And at best as a matter of law the plaintiff

01:16  18   should only be entitled to an additional half-time of damages

01:16  19   if they're entitled to anything.

01:16  20          And you'll hear me in a minute move for Rule 50 on

01:16  21   damages completely.  And that is my next argument, the hours

01:17  22   worked.  As a matter of law, they have not carried their

01:17  23   burden.  Under *Anderson versus Mt. Clemens Pottery* -- it's an

01:17  24   old case from the United States Supreme Court.  It goes all the

01:17  25   way back to 1947.  In that case, Your Honor, it's very, very

JURY TRIAL - VOLUME V OF V

01:17  1    important that you understand that that case does not hold that

01:17  2    all the plaintiff has to do is put on evidence that there's no

01:17  3    time records or that the time records aren't accurate and the

01:17  4    plaintiff just wins.  That's not the standard in that case.

01:17  5    The standard in that case is is the plaintiff has to prove his

01:17  6    hours workweek by workweek by the way to the amount and extent

01:17  7    such that a reasonable and just inference arises that those

01:17  8    hours were worked in those workweeks.

01:17  9         Then and only then does the burden shift to the

01:17  10   defendants.  And before I even get to the burden shifting,

01:18  11   we're moving for Rule 50 in that the plaintiffs have not met

01:18  12   their burden under this initial requirement under *Anderson,* and

01:18  13   here's why.  And I'd like to take plaintiff Milan first.

01:18  14        Mr. Milan said from the stand he has no idea in any

01:18  15   week what he worked.  He said in his deposition he could guess.

01:18  16   And when I confronted that with him during the trial, he said

01:18  17   -- he took it back and said, I can't even guess.  And we can't

01:18  18   have in Federal Court, Your Honor, when it comes to damages

01:18  19   even under the standard, we can't have people guessing or

01:18  20   people getting damages when they can't even guess what their

01:18  21   overtime would be.

01:18  22        And that's what we have with the jury.  What is the

01:18  23   jury going to do with this?  They're going to go back and say,

01:18  24   Well, Mr. Milan said he can't even guess.  So what are we

01:18  25   supposed to do?  And the troubling thing is if you recall from

JURY TRIAL - VOLUME V OF V

01:18  1    the evidence, the troubling thing is somehow the lawyer knows.

01:19  2    The lawyer came up with the damages calculation even though Mr.

01:19  3    Milan said he never spoken to anyone about what hours he worked

01:19  4    or what he might possibly be owed.  And so as a matter of law,

01:19  5    Your Honor, we move for Rule 50 with respect to the damages of

01:19  6    both plaintiffs.

01:19  7         Mr. Feliciano also said that it's just a guess what

01:19  8    his damages are.  And we know that although Mr. Feliciano stuck

01:19  9    with it a lot more than Mr. Milan -- Mr. Feliciano stuck with

01:19 10    the 66-hour a week thing -- he still readily admitted he

01:19 11    readily receded from that and admitted in any given workweek he

01:19 12    really doesn't know how many hours that he worked.  And so

01:19 13    under *Anderson* they haven't met their burden.

01:19 14         Now, if you find that they have and the burden shifts

01:19 15    to the defendant to show one of two things, either show the

01:19 16    precise amount of hours worked or cast doubt on the inference

01:20 17    that the plaintiff has drawn, we argue to you, Judge, that we

01:20 18    have done that.  We have rebutted any sort of inference that

01:20 19    the plaintiffs' evidence -- any inference that might arise out

01:20 20    of that.  And the reason is is you heard that, although Mr.

01:20 21    Feliciano denied it, you heard that Mr. Milan and Mr. Feliciano

01:20 22    were on the same crew.  You heard Mr. Milan and when he would

01:20 23    return back to the shop.  It was 4:00 o'clock.  You heard when

01:20 24    they would start working in the morning.  You heard the breaks

01:20 25    that were taken during the day.

APRIL 15, 2011

JURY TRIAL - VOLUME V OF V

01:20  1         It's very clear that they haven't -- that we have

01:20  2    shown that no overtime was worked; that this was a 35- to

01:20  3    40-hour-a-week type of a job with respect to actual work-work.

01:20  4    And there's a couple of things from the evidence that they have

01:20  5    not rebutted.  And that is, one, it's clear that they were not

01:21  6    performing work once they got back to the shop.  There wasn't

01:21  7    anything to perform.  There was nothing left in the truck to

01:21  8    unload.  There wasn't anything to do.

01:21  9         Because of that, Judge, their workday stopped under

01:21 10    the law whenever they left the last job site because commute

01:21 11    time under the Portal to Portal Act is not compensable.  So if

01:21 12    they rode -- when they rode back from Boynton Beach and it took

01:21 13    them an hour to get back to the shop, that time from 3:00

01:21 14    o'clock to 4:00 o'clock is not work time.  So we have shown,

01:21 15    Judge, by the averages by what we've been able to do here that

01:21 16    no overtime was worked.

01:21 17         The last argument that I have is is that judgment as a

01:21 18    matter of law should be granted in favor of the defendants

01:21 19    under the doctrine of in peri delicto.  And that is we have a

01:21 20    situation where people -- with respect to Mr. Milan, he applied

01:21 21    for work under a false Social Security number.  That's a felony

01:22 22    under Federal law.  Under 18 U.S.C. § 1546, Subsection (a).

01:22 23    And both -- neither of them reported any of this income on

01:22 24    their Federal tax return.  And then here they are in Federal

01:22 25    Court wanting a jury to award overtime.  And it's unclear if

01:22  1  the jury awards them anything whether they're going to pay

01:22  2  taxes on that.  And this is something where there's illegality

01:22  3  going on here, and we are arguing under the doctrine of in peri

01:22  4  delicto that in essence the Court not get involved, not uphold

01:22  5  what is essentially an illegal deal or illegal things going on.

01:22  6  And the law has been -- that doctrine was first coined I think

01:22  7  it was Lord Blackwell in 16 --

01:22  8          THE COURT:  During the reign of Edward the Confessor.

01:22  9          MR. KLEPPIN:  I don't know whose reign it was, but it

01:22  10  was Lord Mansfield in 1678.  It goes back that far; that a

01:22  11  Court shouldn't dirty its hands so to speak when things like

01:23  12  this are going on.  And I'll just cite you one modern case that

01:23  13  gets into this, and that is *Hoffman versus Plastic* -- *NLRB*

01:23  14  *verses Hoffman Plastic Products, Inc*.  And that's a Supreme

01:23  15  Court case from 2002.  And it holds by the way -- it precluded

01:23  16  relief under the National Labor Relations Act which is a sister

01:23  17  statute to the Fair Labor Standards Act.  It was passed in the

01:23  18  same legislation back in 1938.  It held that any sort of

01:23  19  serious criminal activity on the part of an employee -- it

01:23  20  doesn't -- it really doesn't say criminal activity.  It says

01:23  21  any serous misconduct works to prevent the plaintiff from then

01:23  22  suing under the employment statutes, in that case the NLRA.  I

01:23  23  realize it's not the same statute, but they're sister statutes

01:23  24  the Courts refer to them as.  It precluded them from relief.

01:24  25  And we're really just asking that you would extend that

01:24  1    doctrine to the present circumstances before you.

01:24  2            THE COURT:  Ms. Rickert --

01:24  3            MR. KLEPPIN:  That is our argument in a nutshell.  If

01:24  4    there's anything -- if you have any questions, I'd be happy to

01:24  5    answer them, Your Honor, or if there's anything --

01:24  6            THE COURT:  Excuse me -- retype that, please.  Go

01:24  7    ahead.

01:24  8            MR. KLEPPIN:  -- or if there's anything further that

01:24  9    you would like from the defense at this time, we'd be happy to

01:24 10    give you that.  Mr. Leiva would like to join in on this motion

01:24 11    if he could have that opportunity I believe.

01:24 12            THE COURT:  Do you join in the motion, Mr. Leiva?

01:24 13            MR. LEIVA:  Yes, Your Honor.

01:24 14            THE COURT:  Okay.  What do you say, Mr. Kelly?

01:24 15            MR. KELLY:  Yes, Your Honor.  May I stay here at this

01:24 16    desk?

01:24 17            THE COURT:  Sure.

01:24 18            MR. KELLY:  Okay.  I first want to address the issue

01:24 19    concerning individual liability.  And I have two cases in

01:24 20    particular that I would like to address and also a section from

01:24 21    the 29 U.S.C. 203(d).  I've highlighted portions of this.  Can

01:24 22    I give you copies of this or do you just want me to tell you

01:24 23    them about?

01:24 24            THE COURT:  Well, if you have them, I'd like to look

01:25 25    at them.

01:25  1           MR. KELLY:  Yeah.  I'd like to give you a copy of each

01:25  2  of these.  I'll give defense counsel copies.

01:25  3           May I approach, Your Honor?

01:25  4           THE COURT:  Yes, sir.  Just hand them to the Marshal,

01:25  5  please.

01:25  6           MR. KELLY:  I have them turned to the page.  I have

01:25  7  them turned to the page, and I've highlighted two in yellow.

01:25  8  The other one I've marked off.  And I will -- I want to first

01:25  9  start -- Oh, I'm sorry.

01:25 10           MR. KLEPPIN:  Thank you.

01:25 11           MR. KELLY:  I would first generally just to start

01:25 12  actually look at the statute itself before I go into the cases

01:25 13  just to preface this.  203(d) in and of itself states that the

01:25 14  definition of an employer includes any person acting directly

01:26 15  or indirectly in the interest of an employer in relation to an

01:26 16  employee and includes a public agency but not -- does not

01:26 17  include any labor organization other than when acting as an

01:26 18  employer or anyone acting in the capacity of officer or agent

01:26 19  of such labor organization.

01:26 20           Then it uses the word agent.  I mean I think that this

01:26 21  alone expressly under defining what an employer is specifically

01:26 22  knocks out any argument that he can try to somehow splice

01:26 23  between an officer and director on that alone as a reason to

01:26 24  say that they're not individually liable despite the fact that

01:26 25  there is some evidence like Mr. M<sup>c</sup>Carroll's business card

01:26  1    showing him to be a vice president.  They're both directors.

01:26  2            So I just want to look at the plain language of that

01:26  3    just on that alone.  However, when I go to the case of *Olivas*,

01:26  4    the *Olivas* case versus *A Little Havana Check Cash,*

01:27  5    *Incorporated*.  That case there is -- the cite is 324 Fed.

01:27  6    Appendix 839.  It's April 27th, 2009, 11th Circuit case.  And my

01:27  7    firm actually tried this case.  And what happened in this case

01:27  8    is that we had a trial.  It was a husband and wife who both

01:27  9    claimed to have operational control, and Judge Jordan had made

01:27  10   the decision that the wife had too little operational control

01:27  11   particularly in relation to Mr. Rodriguez who was the husband.

01:27  12           So we appealed that case, and the 11th Circuit

01:27  13   reversed.  And specifically if you look at the language I

01:27  14   highlighted, it cites *Donovan versus Janitorial Services*, 672

01:27  15   F.2d 528.  That's a 5th Circuit case.  I gave you that as well.

01:27  16   And I want to talk about that specifically in a moment.  But

01:27  17   with respect to *Olivas* the magic language in there is that

01:28  18   occasional control does not diminish the significance of the

01:28  19   existence of such control.

01:28  20           And later on -- I don't believe that Rule 50 is at all

01:28  21   appropriate, and I'm going to later on ask for a jury

01:28  22   instruction because of the facts adduced in this trial is

01:28  23   absolutely crucial that we are allowed to let the jury know

01:28  24   about that.  This is a -- we looked at the facts.  There was

01:28  25   strong evidence in the case to at least show that Mr.

01:28  1   Heidelberger was here at least once a month.  That is

01:28  2   occasional.  Whether -- did he actually have control?  Was he

01:28  3   an employer?  He paid out of his pocket $20,000 on a credit

01:28  4   card.  He met with Mr. Feliciano.  That's a fact.  I mean they

01:28  5   can judge.

01:28  6        If you look at the *Donovan* case, I think the *Donovan*

01:28  7   case really will just wrap this up showing why even Mr.

01:28  8   Heidelberger had less control apparently or less involvement

01:29  9   than Mr. M<sup>c</sup>Carroll.  If you look at the *Donovan* case that I

01:29 10   just cited -- it's cited in *Olivas* -- that case there said --

01:29 11   they talk about this Mr. Meis.  Through day-to-day management

01:29 12   of Johnson Disposal is in the hands of the president Gary

01:29 13   Johnson, not Meis.  But the Court said, Meis' considerable

01:29 14   investment, investment in the company, gives him ultimate if

01:29 15   latent authority over its affairs; that Meis has exercised that

01:29 16   authority only occasionally through firing one employee,

01:29 17   reprimanding others, and engaging in some direct supervision of

01:29 18   Johnson Disposal drivers does not diminish the significance of

01:29 19   its existence.

01:29 20        I think that -- if we focus on just on Mr.

01:29 21   Heidelberger, that's Mr. Heidelberger I think to a tee in this

01:29 22   case.  I mean he was a significant investment.  Between him and

01:29 23   Mr. M<sup>c</sup>Carroll, a million dollars were invested in this company.

01:29 24   He was there once a month.  He actually along with Mr.

01:29 25   M<sup>c</sup>Carroll escorted the head of the department who -- head Mr.

01:30  1   Sullivan who was in charge of that wing.  I mean this person,

01:30  2   Mr. Sullivan, was a -- the defendant said he was the one who

01:30  3   had operational control over the manufacturing wing.  And him

01:30  4   and Mr. M$^c$Carroll, Mr. Heidelberger had -- obviously had

01:30  5   control when they marched him out the door after investing a

01:30  6   million dollars in the company.

01:30  7          And, you know, so if we're just looking at Mr.

01:30  8   Heidelberger, he fits to a tee in here.  I mean also he met

01:30  9   with, like I said, with Mr. Feliciano; coaxed him into staying,

01:30 10   made promises to pay him.  I thought that it was pretty

01:30 11   interesting that, you know, the defense tried to shy away from

01:30 12   the fact that Mr. Heidelberger had been involved in coming up

01:30 13   with not just crunching numbers but actually suggesting that

01:30 14   what was needed was an increase in the square footage which

01:30 15   necessarily does but one thing, causes an increase for employee

01:30 16   work.  It increases labor.  I mean these things that, you know

01:31 17   -- and he also fired a manager.  This guy here in this Texas

01:31 18   case, this 5th Circuit case, Mr. Meis and Donovan that *Olivas*

01:31 19   and the 11th circuit relied on, he said he fired one employee.

01:31 20          Mr. Heidelberger fired one person we know about and

01:31 21   then also with Mr. M$^c$Carroll, you know, marched the guy out the

01:31 22   door.  And there was a common -- there was a -- it was

01:31 23   occasional because he was there throughout the life of the

01:31 24   company.  Not until the end was he gone.

01:31 25          And, you know, Mr. Feliciano provided testimony that

01:31  1   Mr. Heidelberger, he would show up to the job and in no

01:31  2   uncertain terms was there checking on the progress of the job.

01:31  3   He was overseeing it.  Everybody -- he thought him to be the

01:31  4   boss.  So I mean these type of facts -- I mean it's not to the

01:31  5   level of Mr. M$^c$Carroll and certainly not to the level of Mr.

01:31  6   Leiva, but it's -- under this case law I mean there's this

01:31  7   occasional type of control and authority over the company that

01:32  8   certainly requires a jury determination.  And Mr. M$^c$Carroll I

01:32  9   don't -- I think his is -- yeah, he was there.  He admitted he

01:32 10   was there 40 percent of the time.  And Mr. -- you know, Mr.

01:32 11   Feliciano, he gave some details as to him, you know, directly

01:32 12   involved in supervision.  I mean I know they tried to say those

01:32 13   guys didn't know about the actual physical hanging of the

01:32 14   hurricane shutters; but that doesn't mean that they can't show

01:32 15   up to this place after investing a million dollars in the place

01:32 16   and saying -- you know, and letting it be known that you better

01:32 17   be doing your job.  So if the Court -- I don't want to go on.

01:32 18   I think that sums my argument up in particular with respect to

01:32 19   203(d) of Title 29, you know, regarding the definition of an

01:32 20   employer.  You cannot -- they cannot just say, Oh, arguably

01:32 21   they weren't -- they were only directors and officers.

01:32 22        If the Court wants me to go through -- provide more

01:32 23   facts, I can go through my notes and do so; but I think that

01:32 24   the law is what it is.  And I think the jury needs to know

01:33 25   that, you know, that occasional is sufficient.  They have -- I

APRIL 15, 2011

01:33  1    mean if they don't, it's based on the facts deduced from trial.

01:33  2    It's not fair to the plaintiffs.  It's prejudicial because

01:33  3    they're going to try to tell that jury that day to day, day to

01:33  4    day and that they have to be there every day.  And it just --

01:33  5    it's not the law.  Day to day means something very specific.

01:33  6    And this -- you know, this -- I don't see how the Court in this

01:33  7    case would want to go the other way based on *Olivas*.  I mean

01:33  8    *Olivas* got reversed, and it went back.  And Mr. Zidell tried

01:33  9    the case and won.  So I'd like to go on to -- from there I'd

01:33  10   like to go on to the salary issue from there.

01:33  11          With respect to the salary I'm actually concerned

01:33  12   about what's been going on with the salary argument because it

01:33  13   seems to me that there's been some type of backdooring in of an

01:33  14   exemption argument, trying to say -- they didn't specifically

01:33  15   say it I don't think, but it seems like they're going in a

01:33  16   direction of trying to -- you know, they were salary.  So

01:34  17   that's fine.  You know, that salary's for all their hours

01:34  18   worked.  So, therefore, they're entitled to nothing.  And I

01:34  19   think that's kind of how I'm afraid they're going to go in

01:34  20   closing.  I would ask the Court even for a motion in limine at

01:34  21   some point.  I mean I'd like to even move now or later on that

01:34  22   that they can't make that argument because there has never been

01:34  23   an exemption pled in this case.  And there's not facts deduced

01:34  24   at trial at all that will justify any type of executive

01:34  25   exemption or administrative exemption.  These guys are hourly

JURY TRIAL - VOLUME V OF V

01:34   1   workers.  And that is why that I included in my jury

01:34   2   instructions -- and I'm going to cite the law in there.  I

01:34   3   included jury instruction number 19 because there's a case in

01:34   4   there.  It's an 11th Circuit case.  It's called *Rodriguez versus*

01:34   5   *Farm Stores Grocery*.  And it's another one of Mr. Zidell's

01:34   6   cases.  It's 21 Fla.L.Weekly.C353.  It's a 2008, 11th Circuit

01:34   7   case.  It's in my jury instructions.  And I quoted in the jury

01:34   8   instructions.  And, granted, what it does say is, you know, if

01:35   9   the employee is employed solely on a weekly salary basis, his

01:35  10   regular hourly rate of pay on which time and a half must be

01:35  11   paid is computed by dividing a salary by the number of hours

01:35  12   which the salary is intended to compensate.

01:35  13          For example, if an employee is hired at a salary of

01:35  14   $182.70 and if it is understood -- I'm underscoring understood

01:35  15   that the salary is compensation for a regular week of 35 hours,

01:35  16   the employee's regular rate is $182.70 divided by 35.  The

01:35  17   problem we have is that Mr. Feliciano did not understand that

01:35  18   to be that.  If -- in other words, if Mr. Feliciano said, Yeah,

01:35  19   my understanding was that that money was just that salary of

01:35  20   $800.  That was for all my hours worked.  That was my

01:35  21   understanding.  Then what we would be required to do is divide

01:35  22   his hours by that total $800 to get his hourly rate in which

01:35  23   case any hour over 40 he would only be entitled now to seek

01:36  24   half time, the premium rate.  But that was not his

01:36  25   understanding.  He testified -- and it's up to the jury to

01:36  1    decide this.  He testified that his understanding was that he

01:36  2    was to be working 40 hours a week.  So if you look at the *Farm*

01:36  3    *Stores*, I mean it specifically -- I quoted in there.  It

01:36  4    specifically used that.  And if it is understood that the

01:36  5    salary is compensated for a regular work week of a certain

01:36  6    number of hours.  His understanding was this compensation was

01:36  7    for 40 hours, and that's exactly what we're doing here.  We're

01:36  8    taking his understanding, which is 40 hours, and we're dividing

01:36  9    it by what he was paid.  And we're saying that's his hourly

01:36  10   rate for those 40 hours.  But there was no understanding for

01:36  11   him that he has, and he testified to it, that that was for

01:36  12   hours over 40.  So in a nutshell I'd ask the Court if it is

01:36  13   inclined to rule right away on this, to please look at that

01:36  14   number 19 instruction that I put in there and under the guise

01:37  15   that, you know, he provided testimony as did Mr. Aguirre I

01:37  16   believe that he -- what their understanding was -- or Mr.

01:37  17   Ibacache I believe it was; that they understood that it was for

01:37  18   40 hours.  And, you know, and also that I think the defense

01:37  19   needs to be reigned in to be sure that they do not represent to

01:37  20   the jury that there's any type of exemption here; that they

01:37  21   somehow are, you know, not entitled to seek overtime because

01:37  22   they're exempt salaried employees.  And so that's all I have to

01:37  23   say on that particular issue with respect to the salary.

01:37  24           And then the next point that they raised in this case

01:37  25   was regarding the evidence of the hours.  *Anderson versus Mt.*

01:37    1    *Clemens Pottery*, it's a staple case in this area.  It's one of

01:37    2    the most important cases in FLSA evidentiary matters.  And I

01:37    3    put that case -- I quoted from that case also in my jury

01:38    4    instructions.  And I'm not going to read the whole thing, but

01:38    5    I've quoted a piece of it in there; but I will point out that

01:38    6    it does say that, you know, if the employer -- it is really the

01:38    7    employer's responsibility to keep records.  Okay.  They must do

01:38    8    that.  If you don't do that, that's illegal.  And it says,

01:38    9    Where the employer's records of the work time is inaccurate or

01:38   10    missing -- and I'll stop there.  I don't want to quote the

01:38   11    whole thing.  It goes on later to say that, you know, if you

01:38   12    have accurate or incomplete records.  The employee has to carry

01:38   13    out a burden if -- by proving that they've, in fact, performed

01:38   14    the work for which they have been improperly compensated.  And

01:38   15    if he or she produces sufficient evidence to show the amount --

01:38   16    and that's I think the key -- the amount and extent of that

01:38   17    work as a matter of just and reasonable inference.  They

01:38   18    haven't done it.  They haven't kept the records.  They have an

01:38   19    inference in their favor.  What records are they going to do or

01:38   20    produce?  None.  It's not their obligation to produce time

01:38   21    records or keep logs or do any of the things that they claim we

01:39   22    should have done.  They don't have to do that.  Hindsight's

01:39   23    20/20.  What they do have to do is they have to come out and

01:39   24    they have to at least provide some type of testimonial evidence

01:39   25    to at least show that they've worked some hours.  And it just

01:39   1   isn't their evidence.  I would like to point to -- I mean we've

01:39   2   all had witnesses here, and I think some of their witnesses

01:39   3   were biased.  But they had Mr. Bungo here which I thought was

01:39   4   very helpful to us because Mr. Bungo was their witness, and he

01:39   5   said that he got there at 7:45 in the morning.  And he said

01:39   6   that some of the installers were there at 7:45 in the morning.

01:39   7   That is in line with what my clients have been saying.  My

01:39   8   client's been saying, We're required to get there at 7:30.  And

01:39   9   then he also said -- he mentioned 5:00 o'clock.  At first he

01:39   10  came out and he said -- I think, you know, he mentioned 5:00

01:39   11  o'clock.  Then he a little bit -- I think he a little tried to

01:39   12  add well, maybe 3:00 to 5:00 or something like that; but he

01:39   13  certainly provided testimony -- and it was their witness --

01:39   14  that would establish that his hours that he -- they're in the

01:40   15  range of what he was arguing.

01:40   16       And with Mr. Milan -- I mean I think Mr. Feliciano is

01:40   17  much more detailed.  I mean he was there for a longer time.  I

01:40   18  think that he speaks English.  We were all able to pick up on

01:40   19  what he said.  I think that he was very detailed with respect

01:40   20  to his hours.  And he even said, you know, at the least

01:40   21  probably 60 hours.  He gave very detailed testimony as to when

01:40   22  he started.  He explained to the jury what he did and how he

01:40   23  did it.  I mean he accounted for the fact that sometimes they'd

01:40   24  load the trucks up and put the stuff on a balcony and then they

01:40   25  would -- you know, they would be ready for the next day and

01:40  1   they would be loading ahead, you know.  I don't think that he

01:40  2   got tripped up on his explanation of that.  And he -- Mr. Milan

01:40  3   I think he had more difficulty, you know, with respect to his

01:40  4   previous deposition testimony.  But in the end when I sifted

01:40  5   through his testimony, okay, he stuck with 7:30 for him showing

01:40  6   up which is in line with Mr. Bungo and other testimony.  Bungo

01:41  7   said he saw installers there before 7:45.  All these guys say,

01:41  8   Oh, never until 8:30, you know, stuff like that.  He said 7:30.

01:41  9   I don't think that he backed off of that.  And then made an

01:41  10  issue because he had some deposition testimony that may have

01:41  11  said something like 7:00 o'clock and they made an issue between

01:41  12  how many hours it took, you know, after he got there at 7:00

01:41  13  o'clock which it didn't fit.  However, even if you use a 4:30

01:41  14  time for Mr. Milan, 7:30 to 4:30, you know, if you multiply --

01:41  15  that's 9.5 hours.  If you multiply that times six days that he

01:41  16  said he worked, we're still at 57 hours.  Whatever anybody

01:41  17  thinks about the total amount of hours, we don't have time

01:41  18  records.  And that's why the Supreme Court requires it because

01:41  19  it's hard.  I mean you've got -- now we've got tons of

01:41  20  witnesses.  We've got a bunch of guys having to remember four

01:41  21  years ago what their schedules were, you know.  So they

01:41  22  provided testimony to establish what their claim is.  And now

01:42  23  the inference is in their favor.  And they can come forward

01:42  24  with something and try to rebut it, and I think they have cases

01:42  25  that they're going to try to -- but that's for the jury.  And I

01:42  1    think that I need to argue to the jury that the inference is

01:42  2    there.  I mean what they did has resulted in them having a weak

01:42  3    argument.  And I think the inference is going against them.  So

01:42  4    certainly to say that Rule 50 should be granted against them, I

01:42  5    think it's a foregone conclusion.  I can see how that would

01:42  6    happen, but I think the inference is against them.  But I think

01:42  7    I should -- I need to argue that to the jury.

01:42  8         And then on the final note -- with respect to the pay

01:42  9    obviously there's admissions that they weren't paid anything in

01:42  10   addition for overtime hours, so that's not disputed.  With

01:42  11   respect to the last argument, the in peri delicto argument, I

01:42  12   don't have any case law on that but I know Mr. Kleppin --

01:42  13            THE COURT:  That's because there isn't any.

01:42  14            MR. KELLY:  Except for Lord Blackmore I think.

01:42  15            MR. KLEPPIN:  No.

01:43  16            MR. KELLY:  But -- well, actually if the Court is

01:43  17   going -- wants to look into this one further, I think that a

01:43  18   good argument or a good case to start on -- I don't have it

01:43  19   with me -- would be the -- I know the name of the case.  It's

01:43  20   actually a case between our firms, Mr. Kleppin and my firm.

01:43  21   And he made this argument in a case of *Solano*, S-o-l-a-n-o,

01:43  22   versus *A Navas Party*.  And it's a case -- it was tried before

01:43  23   Judge Altonaga in Miami.  I don't know the docket number, but

01:43  24   it would be easy to pull up on Pacer.  And she denied a Rule 50

01:43  25   motion with respect to in peri delicto arguments.  And she -- I

01:43 1    think that that in peri delicto argument was raised prior to.

01:43 2    You know that as well in summary judgment.  It just -- she just

01:43 3    denied it across the board the entire time, and I just don't

01:43 4    think that they can come here and argue this, you know, with

01:43 5    respect to these guys.  I mean, you know, they're hiring --

01:43 6    they're obviously hiring -- I mean Mario is a Puerto Rican.

01:43 7    So, you know, he has the citizenship; but, you know, these guys

01:43 8    were hiring illegals.  You know, these guys -- why aren't they

01:44 9    given W-2s.  I mean that's for the jury to decide.  I mean

01:44 10   these guys didn't have Social Security numbers.  I mean, you

01:44 11   know, these guys weren't -- they were certainly violating the

01:44 12   IRA regulations.  They're required to withhold money from

01:44 13   workers.  I mean their hands are unclean.  You know, they have

01:44 14   unclean hands.  We're dovetailing into *Patel* again with

01:44 15   immigration.  I mean these guys are immigrants and they're not

01:44 16   gonna -- you know, they basically try to say that if they don't

01:44 17   have Social Security numbers, they're not given W-2 and they're

01:44 18   not going to file their taxes and so you can't bring --

01:44 19   immigrants can't bring a case.  It's just like *Patel*.  It's

01:44 20   basically saying an immigrant can't sue for overtime.  It's

01:44 21   going to result in that.  But I would -- if the Court is

01:44 22   withholding on that at all, I'd ask that you look into that

01:44 23   *Solano versus A Navas Party* case before Judge Altonaga in the

01:44 24   Southern District of Miami and the Rule 50 and I think summary

01:44 25   judgment pleadings as well that she alludes to in there.

01:44  1   That's all I have for these arguments.

01:44  2              **THE COURT:**  All right.

01:44  3              **MR. KLEPPIN:**  Can I just have one minute, Your Honor?

01:44  4              **THE COURT:**  Yeah.  Just a second.

01:47  5              Okay.  What do you say, Mr. Kleppin?

01:47  6              **MR. KLEPPIN:**  Thank you, Your Honor.  Initially on

01:47  7   individual liability with respect to *Donovan versus Janitorial*

01:47  8   *Services, Inc.* that Mr. Kelly has handed up there to you, it's

01:47  9   a case from 1982 from another circuit, that case was not about

01:47  10  holding an individual corporate officer or director liable

01:47  11  under the Fair Labor Standards Act.  It was to try to hold two

01:47  12  different corporations liable.  And the issue was did one

01:47  13  particular -- did one -- did activities by an officer in one of

01:47  14  the companies from a standpoint of agency principals, did it

01:47  15  bind the other corporation such that it should fall under a

01:47  16  civil contempt order.  That's what was going on there.  There

01:47  17  was -- that is not a case about was the individual at issue,

01:47  18  Mr. Meis, M-e-i-s, in that case.  The issue was not whether or

01:48  19  not he would be individually liable for any sort of overtime

01:48  20  violations.

