**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**CASE NUMBER 07-61295-CIV-GONZALEZ/COHN**

| | |
|---|---|
| **REINALDO RAMON LAMONICA,** | **COURTROOM C** |
| **AUGUSTIN MILAN,** | |
| **ANGELES LAMONICA SOLER,** | |
| **MARIO FELICIANO,** | |
| **GUILLERMO ALBOREZ, and** | |
| **JULIO ALBOREZ,** | |
| | |
| Plaintiffs, | **FORT LAUDERDALE, FLORIDA** |
| | |
| vs. | |
| | |
| **SAFE HURRICANE SHUTTERS, INC.,** | **APRIL 18, 2011** |
| **EDWARD LEIVA, STEVE HEIDELBERGER,** | |
| **and FRANCIS M<sup>c</sup>CARROLL,** | |
| | |
| Defendants. | **{Pages 1 - 139}** |

───────────────────────────────────────────

**JURY TRIAL - VOLUME VI OF VI**
**BEFORE THE HONORABLE JOSE A. GONZALEZ, JR.,**
**SENIOR UNITED STATES DISTRICT JUDGE**

───────────────────────────────────────────

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

    **K. DAVID KELLY, ESQ.**
    *J.H. Zidell, PA*
    300 71st Street, Suite 605
    Miami Beach, FL  33141
    T: 305.865.6766; F: 305.865.7167
    david.kelly38@rocketmail.com

**FOR THE DEFENDANTS:**
(Safe Hurricane    **CHRIS KLEPPIN, ESQ.**
Shutters, Inc.,    *Glasser, Boreth & Kleppin*
Steve Heidelberger,    8751 W. Broward Boulevard
and Francis M<sup>c</sup>Carroll)    Plantation, FL  33324
    T: 954.424.1933; F: 954.474.7405
    glabor@aol.com

1   **FOR THE DEFENDANT:**          **EDWARD LEIVA, PRO SE**
    (Edward Leiva)
2
    **REPORTED BY:**
3                                   **JILL MICHELLE HARDY-HOBBS, CCR, FPR**
                                    *Official United States Court Reporter*
4                                   400 North Miami Avenue, Suite 08S33
                                    Miami, FL  33128      T: 305.523.5022
5                                   Jill_hardy-hobbs@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 18, 2011

1

# <u>TABLE OF CONTENTS</u>

2                                                          <u>**PAGE**</u>

3    Opening argument by Mr. Kelly......................     9

4    Closing argument by Mr. Kleppin...................    48

5    Closing argument by Mr. Leiva.....................    87

6    Closing argument by Mr. Kelly.....................    93

7    Jury Charge.......................................    96

8    Verdict...........................................   116

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:22   1       **(Call to the Order of the Court)**

09:22   2           **THE COURT:**  Good morning, Ladies and Gentlemen.

09:22   3           **MR. KLEPPIN:**  Good morning.

09:22   4           **MR. KELLY:**  Good morning.

09:22   5           **MR. LEIVA:**  Good morning, Your Honor.

09:22   6           **THE COURT:**  Our jurors are all now present and

09:22   7   accounted for, so we're ready to proceed with the closing

09:22   8   arguments.

09:22   9           Are you ready, Mr. Kelly?

09:23  10           **MR. KELLY:**  Yes, Your Honor.  Before we start I just

09:23  11   wanted to for the record, quickly just for the record, ask

09:23  12   again with respect to the jury instruction as to the

09:23  13   operational control.

09:23  14           I mean there's language in one of the jury

09:23  15   instructions that uses day-to-day operations, and I would just

09:23  16   again ask based on the facts deduced at trial that the Court

09:23  17   allow there to be some language included in there that says

09:23  18   that it can be occasional, either that or remove the day-to-day

09:23  19   language so that the jury doesn't think that it has to be every

09:23  20   day that they're there.

09:23  21           **THE COURT:**  Objection overruled.

09:23  22           **MR. KELLY:**  And also I was looking at the jury

09:23  23   instructions -- not the jury instructions -- the verdict form.

09:23  24   I just want to draw the Court's attention -- I don't think the

09:23  25   jury needs to -- it just dawned on me this weekend.  I don't

09:23  1   think that the jury needs to decide whether or not, yes or no,

09:23  2   whether defendant -- regarding defendant Edward Leiva because

09:23  3   the summary judgment's already found that he has operational

09:23  4   control.

09:23  5        It seems it would be appropriate that, you know,

09:23  6   underneath Safe Hurricane's yes or no, putting a parenthesis,

09:23  7   If you find defendant Safe Hurricane Shutters was liable, Mr.

09:24  8   Leiva's also liable.  If you find that they weren't liable, Mr.

09:24  9   Leiva's not liable.

09:24  10       In other words, I don't think that the jurors should

09:24  11  check off yes or no 'cause that decision has already been made

09:24  12  by the Court.  I mean I could explain to them in jury

09:24  13  instructions, but they could be confused; and I don't want a

09:24  14  JNOV issue to come up.

09:24  15       **THE COURT:**  Objection overruled.

09:24  16       **MR. KELLY:**  Okay.

09:24  17       **MR. KLEPPIN:**  Your Honor, the defense just has two

09:24  18  things.  One is in the plaintiffs' proposed instruction number

09:24  19  12 on operational control by a corporate officer, there the

09:24  20  plaintiffs' own language said that operational control by a

09:24  21  corporate officer, blah-blah-blah --

09:24  22       **THE COURT:**  I took that out.

09:24  23       **MR. KLEPPIN:**  I see that.  The Court sua sponte did

09:24  24  that, and we do object to that.  And the plaintiff conceded

09:24  25  that that should be in there.

APRIL 18, 2011

09:24  1          THE COURT:  Okay.  Objection overruled.

09:24  2          MR. KLEPPIN:  The other thing, Your Honor, is is that

09:24  3  Mr. Leiva would like to cede 15 minutes of his time in closing

09:24  4  argument to me.  Is that okay?

09:24  5          THE COURT:  Are you agreeable to that?

09:24  6          MR. LEIVA:  Yes, Your Honor.

09:24  7          THE COURT:  All right.  So it's one hour for the

09:25  8  plaintiff, one hour for the corporate defendants Mr.

09:25  9  Heidelberger and Mr. M^cCarroll, and 15 minutes for Mr. Leiva.

09:25  10         MR. KLEPPIN:  Yes.

09:25  11         THE COURT:  Okay.

09:25  12         MR. KLEPPIN:  There's one final thing, Your Honor.

09:25  13 And that is where you had the supplemental instruction on

09:25  14 damages.

09:25  15         THE COURT:  Right.

09:25  16         MR. KLEPPIN:  It started out, In fixing an award of

09:25  17 damages, if any, blah-blah-blah.  I notice that you put that

09:25  18 way in the back of the instructions after operational control.

09:25  19 And we were wondering if you could move that up and put that

09:25  20 right after plaintiffs' instruction number 9, the substantive

09:25  21 instruction on Fair Labor Standards Act because that is where

09:25  22 they're really instructed as to damages right there.  Does that

09:25  23 make sense?

09:25  24         THE COURT:  Well, I don't know.  I'm going to look.

09:25  25         MR. KLEPPIN:  It would be just before the record --

09:25  1          THE COURT:  I see what you're saying.

09:25  2          MR. KLEPPIN:  Yes.  I think it just gets lost where

09:26  3   it's at, Your Honor.

09:26  4          THE COURT:  All right.  I think that's a good

09:26  5   suggestion.

09:26  6          MR. KLEPPIN:  Thank you.

09:26  7          THE COURT:  I will follow that.  I won't take that as

09:26  8   an objection.  I'll take that as a suggestion which I'll

09:26  9   accept.  Okay.  Are we ready?

09:26 10          MR. KELLY:  Yes.

09:26 11          THE COURT:  Very good.  All right.  Mr. Marshal, bring

09:26 12   in the jury.  I want you to know that I hardly slept all

09:26 13   weekend in anticipation of this moment.  The excitement was

09:26 14   overwhelming.

09:27 15          (Jury In)

09:27 16          THE COURT:  Good morning, Members of the Jury.

09:27 17          THE JURY:  Good morning.

09:27 18          THE COURT:  Please be seated.  Members of the Jury, as

09:27 19   I told you last week, the first -- the last order of business

09:27 20   in connection with the trial of this case will now occur, and

09:27 21   that will consist of the closing arguments of the attorneys for

09:27 22   the respective parties.

09:27 23          As you know, what the lawyers will say to you now in

09:27 24   the course of these closing arguments is not the evidence in

09:27 25   the case.  The evidence in the case consists of the testimony

8

09:27  1    of the witnesses that you heard here last week testifying from

09:27  2    this witness stand and also consists of those items of

09:27  3    documentary evidence that the Court has received into evidence,

09:27  4    marked as exhibits, and made a part of the record.

09:27  5         Now, although what the lawyers will say to you now is

09:27  6    not evidence; nevertheless, once again, it's an important part

09:27  7    of the case because it permits the lawyers for every -- for

09:27  8    each party and it permits Mr. Leiva who represents himself to

09:27  9    argue to you at this time what they believe the evidence in the

09:27  10   case has proven or failed to prove.

09:27  11        You will find that the order of argument is identical

09:28  12   to the order of proof.  You'll first hear from Mr. Kelly on

09:28  13   behalf of the plaintiffs.

09:28  14        Who's going to argue first for the defense?

09:28  15        **MR. KLEPPIN:**  I'll argue first, Your Honor.

09:28  16        **THE COURT:**  All right.  Then you'll hear from Mr.

09:28  17   Kleppin on behalf of Safe Hurricane Shutters, Mr. Heidelberger,

09:28  18   and Mr. M^cCarroll.  You will then hear from Mr. Leiva on his

09:28  19   own behalf.  And then Mr. Kelly has the opportunity to close

09:28  20   and conclude the arguments in rebuttal.

09:28  21        After the arguments have been concluded, the Court

09:28  22   will instruct you on the law that you must follow and apply in

09:28  23   reaching your verdict.

09:28  24        As I told you on Friday, when we take our mid-morning

09:28  25   recess, the clerk will furnish you with some menus and we'll

09:28  1    take your lunch orders and we'll order your lunch and we'll

09:28  2    have your lunch served to you in the jury room during the

09:29  3    course of your deliberations.  And we should have this case to

09:29  4    you for your consideration before you recess for lunch.

09:29  5         So, Mr. Kelly, if you are ready, you may proceed with

09:29  6    your closing argument at this time.

09:29  7         **MR. KELLY:**  Thank you, Your Honor.

09:29  8         Good morning.  And again I want to thank you for

09:29  9    serving as jurors in this matter on behalf of myself and the

09:29  10   plaintiffs who are with us today, Mario Feliciano and Augustin

09:29  11   Milan.  Thank you for taking the entire week out of your own

09:29  12   personal lives to listen to all this evidence and testimony.

09:29  13        You may recall during jury selection that I briefly

09:30  14   talked about the preponderance of the evidence standard.  That

09:30  15   means that the plaintiff -- these plaintiffs only need to tip

09:30  16   the balance slightly to win.  That means that -- you know, in

09:30  17   comparison to a criminal case, it's a lower standard.

09:30  18        You know, if you have a criminal case, you've probably

09:30  19   heard beyond a reasonable doubt.  There's reasons for that.  If

09:30  20   you send somebody to jail, you better be very, very sure.

09:30  21        So it's less in a case like this.  But still we have

09:30  22   to prove our case, and we have to tip the balance so that it's

09:30  23   -- so that plaintiffs can rightfully be awarded if you find so.

09:30  24        You know, basically if -- you know, if you find that

09:30  25   the plaintiffs were more likely than not owed the wages, then

09:30  1    they win the case.  More likely than not.  So that's really --

09:30  2    when you're thinking about all the evidence, you just want to

09:30  3    ask really were they more likely overall?  I mean there may be

09:30  4    some doubt, but this isn't a criminal case.

09:31  5         And the Court will instruct you on this.  After you

09:31  6    hear me and you hear them, the Court's going to give you some

09:31  7    detailed instructions on what the law is; and you'll have to

09:31  8    apply the facts that you heard to what the law is.  And you'll

09:31  9    hear language in particular that the claim -- the plaintiffs

09:31  10   must show that the claim is more likely than not true, more

09:31  11   likely.

09:31  12        The Fair Labor Standards Act or the FLSA is -- it's a

09:31  13   Federal law designed to protect workers from unfair payment

09:31  14   practices among other things.  It covers not only overtime

09:31  15   wages but minimum wages.

09:31  16        This has primarily been an overtime wage case.  I'm

09:31  17   going to get into that in detail; however, I think that

09:31  18   rightfully if we want to properly get to what Mr. Feliciano in

09:31  19   particular is owed, we're going to have to discuss at least

09:31  20   briefly the concept of minimum wages.  However, it's primarily

09:31  21   overtime.  And I will get to that.  In this case we'll dealing

09:31  22   with a Federal law based on what's come out in this case.

09:32  23        And the evidence in this case had shown that the

09:32  24   defendants, all of them, Safe Hurricane who was doing business

09:32  25   as Advanced Hurricane Protection as well as Mr. Leiva and also

09:32   1   Mr. Heidelberger and Mr. M^cCarroll were all the employers of

09:32   2   these plaintiffs under the law, and I'll explain why we believe

09:32   3   that you should find them all to be the employers in this case.

09:32   4          The evidence in this case showed that the plaintiffs,

09:32   5   Mr. Milan and Mr. Feliciano, they were involved in

09:32   6   labor-intensive type of work.  They were blue-collar workers if

09:32   7   you want to put it that way.  I think that's clear to

09:32   8   everybody.  These were the type of workers that are entitled to

09:32   9   overtime wages, the minimum wages.  They weren't salaried

09:32   10  workers.

09:32   11         I think maybe some people on the jury if I recall may

09:32   12  have at one time been salaried, may currently be salaried.  So

09:32   13  I think some of you have actually experienced that personally;

09:33   14  but I think everybody at this point can differentiate between

09:33   15  the two, and these two employees were the type of workers that

09:33   16  are entitled to be paid time-and-a-half if they work over 40.

09:33   17         There's nothing in the instructions or law that you'll

09:33   18  hear that says that they're entitled to be docked any type of

09:33   19  overtime pay based on their -- the type of job that they did.

09:33   20         They would do various things in addition to installing

09:33   21  hurricane shutters.  You heard they would load and unload

09:33   22  equipment.  They would in addition actually do clean-up duties.

09:33   23  There was some driving involved, things like that.  Primarily

09:33   24  they were installers, though.

09:33   25         Near the end Mr. Milan you heard when the company was

09:33  1   going down, going under, you know, closed, he worked there for

09:33  2   about a month.  When it closed he was doing some work in the

09:33  3   factory for a few days; but for the most part, both of them

09:33  4   were installers.

09:33  5          The evidence showed that Mr. Feliciano -- he started

09:33  6   in approximately late August of 2006, and he worked until about

09:33  7   mid-September 2007.  The evidence showed Mr. Milan started

09:34  8   working in late July of 2007 until about mid-September 2007.

09:34  9          However, the evidence I think as admitted that it

09:34  10  showed that in September of 2007 Safe Hurricane was about done.

09:34  11  The company was at that point about to be closed.  So as far as

09:34  12  the actual work in September, they really didn't I think work

09:34  13  very much in September.

09:34  14         I think at most Mr. Milan may have worked three days

09:34  15  in the factory which was a part of his general job, but they

09:34  16  were technically still employed which is why we said they

09:34  17  worked through September.  They were still there waiting to get

09:34  18  their final pay, so on and so forth.  The company was still

09:34  19  open, but there was really not that much work at this point.

09:34  20         So, in short, Mr. Feliciano if we're trying to be

09:34  21  somewhat consecutive in the estimates, we're saying that he

09:34  22  worked about 52 weeks, about a year because he worked in

09:35  23  October.  It could have been a little more.  But overall he

09:35  24  worked, you know, from that August to September period; but he

09:35  25  didn't work in September.  So I think it's fair to say he

JURY TRIAL - VOLUME VI OF VI

09:35  1  worked about 52 weeks, about a solid year.

09:35  2      Mr. Milan, the same thing.  I mean there are days here

09:35  3  and days there.  He worked a few days.  If you want to just be

09:35  4  conservative with the employment period, I'd say probably about

09:35  5  four weeks.  So he was only there about a month.  So to make it

09:35  6  short, one month Mr. Milan was there.  About one year Mr.

09:35  7  Feliciano was there.  And that's the period we're dealing with.

09:35  8      And also I wanted to point out -- and we wanted to

09:35  9  point out that Mario admitted that he probably took off up to

09:35 10  12 days.  That's pretty reasonable.  He left and went to Puerto

09:35 11  Rico for a little while, took off some days for the holidays.

09:35 12  So he estimated about 12 days.  And there was nothing really in

09:35 13  the record that showed otherwise.  I mean I think it's pretty

09:35 14  straightforward.  That seems reasonable.  Two weeks off.

09:35 15  That's about what often workers get.  Mr. Milan was only there

09:35 16  for a month.  I don't recall him getting any days off.  He was

09:36 17  only there a short period.

09:36 18      So when we do these calculations here, we are taking

09:36 19  into consideration those two weeks, and we're not asking for

09:36 20  those two weeks.  We're not asking for that for Mario.  We're

09:36 21  deducting that.  So he worked 52 hours or 52 weeks.  I'm sorry.

09:36 22  But when it comes down to it, we're asking for about 50 weeks

09:36 23  of compensation.

09:36 24      You might remember the paper signed by Mr. Feliciano.

09:36 25  I think it was -- when you're looking through some of the

09:36  1    evidence -- it was admitted that that wasn't that much -- you

09:36  2    may recall there was a paper there because there was this

09:36  3    dispute over the amount of hours that he actually or weeks that

09:36  4    he wasn't actually paid.  There were periods of like four or

09:36  5    five weeks he wasn't paid at all.

09:36  6         And the way things were being handled there I mean it

09:36  7    was -- you know, it was -- defendants were pretty unpredictable

09:36  8    and unreliable and even sloppy with paying their workers.  I

09:36  9    mean they would pace -- they would not pay them.  Then they

09:36  10   would come in and put pieces of the pay on part of their

09:37  11   checks.  And, you know, so it appears that some of the money

09:37  12   certainly fell through the cracks.

09:37  13        But one clear bright line I think you can look at is

09:37  14   that document where Mr. Feliciano signed it.  And it was near

09:37  15   the end of his employment.  There was a week for August 24th,

09:37  16   2007, and the week August 31st, 2007.  He didn't sign his name

09:37  17   beside it.

09:37  18        So there's documentation, and I believe they admitted

09:37  19   it into evidence that there's that written document that he

09:37  20   testified about that he did not sign his name.  So there's

09:37  21   clearly those two weeks that he was not paid at all.

09:37  22        So what I'm getting at with that is when you -- and

09:37  23   I'll talk about the calculations later; but when you're

09:37  24   considering the fact that he took two weeks off for vacation,

09:37  25   also consider that at least it was probably more; but it's

APRIL 18, 2011

09:37  1   clear that he wasn't paid for two weeks.  So that needs to

09:38  2   offset the damages that he's seeking, and I'll get to that in a

09:38  3   moment.

09:38  4        I mean you add all this together with missing time

09:38  5   records, failure to document taxes, failure to document cash

09:38  6   payments.  It's often complicated to really get a handle on

09:38  7   what was not paid, but we should at least say two weeks.

09:38  8        If you've heard some testimony that you feel clearly

09:38  9   in your mind makes it seem that you're satisfied that we were

09:38 10   able to show clearly that there were other weeks that he was

09:38 11   not paid at all, we'd ask you to take that into consideration.

09:38 12        Those two weeks that he wasn't paid anything, those

09:38 13   two weeks he wasn't paid anything, that was a minimum wage

09:38 14   violation.  So that's why before I mentioned minimum wage.

09:38 15        I think what I'm going to do is before we get into

09:38 16   this, I want to go right to the calculation, how you're going

09:38 17   to go about doing this.  You're going to get a jury instruction

09:38 18   from the Judge.  Most of the claims here, as I said, are

09:39 19   overtime, time-and-a-half.  Right?  And this is what the jury

09:39 20   instruction is going to say.  This is what the Judge is going

09:39 21   to read to you:

09:39 22        If the employee is employed solely on a weekly

09:39 23   salaried basis, his regular hourly rate of pay on which

09:39 24   time-and-a-half must be paid is computed by dividing the salary

09:39 25   by the number of hours which the salary is intended to

09:39   1   compensate.

09:39   2        So you take the salary -- in which case he had started

09:39   3   out at 800, then he got 900, then he got a thousand.  We're

09:39   4   going to try to use an average of 900 to be fair -- take that,

09:39   5   for example, $900 salary and divide it by his hours; and that's

09:39   6   what his hourly rate is because he's not supposed to be getting

09:39   7   a salary.  He's a blue-collar labor worker.

09:39   8        However, there's other language in here that is going

09:39   9   to be an instruction, and it's very important.  And it's very

09:39  10   important with respect to how much damages he's supposed to

09:39  11   get.  And this is what else you'll hear after that:

09:39  12        If an employee is hired -- this is an example.  If the

09:40  13   employee, for example, at a salary of $220.80 for a 40-hour

09:40  14   week, his regular rate is five fifty-two an hour.

09:40  15        His argument -- the argument that Mr. Feliciano has

09:40  16   made and the other witnesses that came forward and said was

09:40  17   that when they were hired, they were given a salary allegedly

09:40  18   for a 40-hour week.

09:40  19        So when you calculate this, these damages, you have to

09:40  20   make a determination whether you believe that or not because

09:40  21   that's going to have an impact on how much damages he's going

09:40  22   to get.

09:40  23        For example, if you believe that he was supposed to

09:40  24   get 40 hours a week, you'll take that $900 and you'll divide

09:40  25   that $900 by 40, and that's his hourly rate.  And that hourly

09:40  1   rate is going to be -- if you add the time-and-a-half if he

09:41  2   wasn't paid for anything, it's going to be $33.75.

09:41  3        So, for example, if I take 900, if that was his

09:41  4   salary, and I divide it by 40, that's $22.50 per hour.  So what

09:41  5   we're saying is that he was making $22.50 an hour for his 40

09:41  6   hours, and that's what he was paid.  However, if he worked 60,

09:41  7   he was working 20 additional hours a week.  Right?

09:41  8        So his argument is that he got paid nothing for those

09:41  9   hours because when he got hired, the intention was that he was

09:41  10  to be paid 40 hours in which case he's entitled to

09:41  11  time-and-a-half for all those unpaid hours over 40 which will

09:41  12  be a total of $33.75 an hour.

09:41  13       And that's what these jury instructions are saying.

09:41  14  If an employee is hired at a salary, for example -- it doesn't

09:41  15  say "example," but it said -- it's giving you an example.  If

09:42  16  an employee is hired at a salary of $220.80 for a 40-hour week,

09:42  17  his regular rate is five fifty-two an hour.  So it gives you an

09:42  18  idea.  So we're saying that his hourly rate was twenty-two

09:42  19  fifty.

09:42  20       He wasn't supposed to be getting a salary, but he was

09:42  21  given a salary.  And when he was hired, he testified and other

09:42  22  workers that were here testified that they were clearly led to

09:42  23  believe that that was for a 40-hour week.

09:42  24       But what about the missing two weeks?  That's a

09:42  25  different story because we know that there were at least two

09:42 1   weeks he wasn't paid anything.  That's a minimum wage

09:42 2   violation.  And what I'm talking about before about this jury

09:42 3   instruction, that's 40 hours and what -- and it goes to what

09:42 4   was he paid or not paid over 40 hours.  However, if there was

09:42 5   an entire week he wasn't paid anything, by the law -- we're

09:42 6   just being conservative, and we're trying not to get more than

09:42 7   he's entitled to -- we're stuck with a minimum wage calculation

09:43 8   for that week -- those two weeks.  He wasn't paid anything.

09:43 9         The Federal minimum wage rate at that time the Judge

09:43 10  will instruct you on.  The rate fluctuates.  It changes.  Every

09:43 11  year or so it increases.  At this time when you -- if you

09:43 12  consider that exhibit that showed where he signed his name,

09:43 13  those two weeks were at the end of his employment.  They were

09:43 14  near, you know, the end of his employment 2007.

09:43 15        At that time the minimum wage rate was only $5.85.  So

09:43 16  for that -- this period where he was unpaid if we're going to

09:43 17  be conservative with the estimate, he's only entitled to the

09:43 18  minimum wage rate; not his regular salary rate.

09:43 19        So, you know, in a nutshell what we do is we take the

09:43 20  first 40 hours and we multiple it times $5.85 and that comes to

09:43 21  a total of $468.  But then he normally worked, for example, 20

09:43 22  hours of overtime.  So the time-and-a-half rate for that is

09:43 23  $8.77 which is $350.80.

09:44 24        So I just wanted to give you a preliminary

09:44 25  understanding, you know, of how this works.  The overtime is

09:44  1   one thing.  The minimum wage is one thing.

09:44  2        And now I want to go into -- so on the one hand, he

09:44  3   took two weeks off.  We're striking that two weeks off.

09:44  4   However, he was docked two weeks surely at least, and he's

09:44  5   entitled to offset that.

09:44  6        Now I want to look at the evidence.  Yerko Aguirre

09:44  7   said Feliciano -- he said about 7:00 a.m. to about 6:00 p.m.

09:44  8   Monday through Saturday.  That's what the first witness, Mr.

09:44  9   Aguirre, said.

09:44  10       This was substantiated by Mario.  He said well over 60

09:44  11  hours.  He said -- I said, What's the least.  And he said,

09:44  12  Around 60 hours normally.  They were required to be there --

09:44  13  and this was a common theme.  They were required to be there at

09:44  14  7:30 a.m. as normal business.

09:44  15       Mario said that generally the most he would work was

09:44  16  -- the most would be about 66 hours a week normally, but it was

09:45  17  normally at least 60.

09:45  18       Mr. Aguirre normally said -- said normally when it

09:45  19  rained they would start up again after it stopped and they

09:45  20  wouldn't quit for the day.  You know, this makes sense.

09:45  21       I mean you have -- you're the jury.  You have to make

09:45  22  a decision.  I mean you live in south Florida too.  You know,

09:45  23  think of the jobs.  A lot of times these guys were on

09:45  24  balconies.  You know, sometimes it rains and it stops, and then

09:45  25  they -- it doesn't make sense that Safe Hurricane Shutters is

| | | |
|---|---|---|
| 09:45 | 1 | just going to want them to pack up all the time as soon as it |
| 09:45 | 2 | rains. |
| 09:45 | 3 | I mean I heard Hurricane Ernesto.  I didn't see that |
| 09:45 | 4 | much detail about it; but assuming there was a hurricane, |
| 09:45 | 5 | granted, they -- I'm sure they went home.  There were some |
| 09:45 | 6 | times that it came out that -- during the testimony that there |
| 09:45 | 7 | were some days that they went home.  You'll have to weigh |
| 09:45 | 8 | little things like that.  We can't account for every little |
| 09:45 | 9 | detail in here because these guys didn't keep time records. |
| 09:45 | 10 | I'm going to go into that later, but it's so important |
| 09:45 | 11 | I might as well just digress for a moment before I go into |
| 09:46 | 12 | detail in a jury instruction. |
| 09:46 | 13 | What would have been nice in this case is if they had |
| 09:46 | 14 | been doing what they were supposed to do under the law:  These |
| 09:46 | 15 | guys come to the shop or the lounge that they called it and |
| 09:46 | 16 | went in and punched their timecard, punched in every day, and |
| 09:46 | 17 | they had them sign their timecards. |
| 09:46 | 18 | And then what I would have today is I would have a |
| 09:46 | 19 | stack of documents, and I would -- instead of me sitting here |
| 09:46 | 20 | for five days and going through all these witnesses recreating |
| 09:46 | 21 | schedules, I would give you a stack of documents; and you would |
| 09:46 | 22 | just go back there and you'd look through the stack of |
| 09:46 | 23 | documents and you'd just add them up.  That wasn't what |
| 09:46 | 24 | happened, and I'll into more detail and why they broke the law |
| 09:46 | 25 | in not keeping those type of records. |

09:46 1    So Hurricane Ernesto -- I guess it happened at some

09:46 2 point, so maybe they missed a day for that or something.  I

09:46 3 don't know of any other particularized details they provided as

09:46 4 to which day; but the testimony seemed to indicate normally

09:46 5 it'd rain a little bit, stop.  They'd keep working -- they were

09:46 6 off and on -- on balconies.

09:47 7    Mario also explained though that there were times that

09:47 8 he worked even more.  And this is another example.  We don't

09:47 9 have time records.  However, I didn't see anything that

09:47 10 discredited him when he was saying that they moved to the new

09:47 11 location.  They were apparently moving from one location.  This

09:47 12 was towards the end it seemed when the company was starting to

09:47 13 go under.

09:47 14    But he was testifying that -- and he said to Mr.

09:47 15 Leiva, Mr. Leiva, you know that; that they were moving, and he

09:47 16 was sometimes there till 10:00 o'clock.  You know, they were

09:47 17 moving from one location to the other.  So there's times

09:47 18 throughout this employment period that he worked more hours,

09:47 19 you know.  So if he was working till 10:00 o'clock, that

09:47 20 certainly increases his hours.

09:47 21    And these calculations that I'm going to give you in a

09:47 22 moment don't even factor that in.  I'm trying to -- what I'm

09:47 23 trying to do is when I give you this calculation that I'm about

09:47 24 to give you is give the amount that he at least worked based on

09:47 25 the overall evidence, but there's pieces of time where he's not

09:47  1   being accounted for.  He's losing some of those hours because

09:47  2   it's hard to quantify those exactly how many days it took to

09:48  3   move, but there were days.  So, you know, based on what you

09:48  4   heard I'm trying to tell you at least what the evidence showed.

09:48  5   If you think that there were some extra hours that he should be

09:48  6   added on, then that's in your judgment to make.

09:48  7        I mean you're either going to hear -- you know, I'm

09:48  8   going to explain what our position was and the facts were that

09:48  9   we understand them to be.  And then we want you to take those

09:48  10  and, you know, give what you think is fair based on what all

09:48  11  the testimony showed.

09:48  12        As I said before, you know, there were periods where

09:48  13  he -- you know, he started out at $800.  He made $900 later.

09:48  14  And then later I think in later or early 2007, he started

09:48  15  getting a thousand dollars.  We're using $900.  If you want to

09:48  16  use less or more, that's up to you.  We're just -- it's -- you

09:48  17  know, it's the best we can do.  We're allowed to make some type

09:49  18  of accurate -- we're allowed to provide some type of accurate

09:49  19  basis for these calculations, and we're saying about $900 is

09:49  20  fair.

09:49  21        Brad Bungo, you may remember him.  He was a fairly

09:49  22  recent witness.  He had glasses.  He was the IT guy.  He was

09:49  23  Mr. Leiva's I think former son-in-law.  He was the vice

09:49  24  president of internet technology at Safe Hurricane.  He said

09:49  25  that he would come in at 7:45 and some of the installers were

09:49  1    there.  He at least said that.  I mean this guy is a -- I would

09:49  2    consider him to be a biased witness.  He wasn't my witness.  I

09:49  3    didn't call him; but he certainly came in here and said, Yeah,

09:49  4    I'd come in at 7:45 in the morning and I see these installers

09:49  5    here.

09:49  6          So doesn't that kind of match up with what Mario was

09:49  7    saying; that he normally got there -- I mean they're required

09:49  8    to be there at 7:30.  He said that -- he said he came in

09:49  9    earlier, sometimes around 7:15 or so.  Their own witness

09:50  10   matched up with what these workers were saying and these other

09:50  11   employees that were in here too like Mr. Aguirre, and we also

09:50  12   had Mr. Ibacache in here.

09:50  13         However, they had Mr. Lares come in, Keith Lares,

09:50  14   another one of their witnesses who actually grew up with Mr.

09:50  15   Leiva's nephew.  He tried to discredit Mr. Feliciano's

09:50  16   testimony and then admitted that he only worked with Mr.

09:50  17   Feliciano for two to three weeks at most in 2006.

09:50  18         And then what is important is that Mr. Lares and Mr.

09:50  19   Bungo's testimony contradicted each other because both of their

09:50  20   witnesses -- Mr. Bungo clearly said -- he was their internet

09:50  21   technology guy.  He was coming in there.  He saw what was going

09:50  22   on.  He said he got in there by 7:45 and they were already

09:50  23   there, some of the installers.  So obviously they came in at

09:50  24   7:45.  But then Mr. Lares comes in, their other witness, and

09:50  25   says that the installers would arrive at 8:30.  I mean you're

09:51  1    talking 45 minutes to an hour differential between -- and this

09:51  2    is very important for this case.

09:51  3         These guys did not keep time records, and their

09:51  4    witnesses were coming in and basically -- you know, that's at

09:51  5    least five hours a week, six hours a week.  These guys worked

09:51  6    six hours, and he's shaving off 45 minutes to an hour a week.

09:51  7    That's six hours of overtime alone that their witnesses are

09:51  8    contradicting themselves over.  That's very important.  That

09:51  9    was their witnesses who said this, not mine.  And it matches up

09:51 10    with what these -- that's all we can do at this point.  They

09:51 11    didn't keep the records.

09:51 12         My clients were not required to keep the records.  The

09:51 13    Supreme Court of the United States said that these guys have to

09:51 14    keep records.  That's their job.  That's what they're required

09:51 15    to do.  It's not nice to do that.  It's not if they want to do

09:51 16    that.  It's that they have to do it.  And I'll real the

09:51 17    instruction on it later, but these guys -- the best they can do

09:51 18    at this point is testify what they can remember, give you their

09:51 19    best good faith estimate.  And all I can do is bring other

09:52 20    witnesses in at this point and try to substantiate it.  And at

09:52 21    least their own witnesses came in here and started contracting

09:52 22    themselves and they were substantiating what these guys were

09:52 23    saying; that these guys were here before 7:45 at least.

09:52 24         So I'm going to get right to the calculation on this.

09:52 25    I've already read the jury instruction to you, but it's very

09:52   1   important that, you know, that you decide which way to go.

09:52   2   There's really two ways you can go on this.  Or position is

09:52   3   that, like I said, these guys came in.  They agreed to 40

09:52   4   hours.  So you're to take that salary.  They were not supposed

09:52   5   to get a salary; but since they got a salary you divide the 40

09:52   6   hours they were supposed to get -- supposed to work and divide

09:52   7   that and you get the hourly rate which would be, you know,

09:52   8   twenty-two fifty an hour for Mario.  So obviously if he's

09:52   9   entitled to time-and-a-half, any hour over 40 he's entitled to

09:53  10   37 -- 33.75 an hour.

09:53  11          We established as best we could the hours.  If he

09:53  12   worked 60 hours in a week, if he worked 60, that's 20 overtime

09:53  13   hours.  If he worked 50 hours -- remember that?  He worked a

09:53  14   little under -- he worked about a year solid.  If I deduct two

09:53  15   weeks for his vacation, it's 50 weeks.  So if I take that

09:53  16   $33.75 and I multiply that times 20 overtime hours and I

09:53  17   multiply that times 50 weeks, then I come -- from that total I

09:53  18   come to $33,750.  That's $33,750 that these guys did not --

09:53  19   even though they went under, this is $33,750 that they didn't

09:53  20   pay him.  They didn't have to pay him.  And there's other

09:53  21   workers too that they didn't pay.  So that's part of the

09:53  22   overtime.

09:53  23          But, remember, I segregated the minimum wage at the

09:53  24   lower rate.  Remember those two -- at least two weeks.  I mean

09:53  25   this amount I just gave you, if you -- you know, if you feel

09:54  1    that that should be raised a little bit because he was working

09:54  2    till 10:00 o'clock helping to move, that's up to you.  If you

09:54  3    feel that for some reason it should be reduced a little bit,

09:54  4    that's your decision.  That's why you're here because we don't

09:54  5    have a camcorder documenting the entire week or the entire year

09:54  6    that he worked.  And all we can do is present the evidence and

09:54  7    you have to make that decision.

09:54  8         But if you multiply the five eighty-five overtime --

09:54  9    $5.85 was the Federal overtime -- for 40 hours a week for two

09:54  10   weeks, that's $468.  So if he worked 20 overtime hours based on

09:54  11   a minimum wage rate, that time-and-a-half rate for minimum wage

09:54  12   would be $8.77.  Multiply that times 20 hours of overtime.  If

09:54  13   he worked 60, that would be 20 hours' overtime times two weeks.

09:54  14   That's $350.80.

09:54  15        So in the end, you know, at least based on the

09:54  16   time-and-a-half calculation, if you're able to find that they

09:55  17   agreed to 40 hours a week, then he's asking for at least

09:55  18   $34,568.80, about 34 and a half is what he's looking for.

09:55  19        Mr. Milan's claim was significantly smaller.  I mean

09:55  20   he was there for -- we said four weeks is about what it shows.

09:55  21   Again, no time records for him.  I tried to go -- I went

09:55  22   through -- I combed through my notes on his testimony.  I put

09:55  23   everything together, and what I did was I came up with at least

09:55  24   what he should get based on the testimony that I think was

09:55  25   uncontradicted other than some allegations that try to say, Oh,

JURY TRIAL - VOLUME VI OF VI

09:55 1    he came -- somebody came in at 3:00.  Somebody came in at this

09:55 2    time.  It's like his own -- their own witnesses said -- one guy

09:55 3    says they came in at 8:30.  The One guys says, I got in at 7:45

09:55 4    and they were already there.  What I'm seeing is that Milan

09:55 5    started at 7:30.  That matches up with what Bungo said; that he

09:55 6    came in at 7:45 and installers were already there.

09:55 7         The recurrent theme in this case is 7:30 is when they

09:56 8    were expected to be there.  Even if you take the least amount

09:56 9    of time that he gave, you're somewhere in -- maybe 4:00 to 4:30

09:56 10   with Mr. Milan.  Certainly -- I'm talking about the -- back to

09:56 11   the shop.  I think it's fair to say that these guys were in the

09:56 12   shop for half an hour.  There was, you know, there was times

09:56 13   when they came back there and they had -- you know, there were

09:56 14   other -- ladders that needed -- unloaded.

09:56 15        Mario provided some details -- they tried to trip him

09:56 16   up on it -- where they would actually have him loading the

09:56 17   trucks for the next day.  They were trying to -- you know, they

09:56 18   were having him at one point, you know, pre-load other units.

09:56 19   So it's -- you know, to say that they were there for at least a

09:56 20   half an hour is not much to ask.  I mean they had to clean up

09:56 21   the trucks, do some unloading.  They were there for half an

09:56 22   hour.  I mean that's in your domain to choose.  If you think it

09:57 23   was 15 minutes, it's 15 minutes.

09:57 24        But like Mr. Milan got there at 7:30 during that month

09:57 25   he worked there, and he was back to that shop at 5:30.  It's

09:57  1    not -- it matches up the evidence to say he was out of there by

09:57  2    5:00.  You know, if you add -- so that alone if you just say

09:57  3    Mr. Milan showed up at 7:30 and was out of there at 5:00, that

09:57  4    was 57 hours a week.  That's still 17 hours of overtime even

09:57  5    based on that.

09:57  6           He also testified his wife was normally there to pick

09:57  7    him up at 5:00 or 5:30.  There's a reason for that.  That

09:57  8    substantiates his claim.  His wife was normally there at 5:00

09:57  9    to 5:30 on normal days.

09:57 10           Now, he said 60 hours or close.  So, you know, if I

09:57 11    take the lower end of that spectrum, I come up with at least

09:57 12    57, so -- and that matches up with the installers.  You know,

09:57 13    these installers were normally -- the testimony was --

09:57 14    throughout this case was pretty standard.  They were required

09:57 15    to be there at 7:30.  I got there at 7:15, got there at 7:30,

09:58 16    sometimes before 7:15.

09:58 17           You know, and you're going to hear I think -- and

09:58 18    you've heard from the defendants already.  They intertwined I

09:58 19    think a lot of argument already in what they've presented.  You

09:58 20    know, I was pretty confined to the facts in the case, and now

09:58 21    I'm trying to argue.  But I think that the defendants there,

09:58 22    they tried to use this guesswork language.  They're going to

09:58 23    throw guesswork around; and they're going to say, Oh, he just

09:58 24    guessed.  He just guessed.  Even in his deposition he used the

09:58 25    word guess.

09:58  1        Well, when I read the instruction to you as far as the
09:58  2   time records, okay, these guys have to estimate, okay.  They
09:58  3   want to say guess, estimate.  These guys are estimating.
09:58  4   They're not just coming up with some wild guess out of nowhere.
09:58  5   These guys -- I've had to match up testimony of multiple people
09:58  6   throughout this trial.

09:58  7        Like their own client, for example, Mr. Bungo, I had
09:58  8   to point out -- I think it's important.  I need to point out
09:58  9   that their own witness is saying he's seeing these installers
09:59 10   there before 7:45.  That's not guesswork.  We had to piece all
09:59 11   this together because these guys didn't keep time records.

09:59 12        And I've got these guys here in trial four years
09:59 13   later?  This is a 2007 case.  My guys are here now four years
09:59 14   later, and now they're having to testify in front of everybody
09:59 15   and remember exactly what their schedule is.  I think that they
09:59 16   need to have some leeway with respect to what they provide as
09:59 17   far as estimations are concerned.

09:59 18        I mean that's why the Supreme Court requires time
09:59 19   records because you can't effectively run a business if you're
09:59 20   going to have, you know, a lack of records.  And then, you
09:59 21   know, you end up in a lawsuit and then it's just a bunch of
09:59 22   testimony going back and forth.  It's ineffective.  You know,
09:59 23   the law -- that's why -- the law could have made a choice one
09:59 24   way or the other.  What could the Supreme Court say?  They
09:59 25   could have said, The employee has to keep time records.  If you

09:59  1    don't keep time records, then you can't bring an overtime

09:59  2    claim.  They didn't say that.  The United States Supreme Court

09:59  3    didn't say that.  They said that the employer has to keep the

10:00  4    time records.  If they don't, that's a bad thing; and it's

10:00  5    going to hurt you in court.  And I'm going to read the

10:00  6    instruction to you.

10:00  7         So in a nutshell with respect to Mr. Milan's claim, he

10:00  8    said he worked 700 -- he got a salary of $700.  If he's an

10:00  9    installer like everybody else, if he was installing like

10:00  10   everybody else, he needs to be treated like -- the same as the

10:00  11   other installers.  And he was on the same type of agreement as

10:00  12   everybody else and he was supposed to be working 40 hours and

10:00  13   if he was doing that, maybe it would have been fair if they

10:00  14   were doing that because it wouldn't have been a minimum wage

10:00  15   violation.  If they were actually doing this and not working

10:00  16   these guys over 40 hours, it might have been fair because it

10:00  17   wouldn't have been over minimum wage.

10:00  18        But if you divide that $700 by 40 hours, that comes to

10:00  19   $17.50, so -- and, again, you divide that.  So that's his

10:01  20   hourly wage.  And, of course, that jury instruction, his

10:01  21   time-and-a-half rate over 40, he would be entitled to $26.25

10:01  22   for every hour over 40.  If he -- on the lower end of the

10:01  23   spectrum, if he works 57 hours a week, that would be 17 hours

10:01  24   of overtime.  So the calculation is very simple as to Mr.

10:01  25   Milan.  It's simply $26.25 times 17 overtime hours a week times

10:01  1    four weeks.  He only worked there four weeks.  That comes to

10:01  2    $1,785.  So that's $1,785 that Safe Hurricane Shutters got to

10:01  3    keep.  Even though they went down, they still -- they got some

10:01  4    cheap labor out of it.

10:01  5          Those calculations are what we're asking for, you

10:01  6    know, based on the evidence.  When you read the jury

10:01  7    instructions, of course, though, you will -- I don't want to

10:01  8    confuse the issue; but I think that I need to point it out to

10:02  9    you, and it is dry.  It's somewhat boring and it's dry to sit

10:02  10   here and go over this; but I just want to make sure that, you

10:02  11   know, you have the option to do what's right.

10:02  12         That jury instruction I told you -- and the Judge will

10:02  13   read it to you -- remember, if there's a 40-hour agreement,

10:02  14   then you base it on 40 hours.  However, if you find that there

10:02  15   wasn't an agreement for 40 hours, the best you can do is you

10:02  16   can take whatever their salary was, divide it by all the hours

10:02  17   they worked.

10:02  18         So Mario, for example, his average -- if you say,

10:02  19   Okay, I'll give you 60 hours.  You may have worked 66 here.

10:02  20   You may have worked till 10:00 o'clock those; but, you know

10:02  21   what, we're going to give you -- we're just going to -- you

10:02  22   have to arrive at some reasonable calculation.  We'll say 60

10:02  23   hours which is six days a week, ten hours a day.  That's not

10:02  24   some farfetched type of work.  If you're working six days a

10:02  25   week, that's -- you know, 10 hours a day -- that's based on the

10:02   1    schedules, him showing up there at 7:15 to 7:30 or earlier,

10:03   2    it's not hard at all to rack up 60 hours a week.

10:03   3         So if you took -- if you took his $900 -- we use that

10:03   4    -- divide that by 60 hours, you come to 15 bucks an hour.  So,

10:03   5    in other words, you'd be saying he worked 60 hours.  He

10:03   6    basically got paid -- he basically got paid 15 bucks for every

10:03   7    hour he worked.  But, of course, if you do that, then he didn't

10:03   8    get his half-time, right, because he needs time-and-a-half.

10:03   9         If he got paid 15 for every hour, any hour he worked

10:03  10    over 40, he needs an additional seven-fifty.  That's the

10:03  11    premium half-time.  And that would reduce his claim.  I mean it

10:03  12    would be -- in that instance you would take seven-fifty an hour

10:03  13    times his 20 overtime hours times his 50 weeks.  You come up

10:03  14    with like $7500.

10:03  15         And if you added in the overtime -- the overtime is

10:03  16    the same.  I already told you how it's calculated.  If he

10:03  17    wasn't paid for at least two weeks, you come up with like 83 --

10:03  18    $8,318.80.  That's what you're left with in the case.  I mean

10:03  19    you've got to make a decision somewhere.  And that's for you to

10:03  20    do, and I think that's why you're here today because it's not

10:03  21    something really anybody can do legally.  I mean you have to

10:04  22    look at the facts and make a decision.

10:04  23         But let's just look at the overall picture.  What were

10:04  24    these guys doing here?  Let's try to figure out what they

10:04  25    intended to do.  Mr. Leiva and Mr. M<sup>c</sup>Carroll and Mr.

APRIL 18, 2011

10:04 1 Heidelberger, all three of the individual defendants, we know

10:04 2 that admittedly they had a business up in New York.  They told

10:04 3 you that.  And that was shortly before this business here.

10:04 4 They had the business.  They, you know, didn't -- you know, Mr.

10:04 5 Heidelberger didn't have any idea how much he sold the company

10:04 6 for; but he did say that he split it three ways with Mr. Leiva

10:04 7 and Mr. M^cCarroll.  They were all involved in this business.

10:04 8           But what I'm getting at with this is did not they say

10:04 9 -- and I brought this out multiple times, and this came out I

10:04 10 think through all of them -- that these guys up in New York got

10:04 11 time-and-a-half.  That says to me that these guys knew full

10:04 12 well what time-and-a-half was.  These guys knew what they were

10:04 13 doing, and they ran a business.

10:04 14           And then they come down to Florida after that and they

10:04 15 give these guys this phoney-baloney salary, and I don't know

10:05 16 why they did that; but maybe they intended to give them 40

10:05 17 hours.  And they thought, Well, that's okay.  If we do that,

10:05 18 we'll give them 40 hours.  And then they come down and the

10:05 19 business starts having problems, and they start working them 60

10:05 20 hours and not paying them overtime.

10:05 21           I think that seems reasonable what happened and it

10:05 22 seems why they probably or may have agreed -- that's what these

10:05 23 guys are saying.  We came down.  Some of the guys came down

10:05 24 here.  Some of them were already here.  We made this deal with

10:05 25 these guys.  They gave me the salary.  Mario started at 800,

10:05  1    and that was supposed to be for 40 hours.  And if they had of

10:05  2    done that, that would be -- you know, there would be no

10:05  3    overtime.  They didn't work 40 hours.  And it would certainly

10:05  4    not be minimum wage.  It would be -- so that may very well be

10:05  5    what happened.  And that's why I think that when you look at

10:05  6    the overall picture, that you should find that they did not pay

10:05  7    them for 40 hours because that seems what happened.  They made

10:05  8    this deal with these guys.  Here's a salary.

10:05  9         The alternative is it's less money, but it makes them

10:06  10   look a little more culpable if it wasn't that because what they

10:06  11   probably -- if they're going to make that argument, they're

10:06  12   going to say, Yeah, we were up in New York before we came down

10:06  13   here and we know that you have to pay time-and-a-half to

10:06  14   workers 'cause we did it.  We had another company up there that

10:06  15   we sold and split the money three ways.

10:06  16        So they purposely then came down and paid these guys a

10:06  17   salary for every hour they work.  No matter how many hours you

10:06  18   guys work you're only getting this much money.  So they

10:06  19   intentionally at that point didn't pay them their overtime.

10:06  20        But that benefits them in a way because if you do

10:06  21   that, then they get less, right, because if you guys divide

10:06  22   this by every hour worked, then they're only going to get their

10:06  23   half-time for that hour, you know, their half-time for the 40

10:06  24   hours.

10:06  25        But, so either way it shows that they were knowingly

```
10:06   1   involved in this type of salary scheme that is not appropriate
10:06   2   for these type of workers.  And they had another business in
10:06   3   New York.  And they were real articulate to tell you that up
10:07   4   there with these guys, they paid them time-and-a-half.  They
10:07   5   come down here and paid a salary to these -- a lot of these
10:07   6   guys without Social Security numbers.
10:07   7        Some of the guys were apparently -- they testified
10:07   8   they were afraid to complain about it.  They would -- they
10:07   9   would be fired.  Mr. Feliciano had indicated that -- you know,
10:07  10   when he said something about it, basically the attitude was
10:07  11   like, Well, you know, if you don't like it, leave, so --
10:07  12        Be that as it may, we would ask that you use the
10:07  13   time-and-a-half calculation because it appears to be -- the
10:07  14   testimony shows that that's what they agreed to.  It wasn't
10:07  15   just Mario that said it.  There were other witnesses that said
10:07  16   it; that they were told that this is for 40 hours.  So it seems
10:07  17   clear that these guys were paid nothing for their hours over
10:08  18   40.
10:08  19        And I think these guys -- they started having trouble
10:08  20   with the business, and they started having to work these guys
10:08  21   more than they perhaps intended to do.  And I think that's
10:08  22   something I'll touch on later when I get to the individual
10:08  23   defendants.
10:08  24        But just -- and Mr. Milan too if you used his
10:08  25   half-time, it would be obviously less as well.  I mean if you
```

10:08 1    took his -- if you took his hourly rate and you divided it, you

10:08 2    know, it would be basically eight seventy-five an hour times

10:08 3    the 17 overtime hours times four weeks.  It would be like $595

10:08 4    if you find that he's only entitled to the half-time, but I

10:08 5    won't harp on that anymore.

10:08 6            Lunch periods, just real quickly, do what you want to

10:08 7    do with the lunch periods.  Like anything, I mean it's -- you

10:08 8    know, you heard different testimony.  It seemed like these guys

10:08 9    -- it was a recurrent theme that these guys were eating on the

10:08 10   fly.  I mean, you know, it didn't seem like they were taking a

10:08 11   very detailed lunch.

10:09 12           One of the -- I think it was Mr. Lares who tried to --

10:09 13   he was with Mario for like three weeks -- tried to talk about I

10:09 14   think some bakery or something like that on the way to work.

10:09 15   There's not -- of course, there's no time records so there's no

10:09 16   documentation as to how long these breaks really were; but I

10:09 17   continued to hear that these guys were working.

10:09 18           I mean you're standing on a balcony.  You're probably

10:09 19   installing your hurricane shutters.  You have a cooler there.

10:09 20   You pull it out.  You take a drink.  You talk.  Maybe take a

10:09 21   smoke or whatever.  Maybe grab a sandwich.  Eat the sandwich.

10:09 22           You'll get a jury instruction on that.  You're just

10:09 23   going to have to -- you're just going to have to make that

10:09 24   decision yourself.  You know, you'll get a jury instruction.

10:09 25   Basically you'll hear the Judge say that ordinarily 30 minutes

10:09   1    or more is long enough for a bona fide meal period.  I'm not

10:09   2    going to read all of it.  There's not that much time.  I've got

10:09   3    to move on.  But you'll get a full jury instruction on that.

10:09   4        If you feel that they proved that these guys took a

10:09   5    consistent half-an-hour break every time and they have time --

10:09   6    they don't have time records to show it; but if you believe

10:09   7    they somehow established that throughout his entire year he

10:10   8    worked and throughout his entire month he worked, that they

10:10   9    consistently took this half-an-hour break where they sat down

10:10  10    and took a break and ate their sandwiches, you know, we ask you

10:10  11    to do what's right.

10:10  12        But it seemed like they were eating on the fly.  They

10:10  13    were rushing through these projects and just, you know, not

10:10  14    taking this half-an-hour bona fide meal period.

10:10  15        So real quick then I'm going to try go the into this

10:10  16    *Mt. Clemens* instruction.  I just want -- you're only going to

10:10  17    hear -- you'll hear the Judge read this once; and I just want

10:10  18    to make sure, you know, that you hear it.  And basically it

10:10  19    says that -- this just comes from the Supreme Court of the

10:10  20    United States.

10:10  21        It's the employer's responsibility of keeping records

10:10  22    of hours worked by employees under the Fair Labor Standards

10:10  23    Act.  Where the employer's records of work time are inaccurate,

10:10  24    completely missing and the employee cannot offer a convincing

10:10  25    substitute -- sorry.  Where the employer's records of work time

| | | |
|---|---|---|
| 10:10 | 1 | are inaccurate or completely missing and the employee cannot |
| 10:11 | 2 | offer convincing substitutes, the employee has covered or |
| 10:11 | 3 | carried out his burden if he or she proves that he or she has, |
| 10:11 | 4 | in fact, worked or performed work for which he or she has been |
| 10:11 | 5 | improperly compensated and if he/she produces sufficient |
| 10:11 | 6 | evidence to show the amount and the extent of work as a matter |
| 10:11 | 7 | or just and reasonable inference. |
| 10:11 | 8 | That's our argument.  I mean they have to keep the |
| 10:11 | 9 | records.  That's what the Court says.  They don't have to keep |
| 10:11 | 10 | records.  All they have to do is show the extent of their work |
| 10:11 | 11 | with some sufficient evidence.  What else do we have?  As |
| 10:11 | 12 | normally in these cases when these guys don't keep the records, |
| 10:11 | 13 | we have testimony.  And we can bring in multiple employees to |
| 10:11 | 14 | try to get a commonality of the -- you know, they get a |
| 10:11 | 15 | commonality of the schedule so you can come up with an idea so |
| 10:11 | 16 | that you can infer that they're telling the truth. |
| 10:11 | 17 | And I think -- like I said, I think that Mr. Bungo |
| 10:11 | 18 | helped us a lot, their own witness, just simply the fact that |
| 10:11 | 19 | he was coming in there and he was saying that they were working |
| 10:12 | 20 | -- coming in there -- they were already there when he'd come in |
| 10:12 | 21 | at 7:45.  And he also used language like -- at first he said |
| 10:12 | 22 | 5:00 o'clock, normally 5:00 they were leaving.  Then he said, |
| 10:12 | 23 | Well, between 3:00 or 5:00.  Then we have other testimony. |
| 10:12 | 24 | You'll have to make that -- you'll have to make that |
| 10:12 | 25 | determination. |

APRIL 18, 2011

10:12  1    But once they bring that evidence as a matter of just

10:12  2    and reasonable inference which they have, the burden then

10:12  3    shifts to them to come forward with evidence -- and this is

10:12  4    what's important -- of the precise amount of work.  The precise

10:12  5    amount of work performed or with evidence to negate the

10:12  6    reasonable inference to be drawn from the employee's evidence.

10:12  7    If the employer fails to produce such evidence, the employee

10:12  8    may then be awarded damages even though the result be only

10:12  9    approximate.  Okay?

10:12  10   That's why I wanted to read that last sentence

10:12  11   emphatically because approximate -- that means they can

10:12  12   estimate.  These guys didn't keep the records.  They want to

10:12  13   say, oh, they guessed, they guessed.  They pulled up some wild

10:13  14   guess out of the air even though there's multiple witnesses

10:13  15   that their testimony put them all within the same range.

10:13  16   So at this point there is an inference against them.

10:13  17   And I don't see how they came up with any type of precise type

10:13  18   of evidence to rebut this.  I mean they came -- they brought

10:13  19   witnesses with conflicting testimony.  They had Mr. Lares and

10:13  20   Mr. Bungo come in here and Mr. Bungo saying that he came in at

10:13  21   7:45 in the morning and they're there; and he sees them already

10:13  22   there, these installers.

10:13  23   And then Mr. Lares comes in right after him or it was

10:13  24   right before him there, one after the other.  He says 8:30.

10:13  25   They haven't carried their burden.  They haven't rebutted this

10:13  1    at all, and they don't have time records.  I mean it's very

10:13  2    important because it's -- you know, it's an evidentiary issue.

10:13  3    I've got to prove the case.  That's true.  But at the same time

10:13  4    they have their own legal requirements that they need to comply

10:13  5    with which they didn't do.

10:14  6           I mean after four years they're still -- I mean after

10:14  7    four years they're still saying that they worked no overtime.

10:14  8    I mean after everything you've heard they still say they're

10:14  9    entitled to nothing.  After four years, nothing?  It just

10:14  10   doesn't -- they won't even concede to -- they won't concede to

10:14  11   anything.  You know, it's, you know, really just a matter of

10:14  12   shifting blame and, you know, denying everything that's really

10:14  13   been the theme of their case.

10:14  14          So, again, I would -- you know, we would -- just to

10:14  15   reiterate the amounts, we're asking for you to award him 20

10:14  16   hours of overtime, Mario, for, you know, for -- 20 hours of

10:14  17   completely unpaid hours a week which is a total -- if you add

10:14  18   it up over the year, we're asking for about $34,568.80.

10:14  19          Mr. Milan we're asking for like $1,785.  That's what

10:15  20   we're asking for because our theme is that they weren't paid

10:15  21   anything for the 40 hours.  That's -- I don't want to harp on

10:15  22   that continuously, but it's kind of the heart of their

10:15  23   argument.

10:15  24          You know, as far as the individuals -- and one of the

10:15  25   problems we have in this case is we only have an issue of -- we

10:15  1    would only have an issue of entitlement.  You know, were they

10:15  2    or were they not paid?  That's one of the most important parts

10:15  3    of the case.  One of the things that they like to say is they

10:15  4    like to say that -- well, some of the guys never complained.

10:15  5    Well, Mario complained.  And he said that Mr. Leiva said, you

10:15  6    know, If you don't like it, walk.  If you don't like it, leave.

10:15  7         Then some of them, You never complained.  And they

10:15  8    said no.  But it doesn't matter because they don't have to.

10:15  9    That doesn't -- you can't -- you'll hear nothing in the

10:15 10    instructions.  You cannot tell an employee, Hey, you know what,

10:15 11    you know, The law says this; but, you know, if you want a job,

10:15 12    I'll give you a job.  I'll give you some work; but me and you

10:15 13    are going to have a little agreement that I'm not going to pay

10:15 14    you overtime.  You can't do that.  It's illegal.  It's

10:16 15    irrelevant as to whether or not one of these guys complained or

10:16 16    Mr. Milan complained.  It's just irrelevant.

10:16 17         But aside from the damages which is really the heart

10:16 18    of the case, who's liable?  Whose liable?  We have a broke

10:16 19    company, and that's a real fact.  I mean these guys have had --

10:16 20    they had to come here to court four years later; and they're

10:16 21    still trying to get their overtime wages, minimum wages.  We're

10:16 22    still here four years later.  And, you know, Hurricane Shutters

10:16 23    has been long gone.  And it's just an empty broke company that

10:16 24    no longer exists.  And, you know, the question is:  Who's

10:16 25    really liable to pay for this.

APRIL 18, 2011

JURY TRIAL - VOLUME VI OF VI

10:16  1      Mr. Leiva -- you're going to hear in the jury

10:16  2  instructions -- you're going to have to -- you're going to get

10:16  3  a verdict form, and I just want to explain it to you.  You're

10:16  4  going to say -- first you're going to find out whether you

10:16  5  decide for Mr. Feliciano, yes or no.  Then you're going to say

10:16  6  Milan, yes or no.  If you answer no to both of those, then the

10:17  7  case is over.  If you put yes to either of those, then you've

10:17  8  got to on and show who you believe may be liable.

10:17  9      The first one is Safe Hurricane Shutters.  Did they or

10:17  10  did they not pay these guys the wages.  If you say yes for Safe

10:17  11  Hurricane, it's over; but if you say -- you know, if you

10:17  12  decided for the --you know, you're going to say, We, the Jury,

10:17  13  unanimously find from the preponderance of the evidence as

10:17  14  follows:  For the defendant, Safe Hurricane Shutters.  If you

10:17  15  put no, then you've got to go on to Mr. Leiva.  Yes or no.

10:17  16      I would prefer to not have that, that you'd have to

10:17  17  check anything for Mr. Leiva but because he's already been

10:17  18  found -- if Safe Hurricane is liable, he's liable.  Okay?  And

10:17  19  you're going to hear that in the jury instruction.  And I just

10:17  20  want to make sure that if you check off that Safe Hurricane is

10:17  21  liable, you automatically have to find him liable.  I mean

10:17  22  you're going to be instructed that he was already liable.

10:17  23      You know, for example, you're going to hear -- you're

10:17  24  going to hear, In this matter it's already been established

10:17  25  that defendant Edward Leiva shall be liable individually, shall

43

10:18 1   be, if the corporate defendant is found liable.  The reason is

10:18 2   'cause he's been pretty open with it.  Yeah, I was there all

10:18 3   the time.  I was really -- he was running the details of the

10:18 4   company.  It was so overwhelming his involvement in the case

10:18 5   that he's automatically liable if you find the company liable.

10:18 6       But the difficult question comes to Mr. -- Mr.

10:18 7   Heidelberger is not here today, and Mr. M$^{c}$Carroll who's over

10:18 8   there.  Were they or were they not liable?  The jury

10:18 9   instructions will explain to you that Mr. Leiva has already

10:18 10  been found liable.  However, there's going to be various prongs

10:18 11  or tests or whatever you want to call them that are going to

10:18 12  have to be considered by the facts as to whether these other

10:18 13  two defendants are liable.

10:18 14       **THE COURT:**  You have 10 minutes left, Mr. Kelly.

10:18 15       **MR. KELLY:**  Okay.  Thank you.  I'll just basically go

10:18 16  over some details here.  They invested a million dollars in the

10:19 17  company, both of them together, more than Mr. Leiva.  They had

10:19 18  the same percentage of ownership as both of them.  They were

10:19 19  both directors admittedly.  I had to pull it out of him.  He

10:19 20  had a business card that said he was a vice president on it.

10:19 21       Yerko Aguirre said that they would be out on a job.

10:19 22  Yerko said that Mr. M$^{c}$Carroll purchased tools for the trucks,

10:19 23  supervised job sites.  Aguirre said that Mr. Heidelberger was

10:19 24  there one time a month.  You know, there was -- whether he was

10:19 25  there two or one time a month, he was there consistently.

10:19  1         But one that's interesting regarding Mr. Heidelberger.

10:19  2   Okay.  Mr. M^cCarroll said he was there 40 percent of the time.

10:19  3   We know that.  Mr. Heidelberger, though, he admitted -- he said

10:19  4   he would talk to Mr. Leiva about the business every ten days

10:19  5   regarding operation.  Mr. -- you know, he was in Colorado; but

10:19  6   he's still calling up every ten days talking to Mr. Leiva, and

10:19  7   he's coming once a month.  He was going to -- and Mr. M^cCarroll

10:19  8   was there 40 percent of the time.

10:19  9         Both of these -- didn't these guys say that they -- we

10:19 10   had this Mr. Sullivan.  Remember, he was supposedly stealing

10:19 11   from the company.  Mr. Sullivan was the head of the operations

10:20 12   of the manufacturing department.  Mr. M^cCarroll and Mr. -- not

10:20 13   Mr. Leiva -- Mr. M^cCarroll and Mr. Heidelberger escorted him

10:20 14   out the door.  I mean the guy's in charge of operations; and

10:20 15   they're saying, No, I don't have any authority and they walked

10:20 16   up and just -- and threw the guy out.  I mean they had power

10:20 17   and control in this company.  I mean they were -- as far as

10:20 18   payment of wages, at the beginning, didn't Mr. Heidelberger

10:20 19   who's not here with us today, did not he pay -- admitted he

10:20 20   paid like $20,000 on his credit card.  I mean that's -- he's

10:20 21   participating directly.  He doesn't want these guys to quit.

10:20 22   If they quit, he loses money.  He wants to benefit off of their

10:20 23   wages.  You know, they're not paying overtime.

10:20 24         And then what else did Mr. Heidelberger do at the end?

10:20 25   He went and he met with them again.  And he said, Come on,

10:20  1   Mario, stay with -- he was the best installer is what he said,

10:20  2   so obviously he's talking to him; and he's talking to others

10:20  3   translating, rather Spanish speakers -- stay with the company,

10:20  4   stay with the company.  He was, you know, part of the -- you

10:20  5   know, part of this company as a controlling person.

10:20  6        I mean you're going to see that, you know, he charted

10:20  7   out costs.  What did he do?  He didn't just talk about prices.

10:21  8   He asked for 80 -- he told Leiva that they needed to update to

10:21  9   8500 square feet, 8500 square feet.  He wanted to -- what's

10:21  10  that?  That's increase -- you need to increase production.  You

10:21  11  need to increase these guys, make these guys work.

10:21  12       You know, this jury instruction -- I want to point out

10:21  13  very importantly when you consider all the facts of these

10:21  14  gentlemen here that you're going to hear about day-to-day

10:21  15  operations.  They don't need to be there every day.  If they

10:21  16  needed to be there every day, you wouldn't be deciding this

10:21  17  right now because it would be thrown out because the issue is

10:21  18  the over -- you're going to hear in there the employer is

10:21  19  defined as any person acting directly or indirectly in the

10:21  20  interest of an employer in relation to the employee.

10:21  21       When you decide this, you need to decide the whole

10:21  22  activity, the overall activity, whether they controlled the

10:21  23  operation of the company which they did.  They fired people.

10:21  24  Mr. M^cCarroll, he fired multiple people.  He fired two --

10:21  25       How many minutes do I have, Your Honor?

APRIL 18, 2011

10:21  1          **THE COURT:**  You have 7 minutes left.

10:22  2          **MR. KELLY:**  Okay.  He fired two installers, hired

10:22  3   multiple people.  He admitted -- I impeached him in his

10:22  4   deposition testimony.  He admitted he was involved in

10:22  5   determining the salary of the salespeople.  I mean Mr.

10:22  6   M$^c$Carroll was more than Mr. Heidelberger there a lot, 40

10:22  7   percent of time; but Mr. Heidelberger was still involved.  He

10:22  8   was in Colorado contacting Mr. Leiva every ten days, coming

10:22  9   every month.

10:22  10         And when he was here, he was doing big stuff.  He was

10:22  11  going to the job sites, checking on the workers, looking at

10:22  12  what was going on.  He didn't need to know how to hang up a

10:22  13  hurricane shutter to be an employer.  He had to go there and

10:22  14  make sure they were following up on deadlines.  That's what was

10:22  15  important.  As a big -- as a top boss, that's what -- I mean

10:22  16  these guys were all employers, and they -- they just want to

10:22  17  say that it was, you know -- it wasn't them.

10:22  18         And I mean you've just got to look at the facts.  I

10:22  19  mean, you know, you heard that Mr. Heidelberger -- Mr. Ibacache

10:22  20  said a date.  I wrote in my notes that they both gave verbal

10:22  21  orders to the workers.  They were communicating with the

10:22  22  workers.  Mr. Heidelberger was seeing what they were doing, and

10:22  23  then he was talking to Mr. Leiva what needed to be done.  It

10:23  24  wasn't just about raising prices either.  Like I said, he was

10:23  25  talking about increasing output which was necessary for labor

10:23   1   purposes.

10:23   2           So I'd ask you to consider the whole overall jury

10:23   3   instructions when you hear this because these guys are going to

10:23   4   say one thing to you.  Mr. Heidelberger and Mr. M$^c$Carroll were

10:23   5   not there every day.  That's their argument.  They weren't

10:23   6   there every day.  Mr. Leiva was.  It's all his fault.  They

10:23   7   didn't do anything.  They weren't employers.  They didn't pay

10:23   8   any wages.  They didn't have any control.

10:23   9           They don't have to be there every day.  And, like I

10:23  10   said, if it meant them to be there every day, you wouldn't be

10:23  11   deciding this right now.  We wouldn't have made it to the jury.

10:23  12   So you've got to look at the overall situation whether they

10:23  13   were directly or indirectly controlling these people or

10:23  14   affecting them in the operations of the company which they

10:23  15   were.

10:23  16           So in conclusion, you know, you can calculate the

10:23  17   damages how you want.  We ask, though, that you calculate it on

10:24  18   a 40-hour agreement; that they weren't paid anything, both of

10:24  19   them, for their hours over 40.  We'd ask for $34,568.80 for Mr.

10:24  20   Feliciano.  We'd ask for $1,785 for Mr. Milan.

10:24  21           I think they're getting off easy in here with respect

10:24  22   to all the employees that they had.  And, you know, if you

10:24  23   think you need to up it a little bit, like I said, you know,

10:24  24   Mr. Milan -- Mr. Feliciano, for example, said he was working

10:24  25   till 10:00.  That's undisputed.  I didn't hear that they

10:24  1    weren't moving.  If you think it needs to be upped a little

10:24  2    bit, we'd ask you to do that.

10:24  3          And I thank you very much for your time, and we

10:24  4    appreciate your attention in this matter.

10:24  5          **THE COURT:**  Thank you, Mr. Kelly.

10:24  6          Mr. Kleppin, you can proceed, sir.

10:25  7          **MR. KLEPPIN:**  Good morning.  I too thank you for

10:25  8    agreeing to resolve the civil dispute between the parties.  I

10:25  9    did forewarn you that it wouldn't be that exciting.  I know it

10:25  10   wasn't; but it's an important dispute, and it does mean quite a

10:25  11   bit to the parties so we do thank you.

10:25  12         I first want to go right into the verdict form; and

10:25  13   that is, as you know, there are six plaintiffs who aren't here

10:25  14   at all during this court case who claimed that they were owed

10:25  15   tens of thousands of dollars.  And if the case had any merit,

10:25  16   they'd be here seeking their money too.

10:25  17         Now, with respect to the verdict form -- and I have a

10:25  18   copy of it here.  This is what you're going to get when you go

10:25  19   back into the jury room.  The first question is, We, the Jury

10:25  20   unanimously find from a preponderance of the evidence as

10:25  21   follows:  And then it asks you a series of questions.  The

10:25  22   first one is for the plaintiff Mario Feliciano.  We ask that

10:25  23   you mark that no.  The second question for the plaintiff

10:26  24   Augustin Milan, we ask that you mark that no.

10:26  25         Now, Mr. Kelly said, Oh, you just stop there once you

10:26  1    answer those questions.  The verdict form doesn't tell you to

10:26  2    stop there.  The verdict form asks you to fill out the next

10:26  3    questions which are for the defendant Safe Hurricane Shutters.

10:26  4    We ask that you mark that yes.  That would be a defense verdict

10:26  5    for the company.  The next question is for the defendant Edward

10:26  6    Leiva.  We ask that you mark that yes also and that you find

10:26  7    for Ed Leiva also.

10:26  8          For the defendant Steve Heidelberger, we ask that you

10:26  9    mark that yes.  That would be a finding that you find in favor

10:26  10   of Mr. Heidelberger.  The last question is for defendant Frank

10:26  11   McCarroll, and we ask that you mark that yes so that you find

10:26  12   for Mr. McCarroll.  And the reason that we ask that you find in

10:26  13   our favor is when I'm done with my closing, hopefully you will

10:27  14   agree with me overwhelmingly that that's how the verdict form

10:27  15   should be filled out, and here's why:

10:27  16         The first important issue is believability and who's

10:27  17   telling the truth and who isn't and who you should find is

10:27  18   telling the truth and why because there's reasons.  You're

10:27  19   going to be instructed -- and I have a copy of the jury

10:27  20   instructions right here.  I'm going to read from them.

10:27  21         You should find that Yerko Aguirre and Mr. Ibacache

10:27  22   are greatly stretching and overexaggerating the truth.  They're

10:27  23   doing that because they also have a court case against the

10:27  24   company and against Mr. McCarroll and Mr. Heidelberger.

10:27  25   They're biased.  They have reasons for why they would want to

10:27  1   color their testimony in their favor.  They're seeking tens of

10:27  2   thousands of dollars -- Mr. Ibacache over a hundred thousand

10:27  3   dollars -- from the defendant.  Now, the two plaintiffs also

10:27  4   are biased because obviously they're seeking a lot of money.

10:28  5        The other thing I want you to remember is remember I

10:28  6   had to walk up to the witness stand repeatedly with all of the

10:28  7   plaintiffs' witnesses, repeatedly with the deposition testimony

10:28  8   that they gave under oath previously, with their affidavits

10:28  9   that they had given under oath previously.  You remember how

10:28  10  what they're saying here today in the courtroom differed

10:28  11  significantly to what they said before under oath?

10:28  12       Here's what you're going to be instructed on:  Now, in

10:28  13  saying that you must consider all of the evidence, I do not

10:28  14  mean that you must accept all of the evidence as true or

10:28  15  accurate.  You should decide whether you believe what each

10:28  16  witness had to say and how important that testimony was.  In

10:28  17  making that decision, you may believe or disbelieve any witness

10:28  18  in whole or in part.  That's what you're going to be instructed

10:28  19  on.  And, remember, you swore that you would uphold the law

10:28  20  when you were impaneled as jurors; and we ask that you do that

10:29  21  here.

10:29  22       It's very, very clear that the plaintiffs just aren't

10:29  23  believable; and I will go into all of the reasons, all of those

10:29  24  little things that I was able to effectively cross-examine them

10:29  25  on that show that they're just not being truthful time and time

10:29 1    and time again.  They're overexaggerating their hours,

10:29 2    overexaggerating Mr. Heidelberger's involvement,

10:29 3    overexaggerating Mr. M<sup>c</sup>Carroll's involvement all to get a lot

10:29 4    of money, a lot of money that they're not entitled to under the

10:29 5    law.

10:29 6         Now, the instructions go on to say, In deciding

10:29 7    whether you believe or do not believe any witness.  I suggest

10:29 8    that you ask yourself a few questions.  Did the witness impress

10:29 9    you as one who's telling the truth?  Did these individuals that

10:29 10   committed income tax evasion impress you as someone who's

10:29 11   telling the truth?

10:29 12        They signed tax returns under penalty of perjury that

10:29 13   they were true and correct to our Government.  Do you believe

10:29 14   anything that they're saying if they're going to cheat on their

10:30 15   taxes?  It shows that when it comes to money, they'll be

10:30 16   dishonest.  That's what that shows.

10:30 17        You're going to go on to be instructed, Did the

10:30 18   witness have any particular reason not to tell the truth.  Yes,

10:30 19   they did.  They want a lot of money.  They want to say they

10:30 20   worked all these hours when they really didn't as the simple

10:30 21   evidence will show.  Did the witness have a personal interest

10:30 22   in the outcome of the case?  You better believe Mr. Aguirre and

10:30 23   Mr. Ibacache both have a personal interest in the outcome of

10:30 24   this case.  You better believe it because they have their own.

10:30 25        Now, with respect to prior inconsistent statements

10:30  1    you're going to be instructed that, quote, You should also ask

10:30  2    yourself whether there was evidence tending to prove that the

10:30  3    witness testified falsely concerning some important fact or

10:30  4    whether there was evidence that at some other time the witness

10:31  5    said or did something or failed to say or do something which

10:31  6    was different from the testimony the witness gave before you

10:31  7    during the trial.

10:31  8         I've got a million instances of that.  I will go into

10:31  9    it.  If you remember, they wanted to say, Oh, no, we absolutely

10:31  10   kept working whether -- no matter what the rain or lightening.

10:31  11   And, remember, in the depositions, Oh, no, we'd shut it down at

10:31  12   2:00 or 3:00.  If it rained, we couldn't work if the ground was

10:31  13   wet because we're dealing with electrical tools.

10:31  14        I'll give you all the examples as I go through the

10:31  15   issues of law when it makes sense in my closing, but I want you

10:31  16   to remember this.  It's very important that you remember that

10:31  17   time and time again these guys signed affidavits under oath.

10:31  18   Their attorney gave them affidavits that say, Mr. Heidelberger

10:31  19   and Mr. M$^c$Carroll had operational control every day and they

10:31  20   regularly exercised it over us.  They signed that.  And that's

10:31  21   the only reason M$^c$Carroll and Heidelberger are part of this

10:31  22   suit.

10:31  23        Do you believe that for one minute?  Both of them --

10:32  24   Milan, Ibacache, Aguirre -- they don't know what operational

10:32  25   control even is.  They asked me from the stand.  Can you define

10:32   1   it for me?  What on earth is that?  Well, why were they signing

10:32   2   that under oath?  Do you believe any of this stuff?

10:32   3        Now, and the other instance with Mr. Milan is is that

10:32   4   he applied for work using a false Social Security number, and

10:32   5   that's a very serious felony in our country under 18 U.S.C. §

10:32   6   1546(a).  It's either a five- or ten-year maximum prison

10:32   7   sentence for that.  I can't remember which.  Extremely

10:32   8   important felony, serious; and that further shows that he's

10:32   9   someone who isn't believable.

10:32  10        Also, if you remember, Mr. Milan was suggesting, Oh,

10:32  11   the defendant was doing something wrong with the tax documents.

10:32  12   We never got any tax documents.  Remember from his deposition?

10:32  13   He very clearly in his deposition acknowledged that Mr. Leiva

10:33  14   sat down with him and had him fill out all of the tax

10:33  15   documents.  We impeached him on that.

10:33  16        Now, with respect to individual liability and before I

10:33  17   start discussing the evidence, before I start discussing the

10:33  18   facts, let's get into what you're going to be instructed as a

10:33  19   matter of law that you have to follow.  And just to give you a

10:33  20   very short roadmap of my closing argument I'm first going to

10:33  21   discuss individual liability, and then I am going to discuss

10:33  22   the hours worked because the plaintiff can't -- the plaintiffs

10:33  23   can't prove either one of those issues.

10:33  24        You're going to be instructed -- and I'm quoting from

10:33  25   the instructions.  Personal liability may arise from

| | | |
|---|---|---|
| 10:33 | 1 | significant ownership interest coupled with operational |
| 10:33 | 2 | control.  They then go on to state, Mr. Heidelberger or Mr. |
| 10:33 | 3 | M$^c$Carroll cannot be held individually liable for violating the |
| 10:34 | 4 | overtime and minimum wage provisions of the Fair Labor |
| 10:34 | 5 | Standards Act unless you find by a preponderance of the |
| 10:34 | 6 | evidence that Mr. Heidelberger and/or Mr. M$^c$Carroll had |
| 10:34 | 7 | operational control over the corporate defendant, that is, that |
| 10:34 | 8 | they were employers within the meaning of the act. |
| 10:34 | 9 | Mr. Heidelberger and/or Mr. M$^c$Carroll are considered |
| 10:34 | 10 | employers if they had operational control of significant |
| 10:34 | 11 | aspects of the company's day-to-day functions including |
| 10:34 | 12 | compensation of the employees or other matters in relationship |
| 10:34 | 13 | to employees, unquote. |
| 10:34 | 14 | That's right out of the jury instructions, Ladies and |
| 10:34 | 15 | Gentlemen.  There is no way even taking the evidence in the |
| 10:34 | 16 | light most favorable to the plaintiffs, which we ask that you |
| 10:34 | 17 | do not do -- we ask that you believe Mr. Heidelberger who was |
| 10:35 | 18 | unimpeached.  He didn't cheat on his taxes.  He didn't say |
| 10:35 | 19 | things under oath that were false.  He didn't say things in |
| 10:35 | 20 | affidavits that were false.  We ask that you believe him when |
| 10:35 | 21 | he said he went there about every quarter or so for a couple of |
| 10:35 | 22 | days because that's the truth. |
| 10:35 | 23 | But if you're going to believe the plaintiffs -- we |
| 10:35 | 24 | ask that you don't -- but if you're going to believe the |
| 10:35 | 25 | plaintiffs, what's the best they got?  The best they have is |

10:35  1   one to four days a month for Mr. Heidelberger, one to four days

10:35  2   a month.  Someone who was there that few of times cannot

10:35  3   possibly have operational control of significant aspects of the

10:35  4   company's day-to-day functions.  No way.  That's why on this

10:35  5   verdict form, we ask that you find in favor of Mr.

10:35  6   Heidelberger.  This isn't even close.

10:35  7          Now, you heard Mr. Kelly say, Oh, wait a minute, there

10:36  8   were those phone calls every ten days or so.  Three phone calls

10:36  9   a month?  Three phone calls a month suddenly takes the little

10:36  10  bit he was there and in a tsunami-like size sweep suddenly

10:36  11  makes Mr. Heidelberger have operational control of significant

10:36  12  aspects of the company day to day?  No way, no way, absolutely

10:36  13  not.  And so we ask that you find for Mr. Heidelberger.

10:36  14         There wasn't even that much testimony as to what Mr.

10:36  15  Heidelberger even told Mr. Leiva over the telephone.  Mr. Kelly

10:36  16  hardly went into that at all, but you could get a sense from

10:36  17  listening to Mr. Heidelberger and Mr. Leiva who was running

10:36  18  this thing day to day.  Mr. Heidelberger simply had a minority

10:36  19  ownership interest in the company and simply was curious as to

10:36  20  what was going on occasionally so he would call.  That does not

10:36  21  make that man liable under this statute.

10:36  22         And again going back to that first part of the

10:37  23  instruction on individual liability that I read using the

10:37  24  quote, significant ownership interest coupled with operational

10:37  25  control, unquote, that's in the jury instructions, Heidelberger

10:37  1   didn't have a significant ownership interest, not at

10:37  2   22-and-a-half percent.  And that was born true by the

10:37  3   testimony.  He couldn't get Ed Leiva to do anything.  He

10:37  4   couldn't.  He tried with the pricing control thing; and Ed

10:37  5   Leiva just said, Ah.  Ed Leiva didn't have to listen to him.

10:37  6   So there was no significant ownership interest.  The

10:37  7   significant ownership interest is missing.  He'd have to have a

10:37  8   majority of the ownership interest so he could tell this guy,

10:37  9   Look, I know you're CEO and whatever; but this is how you're

10:37  10  going to do it.  He couldn't do that.

10:37  11       And that's the same with Mr. M$^c$Carroll.  It's no

10:37  12  different for Mr. M$^c$Carroll, and that's why we ask that you

10:37  13  find in favor of him.  He didn't have any greater ownership

10:38  14  interest than what Mr. Heidelberger had.  He didn't have a

10:38  15  significant ownership interest.  And he also, by the way, was

10:38  16  not involved in running this company day to day.  He had

10:38  17  nothing to do -- you heard the day-to-day functions.  He helped

10:38  18  in sales somewhat.  There's no salesman here suing, Ladies and

10:38  19  Gentlemen.  There aren't any.  He would run some errands and do

10:38  20  some gofering for Ed Leiva.  You heard some of that.  He met

10:38  21  with a few customers and so forth and so on.  This isn't

10:38  22  day-to-day control.

10:38  23       Remember the testimony he was gone for six whole weeks

10:38  24  all in one shot?  Certainly no day-to-day control over that

10:38  25  period of time.  He was on a sailboat.  He couldn't call

10:38    1    anybody.  He couldn't communicate with the office in any way.

10:38    2    And when someone's there less than 40 percent or less of the

10:38    3    time, they're just not able to run a company day to day such

10:38    4    that they should be held liable for wage-and-hour violations if

10:38    5    there are any; and we will show in a minute that there really

10:39    6    are not.  There are none.

10:39    7         The other thing that should really make you wonder

10:39    8    about all of this with Heidelberger and M$^{c}$Carroll is if

10:39    9    Heidelberger and M$^{c}$Carroll are really so liable, if they really

10:39   10    did operate this thing day to day and whatever, why is it that

10:39   11    the plaintiffs and Mr. Aguirre lied in the affidavits?

10:39   12    Remember that?  I confronted them with it.  In.

10:39   13         Particular Mr. Aguirre where he -- he even lied and

10:39   14    said that Frank M$^{c}$Carroll had to make sure that, quote, I had

10:39   15    -- he says right in here, Along with Edward Leiva both Steve

10:39   16    Heidelberger and Francis M$^{c}$Carroll made sure I had enough

10:39   17    experience to work and to ensure I had the necessary skills for

10:39   18    the job.  He said that in his affidavit that his -- when his

10:39   19    lawyer had him sign that, to add M$^{c}$Carroll and Heidelberger to

10:39   20    the suit.

10:39   21         You heard the testimony.  You heard what he said in

10:39   22    his deposition.  Oh, I knew Ed Leiva.  He hired me up in New

10:39   23    York.  He cut the deal with me.  I went down there.  I thought

10:39   24    this was all going to be great.  Steve Heidelberger -- it's a

10:40   25    lie.  This is an affidavit that I confronted him with.  He

10:40  1   swore what was in here was true.  That's not true.  And it's

10:40  2   not just that.  It goes on and on.

10:40  3        He says that M$^c$Carroll and Heidelberger, quote, spent

10:40  4   significant time with myself and the other employees and

10:40  5   regularly gave us instructions and supervised our work,

10:40  6   unquote.  Another lie.  You know that's a lie.

10:40  7        Mr. Feliciano admitted that M$^c$Carroll and Heidelberger

10:40  8   don't even know how to hang a hurricane shutter, have no idea.

10:40  9   They couldn't tell them what to do every day.  They couldn't

10:40 10   tell them what to do at all.  They couldn't supervise them and

10:40 11   tell them and give them any sort of feedback as to how they

10:40 12   should perform their job, whether it was good or not, the

10:40 13   performance.

10:40 14        What is in here is just absolutely false testimony,

10:40 15   and you shouldn't believe anything these people are saying when

10:40 16   they're going to submit things that are false under oath.

10:41 17        And if you remember from Mr. Ibacache -- and we asked

10:41 18   Mr. Milan about this -- that they said that Heidelberger and

10:41 19   M$^c$Carroll, quote, regularly exercised control over us while we

10:41 20   performed our job for the defendants and they demonstrated

10:41 21   operational control on a regular basis, unquote.

10:41 22        I mean that's just very sad, very sad when a lawyer

10:41 23   gets his client to sign that under oath.  And from the witness

10:41 24   stand you heard it.  Operational control?  What's that?  And

10:41 25   regularly?  Regularly?  It wasn't regularly with either Steve

10:41  1   Heidelberger or Frank M^cCarroll that these plaintiffs even saw

10:41  2   those guys.

10:41  3          Then you also heard that -- the testimony time and

10:42  4   time again was just -- it was very clear Ed Leiva had

10:42  5   operational control.  He admits it.  It was his company to run.

10:42  6   That's how it was set up.  It was his job.

10:42  7          You heard Mr. Milan.  Oh, I wanted to go get this job.

10:42  8   The guys told me how great it was.  I went to go speak with Ed

10:42  9   Leiva because I knew he was in charge of the installers.

10:42  10  That's what they all said.  Remember that testimony?  He also

10:42  11  said that he never even spoke or saw Steve Heidelberger or

10:42  12  Frank M^cCarroll.  Remember that testimony?  Never saw them, but

10:42  13  these guys have day-to-day operational control?

10:42  14         So we ask you to find that Steve Heidelberger and

10:42  15  Frank M^cCarroll are in no way liable for anything that occurred

10:42  16  here.  We ask that you fill out that verdict form in their

10:42  17  favor.

10:42  18         Now, with respect to whether overtime hours were

10:42  19  worked --

10:42  20         **THE COURT:**  I think this would be a good place to take

10:42  21  a break, Mr. Kleppin --

10:42  22         **MR. KLEPPIN:**  Oh, the morning break?  Okay.  Sure.

10:43  23         **THE COURT:**  -- before you get into your --

10:43  24         **MR. KLEPPIN:**  That would be great.  Thank you.  Yes.

10:43  25         **THE COURT:**  Okay.  We'll take our morning recess at

10:43  1    this time, Members of the Jury.  We'll be in recess for 15

10:43  2    minutes.  When we come back, we'll hear the conclusion of the

10:43  3    argument on behalf of Mr. Kleppin's clients.  Thank you.

10:43  4         You may take the jury out.  And we're going to give

10:43  5    you the menus now so you can order your lunch.

10:43  6         **(Jury Out)**

10:43  7         **THE COURT:**  All right.  Court's in recess for 15

11:01  8    minutes.  You have 41 minutes left, Mr. Kleppin.

9           **MR. KLEPPIN:**  Thank you.  Thank you, Your Honor.

10          **(Recess)**

11          **THE LAW CLERK:**  All rise.

12          **THE COURT:**  Okay.  As soon as we get the menus, we can

13          continue.

14          **(Jury In)**

11:02  15        **THE COURT:**  Be seated, please.  Mr. Kleppin, you can

11:02  16   continue with your argument.

11:02  17        **MR. KLEPPIN:**  Thank you, Your Honor.  Before I turn to

11:02  18   the amount of hours worked, I just want to briefly talk about a

11:02  19   few points.  One is in general with violations of the Fair

11:03  20   Labor Standards Act.  In this particular case, there's

11:03  21   absolutely no motivation whatsoever for Mr. Heidelberger, Mr.

11:03  22   M\(^c\)Carroll, or Mr. Leiva to try to cheat these plaintiffs or the

11:03  23   other installers out of their overtime.

11:03  24        Number one, Mr. Leiva was earning about $500 a week.

11:03  25   He stopped cashing his checks early on and wasn't receiving any

APRIL 18, 2011

11:03  1  money from the company.  Why on earth is he going to be so into

11:03  2  cheating other people out of -- workers out of their pay?  You

11:03  3  heard how generous Mr. Leiva was to these guys.  That's one of

11:03  4  the reasons why he's so upset.  That's pretty clear.  He's

11:03  5  someone who pays for lodging, pays for meals, pays for

11:03  6  barbecues.

11:03  7       You even heard Ibacache and Aguirre say, Mr. Leiva is

11:03  8  very honest.  Whatever he says is the truth.  The guy is great.

11:03  9  They vouched for Mr. Leiva's honesty.

11:03  10       Mr. Heidelberger and M$^c$Carroll simply invested money

11:03  11  in the business.  They never got one penny back.  This isn't a

11:04  12  situation where after so many years of business the net of the

11:04  13  company is a hundred thousand dollars; and if we didn't pay

11:04  14  people overtime, we might increase the net to 200,000 and so

11:04  15  some conscious decision is made to cheat somebody.

11:04  16       You also heard that all of the hourly workers were

11:04  17  paid their overtime.  You heard the people in the shop and the

11:04  18  warehouse and whatnot.  Their time was kept by a punch clock.

11:04  19  They were paid their time-and-a-half.

11:04  20       Now, before we get to hours worked, what is so

11:04  21  important in this case -- it's not something you heard.  It's

11:04  22  not something you saw.  It's actually something you didn't see.

11:04  23  Why is it that the plaintiffs didn't put one person on the

11:04  24  stand, not one who doesn't have their own lawsuit or some

11:04  25  personal interest in this?  Why didn't they go get one worker

11:04  1    from the crew to testify, You know, that's right.  Yeah, we

11:04  2    were working overtime.  Oh, boy.  These were the hours we

11:04  3    worked, and we worked overtime; and it wasn't being properly

11:04  4    paid.

11:05  5          Why is it just these guys and Aguirre and Ibacache?

11:05  6    That's something you ought to be telling yourself.  And the

11:05  7    reason for that is no overtime was worked.  And that's why we

11:05  8    hear from Mr. Ibacache.  Remember, I asked him pointblank.  I

11:05  9    said, You told Mr. Leiva your attorney made all this up.  He

11:05  10   couldn't deny it.  If he didn't really say that, he would have

11:05  11   denied that in a minute.  You know what the inference is that

11:05  12   you can draw from Mr. Ibacache's failure to deny that?  That

11:05  13   that is, in fact, exactly what happened.  His attorney made up

11:05  14   this whole overtime thing.

11:05  15         You're going to be instructed -- and I'm quoting right

11:05  16   from the instructions.  You are not limited to what you see and

11:05  17   hear as the witnesses testify.  You are permitted to draw from

11:05  18   facts which you have -- which you find have been proved such

11:05  19   reasonable inferences as seem justified in the light of your

11:05  20   experience.  Inferences are deductions or conclusions which

11:05  21   reason and common sense lead you to draw from which have been

11:06  22   established by the evidence in this case.  That's the

11:06  23   instruction that you're going to get.

11:06  24         And it's very clear.  If someone didn't -- if Mr.

11:06  25   Ibacache didn't say that to Mr. Leiva, boy, he would have said

11:06  1   that from the stand in one minute.  He even has his own suit

11:06  2   going on.  And he can't deny that statement?  It's because the

11:06  3   statement was made.  Why would you ever tell Mr. Leiva that

11:06  4   your attorney told you to make it all up if your attorney

11:06  5   really didn't say that to you?  That's another reason why you

11:06  6   should find for the defendants straight out.

11:06  7        Now with respect to -- I just briefly want to hit on

11:06  8   the minimum wage claim, and then we're going to go to hours

11:06  9   worked.  Mr. Milan testified under oath he was paid for all of

11:06 10   the weeks that he worked.  He said he got his $700 salary for

11:06 11   all the weeks.  He doesn't have a minimum wage claim.  If he

11:06 12   doesn't have one, why would Mr. Feliciano have one then?  How

11:07 13   about Mr. Lares?  You heard him.  So you're going to have to

11:07 14   decide whether Mr. Leiva is a guy who stands by his word and

11:07 15   acknowledges his debts and pays them.

11:07 16        You heard Mr. Lares say right from that witness stand

11:07 17   that, My God, it took till November; but he was paid every

11:07 18   penny that he was owed for working in that company.  If Mr.

11:07 19   Leiva was some guy that wanted to shortchange employees or

11:07 20   cheat them, he wouldn't have paid Mr. Lares after the company

11:07 21   went under.  He would have walked away from the whole thing.

11:07 22        And you heard Mr. Feliciano when this case first

11:07 23   started, There was five weeks I wasn't paid for.  I want all

11:07 24   the money.  Remember that?  Now because I had to get up and

11:07 25   impeach him with what he said in his deposition that it was

| | | |
|---|---|---|
| 11:07 | 1 | just two weeks behind.  And you heard Mr. Leiva say, Huh-uh |
| 11:07 | 2 | (negative).  At one point it was two weeks behind; but before |
| 11:07 | 3 | this whole thing ended, I paid Mr. Feliciano everything he was |
| 11:07 | 4 | owed. |
| 11:07 | 5 | You're going to have to believe the circumstances of |
| 11:08 | 6 | this case are overwhelming; that Mr. Leiva is a guy that's |
| 11:08 | 7 | going to go out and pay people and take care of his debts, and |
| 11:08 | 8 | that's what he did here.  So there are no minimum wage claims |
| 11:08 | 9 | here at all.  There's nobody that worked and didn't get paid. |
| 11:08 | 10 | And did you see the testimony about September?  Mr. |
| 11:08 | 11 | Feliciano first said, Oh, I worked all the way to the end of |
| 11:08 | 12 | September.  So that's four weeks of full overtime and minimum |
| 11:08 | 13 | wage too because I didn't get paid anything.  Then you heard |
| 11:08 | 14 | really that his testimony in his deposition was, Well, we |
| 11:08 | 15 | worked close to September.  Yeah, meaning late August.  Sure. |
| 11:08 | 16 | It ended in late August.  You heard Mr. Leiva.  This whole |
| 11:08 | 17 | thing ended in August.  We didn't get to September.  Mr. Milan |
| 11:08 | 18 | tried to drag it down into September, and then he got caught |
| 11:08 | 19 | with Labor Day.  People don't work during Labor Day, Safe |
| 11:08 | 20 | Hurricane Shutters included. |
| 11:08 | 21 | But you have to look at this very critically because |
| 11:08 | 22 | Mr. Feliciano wanted you to award him money for the whole month |
| 11:08 | 23 | of September.  Now that's out.  But yet he wants you to believe |
| 11:09 | 24 | everything else that he had to say.  The same with Mr. Milan. |
| 11:09 | 25 | He worked deep into September.  Now all of a sudden they're |

11:09   1    retreating from that.

11:09   2          You see in closing now they want a lot less money.  We

11:09   3    better -- oh, we better pair this down.  Whatever happened to

11:09   4    this 66 hours a week, 7:00 a.m. to 6:00 p.m. six days a week?

11:09   5    Remember that?  What happened to that?  That's gone so fast.

11:09   6    Mr. Kelly won't go anywhere near it, will he?

11:09   7          Then you have to ask yourself what really is the truth

11:09   8    because I'm going to go through it in a minute.  We're going to

11:09   9    spend the rest of our time on the hours worked.  And let me

11:09   10   tell you it's hideous for the plaintiffs how this comes out.

11:09   11   It's outrageous.  In fact, it shows that the attorney probably

11:09   12   just made this up.  That's what we're looking at here.

11:09   13         There's a very simple way -- and I'm going to go into

11:09   14   the testimony in detail.  You will see the questions that I

11:09   15   asked.  There's a reason and there's a method to what I asked,

11:09   16   and I will go through it all with you now so you understand it;

11:10   17   but this overtime claim can be junked and debunked in a minute,

11:10   18   in a minute.  And here's how:

11:10   19         And to begin with, it's amazing that in the closing

11:10   20   argument of this case, we first hear the plaintiff saying, Oh,

11:10   21   these holiday weeks, gee, we better not seek overtime in those.

11:10   22   And the ones that we heard were away on vacation only got paid

11:10   23   our salary anyway.  You know what?  You don't have to award us

11:10   24   those.  Why wasn't this done from the very beginning of the

11:10   25   suit?  Why wasn't there an honest attempt to set forth what

11:10  1   actual weeks overtime was worked.  Because you're going to be

11:10  2   instructed the plaintiff has to prove it week by week.  This

11:10  3   isn't just, Let's get up here and make it look like we worked a

11:10  4   lot of hours and hopefully the jury will give us some money.

11:10  5         You're going to be instructed that, quote, under the

11:10  6   law all workweeks stand alone.  That means that it is necessary

11:10  7   for you to determine the hours worked by the plaintiffs on a

11:10  8   week-by-week basis in determining whether they worked more than

11:11  9   40 hours in any single workweek.  The law does not permit

11:11  10  averaging of the workweek -- of the hours worked among

11:11  11  workweeks.  You cannot reduce them.  So it's got to be by the

11:11  12  week.

11:11  13        They could have done this from the beginning, sat down

11:11  14  honestly and said, Look, we're not going to seek it for Labor

11:11  15  Day.  We're not going to seek it for Thanksgiving.  We're not

11:11  16  going to seek it for Christmas.  We're not going to seek it

11:11  17  when we went to see our families and so forth and so on and you

11:11  18  would have more of an honest explanation of what hours were

11:11  19  really worked.

11:11  20        Also we're going to get into the fact that there's no

11:11  21  time records.  But remember the logs?  They could have gone to

11:11  22  those condominiums.  Mario Feliciano was at those condos for

11:11  23  many, many, many months.  They all have a log what time he

11:11  24  came, what time he left.  No attempt to go get those logs to

11:11  25  prove, Hey, look, these are the real hours I was working.

11:11  1   Those logs would show they left all the time real early in the

11:12  2   day when it was raining or when it was windy and when there

11:12  3   were other weather conditions, and that's what those records

11:12  4   will show.  That's why they're not here.

11:12  5        Remember Mr. Ibacache?  He was asked, So how are you

11:12  6   going to prove how many hours you worked a week?  Answer,

11:12  7   Possibly going to the homes or the buildings that we worked on.

11:12  8   Yeah, he knew about the logs.  He knew about them.  He didn't

11:12  9   go get them either.  He doesn't have them.

11:12 10        Here's how the overtime very quickly can be shown to

11:12 11   be a gross overestimation.  And I'm going to start with what

11:12 12   time they got there in the morning.  You heard Mr. Ibacache say

11:12 13   and both plaintiffs, We got there at 7:00 a.m., 7:00 a.m.  Do

11:12 14   you believe that?  Do you believe that for a minute?  You

11:12 15   shouldn't.

11:12 16        Here's why:  Several reasons why.  Remember what Mr.

11:12 17   Bungo said?  Yeah, Mr. Bungo said -- Mr. Kelly's blown that out

11:12 18   of proportion.  Mr. Bungo said, No, there's days when at 7:45

11:13 19   when I got there there were some installers waiting outside.  I

11:13 20   saw that happen.

11:13 21        Now, he didn't say every installer was there by 7:45.

11:13 22   He didn't say the plaintiffs were there every day at 7:45.  He

11:13 23   didn't say the plaintiffs were there more often than not at

11:13 24   7:45.  That's all he said, was, you know, there were some

11:13 25   mornings at 7:45 there was some installers standing out there.

11:13  1    I saw them.

11:13  2         Remember Mr. Ibacache who claims he had the key to the

11:13  3    business that Mr. Leiva disputes?  If Mr. Ibacache had a key to

11:13  4    the business and if Mr. Ibacache got there at 7:00 every

11:13  5    morning and these guys got there at 7:00 every morning, no one

11:13  6    would have be waiting outside still at 7:45.  They would have

11:13  7    been in the business.  They would have been doing whatever they

11:13  8    wanted to do, whether it be drinking coffee or frankly whether

11:13  9    it be working, loading the truck or preparing some work for the

11:13 10    day.  Whichever it would have been, it wouldn't have been

11:13 11    standing out in the parking lot.  When you have a key to the

11:13 12    shop, you don't stand out in the parking lot.  You're standing

11:13 13    there in the parking lot waiting for someone to open up with a

11:14 14    key.

11:14 15         And if you got there earlier than the shop opens,

11:14 16    that's not work time.  You don't get compensated for that.  If

11:14 17    the shop doesn't open till 7:45 or 8:00 or whatever time, you

11:14 18    can't just show up at 5:00 in the morning and say, Oh, well,

11:14 19    hey, this is three hours of work time.  I'm owed this every

11:14 20    day.  No, I don't think so.  Because you're going to be

11:14 21    instructed under the FLSA only work goes into these -- the

11:14 22    compensable time goes into how many hours of overtime are

11:14 23    worked in a week.

11:14 24         And that definition is -- I have it right here.  Work

11:14 25    -- I'm quoting.  Work is defined by the Fair Labor Standards

11:14  1   Act as physical or mental exertion, whether burdensome or not,

11:14  2   controlled or required by the employer and pursued necessarily

11:14  3   and primarily for the benefit of the employer and his business.

11:14  4        It's not work time to be standing out there waiting

11:15  5   for the shop to be open.  It's work time when you're really

11:15  6   doing something to help the company.  When you're on a coffee

11:15  7   break, it's not work time unless it's in the middle of some

11:15  8   shift and someone wants to take 15 minutes or whatever as a

11:15  9   break, yes.  That still counts as work time.

11:15  10       But you heard in this case coffee in the morning.  You

11:15  11  heard the breakfast business where every day at least for the

11:15  12  weeks Mr. Lares was with this crew they stopped at the

11:15  13  Brazilian bakery.  There's been no facts to suggest that it was

11:15  14  different any other week.

11:15  15       Also you heard about the lunchtime, and you heard that

11:15  16  they tried -- Mr. Ibacache clearly tried to keep that lie going

11:15  17  in his deposition, but it came out because he denied if he ever

11:15  18  ate lunch when he was asked it straight up in his deposition;

11:15  19  but then as he was going through the hours he worked each day,

11:15  20  it came out, oops, and then we took -- then we would take our

11:15  21  half an hour for lunch.

11:15  22       And you heard Mr. Feliciano not include the half an

11:15  23  hour for lunch in his work time.  And there's a reason for that

11:15  24  'cause you're going to be -- remember you heard this, Oh, we

11:16  25  would just take a bunch of breaks all during the day.  They

11:16  1    were just five minutes and that was it.  That just isn't --

11:16  2    that's not what occurred.  You heard the other witnesses say,

11:16  3    Oh, no.  Those breaks were being taken.  And you heard Ibacache

11:16  4    who was on their crew say they took lunch when they had to

11:16  5    because they were impeached with their former testimony.

11:16  6          It's important because these very small little rest

11:16  7    periods count as compensable time; but when you take more than

11:16  8    20 minutes -- if you take longer than a 20-minute break, it's

11:16  9    not compensable.  If you take a lunch break that's typically a

11:16  10   half an hour at least -- but actually it can be less than that

11:16  11   -- it's compensable.

11:16  12         Here's how you're going to be instructed:  Rest

11:16  13   periods of 5 to 20 minutes must be counted as hours worked for

11:16  14   purposes of determining whether overtime was worked.  Bona fide

11:16  15   meal periods are not work time.  Ordinarily 30 minutes or more

11:16  16   is long enough for a bona fide meal period.  And it goes on to

11:16  17   say it can be shorter under certain circumstances, but I don't

11:17  18   think those -- those really aren't applicable here because it

11:17  19   was a half an hour.

11:17  20         You heard Mr. Lares say it.  You heard Mr. Ibacache

11:17  21   say it.  They're denying it.  Why?  Why is it?  Because they

11:17  22   want a lot of money.  They want it to be 66 hours.  They don't

11:17  23   want less.  They want a lot of doe.

11:17  24         Let's go through these hours.  You heard a bunch of

11:17  25   witnesses say, you know, 8:00/8:30/9:00, whatever.  These guys

11:17  1    would really start working by then.  A bunch of people said it.

11:17  2    You heard the plaintiff say 7:00 a.m., 7:00 a.m. sharp, 7:00 to

11:17  3    7:15.  You heard Mr. Ibacache say, Well, I never got there

11:17  4    until Reinaldo Lamonica got there.  Every single day I got

11:17  5    there he was already there.  You heard a couple of weeks of his

11:17  6    time records.  They went anywhere from 7:34 to 8:22.

11:17  7           But, anyway, let's take a -- let's use what Mr. Bungo

11:17  8    said or very close thereto.  Let's say these guys really

11:17  9    started at 8:00.  That's very close to what Bungo said, and

11:18 10    it's just an extra 15 minutes because some of the other people

11:18 11    said they started later.  Let's use 8:00.  If they worked six

11:18 12    days a week, that right there knocks six hours off.  We're

11:18 13    already at 60.  We're already at 60 right then and there.

11:18 14           Now, you also heard about the coffee break.  Remember

11:18 15    that in the morning?  Also if they're just there at the shop

11:18 16    and they're not working, it doesn't count as work time.

11:18 17    There's been no testimony that they were ordered to report at

11:18 18    this time and ordered to do this and that and that and this.

11:18 19    If you want to come in at 8:00 o'clock and not really get

11:18 20    started till 8:30 or 9:00 o'clock, you can't sue for overtime

11:18 21    and calculate your damages under the theory that you got there

11:18 22    and were working at 8:00 o'clock.

11:18 23           These damages should have been -- and they know

11:18 24    better.  The start should have been around 8:30 or 9:00, but

11:18 25    let's leave it at 8:00.  That gets us to 60 right there.  Then

JURY TRIAL - VOLUME VI OF VI

11:18  1    I want to go to when the day ended.  Bungo, 3:00 to 5:00

11:19  2    o'clock.  The average of that is 4:00 o'clock.  You heard a

11:19  3    bunch of other witnesses say 3:30/4:00 it would end.  You heard

11:19  4    the plaintiffs, Oh, 7:00.

11:19  5         Now, you heard Mr. Milan impeached.  He admitted in

11:19  6    his deposition most days it was 4:00 p.m. occasionally to 5:00

11:19  7    p.m.  So you also heard him say he worked till 7:00.  But

11:19  8    because the damages have been calculated as if they stopped

11:19  9    working at 6:00, I want to use that measure because that's what

11:19  10   I know Mr. Milan said.  He never spoke to anyone about his

11:19  11   hours worked or what he's owed which is clear he didn't speak

11:19  12   to his lawyer about it and the lawyer is making this up.

11:19  13   However, let's just go with the 6:00 o'clock finish time.

11:19  14        If you move that to 4:00 o'clock because that is what

11:19  15   Bungo, a disinterested witness, has said.  Lares I believe was

11:19  16   3:30 to 4:00.  And Milan by his own deposition testimony

11:19  17   admitted it.  That shaves off two hours a day.  On a six-hour

11:19  18   -- a six-day-a-week, that's 12 hours right there.  That's 12

11:19  19   hours gone.  Now we're at 18 hours off the 66.  We're at 48,

11:20  20   aren't we?

11:20  21        Well, the lunch and the breakfast breaks, you heard

11:20  22   Mr. Lares say, We were completely relieved of duty.  They were

11:20  23   half an hour at least each on average.  That's an hour a day.

11:20  24   That's another six hours.  And now we're down to 42, aren't we?

11:20  25   We got to 42 real quick.  Remember the situation about the

APRIL 18, 2011

11:20  1    Saturday work?  It's very clear that Mr. Feliciano did not work

11:20  2    every Saturday.  He only worked some Saturdays.  If you take

11:20  3    out Saturday, boom, 11 hours gone just like that.  We're way,

11:20  4    way under 40.  We're way under 40.

11:20  5          Also everyone other than the two plaintiffs said, Oh,

11:20  6    yeah, Saturday, Saturdays we would stop.  It was just a half

11:20  7    day.  If Saturday's a half day, you take off seven hours, boom.

11:20  8    You're still -- just like that, you're under 40.  But it's like

11:20  9    -- it's more.  It doesn't stop there.

11:20  10         And you may want to -- you may wonder why I asked

11:20  11   these questions about who was on the crew and who drove the

11:21  12   truck and these sorts of things and why that's a big deal.

11:21  13   Because they tried to lie about that.  Remember Mr. Milan in

11:21  14   his deposition, Chris Jerico drove the truck.  But here Mr.

11:21  15   Feliciano's saying, I drove the truck.  Ibacache admitted

11:21  16   Feliciano didn't always drive the truck.

11:21  17         Here's why driving the truck is important:  Commute

11:21  18   time does not count as overtime hours worked.  It's not work.

11:21  19   People don't clock in at their home and then when they get to

11:21  20   the office, the drive to the office counts as commute time.

11:21  21   Same with workers in a truck.  The workers had a choice.  If

11:21  22   you want to come to the office, fine.  You can hop on the truck

11:21  23   and we'll provide, you know, free transportation to the work

11:21  24   site.  If you want to go to the work site on your own using

11:21  25   your own transportation, you're free to do that too.  In that

11:21  1    situation the commute time isn't compensable.

11:21  2         We heard if you stop at 4:00 o'clock -- you heard the

11:21  3    plaintiffs themselves, Oh, the last whole six months we were

11:22  4    there we were working up in Palm Beach.  That's an hour or

11:22  5    hour-and-a-half commute.  Well now you're stopping working at

11:22  6    3:00, maybe earlier if you're arriving back at 4:00.  That

11:22  7    hour, hour-and-a-half a day which is somewhere in the

11:22  8    neighborhood of six to eight hours a week is further time

11:22  9    that's not compensable.  We're so far under 40 it's not funny.

11:22  10        And here's what's so important:  Remember this

11:22  11   business about loading the truck, why that's important?  The

11:22  12   law is if when you drive back to the office if the employer

11:22  13   makes you work, if the employer says, You're going to unload

11:22  14   the truck or you're going to clean the truck or you're going to

11:22  15   do this, that, or the other thing, then that commute, that ride

11:22  16   back to the office counts as hours worked.  It's work time.  So

11:22  17   is the work you're doing in the shop.  That's why those facts

11:22  18   were so important.

11:22  19        You must have been wondering why is he asking all

11:22  20   these questions about who was unloading the truck and when that

11:22  21   occurred.  That's why.  That's why.  This thing ain't anywhere

11:22  22   near 40, folks.  It's nowhere near it.

11:23  23        And you heard.  It wasn't that difficult in

11:23  24   cross-examination to absolutely pierce this thing right through

11:23  25   the gut because what do you do when you install hurricane

11:23   1    shutters?  Well, you drive a truck with hurricane shutters in

11:23   2    the back, and you put them up on the house or the condo; and

11:23   3    then you go back to the office.  There isn't going to be

11:23   4    anything to unload.  Remember the whole thing where -- it

11:23   5    reminded me of It's a Mad Mad Mad Mad World where Phil Silvers

11:23   6    -- they found the money and they're counting it all up at the

11:23   7    end, and he counts himself first.  One is he's going to count

11:23   8    the shares and then goes back to himself and counts himself

11:23   9    again 14.  And, of course, the others figured out in a minute

11:23   10   that he double counted.

11:23   11         And that's exactly what we have here with the

11:23   12   unloading -- with the loading the trucks.  We loaded the trucks

11:23   13   in the morning, and then we went out to the job site.  We

11:23   14   worked all day.  We didn't take any lunch.  Whether it was

11:23   15   raining, lighting, snow, thunder, hail, tornado, hurricane,

11:23   16   earthquake, you name it, we worked and worked and worked and

11:23   17   never ever ever stopped until we got back at 6:00 p.m. and then

11:24   18   we loaded the truck for the next day.  Oops, oops.

11:24   19         Wait a minute.  Let's go through that again.  You

11:24   20   didn't load the truck for the next day if you loaded the truck

11:24   21   in the morning.  You can load the truck in the morning or the

11:24   22   evening, not at both times.  Sorry.  That doesn't work.

11:24   23         And the reason that they're doing that is because they

11:24   24   want to include all the time, all the time from when they left

11:24   25   Boynton or West Palm Beach or Points of America until they get

11:24  1  back to the shop and then make it look like they're working,

11:24  2  doing all these things, so this is all continuous work time so

11:24  3  they can manufacture an overtime claim when one doesn't exist.

11:24  4  That's what all this is about.  That's what all this is about.

11:24  5       And I want to talk about the time records for a minute

11:24  6  because there is an instruction on time records, and I want to

11:24  7  go through that with you.  And, by the way, I don't even have

11:25  8  to get to the morning.

11:25  9       In the morning whether they were working or not, Keith

11:25 10  Lares made it sound as if some mornings before they got on the

11:25 11  truck they would load certain things on the truck and there was

11:25 12  work involved.  And when they were -- I'm sure some of the time

11:25 13  in the morning they worked and the commute time out to the job

11:25 14  is probably compensable.  Other days it probably is not because

11:25 15  you heard Mr. Lares say that there were some times the

11:25 16  warehouse people would load the truck.  They didn't have to

11:25 17  work every morning.

11:25 18       But, again, the plaintiffs made no attempt, no attempt

11:25 19  to factor any of this into their damages calculation.  See, if

11:25 20  they really went through what the truth was as to what occurred

11:25 21  there, there wouldn't be any damages calculations.  That's

11:25 22  because there's no overtime owed.  That's what happened here.

11:25 23       Let's get to the time records.  It's very important.

11:25 24  The time records don't say -- they do not say if the defendant

11:25 25  didn't keep records, the plaintiff wins.  Here's what they say:

11:26  1   Where the employer's records of time are inaccurate or

11:26  2   completely missing and the employee cannot offer convincing

11:26  3   substitutes.

11:26  4       Here the employee could offer convincing substitutes.

11:26  5   Remember the logs, they knew about it.  They could have gone

11:26  6   and gotten those logs and said, Here's what we worked.  Here's

11:26  7   what we worked.  Boy, we've got to prove our overtime.  So I

11:26  8   don't think you should apply the shifting burdens.  We ask you

11:26  9   to stop right there and find that they didn't prove their claim

11:26 10   because they didn't bring those logs here.

11:26 11       But let's get beyond that a minute.  Let's just look

11:26 12   beyond that for a second, and we'll continue with the

11:26 13   instruction.  If they cannot offer convincing substitutes,

11:26 14   again which they could have here, the employee has carried out

11:26 15   his burden if he proves that he has, in fact, performed work

11:26 16   for which he has been improperly compensated and if he produces

11:26 17   sufficient evidence to show the amount and extent of that work

11:27 18   as a matter of just and reasonable inference.

11:27 19       That's what the plaintiffs have to prove.  It doesn't

11:27 20   say anything about the defendants doing anything.  They've got

11:27 21   to prove that.  They haven't.  You don't prove that when you

11:27 22   don't put anybody up on the stand who isn't -- who doesn't have

11:27 23   a bias or an interest in this thing.  You don't prove that when

11:27 24   you go get the logs.  You don't prove that when you grossly

11:27 25   overexaggerate what your hours worked are to get tens of

11:27 1    thousands of dollars.  I mean these guys were paid -- one guy

11:27 2    50 grand a year, the other guy 35 grand a year.  One guy even

11:27 3    said, I'd still be there today.  It was great money.  This

11:27 4    thing was fabulous, this job.

11:27 5         Now, we ask that you find that the plaintiff has not

11:27 6    carried that burden.  They just simply have not.  There hasn't

11:27 7    been one workweek where they honestly have been able to set

11:27 8    forth how they worked overtime.  Now, if you find that they

11:27 9    have -- and we ask that you not -- but if you find that they

11:28 10   have, the instruction goes on to state, quote, The burden then

11:28 11   shifts to the employer to come forward with evidence of the

11:28 12   precise amount of work performed or -- it's in the disjunctive

11:28 13   -- or with evidence to negate the reasonableness of the

11:28 14   inference to be drawn from the employee's evidence.

11:28 15        Then and only then if the employer can't do that --

11:28 16   and we can.  We have.  We've negated any inference that may

11:28 17   have arose, and we don't think any inference has arisen that

11:28 18   overtime was worked in any specific workweek.  Even if it has,

11:28 19   we've negated it.

11:28 20        We've negated it by the examination questions that

11:28 21   you've heard and the evidence that was presented, by the fact

11:28 22   that lunch hours were taken, that breakfast was taken.  They

11:28 23   stopped working way earlier than what they're saying, way

11:28 24   earlier.  The commute time isn't compensable.  They didn't work

11:29 25   a full Saturday.  They're eating barbecue.  Imagine this.

11:29   1    They're eating barbecue and drinking beer.  They were paid a

11:29   2    thousand dollars a week to work there.  Mr. Leiva paid for the

11:29   3    meat and the beer.  And these guys want you to now pay them

11:29   4    overtime while they were doing that.  It's amazing, isn't it?

11:29   5    It's amazing.

11:29   6            You're the conscious of our community.  Are you going

11:29   7    to for one minute, for one minute entertain this?  The

11:29   8    instruction goes on to say if the employer -- and that's why

11:29   9    Mr. Leiva's upset.  Mr. Leiva's clearly upset.  I've sat next

11:29   10   to him the whole trial.  He's not happy.  He's not happy.  It's

11:29   11   clear he wishes the business was successful.  He blames himself

11:29   12   for that.  Sometimes it's not easy to forgive yourself.  The

11:29   13   other thing that he's upset about is when he sees people come

11:30   14   in and want something for nothing, something they're not

11:30   15   entitled to.  It's clear that's very troubling to him.

11:30   16           If the employer fails to produce such evidence, the

11:30   17   employee may then -- may then be awarded damages even though

11:30   18   the result be only approximate.  That's the rest of the

11:30   19   instruction.  It ends there.  They may be awarded.

11:30   20           We ask that you do not award them.  They have -- they

11:30   21   are in no way entitled to some approximation for overtime

11:30   22   hours, not when they've greatly overexaggerated them to the

11:30   23   extent that they have, not when in their depositions they can't

11:30   24   even guess what hours that they worked.  They can't --

11:30   25           Mr. Milan was classic.  A very simple syllogism, not

11:30   1   that complicated.  You have no idea for any work what hours you
11:30   2   worked, do you?  No, none.  You can't -- You'd be guessing?
11:30   3   Yes, I'd be guessing.  Then if you remember from the trial, he
11:31   4   went even further.  He said, I can't even guess if you remember
11:31   5   that.  He said that.  The rest of it is, But my attorney knows.
11:31   6   Oh, my attorney knows.  Goodness, my attorney has all that
11:31   7   information.  Remember that?  Yeah.  Uh-huh (affirmative).
11:31   8   Yeah.  The attorney has all the information all right.

11:31   9       So that's why with under the record-keeping thing, it
11:31  10   doesn't help the plaintiff here.  It's not a situation where
11:31  11   there's solid evidence on the side of the plaintiffs from
11:31  12   unimpeachable witnesses that can say, Hey, you know what, an
11:31  13   average this is what these people were working.

11:31  14       Remember what Brad Bungo said?  Brad Bungo said very
11:31  15   clearly, Yeah, this was like a 35- to 40-hour-a-week job.
11:31  16   Yeah, yeah.  It's not overtime.  Keith Lares said the same
11:31  17   thing.  Ah, yeah, the installers, no, they weren't working
11:31  18   overtime.

11:31  19       The whole schedule was designed by Mr. Leiva so that
11:31  20   the installers wouldn't work overtime.  That's why they didn't.
11:31  21   The whole thing set up from the beginning.  Mr. Leiva said that
11:31  22   very clearly.  They didn't work overtime.  That's why they
11:31  23   didn't need to get involved in paying them overtime.  They
11:32  24   compensated them properly under the law by doing what it is
11:32  25   that they did here.

APRIL 18, 2011

11:32  1          The other thing that's so important is the lies that

11:32  2    you heard about whether Mr. Milan was on Mr. Feliciano's crew.

11:32  3    Do you remember that?  There's all this arguing about who was

11:32  4    on whose crew.  And that's critical because Mr. Milan in his

11:32  5    deposition -- they were dead from that deposition because Milan

11:32  6    said, I was on Feliciano's crew, the guy that was deposed just

11:32  7    before me; and Chris Jerico was the driver, not Mr. Feliciano.

11:32  8    That's why they had to get him off of Mr. Feliciano's crew.

11:32  9          The other thing is if someone's really going to work

11:32 10    hours approaching 66 in a workweek and they really think that

11:32 11    they're not getting paid properly, what they'll do is they will

11:33 12    keep a log of that if they really have to keep the job because

11:33 13    they really, really just can't afford to be without a job.

11:33 14    It's the best they can get.  They'll still keep a log so they

11:33 15    can come in later and say, Hey, here's the hours that I've

11:33 16    really been working and I don't think I'm being paid properly.

11:33 17    The plaintiffs didn't do that here.  The fact that there's no

11:33 18    time records does not give the plaintiffs license to seek money

11:33 19    that they're not entitled to.  It does not give them that

11:33 20    license.

11:33 21          You heard about Marine Tower and Points of America.

11:33 22    You heard that the hours were limited as to what they could

11:33 23    work.  You also heard that on Saturdays Marine Tower was shut

11:33 24    down.  There's no work on Saturdays.  Again if they were going

11:33 25    to be honest about their damages calculations, those months --

11:34   1    and it was three or four months.  You heard Mr. Feliciano say,

11:34   2    Oh, it was just two one to two; but you heard Mr. Leiva say

11:34   3    that was a three- or four-month project.  All those Saturdays

11:34   4    would have been deleted from the damages calculations.  Mr.

11:34   5    Kelly shouldn't be up here giving you a damages calculation

11:34   6    that's the same for every week.  The damages calculation should

11:34   7    take into account fairly and honestly the realities of this

11:34   8    workplace which was that Mr. Feliciano didn't work Saturdays

11:34   9    for a fourth, somewhere between a third and a fourth of his

11:34   10   time there.

11:34   11         How did Feliciano get the job in the first place?

11:34   12   Remember that?  Oh, My God, everyone was telling me this job's

11:34   13   great.  It pays great.  It's easy.  I'm there.  If people were

11:34   14   being forced to work 66 hours a week in violation of the Fair

11:34   15   Labor Standards Act, people wouldn't have been telling that to

11:34   16   Mr. Feliciano and Mr. Feliciano would have never gotten the job

11:34   17   there.

11:34   18         How about this?  They even have in their damages

11:34   19   calculations that they were working after dark even when they

11:35   20   both said, Oh, no, no.  We never ever ever worked after dark.

11:35   21   Believe it or not, if you take what they were saying

11:35   22   damageswise, oh, 6:30/7:00 p.m., even 6:00 p.m., you're into

11:35   23   darkness for a significant period of the time.  That's just

11:35   24   another fact that goes to show that they're not truthful.

11:35   25         Mr. Milan said -- he admitted there was no work when

11:35  1   the ground was wet.  He didn't -- when I asked him that, I had

11:35  2   to show him his testimony where he had said, We would stop

11:35  3   working at 2:00/3:00 o'clock.  The ground was wet, and we'd

11:35  4   leave and go -- and leave for the day.

11:35  5        The other thing I want to talk to you about is the

11:35  6   salary for the -- by the week rather than salary for the first

11:36  7   40 hours.  Do you even remotely believe that?  The letters say

11:36  8   the salary whether it was 800, 900, a thousand, it was to

11:36  9   compensate per week.  But here you have them, Oh, no, it was

11:36  10  just for the first 40 hours; and everything under that -- after

11:36  11  that was uncompensated.  That's just to get the maximum amount

11:36  12  that they can get when that really isn't true.

11:36  13       You heard Mr. Ibacache say -- were there some weeks

11:36  14  that you didn't work overtime?  He said, Yes.  Yeah, there

11:36  15  were.  Why didn't they take that into account?  Why didn't they

11:36  16  just admit, Yes, there's some weeks where we didn't work

11:36  17  overtime.

11:36  18       The reason they couldn't do that is because once you

11:36  19  admit, if you're the plaintiffs in this case, that there's one

11:36  20  week in which they did not work overtime, you can no longer

11:36  21  take the position that the salary was designed to compensate

11:36  22  for the first 40 hours worked and nothing thereon.  It can't

11:36  23  compensate for the first 40 hours worked unless if you work

11:36  24  less than 40 hours, you're then deducted money.  Like if

11:36  25  there's a week you work 30 or 32 hours, you don't get that

11:37   1   salary then because that's only designed to compensate for the

11:37   2   first 40 worked.

11:37   3          You're going to hear about de minimus time that the

11:37   4   employee -- it's only when the employee's required to give up a

11:37   5   substantial measure of his time and effort that compensable

11:37   6   working time is involved.  De minimus time applies where there

11:37   7   are uncertain and indefinite periods of time involved of a few

11:37   8   seconds or minutes in duration and where the failure to count

11:37   9   such time is due to the considerations justified by industrial

11:37  10   realities.  Periods of up to 10 minutes can be considered de

11:37  11   minimus.  Some of this time around the shop can be considered

11:37  12   de minimus.  It's not compensable.

11:37  13          Stand by and waiting time, you're going to be

11:37  14   instructed on that.  It's one thing if the employer says,

11:37  15   You're going to be here at a certain hour.  You're going to

11:37  16   wait right here until we tell you something to do and the

11:38  17   employer doesn't give you anything to do for a period of time.

11:38  18   That's compensable.  That's standby time.

11:38  19          But if you just decide to come at a certain time and

11:38  20   hang out, talk with the guys, hang out and have coffee hour,

11:38  21   you can't later say, Oh, well, we were getting here at "X"

11:38  22   amount of time in the morning and so we should get overtime for

11:38  23   all this uncompensated time.  It doesn't work that way, and

11:38  24   you're not going to be instructed that way.

11:38  25          So in sum what we ask you to do -- oh, and then

11:38  1    finally with respect to damages, you're going to be instructed

11:38  2    very specifically -- and again we ask that you not get to

11:38  3    damages.  We ask that you find for the defendants; that you do

11:38  4    not award the plaintiffs a penny.  They haven't proven it.

11:38  5    They haven't earned it.  They're not owed it.  It's an outrage.

11:38  6         But if you do, you're going to be instructed, quote,

11:38  7    in fixing an award of damages, if any, you must use sound

11:38  8    discretion drawing reasonable inferences from the facts in

11:38  9    evidence.  You may not award damages based on sympathy,

11:39 10    speculation, or guesswork.  And we leave it to you that that's

11:39 11    all we -- that that's all you have to do with respect to

11:39 12    damages is to guess as to them at this point.

11:39 13         **THE COURT:**  You have five minutes.

11:39 14         **MR. KLEPPIN:**  Thank you, Your Honor.  The other thing

11:39 15    I just want to leave you with is again we ask that you find for

11:39 16    the defendants.  You've heard all of this evidence.  You've sat

11:39 17    here for a week.  The plaintiffs haven't proven their case.

11:39 18         There's a series of interrogatories that we served on

11:39 19    the plaintiffs, and I think you remember them.  I asked some of

11:39 20    the witnesses about the interrogatory.  It was read into

11:39 21    evidence and so forth, and an answer was given where the

11:39 22    attorney will assist the plaintiff in giving the response.

11:40 23         And one was very simple.  Remember it?  It was

11:40 24    described in detail, Each act or omission on the part of the

11:40 25    defendants or any of its employees that you contend constituted

11:40  1   a violation of the Fair Labor Standards Act and then list all

11:40  2   the facts associated therewith and that kind of thing; explain

11:40  3   them.  Remember how they didn't list the minimum wage claim

11:40  4   there?  If they had a minimum wage claim, it would be right

11:40  5   there.  Say, well, for the last how many weeks of my work or

11:40  6   whatever I wasn't paid.  I wasn't paid, so I want that money.

11:40  7   It wasn't there.

11:40  8          The other thing, remember when we read in the one on

11:40  9   damages?  It was very lengthy.  I'm not going to read in the

11:40  10  whole thing again, but we basically asked them -- I'll

11:40  11  paraphrase -- Could you please tell us what your damages are in

11:40  12  this case.  And do you remember for Mr. Milan -- do you

11:40  13  remember the attorney had him listed as an hourly worker.  It

11:40  14  was $17 an hour.  Do you remember?  I don't know if you caught

11:40  15  that or if you remember that, but that is the answer to the

11:40  16  interrogatory.

11:40  17         It goes to show you -- it's very clear that Mr. Milan

11:40  18  never even spoke to the attorney about what his damages were.

11:41  19  This is just all made up.  And these things are costly to

11:41  20  defend.  And maybe the defendant spelled principal p-l-e rather

11:41  21  than p-a-l.  But, you know, the defendants in this case

11:41  22  decided, We're not liable for this individually or otherwise.

11:41  23  We don't think the company is either.  And this whole thing is

11:41  24  outrageous that they're working all these crazy hours when they

11:41  25  really weren't and we had the schedule the way we had it and

11:41  1    whatnot.  And so, therefore, this is something that we're going

11:41  2    to fight and see that justice is done here.  And that's what we

11:41  3    ask that you do.

11:41  4              We ask that as the conscious of our community that you

11:41  5    find that the defendants should prevail in this case and that

11:41  6    the plaintiff should not.  I thank you very much.

11:41  7              **THE COURT:**  Thank you, sir.

11:41  8              Mr. Leiva, you may proceed with your closing argument.

11:41  9              **MR. LEIVA:**  Sure.  Thank you, Your Honor.

11:42  10             Good afternoon.  I gave earlier the time.  I would

11:42  11   like to say thank you for being here, for listening to all the

11:42  12   evidence and also for the Honorable Judge, for his patience

11:42  13   with me.

11:42  14             I would like to say that -- first of all, I take

11:42  15   personal offense to -- when I was in New York, I had a business

11:42  16   about ten years ago that I pay overtime which I did.  And then

11:42  17   he's trying to say that I came to Florida with the intention of

11:42  18   doing some shady business.  I'm not a lawyer, so I don't do

11:42  19   those kind of things.  But to steal from these people, their

11:42  20   work and their labor and things of that nature I think is

11:42  21   offensive to me and that's uncalled for.

11:43  22             With respect to the office we did have overtime.

11:43  23   Payroll books.  I've got overtime cards, payroll books.  See,

11:43  24   they never bothered with that, with nothing.  The Lamonicas

11:43  25   there with all the overtime pay.  And as you shall notice when

11:43  1    I was on the stand, they didn't ask me any question really.  It

11:43  2    was on the shoulders of all of them.  I think I was even less

11:43  3    than Mr. Milan there even though I would say I was the most

11:43  4    important player.  I was the most important person.  I was the

11:43  5    president of the company.  I run the business.  And I really

11:43  6    made all the decisions from the very beginning from getting the

11:43  7    warehouse, from getting the furniture to the office, from

11:43  8    getting the telephone system.  Everything was in my hands.

11:44  9         But they implicated these two individuals as a pawn,

11:44  10   as the investors because, one simple reason, I'm broke.  They

11:44  11   know it.  I was in their office.  I offered them my watch, my

11:44  12   jacket.  I took my tie off.  I was taking my shirt off, and

11:44  13   they said to stop.  I would have left my socks in there.  I had

11:44  14   nothing.  I lost all my money.  I didn't have money at one

11:44  15   point.  I lost all my money.  I'm worthless.  So they can throw

11:44  16   me under the bus.  I've got nothing to give them.  I offered

11:44  17   them.

11:44  18        So they had to found out two other individuals or

11:44  19   three individuals that have money.  See, that's the whole thing

11:44  20   is money.  So they find out that Mr. Heidelberger was there

11:44  21   five times in a year and -- in 15 months five/six times.  And

11:44  22   he's got a smirk on his face because obviously he thinks he saw

11:45  23   him more than that.

11:45  24        And they remember two events.  When they escorted Tom

11:45  25   Sullivan out of the office, and they mentioned it.  Why did

11:45 1    they escort him out of the office and not me?  I was securing

11:45 2    the computer system.  I was in his office.  I couldn't leave

11:45 3    that office.  There were -- remember, a lot of the employees

11:45 4    were hired by this management team, Mr. Sullivan included.  And

11:45 5    Mr. Sullivan also hired salary employees, salary employees.  So

11:45 6    I was in the office securing the software, the computer.  All

11:45 7    the records were in his computer.  He was the manager.  He was

11:45 8    the factory manager with all the calculations.  He's got all

11:45 9    the formulas there and all.

11:45 10        I couldn't leave that office for one second.  So I

11:45 11   asked them to help me, and they happen to be there.  It wasn't

11:45 12   a coincidence because I know I had to fire Tom Sullivan.  I

11:45 13   asked them to come to help me out.  Do it.  Because I didn't

11:46 14   know what was going to be the reaction of the other employees

11:46 15   that he hired.  That's one explanation.

11:46 16        Then they remember Mr. Heidelberger being in July, and

11:46 17   I think that's the first time they really talked to them

11:46 18   personally.  I asked them to come in July.  I wanted him to see

11:46 19   if we can save the business.  I was running out of money until

11:46 20   July 6th.  There was never a problem with the payroll.  July 13

11:46 21   was the first catastrophic day when we couldn't meet payroll.

11:46 22   And Mr. Heidelberger must have been there around July 20 or

11:46 23   late July to help me out; how we could pay this individual.  I

11:46 24   end up putting more of my own money into it.  I had to sell my

11:46 25   car, which I did.  I had to sell my jewelry.  I sold

11:46   1   everything.  And I paid them.

11:46   2        Then they say -- see, for me communication is very

11:46   3   important.  Were they salary employees?  Yes or no.  I gave

11:47   4   them over 1500 checks, 1500 checks.  Not one check, not two.

11:47   5   1500 checks, the same amount, all the time except when they got

11:47   6   their raises, a hundred dollars.  I didn't give raises of 75

11:47   7   cents an hour, 50 cents an hour.  You noticed that.  It was

11:47   8   always a hundred dollars at a time.  These people were salary

11:47   9   employees.  They always were salary employees.

11:47  10        Now they claim that they were afraid to come to me.

11:47  11   These are grown-up men.  These are tough guys, very tough

11:47  12   people.  These are not your, you know, school teacher or -- no,

11:47  13   these are rough guys.  They've come to me.  The first check

11:47  14   that they got, it was short a penny.  They would have been in

11:48  15   my office.  I'm telling you so.

11:48  16        And I've had meetings with them because I gave them

11:48  17   the work orders every morning, and I got to the cafeteria

11:48  18   around 8:30 with the work.  They were all there.  You think one

11:48  19   person, one out of 24, 25, 26 men would have come to me and

11:48  20   say, Ed, come on, what is this?  Out of 1500 checks?  I think

11:48  21   he signed that letter that he said he was getting $800 a week.

11:48  22   He signed a letter.  And it's true.  That's what he was making,

11:48  23   $800 per week.

11:48  24        See, I've got the honor system.  I trusted them.  I

11:48  25   trusted all my employees all my life.  And they know that I

11:48  1   trusted them.  And now he turns against me.  When he needed me,

11:48  2   I was for him.  They threw him out of his apartment.  I didn't

11:49  3   even know this man.  I gave him the money.

11:49  4         He talked to the other installers for a long -- for a

11:49  5   while.  Why he didn't ask them how they got paid?  He took the

11:49  6   job.  He -- Milan came to work for me in July.  He talked to

11:49  7   all of them.  He never asked me about what is this $700.  He

11:49  8   was working out of a pickup truck on Sample for $7 an hour.  I

11:49  9   gave him $700.  You see the difference between getting paid

11:49 10   $280 a week?  When you've got those trucks over there, they

11:49 11   pick you up on street corner and exploit these people.  I was

11:49 12   giving them $700, and that's how I paid these people.

11:49 13         And if I would have been in business today, he still

11:49 14   would have been -- he wouldn't have been making a thousand

11:49 15   dollars.  He would have been making $1400.  They know it.

11:49 16   Nobody left that business.  Nobody quit.  They wanted to be

11:49 17   with me, and I think they tried.  I'm not saying they didn't

11:50 18   try.  They worked hard and they -- we all tried to save that

11:50 19   business.  It was a great business for everyone.

11:50 20         I would have given them the shirt on my back.  He

11:50 21   would have been working for me and not making a thousand.  Mr.

11:50 22   Feliciano would have been making $1400.  Who knows how much.

11:50 23   So there was no question of overtime.  He keeps talking about

11:50 24   overtime.  He hasn't calculated of these.  It was an honor

11:50 25   system.  They went to their work.  Coming back from 95 with all

11:50  1    the traffic, I don't know how long it took them.  I don't know.

11:50  2    It was not my concern.  Did they take lunch?  Of course they

11:50  3    took lunch, but did they take an hour?  I don't know.  I

11:50  4    trusted them.

11:50  5         Now he claims that he took lunch, one sandwich in his

11:50  6    hand and a drill, a heavy drill.  These are not just a little

11:50  7    drill because you're drilling through cement.  He was eating a

11:50  8    sandwich while he was drilling into the concrete.  I mean what

11:51  9    are these guys?  Superman?  How can you -- and Ibacache says it

11:51  10   was one of the dirtiest jobs he ever got, the dust.  And,

11:51  11   believe me, there's dust all over.  We had to put a plastic

11:51  12   thing around.  You know, there's dust.  You know, you're

11:51  13   drilling into the concrete.  That's what Ibacache said.  But

11:51  14   he's eating a sandwich with all the dust where he's drilling

11:51  15   and all the things coming down.  So he never took a lunch.

11:51  16   He's got a drill, three-pound drill drilling into concrete.

11:51  17   Superman.  You're not superman.  You're good, Mario; but you're

11:51  18   not that good.  Trust me.  Come on.

11:51  19        So you see what I'm saying.  It's a fantasy that they

11:51  20   never -- they went on the run.  No, there was no running here.

11:51  21   This is not a running game, my friend.  This is not a running

11:51  22   game.  They took a lunch.  They might have taken ten breaks.  I

11:51  23   don't know.  A lot of them smoke.  Was I there to stop them

11:51  24   from smoking?  Of course not.  I trusted them, and I made a

11:52  25   mistake.  I trust humans, always people; but that changed.  It

11:52  1    changed because it's not fair what they do.  It's not fair what

11:52  2    you do.  You should be ashamed of yourself.  I mean no

11:52  3    conscious, no morals any more in this country.  At least I have

11:52  4    to answer to only one authority.  That's God.  He knows I'm

11:52  5    telling the truth.  That's all I have to say.

11:52  6              THE COURT:  Thank you, sir.  You have 4 minutes left,

11:52  7    Mr. Kelly.

11:52  8              MR. KELLY:  Regarding some of the waiting time I just

11:52  9    wanted to point out that these guys when they were in the

11:53 10    morning at the place of work, that was for their benefit.

11:53 11    You'll get a standby instruction.  Standby time or waiting time

11:53 12    is compensable if it's in furtherance of the employer's

11:53 13    business objectives.  They were at that place 'cause those

11:53 14    trucks had to be loaded and they had to take those trucks to

11:53 15    that location.  That was not -- you know, they couldn't go from

11:53 16    their house directly to the location.

11:53 17              Mario testified that they would double load those.

11:53 18    They would get to the site, unload them.  They would unload

11:53 19    additional ones, put them on the balconies for the next day.

11:53 20    And there was extra there for the next day.  They would come

11:53 21    back and they would reload it, so I just wanted to point out

11:53 22    that instruction on that particular point.

11:53 23              Regarding Saturdays, there was testimony that they

11:53 24    worked on residential houses so there were houses on those days

11:53 25    as well.  So when they were at that big project when it didn't

11:53  1    work on Saturday, they were at residential houses.  That was a

11:53  2    common fact that we heard throughout this case.

11:53  3         With respect to the time records, you know, it's their

11:53  4    burden to have them.  I mean you could -- they could always

11:53  5    make that argument, Well, they should -- they don't have

11:54  6    convincing substitutes.  They should have convincing

11:54  7    substitutes.  They should have kept their own logs.

11:54  8         It's not their job to keep the logs.  You can read the

11:54  9    statute for themselves.  They're constrained now to the

11:54 10    evidence that we have here today.  This is all we have.

11:54 11    There's nothing else.  Those records he has there, they're not

11:54 12    in evidence because they're not time records for these guys.

11:54 13    These are time records for some other employees apparently they

11:54 14    had.  You'll have to look at what you have there.

11:54 15         With respect to the -- with respect to, you know, Mr.

11:54 16    M^cCarroll, I mean you may recall he signed a hold harmless

11:54 17    agreement.  It's just another issue.  He was passing out work

11:54 18    orders as well.  And then he admitted -- I had him up there,

11:54 19    and he admitted that him and Mr. Leiva both signed a hold

11:54 20    harmless agreement with respect to Mr. Jovenoff (ph) who made a

11:54 21    business decision that hold harmless means that he's not going

11:54 22    to hold this Mr. Jovenauf (ph) personally liable with respect

11:54 23    to work orders.  Mr. M^cCarroll said that.  I mean that's a

11:54 24    fact.  And I mean he was signing on behalf of this company.  He

11:54 25    was not just some detached investor.

APRIL 18, 2011

11:54  1          With respect to the issue of the times, Mr. Bungo --

11:55  2   I'll leave that testimony.  I mean Mr. Bungo was saying he was

11:55  3   seeing installers there before 7:45.  But Mr. Lares, no, 8:30

11:55  4   all the time.  I mean you can judge that on your own for what

11:55  5   it's worth.

11:55  6          The W-2s, taxes, taxes, taxes.  I mean we've heard a

11:55  7   lot of testimony about the taxes.  Well, you know, where are

11:55  8   the W-2s?  Where are the 1099s?  These were employees.  They

11:55  9   should have had W-2s.  I don't see them.  They said they didn't

11:55 10   have them.  The defense were violating IRS regulations.  Okay.

11:55 11   Let's forget about the fact that they're violating IRS

11:55 12   regulations.  You know it would be nice to have the W-2s

11:55 13   because there would be a little more evidence to show what was

11:55 14   actually allegedly paid.  Here's some cash.  Here's some

11:55 15   checks.  Here's some this.  No W-2s.

11:55 16          With respect to the percentage of ownership, I mean

11:55 17   how could they say that these other guys, M^cCarroll and

11:55 18   Heidelberger, were not significant owners?  They had the same

11:55 19   percentage as Mr. Leiva.  Mr. Leiva has already been found that

11:55 20   he had the significant control over the company.  You don't

11:56 21   have to decide that.  If you find the corporation is liable,

11:56 22   he's automatically liable.  They had the same ownership.  I

11:56 23   don't know how they're coming up and making this argument.

11:56 24          Points of America, you heard they -- I mean that was a

11:56 25   9:00 to 5:00 project.  These guys got there -- you know, they

11:56  1    were required to get there at 7:30.  It makes sense.  They had

11:56  2    to load up the vehicle, get it to the premises.  And they

11:56  3    worked there until 5:00.  They'd get back there by 6:00.  They

11:56  4    had to load up the truck there.

11:56  5         I mean these hours are -- when you look at all the

11:56  6    facts, there's plenty of -- plenty of establishment of their

11:56  7    hours.  Mr. Leiva just said, Well, I don't really know how long

11:56  8    they were on 95.  He just said that.  He doesn't know how long

11:56  9    they were on.  I don't know how he's denying this.

11:56  10        And remember those jury instructions, direct or

11:56  11   indirect.  They're going to try to say day to day, day to day.

11:56  12   We know all the facts are out there.  For example, the -- we're

11:56  13   talking about operational issues.  Isn't it -- when these

11:56  14   workers stay and continue to work day to day because Mr.

11:56  15   Heidelberger promises to pay them and he's meeting with them,

11:56  16   that's operation of the day-to-day finances of the company and

11:57  17   the labor.  If those guys would have quit, that company

11:57  18   wouldn't have operated any more.  I mean he was there --

11:57  19             THE COURT:  That's your time, sir.

11:57  20             MR. KELLY:  -- regularly.  Thank you.

11:57  21             THE COURT:  Do you have enough paper, Madam Reporter?

11:57  22             THE COURT REPORTER:  Yes.

11:57  23             THE COURT:  Members of the Jury, I will now explain to

11:57  24   you the rules of law that you must follow and apply in deciding

11:57  25   this case.  When I have finished, you will go to the jury room

APRIL 18, 2011

11:57   1   and begin your discussions which we call your deliberations.

11:57   2   In deciding this case, you must follow and apply the law as I

11:57   3   explain it to you whether you agree with that law or not; and

11:57   4   you must not let your decision be influenced in any way by

11:58   5   sympathy or by prejudice for or against anyone.

11:58   6           The fact that a corporation is involved as a party

11:58   7   must not affect your decision in any way.  A corporation and

11:58   8   all other persons stand equal before the law and must be dealt

11:58   9   with as equals in a court of justice.  When a corporation is

11:58   10  involved, of course, it may act only through people as its

11:58   11  employees.  And in general a corporation is responsible under

11:58   12  the law for any of the acts and statements of its employees

11:58   13  that are made within the scope of their duties as employees of

11:58   14  the company.

11:58   15          In your deliberations you should consider only the

11:58   16  evidence, that is the testimony of the witnesses and the

11:58   17  exhibits admitted in the record; but as you consider the

11:58   18  evidence, both direct and circumstantial, you may make

11:58   19  deductions and reach conclusions which reason and commonsense

11:58   20  lead you to make.

11:58   21          Direct evidence is the testimony of one who asserts

11:58   22  actual knowledge of a fact such as an eye witness.

11:58   23  Circumstantial evidence is proof of a chain of facts and

11:59   24  circumstances tending to prove or disprove any fact in dispute.

11:59   25  The law makes no distinction between the weight you may give to

11:59  1    either direct or circumstantial evidence.

11:59  2         Remember that anything the lawyers say is not evidence

11:59  3    in the case.  And except for my instructions to you on the law,

11:59  4    you should disregard anything I may have said during the trial

11:59  5    in arriving at your own decision concerning the facts.  It is

11:59  6    your own recollection and interpretation of the evidence that

11:59  7    controls.

11:59  8         Now, in saying that you must consider all the evidence

11:59  9    I do not mean that you must accept all of the evidence as true

11:59  10   or accurate.  You should decide whether you believe what each

11:59  11   witness had to say and how important that testimony was.  In

11:59  12   making that decision, you may believe or disbelieve any witness

11:59  13   in whole or in part.  Also the number of witnesses testifying

11:59  14   concerning any particular dispute is not controlling.

12:00  15        In deciding whether you believe or do not believe any

12:00  16   witness, I suggest that you ask yourself a few questions:  Did

12:00  17   the witness impress you as one who was telling the truth?  Did

12:00  18   the witness have any particular reason not to the tell the

12:00  19   truth?  Did the witness have a personal interest in the outcome

12:00  20   of the case?  Did the witness seem to have a good memory?  Did

12:00  21   the witness have the opportunity and ability to observe

12:00  22   accurately the things he or she testified about?  Did the

12:00  23   witness appear to answer the questions clearly and answer them

12:00  24   directly?  Did the witness' testimony differ from other

12:00  25   testimony or other evidence?

APRIL 18, 2011

12:00  1      You should also ask yourself whether there was

12:00  2   evidence tending to prove that the witness testified falsely

12:00  3   concerning some important facts or whether there was evidence

12:00  4   that at some other time the witness said or did something or

12:00  5   failed to say or do something which was different from the

12:00  6   testimony the witness gave before you during the trial.

12:01  7      You should keep in mind, of course, that a simple

12:01  8   mistake by a witness does not necessarily mean that the witness

12:01  9   was not telling the truth as he or she remembers it because

12:01 10   people naturally tend to forget some things or remember other

12:01 11   things inaccurately.

12:01 12      So if a witness has made a misstatement, you need to

12:01 13   consider whether that misstatement was simply an innocent lapse

12:01 14   of memory or an intentional falsehood.  And the significance of

12:01 15   that may depend on whether it has to do with an important fact

12:01 16   or with only an unimportant detail.

12:01 17      As I've said you are to consider all the evidence in

12:01 18   the case; but in your consideration of the evidence, you are

12:01 19   not limited to the bald statements of the witnesses.  In other

12:01 20   words, you are not limited to what you see and hear as the

12:01 21   witnesses testify.  You are permitted to draw from facts which

12:01 22   you find have been proved such reasonable inferences as seem

12:01 23   justified in the light of your experience.  Inferences are

12:02 24   deductions or conclusions which reason and commonsense lead the

12:02 25   jury to draw from the facts which have been established by the

12:02  1    evidence in the case.

12:02  2         In this case it is the responsibility of the

12:02  3    plaintiffs to prove every essential part of the plaintiffs'

12:02  4    claim by a preponderance of the evidence.  That is sometimes

12:02  5    called the burden of proof or the burden or persuasion.  A

12:02  6    preponderance of the evidence simplify means an amount of

12:02  7    evidence that is enough to persuade you that the plaintiffs'

12:02  8    claim is more likely true than not true.

12:02  9         In deciding whether any fact has been proved by a

12:02  10   preponderance of the evidence, you may consider the testimony

12:02  11   of all of the witnesses regardless of who may have called them

12:02  12   and all of the exhibits received in evidence regardless of who

12:02  13   may have produced them.  If the proof fails to establish any

12:02  14   part of the plaintiffs' claim by a preponderance of the

12:02  15   evidence, you should find for the defendants as to that claim.

12:02  16        This case arises under the Fair Labor Standards Act,

12:03  17   the Federal law that among other things provides for the

12:03  18   payment of time-and-a-half overtime pay.  The plaintiffs claim

12:03  19   that the defendants did not pay them the overtime pay required

12:03  20   by law.

12:03  21        The plaintiffs, in fact, claimed that they were not

12:03  22   paid overtime or straight time or, in other words, they were

12:03  23   only paid for the first 40 hours they worked each week and were

12:03  24   not paid at all for the hours they worked in addition to 40

12:03  25   hours.

12:03  1    Therefore, the term overtime in this case includes

12:03  2  such overtime -- includes both -- such overtime and straight

12:03  3  time.  Claims also exist alleging a minimum wage violation for

12:03  4  completely unpaid wages.

12:03  5    The plaintiffs in order to prevail must prove by a

12:03  6  preponderance of the evidence three things:  First, that the

12:03  7  plaintiffs were employed by the defendants during the time

12:03  8  period involved; second, that the defendants' business or

12:04  9  business under unified operation or common control employed at

12:04  10  least two persons and was engaged in commerce or the production

12:04  11  of goods for commerce and had an annual gross sales of at least

12:04  12  $500,000; and, third, that the defendants failed to pay the

12:04  13  plaintiffs the overtime pay required by law.

12:04  14    You should consider the first and second prongs as

12:04  15  already established.  The act requires an employer to pay its

12:04  16  employee at a rate of at least one-and-a-half times their

12:04  17  regular rate for the time worked in one week over 40 hours.

12:04  18  This is commonly known as time-and-a-half pay for overtime

12:04  19  worked.

12:04  20    The employee's regular rate during a particular week

12:04  21  is the basis for calculating any overtime pay due him for that

12:04  22  week.  The regular rate for a week is determined by dividing

12:04  23  the first 40 hours worked into the total wages paid for those

12:04  24  40 hours.  The overtime rate then would be one-and-a-half of

12:05  25  that rate and would be owing for each hour in excess of 40

12:05  1    hours worked during the workweek.

12:05  2         As to minimum wages through 2006 until July 24, 2007,

12:05  3    the Federal minimum wage rate was $5.15.  The Federal minimum

12:05  4    wage rate was raised to $5.85 on July 24, 2007, and remained at

12:05  5    that rate until July 24th, 2008.

12:05  6         If upon consideration of all the evidence you find

12:05  7    that the plaintiffs have failed to prove their claims, of

12:05  8    course, your verdict should be for the defendants.  If,

12:05  9    however, you find that the plaintiffs have proved their claims,

12:05 10    then you must turn to the question of damages that the

12:05 11    plaintiffs are entitled to recover.  The measure of damages is

12:05 12    the difference between what the employee should have been paid

12:05 13    under the act and the amounts that you find were actually paid.

12:06 14         In fixing an award of damages, if any, you must use

12:06 15    sound discretion drawing reasonable inferences from the facts

12:06 16    in evidence.  You may not award damages based upon sympathy,

12:06 17    speculation, or guesswork.  Also you must not include in any

12:06 18    award of damages any sums for the purposes of punishing a

12:06 19    defendant or to set an example since only actual damages may be

12:06 20    recovered.

12:06 21         It is the employer's responsibility of keeping records

12:06 22    of hours worked by employees under the Fair Labor Standards

12:06 23    Act.  Where the employer's records of work time are inaccurate

12:06 24    or completely missing and the employee cannot offer convincing

12:06 25    substitutes, the employee has carried out his or her burden if

12:06  1  he proves that he has, in fact, performed work for which he has

12:07  2  been improperly compensated and if he produces sufficient

12:07  3  evidence to show the amount and extent of that work as a matter

12:07  4  of just and reasonable inference.

12:07  5       The burden then shifts to the employer to come forward

12:07  6  with evidence of the precise amount of work performed or with

12:07  7  evidence to negate the reasonableness of the inferences to be

12:07  8  drawn from the employee's evidence.  If the employer fails to

12:07  9  produce such evidence, the employee may then be awarded damages

12:07  10  even though the result may be only approximate.

12:07  11       Under the law all workweeks stand alone.  That means

12:07  12  that it is necessary for you to determine the hours worked by

12:07  13  the plaintiff on a week-by-week basis in determining whether he

12:07  14  worked more than 40 hours in any single workweek.  The law does

12:07  15  not permit the averaging of hours worked among workweeks.  You

12:07  16  cannot reduce the amount of overtime hours you find the

12:07  17  plaintiff worked by hours not worked by the plaintiff in other

12:07  18  weeks.

12:07  19       Work is defined by the Fair Labor Standards Act as

12:08  20  physical or mental exertion, whether burdensome or not,

12:08  21  controlled or required by the employer and pursued necessarily

12:08  22  and primarily for the benefit of the employer in his or her

12:08  23  business.  Compensable time includes far more than the time

12:08  24  that the employee spends engaged in active labor.  Stand-by

12:08  25  time or waiting time is compensable under the FLSA if it is in

12:08 1   furtherance of the employer's business objectives.  Whether

12:08 2   time is spent predominantly for the employer's benefit or for

12:08 3   the employee's is a question depending upon the circumstances

12:08 4   of the case.

12:08 5       Rest periods of 5 to 20 minutes must be counted as

12:08 6   hours worked for purposes of determining whether overtime was

12:08 7   worked.  Bona fide meal periods are not work time.  Bona fide

12:08 8   periods do not include coffee breaks or time for snacks.  These

12:08 9   are rest periods.  The employee must be completely relieved of

12:09 10  duty for the purpose of eating regular meals.  Ordinarily 30

12:09 11  minutes or more is long enough for a bona fide meal period.  A

12:09 12  shorter period may be long enough under special conditions.

12:09 13      The employee is not relieved from duty if he is

12:09 14  required to perform any duties, whether active or inactive,

12:09 15  while eating.  For example, an office employee who's required

12:09 16  to eat at his desk or a factory worker who is required to be at

12:09 17  his machine is working while eating.

12:09 18      It is only when an employee is required to give a

12:09 19  substantial measure of his time and effort that compensable

12:09 20  working time is involved.  Therefore, in recording working time

12:09 21  under the Act, insubstantial or insignificant periods of time

12:09 22  beyond the scheduled working hours which cannot as a practical

12:09 23  administrative matter be precisely recorded for payroll

12:09 24  purposes may be disregarded.  This is referred to as de minimus

12:10 25  time.

12:10  1          De minimus time applies where there are uncertain and

12:10  2    indefinite periods of times involving a few seconds or minutes

12:10  3    in duration and where the failure to count such time is due to

12:10  4    the considerations justified by industrial realities.  Periods

12:10  5    of up to 10 minutes may be considered de minimus.

12:10  6          In determining whether time was de minimus, you should

12:10  7    consider the amount of daily time spent on that work, the

12:10  8    administrative difficulty in recording that time, the size of

12:10  9    the aggregate claim, and the regularity of the work.

12:10  10          Time spent waiting for an assignment may not count

12:10  11    toward hours worked depending on all of the circumstances.  In

12:10  12    making this determination, you must decide whether the

12:10  13    plaintiff was waiting to be engaged which is not working time

12:10  14    or engaged to be waiting which is working time.

12:10  15          The key to whether the plaintiff was waiting to be

12:10  16    engaged or engaged to be waiting is whether he was able to use

12:11  17    the waiting time predominately for his own purposes.  Generally

12:11  18    an employee's waiting time must be severely restricted for it

12:11  19    to be construed as work time.

12:11  20          For example, if the time a plaintiff's waiting is

12:11  21    unpredictable and of short duration, it is considered on-duty

12:11  22    waiting time and counts as hours worked because the plaintiff

12:11  23    is unable to use the time effectively for his own purposes.

12:11  24    However, if the plaintiff is relieved of duties during the

12:11  25    waiting period and the waiting period is long enough to enable

12:11  1   the plaintiff to use the time effectively for his own purposes,

12:11  2   he is considered off duty and the time is not counted as hours

12:11  3   worked.

12:11  4          If the employee is employed solely on a weekly salary

12:11  5   basis, his regular hourly rate of pay on which time-and-a-half

12:11  6   hours must be paid is computed by dividing the salary by the

12:11  7   number of hours which the salary is intended to compensate.

12:12  8   For example, if an employee is hired at a salary of $220.80 for

12:12  9   a 40-hour week, his regular rate is $5.52 an hour.

12:12  10         An individual employee's rights for overtime

12:12  11  compensation under the Fair Labor Standards Act cannot be

12:12  12  abridged by contract or otherwise waived by the employee.

12:12  13  Under the Fair Labor Standards Act, the term employer is

12:12  14  defined more broadly.  The term would be interpreted in

12:12  15  traditional common law application in order to meet the

12:12  16  remedial purposes as defined in the Fair Labor Standards Act.

12:12  17         Now, I'll pause and take a drink of water.

12:12  18         Personal liability may arrive from significant

12:12  19  ownership interest coupled with operational control.  In this

12:12  20  matter it has already been established that the defendant

12:13  21  Edward Leiva shall be liable individually if the corporate

12:13  22  defendant is also found -- is found liable.  However, you must

12:13  23  make a determination as to whether the evidence demonstrates

12:13  24  that the defendant Steve Heidelberger and Francis M$^{c}$Carroll

12:13  25  shall also be liable individually if the corporate defendant is

12:13  1    found liable.

12:13  2          Operational control over a corporation's covered

12:13  3    enterprise makes both the owner and the corporation jointly and

12:13  4    severally liable for overtime wages under the Fair Labor

12:13  5    Standards Act.  In this matter it has already been established

12:13  6    that the defendant Ed Leiva shall be liable individually if the

12:13  7    corporate defendant is found liable.  However, you must make a

12:13  8    determination as to whether the evidence demonstrates that the

12:13  9    defendants Steve Heidelberger and Francis M°Carroll shall also

12:13  10   be liable individually if the corporate defendant is found

12:14  11   liable.

12:14  12         As you know, the plaintiffs have sued Mr.

12:14  13   Heidelberger, Mr. M°Carroll, and Mr. Leiva individually.  While

12:14  14   Mr. Leiva concedes that he had operational control over the

12:14  15   business, Mr. Heidelberger and Mr. M°Carroll dispute that they

12:14  16   did.  Mr. Heidelberger and Mr. M°Carroll cannot be held

12:14  17   individually liable for violating the overtime and minimum wage

12:14  18   provisions of the Fair Labor Standards Act unless you find by a

12:14  19   preponderance of the evidence that Mr. Heidelberger and/or Mr.

12:14  20   M°Carroll had operational control over the corporate defendant.

12:14  21   That is that they were employers within the meaning of the act.

12:14  22         Employer is defined as any person acting directly or

12:14  23   indirectly in the interest of an employer in relation to an

12:14  24   employee.  When deciding whether Mr. Heidelberger and/or Mr.

12:14  25   M°Carroll were employers under this definition, you must

12:15  1  consider the circumstances of the whole activity.

12:15  2  Mr. Heidelberger and/or Mr. M^cCarroll are considered

12:15  3  employers if they had operational control of significant

12:15  4  aspects of the company's day-to-day functions including

12:15  5  compensation of employees or other matters in relationship to

12:15  6  employees.  Any person with operational control of the

12:15  7  corporation's covered enterprise is an employer and is along

12:15  8  with the corporation jointly and severally liable under the

12:15  9  FLSA for unpaid wages.

12:15  10  Of course, the fact that I have given you instructions

12:15  11  concerning the issue of plaintiffs' damages should be not be

12:15  12  interpreted in any way as an indication that I believe the

12:15  13  plaintiffs should or should not prevail in this case.  Any

12:15  14  verdict you reach in the jury room must be unanimous.  In other

12:15  15  words, to return a verdict, you must all agree.  Your

12:15  16  deliberations will be secret, and you will never have to

12:16  17  explain your verdict to anyone.

12:16  18  It is your duty to discuss the case with one another

12:16  19  in an effort to reach agreement if you can do so.  Each of you

12:16  20  must decide the case for yourself but only after full

12:16  21  consideration of the evidence with the other Members of the

12:16  22  Jury.

12:16  23  While you are discussing the case do not hesitate to

12:16  24  re-examine your own opinion and change your mind if you become

12:16  25  convinced that you were wrong, but do not give up your honest

12:16  1  beliefs solely because the others think differently or merely

12:16  2  to get the case over with.

12:16  3          Remember that in a very real way you are Judges.  You

12:16  4  are the Judges of the facts of this case, and your only

12:16  5  interest is to seek the truth from the evidence in the case.

12:16  6          If you find for the plaintiffs, you must not take into

12:16  7  any account any consideration of attorney's fees or court costs

12:16  8  in deciding the amount of the plaintiffs' damages.  The matter

12:16  9  of attorney's fees and court costs will be decided later by the

12:16 10  Court.

12:16 11          When you go to the jury room, you should first select

12:17 12  one of your members who will act as your foreman or forewoman

12:17 13  who will preside over your deliberations and who will speak for

12:17 14  you here in court.

12:17 15          A form of verdict has been prepared for your

12:17 16  convenience, and it reads as follows:  We, the Jury,

12:17 17  unanimously find from the preponderance of the evidence as

12:17 18  follows:  And then there's a series of questions.

12:17 19          The first one says:  For the plaintiff Mario

12:17 20  Feliciano, for the plaintiff Augustin Milan, for the defendant

12:17 21  Safe Hurricane Shutters, for the defendant Edward Leiva, for

12:17 22  the defendant Steve Heidelberger, and for the defendant Francis

12:17 23  McCarroll.  After each of those questions, there's a blank

12:17 24  space on the face of the verdict form.  It says yes or no.

12:17 25          When you have reached unanimous agreement as to your

12:17  1    verdict with regard to that particular plaintiff or defendant,

12:17  2    you should indicate your finding by having your foreman or

12:17  3    forewoman mark the appropriate yes or no box.

12:17  4         The verdict form goes on to explain that if you have

12:18  5    not found in favor of either plaintiff, your verdict is for all

12:18  6    of the defendants.

12:18  7         You should sign and date the verdict and then return

12:18  8    it to the Court.

12:18  9         If you have found in favor of either plaintiff and

12:18  10   against one or more of the defendants, you must then consider

12:18  11   the question of damages to be assessed.

12:18  12        And then you have two additional questions.  The fifth

12:18  13   question says, Damages awarded to plaintiff Mario Feliciano.

12:18  14   You will see that there's a blank space with a dollar sign to

12:18  15   the left.  And when you have reached unanimous agreement as to

12:18  16   the amount of damages to be awarded Mr. Feliciano, if any,

12:18  17   again your foreman or forewoman will fill in that blank space

12:18  18   by writing the dollar amount in there that you find appropriate

12:18  19   making sure to put in a decimal point so that we can see the

12:18  20   difference between dollars and cents.  And, finally, damages to

12:18  21   be award plaintiff Augustin Milan.

12:18  22        And it goes on to say, So say we all.

12:18  23        As I've said you will take the verdict form to the

12:19  24   jury room.  And when you have reached unanimous agreement as to

12:19  25   your verdict, your foreman or forewoman will fill out the

12:19  1    verdict form, date and sign it, and then return it to the

12:19  2    Court.

12:19  3            Should you desire to communicate with the Court during

12:19  4    the course of your deliberations, you should reduce your

12:19  5    message or question to writing and then pass it to the Marshal

12:19  6    who will then bring it to the Court's attention.

12:19  7            We will then respond as promptly as we can usually in

12:19  8    writing, but occasionally it may be necessary to have you

12:19  9    return here into the courtroom where you may be addressed

12:19  10   orally.  You are cautioned, however, that with respect to any

12:19  11   message or question that you do send, you should never state or

12:19  12   specify your numerical division at that time.

12:19  13           The exhibits which have been received in evidence will

12:19  14   be assembled by the clerk, and they will be delivered to you in

12:19  15   a few minutes to assist you in the course -- during your

12:19  16   deliberations.

12:19  17           Should you desire to communicate with the Court

12:19  18   between now and 1:30, please understand that we will not be in

12:20  19   a position to respond to your question, if any, because they're

12:20  20   going -- I've ordered your lunch; but they have to go out and

12:20  21   they have to buy their own lunch today so they have to leave

12:20  22   the courthouse.  So I have ordered your lunch.  I've asked that

12:20  23   it be delivered between 12:30 and 12:45, so it should be here

12:20  24   in a few minutes.

12:20  25           I would again remind that your verdict in this case

12:20  1   must be unanimous; that it has to be agreed to and concurred in

12:20  2   by each and all of you before you may return it to the Court as

12:20  3   a verdict.  And with those instructions you may now retire in

12:20  4   the consideration of that verdict.

12:20  5        You may take the jury out, Mr. Marshal.

12:20  6        **THE MARSHALL:**  All rise for the jury.

12:20  7   **(Jury Out)**

12:20  8        **THE COURT:**  All right.  Would counsel for the

12:20  9   plaintiffs and the defendants please go over the exhibits so we

12:20 10   can send them back to the jury room, the ones that have been

12:20 11   received in evidence.  And as you've heard me tell the jury, I

12:21 12   will excuse the parties and counsel until 1:30.

12:21 13        All right, Gentlemen, we'll see you at 1:30.

      14        **MR. KLEPPIN:**  You want us within like five minutes

      15   from the courthouse?

      16        **THE COURT:**  Yeah, yes.

      17        **THE LAW CLERK:**  Yeah.  I mean --

      18        **MR. KLEPPIN:**  Sure.  I understand.

      19        **THE LAW CLERK:**  Don't head out to west Broward.

12:23 20        **MR. KLEPPIN:**  Right.  No.  Not at all.  Any problem if

12:23 21   my partner Harry Boreth comes and stays here during the -- so I

12:23 22   can go do other matters?  Is that a --

12:23 23        **THE COURT:**  You mean to take the verdict?

12:23 24        **MR. KLEPPIN:**  Yes.

12:23 25        **THE COURT:**  That's fine.

APRIL 18, 2011

12:23  1        MR. KLEPPIN:  Thank you.

12:24  2        THE COURT:  We need somebody here though.

12:24  3        MR. KLEPPIN:  Oh, I understand.  No.  There will be

12:24  4  absolutely be someone here, Your Honor.

12:24  5        THE COURT:  All right.  Okay.  Court's in recess until

12:24  6  we hear from the jury.

01:41  7     (Lunch Recess)

01:41  8        THE LAW CLERK:  All rise.

01:41  9        THE COURT:  All right.  Be seated, please.  Come to

01:41  10  order.  I have received a message from the jury.  No sooner did

01:41  11  you leave then, of course, they have sent us a message.  The

01:41  12  record should reflect that I'm now furnishing counsel with a

01:41  13  copy of the message and a copy of the Court's proposed response

01:41  14  to the message.  All right.  There you go.

01:44  15        All right.  Objections to the Court's proposed

01:44  16  response for the plaintiffs?

01:44  17        MR. KELLY:  I don't object, Your Honor, on behalf of

01:44  18  plaintiffs as to what was provided; however, I'm just wondering

01:44  19  based on what that -- the first paragraph.  They said, Please

01:44  20  provide a copy of the section pertaining to FLSA on salaried or

01:44  21  hourly definitions.  I'm wondering if they need to have a copy

01:44  22  also of instruction 19, calculation of hourly --

01:44  23        MR. LEIVA:  No.

01:44  24        MR. KELLY:  -- because that deals with the -- you

01:44  25  know, if an employee is hired at a salary at 228.8.

01:44  1          THE COURT:  I thought of that, and it's included in

01:44  2     what's already here.

01:44  3          MR. KELLY:  Oh, it's there?

01:45  4          THE COURT:  It's just says the same thing again.  It's

01:45  5     just different numbers.  Okay.  Objections for the defendants?

01:45  6          MR. KELLY:  I see what you mean, Judge.

01:45  7          MR. KLEPPIN:  Well, we object to the substantive

01:45  8     instruction being given to the jury because they didn't ask for

01:45  9     it.  They just simply asked to be provided a copy of the

01:45  10    section of the statute pertaining to salary versus hourly

01:45  11    definition.

01:45  12         The substantive instruction partly over the

01:45  13    defendants' objection, by the way, specifically didn't get into

01:45  14    the whole half-time thing and salary thing, and so we object to

01:45  15    that.

01:45  16         We do not object with respect to the second question.

01:45  17    We do not object to the jury being given the instructions on

01:45  18    operational control because they clearly asked for that

01:45  19    definition to be given.  However, we do think that if these

01:45  20    instructions are going to go back to the jury room, that all of

01:46  21    the headings be taken out; that they all kind of be put

01:46  22    together to make them flow.  The jury might be wondering what

01:46  23    language has been deleted, and some of them cite cases and

01:46  24    authorities and citations.  We would want all that extraneous

01:46  25    information deleted and just simply have the words as you've

01:46  1    read them.

01:46  2          THE COURT:  Objection overruled.  Do you join in that

01:46  3    objection, Mr. Leiva?  Leiva.  I'm going to get right.

01:46  4          MR. LEIVA:  Well, yeah.  I have my own objection to

01:46  5    these.

01:46  6          THE COURT:  All right.  What objection do you have?

01:46  7          MR. LEIVA:  That in no -- anywhere here you explained

01:46  8    the difference between a salary employee and an hourly.

01:46  9    They're asking for something specifically that pertains -- the

01:46  10   difference between a salary employee versus an hourly

01:46  11   definition of an employee.  And you don't anywhere here I see

01:46  12   any comparison or difference between one or the other.

01:46  13         THE COURT:  All right.

01:46  14         MR. LEIVA:  So I think it is very unfair that when

01:47  15   answering their question whether it's proper in the way they

01:47  16   ask that question.

01:47  17         MR. KLEPPIN:  The defendants also object, Your Honor,

01:47  18   with respect to not giving them the instruction that talks

01:47  19   about the guesswork, speculation, inferences because that is

01:47  20   part and partial of the substantive instruction that you're

01:47  21   giving them.

01:47  22         THE COURT:  All right.  All those objections will be

01:47  23   overruled, and you may give this back to the jury.  And we'll

01:47  24   be in recess until we hear again from the jury.  Court's in

01:47  25   recess until we hear further from the jury.

APRIL 18, 2011

JURY TRIAL - VOLUME VI OF VI

01:47  1      **(Recess)**

01:47  2          **THE LAW CLERK:**  All rise.

02:21  3          **THE COURT:**  All right.  Be seated and come to order.

02:21  4  The jury has announced that it has reached a verdict.

02:21  5          So bring in the jury, Mr. Marshal.

02:21  6      **(Jury In)**

02:21  7          **THE COURT:**  Members of the Jury, you may be seated.

02:21  8  Members of the Jury, have you reached a verdict?

02:21  9          **JURY FOREPERSON:**  We have, Your Honor.

02:21  10         **THE COURT:**  Please pass the verdict to the Marshal.

02:22  11  Thank you.

02:22  12         Members of the Jury, harken to the reading of your

02:22  13  verdict.

02:22  14         Madam Clerk, you may publish the verdict.

02:22  15         **THE CLERK:**  Case Number 07-61295-Civil.  Mario

02:22  16  Feliciano and Augustin Milan, plaintiffs versus Safe Hurricane

02:22  17  Shutters, Inc.

02:22  18         Verdict, We, the jury, unanimously find from a

02:22  19  preponderance of the evidence as follows:   For the plaintiff

02:23  20  Mario Feliciano, yes; for the plaintiff Augustin Milan, yes;

02:23  21  for the defendant Safe Hurricane Shutters, no; for the

02:23  22  defendant Edward Leiva, no; for the defendant Steve

02:23  23  Heidelberger, no; for the defendant Francis M$^c$Carroll, no.

02:23  24         Damages awarded to plaintiff Mario Feliciano,

02:23  25  $20,849.38.  Damages awarded to plaintiff Augustin Milan,

APRIL 18, 2011

02:23  1    $1,312.50.

02:23  2         So say we all, dated April 18th, 2011, signed by the

02:23  3    jury foreperson.

02:23  4         THE COURT:  Members of the Jury, is this your verdict?

02:23  5         THE JURY:  (Responds affirmatively).

02:23  6         THE COURT:  Would you please poll the jury, Madam

02:23  7    Clerk, please.  As your names are called, Ladies and Gentlemen,

02:24  8    would you please answer out loud.

02:24  9         THE CLERK:  Luis Santiago, is the verdict as published

02:24 10    your verdict?

02:24 11         JUROR SANTIAGO:  Yes.

02:24 12         THE CLERK:  Paola Verde, is the verdict as published

02:24 13    your verdict?

02:24 14         JUROR VERDE:  Yes.

02:24 15         THE CLERK:  Lee Kalvaitis, is the verdict as published

02:24 16    your verdict?

02:24 17         JUROR KALVAITIS:  Yes.

02:24 18         THE CLERK:  Abby Smiley, is the verdict as published

02:24 19    your verdict?

02:24 20         JUROR SMILEY:  Yes.

02:24 21         THE CLERK:  Adriana Velasco, is the verdict as

02:24 22    published your verdict?

02:24 23         JUROR VELASCO:  Yes.

02:24 24         THE CLERK:  Jennifer Veasey, is the verdict as

02:24 25    published your verdict?

APRIL 18, 2011

02:24  1          **JUROR VEASEY:**  Yes.

02:24  2          **THE CLERK:**  Maria Puig, is the verdict as published

02:24  3  your verdict?

02:24  4          **JUROR PUIG:**  Yes.

02:24  5          **THE CLERK:**  Ellys Rodriguez, is the verdict as

02:24  6  published your verdict?

02:24  7          **JUROR RODRIGUEZ:**  Yes.

02:24  8          **THE COURT:**  The jury has been polled, and all answered

02:24  9  in the affirmative.  You may record the verdict, Madam Clerk.

02:24 10          Members of the Jury, before I excuse you from further

02:24 11  attention to this case, I wish to thank you most sincerely on

02:24 12  behalf of the litigants, on behalf of the Court, but especially

02:25 13  on behalf of your fellow citizens of the United States for the

02:25 14  service that you have rendered here both last week and today to

02:25 15  the cause of the administration of justice in our country.

02:25 16          I hope you found this to be an interesting, a

02:25 17  rewarding, and an enriching experience.  And I hope you'll

02:25 18  leave here this afternoon with the satisfaction of knowing that

02:25 19  you've discharged the highest responsibility of citizenship in

02:25 20  our country which is that of serving as a juror and sitting as

02:25 21  a Judge on the rights and the affairs of our fellow citizens.

02:25 22          So the jury will stand discharged at this time with

02:25 23  the thanks of the Court.  And today is a big day in our

02:25 24  country.  Do you know what it is? April the 18th.  Do you what

02:25 25  happened on April the 18th?  On the 18th of April in '75 hardly

JURY TRIAL - VOLUME VI OF VI

02:25    1    a man is now alive to remember that famous day and year.

02:25    2    What's the rest of that poem?  Our teacher knows that.

02:25    3              **JUROR KALVAITIS:**  Paul Revere.

02:25    4              **THE COURT:**  Listen my children and you shall hear of

02:26    5    the midnight ride of Paul Revere.  So today on Patriots' Day

02:26    6    it's appropriate that I'm here to thank you for serving your

02:26    7    fellow countrymen and countrywomen in connection with this

02:26    8    case.  The jury will stand discharged with the thanks of the

02:26    9    Court.

02:26   10              You may take out the jury, Madam Clerk.

02:26   11              **THE MARSHALL:**  All rise for the jury.

02:26   12         **(Jury Out)**

02:26   13              **THE COURT:**  Okay.  Mr. Kelly, I'd ask that you prepare

02:26   14    a form of final judgment for entry in this case and please

02:26   15    submit it at your earliest so that the same may be entered and

02:26   16    court will be in recess if there's no further business at this

02:26   17    time until tomorrow.

        18         **(Concluded)**

        19

        20

        21

        22

        23

        24

        25

JURY TRIAL - VOLUME VI OF VI

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4     transcription of proceedings in the above-entitled matter.

5

6

      6/24/11                    /s/ Jill Michelle Hardy-Hobbs
7     -------                    ---------------------------------------
       DATE                      JILL MICHELLE HARDY-HOBBS, CCR, FPR
8                                *OFFICIAL UNITED STATES COURT REPORTER*
                                 400 NORTH MIAMI AVENUE, SUITE 08S33
9                                MIAMI, FL  33128    T: 305.523.5022
                                 jill_hardy-hobbs@flsd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APRIL 18, 2011

121

JURY TRIAL - VOLUME VI OF VI

## $

**$1,312.50** [1] - 117:1
**$1,785** [4] - 31:2, 40:19, 47:20
**$1400** [2] - 91:15, 91:22
**$17** [1] - 86:14
**$17.50** [1] - 30:19
**$20,000** [1] - 44:20
**$20,849.38** [1] - 116:25
**$22.50** [2] - 17:4, 17:5
**$220.80** [3] - 16:13, 17:16, 106:8
**$26.25** [2] - 30:21, 30:25
**$280** [1] - 91:10
**$33,750** [3] - 25:18, 25:19
**$33.75** [3] - 17:2, 17:12, 25:16
**$34,568.80** [3] - 26:18, 40:18, 47:19
**$350.80** [2] - 18:23, 26:14
**$468** [2] - 18:21, 26:10
**$5.15** [1] - 102:3
**$5.52** [1] - 106:9
**$5.85** [4] - 18:15, 18:20, 26:9, 102:4
**$500** [1] - 60:24
**$500,000** [1] - 101:12
**$595** [1] - 36:3
**$700** [6] - 30:8, 30:18, 63:10, 91:7, 91:9, 91:12
**$7500** [1] - 32:14
**$8,318.80** [1] - 32:18
**$8.77** [2] - 18:23, 26:12
**$800** [3] - 22:13, 90:21, 90:23
**$900** [7] - 16:5, 16:24, 16:25, 22:13, 22:15, 22:19, 32:3

## '

**'75** [1] - 118:25

## /

**/s** [1] - 120:6

## 0

**07-61295-CIV-GONZALEZ/COHN** [1] - 1:3
**07-61295-Civil** - 116:15
**08S33** [2] - 2:4, 120:8

## 1

**1** [1] - 1:11
**10** [4] - 31:25, 43:14, 84:10, 105:5
**1099s** [1] - 95:8
**10:00** [5] - 21:16, 21:19, 26:2, 31:20, 47:25
**11** [1] - 73:3
**116** [1] - 3:8
**12** [5] - 5:19, 13:10, 13:12, 72:18
**12:30** [1] - 111:23
**12:45** [1] - 111:23
**13** [1] - 89:20
**14** [1] - 75:9
**15** [12] - 6:3, 6:9, 27:23, 32:4, 32:6, 32:9, 60:1, 60:7, 69:8, 71:10, 88:21
**1500** [4] - 90:4, 90:5, 90:20
**1546(a)** [1] - 53:6
**17** [4] - 28:4, 30:23, 30:25, 36:3
**18** [3] - 1:9, 53:5, 72:19
**18th** [4] - 117:2, 118:24, 118:25
**19** [1] - 113:22
**1:30** [3] - 111:18, 112:12, 112:13

## 2

**20** [14] - 17:7, 18:21, 25:12, 25:16, 26:10, 26:12, 26:13, 32:13, 40:15, 40:16, 70:8, 70:13, 89:22, 104:5
**20-minute** [1] - 70:8
**200,000** [1] - 61:14
**2006** [3] - 12:6, 23:17, 102:2
**2007** [11] - 12:7, 12:8, 12:10, 14:16, 18:14, 22:14, 29:13,

102:2, 104:4
**2008** [1] - 102:5
**2011** [2] - 1:9, 117:2
**22-and-a-half** [1] - 56:2
**228.8** [1] - 113:25
**24** [3] - 90:19, 102:2, 102:4
**24th** [2] - 14:15, 102:5
**25** [1] - 90:19
**26** [1] - 90:19
**2:00** [1] - 52:12
**2:00/3:00** [1] - 83:3

## 3

**30** [4] - 36:25, 70:15, 83:25, 104:10
**300** [1] - 1:18
**305.523.5022** [2] - 2:4, 120:9
**305.865.6766** [1] - 1:19
**305.865.7167** [1] - 1:19
**31st** [1] - 14:16
**32** [1] - 83:25
**33.75** [1] - 35:10
**33128** [2] - 2:4, 120:9
**33141** [1] - 1:18
**33324** [1] - 1:22
**34** [1] - 26:18
**35** [2] - 78:2, 80:15
**37** [1] - 25:10
**3:00** [5] - 27:1, 38:23, 52:12, 72:1, 74:6
**3:30** [1] - 72:16
**3:30/4:00** [1] - 72:3

## 4

**4** [1] - 93:6
**40** [56] - 11:16, 16:24, 16:25, 17:4, 17:5, 17:10, 17:11, 18:3, 18:4, 18:20, 25:3, 25:5, 25:9, 26:9, 26:17, 30:12, 30:16, 30:18, 30:21, 30:22, 31:14, 31:15, 32:10, 33:16, 33:18, 34:1, 34:3, 34:7, 34:23, 35:16, 35:18, 40:21, 44:2, 44:8, 46:6, 47:19, 57:2, 66:9, 73:4, 73:8, 74:9, 74:22, 83:7, 83:10,

83:22, 83:23, 83:24, 84:2, 100:23, 100:24, 101:17, 101:23, 101:24, 101:25, 103:14
**40-hour** [7] - 16:13, 16:18, 17:16, 17:23, 31:13, 47:18, 106:9
**40-hour-a-week** [1] - 80:15
**400** [2] - 2:4, 120:8
**41** [1] - 60:8
**42** [2] - 72:24, 72:25
**45** [2] - 24:1, 24:6
**48** [2] - 3:4, 72:19
**4:00** [7] - 27:9, 72:2, 72:6, 72:14, 72:16, 74:2, 74:6
**4:30** [1] - 27:9

## 5

**5** [2] - 70:13, 104:5
**50** [7] - 13:22, 25:13, 25:15, 25:17, 32:13, 78:2, 90:7
**52** [4] - 12:22, 13:1, 13:21
**57** [3] - 28:4, 28:12, 30:23
**5:00** [12] - 28:2, 28:3, 28:7, 28:8, 38:22, 38:23, 68:18, 72:1, 72:6, 95:25, 96:3
**5:30** [3] - 27:25, 28:7, 28:9

## 6

**6/24/11** [1] - 120:6
**60** [17] - 17:6, 19:10, 19:12, 19:17, 25:12, 26:13, 28:10, 31:19, 31:22, 32:2, 32:4, 32:5, 33:19, 71:13, 71:25
**605** [1] - 1:18
**66** [7] - 19:16, 31:19, 65:4, 70:22, 72:19, 81:10, 82:14
**6:00** [7] - 19:7, 65:4, 72:9, 72:13, 75:17, 82:22, 96:3
**6:30/7:00** [1] - 82:22
**6th** [1] - 89:20

## 7

**7** [2] - 46:1, 91:8
**700** [1] - 30:8
**71st** [1] - 1:18
**75** [1] - 90:6
**7:00** [11] - 19:7, 65:4, 67:13, 68:4, 68:5, 71:2, 72:4, 72:7
**7:15** [5] - 23:9, 28:15, 28:16, 32:1, 71:3
**7:30** [10] - 19:14, 23:8, 27:5, 27:7, 27:24, 28:3, 28:15, 32:1, 96:1
**7:34** [1] - 71:6
**7:45** [18] - 22:25, 23:4, 23:22, 23:24, 24:23, 27:3, 27:6, 29:10, 38:21, 39:21, 67:18, 67:21, 67:22, 67:24, 67:25, 68:6, 68:17, 95:3

## 8

**80** [1] - 45:8
**800** [3] - 16:3, 33:25, 83:8
**83** [1] - 32:17
**8500** [2] - 45:9
**87** [1] - 3:5
**8751** [1] - 1:22
**8:00** [6] - 68:17, 71:9, 71:11, 71:19, 71:22, 71:25
**8:00/8:30/9:00** [1] - 70:25
**8:22** [1] - 71:6
**8:30** [7] - 23:25, 27:3, 39:24, 71:20, 71:24, 90:18, 95:3

## 9

**9** [2] - 3:3, 6:20
**900** [4] - 16:3, 16:4, 17:3, 83:8
**93** [1] - 3:6
**95** [2] - 91:25, 96:8
**954.424.1933** [1] - 1:23
**954.474.7405** [1] - 1:23
**96** [1] - 3:7
**9:00** [3] - 71:20, 71:24, 95:25

JURY TRIAL - VOLUME VI OF VI

## A

**a.m** [7] - 19:7, 19:14, 65:4, 67:13, 71:2
**abby** [1] - 117:18
**ability** [1] - 98:21
**able** [6] - 15:10, 26:16, 50:24, 57:3, 78:7, 105:16
**above-entitled** [1] - 120:4
**abridged** [1] - 106:12
**absolutely** [6] - 52:9, 55:12, 58:14, 60:21, 74:24, 113:4
**accept** [3] - 7:9, 50:14, 98:9
**account** [4] - 20:8, 82:7, 83:15, 109:7
**accounted** [2] - 4:7, 22:1
**accurate** [5] - 22:18, 50:15, 98:10, 120:3
**accurately** [1] - 98:22
**acknowledged** [1] - 53:13
**acknowledges** [1] - 63:15
**act** [10] - 6:21, 54:8, 85:24, 97:10, 101:15, 102:13, 103:19, 104:21, 107:21, 109:12
**Act** [14] - 10:12, 37:23, 54:5, 60:20, 69:1, 82:15, 86:1, 100:16, 102:23, 106:11, 106:13, 106:16, 107:5, 107:18
**acting** [2] - 45:19, 107:22
**active** [2] - 103:24, 104:14
**activity** [3] - 45:22, 108:1
**acts** [1] - 97:12
**actual** [4] - 12:12, 66:1, 97:22, 102:19
**add** [6] - 15:4, 17:1, 20:23, 28:2, 40:17, 57:19
**added** [2] - 22:6, 32:15
**addition** [3] - 11:20, 11:22, 100:24
**additional** [4] - 17:7, 32:10, 93:19, 110:12
**addressed** [1] -

111:9
**administration** [1] - 118:15
**administrative** [2] - 104:23, 105:8
**admit** [2] - 83:16, 83:19
**admits** [1] - 59:5
**admitted** [17] - 12:9, 13:9, 14:1, 14:18, 23:16, 44:3, 44:19, 46:3, 46:4, 58:7, 72:5, 72:17, 73:15, 82:25, 94:18, 94:19, 97:17
**admittedly** [2] - 33:2, 43:19
**adriana** [1] - 117:21
**advanced** [1] - 10:25
**affairs** [1] - 118:21
**affect** [1] - 97:7
**affecting** [1] - 47:14
**affidavit** [2] - 57:18, 57:25
**affidavits** [5] - 50:8, 52:17, 52:18, 54:20, 57:11
**affirmative)** [1] - 80:7
**affirmatively)** [1] - 117:5
**afford** [1] - 81:13
**afraid** [2] - 35:8, 90:10
**afternoon** [2] - 87:10, 118:18
**aggregate** [1] - 105:9
**ago** [1] - 87:16
**agree** [3] - 49:14, 97:3, 108:15
**agreeable** [1] - 6:5
**agreed** [5] - 25:3, 26:17, 33:22, 35:14, 112:1
**agreeing** [1] - 48:8
**agreement** [11] - 30:11, 31:13, 31:15, 41:13, 47:18, 94:17, 94:20, 108:19, 109:25, 110:15, 110:24
**Aguirre** [13] - 19:6, 19:9, 19:18, 23:11, 43:21, 43:23, 49:21, 51:22, 52:24, 57:11, 57:13, 61:7, 62:5
**ain't** [1] - 74:21
**air** [1] - 39:14
**ALBOREZ** [2] - 1:6, 1:6
**alive** [1] - 119:1
**allegations** [1] -

26:25
**allegedly** [2] - 16:17, 95:14
**alleging** [1] - 101:3
**allow** [1] - 4:17
**allowed** [2] - 22:17, 22:18
**alone** [4] - 24:7, 28:2, 66:6, 103:11
**alternative** [1] - 34:9
**amazing** [2] - 65:19, 79:4, 79:5
**America** [3] - 75:25, 81:21, 95:24
**amount** [21] - 14:3, 21:24, 25:25, 27:8, 38:6, 39:4, 39:5, 60:18, 77:17, 78:12, 83:11, 84:22, 90:5, 100:6, 103:3, 103:6, 103:16, 105:7, 109:8, 110:16, 110:18
**amounts** [2] - 40:15, 102:13
**ANGELES** [1] - 1:5
**announced** [1] - 116:4
**annual** [1] - 101:11
**Answer** [1] - 67:6
**answer** [8] - 42:6, 49:1, 85:21, 86:15, 93:4, 98:23, 117:8
**answered** [1] - 118:8
**answering** [1] - 115:15
**anticipation** [1] - 7:13
**anyway** [2] - 65:23, 71:7
**apartment** [1] - 91:2
**appear** [1] - 98:23
**aPPEARANCES** [1] - 1:15
**applicable** [1] - 70:18
**application** [1] - 106:15
**applied** [1] - 53:4
**applies** [2] - 84:6, 105:1
**apply** [5] - 8:22, 10:8, 77:8, 96:24, 97:2
**appreciate** [1] - 48:4
**approaching** [1] - 81:10
**appropriate** [5] - 5:5, 35:1, 110:3, 110:18, 119:6
**approximate** [4] -

39:9, 39:11, 79:18, 103:10
**approximation** [1] - 79:21
**April** [4] - 117:2, 118:24, 118:25
**APRIL** [1] - 1:9
**argue** [4] - 8:9, 8:14, 8:15, 28:21
**arguing** [1] - 81:3
**argument** [22] - 3:3, 3:4, 3:5, 3:6, 6:4, 8:11, 9:6, 16:15, 17:8, 28:19, 34:11, 38:8, 40:23, 47:5, 53:20, 60:3, 60:16, 65:20, 87:8, 94:5, 95:23
**arguments** [5] - 4:8, 7:21, 7:24, 8:20, 8:21
**arise** [1] - 53:25
**arisen** [1] - 78:17
**arises** [1] - 100:16
**arose** [1] - 78:17
**arrive** [3] - 23:25, 31:22, 106:18
**arriving** [2] - 74:6, 98:5
**articulate** [1] - 35:3
**ashamed** [1] - 93:2
**aside** [1] - 41:17
**aspects** [4] - 54:11, 55:3, 55:12, 108:4
**assembled** [1] - 111:14
**asserts** [1] - 97:21
**assessed** [1] - 110:11
**assignment** [1] - 105:10
**assist** [2] - 85:22, 111:15
**associated** [1] - 86:2
**assuming** [1] - 20:4
**ate** [2] - 37:10, 69:18
**attempt** [4] - 65:25, 66:24, 76:18
**attention** [4] - 4:24, 48:4, 111:6, 118:11
**attitude** [1] - 35:10
**attorney** [13] - 52:18, 62:9, 62:13, 63:4, 65:11, 80:5, 80:6, 80:8, 85:22, 86:13, 86:18
**attorney's** [2] - 109:7, 109:9
**attorneys** [1] - 7:21
**August** [7] - 12:6, 12:24, 14:15, 14:16, 64:15, 64:16, 64:17

**Augustin** [7] - 9:10, 48:24, 109:20, 110:21, 116:16, 116:20, 116:25
**AUGUSTIN** [1] - 1:4
**authorities** [1] - 114:24
**authority** [2] - 44:15, 93:4
**automatically** [3] - 42:21, 43:5, 95:22
**AVENUE** [1] - 120:8
**Avenue** [1] - 2:4
**average** [5] - 16:4, 31:18, 72:2, 72:23, 80:13
**averaging** [2] - 66:10, 110:15
**award** [12] - 6:16, 40:15, 64:22, 65:23, 79:20, 85:4, 85:7, 85:9, 102:14, 102:16, 102:18, 110:21
**awarded** [9] - 9:23, 39:8, 79:17, 79:19, 103:9, 110:13, 110:16, 116:24, 116:25

## B

**bad** [1] - 30:4
**bakery** [2] - 36:14, 69:13
**balance** [2] - 9:16, 9:22
**balconies** [3] - 19:24, 21:6, 93:19
**balcony** [1] - 36:18
**bald** [1] - 99:19
**baloney** [1] - 33:15
**barbecue** [2] - 78:25, 79:1
**barbecues** [1] - 61:6
**base** [1] - 31:14
**based** [15] - 4:16, 10:22, 11:19, 21:24, 22:3, 22:10, 26:10, 26:15, 26:24, 28:5, 31:6, 31:25, 85:9, 102:16, 113:19
**basis** [7] - 15:23, 22:19, 58:21, 66:8, 101:21, 103:13, 106:5
**Beach** [3] - 1:18, 74:4, 75:25
**become** [1] - 108:24
**beer** [2] - 79:1, 79:3
**begin** [2] - 65:19,

JURY TRIAL - VOLUME VI OF VI

97:1
**beginning** [5] - 44:18, 65:24, 66:13, 80:21, 88:6
**behalf** [10] - 8:13, 8:17, 8:19, 9:9, 60:3, 94:24, 113:17, 118:12, 118:13
**behind** [2] - 64:1, 64:2
**beliefs** [1] - 109:1
**believability** [1] - 49:16
**believable** [2] - 50:23, 53:9
**benefit** [5] - 44:22, 69:3, 93:10, 103:22, 104:2
**benefits** [1] - 34:20
**beside** [1] - 14:17
**best** [9] - 22:17, 24:17, 24:19, 25:11, 31:15, 45:1, 54:25, 81:14
**better** [7] - 9:20, 51:22, 51:24, 65:3, 65:21, 71:24
**between** [14] - 11:14, 24:1, 38:23, 48:8, 82:9, 91:9, 97:25, 102:12, 110:20, 111:18, 111:23, 115:8, 115:10, 115:12
**beyond** [4] - 9:19, 77:11, 77:12, 104:22
**bias** [1] - 77:23
**biased** [3] - 23:2, 49:25, 50:4
**big** [5] - 46:10, 46:15, 73:12, 93:25, 118:23
**bit** [7] - 21:5, 26:1, 26:3, 47:23, 48:2, 48:11, 55:10
**blah** [6] - 5:21, 6:17
**blah-blah-blah** [2] - 5:21, 6:17
**blame** [1] - 40:12
**blames** [1] - 79:11
**blank** [3] - 109:23, 110:14, 110:17
**blown** [1] - 67:17
**blue** [2] - 11:6, 16:7
**blue-collar** [2] - 11:6, 16:7
**bona** [7] - 37:1, 37:14, 70:14, 70:16, 104:7, 104:11
**books** [2] - 87:23
**boom** [2] - 73:3, 73:7

**Boreth** [2] - 1:21, 112:21
**boring** [1] - 31:9
**born** [1] - 56:2
**boss** [1] - 46:15
**bothered** [1] - 87:24
**Boulevard** [1] - 1:22
**box** [1] - 110:3
**boy** [3] - 62:2, 62:25, 77:7
**Boynton** [1] - 75:25
**Brad** [3] - 22:21, 80:14
**Brazilian** [1] - 69:13
**break** [10] - 37:5, 37:9, 37:10, 59:21, 59:22, 69:7, 69:9, 70:8, 70:9, 71:14
**breakfast** [3] - 69:11, 72:21, 78:22
**breaks** [6] - 36:16, 69:25, 70:3, 72:21, 92:22, 104:8
**briefly** [4] - 9:13, 10:20, 60:18, 63:7
**bright** [1] - 14:13
**bring** [8] - 7:11, 24:19, 30:1, 38:13, 39:1, 77:10, 111:6, 116:5
**broadly** [1] - 106:14
**broke** [4] - 20:24, 41:18, 41:23, 88:10
**brought** [2] - 33:9, 39:18
**broward** [1] - 112:19
**Broward** [1] - 1:22
**bucks** [2] - 32:4, 32:6
**buildings** [1] - 67:7
**bunch** [5] - 29:21, 69:25, 70:24, 71:1, 72:3
**bungo** [2] - 39:20, 72:1
**Bungo** [16] - 22:21, 23:20, 27:5, 29:7, 38:17, 39:20, 67:17, 67:18, 71:7, 71:9, 72:15, 80:14, 95:1, 95:2
**Bungo's** [1] - 23:19
**burden** [1] - 38:3, 39:2, 39:25, 77:15, 78:6, 78:10, 94:4, 100:5, 102:25, 103:5
**burdens** [1] - 77:8
**burdensome** [2] - 69:1, 103:20
**bus** [1] - 88:16

**business** [39] - 7:19, 10:24, 19:14, 29:19, 33:2, 33:3, 33:4, 33:7, 33:13, 33:19, 35:2, 35:20, 43:20, 44:4, 61:11, 61:12, 68:3, 68:4, 68:7, 69:3, 69:11, 74:11, 79:11, 87:15, 87:18, 88:5, 89:19, 91:13, 91:16, 91:19, 93:13, 94:21, 101:8, 101:9, 103:23, 104:1, 107:15, 119:16
**buy** [1] - 111:21
**BY** [1] - 2:2

**C**

**cafeteria** [1] - 90:17
**calculate** [4] - 16:19, 47:16, 47:17, 71:21
**calculated** [3] - 32:16, 72:8, 91:24
**calculating** [1] - 101:21
**calculation** [12] - 15:16, 18:7, 21:23, 24:24, 26:16, 30:24, 31:22, 35:13, 76:19, 82:5, 82:6, 113:22
**calculations** [10] - 13:18, 14:23, 21:21, 22:19, 31:5, 76:21, 81:25, 82:4, 82:19, 89:8
**camcorder** [1] - 26:5
**cannot** [1] - 37:24, 38:1, 41:10, 54:3, 55:2, 66:11, 77:2, 77:13, 102:24, 103:16, 104:22, 106:11, 107:16
**car** [1] - 89:25
**card** [2] - 43:20, 44:20
**cards** [1] - 87:23
**care** [1] - 64:7
**carried** [5] - 38:3, 39:25, 77:14, 78:6, 102:25
**case** [75] - 1:3, 7:20, 7:25, 8:7, 8:10, 9:3, 9:17, 9:18, 9:21, 9:22, 10:1, 10:4, 10:16, 10:21, 10:22, 10:23, 11:3, 11:4, 16:2, 17:10, 20:13, 24:2, 27:7, 28:14, 28:20, 29:13, 32:18, 40:3,

40:13, 40:25, 41:3, 41:18, 42:7, 43:4, 48:14, 48:15, 49:23, 51:22, 51:24, 60:20, 61:21, 62:22, 63:22, 64:6, 65:20, 69:10, 83:19, 85:17, 86:12, 86:21, 87:5, 94:2, 96:25, 97:2, 98:3, 98:20, 99:18, 100:1, 100:2, 100:16, 101:1, 104:4, 108:13, 108:18, 108:20, 108:23, 109:2, 109:4, 109:5, 111:25, 116:15, 118:11, 119:8, 119:14
**cases** [2] - 38:12, 114:23
**cash** [2] - 15:5, 95:14
**cashing** [1] - 60:25
**catastrophic** [1] - 89:21
**caught** [2] - 64:18, 86:14
**cautioned** [1] - 111:10
**CCR** [2] - 2:3, 120:7
**cede** [1] - 6:3
**cement** [1] - 92:7
**cents** [3] - 90:7, 110:20
**CEO** [1] - 56:9
**certain** [4] - 70:17, 76:11, 84:15, 84:19
**certainly** [6] - 14:12, 21:20, 23:3, 27:10, 34:3, 56:24
**certify** [1] - 120:3
**chain** [1] - 97:23
**change** [1] - 108:24
**changed** [2] - 92:25, 93:1
**changes** [1] - 18:10
**charge** [2] - 44:14, 59:9
**Charge.................... .................** [1] - 3:7
**charted** [1] - 45:6
**cheap** [1] - 31:4
**cheat** [5] - 51:14, 54:18, 60:22, 61:15, 63:20
**cheating** [1] - 61:2
**check** [5] - 5:11, 42:17, 42:20, 90:4, 90:13
**checking** [1] - 46:11
**checks** [7] - 14:11, 60:25, 90:4, 90:5,

90:20, 95:15
**children** [1] - 119:4
**choice** [2] - 29:23, 73:21
**choose** [1] - 27:22
**Chris** [2] - 73:14, 81:7
**CHRIS** [1] - 1:21
**Christmas** [1] - 66:16
**circumstances** [6] - 64:5, 70:17, 97:24, 104:3, 105:11, 108:1
**circumstantial** [3] - 97:18, 97:23, 98:1
**citations** [1] - 114:24
**cite** [1] - 114:23
**citizens** [2] - 118:13, 118:21
**citizenship** [1] - 118:19
**civil** [1] - 48:8
**claim** [21] - 10:9, 10:10, 26:19, 28:8, 30:2, 30:7, 32:11, 63:8, 63:11, 65:17, 76:3, 77:9, 86:3, 86:4, 90:10, 100:4, 100:8, 100:14, 100:15, 100:18, 105:9
**claimed** [2] - 48:14, 100:21
**claims** [7] - 15:18, 64:8, 68:2, 92:5, 101:3, 102:7, 102:9
**classic** [1] - 79:25
**clean** [3] - 11:22, 27:20, 74:14
**clean-up** [1] - 11:22
**clear** [13] - 11:7, 14:13, 15:1, 35:17, 50:22, 59:4, 61:4, 62:24, 72:11, 73:1, 79:11, 79:15, 86:17
**clearly** [12] - 14:21, 15:8, 15:10, 17:22, 23:20, 53:13, 69:16, 79:9, 80:15, 80:22, 98:23, 114:18
**Clemens** [1] - 37:16
**CLERK** [14] - 60:11, 112:17, 112:19, 113:8, 116:2, 116:15, 117:9, 117:12, 117:15, 117:18, 117:21, 117:24, 118:2, 118:5
**Clerk** [1] - 119:10
**clerk** [5] - 8:25, 111:14, 116:14,

JURY TRIAL - VOLUME VI OF VI

117:7, 118:9
**client** [2] - 29:7, 58:23
**clients** [2] - 24:12, 60:3
**clock** [2] - 61:18, 73:19
**close** [6] - 8:19, 28:10, 55:6, 64:15, 71:8, 71:9
**closed** [3] - 12:1, 12:2, 12:11
**Closing** [3] - 3:4, 3:5, 3:6
**closing** [11] - 4:7, 6:3, 7:21, 7:24, 9:6, 49:13, 52:15, 53:20, 65:2, 65:19, 87:8
**coffee** [6] - 68:8, 69:6, 69:10, 71:14, 84:20, 104:8
**coincidence** [1] - 89:12
**collar** [2] - 11:6, 16:7
**color** [1] - 50:1
**Colorado** [2] - 44:5, 46:8
**combed** [1] - 26:22
**coming** [10] - 23:21, 24:4, 29:4, 38:19, 38:20, 44:7, 46:8, 91:25, 92:15, 95:23
**commerce** [2] - 101:10, 101:11
**committed** [1] - 51:10
**common** [5] - 19:13, 62:21, 94:2, 101:9, 106:15
**commonality** [2] - 38:14, 38:15
**commonly** [1] - 101:18
**commonsense** [2] - 97:19, 99:24
**communicate** [3] - 57:1, 111:3, 111:17
**communicating** [1] - 46:21
**communication** - 90:2
**community** [2] - 79:6, 87:4
**commute** [7] - 73:17, 73:20, 74:1, 74:5, 74:15, 76:13, 78:24
**company** [37] - 11:25, 12:11, 12:18, 21:12, 33:5, 34:14, 41:19, 41:23, 43:4,

43:5, 43:17, 44:11, 44:17, 45:3, 45:4, 45:5, 45:23, 47:14, 49:5, 49:24, 55:12, 55:19, 56:16, 57:3, 59:5, 61:1, 61:13, 63:18, 63:20, 69:6, 86:23, 88:5, 94:24, 95:20, 96:16, 96:17, 97:14
**company's** [3] - 54:11, 55:4, 108:4
**comparison** [2] - 9:17, 115:12
**compensable** [15] - 68:22, 70:7, 70:9, 70:11, 74:1, 74:9, 76:14, 78:24, 84:5, 84:12, 84:18, 93:12, 103:23, 103:25, 104:19
**compensate** [6] - 16:1, 83:9, 83:21, 83:23, 84:1, 106:7
**compensated** [5] - 38:5, 68:16, 77:16, 80:24, 103:2
**compensation** [4] - 13:23, 54:12, 106:11, 108:5
**complain** [1] - 35:8
**complained** [5] - 41:4, 41:5, 41:7, 41:15, 41:16
**completely** [8] - 37:24, 38:1, 40:17, 72:22, 77:2, 101:4, 102:24, 104:9
**complicated** [2] - 15:6, 80:1
**comply** [1] - 40:4
**computed** [2] - 15:24, 106:6
**computer** [3] - 89:2, 89:6, 89:7
**concede** [2] - 40:10
**conceded** [1] - 5:24
**concedes** [1] - 107:14
**concept** [1] - 10:20
**concern** [1] - 92:2
**concerned** [1] - 29:17
**concerning** [5] - 52:3, 98:5, 98:14, 99:3, 108:11
**conclude** [1] - 8:20
**Concluded** [1] - 119:18
**concluded** [1] - 8:21

**conclusion** [2] - 47:16, 60:2
**conclusions** [2] - 62:20, 97:19, 99:24
**concrete** [3] - 92:8, 92:13, 92:16
**concurred** [1] - 112:1
**conditions** [2] - 67:3, 104:12
**condo** [1] - 75:2
**condominiums** [1] - 66:22
**condos** [1] - 66:22
**confined** [1] - 28:20
**conflicting** [1] - 39:19
**confronted** [2] - 57:12, 57:25
**confuse** [1] - 31:8
**confused** [1] - 5:13
**connection** [2] - 7:20, 119:7
**conscious** [4] - 61:15, 79:6, 87:4, 93:3
**consecutive** [1] - 12:21
**conservative** [3] - 13:4, 18:6, 18:17
**consider** [16] - 14:25, 18:12, 23:2, 45:13, 47:2, 50:13, 97:15, 97:17, 98:8, 99:13, 99:17, 100:10, 101:14, 105:7, 108:1, 110:10
**consideration** [8] - 9:4, 13:19, 15:11, 99:18, 102:6, 108:21, 109:7, 112:4
**considerations** [2] - 84:9, 105:4
**considered** [8] - 43:12, 54:9, 84:10, 84:11, 105:5, 105:21, 106:2, 108:2
**considering** [1] - 14:24
**consist** [1] - 7:21
**consistent** [1] - 37:5
**consistently** [2] - 37:9, 43:25
**consists** [2] - 7:25, 8:2
**constituted** [1] - 85:25
**constrained** [1] - 94:9
**construed** [1] -

105:19
**contacting** [1] - 46:8
**contend** [1] - 85:25
**CONTENTS** [1] - 3:1
**continue** [4] - 60:13, 60:16, 77:12, 96:14
**continued** [1] - 36:17
**continuous** [1] - 76:2
**continuously** [1] - 40:22
**contract** [1] - 106:12
**contracting** [1] - 24:21
**contradicted** [1] - 23:19
**contradicting** [1] - 24:8
**control** [32] - 4:13, 5:4, 5:19, 5:20, 6:18, 44:17, 47:8, 52:19, 52:25, 54:2, 54:7, 54:10, 55:3, 55:11, 55:25, 56:4, 56:22, 56:24, 58:19, 58:21, 58:24, 59:5, 59:13, 95:20, 101:9, 106:19, 107:2, 107:14, 107:20, 108:3, 108:6, 114:18
**controlled** [3] - 45:22, 69:2, 103:21
**controlling** [3] - 45:5, 47:13, 98:14
**controls** [1] - 98:7
**convenience** [1] - 109:16
**convinced** [1] - 108:25
**convincing** [8] - 37:24, 38:2, 77:2, 77:4, 77:13, 94:6, 102:24
**cooler** [1] - 36:19
**copy** [7] - 48:18, 49:19, 113:13, 113:20, 113:21, 114:9
**corner** [1] - 91:11
**corporate** [10] - 5:19, 5:21, 6:8, 43:1, 54:7, 106:21, 106:25, 107:7, 107:10, 107:20
**corporation** [7] - 95:21, 97:6, 97:7, 97:9, 97:11, 107:3, 108:8
**corporation's** [2] - 107:2, 108:7
**correct** [1] - 51:13
**costly** [1] - 86:19

**costs** [3] - 45:7, 109:7, 109:9
**counsel** [3] - 112:8, 112:12, 113:12
**count** [7] - 70:7, 71:16, 73:18, 75:7, 84:8, 105:3, 105:10
**counted** [4] - 70:13, 75:10, 104:5, 106:2
**counting** [1] - 75:6
**country** [5] - 53:5, 93:3, 118:15, 118:20, 118:24
**countrymen** [1] - 119:7
**countrywomen** [1] - 119:7
**counts** [6] - 69:9, 73:20, 74:16, 75:7, 75:8, 105:22
**couple** [2] - 54:21, 71:5
**coupled** [1] - 54:1, 55:24, 106:19
**course** [16] - 7:24, 9:3, 30:20, 31:7, 32:7, 36:15, 75:9, 92:2, 92:24, 97:10, 99:7, 102:8, 108:10, 111:4, 111:15, 113:11
**Court** [19] - 2:3, 4:1, 4:16, 5:23, 8:3, 8:21, 10:5, 24:13, 29:18, 29:24, 30:2, 37:19, 38:9, 109:10, 111:2, 111:3, 111:17, 118:23, 119:9
**court** [13] - 5:12, 30:5, 41:20, 48:14, 49:23, 97:9, 109:7, 109:9, 109:14, 110:8, 112:2, 118:12, 119:16
**COURT** [57] - 1:1, 4:2, 4:6, 4:21, 5:15, 5:22, 6:1, 6:5, 6:7, 6:11, 6:15, 6:24, 7:1, 7:4, 7:7, 7:11, 7:16, 7:18, 8:16, 43:14, 46:1, 48:5, 59:20, 59:23, 59:25, 60:7, 60:12, 60:15, 85:13, 87:7, 93:6, 96:19, 96:21, 96:22, 96:23, 112:8, 112:16, 112:23, 112:25, 113:2, 113:5, 113:9, 114:1, 114:4, 115:2, 115:6, 115:13, 115:22, 116:3, 116:7, 116:10, 117:4, 117:6,

JURY TRIAL - VOLUME VI OF VI

118:8, 119:4, 119:13, 120:8

**Court's** [8] - 4:24, 10:6, 60:7, 111:6, 113:5, 113:13, 113:15, 115:24

**courthouse** [2] - 111:22, 112:15

**courtroom** [2] - 50:10, 111:9

**COURTROOM** [1] - 1:4

**covered** [3] - 38:2, 107:2, 108:7

**covers** [1] - 10:14

**cracks** [1] - 14:12

**crazy** [1] - 86:24

**credit** [1] - 44:20

**crew** [8] - 62:1, 69:12, 70:4, 73:11, 81:2, 81:4, 81:6, 81:8

**criminal** [3] - 9:17, 9:18, 10:4

**critical** [1] - 81:4

**critically** [1] - 64:21

**cross** [2] - 50:24, 74:24

**cross-examination** [1] - 74:24

**cross-examine** [1] - 50:24

**culpable** [1] - 34:10

**curious** [1] - 55:19

**customers** [1] - 56:21

**cut** [1] - 57:23

**D**

**daily** [1] - 105:7

**damages** [44] - 6:14, 6:17, 6:22, 15:2, 16:10, 16:19, 16:21, 39:8, 41:17, 47:17, 71:21, 71:23, 72:8, 76:19, 76:21, 79:17, 81:25, 82:4, 82:5, 82:6, 82:18, 85:1, 85:3, 85:7, 85:9, 85:12, 86:9, 86:11, 86:18, 102:10, 102:11, 102:14, 102:16, 102:18, 102:19, 103:9, 108:11, 109:8, 110:11, 110:13, 110:16, 110:20, 116:24, 116:25

**damageswise** [1] -

82:22

**dark** [2] - 82:19, 82:20

**darkness** [1] - 82:23

**date** [3] - 46:20, 110:7, 111:1

**Date** [1] - 120:7

**dated** [1] - 117:2

**DAVID** [1] - 1:17

**david.kelly38@ rocketmail.com** [1] - 1:19

**dawned** [1] - 4:25

**day-to-day** [11] - 4:15, 4:18, 45:14, 54:11, 55:4, 56:17, 56:22, 56:24, 59:13, 96:16, 108:4

**days** [29] - 12:3, 12:14, 13:2, 13:3, 13:10, 13:11, 13:12, 13:16, 20:7, 20:20, 22:2, 22:3, 28:9, 31:23, 31:24, 44:4, 44:6, 46:8, 54:22, 55:1, 55:8, 65:4, 67:18, 71:12, 72:6, 76:14, 93:24

**de** [8] - 84:3, 84:6, 84:10, 84:12, 104:24, 105:1, 105:5, 105:6

**dead** [1] - 81:5

**deadlines** [1] - 46:14

**deal** [4] - 33:24, 34:8, 57:23, 73:12

**dealing** [3] - 10:21, 13:7, 52:13

**deals** [1] - 113:24

**dealt** [1] - 97:8

**debts** [2] - 63:15, 64:7

**debunked** [1] - 65:17

**decide** [12] - 5:1, 25:1, 42:5, 45:21, 50:15, 63:14, 84:19, 95:21, 98:10, 105:12, 108:20

**decided** [3] - 42:12, 86:22, 109:9

**deciding** [9] - 45:16, 47:11, 51:6, 96:24, 97:2, 98:15, 100:9, 107:24, 109:8

**decimal** [1] - 110:19

**decision** [14] - 5:11, 19:22, 26:4, 26:7, 32:19, 32:22, 36:24, 50:17, 61:15, 94:21, 97:4, 97:7, 98:5, 98:12

**decisions** [1] - 88:6

**deduced** [1] - 4:16

**deduct** [1] - 25:14

**deducted** [1] - 83:24

**deducting** [1] - 13:21

**deductions** [3] - 62:20, 97:19, 99:24

**deep** [1] - 64:25

**defend** [1] - 86:20

**DEFENDANT** [1] - 2:1

**defendant** [33] - 5:2, 5:7, 42:14, 42:25, 43:1, 49:3, 49:5, 49:8, 49:10, 50:3, 53:11, 54:7, 76:24, 86:20, 102:19, 106:20, 106:22, 106:24, 106:25, 107:6, 107:7, 107:10, 107:20, 109:20, 109:21, 109:22, 110:1, 116:21, 116:22, 116:23

**Defendants** [1] - 1:11

**defendants** [27] - 6:8, 10:24, 14:7, 28:18, 28:21, 33:1, 35:23, 43:13, 58:20, 63:6, 77:20, 85:3, 85:16, 85:25, 86:21, 87:5, 100:15, 100:19, 101:7, 101:12, 102:8, 107:9, 110:6, 110:10, 112:9, 114:5, 115:17

**DEFENDANTS** [1] - 1:20

**defendants'** [2] - 101:8, 114:13

**defense** [4] - 5:17, 8:14, 49:4, 95:10

**define** [1] - 52:25

**defined** [6] - 45:19, 68:25, 103:19, 106:14, 106:16, 107:22

**definition** [5] - 68:24, 107:25, 114:11, 114:19, 115:11

**definitions** [1] - 113:21

**deleted** [3] - 82:4, 114:23, 114:25

**deliberations** [7] - 9:3, 97:1, 97:15, 108:16, 109:13, 111:4, 111:16

**delivered** [2] - 111:14, 111:23

demonstrated [1] - 58:20

**demonstrates** [2] - 106:23, 107:8

**denied** [2] - 62:11, 69:17

**deny** [3] - 62:10, 62:12, 63:2

**denying** [3] - 40:12, 70:21, 96:9

**department** [1] - 44:12

**deposed** [1] - 81:6

**deposition** [15] - 28:24, 46:4, 50:7, 53:12, 53:13, 57:22, 63:25, 64:14, 69:17, 69:18, 72:6, 72:16, 73:14, 81:5

**depositions** [2] - 52:11, 79:23

**described** [1] - 85:24

**designed** [4] - 10:13, 80:19, 83:21, 84:1

**desire** [2] - 111:3, 111:17

**desk** [1] - 104:16

**detached** [1] - 94:25

**detail** [8] - 10:17, 20:4, 20:9, 20:12, 20:24, 65:14, 85:24, 99:16

**detailed** [2] - 10:7, 36:11

**details** [4] - 21:3, 27:15, 43:3, 43:16

**determination** [5] - 16:20, 38:25, 105:12, 106:23, 107:8

**determine** [2] - 66:7, 103:12

**determined** [1] - 101:22

**determining** [6] - 46:5, 66:8, 70:14, 103:13, 104:6, 105:6

**differ** [1] - 98:24

**differed** [1] - 50:10

**difference** [6] - 91:9, 102:12, 110:20, 115:8, 115:10, 115:12

**different** [7] - 17:25, 36:8, 52:6, 56:12, 69:14, 99:5, 114:5

**differential** [1] - 24:1

**differentiate** [1] - 11:14

**differently** [1] - 109:1

**difficult** [2] - 43:6,

74:23

**difficulty** [1] - 105:8

**digress** [1] - 20:11

**direct** [4] - 96:10, 97:18, 97:21, 98:1

**directly** [6] - 44:21, 45:19, 47:13, 93:16, 98:24, 107:22

**directors** [1] - 43:19

**dirtiest** [1] - 92:10

**disbelieve** [2] - 50:17, 98:12

**discharged** [3] - 118:19, 118:22, 119:8

**discredit** [1] - 23:15

**discredited** [1] - 21:10

**discretion** [2] - 85:8, 102:15

**discuss** [4] - 10:19, 53:21, 108:18

**discussing** [3] - 53:17, 108:23

**discussions** [1] - 97:1

**dishonest** [1] - 51:16

**disinterested** [1] - 72:15

**disjunctive** [1] - 78:12

**disprove** [1] - 97:24

**dispute** [6] - 14:3, 48:8, 48:10, 97:24, 98:14, 107:15

**disputes** [1] - 68:3

**disregard** [1] - 98:4

**disregarded** [1] - 104:24

**distinction** [1] - 97:25

**DISTRICT** [3] - 1:1, 1:1, 1:14

**divide** [10] - 16:5, 16:24, 17:4, 25:5, 25:6, 30:18, 30:19, 31:16, 32:4, 34:21

**divided** [1] - 36:1

**dividing** [3] - 15:24, 101:22, 106:6

**DIVISION** [1] - 1:2

**division** [1] - 111:12

**docked** [2] - 11:18, 19:4

**document** [4] - 14:14, 14:19, 15:5

**documentary** [1] - 8:3

**documentation** [2] - 14:18, 36:16

**documenting** [1] -

JURY TRIAL - VOLUME VI OF VI

26:5

**documents** [6] - 20:19, 20:21, 20:23, 53:11, 53:12, 53:15

**doe** [1] - 70:23

**dollar** [2] - 110:14, 110:18

**dollars** [12] - 22:15, 43:16, 48:15, 50:2, 50:3, 61:13, 78:1, 79:2, 90:6, 90:8, 91:15, 110:20

**domain** [1] - 27:22

**done** [7] - 12:10, 34:2, 46:23, 49:13, 65:24, 66:13, 87:2

**door** [1] - 44:14

**double** [2] - 75:10, 93:17

**doubt** [2] - 9:19, 10:4

**down** [20] - 12:1, 13:22, 31:3, 33:14, 33:18, 33:23, 34:12, 34:16, 35:5, 37:9, 52:11, 53:14, 57:23, 64:18, 65:3, 66:13, 72:24, 81:24, 92:15

**drag** [1] - 64:18

**draw** [6] - 4:24, 62:12, 62:17, 62:21, 99:21, 99:25

**drawing** [2] - 85:8, 102:15

**drawn** [3] - 39:6, 78:14, 103:8

**drill** [5] - 92:6, 92:7, 92:16

**drilling** [5] - 92:7, 92:8, 92:13, 92:14, 92:16

**drink** [2] - 36:20, 106:17

**drinking** [2] - 68:8, 79:1

**drive** [4] - 73:16, 73:20, 74:12, 75:1

**driver** [1] - 81:7

**driving** [2] - 11:23, 73:17

**drove** [3] - 73:11, 73:14, 73:15

**dry** [2] - 31:9

**due** [3] - 84:9, 101:21, 105:3

**duration** [3] - 84:8, 105:3, 105:21

**during** [17] - 9:2, 9:13, 20:6, 27:24, 48:14, 52:7, 64:19, 69:25, 98:4, 99:6,

101:7, 101:20, 102:1, 105:24, 111:3, 111:15, 112:21

**dust** [4] - 92:10, 92:11, 92:12, 92:14

**duties** [4] - 11:22, 97:13, 104:14, 105:24

**duty** [6] - 72:22, 104:10, 104:13, 105:21, 106:2, 108:18

---

## E

**earliest** [1] - 119:15

**early** [3] - 22:14, 60:25, 67:1

**earned** [1] - 85:5

**earning** [1] - 60:24

**earth** [2] - 53:1, 61:1

**earthquake** [1] - 75:16

**easy** [3] - 47:21, 79:12, 82:13

**eat** [1] - 104:16

**Eat** [1] - 36:21

**eating** [9] - 36:9, 37:12, 78:25, 79:1, 92:7, 92:14, 104:10, 104:15, 104:17

**Ed** [8] - 49:7, 56:3, 56:4, 56:20, 57:22, 59:4, 90:20, 107:6

**ed** [2] - 56:5, 59:8

**eDWARD** [1] - 2:1

**EDWARD** [1] - 1:10

**Edward** [8] - 2:1, 5:2, 42:25, 49:5, 57:15, 106:21, 109:21, 116:22

**effectively** [4] - 29:19, 50:24, 105:23, 106:1

**effort** [3] - 84:5, 104:19, 108:19

**eight** [2] - 36:2, 74:8

**eighty** [1] - 26:8

**eighty-five** [1] - 26:8

**either** [13] - 4:18, 22:7, 34:25, 42:7, 46:24, 53:6, 53:23, 58:25, 67:9, 86:23, 98:1, 110:5, 110:9

**electrical** [1] - 52:13

**Ellys** [1] - 118:5

**emphatically** [1] - 39:11

**employed** [5] - 12:16, 15:22, 101:7, 101:9, 106:4

**employee** [35] - 15:22, 16:12, 16:13, 17:14, 17:16, 29:25, 37:24, 38:1, 38:2, 39:7, 41:10, 45:20, 77:2, 77:4, 77:14, 79:17, 84:4, 101:16, 102:12, 102:24, 102:25, 103:9, 103:24, 104:9, 104:13, 104:15, 104:18, 106:4, 106:8, 106:12, 107:24, 113:25, 115:8, 115:10, 115:11

**employee's** [8] - 39:6, 78:14, 84:4, 101:20, 103:8, 104:3, 105:18, 106:10

**employees** [26] - 11:15, 23:11, 37:22, 38:13, 47:22, 54:12, 54:13, 58:4, 63:19, 85:25, 89:3, 89:5, 89:14, 90:3, 90:9, 90:25, 94:13, 95:8, 97:11, 97:12, 97:13, 102:22, 108:5, 108:6

**Employer** [1] - 107:22

**employer** [23] - 30:3, 39:7, 45:18, 45:20, 46:13, 69:2, 69:3, 74:12, 74:13, 78:11, 78:15, 79:8, 79:16, 84:14, 84:17, 101:15, 103:5, 103:8, 103:21, 103:22, 106:13, 107:23, 108:7

**employer's** [9] - 37:21, 37:23, 37:25, 77:1, 93:12, 102:21, 102:23, 104:1, 104:2

**employers** [9] - 11:1, 11:3, 46:16, 47:7, 54:8, 54:10, 107:21, 107:25, 108:3

**employment** [5] - 13:4, 14:15, 18:13, 18:14, 21:18

**empty** [1] - 41:23

**enable** [1] - 105:25

**end** [14] - 11:25, 14:15, 18:13, 18:14, 21:12, 26:15, 28:11, 29:21, 30:22, 44:24, 64:11, 72:3, 75:7, 89:24

**ended** [4] - 64:3, 64:16, 64:17, 72:1

**ends** [1] - 79:19

**engaged** [6] - 101:10, 103:24, 105:13, 105:14, 105:16

**enriching** [1] - 118:17

**ensure** [1] - 57:17

**entered** [1] - 119:15

**enterprise** [2] - 107:3, 108:7

**entertain** [1] - 79:7

**entire** [6] - 9:11, 18:5, 26:5, 37:7, 37:8

**entitled** [18] - 11:8, 11:16, 11:18, 17:10, 18:7, 18:17, 19:5, 25:9, 30:21, 36:4, 40:9, 51:4, 79:15, 79:21, 81:19, 102:11, 120:4

**entitlement** [1] - 41:1

**entry** [1] - 119:14

**equal** [1] - 97:8

**equals** [1] - 97:9

**equipment** [1] - 11:22

**Ernesto** [2] - 20:3, 21:1

**errands** [1] - 56:19

**escort** [1] - 89:1

**escorted** [2] - 44:13, 88:24

**especially** [1] - 118:12

**ESQ** [5] - 1:17, 1:21

**essential** [1] - 100:3

**establish** [1] - 100:13

**established** [8] - 25:11, 37:7, 42:24, 62:22, 99:25, 101:15, 106:20, 107:5

**establishment** [1] - 96:6

**estimate** [5] - 18:17, 24:19, 29:2, 29:3, 39:12

**estimated** [1] - 13:12

**estimates** [1] - 12:21

**estimating** [1] - 29:3

**estimations** [1] - 29:17

**evasion** [1] - 51:10

**evening** [1] - 75:22

**events** [1] - 88:24

**evidence** [93] - 7:24, 7:25, 8:3, 8:6, 8:9, 9:12, 9:14, 10:2, 10:23, 11:4, 12:5,

12:7, 12:9, 14:1, 14:19, 19:6, 21:25, 22:4, 26:6, 28:1, 31:6, 38:6, 38:11, 39:1, 39:3, 39:5, 39:6, 39:7, 39:18, 42:13, 48:20, 50:13, 50:14, 51:21, 52:2, 52:4, 53:17, 54:6, 54:15, 62:22, 77:17, 78:11, 78:13, 78:14, 78:21, 79:16, 80:11, 85:9, 85:16, 85:21, 87:12, 94:10, 94:12, 95:13, 97:16, 97:18, 97:21, 97:23, 98:1, 98:2, 98:6, 98:8, 98:9, 98:25, 99:2, 99:3, 99:17, 99:18, 100:1, 100:4, 100:6, 100:7, 100:10, 100:12, 100:15, 101:6, 102:6, 102:16, 103:3, 103:6, 103:7, 103:8, 103:9, 106:23, 107:8, 107:19, 108:21, 109:5, 109:17, 111:13, 112:11, 116:19

**evidentiary** [1] - 40:2

**exactly** [4] - 22:2, 29:15, 62:13, 75:11

**examination** [2] - 74:24, 78:20

**examine** [2] - 50:24, 108:24

**example** [19] - 16:5, 16:12, 16:13, 16:23, 17:3, 17:14, 17:15, 18:21, 21:8, 29:7, 31:18, 42:23, 47:24, 96:12, 102:19, 104:15, 105:20, 106:8

**examples** [1] - 52:14

**except** [2] - 90:5, 98:3

**excess** [1] - 101:25

**excitement** [1] - 7:13

**exciting** [1] - 48:9

**excuse** [2] - 112:12, 118:10

**exercised** [2] - 52:20, 58:19

**exertion** [2] - 69:1, 103:20

**exhibit** [1] - 18:12

**exhibits** [5] - 8:4, 97:17, 100:12, 111:13, 112:9

**exist** [2] - 76:3, 101:3

**exists** [1] - 41:24

JURY TRIAL - VOLUME VI OF VI

**expected** [1] - 27:8
**experience** [4] - 57:17, 62:20, 99:23, 118:17
**experienced** [1] - 11:13
**explain** [10] - 5:12, 11:2, 22:8, 42:3, 43:9, 86:2, 96:23, 97:3, 108:17, 110:4
**explained** [2] - 21:7, 115:7
**explanation** [2] - 66:18, 89:15
**exploit** [1] - 91:11
**extent** [5] - 38:6, 38:10, 77:17, 79:23, 103:3
**extra** [3] - 22:5, 71:10, 93:20
**extraneous** [1] - 114:24
**Extremely** [1] - 53:7
**eye** [1] - 97:22

**F**

**fabulous** [1] - 78:4
**face** [2] - 88:22, 109:24
**fact** [23] - 14:24, 38:4, 38:18, 41:19, 52:3, 62:13, 65:11, 66:20, 77:15, 78:21, 81:17, 82:24, 94:2, 94:24, 95:11, 97:6, 97:22, 97:24, 99:15, 100:9, 100:21, 103:1, 108:10
**factor** [2] - 21:22, 76:19
**factory** [4] - 12:3, 12:15, 89:8, 104:16
**facts** [23] - 4:16, 10:8, 22:8, 28:20, 32:22, 43:12, 45:13, 46:18, 53:18, 62:18, 69:13, 74:17, 85:8, 86:2, 96:6, 96:12, 97:23, 98:5, 99:3, 99:21, 99:25, 102:15, 109:4
**failed** [5] - 8:10, 52:5, 99:5, 101:12, 102:7
**fails** [4] - 39:7, 79:16, 100:13, 103:8
**failure** [5] - 15:5, 62:12, 84:8, 105:3

**fair** [14] - 6:21, 10:12, 12:25, 16:4, 22:10, 22:20, 27:11, 30:13, 30:16, 68:25, 86:1, 93:1, 103:19
**Fair** [11] - 37:22, 54:4, 60:19, 82:14, 100:16, 102:22, 106:11, 106:13, 106:16, 107:4, 107:18
**fairly** [2] - 22:21, 82:7
**faith** [1] - 24:19
**false** [5] - 53:4, 54:19, 54:20, 58:14, 58:16
**falsehood** [1] - 99:14
**falsely** [2] - 52:3, 99:2
**families** [1] - 66:17
**famous** [1] - 119:1
**fantasy** [1] - 92:19
**far** [7] - 12:11, 29:1, 29:17, 40:24, 44:17, 74:9, 103:23
**farfetched** [1] - 31:24
**fast** [1] - 65:5
**fault** [1] - 47:6
**favor** [8] - 49:9, 49:13, 50:1, 55:5, 56:13, 59:17, 110:5, 110:9
**favorable** [1] - 54:16
**Federal** [7] - 10:13, 10:22, 18:9, 26:9, 100:17, 102:3
**feedback** [1] - 58:11
**fees** [2] - 109:7, 109:9
**feet** [2] - 45:9
**Feliciano** [39] - 9:10, 10:18, 11:5, 12:5, 12:20, 13:7, 13:24, 14:14, 16:15, 19:7, 23:17, 35:9, 42:5, 47:20, 47:24, 48:22, 58:7, 63:12, 63:22, 64:3, 64:11, 64:22, 66:22, 69:22, 73:1, 73:16, 81:7, 82:1, 82:8, 82:11, 82:16, 91:22, 109:20, 110:13, 110:16, 116:16, 116:20, 116:24
**FELICIANO** [1] - 1:5
**Feliciano's** [5] - 23:15, 73:15, 81:2, 81:6, 81:8

**fell** [1] - 14:12
**fellow** [3] - 118:13, 118:21, 119:7
**felony** [2] - 53:5, 53:8
**few** [11] - 12:3, 13:3, 51:8, 55:2, 56:21, 60:19, 84:7, 98:16, 105:2, 111:15, 111:24
**fide** [7] - 37:1, 37:14, 70:14, 70:16, 104:7, 104:11
**fifth** [1] - 110:12
**fifty** [6] - 16:14, 17:17, 17:19, 25:8, 32:10, 32:12
**fifty-two** [2] - 16:14, 17:17
**fight** [1] - 87:2
**figure** [1] - 32:24
**figured** [1] - 75:9
**fill** [5] - 49:2, 53:14, 59:16, 110:17, 110:25
**filled** [1] - 49:15
**final** [3] - 6:12, 12:18, 119:14
**finally** [2] - 85:1, 110:20
**finances** [1] - 96:16
**fine** [2] - 73:22, 112:25
**finish** [1] - 72:13
**finished** [1] - 96:25
**fire** [1] - 89:12
**fired** [5] - 35:9, 45:23, 45:24, 46:2
**first** [36] - 7:19, 8:12, 8:14, 8:15, 18:20, 19:8, 38:21, 42:4, 42:9, 48:12, 48:19, 48:22, 49:16, 53:20, 55:22, 63:22, 64:11, 65:20, 75:7, 82:11, 83:6, 83:10, 83:22, 83:23, 84:2, 87:14, 89:17, 89:21, 90:13, 100:23, 101:6, 101:14, 101:23, 109:11, 109:19, 113:19
**five** [14] - 14:5, 16:14, 17:17, 20:20, 24:5, 26:8, 36:2, 53:6, 63:23, 70:1, 85:13, 88:21, 112:14
**five/six** [1] - 88:21
**fixing** [3] - 6:16, 85:7, 102:14
**FL** [4] - 1:18, 1:22, 2:4, 120:9

**FLORIDA** [2] - 1:1, 1:7
**Florida** [3] - 19:22, 33:14, 87:17
**flow** [1] - 114:22
**FLSA** [5] - 10:12, 68:21, 103:25, 108:9, 113:20
**fluctuates** [1] - 18:10
**fly** [2] - 36:10, 37:12
**folks** [1] - 74:22
**follow** [5] - 7:7, 8:22, 53:19, 96:24, 97:2
**following** [1] - 46:14
**follows** [5] - 42:14, 48:21, 109:16, 109:18, 116:19
**FOR** [3] - 1:16, 1:20, 2:1
**forced** [1] - 82:14
**foregoing** [1] - 120:3
**foreman** [4] - 109:12, 110:2, 110:17, 110:25
**FOREPERSON** [1] - 116:9
**foreperson** [1] - 117:3
**forewarn** [1] - 48:9
**forewoman** [4] - 109:12, 110:3, 110:17, 110:25
**forget** [2] - 95:11, 99:10
**forgive** [1] - 79:12
**form** [15] - 4:23, 42:3, 48:12, 48:17, 49:1, 49:2, 49:14, 55:5, 59:16, 109:15, 109:24, 110:4, 110:23, 111:1, 119:14
**former** [2] - 22:23, 70:5
**formulas** [1] - 89:9
**FORT** [2] - 1:2, 1:7
**forth** [7] - 12:18, 29:22, 56:21, 65:25, 66:17, 78:8, 85:21
**forward** [4] - 16:16, 39:3, 78:11, 103:5
**four** [18] - 13:5, 14:4, 26:20, 29:12, 29:13, 31:1, 36:3, 40:6, 40:7, 40:9, 41:20, 41:22, 55:1, 64:12, 82:1, 82:3
**four-month** [1] - 82:3
**fourth** [2] - 82:9
**FPR** [2] - 2:3, 120:7
**FRANCIS** [1] - 1:10
**Francis** [6] - 1:22,

57:16, 106:24, 107:9, 109:22, 116:23
**Frank** [5] - 49:10, 57:14, 59:1, 59:12, 59:15
**frankly** [1] - 68:8
**free** [2] - 73:23, 73:25
**Friday** [1] - 8:24
**friend** [1] - 92:21
**front** [1] - 29:14
**full** [5] - 33:11, 37:3, 64:12, 78:25, 108:20
**functions** [4] - 54:11, 55:4, 56:17, 108:4
**funny** [1] - 74:9
**furnish** [1] - 8:25
**furnishing** [1] - 113:12
**furniture** [1] - 88:7
**furtherance** [2] - 93:12, 104:1

**G**

**game** [2] - 92:21, 92:22
**gee** [1] - 65:21
**general** [3] - 12:15, 60:19, 97:11
**generally** [2] - 19:15, 105:17
**generous** [1] - 61:3
**gentlemen** [2] - 45:14, 112:13
**Gentlemen** [4] - 4:2, 54:15, 56:19, 117:7
**given** [9] - 16:17, 17:21, 50:9, 85:21, 91:20, 108:10, 114:8, 114:17, 114:19
**glabor@aol.com** [1] - 1:23
**Glasser** [1] - 1:21
**glasses** [1] - 22:22
**God** [3] - 63:17, 82:12, 93:4
**gofering** [1] - 56:20
**GONZALEZ** [1] - 1:13
**Goodness** [1] - 80:6
**goods** [1] - 101:11
**Government** [1] - 51:13
**grab** [1] - 36:21
**grand** [2] - 78:2
**granted** [1] - 20:5
**great** [8] - 57:24, 59:8, 59:24, 61:8,

JURY TRIAL - VOLUME VI OF VI

78:3, 82:13, 91:19

**greater** [1] - 56:13

**greatly** [2] - 49:22, 79:22

**grew** [1] - 23:14

**gross** [2] - 67:11, 101:11

**grossly** [1] - 77:24

**ground** [3] - 52:12, 83:1, 83:3

**grown** [1] - 90:11

**grown-up** [1] - 90:11

**guess** [8] - 21:1, 28:25, 29:3, 29:4, 39:14, 79:24, 80:4, 85:12

**guessed** [4] - 28:24, 39:13

**guessing** [2] - 80:2, 80:3

**guesswork** [6] - 28:22, 28:23, 29:10, 85:10, 102:17, 115:19

**GUILLERMO** [1] - 1:6

**gut** [1] - 74:25

**guy** [14] - 22:22, 23:1, 23:21, 27:2, 44:16, 56:8, 61:8, 63:14, 63:19, 64:6, 78:1, 78:2, 81:6

**guys** [74] - 19:23, 20:9, 20:15, 24:3, 24:5, 24:13, 24:17, 24:22, 24:23, 25:3, 25:18, 27:3, 27:11, 29:2, 29:3, 29:5, 29:11, 29:12, 29:13, 30:16, 32:24, 33:10, 33:11, 33:12, 33:15, 33:23, 33:25, 34:8, 34:16, 34:18, 34:21, 35:4, 35:6, 35:7, 35:17, 35:19, 35:20, 36:8, 36:9, 36:17, 37:4, 38:12, 39:12, 41:4, 41:15, 41:19, 42:10, 44:9, 44:21, 45:11, 46:16, 47:3, 52:17, 59:2, 59:8, 59:13, 61:3, 62:5, 68:5, 70:25, 71:8, 78:1, 79:3, 84:20, 90:11, 90:13, 92:9, 93:9, 94:12, 95:17, 95:25, 96:17

# H

**hail** [1] - 75:15

**half** [45] - 11:16, 15:19, 15:24, 17:1, 17:11, 18:22, 25:9, 26:11, 26:16, 26:18, 27:12, 27:20, 27:21, 30:21, 32:8, 32:11, 33:11, 33:12, 34:13, 34:23, 35:4, 35:13, 35:25, 36:4, 37:5, 37:9, 37:14, 61:19, 69:21, 69:22, 70:10, 70:19, 72:23, 73:6, 73:7, 74:5, 74:7, 100:18, 101:16, 101:18, 101:24, 106:5, 114:14

**half-an-hour** [3] - 37:5, 37:9, 37:14

**half-time** [7] - 32:8, 32:11, 34:23, 35:25, 36:4, 114:14

**hand** [2] - 19:2, 92:6

**handle** [1] - 15:6

**handled** [1] - 14:6

**hands** [1] - 88:8

**hang** [4] - 46:12, 58:8, 84:20

**happy** [2] - 79:10

**hard** [2] - 22:2, 32:2, 91:18

**hardly** [3] - 7:12, 55:16, 118:25

**Hardy** [1] - 120:6

**HARDY** [2] - 2:3, 120:7

**Hardy-Hobbs** [1] - 120:6

**HARDY-HOBBS** [2] - 2:3, 120:7

**harken** [1] - 116:12

**harmless** [3] - 94:16, 94:20, 94:21

**harp** [2] - 36:5, 40:21

**Harry** [1] - 112:21

**he/she** [1] - 38:5

**head** [2] - 44:11, 112:19

**headings** [1] - 114:21

**hear** [34] - 8:12, 8:16, 8:18, 10:6, 10:9, 11:18, 16:11, 22:7, 28:17, 36:17, 36:25, 37:17, 37:18, 41:9, 42:1, 42:19, 42:23, 42:24, 45:14, 45:18,

47:3, 47:25, 60:2, 62:8, 62:17, 65:20, 84:3, 99:20, 113:6, 115:24, 115:25, 119:4

**heard** [70] - 8:1, 9:19, 10:8, 11:21, 11:25, 15:8, 20:3, 22:4, 28:18, 36:8, 40:8, 46:19, 55:7, 56:17, 56:20, 57:21, 58:24, 59:3, 59:7, 61:3, 61:7, 61:16, 61:17, 61:21, 63:13, 63:16, 63:22, 64:1, 64:13, 64:16, 65:22, 67:12, 69:10, 69:11, 69:15, 69:22, 69:24, 70:2, 70:3, 70:20, 70:24, 71:2, 71:3, 71:5, 71:14, 72:2, 72:3, 72:5, 72:7, 72:21, 74:2, 74:23, 76:15, 78:21, 81:2, 81:21, 81:22, 81:23, 82:1, 82:2, 83:13, 85:16, 94:2, 95:6, 95:24, 112:11

**heart** [2] - 40:22, 41:17

**heavy** [1] - 92:6

**Heidelberger** [64] - 1:22, 6:9, 8:17, 11:1, 33:1, 33:5, 43:7, 43:23, 44:1, 44:3, 44:13, 44:18, 44:24, 46:6, 46:7, 46:19, 46:22, 47:4, 49:8, 49:10, 49:24, 52:18, 52:21, 54:2, 54:6, 54:9, 54:17, 55:1, 55:6, 55:11, 55:13, 55:15, 55:17, 55:18, 55:25, 56:14, 57:8, 57:9, 57:16, 57:19, 57:24, 58:3, 58:7, 58:18, 59:1, 59:11, 59:14, 60:21, 61:10, 88:20, 89:16, 89:22, 95:18, 96:15, 106:24, 107:9, 107:13, 107:15, 107:16, 107:19, 107:24, 108:2, 109:22, 116:23

**HEIDELBERGER** [1] - 1:10

**Heidelberger's** [1] - 51:2

**held** [3] - 54:3, 57:4, 107:16

**help** [5] - 69:6,

80:10, 89:11, 89:13, 89:23

**helped** [2] - 38:18, 56:17

**helping** [1] - 26:2

**hereby** [1] - 120:3

**hesitate** [1] - 108:23

**hideous** [1] - 65:10

**highest** [1] - 118:19

**himself** [5] - 8:8, 75:7, 75:8, 79:11

**hired** [13] - 16:12, 16:17, 17:9, 17:14, 17:16, 17:21, 46:2, 57:22, 89:4, 89:5, 89:15, 106:8, 113:25

**hit** [1] - 63:7

**HOBBS** [2] - 2:3, 120:7

**Hobbs** [1] - 120:6

**hobbs@flsd. uscourts.gov** [2] - 2:5, 120:9

**hold** [4] - 94:16, 94:19, 94:21, 94:22

**holiday** [1] - 65:21

**holidays** [1] - 13:11

**home** [3] - 20:5, 20:7, 73:19

**homes** [1] - 67:7

**honest** [5] - 61:8, 65:25, 66:18, 81:25, 108:25

**honestly** [3] - 66:14, 78:7, 82:7

**honesty** [1] - 61:9

**Honor** [18] - 4:5, 4:10, 5:17, 6:2, 6:6, 6:12, 7:3, 8:15, 9:7, 45:25, 60:9, 60:17, 85:14, 87:9, 113:4, 113:17, 115:17, 116:9

**honor** [2] - 90:24, 91:24

**Honorable** [1] - 87:12

**HONORABLE** [1] - 1:13

**hop** [1] - 73:22

**hope** [2] - 118:16, 118:17

**hopefully** [2] - 49:13, 66:4

**hour** [49] - 6:7, 6:8, 16:14, 17:4, 17:5, 17:12, 17:17, 24:1, 24:6, 25:8, 25:9, 25:10, 27:12, 27:20, 27:22, 30:22, 32:4, 32:7, 32:9, 32:12,

34:17, 34:22, 34:23, 36:2, 37:5, 37:9, 37:14, 57:4, 69:21, 69:23, 70:10, 70:19, 72:17, 72:23, 74:4, 74:5, 74:7, 84:15, 84:20, 86:14, 90:7, 91:8, 92:3, 101:25, 106:9

**hour-and-a-half** [2] - 74:5, 74:7

**hourly** [16] - 15:23, 16:6, 16:25, 17:18, 25:7, 30:20, 36:1, 61:16, 86:13, 106:5, 113:21, 113:22, 114:10, 115:8, 115:10

**hours** [146] - 13:21, 14:3, 15:25, 16:5, 16:24, 17:6, 17:7, 17:9, 17:10, 17:11, 18:3, 18:4, 18:20, 18:22, 19:11, 19:12, 19:16, 21:18, 21:20, 22:1, 22:5, 24:5, 24:6, 24:7, 25:4, 25:6, 25:11, 25:12, 25:13, 25:16, 26:9, 26:10, 26:12, 26:17, 28:4, 28:10, 30:12, 30:16, 30:18, 30:23, 30:25, 31:14, 31:15, 31:16, 31:19, 31:23, 31:25, 32:2, 32:4, 32:5, 32:13, 33:17, 33:18, 33:20, 34:1, 34:3, 34:7, 34:17, 34:24, 35:16, 35:17, 36:3, 37:22, 40:16, 40:17, 40:21, 47:19, 51:1, 51:20, 53:22, 59:18, 60:18, 61:20, 62:2, 63:8, 65:4, 65:9, 66:4, 66:7, 66:9, 66:10, 66:18, 66:25, 67:6, 68:19, 68:22, 69:19, 70:13, 70:22, 70:24, 71:12, 72:11, 72:17, 72:18, 72:19, 72:24, 73:3, 73:7, 73:18, 74:8, 74:16, 77:25, 78:22, 79:22, 79:24, 80:1, 81:10, 81:15, 81:22, 82:14, 83:7, 83:10, 83:22, 83:23, 83:24, 83:25, 86:24, 96:5, 96:7, 100:23, 100:24, 100:25, 101:17, 101:23, 101:24, 102:1, 102:22, 103:12,

JURY TRIAL - VOLUME VI OF VI

103:14, 103:15, 103:16, 103:17, 104:6, 104:22, 105:11, 105:22, 106:2, 106:6, 106:7

**hours'** [1] - 26:13

**house** [2] - 75:2, 93:16

**houses** [3] - 93:24, 94:1

**humans** [1] - 92:25

**hundred** [4] - 50:2, 61:13, 90:6, 90:8

**hurricane** [12] - 10:25, 11:21, 20:3, 20:4, 22:24, 36:19, 41:22, 46:13, 58:8, 74:25, 75:1, 75:15

**Hurricane** [18] - 1:21, 5:7, 8:17, 10:24, 12:10, 19:25, 21:1, 31:2, 42:9, 42:11, 42:14, 42:18, 42:20, 49:3, 64:20, 109:21, 116:16, 116:21

**HURRICANE** [1] - 1:9

**Hurricane's** [1] - 5:6

**hurt** [1] - 30:5

## I

**Ibacache** [24] - 23:12, 46:19, 49:21, 50:2, 51:23, 52:24, 58:17, 61:7, 62:5, 62:8, 62:25, 67:5, 67:12, 68:2, 68:3, 68:4, 69:16, 70:3, 70:20, 71:3, 73:15, 83:13, 92:9, 92:13

**Ibacache's** [1] - 62:12

**idea** [5] - 17:18, 33:5, 38:15, 58:8, 80:1

**identical** [1] - 8:11

**illegal** [1] - 41:14

**Imagine** [1] - 78:25

**impact** [1] - 16:21

**impaneled** [1] - 50:20

**impeach** [1] - 63:25

**impeached** [4] - 46:3, 53:15, 70:5, 72:5

**implicated** [1] - 88:9

**important** [33] - 8:6, 16:9, 16:10, 20:10, 23:18, 24:2, 24:8,

25:1, 29:8, 39:4, 40:2, 41:2, 46:15, 48:10, 49:16, 50:16, 52:3, 52:16, 53:8, 61:21, 70:6, 73:17, 74:10, 74:11, 74:18, 76:23, 81:1, 88:4, 90:3, 98:11, 99:3, 99:15

**importantly** [1] - 45:13

**impress** [3] - 51:8, 51:10, 98:17

**improperly** [2] - 38:5, 77:16, 103:2

**inaccurate** [4] - 37:23, 38:1, 77:1, 102:23

**inaccurately** [1] - 99:11

**inactive** [1] - 104:14

**Inc** [2] - 1:21, 116:17

**INC** [1] - 1:9

**include** [4] - 69:22, 75:24, 102:17, 104:8

**included** [4] - 4:17, 64:20, 89:4, 114:1

**includes** [3] - 101:1, 101:2, 103:23

**including** [2] - 54:11, 108:4

**income** [1] - 51:10

**inconsistent** [1] - 51:25

**increase** [4] - 45:10, 45:11, 61:14

**increases** [2] - 18:11, 21:20

**increasing** [1] - 46:25

**indefinite** [1] - 84:7, 105:2

**indicate** [2] - 21:4, 110:2

**indicated** [1] - 35:9

**indication** [1] - 108:12

**indirect** [1] - 96:11

**indirectly** [3] - 45:19, 47:13, 107:23

**individual** [7] - 33:1, 35:22, 53:16, 53:21, 55:23, 89:23, 106:10

**individually** [9] - 42:25, 54:3, 86:22, 106:21, 106:25, 107:6, 107:10, 107:13, 107:17

**individuals** [5] - 40:24, 51:9, 88:9, 88:18, 88:19

**industrial** [2] - 84:9, 105:4

**ineffective** [1] - 29:22

**infer** [1] - 38:16

**inference** [10] - 38:7, 39:2, 39:6, 39:16, 62:11, 77:18, 78:14, 78:16, 78:17, 103:4

**inferences** [7] - 62:19, 85:8, 99:22, 99:23, 102:15, 103:7, 115:19

**Inferences** [1] - 62:20

**influenced** [1] - 97:4

**information** [3] - 80:7, 80:8, 114:25

**innocent** [1] - 99:13

**insignificant** [1] - 104:21

**install** [1] - 74:25

**installer** [2] - 30:9, 45:1, 67:21

**installers** [21] - 11:24, 12:4, 22:25, 23:4, 23:23, 23:25, 27:6, 28:12, 28:13, 29:9, 30:11, 39:22, 46:2, 59:9, 60:23, 67:19, 67:25, 80:17, 80:20, 91:4, 95:3

**installing** [3] - 11:20, 30:9, 36:19

**instance** [2] - 32:12, 53:3

**instances** [1] - 52:8

**instead** [1] - 20:19

**instruct** [3] - 8:22, 10:5, 18:10

**instructed** [18] - 6:22, 42:22, 49:19, 50:12, 50:18, 51:17, 52:1, 53:18, 53:24, 62:15, 66:2, 66:5, 68:21, 70:12, 84:14, 84:24, 85:1, 85:6

**instruction** [36] - 4:12, 5:18, 6:13, 6:20, 6:21, 15:17, 15:20, 16:9, 18:3, 20:12, 24:17, 24:25, 29:1, 30:6, 30:20, 31:12, 36:22, 36:24, 37:3, 37:16, 42:19, 45:12, 55:23, 62:23, 76:6, 77:13, 78:10, 79:8, 79:19, 93:11, 93:22, 113:22, 114:8, 114:12, 115:18,

115:20

**instructions** [26] - 4:15, 4:23, 5:13, 6:18, 10:7, 11:17, 17:13, 31:7, 41:10, 42:2, 43:9, 47:3, 49:20, 51:6, 53:25, 54:14, 55:25, 58:5, 62:16, 96:10, 98:3, 108:10, 112:3, 114:17, 114:20

**insubstantial** [1] - 104:21

**intended** [5] - 15:25, 32:25, 33:16, 35:21, 106:7

**intensive** [1] - 11:6

**intention** [2] - 17:9, 87:17

**intentional** [1] - 99:14

**intentionally** [1] - 34:19

**interest** [18] - 45:20, 51:21, 51:23, 54:1, 55:19, 55:24, 56:1, 56:6, 56:7, 56:8, 56:14, 56:15, 61:25, 77:23, 98:19, 106:19, 107:23, 109:5

**interesting** [2] - 44:1, 118:16

**internet** [2] - 22:24, 23:20

**interpretation** [1] - 98:6

**interpreted** [2] - 106:14, 108:12

**interrogatories** [1] - 85:18

**interrogatory** [2] - 85:20, 86:16

**intertwined** [1] - 28:18

**invested** [2] - 43:16, 61:10

**investor** [1] - 94:25

**investors** [1] - 88:10

**involved** [15] - 11:5, 11:23, 33:7, 35:1, 46:4, 46:7, 56:16, 76:12, 80:23, 84:6, 84:7, 97:6, 97:10, 101:8, 104:20

**involvement** [3] - 43:4, 51:2, 51:3

**involving** [1] - 105:2

**irrelevant** [2] - 41:15, 41:16

**IRS** [2] - 95:10, 95:11

**issue** [10] - 5:14,

31:8, 40:2, 40:25, 41:1, 45:17, 49:16, 94:17, 95:1, 108:11

**issues** [3] - 52:15, 53:23, 96:13

**IT** [1] - 22:22

**it'd** [1] - 21:5

**items** [1] - 8:2

## J

**J.H** [1] - 1:17

**jacket** [1] - 88:12

**jail** [1] - 9:20

**Jennifer** [1] - 117:24

**Jerico** [2] - 73:14, 81:7

**jewelry** [1] - 89:25

**jILL** [1] - 2:3

**Jill** [1] - 120:6

**JILL** [1] - 120:7

**jill_hardy** [2] - 2:5, 120:9

**jill_hardy-hobbs@ flsd.uscourts.gov** [2] - 2:5, 120:9

**JNOV** [1] - 5:14

**job** [23] - 11:19, 12:15, 24:14, 41:11, 41:12, 43:21, 43:23, 46:11, 57:18, 58:12, 58:20, 59:6, 59:7, 75:13, 76:13, 78:4, 80:15, 81:12, 81:13, 82:11, 82:16, 91:6, 94:8

**job's** [1] - 82:12

**jobs** [2] - 19:23, 92:10

**join** [1] - 115:2

**jointly** [2] - 107:3, 108:8

**JOSE** [1] - 1:13

**Jovenauf** [1] - 94:22

**Jovenoff** [1] - 94:20

**JR** [1] - 1:13

**judge** [1] - 95:4

**JUDGE** [1] - 1:14

**Judge** [9] - 15:18, 15:20, 18:9, 31:12, 36:25, 37:17, 87:12, 114:6, 118:21

**Judges** [1] - 109:3

**judges** [1] - 109:4

**judgment** [2] - 22:6, 119:14

**judgment's** [1] - 5:3

**JULIO** [1] - 1:6

**July** [11] - 12:8,

JURY TRIAL - VOLUME VI OF VI

89:16, 89:18, 89:20, 89:22, 89:23, 91:6, 102:2, 102:4, 102:5
**junked** [1] - 65:17
**juror** [2] - 117:11, 118:20
**JUROR** [8] - 117:14, 117:17, 117:20, 117:23, 118:1, 118:4, 118:7, 119:3
**jurors** [4] - 4:6, 5:10, 9:9, 50:20
**JURY** [4] - 1:13, 7:17, 116:9, 117:5
**Jury** [20] - 3:7, 7:15, 7:16, 7:18, 42:12, 48:19, 60:1, 60:6, 60:14, 96:23, 108:22, 109:16, 112:7, 116:6, 116:7, 116:8, 116:12, 117:4, 118:10, 119:12
**jury** [66] - 4:12, 4:14, 4:19, 4:22, 4:23, 4:25, 5:1, 5:12, 7:12, 9:2, 9:13, 11:11, 15:17, 15:19, 17:13, 18:2, 19:21, 20:12, 24:25, 30:20, 31:6, 31:12, 36:22, 36:24, 37:3, 42:1, 42:19, 43:8, 45:12, 47:2, 47:11, 48:19, 49:19, 54:14, 55:25, 60:4, 66:4, 96:10, 96:25, 99:25, 108:14, 109:11, 110:24, 112:5, 112:6, 112:10, 112:11, 113:6, 113:10, 114:8, 114:17, 114:20, 114:22, 115:23, 115:24, 115:25, 116:4, 116:5, 116:18, 117:3, 117:6, 118:8, 118:22, 119:8, 119:10, 119:11
**justice** [3] - 87:2, 97:9, 118:15
**justified** [4] - 62:19, 84:9, 99:23, 105:4

**K**

**Kalvaitis** [1] - 117:15
**KALVAITIS** [2] - 117:17, 119:3
**keep** [22] - 20:9, 21:5, 24:3, 24:11, 24:12, 24:14, 29:11, 29:25, 30:1, 30:3, 31:3, 38:8, 38:9,

38:12, 39:12, 69:16, 76:25, 81:12, 81:14, 94:8, 99:7
**keeping** [4] - 20:25, 37:21, 80:9, 102:21
**keeps** [1] - 91:23
**Keith** [3] - 23:13, 76:9, 80:16
**KELLY** [15] - 1:17, 4:4, 4:10, 4:22, 5:16, 7:10, 9:7, 43:15, 46:2, 93:8, 96:20, 113:17, 113:24, 114:3, 114:6
**Kelly** [13] - 4:9, 8:12, 8:19, 9:5, 43:14, 48:5, 48:25, 55:7, 55:15, 65:6, 82:5, 93:7, 119:13
**Kelly's** [1] - 67:17
**Kelly**...................
[2] - 3:3, 3:6
**kept** [3] - 52:10, 61:18, 94:7
**key** [5] - 68:2, 68:3, 68:11, 68:14, 105:15
**kind** [5] - 23:6, 40:22, 86:2, 87:19, 114:21
**KLEPPIN** [26] - 1:21, 4:3, 5:17, 5:23, 6:2, 6:10, 6:12, 6:16, 6:25, 7:2, 7:6, 8:15, 48:7, 59:22, 59:24, 60:9, 60:17, 85:14, 112:14, 112:18, 112:20, 112:24, 113:1, 113:3, 114:7, 115:17
**Kleppin** [6] - 1:21, 8:17, 48:6, 59:21, 60:8, 60:15
**Kleppin's** [1] - 60:3
**Kleppin**...................
[1] - 3:4
**knocks** [1] - 71:12
**knowing** [1] - 118:18
**knowingly** [1] - 34:25
**knowledge** [1] - 97:22
**known** [1] - 101:18
**knows** [5] - 80:5, 80:6, 91:22, 93:4, 119:2

**L**

**labor** [10] - 10:12, 11:6, 16:7, 31:4, 46:25, 68:25, 86:1,

87:20, 96:17, 103:24
**Labor** [16] - 6:21, 37:22, 54:4, 60:20, 64:19, 66:14, 82:15, 100:16, 102:22, 103:19, 106:11, 106:13, 106:16, 107:4, 107:18
**labor-intensive** [1] - 11:6
**lack** [1] - 29:20
**ladders** [1] - 27:14
**Ladies** [4] - 4:2, 54:14, 56:18, 117:7
**Lamonica** [1] - 71:4
**LAMONICA** [2] - 1:4, 1:5
**Lamonicas** [1] - 87:24
**language** [9] - 4:14, 4:17, 4:19, 5:20, 10:9, 16:8, 28:22, 38:21, 114:23
**lapse** [1] - 99:13
**Lares** [18] - 23:13, 23:18, 23:24, 36:12, 39:19, 39:23, 63:13, 63:16, 63:20, 69:12, 70:20, 72:15, 72:22, 76:10, 76:15, 80:16, 95:3
**last** [8] - 7:19, 8:1, 39:10, 49:10, 74:3, 86:5, 118:14
**late** [5] - 12:6, 12:8, 64:15, 64:16, 89:23
**LAUDERDALE** [2] - 1:2, 1:7
**LAW** [5] - 60:11, 112:17, 112:19, 113:8, 116:2
**law** [35] - 8:22, 10:7, 10:8, 10:13, 10:22, 11:2, 11:17, 18:5, 20:14, 20:24, 22:23, 29:23, 41:11, 50:19, 51:5, 52:15, 53:19, 66:6, 66:9, 74:12, 80:24, 96:24, 97:2, 97:3, 97:8, 97:12, 97:25, 98:3, 100:17, 100:20, 101:13, 103:11, 103:14, 106:15
**lawsuit** [2] - 29:21, 61:24
**lawyer** [5] - 57:19, 58:22, 72:12, 87:18
**lawyers** [4] - 7:23, 8:5, 8:7, 98:2

**lead** [3] - 62:21, 97:20, 99:24
**least** [28] - 10:19, 14:25, 15:7, 17:25, 19:4, 19:11, 19:17, 21:24, 22:4, 23:1, 24:5, 24:21, 24:23, 25:24, 26:15, 26:17, 26:23, 27:8, 27:19, 28:11, 32:17, 69:11, 70:10, 72:23, 93:3, 101:10, 101:11, 101:16
**leave** [13] - 35:11, 41:6, 71:25, 83:4, 85:10, 85:15, 89:2, 89:10, 95:2, 111:21, 113:11, 118:18
**leaving** [1] - 38:22
**led** [1] - 17:22
**lee** [1] - 117:15
**leeway** [1] - 29:16
**left** [12] - 13:10, 32:18, 43:14, 46:1, 60:8, 66:24, 67:1, 75:24, 88:13, 91:16, 93:6, 110:15
**legal** [1] - 40:4
**legally** [1] - 32:21
**Leiva** [68] - 2:1, 5:2, 6:3, 6:9, 8:8, 8:18, 10:25, 21:15, 32:25, 33:6, 41:5, 42:1, 42:15, 42:17, 42:25, 43:9, 43:17, 44:4, 44:6, 44:13, 45:8, 46:8, 46:23, 47:6, 49:6, 49:7, 53:13, 55:15, 55:17, 56:3, 56:5, 56:20, 57:15, 57:22, 59:4, 59:9, 60:22, 60:24, 61:3, 61:7, 62:9, 62:25, 63:3, 63:14, 63:19, 64:1, 64:6, 64:16, 68:3, 79:2, 80:19, 94:19, 95:19, 96:7, 106:21, 107:6, 107:13, 107:14, 109:21, 115:3, 116:22
**LEIVA** [9] - 1:10, 2:1, 4:5, 6:6, 87:9, 113:23, 115:4, 115:7, 115:14
**Leiva's** [7] - 5:8, 5:9, 22:23, 23:15, 61:9, 79:9
**Leiva**...................
[1] - 3:5
**lengthy** [1] - 86:9

**less** [12] - 9:21, 22:16, 34:9, 34:21, 35:25, 57:2, 65:2, 70:10, 70:23, 83:24, 88:2
**letter** [2] - 90:21, 90:22
**letters** [1] - 83:7
**liability** [5] - 53:16, 53:21, 53:25, 55:23, 106:18
**liable** [40] - 5:7, 5:8, 5:9, 41:18, 41:25, 42:8, 42:18, 42:21, 42:22, 42:25, 43:1, 43:5, 43:8, 43:10, 43:13, 54:3, 55:21, 57:4, 57:9, 59:15, 86:22, 94:22, 95:21, 95:22, 106:21, 106:22, 106:25, 107:1, 107:4, 107:6, 107:7, 107:10, 107:11, 107:17, 108:8
**license** [2] - 81:18, 81:20
**lie** [5] - 57:25, 58:6, 69:16, 73:13
**lied** [2] - 57:11, 57:13
**lies** [1] - 81:1
**life** [1] - 90:25
**light** [3] - 54:16, 62:19, 99:23
**lightening** [1] - 52:10
**lighting** [1] - 75:15
**likely** [6] - 9:25, 10:1, 10:3, 10:10, 10:11, 100:8
**limited** [4] - 62:16, 81:22, 99:19, 99:20
**line** [1] - 14:13
**list** [2] - 86:1, 86:3
**listed** [1] - 86:13
**listen** [3] - 9:12, 56:5, 119:4
**listening** [2] - 55:17, 87:11
**litigants** [1] - 118:12
**live** [1] - 19:22
**lives** [1] - 9:12
**load** [9] - 11:21, 27:18, 75:20, 75:21, 76:11, 76:16, 93:17, 96:2, 96:4
**loaded** [4] - 75:12, 75:18, 75:20, 93:14
**loading** [4] - 27:16, 68:9, 74:11, 75:12
**location** [5] - 21:11, 21:17, 93:15, 93:16

JURY TRIAL - VOLUME VI OF VI

**lodging** [1] - 61:5
**log** [3] - 66:23, 81:12, 81:14
**logs** [10] - 66:21, 66:24, 67:1, 67:8, 77:5, 77:6, 77:10, 77:24, 94:7, 94:8
**Look** [2] - 56:9, 66:14
**look** [17] - 6:24, 14:13, 19:6, 20:22, 32:22, 32:23, 34:5, 34:10, 46:18, 47:12, 64:21, 66:3, 66:25, 76:1, 77:11, 94:14, 96:5
**looking** [5] - 4:22, 13:25, 26:18, 46:11, 65:12
**loses** [1] - 44:22
**losing** [1] - 22:1
**lost** [3] - 7:2, 88:14, 88:15
**loud** [1] - 117:8
**lounge** [1] - 20:15
**lower** [4] - 9:17, 25:24, 28:11, 30:22
**luis** [1] - 117:9
**lunch** [24] - 9:1, 9:2, 9:4, 36:6, 36:7, 36:11, 60:5, 69:18, 69:21, 69:23, 70:4, 70:9, 72:21, 75:14, 78:22, 92:2, 92:3, 92:5, 92:15, 92:22, 111:20, 111:21, 111:22
**Lunch** [1] - 113:7
**lunchtime** [1] - 69:15

**M**

**machine** [1] - 104:17
**mad** [1] - 75:5
**Mad** [3] - 75:5
**Madam** [3] - 96:21, 118:9, 119:10
**madam** [2] - 116:14, 117:6
**majority** [1] - 56:8
**man** [3] - 55:21, 91:3, 119:1
**management** [1] - 89:4
**manager** [2] - 89:7, 89:8
**manufacture** [1] - 76:3
**manufacturing** [1] - 44:12

**Maria** [1] - 118:2
**Marine** [2] - 81:21, 81:23
**Mario** [25] - 9:10, 13:9, 13:20, 19:10, 19:15, 21:7, 23:6, 25:8, 27:15, 31:18, 33:25, 35:15, 36:13, 40:16, 41:5, 45:1, 48:22, 66:22, 92:17, 93:17, 109:19, 110:13, 116:15, 116:20, 116:24
**MARIO** [1] - 1:5
**mark** [7] - 48:23, 48:24, 49:4, 49:6, 49:9, 49:11, 110:3
**marked** [1] - 8:4
**Marshal** [5] - 7:11, 111:5, 112:5, 116:5, 116:16
**MARSHALL** [2] - 112:6, 119:11
**match** [2] - 23:6, 29:5
**matched** [1] - 23:10
**matches** [4] - 24:9, 27:5, 28:1, 28:12
**matter** [17] - 9:9, 34:17, 38:6, 39:1, 40:11, 41:8, 42:24, 48:4, 52:10, 53:19, 77:18, 103:3, 104:23, 106:20, 107:5, 109:8, 120:4
**matters** [3] - 54:12, 108:5, 112:22
**maximum** [2] - 53:6, 83:11
**McCarroll** [52] - 1:10, 1:22, 6:9, 8:18, 11:1, 32:25, 33:7, 43:7, 43:22, 44:2, 44:7, 44:12, 44:13, 45:24, 46:6, 47:4, 49:11, 49:12, 49:24, 52:19, 52:21, 54:3, 54:6, 54:9, 56:11, 56:12, 57:8, 57:9, 57:14, 57:16, 57:19, 58:3, 58:7, 58:19, 59:1, 59:12, 59:15, 60:22, 61:10, 94:16, 94:23, 95:17, 106:24, 107:9, 107:13, 107:15, 107:16, 107:20, 107:25, 108:2, 109:23, 116:23
**McCarroll's** [1] - 51:3

**meal** [6] - 37:1, 37:14, 70:15, 70:16, 104:7, 104:11
**meals** [2] - 61:5, 104:10
**mean** [66] - 4:14, 5:12, 10:3, 13:2, 13:13, 14:6, 14:9, 15:4, 19:21, 19:22, 20:3, 22:7, 23:1, 23:7, 23:25, 25:24, 26:19, 27:20, 27:22, 29:18, 32:11, 32:18, 32:21, 35:25, 36:7, 36:10, 36:18, 38:8, 39:18, 40:1, 40:6, 40:8, 41:19, 42:21, 44:14, 44:16, 44:17, 44:20, 45:6, 46:5, 46:15, 46:18, 46:19, 48:10, 50:14, 58:22, 78:1, 92:8, 93:2, 94:4, 94:16, 94:23, 94:24, 95:2, 95:4, 95:6, 95:16, 95:24, 96:5, 96:18, 98:9, 99:8, 112:17, 112:23, 114:6
**meaning** [2] - 54:8, 64:15, 107:21
**means** [7] - 9:15, 9:16, 39:11, 66:6, 94:21, 100:6, 103:11
**meant** [1] - 47:10
**measure** [4] - 72:9, 84:5, 102:11, 104:19
**meat** [1] - 79:3
**meet** [2] - 89:21, 106:15
**meeting** [1] - 96:15
**meetings** [1] - 90:16
**members** [2] - 60:1, 109:12
**Members** [9] - 7:16, 7:18, 96:23, 108:21, 116:7, 116:8, 116:12, 117:4, 118:10
**memory** [2] - 98:20, 99:14
**men** [2] - 90:11, 90:19
**mental** [2] - 69:1, 103:20
**mentioned** [2] - 15:14, 88:25
**menus** [3] - 8:25, 60:5, 60:12
**merely** [1] - 109:1
**merit** [1] - 48:15
**message** [6] - 111:5, 111:11, 113:10,

113:11, 113:13, 113:14
**met** [2] - 44:25, 56:20
**method** [1] - 65:15
**Miami** [3] - 1:18, 2:4, 2:4
**MIAMI** [2] - 120:8, 120:9
**MICHELLE** [2] - 2:3, 120:7
**Michelle** [1] - 120:6
**mid** [3] - 8:24, 12:7, 12:8
**mid-morning** [1] - 8:24
**mid-September** [2] - 12:7, 12:8
**middle** [1] - 69:7
**midnight** [1] - 119:5
**might** [6] - 13:24, 20:11, 30:16, 61:14, 92:22, 114:22
**Milan** [46] - 9:11, 11:5, 11:25, 12:7, 12:14, 13:2, 13:6, 13:15, 27:4, 27:10, 27:24, 28:3, 30:25, 35:24, 40:19, 41:16, 42:6, 47:20, 47:24, 48:24, 52:24, 53:3, 53:10, 58:18, 59:7, 63:9, 64:17, 64:24, 72:5, 72:10, 72:16, 73:13, 79:25, 81:2, 81:5, 82:25, 86:12, 86:17, 88:3, 91:6, 109:20, 110:21, 116:16, 116:20, 116:25
**MILAN** [1] - 1:4
**Milan's** [2] - 26:19, 30:7
**million** [2] - 43:16, 52:8
**mind** [3] - 15:9, 99:7, 108:24
**mine** [1] - 24:9
**minimum** [30] - 10:15, 10:20, 11:9, 15:13, 15:14, 18:1, 18:7, 18:9, 18:15, 18:18, 19:1, 25:23, 26:11, 30:14, 30:17, 34:4, 41:21, 54:4, 63:8, 63:11, 64:8, 64:12, 86:3, 86:4, 101:3, 102:2, 102:3, 107:17
**minimus** [8] - 84:3,

84:6, 84:11, 84:12, 104:24, 105:1, 105:5, 105:6
**minority** [1] - 55:18
**minute** [15] - 52:23, 55:7, 57:5, 62:11, 63:1, 65:8, 65:17, 65:18, 67:14, 75:9, 75:19, 76:5, 77:11, 79:7
**minutes** [30] - 6:3, 6:9, 24:1, 24:6, 27:23, 36:25, 43:14, 45:25, 46:1, 60:2, 60:8, 69:8, 70:1, 70:8, 70:13, 70:15, 71:10, 84:8, 84:10, 85:13, 93:6, 104:5, 104:11, 105:2, 105:5, 111:15, 111:24, 112:14
**missed** [1] - 21:2
**missing** [7] - 15:4, 17:24, 37:24, 38:1, 56:7, 77:2, 102:24
**misstatement** [2] - 99:12, 99:13
**mistake** [2] - 92:25, 99:8
**moment** [4] - 7:13, 15:3, 20:11, 21:22
**Monday** [1] - 19:8
**money** [31] - 14:11, 34:9, 34:15, 34:18, 44:22, 48:16, 50:4, 51:4, 51:15, 51:19, 61:1, 61:10, 63:24, 64:22, 65:2, 66:4, 70:22, 75:6, 78:3, 81:18, 83:24, 86:6, 88:14, 88:15, 88:19, 88:20, 89:19, 89:24, 91:3
**month** [16] - 12:2, 13:5, 13:6, 13:16, 27:24, 37:8, 43:24, 43:25, 44:7, 46:9, 55:1, 55:2, 55:9, 64:22, 82:3
**months** [5] - 66:23, 74:3, 81:25, 82:1, 88:21
**morals** [1] - 93:3
**morning** [29] - 4:2, 4:3, 4:4, 4:5, 7:16, 7:17, 8:24, 9:8, 23:4, 39:21, 48:7, 59:22, 59:25, 67:12, 68:5, 68:18, 69:10, 71:15, 75:13, 75:21, 76:8, 76:9, 76:13, 76:17,

JURY TRIAL - VOLUME VI OF VI

84:22, 90:17, 93:10
**mornings** [2] -
67:25, 76:10
**most** [12] - 12:3,
12:14, 15:18, 19:15,
19:16, 23:17, 41:2,
54:16, 72:6, 88:3,
88:4, 118:11
**motivation** [1] -
60:21
**move** [5] - 6:19,
22:3, 26:2, 37:3,
72:14
**moved** [1] - 21:10
**moving** [4] - 21:11,
21:15, 21:17, 48:1
**MR** [46] - 4:3, 4:4,
4:5, 4:10, 4:22, 5:16,
5:17, 5:23, 6:2, 6:6,
6:10, 6:12, 6:16, 6:25,
7:2, 7:6, 7:10, 8:15,
9:7, 43:15, 46:2, 48:7,
59:22, 59:24, 60:9,
60:17, 85:14, 87:9,
93:8, 96:20, 112:14,
112:18, 112:20,
112:24, 113:1, 113:3,
113:17, 113:23,
113:24, 114:3, 114:6,
114:7, 115:4, 115:7,
115:14, 115:17
**Mt** [1] - 37:16
**multiple** [7] - 18:20,
29:5, 33:9, 38:13,
39:14, 45:24, 46:3
**multiply** [4] - 25:16,
25:17, 26:8, 26:12
**must** [34] - 8:22,
10:10, 15:24, 50:13,
50:14, 70:13, 74:19,
85:7, 89:22, 96:24,
97:2, 97:4, 97:7, 97:8,
98:8, 98:9, 101:5,
102:10, 102:14,
102:17, 104:5, 104:9,
105:12, 105:18,
106:6, 106:22, 107:7,
107:25, 108:14,
108:15, 108:20,
109:6, 110:10, 112:1

# N

**name** [4] - 14:16,
14:20, 18:12, 75:16
**names** [1] - 117:7
**naturally** [1] - 99:10
**nature** [1] - 87:20
**near** [6] - 11:25,
14:14, 18:14, 65:6,

74:22
**necessarily** [3] -
69:2, 99:8, 103:21
**necessary** [5] -
46:25, 57:17, 66:6,
103:12, 111:8
**need** [15] - 9:15,
29:8, 29:16, 31:8,
40:4, 45:10, 45:11,
45:15, 45:21, 46:12,
47:23, 80:23, 99:12,
113:2, 113:21
**needed** [5] - 27:14,
45:8, 45:16, 46:23,
91:1
**needs** [7] - 4:25, 5:1,
15:1, 30:10, 32:8,
32:10, 48:1
**negate** [3] - 39:5,
78:13, 103:7
**negated** [3] - 78:16,
78:19, 78:20
**negative** [1] - 64:2
**neighborhood** [1] -
74:8
**nephew** [1] - 23:15
**net** [2] - 61:12, 61:14
**never** [18] - 41:4,
41:7, 53:12, 59:11,
61:11, 71:3, 72:10,
75:17, 82:16, 82:20,
86:18, 87:24, 89:20,
91:7, 92:15, 92:20,
108:16, 111:11
**Never** [1] - 59:12
**nevertheless** [1] -
8:6
**New** [6] - 33:2,
33:10, 34:12, 35:3,
57:22, 87:15
**new** [1] - 21:10
**next** [8] - 27:17,
49:2, 49:5, 75:18,
75:20, 79:9, 93:19,
93:20
**nice** [3] - 20:13,
24:15, 95:12
**nobody** [2] - 64:9,
91:16
**Nobody** [1] - 91:16
**none** [2] - 57:6, 80:2
**normal** [2] - 19:14,
28:9
**normally** [13] -
18:21, 19:12, 19:16,
19:17, 19:18, 21:4,
23:7, 28:6, 28:8,
28:13, 38:12, 38:22
**NORTH** [1] - 120:8
**North** [1] - 2:4

**notes** [2] - 26:22,
46:20
**nothing** [14] - 11:17,
13:12, 17:8, 35:17,
40:9, 41:9, 56:17,
79:14, 83:22, 87:24,
88:14, 88:16, 94:11
**notice** [2] - 6:17,
87:25
**noticed** [1] - 90:7
**November** [1] -
63:17
**nowhere** [1] - 29:4,
74:22
**number** [8] - 5:18,
6:20, 15:25, 53:4,
60:24, 98:13, 106:7,
116:15
**Number** [1] - 1:3
**numbers** [2] - 35:6,
114:5
**numerical** [1] -
111:12
**nutshell** [1] - 18:19,
30:7

# O

**o'clock** [14] - 21:16,
21:19, 26:2, 31:20,
38:22, 71:19, 71:20,
71:22, 72:2, 72:13,
72:14, 74:2, 83:3
**oath** [9] - 50:8, 50:9,
50:11, 52:17, 53:2,
54:19, 58:16, 58:23,
63:9
**object** [7] - 5:24,
113:17, 114:7,
114:14, 114:16,
114:17, 115:17
**objection** [9] - 4:21,
5:15, 6:1, 7:8, 114:13,
115:2, 115:3, 115:4,
115:6
**objections** [3] -
113:15, 114:5, 115:22
**objectives** [2] -
93:13, 104:1
**observe** [1] - 98:21
**obviously** [6] -
23:23, 25:8, 35:25,
45:2, 50:4, 88:22
**occasional** [1] - 4:18
**occasionally** [3] -
55:20, 72:6, 111:8
**occur** [1] - 7:20
**occurred** [4] - 59:15,
70:2, 74:21, 76:20

**October** [1] - 12:23
**OF** [3] - 1:1, 1:13, 3:1
**offense** [1] - 87:15
**offensive** [1] - 87:21
**offer** [6] - 37:24,
38:2, 77:2, 77:4,
77:13, 102:24
**offered** [2] - 88:11,
88:16
**office** [18] - 57:1,
73:20, 73:22, 74:12,
74:16, 75:3, 87:22,
88:7, 88:11, 88:25,
89:1, 89:2, 89:3, 89:6,
89:10, 90:15, 104:15
**officer** [2] - 5:19,
5:21
**Official** [1] - 2:3
**OFFICIAL** [1] - 120:8
**offset** [2] - 15:2, 19:5
**often** [3] - 13:15,
15:6, 67:23
**omission** [1] - 85:24
**on-duty** [1] - 105:21
**once** [6] - 8:6, 37:17,
39:1, 44:7, 48:25,
83:18
**one** [78] - 4:14, 5:18,
6:7, 6:8, 6:12, 11:12,
13:6, 14:13, 19:1,
19:2, 21:11, 21:17,
23:14, 27:2, 27:18,
29:23, 39:24, 40:24,
41:2, 41:3, 41:15,
42:9, 43:24, 43:25,
44:1, 47:4, 48:22,
51:9, 52:23, 53:23,
55:1, 56:24, 60:19,
60:24, 61:3, 61:11,
61:23, 61:24, 61:25,
63:1, 63:12, 64:2,
68:5, 75:7, 76:3, 78:1,
78:7, 79:7, 82:2,
83:19, 84:14, 85:23,
86:8, 88:10, 88:14,
89:10, 89:15, 90:4,
90:18, 90:19, 92:5,
92:10, 93:4, 97:21,
98:17, 101:16,
101:17, 101:24,
108:18, 109:12,
109:19, 110:10,
115:12
**One** [3] - 27:3, 36:12,
78:2
**one-and-a-half** [2] -
101:16, 101:24
**ones** [3] - 65:22,
93:19, 112:10
**oops** [3] - 69:20,

75:18
**open** [5] - 12:19,
43:2, 68:13, 68:17,
69:5
**Opening** [1] - 3:3
**opens** [1] - 68:15
**operate** [1] - 57:10
**operated** [1] - 96:18
**operation** [4] - 44:5,
45:23, 96:16, 101:9
**operational** [25] -
4:13, 5:3, 5:19, 5:20,
6:18, 52:19, 52:24,
54:1, 54:7, 54:10,
55:3, 55:11, 55:24,
58:21, 58:24, 59:5,
59:13, 96:13, 106:19,
107:2, 107:14,
107:20, 108:3, 108:6,
114:18
**operations** [5] -
4:15, 44:11, 44:14,
45:15, 47:14
**opinion** [1] - 108:24
**opportunity** [2] -
8:19, 98:21
**option** [1] - 31:11
**orally** [1] - 111:10
**order** [9] - 7:19, 8:11,
8:12, 9:1, 60:5, 101:5,
106:15, 113:10, 116:3
**Order** [1] - 4:1
**ordered** [4] - 71:17,
71:18, 111:20, 111:22
**orders** [5] - 9:1,
46:21, 90:17, 94:18,
94:23
**ordinarily** [1] -
36:25, 70:15, 104:10
**otherwise** [3] -
13:13, 86:22, 106:12
**ought** [1] - 62:6
**outcome** [3] - 51:22,
51:23, 98:19
**output** [1] - 46:25
**outrage** [1] - 85:5
**outrageous** [2] -
65:11, 86:24
**outside** [2] - 67:19,
68:6
**overall** [8] - 10:3,
12:23, 21:25, 32:23,
34:6, 45:22, 47:2,
47:12
**overestimation** [1] -
67:11
**overexaggerate** [1] -
77:25
**overexaggerated** [1]
- 79:22

JURY TRIAL - VOLUME VI OF VI

**overexaggerating** [4] - 49:22, 51:1, 51:2, 51:3

**overruled** [5] - 4:21, 5:15, 6:1, 115:2, 115:23

**overtime** [88] - 10:14, 10:16, 10:21, 11:9, 11:19, 15:19, 18:22, 18:25, 24:7, 25:12, 25:16, 25:22, 26:8, 26:9, 26:10, 26:12, 26:13, 28:4, 30:1, 30:24, 30:25, 32:13, 32:15, 33:20, 34:3, 34:19, 36:3, 40:7, 40:16, 41:14, 41:21, 44:23, 54:4, 59:18, 60:23, 61:14, 61:17, 62:2, 62:3, 62:7, 62:14, 64:12, 65:17, 65:21, 66:1, 67:10, 68:22, 70:14, 71:20, 73:18, 76:3, 76:22, 77:7, 78:8, 78:18, 79:4, 79:21, 80:16, 80:18, 80:20, 80:22, 80:23, 83:14, 83:17, 83:20, 84:22, 87:16, 87:22, 87:23, 87:25, 91:23, 91:24, 100:18, 100:19, 100:22, 101:1, 101:2, 101:13, 101:18, 101:21, 101:24, 103:16, 104:6, 106:10, 107:4, 107:17

**overwhelming** [3] - 7:14, 43:4, 64:6

**overwhelmingly** [1] - 49:14

**owed** [9] - 9:25, 10:19, 48:14, 63:18, 64:4, 68:19, 72:11, 76:22, 85:5

**owing** [1] - 101:25

**own** [28] - 5:20, 8:19, 9:11, 23:9, 24:21, 27:2, 29:7, 29:9, 38:18, 40:4, 51:24, 61:24, 63:1, 72:16, 73:24, 73:25, 89:24, 94:7, 95:4, 98:5, 98:6, 105:17, 105:23, 106:1, 108:24, 111:21, 115:4

**owner** [1] - 107:3

**owners** [1] - 95:18

**ownership** [13] - 43:18, 54:1, 55:19,

55:24, 56:1, 56:6, 56:7, 56:8, 56:13, 56:15, 95:16, 95:22, 106:19

## P

**p-a-l** [1] - 86:21

**p.m** [7] - 19:7, 65:4, 72:6, 72:7, 75:17, 82:22

**PA** [1] - 1:17

**pace** [1] - 14:9

**pack** [1] - 20:1

**PAGE** [1] - 3:2

**Pages** [1] - 1:11

**paid** [61] - 11:16, 14:4, 14:5, 14:21, 15:1, 15:7, 15:11, 15:12, 15:13, 15:24, 17:2, 17:6, 17:8, 17:10, 18:1, 18:4, 18:5, 18:8, 32:6, 32:9, 32:17, 34:16, 35:4, 35:5, 35:17, 40:20, 41:2, 44:20, 47:18, 61:17, 61:19, 62:4, 63:9, 63:17, 63:20, 63:23, 64:3, 64:9, 64:13, 65:22, 78:1, 79:1, 79:2, 81:11, 81:16, 86:6, 90:1, 91:5, 91:9, 91:12, 95:14, 100:22, 100:23, 100:24, 101:23, 102:12, 102:13, 106:6

**pair** [1] - 65:3

**Palm** [2] - 74:4, 75:25

**paola** [1] - 117:12

**paper** [3] - 13:24, 14:2, 96:21

**paragraph** [1] - 113:19

**paraphrase** [1] - 86:11

**parenthesis** [1] - 5:6

**parking** [3] - 68:11, 68:12, 68:13

**part** [16] - 8:4, 8:6, 12:3, 12:15, 14:10, 25:21, 45:4, 45:5, 50:18, 52:21, 55:22, 85:24, 98:13, 100:3, 100:14, 115:20

**partial** [1] - 115:20

**participating** [1] - 44:21

**particular** [10] - 10:9, 10:19, 51:18, 57:13, 60:20, 93:22, 98:14, 98:18, 101:20, 110:1

**particularized** [1] - 21:3

**parties** [4] - 7:22, 48:8, 48:11, 112:12

**partly** [1] - 114:12

**partner** [1] - 112:21

**parts** [1] - 41:2

**party** [2] - 8:8, 97:6

**pass** [2] - 111:5, 116:10

**passing** [1] - 94:17

**patience** [1] - 87:12

**patriots'** [1] - 119:5

**paul** [1] - 119:3

**Paul** [1] - 119:5

**pause** [1] - 106:17

**pawn** [1] - 88:9

**pay** [33] - 11:9, 12:18, 14:9, 14:10, 15:23, 25:20, 25:21, 34:6, 34:13, 34:19, 41:13, 41:25, 42:10, 44:19, 47:7, 61:2, 61:13, 64:7, 79:3, 87:16, 87:25, 89:23, 96:15, 100:18, 100:19, 101:12, 101:13, 101:15, 101:18, 101:21, 106:5

**paying** [4] - 14:8, 33:20, 44:23, 80:23

**payment** [3] - 10:13, 44:18, 100:18

**payments** [1] - 15:6

**payroll** [5] - 87:23, 89:20, 89:21, 104:23

**pays** [2] - 61:5, 63:15, 82:13

**penalty** [1] - 51:12

**penny** [4] - 61:11, 63:18, 85:4, 90:14

**people** [27] - 11:11, 29:5, 45:23, 45:24, 46:3, 47:13, 58:15, 61:2, 61:14, 61:17, 64:7, 71:1, 71:10, 73:19, 76:16, 79:13, 80:13, 82:13, 82:15, 87:19, 90:8, 90:12, 91:11, 91:12, 92:25, 97:10, 99:10

**People** [1] - 64:19

**per** [3] - 17:4, 83:9, 90:23

**percent** [5] - 44:2, 44:8, 46:7, 56:2, 57:2

**percentage** [3] - 43:18, 95:16, 95:19

**perform** [2] - 58:12, 104:14

**performance** [1] - 58:13

**performed** [7] - 38:4, 39:5, 58:20, 77:15, 78:12, 103:1, 103:6

**perhaps** [1] - 35:21

**period** [17] - 12:24, 13:4, 13:7, 13:17, 18:16, 21:18, 37:1, 37:14, 56:25, 70:16, 82:23, 84:17, 101:8, 104:11, 104:12, 105:25

**periods** [16] - 14:4, 22:12, 36:6, 36:7, 70:7, 70:13, 70:15, 84:7, 84:10, 104:5, 104:7, 104:8, 104:9, 104:21, 105:2, 105:4

**perjury** [1] - 51:12

**permit** [2] - 66:9, 103:15

**permits** [2] - 8:7, 8:8

**permitted** [2] - 62:17, 99:21

**person** [7] - 45:5, 45:19, 61:23, 88:4, 90:19, 107:22, 108:6

**personal** [8] - 9:12, 51:21, 51:23, 53:25, 61:25, 87:15, 98:19, 106:18

**personally** [3] - 11:13, 89:18, 94:22

**persons** [2] - 97:8, 101:10

**persuade** [1] - 100:7

**persuasion** [1] - 100:5

**pertaining** [2] - 113:20, 114:10

**pertains** [1] - 115:9

**ph** [2] - 94:20, 94:22

**Phil** [1] - 75:5

**phone** [3] - 55:8, 55:9

**phoney** [1] - 33:15

**phoney-baloney** [1] - 33:15

**physical** [2] - 69:1, 103:20

**pick** [2] - 28:6, 91:11

**pickup** [1] - 91:8

**picture** [2] - 32:23, 34:6

**piece** [1] - 29:10

**pieces** [2] - 14:10, 21:25

**pierce** [1] - 74:24

**place** [4] - 59:20, 82:11, 93:10, 93:13

**plaintiff** [33] - 5:24, 6:8, 9:15, 48:22, 48:23, 53:22, 65:20, 66:2, 71:2, 76:25, 78:5, 80:10, 85:22, 87:6, 103:13, 103:17, 105:13, 105:15, 105:22, 105:24, 106:1, 109:19, 109:20, 110:1, 110:5, 110:9, 110:13, 110:21, 116:19, 116:20, 116:24, 116:25

**plaintiff's** [1] - 105:20

**Plaintiffs** [2] - 1:7, 1:16

**plaintiffs** [52] - 8:13, 9:10, 9:15, 9:23, 9:25, 10:9, 11:2, 11:4, 48:13, 50:3, 50:22, 53:22, 54:16, 54:23, 54:25, 57:11, 59:1, 60:22, 61:23, 65:10, 66:7, 67:13, 67:22, 67:23, 72:4, 73:5, 74:3, 76:18, 77:19, 80:11, 81:17, 81:18, 83:19, 85:4, 85:17, 85:19, 100:3, 100:18, 100:21, 101:5, 101:7, 101:13, 102:7, 102:9, 102:11, 107:12, 108:13, 109:6, 112:9, 113:16, 113:18, 116:16

**plaintiffs'** [9] - 5:18, 5:20, 6:20, 50:7, 100:3, 100:7, 100:14, 108:11, 109:8

**Plantation** [1] - 1:22

**plastic** [1] - 92:11

**player** [1] - 88:4

**PLE** [1] - 86:20

**plenty** [2] - 96:6

**poem** [1] - 119:2

**point** [23] - 11:14, 12:11, 12:19, 13:8, 13:9, 21:2, 24:10, 24:18, 24:20, 27:18, 29:8, 31:8, 34:19, 39:16, 45:12, 64:2, 85:12, 88:15, 93:9, 93:21, 93:22, 110:19

JURY TRIAL - VOLUME VI OF VI

**pointblank** [1] - 62:8
**Points** [2] - 75:25, 81:21
**points** [2] - 60:19, 95:24
**poll** [1] - 117:6
**polled** [1] - 118:8
**position** [4] - 22:8, 25:2, 83:21, 111:19
**possibly** [2] - 55:3, 67:7
**pound** [1] - 92:16
**power** [1] - 44:16
**practical** [1] - 104:22
**practices** [1] - 10:14
**pre** [1] - 27:18
**pre-load** [1] - 27:18
**precise** [5] - 39:4, 39:17, 78:12, 103:6
**precisely** [1] - 104:23
**predominantly** [1] - 104:2
**predominately** [1] - 105:17
**prefer** [1] - 42:16
**prejudice** [1] - 97:5
**preliminary** [1] - 18:24
**premises** [1] - 96:2
**premium** [1] - 32:11
**prepare** [1] - 119:13
**prepared** [1] - 109:15
**preparing** [1] - 68:9
**preponderance** [2] - 9:14, 42:13, 48:20, 54:5, 100:4, 100:6, 100:10, 100:14, 101:6, 107:19, 109:17, 116:19
**present** [2] - 4:6, 26:6
**presented** [2] - 28:19, 78:21
**preside** [1] - 109:13
**president** [3] - 22:24, 43:20, 88:5
**pretty** [7] - 13:10, 13:13, 14:7, 28:14, 28:20, 43:2, 61:4
**prevail** [3] - 87:5, 101:5, 108:13
**previously** [2] - 50:8, 50:9
**prices** [2] - 45:7, 46:24
**pricing** [1] - 56:4
**primarily** [5] - 10:16, 10:20, 11:23, 69:3,

103:22
**principal** [1] - 86:20
**prison** [1] - 53:6
**PRO** [1] - 2:1
**problem** [2] - 89:20, 112:20
**problems** [2] - 33:19, 40:25
**proceed** [4] - 4:7, 9:5, 48:6, 87:8
**proceedings** [1] - 120:4
**produce** [3] - 39:7, 79:16, 103:9
**produced** [1] - 100:13
**produces** [3] - 38:5, 77:16, 103:2
**production** [2] - 45:10, 101:10
**project** [2] - 82:3, 93:25, 95:25
**projects** [1] - 37:13
**promises** [1] - 96:15
**promptly** [1] - 111:7
**prongs** [2] - 43:10, 101:14
**proof** [4] - 8:12, 97:23, 100:5, 100:13
**proper** [1] - 115:15
**properly** [5] - 10:18, 62:3, 80:24, 81:11, 81:16
**proportion** [1] - 67:18
**proposed** [3] - 5:18, 113:13, 113:15
**protect** [1] - 10:13
**protection** [1] - 10:25
**prove** [20] - 8:10, 9:22, 40:3, 52:2, 53:23, 66:2, 66:25, 67:6, 77:7, 77:9, 77:19, 77:21, 77:23, 77:24, 97:24, 99:2, 100:3, 101:5, 102:7
**proved** [5] - 37:4, 62:18, 99:22, 100:9, 102:9
**proven** [3] - 8:10, 85:4, 85:17
**proves** [3] - 38:3, 77:15, 103:1
**provide** [4] - 22:18, 29:16, 73:23, 113:20
**provided** [4] - 21:3, 27:15, 113:18, 114:9
**provides** [1] - 100:17
**provisions** [2] - 54:4,

107:18
**publish** [1] - 116:14
**published** [8] - 117:9, 117:12, 117:15, 117:18, 117:22, 117:25, 118:2, 118:6
**Puerto** [1] - 13:10
**Puig** [1] - 118:2
**PUIG** [1] - 118:4
**pull** [2] - 36:20, 43:19
**pulled** [1] - 39:13
**punch** [1] - 61:18
**punched** [2] - 20:16
**punishing** [1] - 102:18
**purchased** [1] - 43:22
**purpose** [1] - 104:10
**purposely** [1] - 34:16
**purposes** [9] - 47:1, 70:14, 102:18, 104:6, 104:24, 105:17, 105:23, 106:1, 106:16
**pursued** [2] - 69:2, 103:21
**put** [15] - 6:17, 6:19, 11:7, 14:10, 26:22, 39:15, 42:7, 42:15, 61:23, 75:2, 77:22, 92:11, 93:19, 110:19, 114:21
**putting** [2] - 5:6, 89:24

**Q**

**quantify** [1] - 22:2
**quarter** [1] - 54:21
**questions** [13] - 48:21, 49:1, 49:3, 51:8, 65:14, 73:11, 74:20, 78:20, 98:16, 98:23, 109:18, 109:23, 110:12
**quick** [2] - 37:15, 72:25
**quickly** [4] - 4:11, 36:6, 67:10
**quit** [5] - 19:20, 44:21, 44:22, 91:16, 96:17
**quite** [1] - 48:10
**quote** [8] - 52:1, 55:24, 57:14, 58:3, 58:19, 66:5, 78:10, 85:6
**quoting** [3] - 53:24,

62:15, 68:25

**R**

**rack** [1] - 32:2
**rain** [2] - 21:5, 52:10
**rained** [2] - 19:19, 52:12
**raining** [1] - 67:2, 75:15
**rains** [2] - 19:24, 20:2
**raised** [2] - 26:1, 102:4
**raises** [1] - 90:6
**raising** [1] - 46:24
**RAMON** [1] - 1:4
**ran** [1] - 33:13
**range** [1] - 39:15
**rate** [30] - 15:23, 16:6, 16:14, 16:25, 17:1, 17:17, 17:18, 18:9, 18:10, 18:15, 18:18, 18:22, 25:7, 25:24, 26:11, 30:21, 36:1, 101:16, 101:17, 101:20, 101:22, 101:24, 101:25, 102:3, 102:4, 102:5, 106:5, 106:9
**rather** [3] - 45:3, 83:6, 86:20
**re** [1] - 108:24
**re-examine** [1] - 108:24
**reach** [3] - 97:19, 108:14, 108:19
**reached** [5] - 109:25, 110:15, 110:24, 116:4, 116:8
**reaching** [1] - 8:23
**reaction** [1] - 89:14
**read** [16] - 15:21, 24:25, 29:1, 30:5, 31:6, 31:13, 37:2, 37:17, 39:10, 49:20, 55:23, 85:20, 86:8, 86:9, 94:8, 115:1
**reading** [1] - 116:12
**reads** [1] - 109:16
**ready** [4] - 4:7, 4:9, 7:9, 9:5
**real** [9] - 24:16, 35:3, 36:6, 37:15, 41:19, 66:25, 67:1, 72:25, 109:3
**realities** [3] - 82:7, 84:10, 105:4
**really** [43] - 6:22,

10:1, 10:3, 12:12, 12:19, 13:12, 15:6, 25:2, 32:21, 36:16, 40:11, 40:12, 41:17, 41:25, 43:3, 51:20, 57:5, 57:7, 57:9, 62:10, 63:5, 64:14, 65:7, 66:19, 69:5, 70:18, 71:1, 71:8, 71:19, 76:20, 81:9, 81:10, 81:12, 81:13, 81:16, 83:12, 86:25, 88:1, 88:5, 89:17, 96:7
**reason** [17] - 26:3, 28:7, 43:1, 49:12, 51:18, 52:21, 62:7, 62:21, 63:5, 65:15, 69:23, 75:23, 83:18, 88:10, 97:19, 98:18, 99:24
**reasonable** [14] - 9:19, 13:10, 13:14, 31:22, 33:21, 38:7, 39:2, 39:6, 62:19, 77:18, 85:8, 99:22, 102:15, 103:4
**reasonableness** [2] - 78:13, 103:7
**reasons** [6] - 9:19, 49:18, 49:25, 50:23, 61:4, 67:16
**rebut** [1] - 39:18
**rebuttal** [1] - 8:20
**rebutted** [1] - 39:25
**received** [5] - 8:3, 100:12, 111:13, 112:11, 113:10
**receiving** [1] - 60:25
**recent** [1] - 22:22
**recess** [9] - 8:25, 9:4, 59:25, 60:1, 60:7, 113:5, 115:24, 115:25, 119:16
**Recess** [2] - 60:10, 113:7, 116:1
**recollection** [1] - 98:6
**record** [9] - 4:11, 6:25, 8:4, 13:13, 80:9, 97:17, 113:12, 118:9
**record-keeping** [1] - 80:9
**recorded** [1] - 104:23
**recording** [2] - 104:20, 105:8
**records** [43] - 15:5, 20:9, 20:25, 21:9, 24:3, 24:11, 24:12,

JURY TRIAL - VOLUME VI OF VI

24:14, 26:21, 29:2, 29:11, 29:19, 29:20, 29:25, 30:1, 30:4, 36:15, 37:6, 37:21, 37:23, 37:25, 38:9, 38:10, 38:12, 39:12, 40:1, 66:21, 67:3, 71:6, 76:5, 76:6, 76:23, 76:24, 76:25, 77:1, 81:18, 89:7, 94:3, 94:11, 94:12, 94:13, 102:21, 102:23

**recover** [1] - 102:11
**recovered** [1] - 102:20
**recreating** [1] - 20:20
**recurrent** [2] - 27:7, 36:9
**reduce** [4] - 32:11, 66:11, 103:16, 111:4
**reduced** [1] - 26:3
**referred** [1] - 104:24
**reflect** [1] - 113:12
**regard** [1] - 110:1
**Regarding** [1] - 93:8
**regarding** [4] - 5:2, 44:1, 44:5, 93:23
**regardless** [2] - 100:11, 100:12
**regular** [11] - 15:23, 16:14, 17:17, 18:18, 58:21, 101:17, 101:20, 101:22, 104:10, 106:5, 106:9
**regularity** [1] - 105:9
**regularly** [7] - 52:20, 58:5, 58:19, 58:25, 96:20
**regulations** [2] - 95:10, 95:12
**REINALDO** [1] - 1:4
**Reinaldo** [1] - 71:4
**reiterate** [1] - 40:15
**relation** [2] - 45:20, 107:23
**relationship** [2] - 54:12, 108:5
**relieved** [4] - 72:22, 104:9, 104:13, 105:24
**reload** [1] - 93:21
**remained** [1] - 102:4
**remedial** [1] - 106:16
**remember** [52] - 13:24, 22:21, 24:18, 25:13, 25:23, 25:24, 29:15, 31:13, 44:10, 50:5, 50:9, 50:19, 52:9, 52:11, 52:16, 53:7, 53:10, 57:12,

58:17, 62:8, 65:5, 66:21, 67:5, 67:16, 69:24, 71:14, 72:25, 73:13, 77:5, 80:3, 80:4, 80:14, 81:3, 82:12, 85:19, 85:23, 86:3, 86:8, 86:12, 86:13, 86:14, 86:15, 88:24, 89:3, 89:16, 96:10, 98:2, 99:10, 109:3, 119:1
**Remember** [9] - 53:12, 56:23, 59:10, 59:12, 63:24, 68:2, 74:10, 75:4, 80:7
**remembers** [1] - 99:9
**remind** [1] - 111:25
**reminded** [1] - 75:5
**remotely** [1] - 83:7
**remove** [1] - 4:18
**rendered** [1] - 118:14
**repeatedly** [2] - 50:6, 50:7
**report** [1] - 71:17
**REPORTED** [1] - 2:2
**REPORTER** [2] - 96:22, 120:8
**Reporter** [2] - 2:3, 96:21
**represents** [1] - 8:8
**required** [16] - 19:12, 19:13, 23:7, 24:12, 24:14, 28:14, 69:2, 84:4, 96:1, 100:19, 101:13, 103:21, 104:14, 104:15, 104:16, 104:18
**requirements** [1] - 40:4
**requires** [2] - 29:18, 101:15
**residential** [2] - 93:24, 94:1
**resolve** [1] - 48:8
**respect** [23] - 4:12, 16:10, 29:16, 30:7, 47:21, 48:17, 51:25, 53:16, 59:18, 63:7, 85:1, 85:11, 87:22, 94:3, 94:15, 94:20, 94:22, 95:1, 95:16, 111:10, 114:16, 115:18
**respective** [1] - 7:22
**respond** [2] - 111:7, 111:19
**responds** [1] - 117:5
**response** [3] - 85:22, 113:13, 113:16

**responsibility** [4] - 37:21, 100:2, 102:21, 118:19
**responsible** [1] - 97:11
**rest** [8] - 65:9, 70:6, 70:12, 79:18, 80:5, 104:5, 104:9, 119:2
**restricted** [1] - 105:18
**result** [3] - 39:8, 79:18, 103:10
**retire** [1] - 112:3
**retreating** [1] - 65:1
**return** [5] - 108:15, 110:7, 111:1, 111:9, 112:2
**returns** [1] - 51:12
**Revere** [2] - 119:3, 119:5
**rewarding** [1] - 118:17
**Rico** [1] - 13:11
**ride** [2] - 74:15, 119:5
**rightfully** [2] - 9:23, 10:18
**rights** [2] - 106:10, 118:21
**rise** [5] - 60:11, 112:6, 113:8, 116:2, 119:11
**roadmap** [1] - 53:20
**Rodriguez** [1] - 118:5
**RODRIGUEZ** [1] - 118:7
**room** [8] - 9:2, 48:19, 96:25, 108:14, 109:11, 110:24, 112:10, 114:20
**rough** [1] - 90:13
**rules** [1] - 96:24
**run** [6] - 29:19, 56:19, 57:3, 59:5, 88:5, 92:20
**running** [7] - 43:3, 55:17, 56:16, 89:19, 92:20, 92:21
**rushing** [1] - 37:13

---

## S

**sad** [2] - 58:22
**Safe** [17] - 1:21, 5:6, 5:7, 8:17, 10:24, 12:10, 19:25, 31:2, 42:9, 42:14, 42:18, 42:20, 49:3, 64:19,

109:21, 116:16, 116:21
**SAFE** [1] - 1:9
**safe** [2] - 22:24, 42:10
**sailboat** [1] - 56:25
**salaried** [5] - 11:9, 11:12, 15:23, 113:20
**salary** [46] - 15:24, 15:25, 16:2, 16:5, 16:7, 16:13, 16:17, 17:4, 17:14, 17:16, 17:20, 17:21, 18:18, 25:4, 25:5, 30:8, 31:16, 33:15, 33:25, 34:8, 34:17, 35:1, 35:5, 46:5, 63:10, 65:23, 83:6, 83:8, 83:21, 84:1, 89:5, 90:3, 90:8, 90:9, 106:4, 106:6, 106:7, 106:8, 113:25, 114:10, 114:14, 115:8, 115:10
**sales** [2] - 56:18, 101:11
**salesman** [1] - 56:18
**salespeople** [2] - 46:5
**sample** [1] - 91:8
**sandwich** [5] - 36:21, 92:5, 92:8, 92:14
**sandwiches** [1] - 37:10
**Santiago** [1] - 117:9
**SANTIAGO** [1] - 117:11
**sat** [5] - 37:9, 53:14, 66:13, 79:9, 85:16
**satisfaction** [1] - 118:18
**satisfied** [1] - 15:9
**Saturday** [7] - 19:8, 73:1, 73:2, 73:3, 73:6, 78:25, 94:1
**Saturday's** [1] - 73:7
**Saturdays** [5] - 73:2, 81:23, 81:24, 82:8, 93:23
**saturdays** [2] - 73:6, 82:3
**save** [2] - 89:19, 91:18
**saw** [8] - 23:21, 59:1, 59:11, 59:12, 61:22, 67:20, 68:1, 88:22
**schedule** [4] - 29:15, 38:15, 80:19, 86:25
**scheduled** [1] -

104:22
**schedules** [2] - 20:21, 32:1
**scheme** [1] - 35:1
**school** [1] - 90:12
**scope** [1] - 97:13
**SE** [1] - 2:1
**seated** [5] - 7:18, 60:15, 113:9, 116:3, 116:7
**second** [6] - 48:23, 77:12, 89:10, 101:8, 101:14, 114:16
**seconds** [2] - 84:8, 105:2
**secret** [1] - 108:16
**section** [2] - 113:20, 114:10
**securing** [2] - 89:1, 89:6
**Security** [2] - 35:6, 53:4
**see** [26] - 5:23, 7:1, 20:3, 21:9, 23:4, 39:17, 45:6, 61:22, 62:16, 64:10, 65:2, 65:14, 66:17, 87:2, 87:23, 89:18, 90:2, 91:9, 92:19, 95:9, 99:20, 110:14, 110:19, 112:13, 114:6, 115:11
**See** [3] - 76:19, 88:19, 90:24
**seeing** [4] - 27:4, 29:9, 46:22, 95:3
**seek** [7] - 65:21, 66:14, 66:15, 66:16, 81:18, 109:5
**seeking** [4] - 15:2, 48:16, 50:1, 50:4
**seem** [5] - 15:9, 36:10, 62:19, 98:20, 99:22
**sees** [2] - 39:21, 79:13
**segregated** [1] - 25:23
**select** [1] - 109:11
**selection** [1] - 9:13
**sell** [2] - 89:24, 89:25
**send** [3] - 9:20, 111:11, 112:10
**SENIOR** [1] - 1:14
**sense** [7] - 6:23, 19:20, 19:25, 52:15, 55:16, 62:21, 96:1
**sent** [1] - 113:11
**sentence** [2] - 39:10, 53:7

**September** [14] - 12:7, 12:8, 12:10, 12:12, 12:13, 12:17, 12:24, 12:25, 64:10, 64:12, 64:17, 64:18, 64:23, 64:25

**september** [1] - 64:15

**series** [3] - 48:21, 85:18, 109:18

**serious** [2] - 53:5, 53:8

**served** [2] - 9:2, 85:18

**service** [1] - 118:14

**serving** [3] - 9:9, 118:20, 119:6

**set** [5] - 59:6, 65:25, 78:7, 80:21, 102:19

**seven** [3] - 32:10, 32:12, 73:7

**seven-fifty** [2] - 32:10, 32:12

**seventy** [1] - 36:2

**seventy-five** [1] - 36:2

**several** [1] - 67:16

**severally** [2] - 107:4, 108:8

**severely** [1] - 105:18

**shady** [1] - 87:18

**shall** [8] - 42:25, 87:25, 106:21, 106:25, 107:6, 107:9, 119:4

**shares** [1] - 75:8

**sharp** [1] - 71:2

**shaves** [1] - 72:17

**shaving** [1] - 24:6

**shift** [1] - 69:8

**shifting** [2] - 40:12, 77:8

**shifts** [3] - 39:3, 78:11, 103:5

**shirt** [2] - 88:12, 91:20

**shop** [13] - 20:15, 27:11, 27:12, 27:25, 61:17, 68:12, 68:15, 68:17, 69:5, 71:15, 74:17, 76:1, 84:11

**short** [6] - 12:20, 13:6, 13:17, 53:20, 90:14, 105:21

**shortchange** [1] - 63:19

**shorter** [2] - 70:17, 104:12

**shortly** [1] - 33:3

**shot** [1] - 56:24

**shoulders** [1] - 88:2

**show** [18] - 10:10, 15:10, 37:6, 38:6, 38:10, 42:8, 50:25, 51:21, 57:5, 67:1, 67:4, 68:18, 77:17, 82:24, 83:2, 86:17, 95:13, 103:3

**showed** [9] - 11:4, 12:5, 12:7, 12:10, 13:13, 18:12, 22:4, 22:11, 28:3

**showing** [1] - 32:1

**shown** [2] - 10:23, 67:10

**shows** [7] - 26:20, 34:25, 35:14, 51:15, 51:16, 53:8, 65:11

**shut** [2] - 52:11, 81:23

**shutter** [2] - 46:13, 58:8

**Shutters** [12] - 1:21, 5:7, 8:17, 19:25, 31:2, 42:9, 42:14, 49:3, 64:20, 109:21, 116:17, 116:21

**shutters** [1] - 11:21, 36:19, 41:22, 75:1

**SHUTTERS** [1] - 1:9

**side** [1] - 80:11

**sign** [8] - 14:16, 14:20, 20:17, 57:19, 58:23, 110:7, 110:14, 111:1

**signed** [11] - 13:24, 14:14, 18:12, 51:12, 52:17, 52:20, 90:21, 90:22, 94:16, 94:19, 117:2

**significance** [1] - 99:14

**significant** [15] - 54:1, 54:10, 55:3, 55:11, 55:24, 56:1, 56:6, 56:7, 56:15, 58:4, 82:23, 95:18, 95:20, 106:18, 108:3

**significantly** [2] - 26:19, 50:11

**signing** [2] - 53:1, 94:24

**Silvers** [1] - 75:5

**simple** [7] - 30:24, 51:20, 65:13, 79:25, 85:23, 88:10, 99:7

**simplify** [1] - 100:6

**simply** [9] - 30:25, 38:18, 55:18, 55:19, 61:10, 78:6, 99:13,

114:9, 114:25

**sincerely** [1] - 118:11

**single** [3] - 66:9, 71:4, 103:14

**sit** [1] - 31:9

**site** [4] - 73:24, 75:13, 93:18

**sites** [2] - 43:23, 46:11

**sitting** [2] - 20:19, 118:20

**situation** [5] - 47:12, 61:12, 72:25, 74:1, 80:10

**six** [15] - 24:5, 24:6, 24:7, 31:23, 31:24, 48:13, 56:23, 65:4, 71:11, 71:12, 72:17, 72:18, 72:24, 74:3, 74:8

**six-day-a-week** [1] - 72:18

**six-hour** [1] - 72:17

**size** [2] - 55:10, 105:8

**skills** [1] - 57:17

**slept** [1] - 7:12

**slightly** [1] - 9:16

**sloppy** [1] - 14:8

**small** [1] - 70:6

**smaller** [1] - 26:19

**smiley** [1] - 117:18

**SMILEY** [1] - 117:20

**smirk** [1] - 88:22

**smoke** [2] - 36:21, 92:23

**smoking** [1] - 92:24

**snacks** [1] - 104:8

**snow** [1] - 75:15

**Social** [2] - 35:6, 53:4

**socks** [1] - 88:13

**software** [1] - 89:6

**sold** [3] - 33:5, 34:15, 89:25

**solely** [3] - 15:22, 106:4, 109:1

**SOLER** [1] - 1:5

**solid** [3] - 13:1, 25:14, 80:11

**someone** [8] - 51:10, 53:9, 55:2, 61:5, 62:24, 68:13, 69:8, 113:4

**sometimes** [6] - 19:24, 21:16, 23:9, 28:16, 79:12, 100:4

**somewhat** [3] - 12:21, 31:9, 56:18

**somewhere** [4] - 27:9, 32:19, 74:7, 82:9

**son** [1] - 22:23

**son-in-law** [1] - 22:23

**soon** [2] - 20:1, 60:12

**sooner** [1] - 113:10

**sorry** [3] - 13:21, 37:25, 75:22

**sort** [1] - 58:11

**sorts** [1] - 73:12

**sound** [3] - 76:10, 85:7, 102:15

**south** [1] - 19:22

**sOUTHERN** [1] - 1:1

**space** [3] - 109:24, 110:14, 110:17

**Spanish** [1] - 45:3

**speakers** [1] - 45:3

**special** [1] - 104:12

**specific** [1] - 78:18

**specifically** [3] - 85:2, 114:13, 115:9

**specify** [1] - 111:12

**spectrum** [2] - 28:11, 30:23

**speculation** [3] - 85:10, 102:17, 115:19

**spelled** [1] - 86:20

**spend** [1] - 65:9

**spends** [1] - 103:24

**spent** [4] - 58:3, 104:2, 105:7, 105:10

**split** [2] - 33:6, 34:15

**sponte** [1] - 5:23

**square** [2] - 45:9

**stand** [17] - 8:2, 50:6, 52:25, 58:24, 61:24, 63:1, 63:16, 66:6, 68:12, 77:22, 84:13, 88:1, 97:8, 103:11, 103:24, 118:22, 119:8

**stand-by** [1] - 103:24

**standard** [3] - 9:14, 9:17, 28:14

**standards** [2] - 10:12, 103:19

**Standards** [14] - 6:21, 37:22, 54:5, 60:20, 68:25, 82:15, 86:1, 100:16, 102:22, 106:11, 106:13, 106:16, 107:5, 107:18

**standby** [3] - 84:18, 93:11

**standing** [5] - 36:18,

67:25, 68:11, 68:12, 69:4

**stands** [1] - 63:14

**start** [8] - 4:10, 19:19, 33:19, 53:17, 67:11, 71:1, 71:24

**started** [15] - 6:16, 12:5, 12:7, 16:2, 22:13, 22:14, 24:21, 27:5, 33:25, 35:19, 35:20, 63:23, 71:9, 71:11, 71:20

**starting** [1] - 21:12

**starts** [1] - 33:19

**state** [3] - 54:2, 78:10, 111:11

**statement** [2] - 63:2, 63:3

**statements** [3] - 51:25, 97:12, 99:19

**STATES** [3] - 1:1, 1:14, 120:8

**States** [5] - 2:3, 24:13, 30:2, 37:20, 118:13

**statute** [3] - 55:21, 94:9, 114:10

**stay** [4] - 45:1, 45:3, 45:4, 96:14

**stays** [1] - 112:21

**steal** [1] - 87:19

**stealing** [1] - 44:10

**steve** [1] - 106:24

**STEVE** [1] - 1:10

**Steve** [10] - 1:22, 49:8, 57:15, 57:24, 58:25, 59:11, 59:14, 107:9, 109:22, 116:22

**still** [19] - 9:21, 12:16, 12:17, 12:18, 28:4, 31:3, 40:6, 40:7, 40:8, 41:21, 41:22, 44:6, 46:7, 68:6, 69:9, 73:8, 78:3, 81:14, 91:13

**stop** [10] - 21:5, 48:25, 49:2, 73:6, 73:9, 74:2, 77:9, 83:2, 88:13, 92:23

**stopped** [6] - 19:19, 60:25, 69:12, 72:8, 75:17, 78:23

**stopping** [1] - 74:5

**stops** [1] - 19:24

**story** [1] - 17:25

**straight** [4] - 63:6, 69:18, 100:22, 101:2

**straightforward** [1] - 13:14

**street** [1] - 91:11

JURY TRIAL - VOLUME VI OF VI

**Street** [1] - 1:18
**stretching** [1] - 49:22
**striking** [1] - 19:3
**stuck** [1] - 18:7
**stuff** [2] - 46:10, 50:7
**sua** [1] - 5:23
**submit** [2] - 58:16, 119:15
**substantial** [2] - 84:5, 104:19
**substantiate** [1] - 24:20
**substantiated** [1] - 19:10
**substantiates** [1] - 28:8
**substantiating** [1] - 24:22
**substantive** [4] - 6:20, 114:7, 114:12, 115:20
**substitute** [1] - 37:25
**substitutes** [7] - 38:2, 77:3, 77:4, 77:13, 94:6, 94:7, 102:25
**successful** [1] - 79:11
**sudden** [1] - 64:25
**suddenly** [2] - 55:9, 55:10
**sue** [1] - 71:20
**sued** [1] - 107:12
**sufficient** [4] - 38:5, 38:11, 77:17, 103:2
**suggest** [3] - 51:7, 69:13, 98:16
**suggesting** [1] - 53:10
**suggestion** [2] - 7:5, 7:8
**suing** [1] - 56:18
**suit** [4] - 52:22, 57:20, 63:1, 65:25
**Suite** [2] - 1:18, 2:4
**SUITE** [1] - 120:8
**Sullivan** [6] - 44:10, 44:11, 88:25, 89:4, 89:5, 89:12
**sum** [1] - 84:25
**summary** [1] - 5:3
**sums** [1] - 102:18
**superman** [3] - 92:9, 92:17
**supervise** [1] - 58:10
**supervised** [2] - 43:23, 58:5
**supplemental** [1] - 6:13

**supposed** [10] - 16:6, 16:10, 16:23, 17:20, 20:14, 25:4, 25:6, 30:12, 34:1
**supposedly** [1] - 44:10
**Supreme** [5] - 24:13, 29:18, 29:24, 30:2, 37:19
**surely** [1] - 19:4
**sweep** [1] - 55:10
**swore** [2] - 50:19, 58:1
**syllogism** [1] - 79:25
**sympathy** [3] - 85:9, 97:5, 102:16
**system** [4] - 88:8, 89:2, 90:24, 91:25

# T

**tABLE** [1] - 3:1
**talks** [1] - 115:18
**tax** [5] - 51:10, 51:12, 53:11, 53:12, 53:14
**taxes** [7] - 15:5, 51:15, 54:18, 95:6, 95:7
**teacher** [2] - 90:12, 119:2
**team** [1] - 89:4
**technically** [1] - 12:16
**technology** [2] - 22:24, 23:21
**telephone** [2] - 55:15, 88:8
**ten** [8] - 31:23, 44:4, 44:6, 46:8, 53:6, 55:8, 87:16, 92:22
**ten-year** [1] - 53:6
**tend** [1] - 99:10
**tending** [3] - 52:2, 97:24, 99:2
**tens** [3] - 48:15, 50:1, 77:25
**term** [3] - 101:1, 106:13, 106:14
**testified** [10] - 14:20, 17:21, 17:22, 28:6, 35:7, 52:3, 63:9, 93:17, 98:22, 99:2
**testify** [5] - 24:18, 29:14, 62:1, 62:17, 99:21
**testifying** [3] - 8:1, 21:14, 98:13
**testimony** [49] - 7:25, 9:12, 15:8, 20:6,

21:4, 22:11, 23:16, 23:19, 26:22, 26:24, 28:13, 29:5, 29:22, 35:14, 36:8, 38:13, 38:23, 39:15, 39:19, 46:4, 50:1, 50:7, 50:16, 52:6, 55:14, 56:3, 56:23, 57:21, 58:14, 59:3, 59:10, 59:12, 64:10, 64:14, 65:14, 70:5, 71:17, 72:16, 83:2, 93:23, 95:2, 95:7, 97:16, 97:21, 98:11, 98:24, 98:25, 99:6, 100:10
**tests** [1] - 43:11
**Thanksgiving** [1] - 66:15
**THE** [75] - 1:13, 1:16, 1:20, 2:1, 4:2, 4:6, 4:21, 5:15, 5:22, 6:1, 6:5, 6:7, 6:11, 6:15, 6:24, 7:1, 7:4, 7:7, 7:11, 7:16, 7:17, 7:18, 8:16, 43:14, 46:1, 48:5, 59:20, 59:23, 59:25, 60:7, 60:11, 60:12, 60:15, 85:13, 87:7, 93:6, 96:19, 96:21, 96:22, 96:23, 112:6, 112:8, 112:16, 112:17, 112:19, 112:23, 112:25, 113:2, 113:5, 113:8, 113:9, 114:1, 114:4, 115:2, 115:6, 115:13, 115:22, 116:2, 116:3, 116:7, 116:10, 116:15, 117:4, 117:6, 117:9, 117:15, 117:18, 117:21, 117:24, 118:2, 118:5, 118:8, 119:4, 119:11, 119:13
**theme** [5] - 19:13, 27:7, 36:9, 40:13, 40:20
**themselves** [4] - 24:8, 24:22, 74:3, 94:9
**theory** [1] - 71:21
**therefore** [3] - 87:1, 101:1, 104:20
**thereon** [1] - 83:22
**thereto** [1] - 71:8
**therewith** [1] - 86:2
**they've** [3] - 28:19, 77:20, 79:22
**They've** [1] - 90:13
**thinking** [1] - 10:2

**thinks** [1] - 88:22
**third** [2] - 82:9, 101:12
**thousand** [8] - 16:3, 22:15, 50:2, 61:13, 79:2, 83:8, 91:14, 91:21
**thousands** [3] - 48:15, 50:2, 78:1
**three** [14] - 12:14, 23:17, 33:1, 33:6, 34:15, 36:13, 55:8, 55:9, 68:19, 82:1, 82:3, 88:19, 92:16, 101:6
**three-pound** [1] - 92:16
**threw** [2] - 44:16, 91:2
**throughout** [6] - 21:18, 28:14, 29:6, 37:7, 37:8, 94:2
**throw** [2] - 28:23, 88:15
**thrown** [1] - 45:17
**thunder** [1] - 75:15
**tie** [1] - 88:12
**time-and-a-half** [20] - 11:16, 15:19, 15:24, 17:1, 17:11, 18:22, 25:9, 26:11, 26:16, 30:21, 32:8, 33:11, 33:12, 34:13, 35:4, 35:13, 61:19, 100:18, 101:18, 106:5
**timecard** [1] - 20:16
**timecards** [1] - 20:17
**tip** [2] - 9:15, 9:22
**today** [13] - 9:10, 20:18, 32:20, 43:7, 44:19, 50:10, 78:3, 91:13, 94:10, 111:21, 118:14, 118:23, 119:5
**together** [5] - 15:4, 26:23, 29:11, 43:17, 114:22
**Tom** [2] - 88:24, 89:12
**tomorrow** [1] - 119:17
**took** [23] - 5:22, 13:9, 13:11, 14:24, 19:3, 22:2, 32:3, 36:1, 37:4, 37:9, 37:10, 63:17, 69:20, 70:4, 88:12, 91:5, 92:1, 92:3, 92:5, 92:15, 92:22
**tools** [2] - 43:22, 52:13
**top** [1] - 46:15

**tornado** [1] - 75:15
**total** [5] - 17:12, 18:21, 25:17, 40:17, 101:23
**touch** [1] - 35:22
**tough** [2] - 90:11
**toward** [1] - 105:11
**towards** [1] - 21:12
**Tower** [2] - 81:21, 81:23
**traditional** [1] - 106:15
**traffic** [1] - 92:1
**transcription** [1] - 120:4
**translating** [1] - 45:3
**transportation** [2] - 73:23, 73:25
**treated** [1] - 30:10
**TRIAL** [1] - 1:13
**trial** [9] - 4:16, 7:20, 29:6, 29:12, 52:7, 79:10, 80:3, 98:4, 99:6
**tried** [13] - 23:15, 26:21, 27:15, 28:22, 36:12, 36:13, 56:4, 64:18, 69:16, 73:13, 91:17, 91:18
**trip** [1] - 27:15
**trouble** [1] - 35:19
**troubling** [1] - 79:15
**truck** [22] - 68:9, 73:12, 73:14, 73:15, 73:16, 73:17, 73:21, 73:22, 74:11, 74:14, 74:20, 75:1, 75:18, 75:20, 75:21, 76:11, 76:16, 91:8, 96:4
**trucks** [2] - 27:17, 27:21, 43:22, 75:12, 91:10, 93:14
**true** [12] - 10:10, 40:3, 50:14, 51:13, 56:2, 58:1, 83:12, 90:22, 98:9, 100:8
**trust** [2] - 92:18, 92:25
**trusted** [5] - 90:24, 90:25, 91:1, 92:4, 92:24
**truth** [16] - 38:16, 49:17, 49:18, 49:22, 51:9, 51:11, 51:18, 54:22, 61:8, 65:7, 76:20, 93:5, 98:17, 98:19, 99:9, 109:5
**truthful** [2] - 50:25, 82:24
**try** [9] - 16:4, 24:20,

JURY TRIAL - VOLUME VI OF VI

26:25, 32:24, 37:15, 38:14, 60:22, 91:18, 96:11

**trying** [9] - 12:20, 18:6, 21:22, 21:23, 22:4, 27:17, 28:21, 41:21, 87:17

**tsunami** [1] - 55:10

**tsunami-like** [1] - 55:10

**turn** [2] - 60:17, 102:10

**turns** [1] - 91:1

**twenty** [2] - 17:18, 25:8

**twenty-two** [2] - 17:18, 25:8

**two** [48] - 5:17, 11:15, 13:14, 13:19, 13:20, 14:21, 14:24, 15:1, 15:7, 15:12, 15:13, 16:14, 17:17, 17:18, 17:24, 17:25, 18:8, 18:13, 19:3, 19:4, 23:17, 25:2, 25:8, 25:14, 25:24, 26:9, 26:13, 32:17, 43:13, 43:25, 45:24, 46:2, 50:3, 64:1, 64:2, 72:17, 73:5, 82:2, 88:9, 88:18, 88:24, 90:4, 101:10, 110:12

**type** [14] - 11:6, 11:8, 11:15, 11:18, 11:19, 20:25, 22:17, 22:18, 30:11, 31:24, 35:1, 35:2, 39:17

**typically** [1] - 70:9

**U**

**U.S.C** [1] - 53:5

**unable** [1] - 105:23

**unanimous** [5] - 108:14, 109:25, 110:15, 110:24, 112:1

**unanimously** [4] - 42:13, 48:20, 109:17, 116:18

**uncalled** [1] - 87:21

**uncertain** [2] - 84:7, 105:1

**uncompensated** [2] - 83:11, 84:23

**uncontradicted** [1] - 26:25

**under** [47] - 11:2, 12:1, 20:14, 21:13, 25:14, 25:19, 37:22,

50:8, 50:9, 50:11, 51:4, 51:12, 52:17, 53:2, 53:5, 54:19, 55:21, 58:16, 58:23, 63:9, 63:21, 66:5, 68:21, 70:17, 71:21, 73:4, 73:8, 74:9, 80:9, 80:24, 83:10, 88:16, 97:11, 100:16, 101:9, 102:13, 102:22, 103:11, 103:25, 104:12, 104:21, 106:11, 106:13, 107:4, 107:25, 108:8

**underneath** [1] - 5:6

**undisputed** [1] - 47:25

**unfair** [2] - 10:13, 115:14

**unified** [1] - 101:9

**unimpeachable** [1] - 80:12

**unimpeached** [1] - 54:18

**unimportant** [1] - 99:16

**United** [5] - 2:3, 24:13, 30:2, 37:20, 118:13

**UNITED** [2] - 1:1, 120:8

**uNITED** [1] - 1:14

**units** [1] - 27:18

**unless** [4] - 54:5, 69:7, 83:23, 107:18

**unload** [5] - 11:21, 74:13, 75:4, 93:18

**unloaded** [1] - 27:14

**unloading** [3] - 27:21, 74:20, 75:12

**unpaid** [5] - 17:11, 18:16, 40:17, 101:4, 108:9

**unpredictable** [2] - 14:7, 105:21

**unquote** [4] - 54:13, 55:25, 58:6, 58:21

**unreliable** [1] - 14:8

**up** [74] - 5:14, 6:19, 11:22, 13:9, 19:19, 20:1, 20:23, 22:16, 23:6, 23:10, 23:14, 24:9, 26:2, 26:23, 27:5, 27:16, 27:20, 28:1, 28:3, 28:7, 28:11, 28:12, 29:4, 29:5, 29:21, 32:1, 32:2, 32:13, 32:17, 33:2, 33:10, 34:12, 34:14, 35:3, 38:15,

39:13, 39:17, 40:18, 44:6, 44:16, 46:12, 46:14, 47:23, 50:6, 57:22, 59:6, 62:9, 62:13, 63:4, 63:24, 65:12, 66:3, 68:13, 68:18, 69:18, 72:12, 74:4, 75:2, 75:6, 77:22, 80:21, 82:5, 84:4, 84:10, 86:19, 89:24, 90:11, 91:11, 94:18, 95:23, 96:2, 96:4, 105:5, 108:25

**update** [1] - 45:8

**uphold** [1] - 50:19

**upped** [1] - 48:1

**upset** [4] - 61:4, 79:9, 79:13

**uses** [1] - 4:15

**V**

**vacation** [3] - 14:24, 25:15, 65:22

**various** [2] - 11:20, 43:10

**Veasey** [1] - 117:24

**VEASEY** [1] - 118:1

**vehicle** [1] - 96:2

**Velasco** [1] - 117:21

**VELASCO** [1] - 117:23

**verbal** [1] - 46:20

**Verde** [1] - 117:12

**VERDE** [1] - 117:14

**verdict** [52] - 4:23, 8:23, 42:3, 48:12, 48:17, 49:1, 49:2, 49:4, 49:14, 55:5, 59:16, 102:8, 108:14, 108:15, 108:17, 109:15, 109:24, 110:1, 110:4, 110:5, 110:7, 110:23, 110:25, 111:1, 111:25, 112:3, 112:4, 112:23, 116:4, 116:8, 116:10, 116:13, 116:14, 116:18, 117:4, 117:9, 117:10, 117:12, 117:13, 117:15, 117:16, 117:18, 117:19, 117:21, 117:22, 117:24, 117:25, 118:2, 118:3, 118:5, 118:6, 118:9

**Verdict...................**

**.....................** [1] - 3:8

**versus** [3] - 114:10, 115:10, 116:16

**VI** [2] - 1:13

**vice** [2] - 22:23, 43:20

**violating** [4] - 54:3, 95:10, 95:11, 107:17

**violation** [6] - 15:14, 18:2, 30:15, 82:14, 86:1, 101:3

**violations** [2] - 57:4, 60:19

**VOLUME** [1] - 1:13

**vouched** [1] - 61:9

**vs** [1] - 1:8

**W**

**w-2s** [3] - 95:6, 95:8, 95:9

**W-2s** [2] - 95:12, 95:15

**wage** [28] - 10:16, 15:13, 15:14, 18:1, 18:7, 18:9, 18:15, 18:18, 19:1, 25:23, 26:11, 30:14, 30:17, 30:20, 34:4, 54:4, 57:4, 63:8, 63:11, 64:8, 64:13, 86:3, 86:4, 101:3, 102:3, 102:4, 107:17

**wage-and-hour** [1] - 57:4

**wages** [17] - 9:25, 10:15, 10:20, 11:9, 41:21, 42:10, 44:18, 44:23, 47:8, 101:4, 101:23, 102:2, 107:4, 108:9

**wait** [3] - 55:7, 75:19, 84:16

**waiting** [20] - 12:17, 67:19, 68:6, 68:13, 69:4, 84:13, 93:8, 93:11, 103:25, 105:10, 105:13, 105:14, 105:15, 105:16, 105:17, 105:18, 105:20, 105:22, 105:25

**waived** [1] - 106:12

**walk** [2] - 41:6, 50:6

**walked** [2] - 44:15, 63:21

**wants** [3] - 44:22, 64:23, 69:8

**warehouse** [3] - 61:18, 76:16, 88:7

**watch** [1] - 88:11

**water** [1] - 106:17

**ways** [3] - 25:2, 33:6, 34:15

**weather** [1] - 67:3

**week** [62] - 7:19, 8:1, 9:11, 14:15, 14:16, 16:14, 16:18, 16:24, 17:7, 17:16, 17:23, 18:5, 18:8, 19:16, 24:5, 24:6, 25:12, 26:5, 26:9, 26:17, 28:4, 30:23, 30:25, 31:23, 31:25, 32:2, 40:17, 60:24, 65:4, 66:2, 66:8, 66:12, 67:6, 68:23, 69:14, 71:12, 72:18, 74:8, 79:2, 82:6, 82:14, 83:6, 83:9, 83:20, 83:25, 85:17, 90:21, 90:23, 91:10, 100:23, 101:17, 101:20, 101:22, 103:13, 106:9, 118:14

**week-by-week** [2] - 66:8, 103:13

**weekend** [2] - 4:25, 7:13

**weekly** [2] - 15:22, 106:4

**weeks** [53] - 12:22, 13:1, 13:5, 13:14, 13:19, 13:20, 13:21, 13:22, 14:3, 14:5, 14:21, 14:24, 15:1, 15:7, 15:10, 15:12, 15:13, 17:24, 18:1, 18:8, 18:13, 19:3, 19:4, 23:17, 25:15, 25:17, 25:24, 26:10, 26:13, 26:20, 31:1, 32:13, 32:17, 36:3, 36:13, 56:23, 63:10, 63:11, 63:23, 64:1, 64:2, 64:12, 65:21, 66:1, 69:12, 71:5, 83:13, 83:16, 86:5, 103:18

**weigh** [1] - 20:7

**weight** [1] - 97:25

**West** [1] - 75:25

**west** [1] - 112:19

**wet** [3] - 52:13, 83:1, 83:3

**whatnot** [2] - 61:18, 87:1

**whatsoever** [1] - 60:21

**whichever** [1] -

JURY TRIAL - VOLUME VI OF VI

68:10

**whole** [20] - 45:21, 47:2, 50:18, 56:23, 62:14, 63:21, 64:3, 64:16, 64:22, 74:3, 75:4, 79:10, 80:19, 80:21, 86:10, 86:23, 88:19, 98:13, 108:1, 114:14

**wife** [2] - 28:6, 28:8
**wild** [2] - 29:4, 39:13
**win** [2] - 9:16, 10:1
**windy** [1] - 67:2
**wins** [1] - 76:25
**wish** [1] - 118:11
**wishes** [1] - 79:11
**witness** [38] - 8:2, 19:8, 22:22, 23:2, 23:9, 23:24, 29:9, 38:18, 50:6, 50:16, 50:17, 51:7, 51:8, 51:18, 51:21, 52:3, 52:4, 52:6, 58:23, 63:16, 72:15, 97:22, 98:11, 98:12, 98:16, 98:17, 98:18, 98:19, 98:20, 98:21, 98:23, 99:2, 99:4, 99:6, 99:8, 99:12

**witness'** [1] - 98:24
**witnesses** [26] - 8:1, 16:16, 20:20, 23:14, 23:20, 24:4, 24:7, 24:9, 24:20, 24:21, 27:2, 35:15, 39:14, 39:19, 50:7, 62:17, 70:2, 70:25, 72:3, 80:12, 85:20, 97:16, 98:13, 99:19, 99:21, 100:11

**wonder** [2] - 57:7, 73:10
**wondering** [5] - 6:19, 74:19, 113:18, 113:21, 114:22
**word** [2] - 28:25, 63:14
**words** [6] - 5:10, 32:5, 99:20, 100:22, 108:15, 114:25
**worker** [4] - 16:7, 61:25, 86:13, 104:16
**workers** [20] - 10:13, 11:6, 11:8, 11:10, 11:15, 13:15, 14:8, 17:22, 23:10, 25:21, 34:14, 35:2, 46:11, 46:21, 46:22, 61:2, 61:16, 73:21, 96:14
**workplace** [1] - 82:8

**works** [2] - 18:25, 30:23
**workweek** [7] - 66:9, 66:10, 78:7, 78:18, 81:10, 102:1, 103:14
**workweeks** [4] - 66:6, 66:11, 103:11, 103:15
**world** [1] - 75:5
**worth** [1] - 95:5
**worthless** [1] - 88:15
**writing** [3] - 110:18, 111:5, 111:8
**written** [1] - 14:19
**wrote** [1] - 46:20

## Y

**year** [13] - 12:22, 13:1, 13:6, 18:11, 25:14, 26:5, 37:7, 40:18, 53:6, 78:2, 88:21, 119:1
**years** [9] - 29:12, 29:13, 40:6, 40:7, 40:9, 41:20, 41:22, 61:12, 87:16
**Yerko** [4] - 19:6, 43:21, 43:22, 49:21
**York** [6] - 33:2, 33:10, 34:12, 35:3, 57:23, 87:15
**yourself** [10] - 36:24, 51:8, 52:2, 62:6, 65:7, 79:12, 93:2, 98:16, 99:1, 108:20

## Z

**Zidell** [1] - 1:17

## §

**§** [1] - 53:5

APRIL 18, 2011