01:48  21              With respect to the *Olivas* case, the *Olivas* case helps

01:48  22  us.  One, unfortunately it's not a published opinion so it's

01:48  23  only persuasive.  It's not binding on you.  However, it cites

01:48  24  the exact same standard that I'm using from *Patel versus Wargo*

01:48  25  and from *Alvarez Perez.*  It specifically holds that in *Patel*

01:48  1     *versus Wargo* we concluded that status as a corporate officer

01:48  2     alone is insufficient to render an individual an employer to

01:48  3     hold the officer personally liable for unpaid wages.

01:48  4              It goes on to say, Rather, we held in *Patel* that to be

01:48  5     personally liable as an employer a corporate officer must be

01:48  6     either -- must either be, one, involved in the day-to-day

01:48  7     operation or have some direct responsibility for the

01:48  8     supervision of the employee.  And that is -- and in that case

01:49  9     it went on to reverse because the individual business owner did

01:49  10    have day-to-day operation.  She was there running this store

01:49  11    with her husband.  Sometimes the husband would be gone and she

01:49  12    ran the whole thing.  The Trial Judge in that case, Judge

01:49  13    Jordan, he took issue with the fact that the wife had very

01:49  14    little involvement with the plaintiff herself.  But in that

01:49  15    situation she was there day to day running the business.  And

01:49  16    in this instance we don't have that.  We do not have day to

01:49  17    day.  I disagree with Mr. Kelly that occasional control is

01:49  18    enough.  The control from binding case law is day to day.  Even

01:49  19    if occasional control is enough, the sort of involvement that

01:49  20    Mr. Heidelberger and Mr. M$^{c}$Carroll had in this case, Your

01:49  21    Honor, was not the sort of authority that would bind them to be

01:50  22    personally liable for wages.  They weren't making decisions

01:50  23    concerning who should -- whether these plaintiffs.  And this

01:50  24    case says you look at the plaintiffs.  They didn't make

01:50  25    decisions as to how much they should be paid, what they should

01:50  1   be paid, what their hours should be, or anything like that.

01:50  2         With respect to the fluctuating workweek issue and

01:50  3   whether or not the plaintiff should be able to present to a

01:50  4   jury that they're entitled to half time they cite this

01:50  5   *Rodriguez versus Farm Store Groceries, Inc.* case.  And in that

01:50  6   case the parties agreed that the plaintiffs, in fact, the

01:50  7   salary was designed to compensate only 35 hours a week.  That's

01:50  8   not what we have here.  There is -- that understanding can't be

01:50  9   there because *Davis versus Friendly Express, Inc.* tells us --

01:50  10  the case I cited to you earlier -- it tells us that when you're

01:50  11  paid that same salary and your hours vary, that the situation

01:51  12  is you've been taught a very clear and regular lesson that that

01:51  13  salary is designed to compensate you for all hours worked.

01:51  14        With respect to Barrera Solano case that Mr. Kelly

01:51  15  brought up, that case was -- the issue there was whether the in

01:51  16  peri delicto doctrine should be extended to an individual who's

01:51  17  an illegal alien.  I'm not raising that here.  This case isn't

01:51  18  about illegal aliens.  I know some of that came out from the

01:51  19  witness stand there, but I'm not moving under this illegal

01:51  20  alien thing in this case.  This -- the in peri delicto doctrine

01:51  21  should apply here because Mr. Milan applied for the work using

01:51  22  false Social Security documents.  He got the job fraudulently,

01:51  23  and that's a felony; and that's unrebutted in the case and

01:51  24  because these men did not pay income taxes on their return.

01:51  25  We're in the position where if whatever -- we're in a situation

01:52  1    I believe that the jury by awarding them any more money is just

01:52  2    going to enable them to be able to commit further income tax

01:52  3    evasion.  I just don't think that that's something that the

01:52  4    Court should be involving itself in.

01:52  5         There is one case from Judge Turnoff.  It's a 2009

01:52  6    case.  I can't remember the cite.  He held that the in peri

01:52  7    delicto doctrine does apply to FLSA cases.  The procedural

01:52  8    posture of that case was that a plaintiff had moved to strike

01:52  9    the affirmative defense of unclean hands in peri delicto, and

01:52  10   he did not strike it.  He held that that's an affirmative

01:52  11   defense that could potentially apply to a Fair Labor Standards

01:52  12   Act case.

01:53  13        And just one thing further, Your Honor.  In the

01:53  14   Barrera Solano case why the Judge denied it on the illegal

01:53  15   alien issue is because currently the status of the law in the

01:53  16   11th Circuit is that an illegal alien can come into court and

01:53  17   sue for overtime.  However, that issue is being hotly

01:53  18   contested.  It's before a panel of the 11th Circuit.  I argued

01:53  19   it orally a year and a half ago.  It's my case.  Six months

01:53  20   after the oral argument the panel asked the solicitor general

01:53  21   of the United States to give the administration's opinion on

01:53  22   how the Court should rule on that matter.  And we're waiting

01:53  23   for an opinion, so we don't know how that's going to come out;

01:53  24   but that is very much an issue that is still alive, Your Honor.

01:53  25        **THE COURT:**  Okay.  Ms. Rickert, would you give this

01:53  1   back to Mr. Kelly, please.

01:55  2          MR. KELLY:  Thank you.

01:55  3          THE COURT:  Yeah.  Retype this again.  Keep changing

01:55  4   it.

01:55  5          MR. KELLY:  Is there anything I can add, Your Honor?

01:55  6   I don't want to interrupt you.

01:55  7          THE COURT:  No.  I'm thinking.  I'm doing something

01:55  8   else.

01:55  9          MR. KELLY:  Okay.

02:08  10          Your Honor?

02:08  11          THE COURT:  Yes.

02:08  12          MR. KELLY:  May I just -- may I give you a courtesy

02:08  13   copy of Judge Cohn's order in this case on these same issues?

02:08  14          THE COURT:  No.

02:08  15          MR. KELLY:  The law hasn't changed.

02:17  16          THE COURT:  Okay.  Ms. Rickert, would you give this

02:17  17   back to Mr. Kelly, please.  Now, this is a new instruction.

02:18  18   Type this up.  Okay.

02:18  19          The Rule 50 motion of the defendants made at the

02:18  20   conclusion of the plaintiffs' case in chief, which motion is

02:18  21   made on behalf of all defendants, will be denied.

02:18  22          Are there any motions to be made at the close of all

02:18  23   the evidence?

02:18  24          MR. KLEPPIN:  Yes, Your Honor.  The defendants will

02:18  25   renew their motions at this time for Rule 50.

JURY TRIAL - VOLUME V OF V

02:18  1          MR. LEIVA:  I join, Your Honor.

02:18  2          THE COURT:  All right.  The renewed motion of all

02:18  3  defendants -- the renewed Rule 50 motion of all defendants made

02:19  4  at the conclusion of all the evidence will likewise be denied.

02:19  5          I'm going to take 10 minutes.  And when we come back,

02:19  6  we will do the charge conference.  Please find your proposed

02:19  7  instructions for the plaintiff and for the defendant.  And then

02:19  8  when I come back, I'm going to go through the instructions as

02:19  9  to which are granted and which are refused.  And I'm going to

02:19  10  go fast, so be prepared to write fast.  And I shall also

02:19  11  furnish you at that time with a proposed verdict form in this

02:19  12  case and also furnish you with two additional instructions that

02:19  13  the Court is going to give so court's in recess for 10 minutes.

02:31  14      **(Recess)**

02:31  15          THE LAW CLERK:  All rise.

02:31  16          THE COURT:  All right.  This is the charge conference

02:31  17  in the case of Lamonica versus Safe Hurricane Shutters, Inc.

02:31  18          Beginning with the plaintiffs' proposed instructions,

02:31  19  plaintiffs' proposed instruction number 1 is granted.

02:31  20  Plaintiffs' number 2 is granted.  Plaintiffs' number 3 is

02:31  21  granted.  Plaintiffs' number 4 is granted.  Plaintiffs' number

02:32  22  6 is granted.  Plaintiffs' number 9 is granted.  Plaintiffs'

02:32  23  number 10 is granted.  Plaintiffs' number 11 is granted.

02:32  24  Plaintiffs' number 12 is granted.  Plaintiffs' number 13 is

02:32  25  granted.  Plaintiffs' number 15 is granted.  Plaintiffs' number

02:32   1    18 is granted.  Plaintiffs' number 19 is granted as amended,

02:32   2    and the amendment is that the language that's in the brackets

02:32   3    following "for example" is stricken.  The last sentence

02:32   4    remains.  20 is granted.  21 is granted.  7 is granted.  8 is

02:33   5    granted.

02:33   6            Of the plaintiffs' requested instructions the

02:33   7    following --

02:33   8            **MR. KLEPPIN:**  I thought that was the plaintiffs'.

02:33   9            **THE COURT:**  I'm sorry.  Yeah.  Of plaintiffs'

02:33  10    requested instructions the following are refused:  5, 14, 16,

02:33  11    17.

02:33  12            Of the defendants' requested instructions 11 is

02:33  13    granted.  13 is granted.  14 is granted.  16 is granted.  17 is

02:33  14    granted.  20 is granted.

02:33  15            Of the defendants' requested instructions the

02:34  16    following are refused:   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 15,

02:34  17    18, 21, 22.

02:35  18            Additionally the Court will give its own instruction

02:35  19    on operational control.  I've provided copies of proposed

02:35  20    instructions to counsel for the plaintiff and defendant.

02:35  21            The Court will also give -- I don't know if I said

02:35  22    that earlier.  If I didn't, I erred.  Defendants' proposed jury

02:35  23    instruction 19 is also refused.

02:36  24            The Court will also give another instruction with

02:36  25    regard -- its own instruction with regard to the issue of

02:36  1    damages, and I furnished counsel with the copy of the Court's

02:36  2    proposed instructions with reference to that issue.

02:36  3            MR. KLEPPIN:  Thank you.

02:36  4            THE COURT:  And we will be in recess.  Oh, and I'm

02:36  5    also going to furnish counsel at this time with copies of the

02:37  6    proposed form of verdict for use in this case, and we'll be in

02:37  7    recess for 10 minutes.  And when I come back, I'll hear your

02:37  8    objections, if any, to the Court's proposed instructions in

02:37  9    this case.  Court's in recess for 10 minutes.

02:37  10           (Recess)

02:47  11           THE COURT:  Be seated, please.  Objections for the

02:47  12   plaintiffs' to the form of verdict?

02:47  13           MR. KELLY:  Not for the plaintiff, Your Honor.

02:47  14           THE COURT:  For the defendants?

02:47  15           MR. KLEPPIN:  Yes, Your Honor.  We have some.  We

02:47  16   believe that -- we object to the jury not being instructed on

02:47  17   deciding what --

02:47  18           THE COURT:  No.  I'm talking about the verdict form.

02:47  19           MR. KLEPPIN:  That's what I'm talking about.

02:47  20           THE COURT:  Oh, okay.

02:47  21           MR. KLEPPIN:  The verdict form.  I'm sorry.  Did I say

02:47  22   the jury being -- I mean the jury being instructed on the

02:47  23   verdict form; that there's no place on the verdict form for the

02:47  24   jury to find whether or not these people were paid a salary

02:47  25   that was designed to just to pay 40 hours or designed to pay --

02:47  1    compensate them no matter how many hours that they worked.

02:48  2        Also we believe that it should be broken up by minimum

02:48  3    wage and by overtime because the way it's set up we object to

02:48  4    that not being on here because the way it's set up they could

02:48  5    check that they find for one of the plaintiffs against one of

02:48  6    the defendants and then they put $500 as an award.  And we

02:48  7    don't know whether that's for the minimum wages or whether it's

02:48  8    for overtime.  And so those are the defendants' objections,

02:48  9    Your Honor, to the verdict form.

02:48  10       THE COURT:  All right.  That objection will be

02:48  11   overruled.  Objections to the Court's proposed instructions for

02:48  12   the plaintiff?

02:48  13       MR. KELLY:  I would just ask with the one instruction

02:48  14   the Court added where the Court put sympathy, speculation, or

02:48  15   guesswork --

02:48  16       THE COURT:  Right.

02:48  17       MR. KELLY:  -- but it's something to the extent that

02:49  18   however the -- you know, after that first sentence there,

02:49  19   reasonable inference from the facts in evidence, you know,

02:49  20   something saying estimation; that they can provide an

02:49  21   estimation.  You know, they're not allowed to have guesswork or

02:49  22   speculation; but they're allowed to estimate.  I think that

02:49  23   there's a lot of mincing in these cases between -- there's a

02:49  24   difference between the two, and I think that there arguably is.

02:49  25       MR. KLEPPIN:  It's already given to them, Your Honor.

02:49  1    You're giving his --

02:49  2              THE COURT:  Okay.

02:49  3              MR. KLEPPIN:  -- instruction on *Anderson*.

02:49  4              THE COURT:  That's objection is overruled.  Any other

02:49  5    objections for the plaintiff?

02:49  6              MR. KELLY:  No, Your Honor.

02:49  7              THE COURT:  Objections for the defendants?

02:49  8              MR. KLEPPIN:  Yes, Your Honor.  First I'd like to

02:49  9    clarify.  You had said that you were granting some of these

02:49  10   individual liability instructions the parties were giving.  Are

02:49  11   you going to give those in addition to the Court's instruction

02:49  12   on operational control or --

02:49  13             THE COURT:  I'm going to give the ones that he

02:49  14   submitted plus that one, yes.

02:49  15             MR. KLEPPIN:  Okay.  So you are going to give his and

02:49  16   this combined?

02:49  17             THE COURT:  Correct.

02:49  18             MR. KLEPPIN:  Okay.  We just object to the defendants'

02:49  19   instruction number 2 not being given on objections of counsel.

02:50  20             THE COURT:  Overruled.

02:50  21             MR. KLEPPIN:  Okay.  We object to the defendants'

02:50  22   instruction on inference defined because there's a number of

02:50  23   inferences that can be drawn from this evidence.  And, in fact,

02:50  24   your jury instruction on damages that you're adding, the

02:50  25   paragraph that you gave us, actually uses the word "inference."

APRIL 15, 2011

02:50  1          THE COURT:  Which one of those is yours?  Number 6.

02:50  2          MR. KLEPPIN:  Instruction number 6, Your Honor.  I'm

02:50  3  sorry.

02:50  4          THE COURT:  Okay.

02:50  5          MR. KLEPPIN:  You can certainly take out the word

02:50  6  bald.  It's sort of out of place.  You can just say to the

02:50  7  statements of the witnesses.

02:50  8          THE COURT:  All right.  I'll sustain that objection,

02:50  9  and I'll give that instruction.

02:50  10          MR. KLEPPIN:  Thank you, Your Honor.  We also object

02:50  11  to the jury -- and this is part of our -- the defendants'

02:51  12  instruction number 10.  The way you have the Fair Labor

02:51  13  Standards Act substantive instruction now using Mr. Kelly's is

02:51  14  is that the jury is not going to be able to use the half-time

02:51  15  calculation.  In other words, if they do find that there's

02:51  16  liability on behalf of any of defendants, they can't find that

02:51  17  the salary was intended to compensate for all hours worked and

02:51  18  then award only an additional half time.  It's almost as if

02:51  19  you're granting Rule 50 on the fluctuating workweek method and

02:51  20  finding as a matter of law that the jury must find that the

02:51  21  salary was intended to only compensate a certain amount of

02:51  22  hours that's fixed and then they must award all the rest to

02:51  23  time and a half as if all the rest of the hours were not

02:51  24  compensated for.

02:51  25          MR. KELLY:  Your Honor --

APRIL 15, 2011

02:51  1          MR. KLEPPIN:  In other words, it's an all or nothing

02:51  2    thing.  The way Mr. Kelly has calculated damages in this case

02:52  3    the jury could award, let's say, Mr. Feliciano $52,000

02:52  4    approximately.  If the fluctuating workweek method is used as

02:52  5    we've argued, he would only be entitled to one-third of that or

02:52  6    about 16,000 or $16,500 or whatever it is.  And that would be

02:52  7    totally taken away from the jury if there isn't an instruction

02:52  8    on that.

02:52  9          We have that down at the bottom of page 17 of our

02:52  10   instruction where we say if they find that the salary was

02:52  11   simply intended to compensate for all hours worked no matter

02:52  12   what they are and they would vary, that there's this test under

02:52  13   29 C.F.R. 778.114 which is, Did the parties have a clear and

02:52  14   mutual understand.

02:52  15         THE COURT:  I'm sorry.  Where are you reading?

02:52  16         MR. KLEPPIN:  At the top of page -- at the bottom of

02:52  17   page 17, top of page 18 of the defendants' proposed

02:53  18   instructions.

02:53  19         THE COURT:  Okay.

02:53  20         MR. KLEPPIN:  Docket entry 186.

02:53  21         THE COURT:  I'm reading it.  Let me find it here.

02:53  22         MR. KLEPPIN:  Sure.

02:53  23         THE COURT:  Okay.  All right.  Go ahead.  I see it

02:53  24   now.

02:53  25         MR. KLEPPIN:  Yes.  And that language is taken right

02:53  1   out of the C.F.R., 29 C.F.R. 778.114.  And the *Davis versus*

02:53  2   *Friendly* case where if there is a clear and mutual

02:53  3   understanding, then the jury can find that they should just

02:53  4   simply take that salary and divide it into however many hours

02:53  5   that they find the plaintiffs worked.

02:53  6        In other words, let's say that the jury does find

02:53  7   liability on one or more of the defendants.  They find 50 hours

02:53  8   on average were worked every week.  They would then -- this

02:53  9   instruction allows them to take the thousand dollars, divide 50

02:53  10  into it, and come up with the regular rate of $20 an hour and

02:53  11  award $10 an hour every week for those 10 hours of overtime

02:53  12  work that they found.  Your instruction would require them to

02:54  13  award $30 an hour.

02:54  14        **MR. KELLY:**  May I respond to that, Your Honor?

02:54  15        **THE COURT:**  Yes, sir.

02:54  16        **MR. KELLY:**  Yeah.  I think that -- well, first of all,

02:54  17  I think you -- my notes indicate you granted defendants' 17.

02:54  18  Let me see.  Instruction number -- oh, I see.  Well, actually

02:54  19  as to my exhibit or my jury instruction 19, I think you

02:54  20  actually did do what he wants you to do because your first

02:54  21  sentence that you left in there you said, If the employees

02:54  22  employed solely on a weekly salary basis.  His regular hourly

02:54  23  rate of pay on which time and a half must be paid is computed

02:54  24  by dividing the salary by the number of hours which the salary

02:54  25  is intended to compensate.  They can simply now argue it wasn't

02:54  1    intended for 40 hours.  It was intended for --

02:54  2         THE COURT:  Two hours.

02:54  3         MR. KELLY:  Yeah, or whatever.  So I mean -- and then

02:54  4    at the end you use the language with 40 in there, and that's

02:54  5    going to be my argument.  I'll probably, you know, argue in the

02:55  6    alternative.  I'm going to look through my stuff when I prep,

02:55  7    but I'm probably going to say --

02:55  8         THE COURT:  That objection's overruled.

02:55  9         MR. KLEPPIN:  But the issue, Your Honor, is --

02:55 10         THE COURT:  The objection's overruled.  What's your

02:55 11    next objection?

02:55 12         MR. KLEPPIN:  The next objection, Your Honor, is to

02:55 13    not giving defendants' proposed jury instruction number 12 on

02:55 14    commute time, and in the alternative --

02:55 15         THE COURT:  Okay.  That objection's is overruled.

02:55 16         MR. KLEPPIN:  The -- not giving the work-defined

02:55 17    instruction --

02:55 18         THE COURT:  I'm giving it.

02:55 19         MR. KLEPPIN:  Oh, you are?

02:55 20         THE COURT:  The same one he -- yeah.  I refused yours

02:55 21    because I granted his.

02:55 22         MR. KLEPPIN:  I see.  I know you did that with a

02:55 23    number of these instruction, and I apologize.  I just grabbed

02:55 24    mine first rather than his.  Okay.  And then to a couple that

02:55 25    you're going to give on -- with respect to the plaintiff we

APRIL 15, 2011

02:55   1    object to any jury instruction on the Florida minimum wage

02:55   2    because the testimony was very clear from the plaintiffs that

02:55   3    there was no written demand for minimum wages that were -- that

02:56   4    was provided to the defendants.  And the Florida Minimum Wage

02:56   5    Act requires that there be a demand in writing coupled with a

02:56   6    30-day waiting period.

02:56   7        MR. KELLY:  I'm just curious if the affirmative

02:56   8    defenses even raise that.

02:56   9        MR. KLEPPIN:  It's not an affirmative defense.  It's

02:56  10    part of the prima facie case to assert that claim.

02:56  11        THE COURT:  That is correct.

02:56  12        MR. KLEPPIN:  Yes.

02:56  13        THE COURT:  That objection is sustained.

02:56  14        MR. KLEPPIN:  Thank you, Your Honor.

02:56  15        THE COURT:  That reference to the Florida minimum wage

02:56  16    will be stricken from plaintiffs' proposed instruction number

02:56  17    9.

02:56  18        MR. KELLY:  Plaintiffs' proposed 9.  Where exactly is

02:56  19    the sentence stricken?

02:56  20        MR. KLEPPIN:  I'll show it to you in just one second.

02:57  21        Your Honor, we also object to Plaintiffs' Number 18

02:57  22    that you're giving.  It's very wordy.  It says that the

02:57  23    employer is defined more broadly than the term would be

02:57  24    interpreted in traditional common law application.  The jury is

02:57  25    not going to know what on earth that even means.

02:57  1          THE COURT:  Well, you don't think we do these

02:57  2    instructions because we hope that the jury will understand

02:57  3    them.  Their function is magical.  That's what it's supposed to

02:57  4    do.  This has magic, magical properties.  Okay.  Overruled.

02:57  5          MR. KLEPPIN:  Okay.  And then we object to instruction

02:57  6    number 19.  As we've said earlier, we don't think that lets the

02:57  7    jury award half time.

02:57  8          THE COURT:  Okay.

02:57  9          MR. KLEPPIN:  And we also object to 20.

02:57 10          THE COURT:  All right.

02:57 11          MR. KLEPPIN:  Because this isn't a situation where the

02:57 12    employer went out and had someone sign a piece of paper saying

02:57 13    you agree -- you know, you're agreeing not to work overtime --

02:58 14    not to be paid overtime.  There's no --

02:58 15          THE COURT:  Okay.  The objection to 19 is overruled.

02:58 16    It's interesting that you object to 20 because my law clerk

02:58 17    says that -- well, she has the same feeling that you do.

02:58 18          MR. KLEPPIN:  Yeah.

02:58 19          THE COURT:  That's the most important instruction in

02:58 20    the whole body of instructions because I think that most

02:58 21    people, most lay people would think that if you agreed to less

02:58 22    than the minimum wage, you were stuck with it and that's not

02:58 23    the law.

02:58 24          MR. KLEPPIN:  But this is -- number 20 here, Your

02:58 25    Honor, is a misstatement of the law; and here's why:  You can

JURY TRIAL - VOLUME V OF V

02:58  1   waive your rights under the FLSA.  It happens all the time.  I

02:58  2   have Judges make those findings all the time in FLSA cases.

02:58  3   The issue is you can't waive them with an express contract

02:59  4   where it's a deal where the employer says, Sign here.  You

02:59  5   agree to work overtime and you don't have to be paid it and you

02:59  6   can't sue me if you (sic) don't pay it.  But they can be

02:59  7   abridged.  They can be waived.  It happens all the time in

02:59  8   these sorts of cases, and I'm just afraid --

02:59  9        THE COURT:  What do you think about that?

02:59  10        MR. KELLY:  I think that -- I disagree.  And we dealt

02:59  11   with this in a recent case.  These cases have evolved in

02:59  12   different ways with respect to that.  However, I think the

02:59  13   whole body evolved.  You know, for example, there's this

02:59  14   concept now in some of the case law that an employer -- you

02:59  15   know, an employee can, you know, be paid to do -- I just

02:59  16   disagree.  I mean I think -- I don't think that an employee can

02:59  17   -- an employer can have -- an employee can say I'm not being

02:59  18   paid overtime.  I haven't seen that.  I'd like to see a black

02:59  19   letter case that says an employer -- and employee can say, you

02:59  20   know what, you're required to pay me overtime; but I need this

02:59  21   job so I'm going to take this job regardless.  Don't pay me.

02:59  22   They can come back and sue later for that.

02:59  23        MR. KLEPPIN:  There's an 11th Circuit case, *Pagent*.  I

03:00  24   can't remember the rest of it in the citation.  And Judge King

03:00  25   has followed it and other Judges in my cases where, for

APRIL 15, 2011

JURY TRIAL - VOLUME V OF V

03:00  1   instance -- looked like, for instance, Mr. Milan testified, Oh,

03:00  2   I was always paid for my -- I received a week -- I always

03:00  3   received a week's pay or they'll testify that, Hey, what was

03:00  4   done here wasn't willful.  That's an admission.  Admissions can

03:00  5   be used against plaintiffs all the time in these sorts of

03:00  6   cases.

03:00  7       MR. KELLY:  That's a factual issue.  He can then make

03:00  8   the argument that -- not that he waived it, but he made the

03:00  9   argument that he admitted that he's not entitled to any.  I

03:00  10  mean he admitted that he didn't work the hours.

03:00  11      MR. KLEPPIN:  Well, let me give you --

03:00  12      MR. KELLY:  But not just that I worked the -- you

03:00  13  can't say that he worked the hours, but it doesn't matter

03:00  14  because he said that I just waive it.  I don't have any rights

03:00  15  to it anymore.

03:00  16      MR. KLEPPIN:  Well, I'll give you an example.  I'll

03:00  17  give you an example.  Mr. -- this is what I meant to say, and

03:00  18  I'm sorry I misspoke before.  Mr. Milan -- I specifically asked

03:00  19  him, Weren't you paid the $700 for every week you worked?  Yes,

03:00  20  I was.

03:00  21      Now, I'm going to argue to the jury that that means

03:01  22  his minimum wage claim they should find in favor of the defense

03:01  23  on that.  And that's him waiving a claim.  His attorney is

03:01  24  saying, Oh, no, he's got a minimum wage claim for the last

03:01  25  couple of weeks he wasn't paid.  Well, Mr. Milan is able to

APRIL 15, 2011

03:01  1    absolutely say, I was paid $700 for every week.  And then Mr.

03:01  2    Kelly's going to say, Wait a wait.  Mr. Milan can't waive his

03:01  3    right to overtime.  You heard Mr. Kleppin say that Mr. Kleppin

03:01  4    got him to say that he was paid $700 every week.  Well, Mr.

03:01  5    Milan just can't -- that would be a waiver of his claim or an

03:01  6    abridgment of his claim.  Mr. Milan can't do that.  He's

03:01  7    absolutely entitled to the two weeks because we know that.  And

03:01  8    I'm afraid that this jury instruction is going to impede my

03:01  9    ability to argue in my closing some of these issues.

03:01 10            THE COURT:  All right.  That's objection's overruled.

03:01 11            MR. KLEPPIN:  And then, lastly, Your Honor, on

03:01 12    operational control we object to the defense instruction that

03:01 13    they must be an officer not given.  And we object to Mr.

03:01 14    Kelly's instruction where he says that the exercise can only be

03:02 15    occasional because that's in plaintiffs' instruction 21 that

03:02 16    you said you're going to give.  He says that liability may also

03:02 17    be found even if control is restricted or exercised only

03:02 18    occasionally.  And it's frankly contrary to the instruction

03:02 19    you're giving that requires day-to-day control.

03:02 20            MR. KELLY:  That is helping to interpret day-to-day

03:02 21    control from *Olivas*.

03:02 22            THE COURT:  All right.  The objection to that will be

03:03 23    sustained.

03:03 24            MR. KLEPPIN:  Thank you, Your Honor.

03:03 25            THE COURT:  I'll take that sentence out.

APRIL 15, 2011

03:03  1          MR. KELLY:  Your Honor, so can I ask a question?  I'm

03:03  2   not clear on that particular instruction there.  What's left

03:03  3   with respect to --

03:03  4          THE COURT:  Everything is left except the second

03:03  5   sentence which talks about liability may also be found even if

03:03  6   control is restricted or exercised only occasionally.  As such

03:03  7   does not diminish the significance of the existence of such

03:03  8   control.

03:03  9          MR. KELLY:  That's being stricken out?

03:03  10         THE COURT:  That's correct.

03:03  11         MR. KELLY:  Judge, is that anywhere else in any of

03:03  12  these instructions with respect -- because now the jury's going

03:03  13  to do exactly what we're talking about *Olivas* now.  It's not

03:03  14  they have -- he's going to be able to say now that they have to

03:03  15  be there every single day.

03:03  16         THE COURT:  You object to that taken out?

03:03  17         MR. KELLY:  Yeah.  Yes.

03:03  18         THE COURT:  Overruled.  What else?

03:03  19         MR. KLEPPIN:  Nothing from the defense, Your Honor.

03:03  20         THE COURT:  All right.  How long do you need in

03:03  21  argument, Mr. Kelly?

03:03  22         MR. KELLY:  I'm sorry?

03:03  23         THE COURT:  How long will you need in argument?

03:03  24         MR. KELLY:  I would say I need -- I would like to

03:04  25  reserve 40 minutes.

03:04   1        **THE COURT:**  40 minutes.

03:04   2        Mr. Leiva, do you have any objections, other

03:04   3   objections to the Court's proposed instructions?

03:04   4        **MR. KLEPPIN:**  Or verdict form?

03:04   5        **MR. LEIVA:**  I would like to ask a question about the

03:04   6   verdict form --

03:04   7        **THE COURT:**  Okay.

03:04   8        **MR. LEIVA:**  -- if possible, Your Honor.

03:04   9        **THE COURT:**  Yes, of course.

03:04  10        **MR. KLEPPIN:**  That's the one I proposed.  Do you want

03:04  11   to see the one actually the Court is giving?

03:04  12        **MR. LEIVA:**  This is terrible.  You're proposed this.

03:04  13   It's terrible.  If this is bad, I can even imagine how bad the

03:04  14   other ones are.  Let me see what he --

03:04  15        **MR. KLEPPIN:**  He's talking about my filing, Your

03:04  16   Honor; not yours.

03:04  17        **MR. LEIVA:**  And I think it's terrible, Your Honor.

03:04  18   Terrible.

03:04  19        **THE COURT:**  Okay.  Well, I'm not going to use it

03:04  20   anyway, so you don't have to argue anymore.

03:04  21        **MR. KLEPPIN:**  For the record it's wonderful, Your

03:04  22   Honor.

03:04  23        **THE COURT:**  All right.  Very good.  I'm going to use

03:04  24   my own.

03:04  25        **MR. KLEPPIN:**  Mr. Kelly, do you have your verdict form

03:04  1    available to show Mr. Leiva so he can make his arguments?  I

03:04  2    can't find my copy.  I'm sorry.

03:04  3           MR. KELLY:  I wanted to -- before we move on to the

03:04  4    verdict form, I had one more question about the jury

03:05  5    instructions before we left here.

03:05  6           THE COURT:  Go ahead.

03:05  7           MR. KELLY:  I just -- I wasn't clear.  And while we're

03:05  8    on the record I need to be clear as to my instruction 9.  I was

03:05  9    listening to the legal argument.  I didn't see exactly which

03:05  10   sentence was struck out of my exhibit 9 or my number 9.

03:05  11          THE COURT:  Number 9?

03:05  12          MR. KELLY:  Yes.  It had something to do with --

03:05  13          THE COURT:  The part about, However, under the Florida

03:05  14   constitution in the State of Florida starting on et cetera.

03:05  15          MR. KELLY:  Or however.  Okay.  To -- oh, so the whole

03:05  16   state is out?

03:05  17          THE COURT:  Right.

03:05  18          MR. KELLY:  Okay.

03:05  19          THE COURT:  How long will you --

03:05  20          MR. LEIVA:  Your Honor, I don't want to keep you too

03:05  21   long; but if he has a form, I would like to see it.

03:05  22          THE COURT:  Okay.

03:05  23          MR. LEIVA:  Anyway, the verdict form that he uses --

03:05  24          THE COURT:  Well, he's not using that.

03:05  25          MR. LEIVA:  Well, I would like to see what they use.

03:05  1          MR. KLEPPIN:  The Court's not using that.

03:05  2          THE COURT:  I'm not using that, so what are we talking

03:05  3   about?

03:05  4          MR. LEIVA:  Well, it's terrible.  Thank God.  Thank

03:05  5   God you're not using this.

03:05  6          THE COURT:  Right.

03:05  7          MR. LEIVA:  Can I see?  What is the Court -- can I see

03:05  8   what the Court is using though?

03:05  9          MR. KLEPPIN:  I apologize, Your Honor.  Your clerk did

03:05 10   give me one.  I've looked everywhere for it.  I don't know why

03:06 11   I can't find it in my papers here.

03:06 12          THE COURT:  All right.  Here's another one.

03:06 13          MR. LEIVA:  Thank you, Your Honor.

03:06 14          MR. KLEPPIN:  Thank you.

03:06 15          MR. LEIVA:  Oh, so in here it doesn't ask any

03:06 16   questions about 40 hours --

03:06 17          THE COURT:  No.

03:06 18          MR. LEIVA:  -- for overtime?  Oh, this is much better.

03:06 19   Thank you, Your Honor.

03:06 20          THE COURT:  Well --

03:06 21          MR. LEIVA:  Very intelligently done.

03:06 22          THE COURT:  -- I'm glad you agree.

03:06 23          MR. LEIVA:  No, no.  This is -- somebody is using

03:06 24   their brains here.  Thank you very much.  This is good.

03:06 25          THE COURT:  I do the best I can.

APRIL 15, 2011

03:06  1      MR. LEIVA:  Thank you, Your Honor.  No.  I appreciate

03:06  2  it.

03:06  3      THE COURT:  Okay.

03:06  4      MR. LEIVA:  That makes sense.

03:06  5      THE COURT:  Any other objections?  Do you have any

03:06  6  other objections or any other observations, Mr. Leiva?

03:06  7      MR. LEIVA:  No, sir.  No, Your Honor.

03:06  8      THE COURT:  How long do you need for argument?

03:06  9      MR. KLEPPIN:  I'd like an hour, Your Honor.

03:06  10      THE COURT:  How long do you need, Mr. Leiva?

03:06  11      MR. LEIVA:  Two days.

03:06  12      THE COURT:  Two days.

03:07  13      MR. LEIVA:  No.  I'm just kidding.  Half an hour, Your

03:07  14  Honor, will be fine.  Half an hour.

03:07  15      THE COURT:  Okay.

03:07  16      MR. KELLY:  Can I say 45, Your Honor, because they're

03:07  17  taking an hour just to be sure.

03:07  18      THE COURT:  One hour for the plaintiff.

03:07  19      MR. KELLY:  Okay.

03:07  20      THE COURT:  You have to use at least half of it in

03:07  21  your opening, 45 minutes for --

03:07  22      MR. KLEPPIN:  Mr. Leiva?

03:07  23      THE COURT:  45 minutes for the defendants Safe

03:07  24  Hurricane, Heidelberger, and M$^c$Carroll.  30 minutes for Mr.

03:07  25  Leiva.  So that gives us an hour -- two hours and 15 minutes if

APRIL 15, 2011

JURY TRIAL - VOLUME V OF V

03:07  1    my math is correct.

03:07  2          MR. KELLY:  So I get an hour.  I have to use at least

03:07  3    30 for the --

03:07  4          THE COURT:  Right.

03:07  5          MR. KELLY:  -- initial?

03:07  6          THE COURT:  Okay.

03:07  7          MR. KLEPPIN:  Your Honor, is there any way we could

03:08  8    get a copy of the final jury instructions?

03:08  9          THE COURT:  I'll have them for you --

03:08  10         MR. KLEPPIN:  Okay.

03:08  11         THE COURT:  -- Monday morning in the order in which

03:08  12   they're going to be read.

03:08  13         MR. KLEPPIN:  Do you know what time Monday morning?

03:08  14         THE COURT:  9:00 o'clock.  Be here at 9:00 and we'll

03:08  15   go right into the closing arguments.  If you want to come at

03:08  16   8:30, I'll meet you here.

03:08  17         MR. KLEPPIN:  Well, seriously, if I did come at 8:30,

03:08  18   could I get a copy of the instructions then just to --

03:08  19         THE COURT:  Yes, sir, you sure can.

03:08  20         MR. KLEPPIN:  Okay.  And the verdict form?  Thank you,

03:08  21   Your Honor.

03:08  22         THE COURT:  All right.  Have a good weekend.  We'll

03:08  23   see you Monday morning at 8:30 if you want to be here.  You can

03:08  24   come in later if you want, Mr. Kelly.

03:08  25         MR. KELLY:  But we all have to be here at 9:00,

APRIL 15, 2011

JURY TRIAL - VOLUME V OF V

03:08 1   though, required to be here at 9:00?

03:08 2        THE COURT:  9:00 o'clock.  Yeah.  9:00 o'clock is when

03:08 3   I want to bring in the jury, but --

03:08 4        MR. KLEPPIN:  Thank you, Your Honor.  Have a nice

03:08 5   weekend.

03:08 6        MR. KELLY:  Thank you.

03:08 7        THE COURT:  Very good.

03:08 8        MR. LEIVA:  Thank you, Your Honor.

9        (Adjourned)

10

11

12              C E R T I F I C A T E

13

14        I hereby certify that the foregoing is an accurate

15   transcription of proceedings in the above-entitled matter.

16

17

18   6/24/11                    /s/ Jill Michelle Hardy-Hobbs
     -------                    ---------------------------------------
19    DATE                      JILL MICHELLE HARDY-HOBBS, CCR, FPR
                                OFFICIAL UNITED STATES COURT REPORTER
                                400 NORTH MIAMI AVENUE, SUITE 08S33
20                              MIAMI, FL  33128    T: 305.523.5022
                                jill_hardy-hobbs@flsd.uscourts.gov
21

22

23

24

25

APRIL 15, 2011

**$**

**$10** [3] - 71:10, 74:22, 132:11
**$16,500** [1] - 131:6
**$17** [2] - 16:2, 17:12
**$182.70** [2] - 113:14, 113:16
**$20** [1] - 132:10
**$20,000** [1] - 109:3
**$25.50** [2] - 16:3, 16:5
**$3,978** [1] - 16:5
**$30** [1] - 132:13
**$40,000** [1] - 64:11
**$500** [1] - 128:6
**$52,000** [1] - 131:3
**$700** [8] - 11:21, 12:3, 12:9, 17:13, 48:24, 137:19, 138:1, 138:4
**$73,000** [1] - 71:7
**$75,000** [1] - 77:18
**$800** [6] - 58:3, 58:6, 78:8, 78:20, 113:20, 113:22
**$900** [1] - 78:8

**'**

**'06** [5] - 30:14, 36:10, 50:3, 68:20, 72:16
**'07** [10] - 31:15, 42:20, 45:12, 49:4, 66:5, 66:25, 68:21, 72:16
**'08** [1] - 31:15

**/**

**/s** [1] - 145:17

**0**

07-61295-CIV-GONZALEZ/COHN [1] - 1:3
**08S33** [2] - 2:4, 145:19

**1**

**1** [3] - 1:11, 125:19, 126:16
**10** [10] - 15:25, 50:16, 125:5, 125:13,

125:23, 126:16, 127:7, 127:9, 130:12, 132:11
**1099** [7] - 55:25, 56:3, 56:9, 64:4, 64:7, 64:12, 80:11
**1099s** [12] - 64:8, 64:9, 64:22, 68:3, 68:16, 68:18, 68:24, 69:5, 69:8, 80:9, 80:14, 80:19
**11** [4] - 15:25, 66:21, 125:23, 126:12
**1150** [1] - 97:15
**11:00** [2] - 46:3, 60:3
**11:30** [1] - 60:3
**11th** [11] - 97:13, 97:16, 100:19, 108:6, 108:12, 110:19, 113:4, 113:6, 123:16, 123:18, 136:23
**12** [4] - 50:4, 125:24, 126:16, 133:13
**124** [1] - 4:12
**125** [1] - 4:13
**12:00** [1] - 46:3
**13** [4] - 50:4, 79:21, 125:24, 126:13
**14** [2] - 126:10, 126:13
**142** [1] - 100:20
**15** [5] - 1:9, 65:5, 125:25, 126:16, 143:25
**1546** [1] - 104:22
**16** [3] - 105:7, 126:10, 126:13
**16,000** [1] - 131:6
**1678** [1] - 105:10
**17** [5] - 126:11, 126:13, 131:9, 131:17, 132:17
**18** [1] - 104:22, 126:1, 126:17, 131:17, 134:21
**186** [1] - 131:20
**19** [9] - 13:5, 13:7, 113:3, 114:14, 126:1, 126:23, 132:19, 135:6, 135:15
**1938** [1] - 105:18
**1947** [1] - 101:25
**1982** [1] - 120:9
**1:00** [4] - 46:3, 95:4, 95:5, 95:9

**2**

**2** [8] - 83:10, 83:15,

83:22, 83:23, 83:25, 125:20, 126:16, 129:19
**20** [7] - 3:5, 68:25, 126:4, 126:14, 135:9, 135:16, 135:24
**20/20** [1] - 115:23
**2001** [1] - 61:7
**2002** [1] - 105:15
**2003** [1] - 100:19
**2006** [9] - 30:8, 49:6, 57:2, 57:13, 59:5, 68:5, 69:4, 78:8, 86:13
**2007** [15] - 13:9, 15:24, 15:25, 31:5, 31:6, 59:5, 66:9, 68:7, 68:24, 68:25, 69:3, 69:8, 72:25, 79:20, 84:14
**2008** [3] - 69:1, 69:7, 113:6
**2009** [2] - 108:6, 123:5
**2011** [1] - 1:9
**203(d** [2] - 107:13, 111:19
**203(d)** [1] - 106:21
**21** [5] - 18:25, 113:6, 126:4, 126:17, 138:15
**21488682** [1] - 100:19
**21st** [1] - 86:13
**22** [1] - 126:17
**23** [2] - 57:10, 57:11
**23rd** [1] - 86:13
**25th** [1] - 57:13
**26** [2] - 16:4, 16:5
**27th** [1] - 108:6
**29** [6] - 15:24, 101:14, 106:21, 111:19, 131:13, 132:1
**2:00** [2] - 39:15, 59:11
**2:30** [1] - 59:12

**3**

**3** [5] - 85:19, 86:4, 86:6, 125:20, 126:16
**30** [11] - 3:10, 13:5, 24:9, 24:21, 29:14, 37:24, 38:24, 39:2, 58:11, 143:24, 144:3
**30-day** [1] - 134:6
**300** [1] - 1:18
**305.523.5022** [2] - 2:4, 145:20
**305.865.6766** [1] -

1:19
**305.865.7167** [1] - 1:19
**31** [5] - 14:17, 82:1, 82:9, 82:11, 82:12
**32** [2] - 32:23, 58:11
**324** [1] - 108:5
**33128** [2] - 2:4, 145:20
**33141** [1] - 1:18
**33324** [1] - 1:22
**35** [8] - 24:9, 26:21, 58:11, 60:13, 104:2, 113:15, 113:16, 122:7
**37** [1] - 29:18
**3:00** [8] - 39:15, 59:12, 59:18, 71:22, 93:14, 94:12, 104:13, 116:12

**4**

**4** [6] - 84:6, 84:20, 84:22, 84:25, 125:21, 126:16
**4-14-11** [4] - 3:3, 3:18, 7:24, 66:1
**40** [29] - 32:16, 32:17, 53:7, 58:11, 58:16, 60:13, 61:22, 62:17, 62:18, 69:16, 70:1, 70:13, 100:9, 100:17, 101:12, 111:10, 113:23, 114:2, 114:7, 114:8, 114:10, 114:12, 114:18, 127:25, 133:1, 133:4, 139:25, 140:1, 142:16
**40-hour-a-week** [1] - 104:3
**400** [2] - 2:4, 145:19
**41** [5] - 4:11, 90:14, 90:20, 95:20, 97:2
**43** [1] - 71:7
**45** [7] - 18:14, 39:2, 39:7, 66:17, 143:16, 143:21, 143:23
**46** [2] - 3:11, 3:12
**47** [1] - 18:25
**4:00** [11] - 34:13, 35:7, 35:9, 35:11, 35:13, 35:15, 39:12, 60:11, 70:3, 103:23, 104:14
**4:30** [2] - 117:13, 117:14
**4th** [1] - 100:20

**5**

**5** [5] - 86:16, 87:2, 87:4, 126:10, 126:16
**50** [24] - 4:11, 4:12, 28:11, 90:14, 90:20, 95:12, 95:18, 95:23, 97:2, 97:8, 101:20, 102:11, 103:5, 108:20, 118:4, 118:24, 119:24, 124:19, 124:25, 125:3, 130:19, 132:7, 132:9
**500** [2] - 43:5, 43:6
**515** [1] - 97:15
**528** [1] - 108:15
**55** [1] - 3:13
**56** [1] - 3:15
**57** [1] - 117:16
**5:00** [7] - 12:16, 59:10, 59:16, 59:18, 116:9, 116:10, 116:12
**5:20** [1] - 12:16
**5:30** [2] - 12:16, 27:11
**5:45** [1] - 27:11
**5th** [2] - 108:15, 110:18

**6**

**6** [7] - 14:19, 61:15, 79:20, 125:22, 126:16, 130:1, 130:2
**6/24/11** [1] - 145:17
**60** [9] - 3:16, 12:20, 14:8, 17:10, 18:1, 18:4, 116:21
**605** [1] - 1:18
**63** [1] - 3:17
**632** [1] - 97:14
**65** [1] - 3:19
**66** [3] - 16:3, 17:2, 17:25
**66-hour** [1] - 103:10
**67** [1] - 3:21
**672** [1] - 108:14

**7**

**7** [4] - 3:4, 14:19, 126:4, 126:16
**700** [1] - 32:1
**712** [1] - 100:21
**71st** [1] - 1:18
**75** [1] - 3:22
**778.114** [3] - 101:15,

JURY TRIAL - VOLUME V OF V

131:13, 132:1
**7:00** [2] - 117:11, 117:12
**7:30** [6] - 51:4, 69:20, 116:8, 117:5, 117:8, 117:14
**7:45** [3] - 116:5, 116:6, 117:7
**7:45/8:00** [1] - 59:22

**8**

**8** [2] - 126:4, 126:16
**800** [1] - 32:5
**803** [1] - 97:14
**81** [1] - 3:23
**82** [2] - 5:3
**83** [3] - 4:4, 5:4
**839** [1] - 108:6
**84** [2] - 5:5
**850** [1] - 32:5
**86** [2] - 5:6
**87** [3] - 4:5, 5:7
**8751** [1] - 1:22
**89** [3] - 4:6, 5:13
**8:00** [4] - 50:16, 50:17, 60:9, 60:10
**8:30** [16] - 36:20, 50:8, 50:10, 50:14, 50:16, 59:20, 60:4, 60:8, 60:9, 60:10, 69:21, 70:3, 117:8, 144:16, 144:17, 144:23

**9**

**9** [9] - 15:7, 125:22, 126:16, 134:17, 134:18, 141:8, 141:10, 141:11
**9.5** [1] - 117:15
**90** [2] - 72:5, 78:8
**90-plus** [1] - 51:10
**95** [1] - 4:11
**954.424.1933** [1] - 1:23
**954.474.7405** [1] - 1:23
**9:00** [11] - 37:1, 60:3, 60:5, 93:22, 94:23, 144:14, 144:25, 145:1, 145:2
**9:30** [1] - 37:2

**A**

**a)** [1] - 104:22

**ability** [3] - 80:1, 84:1, 138:9
**able** [11] - 10:24, 11:11, 13:10, 47:9, 104:15, 116:18, 122:3, 123:2, 130:14, 137:25, 139:14
**above-entitled** [1] - 145:15
**abridged** [1] - 136:7
**abridgment** [1] - 138:6
**absence** [1] - 7:13
**absentee** [1] - 98:11
**absolutely** [8] - 18:2, 26:11, 39:6, 41:19, 70:23, 108:23, 138:1, 138:7
**accepted** [2] - 101:4, 101:5
**accordance** [1] - 76:20
**account** [1] - 59:13
**accounted** [1] - 116:23
**accounting** [2] - 68:10
**accuracy** [1] - 13:10
**accurate** [4] - 49:5, 102:3, 115:12, 145:14
**acquainted** [1] - 47:16
**act** [4] - 104:11, 105:16, 105:17, 123:12
**Act** [3] - 120:11, 130:13, 134:5
**acting** [3] - 107:14, 107:17, 107:18
**activities** [2] - 99:13, 120:13
**activity** [2] - 105:19, 105:20
**actual** [3] - 15:16, 104:3, 111:13
**add** [2] - 116:12, 124:5
**added** [1] - 128:14
**adding** [1] - 129:24
**addition** [2] - 118:10, 129:11
**additional** [4] - 91:17, 101:18, 125:12, 130:18
**additionally** [1] - 126:18
**address** [4] - 88:16, 88:17, 106:18, 106:20
**addressing** [1] - 26:1
**adduced** [1] - 108:22

**Adjourned** [1] - 145:9
**administration's** [1] - 123:21
**administrative** [1] - 112:25
**admission** [5] - 83:21, 84:19, 86:3, 87:1, 137:4
**admissions** [2] - 118:9, 137:4
**admit** [1] - 77:13
**admitted** [8] - 57:9, 89:14, 100:7, 103:10, 103:11, 111:9, 137:9, 137:10
**advanced** [6] - 19:1, 57:15, 66:22, 66:23, 66:24, 88:6
**affairs** [2] - 94:14, 109:15
**affirmative)** [2] - 57:16, 96:4
**afraid** [3] - 112:19, 136:8, 138:8
**afternoon** [6] - 6:13, 8:3, 39:11, 39:16, 59:8, 75:22
**agency** [3] - 53:2, 107:16, 120:14
**agent** [3] - 86:20, 107:18, 107:20
**ago** [5] - 41:15, 53:8, 75:24, 117:21, 123:19
**agree** [5] - 11:11, 22:10, 135:13, 136:5, 142:22
**agreed** [3] - 11:24, 122:6, 135:21
**agreeing** [1] - 135:13
**agreement** [2] - 54:21
**Aguirre** [16] - 90:18, 90:20, 90:24, 90:25, 91:1, 91:6, 91:11, 91:16, 91:21, 91:23, 92:4, 92:6, 92:12, 92:15, 92:19, 114:15
**ahead** [7] - 84:13, 90:22, 92:14, 106:7, 117:1, 131:23, 141:6
**AJ** [1] - 68:10
**Alan** [1] - 85:8
**Alborez** [2] - 95:21
**ALBOREZ** [2] - 1:6, 1:6
**alien** [4] - 122:17, 122:20, 123:15, 123:16
**aliens** [1] - 122:18

**alive** [1] - 123:24
**allegations** [1] - 74:9
**allegedly** [2] - 79:12, 98:9
**alleging** [1] - 79:15
**allow** [2] - 73:3, 96:21
**allowed** [4] - 76:24, 108:23, 128:21, 128:22
**allows** [1] - 132:9
**alludes** [1] - 119:25
**almost** [3] - 70:25, 93:15, 130:18
**Aloleo** [2] - 67:18, 67:19
**alone** [5] - 93:8, 107:21, 107:23, 108:3, 121:2
**alternative** [4] - 95:19, 95:23, 133:6, 133:14
**Altonaga** [2] - 118:23, 119:23
**aluminum** [1] - 10:6
**Alvarez** [2] - 97:14, 120:25
**amended** [1] - 126:1
**amendment** [2] - 85:22, 126:2
**America** [5] - 72:13, 73:18, 73:25, 74:1, 79:23
**American** [3] - 78:11, 78:13, 79:23
**amount** [14] - 12:8, 12:14, 16:2, 32:19, 32:21, 58:6, 100:24, 101:8, 102:6, 103:16, 115:15, 115:16, 117:17, 130:21
**amounts** [2] - 32:22, 79:12
**analyze** [1] - 62:23
**Anderson** [5] - 101:23, 102:12, 103:13, 114:25, 129:3
**Angeles** [1] - 95:21
**ANGELES** [1] - 1:5
**angles** [6] - 25:3, 25:6, 25:8, 25:9, 25:14
**Angles** [1] - 25:9
**answer** [20] - 11:18, 13:11, 13:14, 13:16, 14:16, 15:3, 15:13, 15:23, 16:6, 16:16, 17:25, 18:4, 19:3, 19:5, 19:9, 23:14, 53:8, 66:23, 78:18,

**106:5**
**answered** [1] - 23:2
**anyplace** [1] - 37:10
**anyway** [2] - 140:20, 141:23
**apartment** [1] - 79:2
**apologies** [1] - 26:14
**apologize** [5] - 6:17, 26:13, 91:8, 133:23, 142:9
**appealed** [1] - 108:12
**appear** [1] - 95:22
**aPPEARANCES** [1] - 1:15
**appeared** [1] - 97:9
**Appendix** [1] - 108:6
**application** [1] - 134:24
**applied** [2] - 104:20, 122:21
**apply** [4] - 101:17, 122:21, 123:7, 123:11
**appreciate** [2] - 94:21, 143:1
**approach** [10] - 13:2, 14:23, 14:25, 16:17, 27:15, 66:14, 81:21, 83:4, 87:10, 107:3
**appropriate** [1] - 108:21
**approval** [1] - 6:17
**approved** [1] - 78:5
**April** [3] - 72:20, 72:21, 108:6
**APRIL** [1] - 1:9
**April/may** [1] - 72:23
**area** [2] - 7:1, 115:1
**arguably** [2] - 111:20, 128:24
**argue** [12] - 101:9, 103:17, 118:1, 118:7, 119:4, 132:25, 133:5, 137:21, 138:9, 140:20
**argued** [2] - 123:18, 131:5
**arguing** [3] - 96:23, 105:3, 116:15
**argument** [27] - 75:15, 96:23, 97:11, 99:15, 100:4, 101:21, 104:17, 106:3, 107:22, 111:18, 112:12, 112:14, 112:22, 118:3, 118:11, 118:18, 118:21, 119:1, 123:20, 133:5, 137:8, 137:9, 139:21, 139:23, 141:9, 143:8

JURY TRIAL - VOLUME V OF V

**arguments** [10] - 93:3, 93:11, 93:19, 94:1, 94:6, 97:8, 118:25, 120:1, 141:1, 144:15

**arise** [2] - 79:21, 103:19

**arises** [1] - 102:7

**arranged** [1] - 29:3

**arrangements** [1] - 6:15

**arrive** [6] - 10:21, 27:11, 50:10, 50:11, 50:24, 59:21

**arrived** [3] - 23:23, 50:21, 69:20

**articles** [3] - 83:16, 85:22, 85:23

**aspect** [2] - 19:25, 40:17

**aspects** [1] - 97:20

**assert** [3] - 41:20, 41:24, 134:10

**assignment** [1] - 70:6

**assignments** [2] - 81:9, 81:10

**assume** [2] - 53:8, 64:15

**assurances** [1] - 52:14

**attempted** [1] - 96:21

**attend** [1] - 94:13

**attention** [2] - 93:21, 94:15

**attorney** [23] - 13:21, 13:24, 14:13, 14:14, 14:16, 14:20, 15:4, 16:11, 16:21, 16:25, 17:1, 17:16, 19:16, 21:10, 21:12, 21:13, 21:20, 21:21, 26:13, 71:8, 74:15, 91:15, 137:23

**attorneys** [1] - 93:12

**August** [9] - 13:9, 30:8, 30:14, 42:20, 44:14, 45:12, 50:3, 57:13, 66:4

**AUGUSTIN** [3] - 1:4, 3:3, 7:23

**authority** [12] - 40:19, 41:21, 41:24, 96:2, 98:5, 99:3, 99:23, 100:18, 109:15, 109:16, 111:7, 121:21

**available** [1] - 141:1

**Avenue** [1] - 2:4

**AVENUE** [1] - 145:19

**average** [10] - 35:6, 35:8, 35:14, 37:23, 38:22, 39:12, 59:13, 59:16, 59:18, 132:8

**averages** [1] - 104:15

**await** [1] - 94:9

**award** [8] - 104:25, 128:6, 130:18, 130:22, 131:3, 132:11, 132:13, 135:7

**awarding** [1] - 123:1

**awards** [1] - 105:1

**aware** [8] - 51:5, 52:3, 52:6, 52:12, 54:6, 55:5, 55:11, 80:21

## B

**B-u-n-g-o** [1] - 56:15

**b-u-n-g-o** [1] - 56:21

**backdooring** [1] - 112:13

**backed** [1] - 117:9

**background** [2] - 74:14, 74:21

**bad** [2] - 140:13

**bakery** [4] - 37:12, 37:15, 37:19, 38:10

**balcony** [1] - 116:24

**bald** [1] - 130:6

**bank** [1] - 79:22

**Bank** [1] - 79:23

**bar** [1] - 75:8

**barbecues** [3] - 71:17, 71:19, 71:20

**Barrera** [2] - 122:14, 123:14

**based** [4] - 56:9, 61:21, 112:1, 112:7

**basis** [5] - 7:12, 15:17, 47:13, 113:9, 132:22

**bathrooms** [1] - 81:2

**Beach** [4] - 1:18, 88:17, 88:19, 104:12

**became** [4] - 30:11, 32:4, 47:16, 49:1

**become** [3] - 19:7, 31:13, 49:3

**beforehand** [1] - 6:17

**beg** [1] - 19:22

**began** [1] - 8:25

**begin** [1] - 77:14

**beginning** [4] - 11:24, 72:25, 77:16, 125:18

**behalf** [9] - 15:4, 20:4, 20:8, 28:4, 92:5, 93:6, 95:5, 124:21, 130:16

**behind** [5] - 43:21, 66:11, 66:12, 79:20, 89:20

**belief** [1] - 74:10

**below** [1] - 74:7

**best** [7] - 71:6, 80:1, 99:7, 99:8, 99:9, 101:17, 142:25

**better** [4] - 28:25, 98:24, 111:16, 142:18

**between** [14] - 12:6, 18:14, 24:9, 50:16, 54:22, 59:18, 69:20, 71:7, 107:23, 109:22, 117:11, 118:20, 128:23, 128:24

**beverage** [1] - 38:2

**beyond** [2] - 18:20, 73:13

**biased** [1] - 116:3

**big** [2] - 26:15, 79:22

**bill** [1] - 79:3

**bind** [2] - 120:15, 121:21

**binding** [2] - 120:23, 121:18

**bit** [5] - 30:13, 35:4, 44:12, 68:25, 116:11

**bite** [4] - 37:7, 37:10, 37:11, 51:8

**black** [2] - 74:11, 136:18

**Blackmore** [1] - 118:14

**Blackwell** [1] - 105:7

**blocks** [1] - 41:17

**board** [2] - 33:20, 119:3

**Bober** [2] - 74:17, 74:18

**body** [2] - 135:20, 136:13

**bolts** [2] - 25:1, 25:5

**Boreth** [1] - 1:21

**boss** [3] - 20:19, 76:8, 111:4

**bottom** [3] - 84:25, 131:9, 131:16

**Boulevard** [1] - 1:22

**bounce** [1] - 30:23

**bounced** [2] - 18:6, 18:9

**boy** [1] - 100:23

**Boynton** [1] - 104:12

**brackets** [1] - 126:2

**BRAD** [1] - 3:14

**Brad** [6] - 31:14, 43:12, 43:15, 56:13, 56:19, 68:13

**bRAD** [1] - 56:17

**brains** [1] - 142:24

**Brazil** [1] - 22:1

**Brazilian** [6] - 22:4, 22:23, 22:24, 37:12, 37:15, 38:10

**break** [6] - 8:19, 30:13, 37:25, 38:12, 38:19, 51:8

**breaks** [5] - 51:11, 60:12, 70:6, 78:24, 103:24

**breathing** [1] - 99:2

**brief** [2] - 21:1, 90:10

**briefly** [3] - 72:7, 81:20, 82:23

**Bring** [1] - 65:16

**bring** [11] - 6:10, 9:25, 21:3, 21:23, 33:16, 35:15, 38:24, 94:3, 119:18, 119:19, 145:3

**broadly** [1] - 134:23

**broke** [3] - 74:21, 81:1, 94:4

**broken** [1] - 128:2

**brother** [1] - 74:11

**brought** [2] - 21:10, 122:15

**Broward** [1] - 1:22

**Broward/palm** [1] - 88:18

**building** [7] - 50:23, 51:25, 52:1, 73:15, 88:16, 88:17

**bunch** [2] - 30:23, 117:20

**BUNGO** [5] - 3:14, 56:17, 56:19, 56:21, 60:19

**Bungo** [15] - 31:14, 43:12, 56:13, 56:19, 56:24, 57:11, 61:1, 63:23, 64:3, 65:3, 68:13, 116:3, 116:4, 117:6

**burden** [7] - 101:23, 102:9, 102:10, 102:12, 103:13, 103:14, 115:13

**business** [19] - 54:10, 54:11, 57:15, 77:1, 77:23, 83:19, 86:1, 86:22, 86:24, 88:1, 88:6, 88:9, 88:13, 89:19, 98:18, 98:19, 107:25, 121:9,

121:15

**busy** [2] - 37:19, 37:21

**buy** [1] - 94:5

**BY** [37] - 2:2, 7:25, 13:4, 14:5, 15:2, 15:11, 16:23, 19:24, 20:15, 22:14, 23:13, 24:2, 24:20, 25:12, 26:16, 27:5, 27:16, 30:3, 46:14, 53:23, 54:4, 55:9, 55:24, 60:25, 63:10, 64:2, 66:2, 66:16, 67:25, 81:24, 82:13, 83:8, 84:4, 84:23, 86:7, 87:25, 89:12

## C

**C.F.R** [4] - 101:15, 131:13, 132:1

**calculated** [1] - 131:2

**calculation** [2] - 103:2, 130:15

**cannot** [5] - 12:16, 27:9, 67:20, 111:20

**capacity** [1] - 107:18

**card** [9] - 52:5, 54:10, 88:1, 88:6, 88:13, 89:19, 99:12, 107:25, 109:4

**cards** [2] - 54:11, 54:17

**care** [2] - 47:9, 93:23

**carried** [2] - 24:6, 101:22

**carry** [1] - 115:12

**case** [116] - 1:3, 7:9, 15:4, 15:13, 28:2, 28:4, 28:10, 28:11, 28:13, 28:18, 28:20, 47:5, 65:21, 75:1, 82:25, 91:7, 92:12, 92:13, 93:2, 93:20, 94:1, 94:16, 94:20, 95:13, 95:24, 96:20, 97:4, 97:12, 97:24, 99:24, 100:9, 100:19, 100:20, 101:24, 101:25, 102:1, 102:4, 102:5, 105:12, 105:15, 105:22, 108:3, 108:4, 108:5, 108:6, 108:7, 108:12, 108:15, 108:25, 109:6, 109:7, 109:9, 109:10, 109:22, 110:18, 111:6, 112:7,

JURY TRIAL - VOLUME V OF V

112:9, 112:23, 113:3, 113:4, 113:7, 113:23, 114:24, 115:1, 115:3, 118:12, 118:18, 118:19, 118:20, 118:21, 118:22, 119:19, 119:23, 120:9, 120:17, 120:18, 120:21, 121:8, 121:12, 121:18, 121:20, 121:24, 122:5, 122:6, 122:10, 122:14, 122:15, 122:17, 122:20, 122:23, 123:5, 123:6, 123:8, 123:12, 123:14, 123:19, 124:13, 124:20, 125:12, 125:17, 127:6, 127:9, 131:2, 132:2, 134:10, 136:11, 136:14, 136:19, 136:23

**cases** [16] - 97:16, 100:3, 100:25, 101:13, 106:19, 107:12, 113:6, 115:2, 117:24, 123:7, 128:23, 136:2, 136:8, 136:11, 136:25, 137:6

**cash** [21] - 18:9, 44:18, 44:24, 45:1, 45:4, 45:9, 45:11, 45:14, 45:16, 45:17, 45:18, 70:21, 71:6, 71:13, 79:16, 79:18, 79:25, 82:7, 108:4

**cash-flow** [1] - 45:11

**cast** [1] - 103:16

**cat** [3] - 24:23, 77:25

**catch** [1] - 44:2

**categories** [1] - 15:17

**category** [2] - 15:15, 87:18

**causes** [1] - 110:15

**CCR** [2] - 2:3, 145:18

**certain** [6] - 45:2, 58:6, 63:21, 90:3, 114:5, 130:21

**certainly** [10] - 62:17, 75:17, 95:23, 95:24, 111:5, 111:8, 116:13, 118:4, 119:11, 130:5

**certify** [1] - 145:14

**cetera** [2] - 94:21, 141:14

**chair** [1] - 71:1

**chance** [1] - 91:21

**change** [5] - 21:14,

21:15, 21:16, 32:2, 86:19

**changed** [1] - 124:15

**changing** [1] - 124:3

**characterized** [1] - 17:11

**charge** [8] - 62:3, 68:12, 93:10, 95:8, 98:23, 110:1, 125:6, 125:16

**Charge** [1] - 4:13

**check** [11] - 18:6, 18:9, 42:25, 43:1, 43:3, 43:7, 43:10, 44:21, 77:15, 108:4, 128:5

**checking** [1] - 111:2

**checks** [10] - 42:22, 43:19, 43:21, 43:24, 44:20, 44:22, 63:18, 63:21, 79:23, 100:23

**chief** [5] - 28:12, 28:19, 95:13, 97:4, 124:20

**children** [1] - 94:10

**CHRIS** [1] - 1:21

**Christian** [1] - 24:4

**Circuit** [12] - 97:13, 97:16, 100:19, 108:6, 108:12, 108:15, 110:18, 113:4, 113:6, 123:16, 123:18, 136:23

**circuit** [3] - 100:20, 110:19, 120:9

**circumstances** [1] - 106:1

**citation** [1] - 136:24

**cite** [5] - 105:12, 108:5, 113:2, 122:4, 123:6

**cited** [5] - 96:2, 109:10, 122:10

**cites** [3] - 100:20, 108:14, 120:23

**citing** [1] - 97:13

**citizenship** [1] - 119:7

**Civil** [1] - 97:3

**civil** [1] - 120:16

**claim** [12] - 15:12, 17:3, 55:4, 115:21, 117:22, 134:10, 137:22, 137:23, 137:24, 138:5, 138:6

**claimed** [1] - 108:9

**claiming** [1] - 16:1

**claims** [2] - 15:20, 96:22

**clarify** [2] - 11:17,

129:9

**clean** [1] - 34:6

**cleaned** [1] - 34:8

**cleaners** [1] - 71:9

**clear** [21] - 12:5, 18:3, 91:19, 92:3, 97:17, 98:20, 99:16, 99:24, 100:10, 101:2, 101:3, 101:13, 104:1, 104:5, 122:12, 131:13, 132:2, 134:2, 139:2, 141:7, 141:8

**clearer** [1] - 97:13

**Clemens** [2] - 101:23, 115:1

**clerk** [2] - 135:16, 142:9

**CLERK** [2] - 65:13, 125:15

**client** [1] - 92:11

**client's** [1] - 116:8

**clients** [2] - 92:5, 116:7

**clock** [1] - 69:14

**close** [11] - 17:10, 18:4, 35:19, 35:23, 66:5, 66:24, 71:24, 95:6, 95:14, 124:22

**closed** [6] - 35:20, 69:10, 73:12, 73:15, 80:17

**closing** [9] - 30:12, 75:15, 93:3, 93:11, 93:19, 93:25, 112:20, 138:9, 144:15

**club** [1] - 97:15

**coaxed** [1] - 110:9

**code** [1] - 101:15

**coffee** [1] - 36:25

**cohn's** [1] - 124:13

**coincidence** [3] - 21:8, 21:19, 21:20

**coined** [1] - 105:6

**collection** [1] - 53:2

**combined** [2] - 98:3, 129:16

**coming** [5] - 10:1, 50:25, 60:4, 91:25, 110:12

**commented** [1] - 13:1

**commit** [1] - 123:2

**committed** [1] - 22:6

**common** [2] - 110:22, 134:24

**companies** [1] - 120:14

**company** [61] -

11:22, 12:6, 14:1, 20:1, 20:5, 20:9, 20:21, 23:3, 23:18, 27:3, 31:14, 32:12, 36:1, 36:4, 42:16, 43:18, 43:21, 44:2, 44:3, 44:12, 44:16, 44:17, 45:4, 45:11, 46:18, 50:2, 51:2, 53:1, 53:4, 53:10, 53:11, 53:12, 53:13, 53:14, 53:24, 54:5, 54:6, 55:25, 57:7, 59:3, 64:11, 64:12, 66:10, 66:25, 69:10, 70:16, 71:2, 71:17, 80:17, 82:7, 83:18, 84:17, 98:1, 98:12, 99:25, 109:14, 109:23, 110:6, 110:24, 111:7

**company's** [1] - 89:13

**compensable** [2] - 101:10, 104:11

**compensate** [10] - 100:12, 100:17, 113:12, 122:7, 122:13, 128:1, 130:17, 130:21, 131:11, 132:25

**compensated** [8] - 8:17, 16:3, 32:14, 32:16, 58:6, 114:5, 115:14, 130:24

**compensation** [4] - 77:20, 97:21, 113:15, 114:6

**compensatory** [1] - 15:16

**complained** [1] - 19:25

**complaining** [2] - 20:4, 20:9

**completed** [1] - 78:1

**completely** [3] - 38:1, 97:25, 101:21

**computed** [3] - 15:18, 113:11, 132:23

**computer** [1] - 78:14

**computers** [1] - 81:1

**concentrating** [1] - 36:17

**concept** [1] - 136:14

**concern** [1] - 57:14

**concerned** [2] - 36:11, 112:11

**concerning** [7] - 57:14, 61:17, 62:24, 69:24, 93:9, 106:19,

121:23

**conclude** [1] - 94:6

**concluded** [1] - 121:1

**conclusion** [8] - 28:11, 28:18, 93:5, 95:13, 97:3, 118:5, 124:20, 125:4

**condition** [1] - 7:11

**condo** [1] - 36:14

**condominium** [4] - 72:11, 73:19, 73:24, 74:4

**confer** [4] - 90:9, 90:12, 92:11, 93:9

**conference** [3] - 45:16, 125:6, 125:16

**Conference.............**
**.......................** [1] -
4:13

**confessor** [1] - 105:8

**confronted** [1] - 102:16

**confused** [1] - 23:15

**confuses** [1] - 25:23

**confusion** [1] - 91:10

**congregate** [1] - 50:22

**connection** [1] - 93:2

**consider** [5] - 28:5, 28:14, 93:7, 93:24, 95:7

**considerable** [1] - 109:13

**consideration** [3] - 93:8, 93:20, 94:2

**constitution** [1] - 141:14

**contact** [1] - 92:19

**contacted** [3] - 21:3, 21:23, 21:25

**contempt** [1] - 120:16

**contend** [1] - 99:21

**CONTENTS** [1] - 4:9

**contested** [1] - 123:18

**context** [1] - 99:15

**continue** [5] - 19:8, 23:10, 23:17, 28:13, 91:12

**Continued** [3] - 3:3, 3:18, 7:24

**continued** [3] - 20:23, 52:14, 66:1

**continuing** [3] - 7:12, 51:9, 84:1

**contract** [4] - 73:24, 73:25, 74:5, 136:3

**contrary** [1] - 138:18

JURY TRIAL - VOLUME V OF V

**control** [27] - 40:22, 42:8, 42:13, 42:15, 51:20, 97:20, 99:23, 108:9, 108:10, 108:18, 108:19, 109:2, 109:8, 110:3, 110:5, 111:7, 121:17, 121:18, 121:19, 126:19, 129:12, 138:12, 138:17, 138:19, 138:21, 139:6, 139:8
**controller** [6] - 30:12, 31:13, 31:16, 31:19, 42:6, 42:22
**convenient** [1] - 93:17
**conversation** [2] - 52:11, 52:16
**cooler** [1] - 38:2
**copies** [5] - 80:18, 106:22, 107:2, 126:19, 127:5
**copy** [6] - 107:1, 124:13, 127:1, 141:2, 144:8, 144:18
**cords** [2] - 11:8, 39:20
**corporate** [5] - 97:18, 97:19, 120:10, 121:1, 121:5
**corporation** [3] - 84:14, 89:18, 120:15
**corporations** [3] - 86:20, 97:21, 120:12
**Correct** [1] - 76:14
**correct** [89] - 8:20, 9:11, 9:12, 9:14, 9:18, 9:23, 10:2, 10:3, 10:24, 11:9, 11:10, 11:19, 12:3, 12:4, 12:12, 12:15, 13:16, 13:17, 13:22, 13:25, 14:7, 14:21, 16:16, 16:19, 17:12, 18:8, 18:10, 18:11, 18:13, 19:13, 19:16, 19:18, 20:1, 20:22, 23:12, 25:7, 25:17, 25:18, 25:19, 26:18, 26:22, 31:1, 32:11, 33:23, 48:3, 48:4, 48:5, 48:6, 48:11, 48:12, 48:19, 49:25, 51:12, 56:2, 56:6, 56:7, 57:16, 58:4, 58:8, 58:12, 58:14, 60:15, 61:19, 61:20, 62:13, 62:14, 62:19, 68:22, 69:6, 69:10, 69:19, 76:7,

76:13, 80:5, 80:15, 82:8, 85:17, 86:11, 88:4, 88:7, 88:10, 88:13, 88:19, 129:17, 134:11, 139:10, 144:1
**correction** [1] - 21:9
**correctly** [3] - 10:12, 43:2, 45:6
**cost** [1] - 91:16
**costly** [1] - 91:16
**counsel** [8] - 90:12, 92:11, 95:1, 107:2, 126:20, 127:1, 127:5, 129:19
**county** [1] - 100:20
**couple** [19] - 23:19, 30:11, 35:4, 40:13, 41:11, 41:15, 44:6, 44:21, 63:24, 66:3, 77:24, 80:24, 81:17, 82:15, 84:24, 97:16, 104:4, 133:24, 137:25
**coupled** [1] - 134:5
**course** [21] - 20:24, 23:17, 23:18, 27:7, 27:14, 27:18, 53:25, 70:23, 71:14, 72:9, 73:23, 74:3, 77:9, 77:24, 83:18, 84:16, 86:1, 86:21, 92:10, 94:8, 140:9
**Court** [39] - 2:3, 6:1, 26:9, 28:7, 93:6, 93:8, 93:10, 93:12, 93:24, 95:5, 95:7, 95:12, 95:15, 96:1, 96:21, 96:23, 101:24, 102:18, 104:25, 105:4, 105:15, 111:17, 111:22, 112:6, 112:20, 114:12, 118:16, 119:21, 123:4, 125:13, 126:18, 126:21, 126:24, 128:14, 140:11, 142:7, 142:8
**court** [5] - 105:11, 109:13, 117:18, 123:16, 123:22
**COURT** [219] - 1:1, 6:2, 6:5, 6:8, 6:10, 6:18, 6:21, 6:25, 7:3, 7:5, 7:7, 13:3, 14:24, 15:1, 19:19, 19:21, 20:13, 22:10, 22:13, 22:21, 22:25, 23:4, 23:6, 23:10, 23:12, 24:19, 26:10, 26:12, 27:22, 28:3, 28:23,

28:25, 29:10, 29:13, 29:16, 29:19, 29:22, 29:24, 30:1, 46:11, 46:23, 54:3, 55:8, 55:21, 56:11, 56:14, 56:16, 56:18, 56:20, 60:17, 60:22, 63:9, 63:25, 65:3, 65:8, 65:11, 65:14, 65:19, 66:15, 67:6, 67:9, 67:11, 67:14, 67:16, 67:21, 67:23, 75:7, 75:10, 75:12, 75:17, 81:16, 81:18, 81:20, 81:22, 82:11, 82:20, 82:24, 83:5, 83:23, 84:2, 84:21, 86:5, 87:3, 87:7, 87:9, 87:12, 87:15, 87:23, 89:2, 89:6, 89:9, 90:5, 90:11, 90:15, 90:17, 90:23, 91:2, 91:9, 91:11, 91:14, 91:19, 92:2, 92:10, 92:12, 92:17, 92:21, 92:24, 95:1, 95:4, 95:11, 96:4, 96:6, 96:11, 96:16, 97:1, 97:10, 105:8, 106:2, 106:6, 106:12, 106:14, 106:17, 106:24, 107:4, 118:13, 120:2, 120:4, 123:25, 124:3, 124:7, 124:11, 124:14, 124:16, 125:2, 125:16, 126:9, 127:4, 127:11, 127:14, 127:18, 127:20, 128:10, 128:16, 129:2, 129:4, 129:7, 129:13, 129:17, 129:20, 130:1, 130:4, 130:8, 131:15, 131:19, 131:21, 131:23, 132:15, 133:2, 133:8, 133:10, 133:15, 133:18, 133:20, 134:11, 134:13, 134:15, 135:1, 135:8, 135:10, 135:15, 135:19, 136:9, 138:10, 138:22, 138:25, 139:4, 139:10, 139:16, 139:18, 139:20, 139:23, 140:1, 140:7, 140:9, 140:19, 140:23, 141:6, 141:11, 141:13, 141:17, 141:19,

141:22, 141:24, 142:2, 142:6, 142:12, 142:17, 142:20, 142:22, 142:25, 143:3, 143:5, 143:8, 143:10, 143:12, 143:15, 143:18, 143:20, 143:23, 144:4, 144:6, 144:9, 144:11, 144:14, 144:19, 144:22, 145:2, 145:7, 145:19
**court's** [1] - 125:13
**Court's** [10] - 28:19, 93:3, 95:8, 127:1, 127:8, 127:9, 128:11, 129:11, 140:3, 142:1
**courtesy** [1] - 124:12
**COURTROOM** [1] - 1:4
**courtroom** [1] - 31:3
**Courts** [1] - 105:24
**create** [1] - 89:22
**created** [6] - 68:5, 68:7, 68:9, 85:25, 89:19, 89:24
**creation** [1] - 68:14
**credit** [3] - 52:5, 99:11, 109:3
**crew** [18] - 9:13, 30:20, 34:6, 36:19, 36:20, 36:23, 37:3, 37:23, 38:10, 38:23, 39:7, 39:8, 39:9, 58:22, 60:4, 60:11, 73:9, 103:22
**crew's** [1] - 37:25
**crewmen** [2] - 59:19, 60:7
**crews** [1] - 30:21, 30:24, 33:6, 35:6, 35:12, 39:1, 39:4, 45:25, 46:2, 59:8, 59:16
**criminal** [2] - 105:19, 105:20
**cross** [16] - 46:11, 46:23, 60:22, 75:18, 87:7, 87:9, 87:23, 90:18, 90:24, 91:12, 91:21, 91:22, 91:25, 92:4, 92:6, 92:15
**Cross** [8] - 3:4, 3:5, 3:11, 3:12, 3:16, 3:19, 3:22, 4:5
**CROSS** [8] - 7:24, 20:14, 46:13, 46:25, 60:24, 66:1, 75:19, 87:24
**cross-examination**

[3] - 90:24, 91:12, 92:15
**Cross-examination** [8] - 3:4, 3:5, 3:11, 3:12, 3:16, 3:19, 3:22, 4:5
**CROSS-EXAMINATION** [8] - 7:24, 20:14, 46:13, 46:25, 60:24, 66:1, 75:19, 87:24
**cross-examine** [11] - 46:11, 46:23, 60:22, 75:18, 87:9, 90:18, 91:21, 91:22, 91:25, 92:4, 92:6
**crucial** [1] - 108:23
**crunching** [1] - 110:13
**culture** [2] - 78:13
**curious** [2] - 47:6, 134:7
**current** [1] - 19:13

**D**

**D-2** [1] - 5:4
**D-3** [1] - 5:6
**D-31** [1] - 5:3
**D-4** [1] - 5:5
**D-5** [1] - 5:7
**damage** [4] - 15:12, 15:14, 15:22
**damages** [19] - 15:15, 15:16, 15:18, 15:19, 15:20, 16:1, 101:8, 101:18, 101:21, 102:18, 102:20, 103:2, 103:5, 103:8, 127:1, 129:24, 131:2
**dangerous** [3] - 18:22, 19:8, 39:19
**dark** [3] - 11:12, 11:15, 11:19
**Date** [1] - 145:18
**date** [2] - 15:14, 86:13
**dated** [2] - 45:21, 57:13
**dates** [1] - 59:3
**daughter** [2] - 61:4, 61:5
**Dave** [1] - 47:4
**DAVID** [1] - 1:17
**david.kelly38@ rocketmail.com** [1] - 1:19
**Davis** [3] - 100:18,

JURY TRIAL - VOLUME V OF V

122:9, 132:1

**day-to-day** [9] - 42:8, 97:21, 98:23, 99:23, 109:11, 121:6, 121:10, 138:19, 138:20

**days** [21] - 15:25, 18:12, 19:1, 35:9, 35:10, 38:14, 38:15, 40:14, 40:15, 41:11, 41:15, 46:2, 59:10, 59:14, 59:15, 61:8, 69:21, 99:9, 117:15, 143:11, 143:12

**dead** [1] - 37:19

**deal** [5] - 26:15, 52:18, 101:11, 105:5, 136:4

**dealings** [1] - 62:10

**dealt** [1] - 136:10

**decide** [2] - 114:1, 119:9

**deciding** [1] - 127:17

**decision** [1] - 108:10

**decisions** [2] - 121:22, 121:25

**deduced** [2] - 112:1, 112:23

**defendant** [7] - 28:17, 88:9, 97:5, 103:15, 110:2, 125:7, 126:20

**DEFENDANT** [3] - 2:1, 67:15, 83:6

**defendants** [20] - 7:9, 15:24, 28:6, 28:14, 76:9, 97:1, 102:10, 104:18, 124:19, 124:21, 124:24, 125:3, 127:14, 128:6, 129:7, 130:16, 132:7, 134:4, 143:23

**Defendants** [1] - 1:11

**DEFENDANTS** [1] - 1:20

**DEFENDANTS'** [4] - 3:7, 4:1, 5:1, 56:17

**Defendants'** [14] - 29:21, 82:12, 83:10, 83:15, 83:23, 83:25, 84:6, 84:19, 84:22, 86:4, 86:6, 86:16, 87:2, 87:4

**defendants'** [15] - 82:1, 82:9, 82:11, 83:22, 85:18, 126:12, 126:15, 126:22, 128:8, 129:18,

129:21, 130:11, 131:17, 132:17, 133:13

**Defense** [2] - 90:12, 92:11

**defense** [14] - 90:13, 91:7, 92:16, 95:19, 106:9, 107:2, 110:11, 114:18, 123:9, 123:11, 134:9, 137:22, 138:12, 139:19

**defenses** [1] - 134:8

**defined** [3] - 129:22, 133:16, 134:23

**defining** [1] - 107:21

**definition** [2] - 107:14, 111:19

**degree** [1] - 51:10

**delay** [1] - 43:18

**delayed** [1] - 44:17

**deliberate** [2] - 93:13, 94:18

**deliberation** [2] - 93:21, 94:8

**delicto** [6] - 104:19, 105:4, 118:11, 118:25, 119:1, 122:16, 122:20, 123:7, 123:9

**delivered** [1] - 10:14

**demand** [2] - 134:3, 134:5

**denied** [7] - 96:24, 103:21, 118:24, 119:3, 123:14, 124:21, 125:4

**deny** [3] - 76:9, 76:12

**department** [2] - 51:20, 109:25

**depended** [3] - 35:23, 36:14, 59:12

**deported** [2] - 22:4, 22:6, 22:23

**deposition** [15] - 13:5, 13:16, 13:17, 14:10, 14:17, 14:21, 18:25, 19:10, 19:12, 19:15, 66:17, 67:2, 102:15, 117:4, 117:10

**describe** [2] - 23:21, 36:9

**described** [2] - 42:12, 60:10

**describing** [1] - 36:3

**description** [2] - 24:10, 24:18

**designed** [7] - 70:12, 100:11, 100:17,

122:7, 122:13, 127:25

**desk** [1] - 106:16

**despite** [1] - 107:24

**destroyed** [2] - 80:22, 80:23, 81:2, 81:3

**detail** [1] - 79:4

**detailed** [3] - 116:17, 116:19, 116:21

**details** [2] - 6:22, 111:11

**determination** [1] - 111:8

**determined** [1] - 101:3

**dialysis** [1] - 6:15

**difference** [1] - 128:24

**different** [4] - 30:21, 69:1, 120:12, 136:12

**difficulty** [1] - 117:3

**Dime** [1] - 53:2

**Dime-a-call** [1] - 53:2

**diminish** [3] - 108:18, 109:18, 139:7

**DIRECT** [4] - 30:2, 56:22, 67:24, 83:7

**Direct** [4] - 3:10, 3:15, 3:21, 4:4

**direct** [5] - 54:1, 55:6, 63:7, 109:17, 121:7

**direction** [1] - 112:16

**directly** [5] - 47:16, 63:18, 93:19, 107:14, 111:11

**director** [16] - 85:6, 85:7, 85:8, 85:10, 85:12, 85:14, 85:16, 90:2, 98:11, 98:17, 98:21, 98:22, 99:17, 99:20, 107:23, 120:10

**directors** [6] - 85:1, 86:10, 98:2, 100:1, 108:1, 111:21

**directorship** [1] - 99:18

**dirty** [1] - 105:11

**disagree** [5] - 91:15, 91:17, 121:17, 136:10, 136:16

**disagreement** [1] - 77:18

**disbursement** [1] - 45:9

**disclose** [2] - 64:20, 64:21

**disclosed** [1] - 87:14

**discuss** [1] - 94:16

**discussed** [2] - 17:8,

94:17

**dismissal** [1] - 95:20

**dismissed** [1] - 97:6

**disposal** [2] - 109:12, 109:18

**disposition** [1] - 28:10

**disputed** [1] - 118:10

**disregard** [1] - 99:15

**disrespect** [1] - 7:15

**DISTRICT** [3] - 1:1, 1:1, 1:14

**District** [1] - 119:24

**divide** [3] - 113:21, 132:4, 132:9

**divided** [1] - 113:16

**dividing** [3] - 113:11, 114:8, 132:24

**DIVISION** [1] - 1:2

**divorced** [1] - 61:4

**docket** [2] - 118:23, 131:20

**doctrine** [7] - 104:19, 105:3, 105:6, 106:1, 122:16, 122:20, 123:7

**document** [7] - 16:25, 56:4, 57:9, 84:5, 85:25, 86:15, 88:12

**documents** [9] - 15:20, 68:5, 79:12, 82:4, 82:14, 86:24, 89:14, 89:16, 132:9

**dollars** [5] - 44:6, 109:23, 110:6, 111:15, 132:9

**done** [10] - 7:12, 21:14, 35:20, 46:4, 92:23, 103:18, 115:18, 115:22, 137:4, 142:21

**Donovan** [7] - 96:20, 108:14, 109:6, 109:9, 110:18, 120:7

**door** [4] - 24:16, 51:24, 110:5, 110:22

**doors** [1] - 24:16

**doubt** [2] - 92:2, 103:16

**dovetailing** [1] - 119:14

**down** [17] - 8:19, 16:7, 27:23, 30:13, 35:16, 36:3, 36:4, 36:7, 45:15, 47:17, 54:14, 65:4, 67:12, 79:7, 82:20, 90:5, 131:9

**drafted** [1] - 82:14

**drafting** [1] - 57:19

**drawn** [2] - 103:17, 129:23

**dream** [2] - 75:15, 75:16

**drills** [2] - 11:8, 39:20

**drink** [1] - 38:21

**drinks** [2] - 37:9, 38:3

**drive** [2] - 9:13, 36:23

**drivers** [1] - 109:18

**drop** [1] - 34:12

**due** [1] - 44:13

**during** [15] - 21:1, 32:2, 40:2, 45:10, 51:6, 59:6, 59:14, 60:12, 69:23, 79:11, 94:8, 95:22, 102:16, 103:25, 105:8

**duties** [1] - 49:23

**duty** [1] - 38:1

**E**

**early** [7] - 31:5, 31:6, 35:22, 35:23, 45:12, 49:4, 68:21

**earn** [1] - 64:11

**earned** [2] - 64:20, 64:21

**earth** [1] - 134:25

**easy** [1] - 118:24

**eat** [7] - 37:7, 37:10, 37:11, 37:22, 38:4, 38:13, 38:17

**eating** [2] - 38:19, 38:22

**Ed** [1] - 67:13

**Eddie** [15] - 42:17, 43:15, 44:5, 44:8, 45:7, 45:13, 45:17, 46:16, 47:8, 47:11, 54:22, 60:20, 85:5

**EDWARD** [5] - 1:10, 3:9, 3:20, 29:21, 67:15

**eDWARD** [1] - 2:1

**Edward** [7] - 2:1, 29:23, 53:12, 67:18, 85:7, 105:8

**effort** [2] - 33:20, 33:22

**either** [9] - 10:22, 43:15, 50:19, 53:13, 74:7, 96:2, 103:15, 121:6

**elderly** [1] - 74:3

**electric** [2] - 18:22,

APRIL 15, 2011

JURY TRIAL - VOLUME V OF V

79:3

**electrical** [1] - 39:19
**electronic** [1] - 83:16
**elicit** [1] - 96:22
**emanates** [1] -
101:14
**employed** [3] -
44:23, 113:9, 132:22
**employee** [18] - 48:3,
53:16, 62:12, 68:4,
80:5, 105:19, 107:16,
109:16, 110:15,
110:19, 113:9,
113:13, 115:12,
121:8, 136:15,
136:16, 136:17,
136:19
**employee's** [1] -
113:16
**employees** [16] -
34:20, 42:23, 45:9,
46:18, 62:24, 62:25,
63:1, 63:4, 68:20,
69:5, 76:19, 77:4,
80:6, 97:22, 114:22,
132:21
**employees'** [1] -
52:5
**employer** [18] - 76:7,
76:16, 76:18, 107:14,
107:15, 107:18,
107:21, 109:3,
111:20, 115:6, 121:2,
121:5, 134:23,
135:12, 136:4,
136:14, 136:17,
136:19
**employer's** [2] -
115:7, 115:9
**employers** [2] -
76:10, 76:13
**employment** [6] -
9:2, 59:3, 61:8, 66:21,
66:23, 105:22
**enable** [1] - 123:2
**encourage** [1] - 23:6
**end** [28] - 9:5, 9:15,
9:20, 9:25, 10:16,
10:22, 11:2, 32:4,
33:4, 33:9, 34:4, 34:7,
34:8, 34:9, 34:13,
35:6, 35:25, 44:23,
45:3, 48:8, 55:25,
66:22, 70:17, 71:4,
73:16, 110:24, 117:4,
133:4
**engaging** [1] -
109:17
**English** [5] - 24:1,
29:7, 78:9, 78:10,

116:18

**entailed** [1] - 26:17
**entire** [2] - 74:14,
119:3
**entitled** [10] -
101:18, 101:19,
112:18, 113:23,
114:21, 122:4, 131:5,
137:9, 138:7, 145:15
**entitlement** [1] - 57:4
**entity** [1] - 84:15
**entry** [2] - 97:1,
131:20
**equals** [2] - 16:4,
16:5
**equipment** [1] -
39:20
**erred** [1] - 126:22
**escorted** [2] - 51:24,
109:25
**ESQ** [2] - 1:17, 1:21
**essence** [1] - 105:4
**essentially** [1] -
105:5
**establish** [2] -
116:14, 117:22
**estimate** [1] - 35:13,
128:22
**estimation** [2] -
128:20, 128:21
**et** [2] - 94:21, 141:14
**evade** [1] - 64:18
**evasion** [1] - 123:3
**events** [1] - 58:22
**eventually** [2] - 44:2,
52:14
**everywhere** [1] -
142:10
**EVIDENCE** [4] - 5:2,
5:12
**evidence** [42] - 28:4,
28:6, 28:14, 57:10,
74:2, 79:19, 82:10,
82:12, 83:24, 83:25,
84:21, 84:22, 86:5,
86:6, 87:3, 87:4, 89:1,
89:3, 89:4, 89:14,
93:1, 93:6, 95:6,
95:14, 97:25, 98:7,
98:8, 99:7, 102:2,
103:1, 103:19, 104:4,
107:25, 108:25,
114:25, 115:15,
115:24, 116:1,
124:23, 125:4,
128:19, 129:23
**evidentiary** [1] -
115:2
**evolved** [2] - 136:11,
136:13

**exact** [2] - 13:13,
120:24
**exactly** [11] - 20:23,
24:13, 32:6, 38:16,
43:5, 45:17, 100:25,
113:7, 134:18,
139:13, 141:9
**EXAMINATION** [21] -
3:1, 3:7, 4:1, 5:1,
5:11, 7:24, 20:14,
30:2, 46:13, 46:25,
55:23, 56:22, 60:24,
64:1, 66:1, 67:24,
75:19, 81:23, 83:7,
87:24, 89:11
**examination** [24] -
3:4, 3:5, 3:10, 3:11,
3:12, 3:13, 3:15, 3:16,
3:17, 3:19, 3:21, 3:22,
3:23, 4:4, 4:5, 4:6,
7:17, 7:20, 54:1, 55:7,
63:8, 90:24, 91:12,
92:15
**examine** [12] - 20:13,
46:11, 46:23, 60:22,
75:18, 87:9, 90:18,
91:21, 91:22, 91:25,
92:4, 92:6
**examining** [1] - 6:6
**example** [6] - 32:23,
113:13, 126:3,
136:13, 137:16,
137:17
**exceed** [2] - 70:1,
70:13
**excellent** [1] - 20:20
**except** [3] - 74:22,
118:14, 139:4
**excuse** [3] - 31:15,
70:2, 76:11
**Excuse** [1] - 106:6
**excused** [6] - 6:13,
28:12, 28:24, 29:10,
93:22, 94:23
**executive** [1] -
112:24
**exempt** [2] - 62:25,
114:22
**exemption** [5] -
112:14, 112:23,
112:25, 114:20
**exercise** [2] - 92:7,
138:14
**exercised** [3] -
109:15, 138:17, 139:6
**Exhibit** [27] - 57:10,
57:11, 82:1, 82:9,
82:12, 83:10, 83:22,
83:23, 83:25, 84:6,
84:19, 84:22, 84:24,

85:18, 86:4, 86:6,
86:16, 87:2, 87:4,
87:11, 89:2, 89:4
**exhibit** [7] - 61:17,
87:14, 87:17, 88:22,
89:1, 132:19, 141:9
**EXHIBITS** [2] - 5:1,
5:11
**existence** [3] -
108:19, 109:19, 139:7
**expectation** [1] -
51:3
**expediting** [1] - 28:9
**expeditious** [1] -
93:17
**expense** [1] - 91:18
**expenses** [1] - 91:25
**explain** [4] - 24:12,
71:19, 73:14, 75:16
**explained** [1] -
116:22
**explanation** [2] -
15:18, 117:2
**express** [1] - 136:3
**Express** [2] - 100:19,
122:9
**expressly** [1] -
107:21
**extend** [3] - 99:18,
99:20, 105:25
**extended** [1] -
122:16
**extension** [2] - 11:8,
39:20
**extensions** [1] - 19:5
**extent** [5] - 51:14,
51:21, 102:6, 115:16,
128:17

**F**

**F.2d** [2] - 97:14,
108:15
**F.3d** [2] - 97:15,
100:20
**fabricated** [1] - 74:8
**facie** [1] - 134:10
**fact** [12] - 13:20,
44:25, 69:18, 101:4,
107:24, 109:4,
110:12, 115:13,
116:23, 121:13,
122:6, 129:23
**factor** [1] - 63:1
**factory** [5] - 10:15,
11:14, 27:2, 27:4,
27:6
**facts** [7] - 108:22,
108:24, 111:4,

111:23, 112:1,
112:23, 128:19
**factual** [2] - 15:17,
137:7
**failed** [2] - 78:4,
95:24
**failing** [1] - 95:25
**failure** [1] - 95:22
**Fair** [1] - 130:12
**fair** [14] - 8:13, 46:17,
46:19, 46:20, 47:7,
47:8, 49:8, 49:9,
50:20, 105:17, 112:2,
120:11, 123:11
**fairly** [1] - 46:20
**fall** [1] - 120:15
**falls** [2] - 15:15,
87:17
**false** [2] - 104:21,
122:22
**familiar** [1] - 21:16
**families** [1] - 79:7
**family** [3] - 47:17,
74:11, 94:13
**far** [4] - 35:9, 36:11,
58:10, 105:10
**farm** [3] - 113:5,
114:2, 122:5
**fast** [2] - 125:10
**fault** [1] - 80:10
**favor** [4] - 104:18,
115:19, 117:23,
137:22
**favorable** [1] - 99:8
**favorite** [1] - 72:17
**February** [3] - 57:2,
59:5
**Fed** [1] - 108:5
**Federal** [7] - 56:8,
97:2, 101:15, 102:18,
104:22, 104:24
**Feliciano** [42] - 31:3,
49:7, 50:9, 50:10,
51:7, 58:5, 61:25,
64:23, 65:9, 65:14,
65:17, 65:20, 66:17,
67:8, 67:11, 70:17,
70:25, 72:4, 72:8,
73:5, 79:8, 80:5,
80:21, 81:6, 81:13,
82:6, 82:15, 100:6,
100:8, 103:7, 103:8,
103:9, 103:21, 109:4,
110:9, 110:25,
111:11, 113:17,
113:18, 116:16, 131:3
**FELICIANO** [3] - 1:5,
3:18, 65:25
**Feliciano's** [7] -
17:3, 30:22, 30:25,

JURY TRIAL - VOLUME V OF V

37:3, 57:14, 58:2, 73:9

**felony** [2] - 104:21, 122:23

**few** [6] - 36:8, 38:16, 63:5, 71:8, 71:24, 75:23

**fifty** [1] - 77:17

**file** [2] - 62:4, 119:18

**filing** [1] - 140:15

**final** [2] - 118:8, 144:8

**financed** [1] - 78:11

**findings** [1] - 136:2

**fine** [3] - 6:18, 112:17, 143:14

**finish** [3] - 35:12, 70:7, 92:15

**finishing** [1] - 36:1

**fired** [5] - 52:2, 66:22, 110:17, 110:19, 110:20

**firing** [1] - 109:16

**firm** [4] - 19:13, 68:10, 108:7, 118:20

**firms** [1] - 118:20

**first** [33] - 21:11, 21:12, 30:6, 30:10, 31:21, 32:16, 42:20, 42:21, 48:10, 48:18, 48:20, 48:21, 50:15, 58:16, 69:10, 79:8, 79:21, 88:21, 92:13, 97:11, 100:9, 100:17, 101:12, 102:13, 105:6, 106:18, 107:8, 107:11, 116:9, 128:18, 132:16, 132:20, 133:24

**First** [1] - 129:8

**fit** [1] - 117:13

**fits** [1] - 110:8

**five** [4] - 8:23, 15:18, 18:18, 77:17

**fix** [1] - 78:3

**fixed** [1] - 130:22

**FL** [4] - 1:18, 1:22, 2:4, 145:20

**Fla.L.weekly.C353** [1] - 113:6

**flat** [1] - 61:18

**floor** [1] - 19:5

**floors** [1] - 74:7

**Florida** [8] - 18:16, 88:18, 89:17, 134:1, 134:4, 134:15, 141:13, 141:14

**FLORIDA** [2] - 1:1, 1:7

**Floridian** [1] - 96:20

**flow** [1] - 45:11

**FLSA** [5] - 100:3, 115:2, 123:7, 136:1, 136:2

**fluctuating** [5] - 101:14, 101:16, 122:2, 130:19, 131:4

**fly** [1] - 6:16

**focus** [2] - 45:10, 109:20

**follow** [3] - 14:2, 89:8, 94:12

**follow-up** [1] - 89:8

**followed** [2] - 23:20, 136:25

**following** [7] - 16:1, 93:11, 94:14, 126:3, 126:7, 126:10, 126:16

**food** [1] - 38:4

**footage** [4] - 52:9, 77:13, 77:25, 110:14

**FOR** [3] - 1:16, 1:20, 2:1

**foregoing** [1] - 145:14

**foregone** [1] - 118:5

**form** [17] - 56:1, 95:25, 125:11, 127:6, 127:12, 127:18, 127:21, 127:23, 128:9, 140:4, 140:6, 140:25, 141:4, 141:21, 141:23, 144:20

**forms** [2] - 63:4, 95:8

**formula** [1] - 15:19

**FORT** [2] - 1:2, 1:7

**forth** [1] - 94:14

**forward** [3] - 21:16, 75:17, 117:23

**four** [9] - 15:17, 18:18, 30:19, 40:7, 43:23, 66:12, 74:7, 99:9, 117:20

**FPR** [2] - 2:3, 145:18

**frame** [1] - 50:4

**FRANCIS** [3] - 1:10, 4:3, 83:6

**Francis** [3] - 1:22, 83:3, 85:14

**Frank** [7] - 41:1, 41:3, 42:8, 82:22, 88:2, 88:22, 98:1

**frankly** [3] - 78:22, 96:1, 138:18

**fraudulently** [1] - 122:22

**Fred** [1] - 56:14

**Freddie** [2] - 47:19, 47:21

**free** [2] - 79:5

**friend** [3] - 47:22, 52:22, 72:4

**friendly** [1] - 100:18, 122:9, 132:2

**friends** [3] - 47:17, 72:2, 72:6

**front** [6] - 50:23, 83:11, 85:19, 86:14, 100:24

**full** [7] - 29:22, 32:24, 44:8, 44:10, 56:18, 67:17, 83:2

**function** [1] - 135:3

**functions** [1] - 97:21

**funded** [1] - 72:1

**funds** [1] - 71:2

**furnish** [3] - 125:11, 125:12, 127:5

**furnished** [1] - 127:1

**furniture** [1] - 79:2

**G**

**garage** [2] - 24:14, 24:15

**Gary** [1] - 109:12

**gas** [4] - 37:6, 77:22, 79:3

**general** [6] - 35:25, 37:11, 46:21, 47:6, 62:5, 123:20

**generally** [3] - 59:8, 59:10, 107:11

**gentleman** [2] - 25:23, 31:2

**Gentlemen** [2] - 6:2, 7:7

**given** [19] - 12:12, 12:19, 14:6, 14:10, 26:8, 48:21, 57:23, 63:3, 63:11, 63:15, 63:16, 63:18, 71:6, 103:11, 119:9, 119:17, 128:25, 129:19, 138:13

**glabor@aol.com** [1] - 1:23

**Glad** [1] - 29:12

**glad** [1] - 142:22

**Glasser** [1] - 1:21

**God** [1] - 142:4, 142:5

**gonna** [1] - 119:16

**GONZALEZ** [1] - 1:13

**google** [1] - 94:20

**Government** [2] - 56:8, 94:4

**grab** [2] - 36:25, 37:6

**grabbed** [2] - 21:25, 133:23

**grabbing** [1] - 37:22

**grant** [2] - 95:19, 96:1

**granted** [30] - 97:4, 104:18, 113:8, 118:4, 125:9, 125:19, 125:20, 125:21, 125:22, 125:23, 125:24, 125:25, 126:1, 126:4, 126:5, 126:13, 126:14, 132:17, 133:21

**granting** [2] - 129:9, 130:19

**Griffin** [1] - 100:20

**Groceries** [1] - 122:5

**Grocery** [1] - 113:5

**ground** [3] - 18:21, 19:7, 95:24

**grounds** [1] - 96:25

**group** [1] - 30:22

**grow** [1] - 47:25

**guess** [16] - 12:14, 12:16, 12:18, 13:13, 17:9, 28:25, 61:11, 68:20, 72:11, 88:14, 90:22, 102:15, 102:17, 102:20, 102:24, 103:7

**guessing** [1] - 102:19

**guesswork** [2] - 128:15, 128:21

**GUILLERMO** [1] - 1:6

**Guillermo** [1] - 95:21

**guise** [1] - 114:14

**guy** [5] - 22:23, 22:24, 99:8, 110:17, 110:21

**guys** [11] - 77:10, 111:13, 112:25, 117:7, 117:20, 119:5, 119:7, 119:8, 119:10, 119:11, 119:15

**H**

**Half** [1] - 143:14

**half** [36] - 16:2, 26:21, 38:9, 39:8, 39:9, 41:6, 41:7, 45:23, 49:19, 53:7, 53:19, 60:11, 62:18, 70:4, 73:10, 73:11, 74:11, 77:6, 77:8,

77:10, 99:14, 101:8, 101:9, 101:10, 101:18, 113:10, 113:24, 122:4, 123:19, 130:14, 130:18, 130:23, 132:23, 135:7, 143:13, 143:20

**half-time** [4] - 16:2, 101:8, 101:18, 130:14

**hammer** [1] - 80:23

**hand** [6] - 29:20, 56:16, 67:14, 69:5, 98:8, 107:4

**handed** [3] - 83:9, 84:5, 120:8

**handing** [1] - 45:14

**hands** [5] - 105:11, 109:12, 119:13, 119:14, 123:9

**handwriting** [4] - 17:22, 27:17, 82:3, 82:5

**hang** [3] - 11:15, 11:18, 28:25

**hanging** [1] - 111:13

**happy** [6] - 22:15, 22:25, 23:16, 76:22, 106:4, 106:9

**hard** [4] - 26:6, 38:18, 39:15, 117:19

**HARDY** [2] - 2:3, 145:18

**Hardy** [1] - 145:17

**HARDY-HOBBS** [2] - 2:3, 145:18

**Hardy-Hobbs** [1] - 145:17

**Havana** [1] - 108:4

**head** [5] - 37:5, 43:6, 54:12, 109:25

**heading** [2] - 37:1, 37:21

**health** [2] - 6:16, 6:24

**hear** [11] - 28:8, 74:6, 79:15, 93:3, 93:6, 93:11, 95:5, 95:12, 97:10, 101:20, 127:7

**heard** [21] - 17:25, 18:1, 28:4, 48:25, 50:8, 54:23, 69:23, 69:24, 72:7, 75:23, 78:22, 78:25, 93:1, 96:6, 97:24, 103:20, 103:21, 103:22, 103:23, 103:24, 138:3

**Hearsay** [1] - 75:6

**HEIDELBERGER** [1] - 1:10

JURY TRIAL - VOLUME V OF V

**heidelberger** [1] - 52:18

**Heidelberger** [35] - 1:22, 6:13, 7:9, 39:22, 40:4, 40:11, 40:18, 40:21, 51:12, 51:23, 52:2, 52:4, 52:8, 52:12, 52:24, 53:3, 53:6, 76:12, 77:2, 85:12, 86:9, 98:1, 99:6, 99:22, 109:1, 109:8, 109:21, 110:4, 110:8, 110:12, 110:20, 111:1, 121:20, 143:24

**Heidelberger's** [1] - 52:22

**held** [6] - 99:5, 99:23, 105:18, 121:4, 123:6, 123:10

**help** [5] - 11:14, 24:17, 33:24, 33:25, 49:14

**helpful** [1] - 116:4

**helping** [3] - 27:3, 48:22, 138:20

**helps** [1] - 120:21

**hereby** [1] - 145:14

**herself** [1] - 121:14

**hi** [2] - 60:18, 60:19

**highlighted** [3] - 106:21, 107:7, 108:14

**himself** [3] - 42:3, 42:5, 54:7

**hindering** [1] - 43:23

**Hindsight's** [1] - 115:22

**hired** [4] - 57:3, 76:21, 78:19, 113:13

**hiring** [4] - 55:12, 119:5, 119:6, 119:8

**Hobbs** [1] - 145:17

**HOBBS** [2] - 2:3, 145:18

**hobbs@flsd. uscourts.gov** [2] - 2:5, 145:20

**Hoffman** [2] - 105:13, 105:14

**hold** [8] - 54:7, 97:18, 99:17, 100:25, 101:1, 102:1, 120:11, 121:3

**holding** [1] - 120:10

**holds** [2] - 105:15, 120:25

**home** [4] - 6:16, 34:10, 49:22, 72:20

**honor** [4] - 70:5, 70:15, 78:6, 78:20

**Honor** [113] - 6:7, 6:9, 6:11, 7:4, 7:22, 13:2, 14:23, 14:25, 20:12, 22:9, 24:17, 24:18, 27:21, 27:25, 28:1, 28:21, 28:24, 29:3, 46:9, 46:24, 53:22, 55:20, 56:13, 60:16, 63:24, 65:2, 65:24, 66:14, 67:10, 75:8, 81:19, 81:21, 82:10, 82:19, 83:4, 83:21, 84:3, 84:20, 86:3, 87:1, 87:6, 87:10, 87:20, 89:5, 89:10, 90:4, 90:9, 90:13, 90:19, 91:10, 91:13, 92:23, 95:17, 96:8, 96:10, 96:17, 97:7, 97:11, 100:3, 100:16, 101:25, 102:18, 103:5, 106:5, 106:13, 106:15, 107:3, 120:3, 120:6, 121:21, 123:13, 123:24, 124:5, 124:10, 124:24, 125:1, 127:13, 127:15, 128:9, 128:25, 129:6, 129:8, 130:2, 130:10, 130:25, 132:14, 133:9, 133:12, 134:14, 134:21, 135:25, 138:11, 138:24, 139:1, 139:19, 140:8, 140:16, 140:17, 140:22, 141:20, 142:9, 142:13, 142:19, 143:1, 143:7, 143:9, 143:14, 143:16, 144:7, 144:21, 145:4, 145:8

**HONORABLE** [1] - 1:13

**hope** [3] - 28:9, 94:22, 135:2

**hot** [2] - 38:20

**hotly** [1] - 123:17

**hour** [26] - 16:2, 17:12, 18:15, 26:21, 38:9, 39:3, 39:8, 39:9, 49:19, 70:4, 98:25, 104:13, 113:23, 132:10, 132:11, 132:13, 143:9, 143:13, 143:14, 143:17, 143:18, 143:25, 144:2

**hour's** [1] - 60:12

**hourly** [11] - 8:7, 8:10, 31:23, 34:18, 34:20, 69:12, 112:25, 113:10, 113:22, 114:9, 132:22

**hours** [111] - 8:8, 10:18, 11:3, 11:25, 12:2, 12:7, 12:11, 12:14, 12:19, 12:20, 12:22, 12:24, 13:9, 13:13, 13:20, 14:3, 14:6, 14:8, 14:11, 14:12, 15:25, 16:3, 16:4, 16:5, 17:2, 17:6, 17:10, 18:4, 18:5, 18:18, 19:18, 26:24, 32:15, 32:17, 32:23, 34:15, 48:13, 53:7, 58:9, 58:16, 60:10, 60:13, 61:22, 62:17, 62:18, 69:16, 69:24, 70:1, 70:13, 70:18, 73:21, 100:7, 100:8, 100:9, 100:12, 100:13, 100:18, 100:25, 101:1, 101:5, 101:12, 101:21, 102:6, 102:8, 103:3, 103:12, 103:16, 112:17, 113:11, 113:15, 113:20, 113:22, 114:2, 114:6, 114:7, 114:8, 114:10, 114:12, 114:18, 114:25, 115:25, 116:14, 116:20, 116:21, 117:12, 117:15, 117:16, 117:17, 118:10, 122:1, 122:7, 122:11, 122:13, 122:25, 128:1, 130:17, 130:22, 130:23, 131:11, 132:4, 132:7, 132:11, 132:24, 133:1, 133:2, 137:10, 137:13, 142:16, 143:25

**house** [2] - 9:17, 40:16

**hundred** [3] - 32:10, 44:6, 77:17

**Hurricane** [33] - 1:21, 13:22, 13:25, 14:13, 30:6, 31:22, 32:3, 39:25, 40:3, 40:24, 41:3, 42:9, 42:19, 42:23, 48:3, 53:16, 54:16, 55:3, 56:24, 57:14, 62:12, 66:4, 68:4, 68:19, 76:15, 83:16, 84:15, 85:23, 86:1, 86:22, 88:10, 89:15, 125:17

**hurricane** [15] - 9:8, 9:11, 9:16, 9:20, 10:23, 11:15, 11:18, 11:21, 19:2, 53:4, 53:14, 57:15, 88:7, 111:14, 143:24

**HURRICANE** [1] - 1:9

**husband** [4] - 108:8, 108:11, 121:11

**I**

**I-9** [1] - 80:9

**I-9s** [1] - 80:8

**Ibacache** [2] - 75:3, 114:17

**ice** [2] - 37:6, 38:2

**idea** [22] - 8:11, 9:7, 12:11, 13:11, 14:3, 14:6, 14:10, 18:2, 18:19, 23:22, 24:11, 48:7, 51:19, 51:23, 52:4, 54:20, 55:1, 64:25, 74:10, 89:19, 90:1, 102:14

**identification** [5] - 82:1, 83:10, 84:6, 85:18, 86:15

**identifies** [1] - 88:15

**identify** [3] - 15:20, 15:21, 82:3

**illegal** [8] - 105:5, 115:8, 122:17, 122:18, 122:19, 123:14, 123:16

**illegality** [1] - 105:2

**illegals** [1] - 119:8

**imagine** [2] - 79:4, 140:13

**immigrant** [1] - 119:20

**immigrants** [2] - 119:15, 119:19

**immigration** [2] - 22:1, 119:15

**impede** [1] - 138:8

**imperative** [1] - 35:21

**important** [3] - 102:1, 115:2, 135:19

**improperly** [1] - 115:14

**IN** [4] - 5:2, 5:12

**inaccurate** [1] - 115:9

**Inc** [7] - 1:21, 97:15, 105:14, 120:8, 122:5, 122:9, 125:17

**INC** [1] - 1:9

**inclined** [1] - 114:13

**Include** [1] - 15:13

**include** [1] - 107:17

**included** [3] - 71:24, 113:1, 113:3

**includes** [2] - 107:14, 107:16

**including** [4] - 15:19, 58:5, 68:19, 97:21

**income** [6] - 56:1, 56:5, 56:8, 104:23, 122:24, 123:2

**incomplete** [1] - 115:12

**Incorporated** [2] - 88:10, 108:5

**incorporation** [2] - 83:16, 85:23

**increase** [3] - 52:9, 110:14, 110:15

**increases** [1] - 110:16

**increasing** [1] - 52:10

**incredible** [1] - 74:6

**INDEX** [3] - 3:1, 3:7, 5:1

**iNDEX** [2] - 4:1, 5:11

**indicate** [1] - 132:17

**indirectly** [1] - 107:15

**individual** [12] - 58:7, 64:13, 97:12, 98:15, 106:19, 120:7, 120:10, 120:17, 121:2, 121:9, 122:16, 129:10

**individually** [6] - 98:14, 99:5, 99:12, 99:24, 107:24, 120:19

**individuals** [5] - 63:21, 64:5, 64:9, 64:22

**inference** [13] - 102:7, 103:16, 103:18, 103:19, 115:17, 115:19, 117:23, 118:1, 118:3, 118:6, 128:19, 129:22, 129:25

**inferences** [1] - 129:23

**influenced** [1] - 63:12

JURY TRIAL - VOLUME V OF V

**information** [2] - 14:20, 57:5

**initial** [1] - 102:12, 144:5

**initials** [1] - 82:5

**inquire** [4] - 30:1, 60:17, 65:23, 67:23

**inside** [2] - 24:14, 35:15

**inspection** [1] - 78:2

**inspector** [1] - 78:5

**install** [3] - 9:9, 10:24, 30:15

**installation** [2] - 35:3, 36:5

**installations** [1] - 30:11

**installed** [2] - 9:11, 9:17

**installer** [16] - 27:3, 30:18, 30:21, 32:23, 32:24, 33:2, 40:18, 41:21, 41:22, 41:25, 48:8, 49:24, 62:17, 63:11, 63:12, 77:12

**installers** [37] - 33:17, 33:24, 34:9, 34:12, 36:2, 45:1, 45:10, 49:10, 49:14, 49:18, 50:15, 51:3, 52:13, 54:16, 54:18, 54:19, 54:22, 55:1, 58:5, 60:13, 62:3, 62:5, 62:8, 62:9, 62:11, 62:21, 63:3, 64:4, 64:5, 68:3, 68:19, 69:24, 70:12, 71:12, 72:5, 116:6, 117:7

**installing** [1] - 49:23

**instance** [4] - 40:13, 121:16, 137:1

**instead** [1] - 25:23

**institute** [1] - 78:11

**instructed** [3] - 63:20, 127:16, 127:22

**Instruction** [1] - 130:2

**instruction** [39] - 26:8, 108:22, 113:3, 114:14, 124:17, 125:19, 126:18, 126:23, 126:24, 126:25, 128:13, 129:3, 129:11, 129:19, 129:22, 129:24, 130:9, 130:12, 130:13, 131:7, 131:10, 132:9, 132:12, 132:18,

132:19, 133:13, 133:17, 133:23, 134:1, 134:16, 135:5, 135:19, 138:8, 138:12, 138:14, 138:15, 138:18, 139:2, 141:8

**instructions** [28] - 93:4, 93:9, 95:7, 113:2, 113:7, 113:8, 115:4, 125:7, 125:8, 125:12, 125:18, 126:6, 126:10, 126:12, 126:15, 126:20, 127:2, 127:8, 128:11, 129:10, 131:18, 135:2, 135:20, 139:12, 140:3, 141:5, 144:8, 144:18

**instructor** [1] - 78:15

**insufficient** [1] - 121:2

**insurance** [1] - 77:21

**intelligently** [1] - 142:21

**intended** [7] - 113:12, 130:17, 130:21, 131:11, 132:25, 133:1

**interest** [10] - 7:14, 97:20, 98:2, 98:3, 98:12, 98:18, 98:22, 99:20, 107:15

**interesting** [2] - 110:11, 135:16

**interim** [1] - 79:24

**interjected** [1] - 40:18

**internet** [1] - 94:20

**interpret** [1] - 138:20

**interpreted** [1] - 134:24

**interpreter** [5] - 26:1, 26:4, 29:5, 29:9

**INTERPRETER** [11] - 14:4, 15:9, 22:17, 24:1, 25:9, 25:22, 27:25, 28:24, 29:2, 29:12, 29:18

**interrogatories** [2] - 16:8, 16:15

**interrogatory** [3] - 15:3, 15:7, 17:25

**interrupt** [1] - 124:6

**invested** [1] - 109:23

**investing** [2] - 110:5, 111:15

**investment** [3] - 109:14, 109:22

**involuntary** [1] - 95:20

**involve** [3] - 24:10, 42:3, 42:5

**involved** [8] - 38:19, 45:8, 53:10, 53:12, 105:4, 110:12, 111:12, 121:6

**involvement** [5] - 53:11, 53:13, 109:8, 121:14, 121:19

**involving** [1] - 123:4

**IRA** [1] - 119:12

**issuance** [1] - 68:13

**issue** [22] - 6:24, 64:12, 97:17, 106:18, 112:10, 114:23, 117:10, 117:11, 120:12, 120:17, 120:18, 121:13, 122:2, 122:15, 123:15, 123:17, 123:24, 126:25, 127:2, 133:9, 136:3, 137:7

**issued** [1] - 64:9

**issues** [5] - 42:3, 42:5, 62:24, 124:13, 138:9

**IT** [1] - 57:4

**item** [6] - 15:12, 15:13, 15:15, 15:18, 15:19, 24:23

**items** [2] - 24:12, 24:24

**itself** [3] - 107:12, 107:13, 123:4

---

**J**

**J.H** [1] - 1:17

**jacket** [1] - 71:11

**Janitorial** [2] - 108:14, 120:7

**January** [6] - 68:24, 68:25, 69:3, 69:7

**jILL** [1] - 2:3

**Jill** [1] - 145:17

**JILL** [1] - 145:18

**jill_hardy** [2] - 2:5, 145:20

**jill_hardy-hobbs@ flsd.uscourts.gov** [2] - 2:5, 145:20

**job** [40] - 26:19, 27:14, 31:9, 32:20, 33:15, 33:16, 35:20, 35:21, 36:13, 36:17, 36:24, 37:5, 38:11,

38:18, 48:16, 49:13, 49:24, 59:24, 60:1, 61:9, 70:6, 72:17, 77:25, 78:1, 78:2, 78:3, 78:5, 78:22, 81:9, 98:9, 98:13, 104:3, 104:10, 111:1, 111:2, 111:17, 122:22, 136:21

**jobs** [2] - 35:22, 36:16

**Johnson** [3] - 109:12, 109:13, 109:18

**join** [6] - 96:10, 96:13, 96:15, 106:10, 106:12, 125:1

**Jordan** [2] - 108:9, 121:13

**JOSE** [1] - 1:13

**JR** [1] - 1:13

**Judge** [14] - 25:22, 103:17, 104:9, 104:15, 108:9, 118:23, 119:23, 121:12, 123:5, 123:14, 124:13, 136:24, 139:11

**judge** [1] - 109:5

**JUDGE** [1] - 1:14

**Judges** [2] - 136:2, 136:25

**judgment** [4] - 97:2, 104:17, 119:2, 119:25

**JULIO** [1] - 1:6

**Julio** [1] - 95:21

**July** [8] - 15:24, 31:14, 45:12, 59:5, 61:14, 61:15, 79:20, 79:21

**June** [4] - 72:25, 86:13

**June/July** [1] - 43:25

**jury** [61] - 6:10, 6:20, 23:21, 28:12, 65:5, 65:6, 65:16, 65:17, 75:14, 79:15, 94:8, 94:24, 94:25, 95:2, 102:22, 102:23, 104:25, 105:1, 108:21, 108:23, 111:8, 111:24, 112:3, 113:1, 113:3, 113:7, 113:25, 114:20, 115:3, 116:22, 117:25, 118:1, 118:7, 119:9, 122:4, 123:1, 126:22, 127:16, 127:22, 127:24, 129:24, 130:11,

130:14, 130:20, 131:3, 131:7, 132:3, 132:6, 132:19, 133:13, 134:1, 134:24, 135:2, 135:7, 137:21, 138:8, 141:4, 144:8, 145:3

**JURY** [1] - 1:13

**Jury** [7] - 7:6, 28:3, 65:7, 65:18, 65:19, 92:25, 95:3

**jury's** [1] - 139:12

**justify** [1] - 112:24

---

**K**

**Keep** [1] - 124:3

**keep** [8] - 35:14, 45:4, 75:14, 76:18, 81:4, 115:7, 115:21, 141:20

**keeping** [2] - 54:17, 54:23

**KEITH** [2] - 3:9, 29:21

**Keith** [2] - 28:22, 61:9

**keith** [1] - 29:23

**Kelly** [19] - 27:24, 47:4, 60:22, 67:9, 75:18, 87:9, 92:22, 96:7, 96:9, 106:14, 120:8, 121:17, 122:14, 124:1, 124:17, 131:2, 139:21, 140:25, 144:24

**KELLY** [71] - 1:17, 16:22, 28:1, 29:3, 46:24, 47:1, 53:23, 54:2, 54:4, 55:9, 55:17, 60:23, 60:25, 63:10, 63:23, 67:10, 75:6, 75:20, 81:14, 87:10, 87:17, 87:21, 87:25, 88:25, 92:18, 92:23, 96:8, 96:17, 107:1, 107:6, 107:11, 118:14, 118:16, 124:2, 124:5, 124:9, 124:12, 124:15, 127:13, 128:13, 128:17, 129:6, 130:25, 132:14, 132:16, 133:3, 134:7, 134:18, 136:10, 137:7, 137:12, 138:20, 139:1, 139:9, 139:11, 139:17,

JURY TRIAL - VOLUME V OF V

139:22, 139:24,
141:3, 141:7, 141:12,
141:15, 141:18,
143:16, 143:19,
144:2, 144:5, 144:25,
145:6

**Kelly's** [3] - 130:13,
138:2, 138:14

**Kelly**..........................
[4] - 3:12, 3:16, 3:22,
4:5

**Kennel** [1] - 97:15
**kept** [10] - 19:18,
34:23, 75:24, 76:3,
76:4, 83:18, 84:16,
85:25, 86:21, 115:18
**key** [1] - 115:16
**kidding** [1] - 143:13
**Kiko** [1] - 20:25
**kind** [3] - 35:18,
36:1, 112:19
**King** [1] - 136:24
**KLEPPIN** [171] -
1:21, 6:3, 6:7, 6:9,
6:11, 6:19, 6:23, 7:1,
7:4, 7:22, 7:25, 13:2,
13:4, 14:5, 14:23,
14:25, 15:2, 15:11,
16:23, 19:20, 19:22,
19:24, 20:12, 22:8,
22:19, 22:22, 23:2,
23:5, 23:11, 25:25,
26:4, 26:8, 26:15,
28:21, 29:8, 29:15,
30:3, 46:9, 53:22,
53:25, 55:6, 55:19,
55:22, 55:24, 56:13,
56:15, 56:23, 60:16,
60:20, 63:7, 63:24,
64:2, 65:2, 65:9,
65:24, 66:2, 66:14,
66:16, 67:5, 67:13,
67:25, 75:8, 75:11,
81:17, 81:19, 81:21,
81:24, 82:9, 82:13,
82:19, 82:22, 83:4,
83:8, 83:21, 84:1,
84:3, 84:4, 84:19,
84:23, 86:3, 86:7,
87:1, 87:5, 87:13,
87:16, 87:19, 89:5,
89:7, 89:10, 89:12,
90:4, 90:8, 90:13,
90:16, 90:19, 91:1,
91:3, 91:10, 91:13,
91:15, 92:8, 92:14,
95:17, 96:5, 96:9,
96:13, 97:7, 97:11,
105:9, 106:3, 106:8,
107:10, 118:15,

120:3, 120:6, 124:24,
126:8, 127:3, 127:15,
127:19, 127:21,
128:25, 129:3, 129:8,
129:15, 129:18,
129:21, 130:2, 130:5,
130:10, 131:1,
131:16, 131:20,
131:22, 131:25,
133:9, 133:12,
133:16, 133:19,
133:22, 134:9,
134:12, 134:14,
134:20, 135:5, 135:9,
135:11, 135:18,
135:24, 136:23,
137:11, 137:16,
138:1, 138:24,
139:19, 140:4,
140:10, 140:15,
140:21, 140:25,
142:1, 142:9, 142:14,
143:9, 143:22, 144:7,
144:10, 144:13,
144:17, 144:20, 145:4
**Kleppin** [16] - 1:21,
4:12, 6:6, 28:20,
48:23, 65:8, 65:23,
82:21, 90:7, 92:4,
95:16, 118:12,
118:20, 120:5, 138:3
**Kleppin**.................
[1] - 4:11
**Kleppin**.................
[3] - 3:13, 3:17, 4:6
**kleppin**.................
[1] - 3:23
**Kleppin**.................
. [4] - 3:10, 3:15, 3:21,
4:4
**Kleppin**.................
.. [2] - 3:4, 3:19
**knocks** [1] - 107:22
**knowledge** [5] -
15:21, 42:10, 51:14,
51:22, 52:7
**known** [5] - 47:15,
61:6, 61:7, 99:3,
111:16
**knows** [3] - 14:14,
103:1

# L

**L-a-r-e-s** [1] - 29:25
**Labor** [1] - 130:12
**labor** [9] - 52:10,
54:21, 105:16,
105:17, 107:17,
107:19, 110:16,

120:11, 123:11
**lack** [1] - 7:14
**ladder** [1] - 25:16
**ladders** [3] - 26:18,
49:16, 49:17
**Ladies** [1] - 7:7
**lady** [1] - 27:12
**LAMONICA** [2] - 1:4,
1:5
**Lamonica** [4] -
20:25, 95:20, 95:21,
125:17
**Lamonica's** [1] -
74:10
**Lamonicas** [2] -
69:12, 69:21
**language** [9] - 48:24,
78:9, 78:13, 108:2,
108:13, 108:17,
126:2, 131:25, 133:4
**LARES** [4] - 3:9,
29:21, 29:23, 29:25
**Lares** [7] - 28:22,
46:10, 47:2, 56:11,
61:9, 70:24, 71:15
**lares** [2] - 29:23,
30:4
**large** [2] - 24:16,
78:24
**largely** [1] - 69:20
**last** [17] - 13:8,
18:14, 28:2, 29:24,
35:4, 36:8, 56:20,
61:15, 67:21, 79:20,
86:8, 86:9, 104:10,
104:17, 118:11,
126:3, 137:24
**lastly** [1] - 138:11
**late** [8] - 35:22,
44:10, 44:15, 44:20,
59:15, 60:5, 66:4,
70:22
**latent** [1] - 109:15
**LAUDERDALE** [2] -
1:2, 1:7
**law** [37] - 19:13,
28:8, 64:15, 76:20,
93:4, 93:7, 93:9, 95:7,
97:12, 98:14, 98:20,
99:16, 100:9, 100:17,
101:3, 101:16,
101:17, 101:22,
103:4, 104:10,
104:18, 104:22,
105:6, 111:6, 111:24,
112:5, 113:2, 118:12,
121:18, 123:15,
124:15, 130:20,
134:24, 135:16,
135:23, 135:25,

136:14
**LAW** [2] - 65:13,
125:15
**laws** [1] - 98:25
**lawsuit** [7] - 19:16,
21:3, 21:10, 21:17,
21:24, 74:8, 75:3
**lawyer** [3] - 19:13,
103:1, 103:2
**lawyers** [2] - 93:3,
93:9
**lay** [1] - 135:21
**leader** [1] - 47:8
**learned** [1] - 78:10
**least** [13] - 49:18,
49:19, 100:6, 100:14,
100:15, 108:25,
109:1, 115:24,
115:25, 116:20,
143:20, 144:2
**leave** [1] - 23:7
**leaving** [2] - 59:24,
60:1
**left** [26] - 6:12, 8:3,
24:14, 31:14, 37:4,
44:14, 51:25, 52:1,
61:11, 61:13, 62:5,
66:10, 66:12, 66:25,
71:5, 71:8, 71:10,
94:5, 104:7, 104:10,
132:21, 139:2, 139:4,
141:5
**legal** [5] - 93:15,
93:23, 98:10, 98:11,
141:9
**legally** [1] - 76:23
**legislation** [1] -
105:18
**LEIV** [1] - 67:22
**LEIVA** [64] - 1:10,
2:1, 3:20, 6:4, 20:15,
22:12, 22:14, 22:18,
22:20, 22:24, 23:8,
23:13, 24:2, 24:17,
24:20, 25:7, 25:10,
25:12, 26:3, 26:6,
26:11, 26:13, 26:16,
27:1, 27:5, 27:15,
27:16, 27:21, 29:7,
46:14, 46:22, 60:18,
60:21, 67:7, 67:15,
67:18, 67:22, 75:14,
87:8, 91:24, 96:12,
96:15, 106:13, 125:1,
140:5, 140:8, 140:12,
140:17, 141:20,
141:23, 141:25,
142:4, 142:7, 142:13,
142:15, 142:18,
142:21, 142:23,

143:1, 143:4, 143:7,
143:11, 143:13, 145:8
**Leiva** [59] - 2:1,
11:23, 12:9, 18:6,
20:6, 20:13, 22:11,
23:10, 23:11, 25:25,
26:9, 26:10, 26:25,
42:17, 42:25, 43:1,
44:8, 44:17, 46:11,
47:13, 47:15, 47:23,
53:12, 60:17, 61:3,
61:6, 62:10, 62:22,
63:20, 67:6, 67:13,
67:18, 67:22, 75:11,
75:12, 75:21, 75:23,
78:16, 81:15, 81:25,
82:20, 85:5, 85:7,
87:7, 90:10, 96:9,
99:25, 106:10,
106:12, 111:6, 140:2,
141:1, 143:6, 143:10,
143:22, 143:25
**Leiva's** [3] - 14:1,
22:8, 44:21
**Leiva**....... [1] - 4:12
**Leiva**.....................
[2] - 3:5, 3:11
**less** [10] - 10:17,
11:2, 12:20, 18:1,
41:6, 41:7, 99:14,
109:8, 135:21
**lesson** [2] - 100:23,
122:12
**letter** [5] - 5:12,
57:13, 57:17, 61:16,
136:19
**letterhead** [1] - 57:23
**letting** [1] - 111:16
**level** [2] - 111:5
**liability** [9] - 97:12,
98:15, 106:19, 120:7,
129:10, 130:16,
132:7, 138:16, 139:5
**liable** [16] - 97:23,
98:12, 98:14, 98:16,
98:17, 98:19, 99:5,
99:12, 99:24, 107:24,
120:10, 120:12,
120:19, 121:3, 121:5,
121:22
**lie** [1] - 27:9
**life** [1] - 110:23
**light** [1] - 99:7
**lightening** [2] -
39:18, 58:21
**lighter** [2] - 36:15,
36:18
**lightning** [2] - 39:15,
46:3
**likewise** [1] - 125:4

JURY TRIAL - VOLUME V OF V

**limine** [1] - 112:20
**limited** [1] - 73:21
**line** [8] - 13:5, 13:7, 14:19, 18:25, 66:21, 116:7, 117:6
**list** [2] - 85:3, 87:14
**listed** [3] - 85:16, 86:9, 89:14
**listening** [1] - 141:9
**literally** [2] - 39:17, 46:2
**litigation** [1] - 7:14
**living** [1] - 99:2
**load** [10] - 23:20, 24:12, 24:21, 26:21, 33:15, 33:18, 33:24, 33:25, 37:1, 116:24
**loaded** [4] - 10:17, 24:6, 24:11, 34:1
**loading** [4] - 24:18, 26:17, 26:22, 117:1
**loan** [1] - 99:11
**loans** [2] - 79:7, 79:8
**location** [1] - 73:22
**logs** [1] - 115:21
**look** [21] - 13:5, 14:17, 25:1, 75:17, 78:21, 94:20, 95:8, 99:7, 99:11, 106:24, 107:12, 108:2, 108:13, 109:6, 109:9, 114:2, 114:13, 118:17, 119:22, 121:24, 133:6
**looked** [3] - 108:24, 137:1, 142:10
**looking** [3] - 24:22, 98:9, 110:7
**Lord** [1] - 105:7, 105:10, 118:14
**Louise** [1] - 29:10
**lounge** [1] - 50:12
**loved** [2] - 76:22, 78:25
**Lunch** [1] - 95:10
**lunch** [10] - 38:4, 38:12, 38:18, 38:22, 38:24, 70:4, 94:4, 94:5, 94:7
**lunches** [1] - 78:23
**lunchtime** [2] - 38:5, 70:6

## M

**magic** [2] - 108:17, 135:4
**magical** [2] - 135:3, 135:4

**mail** [1] - 80:8
**mailed** [4] - 69:1, 69:8, 80:13
**main** [1] - 72:11
**maintain** [2] - 99:18, 99:21
**major** [1] - 77:18
**majority** [1] - 98:3
**man** [2] - 20:20, 29:13
**man's** [1] - 44:12
**manage** [3] - 32:21, 48:24, 49:1
**managed** [1] - 51:21
**management** [5] - 48:2, 48:3, 50:6, 53:16, 109:11
**manager** [14] - 30:12, 31:10, 31:11, 32:5, 33:1, 33:3, 34:19, 35:5, 42:2, 48:18, 49:1, 49:3, 98:16, 110:17
**managers** [1] - 77:16
**manner** [5] - 8:17, 20:2, 20:9, 31:23, 100:10
**Mansfield** [1] - 105:10
**manufactured** [1] - 10:12
**manufacturing** [2] - 51:20, 110:3
**March** [2] - 72:15, 72:16
**marched** [2] - 110:5, 110:21
**marching** [1] - 91:14
**Maria** [1] - 85:16
**Marine** [5] - 72:21, 72:22, 73:1, 73:3, 73:6
**MARIO** [3] - 1:5, 3:18, 65:25
**Mario** [13] - 30:22, 50:15, 50:19, 50:20, 57:14, 64:23, 65:9, 65:17, 70:17, 72:8, 79:8, 80:21, 119:6
**Mario's** [2] - 39:4, 39:7
**mark** [1] - 77:15
**marked** [7] - 81:25, 83:9, 84:5, 85:18, 86:15, 87:11, 107:8
**marketing** [1] - 89:18
**married** [1] - 61:4
**Marshal** [3] - 65:5, 65:16, 107:4
**MARSHAL** [2] - 65:6,
94:25
**material** [6] - 10:7, 10:9, 10:11, 26:19, 26:23, 36:14
**materials** [2] - 10:14, 24:15
**math** [1] - 144:1
**mathematical** [1] - 15:19
**matter** [17] - 12:7, 32:15, 100:8, 100:17, 101:3, 101:16, 101:17, 101:22, 103:4, 104:18, 115:17, 123:22, 128:1, 130:20, 131:11, 137:13, 145:15
**matters** [5] - 28:8, 93:7, 93:15, 93:23, 115:2
**McCarroll** [46] - 1:10, 1:22, 4:3, 41:1, 41:3, 41:18, 41:20, 42:8, 51:24, 53:10, 53:20, 76:12, 77:2, 82:22, 82:24, 83:3, 83:6, 83:9, 84:5, 85:14, 85:19, 86:14, 87:5, 87:15, 88:1, 88:2, 88:22, 89:8, 89:13, 90:5, 90:10, 98:1, 98:8, 99:13, 99:22, 109:9, 109:23, 109:25, 110:4, 110:21, 111:5, 111:8, 121:20, 143:24
**McCarroll's** [1] - 107:25
**mean** [52] - 10:19, 13:17, 22:17, 27:13, 42:25, 43:12, 56:8, 59:11, 72:2, 72:3, 74:4, 74:6, 78:25, 79:14, 79:15, 79:17, 79:24, 81:9, 91:17, 107:20, 109:4, 109:22, 110:1, 110:8, 110:16, 111:4, 111:6, 111:12, 111:14, 112:1, 112:7, 112:21, 114:3, 116:1, 116:16, 116:17, 116:23, 117:19, 118:2, 119:5, 119:6, 119:9, 119:10, 119:13, 119:15, 127:22, 133:3, 136:16, 137:10
**meaning** [4] - 17:5, 19:7, 39:4, 70:5

**means** [3] - 112:5, 134:25, 137:21
**meant** [3] - 7:14, 47:6, 137:17
**measurements** [2] - 9:24, 10:2
**medical** [2] - 7:10, 7:15
**meet** [1] - 144:16
**meeting** [1] - 52:12
**MEIS** [1] - 120:18
**Meis** [5] - 109:11, 109:13, 109:15, 110:18, 120:18
**Meis'** [1] - 109:13
**member** [3] - 38:10, 38:23, 47:18
**Members** [3] - 28:3, 65:19, 92:25
**men** [1] - 122:24
**mention** [2] - 50:8, 75:23
**mentioned** [3] - 43:15, 116:9, 116:10
**met** [7] - 21:1, 74:25, 75:1, 102:11, 103:13, 109:4, 110:8
**metal** [3] - 33:13, 49:11, 49:14
**method** [2] - 130:19, 131:4
**MIAMI** [2] - 145:19, 145:20
**Miami** [5] - 1:18, 2:4, 2:4, 118:23, 119:24
**Michael** [1] - 85:16
**MICHELLE** [2] - 2:3, 145:18
**Michelle** [1] - 145:17
**middle** [3] - 59:14, 67:19, 84:25
**might** [15] - 10:1, 32:17, 39:1, 40:11, 40:12, 41:9, 41:10, 41:22, 44:20, 58:22, 59:15, 63:6, 68:25, 103:4, 103:19
**mike** [1] - 77:15
**Milan** [33] - 6:6, 7:18, 8:1, 20:18, 22:25, 27:22, 48:5, 62:15, 70:17, 72:4, 79:10, 80:5, 81:8, 100:6, 102:13, 102:14, 102:24, 103:3, 103:9, 103:21, 103:22, 104:20, 116:16, 117:2, 117:14, 122:21, 137:1, 137:18, 137:25,
138:2, 138:5, 138:6
**MILAN** [5] - 1:4, 3:3, 7:23, 25:11, 27:2
**million** [3] - 109:23, 110:6, 111:15
**mincing** [1] - 128:23
**mind** [1] - 47:12
**mine** [6] - 47:22, 72:4, 72:6, 75:16, 133:24
**minimum** [8] - 128:2, 128:7, 134:1, 134:3, 134:15, 135:22, 137:22, 137:24
**Minimum** [1] - 134:4
**minute** [3] - 33:2, 101:20, 120:3
**minutes** [20] - 18:15, 24:9, 24:21, 26:21, 37:24, 38:25, 39:2, 39:3, 39:7, 65:5, 125:5, 125:13, 127:7, 127:9, 139:25, 140:1, 143:21, 143:23, 143:24, 143:25
**mirror** [1] - 17:3
**misconduct** [1] - 105:21
**misformed** [1] - 10:4
**mismanufactured** [1] - 10:5
**missing** [1] - 115:10
**misspoke** [1] - 137:18
**misstatement** [1] - 135:25
**mistake** [1] - 80:12
**modern** [1] - 105:12
**moment** [5] - 9:5, 11:6, 90:10, 92:9, 108:16
**moments** [1] - 75:23
**Monday** [14] - 90:25, 91:1, 91:12, 91:17, 92:20, 93:19, 93:22, 93:25, 94:4, 94:19, 94:23, 144:11, 144:13, 144:23
**money** [26] - 32:21, 43:8, 44:5, 44:15, 64:20, 64:21, 70:17, 71:1, 71:2, 71:3, 71:5, 71:7, 74:19, 74:20, 77:17, 79:12, 79:25, 82:15, 91:17, 94:5, 99:25, 100:1, 113:19, 119:12, 123:1
**month** [7] - 30:16, 31:20, 31:21, 61:14, 99:9, 109:1, 109:24

**months** [14] - 22:7, 30:11, 30:14, 30:19, 36:8, 44:11, 50:1, 50:4, 50:5, 73:1, 79:4, 123:19

**morning** [41] - 6:2, 6:3, 6:4, 7:7, 8:1, 8:2, 9:7, 20:16, 20:17, 20:18, 23:21, 23:25, 30:4, 30:5, 33:14, 33:16, 33:18, 33:20, 36:21, 37:4, 37:17, 47:2, 47:3, 59:19, 61:1, 61:2, 65:4, 68:1, 68:2, 75:21, 93:19, 93:22, 93:25, 94:19, 94:23, 103:24, 116:5, 116:6, 144:11, 144:13, 144:23

**Morris** [1] - 77:16

**most** [13] - 38:15, 38:24, 53:15, 60:7, 69:21, 78:8, 93:16, 93:17, 99:8, 115:2, 135:19, 135:20, 135:21

**mother** [1] - 74:12

**motion** [4] - 4:11, 4:12, 96:2, 96:10, 96:14, 96:15, 97:1, 97:3, 106:10, 106:12, 112:20, 118:25, 124:19, 124:20, 125:2, 125:3

**motions** [12] - 28:8, 28:11, 28:17, 90:14, 90:21, 91:6, 93:6, 95:5, 95:12, 95:13, 124:22, 124:25

**move** [12] - 79:7, 82:9, 83:21, 84:19, 86:3, 87:1, 95:18, 95:23, 101:20, 103:5, 112:21, 141:3

**MOVED** [2] - 5:2, 5:12

**moved** [1] - 123:8

**moves** [1] - 95:19

**moving** [2] - 102:11, 122:19

**MR** [306] - 6:3, 6:4, 6:7, 6:9, 6:11, 6:19, 6:23, 7:1, 7:4, 7:22, 7:25, 13:2, 13:4, 14:5, 14:23, 14:25, 15:2, 15:11, 16:22, 16:23, 19:20, 19:22, 19:24, 20:12, 20:15, 22:8, 22:12, 22:14, 22:18, 22:19, 22:20, 22:22,

22:24, 23:2, 23:5, 23:8, 23:11, 23:13, 24:2, 24:17, 24:20, 25:7, 25:10, 25:11, 25:12, 25:25, 26:3, 26:4, 26:6, 26:8, 26:11, 26:13, 26:15, 26:16, 27:1, 27:5, 27:15, 27:16, 27:21, 28:1, 28:21, 29:3, 29:7, 29:8, 29:15, 29:23, 29:25, 30:3, 46:9, 46:14, 46:22, 46:24, 47:1, 53:22, 53:23, 53:25, 54:2, 54:4, 55:6, 55:9, 55:17, 55:19, 55:22, 55:24, 56:13, 56:15, 56:21, 56:23, 60:16, 60:18, 60:19, 60:20, 60:21, 60:23, 60:25, 63:7, 63:10, 63:23, 63:24, 64:2, 65:2, 65:9, 65:24, 66:2, 66:14, 66:16, 67:5, 67:7, 67:10, 67:13, 67:18, 67:22, 67:25, 75:6, 75:8, 75:11, 75:14, 75:20, 81:14, 81:17, 81:19, 81:21, 81:24, 82:9, 82:13, 82:19, 82:22, 83:3, 83:4, 83:8, 83:21, 84:1, 84:3, 84:4, 84:19, 84:23, 86:3, 86:7, 87:1, 87:5, 87:8, 87:10, 87:13, 87:16, 87:17, 87:19, 87:21, 87:25, 88:25, 89:5, 89:7, 89:10, 89:12, 90:4, 90:8, 90:13, 90:16, 90:19, 91:1, 91:3, 91:10, 91:13, 91:15, 91:24, 92:8, 92:14, 92:18, 92:23, 95:17, 96:5, 96:8, 96:9, 96:12, 96:13, 96:15, 96:17, 97:7, 97:11, 105:9, 106:3, 106:8, 106:13, 106:15, 106:18, 107:1, 107:6, 107:10, 107:11, 118:14, 118:15, 118:16, 120:3, 120:6, 124:2, 124:5, 124:9, 124:12, 124:15, 124:24, 125:1, 126:8, 127:3, 127:13, 127:15, 127:19, 127:21, 128:13, 128:17,

128:25, 129:3, 129:6, 129:8, 129:15, 129:18, 129:21, 130:2, 130:5, 130:10, 130:25, 131:1, 131:16, 131:20, 131:22, 131:25, 132:14, 132:16, 133:3, 133:9, 133:12, 133:16, 133:19, 133:22, 134:7, 134:9, 134:12, 134:14, 134:18, 134:20, 135:5, 135:9, 135:11, 135:18, 135:24, 136:10, 136:23, 137:7, 137:11, 137:12, 137:16, 138:11, 138:20, 138:24, 139:1, 139:9, 139:11, 139:17, 139:19, 139:22, 139:24, 140:4, 140:5, 140:8, 140:10, 140:12, 140:15, 140:17, 140:21, 140:25, 141:3, 141:7, 141:12, 141:15, 141:18, 141:20, 141:23, 141:25, 142:1, 142:4, 142:7, 142:9, 142:13, 142:14, 142:15, 142:18, 142:21, 142:23, 143:1, 143:4, 143:7, 143:9, 143:11, 143:13, 143:16, 143:19, 143:22, 144:2, 144:5, 144:7, 144:10, 144:13, 144:17, 144:20, 144:25, 145:4, 145:6, 145:8

**Mt** [2] - 101:23, 114:25

**multiply** [1] - 117:14, 117:15

**must** [13] - 80:24, 93:8, 98:21, 99:16, 113:10, 115:7, 121:5, 121:6, 130:20, 130:22, 132:23, 138:13

**mutual** [5] - 12:5, 101:2, 101:3, 131:14, 132:2

**N**

**name** [21] - 17:19,

17:20, 17:23, 22:2, 22:3, 24:5, 29:22, 29:24, 37:13, 37:14, 56:18, 56:20, 67:17, 67:19, 67:21, 83:2, 83:3, 88:1, 88:9, 88:22, 118:19

**name's** [1] - 47:4

**named** [4] - 51:15, 84:15, 85:5, 85:7

**names** [2] - 64:25, 85:3

**national** [1] - 105:16

**nature** [3] - 15:13, 33:14, 39:20

**Navas** [1] - 118:22

**navas** [1] - 119:23

**near** [2] - 24:16

**necessarily** [2] - 52:9, 110:15

**necessary** [1] - 33:8

**necessitate** [1] - 58:22

**necessitates** [1] - 59:14

**need** [18] - 20:7, 29:4, 29:6, 29:8, 34:6, 38:20, 52:8, 92:6, 118:1, 118:7, 136:20, 139:20, 139:23, 139:24, 141:8, 143:8, 143:10

**needed** [6] - 6:13, 30:23, 35:21, 79:9, 79:25, 110:14

**needs** [2] - 111:24, 114:19

**negatively)** [1] - 54:12

**neglected** [1] - 6:12

**nephew** [2] - 47:24, 48:2

**never** [28] - 12:21, 12:24, 13:19, 13:21, 13:24, 14:11, 16:10, 16:15, 17:6, 17:8, 17:11, 19:18, 19:25, 20:8, 27:8, 54:10, 54:11, 54:23, 70:6, 70:7, 70:9, 79:7, 103:3, 112:22, 117:8

**new** [2] - 10:7, 124:17

**New** [8] - 50:3, 52:25, 53:3, 72:3, 77:1, 78:11, 96:20

**next** [14] - 24:4, 31:2, 34:14, 35:22, 56:12, 65:8, 67:12, 82:21, 90:7, 101:21, 114:24,

116:25, 133:11, 133:12

**nice** [4] - 29:15, 78:19, 94:22, 145:4

**night** [2] - 11:9, 34:3

**NLRA** [1] - 105:22

**NLRB** [1] - 105:13

**nobody** [1] - 21:18

**noise** [1] - 74:6

**noncompensable** [1] - 101:13

**None** [1] - 115:20

**none** [1] - 89:17

**nonexempt** [1] - 62:25

**nonmajority** [4] - 98:2, 98:12, 98:22, 99:20

**nonsense** [1] - 16:20

**nonstop** [1] - 18:18

**noon** [2] - 93:21, 94:2

**noontime** [1] - 93:15

**normal** [4] - 83:18, 84:16, 86:1, 86:21

**normally** [4] - 28:7, 28:18, 50:21, 50:24

**NORTH** [1] - 145:19

**North** [1] - 2:4

**note** [2] - 58:2, 118:8

**notes** [3] - 82:17, 111:23, 132:17

**nothing** [10] - 10:22, 33:11, 44:9, 47:12, 71:10, 74:22, 104:7, 112:18, 131:1, 139:19

**November** [2] - 72:15, 72:16

**nowhere** [1] - 16:17

**number** [43] - 5:2, 9:1, 13:13, 15:7, 21:5, 43:6, 63:13, 98:25, 99:1, 100:14, 104:21, 113:3, 113:11, 114:6, 114:14, 118:23, 125:19, 125:20, 125:21, 125:22, 125:23, 125:24, 125:25, 126:1, 129:19, 129:22, 130:2, 130:12, 132:18, 132:24, 133:13, 133:23, 134:16, 134:21, 135:6, 135:24, 141:10, 141:11

**Number** [12] - 1:3, 57:10, 83:10, 83:15, 83:22, 84:6, 84:20, 85:19, 86:4, 86:16,

JURY TRIAL - VOLUME V OF V

87:2, 130:1
**numbers** [5] - 88:18, 88:20, 110:13, 119:10, 119:17
**nutshell** [2] - 106:3, 114:12

**O**

**o'clock** [27] - 34:13, 35:7, 35:9, 35:11, 35:13, 35:15, 59:22, 60:5, 60:11, 70:3, 93:14, 93:23, 94:12, 94:23, 95:5, 95:9, 103:23, 104:14, 116:9, 116:11, 117:11, 117:13, 144:14, 145:2
**oath** [4] - 7:19, 16:8, 65:22, 83:1
**object** [16] - 22:8, 25:25, 87:13, 127:16, 128:3, 129:18, 129:21, 130:10, 134:1, 134:21, 135:5, 135:9, 135:16, 138:12, 138:13, 139:16
**objected** [1] - 23:8
**objecting** [1] - 96:24
**objection** [18] - 22:19, 22:22, 23:9, 23:11, 53:22, 55:6, 63:7, 75:6, 89:5, 89:6, 128:10, 129:4, 130:8, 133:11, 133:12, 134:13, 135:15, 138:22
**Objection** [1] - 23:5
**objection's** [4] - 133:8, 133:10, 133:15, 138:10
**objections** [12] - 28:17, 127:8, 127:11, 128:8, 128:11, 129:5, 129:7, 129:19, 140:2, 140:3, 143:5, 143:6
**obligation** [1] - 115:20
**obligations** [1] - 94:11
**observations** [2] - 62:5, 143:6
**observe** [1] - 51:7
**obviously** [3] - 110:4, 118:9, 119:6
**occasion** [1] - 35:5
**occasional** [8] -

108:18, 109:2, 110:23, 111:7, 111:25, 121:17, 121:19, 138:15
**occasionally** [6] - 10:10, 49:13, 98:13, 109:16, 138:18, 139:6
**October** [1] - 44:15
**OF** [8] - 1:1, 1:13, 3:1, 3:7, 4:1, 4:9, 5:1, 5:11
**offer** [2] - 28:6, 28:15
**offered** [3] - 71:11, 76:21, 78:7
**office** [7] - 29:3, 59:21, 62:1, 74:25, 80:22, 86:19
**officer** [13] - 89:15, 90:1, 98:21, 98:23, 99:16, 107:18, 107:23, 120:10, 120:13, 121:1, 121:3, 121:5, 138:13
**officers** [5] - 85:1, 97:18, 97:19, 98:1, 111:21
**Official** [1] - 2:3
**official** [1] - 57:4
**OFFICIAL** [1] - 145:19
**often** [3] - 38:24, 49:14, 67:19
**old** [2] - 10:7, 101:24
**older** [1] - 29:16
**Olivas** [11] - 108:3, 108:4, 108:17, 109:10, 110:18, 112:7, 112:8, 120:21, 138:21, 139:13
**once** [6] - 70:11, 83:2, 99:8, 104:6, 109:1, 109:24
**one** [67] - 6:11, 7:9, 10:8, 14:16, 15:13, 21:3, 21:11, 25:18, 32:23, 36:13, 36:17, 39:7, 41:16, 43:16, 49:12, 50:15, 53:7, 54:11, 55:19, 55:21, 62:20, 64:5, 64:23, 77:12, 77:17, 80:25, 86:24, 92:8, 98:24, 99:9, 99:15, 100:13, 103:15, 104:5, 105:12, 107:8, 109:16, 110:2, 110:15, 110:19, 110:20, 113:5, 115:1, 118:17, 120:3, 120:12, 120:13,

120:22, 121:6, 123:5, 123:13, 128:5, 128:13, 129:14, 130:1, 131:5, 132:7, 133:20, 134:20, 140:10, 140:11, 141:4, 142:10, 142:12, 143:18
**one-fifty** [1] - 77:17
**one-third** [1] - 131:5
**ones** [3] - 25:15, 129:13, 140:14
**ongoing** [2] - 6:23, 7:10
**open** [2] - 20:21, 23:3
**opened** [1] - 23:18
**opening** [1] - 143:21
**operation** [2] - 121:7, 121:10
**operational** [13] - 40:22, 42:8, 42:12, 42:15, 51:19, 97:20, 99:23, 108:9, 108:10, 110:3, 126:19, 129:12, 138:12
**operations** [1] - 98:24
**opinion** [3] - 120:22, 123:21, 123:23
**opportunity** [1] - 106:11
**opposed** [5] - 36:10, 90:22, 91:4, 91:5, 98:21
**oral** [1] - 123:20
**orally** [1] - 123:19
**Order** [1] - 6:1
**order** [8] - 28:10, 77:23, 94:7, 95:12, 95:15, 120:16, 124:13, 144:11
**orders** [2] - 91:14, 98:8
**organization** [2] - 107:17, 107:19
**original** [1] - 74:15
**Orlando** [1] - 97:15
**otherwise** [2] - 51:3, 101:8
**ought** [1] - 98:24
**outcome** [1] - 7:14
**outside** [9] - 11:13, 11:19, 24:15, 28:8, 35:15, 53:25, 55:6, 63:7, 79:13
**overkill** [1] - 92:19
**Overruled** [1] - 23:6
**overruled** [16] - 23:11, 54:3, 55:8,

63:9, 87:23, 89:6, 128:11, 129:4, 129:20, 133:8, 133:10, 133:15, 135:4, 135:15, 138:10, 139:18
**overseeing** [1] - 111:3
**overtime** [29] - 16:4, 16:5, 16:20, 17:1, 35:1, 69:16, 74:9, 75:3, 98:19, 100:15, 102:21, 104:2, 104:16, 104:25, 114:21, 118:10, 119:20, 120:19, 123:17, 128:3, 128:8, 132:11, 135:13, 135:14, 136:5, 136:18, 136:20, 138:3, 142:18
**owed** [8] - 12:25, 13:20, 14:12, 14:14, 14:19, 17:7, 66:25, 103:4
**owes** [1] - 44:9
**own** [16] - 19:18, 20:8, 71:2, 71:3, 71:7, 71:13, 77:20, 77:21, 77:22, 78:12, 78:15, 126:18, 126:25, 140:24
**owner** [3] - 98:11, 98:18, 121:9
**ownership** [4] - 97:19, 98:2, 98:3, 98:22

**P**

**PA** [1] - 1:17
**Pacer** [1] - 118:24
**PAGE** [3] - 3:2, 4:2, 4:10
**page** [18] - 3:8, 13:5, 14:17, 17:17, 17:18, 18:25, 66:17, 84:25, 86:8, 86:9, 88:12, 88:21, 107:6, 107:7, 131:9, 131:16, 131:17
**Pagent** [1] - 136:23
**Pages** [1] - 1:11
**paid** [69] - 8:7, 8:10, 8:11, 8:12, 11:21, 12:3, 16:1, 17:13, 18:9, 31:22, 32:19, 32:20, 32:22, 34:17, 35:1, 41:25, 43:18, 44:8, 44:10, 44:14, 44:24, 45:1, 45:16,

45:19, 48:16, 48:24, 49:1, 52:4, 52:15, 58:20, 62:18, 66:10, 69:12, 69:16, 70:17, 70:24, 76:24, 77:17, 78:2, 78:4, 78:14, 79:3, 79:4, 82:6, 82:16, 98:6, 100:5, 100:11, 101:11, 109:3, 113:11, 114:9, 118:9, 121:25, 122:1, 122:11, 127:24, 132:23, 135:14, 136:5, 136:15, 136:18, 137:2, 137:19, 137:25, 138:1, 138:4
**panel** [2] - 123:18, 123:20
**paper** [2] - 45:18, 135:12
**papers** [1] - 142:11
**paperwork** [1] - 24:4
**paragraph** [1] - 129:25
**pardon** [3] - 14:24, 19:23, 22:21
**park** [2] - 34:9, 49:21
**parked** [1] - 24:15
**part** [8] - 36:5, 52:11, 54:21, 55:11, 105:19, 130:11, 134:10, 141:13
**parted** [1] - 44:3, 44:16
**particular** [11] - 45:10, 58:7, 73:18, 96:23, 97:24, 99:7, 106:20, 111:18, 114:23, 120:13, 139:2
**particularly** [2] - 98:21, 108:11
**parties** [7] - 92:25, 93:7, 97:5, 122:6, 129:10, 131:13
**party** [4] - 16:9, 95:6, 118:22, 119:23
**pass** [1] - 78:2
**passed** [1] - 105:17
**Patel** [6] - 97:14, 119:14, 119:19, 120:24, 120:25, 121:4
**patience** [1] - 94:15
**patient** [1] - 94:21
**pattern** [1] - 41:14
**patterns** [1] - 41:16
**Patton** [1] - 85:8
**pay** [43] - 12:8, 17:11, 18:7, 20:1, 20:4, 20:10, 42:22,

JURY TRIAL - VOLUME V OF V

42:25, 43:8, 44:17, 53:6, 55:2, 62:20, 67:1, 69:18, 70:20, 71:2, 71:6, 77:6, 77:10, 77:11, 77:12, 77:21, 77:22, 79:20, 82:16, 100:7, 100:9, 100:23, 105:1, 110:10, 113:10, 118:8, 122:24, 127:25, 132:23, 136:6, 136:20, 136:21, 137:3
**paychecks** [2] - 101:4, 101:5
**paying** [4] - 43:22, 44:12, 44:21, 77:12
**payments** [3] - 45:5, 45:9, 70:22
**payroll** [7] - 43:2, 43:9, 63:17, 63:19, 63:22, 99:11
**people** [35] - 9:1, 10:4, 11:14, 27:4, 33:7, 33:18, 33:25, 34:18, 37:21, 42:22, 44:24, 45:16, 47:9, 60:4, 60:11, 67:20, 68:18, 69:1, 69:9, 73:7, 74:3, 74:5, 78:8, 78:12, 78:24, 79:24, 80:25, 97:22, 99:10, 102:19, 102:20, 104:20, 127:24, 135:21
**per** [8] - 15:25, 16:2, 16:3, 16:4, 17:12, 32:1, 58:7
**percent** [3] - 72:5, 78:9, 111:10
**Perez** [2] - 97:14, 120:25
**perform** [2] - 11:3, 104:7
**performed** [3] - 40:17, 98:10, 115:13
**performing** [1] - 104:6
**perhaps** [3] - 10:12, 10:23, 70:22
**peri** [9] - 104:19, 105:3, 118:11, 118:25, 119:1, 122:16, 122:20, 123:6, 123:9
**period** [6] - 21:1, 40:5, 43:25, 45:10, 51:6, 134:6
**periods** [1] - 18:17
**permit** [1] - 94:17

**person** [12] - 8:11, 15:21, 20:6, 21:25, 22:2, 22:3, 46:17, 51:15, 90:1, 107:14, 110:1, 110:20
**personal** [4] - 47:13, 52:5, 52:7, 59:17
**personally** [9] - 51:18, 52:13, 56:9, 68:24, 80:17, 97:22, 121:3, 121:5, 121:22
**Personally** [2] - 52:20, 52:21
**persons** [1] - 8:23
**persuasive** [1] - 120:23
**ph** [4] - 24:23, 67:18, 67:19
**phone** [2] - 21:5, 88:20
**physical** [2] - 6:16, 111:13
**physically** [1] - 58:25
**pick** [6] - 13:7, 27:10, 77:23, 78:21, 94:10, 116:18
**pickup** [1] - 10:17
**pictures** [1] - 81:2
**piece** [4] - 31:23, 45:18, 115:5, 135:12
**place** [7] - 9:21, 15:14, 37:19, 111:15, 127:23, 130:6
**placed** [3] - 24:16, 25:15, 86:14
**plain** [1] - 108:2
**plaintiff** [24] - 15:23, 19:15, 62:15, 97:5, 99:8, 100:5, 100:6, 101:17, 102:2, 102:4, 102:5, 102:13, 103:17, 105:21, 121:14, 122:3, 123:8, 125:7, 126:20, 127:13, 128:12, 129:5, 133:25, 143:18
**PLAINTIFF** [2] - 7:23, 65:25
**plaintiffs** [21] - 27:24, 28:5, 47:4, 75:24, 92:24, 97:9, 98:5, 98:6, 98:7, 100:5, 100:10, 102:11, 103:6, 112:2, 121:23, 121:24, 122:6, 128:5, 132:5, 134:2, 137:5
**Plaintiffs** [2] - 1:7, 1:16
**PLAINTIFFS'** [2] -

3:1, 5:11
**plaintiffs'** [28] - 28:11, 28:18, 91:7, 95:13, 97:4, 103:19, 124:20, 125:18, 125:19, 125:20, 125:21, 125:22, 125:23, 125:24, 125:25, 126:1, 126:6, 126:8, 126:9, 127:12, 134:16, 134:21, 138:15
**Plaintiffs'** [6] - 57:10, 57:11, 87:11, 89:2, 89:4, 134:18
**Plantation** [1] - 1:22
**plastic** [2] - 105:13, 105:14
**pleadings** [1] - 119:25
**pled** [1] - 112:23
**plus** [1] - 129:14
**pocket** [4] - 71:13, 78:12, 78:15, 109:3
**point** [12] - 28:7, 36:16, 43:16, 43:17, 47:10, 48:17, 61:10, 93:18, 112:21, 114:24, 115:5, 116:1
**points** [2] - 43:23, 72:13
**Points** [3] - 73:18, 73:24, 74:1
**policy** [1] - 54:17
**Pompano** [1] - 88:17
**poor** [1] - 27:12
**pops** [1] - 43:6
**portal** [2] - 104:11
**portion** [2] - 25:16, 93:16
**portions** [1] - 106:21
**position** [12] - 30:9, 40:17, 50:6, 51:22, 54:6, 54:9, 54:10, 57:3, 57:6, 61:12, 99:1, 122:25
**possible** [1] - 140:8
**possibly** [2] - 40:21, 103:4
**posture** [1] - 123:8
**postures** [1] - 93:1
**potentially** [1] - 123:11
**pottery** [2] - 101:23, 115:1
**precise** [1] - 103:16
**precluded** [2] - 105:15, 105:24
**preface** [1] - 107:13
**prejudice** [1] - 28:16

**prejudicial** [1] - 112:2
**premium** [1] - 113:24
**prep** [1] - 133:6
**prepare** [1] - 20:3
**prepared** [2] - 45:20, 125:10
**presence** [2] - 28:9, 94:18
**present** [10] - 7:2, 45:13, 45:14, 51:25, 52:16, 95:25, 97:8, 98:13, 106:1, 122:3
**presented** [1] - 79:19
**president** [11] - 53:21, 54:5, 54:7, 57:4, 85:5, 85:7, 85:8, 88:23, 89:17, 108:1, 109:12
**pretty** [2] - 37:21, 110:10
**prevent** [1] - 105:21
**previous** [3] - 13:15, 96:18, 117:4
**PREVIOUSLY** [3] - 7:23, 65:25, 83:6
**previously** [6] - 27:18, 36:15, 51:12, 52:23, 65:21, 82:25
**prima** [1] - 134:10
**primarily** [5] - 30:22, 30:25, 36:17, 49:23, 53:15
**primary** [2] - 36:13, 49:24
**principals** [1] - 120:14
**print** [1] - 17:23
**printed** [2] - 17:17, 45:22
**private** [1] - 72:20
**PRO** [1] - 2:1
**problem** [6] - 6:18, 78:4, 79:9, 79:21, 79:22, 113:17
**problems** [1] - 45:11
**procedural** [1] - 123:7
**Procedure** [1] - 97:3
**procedure** [1] - 23:20
**proceed** [5] - 7:17, 7:20, 28:5, 28:20, 95:16
**proceedings** [3] - 28:19, 96:1, 145:15
**processed** [1] - 10:8
**produce** [2] - 115:20
**produces** [1] - 115:15

**production** [1] - 77:15
**products** [1] - 105:14
**profit** [1] - 84:14
**progress** [1] - 111:2
**project** [4] - 18:13, 18:21, 19:3, 24:5
**promises** [1] - 110:10
**pronounce** [1] - 67:20
**proper** [1] - 87:23
**properties** [1] - 135:4
**proposed** [17] - 125:6, 125:11, 125:18, 125:19, 126:19, 126:22, 127:2, 127:6, 127:8, 128:11, 131:17, 133:13, 134:16, 134:18, 140:3, 140:10, 140:12
**proposition** [1] - 100:21
**protection** [2] - 57:15, 88:7
**prove** [2] - 95:24, 102:5
**proven** [1] - 101:16
**provide** [8] - 52:13, 55:10, 78:1, 79:23, 79:25, 112:22, 115:24, 128:20
**provided** [12] - 55:3, 68:19, 68:23, 79:2, 79:11, 110:25, 114:15, 116:13, 117:22, 126:19, 134:4
**proving** [1] - 115:13
**public** [2] - 54:8, 107:16
**published** [1] - 120:22
**Puerto** [1] - 119:6
**pull** [1] - 118:24
**punch** [3] - 34:21, 54:17, 69:14
**punitive** [1] - 15:16
**purposes** [6] - 82:1, 83:10, 84:6, 85:18, 86:15, 89:18
**pursuant** [2] - 95:14, 97:2
**put** [9] - 25:14, 38:2, 71:23, 102:2, 114:14, 115:3, 116:24, 128:6, 128:14
**putting** [1] - 99:10

## Q

**qualify** [1] - 47:7
**quarter** [1] - 41:7
**questions** [27] - 20:12, 23:19, 24:19, 26:1, 27:21, 46:9, 46:22, 60:16, 60:21, 63:24, 65:2, 66:3, 67:5, 67:7, 67:10, 75:11, 75:13, 81:14, 82:19, 84:24, 87:5, 87:8, 87:13, 88:25, 90:4, 106:4, 142:16
**quick** [1] - 37:7
**quit** [2] - 58:23, 66:22
**quite** [2] - 73:7, 76:22
**quote** [1] - 115:10
**quoted** [4] - 113:7, 114:3, 115:3, 115:5
**quoting** [1] - 97:19

## R

**rain** [7] - 18:12, 18:14, 19:1, 39:18, 46:3, 58:21
**raining** [2] - 18:13, 18:20, 39:14
**rains** [1] - 18:17
**raise** [6] - 28:17, 29:19, 32:10, 56:16, 67:14, 134:8
**raised** [3] - 74:12, 114:24, 119:1
**raising** [1] - 122:17
**RAMON** [1] - 1:4
**ran** [1] - 121:12
**random** [2] - 13:7, 13:8
**range** [2] - 43:5, 116:15
**rate** [7] - 113:10, 113:16, 113:22, 113:24, 114:10, 132:10, 132:23
**rather** [4] - 17:23, 74:13, 121:4, 133:24
**raw** [1] - 10:7
**re** [3] - 65:9, 82:22, 96:23
**re-arguing** [1] - 96:23
**re-call** [2] - 65:9, 82:22
**reached** [1] - 94:11

**read** [4] - 13:15, 94:19, 115:4, 144:12
**readily** [2] - 103:10, 103:11
**reading** [2] - 131:15, 131:21
**ready** [2] - 6:8, 116:25
**realize** [1] - 100:5, 105:23
**really** [17] - 6:15, 12:18, 18:1, 18:2, 35:23, 37:25, 39:14, 66:4, 67:20, 78:25, 101:10, 103:12, 105:20, 105:25, 109:7, 115:6
**reason** [10] - 9:21, 10:11, 10:24, 62:7, 73:12, 74:2, 89:20, 99:4, 103:20, 107:23
**reasonable** [3] - 102:7, 115:17, 128:19
**reasons** [1] - 100:12
**rebut** [1] - 117:24
**rebuttal** [7] - 87:11, 87:17, 87:18, 88:21, 89:1, 92:22, 92:24
**rebutted** [2] - 103:18, 104:5
**receded** [1] - 103:11
**receipt** [3] - 43:19, 79:16, 79:18
**receive** [2] - 32:24, 58:13
**RECEIVED** [2] - 5:2, 5:12
**received** [23] - 55:2, 56:1, 56:3, 58:16, 61:19, 64:4, 64:6, 64:23, 82:11, 82:12, 83:23, 83:25, 84:21, 84:22, 86:5, 86:6, 87:3, 87:4, 89:3, 89:4, 100:22, 137:2, 137:3
**receiving** [1] - 44:15
**recent** [1] - 136:11
**Recess** [4] - 65:12, 95:10, 125:14, 127:10
**recess** [12] - 28:8, 65:4, 65:5, 93:18, 94:13, 95:1, 95:4, 95:9, 125:13, 127:4, 127:7, 127:9
**recessing** [1] - 93:14
**recognize** [2] - 83:13, 84:9
**recollection** [3] - 39:10, 59:17, 64:4
**reconstruct** [1] -

96:22
**reconvene** [1] - 93:25
**record** [14] - 11:17, 25:22, 25:24, 34:23, 54:13, 80:20, 91:5, 92:18, 96:13, 96:24, 100:14, 140:21, 141:8
**records** [25] - 45:4, 69:18, 75:23, 75:24, 75:25, 76:1, 76:3, 76:4, 76:5, 76:6, 76:19, 79:11, 79:17, 81:3, 81:4, 82:6, 102:3, 115:7, 115:9, 115:12, 115:18, 115:19, 115:21, 117:18
**recycle** [1] - 10:6
**redirect** [3] - 55:20, 81:23, 89:8
**Redirect** [4] - 3:13, 3:17, 3:23, 4:6
**REDIRECT** [3] - 55:23, 64:1, 89:11
**refer** [3] - 58:2, 96:18, 105:24
**reference** [2] - 127:2, 134:15
**referenced** [2] - 61:16, 96:20
**referred** [1] - 96:19
**referring** [2] - 11:13, 96:22
**reflecting** [2] - 76:1, 76:6
**refused** [5] - 125:9, 126:10, 126:16, 126:23, 133:20
**regard** [2] - 126:25
**regarding** [2] - 111:19, 114:25
**regardless** [4] - 12:2, 48:13, 58:9, 136:21
**registered** [3] - 86:19, 86:20, 89:16
**regular** [9] - 7:11, 100:22, 113:10, 113:15, 113:16, 114:5, 122:12, 132:10, 132:22
**regularly** [1] - 50:9
**regulations** [2] - 101:15, 119:12
**reign** [2] - 105:8, 105:9
**reigned** [1] - 114:19
**Reinaldo** [5] - 20:25, 74:10, 95:20
**REINALDO** [1] - 1:4

**reinstatement** [1] - 84:14
**related** [3] - 35:18, 47:23, 61:3
**relation** [2] - 107:15, 108:11
**relations** [1] - 105:16
**relatively** [1] - 41:5
**relatives** [1] - 72:6
**relevance** [2] - 22:19, 22:22
**relevant** [1] - 15:17
**relied** [1] - 110:19
**relief** [2] - 105:16, 105:24
**relieved** [1] - 38:1
**remain** [1] - 65:16
**remainder** [1] - 93:24
**remaining** [1] - 82:16
**remains** [2] - 93:2, 126:4
**remember** [38] - 8:4, 8:6, 8:23, 11:4, 16:10, 16:11, 16:12, 16:13, 16:14, 20:11, 21:7, 23:19, 31:4, 32:4, 32:5, 37:14, 38:16, 41:16, 43:2, 43:3, 43:5, 43:14, 43:21, 44:14, 45:6, 45:17, 48:5, 48:8, 57:19, 64:9, 66:18, 80:21, 80:23, 92:12, 117:20, 123:6, 136:24
**remembers** [1] - 26:25
**remind** [2] - 94:16, 94:19
**reminded** [3] - 7:18, 65:21, 82:25
**render** [1] - 121:2
**renew** [1] - 124:25
**Renewed** [1] - 4:12
**renewed** [2] - 125:2, 125:3
**repaid** [1] - 79:7
**repeat** [2] - 8:15, 23:15
**report** [3] - 56:5, 56:8, 64:13
**REPORTED** [1] - 2:2
**reported** [1] - 104:23
**REPORTER** [1] - 145:19
**Reporter** [1] - 2:3
**represent** [2] - 47:4, 114:19
**represented** [3] - 19:12, 19:14, 19:16

**reprimanding** [1] - 109:17
**requested** [5] - 72:17, 126:6, 126:10, 126:12, 126:15
**require** [4] - 52:9, 56:5, 93:8, 132:12
**required** [6] - 6:24, 113:21, 116:8, 119:12, 136:20, 145:1
**requirement** [1] - 102:12
**requires** [4] - 111:8, 117:18, 134:5, 138:19
**reserve** [1] - 139:25
**reserved** [2] - 28:12, 95:14
**respect** [47] - 11:7, 34:17, 41:1, 41:21, 47:11, 53:14, 53:20, 54:16, 55:1, 61:8, 64:22, 66:3, 68:3, 69:12, 69:23, 70:16, 71:12, 73:18, 76:19, 78:16, 79:1, 80:25, 97:9, 97:12, 98:5, 99:6, 103:5, 104:3, 104:20, 108:17, 111:18, 112:11, 114:23, 116:19, 117:3, 118:8, 118:11, 118:25, 119:5, 120:7, 120:21, 122:2, 122:14, 133:25, 136:12, 139:3, 139:12
**respective** [2] - 69:9, 92:5, 93:7
**respond** [1] - 132:14
**responsibility** [2] - 115:7, 121:7
**rest** [11] - 28:2, 71:9, 72:5, 90:14, 90:22, 91:4, 92:16, 92:24, 130:22, 130:23, 136:24
**rested** [3] - 87:19, 91:8, 92:25
**resting** [3] - 90:20, 90:22, 91:5
**restricted** [2] - 138:17, 139:6
**result** [1] - 119:21
**resulted** [1] - 118:2
**retire** [1] - 93:12
**retired** [1] - 94:18
**return** [7] - 35:6, 56:6, 59:9, 64:14, 103:23, 104:24, 122:24
**returned** [2] - 49:20,

JURY TRIAL - VOLUME V OF V

59:16
retype [1] - 106:6
Retype [1] - 124:3
reverse [1] - 121:9
reversed [2] -
108:13, 112:8
review [1] - 57:11
Rican [1] - 119:6
Rickert [3] - 106:2,
123:25, 124:16
rights [2] - 136:1,
137:14
rise [4] - 65:6, 65:13,
94:25, 125:15
rode [2] - 104:12
Rodriguez [3] -
108:11, 113:4, 122:5
Ronald [1] - 85:10
room [2] - 45:16,
94:8
roughly [3] - 70:3,
72:14
row [2] - 18:18,
41:12
Rule [23] - 28:10,
90:14, 90:20, 95:12,
95:18, 95:20, 95:23,
97:2, 97:8, 102:11,
103:5, 108:20, 118:4,
118:24, 119:24,
124:19, 124:25,
125:3, 130:19
rule [5] - 4:11, 51:2,
101:20, 114:13,
123:22
Rules [1] - 97:3
rules [2] - 73:24,
74:5
ruling [1] - 28:16
running [3] - 42:15,
121:10, 121:15

S

SAFE [1] - 1:9
safe [4] - 40:10, 53:4,
53:14, 143:23
Safe [33] - 1:21,
13:22, 13:25, 14:13,
30:6, 31:22, 32:3,
39:25, 40:3, 40:24,
41:3, 42:9, 42:18,
42:23, 48:3, 53:16,
54:16, 55:3, 56:24,
57:14, 62:12, 66:4,
68:4, 68:18, 76:15,
83:16, 84:15, 85:23,
86:1, 86:22, 88:9,
89:15, 125:17

Saffron [1] - 77:15
salaried [1] - 114:22
salaries [1] - 79:13
salary [60] - 8:8,
8:10, 11:23, 13:23,
17:15, 20:7, 20:23,
31:23, 31:24, 31:25,
32:7, 32:12, 32:14,
32:16, 32:24, 34:18,
43:4, 48:10, 58:2,
58:6, 58:13, 58:15,
61:17, 61:18, 62:21,
76:21, 76:24, 78:7,
78:18, 78:19, 78:20,
80:6, 100:7, 100:11,
100:16, 101:12,
112:10, 112:11,
112:12, 112:16,
113:9, 113:11,
113:12, 113:13,
113:15, 113:19,
114:5, 114:23, 122:7,
122:11, 122:13,
127:24, 130:17,
130:21, 131:10,
132:4, 132:22, 132:24
salary's [1] - 112:17
Samantha [2] -
74:16, 74:25
Samara [2] - 74:17,
74:18
Sanford [1] - 97:15
sat [1] - 45:16
Saturday [6] - 45:23,
45:25, 60:12, 70:4,
73:10, 73:11
Saturdays [6] -
71:20, 73:3, 73:5,
73:6, 73:7, 73:8
save [2] - 91:18,
91:24
saw [7] - 40:9, 41:13,
42:13, 42:16, 54:10,
54:11, 117:7
saws [1] - 36:6
schedule [6] - 17:8,
48:7, 69:25, 70:2,
70:12, 94:12
scheduled [2] - 7:12,
7:15
schedules [1] -
117:21
school [2] - 78:10,
78:14
scope [6] - 53:25,
55:6, 63:7, 83:19,
84:16, 86:21
scrap [3] - 33:13,
49:11, 49:13
screws [2] - 25:1,

25:21
SE [1] - 2:1
search [1] - 80:20
seat [3] - 56:18,
65:20, 67:16
seated [6] - 6:5, 7:8,
65:19, 83:1, 95:11,
127:11
second [10] - 6:11,
33:3, 42:20, 66:8,
86:8, 88:12, 100:4,
120:4, 134:20, 139:4
secretary [1] - 85:10
section [1] - 106:20
Security [6] - 63:6,
63:13, 104:21,
119:10, 119:17,
122:22
see [41] - 16:17,
21:9, 27:17, 29:11,
29:12, 35:5, 39:22,
39:25, 40:3, 40:12,
41:3, 41:9, 41:17,
50:8, 50:25, 58:25,
84:7, 84:25, 85:5,
85:20, 85:22, 86:16,
87:15, 88:13, 88:22,
96:21, 112:6, 118:5,
131:23, 132:18,
133:22, 136:18,
140:11, 140:14,
141:9, 141:21,
141:25, 142:7, 144:23
seeing [1] - 58:7
seek [2] - 113:23,
114:21
send [1] - 80:16
SENIOR [1] - 1:14
sense [3] - 47:9,
70:14, 143:4
sent [3] - 22:1, 80:7,
80:14
sentence [7] - 126:3,
128:18, 132:21,
134:19, 138:25,
139:5, 141:10
September [5] -
15:25, 66:5, 66:8,
66:24, 69:11
serious [1] - 105:19
seriously [1] -
144:17
serous [1] - 105:21
served [1] - 94:7
services [3] - 29:6,
68:10, 120:8
Services [1] - 108:14
set [6] - 7:16, 69:25,
70:2, 79:3, 128:3,
128:4

seven [4] - 15:21,
32:8, 50:7, 78:20
several [3] - 19:21,
36:16, 77:16
Shakes [1] - 54:12
shall [1] - 125:10
shape [1] - 95:25
sheep [1] - 74:11
sheet [3] - 24:23,
77:25
shift [1] - 102:9
shifting [1] - 102:10
shifts [1] - 103:14
shop [38] - 9:4, 9:13,
9:19, 10:2, 10:22,
11:2, 24:3, 30:10,
30:11, 30:14, 32:4,
32:21, 33:4, 33:13,
34:20, 35:16, 35:19,
35:20, 35:23, 36:11,
36:18, 36:20, 37:4,
39:11, 39:17, 46:4,
48:22, 48:24, 49:2,
49:11, 49:15, 49:19,
50:23, 58:23, 59:9,
103:23, 104:6, 104:13
short [3] - 25:15,
51:6, 51:8
shortly [1] - 50:19
show [17] - 15:3,
51:4, 57:9, 69:20,
76:19, 81:3, 81:12,
82:6, 103:15, 108:25,
111:1, 111:14,
115:15, 115:25,
134:20, 141:1
showed [1] - 17:16
showing [6] - 56:1,
66:17, 81:25, 108:1,
109:7, 117:5
shown [3] - 16:25,
104:2, 104:14
shut [4] - 36:3, 36:4,
36:6, 36:7
shutter [6] - 9:20,
10:1, 10:12, 10:23,
11:22, 24:24
Shutters [30] - 1:21,
13:22, 13:25, 14:13,
30:7, 31:22, 32:3,
39:25, 40:3, 40:24,
41:3, 42:9, 42:19,
42:23, 48:3, 56:24,
57:15, 62:12, 66:4,
68:4, 68:19, 76:16,
83:17, 84:15, 85:23,
86:1, 86:22, 88:10,
89:15, 125:17
SHUTTERS [1] - 1:9
shutters [11] - 9:8,

9:11, 9:16, 10:5,
11:15, 11:18, 24:11,
24:22, 25:4, 25:14,
111:14
shy [1] - 110:11
sic [1] - 136:6
side [2] - 25:14, 75:8
sifted [1] - 117:4
sign [6] - 16:16,
17:23, 45:7, 45:17,
135:12, 136:4
signature [5] - 16:17,
57:17, 57:24, 57:25,
82:3
signed [4] - 16:8,
16:10, 16:15, 79:19
significance [3] -
108:18, 109:18, 139:7
significant [3] -
97:19, 97:20, 109:22
Simon [1] - 85:10
simply [4] - 98:12,
131:11, 132:4, 132:25
single [2] - 25:17,
139:15
sister [2] - 105:16,
105:23
sit [1] - 44:8
site [9] - 33:16,
36:24, 37:5, 38:11,
59:24, 60:1, 78:22,
98:14, 104:10
sites [2] - 72:8, 98:9
sitting [2] - 31:2,
70:25
situation [7] -
100:11, 101:1,
104:20, 121:15,
122:11, 122:25,
135:11
six [8] - 8:23, 15:19,
15:25, 16:3, 16:5,
50:7, 117:15, 123:19
skills [2] - 78:9,
78:14
Social [6] - 63:6,
63:12, 104:21,
119:10, 119:17,
122:22
Solano [3] - 118:21,
119:23, 123:14
solano [1] - 122:14
SOLANO [1] -
118:21
solely [2] - 113:9,
132:22
SOLER [1] - 1:5
solicitor [1] - 123:20
someone [6] - 17:21,
64:11, 89:24, 99:4,

JURY TRIAL - VOLUME V OF V

99:12, 135:12
**sometime** [1] - 49:4
**sometimes** [11] - 9:23, 24:25, 33:13, 35:14, 37:12, 40:1, 44:6, 47:8, 49:14, 116:23, 121:11
**somewhat** [1] - 25:2
**somewhere** [1] - 50:4
**sorry** [13] - 19:20, 19:22, 21:15, 28:1, 90:21, 107:9, 126:9, 127:21, 130:3, 131:15, 137:18, 139:22, 141:2
**sort** [11] - 32:7, 35:25, 36:2, 45:20, 56:1, 103:18, 105:18, 120:19, 121:19, 121:21, 130:6
**sorts** [2] - 136:8, 137:5
**sotto** [2] - 90:12, 92:11
**sounds** [1] - 30:24
**south** [1] - 18:16
**Southern** [1] - 119:24
**sOUTHERN** [1] - 1:1
**Spanish** [3] - 29:5, 78:11, 78:12
**speaks** [1] - 116:18
**specific** [6] - 41:14, 41:16, 48:21, 64:3, 64:5, 112:5
**specifically** [9] - 73:25, 107:21, 108:13, 108:16, 112:14, 114:3, 114:4, 120:25, 137:18
**speculation** [2] - 128:14, 128:22
**Spell** [2] - 29:24, 67:21
**spell** [2] - 56:14, 56:20
**spend** [1] - 38:9
**spending** [1] - 38:22
**spirit** [1] - 28:9
**splice** [1] - 107:22
**spoken** [3] - 12:24, 13:19, 103:3
**square** [5] - 44:7, 52:9, 77:12, 77:25, 110:14
**staff** [1] - 17:8
**stand** [7] - 28:22, 65:10, 65:14, 97:5, 97:6, 102:14, 122:19

**standard** [7] - 98:10, 98:11, 98:15, 102:4, 102:5, 102:19, 120:24
**Standards** [3] - 105:17, 123:11, 130:13
**standards** [1] - 120:11
**standing** [1] - 65:16
**standpoint** [2] - 101:10, 120:14
**stands** [1] - 100:21
**staple** [1] - 115:1
**start** [11] - 21:17, 30:6, 57:1, 59:19, 59:20, 78:20, 96:19, 103:24, 107:9, 107:11, 118:18
**started** [15] - 7:8, 22:5, 30:15, 31:21, 47:17, 48:10, 48:17, 48:18, 48:20, 48:21, 71:22, 72:21, 75:4, 82:7, 116:22
**starting** [2] - 31:5, 141:14
**State** [2] - 89:16, 141:14
**state** [4] - 15:7, 15:12, 89:17, 141:16
**statement** [2] - 45:20, 86:19
**statements** [3] - 22:13, 45:6, 130:7
**STATES** [3] - 1:1, 1:14, 145:19
**States** [2] - 2:3, 101:24, 123:21
**states** [3] - 15:7, 85:1, 107:13
**stating** [1] - 45:18
**status** [2] - 121:1, 123:15
**statute** [3] - 105:17, 105:23, 107:12
**statutes** [2] - 105:22, 105:23
**stay** [4] - 9:1, 37:23, 49:17, 106:15
**stayed** [2] - 11:9, 11:13
**staying** [1] - 110:9
**step** [4] - 27:23, 67:12, 82:20, 90:5
**STEVE** [1] - 1:10
**Steve** [8] - 1:22, 39:22, 40:18, 40:21, 41:6, 51:23, 85:12, 97:25
**still** [16] - 7:18, 23:3,

29:16, 44:23, 60:4, 64:13, 65:22, 78:1, 82:16, 83:1, 86:9, 90:17, 94:5, 103:10, 117:16, 123:24
**stop** [13] - 18:13, 37:11, 38:13, 38:17, 38:20, 38:21, 39:15, 39:16, 39:21, 46:2, 58:22, 66:23, 115:10
**stopped** [8] - 18:14, 19:3, 19:4, 42:18, 44:11, 66:3, 66:24, 104:9
**stopping** [2] - 18:20, 59:14
**store** [2] - 121:10, 122:5
**stores** [2] - 113:5, 114:3
**strapped** [1] - 49:17
**Street** [1] - 1:18
**stretching** [1] - 40:8
**stricken** [4] - 126:3, 134:16, 134:19, 139:9
**strictly** [1] - 89:18
**strike** [2] - 123:8, 123:10
**strong** [1] - 108:25
**struck** [1] - 141:10
**stuck** [4] - 103:8, 103:9, 117:5, 135:22
**stuff** [3] - 116:24, 117:8, 133:6
**subcontractor** [2] - 77:20, 77:22
**subcontractors** [2] - 77:19, 80:3
**subject** [3] - 90:14, 90:20, 91:5
**submitted** [3] - 15:4, 20:9, 129:14
**submitting** [1] - 16:9
**subpoenaed** [1] - 74:2
**subsection** [1] - 104:22
**substantive** [1] - 130:13
**sue** [4] - 119:20, 123:17, 136:6, 136:22
**sued** [1] - 100:1
**sufficient** [2] - 111:25, 115:15
**suggesting** [1] - 110:13
**suggestions** [1] - 52:8
**suing** [1] - 105:22
**Suite** [2] - 1:18, 2:4

**SUITE** [1] - 145:19
**Sullivan** [5] - 51:15, 51:16, 51:19, 110:1, 110:2
**summary** [2] - 119:2, 119:24
**summer** [1] - 18:16
**sums** [1] - 111:18
**supervised** [1] - 34:18
**supervision** [3] - 109:17, 111:12, 121:8
**supervisor** [1] - 77:15
**support** [1] - 15:20
**supposed** [2] - 102:25, 135:3
**Supreme** [3] - 101:24, 105:14, 117:18
**surprise** [1] - 74:1
**suspect** [1] - 57:21
**sustain** [1] - 130:8
**sustained** [4] - 23:8, 75:7, 134:13, 138:23
**switch** [1] - 79:22
**SWORN** [6] - 7:23, 29:21, 56:17, 65:25, 67:15, 83:6
**sworn** [6] - 29:20, 56:16, 65:21, 66:18, 67:14, 82:25
**sympathy** [1] - 128:14
**system** [6] - 70:5, 70:15, 77:13, 78:6, 78:20

# T

**TABLE** [1] - 4:9
**tail** [1] - 44:23
**talks** [1] - 139:5
**tally** [1] - 49:6
**tasks** [1] - 26:17
**taught** [1] - 122:12
**tax** [7] - 56:4, 64:13, 64:15, 69:4, 69:8, 104:24, 123:2
**taxes** [6] - 55:4, 55:15, 64:18, 105:2, 119:18, 122:24
**teach** [1] - 78:12
**team** [1] - 33:22
**technology** [1] - 57:5
**tee** [2] - 109:21, 110:8
**tend** [3] - 7:13, 7:16, 40:16

**term** [1] - 134:23
**termination** [1] - 28:19
**terms** [2] - 48:15, 111:2
**terrible** [5] - 140:12, 140:13, 140:17, 140:18, 142:4
**test** [1] - 131:12
**testified** [6] - 25:20, 61:9, 113:25, 114:1, 114:11, 137:1
**testify** [1] - 137:3
**testimonial** [1] - 115:24
**testimony** [23] - 8:9, 13:15, 18:16, 22:8, 28:4, 28:6, 28:14, 61:18, 69:23, 72:7, 93:2, 96:18, 96:22, 110:25, 114:15, 116:13, 116:21, 117:4, 117:5, 117:6, 117:10, 117:22, 134:2
**Texas** [1] - 110:17
**THE** [236] - 1:13, 1:16, 1:20, 2:1, 6:2, 6:5, 6:8, 6:10, 6:18, 6:21, 6:25, 7:3, 7:5, 7:7, 13:3, 14:4, 14:24, 15:1, 15:9, 19:19, 19:21, 20:13, 22:10, 22:13, 22:17, 22:21, 22:25, 23:4, 23:6, 23:10, 23:12, 24:1, 24:19, 25:9, 25:22, 26:10, 26:12, 27:22, 27:25, 28:3, 28:23, 28:24, 28:25, 29:2, 29:10, 29:12, 29:13, 29:16, 29:18, 29:19, 29:22, 29:24, 30:1, 46:11, 46:23, 54:3, 55:8, 55:21, 56:11, 56:14, 56:16, 56:18, 56:20, 60:17, 60:22, 63:9, 63:25, 65:3, 65:6, 65:8, 65:11, 65:13, 65:14, 65:19, 66:15, 67:6, 67:9, 67:11, 67:14, 67:16, 67:21, 67:23, 75:7, 75:10, 75:12, 75:17, 81:16, 81:18, 81:20, 81:22, 82:11, 82:20, 82:24, 83:5, 83:23, 84:2, 84:21, 86:5, 87:3, 87:7, 87:9, 87:12, 87:15, 87:23, 89:2, 89:6, 89:9, 90:5,

JURY TRIAL - VOLUME V OF V

90:11, 90:15, 90:17, 90:23, 91:2, 91:9, 91:11, 91:14, 91:19, 92:2, 92:10, 92:12, 92:17, 92:21, 92:24, 94:25, 95:1, 95:4, 95:11, 96:4, 96:6, 96:11, 96:16, 97:1, 97:10, 105:8, 106:2, 106:6, 106:12, 106:14, 106:17, 106:24, 107:4, 118:13, 120:2, 120:4, 123:25, 124:3, 124:7, 124:11, 124:14, 124:16, 125:2, 125:15, 125:16, 126:9, 127:4, 127:11, 127:14, 127:18, 127:20, 128:10, 128:16, 129:2, 129:4, 129:7, 129:13, 129:17, 129:20, 130:1, 130:4, 130:8, 131:15, 131:19, 131:21, 131:23, 132:15, 133:2, 133:8, 133:10, 133:15, 133:18, 133:20, 134:11, 134:13, 134:15, 135:1, 135:8, 135:10, 135:15, 135:19, 136:9, 138:10, 138:22, 138:25, 139:4, 139:10, 139:16, 139:18, 139:20, 139:23, 140:1, 140:7, 140:9, 140:19, 140:23, 141:6, 141:11, 141:13, 141:17, 141:19, 141:22, 141:24, 142:2, 142:6, 142:12, 142:17, 142:20, 142:22, 142:25, 143:3, 143:5, 143:8, 143:10, 143:12, 143:15, 143:18, 143:20, 143:23, 144:4, 144:6, 144:9, 144:11, 144:14, 144:19, 144:22, 145:2, 145:7

**theoretically** [1] - 98:19

**there'd** [1] - 10:22

**thereafter** [1] - 50:19

**therefore** [4] - 16:1, 99:6, 100:16, 112:18

**they've** [2] - 115:13, 115:25

**thinking** [1] - 124:7

**thinks** [1] - 117:17

**third** [2] - 74:2, 131:5

**thorough** [1] - 96:3

**thousand** [4] - 69:4, 69:7, 71:8, 132:9

**three** [20] - 10:18, 11:3, 15:14, 18:17, 26:24, 30:16, 30:19, 34:14, 40:7, 40:10, 40:15, 41:18, 44:11, 49:7, 49:9, 67:1, 73:1, 74:7, 99:1

**throughout** [3] - 9:1, 36:16, 110:23

**Thursday** [1] - 6:14

**time-and-a-half** [1] - 101:10

**timecard** [1] - 69:22

**timecards** [2] - 62:4, 62:8

**timely** [1] - 79:21

**title** [3] - 31:9, 48:20, 48:21

**Title** [1] - 111:19

**TO** [5] - 3:1, 3:7, 4:1, 5:1, 5:11

**today** [11] - 6:13, 6:15, 7:2, 7:10, 7:12, 20:21, 28:19, 44:8, 80:18, 93:15, 93:24

**together** [2] - 25:3, 29:13

**tolerate** [1] - 74:6

**Tom** [1] - 51:16

**tons** [1] - 117:19

**took** [18] - 10:18, 24:21, 25:1, 26:20, 26:23, 43:13, 47:9, 60:12, 69:1, 71:9, 80:23, 81:1, 102:17, 104:12, 117:12, 121:13

**toolbox** [1] - 26:18

**tools** [4] - 11:7, 18:22, 77:21, 81:1

**top** [2] - 131:16, 131:17

**total** [6] - 16:4, 49:7, 50:1, 79:12, 113:22, 117:17

**totally** [4] - 26:4, 32:17, 58:17, 131:7

**tough** [2] - 30:16, 47:8

**towards** [2] - 45:3, 48:8

**tower** [2] - 72:21,

73:3

**Tower** [3] - 72:22, 73:1, 73:6

**town** [1] - 40:11

**track** [4] - 19:18, 25:13, 54:17, 54:23

**tracks** [2] - 25:11, 26:18

**traditional** [1] - 134:24

**trained** [1] - 72:12

**transcription** [1] - 145:15

**translate** [1] - 15:9

**translation** [1] - 25:7

**treated** [1] - 46:20

**treatment** [2] - 6:24, 7:16

**treatments** [1] - 7:11

**Trial** [1] - 121:12

**TRIAL** [1] - 1:13

**trial** [11] - 6:14, 28:7, 69:24, 79:11, 93:18, 95:22, 102:16, 108:8, 108:22, 112:1, 112:24

**trial's** [1] - 91:20

**tried** [6] - 108:7, 110:11, 111:12, 112:8, 116:11, 118:22

**triple** [1] - 101:7

**tripped** [1] - 117:2

**trouble** [2] - 74:12, 82:7

**troubling** [2] - 102:25, 103:1

**truck** [28] - 9:4, 9:8, 9:13, 9:16, 9:20, 10:5, 10:11, 10:17, 10:23, 11:1, 11:7, 11:9, 23:20, 24:6, 24:14, 24:18, 24:22, 26:17, 26:21, 26:22, 26:23, 34:10, 34:13, 37:1, 49:17, 49:21, 77:21, 104:7

**trucks** [1] - 33:3, 33:6, 33:18, 33:25, 34:3, 34:6, 34:7, 34:8, 35:14, 49:15, 59:24, 116:24

**true** [25] - 9:17, 10:6, 10:18, 11:3, 11:22, 11:23, 12:18, 12:21, 13:13, 14:15, 16:21, 16:24, 17:2, 17:4, 18:7, 18:23, 19:17, 20:10, 20:24, 21:21, 24:25, 42:2, 45:23, 66:7, 66:11

**trust** [2] - 70:15

**trusted** [1] - 78:24

**truth** [1] - 66:19

**try** [15] - 11:6, 24:17, 30:13, 44:22, 59:13, 69:3, 72:7, 99:10, 100:1, 107:22, 112:3, 117:24, 117:25, 119:16, 120:11

**trying** [3] - 73:14, 112:14, 112:16

**turn** [2] - 86:8, 88:12

**turned** [2] - 107:6, 107:7

**Turnoff** [1] - 123:5

**TV** [1] - 79:2

**twenty** [1] - 77:17

**twenty-five** [1] - 77:17

**twice** [1] - 12:1

**Two** [2] - 143:11, 143:12

**two** [39] - 10:1, 10:23, 15:14, 18:17, 32:10, 40:15, 41:12, 41:18, 44:11, 44:20, 49:7, 49:9, 64:5, 65:10, 66:11, 67:1, 69:4, 69:7, 73:1, 73:23, 75:24, 77:11, 79:24, 89:7, 97:9, 98:25, 100:1, 100:12, 100:14, 103:15, 106:19, 107:7, 120:11, 125:12, 128:24, 133:2, 138:7, 143:25

**Type** [1] - 124:18

**type** [11] - 25:21, 39:16, 62:10, 97:22, 104:3, 111:4, 111:7, 112:13, 112:24, 114:20, 115:24

**types** [1] - 11:8

**typical** [5] - 34:11, 34:14, 36:25, 37:17, 49:21

**typically** [10] - 16:8, 33:9, 34:5, 35:7, 35:9, 37:18, 39:9, 40:15, 50:16, 59:24

## U

**U.S.C** [2] - 104:22, 106:21

**ultimate** [1] - 109:14

**uncertain** [1] - 111:2

**unclean** [3] - 119:13, 119:14, 123:9

**unclear** [1] - 104:25

**uncompensated** [2] - 32:18, 58:17

**under** [30] - 7:19, 16:8, 65:22, 83:1, 95:20, 96:2, 98:14, 100:18, 101:23, 102:12, 102:19, 103:13, 104:9, 104:11, 104:19, 104:21, 104:22, 105:3, 105:16, 105:22, 107:21, 111:6, 114:14, 120:11, 120:15, 122:19, 131:12, 136:1, 141:13

**Under** [1] - 104:22

**underscoring** [1] - 113:14

**understood** [4] - 113:14, 114:4, 114:17

**undisputed** [3] - 97:25, 100:13, 100:14

**unfair** [1] - 47:10

**unfortunately** [3] - 21:25, 72:23, 120:22

**United** [2] - 2:3, 101:24, 123:21

**UNITED** [2] - 1:1, 145:19

**uNITED** [1] - 1:14

**unload** [5] - 33:11, 33:14, 49:11, 49:16, 104:8

**unloaded** [1] - 10:14

**unloading** [10] - 10:17, 11:1, 11:2, 26:23, 33:6, 33:7, 33:9, 34:3, 49:15

**unpaid** [2] - 16:4, 121:3

**unrebutted** [2] - 98:4, 122:23

**up** [48] - 7:16, 9:17, 16:21, 17:1, 17:2, 27:10, 32:5, 33:2, 35:12, 35:23, 36:1, 37:1, 37:6, 44:2, 44:22, 47:25, 49:6, 51:4, 53:3, 53:6, 58:16, 77:4, 77:6, 77:23, 78:21, 89:8, 94:10, 94:20, 103:2, 109:7, 110:12, 111:1, 111:15, 111:18, 113:25, 116:18, 116:24, 117:2, 117:6, 118:24, 120:8, 122:15, 124:18,

JURY TRIAL - VOLUME V OF V

128:2, 128:3, 128:4, 132:10
**uphold** [1] - 105:4
**upper** [1] - 25:15
**uses** [3] - 107:20, 129:25, 141:23

**V**

**vaguely** [2] - 31:4, 48:5
**vandalized** [1] - 80:22
**varied** [6] - 11:25, 12:1, 43:23, 100:13, 100:25, 101:5
**various** [1] - 30:24
**vary** [5] - 59:11, 59:23, 101:1, 122:11, 131:12
**verdict** [19] - 93:13, 94:9, 94:12, 94:18, 95:8, 125:11, 127:6, 127:12, 127:18, 127:21, 127:23, 128:9, 140:4, 140:6, 140:25, 141:4, 141:23, 144:20
**verification** [1] - 17:17
**verified** [1] - 16:9
**verify** [2] - 24:22, 25:17
**verses** [1] - 105:14
**versus** [20] - 96:20, 97:14, 100:18, 100:20, 101:23, 105:13, 108:4, 108:14, 113:4, 114:25, 118:22, 119:23, 120:7, 120:24, 121:1, 122:5, 122:9, 125:17, 132:1
**VI** [1] - 1:13
**vice** [8] - 53:21, 54:5, 54:7, 57:4, 85:8, 88:23, 89:17, 108:1
**victor** [1] - 67:22
**victor-a** [1] - 67:22
**view** [1] - 100:10
**vigorously** [2] - 99:18, 99:21
**Vincent** [1] - 56:19
**VINCENT** [2] - 3:14, 56:17
**violating** [1] - 119:11
**violation** [2] - 22:6, 98:25
**violations** [2] -

98:20, 120:20
**virtually** [1] - 98:16
**visited** [1] - 40:7
**voce** [2] - 90:12, 92:11
**VOLUME** [1] - 1:13
**vs** [1] - 1:8

**W**

**W-2** [6] - 63:3, 63:11, 64:4, 64:6, 64:12, 119:17
**W-2s** [14] - 55:3, 55:13, 63:5, 63:15, 63:16, 64:22, 68:3, 68:14, 68:18, 69:5, 69:8, 80:13, 80:14, 119:9
**w-2s** [1] - 55:10
**Wage** [1] - 134:4
**wage** [7] - 98:25, 128:3, 134:1, 134:15, 135:22, 137:22, 137:24
**wages** [8] - 16:4, 52:5, 55:4, 99:10, 121:3, 121:22, 128:7, 134:3
**Wait** [1] - 138:2
**wait** [5] - 27:11, 27:13, 90:25, 91:1, 138:2
**waiting** [2] - 123:22, 134:6
**waive** [9] - 90:24, 91:22, 92:3, 92:7, 92:14, 136:1, 136:3, 137:14, 138:2
**waived** [2] - 136:7, 137:8
**waiver** [1] - 138:5
**waiving** [1] - 137:23
**Wake** [1] - 100:20
**walls** [2] - 80:23, 81:2
**wants** [3] - 111:22, 118:17, 132:20
**warehouse** [30] - 8:4, 8:6, 8:7, 8:9, 8:13, 8:16, 8:20, 9:1, 10:4, 31:6, 31:10, 31:11, 33:1, 33:3, 33:7, 33:18, 33:25, 34:14, 34:17, 34:19, 35:5, 36:2, 36:5, 36:7, 42:2, 42:3, 51:21, 73:12
**wargo** [2] - 97:14,

120:24
**Wargo** [1] - 121:1
**watch** [2] - 71:10, 74:22
**ways** [6] - 44:3, 44:16, 73:23, 77:11, 77:12, 136:12
**weak** [1] - 118:2
**weather** [5] - 51:10, 58:21, 59:11, 59:12, 59:14
**week** [52] - 11:21, 11:25, 12:7, 12:10, 12:12, 12:19, 13:8, 13:9, 14:6, 14:10, 15:25, 16:3, 16:4, 17:2, 17:13, 28:13, 32:1, 32:24, 40:13, 41:11, 41:16, 42:20, 44:20, 53:7, 58:3, 60:14, 61:23, 66:8, 69:10, 70:13, 79:8, 79:21, 93:18, 100:24, 101:4, 101:16, 102:15, 103:10, 113:15, 114:2, 114:5, 122:7, 132:8, 132:11, 137:2, 137:19, 138:1, 138:4
**week's** [1] - 137:3
**weekdays** [1] - 46:6
**weekend** [3] - 94:22, 144:22, 145:5
**weekly** [3] - 32:20, 113:9, 132:22
**weeks** [16] - 16:3, 16:5, 30:14, 30:17, 41:12, 41:18, 45:2, 49:7, 49:9, 66:11, 66:12, 67:1, 79:24, 82:15, 100:15, 137:25, 138:7
**weeks'** [1] - 67:1
**welcome** [1] - 27:20
**wet** [2] - 18:21, 19:7
**whatsoever** [1] - 26:23
**wherein** [1] - 96:18
**whole** [17] - 16:20, 17:1, 30:23, 32:2, 32:12, 36:2, 36:4, 40:5, 40:13, 57:6, 59:6, 115:4, 115:11, 121:12, 135:20, 136:13, 141:15
**wife** [4] - 27:10, 108:8, 108:10, 121:13
**willful** [1] - 137:4
**winding** [1] - 35:16
**wing** [2] - 110:1,

110:3
**wins** [1] - 102:4
**wish** [2] - 28:6, 28:15
**withdraw** [2] - 91:4, 91:7
**withhold** [2] - 55:15, 119:12
**withholding** [1] - 119:22
**witness** [22] - 7:21, 13:2, 14:23, 14:25, 26:2, 28:2, 46:12, 56:12, 60:21, 65:8, 67:12, 81:21, 82:21, 83:4, 87:11, 87:22, 90:7, 92:13, 99:2, 116:4, 116:13, 122:19
**WITNESS** [2] - 29:21, 56:17
**witnessed** [1] - 15:21
**witnesses** [7] - 29:4, 90:9, 100:22, 116:2, 117:20, 130:7
**WITNESSES** [3] - 3:1, 3:7, 4:1
**WL** [1] - 100:19
**won** [1] - 112:9
**wonderful** [1] - 140:21
**word** [3] - 107:20, 129:25, 130:5
**words** [6] - 43:10, 73:9, 113:18, 130:15, 131:1, 132:6
**wordy** [1] - 134:22
**work-defined** [1] - 133:16
**work-work** [1] - 104:3
**workday** [2] - 73:16, 104:9
**worker** [1] - 22:4
**workers** [15] - 8:6, 8:10, 8:13, 8:16, 8:19, 27:4, 33:13, 34:17, 34:20, 43:9, 49:15, 53:6, 73:21, 113:1, 119:13
**workload** [3] - 35:24, 36:9, 36:17
**workmen** [1] - 77:20
**works** [2] - 64:11, 105:21
**workweek** [7] - 101:14, 102:6, 103:11, 122:2, 130:19, 131:4
**workweeks** [1] - 102:8

**workwise** [1] - 52:19
**worried** [1] - 43:8
**worth** [1] - 60:12
**wrap** [1] - 109:7
**write** [4] - 17:24, 42:22, 42:25, 125:10
**writing** [11] - 17:18, 17:21, 19:25, 20:3, 20:4, 43:1, 43:3, 43:7, 45:20, 134:5
**written** [8] - 13:18, 16:7, 19:11, 45:6, 45:22, 51:2, 73:25, 134:3
**wrote** [3] - 17:20, 20:8, 61:17

**Y**

**year** [10] - 31:12, 50:3, 55:25, 64:12, 68:20, 69:4, 69:8, 123:19
**years** [5] - 29:14, 38:16, 53:8, 78:12, 117:21
**yellow** [1] - 107:7
**yesterday** [6] - 6:12, 8:3, 16:10, 16:13, 87:16, 96:19
**York** [7] - 50:3, 52:25, 53:3, 72:3, 77:1, 77:2, 78:11
**yourself** [2] - 43:17, 75:13
**yourselves** [1] - 94:17

**Z**

**Zidell** [9] - 1:17, 13:21, 13:24, 14:12, 21:9, 74:25, 75:1, 75:2, 112:8
**Zidell's** [1] - 113:5

**§**

**§** [1] - 104:22